# EXHIBIT A-37

# DISTRICT OF COLUMBIA COURT OF APPEALS

# BOARD ON PROFESSIONAL RESPONSIBILITY



RECEIVED

Sep 1 2022 4:52pm

Board on Professional
Responsibility

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket No.

2021-D193

# MOTION TO DISMISS
# AND BRIEF IN SUPPORT

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice application in progress

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice
admission in progress

# TABLE OF CONTENTS

Statement of the Case .......................................................................................3

   I.   Procedural Posture ..............................................................................3

   II.  The Allegations in the Charges .........................................................6

Argument and Citation of Authority ...............................................................9

   I.   The Board Lacks Jurisdiction. ...........................................................9

      1.  ██████████████████████████
          ██████████████████████.....................................9

      2.  28 U.S.C. § 530B(a) Does Not Give the Board Jurisdiction That
          Would Interfere with the Take Care Clause, U.S. Const., art. II, § 3,
          and the Opinion Clause, U.S. Const., art. II, § 2, cl. 1. .............................14

      3.  28 U.S.C. § 530B(a) and its Implementing Regulation, 28 C.F.R. §
          77.2(h) Do Not Give the Board Jurisdiction Over the Charged
          Conduct. ..............................................................................17

      4.  The Board Lacks Jurisdiction Because the D.C. Bar Does Not
          "Ordinarily Apply" Discipline to the Conduct Specified in the
          Charges. ..............................................................................22

   II.  The Charges Cannot Surmount the Hurdle of Official Immunity
      Doctrine. ..............................................................................23

   III. The Charges Fail to State a Violation of the Rules. .....................................26

      1.  There Were No False Statements or Attempted False Statements as a
          Matter of Law. .......................................................................26

      2.  There Was No Attempted Violation of Rule 8.4(d) as a Matter of Law. .....35

Conclusion .....................................................................................39

CERTIFICATE OF COMPLIANCE .......................................................41

# DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

| | |
|---|---|
| **In the Matter of** | |
| **JEFFREY B. CLARK** | **Disciplinary Docket No.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2021-D193** |
| **Bar No. 455315** | |
| **Date of Admission: July 7, 1997** | |

## MOTION TO DISMISS AND
## BRIEF IN SUPPORT

Comes now Jeffrey B. Clark, Respondent in the above-entitled matter, and moves to dismiss the Specification of Charges against him on the grounds that the Board lacks jurisdiction over the conduct alleged in the Charges, Respondent possesses immunity, and that the Charges fail to state a violation of the Rules of Professional Responsibility (the "Rules").[1]

### STATEMENT OF THE CASE

#### I.   PROCEDURAL POSTURE

██  ███  █  ██████  █████  █████  ████  █  █████

████████████████████████████████████████████████

---

[1] All arguments in this Motion and brief that relate to the D.C. Rules are presented in the alternative to the logically prior arguments of whether the D.C. Bar possesses jurisdiction to apply its rules to the charged conduct in the first place.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████. Senator

Durbin is a strongly partisan Democrat who was implacably opposed to the policies

of the Trump Administration. This case is highly charged politically and will be the

subject of substantial publicity if it is not maintained under seal.

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

Respondent sought and was granted, over the objection of the ODC, an extension of time to answer or respond to the Charges until September 1, 2022.[2]

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Respondent has also filed with the Board a motion under Board Rule 4.2 to defer proceedings on the Charges ▋ntil ███████████████████████████████, a related congressional investigation, and a related criminal investigation are concluded.

In light of the Hearing Committee's August 31, 2022 ruling (as referenced in footnote 1), ███████████████████████████████████████ or on the request to defer, Respondent is obliged to preserve his rights by submitting this Motion to Dismiss, even though many of the principal arguments in this Motion are

████████████████████████████████████████████████████

██████████████████████████

---

[2] █████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

## II.   THE ALLEGATIONS IN THE CHARGES

After some introductory factual allegations, the Charges specified by ODC all relate to a draft of a letter allegedly prepared by Respondent. The Charges allege that four statements in the letter were false and that one was misleading, constituting attempted dishonesty in violation of Rule 8.4(a) and (c) of the Rules. The draft letter in question was conspicuously labeled in the header on each and every page with the following in red and bolded type: "**Pre-Decisional & Deliberative/Attorney-Client or Legal Work Product Georgia Proof of Concept**" (the "Pre-Decisional Draft"). *See* Subverting Justice: How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election, Interim Majority Staff Report, Senate Judiciary Committee, Key Document H, pp. 187-191 ("Senate Judiciary Report").[3]

The allegedly false statements and the allegedly misleading statement on which the Charges rest all related to certain positions or determinations that the Pre-Decisional draft proposed the Department of Justice ("DOJ") would take regarding the election controversies in Georgia, if they were agreed to by Respondent's superiors short of the dispute reaching the President or by the President if the dispute reached the Oval Office. The Charges contend the proposed positions or determinations were false because the DOJ had not yet taken the positions or determinations proposed by the Pre-Decisional Draft.

---

[3] Available at https://tinyurl.com/4euzhyjh, last visited (Sep. 1, 2022).

Thus, paragraph 15 alleges that the statement in the Pre-Decisional draft that DOJ had "identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia" was false because "DOJ was aware of no allegations of election fraud in Georgia that would have affected the results of the presidential election."

