# EXHIBIT B-15



**DCCA NO. 22-BS-0059**

**DISTRICT OF COLUMBIA**

**COURT OF APPEALS**

Clerk of the Court
Received 03/14/2022 07:56 PM
Filed 03/14/2022 07:56 PM

In the Matter of

**CONFIDENTIAL (J.B.C.), ESQ.**

    **Respondent,**

**A Member of the Bar of the District of
Columbia Court of Appeals**

Disciplinary Docket

No. 2021-D193

## RESPONSE TO ODC'S MOTION FOR LEAVE TO SUPPLEMENT THE RECORD

Charles Burnham
D.C. Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice application in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5202
robert.destro@protonmail.com

**Motion for pro hac vice admission in
progress*

**INTRODUCTION**

The purpose of this Response is threefold: (1) to inform the Court of both the facts and law that make service of the Second Subpoena defective; (2) to explain why disputes over the First Subpoena are not mooted by the Second Subpoena; and (3) to counter-supplement the record with additional materials bearing on the propriety of Respondent's Fifth Amendment defense, including most significantly, the House January 6 Committee's initiation of consultations about granting Respondent Fifth Amendment immunity.

**I.   ADDITIONAL FACTS ABOUT SERVICE OF THE SECOND SUBPOENA**

ODC's Motion for Leave to Supplement the Record neglects to inform the Court that ODC reached out to counsel for Respondent asking if Respondent would make himself available at a particular time and place for service.  Undersigned counsel readily agreed and arranged with Respondent for him to be available at home on the afternoon of February 28, 2022 for that purpose. Respondent was good to his word and took delivery of what was left with him.  He did not attempt to evade service at any time.

Attached is a true and correct copy of the subpoena and related materials Respondent received on February 28, 2022 with a return date of today (Mar. 14, 2022) ("Second Subpoena") (attached as Exh. 1). The Second Subpoena consists of (1) the card of the ODC attorney who personally attempted service (Ms. Azadeh Matinpour, who, it is important to note, is employed by ODC), (2) a check to reimburse for expenses, if ODC had insisted on a personal appearance,[1] (3) the subpoena itself, plus a copy of Superior Court Rule 45(c)-(d) (included by requirement of Rule

---

[1] Despite the fact that the box on the Second Subpoena form ("Production & delivery of these documents will eliminate the need for a personal appearance.") was checked, a phone call to Disciplinary Counsel clarified that he was not requiring Respondent to personally travel to his offices in D.C., if documents were not produced on grounds of privilege.  As a result, Respondent has destroyed the check without cashing it.  Given this, do not know why ODC checked that box on both the First and Second Subpoenas.

45(a)(1)(A)(iv)), and (4) a two-page Attachment to Subpoena.

The Second Subpoena is **_similar to_** the initial subpoena ("First Subpoena") dated November 22, 2022 (though not received in full until January 6, 2022 and only via email in chunks). But it is not identical to it. The one-page subpoena in its narrowest terms, along with the Rule 45 excerpts, and the two-page Attachment to Subpoena are the same. But the First Subpoena had also included (1) a three-page cover letter signed by Mr. Fox taking positions relevant to ODC's Motion to Compel; (2) a summary sheet on the D.C. Bar's Department of Regulation Counsel (which we agree can be disregarded as having no substantive significance); (3) a cover email from Sarah Zdeb, a lawyer working for Senator Durbin; (4) a cover letter from Senator Durbin; and (5) the Senate Judiciary Committee Majority report on which Senator Durbin was basing his complaint to the Bar. The First Subpoena does not include Ms. Matinpour's card (unsurprising, as the First Subpoena was not personally delivered to Respondent) or the check to pay for contingent attendance fees. Both the First Subpoena and the Second Subpoena are blank in the subpoena form's respective boxes labeled "Signature and Title of Server."

The absence of the ODC cover letter, Durbin cover letter, Zdeb cover email, and the Senate Judiciary Committee report from the Second Subpoena is the first point we want to highlight. Those documents provide important details buttressing Respondent's request that the Court should decline enforcement of the First Subpoena or quash it. ODC may have just omitted those documents inadvertently (or perhaps to reduce copying expenses) but we underscore this issue because this Court should reject any argument ODC might try to mount later that the omission of those documents from the Second Subpoena prohibits the Court from considering Mr. Fox's cover letter, Senator Durbin's cover letter, Ms. Zdeb's cover email, etc.

Next, note that Rule 45(b)(1) (emphasis added) limits who can properly act as a process

server.  It must be "[a]ny person who is at least 18 years old *and not a party*."  Ms. Matinpour is a party because her superior, the Disciplinary Counsel, is the moving party here and, as a juridical entity, the Office of the Disciplinary Counsel can only act through its employees such as Ms. Matinpour.  As a result, the Second Subpoena's attempted service is defective.  *See Hobbs v. Ohio Adult Parole Auth.*, Case No. 1:13-cv-928, 2018 WL 4658739, *2 (S.D. Ohio Sept. 28, 2018) ("The return address on the envelope in which the subpoena was sent … shows that it was sent by Hobbs himself and that fact is corroborated by his production of the receipts for certified mail. But Hobbs is a party and may not serve a subpoena himself.").  Wright and Miller explain that Federal Rule of Civil Procedure 45(b)(1) (largely mirrored in Superior Court Rule 45[2]), in its present form, represents a liberalization of the requirement in a prior version of Rule 45 that process be served only by a U.S. Marshal or Deputy Marshal.  *See* Wright & Miller, 9A FED. PRAC. & PROC. CIV. § 2454 (3d ed. Apr. 2021 update) ("Prior to the 1991 amendments to Rule 45, only a United States marshal or the marshal's deputy … were explicitly authorized by the rule to serve subpoenas.").

---

[2] The comment to Superior Court Rule 45 provides as follows:

> Identical to *Federal Rule of Civil Procedure 45*, as amended in 2007, except for: (1) references to 100 mile limits in the federal rule have been changed to 25 miles, which preserves the geographic proportionality originally expressed by Congress in D.C. Code § 11-942; (2) the omission of the inapplicable subsection (a)(2); (3) the addition of language in subsection (a)(1)(A)(iii) providing that the deposition, production, or inspection of documents must be in the District of Columbia, unless otherwise agreed or ordered by the court; and (4) the substitution of specific local language for inapplicable federal language in subsections (a)(1)(A)(i)–(ii), (a)(3), (b)(2), and (c)(3)(A)(ii).

> This rule provides a means for issuing deposition subpoenas for nonresidents of the District of Columbia in cases which qualify, but does not preclude the alternatives of filing with the court a motion for appointment of an examiner under Rule 28-I or resorting directly to the courts of another jurisdiction under its rules and statutes.

> Subpoenas issued by attorneys under subsection (a)(3) must be substantially in the format of Civil Action Form 14.

But Rule 45(b)(1) was not liberalized so far as to allow *anyone* to serve process.  There is an explicit ban on parties serving process and it must be observed.  The fact that a lawyer working for Mr. Fox, Disciplinary Counsel, who designated himself as the moving party on the Motion to Compel,[3] was the one who served the process is a self-standing basis on which to deny the Motion to Compel.  *See Vohra v. City of Placentia*, No. SA CV 11-01267 DSF (RZ), 2012 WL 13123574, *1 (C.D. Cal. June 27, 2012) ("Federal Rule of Civil Procedure 45(b)(1) provides in part that only a "person who is at least 18 years old *and not a party* **may serve a subpoena**." [emphasis added by the Magistrate Judge].  The moving party violated this rule by serving the subpoena himself. ***The motion [for subpoena enforcement] merits denial <u>for this reason alone</u>.***") (emphasis added).[4]

There is yet another reason why this Motion to Compel must be denied: the Second Subpoena form was not signed by Ms. Matinpour, but only bears Mr. Fox's name (rendered in a signature-like font).  At the top of the next page please examine a picture of the relevant part of Exhibit 1, to underscore the point:

---

[3] *See **Disciplinary Counsel's** Motion to Enforce Subpoena *Duces Tecum* (filed Feb. 3, 2022) (emphasis added).

[4] Indeed, there is a body of precedent reading and applying the text of Rule 45(b)(1) to require strict compliance with its terms and on that basis rejecting subpoenas served by parties.  *See, e.g., Haber v. ASN 50th St., LLC*, 272 F.R.D. 377, 381 n.2. (S.D.N.Y. 2011) ("Plaintiff is advised that he may not serve the Sellers Subpoena himself"); *Smith v. Benson*, No. 08-CV-0485Sr, 2011 WL 839736, *1 (W.D.N.Y. Mar. 7, 2011) ("Plaintiff cannot attempt to serve third party subpoenas by regular mail because a party may not effect service himself under Rule 45."); *Gaudin v. Remis*, Civ. No. 00-00765 SPK-LEK, 2007 WL 294130, *3 (D. Haw. Jan. 29, 2007) (reasoning that because subpoenas can be served on "any person," that includes non-parties because the servers of subpoenas explicitly must "not [be] a party" and emphasizing that "[t]he drafters could have used the same language [as in Rule 45(b)(1)] to limit who may be served with a subpoena, but they chose not to do so."); *see also United States v. 2121 Celeste Rd., S.W., Albuquerque, N.M.*, 307 F.R.D. 572, 579 (D.N.M. 2015) (deploying same reasoning as in *Gaudin*).

☑ Production & delivery of these
documents will eliminate the need
for a personal appearance.

DATE SUBPOENA ISSUED: 02/28/2022 _____

☑ If you have any questions regarding this subpoena, please call 202-638-1501.
    Hamilton P. Fox, III, Disciplinary Counsel                *Hamilton P. Fox, III*

This is yet another way in which the Second Subpoena is self-evidently defective.  *See Wyatt v. Anderson*, No. A-13-CA-191-SS, 2014 WL 670855, *14 (W.D. Tex. Feb. 20, 2014) ("They indicate Wyatt 'served' a copy of the subpoena to the parties by placing the copies 'in the U.S. mailbox located on the Eastham unit in Lovelady, Texas.' …. The only signature on the page is Wyatt's, and the 'server's signature' is blank. Wyatt, as a party in the case, cannot serve the subpoenas ….  As such, Wyatt's subpoenas are facially deficient.").  This is exactly the same situation here.  The only signature on the page is that of Mr. Fox, who is a party to this action. And, as this second picture highlights in yellow below, the server's signature *is also blank there*:

| RETURN ON THIS SUBPOENA IS REQUIRED ON OR BEFORE THIS DATE: | |
|---|---|
| ☐ I hereby certify that I have personally served, or have executed as shown in "REMARKS," the above subpoena on the individual at the address below. | |
| Name and Title of Individual Served | Address (If different than shown above) |
| ☐ I hereby certify that, after diligent investigation, I am unable to locate the individual, company, corporation, etc., named in above subpoena for the reason(s) as shown in "REMARKS." | |
| Date(s) of Endeavor | Date and Time of Service |
| REMARKS | Signature and Title of Server |

These defects are not "technicalities" the Court should overlook. Respectfully, the law is the law and we are entitled to insist on strict compliance with Rule 45's requirements for service. Respondent restricted his movements on February 28 precisely so he would be available at his home to receive service; the least he can expect is that ODC will comply with the governing rules

for service.  This is especially true where this enforcement action was initiated by ODC (i) without engaging in a prior meet-and-confer and (ii) ***only three days*** after we filed extensive objections with ODC on January 31, 2022 that ODC could not possibly have fully evaluated before filing this action on February 3, 2022.  And without proper service, no jurisdiction can attach either to this action or to any new action ODC might file after attempting proper service for a third time.

There is one final matter to flag for the Court regarding service, and it is very important. Recall that Mr. Fox has already threatened to "ratchet up the discipline,"[5] simply because Respondent declined to produce documents in light of the various privileges that apply and his many other weighty legal objections. We thus worry that such threats may increase now that two attempts at proper service of a subpoena have failed and we have not agreed to waive service.  For this reason, Respondent requests, if the Court agrees to decline to enforce or quash the Second Subpoena on grounds of noncompliance with Rule 45, that ODC be explicitly instructed as part of any order that it would be improper for ODC to seek ratcheted-up discipline against Respondent because he has insisted on compliance with Rule 45.

## II.   ISSUES RELATED TO THE FIRST SUBPOENA ARE NOT MOOT.

We see ODC taking the step of affirmatively reaching out to us to see if we would agree to arrange a second service date as a tacit acknowledgment that service of the First Subpoena was invalid.

Additionally, service of the Second Subpoena does not moot the defective service issue in this case because the Motion to Compel was filed on February 3, 2022—***well before the second attempt at service had even occurred***.  Even if the second attempt at service were deemed proper (which should not occur), the Court should not allow attempted service on February 28 of the

---

[5] *See* Resp. to Mot. to Compel and Cross-Motion to Quash, Exh. 3 (Harry MacDougald aff. at ¶¶ 5-6).

Second Subpoena to cure the wholly absent service of the First Subpoena, as to which the Motion to Compel was filed, because that would effectively ratify both past defective service and a premature Motion to Compel.  ODC should not be heard to argue that a premature enforcement motion can proceed as if service had always been proper from the inception of a case filed to this Court.  There is no provision for service *nunc pro tunc*.

Instead, the premature filing of the Motion to Compel must carry some consequence for ODC. This Court should not abide defective service of subpoenas or the hasty commencement of litigation to enforce defectively served subpoenas. ODC, a body charged with enforcement of rules, should also be required to follow the rules and not be allowed to ignore them. Service would become an empty formalism, contrary to Superior Court Rule 45 as it applies here, if ODC could proceed in such a fashion. Accordingly, Respondent requests that the Court remind ODC in a short opinion (one fully anonymized, not even using Respondent's initials[6]) that ODC subpoenas should be properly served, unless ODC has secured a waiver of service, before any subpoena enforcement litigation can be commenced.  This will require any other subpoenas ODC issues in this or other matters to align fully with Rule 45, thus restoring that rule to its proper role as more than a mere formalism.

## III.   NEW DEVELOPMENTS BEARING ON RESPONDENT'S FIFTH AMENDMENT DEFENSE STRONGLY SUPPORT NON-ENFORCEMENT OF BOTH THE FIRST OR SECOND SUBPOENA.

Respondent offers the following additional developments as evidence supporting his claim that he has a strong and good-faith basis to invoke his Fifth Amendment privilege and to stand on

---

[6] Full anonymization is warranted here because this is a case arising out of a dispute of national significance.  Use of Respondent's initials or any other identifying information in the requested opinion could thus result in a breach of the confidentiality at the investigative stage and the publication of press stories hounding Respondent. That would not be consistent with the confidentiality required by Board Rule 2.19 and Bar Rule XI, Section 17(a).

the act-of-production doctrine:

A. Barbara McQuade, *United States v. Donald Trump: A "Model Prosecution Memo" on the Conspiracy to Pressure Vice President Pence*, JUST SECURITY (Feb. 22, 2022), *available at* https://www.justsecurity.org/80308/united-states-v-donald-trump-model-prosecution-memo/ (last visited Mar. 14, 2022) (an extensive prosecution memo, in U.S. Department of Justice style, focused on former President Trump but mentioning Respondent as an alleged co-conspirator 17 times, not counting footnotes);

B. Glenn Kirschner, *Trump's Loss in Civil Court Case Provides Roadmap for DOJ to Follow in Criminal Prosecution of Trump*, JUSTICE MATTERS, *available at* https://www.youtube.com/watch?v=iJYJjpev1pY (last visited Mar. 14, 2022) (commending McQuade's prosecution memo and urging government action based on it).

The attacks leveled by McQuade and Kirschner are not off-handed comments or mere bloviation, as ODC has contended to this Court, *see* Disciplinary Counsel's Reply to Respondent's Opposition to Compel and Cross-Motion to Quash Subpoena at 3, but are instead forceful attempts to persuade former colleagues at the Justice Department to act on their recommendations.[7]

C. Even more significantly, on March 2, 2022, the House Select Committee on January 6 filed in the Central District of California "Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions," in *Eastman v. Thompson*, No. 8:22-cv-00099-DOC-DFM, Dkt #

---

[7] *See* Michael S. Schmidt, *at al. In Scrutinizing Trump and His Allies, Jan. 6 Panel Adopts Prosecution Tactics: The House committee investigating the assault on the Capitol and what led to it is employing techniques more common in criminal cases than in congressional inquiries,* NEW YORK TIMES (Feb. 5, 2022) ("[M]embers have openly discussed what criminal laws Mr. Trump and his allies may have violated and how they might recommend that the Justice Department investigate him. Such a step could put considerable additional pressure on Garland, who has not given any specific public indication that the department is investigating Mr. Trump ...."), *available at* https://www.nytimes.com/2022/02/05/us/politics/january-6-committee.html (last visited Mar. 14, 2022).

160 (excerpted version attached as Exh. 2).  That brief argues that President Trump and Dr. Eastman, one of the former President's lawyers, colorably engaged in criminal conduct, such that the crime-fraud exception to the attorney-client privilege should allow the House January 6 Committee to force an *in camera* examination of documents by the Central District of California, which could pierce the privilege claims.  And more importantly for present purposes, this brief or its exhibits mention Respondent more than 40 times.

D. And most significantly, attached as Exhibit 3, two of the undersigned counsel received an email on March 10, 2022 from the January 6 Select Committee's Chief Investigative Counsel. That email states, in relevant part, as follows: "The Select Committee is evaluating a potential grant of use immunity to [Respondent], which would resolve his Fifth Amendment privilege objection."  This is compelling evidence that Respondent's invocation of his Fifth Amendment privilege is legally proper. Otherwise, the Committee would be taking the same position in litigation as ODC is here and trying to pierce Fifth Amendment privilege.[8]  This new development also underscores why ODC was wrong to reject Respondent's request in a January 31, 2022 letter that this investigation should be deferred pending the resolution of related matters, including the Committee's investigation. *Cf.* Board Rule 4.1. As a matter of basic common sense, any investigation here should await the conclusion of the Committee's inquiry, which may occur as early as this Summer.  *See* Jacqueline Alemany & Tom Hamburger, *Committee Investigating Jan. 6 Attack Plans to Begin a More Public Phase of Its Work in the New Year*, WASH. POST (Dec. 27, 2021), *available at* https://tinyurl.com/356hdby2 (last visited Mar. 14, 2022).

In sum, Respondent seems to face more-than-colorable risk, such that his decision to

---

[8] To be clear, Respondent is reserving all of his rights as to those immunity discussions and whether the Committee can also find a way to resolve Respondent's other objections, including most significantly, the executive privilege.

invoke his Fifth Amendment rights on advice of counsel should be accepted at face value and accorded respect. Indeed, before making this filing, we asked ODC to put this matter into abeyance pending conclusion of the January 6 Committee process.  ODC refused unless, perhaps, we would agree in advance to submit Mr. Clark to ODC questioning after he is granted use immunity.  We could not so agree as we will not even be talking to J6 staff about immunity until tomorrow.

E. Finally, today we also lodged with a Hearing Committee of the Board, a Board Rule 3.15 Protective Motion to Quash the Second Subpoena (attached as Exh. 4 but without its sub-exhibits, many of which are briefs filed to this Court). We did this because ODC raised a waiver argument concerning the First Subpoena on page 6 of its Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash.  The Protective Motion to Quash the Second Subpoena should take the waiver issue off the table. In any event, the waiver argument is without merit for the reasons explained in Exhibit 4, which we incorporate by reference here.  Most importantly, we highlighted for the Hearing Committee that it is divested of jurisdiction given the pendency of this case here and the inefficiency that would result if that lower tribunal and this tribunal were simultaneously adjudicating the same matter and same legal disputes.

## CONCLUSION

The Court should dismiss the Motion to Compel, decline to enforce the First Subpoena and the Second Subpoena, or quash those subpoenas on the grounds noted above or set out in Respondent's prior briefing in this matter.  We also commend to the Court our recommendation that it should issue a brief opinion directing ODC to strictly comply with Rule 45's when it serves any future subpoenas in disciplinary matters. Finally, to minimize future interlocutory disputes concerning ODC's investigation here, the Court may wish to instruct ODC that it should take a hard look at deferring this matter until after, at the very least, the House Select Committee proceedings conclude.  That sort of instruction would put this matter back on a more regular track.

Respectfully submitted this 14th day of March 2022.

_/s/ Charles Burnham_____

Charles Burnham
D.C. Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

_* Motion for pro hac vice admission in
progress_

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5202
robert.destro@protonmail.com

_*Motion for pro hac vice admission in
progress_

11

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Response to ODC's Motion for Leave to Supplement the Record* with sufficient postage thereon to insure delivery, and by email addressed to:

> Hamilton P. Fox
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org

This 14th day of March 2022.

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

# OFFICE OF DISCIPLINARY COUNSEL

Board on Professional Responsibility
District of Columbia Court of Appeals

## AZADEH MATINPOUR

Investigative Attorney



515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

matinpoura@dcodc.org
(202) 638-1501, Ext. 1718
fax (202) 638-0862

**Exhibit 1**

**OFFICE OF BAR COUNSEL**
DISTRICT OF COLUMBIA COURT OF APPEALS
DISTRICT OF COLUMBIA BAR
409 E STREET, NW, BLDG. B STE. 228
WASHINGTON, DC 20001

65-270/550

0518

DATE _Feb. 28, 2022_

PAY
TO THE
ORDER OF _Jeffrey B. Clark_                                    $ 77.76

_Twenty Seven and 76/100_                                    DOLLARS

Security Features
Included
Details on Back

SUNTRUST BANK

FOR _Witness fee : expenses_

⑈000518⑈ ⑆055002707⑈ 20685674⑈

# S U B P O E N A

## BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

**NOTICE: THIS SUBPOENA IS ISSUED IN CONNECTION WITH A CONFIDENTIAL INVESTIGATION UNDER THE RULES PROMULGATED BY THIS COURT GOVERNING THE BAR OF THE DISTRICT OF COLUMBIA.**

**BREACH OF THE CONFIDENTIALITY OF THE INVESTIGATION WILL BE DEEMED AS CONTEMPT OF THIS COURT OR GROUNDS FOR DISCIPLINE UNDER THE AFOREMENTIONED RULES OF THIS COURT.** *(Consultation with an attorney does not constitute such a breach.)*

*IN THE MATTER OF:*

Clark/Disciplinary Counsel

DISCIPLINARY DOCKET NO. 2021-D193

TO: Jeffrey B. Clark, Esquire, 8850 Western Hemlock Way, Lorton, VA 22079

YOU ARE HEREBY COMMANDED TO APPEAR at 515 5th Street, N.W., Building A, Room 117, Washington, D.C., 20001, at 9:30 o'clock a.m. , on the 14th day of March 2022 , as a witness in the above captioned matter. You are directed to bring with you Please see attachment to subpoena for description of documents requested.

and not depart the above premises without leave from the authority before whom you appeared.

FAILURE OF ANY PERSON WITHOUT ADEQUATE EXCUSE TO OBEY THIS SUBPOENA AS SERVED MAY BE DEEMED CONTEMPT OF THE DISTRICT OF COLUMBIA COURT OF APPEALS RULES GOVERNING THE BAR.

☑ Production & delivery of these documents will eliminate the need for a personal appearance.

DATE SUBPOENA ISSUED: 02/28/2022

☑ If you have any questions regarding this subpoena, please call 202-638-1501.

Hamilton P. Fox, III, Disciplinary Counsel          *Hamilton P. Fox, III*

| RETURN ON THIS SUBPOENA IS REQUIRED ON OR BEFORE THIS DATE: | |
|---|---|
| ☐ I hereby certify that I have personally served, or have executed as shown in "REMARKS," the above subpoena on the individual at the address below. | |
| Name and Title of Individual Served | Address (If different than shown above) |
| ☐ I hereby certify that, after diligent investigation, I am unable to locate the individual, company, corporation, etc., named in above subpoena for the reason(s) as shown in "REMARKS." | |
| Date(s) of Endeavor | Date and Time of Service |
| REMARKS | Signature and Title of Server |

## Super. Ct. Civ. R. 45(c) and (d)

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.

(1) *Avoiding Undue Burden or Expense; Sanctions*. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection*.

(A) *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for deposition, hearing, or trial.

(B) *Objections*. A person commanded to produce documents, electronically stored information, or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena*.

(A) *When Required*. On timely motion, the court must quash or modify a subpoena that:

(i) fails to allow reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 25 miles from where that person resides, is employed, or regularly transacts business in person—except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place to the place of trial;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(v) *When Permitted*. To protect a person subject to or affected by a subpoena, the court may, on motion, quash or modify the subpoena if it requires: disclosing a trade secret or other confidential research, development, or commercial information;

(vi) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(vii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 25 miles to attend trial.

(B) *Specifying Conditions as an Alternative*. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:

(A) *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection*.