Paragraph 16 alleges that that the statement in the Pre-Decisional draft that DOJ "found 'troubling the current posture of the pending lawsuit in Fulton County' and the 'litigation's sluggish pace'" were false because "DOJ was not concerned by its lack of progress."

Paragraph 17 alleges that the letter's statement "that in Georgia … both a slate of electors supporting Joseph R. Biden, Jr., and a separate slate of electors supporting Donald J. Trump, gathered on that day at the proper location to cast their ballots, and that both sets of those ballots have been transmitted to Washington D.C. to be opened by Vice President Pence" was misleading because only one slate of electors had been certified by the Governor of Georgia. ODC apparently contends the statement is misleading by omitting reference to certification.

Paragraph 18 alleges the statement in the Pre-Decisional Draft that DOJ had concluded that the Governor should convene a special session of the legislature was false because DOJ "had not made such a determination."

Paragraph 19 alleges that the statement in the Pre-Decisional Draft that DOJ

7

had concluded that the legislature could call itself into session if the Governor refused was false because DOJ "had not made such a determination."

The Charges then describe a series of discussions and meetings in which Respondents' immediate superiors rejected the Pre-Decisional Draft, and a meeting with the President on January 3, 2021 in which President Trump also rejected the Pre-Decisional Draft. As a result, DOJ never took the positions or made the determinations proposed in the Pre-Decisional Draft, nor do the Charges allege that Respondent took such positions outside the halls of the Executive Branch in defiance of the decision rendered by the President. Nor has former President Trump complained about Respondent's conduct.

The final charge conclusorily alleges that Respondent's conduct as alleged in the Charges as a whole was an attempt to engage in conduct that would seriously interfere with the administration of justice. There is no specification of *how or why* any of the conduct alleged would seriously interfere with the administration of justice in any tribunal or proceeding.

The gist of the Charges is that Respondent made false statements about DOJ's *existing* positions and determinations when he *proposed in a confidential draft* that DOJ take different positions than his superiors preferred and make different determinations. As noted, the proposed draft was rejected by Respondent's superiors and by the President as the ultimate decisionmaker.

8

## ARGUMENT AND CITATION OF AUTHORITY

### I.   THE BOARD LACKS JURISDICTION.

The Board lacks jurisdiction over the charged conduct for multiple fundamental reasons. ███████████████████████████

███████████ *Second*, the assertion of disciplinary authority by any local bar association over internal confidential deliberations of senior DOJ lawyers, including directly with the President, would violate the separation of powers by intruding upon and attempting to regulate the President's exercise of his core Article II authorities to remove and appoint senior officers of the DOJ, to supervise federal law enforcement and investigations, unconstitutionally interfering with the President's authority under Take Care Clause and the Opinion Clause (alternatively, if the District were entitled to be treated as a "State" under the relevant federal statute (which it is not), then Disciplinary Counsel's assertion of authority would conflict with the Constitution and thereby violate the Supremacy Clause and be preempted. *Third*, the federal statute and its implementing regulation do not grant the jurisdiction claimed by ODC as a straightforward matter of statutory interpretation and administrative law.





2.   28 U.S.C. § 530B(a) DOES NOT GIVE THE BOARD JURISDICTION THAT WOULD INTERFERE WITH THE TAKE CARE CLAUSE, U.S. CONST., ART. II, § 3, AND THE OPINION CLAUSE, U.S. CONST., ART. II, § 2, CL. 1.

Under the U.S. Constitution, the President of the United States, not the Attorney General (as is often asserted in the media popular audiences), is the chief law enforcement officer. *See* U.S. Const., art. II, § 3 (the President "shall take Care that the Laws be faithfully executed …."). The President's constitutional responsibility for seeing that the laws be faithfully executed, carry with it, as a matter of settled law, "illimitable" discretion to remove principal officers carrying out his Executive functions. *See Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 493 (2010). The Constitution vests all Federal law enforcement power, and hence prosecutorial

discretion, in the President. The President's discretion in these areas has long been considered "absolute," and his decisions exercising this discretion are presumed to be regular and are generally deemed non-reviewable. *See, e.g., United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see generally* S. Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521 (2005). The Attorney General and other DOJ lawyers such as the Respondent exercised discretion delegated to them by the President subject to his supervision. They are "the hand" of the President for the discharge of these authorities. *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922).

To assist the President in the discharge of these authorities and responsibilities, he has the right to receive full and frank advice and information from his advisors. The Opinion Clause imposes on senior federal officers like Respondent a reciprocal duty to provide such advice upon request. *See* U.S. Const., art. II, § 2, cl. 1 (Opinion Clause); 28 U.S.C. § 506 (Assistant Attorney Generals, like Mr. Clark, to be appointed by President with advice and consent of Senate); OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys* (Aug. 2, 1985) ("Rules promulgated by state courts or bar associations that are inconsistent with the requirements or exigencies of federal service may violate the Supremacy Clause."), *available at* https://tinyurl.com/56bft7sb, *last visited* (Sep. 1, 2022).