(A) *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation materials must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

# ATTACHMENT TO SUBPOENA

**Clark/Disciplinary Counsel**
**Disciplinary Docket No. 2021-D193**
**Date of Subpoena:  February 28, 2022**
**Due date of Subpoena:  March 14, 2022**

Produce all documents and records (stored in hard copy or electronically), of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state.  The terms "documents" and "records" should be interpreted broadly to include all recorded materials, whether written or electronic, including statements or declarations of witnesses.  Identify the source of any document (including contact information for any persons bringing the document to your attention), how it came to your attention, and the date that it came to your attention.  With respect to any witness statements or declarations, provide contact information sufficient to locate the witness.  Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election.  Err on the side of disclosure; should you subsequently rely on any document that you have not produced, your failure to produce it may be construed against you.

Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election.  These materials should include any notes that you took or notes of others that you maintained of meetings or telephone calls relating to this subject.  Again, you should err on the side of inclusion.

Attachment to Subpoena continues
Clark/Disciplinary Counsel
Page 2

Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental and Natural Resources Division to investigate allegations of election fraud.

Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>     Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>    Defendants. | Case No. 8:22-cv-00099-DOC-DFM<br><br>**CONGRESSIONAL DEFENDANTS'<br>BRIEF IN OPPOSITION TO<br>PLAINTIFF'S PRIVILEGE<br>ASSERTIONS**<br><br>Date:     March 8, 2022<br>Time:    9:00 a.m.<br>Location: Courtroom 9D |

## Exhibit 2

**DEFENDANTS' MEMORANDUM OF LAW**

**INTRODUCTION**

The Select Committee is investigating the violent attack on our Capitol on January 6, 2021, and an effort by the former President of the United States to remain in office by obstructing Congress' count of the electoral votes. Plaintiff John Eastman purports to have been the former President's lawyer in connection with that effort. But Plaintiff's role was not simply as an advisor; he spoke at the rally on the morning of January 6, spreading proven falsehoods to the tens of thousands of people attending that rally, and appears to have a broader role in many of the specific issues the Select Committee is investigating. The Select Committee requires a detailed understanding of all of Plaintiff's activities in order to inform Congress' legislative judgments and to help ensure that no President can threaten the peaceful transition of power ever again.

Plaintiff has already invoked his Fifth Amendment right against self-incrimination in response to 146 separate questions posed by the Select Committee.[1] Now he is attempting to conceal a range of relevant documents behind claims of attorney-client privilege and work-product protection. Below, the Select Committee focuses on Plaintiff's (and apparently Mr. Trump's) claims for documents dated January 4-7, 2021, and respectfully urges the Court to reject every such claim.

*First,* to the extent attorney-client privilege applies in the context of a Congressional subpoena,[2] "[a] party asserting [privilege] has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). Plaintiff here fails to carry his burden of establishing the existence of a legitimate attorney-client relationship with former President Donald Trump during the period at issue. And even if Plaintiff could make such a showing, many of the communications during this period included individuals outside of any attorney-client or confidential relationship—and Plaintiff has not demonstrated the necessary common interest arrangement with these

---

[1] Ex. A, Eastman Deposition.
[2] *Infra* at 37-39

**DEFENDANTS' MEMORANDUM OF LAW**

third parties to preserve the privilege.  And even if Plaintiff could establish an attorney-client relationship and some broad common interest agreement, Plaintiff chose to distribute these communications over an unprotected university server even after he was expressly admonished by the University President and reminded that he was not free to use University email and computers in support of a political candidate.  Finally, Plaintiff admitted that President Trump authorized him to discuss their communications in public, apparently in an effort to establish some form of defense for President Trump's conduct.  Any privilege over these subjects was, therefore, waived.

*Second*, as to work product, Plaintiff falls far short of meeting his burden to establish that the documents are prepared by party, or a party's representative, in anticipation of litigation.  Even had Plaintiff met that burden, the work product doctrine provides nothing close to absolute protection from disclosure.  Courts have already held that former President Trump's interests in secrecy of certain materials ordinarily shielded by executive privilege are outweighed by the Select Committee's interests.  *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *60 (D.C. Cir. Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022) (holding that any such privilege was overcome by the Select Committee's "uniquely compelling need," the sitting President's judgment that release was in the country's best interest, and the careful compromise negotiated between the two branches of government).  Here, Mr. Trump's (or Plaintiff's) interests in protecting work product are outweighed by the Select Committee's substantial need; the Select Committee cannot, without undue hardship, obtain their substantial equivalent by other means.

*Third*, Plaintiff's documents should be reviewed *in camera* by this Court for application of the crime/fraud exception.  The Court inquired about that exception, and the Select Committee has seriously considered that issue.[3]  Although the investigation is continuing and will provide substantial further relevant information, sufficient

---

[3] *See* Scheduling Conference Tr. 6, ECF No. 113.

**DEFENDANTS' MEMORANDUM OF LAW**

information already exists to justify *in camera* review and likely rejection of those privileges.

*Finally*, this Court should deny Plaintiff's effort to shoehorn into this current briefing on privilege issues a motion to reconsider this Court's prior constitutional holdings.

## SUMMARY OF BACKGROUND[4]

Before the 2020 election even took place, President Trump and his supporters began to lay the groundwork to cast doubt on the results.[5]  On election night, Mr. Trump began falsely asserting, without basis, that he had prevailed and called on States to stop counting mail-in and absentee votes.[6]  In the six weeks that followed, President Trump's legal team and his supporters took their allegations to the courts, ultimately litigating and losing more than 60 challenges to the election results in seven States.[7]  State Bars of both

---

[4] The Select Committee is in the midst of its investigation, but has already developed many thousands of pages of evidence.  A full recitation of that evidence—with attached exhibits—would be overwhelmingly lengthy, so the Select Committee here briefly summarizes key points relevant to the documents at issue.  The Select Committee stands ready to make further submissions on specific relevant topics of interest to the Court (under seal, if appropriate).  Order re: Prod. and Priv. Log (Jan. 26, 2022), ECF No. 50, at 3.  Several other federal courts have already summarized the events of January 6, 2021. *See*, *e.g.*, *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315 (D.C. Cir. Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022); *United States v. Nordean*, No. 21-175, (D.D.C.) Mem. Op. (Dec. 28, 2021) (ECF No. 263).

[5] Kevin Liptak, *A List of the Times Trump Has Said He Won't Accept the Election Results or Leave Office if He Loses*, CNN (September 24, 2020), https://www.cnn.com/2020/09/24/politics/trump-election-warnings-leaving-office/index.html.

[6] *President Trump Remarks on Election Status*, C-SPAN (November 4, 2020), https://www.c-span.org/video/?477710-1/president-trump-remarks-election-status ("This is a fraud on the American public.  This is an embarrassment to our country.  We were getting ready to win this election.  Frankly, we did win this election.").

[7] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/.  For relevant examples of decisions

---

**DEFENDANTS' MEMORANDUM OF LAW**

New York and Washington, D.C. suspended the law license of one of President Trump's lead attorneys, Rudolph Giuliani. *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021) (explaining that Giuliani had "communicated demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer" and emphasizing that "[t]he seriousness of [Giuliani's] uncontroverted misconduct cannot be overstated"); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021). Other counsel in litigation challenging the election have also faced sanctions. *See King v. Whitmer*, 20-cv-13134, 2021 WL 3771875, at *1 (E.D. Mich. 2021). (sanctioning Lin Wood, Sidney Powell, and seven others and explaining, "[i]t is one thing to take on the charge of vindicating rights associated with an allegedly fraudulent election. It is another to take on the charge of deceiving a federal court and the American people into believing that rights were infringed, without regard to whether any laws or rights were in fact violated. This is what happened here"). On March 1, 2022, the State Bar of California's Chief Trial Counsel announced an investigation into Plaintiff's actions "following and in relation to the November 2020 presidential election."[8]

---

addressing President Trump's claims of fraud and irregularities, *see*, *e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020) ("[T]his Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."); *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 Ariz. LEXIS 313, at *2, 6-7 (Dec. 8, 2020) (plaintiff failed "to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results"); *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620 (E.D. Wis. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 927 (7th Cir. 2020); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1331 (N.D. Ga. 2020); *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020).

[8] State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation. Disciplinary investigations are launched if a complainant "sufficiently alleges misconduct," including a potential interview of

As the courts were overwhelmingly ruling against President Trump's claims of election misconduct, he and his associates began to plan extra-judicial efforts to overturn the results of the election and prevent the President-elect from assuming office.[9]  At the heart of these efforts was an aggressive public misinformation campaign to persuade millions of Americans that the election had in fact been stolen.  The President and his associates persisted in making "stolen election" claims even after the President's own appointees at the Department of Justice and the Department of Homeland Security, along with his own campaign staff, had informed the President that his claims were wrong.

According to the President's senior campaign advisor, soon after the election, a campaign data expert told the President "in pretty blunt terms" that he was going to lose.[10]  On November 12, 2020, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) issued a public statement noting "unfounded claims and opportunities for misinformation" about the election, and affirming that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[11]  The following month, Attorney General William Barr

---

complainants, and a review of open-sourced and legal documents. California State Bar, *2020 Annual Discipline Report*, at C-2 (Apr. 27, 2021), https://www.calbar.ca.gov/Portals/0/documents/reports/2020-Annual-Discipline-Report.pdf. While Plaintiff is entitled to a presumption of innocence in that process, the Bar's Chief Trial Counsel has determined that the public announcement was "warranted for protection of the public."  State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation (citing Cal. Bus. And Prof. Code, s. 6086.1(b)(2); State Bar Rule of Procedure 2302(d)(1).)

[9] President Trump's January 30, 2022 public statement acknowledges that he was attempting to "overturn" the election on January 6, 2021.  *See Statement by Donald J. Trump, 45th President of the United States of America*, SAVE AMERICA (Jan. 30, 2022), https://www.donaldjtrump.com/news/news-hktthafwz61481.

[10] Ex. D, Jason Miller Deposition 90-91.

[11] CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (concluding that "[t]he

stated publicly that the "U.S. Justice Department ha[d] uncovered no evidence of widespread voter fraud that could change the outcome of the 2020 election," a position he reiterated on December 21 when rejecting calls to appoint a special prosecutor to investigate election fraud.[12]  A senior advisor to the President's campaign agreed with Barr's analysis and said that to the President on multiple occasions.[13]

Evidence obtained by the Select Committee reveals that Acting Attorney General Jeffrey Rosen and Acting Deputy Attorney General Richard Donoghue discussed allegations of voter fraud with President Trump on multiple occasions in December of 2020—and informed him, both as to specific allegations and more generally, that the President's claims of massive fraud sufficient to overturn the election were not supported by the evidence.[14]  According to Rosen, at a December 15, 2020 meeting at the White House that included Rosen, Donoghue, Ken Cuccinelli (Department of Homeland Security), Pat Cipollone (White House Counsel), and Mark Meadows (White House Chief of Staff), participants told the President that "people are telling you things that are

---

November 3rd election was the most secure in American history," and "[t]here [wa]s no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised").

[12] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS (December 1, 2020); *AG Barr says he won't appoint a special counsel to investigate voter fraud*, YAHOO NEWS (December 21, 2020).  In a new book, Mr. Barr reportedly blames the President for the events of January 6, stating that Trump had "lost his grip" and that "[t]he absurd lengths to which [the President] took his 'stolen election' claim led to the rioting on Capitol Hill."  Sadie Gurman, *Ex-Attorney General William Barr Urges GOP to Move On From Trump*, WALL. ST. J. (Feb. 27, 2022), https://www.wsj.com/articles/ex-attorney-general-william-barr-urges-gop-to-move-on-from-trump-11645959600.

[13] Ex. D, Miller Tr. 118-19.

[14] *See* Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final; *see also* Ex. B, Donoghue Tr. 59–62 (discussing specific allegations that Donoghue and Rosen discredited to the President, including a 68% error rate in Michigan; a truck driver who had allegedly driven ballots from New York to Pennsylvania; suitcases of fraudulent ballots allegedly counted in Georgia; and the repeated scanning of ballots, among many others).

not right."[15]  According to Donoghue, he personally informed the President on a December 27, 2020 phone call "in very clear terms" that the Department of Justice had done "dozens of investigations, hundreds of interviews," had looked at "Georgia, Pennsylvania, Michigan, Nevada" and concluded that "the major allegations are not supported by the evidence developed."[16]

The President nevertheless continued to insist falsely through January that he had "won the election in a landslide." And despite being repeatedly told that his allegations of campaign fraud were false, the President continued to feature those same false allegations in ads seen by millions of Americans.[17]  (The Select Committee will address these issues in detail in hearings later this year.)

As the President and his associates propagated dangerous misinformation to the public, Plaintiff was a leader in a related effort to persuade state officials to alter their election results based on these same fraudulent claims.

President Trump, Plaintiff, and several other associates of the President reached out directly to state officials to communicate unsubstantiated allegations of election fraud

---

[15] Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final.

[16] *Id.* at 59-60; *see also id.* at 61-62 (reflecting Donoghue's notes of a phone call, which state, "Told [the President] flat out that much of the information he's getting is false and/or just not supported by the evidence.  We look[ed] at the allegations but they don't pan out.").  *See also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript.

[17] *See* Alex Wayne, Mario Parker, and Mark Niquette, *Trump Campaign to Run Ads Promoting Effort to Overturn Election*, Bloomberg (Dec. 11, 2020), https://www.bloomberg.com/news/articles/2020-12-11/trump-campaign-to-run-ads-promoting-effort-to-overturn-election; Donald J. Trump, The evidence is overwhelming – FRAUD!, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, Stop the Steal, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

**DEFENDANTS' MEMORANDUM OF LAW**

and request that state legislatures disregard popular election results.[18]  On January 2,
2021, the President and Plaintiff convened a video conference with hundreds of state
legislators from swing states won by candidate Biden.[19]  The Trump team reportedly
urged the legislators to "decertify" the election results in their States.[20]  According to
Michigan State Senator Ed McBroom, this call focused (without any valid legal or factual
basis) on the purported power of state legislators to reject the rulings of federal and state
courts and overturn already certified election results.[21]  That same day, President Trump
spoke with Georgia Secretary of State Brad Raffensperger, pressing false and
unsubstantiated claims of election fraud, and ultimately asking Raffensperger to "find
11,780 votes" for Trump in the State.[22]

President Trump also took steps that would have corrupted the Department of
Justice; he offered the role of Acting Attorney General to another Justice Department

---

[18] The Select Committee has interviewed a number of state officials, and their accounts
are consistent with the press reports cited in the paragraph that accompanies this footnote.
Plaintiff has claimed privilege over several communications with state legislators
referring to potential legislative action.  *See, e.g.*, 024762 ("Comm with agent of potential
client re statistical report in anticipation of legislative action or litigation."); 024778
("Comm with co-counsel re possible legislative action in support of pending litigation").
[19] M. Leahy, *President Trump Joins Call Urging State Legislators to Review Evidence
and Consider Decertifying 'Unlawful' Election Results*, BREITBART (Jan. 3, 2021),
https://www.breitbart.com/politics/2021/01/03/president-trump-joins-call-urging-state-
legislators-to-review-evidence-and-consider-decertifying-unlawful-election-results/; *see
also* J. Alemany, *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team
'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct.
23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-
giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.
[20] J. Alemany, *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team
'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct.
23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-
giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.
[21] *Id.*
[22] A. Gardner, *Here's the full transcript and audio of the call between Trump and
Raffensperger*, Washington Post (Jan. 5, 2021),
https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-
vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

**DEFENDANTS' MEMORANDUM OF LAW**

political appointee, Jeffrey Clark, knowing that Mr. Clark was pressing to issue official letters to multiple state legislatures falsely alerting them that the election may have been stolen and urging them to reconsider certified election results.[23]  The Department's senior leadership and President Trump's White House Counsel threatened to resign if President Trump elevated Clark and fired those who were resisting Clark's requests.[24]

Mr. Trump's team also mounted an effort to obtain false election certificates purporting to demonstrate that the electors of seven States were committed to President Trump rather than President Biden.  (The Select Committee has deposed several signers of these false certificates, and plans to interview others.)  Michigan Republican Co-Chair, Meshawn Maddock publicly stated, for example, that she "fought to seat the electors" because "the Trump campaign asked us to do that."[25]  The certificates included false statements that they were official.[26]

When the Electoral College met on December 14, 2020, and confirmed the certified results of the election, the results of the election should have been final.  But Plaintiff advised President Trump to press an unconstitutional plan to disregard those

---

[23] *See* Ex. B, Donoghue Tr. 77-81, 123-24 (discussing the proposed letter to states and Oval Office meeting).

[24] Ex. C, Rosen Tr. at 105-106, 118; Ex. B, Donoghue Tr. 125-27.

[25] *MAGA confession: Trump lawyer admits fraudulent electors plot*, MSNBC (Jan. 21, 2022), https://www.msnbc.com/the-beat-with-ari/watch/maga-confession-trump-lawyer-admits-fraudulent-electors-plot-131436613579.

[26] Five of the seven certificates submitted to federal officials on behalf of Trump-Pence electors in the States falsely claimed to be "the duly elected and qualified Electors for President and Vice President of the United States of America from the State of [Arizona, Georgia, Michigan, Nevada, Wisconsin]." Ex. E, NARA Unofficial Certificates. The certificate submitted on behalf of the Trump-Pence electors in two other States included language indicating that the undersigned electors "might later be determined [to be]" (Pennsylvania) or may "ultimately [be] recognized as" (New Mexico) the duly elected and qualified electors. Ex. E, NARA production 37941, 37944, 37945, 37946, 37947, 38948, 37949.

**DEFENDANTS' MEMORANDUM OF LAW**

results on January 6.[27]  The text of the Twelfth Amendment to the Constitution clearly describes Congress's obligation to count certified electoral votes: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; the person having the greatest Number of votes for President, shall be the President."  U.S. Const., amend. XII.  Nothing in the Constitution permits Congress or the presiding officer (the President of the Senate, Michael R. Pence) to refuse to count certified electoral votes in this context, yet that is precisely what Plaintiff suggested.  Plaintiff's proposal was the subject of heated discussions in the White House in the days before January 6, including with the Vice President's legal counsel and others who told Plaintiff that what he was proposing was illegal.[28]

This did not deter either Plaintiff or President Trump.  Describing his own proposals in a now-public memorandum, Plaintiff characterized his proposed options as "BOLD, Certainly," but necessary because "this Election was Stolen by a strategic Democrat plan to systematically flout existing election laws for partisan advantage," advising that "we're no longer playing by Queensbury Rules."[29]

---

[27] *See* Ex. F, Jacob Tr. 89-96.  Plaintiff's proposals, in the form of two memoranda, are now in the public domain.  *See READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (September 21, 2021), https://www.cnn.com/2021/09/21/politics/read-eastman-memo/index.html and Jan. 3 Memo on Jan. 6 Scenario, CNN, http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--.jan.3.memo.on.jan.6.scenario.pdf (provided by Plaintiff to CNN per CNN reporting, *see* Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM, https://twitter.com/jeremyherb/status/1440432387263922185).

[28] *See, e.g.*, Ex. F, Jacob Tr. 105-11, 127-28.

[29] *Id.*  The Marquess of Queensberry rules are "a code of fair play presumed to apply in any fight" and were developed to regulate boxing matches. *Marquis of Queensberry Rules*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Marquis%20of%20Queensberry%20rules.

**DEFENDANTS' MEMORANDUM OF LAW**

Following this advice from Plaintiff—advice that Plaintiff admitted no member of the Supreme Court would accept[30]—President Trump repeatedly attempted to instruct, direct, or pressure the Vice President, in his capacity as President as of the Senate, to refuse to count the votes from six States.  For example, on January 4, 2021, President Trump and Plaintiff met with Vice President Pence and his staff.  In that meeting, according to one participant, Plaintiff tried to persuade the Vice President to take action on the electors.[31]  Again the next day, Plaintiff tried to persuade the Vice President and his staff that the Vice President should reject certain electors.[32]

The pressure continued on January 6.  At 1:00 a.m., President Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency . . . Mike can send it back!"[33]  At 8:17 a.m., the President tweeted, "States want to correct their votes . . . All Mike Pence has to do is send them back to the States, AND WE WIN.  Do it Mike, this is a time for extreme courage!"[34]  Shortly after this tweet, President Trump placed a phone call to Vice President Pence.[35]  He later connected with the Vice President by phone around 11:20 a.m.[36]  General Keith Kellogg and others were with President Trump during that call, and General Kellogg described the pressure that Trump put on Pence:

---

[30] Ex. F, Jacob Tr. 109-11, 117 ("[Plaintiff] had acknowledged that he would lose 9-0 at the Supreme Court.").

[31] Ex. F  at 82, 95.

[32] *Id.* at 92.

[33] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 1:00:50 AM EST, https://web.archive.org/web/20210106060056/https://twitter.com/realdonaldtrump/status/1346698217304584192.

[34] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 8:17:22 AM EST, https://web.archive.org/web/20210106131747/https://twitter.com/realdonaldtrump/status/1346808075626426371.

[35] Ex. I, Short Tr. 12.

[36] Ex. H, Private Schedule, P-R000285 (handwritten notes on President's private schedule indicate call with VPOTUS at 11:20 AM)]; *see also* Ex. I, Short Tr. at 16; Ex. F, Jacob Tr. 168.

**DEFENDANTS' MEMORANDUM OF LAW**

Q:  It's also been reported that the President said to the Vice President that something to the effect of, "You don't have the courage to make a hard decision."  And maybe not those exact words, but something like that.  Do you remember anything like that?

A:  Words—and I don't remember exactly either, but something like that, yeah.  Like you're not tough enough to make the call.[37]

In his speech to the crowd and television crews that came to the capital on January 6, President Trump explicitly identified the advice given by Plaintiff Eastman when imploring Vice President Pence:

John [Eastman] is one of the most brilliant lawyers in the country and he looked at this, and he said what an absolute disgrace that this could be happening to our Constitution, and he looked at Mike Pence, and I hope Mike is going to do the right thing.  I hope so.  I hope so because if Mike Pence does the right thing, we win the election. . . . And Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country.  And if you're not, I'm going to be very disappointed in you.[38]

Vice President Pence had repeatedly made clear that he would not unilaterally reject electors or return them to the states.[39]  Nevertheless, just before President Trump spoke, Plaintiff falsely alleged widespread manipulation and fraud with voting machines, purportedly altering the election outcome, and then delivered this message to the crowd:

And all we are demanding of Vice President Pence is this afternoon at 1:00 he let the legislators of the state look into this so we get to the bottom of it, and the American people know whether we have control of the direction of our government, or not.  We no longer live in a self-governing republic if we can't get the answer to this question.  This is bigger than President Trump.  It is a very essence of our republican form of government, and it has to be done.

---

[37] Ex. G, Kellogg Tr. 87, 90-92.

[38] Donald J. Trump Speech on January 6, 2021.  The speech transcript can be found at https://wehco.media.clients.ellingtoncms.com/news/documents/2021/01/13/Trump_Jan._6_speech.pdf.

[39] *See, e.g.*, Ex. I, Short Tr. 26-27.

**DEFENDANTS' MEMORANDUM OF LAW**

And anybody that is not willing to stand up to do it, does not deserve to be in the office.  It is that simple.[40]

Shortly thereafter—with the assault on the United States Capitol already underway—Trump tweeted at 2:24 p.m., "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"[41]  The evidence obtained by the Select Committee indicates that President Trump was aware that the violent crowd had breached security and was assaulting the Capitol when Mr. Trump tweeted.[42]  The evidence will show that rioters reacted to this tweet, resulting in further violence at the Capitol.[43]  Indeed, rioters at the Capitol were shouting for the Vice President to be

---

[40] John Eastman at January 6 Rally, C-SPAN, https://www.c-span.org/video/?c4953961/user-clip-john-eastman-january-6-rally.
Rudy Giuliani likewise described this plan in his January 6, 2021 rally speech.  *See* Rudy Giuliani Speech, March for Trump, (Jan. 6, 2021) ("[Vice President Pence] can decide on the validity of these crooked ballots, or he can send it back to the legislators, give them five to 10 days to finally finish the work."), https://www.rev.com/blog/transcripts/rudy-giuliani-speech-transcript-at-trumps-washington-d-c-rally-wants-trial-by-combat.
[41] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 2:24:22PM ET, https://web.archive.org/web/20210106192450/https://twitter.com/realdonaldtrump/status/1346900434540240897.
[42] *See, e.g.*, Ex. J, Williamson Tr. 60-65.
[43] *See United States of America v. Derrick Evans*, https://www.justice.gov/usao-dc/pressrelease/file/1351946/download ("They're making an announcement right now saying if Pence betrayed us you better get your mind right because we're storming that building."); *United States of America v. Marhsall Neefe and Charles Bradford Smith*, https://www.justice.gov/usaodc/case-multi-defendant/file/1432686/download ("Then we heard the news on [P]ence . . . And lost it . . . So we stormed."); *United States of America v. Joshua Matthew Black*, https://www.justice.gov/opa/page/file/1354806/download ("Once we found Pence turned on us and that they had stolen the election, like officially, the crowd went crazy.  I mean, it became a mob.  We crossed the gate.").