This is not a situation in which Respondent appeared before a Court (inherently subjecting himself to its supervisory jurisdiction) in the District of Columbia and misrepresented some fact at oral argument. This case is an attempt by an organ of the D.C. government to peel back the curtain of the Executive Branch and second guess its confidential internal deliberations at the highest level—among the senior-most officials of DOJ and directly with the President himself in the Oval Office regarding how to carry out the President's core authorities under Article II. For a State to try to do that would be a constitutionally unthinkable violation of federalism and the Supremacy Clause and, if the State were purportedly acting pursuant to congressional statute, to the separation of powers too. For a *city government* to try to do so (even one that Congress *sometimes* treats as if it were a State, like D.C.—though Congress *did not* do so here) is even more unthinkable and a patent violation of the separation of powers because the authority of the DCCA and hence the Board descends from Congress's Article I lawmaking. Either way (*i.e.*, the District acting as an analogue to a "State" and thereby violating the Supremacy Clause or the District acting as a creature of Congress and therefore violating the separation of powers), the Charges should therefore be dismissed as an unconstitutional invasion of core Article II authorities of the President.

Certain categories of state action are directly prohibited and thus preempted by the Constitution. *See, e.g.*, U.S. Const. art. I, Section 9, cl. 5 ("No Tax or Duty

shall be laid on Articles exported from any State."); *id*. at cl. 6 ("No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another."); *id*. at art. I, Section 10, cl. 1 ("No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."); *id*. at cl. 2 ("No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress."). The separation of powers is one of the key structural bulwarks protecting liberty. Enactments by state bars or attempts to impose discipline that violate the separation of powers thus can be held to be preempted by their frank incompatibility with the constitutional structure.

3. 28 U.S.C. § 530B(a) AND ITS IMPLEMENTING REGULATION, 28 C.F.R. § 77.2(h) DO NOT GIVE THE BOARD JURISDICTION OVER THE CHARGED CONDUCT.

ODC appears to have given no thought whatsoever to how the Charges

unconstitutionally invade the President's core Article II authorities. ODC has been content so far to rest its assertion of jurisdiction over the charged conduct on 28 U.S.C. § 530B(a) and its implementing regulations at 28 C.F.R. § 77.2(h). A mere statute and regulation, however, cannot override a core constitutional limitation on the authority of the government of the District of Columbia. But even if no constitutional limitation were exceeded, under elementary principles of statutory construction, neither this code section nor the regulation grant the necessary authority over the charged conduct.

The statute Congress passed purporting to subject Justice Department lawyers to state and local bar rules, 28 U.S.C. § 530B(a), provides that "[a]n attorney for the Government shall be subject to *State* laws and rules, and local Federal court rules, governing attorneys in each *State* where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that *State*." (emphasis added). The District of Columbia is *not* a "State." All law in the District is federal law and Congress alone defines the nature, scope, and means of enforcement of all federal powers exercised here, including that of the D.C. Bar. U.S. Const., art. I, § 8, cl. 17 ("Seat of the Government"). Specific language is ordinarily required to treat the District as if it were a State. For example, the Twenty-Third Amendment, by specific text, treats the District as a State for the limited purpose of electoral college votes and the Twelfth Amendment. In no other respect does the

Constitution treat the District as a State. *See also, e.g., District of Columbia v. Carter*, 409 U.S. 418, 432-33 (1973) (D.C. not a State for purposes of 42 U.S.C. § 1983—with the current version of Section 1983 being amended to apply not just to "States" but to the District). The United States Code is replete with examples where Congress has ***specifically defined*** D.C. to fall within the meaning of the term "State," but only for purposes of that particular statute.[4] Indeed, by contrast, Chapter 31 of part II of title 28 of the United States Code (where 28 U.S.C. § 530B is found) lacks any specialized definition section. Congress surely knows how to confer power on District authorities when it wants to and yet it expressly withheld it here.

In 1999, as a matter of administrative law, DOJ issued a regulation under Section 530B(b) that improperly purported ***to extend*** the reach of Section 530B(a) to the District of Columbia. *See* 28 C.F.R. § 77.2(h).

But this regulation is *ultra vires* because a federal agency cannot extend to the District in a regulation a power not given to it by the enabling statute. The preamble of the regulation cites to 28 U.S.C. §§ 509, 510, 515(a), 516, 517, 519, 533, and 547. *See* 64 Fed. Reg. 19,273, 19,274 (Apr. 20, 1999). Simply put, none of these statutes

---

[4] *See, e.g.*, 28 U.S.C. § 1257(b) ("For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."); 42 U.S.C. § 8285a(2) ("the term 'State' means any of the several States, the District of Columbia …"); *see also, e.g.*, 26 U.S.C. § 170(c)(1) (applying term "charitable contribution" for tax purposes to include gifts for the use of "States, a possession of the United States … or the United States or the District of Columbia");. And Supreme Court Rule 47 states that "[t]he term "state court," when used in these Rules, includes the District of Columbia Court of Appeals."

even reference the District of Columbia specifically. And these provisions say nothing about the power of D.C. Bar authorities to sit in oversight of the discretionary actions let alone internal deliberations of U.S. Justice Department lawyers.[5] The 1999 rule is thus invalid under step one of the *Chevron* test, which voids regulatory interpretations of any statute that conflict with the statute's plain text, interpreted using "traditional tools of statutory construction." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). And the canon of interpreting statutes as part of the *corpus juris* (the whole body of the law) is no doubt such a traditional tool of statutory interpretation. *See, e.g., Branch v. Smith*, 538 U.S. 254, 282 (2003)  ("courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes."). The plain text is violated here because D.C. is not a "State."