---

**DEFENDANTS' MEMORANDUM OF LAW**

hanged.[44]  A minute after President Trump's tweet, Plaintiff sent an email to Vice President Pence's lawyer stating:  "The 'siege' is because YOU and your boss did not do what was necessary to allow this to be aired in a public way so the American people can see for themselves what happened."[45]

Later that evening, Plaintiff made a final plea to the Vice President's lawyer:  "I implore you to consider one more relatively minor violation [of the Electoral Count Act] and adjourn for 10 days to allow the legislatures to finish their investigations, as well as to allow a full forensic audit of the massive amount of illegal activity that has occurred here."[46]  Plaintiff *knew* what he was proposing would violate the law, but he nonetheless urged the Vice President to take those actions.

The Vice President rejected Plaintiff's pleas that he violate the law, and has since indicated that what the President and Plaintiff were insisting he do was "Un-American."[47]  Former Fourth Circuit Judge Michael Luttig—for whom Plaintiff had previously worked as a law clerk—described Plaintiff's view of the Vice President's authority as "incorrect at every turn."[48]  Evidence obtained by the Select Committee to date indicates that President Trump's White House Counsel confronted Plaintiff before the rally, and rejected Plaintiff's advice to Mr. Trump.  And Plaintiff admitted that not a single Justice of the Supreme Court would agree with his view that the Vice President could refuse to count certain electoral votes.[49]

---

[44] A. Parker,  *How the rioters who stormed the Capitol came dangerously close to Pence*, Washington Post (Jan. 15, 2021), https://www.washingtonpost.com/politics/pence-rioters-capitol-attack/2021/01/15/ab62e434-567c-11eb-a08b-f1381ef3d207_story.html.
[45] Ex. L (005379, Email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 12:25 p.m. MST).
[46] Exs. L, M (005479, Email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 9:44 p.m. MST).
[47] *See Pence slams Trump for 'un-American' bid to overturn vote*, BBC News (Feb. 4, 2022), https://www.bbc.com/news/av/world-us-canada-60268412.
[48] Tweets by @judgeluttig, Sept. 21, 2021 at 11:50 PM, https://twitter.com/judgeluttig/status/1440523766920933389.
[49] Ex. F, Jacob Tr. 117.

**DEFENDANTS' MEMORANDUM OF LAW**

As documents now available to the Select Committee demonstrate, Plaintiff used his Chapman University email account to email Greg Jacob, Counsel to the Vice President, on January 5 and 6 urging the Vice President to take illegal action and refuse to count electoral votes.[50]

\*   \*   \*

The Select Committee's investigation is continuing to gather evidence on the planning for the violent assault, communications between those who participated, and communications by the Trump team from the Willard war room and elsewhere. Various individuals planned for violence that day, including with the placement of pipe bombs, the accumulation of weaponry for potential use on January 6 across the river in Virginia, and the use of tactical gear and other weaponry.[51] Evidence also indicates that the violent rioters who attacked police, breached the Capitol, and obstructed and impeded the electoral vote were provoked by President Trump's fraudulent campaign to persuade the American people that the election was in fact stolen.[52] Indeed, the President's rhetoric

---

[50] Exs. L, M [Chapman005235, Chapman005236, Chapman005479].

[51] *See* Grand Jury Indictment, *United States v. Crowl et al.*, No. 21-cr-28-APM (Jan 12, 2022), available at: https://www.justice.gov/opa/press-release/file/1462476/download ("Rhodes and certain regional leaders of the Oath Keepers began recruiting others to travel to Washington, D.C., to participate in operations aimed at stopping the transfer of presidential power. They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer Rhodes's call to take up arms at Rhodes's direction. Some also amassed firearms on the outskirts of Washington, D.C., distributed them among 'quick reaction force' ('QRF') teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.").

[52] *See United States v. Chrestman*, No. 1:21-mj-00218 (DDC), https://www.justice.gov/usao-dc/defendants/chrestman-william; K. Polantz, , *Sobbing Capitol rioter described his assault of police Officer Michael Fanone: 'My God. What did I just do?'*, CNN (December 1, 2021) (rioter charged with assaulting Metropolitan Police Department Officer Michael Fanone on January 6 with an "electroshock weapon" told investigators: "Trump called us. Trump called us to D.C. . . . If he's the commander in chief and the leader of our country, and he's calling for help—I thought he was calling

**DEFENDANTS' MEMORANDUM OF LAW**

persuaded thousands of Americans to travel to Washington for January 6, some of whom

marched on the Capitol, breached security, and took other illegal actions. The Select

Committee's hearings will address those issues in detail.

    Ultimately, President Trump issued a video and a tweet urging the rioters to leave

the Capitol, stressing "[w]e love you, you're very special. You've seen what happens,

you see the way others are treated that are so bad and so evil. I know how you feel."[53] At

6:00 p.m., the President tweeted: "These are the things and events that happen when a

sacred landslide election victory is so unceremoniously & viciously stripped away from

great patriots who have been badly & unfairly treated for so long. Go home with love &

in peace. Remember this day forever!"[54]

    The January 6 attack resulted in multiple deaths, physical harm to more than 140

law enforcement officers, and trauma among government employees, press, and

---

for help"); *United States v. Grayson*, No. 1:21-mj-00163 (DDC),
https://www.justice.gov/opa/page/file/1360506/download; *United States v. Cua*, No. 21-
CR-107 (DDC), https://www.justice.gov/usao-dc/case-multi-
defendant/file/1365571/download; Sergeant Aquilino Gonell Testimony, House Select
Committee to Investigate the January 6th Attack on the United States Capitol, *The Law
Enforcement Experience on January 6th* (July 27, 2021) (Capitol Police Sergeant
Aquilino Gonell testifying that during hand-to-hand combat with rioters "all of them, all
of them, were telling us 'Trump sent us.'"). A number of defendants in pending criminal
cases have identified President Trump's allegations about the "stolen election" as a
motivation for their activities at the Capitol; several also specifically cite President
Trump's tweets asking that supporters come to Washington, D.C. on January 6. *See, e.g.*,
*United States v. Sandlin*, https://www.justice.gov/opa/page/file/1362396/download: ("I'm
going to be there to show support for our president and to do my part to stop the steal and
stand behind Trump when he decides to cross the rubicon."); *United States v. Neefe et al.*,
https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is
literally calling people to DC in a show of force. Militias will be there and if there's
enough people they may fucking storm the buildings and take out the trash right there.'").
[53] *President Trump Video Statement on Capitol Protesters*, C-Span (Jan. 6, 2021),
https://www.c-span.org/video/?507774-1/president-trump-claims-election-stolen-tells-
protesters-leave-capitol.
[54] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 6:01:04 PM ET,
https://web.archive.org/web/20210106230114/https://twitter.com/realdonaldtrump/status/
1346954970910707712

**DEFENDANTS' MEMORANDUM OF LAW**

Members of Congress.  *See* H. Res. 503, Preamble.  Law enforcement eventually cleared the rioters, and the electoral count successfully resumed at 8:06 p.m. in the Senate after a nearly six-hour delay.

## **PROCEDURAL HISTORY**

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6, the Select Committee has issued subpoenas to various government agencies, private companies, and numerous individuals, including Plaintiff and his former employer, Chapman University.  In a cover letter accompanying the subpoena at issue here, Chairman Thompson explained that the Select Committee had "credible evidence" that Plaintiff knew about, and "may have participated in, attempts to encourage the Vice President of the United States to reject the electors from several states or, at the very least, to delay the electoral college results to give states more time to submit different slates of electors."  Nov. 8, 2021 Select Committee Cover Letter to Eastman at 1.[55]  Chairman Thompson noted that Plaintiff wrote "two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election."  *Id.*  Chairman Thompson also explained that Plaintiff had "participated in a briefing for nearly 300 state legislators from several states regarding purported election fraud," "testified to Georgia state senators regarding alleged voter fraud and reportedly shared a paper that argued that the state legislature could reject election results and directly appoint electors," was "at the Willard Hotel 'war room' with Steve Bannon and others on the days leading up to January 6 where the focus was on delaying or blocking the certification of the election," and on January 6, "spoke at the rally at the White House Ellipse."  *Id.* at 2.

After Plaintiff refused to produce any documents responsive to a subpoena issued to him directly (which is not before this Court), and invoked the Fifth Amendment

---

[55]  *Available at* https://perma.cc/ZV8J-P2QS.

**DEFENDANTS' MEMORANDUM OF LAW**

privilege against forced self-incrimination repeatedly during his deposition, the Select
Committee issued a separate subpoena to Chapman for certain documents in its
possession "attributable to Dr. John Eastman, that are related in any way to the 2020
election or the January 6, 2021 Joint Session of Congress." Compl. Ex. B at 4, ECF No.
1-2. That subpoena requested documents from November 3, 2020 to January 20, 2021.
*Id.* The deadline to produce the subpoenaed documents was January 21, 2022. *Id.* at 3.

The day before the subpoena's deadline, Plaintiff initiated this action and sought to
enjoin Chapman from producing responsive records. In his application for emergency
injunctive relief, Plaintiff made broad assertions of attorney-client privilege without
identifying individual communications to which these privileges applied. This Court
granted Plaintiff's request for a four-day *ex parte* temporary restraining order until the
parties appeared for a January 24 hearing to discuss Plaintiff's request for a temporary
restraining order. *See* Civil Minutes, Jan. 20, 2022, ECF No. 12.

At the January 24 hearing, the parties agreed that Plaintiff would expeditiously
produce a privilege log with particularized assertions of privilege. The Court denied
Plaintiff's application to maintain the temporary restraining order, rejected his First
Amendment, Fourth Amendment, and Congressional authority claims, and ordered
Plaintiff to produce all non-privileged, responsive documents to the Select Committee on
a rolling basis. The Court also denied Plaintiff's blanket attorney-client privilege and
attorney work product protection claims with the proviso that Plaintiff retained the right
to raise these claims as to specific documents during production. *See* Order, Jan. 25,
2020, ECF No. 43.

Although Plaintiff produced the requested logs, those logs failed to provide
sufficient information to allow the Select Committee to assess the privilege assertions'
validity. After several efforts to secure adequate information from Plaintiff,
Congressional Defendants asked this Court to establish a briefing schedule to address
Plaintiff's outstanding privilege assertions and the insufficiency of the information
provided on his daily logs. *See* Notice, Feb. 11, 2022, ECF No. 101. This Court granted

**DEFENDANTS' MEMORANDUM OF LAW**

that request as to the privilege assertions on Plaintiff's January 4-7 document logs and set a hearing to address these issues. *See* Civil Minutes, Feb. 14, 2022, ECF No. 104. At Congressional Defendants' request, the Court also ordered Plaintiff to produce "evidence of all attorney-client and agent relationships asserted in the privilege log," including "evidence documenting any attorney-client relationships that existed with his clients." *Id.* The Court's order did not address motions for reconsideration.

## STANDARD OF REVIEW

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (citations omitted); *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The same is true of the work product doctrine. *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995); *Cameron v. City of El Segundo*, No. 20-CV-04689, 2021 WL 3466324, at *12 (C.D. Cal. Apr. 30, 2021). "Evidentiary privileges in litigation" like those at issue here "are not favored." *Herbert v. Lando*, 441 U.S. 153, 175 (1979). "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), *as amended on denial of reh'g* (Mar. 13, 2002) (internal quotation omitted).

## ARGUMENT

"[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). Inherent in this investigative authority, Congress can compel production of documents and testimony through legislative subpoenas. It should now be beyond dispute that the Select Committee is operating properly with an appropriate legislative

**DEFENDANTS' MEMORANDUM OF LAW**

purpose.  Order, Dkt. No. 43 at 10 (holding that "the issues surrounding the 2020 election and the January 6th attacks" are "clearly 'subjects on which legislation could be had'"); *see also Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *6 (describing "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations).

## I.   Plaintiff Has Not Met His Burden to Establish Application of the Common Law Attorney-Client Privilege

### A.   Plaintiff Has Neither Met His Burden to Establish the Attorney-Client Relationship Nor Has He Sufficiently Established the Privileged Nature of the Communications

Plaintiff claims that "[t]he attorney-client relationship between Dr. Eastman and President Trump should be beyond dispute," Br. at 11, and declares that he filed briefs on behalf of the Trump campaign in state litigation in December 2020.  Pl.'s Ex. 1, Eastman Decl. ¶ 20.  But Plaintiff does not even attempt in his declaration to claim attorney-client privilege over the relevant matters and the relevant time at issue here.

Over the past months, the Congressional Defendants repeatedly asked Plaintiff to disclose the engagement letters that show the identity of his client and the period of the representation.  Ex. 1, Email Exchange Between Douglas Letter and Charles Burnham. Appended to his declaration, Plaintiff finally revealed what he purports is an engagement letter.  That letter identifies the client as "Donald J. Trump for President, Inc."  Ex. A to Ex. 1 at 1.  But—despite a clearly delineated signature page with lines for the client and attorney to sign—that letter is unsigned.  Ex. A to Ex. 1 at 4.  *See In re W/B Assocs.*, 307 B.R. 476, 483 (Bankr. W.D. Pa. 2004), *aff'd sub nom. Est. Partners, Ltd. v. Leckey*, No. 04CV1404, 2005 WL 4659380 (W.D. Pa. Aug. 31, 2005), *aff'd sub nom. In re W/B Assocs.*, 196 F. App'x 105 (3d Cir. 2006) ("An unsigned agreement, in and of itself, raises material questions as to its validity and applicability."); *Solis v. Taco Maker, Inc.*, No. 1:09-CV-3293, 2013 WL 4541912, at *5 (N.D. Ga. Aug. 27, 2013) (unsigned

engagement letter insufficient to establish attorney client relationship).[56]  And Plaintiff provided no declaration from his client regarding the scope of his representation.

The lack of signatures is critical because the letter itself states that it becomes operative "[u]pon the proper signatures by all parties hereto."  Ex. A to Ex. 1 at 1.  By the terms of the letter, therefore, the absence of signatures suggests the letter was not operative.  Plaintiff's declaration, moreover, does not authenticate this unsigned letter, nor does Plaintiff include the cover email by which the engagement letter was "transmitted."  Ex. 1, Eastman Decl.  ¶ 23.[57]  Although Plaintiff had the burden to establish the elements of the privilege in his opening brief, this unsigned and unauthenticated engagement letter is insufficient to establish an attorney-client relationship during the period at issue (January 4 through 7) as to either President Trump the individual or President Trump's campaign.  Any belated effort to cure this defect in his reply by appending a signed engagement letter or the cover email to the letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

Nor can Plaintiff meet his burden by noting his involvement prior to the election in a so-called "Election Integrity Working Group."  Ex. 1, Eastman Decl. ¶ 25.  No documentation accompanies this assertion, which in any event provides no indication that

---

[56]  Plaintiff emphasizes his appearances in a number of cases, but simply naming these cases does not meet Plaintiff's burden to show that the disputed communications related to any of those cases.  One of the cases had already concluded before the time at issue here, *see State of Texas v. Commonwealth of Pennsylvania, et al.*, No. 22O155 (motion for leave to file a bill of complaint denied on December 11, 2020), and nowhere do Plaintiff's privilege logs identify communications linked to either of the other cases.

[57]  Plaintiff had the burden to establish the elements of the privilege in his opening brief.  Any belated effort to cure this defect in his reply by appending a signed engagement letter or the cover email to the letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

**DEFENDANTS' MEMORANDUM OF LAW**

Plaintiff had a relevant attorney-client relationship during January 4 through January 7. "[T]he burden of establishing the existence of the relationship rests on the claimant of the privilege against disclosure. That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). Nor does Plaintiff provide any basis to conclude that the "Working Group" was providing legal advice at the client's request.

Furthermore, 004722, 004723, 004744, 004745, 004766, 004767, and 004788 were received by various third parties, and Plaintiff fails to meet his burden to show that such disclosure did not destroy the privilege. "[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *see also Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007) ("there is no confidentiality where a third party . . . either receives or generates the documents"). "Because the attorney-client privilege applies only where the communication between attorney and client is confidential, there is no privilege protecting the documents the [Select Committee] seeks in the present action." *Reiserer*, 479 F.3d at 1165.

"The mere presence of a third party at an attorney-client meeting does not necessarily destroy the privilege," *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978) because "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice," *Richey*, 632 F.3d at 566. But "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this [common interest] exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. To invoke the common interest exception, "the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Id.* Moreover, "[a] person who is not represented by a lawyer and who is not himself or herself a lawyer cannot participate in a common-interest arrangement." Restatement

(Third) of the Law Governing Lawyers § 76 (2000); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (common interest privilege "only applies when clients are represented by separate counsel").[58]

Plaintiff makes no effort to meet his burden of establishing that the third-party recipients of his emails were retained to assist Plaintiff in providing legal advice, nor does he even try to establish that Plaintiff and these parties had "some form of agreement" to pursue a joint legal strategy. *In re Pac. Pictures Corp.*, 679 F.3d at 1129. This Court instructed Plaintiff to "file with the Court and the Select Committee evidence of all attorney-client and agent relationships asserted in the privilege log." Order, ECF No. 104. ¶ 2. Plaintiff did not identify a single common interest agreement. Plaintiff's self-serving assertion of a common interest "on information and belief" and conclusory claims about a general common interest—as opposed to an actual agreement—do not satisfy his burden to show that these third parties were brought within the ambit of the privilege such that inclusion of these third parties did not destroy any privilege. Br. 17-21; *see also, e.g.*, *Sony Computer Ent. Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 634 (N.D. Cal. 2005) ("Where a third party is present, no presumption of confidentiality obtains, and the usual allocation of burden of proof, resting with the proponent of the

---

[58] *See also Sec. & Exch. Comm'n v. Aequitas Mgmt., LLC*, No. 16-CV-438, 2017 WL 6329716, at *3 (D. Or. July 7, 2017), *objections overruled,* 2017 WL 6328150 (D. Or. Dec. 11, 2017) (common interest privilege "only applies when clients are represented by separate counsel"); *Swortwood v. Tenedora de Empresas, S.A. de C.V.*, No. 13CV362, 2014 WL 895456, at *4 (S.D. Cal. Mar. 6, 2014), *clarified on denial of reconsideration sub nom. Swortwood v. Empresas*, No. 13CV362, 2014 WL 12026069 (S.D. Cal. Apr. 18, 2014) ("Since Mr. Diez Barroso was not individually represented by counsel, Defendant can not establish the applicability of the common interest doctrine."); *Finisar Corp. v. U.S. Bank Tr. Nat. Ass'n*, No. C 07-04052, 2008 WL 2622864, at *4 (N.D. Cal. June 30, 2008) ("Under the strict confines of the common interest doctrine, the lack of representation for the remaining parties vitiates any claim to a privilege.") (quoting *Cavallaro v. United States*, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), aff'd, 284 F.3d 236 (1st Cir. 2002)); *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, No. CV-14-085, 2015 WL 11117150, at *2 (E.D. Wash. June 1, 2015) (for common interest to apply, "[t]he communications, however, must be shared by attorneys for the separate parties").

**DEFENDANTS' MEMORANDUM OF LAW**

privilege, applies in determining whether confidentiality was preserved under [the
relevant privilege statute].”); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951
F.2d 1414, 1427 (3d Cir. 1991) (voluntary disclosure to third party waives attorney-client
privilege even if third party agrees not to further disclose communication).[59]

Ninth Circuit precedent is clear: “A party claiming the privilege must identify
specific communications and the grounds supporting the privilege as to each piece of
evidence over which privilege is asserted.” *Martin*, 278 F.3d at 1000.  Plaintiff’s
privilege log and brief instead summarily label a multitude of documents as privileged
without properly identifying a client, establishing the advice as legal (as opposed to
political or strategic), or showing that the third parties included on the communication
were agents of the client.  Such “[b]lanket assertions [of privilege] are ‘extremely
disfavored.’” *Id.* (quoting *Clarke v. Am. Com. Nat’l Bank*, 974 F.2d 127, 129 (9th
Cir.1992)).  Accordingly, Plaintiff’s attorney-client claims must be rejected.

In addition, to the extent that the Court finds that Plaintiff was providing advice on
political or campaign strategy rather than law, the communications are not privileged,
because “advice on political, strategic, or policy issues . . . would not be shielded from
disclosure by the attorney-client privilege.” *In re Lindsey*, 148 F.3d 1100, 1106 (D.C.
Cir. 1998); *Md. Restorative Just. Initiative v. Hogan*, No. 16-01021, 2017 WL 4280779,
at *3 (D. Md. Sept. 27, 2017) (“A claim of attorney-client privilege is only legitimate
where the client has sought the giving of *legal*, not *political*, advice.”).

---

[59] “It is appropriate that the proponent of the privilege has the burden of proving that a
third party was present to further the interest of the proponent because, in this situation,
where the privilege turns on the nature of the relationship and content of communications
with the third party in question, the proponent is in the better posture to come forward
with specific evidence explaining why confidentiality was not broken.” *Sony Computer
Ent. Am., Inc.*, 229 F.R.D. at 634 n.1.

**DEFENDANTS’ MEMORANDUM OF LAW**

### B. Plaintiff Cannot Invoke Attorney-Client Privilege Over Documents on Chapman's Server[60]

"Confidentiality is an aspect of a communication that must be shown to exist to bring the communication within the attorney-client communication privilege. When the confidentiality element is not shown to exist, the assertion of the attorney-client privilege to safeguard a communication from disclosure, is improper." *Long v. Marubeni Am. Corp.*, No. 05CIV.639, 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006) (use of employer email or internet not privileged when policy disclaimed any right to personal privacy and company retained right to monitor data flowing through its systems).

As the Supreme Court explained, an employee's expectation of privacy "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987). In the context of email communication over an employer's email system, "the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable." *Doe 1 v. George Washington Univ.*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020), *reconsideration denied*, — F. Supp. 3d —, 2021 WL 5416631 (D.D.C. Nov. 19, 2021) (quoting *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009)); *see also In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 258 (Bankr. S.D.N.Y. 2005).

Courts confronting the issue have applied four factors: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *George Washington Univ.*, 480 F. Supp. 3d at 226 (quoting *In re Asia Glob. Crossing, Ltd.*, 322 B.R. at 257). These factors point to the conclusion that any intent Plaintiff may have had to communicate confidentially over the Chapman server was not objectively reasonable.

---

[60] Plaintiff's assertion that the Congressional Defendants waived this argument, Br. 22-23, is addressed at 53-57, *infra*.

**DEFENDANTS' MEMORANDUM OF LAW**

Chapman's Computer and Network Policy directly undermines any purported expectation of confidentiality. That policy is clear: "Users should not expect privacy in the contents of University-owned computers or e-mail messages." *Policies and Procedures: Computer and Network Acceptable Use Policy*, Chapman University, https://perma.cc/7ZUA-ZALN (last visited Mar. 2, 2022) (emphasis added).

The policy also expressly bans personal use on its network and computing systems. *Id.* (all university computing and network systems and services are a "University-owned resource and business tool to be used only by authorized persons for educational purposes or to carry out the legitimate business of the University"). And through its policy, Chapman reserves "the right to retrieve the contents of University-owned computers and e-mail messages for legitimate reasons." *Id.*

Chapman's policy is notable in that, in response to the known risks to privilege posed by university email policies, many other universities have in the past decade developed policies that are more protective of user privacy.[61] The use of "bare-bones-no-privacy policies" like Chapman's, in which users are warned "that they do not have an expectation of privacy," is followed by only a "small minority" of universities. Sisk & Halbur, *supra* at n.61, at 1297, 1301; *Policies and Procedures: Computer and Network*

---

[61] *See, e.g.*, UCLA Policy 410: Nonconsensual Access to Electronic Communications Records (effective on Aug. 16, 2010) (requiring the consent of the user before accessing electronic communications records except in exceptional circumstances), https://perma.cc/3CP4-QSYD; Stanford Administrative Guide, Privacy and Access to Electronic Information 6.1.1 (last updated on Oct. 4, 2016) (acknowledging the importance of users' right to privacy and requiring the consent of the user before accessing electronic communications except in exceptional circumstances), https://perma.cc/E4C5-Z37P; *see generally* American Bar Association, Standing Committee on Ethics and Professional Responsibility, Formal Opinion 11-459 (2011) https://perma.cc/VF5N-VFFB; State Bar of California, Standing Committee on Professional Responsibility and Conduct, Formal Opinion 2010-179 §3(a)(iii) (2010), https://perma.cc/6737-D8NV; G. Sisk & N. Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277 (2010).