Additionally, the Supreme Court has decided *West Virginia v. EPA*, since this investigation got underway. 142 S. Ct. 2587 (2022). *West Virginia* is a landmark administrative law decision holding that a clear statement to delegate power is

---

[5] The preamble of the regulation also mentions (1) Pub. L. 96-132, 93 Stat. 1040, 1044 (1979); and (2) Pub. L. 105-277 (1998), section 102 of the Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act. But both of these provisions are appropriations law limited to one-off fiscal years; they lack general effect. Moreover, the former provision predates Section 530B(a) and the latter provision is silent on 530B(a) and thus cannot be read to amend it. Finally, the fact that the statutes DOJ cited to extend Section 530B(a) to District of Columbia Bar rules point to two specific appropriations statutes mentioning the District shows that not even the DOJ of 1999 thought that it would be plausible to argue that D.C. Bar's rules were "local Federal court rules" within the meaning of Section 530B(a) or the preamble would have made that argument.

required in a statute when the entity wielding delegated power seeks to resolve a "major question." *Id.* at 2607-08. State and local regulation of Executive Branch law enforcement discretion in connection with the 2020 presidential election controversies is surely such a "major question" of political significance. *Id.* And even if the "question" at issue is conceived in more generic terms as a city bar's regulation of internal Executive Branch deliberations at the highest level, a "major question" is undoubtedly involved here. The major questions doctrine operates as a kind of *Chevron* step zero and here, the notion that the D.C. Bar can penetrate into and indeed take over Justice Department deliberations flunks at that zero step, since there is no clear statement the local D.C. Bar possesses such extraordinary power over the highest councils of the Executive Branch. *See also id.* at 2617, 2621 (Gorsuch, J., concurring) (doctrine protects both separation of powers *and* federalism).

In short, the statute by its plain terms does not grant disciplinary authority to the District of Columbia, and under *Chevron* step one (and the new *Chevron* step zero established by the *West Virginia* decision) such authority cannot be conjured out of nothingness by the expedient of a regulation. This would be unlawful bootstrapping in violation of *Chevron*. Hence, the Board lacks disciplinary authority over the charged conduct of the Respondent and the charges should be dismissed.

4.   THE BOARD LACKS JURISDICTION BECAUSE THE D.C.
     BAR DOES NOT "ORDINARILY APPLY" DISCIPLINE TO
     THE CONDUCT SPECIFIED IN THE CHARGES.

Even if the foregoing jurisdictional hurdles were overcome, 28 U.S.C. § 530B

extends state bar disciplinary jurisdiction over federal government lawyers only "to

the *same extent* and in the *same manner* as other attorneys in that State." (Emphasis

added). Similarly, the regulation subjecting lawyers working for the federal

government to local bar disciplinary processes, 28 C.F.R. § 77.2(j)(2), does not apply

if the local jurisdiction "would not *ordinarily* apply its rules of ethical conduct to

particular conduct or activity by the attorney." (Emphasis added).

███████████████████████████████████████████

███████████, we are not aware of any case where Rule 8.4 has been applied to

any pre-decisional discussion among a team of lawyers concerning a proposed draft

statement of position in a letter that, for policy reasons, was never sent, much less to

a senior Senate-confirmed DOJ official engaged in law enforcement and policy

deliberations falling within the President's core Article II authorities at the highest

levels of the DOJ and with the President himself. ODC has been repeatedly

challenged to identify any such case, and has yet to do so.

As far as the undersigned can tell, discipline has *never* been applied to conduct

like that charged, much less *ordinarily*. In other words, the Bar has no jurisdiction

under 28 U.S.C. § 530B or 28 C.F.R. § 77.2 to impose discipline on a theory so

aggressively novel it has never previously been applied to any lawyer under similar circumstances.

## II.   THE CHARGES CANNOT SURMOUNT THE HURDLE OF OFFICIAL IMMUNITY DOCTRINE.

*Nixon v. Fitzgerald* holds that President Nixon was entitled to absolute immunity from liability predicated on his official acts as President. 457 U.S. 731 (1982). And the D.C. Circuit in *Banneker Ventures, L.L.C. v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015), held that an official working for the Washington Metropolitan Area Transit Authority was entitled to absolute immunity when acting within the scope of his discretionary authority (akin to the ethical duties lawyers are held to in many traditional cases such as a lawyer making a misrepresentation to the D.C. Superior Court or D.C. Court of Appeals). The D.C. Circuit found that "[o]nly alleged conduct that manifestly violates an ethical proscription or other statute, regulation, or policy that constrains the exercise of discretion may be subject to liability." *Id.* at 1144.

The purpose of the official immunity doctrine is to discourage timidity in the execution of official duties—a federal constitutional interest descending from Article II that the inferior government interests of the D.C. Bar lack the power to invade or diminish. "When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct."

*Forrester v. White*, 484 U.S. 219, 223 (1988). And that is certainly true here. Mr. Clark should not be chilled by local bar rules in giving advice to the President about the meaning and application of the Constitution to a highly contentious area of election law in the context of the most disputed presidential election perhaps in American history. Instead, the criteria that were exclusively to guide Mr. Clark's conduct were an analysis of the interests of the Executive Branch and ensuring that the Constitution was upheld and defended, which in context meant defending the plenary prerogatives of state legislatures to select their own electors. *See infra* at 29.

"In weighing claims of absolute immunity, we apply the two-part test of *Westfall v. Erwin*[, 484 U.S. 292, 295 (1988)]. "[Covered federal] officials enjoy absolute immunity when their conduct falls "within the scope of their official duties and the conduct is discretionary in nature." *Banneker Ventures*, 798 F.3d at 1140. Mr. Clark meets both prongs of the absolute-immunity test. *First*, Mr. Clark was specifically directed to investigate irregularities in Fulton County, Georgia by the President's Chief of Staff Mark Meadows, acting for the President. *See* Senate Judiciary Report, Key Document W. *Second*, the conduct alleged in the Charges was "discretionary." No ministerial or mandatory duty existed for Mr. Clark to investigate election irregularities and write a letter in a particular form making constitutional arguments that are still unsettled. *See infra* at 29.