**DEFENDANTS' MEMORANDUM OF LAW**

1  *Acceptable Use Policy*, Chapman University ("Users should not expect privacy in the

2  contents of University-owned computers or e-mail messages").

3        Plaintiff was notified of Chapman's relatively stringent policy and can be

4  presumed to be aware of the it.  Plaintiff served on the Chapman faculty for over twenty

5  years and was previously the Dean of Chapman's law school.  According to the

6  University, whenever Plaintiff logged on to Chapman's network during the relevant

7  period he received a "splash screen" message stating: "Use of this computer system

8  constitutes your consent that your activities on, or information you store in, any part of

9  the system is subject to monitoring and recording by Chapman University or its agents,

10  consistent with the Computer and Acceptable Use Policy without further notice."  Decl.

11  of Janine DuMontelle ¶ 6, ECF No. 17-1.

12        Moreover, in reference to Plaintiff's representation of President Trump in Supreme

13  Court litigation, Chapman's President publicly emphasized the university's "clear

14  policies in place regarding outside activity," explaining that "acting privately, Chapman

15  faculty and staff are not free to use Chapman University's email address, physical

16  address or telephone number in connection with the support of a political candidate."

17  Dawn Bonker, *President Struppa's Message on Supreme Court Case*, Chapman

18  University (Dec. 10, 2020), https://perma.cc/3CTG-4DBN.

19        At this Court's hearing on January 15, Chapman's counsel emphasized that

20  President Trump "was not a clinic client, nor would he have been eligible to be a clinic

21  client of Chapman," that Plaintiff's representation of the President was "improper" and

22  "unauthorized," and that Plaintiff's use of his Chapman account for such representation

23  was like "having contraband on our system."  Hearing Tr. Re: Pl.'s App. for TRO at 29.

24        Putting all of this together, Plaintiff certainly had no legitimate expectation of

25  confidentiality during the dates at issue here—January 4-7, 2021—nearly one month after

26  the University President's public statement.

27        Plaintiff insists that this Court should disregard Chapman's policy because

28  Plaintiff is a professor, not a student.  The information provided by the university to this

Court provides no indication that this makes any difference.  To the contrary, less than a month before the period at issue here, Chapman's President admonished Plaintiff's use of the Chapman server and email address for the very purpose used here, and was crystal clear that the policy applied to "*faculty and staff*."  *See* Bonker, *supra* (emphasis added).

Plaintiff's reliance on *Convertino v. U.S. Dep't of Just.* is misplaced.  *Convertino*, like the cases the Congressional Defendants cite above, holds that "for documents sent through e-mail to be protected by the attorney-client privilege there must be a subjective expectation of confidentiality that is found to be objectively reasonable."  674 F. Supp. 2d at 110.  "Because his expectations were reasonable," the District Court for the District of Columbia held in that situation that "[the official's] private e-mails will remain protected by the attorney-client privilege."  *Id.*  Here, by contrast, Plaintiff had no reasonable expectation that his documents would remain protected.  Not only was the University's policy clear, but any expectation of confidentiality was manifestly unreasonable following the admonishment by Chapman's President.  *See* Bonker, *supra*.

For the same reason, *United States v. Long*, 64 M.J. 57 (C.A.A.F. 2006) is inapposite.  *See* Br. at 28 (relying on *Long*).  Applying a clearly erroneous standard, the Court of Appeals for the Armed Forces concluded there that the lower court did not err in finding a subjective expectation of privacy because "the agency [had a] practice of recognizing the privacy interest of users in their e-mail."  *Long*, 64 M.J. at 63.  By contrast, here, as we have highlighted, the University President (in specific reference to Plaintiff and his political work for President Trump) emphasized that Plaintiff and other faculty had staff had no privacy interest.  This fact is also fatal to Plaintiff's reliance on his prior practices violating Chapman's policy.  *See* Br. 29-30.

Likewise, Plaintiff's suggestion that his unauthorized use of Chapman's system is "irrelevant" because "[t]he privilege is held by the client," Br. 30, makes little legal difference.  As the Ninth Circuit has recognized, "[t]here are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client."  *In re Pac. Pictures Corp.*, 679 F.3d at 1130.  Plaintiff's decision to continue

28

**DEFENDANTS' MEMORANDUM OF LAW**

using a server and email account in an unauthorized way after being specifically

admonished by the University President against doing so is precisely such an instance

where, as the attorney, Plaintiff's actions defeated application of the privilege.

### C.  President Trump Waived Privilege By Expressly Asking for Disclosure to Third Parties

"[A] fundamental prerequisite to assertion of the privilege" is "confidentiality both

at the time of the communication and maintained since." *Coastal States Gas Corp. v.

Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  "Voluntary disclosure of

privileged communications constitutes waiver of the privilege for all other

communications on the same subject." *Richey*, 632 F.3d at 566 (citation omitted); *see

also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).

Plaintiff has stated publicly that President Trump authorized Plaintiff's discussion

of advice relating to the election and the events leading up to January 6.  Two

memoranda that Plaintiff wrote outlining how former Vice President Pence could

overturn the results of the Presidential election are already in the public domain and have

been provided to the media, and discussed, by Plaintiff.[62]

Plaintiff discussed the advice in his legal memo at length on a podcast, noting that

Plaintiff himself provided the memorandum to author Bob Woodward, and saying at the

outset that Mr. Trump had "authorized" him "to talk about these things."[63]  Plaintiff has

also made extensive public remarks regarding the events of January 6 and his advice to

President Trump on numerous other occasions.[64]  These "[v]oluntary

---

[62] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN
(Sept. 21, 2021), https://perma.cc/LP48-JRAF; Jan. 3 Memo on Jan. 6 Scenario, CNN,
https://perma.cc/B8XQ-4T3Z (provided by John Eastman to CNN per CNN reporting,
*see* Jeremy Herb (@jeremyherb), Twitter (Sept. 21, 2021, 5:46 PM),
https://perma.cc/GX4R-MK9B.

[63] *Another Way: Discussing the John Eastman Memo with Eastman*, Equal Citizens
(Sept. 27, 2021), https://perma.cc/A2RZ-MFWP.

[64] *See, e.g.*, M. Schmidt , *The Lawyer Behind the Memo on How Trump Could Stay in
Office*, N.Y. Times (Oct. 2, 2021),https://perma.cc/9BQQ-5Y39; John McCormack, *John

**DEFENDANTS' MEMORANDUM OF LAW**

disclosure[s] . . . constitute[] waiver of the privilege for all other communications on the same subject" of the events surrounding the January 6, 2021 joint session of Congress. *United States v. Richey*, 632 F.3d at 566.

Plaintiff asserts that "[t]he statements about President Trump attributed to Dr. Eastman by the defendants make no reference to privilege," Br. 24, but nowhere does he cite authority that waiver must make explicit reference to privilege. And, undermining Plaintiff's representation, Plaintiff indeed recognized the privileged nature of attorney-client relationships. On May 5, 2021, Plaintiff appeared on the Peter Boyles Show and stated that "I would normally not talk about a private conversation I have with a client, but I have express authorization from my client, the President of the United States at the time, to describe what occurred—to truthfully describe what occurred in that conversation."[65]

Plaintiff states the unremarkable proposition that "[c]ourts have long recognized that disclosure of privileged information on a particular subject does not necessarily imply a complete waiver of the privilege." Br. 25.[66] But no one here has asserted a "complete waiver of the privilege." At issue is former President Trump's waiver of the subject matter of issues the events of January 6 and Plaintiff's advice about the effort to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.

Plaintiff insists that this statement does not waive privilege because his "statements in the very same interview that the conversation in question occurred in the presence of

---

*Eastman vs. the Eastman Memo,* Nat'l Rev. (Oct. 22, 2021), https://perma.cc/VD6N-R9Q9; John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on the 2020 Election*, Sacramento Bee (Oct. 7, 2021), https://www.sacbee.com/opinion/op-ed/ai1icle2548 l 2552.html.

[65] *Peter Boyles Show: Peter Boyles May 5 8am*, 710KNUS News/Talk (May 5, 2021), https://perma.cc/Q6YE-KD5F.

[66] Plaintiff relies on *Weil*, 647 F.2d at 25, which is inapposite. Whereas *Weil* involved a company's *inadvertent* disclosure, Plaintiff's disclosure was both intentional and repeated.

three non-clients in addition to the President." Br. 24.  Waiver, however, does not attach
to individual "conversations;" instead, it applies to "all other communications *on the
same subject*." *Richey*, 632 F.3d at 566 (emphasis added and citation omitted).  President
Trump—presumably for strategic and political gain—approved of Plaintiff's public
disclosures of his advice on the subject of the effort to interfere with the counting of the
electoral votes on January 6 in violation of the Electoral Count Act.  He cannot now
come back and reclaim privilege over communications "on the same subject." *Richey*,
632 F.3d at 566.  Neither former President Trump nor Plaintiff can use attorney-client
privilege "both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156,
1162 (9th Cir. 1992) (citation omitted); *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294,
1301-02 (Fed. Cir. 2006).

## II.    The Documents Sought from Chapman Are Not Protected by the Common Law Attorney Work-Product Doctrine

"The work-product doctrine is a qualified privilege that protects from discovery
documents and tangible things prepared by a party or his representative in anticipation of
litigation." *Sanmina Corp.*, 968 F.3d at 1119 (internal quotation marks and citation
omitted).  To qualify for work-product protection, documents must: "(1) be prepared in
anticipation of litigation or for trial and (2) be prepared by or for another party or by or
for that other party's representative." *Richey*, 632 F.3d at 567  (internal quotation marks
and citation omitted).

"The party claiming work product immunity has the burden of proving the
applicability of the doctrine." *Verizon California Inc. v. Ronald A. Katz Tech. Licensing,
L.P.*, 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003) (citations omitted).  The work product
doctrine does not protect against disclosure if the party seeking the discovery "has
substantial need for the materials to prepare its case and cannot, without undue hardship,
obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(ii).  Plaintiff
fails both steps of the test. *First*, he fails to satisfy his burden to invoke the work product
doctrine because he cannot show that the disputed materials were prepared in anticipation

of litigation (as opposed to political purposes).  *Second*, Plaintiff fails to undercut the Select Committee's substantial need for the documents.

### A.  Plaintiff Failed To Meet His Burden To Invoke The Work Product Doctrine

Plaintiff has failed to meet his burden to establish that these materials were prepared in anticipation of litigation, as opposed to primarily for another purpose. Numerous documents make no reference to any pending litigation and or anticipated litigation for which these materials were prepared.[67]  Indeed, Plaintiff emphasized "[t]he main thing here is that Pence should do this without asking for permission—either from a vote of the joint session *or from the Court*."[68] (emphasis added).

Even if litigation was of some concern, Plaintiff does not prove that these materials were created "because of" the prospect of litigation—Plaintiff does not and cannot establish that these documents "would not have been created in substantially similar form but for the prospect of . . . litigation." *Am. C.L. Union of N. California v. United States Dep't of Just.*, 880 F.3d 473, 485-86 (9th Cir. 2018); *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011).  Congressional Defendants believe that many (if not the vast majority) of the communications at issue involved efforts to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.  *See* 20-24,

---

[67] *See* 004494; 004496; 004547; 004553; 004707; 004708; 004713; 004720; 004721; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004827; 004828; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005017; 005018; 005023; 005024; 005045; 005046; 005061; 005064; 005066; 005067; 005068; 005091; 005094; 005096; 005097; 005101; 005113; 005114; 005130; 005131; 005134; 005135; 005154; 005155; 005156; 005157; 005158; 005159; 005160; 005161; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005412; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005667; 005668; 005672; 005676; 005677; 005678; 005680; 005704; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

[68] *See supra* n.27.

**DEFENDANTS' MEMORANDUM OF LAW**

*supra*.  There is no reason to believe that such communications would not have been "created in substantially similar form" absent the possibility that litigation would somehow ensue.  Plaintiff's repeated and unsupported assertions that the documents were prepared "in anticipation of litigation" do not make it so.

Furthermore, it would pervert the purpose of the work-product doctrine to allow Plaintiff to claim protection for his advice aimed at—to put it bluntly—overturning a democratic election.  Because the purpose of the work-product doctrine "is to protect the integrity of the adversary process[,] ... it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process."  *United States v. Christensen*, 828 F.3d 970, 1010 (9th Cir. 2015) (quoting *Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983)); *see also* 38-53, *infra* (discussing the crime-fraud doctrine).  Conduct that is "merely unethical, as opposed to illegal" is "enough to vitiate the work product doctrine" here.  *Id.*  As noted above, *see* n.8 *supra*, Plaintiff is currently the subject of a California State Bar ethics investigation.

Second, Plaintiff fails to establish that all the documents over which he asserts work-product protection were "prepared by or for another party or by or for that other party's representative."  *Richey*, 632 F.3d at 567.  In numerous documents, Plaintiff has asserted privileges over communications with like-minded lawyers, pundits, and "scholar advisors" that purportedly contain work product prepared on behalf of President Trump. [69]  Plaintiff's overreach here is twofold.  First, the paltry descriptions in his privilege claims can scarcely support a claim that his own communications were work product for

---

[69] *See* 004494; 004496; 004547; 004707; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005023; 005024; 005061; 005130; 005131; 005134; 005135; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005668; 005672; 005676; 005677; 005678; 005680; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

**DEFENDANTS' MEMORANDUM OF LAW**

a client, rather than mere discussions about the election with like-minded correspondents.
*See, e.g.,* 023956 (describing a communication "re legal perspectives on the election and
possible litigation"). Second, Plaintiff's correspondents themselves are often not
lawyers, *e.g.*, 005338; even when they are—and even when they are lawyers working on
election-related matters—he has not met his burden to demonstrate that they were
generating work product on behalf of President Trump. Indeed, Plaintiff has presented
no evidence that he had an agent relationship with any of these people, despite this
Court's order instructing Plaintiff to "file with the Court and the Select Committee
evidence of all attorney-client and agent relationships asserted in the privilege log."
Order, ECF No. 104. ¶ 2. In his declaration (Ex. 1 Eastman Decl. ¶ 29), he claims to
have communicated extensively with "statistical and other experts," but makes no
attempt to show that these people—or any of the others on his logs—had agent or
attorney-client relationships. Plaintiff cannot retrospectively designate communications
with ideological or political confreres as deserving work-product protection absent
establishing that those people were representatives of his client.

Finally, Plaintiff waived any claim to work product protection when he shared
these materials with "potential adversaries." *Sanmina*, 968 F.3d at 1121. *See, e.g.*,
004494 (journalists); 005489 ("advisor[s]"); 005283 ("scholar advisors"); 024795
("legislative allies"). Not only is Plaintiff's disclosure "inconsistent with the
maintenance of secrecy," *id.*, Plaintiff acted with complete disregard of the maintenance
of secrecy against someone with interests that were potentially adverse to his or those of
his client, especially Congress. *See United States v. Caldwell*, 7 F.4th 191, 207 (4th Cir.
2021) ("[W]hen an attorney freely and voluntarily discloses the contents of otherwise
protected work product to someone with interests adverse to his or those of the client,

. . . he may be deemed to have waived work product protection.") (quoting *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981)).[70]

For example, in 004494-95 and 004496-538, Plaintiff lists as "W/P" an email exchange with ██████████████████████████. Plaintiff cannot claim work product protection over an email with a journalist, who could well have published the exchange.[71] Plaintiff's

> voluntary disclosure of his alleged work product to present or potential adversaries, in this instance, constituted a waiver of the work product privilege. It was [Plaintiff's] self-interested decision to disclose information to [the Vice President, his staff, and state officials] so as to [facilitate reversal of the election result]. Yet, [Plaintiff] now seeks work product protection for those same disclosures and documents against different adversaries in suits revolving around the same matters disclosed[.]

*Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 248 (C.D. Cal. 1993). The work-product doctrine does not stretch that far.

Further, whether Plaintiff "intended that result or not," work-product protection should cease here because fairness requires it. *Sanmina*, 968 F.3d at 1122. When assessing the fairness principle underlying waivers, "the overriding concern in the work-product context is not the confidentiality of a communication, but the protection of the

---

[70] To the extent the work product doctrine can apply to legislative subpoenas, the term "potential adversaries" should be read broadly. Plaintiff cannot have it both ways: He cannot apply a *litigation* privilege to a *legislative* subpoena but at the same time restrict waiver of that privilege to *litigation* adversaries.

[71] *See Flaherty v. Seroussi*, 209 F.R.D. 300, 307 (N.D.N.Y. 2002) ("dissemination of materials prepared by plaintiff's counsel to the media is conceptually inconsistent with his claim that those documents provide an indication of his closely guarded trial strategy, and should therefore be shielded from disclosure"); *Anderson v. SeaWorld Parks & Ent., Inc.*, 329 F.R.D. 628, 637 (N.D. Cal. 2019) ("Work product protection does not attach to an attorney's work directing a public relations campaign, nor is there any expectation of confidentiality where [attorney] directed the consultants to share the list with a journalist."); *Montesa v. Schwartz*, No. 12CIV6057, 2016 WL 3476431, at *9 (S.D.N.Y. June 20, 2016) ("Plaintiffs cannot argue that their adversaries in this litigation were not substantially more likely to obtain this information by virtue of its disclosure to a journalist, who very well could have published this entire e-mail exchange.")

adversary process." *Id.* at 1124. Here, Plaintiff's selective disclosure of information he

now contends is work product weighs heavily against applying the protection.[72] Plaintiff

"cannot be allowed, after disclosing as much as he pleases, to withhold the remainder."

*Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

"[U]nder the totality of the circumstances, [Plaintiff] acted in such a way that is

inconsistent with the maintenance of secrecy" against the Select Committee regarding the

contested documents. *Sanmina*, 968 F.3d at 1124.

## B.   The Select Committee Has A Substantial Need For The Documents And Cannot Obtain The Substantial Equivalent Of The Documents Without Undue Hardship

Even had Plaintiff sufficiently invoked the work product doctrine, the Select

Committee has a substantial need for the documents and cannot, without undue hardship,

obtain their substantial equivalent by other means. *See Admiral Ins. Co. v. U.S. Dist.

Court for Dist. of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("work-product materials

nonetheless may be ordered produced upon an adverse party's demonstration of

substantial need or inability to obtain the equivalent without undue hardship"). "The

undue hardship prong examines the burden obtaining the information from an alternate

source would impose on the party requesting discovery." *Fletcher v. Union Pac. R.R.

Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000).

Here, the Select Committee has already sought the materials from an alternate

source: Chapman University. This case involves Plaintiff's attempt to impede the Select

Committee from obtaining the documents from that alternate source. Even if some third

source were available for the requested documents, Plaintiff would likely attempt to

prevent disclosure in that circumstance as well. Because the disputed documents are

pivotal to the Select Committee's investigation and it would be nearly impossible to

access these communications otherwise, the work product doctrine does not apply. *See*

---

[72] It also indicates that these documents were created for political or strategic
purposes and not "because of" anticipated litigation. *Am. C.L. Union of N.
California*, 880 F.3d at 485-86.

**DEFENDANTS' MEMORANDUM OF LAW**

*U.S. v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657, at *6-7 (C.D. Cal.) (party established entitlement to opinion work product by showing (1) it would be nearly impossible to get these communications otherwise; (2) the work product was pertinent to the party's "most salient defense"; and (3) the attorney's mental impressions were a pivotal issue).

Plaintiff was a central figure in the effort to encourage the former Vice President to reject the electors from several states and in the strategy to facilitate different slates of electors. He may also have played other important roles in the events under investigation. Plaintiff's "strategy, mental impressions and opinion" concerning these efforts "are directly at issue" in the Select Committee's investigation. *Reavis v. Metro. Prop. & Liab. Ins. Co.*, 117 F.R.D. 160, 164 (S.D. Cal. 1987). The Select Committee, therefore, has a substantial need for these materials.[73]

Plaintiff claims that Congressional Defendants have "offered no argument or evidence of the Select Committee's need for any of these particular documents in pursuit of any valid legislative purpose, much lass [*sic*] a need that would qualify as substantial or compelling in support of a legislative purpose." Br. 16. Congressional Defendants cannot specifically address documents they have not seen, many of which are scantly described in the privilege logs. *See, e.g.*, 004707 ("[c]omm with co-counsel"); 004494 ("[c]omm re statistical evidence"); 004708 ("[c]omm with co-counsel re legal advice"); 004720 ("comm with co-counsel re legal strategy"); 005874 ("comm re fact information"); 004964 ("[a]ttachment"). But as this Court has noted, Plaintiff's "actions clearly fall within the bounds of an investigation into 'the influencing factors that fomented such an attack on American representative democracy,'" ECF No. 43 at 9 (Jan.

---

[73] Plaintiff's privilege log does little to reveal whether the materials he seeks to withhold are ordinary work product or opinion work product. The Select Committee, however, meets either test: It has both a "substantial need" and a "compelling need" for the materials sought. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling").

25, 2022) (quoting H.R. Res. 503 § 3(1)) and "there are numerous plausible legislative measures that could relate to Dr. Eastman's communications," *id.* at 10. The pressing need to complete a full investigation into an unprecedented attack on American democracy by reviewing documents involving a key participant is both substantial and compelling.[74]

## III.  The Court Should Review the Documents *In Camera* Under the Crime Fraud Exception

Communications in which a "client consults an attorney for advice that will serve him in the commission of a fraud or crime" are not privileged from disclosure. *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (internal quotations omitted). This exception to the attorney-client privilege applies where (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) the attorney-client communications for which production is sought are "sufficiently related to" and were made "in furtherance of [the] intended, or present, continuing illegality." *Id.* at 381-83 (internal quotation marks omitted).

It bears emphasizing that this is true even if "the attorney is unaware that his advice may further an illegal purpose." *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988), *cert. denied*, 492 U.S. 906 (1989). And it is likewise true where the crime or

---

[74] Congress has consistently taken the view that its investigative committees are not bound by judicial common law privileges such as the attorney-client privilege or the work product doctrine. *See generally*, Congressional Research Service, Congressional Oversight Manual 61-62 (March 21, 2021). This aspect of Congress's investigative authority is rooted in the separation of powers inherent in the Constitution's structure. *Id.* Congress and its committees make decisions regarding such common law privileges by balancing the important institutional, constitutional, and individual interests at stake on a case-by-case basis. Here, Congressional Defendants have determined, consistent with their prerogatives, not to submit an argument on this point. This is not, however, intended to indicate, in any way, that Congress or its investigative committees will decline to assert this institutional authority in other proceedings.

fraud is ultimately unsuccessful.  *In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377, 382 (9th Cir. 1996).

Critically for this case, an *in camera* review of the documents is warranted when the party seeking production has provided "a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *United States v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted).  That standard has plainly been met here.  As discussed in the Background section above, evidence and information available to the Committee establishes a good-faith belief that Mr. Trump and others may have engaged in criminal and/or fraudulent acts, and that Plaintiff's legal assistance was used in furtherance of those activities.  Accordingly, this Court should conduct an *in camera* review of the documents to determine whether the crime-fraud exception applies.

### A.      Obstruction of an Official Proceeding

The evidence detailed above provides, at minimum, a good-faith basis for concluding that President Trump has violated section 18 U.S.C. § 1512(c)(2).  The elements of the offense under 1512(c)(2) are: (1) the defendant obstructed, influenced or impeded, *or attempted* to obstruct, influence or impede, (2) an official proceeding of the United States, and (3) that the defendant did so corruptly.  *Id.* (emphasis added).  To date, six judges from the United States District Court for the District of Columbia have addressed the applicability of section 1512(c) to defendants criminally charged in connection with the January 6th attack on the Capitol.   Each has concluded that Congress's proceeding to count the electoral votes on January 6th was an "official proceeding" for purposes of this section, and each has refused to dismiss charges against defendants under that section.[75]

---

[75] *United States v. DeCarlo*, No. 21-73, (D.D.C.) Minute Entry (Jan. 21, 2022) (rejecting motion to dismiss for "the reasons stated on the record," after deciding to rule orally "rather than adding a sixth written opinion to those already excellent opinions written by my colleagues"); *United States v. Nordean*, No. 21-175, (D.D.C.) Mem. Op., at 9-12

Section 1512(c) requires a nexus between the obstructive conduct and a "specific official proceeding" that was either "pending or was reasonably foreseeable[.]" *United States v. Lonich*, 2022 U.S. App. LEXIS 623*, at *49-*50 (9th Cir. 2022). The statutory definition of "official proceeding" includes proceedings of various kinds, one of which (as noted above) is "a proceeding before the Congress[.]" 18 U.S.C. § 1515(a)(1)(B). Although the Ninth Circuit has not defined "corruptly," as used in Section 1512(c), it has held that the *mens rea* component of Section 1512(c) is, if anything, more than satisfied simply by proving that a person acted with "consciousness of wrongdoing." *Lonich*, 2022 U.S. App. LEXIS 623*, at *52-*53; *see also United States v. Watters* 717 F.3d 733, 735 (9th Cir. 2013) (upholding district court's jury instructions). Section 1512(c) does not require proof that the accused acted "with an evil or wicked purpose." *Id.* at 735-36 (distinguishing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)).