This doctrine applies, in essence, even in the criminal context, with the D.C.

Court of Appeals having held that bar disciplinary proceedings are construed as quasi-criminal. *See In re Artis*, 883 A.2d 85, 101 (D.C. 2005).*See, e.g.*, 8 OLC Opinions 101, 136-137 (May 30, 1984), *c*, (extending official immunity rationale of *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) and progeny to the criminal context). The Supremacy Clause provides protection for federal agents facing criminal charges from an inferior government as to actions taken in the course of their duties and in a manner generally authorized by federal law. To be immune, the federal agent must act within his government authority, do "no more than is necessary and proper in the performance of his duty," and have "an honest and reasonable belief that what he did was necessary in the performance of his duty." *Clifton v. Cox*, 549 F.2d 722, 729-30 (9th Cir. 1977). As to the first prong, we incorporate the rest of this brief by reference to establish that Mr. Clark acted within the scope of his official duties and suggested that which was necessary and proper within the performance of his duties. And, as to the second, ODC pleads nothing in the charges to indicate that Mr. Clark did not have a reasonable and honest belief in the advice the Charges allege he provided. Disagreement with the opinions of other senior officials on contested questions of fact, law and policy is insufficient as a matter of law to defeat official immunity.

For these reasons, attempts to apply *Banneker Ventures*-like standards of conduct devised by the local D.C. Bar to Respondent are barred based on the doctrine of absolute immunity as well as the complementary doctrine that the criminal law of

inferior sovereignty cannot be applied to federal agents without it being blocked by the Supremacy Clause and the logic of the Constitution confines the unique metes and bounds of the District, making it subordinate to the national government, its superior governing body.

### III.   THE CHARGES FAIL TO STATE A VIOLATION OF THE RULES.

Even if the Board had jurisdiction, the Charges should be dismissed because they fail to state a cognizable violation of the Rules.

#### 1.   THERE WERE NO FALSE STATEMENTS OR ATTEMPTED FALSE STATEMENTS AS A MATTER OF LAW.

The Charges suffer a fatal logical defect. They allege that the Respondent's Pre-Decisional Draft made false statements about certain positions or determinations of DOJ. The challenged statements, however, (as the face of the Pre-Decisional Draft made clear) were mere ***proposals*** for positions and determinations that DOJ ***might*** adopt ***if they were approved by Respondent's superiors, potentially going as high as the President himself***. A proposed position in a ***pre-decisional*** discussion draft that is inherently subject to ***later approval*** by superiors by definition cannot be characterized as false or dishonest statements of the positions the draft proposes be changed. Yet that *non sequitur* is the irreducible essence of the Charges. As mere draft proposed positions subject to approval by superiors, the challenged statements cannot be either false or dishonest within the meaning of Rule 8.4 (*see supra* n.1).

The Charges accordingly fail to state any cognizable violation of Rule 8.4 (*see supra* n.1) and should be dismissed.

This defect in the Charges is not saved by characterizing the challenged statements as "attempted" false or dishonest statements. The statements were either dishonest or not, and they cannot be for the reasons stated above.

Nor is it any answer to say that Respondent recommended or urged that the positions in question be adopted. If they had been adopted by his superiors shy of the President or by the President if the matter went that high (as has been reported in the press they did), and the letter had been sent as the position of DOJ, then in that event the challenged statements would be true—DOJ would have at that point taken those positions and made those determinations in accord with the President's controlling directive.

Moreover, the proposed positions were all opinions or policy judgments about contested facts, points of law and policy. The most that can be said is that Respondent made statements that on their face were not and would not be operative unless approved. If they were not approved, they would be moot, and if they were approved they would have been true. At most the Charges allege that Respondent argued internally for DOJ to take certain positions and was overruled by his superiors and the President. This is not a cognizable violation of Rule 8.4 or any other Rule of Professional Responsibility. What is really going on here is that ODC disagrees with

27

Respondent's proposed positions and wants to punish him for harboring impure thoughts. But there is no such thing as a thought crime under the Rules of Professional Responsibility. Indeed, Rule 2.1 requires lawyers to put forth positions that they know their clients will likely disagree with:

> A client is entitled to straightforward advice expressing the lawyer's honest assessment. Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront. In presenting advice, a lawyer endeavors to sustain the client's morale and may put advice in as acceptable a form as honesty permits. ***However, a lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client.***

*Id.* at cmt. [1] (emphasis added).

Paragraph 17 of the Charges does not allege an outright false statement in the Pre-Decisional Draft. Instead, it alleges the following sentence is "misleading:"

> ***The Department believes*** that in Georgia and several other States, both a slate of electors supporting Joseph R. Biden, Jr., and a separate slate of electors supporting Donald J. Trump, gathered on that day at the proper location to cast their ballots, and that both sets of those ballots have been transmitted to Washington, D.C., to be opened by Vice President Pence.