Congressional proceedings to count electoral votes are governed by the Twelfth Amendment to the U.S. Constitution and by the Electoral Count Act. The Twelfth Amendment requires presidential electors to meet in their respective States and *certify* their State's votes for President and Vice President. U.S. Const., amend. XII. The Twelfth Amendment's text regarding the counting of votes is clear and unequivocal in this context: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; The person having the greatest Number of votes for President, shall be the President." *Id.* Although some have theorized that there may be ambiguity about which slate to count if a state submits two slates officially certified by the state's Governor, no such ambiguity was present on January 6, 2021. Each state submitted only one officially-certified

---

(Dec. 28, 2021) (ECF No. 263); *United States v. Montgomery*, No. 21-46 (D.D.C.), Mem. Op. and Order, at 8-21 (Dec. 28, 2021) (ECF No. 87); *United States v. Mostofsky*, No. 21-138 (D.D.C.), Mem. Op., at 21-24 (Dec. 21, 2021) (ECF No. 88); *United States v. Caldwell*, No. 21-28 (D.D.C.) Mem. Op. and Order, at 8-16 (Dec. 20, 2021) (ECF No. 558); *United States v. Sandlin*, No. 21-88, (D.D.C.) Mem. Op., at 5-9 (Dec. 10, 2021) (ECF No. 63).)

electoral slate.  Also, the specific text of the Twelfth Amendment makes clear that the presiding officer cannot delay the count in this context, by instructing that the presiding officer shall "open all the certificates and the votes shall then be counted . . ."  It is not permissible to wait 10 days or any other extended period before counting certified electoral votes.

The Electoral Count Act of 1887 provides for objections by House and Senate members, and a process to resolve such objections through votes in each separate chamber.  3 U.S.C. §§ 5, 6, 15.  Nothing in the Twelfth Amendment or the Electoral Count Act provides a basis for the presiding officer of the Senate to unilaterally refuse to count electoral votes—for any reason.  Any such effort by the presiding officer would violate the law.   This is exactly what the Vice President's counsel explained at length to Plaintiff and President Trump before January 6.[76]  Plaintiff acknowledged that the Supreme Court would reject such an effort 9-0.[77]  And the Vice President made this crystal clear in writing on January 6: any attempt by the Vice President to take the course of action the President insisted he take would have been *illegal*.[78]

Nevertheless, pursuant to Plaintiff's plan, the President repeatedly asked the Vice President to exercise unilateral authority illegally, as presiding officer of the Joint Session of Congress, to refuse to count electoral votes.  *See supra* at 11-13.  In service of this effort, he and Plaintiff met with the Vice President and his staff several times to advocate that he unilaterally reject and refuse to count or prevent the counting of certified

---

[76] *See, e.g.,* Ex. F, Jacob Tr. 82, 96-97, 107-10 ("[Plaintiff] had acknowledged that he would lose 9-0 at the Supreme Court."); Ex. N, Email Exchange Between John Eastman and Gregory Jacob ("Respectfully, it was gravely, gravely irresponsible for you to entice the President with an academic theory that had no legal viability, and that you well know we would lose before any judge who heard and decided the case.").

[77] Ex. N, Email Exchange Between John Eastman and Gregory Jacob.

[78] Public Letter from Michael R. Pence to Congress (Jan. 6, 2021), https://int.nyt.com/data/documenttools/pence-letter-on-vp-and-counting-electoral-votes/9d6f117b6b98d66f/full.pdf. *See also* Ex. N. Ex. N, Email Exchange Between John Eastman and Gregory Jacob.

**DEFENDANTS' MEMORANDUM OF LAW**

electoral votes, and both also engaged in a public campaign to pressure the Vice
President.  *See supra* at 3-17.

The President and Plaintiff also took steps to alter the certification of electors from
various States.  *See supra* at 18.  For example, the President called and met with state
officials, met numerous times with officials in the Department of Justice, tweeted and
spoke about these issues publicly, and engaged in a personal campaign to persuade the
public that the election had been tainted by widespread fraud.

As indicated, there can be no legitimate question that the Joint Session of Congress
held on January 6th pursuant to the Twelfth Amendment and the Electoral Count Act
constitutes an "official proceeding" under Section 1512(c).[79]

The evidence supports an inference that President Trump and members of his
campaign knew he had not won enough legitimate state electoral votes to be declared the
winner of the 2020 Presidential election during the January 6 Joint Session of Congress,
but the President nevertheless sought to use the Vice President to manipulate the results
in his favor.  By December 14, 2020, the Electoral College had voted to send 306
certified electoral votes for Biden and 232 certified electoral votes for Trump.[80]  No state
legislature had certified an alternate slate between that time and January 6, 2021.
Moreover, no court had endorsed the Trump campaign's numerous attempts to challenge
state election results in the wake of the election.[81]  Thus, even if the Vice President had
authority to reject certified electoral certificates (and he did not), there was no valid
lawful basis to do so. *See supra* at 3-17.

---

[79] *See supra* at 40 n.75 (citing cases).

[80] M. Sherman, *Electoral College makes it official: Biden won, Trump lost*, Associated
Press (Dec. 14, 2020), https://apnews.com/article/joe-biden-270-electoral-college-vote-
d429ef97af2bf574d16463384dc7cc1e.

[81] *See supra* at 3-5.  In the single case the President won, his campaign challenged a state-
ordered deadline extension in Pennsylvania for the submission of personal identification
for mailed ballots, affecting a small number of votes.  *See* Order, *Trump v. Boockvar*, No.
602 M.D. 2020 (Pa. Commonwealth Ct. Nov. 12, 2020),
https://www.pacourts.us/Storage/media/pdfs/20210604/020642-file-10440.pdf.

**DEFENDANTS' MEMORANDUM OF LAW**

Nevertheless, as shown above (*see supra* at 11-13), the President and Plaintiff engaged in an extensive public and private campaign to convince the Vice President to reject certain Biden electors or delay the proceedings, without basis, so that the President and his associates would have additional time to manipulate the results. Had this effort succeeded, the electoral count would have been obstructed, impeded, influenced, and (at the very least) delayed, all without any genuine legal justification and based on the false pretense that the election had been stolen. There is no genuine question that the President and Plaintiff *attempted* to accomplish this specific illegal result.

The evidence is also more than sufficient to establish a good faith belief that Plaintiff's advice was used to further these ends. Plaintiff was the architect of the strategies proposed to the Vice President both directly and through his staff. His memos provided the basis for arguments made to the Vice President by both the President and Plaintiff himself. Plaintiff was likewise personally involved in persuading state legislators that they had authority to reject the election results and submit alternate slates of electors to Congress.[82] And he was even involved in the effort to spread false allegations of election fraud to the public.[83]

## B.    Conspiracy to Defraud the United States

The Select Committee also has a good-faith basis for concluding that the President and members of his Campaign engaged in a criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

An individual "defrauds" the government for purposes of Section 371 if he "interfere[s] with or obstruct[s] one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). The conspiracy need not aim to deprive the government of property. *See Haas v. Henkel*, 216 U.S. 462, 479 (1910). It need not involve any detrimental reliance by the government. *See Dennis v. United States*, 384 U.S. 855, 861-

---

[82] *See supra* at 8, 11.
[83] *See supra* at 13 n.40.

**DEFENDANTS' MEMORANDUM OF LAW**

62 (1966). And "[n]either the conspiracy's goal nor the means used to achieve it need to be independently illegal." *United States v. Boone*, 951 F.2d 1526, 1559 (9th Cir.1991).

To establish a violation Section 371's "defraud" clause, "the government need only show" that (1) the defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means, and (4) that a member of the conspiracy engaged in at least one overt act in furtherance of the conspiracy. *United States v. Meredith*, 685 F.3d 814, 822 (9th Cir. 2012) (citation omitted). The "agreement" need not be express and can be inferred from the conspirators' conduct in furtherance of their common objectives. *Ianelli v. United States*, 420 U.S. 770, 777 & n.10 (1975); *see also United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014).

"This is a very broad provision, which subjects a wide range of activity to potential criminal penalties." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993), *partially overruled on unrelated grounds as recognized by United States v. Conti*, 804 F.3d 977, 980 (9th Cir. 2015).

The evidence supports an inference that President Trump, Plaintiff, and several others entered into an agreement to defraud the United States by interfering with the election certification process, disseminating false information about election fraud, and pressuring state officials to alter state election results and federal officials to assist in that effort. As noted above, in particular, the President and Plaintiff worked jointly to attempt to persuade the Vice President to use his position on January 6, 2021, to reject certified electoral slates submitted by certain States and/or to delay the proceedings by sending the count back to the States. *See supra* at 11-13. Plaintiff first crafted a "plan" to justify this course of action.[84] Plaintiff and the President then met and spoke with the Vice President

---

[84] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (Sept. 21, 2021),https://www.cnn.com/2021/09/21/politics/read-eastman-memo/index.html; Jan. 3 Memo on Jan. 6 Scenario, CNN, http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--.jan.3.memo.on.jan.6.scenario.pdf (provided by John Eastman to CNN per CNN reporting, *see* Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM, https://twitter.com/jeremyherb/status/1440432387263922185).

and members of his staff on several occasions on January 4-6 in an attempt to execute
Plaintiff's plan.[85]  Plaintiff continued these efforts to persuade the Vice President via
ongoing conversations with the Vice President's staff, and the President employed
numerous public statements to exert additional pressure on Pence.[86]  The evidence
developed to date indicates that these actions were all part of a concerted effort to
achieve a common goal: to prevent or delay the certification of the 2020 presidential
election results.

In addition to the legal effort to delay the certification, there is also evidence that
the conspiracy extended to the rioters engaged in acts of violence at the Capitol.  In a
civil case filed against the President and others by several members of Congress, Judge
Amit Mehta in the District of Columbia specifically found that it was plausible to believe
that the President entered into a conspiracy with the rioters on January 6, 2021, "to
disrupt the Certification of the Electoral College vote through force, intimidation, or
threats." *Thompson v. Trump*, No. 21-cv-00400 (APM), --- F.3d ---, 2022 WL 503384, at
*33. (D.D.C. Feb. 18, 2022).  Judge Mehta's opinion demonstrates the breadth of
conspiratorial conduct and further supports the existence of common law fraud.

As part of the effort described above, the conspirators also obstructed a lawful
governmental function by pressuring the Vice President to violate his duty to count the
electoral certificates presented from certain States.  As an alternative, they urged the Vice
President to delay the count to allow state legislatures to convene and select alternate
electors.  The apparent objective of these efforts was to overturn the results of the 2020
presidential election and declare Donald Trump the winner.  In this way, the conspiracy
aimed to obstruct and interfere with the proper functioning of the United States
government.

As summarized *supra* at 11-13, the President and Plaintiff engaged in an extensive
campaign to persuade the public, state officials, members of Congress, and Vice

---

[85] *See supra* at 11.
[86] *See supra* at 11-13.

**DEFENDANTS' MEMORANDUM OF LAW**

President Pence that the 2020 election had been unlawfully "stolen" by Joseph Biden. The President continued this effort despite repeated assurances from countless sources that there was no evidence of widespread election fraud. *See supra* at 6. On November 12, 2020, CISA issued a joint statement of election security agencies stating: "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[87] At around the same time, researchers working for the President's campaign concluded that several the claims of fraud relating to Dominion voting machines were false.[88]

In December, Attorney General Barr publicly announced that there was no widespread election fraud.[89] By January 6, more than 60 court cases had rejected legal claims alleging election fraud.[90] The New York court that suspended Giuliani's law license said that certain of his allegations lacked a "scintilla of evidence."[91] On multiple occasions, acting Attorney General Rosen and acting Deputy Attorney General Donoghue told the President personally that the Department of Justice and Federal

[87] Department of Homeland Security Cybersecurity and Infrastructure Security Agency, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election; *see also* Christopher Krebs, *Opinion: Trump fired me for saying this, but I'll say it again: The election wasn't rigged*, WASHINGTON POST (Dec. 1, 2020), https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html.

[88] *Read the Trump campaign's internal memo*, N.Y. Times (Sept. 21, 2021), https://www.nytimes.com/interactive/2021/09/21/us/trump-campaign-memo.html.

[89] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS (December 1, 2020); *AG Barr says he won't appoint a special counsel to investigate voter fraud*, YAHOO NEWS (December 21, 2020).

[90] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/.

[91] *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021).

Bureau of Investigations had found no evidence to substantiate claims being raised by the President.[92]  Georgia Secretary of State Brad Raffensperger likewise rebutted many of the President's allegations of fraud in Georgia.[93]  Despite these refutations and the absence of any evidence to support the allegations he was making, the President and his associates continued to publicly advance the narrative that the election had been tainted by widespread fraud.[94]

As noted above, the President called and met with state officials regarding the election results, met numerous times with officials in the Department of Justice, tweeted and spoke about these issues publicly, and engaged in a personal campaign to persuade the Vice President to alter the certification results.  *See supra* at 11-13.  For his part, Plaintiff drafted legal memoranda outlining several possible ways to ensure that Donald Trump would be named the winner of the 2020 election, met with the Vice President and his staff to press this plan, and spoke publicly on these issues in advance of the attack on the Capitol.  *See supra* at 12.

A review of the documents at issue is likely to reveal that the President engaged Plaintiff's counsel in furtherance of these conspiratorial ends.

---

[92] Senate Judiciary Committee Staff Report, Subverting Justice, How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election, at 5, 14-16, 19, 27-28, https://www.judiciary.senate.gov/imo/media/doc/Interim%20Staff%20Report%20FINAL.pdf; *see also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript; Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final;

[93] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[94] *See, e.g., Donald Trump Rally Speech Transcript Dalton, Georgia: Senate Runoff Election*, The Rev (Jan. 4, 2021), https://www.rev.com/blog/transcripts/donald-trump-rally-speech-transcript-dalton-georgia-senate-runoff-election (reiterating numerous allegations of election fraud before crowd in Dalton, Georgia on January 4th).

**DEFENDANTS' MEMORANDUM OF LAW**

### C.    Common Law Fraud

There is also evidence to support a good-faith, reasonable belief  that *in camera* review of the materials may reveal that the President and members of his Campaign engaged in common law fraud in connection with their efforts to overturn the 2020 election results.

The District of Columbia, where these events occurred, defines common law fraud as: (1) a false representation; (2) in reference to material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) action is taken in reliance upon the representation.  *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 560 (D.C. 2002).[95]

As described above, the evidence shows that the President made numerous false statements regarding election fraud, both personally and through his associates, to the public at-large and to various state and federal officials.  *See supra* at 6-7.  These statements referred to material facts regarding the validity of state and federal election results.  *See supra* at 7-8.  And the evidence supports a good-faith inference that the President did so with knowledge of the falsity of these statements and an intent to deceive his listeners in hopes they would take steps in reliance thereon.

In addition to the numerous refutations of fraud mentioned above, *see supra* at 7-8, a specific example helps illustrate the point: On December 3, 2020, Trump's YouTube channel posted an edited video clip, purporting to show Georgia officials pulling suitcases of ballots from under a table after poll workers had left for the day.[96] The next morning, a Georgia official responded to the allegation on Twitter, indicating that the video "was watched in its entirety (hours) by @GaSecofState investigators" and

---

[95] The definition of fraudulent deceit under California law largely tracks these elements. *See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (requiring 1) a misrepresentation; 2) knowledge of falsity (or scienter); 3) intent to defraud, *i.e.*, to induce reliance; 4) justifiable reliance; and 5) resulting damage).

[96] Donald J. Trump, *Video from GA shows suitcases filled with ballots pulled from under a table AFTER poll workers left*, YOUTUBE, https://www.youtube.com/watch?v=nVP_60Hm4P8.

**DEFENDANTS' MEMORANDUM OF LAW**

"[s]how[ed] normal ballot processing.[97]  That same day, a local news outlet ran a fact-checking segment debunking the President's claims.[98]  After the broadcast,  the Georgia official tweeted: "You can watch the @wsbtv report to show that the President's team is intentionally misleading the public about what happened at State Farm Arena on election night.  They had the whole video too and ignored the truth."[99]

The next day, the Georgia Secretary of State's office released the full video to local news outlets, which thoroughly debunked the President's claims.[100]  On December 6, 2020, the Chief Investigator in the Georgia Secretary of State's Office issued a sworn declaration affirming that "there were no mystery ballots that were brought in from an unknown location and hidden under tables as has been reported by some" and explaining the context of the video clip.[101]  The following day, Georgia election officials addressed the issue yet again in a public press conference, stating that "what you saw, the secret suitcases with magic ballots, were actually ballots that had been packed into those absentee ballot carriers by the workers in plain view of the monitors and the press."[102]

Nevertheless, on December 11, 2020, and December 23, 2020, the Trump campaign ran two advertisements on Facebook with the same selectively edited footage

---

[97] Gabriel Sterling, Twitter (6:41 A.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334825233610633217.

[98] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, GPB (Dec. 4, 2020), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

[99] Gabriel Sterling, Twitter (2:58 P.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334950232526884873.

[100] Georgia election officials shows frame-by-frame of State Farm Arenda Election Night video," WSB-TV (Dec. 5, 2020), available at: https://www.youtube.com/watch?v=h-9jFuieH_U.

[101] *Coreco Ja'Qan Pearson, et al. v. Brian Kemp, et al.*, 1:20-cv-4809 (N.D. Ga.) (Docket No. 72-1), available at: https://www.documentcloud.org/documents/20420664-frances-watson-affidavit.

[102] Transcript, Press Conference: Georgia Election Officials Briefing Transcript December 7: Will Recertify Election Results Today (Dec. 7, 2020), available at: https://www.rev.com/blog/transcripts/georgia-election-officials-briefing-transcript-december-7-will-recertify-election-results-today.

**DEFENDANTS' MEMORANDUM OF LAW**

and the same claim that the video showed "suitcases of ballots added in secret in Georgia."[103]  On December 27 and 31, 2020, Acting Deputy Attorney General Donoghue again debunked this claim directly to the President.[104]

Undeterred, the Trump campaign continued to run the ads on Facebook.  And the President continued to rely on this allegation in his efforts to overturn the results of the election.  During a January 2, 2021, telephone conversation with Georgia Secretary of State Brad Raffensperger, the President suggested that suitcases of illicit ballots explained a "minimum" of 18,000 votes for President Biden, ultimately asking Raffensperger to "find 11,780 votes" for him in Georgia.[105]  During this call, Raffensperger explained to the President that the video in question had been selectively edited, and that Raffensperger's office had reviewed the full tape and found no evidence of fraud.[106]  Raffensperger also offered to provide the President a link to the full video, to which the President responded: "I don't care about the link.  I don't need it."[107]  The following day, the President tweeted: "I spoke to Secretary of State Brad Raffensperger yesterday about Fulton County and voter fraud in Georgia.  He was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state

---

[103] Donald J. Trump, *The evidence is overwhelming – FRAUD!*, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, *Stop the Steal*, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

[104] [Cite Donoghue TI at 43] (informing President Trump that the "allegations about ballots being smuggled in a suitcase and run through the machines several times, it was not true, that we had looked at it, we looked at the video, we interviewed the witnesses, and it was not true").

[105] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[106] *Id.*

[107] *Id.*

'voters', dead voters, and more.  He has no clue!"[108]  On January 6th, Trump once again reiterated the claim that Georgia "election officials [had] pull[ed] boxes . . . and suitcases of ballots out from under a table" in his speech just before rioters attacked the Capitol.[109]

The evidence also shows that many members of the public acted in reliance on the President's statements.  *See infra* at 52-53.   Several defendants in pending criminal cases identified the President's allegations about the "stolen election" as a motivation for their activities at the Capitol.  And a number specifically cited the President's tweets asking his supporters to come to Washington, D.C. on January 6.  For example, one defendant who later pled guilty to threatening Nancy Pelosi texted a family member on January 6 to say: "[Trump] wants heads and I'm going to deliver."[110]  Another defendant released a statement through his attorney, stating: "I was in Washington, D.C. on January 6, 2021, because I believed I was following the instructions of former President Trump and he was my president and the commander-in-chief.  His statements also had me believing the

---

[108] Jason Braverman, *Trump asks Georgia election officials to 'find' votes during call with Sec. of State*, 11Alive, https://www.11alive.com/article/news/politics/elections/trump-tweets-about-fulton-county-brad-raffensperger-brian-kemp/85-a503efec-df8a-42ee-a92f-70271eac840f (original tweet link broken https://twitter.com/realDonaldTrump/status/1345731043861659650).

[109] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021) ("Then election officials pull boxes, Democrats, and suitcases of ballots out from under a table. You all saw it on television, totally fraudulent. And illegally scanned them for nearly two hours, totally unsupervised. Tens of thousands of votes. This act coincided with a mysterious vote dump of up to 100,000 votes for Joe Biden, almost none for Trump. Oh, that sounds fair. That was at 1:34 a.m."), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[110] Jordan Fischer et al., *Georgia man who wanted to 'remove some craniums' on January 6 sentenced to more than 2 years in prison*, WUSA9 (Dec. 14, 2021), https://www.wusa9.com/article/news/national/capitol-riots/georgia-man-cleveland-meredith-jr-who-wanted-to-remove-some-craniums-on-january-6-sentenced-to-more-than-2-years-in-prison-trump-noggin-pelosi-bowser/65-e3e4de7e-cf5e-4c62-af1f-53fb214576f0.

election was stolen from him."[111]  There are many other examples of this kind.[112]  Indeed, even today, polling suggests that "[m]ore than 40% of Americans still do not believe that Joe Biden legitimately won the 2020 presidential election despite no evidence of widespread voter fraud."[113]

As explained at length above, it appears that President Trump's false statements to his supporters and government officials were informed by Dr. Eastman's extensive advice that the election was stolen and that Congress or the Vice President could change the outcome of the election on January 6.[114]

---

[111] Dan Mangan, *Capitol rioter Garret Miller says he was following Trump's orders, apologizes to AOC for threat*, CNBC (Jan. 25, 2021).

[112] *See, e.g.*, *United States v. Sandlin*, https://www.justice.gov/opa/page/file/1362396/download ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); *United States v. Neefe et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is literally calling people to DC in a show of force.  Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."); *United States v. Caldwell et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1369071/download ("Trump said It's gonna be wild!!!!!!!  It's gonna be wild!!!!!!!  He wants us to make it WILD that's what he's saying. He called us all to the Capitol and wants us to make it wild!! !  Sir Yes Sir!!!  Gentlemen we are heading to DC pack your shit!!").

[113] Maya Yang, *More than 40% in US do not believe Biden legitimately won election – poll*, GUARDIAN (Jan. 5, 2022), https://www.theguardian.com/us-news/2022/jan/05/america-biden-election-2020-poll-victory.

[114] This does not represent the entirety of the evidence obtained by the Select Committee with respect to these issues.  In addition, the Select Committee is receiving new evidence on a regular basis as part of its ongoing investigation.  The Select Committee can make additional evidence available to the Court as requested.

**DEFENDANTS' MEMORANDUM OF LAW**

**IV.  The Select Committee Has Not Waived Its Arguments That Plaintiff Is Not Entitled To Attorney-client Or Work-Product Protections Over The Documents At Issue**

Plaintiff contends that the Select Committee has "waived" its right to object to privilege based on Plaintiff's public statements, the "particulars" of the Chapman University email system, or "any other 'generalized' waiver argument." Br. at 22. That contention is obviously wrong.

Plaintiff reasons that the Select Committee "necessarily conceded the possibility that at least some privileged content exists in the Chapman materials" because it "conced[ed] that a privilege log is appropriate." Br. at 22. The Select Committee made no such concessions. As reflected in the statement quoted in Plaintiff's brief, counsel for the Select Committee stated at the hearing, "if this [a privilege review] is considered something that is important to do now, we would certainly entertain it." *Id.* That is, *if* this Court believed that an initial privilege review and log were appropriate, the Select Committee would not object to such a process. In no way did counsel's statement concede that any of the documents at issue may ultimately be withheld because of privilege.

Indeed, as Plaintiff recognizes, Br. at 22, the Select Committee argued in its brief in opposition to a temporary restraining order that Plaintiff could not claim attorney-client privilege or work product protection over any of the documents at issue (*see* ECF No. 23-1 at 17-23), and the Select Committee never abandoned that argument. To the contrary, in each of the notices the Select Committee has filed with its privilege log objections, it has explicitly "preserve[d] its ability to argue in subsequent briefing on Plaintiff's privilege claims that, as a general matter, none of the documents contained in the Chapman University production set can be withheld on the basis of attorney-client or work product privilege." *See, e.g.*, ECF No. 71 at 2. Plaintiff cites no case law supporting his view of waiver, and the Select Committee is aware of none.