(Emphasis added). This is alleged to be misleading because it does not note that only the Democrat electors had been certified by the Governor. But here again, the challenged statement is a ***proposed*** statement of DOJ's position that would be made only ***if Respondent's superiors agreed***. It is merely a draft position subject to approval by superiors, and cannot be either false or dishonest within the meaning of Rule 8.4 (*see supra* n.1). And, as with the allegedly false statements, if it had been

approved by Respondent's superiors, it would be a true statement of DOJ's position. Additionally, the letter explains that States possess the plenary power under U.S. Const. Art. II, § 1, cl. 2 to select presidential electors. The Charges never dispute the existence of that constitutional power or thus how it could be misleading to the Georgia State Legislature wielding that exceptionally broad grant constitutional power to conduct an investigation to decide whether to certify a different slate of electors than certified by the Governor. Nor do the Charges dispute the letter's legal argumentation that under the Constitution, electors are selected pursuant to a direct delegation of authority in the Constitution itself to state legislatures, ***not to state legislatures plus their Governors***: "The Supreme Court has explained that the Electors Clause 'leaves it to the legislature exclusively to define the method' of appointing Electors, vesting the Legislature with 'the broadest possible power of determination.' *McPherson v. Blacker*, 146 U.S. 1, 27 (1892). This power is 'placed absolutely and wholly with legislatures.' *Id*. at 34-35 (emphasis added)."

Indeed, this is such an important issue that the Supreme Court has recently granted *certiorari* over the validity of the so-called "independent state legislature doctrine" in the analogous context of the election of Senators and Representatives[6]

---

[6] *See Moore v. Harper*, No. 21-1271, SCOTUSBLOG, *available at* https://www.scotusblog.com/case-files/cases/moore-v-harper-2/ (last visited Sept. 1, 2022) (cert. granted June 30, 2022 over the question: "Whether a state's judicial branch may nullify the regulations governing the 'Manner of holding Elections for Senators and Representatives ... prescribed ... by the Legislature thereof,' and replace them with regulations of the state courts' own devising, based on vague state constitutional provisions purportedly vesting the state judiciary with

The fact that Mr. Clark anticipated the position a majority of the Supreme Court may wind up taking in the *Moore v. Harper* case is a point in his favor, not grounds for discipline. Lastly in this vein, note that the pendency of the *Moore* case is another reason to grant the pending Motion to Defer. It would be embarrassing to the D.C. Bar to discipline a lawyer for advocating for the same position the Supreme Court may ultimately adopt. Best for the Board to defer this case until *Moore* is resolved.

In addition, the allegation that the statement is misleading is clearly incorrect in the context of the Pre-Decisional Draft as a whole. The allegedly missing context that allegedly renders the statement misleading—that only the Democrat electors had been certified—is very clearly implied by virtually the entirety of the rest of the draft, including and especially the immediately ensuing description of the eventual certification and counting of the alternate slate of Democrat electors from Hawaii in the 1960 election:

> The Department is aware that a similar situation occurred in the 1960 election. There, Vice President Richard Nixon appeared to win the State of Hawaii on Election Day and Electors supporting Vice President Nixon cast their ballots on the day specified in 3 U.S.C. § 7, which were duly certified by the Governor of Hawaii. But Senator John F. Kennedy also claimed to win Hawaii, with his Electors likewise casting ballots on the prescribed day, and that by January 6, 1961, it had been determined that Senator Kennedy was indeed the winner of Hawaii, so Congress accordingly accepted only the ballots cast for Senator Kennedy. *See* Jack M. Balkin, Bush v. Gore *and the Boundary Between Law and Politics*, 110 YALE L.J. 1407, 1421 n.55 (2001).

---

power to prescribe whatever rules it deems appropriate to ensure a 'fair' or 'free' election.").

(Pre-Decisional Draft at 2).  This is even more obvious if one consults the cited

footnote 55 from the article in the *Yale Law Journal* (paragraph breaks added):

> 55. *See* 107 CONG. REC. 28, 291 (1961). The Hawaii story is particularly interesting. Initial returns suggested that Republican candidate Richard M. Nixon had won Hawaii, but a recount begun on December 13 gave the state to the Democrat, John F. Kennedy. Since the validity of the recount was in litigation, there were actually two sets of electors, one Republican and one Democratic, both of which met on the appointed day, December 19, 1960. The acting Governor certified the Republican electors on November 28, 1960, but a court decision at the end of December affirmed the validity of the December 13 recount. The new Democratic Governor certified the Democratic electors on January 4, 1961, shortly after taking office.
>
> Both sets of electors were submitted to Congress, with the Democratic list arriving on January 6, 1961, the day that the votes were to be counted before a joint session of Congress as provided for in Article II. The presiding officer at the joint session of Congress was Vice President Richard Nixon, who had just lost the 1960 presidential election but was still technically President of the Senate. Nixon stated to the joint session of Congress that he did not intend to set a precedent through his actions, but that in his view the January 4 certificate correctly stated Hawaii's votes and that if there was no objection the Democratic electoral votes would be accepted.
>
> There was no objection, and the Democratic electoral votes were counted. In fact, Hawaii's votes made no difference to the outcome of the election, which was one reason why Nixon counted them. *See* William Josephson & Beverly J. Ross, *Repairing the Electoral College*, 22 J. LEGIS. 145, 166 n.154 (1996); L. Kinvin Wroth, *Election Contests and the Electoral Vote*, 65 DICK. L. REV. 321, 341-43 (1961). Congress accepted Hawaii's electors even though the certification of electors went well beyond the safe harbor period. Nevertheless, because January 4 was also well past the congressionally assigned date for electors to meet, there is a separate issue under Article II, Section 3. *See infra* note 58.