## V. This Court Should Not Revisit Its Ruling Rejecting Plaintiff's First and Fourth Amendment Claims

Plaintiff asks this Court to "revisit" its holding denying a preliminary injunction based on Plaintiff's First and Fourth Amendment claims. Br. at 31-37. That request is procedurally improper. This Court directed Plaintiff to "file briefing … supporting his assertions of privilege for each document between January 4 and January 7, 2021." ECF No. 104. Inserting into such briefing a request for reconsideration of the Court's ruling on Plaintiff's First and Fourth Amendment claims—which are not relevant to the privilege claims—is entirely inappropriate.

Local Rule 7-18 describes the proper procedure for seeking the Court's reconsideration of a previous ruling, and the grounds on which such a request may be made. Barring a showing of good cause, the rule requires that a motion be made no later than 14 days after the Order at issue was entered. In this case, the relevant Order was entered on January 25, almost one month before Plaintiff filed this brief. *See* ECF No. 43. Thus, Plaintiff both failed to submit his request in the proper format of a motion for reconsideration and failed to file it in a timely manner.

Moreover, under Local Rule 7-18, a motion for reconsideration may only be made on the following grounds:

> (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.

Consistent with this rule, "the Federal Rules of Civil Procedure provide that a motion for reconsideration 'should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'" *Zhur v. Neufeld*, No. 17-9203, 2018 WL 4191325, *1 (C.D. Cal. Aug. 29, 2018) (citing Fed. R. Civ. P. 59(e));

*see also Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Contrary to Plaintiff's assertion that his First and Fourth Amendment claims were not fully briefed (Br. at 31), the claims were first raised in Plaintiff's Complaint, the Select Committee responded to these claims in their opposition, ECF No. 23-1 at 24-25, and Plaintiff addressed the First and Fourth Amendments claims in his reply, ECF No. 27 at 23). Following briefing and oral argument, this Court denied Plaintiff's request for a temporary restraining order or preliminary injunction, specifically rejecting his First and Fourth Amendment claims. *See* ECF No. 43 at 12-14. For the reasons stated in the Select Committee's opposition and this Court's Order, that ruling was correct.

Instead of relying on new evidence or intervening case law, Plaintiff simply reargues the merits, relying on precedents addressed in both the Select Committee's opposition and the Court's Order. With respect to the First Amendment claim, Plaintiff discusses "at some length" the Supreme Court's decision in *Watkins v. United States*, 354 U.S. 178 (1957), a decision that this Court correctly applied in its Order. See Br. at 32; ECF No. 43, at 12. Similarly, in reraising his Fourth Amendment claim, Plaintiff unpersuasively attempts to distinguish two "historic" Supreme Court decisions (cited in his Complaint), on which this Court correctly relied in denying a preliminary injunction. *See* Compl. ¶¶ 95, 98; ECF No. 43, at 13; Br. at 36 (citing *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946); *McPhaul v. United States*, 364 U.S. 372, 382 (1960)). Plaintiff offers no explanation as to how his argument raises "a material difference in fact or law from that presented to the Court" previously or "the emergence of new material facts or a change of law." Local Rule 7-18. It does not.

In addition, Plaintiff has not shown that this Court committed clear error. The Court appropriately analyzed the interests at stake in rejecting Plaintiff's First Amendment claim. To determine whether the First Amendment bars the Select Committee's access to information it seeks through a duly-authorized subpoena depends on a balancing of "the competing private and public interests at stake in the particular

**DEFENDANTS' MEMORANDUM OF LAW**

circumstances shown." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  The
Court considered the competing interests at stake and found that "[t]he public interest
here is weighty and urgent," ECF No. 43, at 12, and that Plaintiff identified no "specific
associational interest threatened by" or "any particular harm likely to result from"
production of the materials sought by the Select Committee.  *Id.* at 12-13.

Plaintiff's brief fails to address the substantial public interest in the Select
Committee's investigation, instead arguing that "the Select Committee's resolution poses
the same First Amendment risks of unrestrained congressional power that the Supreme
Court identified in *Watkins*."  Br. at 34.  But, again, Plaintiff has not identified any
specific associational interest threatened by production of his Chapman communications
or any particular harm likely to result from their production.  *See* ECF No. 43, at 12-13.
His vague reference to communications that "reveal much" about third-parties'
"identities, associational choices, political beliefs and other protected First Amendment
interests"—and the notion that "having disfavored views on the 2020 election" can be
"personally damaging"—is insufficient.  Br. at 35-36.  The Court's rejection of Plaintiff's
First Amendment claim was thus unquestionably correct, and Plaintiff provides no
persuasive reason for the Court to reconsider it now.

The Court also appropriately rejected Plaintiff's Fourth Amendment claim, finding
that the subpoena is not "overbroad or indefinite given its context."  ECF No. 43, at 14.
A subpoena is not impermissibly overbroad so as to violate the Fourth Amendment as
long as its call for documents or testimony are within the scope of the Congressional
inquiry at issue.  *See McPhaul*, 364 U.S. at 382.  The requests at issue are well within the
scope of the Select Committee's inquiry.  *See* ECF No. 23-1 at 25.  And Plaintiff's
belated attempt to distinguish *McPhaul* and *Oklahoma Press* is unavailing.  Relying on
recent Supreme Court decisions in distinct Fourth Amendment contexts, the most
Plaintiff can say is that "if *McPhaul* and *Oklahoma Press* were to be decided today they
would be likely to come out quite differently."  Br. 36-37.  Even if that doubtful

**DEFENDANTS' MEMORANDUM OF LAW**

proposition were correct, Plaintiff does not (and cannot) argue that this Court is free to disregard those Supreme Court rulings.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's claims of privilege should be rejected, leaving Chapman University free to comply with the House subpoena at issue here as it has stated it wishes to do.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF
REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte
Noam Biale
Maya Brodziak
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor

**DEFENDANTS' MEMORANDUM OF LAW**

New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

Dated: March 2, 2022

**DEFENDANTS' MEMORANDUM OF LAW**

# **CERTIFICATE OF SERVICE**

## **WASHINGTON, DISTRICT OF COLUMBIA**

I am employed in the aforesaid county, District of Columbia; I am over the age of 18 years and not a party to the within action; my business address is:

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

On March 2, 2022, I served the **CONGRESSIONAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS** on the interested parties in this action:

Anthony T. Caso
Constitutional Counsel Group
174 W Lincoln Ave #620
Anaheim, CA 92805-2901
atcaso@ccg1776.com

Charles Burnham
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
charles@burnhamgorokhov.com

*Attorneys for Plaintiff John C. Eastman*

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)**

The document was served on the following via The United States District Court – Central District's CM/ECF electronic transfer system which generates a Notice of Electronic Filing upon the parties, the assigned judge, and any registered user in the case:

☒ **(FEDERAL)** I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 2, 2022 here, at Bethesda, Maryland.

*/s/* Douglas N. Letter

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>            Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>            Defendants. | Case No. 8:22-cv-00099-DOC-DFM<br><br>**DECLARATION OF DOUGLAS N. LETTER IN SUPPORT OF CONGRESSIONAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS**<br><br>Date:      March 8, 2022<br>Time:      9:00 a.m.<br>Location: Courtroom 9D |

---

**DECLARATION OF DOUGLAS N. LETTER**

I, Douglas N. Letter, declare as follows:

1.      I am the General Counsel, of the U.S. House of Representatives and counsel for the Congressional Defendants in this action.

2.      I make this declaration in support of the Congressional Defendants' Opposition to Plaintiff's Privilege Assertions.

3.      Attached hereto as Exhibit 1 are true and accurate copies of email messages between myself and Plaintiff's counsel, Charles Burnham, that occurred on Monday, January 31, 2022 at 4:06p EST, Thursday, February 3, 2022 at 7:13p EST, and Tuesday, February 8, 2022 at 3:05p EST.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed on March 2, 2022, in Bethesda, Maryland.

/s/ Douglas N. Letter
Douglas N. Letter

**DECLARATION OF DOUGLAS N. LETTER**

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>                    Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>                    Defendants. | Case No. 8:22-cv-00099-DOC-DFM<br><br>**DECLARATION OF JOHN WOOD IN SUPPORT OF CONGRESSIONAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS**<br><br>Date:        March 8, 2022<br>Time:        9:00 a.m.<br>Location: Courtroom 9D |

**DECLARATION OF JOHN F. WOOD**

I, John Wood declare as follows:

1. I am Senior Investigative Counsel and Of Counsel to the Vice Chair, Select Committee to Investigate the January 6th Attack on the U.S. Capitol, U.S. House of Representatives.

2. I make this declaration in support of Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions.

3. Attached hereto as Exhibit A is a true and accurate copy of the transcript of the deposition of John Eastman by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on December 9, 2021.

4. Attached hereto as Exhibit B is a true and accurate copy of certain pages from the interview of Richard Peter Donoghue by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on October 1, 2021.

5. Attached hereto as Exhibit C is a true and accurate copy of certain pages from the interview of Jeffrey A. Rosen by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on October 13, 2021.

6. Attached hereto as Exhibit D is a true and accurate copy of certain pages from the deposition of Jason Miller by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on February 3, 2022.

7. Attached hereto as Exhibit E are true and accurate copies of certain documents produced by the National Archives and Records Administration ("NARA") to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

8. Attached hereto as Exhibit F is a true and accurate copy of certain pages from the deposition of Greg Jacob by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on February 1, 2022.

9. Attached hereto as Exhibit G is a true and accurate copy of certain pages from the deposition of Keith Kellogg, Jr. by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on December 14, 2021.

**DECLARATION OF JOHN F. WOOD**

1

10.     Attached hereto as Exhibit H is a true and accurate copy of a document produced by NARA to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

11.     Attached hereto as Exhibit I is a true and accurate copy of certain pages from the deposition of Marc Short by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on January 26, 2022.

12.     Attached hereto as Exhibit J is a true and accurate copy of certain pages from the deposition of Benjamin Williamson by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on January 25, 2022.

13.     Attached hereto as Exhibit K is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 5, 2021, 7:29 PM MST, along with the attachment thereto, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005235 and Chapman005236.

14.     Attached hereto as Exhibit L is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 12:25 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005379.

15.     Attached hereto as Exhibit M is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 4:45 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005442.

16.     Attached hereto as Exhibit N is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 9:44 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005479.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

**DECLARATION OF JOHN F. WOOD**

Executed on March 2, 2022, in Washington, DC.

*/s/ John F. Wood*
John F. Wood

---

**DECLARATION OF JOHN F. WOOD**

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# Exhibit A

1

2

3

4

5    SELECT COMMITTEE TO INVESTIGATE THE

6    JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7    U.S. HOUSE OF REPRESENTATIVES,

8    WASHINGTON, D.C.

9

10

11

12    DEPOSITION OF:    JOHN EASTMAN

13

14

15

16                                    Thursday, December 9, 2021

17

18                                    Washington, D.C.

19

20

21          The interview in the above matter was held in Room 1309, Longworth House

22    Office Building, commencing at 12:57 p.m.

23          Present:    Representatives Lofgren, Raskin, Cheney, and Kinzinger.

1

2    Appearances:

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    JOHN WOOD, SENIOR INVESTIGATIVE COUNSEL

9    AND OF CHAIR TO THE VICE CHAIR

10   CASEY LUCIER, INVESTIGATIVE COUNSEL

11   JOE MAHER, DETAILEE

12   DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13   JENNA HOPKINS, PROFESSIONAL STAFF

14   EVAN MAULDIN, CHIEF CLERK

15

16

17   For JOHN EASTMAN:

18

19   CHARLES BURNHAM

1    Amendment grounds.

2          Mr. Raskin.    Well, then, if he's going to assert it, would he assert it so I can hear

3    that?

4          Mr. Burnham.    Certainly.

5          The Witness.    Yes.    On advice of counsel, I'm asserting the Fifth.

6          Mr. Raskin.    Okay.    So to be clear, you're asserting the Fifth Amendment as to

7    whether or not you were answering -- you're asserting the Fifth as to whether or not

8    you're refusing to answer questions just about all of your actions or also about the ideas

9    that you have about the electoral college.    Is that right?

10         The Witness.    And on advice of counsel, yes, I'm asserting the Fifth.

11         Mr. Raskin.    Thank you.    I yield back.

12         Mr. Wood.    Do any other members have questions?

13          BY MR. WOOD:

14    Q    Dr. Eastman, if you could turn your attention to exhibit 10 in your binder,

15    which has a -- the first page is an email from Jeffrey Clark at the Department of Justice

16    dated December 28th, 2020, and then the next several pages are a draft of a letter to

17    Governor Brian Kemp, Speaker of the House David Ralston, President Pro Tem of the

18    Senate Butch Miller, all of the State of Georgia.

19         Have you seen this letter before?

20    A    Fifth.

21    Q    Dr. Eastman, did you have any role in drafting this letter?

22    A    Fifth.

23    Q    Dr. Eastman, did you speak to Jeffrey Clark about this letter?

24    A    Fifth.

25    Q    Dr. Eastman, did you speak with anyone else at the Department of Justice

1    regarding efforts to overturn the results of the 2020 Presidential election?

2        A    Fifth.

3        Q    Dr. Eastman, regarding the 2020 election, did you speak with Representative

4    Scott Perry?

5        A    Fifth.

6        Q    Dr. Eastman, with regard to the 2020 election and any efforts to change the

7    outcome of the election, did you speak with Senator Josh Hawley?

8        A    Fifth.

9        Q    And just so I understand, Dr. Eastman, with regard to whether you had any

10   conversations with Senator Josh Hawley about efforts to overturn the results of the 2020

11   election, you're taking the Fifth Amendment on the grounds that your answer could tend

12   to incriminate you?

13       A    Fifth.

14       Q    Is that a yes?

15       Mr. Burnham.    That was an invocation of the Fifth in response to your question

16   about his basis for taking the Fifth, but I think it could be taken as a yes.

17       Mr. Wood.    Okay.    Just to be clear, I wasn't trying to ask about the basis for

18   taking the Fifth, I just wanted to clarify that he was taking the Fifth on the grounds that it

19   could incriminate him, not anything about the factual basis or legal basis underlying that.

20              BY MR. WOOD:

21       Q    Dr. Eastman, did you clerk with now Senator Ted Cruz.

22       A    Yes.

23       Q    Dr. Eastman, did you have any communications with Senator Ted Cruz

24   regarding efforts to change the outcome of the 2020 election?

25       A    Fifth.

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN | Case No. 8:22-cv-00099-DOC-DFM |
| Plaintiff, | |
| vs. | |
| BENNIE G. THOMPSON, *et al.*, | |
| Defendants. | |

# Exhibit B

1

2

3

4     SELECT COMMITTEE TO INVESTIGATE THE

5     JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6     U.S. HOUSE OF REPRESENTATIVES,

7     WASHINGTON, D.C.

8

9

10

11

12     INTERVIEW OF:     RICHARD PETER DONOGHUE

13

14

15                                          Friday, October 1, 2021

16

17                                          Washington, D.C.

18

19

20          The interview in the above matter was held via Webex, commencing at 10:02 a.m.

21          Present:     Representatives Schiff, Lofgren, Murphy, Raskin, and Cheney.

1   <u>Appearances:</u>

2

3

4

5   For the SELECT COMMITTEE TO INVESTIGATE

6   THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8   TIM HEAPHY, CHIEF INVESTIGATIVE COUNSEL

9   MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

10  SOUMYA DAYANANDA, SENIOR INVESTIGATIVE COUNSEL

11  JOE MAHER, DETAILEE

12  DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13  JACOB NELSON, RESEARCHER

14  JENNA HOPKINS, PROFESSIONAL STAFF

15  EVAN MAULDIN, CHIEF CLERK

16  KRISTIN AMERLING, DEPUTY STAFF DIRECTOR

17  SAMANTHA STILES, CHIEF ADMINISTRATIVE OFFICER

18

19  For the DEPARTMENT OF JUSTICE:

20

21  KIRA ANTELL, OFFICE OF LEGISLATIVE AFFAIRS

22  BRAD WEINSHEIMER, OFFICE OF THE DEPUTY ATTORNEY GENERAL

1

2      For RICHARD PETER DONOGHUE:

3

4      GREG ANDRES

5      CHARLES KLUG

6      KATHERINE SWAN

7      BROOK JACKLING

8      Davis Polk

9      901 15th Street, NW

10     Washington, D.C. 20005

1    false and/or just not supported by the evidence.    We look at the allegations but they

2    don't pan out."

3            The President was getting very frustrated.    He said, "This is electioneering fraud."

4            And then, again, I have a quote from him:    "We have an obligation to tell people

5    that this was an illegal, corrupt election."

6            Then he said, "People tell me Jeff Clark is great" and that "I should put him in.

7    People want me to replace DOJ leadership."

8            At which point I responded, sir, that's fine, you should have the leadership you

9    want, but understand, changing the leadership in the Department won't change anything.

10    The --

11        Q    All right.    Let me stop you there.

12        A    -- Department operates --

13        Q    Let me stop you there, Mr. Donoghue.    Just two things.

14            So, going back to, "We have an obligation to tell people that this was an illegal,

15    corrupt election," is it fair to say that what he was asking you to do, primarily, was tell

16    people, in some form, a press conference or otherwise, that there was corruption so that

17    some other political strategy could unfold?    Was it your impression that the precise ask

18    from the President was more about a public statement than actually the day-to-day

19    investigative work?

20        A    I think he probably cared about both of them, but -- I don't want to

21    speculate about what was in his mind, but this is what he said.    And I think what you

22    take away from that, logically, is that he wanted the Department to say something

23    publicly.

24        Q    Right.    So there's pressure on you and Mr. Rosen, to which you push back,

25    to say something publicly, to say something publicly without basis, that there is an illegal,

1      But we weren't reporting back to the White House simply because the President

2    mentioned some allegations.

3      Q    I see.    It wouldn't be consistent with protocol for you to go back to the

4    President every time something that comes up in a discussion is investigated or resolved?

5      A    He didn't instruct us to do that, and we weren't going to do it.    So.

6      Q    Yeah.    All right.    I want to turn your attention, if you can now to

7    exhibit 10, which we get back into Mr. Clark.    The next day, December 28th, you and Mr.

8    Rosen get an email from Mr. Clark, and he is asking for two urgent action items.    Tell us

9    about this email, the two actions that he requested, and what your response was.

10      A    Right.    So DAG Rosen and I spoke, I think, probably several times on the

11    27th and certainly the 28th because that was a Monday.    DAG Rosen and Jeff Clark had

12    a long personal and professional relationship.    They had known each other for decades.

13    They had worked at the same law firm together.    He knew Jeff Clark much better than I

14    did.    And, you know, we discussed why Jeff Clark's name was coming up, why it was

15    coming from the President, why it was coming from this Congressman.    And Jeff Rosen

16    said:    Well, look, I am going to talk to Jeff Clark to find out what's going on here.    We

17    got to get to the bottom of this.

18      So I think he had conversations with Jeff Clark earlier on the 28th.    They

19    preceded this email, which came fairly late in the day.    I did not talk to Jeff Clark before

20    this.

21      So, at 4:40, I received this email from Jeff Clark.    I read it.    I read the

22    attachment.    I had to read it more than once to make sure I really understood what he

23    was proposing.    And then I drafted a response.    I don't know where Jeff Rosen was at

24    this point, but I went to his office, and he wasn't there.    So I didn't get to discuss my

25    response with him before I sent it.    But I sent it out.    And then I saw him shortly

1  afterward, and he was very upset by Jeff Clark's request.    And he said that he had

2  instructed one of his administrative support personnel to get Jeff Clark in his conference

3  room.    He was -- he was a little angry.    And he said:    I want him down here.    We

4  need to talk to this guy and find out what's going on.

5        So I think there's some emails that show up.

6        Q    Yeah.    And I don't want to jump ahead too much, Mr. Donoghue, because I

7  want to get to that conversation.    But let's go back to Mr. Clark's email.    The first thing

8  he asks of you is:    I would like to have your authorization -- "you" meaning you and Mr.

9  Rosen -- to get a classified briefing tomorrow from ODNI led by DNI Ratcliffe on foreign

10  election interference issues.    And he mentions activating the IEEPA and 2018 EO powers

11  about the Dominion machine access to the internet through a smart thermostat with a

12  net connection trail leading back to China.    He is essentially asking if you can get a

13  briefing about this allegation of Chinese control of Dominion machines through a

14  thermostat.    Did that strike you as odd, and what was your reaction to that specific

15  request?

16        A    Yes, it struck me as odd.    I won't go into details, but we received briefing

17  about what the IC, the intelligence community, knew about the election in advance.

18  This was inconsistent with what we had been told.    And I had not heard anything about

19  smart thermostats and internet connections leading back to China and things like that.

20  So the whole thing struck me as very odd.

21        Q    Yeah, and that Mr. Clark, the head -- acting head of the Civil Division is asking

22  for a classified briefing with the Director of National Intelligence about this allegation.

23  That also procedurally was odd?

24        A    Yes.

25        Q    Okay.    He also then -- the second ask is this draft letter, which I believe is

1    attached to the email that he sends you and Mr. Rosen.    And that letter is a draft letter

2    that you and Mr. Rosen and he, Mr. Clark, would sign to the Governor, the Speaker of the

3    House, and the president pro tempore of the Georgia legislature, essentially asking them

4    to stand down and not certify the results of their election.    How did that request strike

5    you, and what did you do about it?

6         A    It struck me as very strange and somewhat alarming.    And, as I said, I had

7    to read it more than once to make sure I understood what he was proposing here.    It

8    was completely inconsistent with the Department's role, generally.    And it was

9    inconsistent with what our investigations, to date, had revealed.    And so I think I made

10    my views known in the email response I sent to him.

11         Q    Yeah, which we'll get to.    To be clear, he asks that -- a version of this letter

12    be sent to each relevant State.    So was his request to send this letter, drafted for

13    Georgia, not just to Georgia officials but to officials in other States where there had been

14    allegations of election fraud?

15         A    Yes.    That was my understanding of his proposal.

16         Q    All right.    He writes that he put it together quickly -- "it" being the

17    letter -- but other messages suggest that it may have been drafted by Ken Klukowski.

18    Do you know Ken Klukowski and what his role may have been within the Department's

19    Civil Division at that time?

20         A    No.    I don't.

21         Q    Okay.    Did you know whether or not Mr. Clark was talking to anyone else in

22    the Department about this letter or other election issues?

23         A    No.    I had no reason to think that.

24         Q    All right.    So you respond, Mr. Donoghue.    We get to your response, which

25    is tab 11.    You drafted a pretty comprehensive, specific response reflecting your

1    frustration on the 28th, just about a little over an hour later, at 5:50.    I won't ask you to

2    read it to us, but just summarize for us your overall reaction and what's reflected in the

3    email.

4              A        I tried to make it clear to him that this is not the Department's role.    Again,

5    we don't do quality control for State elections.    The States run the elections.    We

6    investigate crimes, and we look at civil rights matters.    So I tried to make it clear to him

7    that this is simply not our role, to recommend to the States what they do and, secondly,

8    that we have conducted investigations and that the factual claim he was making here was

9    simply not accurate.    And so I reminded him that AG Barr had made public statements

10    on this point, less than a week prior, or, I guess, exactly a week prior was the last time he

11    had made some public statements, and that this was just completely unacceptable and

12    not anything that I would ever sign.    And I know Jeff Clark -- or Jeff Rosen, rather, had

13    the same response.

14              Q        You say in the first paragraph:    There's no chance that I would sign this

15    letter or anything remotely like this.    You sort of lead with the conclusion.    You then, in

16    the first paragraph, challenge his factual assumptions.    You said:    The investigations

17    that I am aware of relate to suspicions of misconduct that are of such a small scale that it

18    would simply not impact the outcome of the election.    AG Barr made that clear to the

19    public only last week, and I am not aware of intervening developments that would change

20    that conclusion.

21              So, setting aside whether it would be appropriate for the Department to tell a

22    State what to do, you're challenging -- is it fair to say you're challenging the factual basis

23    included in his letter to the State official?

24              A        That's right.    And he himself, Jeff Clark, would have no way of knowing

25    what investigations we had conducted or not because he was not involved in election

1    matters.

2    Q    Right.    You then, in the second paragraph, Mr. Donoghue, you say:    I

3    cannot imagine a scenario in which the Department would recommend that a State

4    would assemble its legislature to determine whether already certified election results

5    should somehow be overridden by legislative action.    This would be a grave step for the

6    Department to take and could have tremendous constitutional, political, and social

7    ramifications for the country.

8        Is that your sort of procedural response here that this is just not the Department's

9    role to be quality control for State elections and tell a State legislature what to do?