The context the Charges claim is misleadingly missing is also supplied by the

reference to President Trump's pending election contest in Georgia, which

presupposed certification of the Democrat electors and not the Republican electors.[7] The Pre-Decisional Draft is obviously premised from beginning to end on the fact the Charges try to argue was misleadingly omitted, *i.e.*, that it was the Democrat and not the Republican electors that had been certified.

A specification of charges that so unfairly takes a passage out of context to disingenuously claim it is misleading when in context it is obviously not misleading ought not to be countenanced and should instead be rejected out of hand.

The ill-considered nature of the Charges is readily apparent upon even brief reflection. If it were a violation of Rule 8.4 (*see supra* n.1) to advocate a position in confidential internal deliberations that is ultimately rejected, then, absent judicial immunity, dissenting judicial opinions would be equally subject to Bar discipline. Dissenting opinions take different views of the facts and the law. The positions of the dissent are first argued internally as confidential discussion drafts analogous to the Pre-Decisional Draft at issue here. If the proposed opinion fails to gain approval, it becomes a dissent and may or may not be published as such. The fact that the

---

[7] O.C.G.A. § 21-2-524(a), provides that an election contest may be filed only ***after*** certification:

(a) A petition to contest the result of a primary or election shall be filed in the office of the clerk of the superior court having jurisdiction within five days after the official consolidation of the returns of that particular office or question ***and certification thereof*** by the election official having responsibility for taking such action under this chapter or within five days after the official consolidation ***and certification of the returns*** of that particular office or question by the election official having responsibility for taking such action under this chapter following a recount pursuant to Code Section 21-2-495 ….

dissenting opinion did not garner approval does not make its characterization of the facts or the law "attempted dishonesty," no matter how much at variance with the majority opinion it might be, and no matter how vehemently the Disciplinary Counsel may disagree. Judicial immunity—rooted in common sense—precludes such absurd overreach, just as it should also be precluded by analogous doctrines immunizing speech and debate in Congress, U.S. Const. art. I § 6, cl.3, and deliberations over the exercise of core presidential law enforcement authorities under Article II. *See United States v. Nixon*, 418 U.S. 683, 708 (1974). *Cf.* D.C. Bar Rule XI § 19(a) (immunizing the deliberative processes of the ODC).

████████████████████████ Disciplinary Counsel displayed considerable indignation toward Respondent based on the surrounding political context. Disciplinary Counsel is entitled to his own personal political opinions but he should not be shoehorning them into a Bar discipline case so far outside the proper remit of such proceedings. As quasi-judicially noticeable, ***three*** Supreme Court Justices and ***eighteen*** State Attorneys General ***publicly*** raised questions about the regularity of the 2020 election similar to those raised ***confidentially*** in the draft letter that Disciplinary Counsel finds so irksome.

Most important in that regard is *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021). There, Justice Thomas dissented from the denial of certiorari because non-legislative state officials had changed the statutory

rules for federal elections and the appointment of presidential electors in violation of the Electors and Elections Clauses of the Constitution. *See* U.S. Const., art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent joined by Justice Gorsuch to flag the same infirmity. Both dissents noted the public importance of resolving the questions presented. If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have advanced similar views, bar discipline should be out of the question.

Justices Thomas and Alito also dissented in relevant fashion in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), a 2020 election challenge filed by Texas (and later joined by 17 other States) that complained about similar unconstitutional election-rule changes made in the so-called battleground States. They would have allowed Texas's bill of complaint to be filed, potentially putting the merits of the election challenge before the Supreme Court. And those two Justices surely did not act unethically in the *Texas* case.

Similarly, a lawyer in Respondent's position should be allowed to present a policy proposal to the President and to his superiors at DOJ that is aligned with the position of 18 State Attorneys General and three Supreme Court Justices without being charged with dishonesty and serious interference with the administration of justice. In other words, this Court should not start down Disciplinary Counsel's slippery slope lest it find itself necessarily implying that three Supreme Court

Justices and 18 State Attorneys General were all acting beyond the pale of legitimate legal debate, the judicial canons, and the Model Code of Professional Responsibility.

> ### 2.   THERE WAS NO ATTEMPTED VIOLATION OF RULE 8.4(d) AS A MATTER OF LAW.

The Charges allege in paragraph 31(b) that "Respondent's conduct in Count I [*sic*] violated … (b) Rules 8.4(a) and 8.4(d), in that Respondent attempted to engage in conduct that would seriously interfere with the administration of justice."

To the extent this charge rests upon the allegedly false statements in the Pre-Decisional Draft, what has been said above should suffice to warrant its dismissal as well.

To the extent the charge rests on conduct described in the Charges other than the allegedly false statements in the Pre-Decisional Draft, it also fails to state a violation of Rule 8.4(a) and 8.4(d) because the conduct in question is not within the scope of Rule 8.4(d) (*see supra* n.1).