10    A    Yes.    That's the point I was making.    Yes.

11    Q    All right.    So, when you and Mr. Rosen get this letter, you compose the

12    response.    You indicated previously that Mr. Rosen essentially summons Mr. Clark up to

13    the 5th floor for a face-to-face meeting.    Does that meeting then occur?

14    A    Yes.    He is on the 4th floor.    But, yes, in the DAG conference on the 4th

15    floor.

16    Q    Okay.    So you are personally present, Mr. Donoghue, for that meeting

17    between Clark and Rosen?

18    A    Yes.    It was the three of us.

19    Q    Tell us about the conversation there with Mr. Clark.

20    A    Mr. Clark explained that he had been looking at some of these allegations on

21    his own, that he had information, that he had concerns about the reliability of the

22    outcome of the election.    He mentioned this smart thermostat thing.    It was clear that

23    he had been reading some affidavits that were attached to some of the civil filings in

24    some of the cases that were pending or already dismissed around the country.    He had

25    various theories that seemed to be derived from the internet about why the outcome of

1   so when you joined at the President's invitation?

2        A     That's right.

3        Q     All right.    And who was inside the meeting when you got there?

4        A     When I entered the Oval Office, the President was behind the desk, and it

5   was Pat Cipollone, Pat Philbin, a White House lawyer named Eric Herschmann, Jeff Clark,

6   Jeff Rosen, Steve Engel, and then me.

7        Q     Are you sure Mr. Herschmann was a White House lawyer?

8        A     He was a lawyer who worked at the White House.    I'm not -- initially I

9   thought he worked in the White House Counsel's Office, but I think later someone told

10  me that wasn't the case.    I don't remember.    His role was never clear to me.    I know

11  he was a lawyer from New York.    I know he had been a prosecutor at some point.    But I

12  don't know what his title exactly was.    I'd seen him in some meetings previously, but I

13  didn't know exactly what his role was.

14       Q     Okay.

15       All right.    And, again, no notes of this meeting.    Is that right?    You don't take

16  notes -- you were inside the Oval Office and, you indicated before, didn't take notes when

17  you were in discussions inside that office.

18       A     No.

19       Q     All right.    Well, tell us what you remember, then, about the conversation.

20  What was the topic when you arrived, and how did it evolve from there?

21       A     The meeting took about another 2-1/2 hours from the time I entered.    It

22  was entirely focused on whether there should be a DOJ leadership change.    So the

23  election allegations played into this, but they were more background than anything else.

24       And the President was basically trying to make a decision and letting everyone

25  speak their minds.    And it was a very blunt, intense conversation that took several

1    hours.    And Jeff Clark certainly was advocating for change in leadership that would put

2    him at the top of the Department, and everyone else in the room was advocating against

3    that and talking about what a disaster this would be.

4         Q     What were Clark's purported bases for why it was in the President's interest

5    for him to step in?    What would he do, how would things change, according to Mr. Clark

6    in the meeting?

7         A     He repeatedly said to the President that, if he was put in the seat, he would

8    conduct real investigations that would, in his view, uncover widespread fraud; he would

9    send out the letter that he had drafted; and that this was a last opportunity to sort of set

10   things straight with this defective election, and that he could do it, and he had the

11   intelligence and the will and the desire to pursue these matters in the way that the

12   President thought most appropriate.

13        Q     You said everyone else in the room was against this.    That's Mr. Cipollone,

14   Mr. Philbin, Mr. Herschmann, you, and Mr. Rosen.    What were the arguments that you

15   put forth as to why it would be a bad idea for him to replace Rosen with Clark?

16        A     So, at one point early on, the President said something to the effect of,

17   "What do I have to lose?    If I do this, what do I have to lose?"    And I said,

18   "Mr. President, you have a great deal to lose.    Is this really how you want your

19   administration to end?    You're going hurt the country, you're going to hurt the

20   Department, you're going to hurt yourself, with people grasping at straws on these

21   desperate theories about election fraud, and is this really in anyone's best interest?"

22        And then other people began chiming in, and that's kind of the way the

23   conversation went.    People would talk about the downsides of doing this.

24        And then -- and I said something to the effect of, "You're going to have a huge

25   personnel blowout within hours, because you're going to have all kinds of problems with

1    resignations and other issues, and that's not going to be in anyone's interest."

2        And so the President said, "Well, suppose I do this" -- I was sitting directly in front

3    of the President.    Jeff Rosen was to my right; Jeff Clark was to my left.    The President

4    said, "Suppose I do this, suppose I replace him," Jeff Rosen, "with him," Jeff Clark, "what

5    do you do?"    And I said, "Sir, I would resign immediately.    There is no way I'm serving

6    1 minute under this guy," Jeff Clark.

7        And then the President turned to Steve Engel, and he said, "Steve, you wouldn't

8    resign, would you?"    And Steve said, "Absolutely I would, Mr. President.    You'd leave

9    me no choice."

10        And I said, "And we're not the only ones.    You should understand that your

11    entire Department leadership will resign.    Every AAG will resign."    I didn't tell him

12    about the call or anything, but I made it clear that I knew what they were going to do.

13        And I said, "Mr. President, these aren't bureaucratic leftovers from another

14    administration.    You picked them.    This is your leadership team.    You sent every one

15    of them to the Senate; you got them confirmed.    What is that going to say about you,

16    when we all walk out at the same time?    And I don't even know what that's going to do

17    to the U.S. attorney community.    You could have mass resignations amongst your

18    U.S. attorneys.    And then it will trickle down from there; you could have resignations

19    across the Department.    And what happens if, within 48 hours, we have hundreds of

20    resignations from your Justice Department because of your actions?    What does that say

21    about your leadership?"

22        So we had that part of the conversation.    Steve Engel, I remember, made the

23    point that Jeff Clark would be leading what he called a graveyard; there would be no one

24    left.    How is he going to do anything if there's no leadership really left to carry out any of

25    these ideas?

1          I made the point that Jeff Clark is not even competent to serve as the Attorney

2   General.    He's never been a criminal attorney.    He's never conducted a criminal

3   investigation in his life.    He's never been in front of a grand jury, much less a trial jury.

4          And he kind of retorted by saying, "Well, I've done a lot of very complicated

5   appeals and civil litigation, environmental litigation, and things like that."    And I said,

6   "That's right.    You're an environmental lawyer.    How about you go back to your office,

7   and we'll call you when there's an oil spill."

8          And so it got very confrontational at points.

9          And Pat Cipollone weighed in at one point, I remember, saying, you know, "That

10   letter that this guy wants to send, that letter is a murder-suicide pact.    It's going to

11   damage everyone who touches it.    And we should have nothing to do with that letter.

12   I don't ever want to see that letter again."    And so we went along those lines.

13          I remember Eric Herschmann chimed in several times, saying that, whatever Jeff

14   Clark wanted to do or thought he could do, there was no reason to think he could really

15   do it.

16          I remember saying at some point that, you know, Jeff wouldn't even know how to

17   find his way to Chris Wray's office, much less march in there and direct the FBI what to

18   do, and that, if you walked into Chris Wray's office, he wouldn't even know who you are.

19          So we had these conversations that went around and around and were very blunt

20   and direct.    And that went on for 2-1/2 hours.

21      Q    At one point, did the President disparage Mr. Rosen or talk about

22   Mr. Rosen's inaction or unwillingness to do anything about the election?

23      A    He did say several times, "You two," pointing at Mr. Rosen and me, "You two

24   haven't done anything.    You two don't care.    You haven't taken appropriate actions.

25   Everyone tells me I should fire you," and things of that nature.

1    He came back to that at the very end when he decided against a leadership

2    change.    And he announced that, and then he came back to that point and he said, "And

3    I know that these two here, they're not going to do anything.    They're not going to fix

4    this.    But that's the way it is, and I'm going to let it go anyway."

5        Q    Did Mr. Cipollone say anything about what he would do with respect to a

6    potential resignation if the President made this change?

7        A    He did at some point.    I guess that was on the heels of us talking about how

8    there would be resignations in the Department.    And I think Pat Cipollone said, "Well,

9    I'm not going to stand for this, I'm not going to be here if this happens either."

10       Q    So he said he would resign or not stand for it, would not be here, if the

11   President made this change.

12       A    Right.

13       Q    Who, Mr. Donoghue, was, sort of, the primary advocate or voice against the

14   leadership change?    Was it you personally, or was it sort of a consensus and everyone

15   was sort of equally chiming in?    Or just give me a better sense as to, sort of, who was

16   doing most of the talking and was the most strenuous advocate.

17       A    It was definitely a consensus.    We were all on the same page except for Jeff

18   Clark.    But we played different roles.

19           For one thing, Jeff Rosen was in a bad position because he was defending his own

20   job.    So anything he said, obviously, was very self-interested.    And so he wasn't in the

21   best position to make some of these arguments.    And by demeanor, he just has a

22   different demeanor, as does Pat Cipollone, as does Steve Engel.    So everyone played

23   their own role.    My demeanor is more aggressive and more blunt, and so I played that

24   role.

25           And so everyone was on the same page, advocating for the same thing in very

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN | Case No. 8:22-cv-00099-DOC-DFM |
| Plaintiff, | |
| vs. | |
| BENNIE G. THOMPSON, *et al.*, | |
| Defendants. | |

# Exhibit C

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.




INTERVIEW OF:     JEFFREY A. ROSEN




Wednesday, October 13, 2021


Washington, D.C.



The interview in the above matter was held in Room 4480, O'Neill House Office Building, commencing at 10:00 a.m.

Present:    Representatives Murphy, Luria, and Cheney.

Appearances:

For the SELECT COMMITTEE TO INVESTIGATE

THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

TIM HEAPHY, CHIEF INVESTIGATIVE COUNSEL

SOUMYA DAYANANDA, SENIOR INVESTIGATIVE COUNSEL

EVAN MAULDIN, CHIEF CLERK

SAMANTHA STILES, CHIEF ADMINISTRATIVE OFFICER

JOHN WOOD, SENIOR INVESTIGATIVE COUNSEL

DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

JOE MAHER, DETAILEE

CASEY LUCIER, INVESTIGATIVE COUNSEL

JENNA HOPKINS, PROFESSIONAL STAFF

DAMON MARKS, RESEARCHER

For the DEPARTMENT OF JUSTICE:

KIRA ANTELL

BRAD WEINSHEIMER

EMILY LOEB

For JEFFREY A. ROSEN:

MEREDITH POHL

REGINALD BROWN

JOHN BYRNES

Kirkland & Ellis LLP

1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

He also defended his own credentials against some of the attacks that were being made.   He argued that the rest of the room were being self-defeating, you know, that, if you don't try it, you don't know what's going to happen, I think was the nature of that.

Let me think.    This was a very, very long meeting.

Q    Yeah.

A    And everybody spoke at one time or another.    Some people spoke repeatedly.    The President interjected some places.    There were a few places he spoke at greater length, but a lot of the meeting, he let other people talk.

Q    Uh-huh.

A    And so I'm trying to remember the different places that Jeff Clark spoke. Because he spoke more than once.    And I have more the image, that he would get in a debate, you know, that Rich Donoghue and he would have back-and-forth, and Steve Engel and he would have back-and-forth, and Eric Herschmann and he would have back-and-forth --

Q    Yeah.

A    -- that that occurred numerous times.

But the overall substance was, different people in the room were saying, this is not legally well-founded, this is not the Department's role, this letter is inappropriate. They challenged Jeff Clark's qualifications to even be making these arguments.    They challenged both whether he was qualified to be Attorney General but also is he even qualified to address election fraud, you know, even from his current position, let's say.

Q    Uh-huh.

A    And so there's this range of issues.

Now, at more than one juncture, a number of people do raise that, if this goes ahead, there are going to be resignations.    And I think lots of people raised that.    I let

other people speak to that, for obvious reasons, that they were speaking in support of me, so it wasn't my place to speak to.    Jeff Clark didn't speak to that, but I think almost everybody else did.    I remember Pat Cipollone spoke to it, Rich Donoghue.

There was one moment where I remember Steve Engel, and Steve was explaining why he thought it was inappropriate for the Department of Justice to be sending a letter to Georgia and that he had multiple reasons for that.    And he commented that, if it went, that there would be resignations.    And, again, this is in substance.    I don't remember the exact words.

And then Steve Engel, when he was saying that, the President said to him, "Well, Steve, you've been at Justice the whole time.    You wouldn't resign."    And Steve -- I remember this because it was very vivid -- said, "No, Mr. President.    If you replace Jeff Rosen with Jeff Clark and send this letter, I would have no choice.    I would have to resign."

And the President looked to me, startled, and said, "Steve, you wouldn't resign." And Engel repeated it.    He said, "Mr. President, I would have no choice.    I would have to resign."

So that was highly corroborative of what had been said by other folks.

Q    Uh-huh.

So the only substantive election-related action that was discussed was the sending of the letter?    Was there also a discussion of the special counsel or the press conference or the Supreme Court brief, the litany of possible things that had been considered that you mentioned in your opening statement?

A    I don't remember them being discussed in individual -- you know, what about the Supreme Court brief --

Q    Yeah.

Mr. Flynn, but Sidney Powell, Mike Lindell -- there were media accounts of these going
on.

I wasn't present at them, and I didn't have anybody reporting to me what
happened at them, but I had a just general awareness from media accounts that that has
happened.

Ms. Cheney.    And did Pat Cipollone ever tell you what he thought about the
President's claims about election fraud?

Mr. Rosen.    So the way you've stated that, I'm not sure.    Because the way the
conversations with him went more was that he was supportive of the Department's
position, you know, that "the Department should do what you think is right," "I agree the
Department should proceed the way you think best."

I would be surprised if he didn't agree on the Department's posture that there had
not been widespread fraud, but I don't know if I can specifically remember that or not.
But I have more of this big-picture recollection that he was very supportive of the
Department and me.    And I maybe -- I'm not sure if I assumed he agreed or he said he
agreed.

Ms. Cheney.    And then my last question:    In the meeting on the 3rd, did he
speak out and say, I also will resign?

Mr. Rosen.    Yes.

Ms. Cheney.    And did Pat Philbin as well?

Mr. Rosen.    He may have.    I think Pat Cipollone recited that lots of people were
going to resign and that it would include him.    And while I don't have a specific, you
know, again, word-for-word kind of recollection, if he did that the way I remember it, I'm
sure he would've included Pat Philbin, because they were very closely aligned.

So Pat Cipollone was one of the people who said that there would be lots of

**Subject: Jeffrey Clark**

From: Heaphy, Tim - To: hmacdougald@ccedlaw.com, Charles Burnham - Cc: Wood, John, George, Dan - Date: March 10, 2022 at 2:10 PM

Harry/Charles,

Can we schedule a call to talk about your client Jeffrey Clark?  The Select Committee is evaluating a potential grant of use immunity to him, which would resolve his Fifth Amendment privilege objection.  We'd like to talk with you about what impact such immunity would have on Mr. Clark's other objections and potential cooperation with the Select Committee.  Let us know if there's a time in tomorrow or early next week when we could schedule a call?

Thanks,

Tim Heaphy

Dan George, John Wood

Timothy J. Heaphy
Chief Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives
202-309-5396 (cell)

-

Exhibit 3

**<u>CONFIDENTIAL (INVESTIGATIVE STAGE)</u>**

**HEARING COMMITTEE # __ OF THE**

**DISTRICT OF COLUMBIA**

**BOARD OF PROFESSIONAL RESPONSIBILITY**

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C., ESQ.)** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | |

**LODGED PROTECTIVE MOTION TO QUASH**

For the reasons explained below, the Hearing Committee (the one that will be assigned to this matter once it is filed with the Office of the Executive Attorney pursuant to Board Rule 3.15), presently lacks jurisdiction in light of Disciplinary Counsel's choice pursuant to Board Rule 3.14 to seek enforcement of subpoenas in ongoing District of Columbia Court of Appeals ("DCCA") Case No. 22-BS-0059 (motion to file under seal pending). We lodge this Protective Motion to Quash here out of an abundance of caution for two reasons: (1) the Office of Disciplinary Counsel ("ODC") has argued for a partial waiver in Case No. 22-BS-0059 (wherein ODC seeks DCCA subpoena-related relief, at the investigative stage, against Respondent); and (2) ODC attempted to serve a new subpoena on the Respondent on February 28, 2022, with a return date of today, March 14, 2022, to try to cure ODC's procedural deficiencies in the first subpoena, which are still being litigated in the pending DCCA action.[1] This Protective Motion to Quash, therefore, is intended to make sure that the Hearing Committee understands that Respondent has met all of his deadlines

---

[1] Today we are also filing in the DCCA a supplement explaining why the second subpoena was also defectively served, as it is out of compliance with Superior Court Rule 45.

1

EXHIBIT 4

and remains actively engaged in promptly sorting through all disputed issues. Insisting Respondent's legal and procedural rights be respected does not equate to failing to cooperate with ODC as that concept is properly understood.  For instance, at this time, rulings from the DCCA are required in Case. No. 22-BS-0059 before proceeding further.

## I.     PROCEDURAL BACKGROUND

The most recent subpoena, attached hereto as Exhibit A, was served on February 28, 2022 (the "Second Subpoena"), to try to cure defective service of a prior subpoena asking for the identical information (the "First Subpoena"). The First Subpoena (i) was not served at all, (ii) was not accompanied by the required fee to pay for contingent attendance at ODC's offices if documents were not to be produced on grounds of privilege, (iii) was not certified and signed by the serving adult, and (iv) in-person service was never waived by counsel or Respondent. Additionally, Respondent did not receive a full copy of the First Subpoena, albeit lacking proper service, until January 6, 2022, at which time Respondent, who had just recovered from COVID-19, immediately set to work discussing the retention of counsel with his professional responsibility insurance carrier. *See* Exhibit C at 3-5. Ethics counsel, once retained and with approval of Respondent's insurer, also began to work on the myriad of legal defenses and issues involved in this case and filed extensive letters objecting to the subpoena with ODC, which is inherently the first step in the Bar's administrative process.

After Respondent objected to the First Subpoena on multiple grounds (*see* Letter #1 to ODC on Behalf of Respondent (Jan. 31, 2022) (Exhibit B) & Letter #2 to ODC on Behalf of Respondent (Jan. 31, 2022) (Exhibit C)), Disciplinary Counsel inexplicably failed to confer with us, choosing instead to proceed immediately to the DCCA and filing Case No. 22-BS-0059 on February 3, 2022 to try to enforce the First Subpoena.  This means that Disciplinary Counsel took a mere three days to evaluate the extensive battery of legal deficiencies in the First Subpoena (as

set out in Exhibits B and C) before rushing into the DCCA.  *See* Disciplinary Counsel's Motion to Enforce Subpoena *Duces Tecum* (Exhibit D).  That case remains pending at the time of this filing.[2] Through counsel, Respondent did agree to be available to accept proper service (for convenience reasons at his home) of the Second Subpoena on February 28, 2021.  Disputes about the impact of the Second Subpoena on the pending DCCA case have not yet been resolved by that Court.

In Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash Subpoena, ODC argued that the motion to quash aspect of Respondent's Cross-Motion to Quash was filed in the wrong place, *i.e.,* it should have been filed with a Hearing Committee.  *See* Exhibit F at 5-7 (but (a) not arguing that any and all arguments challenging the validity of the First Subpoena had been waived; and (b) failing to argue what Respondent had supposedly waived versus what he had not).  Even beyond the fact that the First Subpoena was not properly served, we pointed out that cross-motions are proper under the DCCA's Rules, ODC broke a land-speed record in filing for DCCA enforcement, and that, indeed, ODC made no attempt before February 3, 2022 to respond to any of the array of arguments presented against subpoena validity and enforcement in our January 31, 2022 letters to ODC before rushing into the DCCA on February 3, 2022.  *See* Exhibit G at 1 & 7.

II.  **THE HEARING COMMITTEE DOES NOT HAVE JURISDICTION DUE TO PENDING PROCEEDINGS IN THE DISTRICT OF COLUMBIA COURT OF APPEALS, MAKING SIMULTANEOUS ADJUDICATION INEFFICIENT.**

The DCCA observes the rule that when matters come before it, the lower tribunal is often divested of jurisdiction pending resolution of the case in front of the DCCA.  *Stebbins v. Stebbins*, 673 A.2d 184, 189 (D.C. 1996), collects numerous authorities on this rule as follows:

*Morfessis v. Hollywood Credit Clothing Co*., 163 A.2d 825, 827 (D.C. 1960)

---

[2] *See also* Response to Motion to Compel and Cross-Motion to Quash (Exhibit E); Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash Subpoena (Exhibit F); Respondent's Reply in Support of Cross-Motion to Quash (Exhibit G).

3

(reversing grant of new trial where losing party had already noted an appeal); *Potts v. Catterton*, 82 A.2d 133, 134 (D.C. 1951) (affirming trial court's denial of motion for relief from judgment made during pendency of appeal on the ground that the trial court had no jurisdiction to grant the motion); *Maltby v. Thompson*, 55 A.2d 142–43 (D.C. 1947) (holding that grant of new trial by trial court after appeal had been noted was ineffective); *Lasier v. Lasier*, 47 App. D.C. 80 (1917) (reversing trial court's order correcting clerical mistake in decree where appeal had previously been perfected); *see also Pyramid Nat'l Van Lines v. Goetze*, 66 A.2d 693, 694 (D.C. 1949) ("When the mandate of an appellate court is filed in the lower court, that court reacquires the jurisdiction which it lost by the taking of the appeal."); *Smith v. Pollin*, 90 U.S. App. D.C. 178, 180, 194 F.2d 349, 350 (1952) ("It is clear that the District Court could not grant a motion for a new trial in a case which is pending in this court upon appeal. Jurisdiction of the case is in this court while the appeal is pending.").

Application of this authority here is straightforward. ODC opted to put this matter before DCCA's sphere of appellate authority by filing to enforce the subpoena there. That was ODC's own choice. As a result, the various components of the Board of Professional Responsibility, including any assigned Hearing Committee, lose jurisdiction until it might be able, in appropriate circumstances, to reacquire it after the mandate of the DCCA is issued in Case No. 22-BS-0059.

Anticipating an argument by ODC, we are well aware that the DCCA does not apply this divestiture-of-jurisdiction rule inflexibly. Rather, the Court looks to whether it would be inefficient for a lower tribunal and the DCCA to be simultaneously addressing the same or similar issues: "While the line that marks the division between what the trial court may and may not do is usually cast in terms of 'lack of jurisdiction,' the doctrine is judge-made, designed to avoid the confusion and waste of time that might flow from having two courts deal with a single case at the same time. Hence, it is subject to a common-sense flexibility in application." *Id.* (quoting *Carter v. Cathedral Ave. Coop.*, 532 A.2d 681, 684 n.7 (D.C. 1987)).

We are aware that in *Stebbins* itself, the DCCA held that the request for mandamus to require the trial court to hold a jury trial did not deprive the trial court of jurisdiction to proceed with the case pending resolution of the mandamus petition. "Because the decision whether to issue

4

an extraordinary writ is discretionary and turns on the particular facts of a given case, it would be inexpedient to create a blanket rule that the mere filing of any such petition has the effect of freezing proceedings in the trial court." *Stebbins*, 673 A.2d at 193.

In this case, by contrast, the only matters before the DCCA in Case No. 22-BS-0059 involve the propriety of the subpoenas (although that encompasses numerous sub-issues). This is not a situation where a matter as highly discretionary as a mandamus petition is pending in the Court of Appeals. Instead, a Cross-Motion to Quash is pending in that Court and now a Protective Motion to Quash has been lodged before this Hearing Committee. The matters overlap and there is thus no efficiency in allowing one matter to proceed in the DCCA while another matter proceeds here. *See id.* at 189 ("[T]he issue is whether it is judicially efficient for the trial court to take a particular action in the face of the particular matter pending before the appellate court."). The matters pending in each forum are essentially the same and so common sense dictates that all matters related to the two subpoenas remain the purview of the DCCA alone. "The rule against trial court action affecting matters on appeal is grounded not in metaphysical notions regarding transfer of power, but on practical considerations concerning efficient judicial administration." *Id.* at 190.

As a result, there is no jurisdiction in the Hearing Committee and no efficiency in it now addressing any issue related to the First and Second Subpoenas. It would make no sense and be wasteful for the Hearing Committee and the DCCA to simultaneously adjudicate the same or, at the very least, highly similar issues all going to the validity of one or both subpoenas. Hence, in light of this lack of jurisdiction in the Hearing Committee, this Protective Motion to Quash is lodged here only prophylactically and out of an abundance of caution to preserve Respondent's rights.

### III. THE INTERPLAY OF BOARD RULE 3.15, D.C. BAR RULE XI, SECTION 18, AND SUPERIOR COURT RULE OF CIVIL PROCEDURE 45 IS AMBIGUOUS, MUDDYING HOW RESPONDENTS SHOULD BEST PROTECT THEIR RESPECTIVE POSITIONS.