In *In re Yelverton*, 105 A.3d 413, 426 (D.C. 2014), this Court held that "[c]onduct violates RPC 8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an identifiable case or tribunal, ***and*** (3) harms the judicial process in a more than a de minimis way." (emphasis added). *In re Pearson* is to the same effect, stating the third element in slightly different terms to require that the conduct "taint[s] the judicial process in more than a *de minimis* way'" 228 A.3d 417, 426 (D.C. 2020), *citing In re Hopkins,* 677 A.2d 55, 59–61 (D.C. 1996)*.*

Not one of these three essential elements is remotely established by what is alleged here. *First*, confidential and privileged internal deliberations and debates over proposed positions and legal theories and arguments are not improper. A proposed position in a Pre-Decisional Draft that on its face was subject to approval by superiors is not improper. In *In Re: Hopkins*, this Court explained what is meant by "improper" in this context:

> Our reading of *Shorter, L.R., Reynolds,* and our other DR 1–102(A)(5) cases leads us to conclude that, in order to be prejudicial to the administration of justice, an attorney's conduct must meet the following criteria. First, of course, the conduct must be improper. That is, the attorney must either take improper action or fail to take action when, under the circumstances, he or she should act. *See, e.g, Reback, supra,* 487 A.2d [235] at 239 (D.C. 1985) (improper action); *Jones, supra,* 521 A.2d [1119]at 1121 [D.C. 1986] (failure to act). This conduct may be improper, for example, because it violates a specific statute, court rule or procedure, or other disciplinary rule, but, as here, it may be improper simply because, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice.

*In re Hopkins*, 677 A.2d 55, 60-61 (1996). A draft letter that proposes action by a state legislature under the Electors Clause of the Constitution that would be lawful if undertaken—and which is consistent with the "independent state legislature doctrine" that the Supreme Court may well wind up adopting as the law of the land in its October 2022 term—cannot be "improper" within the meaning of Rule 8.4(d).[8]

---

[8] For present purposes, the Elections Clause issue in *Moore v. Harper*, No. 21-1271 is analogous to the Electors Clause issue discussed in the Pre-Decisional Draft because they both confer the relevant authority upon the state legislatures, though in the case of the Elections Clause that grant is subject to reserved congressional authority. *Compare* U.S. Const. Art. II, § 1, cl. 2 (Electors

*Second*, there is no identifiable case or tribunal because the entire discussion was internal and confidential, the letter was never sent, and no document was ever filed in any court or tribunal anywhere, and there was no effect whatsoever upon the proceedings of any tribunal anywhere, including the Georgia legislature or the joint session of Congress on January 6, 2021. The draft letter does not suggest or imply interfering with, obstructing or delaying the electoral count on January 6. It does not suggest or imply the presentation of anything that was untrue, false or misleading on January 6 or at any other time. To the contrary, it suggests only a state legislative inquiry *and only if the state legislature so chose*, consistent with the "independent state legislature doctrine," into which slate of electors was the lawful choice of the State in question (Georgia). Rather than proposing a delay of the electoral count on January 6, 2021, it contemplates compliance with that deadline by stating that time was of the essence in view of the upcoming proceedings on January 6. A confidential discussion draft that was never sent that suggests that a state legislature lawfully exercise, if it so chose, its power to determine electors under the Electors Clause did not in fact interfere with the Electoral Count Act proceedings, nor did it attempt to do so, nor with any other proceeding.

*Third*, no judicial process or tribunal anywhere, including the joint session of

---

Clause) *with* Art. I, § 4, cl 1 (Elections Clause).

Congress on January 6, 2021, was harmed, impaired, or tainted in any way whatsoever because the draft letter never left the office. Once the President rejected the draft on January 3, 2021, that was the end of the matter. Rule 8.4(d) (*see* supra n.1) simply does not apply to the conduct in question.

To apply Rule 8.4(d) (*see supra* n.1, as relevant to this whole paragraph) in this novel context would require a very substantial expansion of its scope beyond the limits of the previously defined essential elements and would further require the retroactive application of the expanded scope to Respondent. In a quasi-criminal proceeding like this one, retroactive application of a brand new and much more expansive interpretation of rule 8.4(d) to embrace events having zero effect on any judicial proceeding or tribunal would clearly run afoul of the *Ex Post Facto* Clause and the fair notice component of due process. "[A] fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 703-704 (2005) (cleaned up). "The due process clause thus 'prevents … deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.' *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986)." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995). *See also id.* at 1329 ("Of course, it is in the context of criminal liability that this 'no punishment without notice' rule is most commonly applied. *See, e.g.,*

*United States v. National Dairy Corp.*, 372 U.S. 29, 32–33 (1963) ('[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.').").

## CONCLUSION

The Charges in this case should be dismissed because they are an unprecedented and unconstitutional attempt by a mere city government to invade and regulate the exercise of core law enforcement authorities of the President under Article II. Even absent such flagrant unconstitutional overreach, the Charges should be dismissed because the plain text of the statute and the regulation on which the D.C. Bar relies do not grant jurisdiction over Respondent's conduct. Additionally, Respondent's obviously discretionary alleged conduct is protected by official immunity. Finally, even if the D.C. Bar had any legal authority over the conduct in question, the Charges should be dismissed because Respondent's conduct did not violate Rule 8.4 (*see supra* n.1) as a matter of law.

Respectfully submitted this 1st day of September, 2022.

/s/ *Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com
*Motion for pro hac vice admission ████████ *in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
* *Motion for pro hac vice admission* ████████ *in progress*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this filing is prepared in Times New Roman 14, and that the word count in the relevant sections of this filing, as measured by Microsoft Word, including footnotes is 9,762.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464

Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-
6920
charles@burnhamgorokhov.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this **Motion to Dismiss and Brief in Support** by U.S. First Class Mail

with sufficient postage thereon to insure delivery, and by email addressed to:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 1 day of September, 2022.

_/s/ Charles Burnham_
Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-
6920
charles@burnhamgorokhov.com