The rules governing serving, objecting to, enforcing, and quashing subpoenas issued by Disciplinary Counsel straddle (1) D.C. Bar Rule XI, Section 18 ("Bar Rule XI, Section 18"), (2) D.C. Board of Professional Responsibility Rule 3.15 ("Board Rule 3.15"), *and* D.C. Superior Court Rule of Procedure 45 ("Rule 45").  The collision of those three separate rules creates a morass of ambiguity.  As a result, no Respondent can have fair notice under the Due Process Clause as to how, precisely, those three rules fit together.  Hence, a Respondent cannot know with certainty how to assert his or her rights and protect their positions in situations like this one. Nevertheless, the insufficiency of service of the First Subpoena means, in this particular case, that this Protective Motion to Quash can be lodged in response to the Second Subpoena to preclude any waiver argument by ODC.  ODC contacted us to arrange for another attempt at service of its Second Subpoena as a voluntary litigative choice.

The authority to issue subpoenas is conferred by Bar Rule XI, Section 18, which specifically provides that subpoenas are issued subject to Rule 45: "(a) *Issuance of Subpoenas*. In carrying out this rule, … Disciplinary Counsel in matters under investigation may, ***subject to Superior Court Rule 45***, compel by subpoena the attendance of witnesses and the production of … documents." (emphasis added).

And Rule 45, by its own terms, includes provisions for the responding party to serve objections and/or move to quash. *See* Rule 45(c)(2)(B) (objections) and Rule 45(c)(3) (quashing or modifying a subpoena). *See also* Exhibit A at 2 (excerpting as an attachment Rule 45(c)-(d), estopping ODC from arguing that Rule 45's provisions on objecting to and quashing subpoenas do not apply).  Rule 45 also includes provisions for the requesting party to seek enforcement. *See*

Rule 45(c)(2)(B)(i).

The confusion arises because Bar Rule XI, Section 18 layers on top of Rule 45 another set of rules for objecting to, quashing, and enforcing subpoenas. *First*, Bar Rule XI, Section 18 says nothing about the responding party serving objections or what procedures are to be followed by the requesting party in the event of an objection or invocation of one or more privileges. Instead, Bar Rule XI, Section 18(d), without Rule 45's reference to underlying objections, permits the requesting party to immediately file a motion to enforce the subpoena in the D.C. Court of Appeals. *Second*, Bar Rule XI, Section 18(c), regarding "Quashing Subpoenas," provides that "[a]ny challenge to the validity of a subpoena issued in accordance with this section shall be heard and determined by a Hearing Committee designated by the Executive Attorney."

The ambiguity lies in determining whether these provisions of Rule XI, Section 18 somehow displace the corresponding provisions of Rule 45 in whole or in part. This in turn depends, in part, on the scope of the phrase "any challenge to the ***validity*** of a subpoena" in Rule XI, Section 18 (emphasis added).  The questions this engenders are legion:

(1)    Is Rule 45, with its provisions about quashing subpoenas, overridden by the other two rules?  The implication of that would be that the DCCA would be stripped of power to quash under Rule 45, even though Rule 45 is the mechanism chosen in Bar Rule XI, Section 18(a) for subpoena enforcement, which is very odd to say the least.

(2)    Can't Rule 45, on the one hand, and Bar Rule XI, Section 18 and Board Rule 3.15, on the other, be harmonized by holding that the DCCA possesses all of its Rule 45(c)(3) powers to quash, if a motion to quash is filed there as a defensive matter after ODC proceeds to the DCCA (using its Board Rule 3.14  option), whereas in a situation where a respondent opts to first file a motion to quash with a Hearing Committee, Bar Rule XI, Section 18(c)

7

and Board Rule 3.15 govern?

(3)     Are all objections to a subpoena challenges to its validity?

(4)     Are challenges to a subpoena that it is not providing sufficient time to respond (Rule 45(c)(3)(A)(i)), is overbroad, is unduly burdensome (Rule 45(c)(3)(A)(iv)), or calls for the production of privileged information (Rule 45(c)(3)(A)(iii)), or trade secrets or other confidential information (see Rule 45(c)(3)(B)(i)) challenges to the subpoena's validity, or merely to its scope?

(5)     Are there motions to quash that go merely to scope or timing that do not go to validity and thus fall outside the jurisdiction of the Hearing Committee?

The most erudite of monks in the scholastic tradition could debate for an eon how to draw at least some of these lines.  What is really needed is a revised set of rules that better fit together by explicitly resolving all of the foregoing questions or a judicial decision that does its best to draw the relevant lines provisionally, pending a clarification of the interactions between the three sets of rules.  The rules have certainly not been revised since this dispute began and, to our knowledge, there are no judicial decisions carefully explaining how Rule 45, Bar Rule XI, Section 18, and Board Rule 3.15 are all intended to fit together, especially not in a factual setting analogous to this one.  Yet the consequences of drawing an erroneous conclusion and filing a motion to quash in the wrong forum could be severe. This ambiguity could prove extremely unfair to any respondent and especially to this Respondent, who has advanced substantial constitutional and other objections to the First and Second Subpoena he was hoping to amicably work out with ODC.

In light of these ambiguities, and without conceding that his only remedy is before this Hearing Committee, especially given that ODC made the voluntary choice to open the proceeding in the Court of Appeals, Respondent is lodging this Protective Motion to Quash out of an

abundance of caution in order to prevent any implication of waiver of any of his rights or remedies with respect to the Second Subpoena. Respondent's primary position is that the DCCA retains all of its Rule 45 powers to decline to enforce or to quash ODC's subpoenas.

**IV.   THE SECOND SUBPOENA SHOULD BE QUASHED FOR DEFECTIVE SERVICE.**

Exhibit A is a true and correct copy of the Second Subpoena and related materials Respondent received on February 28, 2022 with a return date of today (Mar. 14, 2022). The Second Subpoena consists of (1) the card of the ODC attorney who personally attempted service (Ms. Azadeh Matinpour, who, it is important to note, is employed by ODC), (2) a check to reimburse for expenses, if ODC had insisted on a personal appearance,[3] (3) the subpoena itself, plus a copy of Superior Court Rule 45(c)-(d) (included by requirement of Rule 45(a)(1)(A)(iv)), and (4) a two-page Attachment to Subpoena.

The Second Subpoena is ***similar to*** the First Subpoena dated November 22, 2022 (though not received in full until January 6, 2022 and only via email in chunks).  But it is not identical. The one-page subpoena in its narrowest terms, along with the Rule 45 excerpts, and the two-page Attachment to Subpoena are the same.  But the First Subpoena had also included (1) a three-page cover letter signed by Mr. Fox taking positions relevant to ODC's Motion to Compel; (2) a summary sheet on the D.C. Bar's Department of Regulation Counsel (which we agree can be disregarded as having no substantive significance); (3) a cover email from Sarah Zdeb, a lawyer working for Senator Durbin; (4) a cover letter from Senator Durbin; and (5) the Senate Judiciary

---

[3] Despite the fact that the box on the Second Subpoena form ("Production & delivery of these documents will eliminate the need for a personal appearance.") was checked, a phone call to Disciplinary Counsel clarified that he was not requiring Respondent to personally travel to his offices in D.C., if documents were not produced on grounds of privilege.  As a result, Respondent has destroyed the check without cashing it.  Given this, do not know why ODC checked that box on both the First and Second Subpoenas.

Committee Majority report on which Senator Durbin was basing his complaint to the Bar. The First Subpoena does not include Ms. Matinpour's card (unsurprising, as the First Subpoena was not personally delivered to Respondent) or the check to pay for contingent attendance fees. Both the First Subpoena and the Second Subpoena are blank in the subpoena form's respective boxes labeled "Signature and Title of Server."

The documents omitted from the ODC cover letter, Durbin cover letter, Zdeb cover email, and the Senate Judiciary Committee report from the Second Subpoena are relevant to this Protective Motion, and their omission should not preclude the Hearing Committee from considering them.

Next, Rule 45(b)(1) (emphasis added) limits who can properly act as a process server.[4] It must be "[a]ny person who is at least 18 years old *and not a party*." Ms. Matinpour is a party because her superior, the Disciplinary Counsel, is the moving party here and, as a juridical entity, the Office of the Disciplinary Counsel can only act through its employees such as Mr. Fox and Ms. Matinpour. As a result, the Second Subpoena's attempted service is defective. *See Hobbs v. Ohio Adult Parole Auth.*, Case No. 1:13-cv-928, 2018 WL 4658739, *2 (S.D. Ohio Sept. 28, 2018) ("The return address on the envelope in which the subpoena was sent … shows that it was sent by Hobbs himself and that fact is corroborated by his production of the receipts for certified mail. But Hobbs is a party and may not serve a subpoena himself."). Wright and Miller explain that Rule 45(b)(1) (largely mirrored in Superior Court Rule 45[5]), in its present form, represents a liberalization of the

---

[4] And note that under D.C. Bar Rule XI, Section 18(a), Superior Court Rule 45 governs subpoenas at all stages of the process.

[5] The comment to Superior Court Rule 45 provides as follows:

> Identical to *Federal Rule of Civil Procedure 45*, as amended in 2007, except for: (1) references to 100 mile limits in the federal rule have been changed to 25 miles, which preserves the geographic proportionality originally expressed by Congress

requirement in a prior version of Rule 45 that process be served only by a U.S. Marshal or Deputy

Marshal.  *See* Wright & Miller, 9A FED. PRAC. & PROC. CIV. § 2454 (3d ed. Apr. 2021 update)

("Prior to the 1991 amendments to Rule 45, only a United States marshal or the marshal's deputy

… were explicitly authorized by the rule to serve subpoenas.").

But Rule 45(b)(1) was not liberalized so far as to allow ***anyone*** to serve process.  There is

an explicit ban on parties serving process and it must be observed.  The fact that a lawyer working

for Mr. Fox, Disciplinary Counsel, who designated himself as the moving party on the Motion to

Compel,[6] was the one who served the process is a self-standing basis on which to deny the Motion

to Compel.  *See Vohra v. City of Placentia*, No. SA CV 11-01267 DSF (RZ), 2012 WL 13123574,

*1 (C.D. Cal. June 27, 2012) ("Federal Rule of Civil Procedure 45(b)(1) provides in part that only

a "person who is at least 18 years old ***and not a party* may serve a subpoena**." [emphasis added

by the Magistrate Judge].  The moving party violated this rule by serving the subpoena himself.

---

in D.C. Code § 11-942; (2) the omission of the inapplicable subsection (a)(2); (3) the addition of language in subsection (a)(1)(A)(iii) providing that the deposition, production, or inspection of documents must be in the District of Columbia, unless otherwise agreed or ordered by the court; and (4) the substitution of specific local language for inapplicable federal language in subsections (a)(1)(A)(i)–(ii), (a)(3), (b)(2), and (c)(3)(A)(ii).

This rule provides a means for issuing deposition subpoenas for nonresidents of the District of Columbia in cases which qualify, but does not preclude the alternatives of filing with the court a motion for appointment of an examiner under Rule 28-I or resorting directly to the courts of another jurisdiction under its rules and statutes.

Subpoenas issued by attorneys under subsection (a)(3) must be substantially in the format of Civil Action Form 14.

[6] *See **Disciplinary Counsel's** Motion to Enforce Subpoena Duces Tecum* (filed Feb. 3, 2022) (emphasis added).

***The motion [for subpoena enforcement] merits denial <u>for this reason alone</u>.***") (emphasis added).[7]

There is yet another reason why this Motion to Compel must be denied: the Second Subpoena form was not signed by Ms. Matinpour, but only bears Mr. Fox's name (rendered in a signature-like font).  Here is a picture of the relevant part of Exhibit 1, to underscore the point:



This is yet another way in which the Second Subpoena is self-evidently defective.  *See Wyatt v. Anderson*, No. A-13-CA-191-SS, 2014 WL 670855, \*14 (W.D. Tex. Feb. 20, 2014) ("They indicate Wyatt 'served' a copy of the subpoena to the parties by placing the copies 'in the U.S. mailbox located on the Eastham unit in Lovelady, Texas.' …. The only signature on the page is Wyatt's, and the 'server's signature' is blank. Wyatt, as a party in the case, cannot serve the subpoenas ….  As such, Wyatt's subpoenas are facially deficient.").  This is exactly the same

_____

[7] Indeed, there is a great body of precedent reading and applying the text of Rule 45(b)(1) to require strict compliance with its terms and on that basis rejecting subpoenas served by parties.  *See, e.g., Haber v. ASN 50th St., LLC*, 272 F.R.D. 377, 381 n.2. (S.D.N.Y. 2011) ("Plaintiff is advised that he may not serve the Sellers Subpoena himself"); *Smith v. Benson*, No. 08-CV-0485Sr, 2011 WL 839736, \*1 (W.D.N.Y. Mar. 7, 2011) ("Plaintiff cannot attempt to serve third party subpoenas by regular mail because a party may not effect service himself under Rule 45."); *Gaudin v. Remis*, Civ. No. 00-00765 SPK-LEK, 2007 WL 294130, \*3 (D. Haw. Jan. 29, 2007) (reasoning that because subpoenas can be served on "any person," that includes non-parties because the servers of subpoenas explicitly must "not [be] a party" and "[t]he drafters could have used the same language [as in Rule 45(b)(1)] to limit who may be served with a subpoena, but they chose not to do so."); *see also United States v. 2121 Celeste Rd., S.W., Albuquerque, N.M.*, 307 F.R.D. 572, 579 (D.N.M. 2015) (deploying same reasoning as in *Gaudin*).

situation here. The only signature on the page is that of Mr. Fox, who is a party to this action. And, as this second picture highlights in yellow below, the server's signature *is also blank there*:



These defects are not mere "technicalities" the DCCA and this Hearing Committee should overlook. Respectfully, the law is the law and we are entitled to insist on strict compliance with Rule 45's requirements for service. Respondent restricted his movements on February 28 precisely so he would be available at his home to receive service; the least he can expect is that ODC will comply with the governing rules for service. This is especially true where this enforcement action was initiated by ODC (i) without engaging in a prior meet-and-confer and (ii) *only three days* after we filed extensive objections with ODC on January 31, 2022 that ODC could not possibly have fully evaluated before filing this action on February 3, 2022. And without proper service, no jurisdiction can attach either to this action or to any new action ODC might file after attempting proper service for a third time.

There is one final matter to flag regarding service, and it is very important. Mr. Fox has already threatened to "ratchet up the discipline,"[8] simply because Respondent declined to produce documents in light of the various privileges that apply and his many other weighty legal objections. We thus worry that such threats may increase now that two attempts at proper service of a subpoena

---

[8] *See* Resp. to Mot. to Compel and Cross-Motion to Quash, Exh. 3 (Harry MacDougald aff. at ¶¶ 5-6).

13

have failed and we have not agreed to waive service.  For this reason, Respondent requests, if the Second Subpoena is not quashed on grounds of noncompliance with Rule 45, that ODC be explicitly instructed as part of any order that it would be improper for ODC to seek ratcheted-up discipline against Respondent because he has insisted on compliance with Rule 45.

## V.     PROTECTIVE MOTION TO QUASH AND SUPPORTING OBJECTIONS

Subject to and in addition to the foregoing, Respondent submits herewith the following material, incorporated herein by reference, to support this Protective Motion to Quash:

1. First Letter of January 31, 2022, from counsel for Respondent to Disciplinary Counsel (Exhibit B);

2. Second Letter of January 31, 2022, from counsel for Respondent to Disciplinary Counsel (Exhibit C);

3. Disciplinary Counsel's Motion to Enforce Subpoena *Duces Tecum* (Exhibit D);

4. Respondent's Response to Motion to Compel and Cross-Motion to Quash (Exhibit E);

5. Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash (Exhibit F); and

6. Respondent's Reply in Support of Cross-Motion to Quash (Exhibit G).

## VI.     ADDITIONAL MATERIAL SUPPORTING RESPONDENT'S INVOCATION, ON ADVICE OF COUNSEL, OF THE FIFTH AMENDMENT PRIVILEGE

On advice of undersigned counsel, Respondent has invoked his Fifth Amendment privilege not to testify against himself with respect to the First and Second Subpoenas. In the attached documents, Respondent cited to multiple statements by Members of Congress asserting that Respondent was guilty of a crime. Indeed, Chair Thompson himself, of the House January 6 Select Committee, made such an assertion on the *Rachel Maddow Show*. Respondent also cited to numerous articles in which prominent legal commentators urged that Respondent be criminally

14

prosecuted. Despite this, Disciplinary Counsel has surprisingly contended that this invocation is groundless and is interposed only for purposes of obstruction.

As if to directly belie the position of Disciplinary Counsel, there have been more such calls for Respondents' criminal prosecution since his Reply in Support of Cross-Motion to Quash, item 6 above, was filed on February 21, 2022:

A. Barbara McQuade, *United States v. Donald Trump: A "Model Prosecution Memo" on the Conspiracy to Pressure Vice President Trump*, JUST SECURITY (Feb. 22, 2022), *available at* https://www.justsecurity.org/80308/united-states-v-donald-trump-model-prosecution-memo/ (last visited Mar. 14, 2022) (an extensive prosecution memo, in U.S. Department of Justice style, focused on former President Trump but mentioning Respondent as an alleged co-conspirator 17 times, not counting footnotes);

B. Glenn Kirschner, *Trump's Loss in Civil Court Case Provides Roadmap for DOJ to Follow in Criminal Prosecution of Trump*, JUSTICE MATTERS, *available at* https://www.youtube.com/watch?v=iJYJjpev1pY (last visited Mar. 14, 2022) (commending McQuade's prosecution memo and urging government action based on it).

The attacks leveled by McQuade and Kirschner are not off-handed comments or mere bloviation as ODC has contended to the DCCA, *see* Exhibit F at 3, but forceful attempts to persuade former colleagues at the Justice Department to act on their recommendations.[9]

---

[9] *See also* Michael S. Schmidt & Luke Broadwater, *In Scrutinizing Trump and His Allies, Jan. 6 Panel Adopts Prosecution Tactics: The House committee investigating the assault on the Capitol and what led to it is employing techniques more common in criminal cases than in congressional inquiries,* NEW YORK TIMES (Feb. 5, 2022) ("[M]embers have openly discussed what criminal laws Mr. Trump and his allies may have violated and how they might recommend that the Justice Department investigate him. Such a step could put considerable additional pressure on [Attorney General] Garland, who has not given any specific public indication that the department is investigating Mr. Trump or would support prosecuting him."), *available at*

C. On March 2, 2022, the January 6 Committee filed in the Central District of California "Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions," in *Eastman v. Thompson*, No. 8:22-cv-00099-DOC-DFM, Dkt # 160.  *See* Exhibit H ( excerpted version). That brief argues that President Trump and Dr. Eastman, one of the former President's lawyers, colorably engaged in criminal conduct, such that the crime-fraud exception to the attorney-client privilege should allow the House January 6 Committee to force an *in camera* examination of documents by the Central District of California, which could pierce the privilege claims.  And more importantly for present purposes, this brief or its exhibits mention Respondent more than 40 times.

D. And most significantly, on March 10, 2022, counsel for the January 6 Committee emailed counsel for Respondent to discuss a potential offer of use immunity. *See* Exhibit I. Unlike Disciplinary Counsel, the lawyers for the January 6 Committee, two of whom are former U.S. Attorneys, do not belittle or trivialize Respondent's invocation of his Fifth Amendment rights.[10]

In sum, Respondent seems to face more-than-colorable risk, such that his decision to invoke his Fifth Amendment rights on advice of counsel should be accepted at face value and accorded respect.

On the merits of ODC's investigation into whether misrepresentations about the 2020 presidential election's irregularities were made by Respondent, who was working on such matters in the Executive Branch in late 2020 to early 2021, we also incorporate the following two additional documents, which had they existed at the time, we would have cited in our briefing to

---

https://www.nytimes.com/2022/02/05/us/politics/january-6-committee.html (last visited Mar. 14, 2022).

[10] To be clear, Respondent is reserving all of his rights as to those immunity discussions and whether the Committee can also find a way to resolve Respondent's other objections, including most significantly, the executive privilege.

the DCCA in Case No. 22-BS-0059:

I.  Wisconsin Office of Special Counsel (former Wisconsin Justice Michael Gableman), *Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System* (delivered to the Wisconsin State Assembly on Mar. 1, 2022) (finding a host of irregularities and illegalities in the 2020 Wisconsin presidential election, including a bribery scheme using private money to run ballot harvesting and abuse of nursing home residents voting even after they had been adjudged incompetent to vote by a Wisconsin court, and, in light of those serious defects, recommending decertification of Wisconsin's electors) (Exhibit J).

II.  VoterGA Press Conference, *How Georgia 2020 Election Results Were Electronically Manipulated* (Mar. 7, 2022) (finding 15 separate points demonstrating manipulation of the Fulton County, GA election including all 374,128 in-person ballot images having gone missing and 132,284 of the mail-in ballot images flunking authentication due to missing *.SHA computer files) (Exhibit K).

Those analyses provide evidence sufficient to show that a lawyer at the Justice Department who might have been suspicious of the elections held in Wisconsin and Georgia was not acting beyond the pale, even if other lawyers may have advanced different positions.

## CONCLUSION

In the ongoing moral panic over the last presidential election, a person in Respondent's position would be extremely naïve not to proceed as cautiously as possible.[11] Accordingly,

---

[11] And that is true even though there are documents of public record indicating that Respondent, at most, had pressed a difference of opinion with other lawyers in the last Administration. *See, e.g.,* William P. Barr, ONE DAMN THING AFTER ANOTHER: MEMOIRS OF AN ATTORNEY GENERAL 557 (2022) ("I did not hear about the great brouhaha on January 3[,]2021] involving an effort by the President to replace [Acting Attorney General] Rosen with Jeffrey Clark, acting head of the Civil Division, who was far more sympathetic to claims of nationwide fraud than either Rosen or

Disciplinary Counsel's argument that there is no valid basis for Respondent to harbor well-founded apprehension about the possibility of criminal prosecution and thus no basis for Respondent to validly invoke his Fifth Amendment rights is utterly lacking in merit.  The lodged Protective Motion to Quash, if it is not tabled awaiting resolution of DCCA Case No. 22-BS-0059, as it certainly should be, should in the alternative be granted on numerous grounds incorporated by reference from the attached exhibits (for instance, Respondent has also invoked the fact that ODC has not sought the documents from DOJ (*see Freeman v. Seligson*, 405 F.2d 1326 (D.C. Cir. 1968) (per curiam) ("[W]e are unable to tell what, if any, consideration was given to possible resort to other sources for at least some of the material."),[12] that any documents are subject to executive privilege, that the investigation violates the separation of powers and is preempted by federal law, to list just a few of our objections). But at the very least, if the Protective Motion to Quash is adjudicated by a Hearing Committee despite the lack of jurisdiction over this matter at this time and its inability to resolve the matters efficiently given the pendency of DCCA Case No. 22-BS-0059, Respondent's invocation of the Fifth Amendment is, even standing alone, a more than a strong and sufficient basis to grant the protective motion.

Respectfully submitted this 14th day of March 2022.

*/s/ Charles Burnham*              Robert A. Destro*
Charles Burnham                    Ohio Bar #0024315
DC Bar No. 1003464                 4532 Langston Blvd, #520
1424 K Street, NW                  Arlington, VA 22207
Suite 500                          202-319-5202
Washington DC 20005                robert.destro@protonmail.com
(202) 386-6920                     (*pro hac vice* application pending in DCCA)
charles@burnhamgorokhov.com

---

I had been.").  Sympathy to types of arguments and different ways of looking at facts is not unethical.

[12] "[A] division of this court [i.e., the District of Columbia Court of Appeals, the highest local court in the District] is normally bound by decisions of the D.C. Circuit rendered before February 1, 1971[.]" *Thoma v. Kettler Bros., Inc.*, 632 A.2d 725, 729 n.9 (D.C. 1993).

Harry W. MacDougald
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
(*pro hac vice* application pending in DCCA)

`

# CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing parties and the D.C. Board of Professional Responsibility's Office of the Executive Attorney (for distribution to the relevant Hearing Committee) with a copy of this *Protective Motion to Quash* by email addressed to:

|  |  |
|---|---|
| Hamilton P. Fox | James T. Phalen |
| D.C Bar. | Executive Attorney |
| Building A, Room 117 | Office of the Executive Attorney |
| 515 5th Street NW | 430 E. Street, N.W., Suite 138 |
| Washington DC 20001 | Washington, D.C. 20001 |
| foxp@dcodc.org | jtphalen@dcbpr.org |
| (Mr. Fox, please forward this | [pursuant to an instruction Mr. Phalen |
| lodged filing to Mr. Phalen) | delivered to Mr. MacDougald by phone |
|  | we are also cc-ing CaseManager@dcbpr.org] |

This 14th day of March 2022.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com