# EXHIBIT B-16

<u>**CONFIDENTIAL (INVESTIGATIVE STAGE)**</u>

**HEARING COMMITTEE # __ OF THE**

**DISTRICT OF COLUMBIA**

**BOARD OF PROFESSIONAL RESPONSIBILITY**



RECEIVED

Mar 15 2022 8:40am

Board on Professional
Responsibility

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C., ESQ.)** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | |

## LODGED PROTECTIVE MOTION TO QUASH

For the reasons explained below, the Hearing Committee (the one that will be assigned to this matter once it is filed with the Office of the Executive Attorney pursuant to Board Rule 3.15), presently lacks jurisdiction in light of Disciplinary Counsel's choice pursuant to Board Rule 3.14 to seek enforcement of subpoenas in ongoing District of Columbia Court of Appeals ("DCCA") Case No. 22-BS-0059 (motion to file under seal pending). We lodge this Protective Motion to Quash here out of an abundance of caution for two reasons: (1) the Office of Disciplinary Counsel ("ODC") has argued for a partial waiver in Case No. 22-BS-0059 (wherein ODC seeks DCCA subpoena-related relief, at the investigative stage, against Respondent); and (2) ODC attempted to serve a new subpoena on the Respondent on February 28, 2022, with a return date of today, March 14, 2022, to try to cure ODC's procedural deficiencies in the first subpoena, which are still being litigated in the pending DCCA action.[1] This Protective Motion to Quash, therefore, is intended to make sure that the Hearing Committee understands that Respondent has met all of his deadlines

---

[1] Today we are also filing in the DCCA a supplement explaining why the second subpoena was also defectively served, as it is out of compliance with Superior Court Rule 45.

1

and remains actively engaged in promptly sorting through all disputed issues. Insisting Respondent's legal and procedural rights be respected does not equate to failing to cooperate with ODC as that concept is properly understood.  For instance, at this time, rulings from the DCCA are required in Case. No. 22-BS-0059 before proceeding further.

## I.    PROCEDURAL BACKGROUND

The most recent subpoena, attached hereto as Exhibit A, was served on February 28, 2022 (the "Second Subpoena"), to try to cure defective service of a prior subpoena asking for the identical information (the "First Subpoena"). The First Subpoena (i) was not served at all, (ii) was not accompanied by the required fee to pay for contingent attendance at ODC's offices if documents were not to be produced on grounds of privilege, (iii) was not certified and signed by the serving adult, and (iv) in-person service was never waived by counsel or Respondent. Additionally, Respondent did not receive a full copy of the First Subpoena, albeit lacking proper service, until January 6, 2022, at which time Respondent, who had just recovered from COVID-19, immediately set to work discussing the retention of counsel with his professional responsibility insurance carrier. *See* Exhibit C at 3-5. Ethics counsel, once retained and with approval of Respondent's insurer, also began to work on the myriad of legal defenses and issues involved in this case and filed extensive letters objecting to the subpoena with ODC, which is inherently the first step in the Bar's administrative process.

After Respondent objected to the First Subpoena on multiple grounds (*see* Letter #1 to ODC on Behalf of Respondent (Jan. 31, 2022) (Exhibit B) & Letter #2 to ODC on Behalf of Respondent (Jan. 31, 2022) (Exhibit C)), Disciplinary Counsel inexplicably failed to confer with us, choosing instead to proceed immediately to the DCCA and filing Case No. 22-BS-0059 on February 3, 2022 to try to enforce the First Subpoena.  This means that Disciplinary Counsel took a mere three days to evaluate the extensive battery of legal deficiencies in the First Subpoena (as

set out in Exhibits B and C) before rushing into the DCCA. *See* Disciplinary Counsel's Motion to Enforce Subpoena *Duces Tecum* (Exhibit D). That case remains pending at the time of this filing.[2] Through counsel, Respondent did agree to be available to accept proper service (for convenience reasons at his home) of the Second Subpoena on February 28, 2021. Disputes about the impact of the Second Subpoena on the pending DCCA case have not yet been resolved by that Court.

In Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash Subpoena, ODC argued that the motion to quash aspect of Respondent's Cross-Motion to Quash was filed in the wrong place, *i.e.,* it should have been filed with a Hearing Committee. *See* Exhibit F at 5-7 (but (a) not arguing that any and all arguments challenging the validity of the First Subpoena had been waived; and (b) failing to argue what Respondent had supposedly waived versus what he had not). Even beyond the fact that the First Subpoena was not properly served, we pointed out that cross-motions are proper under the DCCA's Rules, ODC broke a land-speed record in filing for DCCA enforcement, and that, indeed, ODC made no attempt before February 3, 2022 to respond to any of the array of arguments presented against subpoena validity and enforcement in our January 31, 2022 letters to ODC before rushing into the DCCA on February 3, 2022. *See* Exhibit G at 1 & 7.

## II. THE HEARING COMMITTEE DOES NOT HAVE JURISDICTION DUE TO PENDING PROCEEDINGS IN THE DISTRICT OF COLUMBIA COURT OF APPEALS, MAKING SIMULTANEOUS ADJUDICATION INEFFICIENT.

The DCCA observes the rule that when matters come before it, the lower tribunal is often divested of jurisdiction pending resolution of the case in front of the DCCA. *Stebbins v. Stebbins*, 673 A.2d 184, 189 (D.C. 1996), collects numerous authorities on this rule as follows:

> *Morfessis v. Hollywood Credit Clothing Co*., 163 A.2d 825, 827 (D.C. 1960)

---

[2] *See also* Response to Motion to Compel and Cross-Motion to Quash (Exhibit E); Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash Subpoena (Exhibit F); Respondent's Reply in Support of Cross-Motion to Quash (Exhibit G).

(reversing grant of new trial where losing party had already noted an appeal); *Potts v. Catterton*, 82 A.2d 133, 134 (D.C. 1951) (affirming trial court's denial of motion for relief from judgment made during pendency of appeal on the ground that the trial court had no jurisdiction to grant the motion); *Maltby v. Thompson*, 55 A.2d 142–43 (D.C. 1947) (holding that grant of new trial by trial court after appeal had been noted was ineffective); *Lasier v. Lasier*, 47 App. D.C. 80 (1917) (reversing trial court's order correcting clerical mistake in decree where appeal had previously been perfected); *see also Pyramid Nat'l Van Lines v. Goetze*, 66 A.2d 693, 694 (D.C. 1949) ("When the mandate of an appellate court is filed in the lower court, that court reacquires the jurisdiction which it lost by the taking of the appeal."); *Smith v. Pollin*, 90 U.S. App. D.C. 178, 180, 194 F.2d 349, 350 (1952) ("It is clear that the District Court could not grant a motion for a new trial in a case which is pending in this court upon appeal. Jurisdiction of the case is in this court while the appeal is pending.").

Application of this authority here is straightforward. ODC opted to put this matter before DCCA's sphere of appellate authority by filing to enforce the subpoena there. That was ODC's own choice. As a result, the various components of the Board of Professional Responsibility, including any assigned Hearing Committee, lose jurisdiction until it might be able, in appropriate circumstances, to reacquire it after the mandate of the DCCA is issued in Case No. 22-BS-0059.

Anticipating an argument by ODC, we are well aware that the DCCA does not apply this divestiture-of-jurisdiction rule inflexibly. Rather, the Court looks to whether it would be inefficient for a lower tribunal and the DCCA to be simultaneously addressing the same or similar issues: "While the line that marks the division between what the trial court may and may not do is usually cast in terms of 'lack of jurisdiction,' the doctrine is judge-made, designed to avoid the confusion and waste of time that might flow from having two courts deal with a single case at the same time. Hence, it is subject to a common-sense flexibility in application." *Id.* (quoting *Carter v. Cathedral Ave. Coop.*, 532 A.2d 681, 684 n.7 (D.C. 1987)).

We are aware that in *Stebbins* itself, the DCCA held that the request for mandamus to require the trial court to hold a jury trial did not deprive the trial court of jurisdiction to proceed with the case pending resolution of the mandamus petition. "Because the decision whether to issue

4

an extraordinary writ is discretionary and turns on the particular facts of a given case, it would be inexpedient to create a blanket rule that the mere filing of any such petition has the effect of freezing proceedings in the trial court." *Stebbins*, 673 A.2d at 193.

In this case, by contrast, the only matters before the DCCA in Case No. 22-BS-0059 involve the propriety of the subpoenas (although that encompasses numerous sub-issues). This is not a situation where a matter as highly discretionary as a mandamus petition is pending in the Court of Appeals. Instead, a Cross-Motion to Quash is pending in that Court and now a Protective Motion to Quash has been lodged before this Hearing Committee. The matters overlap and there is thus no efficiency in allowing one matter to proceed in the DCCA while another matter proceeds here. *See id.* at 189 ("[T]he issue is whether it is judicially efficient for the trial court to take a particular action in the face of the particular matter pending before the appellate court."). The matters pending in each forum are essentially the same and so common sense dictates that all matters related to the two subpoenas remain the purview of the DCCA alone. "The rule against trial court action affecting matters on appeal is grounded not in metaphysical notions regarding transfer of power, but on practical considerations concerning efficient judicial administration." *Id.* at 190.

As a result, there is no jurisdiction in the Hearing Committee and no efficiency in it now addressing any issue related to the First and Second Subpoenas. It would make no sense and be wasteful for the Hearing Committee and the DCCA to simultaneously adjudicate the same or, at the very least, highly similar issues all going to the validity of one or both subpoenas. Hence, in light of this lack of jurisdiction in the Hearing Committee, this Protective Motion to Quash is lodged here only prophylactically and out of an abundance of caution to preserve Respondent's rights.

### III. THE INTERPLAY OF BOARD RULE 3.15, D.C. BAR RULE XI, SECTION 18, AND SUPERIOR COURT RULE OF CIVIL PROCEDURE 45 IS AMBIGUOUS, MUDDYING HOW RESPONDENTS SHOULD BEST PROTECT THEIR RESPECTIVE POSITIONS.

The rules governing serving, objecting to, enforcing, and quashing subpoenas issued by Disciplinary Counsel straddle (1) D.C. Bar Rule XI, Section 18 ("Bar Rule XI, Section 18"), (2) D.C. Board of Professional Responsibility Rule 3.15 ("Board Rule 3.15"), **and** D.C. Superior Court Rule of Procedure 45 ("Rule 45"). The collision of those three separate rules creates a morass of ambiguity. As a result, no Respondent can have fair notice under the Due Process Clause as to how, precisely, those three rules fit together. Hence, a Respondent cannot know with certainty how to assert his or her rights and protect their positions in situations like this one. Nevertheless, the insufficiency of service of the First Subpoena means, in this particular case, that this Protective Motion to Quash can be lodged in response to the Second Subpoena to preclude any waiver argument by ODC. ODC contacted us to arrange for another attempt at service of its Second Subpoena as a voluntary litigative choice.

The authority to issue subpoenas is conferred by Bar Rule XI, Section 18, which specifically provides that subpoenas are issued subject to Rule 45: "(a) *Issuance of Subpoenas*. In carrying out this rule, … Disciplinary Counsel in matters under investigation may, **subject to Superior Court Rule 45**, compel by subpoena the attendance of witnesses and the production of … documents." (emphasis added).

And Rule 45, by its own terms, includes provisions for the responding party to serve objections and/or move to quash. *See* Rule 45(c)(2)(B) (objections) and Rule 45(c)(3) (quashing or modifying a subpoena). *See also* Exhibit A at 2 (excerpting as an attachment Rule 45(c)-(d), estopping ODC from arguing that Rule 45's provisions on objecting to and quashing subpoenas do not apply). Rule 45 also includes provisions for the requesting party to seek enforcement. *See*

Rule 45(c)(2)(B)(i).

The confusion arises because Bar Rule XI, Section 18 layers on top of Rule 45 another set of rules for objecting to, quashing, and enforcing subpoenas. *First*, Bar Rule XI, Section 18 says nothing about the responding party serving objections or what procedures are to be followed by the requesting party in the event of an objection or invocation of one or more privileges. Instead, Bar Rule XI, Section 18(d), without Rule 45's reference to underlying objections, permits the requesting party to immediately file a motion to enforce the subpoena in the D.C. Court of Appeals. *Second*, Bar Rule XI, Section 18(c), regarding "Quashing Subpoenas," provides that "[a]ny challenge to the validity of a subpoena issued in accordance with this section shall be heard and determined by a Hearing Committee designated by the Executive Attorney."

The ambiguity lies in determining whether these provisions of Rule XI, Section 18 somehow displace the corresponding provisions of Rule 45 in whole or in part. This in turn depends, in part, on the scope of the phrase "any challenge to the ***validity*** of a subpoena" in Rule XI, Section 18 (emphasis added).  The questions this engenders are legion:

(1)     Is Rule 45, with its provisions about quashing subpoenas, overridden by the other two rules?  The implication of that would be that the DCCA would be stripped of power to quash under Rule 45, even though Rule 45 is the mechanism chosen in Bar Rule XI, Section 18(a) for subpoena enforcement, which is very odd to say the least.

(2)     Can't Rule 45, on the one hand, and Bar Rule XI, Section 18 and Board Rule 3.15, on the other, be harmonized by holding that the DCCA possesses all of its Rule 45(c)(3) powers to quash, if a motion to quash is filed there as a defensive matter after ODC proceeds to the DCCA (using its Board Rule 3.14  option), whereas in a situation where a respondent opts to first file a motion to quash with a Hearing Committee, Bar Rule XI, Section 18(c)

7

and Board Rule 3.15 govern?

(3)     Are all objections to a subpoena challenges to its validity?

(4)     Are challenges to a subpoena that it is not providing sufficient time to respond (Rule 45(c)(3)(A)(i)), is overbroad, is unduly burdensome (Rule 45(c)(3)(A)(iv)), or calls for the production of privileged information (Rule 45(c)(3)(A)(iii)), or trade secrets or other confidential information (see Rule 45(c)(3)(B)(i)) challenges to the subpoena's validity, or merely to its scope?

(5)     Are there motions to quash that go merely to scope or timing that do not go to validity and thus fall outside the jurisdiction of the Hearing Committee?

The most erudite of monks in the scholastic tradition could debate for an eon how to draw at least some of these lines.  What is really needed is a revised set of rules that better fit together by explicitly resolving all of the foregoing questions or a judicial decision that does its best to draw the relevant lines provisionally, pending a clarification of the interactions between the three sets of rules.  The rules have certainly not been revised since this dispute began and, to our knowledge, there are no judicial decisions carefully explaining how Rule 45, Bar Rule XI, Section 18, and Board Rule 3.15 are all intended to fit together, especially not in a factual setting analogous to this one.  Yet the consequences of drawing an erroneous conclusion and filing a motion to quash in the wrong forum could be severe. This ambiguity could prove extremely unfair to any respondent and especially to this Respondent, who has advanced substantial constitutional and other objections to the First and Second Subpoena he was hoping to amicably work out with ODC.

In light of these ambiguities, and without conceding that his only remedy is before this Hearing Committee, especially given that ODC made the voluntary choice to open the proceeding in the Court of Appeals, Respondent is lodging this Protective Motion to Quash out of an

abundance of caution in order to prevent any implication of waiver of any of his rights or remedies with respect to the Second Subpoena. Respondent's primary position is that the DCCA retains all of its Rule 45 powers to decline to enforce or to quash ODC's subpoenas.

## IV.   THE SECOND SUBPOENA SHOULD BE QUASHED FOR DEFECTIVE SERVICE.

Exhibit A is a true and correct copy of the Second Subpoena and related materials Respondent received on February 28, 2022 with a return date of today (Mar. 14, 2022). The Second Subpoena consists of (1) the card of the ODC attorney who personally attempted service (Ms. Azadeh Matinpour, who, it is important to note, is employed by ODC), (2) a check to reimburse for expenses, if ODC had insisted on a personal appearance,[3] (3) the subpoena itself, plus a copy of Superior Court Rule 45(c)-(d) (included by requirement of Rule 45(a)(1)(A)(iv)), and (4) a two-page Attachment to Subpoena.

The Second Subpoena is ***similar to*** the First Subpoena dated November 22, 2022 (though not received in full until January 6, 2022 and only via email in chunks).  But it is not identical. The one-page subpoena in its narrowest terms, along with the Rule 45 excerpts, and the two-page Attachment to Subpoena are the same.  But the First Subpoena had also included (1) a three-page cover letter signed by Mr. Fox taking positions relevant to ODC's Motion to Compel; (2) a summary sheet on the D.C. Bar's Department of Regulation Counsel (which we agree can be disregarded as having no substantive significance); (3) a cover email from Sarah Zdeb, a lawyer working for Senator Durbin; (4) a cover letter from Senator Durbin; and (5) the Senate Judiciary

---

[3] Despite the fact that the box on the Second Subpoena form ("Production & delivery of these documents will eliminate the need for a personal appearance.") was checked, a phone call to Disciplinary Counsel clarified that he was not requiring Respondent to personally travel to his offices in D.C., if documents were not produced on grounds of privilege.  As a result, Respondent has destroyed the check without cashing it.  Given this, do not know why ODC checked that box on both the First and Second Subpoenas.

Committee Majority report on which Senator Durbin was basing his complaint to the Bar. The First Subpoena does not include Ms. Matinpour's card (unsurprising, as the First Subpoena was not personally delivered to Respondent) or the check to pay for contingent attendance fees. Both the First Subpoena and the Second Subpoena are blank in the subpoena form's respective boxes labeled "Signature and Title of Server."

The documents omitted from the ODC cover letter, Durbin cover letter, Zdeb cover email, and the Senate Judiciary Committee report from the Second Subpoena are relevant to this Protective Motion, and their omission should not preclude the Hearing Committee from considering them.

Next, Rule 45(b)(1) (emphasis added) limits who can properly act as a process server.[4] It must be "[a]ny person who is at least 18 years old *and not a party*." Ms. Matinpour is a party because her superior, the Disciplinary Counsel, is the moving party here and, as a juridical entity, the Office of the Disciplinary Counsel can only act through its employees such as Mr. Fox and Ms. Matinpour. As a result, the Second Subpoena's attempted service is defective. *See Hobbs v. Ohio Adult Parole Auth.*, Case No. 1:13-cv-928, 2018 WL 4658739, *2 (S.D. Ohio Sept. 28, 2018) ("The return address on the envelope in which the subpoena was sent … shows that it was sent by Hobbs himself and that fact is corroborated by his production of the receipts for certified mail. But Hobbs is a party and may not serve a subpoena himself."). Wright and Miller explain that Rule 45(b)(1) (largely mirrored in Superior Court Rule 45[5]), in its present form, represents a liberalization of the

---

[4] And note that under D.C. Bar Rule XI, Section 18(a), Superior Court Rule 45 governs subpoenas at all stages of the process.

[5] The comment to Superior Court Rule 45 provides as follows:

Identical to *Federal Rule of Civil Procedure 45*, as amended in 2007, except for: (1) references to 100 mile limits in the federal rule have been changed to 25 miles, which preserves the geographic proportionality originally expressed by Congress

requirement in a prior version of Rule 45 that process be served only by a U.S. Marshal or Deputy Marshal.  *See* Wright & Miller, 9A FED. PRAC. & PROC. CIV. § 2454 (3d ed. Apr. 2021 update) ("Prior to the 1991 amendments to Rule 45, only a United States marshal or the marshal's deputy … were explicitly authorized by the rule to serve subpoenas.").

But Rule 45(b)(1) was not liberalized so far as to allow ***anyone*** to serve process.  There is an explicit ban on parties serving process and it must be observed.  The fact that a lawyer working for Mr. Fox, Disciplinary Counsel, who designated himself as the moving party on the Motion to Compel,[6] was the one who served the process is a self-standing basis on which to deny the Motion to Compel.  *See Vohra v. City of Placentia*, No. SA CV 11-01267 DSF (RZ), 2012 WL 13123574, *1 (C.D. Cal. June 27, 2012) ("Federal Rule of Civil Procedure 45(b)(1) provides in part that only a "person who is at least 18 years old ***and not a party* may serve a subpoena**." [emphasis added by the Magistrate Judge].  The moving party violated this rule by serving the subpoena himself.

---

in D.C. Code § 11-942; (2) the omission of the inapplicable subsection (a)(2); (3) the addition of language in subsection (a)(1)(A)(iii) providing that the deposition, production, or inspection of documents must be in the District of Columbia, unless otherwise agreed or ordered by the court; and (4) the substitution of specific local language for inapplicable federal language in subsections (a)(1)(A)(i)–(ii), (a)(3), (b)(2), and (c)(3)(A)(ii).

This rule provides a means for issuing deposition subpoenas for nonresidents of the District of Columbia in cases which qualify, but does not preclude the alternatives of filing with the court a motion for appointment of an examiner under Rule 28-I or resorting directly to the courts of another jurisdiction under its rules and statutes.

Subpoenas issued by attorneys under subsection (a)(3) must be substantially in the format of Civil Action Form 14.

[6] *See **Disciplinary Counsel's** *Motion to Enforce Subpoena *Duces Tecum* (filed Feb. 3, 2022) (emphasis added).

***The motion [for subpoena enforcement] merits denial <u>for this reason alone</u>.***") (emphasis added).[7]

There is yet another reason why this Motion to Compel must be denied: the Second Subpoena form was not signed by Ms. Matinpour, but only bears Mr. Fox's name (rendered in a signature-like font).  Here is a picture of the relevant part of Exhibit 1, to underscore the point:



This is yet another way in which the Second Subpoena is self-evidently defective.  *See Wyatt v. Anderson*, No. A-13-CA-191-SS, 2014 WL 670855, \*14 (W.D. Tex. Feb. 20, 2014) ("They indicate Wyatt 'served' a copy of the subpoena to the parties by placing the copies 'in the U.S. mailbox located on the Eastham unit in Lovelady, Texas.' …. The only signature on the page is Wyatt's, and the 'server's signature' is blank. Wyatt, as a party in the case, cannot serve the subpoenas ….  As such, Wyatt's subpoenas are facially deficient.").  This is exactly the same

[7] Indeed, there is a great body of precedent reading and applying the text of Rule 45(b)(1) to require strict compliance with its terms and on that basis rejecting subpoenas served by parties.  *See, e.g., Haber v. ASN 50th St., LLC*, 272 F.R.D. 377, 381 n.2. (S.D.N.Y. 2011) ("Plaintiff is advised that he may not serve the Sellers Subpoena himself"); *Smith v. Benson*, No. 08-CV-0485Sr, 2011 WL 839736, \*1 (W.D.N.Y. Mar. 7, 2011) ("Plaintiff cannot attempt to serve third party subpoenas by regular mail and may not effect service himself under Rule 45."); *Gaudin v. Remis*, Civ. No. 00-00765 SPK-LEK, 2007 WL 294130, \*3 (D. Haw. Jan. 29, 2007) (reasoning that because subpoenas can be served on "any person," that includes non-parties because the servers of subpoenas explicitly must "not [be] a party" and "[t]he drafters could have used the same language [as in Rule 45(b)(1)] to limit who may be served with a subpoena, but they chose not to do so."); *see also United States v. 2121 Celeste Rd., S.W., Albuquerque, N.M.*, 307 F.R.D. 572, 579 (D.N.M. 2015) (deploying same reasoning as in *Gaudin*).

12

situation here.  The only signature on the page is that of Mr. Fox, who is a party to this action.
And, as this second picture highlights in yellow below, the server's signature *is also blank there*:



These defects are not mere "technicalities" the DCCA and this Hearing Committee should
overlook. Respectfully, the law is the law and we are entitled to insist on strict compliance with
Rule 45's requirements for service.  Respondent restricted his movements on February 28 precisely
so he would be available at his home to receive service; the least he can expect is that ODC will
comply with the governing rules for service.  This is especially true where this enforcement action
was initiated by ODC (i) without engaging in a prior meet-and-confer and (ii) *only three days* after
we filed extensive objections with ODC on January 31, 2022 that ODC could not possibly have
fully evaluated before filing this action on February 3, 2022.  And without proper service, no
jurisdiction can attach either to this action or to any new action ODC might file after attempting
proper service for a third time.

There is one final matter to flag regarding service, and it is very important. Mr. Fox has
already threatened to "ratchet up the discipline,"[8] simply because Respondent declined to produce
documents in light of the various privileges that apply and his many other weighty legal objections.
We thus worry that such threats may increase now that two attempts at proper service of a subpoena

---

[8] *See* Resp. to Mot. to Compel and Cross-Motion to Quash, Exh. 3 (Harry MacDougald aff. at ¶¶
5-6).

have failed and we have not agreed to waive service.  For this reason, Respondent requests, if the Second Subpoena is not quashed on grounds of noncompliance with Rule 45, that ODC be explicitly instructed as part of any order that it would be improper for ODC to seek ratcheted-up discipline against Respondent because he has insisted on compliance with Rule 45.

## V.   PROTECTIVE MOTION TO QUASH AND SUPPORTING OBJECTIONS

Subject to and in addition to the foregoing, Respondent submits herewith the following material, incorporated herein by reference, to support this Protective Motion to Quash:

1. First Letter of January 31, 2022, from counsel for Respondent to Disciplinary Counsel (Exhibit B);

2. Second Letter of January 31, 2022, from counsel for Respondent to Disciplinary Counsel (Exhibit C);

3. Disciplinary Counsel's Motion to Enforce Subpoena *Duces Tecum* (Exhibit D);

4. Respondent's Response to Motion to Compel and Cross-Motion to Quash (Exhibit E);

5. Disciplinary Counsel's Reply to Respondent's Opposition to Motion to Compel and Cross-Motion to Quash (Exhibit F); and

6. Respondent's Reply in Support of Cross-Motion to Quash (Exhibit G).

## VI.   ADDITIONAL MATERIAL SUPPORTING RESPONDENT'S INVOCATION, ON ADVICE OF COUNSEL, OF THE FIFTH AMENDMENT PRIVILEGE

On advice of undersigned counsel, Respondent has invoked his Fifth Amendment privilege not to testify against himself with respect to the First and Second Subpoenas. In the attached documents, Respondent cited to multiple statements by Members of Congress asserting that Respondent was guilty of a crime. Indeed, Chair Thompson himself, of the House January 6 Select Committee, made such an assertion on the *Rachel Maddow Show*. Respondent also cited to numerous articles in which prominent legal commentators urged that Respondent be criminally

prosecuted. Despite this, Disciplinary Counsel has surprisingly contended that this invocation is groundless and is interposed only for purposes of obstruction.

As if to directly belie the position of Disciplinary Counsel, there have been more such calls for Respondents' criminal prosecution since his Reply in Support of Cross-Motion to Quash, item 6 above, was filed on February 21, 2022:

A. Barbara McQuade, *United States v. Donald Trump: A "Model Prosecution Memo" on the Conspiracy to Pressure Vice President Trump*, JUST SECURITY (Feb. 22, 2022), *available at* https://www.justsecurity.org/80308/united-states-v-donald-trump-model-prosecution-memo/ (last visited Mar. 14, 2022) (an extensive prosecution memo, in U.S. Department of Justice style, focused on former President Trump but mentioning Respondent as an alleged co-conspirator 17 times, not counting footnotes);

B. Glenn Kirschner, *Trump's Loss in Civil Court Case Provides Roadmap for DOJ to Follow in Criminal Prosecution of Trump*, JUSTICE MATTERS, *available at* https://www.youtube.com/watch?v=iJYJjpev1pY (last visited Mar. 14, 2022) (commending McQuade's prosecution memo and urging government action based on it).

The attacks leveled by McQuade and Kirschner are not off-handed comments or mere bloviation as ODC has contended to the DCCA, *see* Exhibit F at 3, but forceful attempts to persuade former colleagues at the Justice Department to act on their recommendations.[9]

---

[9] *See also* Michael S. Schmidt & Luke Broadwater, *In Scrutinizing Trump and His Allies, Jan. 6 Panel Adopts Prosecution Tactics: The House committee investigating the assault on the Capitol and what led to it is employing techniques more common in criminal cases than in congressional inquiries,* NEW YORK TIMES (Feb. 5, 2022) ("[M]embers have openly discussed what criminal laws Mr. Trump and his allies may have violated and how they might recommend that the Justice Department investigate him. Such a step could put considerable additional pressure on [Attorney General] Garland, who has not given any specific public indication that the department is investigating Mr. Trump or would support prosecuting him."), *available at*

C. On March 2, 2022, the January 6 Committee filed in the Central District of California "Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions," in *Eastman v. Thompson*, No. 8:22-cv-00099-DOC-DFM, Dkt # 160.  *See* Exhibit H ( excerpted version). That brief argues that President Trump and Dr. Eastman, one of the former President's lawyers, colorably engaged in criminal conduct, such that the crime-fraud exception to the attorney-client privilege should allow the House January 6 Committee to force an *in camera* examination of documents by the Central District of California, which could pierce the privilege claims.  And more importantly for present purposes, this brief or its exhibits mention Respondent more than 40 times.

D. And most significantly, on March 10, 2022, counsel for the January 6 Committee emailed counsel for Respondent to discuss a potential offer of use immunity. *See* Exhibit I. Unlike Disciplinary Counsel, the lawyers for the January 6 Committee, two of whom are former U.S. Attorneys, do not belittle or trivialize Respondent's invocation of his Fifth Amendment rights.[10]

In sum, Respondent seems to face more-than-colorable risk, such that his decision to invoke his Fifth Amendment rights on advice of counsel should be accepted at face value and accorded respect.

On the merits of ODC's investigation into whether misrepresentations about the 2020 presidential election's irregularities were made by Respondent, who was working on such matters in the Executive Branch in late 2020 to early 2021, we also incorporate the following two additional documents, which had they existed at the time, we would have cited in our briefing to

---

https://www.nytimes.com/2022/02/05/us/politics/january-6-committee.html (last visited Mar. 14, 2022).

[10] To be clear, Respondent is reserving all of his rights as to those immunity discussions and whether the Committee can also find a way to resolve Respondent's other objections, including most significantly, the executive privilege.

the DCCA in Case No. 22-BS-0059:

I.  Wisconsin Office of Special Counsel (former Wisconsin Justice Michael Gableman), *Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System* (delivered to the Wisconsin State Assembly on Mar. 1, 2022) (finding a host of irregularities and illegalities in the 2020 Wisconsin presidential election, including a bribery scheme using private money to run ballot harvesting and abuse of nursing home residents voting even after they had been adjudged incompetent to vote by a Wisconsin court, and, in light of those serious defects, recommending decertification of Wisconsin's electors) (Exhibit J).

II.  VoterGA Press Conference, *How Georgia 2020 Election Results Were Electronically Manipulated* (Mar. 7, 2022) (finding 15 separate points demonstrating manipulation of the Fulton County, GA election including all 374,128 in-person ballot images having gone missing and 132,284 of the mail-in ballot images flunking authentication due to missing *.SHA computer files) (Exhibit K).

Those analyses provide evidence sufficient to show that a lawyer at the Justice Department who might have been suspicious of the elections held in Wisconsin and Georgia was not acting beyond the pale, even if other lawyers may have advanced different positions.

## CONCLUSION

In the ongoing moral panic over the last presidential election, a person in Respondent's position would be extremely naïve not to proceed as cautiously as possible.[11]  Accordingly,

---

[11] And that is true even though there are documents of public record indicating that Respondent, at most, had pressed a difference of opinion with other lawyers in the last Administration.  *See, e.g.,* William P. Barr, ONE DAMN THING AFTER ANOTHER: MEMOIRS OF AN ATTORNEY GENERAL 557 (2022) ("I did not hear about the great brouhaha on January 3[,]2021] involving an effort by the President to replace [Acting Attorney General] Rosen with Jeffrey Clark, acting head of the Civil Division, who was far more sympathetic to claims of nationwide fraud than either Rosen or

Disciplinary Counsel's argument that there is no valid basis for Respondent to harbor well-founded apprehension about the possibility of criminal prosecution and thus no basis for Respondent to validly invoke his Fifth Amendment rights is utterly lacking in merit.  The lodged Protective Motion to Quash, if it is not tabled awaiting resolution of DCCA Case No. 22-BS-0059, as it certainly should be, should in the alternative be granted on numerous grounds incorporated by reference from the attached exhibits (for instance, Respondent has also invoked the fact that ODC has not sought the documents from DOJ (*see Freeman v. Seligson*, 405 F.2d 1326 (D.C. Cir. 1968) (per curiam) ("[W]e are unable to tell what, if any, consideration was given to possible resort to other sources for at least some of the material."),[12] that any documents are subject to executive privilege, that the investigation violates the separation of powers and is preempted by federal law, to list just a few of our objections). But at the very least, if the Protective Motion to Quash is adjudicated by a Hearing Committee despite the lack of jurisdiction over this matter at this time and its inability to resolve the matters efficiently given the pendency of DCCA Case No. 22-BS-0059, Respondent's invocation of the Fifth Amendment is, even standing alone, a more than a strong and sufficient basis to grant the protective motion.

Respectfully submitted this 14th day of March 2022.

<table>
<tr><td>*/s/ Charles Burnham*</td><td>Robert A. Destro*</td></tr>
<tr><td>Charles Burnham</td><td>Ohio Bar #0024315</td></tr>
<tr><td>DC Bar No. 1003464</td><td>4532 Langston Blvd, #520</td></tr>
<tr><td>1424 K Street, NW</td><td>Arlington, VA 22207</td></tr>
<tr><td>Suite 500</td><td>202-319-5202</td></tr>
<tr><td>Washington DC 20005</td><td>robert.destro@protonmail.com</td></tr>
<tr><td>(202) 386-6920</td><td>(*pro hac vice* application pending in DCCA)</td></tr>
<tr><td>charles@burnhamgorokhov.com</td><td></td></tr>
</table>

I had been.").  Sympathy to types of arguments and different ways of looking at facts is not unethical.

[12] "[A] division of this court [i.e., the District of Columbia Court of Appeals, the highest local court in the District] is normally bound by decisions of the D.C. Circuit rendered before February 1, 1971[.]" *Thoma v. Kettler Bros., Inc.*, 632 A.2d 725, 729 n.9 (D.C. 1993).

Harry W. MacDougald
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
(*pro hac vice* application pending in DCCA)

`

# CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing parties and the D.C. Board of Professional Responsibility's Office of the Executive Attorney (for distribution to the relevant Hearing Committee) with a copy of this *Protective Motion to Quash* by email addressed to:

| | |
|---|---|
| Hamilton P. Fox | James T. Phalen |
| D.C Bar. | Executive Attorney |
| Building A, Room 117 | Office of the Executive Attorney |
| 515 5th Street NW | 430 E. Street, N.W., Suite 138 |
| Washington DC 20001 | Washington, D.C. 20001 |
| foxp@dcodc.org | jtphalen@dcbpr.org |
| (Mr. Fox, please forward this | [pursuant to an instruction Mr. Phalen |
| lodged filing to Mr. Phalen) | delivered to Mr. MacDougald by phone |
| | we are also cc-ing CaseManager@dcbpr.org] |

This 14th day of March 2022.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

# OFFICE OF DISCIPLINARY COUNSEL

## Board on Professional Responsibility
### District of Columbia Court of Appeals

## AZADEH MATINPOUR

### Investigative Attorney



515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

matinpoura@dcodc.org
(202) 638-1501, Ext. 1718
fax (202) 638-0862

Exhibit A

**OFFICE OF BAR COUNSEL**
DISTRICT OF COLUMBIA COURT OF APPEALS
DISTRICT OF COLUMBIA BAR
409 E STREET, NW, BLDG. B STE. 228
WASHINGTON, DC 20001

65-270/550

0518

DATE _Feb. 28, 2022_

PAY
TO THE
ORDER OF _Jeffrey B. Clark_                                      $ 77.76

_Seventy Seven and 76/100_ ——————————————————— DOLLARS

SUNTRUST BANK

FOR _Witness fee : expenses_

MP

⑈000518⑈  ⑆055002707⑈  206856741⑈

# S U B P O E N A

## BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

**NOTICE: THIS SUBPOENA IS ISSUED IN CONNECTION WITH A CONFIDENTIAL INVESTIGATION UNDER THE RULES PROMULGATED BY THIS COURT GOVERNING THE BAR OF THE DISTRICT OF COLUMBIA.**

**BREACH OF THE CONFIDENTIALITY OF THE INVESTIGATION WILL BE DEEMED AS CONTEMPT OF THIS COURT OR GROUNDS FOR DISCIPLINE UNDER THE AFOREMENTIONED RULES OF THIS COURT.** *(Consultation with an attorney does not constitute such a breach.)*

*IN THE MATTER OF:*

Clark/Disciplinary Counsel                                  DISCIPLINARY DOCKET NO.   2021-D193

TO: Jeffrey B. Clark, Esquire, 8850 Western Hemlock Way, Lorton, VA 22079

YOU ARE HEREBY COMMANDED TO APPEAR at 515 5th Street, N.W., Building A, Room 117, Washington, D.C., 20001, at 9:30 o'clock a.m., on the 14th day of March 2022, as a witness in the above captioned matter. You are directed to bring with you Please see attachment to subpoena for description of documents requested.

and not depart the above premises without leave from the authority before whom you appeared.

FAILURE OF ANY PERSON WITHOUT ADEQUATE EXCUSE TO OBEY THIS SUBPOENA AS SERVED MAY BE DEEMED CONTEMPT OF THE DISTRICT OF COLUMBIA COURT OF APPEALS RULES GOVERNING THE BAR.

☑ Production & delivery of these documents will eliminate the need for a personal appearance.

DATE SUBPOENA ISSUED: 02/28/2022

☑ If you have any questions regarding this subpoena, please call 202-638-1501.

Hamilton P. Fox, III, Disciplinary Counsel                        *Hamilton P. Fox, III*

| RETURN ON THIS SUBPOENA IS REQUIRED ON OR BEFORE THIS DATE: | |
|---|---|
| ☐ I hereby certify that I have personally served, or have executed as shown in "REMARKS," the above subpoena on the individual at the address below. | |
| Name and Title of Individual Served | Address (If different than shown above) |
| ☐ I hereby certify that, after diligent investigation, I am unable to locate the individual, company, corporation, etc., named in above subpoena for the reason(s) as shown in "REMARKS." | |
| Date(s) of Endeavor | Date and Time of Service |
| REMARKS | Signature and Title of Server |

## Super. Ct. Civ. R. 45(c) and (d)

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents, electronically stored information, or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court must quash or modify a subpoena that:

(i) fails to allow reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 25 miles from where that person resides, is employed, or regularly transacts business in person—except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place to the place of trial;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(v) *When Permitted.* To protect a person subject to or affected by a subpoena, the court may, on motion, quash or modify the subpoena if it requires: disclosing a trade secret or other confidential research, development, or commercial information;

(vi) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(vii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 25 miles to attend trial.

(B) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation materials must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

# ATTACHMENT TO SUBPOENA

**Clark/Disciplinary Counsel**
**Disciplinary Docket No. 2021-D193**
**Date of Subpoena:  February 28, 2022**
**Due date of Subpoena:  March 14, 2022**

Produce all documents and records (stored in hard copy or electronically), of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state.  The terms "documents" and "records" should be interpreted broadly to include all recorded materials, whether written or electronic, including statements or declarations of witnesses.  Identify the source of any document (including contact information for any persons bringing the document to your attention), how it came to your attention, and the date that it came to your attention.  With respect to any witness statements or declarations, provide contact information sufficient to locate the witness.  Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election.  Err on the side of disclosure; should you subsequently rely on any document that you have not produced, your failure to produce it may be construed against you.

Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election.  These materials should include any notes that you took or notes of others that you maintained of meetings or telephone calls relating to this subject.  Again, you should err on the side of inclusion.

Attachment to Subpoena continues
Clark/Disciplinary Counsel
Page 2

Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental and Natural Resources Division to investigate allegations of election fraud.

Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

January 31, 2022

Via Email foxp@dcodc.org Only

Hamilton P. ("Phil") Fox, III
Disciplinary Counsel
Office of the Disciplinary Counsel
Building A, Room 117
515 5th Street NW,
Washington, DC 20001

Re: Disciplinary Docket No. 2021-D193 (Disciplinary Counsel & Jeffrey Clark)

RESPONSE TO SUBPOENA DATED 11/22/21, REQUEST FOR DEFERRAL, AND
RELATED ISSUES

Dear Mr. Fox:

Let me begin by thanking you on behalf of Mr. Clark for your patience during the month of December 2020 in communicating with him before he had counsel signed up for this matter, and as he battled COVID. As he had noted for you by email, he did find it challenging to secure counsel for this matter and to submit it to his professional responsibility insurance carrier. *See* Exhibit 1. This is not the sort of bar complaint such insurers regularly see, as you can appreciate. Mr. Clark is truly grateful for your accommodation. It was very humane of you.

1. **Response to Subpoena**

In keeping with his obligation as a Member of the Bar of the District of Columbia to cooperate with an investigation by Disciplinary Counsel, to the extent constitutional and other legal constraints permit (*see* D.C. Bar Rule XI, Section 8(a) ("An attorney under

**Exhibit B**

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 2

investigation has an obligation to respond to Disciplinary Counsel's written inquiries in
the conduct of an investigation, subject to constitutional limitations."), I am acting on Mr.
Clark's behalf to report that in response to the subpoena and allegations (dated
November 22, 2021[1]), and on advice of counsel, Mr. Clark hereby pleads the Fifth
Amendment. And to be precise, recognizing that, like the January 6 Committee in the
U.S. House of Representatives is insisting on a question-by-question invocation, you
might do the same,[2] he specifically pleads that constitutional protection as follows in
response to each of the five specific categories of documents (in turn corresponding to
lines of questions) you seek. We do this as to the categories of documents/lines of
questions as we discern them from the Attachment to Subpoena (though the categories of
documents/lines of questions are not numbered in the Attachment):[3]

1.      "Produce all documents and records (stored in hard copy or electronically),
of which you were aware before January 4, 2021, that contain evidence of irregularities in
the 2020 presidential election and that may have affected the outcome in Georgia or any
other state."

---

[1] On its own, the date of the subpoena is misleading as to the far shorter delta of time between the
subpoena's receipt in some form and my response today. As you know, Mr. Clark did not receive the
subpoena via email (which we do not consider service, to be clear, and please see below) *until January 6,
2022*. *See* Exhibit 1. You know that there were logistical problems in communicating the subpoena to Mr.
Clark—logistical problems that afflicted both your Office and Mr. Clark's personal email address, where
on each end the respective email software was diverting emails into spam boxes, etc. For instance, on
January 10, 2021, you began an email by noting "Your emails are still going into the junk folder, and I did
miss the one about pro hac representation. We are trying to figure out why and correct the situation."
Exhibit 1. Your Office could have issued a new subpoena updating matters to the agreed-upon January 31,
2022 return date but I assume that to save time, you opted not to do so.

[2] *See In re Barber*, 128 A.3d 637, 640 (D.C. 2015) (Mr. Barber was "was free to invoke his Fifth Amendment
right on a question-by-question basis ….").

[3] Today I am also sending in a separate document a response to your letter dated November 22, 2021
(similarly, this letter was not fully received via email by Mr. Clark until January 6, 2022). That letter should
be deemed incorporated by reference into this letter. In includes various barriers and publicly available
factual averments you would need to work through in order to proceed further. This letter focuses on the
subpoena, our request for a deferral, and closely related matters.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 3

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

2. "Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

3. "Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

4. "Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [sic] and Natural Resources Division to investigate allegations of election fraud."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 4

5.      "Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President."

•    On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

Note as well, as a general matter, that you are requesting at least some and likely many categories of documents that are in the possession of the Department of Justice. You can contact DOJ to request such documents going to or coming from Mr. Clark. It would seem incumbent on your Office to seek these documents from DOJ first before pursuing a subpoena path directed at Mr. Clark, a former government official who resigned from federal service more than a year ago on January 14, 2021. *See, e.g., Freeman v. Seligson*, 405 F.2d 1326 (D.C. Cir. 1968) (per curiam) ("[W]e are unable to tell what, if any, consideration was given to possible resort to other sources for at least some of the material. From what does appear, many of the documents sought are exclusively under the Secretary's control, and others are obtainable from third parties, if at all, only at great inconvenience. But we think that, particularly with so large a demand as the subpoena here makes, a determination on good cause requires that all reasonable alternatives be explored.").[4]  You can check with DOJ after written notice to us that you are doing so, but Mr. Clark believes that while he was able to see a subset of documents he requested to see pursuant to DOJ regulations relating to a congressional inquiry, he is not authorized on his own authority to share those documents with your Office.

When we spoke on Friday June 27, 2022, you scoffed at the prospect that Mr. Clark might assert his Fifth Amendment rights, and "promised" me that you would "ratchet up" the disciplinary sanction if he did. It is improper to make a verbal threat to retaliate

---

[4] "[A] division of this court [i.e., the District of Columbia Court of Appeals, the highest local court in the District] is normally bound by decisions of the D.C. Circuit rendered before February 1, 1971[.]" *Thoma v. Kettler Bros., Inc.*, 632 A.2d 725, 729 n.9 (D.C. 1993).  Additionally, consistent with that, I located the *Freeman* precedent from the Westlaw database entitled "All District of Columbia Local Cases."

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 5

for the exercise of constitutional rights when your own rules expressly incorporate constitutional limits on your investigative and disciplinary authority. It is even more improper to do so in writing in the email you sent me later that evening. Such an approach violates the Due Process Clause *by penalizing* the exercise of procedural rights. *See Ex Parte Young*, 209 U.S. 123 (1908). You cannot run the Bar's disciplinary system in a fashion that would penalize Mr. Clark for exercising his rights, just as *Ex Parte Young* faulted a state law regime for making it "difficult, if not impossible, for the company to obtain officers, agents, or employees willing to carry on its affairs except in obedience to the act and orders in question." *Id.* at 145.

The Fifth Amendment protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. An innocent person has the right to claim the Fifth Amendment Privilege if the information requested could conceivably supply a "link in the chain" leading to prosecution. As the Supreme Court held in *Ohio v. Reiner*, the Fifth Amendment "protects the innocent as well as the guilty." 532 U.S. 17, 18 (2001). It is a "safeguard against heedless, unfounded, or tyrannical prosecutions." *Quinn v. United States*, 349 U.S. 155, 162 (1955).

The right against self-incrimination applies to proceedings before the Office of Disciplinary Counsel. *See*, e.g., *In re Artis*, 883 A.2d 85, 103 (D.C. 2005) ("Given the allegations in this case, we find no error in the Board's decision recognizing respondent's right to assert his Fifth Amendment privilege"); *In re Burton*, 472 A.2d 831, 845-46 (D.C. 1984) ("The hearing committee in this case appropriately allowed Respondent to exercise his Fifth Amendment right not to testify, and the committee made it clear that it was *drawing no adverse inference* based on Respondent's failure to testify… or his invoking his Fifth Amendment privilege.") (internal quotations and brackets omitted) (emphasis added); DC Bar Rule XI (8)(a) ("An attorney under investigation has an obligation to respond to Disciplinary Counsel's written inquiries in the conduct of an investigation, *subject to constitutional limitations*.") (emphasis added).

The Fifth Amendment privilege can apply to a production of documents as well as to statements. As the DC Circuit has stated:

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 6

> [T]he act of production communicates at least four different statements. It
> testifies to the fact that: i) documents responsive to a given subpoena exist, ii)
> they are in the possession or control of the subpoenaed party, iii) the
> documents provided in response to the subpoena are authentic; and iv) the
> responding party believes that the documents produced are those described
> in the subpoena.

*United States v. Hubbell*, 167 F.3d 552, 567-68 (D.C. Cir. 1999). When asserting a Fifth
Amendment "act of production" privilege, creating a log documenting such assertion
would itself defeat the privilege. *See, e.g. SEC v. Coldicutt*, 2017 U.S. Dist. LEXIS 88401
(C.D. CA 2017) ("[T]he involuntary act of producing a more detailed privilege log could
have a testimonial aspect").

While we stoutly deny that Mr. Clark has committed any criminal acts, his Fifth
Amendment privileges are nevertheless clearly implicated here because of statements
made by Members of the January 6 Committee and in light of the cottage industry among
partisan pundits and legal commentators trying to dream up theories upon which he
might be criminally prosecuted in order to try him in the press echo chamber. Some of
these pundits and commentators are closely aligned with the Chief of Staff of the January
6 Committee. Here is a non-exhaustive set of examples:

- On December 1, 2021, Chairman Bennie Thompson said on the *Rachel
Maddow Show* that Mr. Clark's invocation of his Fifth Amendment rights
meant that "in some instances you are part and parcel guilty to what
occurred." *See* Tim Hains, *Jan. 6 Committee Bennie Thompson: If You Plead
the Fifth, You're "Part and Parcel Guilty*," REAL CLEAR POLITICS, *available at*
https://www.realclearpolitics.com/video/2021/12/02/january_6_committee
_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_p
arcel_guilty.html#.

- Norm Eisen, former Chief Counsel to the House Committee prosecuting
the first impeachment of President Trump, wrote an article with Danya
Perry and Joshua Perry that in one breath says that Mr. Clark's "fear of

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 7

incrimination could well be justified," and that "we don't discount the possibility that Mr. Clark might face prosecution for his reported conduct" and in another that the Committee "should explore whether there's a sufficient basis for Clark to invoke — or whether this is just another manipulation." *See* https://www.washingtonpost.com/outlook/2021/12/03/clark-eastman-fifth-amendment/. Mr. Eisen and January 6 Committee Chief of Staff Ms. Amerling are previous collaborators in other Democrat political messaging campaigns. *See also* https://www.acslaw.org/wp-content/uploads/2018/04/Smear-Campaign-cover.png.

- David Corn, a notorious smear merchant in the Russiagate Hoax, is another associate of Ms. Amerling in partisan Democrat endeavors. He wrote in *Mother Jones* that Mr. Clark faced a reasonable prospect of criminal prosecution according to Norm Eisen:

  Corn: Could Jeffrey Clark be prosecuted for trying to push DOJ officials to falsely declare the election corrupt? Under what laws? And would there be any criminal liability for Trump, who is clearly a co-conspirator?

  Eisen: Yes and yes, depending on how the investigation evolves. For instance, 18 USC § 610 makes it "unlawful for any person to intimidate, threaten, command, or coerce" a federal employee to "engage in...any political activity." Prosecutors could decide Trump and Clark conspired to violate that statute. While there are not a lot of precedents, no president has ever gone this far into possible illegality before in American history.

  https://www.motherjones.com/politics/2021/12/heres-why-a-former-trump-ally-may-plead-the-fifth-before-the-1-6-committee/ (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 8

- Lawrence Tribe and Dennis Aftergut, *What Does Jeffrey Clark Have to Hide – And What Are Congress and AG Garland Going to Do About It?*, *available at* https://thehill.com/opinion/judiciary/580643-what-does-jeffrey-clark-have-tohide- and-what-are-congress-and-ag-garland (last visited Jan. 31, 2022).

- Glenn Kirschner, *DOJ Officials Thwarted Trump's Coup. Next Step: A Criminal Investigation. available at* https://www.msnbc.com/opinion/doj-officialsthwarted-trump-s-coup-next-step-criminal-investigation-n1276610 (last visited Jan. 31, 2022);

- On August 5, 2021 an editorial from Harvard law professor Laurence H. Tribe, University of Michigan law professor Barbara McQuade and University of Alabama law professor Joyce White Vance appeared in the Washington Post entitled *Here's a Roadmap for the Justice Department to Follow in Investigating Trump*. The editorial argued that Trump and "members of his inner circle" should be investigated for criminal offenses including Obstruction of an Official Proceeding (18 U.S.C. § 1512), *available at* https://www.washingtonpost.com/opinions/2021/08/05/heres-roadmap-justicedepartment- follow-investigating-trump/ (last visited Jan. 31, 2022).

- On January 15, 2022, formerly influential commentator Bill Kristol tweeted as follows: "The forged electoral certificates show coordination across seven states. Those fake certificates were key to the plan of the Eastman memo and to the Jeffrey Clark DOJ draft letter to Georgia. The conspiracy involved fraud and force. At the head of the conspiracy: Donald Trump." *available at* https://twitter.com/BillKristol/status/1482343171103277065 (italics added) (last visited Jan. 31, 2022).

- On December 1, 2021, the January 6 Committee voted to refer Mr. Clark to the Department of Justice for prosecution for criminal contempt of Congress.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 9

It should be obvious to even the most casual observer that statements such as these necessitate a Fifth Amendment response to any official inquiry, including a subpoena from the January 6 Committee. It is equally obvious that the same considerations and others would apply to the subpoena you issued as Disciplinary Counsel. The letter from Senator Durbin that apparently prompted your inquiry openly accused Mr. Clark of criminal conduct. As Senator Durbin wrote, "Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against 'counsel[ing] a client to engage, or assist[ing] a client, in conduct the lawyer knows is criminal or fraudulent." The Bar's investigation thus has as its genesis an accusation of criminal misconduct by an individual U.S. Senator who is also the Chairman of the Senate Judiciary Committee. *Cf. Artis*, 883 A.2d at 103 (evaluating Fifth Amendment assertion in light of "the allegations in this case.")

The subject matters covered by the Bar's subpoena relate directly to the subject matters of the various suggestions that Mr. Clark has criminal liability or should be criminally investigated or prosecuted. For example, the subpoena requests documentation of irregularities in the 2020 election, internal Justice Department correspondence relating to the election, details of conversations with other individuals about the election and other matters. Answers to such queries, though seemingly innocuous in themselves, could very easily supply a "link in the chain" leading to a "heedless, unfounded or tyrannical prosecution[]."

Claiming the protection of Fifth Amendment is not, as a matter of law, an "obstruction" of the Bar's investigation. Further, an as argued in both letters dated today, my opinion is that the entire investigation into the internal deliberative processes of the Department of Justice is *ultra vires*. The Fifth Amendment is unfortunately necessary under the circumstances because it offers available protection against a "heedless, unfounded or tyrannical prosecution[]." Should the Fifth Amendment concerns be definitively resolved, I am sure that Mr. Clark will consider offering substantive responses, subject to the other formal objections asserted in this letter and the accompanying letter of even date should the investigation reach that point.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 10


## 2. Request for Deferral

I hereby also respectfully request that you seek to defer this investigation under D.C. Board Rule (hereafter "Board Rule __") 4.1 because likely all portions (or, at the very least, some portions) of Senator Durbin's charges are currently being investigated by several other entities, including possibly but not limited to:

- the Senate Judiciary Committee, which the Senator Durbin complaint itself evidences and which your November 22 cover letter (emphasis added) recognizes at page 2 is merely an "*interim* report";

- the House Select Committee to Investigate the January 6th Attack on the United States Capitol, *see especially* Business Meeting, *available at* https://january6th.house.gov/legislation/business-meetings/business-meeting-report-recommending-house-representatives-cite-0 (Dec. 1, 2021);

- the Inspector General of the Justice Department, *see* OIG Press Release, *available at* https://oig.justice.gov/news/department-justice-office-inspector-general-announces-initiation-investigation (Jan. 25, 2021).

- The special grand jury criminal investigation, involving former President Trump's election-related activities, being conducted by Fulton County, Georgia. *See In Re: Request for Special Purpose Grand Jury*, Order Approving Request for Special Purpose Grand Jury Pursuant to O.C.G.A. § 15-12-100, *et seq.*, Superior Court of Fulton County, Atlanta Judicial District, No. 2022-EX000024 (entered Jan. 24, 2022);[5] and

- a host of lawsuits involving various persons and entities related to the Dominion, *et al.* voting machines, *see, e.g.*, Jan Wolfe & Helen Coster, *Dominion Sees No Chance of Settling Suits Against Pro-Trump Lawyers Giuliani, Powell*, REUTERS,

---

[5] By referencing this proceeding, there is no acquiescence in Fulton County jurisdiction over Mr. Clark. He retains all of his jurisdictional defenses. Board Rule 4.1 does not require the existence of jurisdiction in a related pending matter over a bar member in order for it to provide proper grounds for deferral.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 11

> *available    at*   https://www.reuters.com/legal/government/dominion-sees-no-chance-settling-suits-against-pro-trump-lawyers-giuliani-powell-2022-01-25/
> (Jan. 25, 2022).[6]

The following table compares the 5 categories of documents in your subpoena to the 18 categories in the January 6 Committee subpoena:

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| [1] "Produce all documents and records (stored in hard copy or electronically), of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state." | "7. From November 3, 2020, through January 20, 2021, all documents and communications provided to you relating in any way to purported election irregularities, election-related fraud, or other election-related malfeasance."<br><br>"8. All documents and communications relating in any way to specific allegations of voter fraud in |

---

[6] Admittedly, no document I am aware of shows Mr. Clark taking a public position on Dominion voting machines while he served in the Justice Department (and to my knowledge not even after he left on January 14, 2021). But the unsent letter to Georgia officials, which Mr. Clark is alleged to have drafted and is one of the focal points of your subpoena and of Senator Durbin's complaint, was also not made public by Mr. Clark. That means, as I cover in more detail in the accompanying separate letter from me dated today, that this investigation should be terminated. Your Office's seems to be proceeding on the theory that even confidential pre-decisional draft documents that were reportedly first batted around by a group of federal lawyers and then discussed with the President, but rejected and never sent or otherwise acted upon, can give rise to a properly founded bar discipline case. Under such a limitless theory, there is no necessary demarcation that would make those extraneous voting machine lawsuits unrelated for purposes of the deferral rule, even though Mr. Clark made no claims in a public forum about those machines. The same breadth you apply to your conception of the Office of Disciplinary Counsel's investigative and prosecutorial authority must also be applied in assessing whether other litigation or investigations are sufficiently related, and thus would provide grounds for deferring this matter, under Board Rule 4.1.

[7] *See* Exhibit 2, Subpoena to Mr. Clark from the January 6 Committee.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 12

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| | Georgia, Pennsylvania, Michigan, Arizona, or any other states." |
| [2] "Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election." | "5. All documents and communications relating in any way to a November 9, 2020, memorandum from Attorney General William Barr concerning investigation of voter fraud allegations."<br><br>"6. From November 3, 2020, through January 20, 2021, all documents provided to you for reviewing, assessing, or reporting on the security of election systems in the United States."<br><br>"9. All documents and communications relating in any way to alleged interference with the tabulation of votes by machines manufactured by Dominion Voting Systems." |
| [3] "Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election." | "2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election."<br><br>"17. All documents and communications relating in any way to state legislatures' selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election." |
| [4] "Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the | "1. Communications referring or relating in any way to plans, efforts, or discussions regarding the Department of Justice's involvement in |

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 13

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [sic] and Natural Resources Division to investigate allegations of election fraud." | investigating allegations of election fraud in the 2020 Presidential election."<br><br>"2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election."<br><br>"4. All documents and communications relating in any way to the possibility of the Department of Justice filing documents in the United States Supreme Court regarding allegations of election fraud and/or the certification of the results of the election."<br><br>"18. All documents and communications relating in any way to Congress's or the Vice President's role and authority when counting electoral votes." |
| [5] "Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President." | "12. All communications with former President Trump, former Chief Staff to the President Mark Meadows, or other individual who worked in the White House complex during the Trump Administration, including any employee or detailee, relating in any way to allegations of fraud in the fall 2020 election." |

You will no doubt see in the above table *substantial overlap* between the items you have subpoenaed and those that the January 6 Committee have subpoenaed, further supporting the wisdom of deferring this Bar inquiry.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 14

Overall, within the meaning of Board Rule 4.1(a), there is thus a "pendency of a related ongoing criminal or disciplinary investigation or upon related criminal or civil litigation where there is a substantial likelihood that the resolution of the related investigation or litigation will help to resolve material issues involved in the pending disciplinary matter." *See also generally* D.C Bar Rule XI, Section 19(d). Note that your November 22, 2021, cover letter to Mr. Clark explicitly concedes that there are "*parallel Congressional investigations*." Letter from Phil Fox to Jeffrey Clark, at 3 (Nov. 22, 2021) (emphasis added). Accordingly, it would seem hard for your Office to now maintain that those investigations, which are in "parallel" and many of which began far earlier, are not a proper basis for a Board Rule 4.1 finding that the resolution of those other matters "will help to resolve material issues involved in the pending disciplinary matter." As a result, it is appropriate to defer this case pending the resolution of those other matters.

Nevertheless, I do see that, in a January 10, 2022 email to Mr. Clark about the January 31, 2022 agreed-on deadline for responding to your letter and subpoena, you stated the following: "We are not going to be receptive to arguments that any production should be put off awaiting any action by the January 6 committee or the Department, and we will assess any such arguments in the context of your obligation as a member of the Bar to respond to our inquiries. This office is an arm of the Court, and we are not going to defer to a congressional inquiry or a dispute with the Department." Exhibit 1.

Respectfully, I think your January 10 statement is directly contrary both to the letter and spirit of Board Rule 4.1(a), especially in light of your concession that there are "parallel Congressional investigations." Under that Board Rule, you should neutrally evaluate whether this deferral request should be granted using the criterion in the rule. If you disagree with my request, please explain in a response to this letter why Board Rule 4.1(a) does not fit this situation quite well, especially given that we are dealing here not with just one related matter pending elsewhere, but *several such matters, multiplying the utility of awaiting the resolution of all of those matters, or at least some of them.*

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 15


Additionally, speed should not be a factor, especially if the accelerated timetable is desired by the January 6 Committee.[8]  Nothing in Board Rule 4.1 indicates that it is a relevant factor that parties in related investigations or matters want your Office to move quickly to advance their own objectives through your investigation, assuming it is and remains independent. (By contrast, the fact that other entities want to move your Office along quickly reveals that they are trying to weaponize bar processes against Mr. Clark, something that you should steadfastly resist as part of your duty to do substantial justice and to maintain the separation of powers between the legislative and judicial branches of the federal government.)  Considering such a factor would thus be improper and outside the bounds of Board Rule 4.1.

We understand that requests for deferral are routinely granted even where doing so entails substantial delay. We certainly believe that Mr. Clark should be entitled to the same treatment as others in this regard. We therefore hope that upon reflection you will agree with the deferral request to put this inquiry on hold until at least some of those matters are concluded.  If you now agree, please refer my request on Mr. Clark's behalf for a deferral to the appropriate "Contact Member" or let me know the name and address of that person and I will direct this deferral request to that person, noting your non-opposition to it.

4.   **Other Related Issues Supporting Deferral or Withdrawal of the Subpoena**

*Your Office's Subpoena Power Cannot Be Used as a Substitute for a Senate Subpoena Power That Under Senate Rules There Is Not Enough Power to Wield.*  The complaint you have opted to docket against Mr. Clark comes directly from Senator Durbin, current Chair of the Senate Judiciary Committee, in his individual capacity; not from the Senate Judiciary Committee itself. The Committee has its own rule governing

---

[8] It seems curious that while this response was coming due on January 31, 2022 and just a few days ago, on January 27, 2022, the January 6 Committee contacted another of Mr. Clark's lawyers, Mr. Charles Burnham, for the first time in weeks, to seek to rapidly schedule a second deposition for Mr. Clark, which would inherently fall *after* the response to your subpoena was due. And then, *just the next day*, on January 28, 2022, DOJ contacted me about providing a redacted version of a document we have long been seeking for the very purpose of preparing for that deposition.  This is quite an alignment of stars.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 16

subpoenas, which, if properly followed, could have issued its own subpoena for these documents. But the Committee has not done so because Rule IX of Rules of Procedure of the United States Senate Committee on the Judiciary provides as follows:

> The Chair of the Committee, *with the agreement of the Ranking Member or by a vote of the Committee,* may subpoena the attendance of a witness at a Committee or Subcommittee hearing or Committee deposition, or the production of memoranda, documents, records, or any other materials. Any such subpoena shall be issued upon the signature of the Chair or any other Member of the Committee designated by the Chair.

*Available at* https://www.judiciary.senate.gov/about/rules (last visited Jan. 31, 2022) (emphasis added). These Rules carry constitutional imprimatur. *See* U.S. Const. art. I, sec. 5 ("Each House may determine the Rules of its Proceedings ....").

No Senate Judiciary Committee subpoena has ever been issued to Mr. Clark. Under the text of Senate Judiciary Committee Rule IX, that must be because the Ranking Member, Senator Grassley did not concur in sending such a subpoena and because Senator Durbin knew that with a total of 22 Members on the Committee, evenly divided between the two political parties, he could not secure a majority of votes to issue a subpoena. Senator Durbin turned instead to your Office.

In light of these facts and these aforementioned sources of federal law, your Office should regard the issue as being preempted, pursuant to the Supremacy Clause. The Senate Judiciary Committee is part of the federal government, to which your Office is subordinate. Nor is the District of Columbia able to cloak its action in any doctrine of federalism; the District of Columbia is subject to direct federal control. Instead, pursuant to the duly prescribed processes of the U.S. Senate, the even divide in the Senate logically precludes the issuance of a subpoena by your Office. This is representative democracy at work, *i.e.*, respecting the ability of the Senate to act or not act as its balance of power lies.

Your Office is thus obligated to respect, as the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, the inability of the Senate Judiciary Committee to issue a subpoena to Mr. Clark. Allowing Senator Durbin (and perhaps his fellow Democrat Committee

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 17

Members)[9] to functionally acquire the power to subpoena, simply by finding a willing local bar entity to issue the subpoena instead, is a flat-out circumvention of the inability of the Senate Judiciary Committee to muster the votes necessary to issue a subpoena to Mr. Clark. And circumvention is precisely what conflict preemption doctrine is designed to prevent. *See, e.g., Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U. S. 246, 255 (2004) (invalidating attempted evasion by California of commitments of authority to a federal agency). The Senate cannot blow hot and cold with its rules; either they are followed consistently or they are not. Thus, if the Senate's rules on hearing testimony were permissibly applied in a way that somehow allows you to receive testimony against Mr. Clark (something, to be clear, we reject because the applicable D.C. rules contemplate an *independent* trial-like process and on Bill of Attainder grounds), then the Senate's subpoena rules (and the limitations thereof) must similarly be observed. Or, by contrast, if the Senate's rule on subpoenas is to be ignored, then the testimony that came in pursuant to other portion(s) of Senate rules must similarly be ignored.[10]

In any event, as an independent matter, the Senate's rules and its authority cannot be supplemented by the devices of local law when the stopping points of those Rules and authority would be exceeded. Otherwise, the majority voting requirement of Senate Judiciary Committee Rule IX would be rendered a nullity.

At the very least, there is no prudent reason for your Office to break the Senate tie by allowing Senator Durbin, in effect, to wield your Office's subpoena power by either

---

[9] Note as well, however, that the October 7, 2021 letter that was sent to you to serve as a complaint is signed by and purports to speak only for Senator Durbin. There is no indication in it that a Senate Judiciary Committee vote of any kind was held before the October 7 letter was sent. This is an independent violation of the Senate Judiciary Committee Rules because there is no indication that the very serious matter of sending an accusation to your Office against Mr. Clark was supported by any other members. *See* Senate Judiciary Committee Rule III (Quorums), *available at* https://www.judiciary.senate.gov/about/rules (last visited Jan. 31, 2022). The Durbin letter obviously threatens Mr. Clark's livelihood, his reputation, and thus the health and integrity of his family as well. It is possible that even fellow Democrat Senators may have recoiled from impugning Mr. Clark, had they been asked before Senator Durbin sent his letter.

[10] However, I fully reserve Mr. Clark's constitutional rights to argue that the Senate Judiciary Committee was exceeding its actual sphere of powers to investigate facts only for the purpose of legislating.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 18

remote control or because of a preference that might exist within your Office's personnel to side with Senator Durbin's views on disputed issues in the administration of the 2020 presidential election. That would be both abuse of prosecutorial discretion for an improper political end and the wading into a deep political divide in the guise of merely policing the ethics rules. Indeed, since there does not appear to have ever been an ethics case like this one, where a member of one branch of the federal government belonging to one political party complains about confidential internal legal deliberations between and among members of the opposite political party inside another branch of the federal government, extreme caution should be exercised. And that level of caution should be heightened further when the situation involves advice to the President as well. And if that protective approach is properly followed, this subpoena should be withdrawn or at least deferred pending the other actions pointed to above. Will the D.C. Bar next investigate Supreme Court law clerks who write drafts or propound arguments in confidential internal discussions that are rejected by the Justice for whom they clerked where a single Senator complains about that position, even though the Justice did not actually adopt it? As you are aware, sometimes the Justices' internal papers are released or leak and, on the logic that you seem to be entertaining, their clerks could thus be investigated years later. *See* Board Rule 19.1 ("Investigations, petitions, and the application of sanctions are not subject to any statute of limitations.").

*Federal Supremacy in the Context of Bar Disciplinary Rules*. As set forth in the Office of Legal Counsel Opinion dated August 2, 1985 and entitled *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*,[11] any local bar's assertion of disciplinary authority over federal government attorneys that interferes with or penalizes the performance of authorized federal responsibilities trenches upon the Supremacy Clause. "The purported imposition of exclusive disciplinary jurisdiction by state courts upon federal lawyers acting in the scope of their federal authority is subject to the overriding requirements of the Supremacy Clause. Rules promulgated by state courts or bar associations that are inconsistent with the requirements or exigencies of federal service may violate the Supremacy Clause." *Id.*

---

[11] *Available at* https://www.justice.gov/file/23741/download (emphasis added) (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 19


*Other Objections.*  Mr. Clark also expressly reserves his right, acknowledged in Board Rule 2.9(a), to assert and claim, at the appropriate time, that Disciplinary Counsel's subpoena and each of the related requests for information, dated November 22, 2021, "seek[] privileged information, seeks information that exceeds constitutional limitations or is otherwise improper," including because, but not limited to, the fact that the requests and questions are vexatious, unduly burdensome, not reasonably calculated to lead to the discovery of information relevant to the investigation, and are otherwise improper under the circumstances and under the applicable D.C. Bar Rules, Board Rules, and Rules of the Superior Court of the District of Columbia.  The requests and questions posed above are unreasonable under the circumstances. They amount to the equivalent of interrogatory discovery, which is impermissible in this context; are overbroad, vague and burdensome; involve information available from other sources, and present an excessive monetary burden.  *See generally In re Artis*, 883 A.2d 85 (D.C. 2005).  Board Rule 2.9(a). This rule also imposes a mandatory duty on you to consult with us at an appropriate time before proceeding further.  I also note the obvious point that since you agreed to a January 31, 2022 response date concerning your letters, any time periods associated with this process begin no earlier than today, and since the subpoena has not been served, in reality even later.

I recognize that that Board Rule specifically involves requests for information by you, whereas here you have opted to proceed by way of a Board Rule 3.14 subpoena (something that itself is curious as it attempts to use the bigger tool first).  However, as a matter of the structure of the Board Rules and the fact that constitutional issues exist here, whether you had opted to proceed via Board Rule 2.9(a) or via Board Rule 3.14, the point remains that request for information, including a subpoena, is invalid if it seeks to intrude into confidential internal legal deliberations undertaken within the federal sphere, especially to counsel the President, the sole head of the Executive Branch.

The questions posed above thus also raise novel, complex and difficult executive privilege, separation of powers, Fifth and Sixth Amendment, and professional responsibility issues.  Without duplicating the points covered in my other letter dated today, consider briefly just the issue of executive privilege. *See, e.g., Trump v. Thompson*, No. 21A272 (Jan. 19, 2022) (statement of Justice Kavanaugh respecting the denial of the

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 20

application for an injunction pending appeal) (observing that "If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe."). The majority in *Trump v. Thompson* were also very cautious to recalibrate the D.C. Circuit's apparent view to the contrary as mere dicta. *See generally* D.C. Bar Rule XI, Section 8(a) ("An attorney under investigation has an obligation to respond to Disciplinary Counsel's written inquiries in the conduct of an investigation, *subject to constitutional limitations*.") (emphasis added).

Additionally, Senator Durbin was clearly *not the client of Mr. Clark here*. As such, the complaint he made to your Office cannot possibly waive any attorney-client privilege binding Mr. Clark. This is not the typical situation in which a complainant approaches you to grieve against his lawyer, or possibly seeks help in drafting a complaint, and thus may need to disclose his confidential information to you to explain why he is complaining. This is instead an atypical situation in which a highly partisan member of one chamber of the legislative branch of the federal government is complaining about internal legal advice given inside Executive Branch of the federal government by a member of the opposite political party. As far as I am aware, there has never been a past disciplinary case like this one, which is *extremely novel* and for that reason alone raises serious due process issues of fair notice. *See In re Ruffalo*, 390 U.S. 544 (1968) (invalidating a disbarment order because the lawyer had no notice that his conduct— hiring a part-time FELA investigator who worked for a railroad—might later be considered by some lawyers as an offense warranting a disbarment order); *id.*, 390 U.S. at 556 (White & Marshall, J.J. concurring in the result) ("I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.").

I do not go into detail on the constitutional and other privilege issue here because my separate letter today does so and also incorporates my prior communications on executive privilege and other matters with the January 6 Select Committee. All of these

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 21

issues, though, also support my request that Disciplinary Counsel seek deferral of this investigation under Board Rule 4.1.

*Unperfected Service of the Subpoena.* Regarding the subpoena itself, one last issue. If you opt not to withdraw the subpoena or defer consideration of this matter pursuant to Board Rule 4.1, please address service of the subpoena. Pursuant to D.C. Bar Rule XI, Section 18(a), you can issue a subpoena at the investigation stage. But that Bar Rule incorporates D.C. Superior Court Civil Rule 45 by reference. And Superior Court Civil Rule 45(b) provides how service is to be accomplished. More specifically, Superior Court Civil Rule 45(b)(1) states that "[s]erving a subpoena requires delivering a copy to the named person, and, if the subpoena requires that person's attendance, tendering the fees for one day's attendance and the mileage allowed by law." Service in accord with the applicable rules has not yet occurred. Mr. Clark did agree by email to respond by today (which he is making good on in my two letters) but that is not the same as receiving formal service. Nor did Mr. Clark specifically waive his right in writing to insist on formal service.

*Confidentiality.* It was troubling to see in your cover letter dated November 22, 2021, your statement to Mr. Clark that you will be "sending a copy of [his] response to the complainant [i.e., Senator Durbin] for comment." Presumably this would have also included any documents produced by Mr. Clark. We submit that such a disclosure is neither "necessary" under the Bar Rules, nor permitted under Rule XI and the DC Rules of Professional Conduct.

I therefore include as an attachment to this letter a D.C. Bar Ethics Opinion that discusses the confidentiality and conflict of interest obligations of Bar Counsel. In cases such as this one, giving anyone in Congress a copy of such materials, is the functional equivalent of a "mass public communication" especially because the leak potential increases astronomically, thus converting this confidential bar investigation into a trial in the press. We respectfully submit that any breach of the confidentiality requirement of D.C. Bar Rule XI, Section 17 by you or anyone in your Office will constitute "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." D.C. Rules of Professional

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 22


Conduct 3.6(c); 3.8(f).  *See* D.C. Bar Legal Ethics Opinion No. 358, at n.6 Exhibit 3 (Jan. 1, 2011).  In your response to this letter, please confirm that you understand these restrictions.  Tempting trial by media (and in this instance an especially ravenous media feasting on breathless and constantly hyped moral panic over 2020 election controversies) is improper under Ethics Opinion No. 358 and D.C. Rules of Professional Conduct 3.6(c) and 3.8(f) (the latter applying as you serve in the role of a "chief prosecutor," *see* Office of Disciplinary Counsel, Purpose and Mission, *available at* https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/purpose-and-mission (last visited Jan. 31, 2022)).

*The Real Ethics Issues Here, If Any Were Within Your Office's Jurisdiction, Are the Anonymous Leaks, Likely Made by One or More Other Federal Lawyers (Not Mr. Clark), That Form the Genesis of Senator Durbin's Complaint.*  It is unfortunate for the state of the Republic to be saying this, but the complaint filed by Senator Durbin is a clear attempt to weaponize the D.C. Bar Rules against Mr. Clark, to play politics, and to besmirch Mr. Clark's stellar reputation.  Stellar at least until anonymous leakers (likely lawyers violating their own professional responsibility, obligations and other duties of confidentiality) attempted to paint themselves as heroes opposing former President Trump in a *New York Times* narrative that began to be spun in late January 2021.  *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General,* New York Times (Jan. 22, 2021), *available at* https://www.nytimes.com/2021/01/22/us/politics/jeffrey-clark-trump-justice-department-election.html.

If anything should be done as to the ethics rules in this situation, you should be investigating who at the Justice Department (or who elsewhere in the federal government that might be lawyers) leaked to the *New York Times*.  Trying to penetrate into the advice Mr. Clark gave to his colleagues in the Department of Justice and to the President of the United States under the shield of confidentiality is not an inquiry within the scope of D.C. Bar Rule XI, and thus not a matter your Office should be pursuing.  Local bar counsel should not be trying to oversee or to regulate the superior federal government's confidential internal deliberations.  Nor do they possess legal authority under our Constitution to do so.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 23

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Enclosures

cc:    Jeffrey Bossert Clark (w/ enclosures)

Redacted

| | |
|---|---|
| **From:** | Phil Fox <FoxP@dcodc.org> |
| **Sent:** | Monday, January 10, 2022 12:12 PM |
| **To:** | Jeffrey Clark |
| **Cc:** | Jason Horrell; Azadeh Matinpour; Angela Thornton |
| **Subject:** | FW: [EXT]RE: 1st part of BLTR with attachments |

FYI

-----Original Message-----
From: Angela Thornton <thorntona@dcodc.org>
Sent: Monday, January 10, 2022 12:08 PM
To: Phil Fox <FoxP@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments

I'm counting 541 - close enough.

-----Original Message-----
From: Phil Fox <FoxP@dcodc.org>
Sent: Monday, January 10, 2022 11:48 AM
To: Angela Thornton <thorntona@dcodc.org>
Subject: FW: [EXT]RE: 1st part of BLTR with attachments

Will you confirm the total number of pages that we sent to him?

-----Original Message-----
From: Phil Fox
Sent: Monday, January 10, 2022 10:27 AM
To: Jeffrey Clark <Redacted>
Cc: Angela Thornton <thorntona@dcodc.org>; Jason Horrell <HorrellJ@dcodc.org>; Azadeh Matinpour
<matinpoura@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments

Your emails are still going into the junk folder, and I did miss the one about pro hac representation.  We are trying to figure out why and correct the situation.

First, with respect to the representation issue, there is an opinion from the Committee of Unauthorized Practice of the D.C. Court of Appeals that essentially says a non-D.C. lawyer can represent you without formal pro hac admission up until the time the case goes before the Court of Appeals.  That means, he can represent you during the investigation, at any hearing before a hearing committee, should one occur, and at the intermediate appellate level before the Board on Professional Responsibility.  Only if exceptions are taken to a Board report and/or the Court otherwise hears the case does he have to obtain pro hac admission.  This recently occurred with a lawyer from Tennessee who represented a former AUSA before a hearing committee and the Board without receiving pro hac admission.  When the matter went before the Court, where it is now pending, he applied for pro hac admission, which the Court promptly granted.

January 31 is fine, but that is a final deadline.  We are not going to be receptive to arguments that any production should be put off awaiting any action by the January 6 committee or the Department, and we will assess any such arguments in the context of your obligation as a member of the Bar to respond to our inquiries. This office is an arm of the Court, and we are not going to defer to a congressional inquiry or a dispute with the Department. You need to produce what you

EXHIBIT 1

1

have by January 31. If there is additional information that you believe is relevant and that you cannot produce, you can produce something akin to a privilege log, identifying the documents generically and explaining why you cannot produce them.

We will double check and get back to you on the total number of pages that we sent you.

-----Original Message-----
From: Phil Fox <FoxP@dcodc.org>
Sent: Monday, January 10, 2022 10:09 AM
To: Phil Fox <FoxP@dcodc.org>
Subject: FW: [EXT]RE: 1st part of BLTR with attachments
Importance: High


-----Original Message-----
From: Jeffrey Clark <Redacted>
Sent: Monday, January 10, 2022 7:19 AM
To: Phil Fox <FoxP@dcodc.org>
Cc: Jason Horrell <horrellj@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Angela Thornton <thorntona@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments
Importance: High

Mr. Fox,

 (1) I think there is a way to add me in your email program as a trusted recipient, which I think should solve the junk folder issue on your end going forward.

 (2) Please also check your junk folder to see if there is an email from me earlier on Friday morning than you sent the email below (11:01 am vs. 11:14 am) asking whether my non-DC-admitted prospective counsel needs to be pro hac-ed in to interact with your office. Or if you did see that email, please let me know whether my lawyer for this proceeding can take over corresponding with you now or whether he needs to take some pro-hac-type step first. Relatedly, can you confirm that the total package I have runs 542 pages?

 (3) Given your position on timing and the original timing delta of about three weeks to respond from when I would have the Bar correspondence in hand, I would propose to respond, including attached documents, by Monday 1/31/22 at 5 pm. Since I could not submit a claim to my insurer without having the document in hand, Friday is the day I submitted that claim and that is obviously relevant to how I will pay for counsel for this matter.

 (4) I reserve all of my legal rights in connection with responding and will take up any points of disagreement with your email below, such as my counsel's position concerning the relevance of the documents we are seeking from DOJ that DOJ is resisting providing and the degree of overlap between this proceeding and the January 6 Select Committee proceeding.

 Thank you.

Respectfully submitted,

Jeff Clark

From: Phil Fox <FoxP@dcodc.org>
Sent: Friday, January 7, 2022 11:14 AM
To: Jeffrey Clark <Redacted                         >
Cc: Jason Horrell <horrellj@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Angela Thornton
<thorntona@dcodc.org>
Subject: Re: [EXT]RE: 1st part of BLTR with attachments


For some reason your emails are ending up in our junk folder.


You are going to need to respond to our inquiry and subpoena this month. I am not willing to wait for you to resolve
whatever scheduling issues you have with the Congressional committee. Our issues are much narrower than their issues;
we are concerned only about the Rules of Professional Conduct. Although I don't understand the problem with our
getting you all the documents, the vast bulk were the Congressional report and the attachments, which I am confident
you have had for months and with which you are undoubtedly thoroughly familiar. I await your explanation of the issues
that you are having with the Department, but the subpoena only calls for documents in your possession. The
Department has been very cooperative, quickly providing Touhey letters, and we will assist you in getting any
documents that you reasonably need if we can. Given the more narrow nature of our inquiry, it is not clear what those
might be. But if we cannot quickly agree upon a time for your response and your document production to occur this
month, we will move to compel a response and to enforce the subpoena.


Get Outlook for iOS <https://aka.ms/o0ukef>

_____

From: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Sent: Friday, January 7, 2022 9:52:30 AM
To: Phil Fox <FoxP@dcodc.org <mailto:FoxP@dcodc.org> >
Cc: Jason Horrell <horrellj@dcodc.org <mailto:horrellj@dcodc.org> >; Azadeh Matinpour <matinpoura@dcodc.org
<mailto:matinpoura@dcodc.org> >
Subject: FW: [EXT]RE: 1st part of BLTR with attachments


A response from Clark.  (again in junk folder)


From: Jeffrey Clark <Redacted          > <mailto:Redacted            >>
Sent: Thursday, January 6, 2022 9:23 PM
To: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Cc: Phil Fox <FoxP@dcodc.org <mailto:FoxP@dcodc.org> >
Subject: [EXT]RE: 1st part of BLTR with attachments

Ms. Thornton,

(1) Thanks, yes, I can confirm I now believe that today, for the first time, I have the letter and subpoena with its attachments and thus have the full document.

Just to confirm with you, though, given our various past logistics problems (on both ends now, it seems), the whole doc, which consists of (a) an email from you (which again I first received only tonight), (b) the ODC letter, (c) subpoena, (d) attachment to subpoena (with the letter and both subpoena documents also received as of today for the first time), (e) a Regulation Counsel one pager, (f) an email from Sara Zdeb to ODC Info  (g) a letter from Senator Durbin, and (h) the Senate Judiciary Committee report runs, when all assembled, to a total of 542 pages.  Please confirm that total page number is correct so that I know I'm not missing anything at this point.

Thank you again.

(2) Mr. Fox, I will endeavor to get this to my ethics counsel as soon as I can.  Someone had agreed to represent me within the last few weeks but has strangely been silent since then.  He is a law professor with ethics rule expertise and it's possible he's gearing up for the new semester or is tied up on other client matters he works on.  But it wouldn't be the first time that in this high-profile matter a prospective lawyer has initially shown interest and then backed out.

Also, tomorrow I will send you an email forwarding some details about the latest as to a dispute I'm having with the Justice Department about access to certain documents.  I will also need to coordinate any response sent to ODC on my behalf by counsel for that purpose in light my next deposition to the January 6 Select Committee, as there is substantial overlap between their inquiry and yours.  In light of the fact that the Select Committee process has been underway for some time, I believe that before responding to this inquiry, I should first be permitted to complete my second deposition.  And at the moment, likely in light of the DOJ issue, that second deposition has not been rescheduled after being postponed due to my run-in with COVID.

After coordinating with my J6 counsel and ethics counsel, and explaining how my pending requests to DOJ impact things, ethics counsel for me will propose a revised response date for the subpoena, given that I just received the subpoena today.

Thank you.

Jeff Clark

From: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Sent: Thursday, January 6, 2022 10:36 AM
To: Redacted                           <mailto Redacted                    >
Subject: FW: 1st part of BLTR with attachments


The following file(s) can be downloaded via SendThisFile:

*        2021-D193 BLetter with attachments part 1 (002).pdf

Download Link: https://www.sendthisfile.com/WVPkz8QjV9TwpeLhh6GXOXM9
<https://www.sendthisfile.com/WVPkz8QjV9TwpeLhh6GXOXM9>


_____



Mr. Clark, per your email I am sending, again, the 1st part of the complaint with ODC's opening letter and written complaint with the 1st few attachments or appendixes A-B.  A second email will follow with attachment or appendix C, only.  I apologize for the delay but your emails to  me are all going into my spam folder.  I will keep an eye out for your emails in the future.


Thank you

Angela

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Jeffrey B. Clark
c/o Robert Driscoll, Esq., McGlinchey, Stafford, PLLC
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 29, 2021                    Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC  20515

Date: October 29, 2021                    Time 10:00 a.m.

☐ **to testify at a hearing**  touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                    Time _____

*To*  any authorized staff member or the United States Marshals Service
_____

_____    to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 13th      day of October                    , 20 21 .

_____
*Chairman or Authorized Member*

Attest _____
*Clerk*

EXHIBIT 2

# PROOF OF SERVICE

Subpoena for  Jeffrey B. Clark
             c/o Robert Driscoll, Esq., McGlinchey, Stafford, PLLC

Address  1725 Pennsylvania Avenue, NW, Suite 420

Washington, DC  20004

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol


*U.S. House of Representatives*
*117th Congress*


Served by (print name)

Title

Manner of service


Date

Signature of Server

Address

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
## Select Committee to Investigate the January 6th Attack on the United States Capitol

October 13, 2021

VIA US and ELECTRONIC MAIL

Jeffrey Bossert Clark, Esq.
c/o Robert Driscoll, Esq.
McGlinchey Stafford PLLC
1725 Pennsylvania Avenue, NW, Suite 420
Washington, DC 20004
rdriscoll@mcglinchey.com

Dear Mr. Clark:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce documents by October 29 and appear for a deposition on October 29.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations.

The Select Committee's investigation has revealed credible evidence that you attempted to involve the Department of Justice in efforts to interrupt the peaceful transfer of power. As detailed in a report issued by the Senate Judiciary Committee, you proposed that the Department send a letter to state legislators in Georgia and other states suggesting that they delay certification of their election results and hold a press conference announcing that the Department was investigating allegations of voter fraud.[1] These proposals were rejected by Department leadership as both lacking a factual basis and inconsistent with the Department's institutional role.[2] The report further indicates that you engaged in unauthorized investigation of allegations of voter fraud and failed to abide by the Department's policy on contacts with the White House.[3] As a result of your efforts to prompt this Departmental action, the President considered installing you as Acting Attorney General. While he did not ultimately make that personnel change, your

---

[1]     "Subverting Justice: How the Former President and his Allies Pressured DOJ to Overturn the 2020 Election," Majority Staff Report of the Senate Judiciary Committee, Issued October 7, 2021 at p. 19.

[2]     *Id.* at 22-23.

[3]     *Id.*

Jeffrey B. Clark, Esq.
Page 2

efforts risked involving the Department of Justice in actions that lacked evidentiary foundation and threatened to subvert the rule of law. Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 if you have questions or wish to discuss this matter.

Sincerely,

Bennie G. Thompson
Chairman

Jeffrey B. Clark, Esq.
Page 3

## <u>SCHEDULE</u>

In accordance with the attached Definitions and Instructions, you, Jeffrey B. Clark, are hereby required to produce, all documents and communications in your possession, custody, or control including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.

1. Communications referring or relating in any way to plans, efforts, or discussions regarding the Department of Justice's involvement in investigating allegations of election fraud in the 2020 Presidential election.

2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election.

3. From November 3, 2020, through January 20, 2021, communications relating in any way to a possible press conference or other public statement by the Department of Justice regarding investigations of allegations of election fraud.

4. All documents and communications relating in any way to the possibility of the Department of Justice filing documents in the United States Supreme Court regarding allegations of election fraud and/or the certification of the results of the election.

5. All documents and communications relating in any way to a November 9, 2020, memorandum from Attorney General William Barr concerning investigation of voter fraud allegations.

6. From November 3, 2020, through January 20, 2021, all documents provided to you for reviewing, assessing, or reporting on the security of election systems in the United States.

7. From November 3, 2020, through January 20, 2021, all documents and communications provided to you relating in any way to purported election irregularities, election-related fraud, or other election-related malfeasance.

8. All documents and communications relating in any way to specific allegations of voter fraud in Georgia, Pennsylvania, Michigan, Arizona, or any other states .

Jeffrey B. Clark, Esq.
Page 4

9. All documents and communications relating in any way to alleged interference with the tabulation of votes by machines manufactured by Dominion Voting Systems.

10. All documents and communications relating in any way to alleged interference in the fall 2020 election by foreign governments, organizations, or individuals.

11. Any documents and communications relating in any way to foreign influence in the United States 2020 Presidential election through social media narratives and disinformation.

12. All communications with former President Trump, former Chief Staff to the President Mark Meadows, or other individual who worked in the White House complex during the Trump Administration, including any employee or detailee, relating in any way to allegations of fraud in the fall 2020 election.

13. All communications with Representative Scott Perry or other Members of Congress relating in any way to allegations of fraud in the fall 2020 election, or to delaying or preventing the certification of the election of Joe Biden as President.

14. All communications with attorneys representing President Trump or the Trump re-election campaign relating in any way to litigation involving the fall 2020 election.

15. All communication with the Trump re-election campaign relating in any way to the fall 2020 election.

16. All communications with Professor John Eastman relating in any way to the fall 2020 election.

17. All documents and communications relating in any way to state legislatures' selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election.

18. All documents and communications relating in any way to Congress's or the Vice President's role and authority when counting electoral votes.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.   In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.   Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.   In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.   The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.   Electronic document productions should be prepared according to the following standards:

   a.   If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.   All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.   Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.   Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.   When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.   The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.  The pendency of or potential for litigation shall not be a basis to withhold any information.

11.  In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.  Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.  If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.  In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.  If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.  If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.  This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.  All documents shall be Bates-stamped sequentially and produced sequentially.

19.  Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.  The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.    The term "including" shall be construed broadly to mean "including, but not limited to."

5.    The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.    The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.    The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.    The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.    The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes in which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

### 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,
JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (I) proceed with the deposition, or (II) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

### REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,
JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# Ethics Opinion 358

# Subpoenaing Witness When Lawyer for Congressional Committee Has Been Advised that Witness Will Decline to Answer Any Questions on Claim of Privilege; Legal Ethics Opinion 31 Revisited.

D.C. Legal Ethics Opinion 31 (1977) concluded that it was a violation of the former Code of Professional Responsibility for a congressional staff lawyer to require a witness to appear before a congressional committee when the committee has been informed that the witness will invoke the self-incrimination privilege as to all substantive questions "and the sole effect of the summons will be to pillory the witness." The committee declines a request to vacate Opinion 31 but notes that under the D.C. Rules of Professional Conduct, as under the former Code of Professional Responsibility, a violation occurs only where the summons serves no substantial purpose "other than to embarrass, delay, or burden" the witness.

### Applicable Rules

- Rule 3.4 (Fairness to Opposing Party and Counsel)
- Rule 3.5 (Impartiality and Decorum of the Tribunal)
- Rule 3.8 (Special Responsibilities of a Prosecutor)
- Rule 4.4 (Respect for Rights of Third Persons)
- Rule 5.2 (Subordinate Lawyers)
- Rule 8.4 (Misconduct)

### Inquiry

### The Request

The Legal Ethics Committee ("Committee") has received a request ("Request") to vacate Legal Ethics Opinion No. 31 ("Opinion 31" or "the Opinion"), which the Committee rendered in 1977 under the former D.C. Code of Professional Responsibility ("D.C. Code"). The Request explains that witnesses subpoenaed to appear before congressional committees have on occasion interpreted Opinion 31 as concluding that compelling the public appearance of a witness who had declared that he would

EXHIBIT 3

assert his self-incrimination privilege in response to all questions constituted a per se violation of the D.C. Code. Based on this interpretation, some witnesses have refused to appear before Congress.

The Request asserts that various legal authorities "establish that there are legitimate reasons for a congressional committee and its staff to summon a witness even when the witness indicates in advance an intent to invoke the Fifth Amendment privilege." Among these, according to the Request, are the committee's right to evaluate the privilege assertion, the possibility that the witness will waive or not assert the privilege, the possibility that the committee will agree to hear the witness in executive session, and the possibility that the committee will immunize the witness's testimony under 18 U.S.C. § 6005.

The Request also states that Opinion 31 did not take into account the Supreme Court's 1976 decision in *Baxter v. Palmigiano*, 425 U.S. 308 (1976), which the Request asserts permits the finder of fact in a civil proceeding to draw an adverse inference from a witness's invocation of the privilege.[1] According to the Request, this law "make[s] absolutely clear that, given the inferences that can appropriately be drawn in civil contexts from a refusal to testify [on self-incrimination grounds], there are legitimate reasons for attorneys for congressional committees to call witnesses even if it appears such witnesses plan to assert the Fifth Amendment privilege." The Request concedes that calling a witness solely to harass or embarrass that person "is not appropriate."

Finally, the Request notes that the Opinion was decided under the now–superseded D.C. Code and states that—

> [a]lthough the ethical considerations against calling a witness solely to harass remain [under the D.C. Rules of Professional Conduct], Opinion No. 31's apparent assumption that there can be no legitimate purpose for calling a witness who has indicated he or she will assert the Fifth Amendment privilege simply cannot stand in light of the clear legal authority set forth above.

### D.C. Legal Ethics Opinion No. 31

In Opinion 31, the Committee described the inquiry before it as follows:

> We have been asked to advise whether it is proper for a congressional committee whose chairman, staff and several members are attorneys to require a witness who is a "target" of a pending grand jury investigation to appear at televised hearings to be questioned when the committee has been notified in advance that the witness will exercise his constitutional privilege not to answer any questions.

Op. 31. The Opinion began its analysis by conceding that "[i]t is *not per se improper* . . . to cause a witness to be summoned in furtherance of a legitimate legislative function of Congress, even though the resultant attending publicity will be damaging to the witness' reputation and possibly prejudicial to him in a future criminal trial." *Id.* (emphasis added). The Opinion continued, however, that "the inquiring power of a congressional committee is limited to obtaining information in aid of Congress'

legislative function" and that "[t]here is no congressional power to expose for the sake of exposure." *Id.*

Acknowledging that this Committee's jurisdiction is confined to rendering opinions on the applicability of the ethics rules to the conduct of staff attorneys acting in their capacities as attorneys, the Opinion stated that "the inquiry before us poses the issue whether it is ethical to summon a witness [before a congressional committee] when it is known in advance that no information will be obtained *and the sole effect of the summons will be to pillory the witness*." Op. 31 (emphasis added).

The Opinion discussed rulings and standards to the effect that calling a witness in a criminal proceeding, when it is known that the witness will invoke, across the board, his privilege against self-incrimination, constitutes prosecutorial misconduct.[2] Analogizing to those authorities, the Opinion concluded that such conduct by a lawyer for a congressional committee "appears to be in conflict with at least the spirit of" D.C. Disciplinary Rule ("DR") 7-106(C)(2). That rule barred a lawyer from asking a witness before a tribunal any question "that [the lawyer] has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness." D.C. Code DR 7-106(C)(2) (superseded 1991). The Opinion concluded that although a congressional committee arguably is not a "tribunal," the principle that an attorney should not ask a witness questions that are "intended to degrade" him was applicable and that a question to which the inquiring lawyer knows the response will be the witness's invocation of his privilege against self-incrimination is by definition irrelevant. *Id.*

Opinion 31 also considered whether such conduct would constitute "conduct . . . prejudicial to the administration of justice," in violation of D.C. Code DR 1-102(A)(5). A majority of the committee concluded that "the language of this standard is too vague to permit its application as a disciplinary rule," Opinion 31 n. 3, though a few months later, the District of Columbia Court of Appeals upheld the rule against a claim of unconstitutional vagueness, *In re Keiler*, 380 A.2d 119, 126 (D.C. 1977).[3]

**Discussion**

The D.C. Rules of Professional Conduct ("D.C. Rules" or "Rules") superseded the D.C. Code effective January 1, 1991.[4] Several provisions of the Rules are relevant to the issue presented by the Request.

Rule 4.4(a) states that "a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person." The comments observe that it is not possible to catalog all the third-party rights that the rule might implicate. D.C. Rule 4.4, cmt. [1].

Rule 8.4(d) prohibits a lawyer from "engag[ing] in conduct that seriously interferes with the administration of justice." Comment [2] states that this prohibition is intended to include conduct proscribed by the similarly worded provision of the D.C. Code, which was DR 1-102(A)(5).[5] Comment [3] to Rule 8.4, which was among the 2007 amendments to the Rules, states that "offensive, abusive, or harassing conduct that seriously interferes with the administration of justice" violates Rule 8.4(d).

Moreover, at least one ethics opinion issued under the D.C. Rules admonishes lawyers not to harass opponents. D.C. Op. 258 n. 4 (1995).[6]

Filing a frivolous lawsuit violates Rule 4.4, *Attorney Grievance Comm'n v. Richardson*, 712 A.2d 525 (Md. 1998), and Rule 8.4(d), *Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515 (Iowa 1996). Unjustified personal attacks on opponents violate both rules. *In re Golden*, 496 S.E.2d 619 (S.C. 1998); *In re Vincenti*, 704 A.2d 927 (N.J. 1998). Moreover, the misuse of official authority by a prosecutor—a position akin to counsel for an investigative congressional committee—violates Rule 8.4(d). *In re Christoff*, 690 N.E. 2d 1135 (Ind. 1997).

Finally, a violation of Rule 8.4(d) "does not have to be affiliated specifically with the judicial decision-making process; the conduct simply must bear on the administration of justice." *In re Mason*, 736 A.2d 1019, 1023 (D.C. 1999). Moreover, "'conduct that is prejudicial to the administration of justice' can be equated to 'conduct unbecoming a member of the bar.'" *Id.* (quoting *In re Solerwitz*, 575 A.2d 287, 292 (D.C. 1990)); *see In re Keiler*, 380 A.2d 119 (D.C. 1977) (finding violation of predecessor to Rule 8.4(d) where lawyer conducted sham arbitration proceeding).

Opinion 31 does not establish a *per se* rule that compelling a witness to testify before a congressional committee when it is known in advance that the witness will invoke the Fifth Amendment privilege violates the ethics rules. Opinion 31 provides that an attorney violates the ethics rules only when he knows that summoning a witness to appear (1) will provide no information to the committee *and* (2) is intended merely to degrade a witness. Specifically, the Opinion states that the issue is "whether it is ethical to summon a witness when it is known in advance that no information will be obtained *and the sole effect of the summons will be to pillory the witness.*" The Opinion further notes that "DR 7-106(C)(2) prohibits only questions that the lawyer has no reasonable basis to believe are relevant *and that are 'intended to degrade' as well.*" Op. 31 (emphasis added).

The Request has not persuaded us that the revised Rules of Professional Conduct, or other governing law, require us to vacate the Opinion. First, the Request concedes the critical point that calling a witness solely to harass or embarrass that person is not appropriate. We agree and conclude, as we did in Opinion 31, that such conduct violates the Rules.

Second, the Request suggests that the Opinion assumes that there can be no legitimate purpose for calling a witness before Congress when it is known that the witness will assert the privilege. We do not read Opinion 31 as making that assumption. The Opinion asserts that where an attorney has some question whether the witness will assert the privilege, there is no need to test that claim of privilege in public and the claim can be resolved by calling the witness in executive session. We do not read the Opinion to mean, however, that the *only* legitimate purpose for calling a witness is to determine whether he will assert the privilege.

Third, the Request relies heavily on the Supreme Court's decision in *Baxter*, which held that an adverse inference properly may be drawn from an inmate's silence at his disciplinary

proceedings. *Baxter*, 425 U.S. at 320. *Baxter* and its progeny allow fact-finders to draw an adverse inference in civil proceedings from the invocation of the Fifth Amendment privilege. It is not clear, though, how that rule alters the threshold ethical question presented in Opinion 31. The Request asserts that this case law undermines "Opinion No. 31's apparent assumption that there can be no legitimate purpose for calling a witness who has indicated he or she will assert the Fifth Amendment privilege." As explained above, however, that assertion is based on a misreading of the Opinion. Only where the sole purpose of proceeding is to degrade the witness is there a violation of the Rules of Professional Conduct.

Opinion 31 correctly asserted that when an attorney causes a witness to be called for the sole purpose of harassing or degrading that witness, that attorney violates our rules. *See* Rules 4.4, 8.4(d). Similarly, a lawyer would violate Rule 8.4(d) by engaging in abuse or harassment of the witness. Further, such conduct by a staff lawyer might constitute assisting another in violating the rules. *See* D.C. Rule 8.4(a). In addition to participation in the hearing itself, such related activities as preparing subpoenas also could subject a lawyer to sanctions, though we note that Rule 5.2 protects a subordinate lawyer who acts at the direction of a supervising attorney so long as there is a reasonable argument that calling the witness is permitted by the Rules. *See* D.C. Rule 5.2 & com. [2].[7]

## Conclusion

 The Request correctly observes that there may be legitimate reasons for a congressional committee to summon a witness who expresses an intention to assert her privilege against self-incrimination. Because the Opinion is consistent with that fact and because the Rules of Professional Conduct are violated only if there is no substantial purpose in calling a witness other than embarrassment, burden, or delay, we decline to vacate Opinion 31.

Published: January 2011

---

1. The Request cites Rad Services v. Aetna Casualty & Surety Co., 808 F. 2d 271, 275-77 (3d Cir. 1986), Brink's Inc. v. City of New York, 717 F.2d 700, 707-10 (2d Cir. 1983), and In re Vitamin Antitrust Litigation, 120 F. Supp. 2d 58, 68 (D.D.C. 2000), as progeny of Baxter.

2. United States v. Coppola, 479 F.2d 1153, 1160 (10th Cir. 1973); San Fratello v. United States, 340 F.2d 560, 564 (4 Cir. 1965); United States v. Tucker, 267 F.2d 212, 215 (3d Cir. 1959); see ABA Project on Standards for Criminal Justice ¶ 5.7(c) (unprofessional to call witness under such circumstances "for the purpose of impressing upon the jury the fact of the claim of privilege").

3. The Opinion also concluded that such conduct violated several D.C. Ethical Considerations ("ECs"). These were D.C. EC 7-10, which called upon lawyers to treat persons involved in the legal process with consideration and to avoid inflicting needless harm, D.C. EC 7-14, which exhorted government lawyers not to harass parties, and D.C. EC 7-25, which said that a lawyer should not ask a witness a question "solely for the purpose of harassing or embarrassing him." Under the D.C. Code, the Ethical Considerations were "aspirational in character," whereas the Disciplinary Rules were mandatory. D.C. Code Preliminary Statement. The Code added, though, that an agency applying the Disciplinary Rules "may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations." Id. The D.C. Rules of Professional Conduct, which superseded the D.C. Code in 1991, do not contain "aspirational" guidelines akin to the Code's

Ethical Considerations.

4. There have been a number of subsequent changes to the D.C. Rules but aside from the new comment [3] to Rule 8.4, which took effect February 1, 2007, none is material to this opinion.

5. As noted above, when this committee issued Opinion 31, a majority of the members found the language of the predecessor provision "too vague to permit its application as a disciplinary rule," D.C. Ethics Op. 31 n. 3 (citing D.C. Code DR 1-102(A)(5)), but the D.C. Court of Appeals subsequently upheld the cited Code provision against a vagueness challenge, see In re Keiler, 380 A.2d at 126.

6. Instructive, though not literally applicable, are Rules 3.4, 3.5, and 3.8. Rule 3.4(e), whose predecessor rule Opinion 31 applied by analogy to the conduct at issue here, prohibits a lawyer from, "[i]n trial, allud[ing] to any matter that the lawyer does not reasonably believe is relevant." Rule 3.5(d) prohibits a lawyer from engaging in "conduct intended to disrupt any proceeding of a tribunal." A congressional committee ordinarily is not a "tribunal" because it is not adjudicatory in character. See D.C. Rule 1.0(n) (defining "tribunal"). Such a committee might be a tribunal, though, when deliberating and voting on whether to recommend to its house of Congress that a witness be cited for contempt of Congress. See id.

 Comment [2] to Rule 3.8, which sets forth special responsibilities of prosecutors, permits public release of an indictment but condemns—

 extrajudicial comment by a prosecutor that serves unnecessarily to heighten public condemnation of the accused without a legitimate law enforcement purpose before the criminal process has taken its course. When that happens, even if the ultimate trial is not prejudiced, the accused may be subjected to unfair and unnecessary condemnation before the trial takes place. Accordingly, a prosecutor should use special care to avoid publicity, such as through televised press conferences, which would unnecessarily heighten condemnation of the accused.

7. We express no opinion on the propriety of a witness invoking an opinion of this committee as a basis for refusing to comply with a congressional subpoena.



<div align="center">

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

</div>

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

<div align="center">

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

</div>

**CONFIDENTIAL**

**VIA EMAIL ONLY** foxp@dcodc.org

<div align="center">

January 31, 2022

</div>

Hamilton P. ("Phil") Fox, III
Disciplinary Counsel
Office of the Disciplinary Counsel
Building A, Room 117
515 5th Street NW,
Washington, DC 20001

<div align="center">

**Re: Clark/Disciplinary Counsel**
**Disciplinary Docket No. 2021-D193**
**Agreed-Upon Date of Response: January 31, 2022**

</div>

Dear Mr. Fox:

I write to you in my capacity as counsel for Mr. Jeffrey Bossert Clark, Esq. (who, come this July, will have been an honorable and estimable member of this Bar for 25 years). The purpose of this letter is to set out just some of Mr. Clark's legal defenses and also to point to some documents that have been released (improperly in my view), along with some public information of a general nature, so as to help guide your prosecutorial discretion. Upon review of these matters, and my related letter (also dated today, and incorporated herein by reference) setting out responses to the subpoena you sent, we would hope you would agree not to proceed further.

You are no doubt well aware that this is a unique case. To begin, please let us know if you are aware of a single situation where a bar complaint was filed solely by the chair of one congressional committee complaining about the purported conduct of a

<div align="center">

Exhibit C

</div>

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 2

lawyer internal to the Executive Branch (as to which the Chair himself has no firsthand knowledge) alleged to have advised the President to endorse the sending of legal correspondence where the relevant correspondence was never sent. I would be extremely surprised if such a situation exists in the annals of the D.C. Bar's enforcement files. Indeed, I would just as surprised if a complaint had ever been filed or seriously entertained by your Office where a leak of private counsel advice to a private client involving unsent correspondence followed by a complaint by a third-party bystander that was not the recipient of the relevant advice which was at issue.

Instead, it appears to both me and to my client that this is a politically supercharged case that the Bar should not intrude into. The purpose of the D.C. Bar Rules is not to referee confidential internal legal discussions, especially not ones inside the superior federal government's Executive Branch, that result in inaction. That would be akin to disciplining a lawyer for "thought crime." The purpose of the D.C. Bar Rules is to protect the public. The consideration of and debate over options and theories furthers the public's interest by improving the quality of the legal judgments and advice that emerge from such exchanges, which are perfectly routine in any law office in America. Anything else would lead to a leaden orthodoxy, which is contrary to the ethic of the entire profession, and certainly contrary to how the Framers anticipated the energetic Executive Branch would run.

I will explain more below about the import of this as a political example of a complainant trying to "weaponize" bar discipline mechanisms. But I first turn to the caution that nothing in this letter should be taken as testimony by Mr. Clark about the underlying facts. That is not the purpose of this letter and indeed we think it is beyond the power of your Office to inquire into facts privileged in multiple dimensions and involving advice within the federal government given to the President of the United States himself.

## Preliminary Caveats

I recognize that you and your Office in the ordinary case would be most interested in the facts as represented by the lawyer facing a disciplinary charge. But in the ordinary case, privilege issues are no barrier to the lawyer setting out the particulars of his factual defense. That is because, I would venture, in many of cases you deal with, the client

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 3

complains about his or her lawyer's conduct in some way and at this confidential stage
of the proceedings, you can investigate any underlying factual disputes before deciding
whether to seek discipline. That way, if you decide not to proceed, the complaining
client's confidences are maintained.

But as we understand you to be proceeding here, any response we provide to your
subpoena should, in your view, automatically go to Senator Durbin at the Senate
Judiciary Committee. "A necessary disclosure includes sending a copy of your response
to the complainant for comment." *See* Fox Letter to Clark, at 3 (Nov. 22, 2021). Of course,
once the information you seek falls into the hands of the Senate, executive privilege and
other privileges would be breached, as your Office would have no power to stop the
Senate from using that information, going forward, however it sees fit. In light of the
confidentiality of the investigative stage and the rules and D.C. Bar Opinion discussed in
greater detail below, you should agree not to send Senator Durbin either response letter
I am submitting today. He was not the client and has no right to information concerning
how an investigation by your Office is proceeding. Bystanders cannot invade the
privilege merely by filing a bar complaint and bystanders should similarly not be entitled
to an explanation as to why advice given to non-bystanders or debated with other
Executive Branch lawyers is privileged.

Because Mr. Clark is duty-bound both under the superior federal constitutional
law that governs privileges held by the President and by the very rules your Office is
designed to enforce, he can neither set out the nature of his legal advice to the President
nor matters subsumed therein, such as the facts of which he made himself aware in
developing that advice. I amplify below on the host of legal reasons why this is true. But
for now pause and consider (as both points are in the public record) that Mr. Clark has
resisted testifying to both the Senate Judiciary Committee and the House January 6 Select
Committee. If sustained, the manner in which you propose to proceed would bust the
privileges and retroactively render pointless the principled legal positions Mr. Clark took.
It cannot be the law that one or another congressional committee can use a bar complaint
as a pass key to open the doors locked by privilege. We are confronted with an extreme
irony: the Office that disciplines lawyers for breaching client confidences is trying to
gather privileged advice given to the President when the President has not complained

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 4

to the Bar, all in order to breach the privilege by giving that information to the President's bitter political adversaries.

Your approach would reveal lawyer-client confidences, not protect them. Therefore, and in more detail below and in my related letter concerning the subpoena, I have to counsel Mr. Clark to proceed differently.

For such reasons, nothing in this letter should be taken as Mr. Clark's testimony or Mr. Clark's representations, in any form, as to the actual underlying facts. Instead, this letter will respond in some places with other documents that the Justice Department in the Biden Administration saw fit (unwisely and improperly in our view) to disclose to the public or with other public information. Accordingly, it is important to reinforce in clear terms our caveats to how this letter should be read, hence the emphasis:

> *Nothing in this letter constitutes testimony by, a factual concession by, or waiver of legal rights or of any of the applicable privileges relied upon here or in related congressional proceedings by Mr. Clark. The Senate Judiciary Committee Chair (and not just your Office) should similarly take note of this caveat as you are apparently determined to act as a pass-through to him. Mr. Clark reserves all of his legal rights, including to defend himself via arguments not presented in this letter as this matter unfolds.*

This letter will also refer to public information available before January 3, 2021, when the Senate Judiciary Committee Chair appears to have concluded that an Oval Office meeting took place. And lastly, this letter will also point out some matters and information coming to light after January 3, 2021. And most importantly, I will also set forth substantive arguments as to why you should close this matter. In totality, it is plain that bar discipline is simply not appropriate for the underlying disputes.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
> Phil Fox, Esq.
> January 31, 2022
> Page 5

I.      **D.C. BAR RULE XI, THE D.C. RULES OF PROFESSIONAL CONDUCT, AND APPLICABLE PROVISIONS OF CONSTITUTIONAL AND STATUTORY LAW ESTABLISH MR. CLARK'S RIGHT TO DUE PROCESS AND CONSTRAIN DISCIPLINARY COUNSEL'S DISCRETION TO SHARE INFORMATION WITH, OR OTHERWISE TO ASSIST ONGOING INVESTIGATIONS CONDUCTED BY CONGRESS OR STATE OFFICIALS.**

Mr. Clark respectfully submits that any disclosure of any part of the investigative record, including the substantive content of his response to Senator Durbin's charges during the investigation phase of a disciplinary proceeding, has no legitimate investigative purpose and does not fall under any of the enumerated exceptions to the confidentiality rules.

In sum, your plan to make confidential investigative material, including legal arguments, available to partisan majority staff is neither a "necessary" disclosure nor an appropriate one. Disciplinary Counsel has no authority to provide investigative material that will inevitably be shared with "fact-checkers," reporters, and others who will seek to "debunk" or otherwise ridicule to a general audience either the substance of the information provided, the arguments made, or Mr. Clark's character, honesty, or good faith interpretation of either his authorities as Assistant Attorney General or the scope of his discretion to exercise them under the circumstances.

Thus, disclosure of any substantive "investigative" information, including the existence of a pending investigation and that information was sought using a subpoena, would violate the confidentiality and *ex parte* communication rules in D.C. Bar Rule XI, various provisions of the D.C. Rules of Professional Conduct, and the impartiality and the *ex parte* communications rules of the D.C. Rules of Judicial Conduct as well.

Moreover, sharing information with Senator Durbin produced by Disciplinary Counsel through either a request for information or a subpoena authorized under D.C. Bar Rule XI, Section 18 would create at least the appearance of an ongoing information-sharing relationship with the Senate Judiciary Committee. It would also raise serious questions about possible collaboration and ongoing *ex parte* communications between and among staff members of the office of Disciplinary Counsel with Members of the Senate Judiciary Committee, their staff, or Members and staff of other Congressional

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 6

committees, including the January 6th Committee, and substantive communications between Disciplinary Counsel and the U.S. Department of Justice concerning the charges asserted by Senator Durbin.

### A.   Confidentiality Is an Essential Component of the Process "Due" Mr. Clark Under D.C. Bar Rule XI, Which Limits Disciplinary Counsel's Authority to Make Disclosures of Investigative Materials.

In *Matter of Williams*, the Court of Appeals observed that:

> It is well settled that disciplinary proceedings are quasi-criminal in nature and that an attorney who is the subject of such proceedings is entitled to procedural due process safeguards. *In re Ruffalo*, 390 U.S. 544, 550 (1968); *In re Thorup*, 432 A.2d 1221, 1225 (D.C.1981); *In re Burka*, 423 A.2d 181, 185 (D.C.1980) (en banc); *In re Colson*, 412 A.2d 1160, 1164 (D.C.1979) (en banc); *In re Wild*, 361 A.2d 182, 184 (D.C. 1976). The procedural requirements which apply in attorney disciplinary proceedings are analogous to those of other "contested cases." *In re Thorup, supra*, 432 A.2d [1221] at 1225.

*Id.*, 464 A.2d at 118–19 (remanding, for, among other things, relying on complaints from the client as "evidence" of misconduct). *Accord In re Artis*, 883 A.2d 85, 100 (D.C. 2005) (observing that "[i]n adopting rules permitting discovery by a prosecutor in a criminal proceeding, courts and legislatures have proceeded with caution because of the Fifth Amendment privilege against self-incrimination, the Sixth Amendment's guarantee of effective assistance of counsel, the attorney-client privilege, and the attorney work product doctrine.")

Disciplinary Counsel's letter of November 22, 2021 appears to assert that a "necessary disclosure" "includes sending a copy of [Respondent's] response to the complainant for comment." Respondent respectfully submits that such a disclosure during the investigation phase of a disciplinary proceeding would violate both D.C. Bar Rule XI and several specific D.C. Rules of Professional Conduct.

D.C. Bar Rule XI, Section 17 provides: "Except as otherwise provided in this rule or as the Court may otherwise order, all proceedings involving allegations of misconduct

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 7

by an attorney shall be kept confidential until either a petition has been filed under
section 8(c) or an informal admonition has been issued." Rule XI, Section 17 contains
only limited exceptions, none of which would permit Disciplinary Counsel—or, indeed,
the Board or any of its members—to share information that could prejudice any
Respondent during the investigation period.

That, however, is precisely what you have indicated that you will do. By sharing
information with the Senator or his staff, you would not only violate the confidentiality
rules that govern proceedings under D.C. Bar Rule XI, but also destroy the separation of
powers that insulates the legislative powers of Congress under Article I from the judicial
powers of the local Court of Appeals by utilizing the subpoena powers granted by the
Court to advance the partisan investigations that Senator Durbin and others are
conducting.

A disciplinary proceeding is quasi-criminal in nature, *Matter of Williams, supra*, and
is conducted under powers delegated by the District of Columbia Court of Appeals.
Disciplinary Counsel must therefore comply with not only the strictures of D.C. Bar Rule
XI, which define the powers of the Office, but also the duties that bind prosecutors under
D.C. Rules of Professional Conduct, and court-appointed personnel under the D.C. Rules
of Judicial Conduct.

D.C. Bar Rule XI, Section 6(a)(4) provides that "Disciplinary Counsel shall have
the power and duty:

(4) To prosecute all disciplinary proceedings before Hearing Committees, the
Board, and the Court. When appearing before the Court, Disciplinary Counsel
may, after notice to the Board, argue for a disposition other than that contained
in the report and recommendation of the Board.

Section 6(a) confers enormous prosecutorial discretion. Like other prosecutors,
Disciplinary Counsel has explicit power to investigate, prosecute, and make
recommendations for disposition that are at odds with the conclusions of the Board. Under
certain specified conditions only, he may "disclose information pertaining to
proceeding" to "any duly authorized law enforcement officer or agency conducting an
investigation," and respond to a grand jury subpoena, but only after having sought and

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 8

received authorization from the Court of Appeals to do so. *See* D.C. Bar Rule XI, Section 17(c)-(f). Board Rule 2.9(b) does not confer, as you appear to claim, unfettered discretion to decide when a disclosure is "necessary."

The confidentiality rule is central to the Due Process obligations of the Court of Appeals, in whose name the Disciplinary Counsel acts. *See* D.C. Bar Rule XI, Sections 1 & 6. Chief among these obligations is Disciplinary Counsel's "responsibility [to serve in the role of] a minister of justice and not simply that of an advocate" who has "specific obligations" ensure that the Respondent "is accorded procedural justice" and that a finding of misconduct "is decided upon the basis of sufficient evidence." *See* D.C. Bar Rule of Professional Conduct 3.8, cmt. [1].

Under D.C. Rules of Professional Conduct 3.4, 3.6 and 3.8, "procedural justice" includes, at a minimum, a requirement that Disciplinary Counsel "shall not"

- Breach the confidentiality requirement of D.C. Bar Rule XI, Section 17 by making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." D.C. Rule of Professional Conduct Rule 3.6 and comment [2] [reminding lawyers that they are bound by Rule 3.4(c) to comply with "special court rules of confidentiality ... that have not been found invalid."

- Knowingly breach the confidentiality requirement of D.C. Bar Rule, Section 17 "except for an open refusal based on an assertion that no valid obligation exists." Rule 3.4(c).

- "In exercising discretion to investigate or to prosecute, improperly favor or invidiously discriminate against any person;" D.C. Rule of Professional Conduct 3.8(a). *See also* U.S. Const., amend. I (association, petition, and speech); D.C. Human Rights Act, § 2-1401.01 (stating the intent of the Council to "secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including *but not limited to* ... political affiliation ...."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 9

- "Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense;" D.C. Rule of Professional Conduct 3.8(d).

- "Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused." D.C. Rule of Professional Conduct 3.8(f).

Sharing investigative information with Senator Durbin about Mr. Clark's submissions or arguments at *any stage of a disciplinary proceeding* is not "necessary" to *Disciplinary Counsel's* conduct of this investigation. Nor is it "necessary" to the ongoing investigation being conducted by Senator Durbin's staff.

To the contrary, *each* instance of information sharing of the sort contemplated by Disciplinary Counsel would be a forbidden "extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." D.C. Rule of Professional Conduct 3.6(c). Any communication with outside parties other than an acknowledgement of receipt of the complaint and that it is "under review" would also be a violation of the D.C. Rules of Judicial Conduct 2.9.

Nor is Disciplinary Counsel is permitted by D.C. Bar Rule XI, by the D.C. Bar Rule of Professional Conduct 3.8 and 1.7(b), or by D.C. Rule of Judicial Conduct 2.3 (bias), 2.4 (external influence), and 2.6 (right to be heard) to use the subpoena power authorized by Rule XI, Section 18 for partisan political purposes. Nor may he authorize any person under his supervision to share information to advance a partisan interpretation of either civil or criminal law. *See* D.C. Rule of Professional Conduct 1.7(a)(4) (forbidding representation if the "lawyer's professional judgment … will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."); Rule 1.10 (imputed disqualification); Rule 5.1 (Responsibilities of Partners, Managers and Supervisory Lawyers).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 10

Senator Durbin has no personal interest in the outcome of this investigation that would warrant any form of *ex parte* communication, coordination, or information-sharing with him or his staff. To our knowledge, Senator Durbin has never been a client of Mr. Clark. Mr. Clark's client was the Executive Branch. *See* D.C. Bar Rule of Professional Conduct 1.13 (the organization as client); D.C. Bar Rule of Professional Conduct 1.13 (duties of former government employees).

Like any Member of Congress, or of the general public, Senator Durbin has an interest in the faithful execution of the laws by members of the Executive Branch, but he has no knowledge of Mr. Clark's conduct within the Department of Justice akin to that which would be within the unique knowledge of a client. Neither he nor his staff can provide any information about Mr. Clark's conduct in office that is not under the exclusive control of the Department of Justice, the White House, President Trump, and those who were parties to the communications referenced in the "interim staff report" and various media outlets. Aside from serving as the nominal "complainant," he has absolutely no personal or institutional (i.e., legislative) interest in the outcome of this investigation. Members of Congress are not junior varsity prosecutors and cannot constitutionally be permitted to slip into such an improper role.

I would welcome your written response to the confidentiality questions posed above and specifically request that you provide us with advance notice of any proposed disclosure to Senator Durbin or his staff so that an appropriate motion for a protective order can be filed in accordance with the Rules.

## B. The Subject Matter of Your Inquiry Poses Novel and Difficult Questions of Constitutional Law and Professional Responsibility Not Suitable For Interpretation or Enforcement in the Disciplinary Context.

You are seeking documents and answers to questions that pose novel, complex and difficult constitutional and professional ethics questions. *See, e.g., Trump v. Thompson,* No. 21A272 (S. Ct. Jan. 19, 2022) (statement of Justice Kavanaugh respecting the denial of the application for injunction pending appeal) (observing that "If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 11

could be a political opponent of a former President), the consequences for the Presidency would be severe.")

Disciplinary Counsel "seeks privileged information, seeks information that exceeds constitutional limitations or is otherwise improper," D.C. Bar Rule 2.9(a), and thus exceeds the lawful scope of a bar disciplinary inquiry. Among these novel, complex, and difficult constitutional, legal and professional ethics questions are the following, and to be clear, I welcome your written response to these questions:

1. Whether Disciplinary Counsel and the Board rejects the claims of executive privilege and separation of powers that Mr. Clark has made to the January 6 Committee and also makes here.

2. Whether Disciplinary Counsel has established, as a matter of fact, any of the following questions:

   i. That there was no foreign interference in the 2020 election. Has it been able to secure access to classified information for this purpose? Do you wish to stand by your position advanced via email that, even if Mr. Clark is denied access by DOJ and/or by the Intelligence Community to information he apparently reviewed on January 1-2, 2021, there is no reason to terminate or delay this proceeding?

   ii. That there was no basis in fact for President Trump to believe that there was (or may have been) foreign interference in the 2020 election?

   iii. That there was no basis in fact for Mr. Clark to believe that there was (or may have been) foreign interference in the 2020 election?

   iv. That there was no basis in fact for any rational lawyer to think that any foreign interference that might have occurred was equivalent to the level of Russian interference in the 2016 election that occupied official Washington for all of President Trump's term of office?

   v. That there were no irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 12

    vi.  That there was no basis in fact for President Trump to believe there were irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

   vii.  That there was no basis in fact for Mr. Clark to believe there were irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

 viii.  That there was a basis in fact for Attorney General Barr to believe there were no irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

   ix.  That there was no basis in fact for any person to conclude that there were possible violations of federal law in the administration of the 2020 election in the State of Georgia that could reasonably be investigated by the Department of Justice?

    x.  That there were no possible violations of federal law in the administration of the 2020 election in the State of Georgia that could reasonably be investigated by the Department of Justice?

   xi.  That Mr. Clark had no factual basis to suggest, if he did, to the senior leadership team at the DOJ that an investigation into the conduct of the election in Georgia should be considered?

  xii.  That the Department of Justice had at the time actually forbidden direct communication by the President with a Senate-confirmed presidential appointee and how that could possibly be consistent with Article II of the Constitution?

 xiii.  That Mr. Clark received a direct order not to communicate with the President on any issue validly within the purview of his position as a Senate-confirmed Assistant Attorney General?

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 13

      xiv. That the testimony of Mr. Donoghue is a true and complete rendition of the facts known to him and to the Department of Justice between December 2020 and January 3, 2021?

      xv. Whether Mr. Donohue is a credible witness?

      xvi. Whether the testimony of Mr. Rosen is a true and complete rendition of the facts known to him and to the Department of Justice between December 2020 and January 3, 2021?

      xvii. Whether Mr. Rosen is a credible witness?

      xviii. That Mr. Clark was *not* specifically asked by the President or by Mr. Rosen to investigate alleged irregularities in the conduct of the 2020 election in the State of Georgia?

3. Whether Disciplinary Counsel views the work product (reports or Member statements), including the factual findings made in the proceedings before the January 6th Committee and the investigation by the Senate Judiciary Committee as something your Office can take as a given without conducting an independent factfinding investigation?

4. Whether Disciplinary Counsel intends, at the appropriate time, to call as witnesses the Department of Justice and White House officials whose testimony was taken before the January 6th Committee and the Senate Judiciary Committee?

5. Whether Disciplinary Counsel considers the documents produced by the Department of Justice to the Senate Judiciary Committee to congressional Committees as the complete documentary record that could justify a formal complaint?

6. Whether Disciplinary Counsel has ever filed a complaint against any attorney for the federal government, including the Department of Justice, based on an internal dispute in an confidential, privileged internal discussion over a legal or policy issue among the attorneys in his or her office?

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 14

7. Whether Disciplinary Counsel has ever filed a complaint against counsel for an organization based on a confidential and privileged internal policy or legal dispute among the attorneys for the organization?

II. **IN YOUR CAPACITY AS "CHIEF PROSECUTOR" OF DISCIPLINARY RULE VIOLATIONS, YOU SHOULD EXERCISE YOUR PROSECUTORIAL DISCRETION TO PROCEED NO FURTHER ON SENATOR DURBIN'S COMPLAINT.**

A. **Chief Prosecutor**

Rule XI of the D.C. Court of Appeals Rules Governing the Bar provides that you serve as the "Chief Prosecutor" of violations of those rules by attorney members of this Bar. https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/purpose-and-mission (last visited Jan. 31, 2022). Hence you have the ability to dismiss the complaint you received from Senator Durbin on October 7, 2021, on the basis of prosecutorial discretion.

You should consider exercising your prosecutorial discretion in light of all of the points both in this letter and my subpoena letter, but I set out several additional overarching observations here that should lead you to that conclusion even without studying the balance of this letter.

B. **This Is a Politically Motivated Bar Complaint.**

*First,* this is self-evidently a political dispute. The letter you received is signed by former President Trump's longtime political foe Senator Durbin (even looking back to the era before the 2020 election).[1] Senator Durbin's letter mentions President Trump *four*

---

[1] *See* Mollie Mansfield, *Colorful Insult: Democrat Senator Dick Durbin Mocks Trump as an 'Orange Cloud' Threatening to Rain on Amy Coney Barrett's Nomination,* THE U.S. SUN (Oct. 14, 2020), *available at* https://www.the-sun.com/news/1632573/donald-trump-orange-cloud-amy-coney-barrett/ (last visited Jan. 31, 202s). Senator Durbin has also criticized President Trump for pushing his authority before Congress "non stop." Lisa Mascaro, *It's Not Just the Presidency: Trump Is Changing Congress,* AP NEWS (July 11, 2020),

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 15

*times*. This is not the kind of dispute that an apolitical bar association should wade into, especially not where Mr. Clark has not been found liable or guilty of any wrongdoing as a prelude to this inquiry.  And in my companion letter on the subpoena, you will see extensive argument as to why you should defer consideration of this matter, if you do not dismiss it, under Board Rule 4.1.  As we noted there, our understanding is that Board Rule 4.1 deferrals are regularly granted.

Every member of the Senate Judiciary Committee majority, many voters, and many pressure groups on the Left, together with left-leaning legal academics, may think it beyond question that President Biden was duly elected and that there were, back in early January 2021 and still are, no sufficient election irregularities to warrant questioning that conclusion.  Messrs. Rosen and Donoghue, among others at the Department of Justice, may also agree with that position.  But a large number of American voters disagree, including many Democrats, and their numbers are growing.[2]

> 1. **It is rational to conclude that numerous American lawyers have questioned and do continue to question, in some fashion, the outcome of the 2020 presidential election.**

I conservatively, if informally, estimate that about 250,000 lawyers in the United States hold a skeptical view about the election, marking it out as a subject appropriate for further investigation to any such lawyer postured to be able to do anything about his or her beliefs.  I could lay out the calculation in great detail, but it boils down to the following table and so in the interests of brevity and because this is a very early stage of the bar process, I do not spell out more at this time:[3]

---

*available at* https://apnews.com/article/immigration-donald-trump-ap-top-news-douglas-brinkley-politics-3e1b0fc5f17ad40b242a9555b2ac412e (last visited Jan. 31, 2022).

[2] According to a recent Rasmussen poll, 79% of Republicans, 41% of Democrats, and 58% of unaffiliated voters believe it is at least somewhat likely that cheating in some form affected the 2020 presidential election outcome.  *See* https://t.co/AhznOMXZ5V (last visited Jan. 31, 2022).

[3] For other relevant sources to my informal estimate, see https://en.wikipedia.org/wiki/2020_United_States_presidential_election (last visited Jan. 31, 2022). Approximately 1 in 300 persons in America are lawyers.  https://www.infobloom.com/what-percent-of-

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 16

| Candidate | Total Number of Votes by Candidate | # of Lawyers (i.e., 1 in 300) | # Who Think Cheating in Some Form According to Rasmussen Poll (using conservative party affiliation poll figure) |
|---|---|---|---|
| Biden | 81,268,924 | 270,896 | 111,068 |
| Trump | 74,216,154 | 247,387 | 143,485 |
| Total | 155,485,078 | 518,284 | 254,552 |

Accordingly, even if, as he is accused, Mr. Clark were of the view that the 2020 election was irregular (especially in Georgia), he would have a lot of company. Are all of these lawyers to be hunted down and disciplined by their respective bars for disagreeing with the view the mainstream media portrays as the only acceptable view in polite Beltway company (even though the Rasmussen poll suggests the public consensus is to the contrary)? It is not a sufficient response to observe Mr. Clark was a lawyer and leader at the Justice Department when he is claimed to have expressed such views. Why should the fact that several of the actual lawyers at the Justice Department in December 2020 to early January 2021 thought one thing (the election was regular, or at least regular enough) but one of them (Mr. Clark, by hypothesis) thought something different constitute a matter for local bar investigation, warranting even penetration into the most confidential deliberations involving the United States President?

> **2.  147 Members of both houses of Congress (35 of whom were lawyers) questioned certifying the electors sent to them and they did so publicly and with potential legal effect, compared to the apparent purely internal letter under consideration here that the Senate report accepts was never sent.**

More importantly, *a total of 147 members of the Senate and House* backed objections on January 6, 2021 to certifying Arizona's or Pennsylvania's electoral

---

the-us-population-do-lawyers-comprise.htm (last visited Jan. 31, 2022). I coupled this with other conservative assumptions. For instance, another source tells me that there are 1.33 million lawyers in America, more than double the conservative assumption of the number of lawyers I use in the table above. *See* Statista, *Number of Lawyers in the United States from 2007 to 2021, available* at https://www.statista.com/statistics/740222/number-of-lawyers-us/ (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 17

outcomes, despite the fact that the mainstream press insisted that Biden had clearly won. See Li Zhou, *147 Republican Lawmakers Still Objected to the Election Results After the Capitol Attack: Congress has certified President-elect Joe Biden as the winner of the election—but some Republicans still objected*, VOX (Jan. 7, 2021), *available as* https://www.vox.com/2021/1/6/22218058/republicans-objections-election-results (last visited Jan. 31, 2022) (listing 8 Senators and 139 members of Congress). Thus, many members of Congress agreed with the views attributed to Mr. Clark by Mr. Durbin.

Indeed, typically a greater percentage of members of Congress are lawyers than the 1 in 300 in the general population. In fact, 35 of 147, or 23.81%, of these objecting members are lawyers.[4] Are the 35 lawyer members of Congress, spread across more than a dozen States, who formally questioned the 2020 presidential election results, also to be subjected to bar discipline? That is unthinkable and reveals that the issue involved here is at its core political. At least two of these 35 members of Congress, both Senators, are also former Supreme Court clerks. As a result, even if this Office were to try to assert that Mr. Clark's actions are unique because lawyers at the top of their profession should know better, that line of defense would fail. Beyond the fact that President Biden's chief of Staff Ron Klain led Mr. Gore's charge from a political strategy standpoint in *Bush v. Gore*, I am not aware of any bar proceedings brought against him and he is at the top of the legal profession. And Senators Hawley and Cruz similarly have credentials that place them at the top of the profession and they questioned the election. Taking that position is not *per se* or inherently false or designed to mislead. The examples of Senators Cruz and Hawley are not purely hypothetical. Apparently, suggesting disbarment was one of Lieutenant General Russel Honoré's first (partisan) reactions. General Honoré had been hand-picked by Speaker Pelosi to do a security review of the Capitol after the January 6 riot. Referring to Senator Hawley, he tweeted "[t]his little piece of s—with his @Yale law degree should be run out of DC and disbarred ASAP." Julie Kelly, JANUARY 6: HOW DEMOCRATS USED THE CAPITOL PROTEST TO LAUNCH A WAR ON TERROR AGAINST THE POLITICAL RIGHT 74 (2022). Although General Honoré later deleted the tweet, *see id.*, his views represent a malign spirit of political revenge that bar authorities should abjure.

---

[4] Again, we could provide information on that calculation in greater detail.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 18


Partisan controversies around Presidential elections have long shelf lives. Up to at least as recently as 2016 (*16 years after* the relevant presidential election was held), the outcome in *Bush v. Gore* is still being vigorously questioned. *See, e.g.*, Michael S. Kang & Joanna M. Shepherd, *The Long Shadow of* Bush v. Gore*: Judicial Partisanship in Election Cases*, 68 STAN. L. REV. 1411 (2016) (the authors are tenured professors at the Emory Law School).

Disputes about the reliability of presidential elections are commonplace and, at least before the new phenomenon of trying to weaponize the bar to settle partisan scores, such disputes were just considered fodder for ordinary dissent. *See, e.g.*, Norman Ornstein, *Enlist George W. Bush and Al Gore to Help Us Prevent a Trump-Biden Nightmare in 2020*, USA TODAY (Aug. 7, 2020) (recognizing that the 2000 presidential election was, to date, "the most controversial and contentious election in American history"), *available at* https://www.usatoday.com/story/opinion/2020/08/07/george-bush-al-gore-help-us-prevent-trump-biden-nightmare-column/3310060001/ (last visited Jan. 31, 2022). *See also* Austin Huguelet, *Congress Has Objected to Electoral College Votes Before. Here's a Look at Past Efforts*, SPRINGFIELD NEWS-LEADER, *available at* https://www.news-leader.com/story/news/politics/2021/01/05/past-objections-electoral-college-vote-counts-president-trump-josh-hawley/4129641001/ (last visited Jan. 31, 2022) ("At a press conference outside the House chamber, Rep. Eddie Bernie Jackson, D-Texas, told reporters there was "overwhelming evidence that George W. Bush did not win this election either by the national popular vote or the Florida popular vote.").

There are also those who think the 2004 presidential election was rigged in favor of President Bush and against John Kerry. *See* Joanna Weiss, *What Happened to the Democrats Who Never Accepted Bush's Election: The 2004 vote-fraud conspiracy movement never really died. What does that mean for Trump's believers—and America?*, Politico (Dec. 19, 2020), *available at* https://www.politico.com/news/magazine/2020/12/19/2004-kerry-election-fraud-2020-448604 (last visited Jan. 31, 2022); *see also* Huguelet, *Congress Has Objected to Electoral College Votes Before*:

When it came time to count the state [of Ohio's] votes, Rep. Stephanie Tubbs Jones, D-Ohio, rose to object and said she had a senator. Sen. Barbara Boxer, D-Calif., concurred, saying she was acting "to cast the light of truth on a flawed system which must be fixed now," according to a New York Times account of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 19

the challenge. The objection failed 1-74 in the Senate and 31-267 in the House, and Republicans dismissed the complaint as sour grapes. Majority Leader Tom DeLay, R-Texas, called it Democrats' "quadrennial crying wolf," as his colleagues ridiculed stories of disenfranchisement as "Hollywood inspired."

Yet we are not aware of any effort to root out lawyers in either the anti-*Bush v. Gore* 2000 or "Kerry-won" 2004 camps and subject them to bar discipline. And surely, Majority Leader DeLay's narrative would not have been enough to launch a bar inquiry based on a presumption that DeLay's view of the world was correct, even if it had achieved the status of media orthodoxy like the claim that President Trump's objections to the 2020 election constitute a "Big Lie."

Democrat politician-lawyers have routinely questioned presidential elections. *See generally* Video Compilation, *2 Decades of Dems Questioning Elections*, *available at* https://rumble.com/vt2xvy-democrats-questioning-the-legitimacy-of-election-results-and-voting-machine.html (Jan. 22, 2022) (showing Joe Biden, then-Senator Obama, then-Senator Clinton, former Governor McAuliffe, current White House of Staff Ron Klain, and David Boies—all lawyers—objecting vehemently to past presidential election results). No bar discipline cases were brought against them for doing so that I know of.

Objections to presidential certifications have become increasingly common. In 2017, Democrats objected to President Trump's certification on the ground, *inter alia,* that Russia had interfered in the 2016 presidential election. One of those objectors was Jaime Raskin, Congressman from Maryland, who is a lawyer and a constitutional law professor. *See Rep. Raskin Challenges Awarding of Electors*, YOUTUBE (Jan. 8, 2017), *available at* https://www.youtube.com/watch?v=bxEr_mRpp44 (last visited Jan. 23, 2022). Imagine if the Maryland bar had launched an inquiry into Representative Raskin's expressed views, alongside Robert Mueller's investigation of President Trump, which we now know concluded there was no Russian collusion. *See* Huguelet, *Congress Has Objected to Electoral College Votes Before* ("However, neither the Mueller report nor the Senate committee's report concluded Trump and his campaign coordinated with Russia on the influence campaign.").

Where one stands on these issues frequently depends on which side of the aisle one sits. It now appears, for instance, that President Biden is laying the groundwork for

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 20

questioning the outcome of the 2022 midterm elections: "'I think it would easily be illegitimate,' said Biden. 'The increase in the prospect of being illegitimate is in proportion to not being able to get these reforms passed.' Vice President Kamala Harris, sent out on the morning shows Thursday, offered basically the same position." David Harsanyi, *Biden Is Not Alone. Democrats Have Been Delegitimizing Elections for Years*, TOWNHALL (Jan. 21, 2022), *available at* https://townhall.com/columnists/davidharsanyi/2022/01/21/biden-is-not-alone-democrats-have-been-delegitimizing-elections-for-years-n2602148 (last visited Jan. 31, 2022). *See also id.* (noting that Representative Adam Schiff, a lawyer, and strong proponent of Russia collusion claims "[n]ever once … offered a scintilla of evidence demonstrating that a single person's vote was changed, altered or appropriated by Trump or Russians or anyone else. Yet at one point, a healthy majority of Democrats claimed to believe that Putin had altered vote tallies. How many Democrats still believe it?").

Finally, imagine if bar complaints were filed against Senator Cruz in Texas or Josh Hawley in Missouri. These would be quickly dismissed as obvious political stunts. By contrast, Senator Durbin's referral here hopes to succeed simply because Mr. Clark is not a politician with a national name, has far fewer resources with which to defend himself and has far fewer friends in politics to support him than either Senator Cruz or Senator Hawley. The Bar should not proceed with a complaint against a former Justice Department official like Mr. Clark simply because he is weaker politically than a hypothetical member of Congress barred in D.C. who happened to object in public to the certification of Biden electors on January 6, 2021.

C.   **The Culpability of Mr. Clark for Claimed Rules Violations Cannot Be Established Based on Assuming the Views of His DOJ Superiors Are Gospel Truth or Entirely Complete.**

Additionally, note that Senators Cruz and Hawley are both qualified to serve as Attorney General of the United States. Senator Hawley was the Attorney General of Missouri and Senator Cruz was the Solicitor General of Texas. Senators often take cabinet positions. Had they happened to be serving as the United States Attorney General role in the Trump Administration, which is far from beyond the pale to assume was possible,

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 21

they might have taken a position concerning election investigations different than former Attorney General Barr or former Acting Attorney General Rosen.

Thus, your Office cannot treat the fact, even if true, that Mr. Clark disagreed with his superiors at the time, Acting Attorney General Rosen and Mr. Donoghue, Principal Associate Deputy Attorney General (performing the duties of the office of Deputy Attorney General), as having any weight, dispositive or otherwise. Those were the gentlemen in the relevant DOJ chairs at the time, but there were respectable voices in the legal community at the time—in Congress no less—that held different views than Messrs. Rosen or Donoghue. For the sake of caution, I couch this next point in terms of Mr. Clark's experience in the Bush 43 Department of Justice—there, he saw for the first time at a formative stage of his accomplished legal career that disagreements between officials at a lower level at DOJ and those at a higher level are not uncommon. Mr. Clark disagreed with various decisions in 2001-2005 made by his Assistant Attorney General boss, whom he deeply respects, and with Solicitors General in that period and also respected, just to name those in two superior offices in the Department back at that time. The Department of Justice has a command structure but it is not an orthodox cathedral of thought from which one is automatically excommunicated for perceived doctrinal heresy. Justice Department leaders can and do disagree on matters of law and on matters of how to interpret or respond to facts.

D.    **No One Asserts the Letter Attributed to Mr. Clark Was Ever Sent to Its Addressees.**

Note as well that according to Senator Durbin, the letter Mr. Clark is said to have drafted was never distributed publicly by him. *See* Senate Judiciary Majority Staff Report at 38-39 ("Donoghue told us that Trump did not reject the Clark course of action until 'very deep into the conversation,' within the final 15 minutes of the two- to three-hour meeting."). By contrast, the 147 members of Congress voted *in an open public process for all to see*—a legal process in Congress that, if sufficient votes had been obtained, would have had at least some legal effect in the external world. And this is true even if it had only (1) triggered a longer legal process before the final certification of Joe Biden came somewhere between January 6, 2021 and inauguration day on January 20, 2021 but (2) had not altered the outcome in terms of Biden being sworn in as President. *See* David Cohen, *Ted Cruz Urges Critics of Presidential Election Challenge to Calm Down*, POLITICO (Jan.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 22

3, 2021), *available at* https://www.politico.com/news/2021/01/03/ted-cruz-presidential-election-challenge-calm-down-453842 (last visited Jan. 31, 2022) ("Cruz said he wants to do an emergency 10-day audit of the results, though he did not explain why he expects that audit would overturn President-elect Joe Biden's victory.").

Mr. Clark's purported letter had no actual or even potential legal effect outside the confines of the Executive Branch (or even inside it because of an alleged presidential decision not to approve it) because it is undisputed that it was never sent to anyone outside the Department, much less to the leaders of the Georgia Legislature or to Governor Kemp. Thus, there would be far more reason to discipline those members of Congress that are also bar members for their ***public objections*** to certain state electors than to discipline Mr. Clark, assuming the Senate Majority Staff Report is accurate, showing that Mr. Clark did no more than put a ***mere option*** before his Justice Department superiors and the President.

Mr. Clark cannot be subject to bar discipline on a basis that could not hold up as applied to similarly situated lawyer officials in any branch of government. At the very least, your Office would need to articulate a basis that would properly single out Mr. Clark but apply to no other federal lawyer officials (or state lawyer officials for that matter[5]) who questioned the 2020 presidential election. What logical stopping points can be articulated that would make Mr. Clark's alleged conduct subject to discipline but not the conduct of congressional lawyer objectors on January 6?

---

[5] There are also numerous state legislators, especially in but not limited to battleground States, who questioned the results of the 2020 presidential election. *See, e.g.,* Melanie Conklin, *These 15 State Legislators Asked Pence Not to Certify Election Results,* Wisconsin Examiner, *available at* https://tinyurl.com/axetbjfk (Jan. 14, 2021); Marie Albiges, *Republican Leaders in Pa. Senate Ask Congress to Delay Electoral College Count,* SPOTLIGHT PA, *available at* https://tinyurl.com/24z7smbw (Jan. 6, 2021); Joseph Wenzel, *23 State Legislators Send Letter Objecting to Electoral College Votes,* NEWS 4 NASHVILLE (Jan. 5, 2021), *available at* https://tinyurl.com/5bkup2mn (listing objecting Tennessee legislators). Given the nature of such legislative positions and the work of lawyers, several lawyers are no doubt among all state legislator objectors spread around the country. Yet there is no movement I know of to discipline state legislator-lawyers for their statements regarding the 2020 presidential election.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 23

The Speech and Debate Clause cannot serve as this logical stopping point distinguishing congressional objectors who were lawyers from Mr. Clark. *See* U.S. Const. art. I, 6, cl. 1 (members of both Houses of Congress "for any Speech of Debate in either House ... shall not be questioned in any other Place"). That is because this is essentially a constitutional rule of preemption making positions taken in speech or debate something that only Congress itself could discipline. As explored later in this letter, Mr. Clark's speech and writing advised the former President and thus is subject to executive privilege, a feature of the constitutional separation of powers. *See* Section III *infra*. Relatedly, applying local bar rules to Executive Branch deliberations is preempted by the constitutional structure. Local bar rules cannot serve as regulators of the superior federal government, which operates pursuant to the Supremacy Clause of the Constitution. *See* Section IV *infra*. Additionally, Mr. Clark cannot be questioned by this body in light of his Fifth Amendment rights, which he explicitly invoked in response to your subpoena and against the House January 6 Select Committee. *See* Ex. 5, Letter from Harry MacDougald to Chair Thompson (Nov. 30, 2021); *see also* my other letter of today's date.

Indeed, federal legislator-lawyers objecting in some fashion to the 2020 presidential election did not confine their remarks to the halls of Congress. They appeared in the media or otherwise communicated their misgivings. "Conversely, speech and debate immunity will not protect Members engaged (even in their official capacities) in such non-legislative activities as negotiations with federal agencies, the issuance of press releases and newsletters, and the delivery of speeches in their home districts. *Gravel v. United States; Hutchinson v. Proxmire* (1979)." Judge James Buckley, *Speech and Debate Clause*, THE HERITAGE GUIDE TO THE CONSTITUTION, *available at* https://www.heritage.org/constitution/#!/articles/1/essays/27/speech-and-debate-clause (last visited Jan. 31, 2022). By contrast, Mr. Clark did not use his position at the Justice Department to make public statements about the election. We are here only because in January 2021, some anonymous leakers at the U.S. Justice Department decided to reveal confidences to the *New York Times* and that led to the Senate inquiry generating the complaint that is before you. *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General*, NEW YORK TIMES (Jan. 22, 2021), *available at* https://www.nytimes.com/2021/01/22/us/politics/jeffrey-clark-trump-justice-department-election.html.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 24

E.    **Comparing the Alleged Facts Concerning Mr. Clark to the Actions of Congressional Lawyer Objectors**

Indeed, Mr. Clark's alleged conduct compares favorably for purposes of considering bar discipline against the objecting Senators and House members who were lawyers:

**(1) No Firsthand Knowledge.** Senator Durbin's referral letter is not based on firsthand knowledge. It is based on testimony given to his Committee, but that testimony constitutes hearsay for purposes of this proceeding. (By contrast, if you were to try to view the testimony given to the Senate as dispositive, then serious Bill of Attainder issues arise. *See infra* Section VI.)

The witnesses themselves are the ones with the firsthand knowledge. Moreover, Mr. Clark was not given the opportunity to have one of his lawyers present to question the relevant Senate Judiciary Committee witnesses or to object to their testimony, denying him his due process rights as to the relevant Senate testimony.[6] *Cf.* Fed. R. Civ. P. 32(a)(1)(A) (deposition cannot be used against a party who was not present or represented or had notice of the taking). More importantly, as the holder of executive privilege, as far as we are aware, former President Trump was also not given the opportunity to be present to object to the questioning of the lawyer witnesses who reported to him. And, by contrast, the lawyer objectors in Congress engaged in public acts, again with potential legal significance.

**(2) Mr. Clark's Alleged Letter Was Never Sent.** Mr. Clark's alleged letter was never sent, whereas objecting members of Congress actually voted on the floor to object to certifying certain electors pursuant to 3 U.S.C. § 15, or, in the case of Rep. Gohmert, filed an unsuccessful federal lawsuit (which Mr. Clark got dismissed).

**(3) Mr. Clark's Alleged, Unsent Letter Had No Legal Effect Allegedly Because of a Presidential Decision, Whereas Congressional Objectors' Actions Did Have Legal Effect.** Given the reported decision of President Trump, Mr. Clark's letter had no legal

---

[6] Mr. Clark was asked to testify himself to the Senate and declined that request (which was not backed by subpoena). But that is different than being given the opportunity to have one of his lawyers present to object to the testimony of others at DOJ as it was provided.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 25

effect and was totally unknown to the public until much later via the *New York Times* anonymous leakers, whereas the members of Congress objecting on January 6, 2021 did cast public votes that had a legal effect, even though they did not change the outcome that most in the American public assumed would result on that day: certifying Biden as President. President Trump's decisions (alleged to be not sending a Georgia letter and leaving the top two leaders at DOJ in place) supersede those of inferior officials in the Executive Branch. Both houses of Congress act by voting and the vote of each member of the Senate and of the House of Representatives are equal to the other votes of their fellow house members.

**(4) Mr. Clark's Alleged Letter was a Mere Option.** Mr. Clark's alleged letter was equivalent to presenting an option to the ultimate decisionmaker. It is more akin to the legal advice that counsel for a Senator or House Member might have received and was free to accept or reject as the principal with legal decisionmaking power. And surely the Bar could not conclude that, if a January 6 objecting member of Congress had received legal advice from a staffer *not* to object that day but had overruled it, the counsel who had recommended to the contrary was acting unethically. The same is true for the obverse situation, i.e., no unethical conduct would exist where counsel for a member of Congress counseled the member to object to the certification of electors for Biden but the member rejected that advice and voted in the negative during the objection process.

Relatedly, I do not believe your Office will be able to point to an analogous situation where, at best, a single Committee of one House of Congress has successfully complained about and seen discipline imposed because of the lawyering performed for the head of another branch of the federal government. As noted above, please inform us if attorney discipline has *ever* been imposed in such a politically charged setting and crossing the boundaries between two of the three branches of the federal government. We will also seek confirmation that this is the null set via working to see filed a D.C. FOIA request, which any further action concerning Senator Durbin's complaint should have to await under Board Rule 4.1. We also explore in Section V below why, in the absence of specific prior precedent in this area, no lawyer with reasonable knowledge of and attentiveness to the bar rules could plausibly be said to be on fair notice (as required by the Due Process Clause) that conduct like Mr. Clark's could violate those rules

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 26

**F.      The Political Nature of the Charges Against Mr. Clark Are Intensified Because They Are Part of an Ongoing Partisan Political Plan.**

Finally, those attentive to the positions the Democrat party is taking in the press know that a plan is being formulated to argue that former President Trump and members of Congress who supported him engaged in an "insurrection" and thus they should be barred from ever holding federal office again pursuant to Section 3 of the Fourteenth Amendment. *See* John Kruzel, *Democrats Quietly Explore Barring Trump from Office Over Jan. 6*, THE HILL (Jan. 6, 2022), *available at* https://thehill.com/policy/national-security/588489-democrats-quietly-explore-barring-trump-from-office-over-jan-6 (last visited Jan. 31, 2022) ("'We intend to litigate this question,' John Bonifax, [Free Speech for the People] told The Hill. 'So if a secretary of state does not follow the mandate of Section 3, the 14th Amendment, we will bring this matter in court.") (also noting that Harvard Law Professor Laurence Tribe has been consulting with some members of Congress and their staffs on the relevant constitutional issues involving disqualification from federal office). Similarly, Marc Elias, Democrat election law mastermind, has tweeted that he would pursue the same strategy against any candidate questioning the 2020 election. *See* https://twitter.com/marceelias/status/1473118873302056961?s=20&t=Ikr]CgSFOunkpE4zh]wCqQ                                                                                  and https://twitter.com/marceelias/status/1473730872255918092?s=20&t=7IxaQUaIXec5oztFCLvhTA

This only reinforces the deeply political nature of the issue and provides even more reason for your Office not to regard this as a matter for bar discipline. Too many legal questions remain the subject of debate as existing judicial precedent does not provide absolutely clear guidance.[7]

---

[7] The notion that President Trump and the 147 members of Congress engaged in "insurrection," as if they were no different than the Confederates in the early 1860s, is such a tortuous constitutional stretch as to be risible. But given the deep divides in the country's judiciary, we cannot rule out that especially some state forums (which for that reason seem to be the main targets for the strategy explored in the Kruzel article in *The Hill*) may take that position in 2022 and 2024 litigation. Review by the U.S. Supreme Court may accordingly become necessary to clarify the law of Section 3 of the Fourteenth Amendment. And those anticipated proceedings are also ones that should give grounds to defer consideration of this matter, if it is not dismissed, pursuant to Bar Rule 4.1

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 27

The effort to damage Mr. Clark's standing in the legal community is part of political strategy to weaken former President Trump's ability to run again for President in 2024 and similarly, even before that, to weaken the ability of President Trump's allies to win election or reelection to Congress in 2022.  The D.C. Bar simply should not wade into a matter of that nature.[8]

G.   **The Political Nature of This Matter Is Also Revealed by the Fact That It Is an Attempt to Relitigate the Failed Second Impeachment Trial of President Trump, Triggering Preclusion and the Political Question Doctrine.**

In general, Article III of the U.S. Constitution contemplates that the federal courts will resolve cases and controversies within their purview either under the Constitution itself or under jurisdiction assigned to them by Congress.  An important exception to that principle is that the Senate adjudicates impeachment trials.  *See* U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives … shall have the sole Power of Impeachment"); *id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.  When sitting for that Purpose, they shall be on Oath or Affirmation.  When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.").  Of course, this recognizes that impeachment involves a member of the Article III branch presiding (though at President Trump's second impeachment, Chief Justice Roberts did not preside) but the involvement of both houses of Congress in the process reflects the inherent political dimensions.

---

[8] I am aware of the D.C. Bar's actions concerning FBI lawyer Kevin Clinesmith, who is listed as an active attorney in good standing (Membership, https://join.dcbar.org/eweb/DynamicPage.aspx?Site=dcbar&WebCode=FindMemberResults (last visited Jan. 31, 2022), despite pleading guilty to forging a FISA document to win approval to spy on Carter Page.  I do not need to take a position on Mr. Clinesmith's case here to note that while he was part of the politically driven and knowingly fraudulent Russia collusion investigation, he pleaded guilty to deliberately falsifying evidence presented to the FISC.  Mr. Clark has not plead guilty to any offense, never took any relevant similarly objectionable position in a court or in public in any type of legal forum, and is not alleged to have falsified any legal documents.  This case is thus radically distinguishable from Mr. Clinesmith's.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 28

The second impeachment of President Trump was an intensely political matter. The single Article of Impeachment that was pursued stated in relevant part as follows:

> In the months preceding the Joint Session, President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials.
>
> ***
>
> President Trump's conduct on January 6, 2021, followed his prior efforts to subvert and obstruct the certification of the results of the 2020 Presidential election.
>
> ***
>
> Wherefore, Donald John Trump, by such conduct, has demonstrated that he will remain a threat to national security, democracy, and the Constitution if allowed to remain in office, and has acted in a manner grossly incompatible with self-governance and the rule of law. Donald John Trump thus warrants impeachment and trial, removal from office, and disqualification to hold and enjoy any office of honor, trust, or profit under the United States.

H. Res. 24 (as received in the Senate of the United States) (Jan. 25, 2021), *available at* https://www.congress.gov/bill/117th-congress/house-resolution/24/text (last visited Jan. 31, 2022).

Note that the ultimate point of the remedy sought is the same as that now on the planning table by former President Trump's opponents, which is to disqualify him from running for or holding office again. For example, Rep. Liz Cheney, Vice Chair of the January 6 Committee, said in a television interview that "[Trump] must not ever again be anywhere close to the Oval Office, ... I'm going to do everything that I can—both to make sure that that never happens." https://www.theguardian.com/us-news/live/2021/may/13/liz-cheney-republicans-trump-us-politics-live?page=with:block-609d22628f08e659a47e3fef#block-609d22628f08e659a47e3fef, *Liz Cheney Does Not Rule*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
       Phil Fox, Esq.
       January 31, 2022
       Page 29

*Out Running for President to Stop Trump*, THE GUARDIAN, May 13, 2021 (last visited Jan. 31, 2022).

But more importantly for present purposes, the Article of Impeachment of which former President Trump was acquitted on February 13, 2021 specifically asserts that he was being impeached on a key ground relative to this matter, *inter alia*, namely that he questioned the 2020 election results. Hence, as a logical matter, it incorporates the allegations that Mr. Clark was part of such conduct by President Trump. And this is not merely a theoretical issue. Mr. Clark was referenced *at least twice* during the impeachment trial. *See* Tr. Day 2 (Feb. 10, 2021), *available at* https://www.congress.gov/117/crec/2021/02/10/CREC-2021-02-10-pt1-PgS615-4.pdf, at S626-S627 (last visited Jan. 31, 2022) ("He turned to Jeffrey Clark, another Justice Department lawyer, who had allegedly expressed support for using the Department of Justice to investigate the election results. Shortly after Acting Attorney General Rosen followed his duty—and the law—to refuse to reopen investigations, President Trump intended to replace Mr. Rosen with Mr. Clark, who could then try to stop Congress from certifying the electoral college results.").[9]

The House Impeachment managers could have called Mr. Clark as a witness but they chose not to. *See* Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule VI (Rev. Aug. 16, 1986), *available at* https://www.senate.gov/artandhistory/history/resources/pdf/3_1986SenatesImpeachmentRules.pdf (last visited Jan. 31, 2022).

---

[9] Note that this statement from the House impeachment managers (a) is couched in "alleged" terms; and (b) suggests that Mr. Clark requested that the election results be *investigated*, which could not be a violation of the Rules of Professional Responsibility. Investigations are what the Justice Department does. Similarly, I do not see how Acting Attorney General Rosen refusing to pursue further investigation and thereby rejecting Mr. Clark's supposed "support for using the Department of Justice to investigate the election results," while perhaps a valid exercise of discretion, was "follow[ing] the law" as if the applicable law embodied a specific command to him. There is no mandatory duty on the Acting Attorney General's to avoid investigating election irregularities as thoroughly as possible. Instead, requesting investigation of the election results, even if that would require a reopening of some kind by the Department, involves discretionary matters that Mr. Clark (assuming the truth of the allegation) was properly able to request and that Mr. Rosen was properly able to oppose, leaving the matter to the President to decide.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 30

He was likely not called for several reasons: (1) the impeachment managers knew that even if his testimony were provided, it would not have supported the claims advanced at trial and in the Article of Impeachment against Mr. Trump that he had incited an insurrection; (2) they suspected that Mr. Clark would consult with the former President's counsel and be told to invoke executive privilege, just as Mr. Clark was instructed to do on August 2 & 3, 2021 by former Congressman Doug Collins when the Senate Judiciary Committee and House Oversight Committee were calling for Mr. Clark to testify. *See* Letter of Harry MacDougald to Chairman Bennie Thompson (Nov. 5, 2021) (Exh. 1); and (3) the ruling on executive privilege would have been referred to the presiding judge of the impeachment trial, in theory Chief Justice Roberts. But Chief Justice Roberts did not preside and so the impeachment trial would have lacked a mechanism to compel Mr. Clark to testify. *See* Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule V Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule VI (Rev. Aug. 16, 1986), *available at* https://www.senate.gov/artandhistory/history/resources/pdf/3_1986SenatesImpeachmentRules.pdf (last visited Jan. 31, 2022). ("The Presiding Officer shall have power to make and issue, by himself or by the Secretary of the Senate, all orders, mandates, writ, and precepts authorized by these rules or by the Senate, and to make and enforce such other regulations and orders in the premises as the Senate may authorize or provide.").

Under ordinary principles of issue and claim preclusion, with the Senate acting as the trying body in the second impeachment, it would not be able to take a second bite at the apple by subcontracting its investigative powers to a professional bar or to the Justice Department to pursue the same topics. The Senate theoretically could have convicted Mr. Trump of the offense(s) he was accused of in the Article of Impeachment and found as a matter of fact that Mr. Clark was part of providing illicit advice, as was asserted at the impeachment trial on February 10, 2021. But the fact remains that the requisite number of Senators did not so conclude. And that is dispositive under the Constitution's carefully delineated form of impeachment trial.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 31

For purposes of claim and issue preclusion against your Office here, Mr. Clark was in privity with President Trump, to whom he gave legal advice.[10]  Section 83 of the Restatement of Judgments expounds:

> Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties . . . the statement that a person is bound by or has the benefit of a judgment as a privy is a short method of stating that under the circumstances and for the purpose of the case at hand he is bound by and entitled to the benefits of all or some of the rules of res judicata by way of merger, bar or collateral estoppel.

RESTATEMENT (FIRST) OF JUDGMENTS § 83, cmt. a (1942).

Having made the alleged actions part of the second impeachment trial, the Senate should not be assisted by an exercise of prosecutorial discretion here by your Office in an attempt to secure bar discipline against Mr. Clark, for the purpose of leveraging him to testify and provide documents when House Impeachment Managers decided not to seek such testimony or documents in February of last year.

An attempt to redo that decision will also run into the barrier of the political question doctrine (*see Nixon v. United States*, 506 U.S. 224 (1993)) fused together with preclusion principles, for the reasons explained in this paragraph and the block quotation below it.  Rejecting an argument advanced on Twitter by former Principal Deputy Solicitor General Neal Katyal that acquittal in President Trump's first impeachment trial (concerning Ukraine) could leave him vulnerable to a second impeachment trial constituting a redo of the first, two law professors participating in a symposium held on "Impeachment and the President," refuted Katyal as follows:

---

[10] To be clear, I am *not* asserting that Mr. Clark is in privity with President Trump on all issues, only the particular sphere of issues addressed in the second impeachment trial, which referred to Mr. Clark's conduct as an agent of the President in the Executive Branch, as part of President Trump's alleged "high Crimes and Misdemeanors."  U.S. Const., art. II, § 4..

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 32

First, even though as noted above impeachment trials are not criminal, they are nevertheless, under the words of Article I, "cases" in which the Senate, acting "on Oath or Affirmation" for this purpose, is empowered to "try" such matters and reach "judgment[s]" about the individuals who are being "tried." Indeed, it is precisely because the Senate is acting as a sort of judicial tribunal in a trial of impeachment that the federal courts (including the Supreme Court) should respect the judicial decisions made by the Senate and treat the results of impeachment trials as "political questions" ordinarily not susceptible to federal judicial review.

Just as state and federal courts in the United States would respect adjudications made by courts in other countries under principles of res judicata, so too they should respect judgments made by the Senate sitting as a judicial tribunal in impeachment cases. (This res judicata explanation for why impeachment trials are "political questions"—which focuses on the distinctively judicial character of the constitutional language empowering the Senate in impeachment proceedings—helps make political question doctrine less subjective and less capacious).

***

Impeachment, and potential removal, of a President is a political as well as a quasi-judicial process.

Vikram David Amar & Jason Mazzone, *The Power to 'Try' 'Cases of Impeachment': Some Reflections on the Finality, Transparency and Integrity of Senate Adjudications of Presidential Impeachments (Including That of Donald J. Trump)*, 95 CHI.-KENT L. REV. 455, 456–57 (2020) (first paragraph break added). President Trump's acquittal in the second impeachment trial means that claims based on conduct that the House Impeachment Managers adduced to the Senators but failed to prevail on are barred from being questioned in any other forum, including local bar disciplinary proceedings.[11]

---

[11] *See also id.* at 459 n.17 ("We suppose someone could argue that since President Trump did not receive a 2/3 vote in his favor, he was neither acquitted nor convicted, and that his impeachment trial resulted in a 'hung' Senate, in which case, the argument would continue, nothing was adjudicated. 'But in impeachment,

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
    Phil Fox, Esq.
    January 31, 2022
    Page 33

* * *

If you consider the arguments in Section II, just as a threshold matter, I hope you will agree that this docket should quickly be closed without action. You could then write a short letter informing Senator Durbin that the D.C. Bar Rules do not exist to discipline attorneys at the Justice Department for taking positions within the range of political debate concerning the last election, especially when those positions are seemingly shared by 8% of the Senate (8 out of 100 Senators) and nearly a third of the House of Representatives (139 out of 435 Representatives).

The happenstance that Mr. Clark's two bosses at the Justice Department effectively supported an outcome under which Joe Biden became President is a non-factor. Bar discipline should not depend on the debatable views on a political question of an attorney's superiors. Legal positions can often be controversial. Internal debate about debatable questions in the Justice Department, which is, by analogy, a law firm, should not be stifled, especially when political judgment is an inseparable part of the analysis.

## III.   THE SEPARATION OF POWERS WOULD BE INVADED BY PROCEEDING FURTHER ON SENATOR DURBIN'S COMPLAINT.

The fact that Senator Durbin has written to you to complain about Mr. Clark's conduct is not something that can be given dispositive weight or indeed any weight. Even assuming Senator Durbin wielded the whole might of the legislative branch (and he does not), he cannot invade the separation of powers. It is for the Executive Branch to investigate potential violations of law and to decide how to exercise the federal government's enforcement powers, not Senator Durbin.

---

when fewer than [two-thirds of the] Senators vote to convict, we say the impeached person is acquitted — even though 67 did not vote against conviction. This has been true from the beginning of the Republic all the way through William Rehnquist's pronouncement that Bill Clinton was acquitted [to the proclamation by Chief Justice Roberts that President Trump was acquitted]. It takes 67 to convict, but only 34 to acquit.' Vikram David Amar, *The Truth, the Whole Truth and Nothing But the Truth about "High Crimes and Misdemeanors" and the Constitution's Impeachment Process*," 16 CONST. COMMENT. 403, 414 (1999).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 34

I begin with *Plaut v. Spendthrift Farms, Inc.*, 514 U.S. 211 (1995). *Plaut* invalidated a congressional statute that invaded the exclusive province of the Judicial Branch by purporting to, in effect, overrule a final judgment rendered by the U.S. Supreme Court. *Plaut* began by holding that the statute at issue "offends a postulate of Article III just as deeply rooted in our law as [others they Court had mentioned but found inapplicable, namely] Article III establishes a "judicial department" with the "province and duty ... to say what the law is" in particular controversies." *Id.* at 218 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

Here, the other branch involved than the Congress is the Executive Branch, not the Judicial Branch, as in *Plaut*. Nevertheless, the "executive department," to use terminology more like *Marbury*, has a "province and duty," conferred on the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Pursuant to that duty, President Trump was free to consult with his appointees and lawyers in the Executive Branch, including Mr. Clark. The President, in the exercise of his executive power under the Constitution, "speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties." *Wilcox v. McConnel*, 38 U.S. (13 Pet.) 498, 513 (1839). *See also Wolsey v. Chapman*, 101 U.S. 755 (1880); *United States v. Farden*, 99 U.S. 10 (1879).

If President Trump considered making Mr. Clark the head of the Justice Department as part of the legal advice he was soliciting, that is fully within his constitutional remit. Nothing made Acting Attorney General Rosen unremovable (and any future legislation that tried to implement such a restriction as a result of the Senate's inquiry that generated the complaint here would be unconstitutional). Indeed, DOJ's Office of Legal Counsel concluded that Matt Whitaker, a non–Senate-confirmed official, could serve as Acting Attorney General. *See* Memorandum for Emmet T. Flood, Counsel to the President, Re: Designating an Acting Attorney General (Nov. 14, 2018), *available at* https://www.documentcloud.org/documents/5113259-OLC-Opinion-on-Matthew-Whitaker-Appointment.html. All the more reason that the President could have done so as to Mr. Clark, who was Senate-confirmed, with bipartisan support no less.

*Plaut* explores the issue of interbranch review and finds that it is unconstitutional for Congress to seek to intrude into spheres in which it does not belong. *See Plaut*, 514 U.S. at 221 ("Madison's Federalist No. 48, [includes] the famous description of the process

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 35

by which "[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex"). "But the doctrine of separation of powers is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features … it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.* at 239.

*Plaut* also tied itself to the analysis in *INS v. Chadha*, 462 U.S. 919, 969 (1983), equating the need for an equivalent rule fencing out Congress: "We think legislated invalidation of judicial judgments deserves the same categorical treatment accorded by *Chadha* to congressional invalidation of executive action …. Separation of powers, a distinctively American political doctrine, profits from the advice authored by a distinctively American poet: Good fences make good neighbors." *Id.* at 240.

*Chadha*'s invalidation of the one-house veto also has application here to Senator Durbin's complaint. He is a Senator in one House, albeit the upper one. And he is a single Senator at that. Under *Chadha*, even if the entire Senate had passed a resolution condemning President Trump and Mr. Clark for the options they considered in an internal debate in December 2020 through early January 2021, such a resolution would have no weight in your Office's inquiry. It would still be an intrusion on the internal deliberation processes of the Executive Branch. President Trump's consideration of appointing Mr. Clark Acting Attorney General and of a letter that would reopen election investigations (as Mr. Clark was accused at President Trump's second, failed impeachment trial) are not unlawful or unconstitutional activities and Congress has no business questioning them. A single house of the legislature, the Senate, has less of a basis to question them. And a single complaining Senator trying to weaponize the bar processes against Mr. Clark, and thus derivatively against former President Trump, still less.

A July 2021 letter to Mr. Clark from Bradley Weinsheimer, Associate Deputy Attorney General, purporting to waive executive privilege, reserved the law enforcement privilege with respect to investigations into the 2020 election. This is a topic into which you want to inquire, but the law enforcement privilege has been asserted as to that topic by the Biden Administration. That being so, it follows that the discussion of election investigations in the Department of Justice and with the President that is the focus of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 36

much of your subpoena is within the self-same law enforcement privilege. The President is the chief law enforcement officer under the Constitution.[12]

At this point, I have attached as exhibits all of my correspondence with the January 6 House Select Committee on the issue of executive privilege (and the other illegal acts of that Committee that try to pressure Mr. Clark to open up the confidential precincts of the Executive Branch to unconstitutional interbranch review).

    1. November 5, 2021, letter to Rep. Bennie G. Thompson

Asserting executive privilege, including presidential communications privilege, law enforcement privilege and deliberative process privilege, attorney-client privilege and work product privilege, discussing the purported waiver by one President of a former President's privileges, and asking the Committee to delay the deposition. The letter also registered an objection to the scope of the subpoena since Mr. Clark had nothing whatsoever to do with the events of January 6.

    2. November 12, 2021, letter and Memo to Rep. Bennie G. Thompson

The letter and the accompanying memo listed and argued that the Committee was violating or attempting to violate separation of powers, due process, executive privilege, that he was a pawn in an inter-branch political dispute, that his testimony was unnecessary and outside the Committee's span of power, that the Committee had repeatedly mischaracterized our position, that it was in violation of applicable Congressional rules,

    3. First November 29, 2021, letter to Rep. Bennie G. Thompson

---

[12] To the extent Mr. Weinsheimer's letter is read to waive President Trumps' executive privilege but reserve *DOJ's* law enforcement privilege, that is a puzzling inversion that would conveniently operate to expose President Trump but shield Messrs. Barr, Rosen, Donoghue and other DOJ officials from having to explain how much—or more likely how little—they did to investigate election irregularities.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
  Phil Fox, Esq.
  January 31, 2022
  Page 37

Arguing that the Committee's composition and genesis preclude use of deposition authority under the Rules of the House, and proposing a deposition on limited topics in a public hearing.

4. Second November 29, 2021, letter to Rep. Bennie G. Thompson

Enumerating additional objections based on review of the transcript, including due process, that the Committee persistently mischaracterized our position, and that we had not been granted access to a certain ODNI draft report on foreign interference in the election.

5. November 30, 2021, letter to Rep. Bennie G. Thompson

Asserting the Fifth Amendment and cataloging the Committee's many legal and procedural defects and its many abuses of the constitutional limits under which it operates and of Mr. Clark's constitutional rights.

**IV.   PREEMPTION**

State and local governments lack the power to regulate the conduct of the federal government. Unfortunately, your November 22 letter shows no awareness of that important principle, so that it can be respected, and it can be explained to us how your Office thinks it can use its authority to intrude into legal advice the President of the United States saw fit to seek and receive.

As noted in my other letter today, and as set forth in the Office of Legal Counsel Opinion dated August 2, 1985 and entitled *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*,[13] any local bar's assertion of disciplinary authority over federal government attorneys that interferes with or penalizes the performance of authorized federal responsibilities very likely violates the Supremacy Clause and is preempted. "The purported imposition of exclusive disciplinary jurisdiction by state courts upon federal lawyers acting in the scope of their federal authority is subject to the overriding requirements of the Supremacy Clause. Rules promulgated by state courts that are inconsistent with the requirements or exigencies of federal service may violate the

---

[13] *Available at* https://www.justice.gov/file/23741/download (emphasis added) (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 38

Supremacy Clause." *Id.* Internal deliberations of the nature into which the Bar is inquiring are authorized activities for senior officials of the Justice Department and so are beyond the regulatory authority of the DC Bar.

It is not the role of a local government (like the District of Columbia, acting in its bar regulatory capacity as a quasi-analogue of a State) to intrude into the federal sphere of authority. And the Supreme Court long ago held that the States lacked the power to tax a federal government entity. *See M'Culloch v. State*, 17 U.S. 316 (1819). Just as "the power to tax involves the power to destroy," *id.* at 431, so the power to use bar subpoenas and investigative demands would be the power to destroy executive privilege and intrude on the superior federal government's confidential deliberations. This is because "the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied." The actions your Office proposes to engage in are plainly repugnant to respecting the superseding federal sphere of action and deliberation. Moreover, the District of Columbia is subordinate to and an instrument of the federal government. It is not its master.

Similarly, your Office's attempt to penetrate into the Executive Branch's workings here violate the teachings of *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995). *Term Limits* holds that the States could not impose additional qualifications for offices for House Representatives or Senators in addition to those set by the Constitution. "As Justice Story recognized, 'the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them .... No state can say, that it has reserved, what it never possessed.' 1 Story § 627." *Id.* at 803. "The Constitution 'nullifies sophisticated as well as simple-minded modes' of infringing on constitutional protections. *Lane v. Wilson*, 307 U.S. 268, 275 (1939); *Harman v. Forssenius*, 380 U.S. [528,] 540–541 [(1965)]." *Term Limits*, 514 U.S. at 829. This logic from *Term Limits*, *Lane*, and *Harman* reinforces why your Office cannot break a potential tie in the Senate Judiciary Committee to issue a subpoena that body did not choose to issue and to your knowledge only one Committee member wants

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 39

to issue.  Doing so would serve as a "sophisticated" but nonetheless improper "mode" "of infringing on constitutional protections."

Moreover, Justice Kennedy provided the fifth vote in *Term Limits* and his rationale for doing so is clear and applies here to bar what your Office has proposed to do in this matter.  "The States have no power, reserved or otherwise, over the exercise of federal authority within its proper sphere. *See* [*M'Culloch*], at 430 (where there is an attempt at 'usurpation of a power which the people of a single State cannot give,' there can be no question whether the power 'has been surrendered' by the people of a single State because '[t]he right never existed'). That the States may not invade the sphere of federal sovereignty is as incontestable, in my view, as the corollary proposition that the Federal Government must be held within the boundaries of its own power when it intrudes upon matters reserved to the States. *See United States v. Lopez*, 514 U.S. 549 (1995)."

V.   **THE THEORY THAT YOUR OFFICE IS PROCEEDING UNDER WOULD VIOLATE DUE PROCESS BY DEPRIVING MR. CLARK OF FAIR NOTICE OF A NOVEL APPLICATION OF THE BAR RULES.**

At various points in my letters of today, I have noted that there does not appear to be a case remotely like this to which ethics rules have been applied and requesting if you are aware of any such authority.  In the absence of that, by proceeding here in order to establish a penal sanction as applied to Mr. Clark's bar license, your Office risks violating due process/fair notice principles.  While potential ambiguity or extensions of the law can be wrought on a prospective basis, it is plainly unlawful to pretend that the law is clear, which is a requirement before penalties can be imposed.  *See, e.g., General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) (Tatel, J.) (EPA could not hold a company liable for a new interpretation of regulations that the company was not aware of) ("In some cases, however, the agency will provide no pre-enforcement warning, effectively deciding 'to use a citation [or other punishment] as the initial means for announcing a particular interpretation'—or for making its interpretation clear. *E.g. Martin v. OSHRC*, 499 U.S. 144, 158 (1991) (noting that such a decision may raise a question about 'the adequacy of notice to regulated parties')."); *see also Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987) (Silberman, J.) (applying the same principle to a permit applicant).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 40

Moreover, the fair notice principles apply equally in the bar discipline context. *See In re Ruffalo*, 390 U.S. U.S. 544 (1968) (invalidating a disbarment order because the lawyer had no notice that his conduct—hiring a part-time FELA investigator who worked for a railroad—might later be considered by some lawyers as an offense warranting a disbarment order); *id.*, 390 U.S. at 1227 (White & Marshall, J.J. concurring in the result) ("I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.").

And here you are contemplating what seems to be an extreme innovation in the bar rules, interpreting them to penetrate into and take sides with one group of lawyers in a dispute over another. That would require the clearest advance notice to the bar in D.C., which is thick with lawyers working for the federal government and with the periodic waves of political appointee lawyers who sweep in and out of the City as presidential administrations change.

## VI.   BILL OF ATTAINDER

Senator Durbin's letter, while it avers many facts and spins many facts as well, cannot be taken to have any effect in this quasi-judicial, administrative-stage proceeding. As a logically prior matter, that is because if the action of a single house of Congress does not carry legal effect because it violates the requirements of bicameralism and presentment, then all the more so as to the action of one Committee in one house of Congress, or one Committee chair in one house. Moreover, only a court can hold a trial under our Constitution and thus no fact that Senator Durbin purports to have found can carry any weight as firmly established as your Office makes an independent inquiry.

But another, interrelated feature of the separation of powers, is the Bill of Attainder. *See* U.S. Const., art. I, § 10, cl. 1. The Bill of Attainder is one of the two individual liberties protected from both federal and state intrusion. James Madison noted in Federalist Paper 44 that "[b]ills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts are contrary to the first principles of the social compact and every principle of sound legislation."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 41

Historically, the punishment of a deprivation of a bar license would fall into the category of a "bill of pains and penalties," with a "bill of attainder" in its narrowest sense in English law meaning a condemnation to death. *See Legal Dictionary, available at* https://tinyurl.com/3ab7nfec (last visited Jan. 31, 2022). But under our Constitution, the Bill of Attainder prohibition applies to pains and penalties as well. *See id. See also Drehman v. Strifle*, 75 U.S. 595 (1869); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810).

One of the pains-and-punishment style Bill of Attainder cases is *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1866). That case struck down a statute which, in essence, disbarred former Confederate soldiers including a former Senator in the Confederacy. Hence, there is direct Supreme Court precedent that brands disbarment, where new legislative action penalizes already past conduct, a Bill of Attainder.

Bills of Attainder can also be set up conditionally, i.e., to apply if one of the targets or targeted classes does or does not do something. That seems eerily applicable here, post January 6, 2021, where the media and many in Congress seek affirmative repudiation of President Trump as a condition of reentry into genteel society in the Nation's capital. Compare the January 6 Committee's entreaties to come in and discuss with the Committee everything the witness can say criticizing President Trump, with the implicit understanding being: in that case, we will go easy on you. *See Cummings v. Missouri*, 71 U.S. 277 (1867) (invalidating loyalty oath or sacrifice one's ability to lawfully serve as a member of the clergy). No one should cow to that kind of imperial infringement on their God-given and constitutional rights. That is not America.

## VII.    OPINION CLAUSE

Under D.C. Bar Rule XI, Section (6)(a)(2), Disciplinary Counsel 's role is to determine whether "the apparent facts, if true, may warrant discipline." Senator Durbin's complaint under D.C. Rule of Professional Conduct 8.4 stands or falls on the allegation that "verifiable falsehoods [were] at the core of Mr. Clark's efforts." Your Office's role prior to the filing of a formal complaint is, therefore, to determine whether there is any truth to the proposition that *all* allegations of election fraud in the State of Georgia were "verifiably false."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 42

If, by contrast, *any* of the allegations being made at the time about the conduct of the election in Georgia were *not* "verifiably false," Senator Durbin's complaint becomes a dispute over the nature and scope of Mr. Clark's authority as Assistant Attorney General—a subject over which neither Disciplinary Counsel nor the Court of Appeals have jurisdiction.

As a Senate-confirmed senior official of the United States Department of Justice, Mr. Clark unquestionably had authority to make recommendations concerning the need for investigations into allegedly illegal conduct that came to his attention. Unless the allegations concerning illegal conduct in Georgia were *known* by Mr. Clark to be "verifiably false" at the time he sought to investigate them, he unquestionably had the authority and discretion to make the legal policy case for mounting an investigation.

Thus, unless this Office finds, as a preliminary matter, that *all* suspicions of illegal conduct in the Georgia election were "verifiably false," Senator Durbin's claims become little more than a baldly partisan effort to intrude into the deliberative process by which senior Justice Department officials resolve disputes over policy and the allocation of the DOJ's investigative resources.

Senator Durbin's reliance on, among other things, the statements of Mr. Clark's former colleagues demonstrates that his complaint is an effort to ensnare this Office and perhaps the D.C. Court of Appeals in an unconstitutional investigation into the internal deliberative process by which the President's advisors in the Department of Justice answer questions posed by the President pursuant to his power under Art. II section 2, cl. 1 ("The President … may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Office ….") *See* Office of Legal Counsel, Memorandum for the Attorney General, Confidentiality of the Attorney General's Communications in Counseling the President, 6 Op. OLC 481 (Aug. 2, 1982), *available at* https://www.justice.gov/sites/default/files/olc/opinions/1982/08/31/op-olc-v006-p0481_0.pdf (last visited Jan. 31, 2022).

Senator Durbin has accused Mr. Clark of illegal conduct. Mr. Clark has responded by claiming his Fifth Amendment privilege against self-incrimination. Disciplinary

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 43

Counsel's letter to Mr. Clark indicates not only that he understands the nature of the charges, but he also expects Mr. Clark to supply the evidence supporting them.

Disciplinary Counsel's November 22 information requests are essentially improper "interrogatories," that are also vague and overbroad. Far exceeding the investigative authority granted by D.C. Bar Rule XI, Section 8, they call for legal conclusions and make unreasonable demands for information already available from other sources. Even more problematic, the interrogatories also seek information that may never be available because neither Disciplinary Counsel nor Mr. Clark at the moment (based on recent information I received from DOJ that Mr. Clark's security clearances were administratively suspended, which is suspicious and we are probing, on January 26, 2021) have either the requisite security clearances to review it, or the authority to demand access to the internal deliberative processes of the Department of Justice or the White House.

In *In Re: Artis*, 883 A.2d 85, 98-99 (D.C. 2005), the Court of Appeals observed that Disciplinary Counsel does not have the authority to demand answers to interrogatories that intrude on the inviolability of constitutionally based privileges.

> In this jurisdiction, the rules of discovery are much more restricted for the prosecutor in a criminal proceeding. *See Herndon, supra*, 596 A.2d at 596 (citing Super. Ct. Crim. R. 16 & 17); *see also Morris v. United States*, 622 A.2d 1116, 1124-25 (D.C.), *cert. denied* 510 U.S. 899 (1993) ("Discovery in criminal trials, especially discovery of the defense case, is very limited because of the adversarial nature of criminal prosecutions."). In adopting rules permitting discovery by a prosecutor in a criminal proceeding, courts and legislatures have proceeded with caution because of the Fifth Amendment privilege against self-incrimination, the Sixth Amendment's guarantee of effective assistance of counsel, the attorney-client privilege, and the attorney work product doctrine. *Middleton v. United States*, 401 A.2d 109, 115 (D.C.1979) (concluding that it was error for the trial court to compel disclosure of evidence gathered by the defense investigator absent statutory or other authority).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 44

The rationale of *Artis* also applies to the Mr. Clark's executive privilege claim. The Office of Legal Counsel of the U.S. Department of Justice has consistently taken the position that

> memoranda prepared by the Attorney General *or his assistants* containing legal or policy advice on issues under consideration by the President and his advisers may be properly encompassed by a claim of executive privilege. ***This category of documents would include, for example, staff level advice to Assistant Attorneys General*** concerning matters on which the President has sought advice, staff level advice to officials in the Office of the President, notes of middle level staff meetings concerning issues before the President or members of his staff, and tentative legal judgments or draft policy statements prepared for the President or his staff.

Office of Legal Counsel, *Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. OLC at 488-489 (emphasis added). *See also* 28 U.S.C. § 506 (establishing a certain fungibility as to most Assistant Attorneys General). This makes perfect sense. Advising the President and lawyering generally is often a collaborative enterprise. There would be no valid basis for construing Opinion Clause protection and ancillary doctrines to protect only words exchanged between the President, and as relevant here, the Acting Attorney General. No, the President may also hear from his Assistant Attorneys General and those Assistants may in turn receive input from their own staffs.

The inquiry that Disciplinary Counsel proposes is inconsistent not only with Executive Privilege, but also with both statutory and common law privileges governing internal government deliberations. Mr. Clark's role was to advise the Attorney General and, when requested, to advise the President. Depending on the circumstances, his client was the Executive Branch as embodied in its Chief Executive. *See* D.C. Rule of Professional Conduct 1.13.

> Exemption 5 of the Freedom of Information Act (FOIA) protects from compulsory disclosure to the public, government materials which are "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 45

agency." 5 U.S.C. § 552(b)(5). This exemption thus codifies the traditional common law privileges afforded certain documents in the context of civil litigation and discovery, *see* Fed. R. Civ. P. 26; Fed. R. Evid. 501, including the executive "deliberative process" privilege, *NLRB v. Sears, supra; EPA v. Mink,* 410 U.S. 73 (1973); *Taxation With Representation v. IRS,* 646 F.2d 666 (D.C. Cir. 1981); the attorney client privilege, *Brinton v. Department v. State,* 636 F.2d 600,603-04 (D.C. Cir. 1980), *cert. denied,* 452 U.S. 905 (1981); *Mead Data Central v. United States Department of Air Force,* 566 F.2d 242, 252-55 (D.C. Cir. 1977); and the attorney work-product privilege, *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 154 (1975); *Bristol-Myers Co. v. FTC,* 598 F.2d 18 (D.C. Cir. 1978), as applied to document requests of government agencies from members of the public. *See also Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854 (D.C. Cir. 1980). All of these privileges encompassed by exemption 5 may be claimed, in appropriate circumstances, to protect communications between the Attorney General's Office and the Office of the President from compulsory disclosure to members of the press and the general public.

Office of Legal Counsel, *Confidentiality of the Attorney General's Communications in Counseling the President,* 6 Op. OLC at 490.

## VIII.   FIRST AMENDMENT AND EQUAL PROTECTION

As every lawyer knows, the First Amendment protects the rights of free speech and free thought, U.S. Const. amend. I, while the Equal Protection clause guarantees the equal protection of the law, protects against arbitrary and capricious impositions by the government. U.S. Cons. Amend. XIV. Your Office's investigation of Mr. Clark threatens both of these rights in that, as discussed at length elsewhere in this letter, the real offense of which he is accused by Senator Durbin and which he wants investigated amounts to no more than a thought crime, a violation of the First Amendment, where a large number of others holding similar thoughts are not being charged or investigated, becoming its own violation of the Equal Protection clause. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 46

confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  I do not elaborate on these themes further given the prodigious length of this letter already, but will do so if required.

IX.   **D.C. BAR RULE OF PROFESSIONAL CONDUCT 8.4(D) CANNOT BE USED TO TURN STANDING ON ONE'S FEDERAL CONSTITUTIONAL RIGHTS IN RESISTING A SUBPOENA INTO AN INDEPENDENT VIOLATION OF THOSE BAR RULES.**

You indicate that you are investigating a potential violation of D.C. Bar Rule of Professional Conduct 8.4. In particular, your November 22 letter states, at page 3: "Please be aware that the District of Columbia Court of Appeals has approved discipline based in part on a violation of Rule 8.4(d) of the D.C. Rules of Professional Conduct (conduct that seriously interferes with the administration of justice) where the attorney failed to comply with Disciplinary Counsel's request for information. Moreover, your cooperation will contribute to the resolution of this matter in a manner which safeguards the rights of the public and protects attorneys from unfounded complaints."

I have already dealt above with the point that the public interest is not served by this inquiry as to a proposed unsent letter that was never delivered in non-draft form outside of the Executive Branch.  Indeed, the superior interest of the people of the United States is instead promoted by respecting and shielding Executive Branch confidences and avoiding chilling the candor of those discussions.

Additionally, your Rule 8.4(d) theory cannot withstand scrutiny.  In *In re Pearson*, 228 A.3d 417, 426 (D.C. 2020), the Court explained that "[a] violation [of Rule 8.4(d)] requires improper conduct that 'bear[s] directly upon the judicial process ... with respect to an identifiable case or tribunal" and "taint[s] the judicial process in more than a *de minimis* way'" citing *In re Hopkins*, 677 A.2d 55, 59–61 (D.C. 1996). In *In re Yelverton*, 105 A.3d 413, 426 (D.C. 2014) the D.C. Court of Appeals held that "[c]onduct violates Rule 8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an identifiable case or tribunal, *and* (3) harms the judicial process in a more than a de minimis way." (emphasis added).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 47

Not a single one of these three essential elements is even remotely satisfied by what is alleged here: a confidential and privileged internal legal deliberation over a letter that was never sent and a course of action that was rejected by the decisionmaker and never taken. Measured against the essential elements identified in *Yelverton*, (1) confidential and privileged internal deliberations and debates over legal theories and arguments are not improper; (2) there is no identifiable case or tribunal because the entire discussion was internal, confidential and totally unknown to the public and no document asserting the arguments or theories was ever filed in any court or tribunal anywhere; and (3) there was no judicial process that was affected in any way whatsoever because nothing was ever filed in any court or tribunal anywhere. The Bar does not have jurisdiction over such conduct.  Rule 8.4(d) does not apply.

**X.    THE OFFICE'S INSUBORDINATION THEORY FAILS.**

On page 2 of your November 22, 2021 letter, you note that "[w]e are particularly concerned with your conduct after Mr. Rosen's and Mr. Donoghue's initial determination on December 28, 2020, not to send your draft letter because it lacked evidentiary support." Read in the context of the full letter, this seems to suggest that if Mr. Clark had continued to press a position to investigate or, in the terms of the House Impeachment Managers when referring to Mr. Clark, "reopen" an investigation, and/or spoke to the President, this could be disciplinable conduct.  Respectfully, this is wrong on legal grounds based on a host of arguments included in this letter, including most importantly the preemption argument and the inability under the separation of powers for a Senator to try to penetrate into the management of the Executive Branch using a bar complaint as a device to do so.

But this Section also sets out certain publicly available documents that, if taken as true, show that any theory of insubordination trying to make December 28 a magic date falters.

Perhaps the easiest way to see this is to look at some of the documents that were released by the House Oversight Committee. (Your Office may not be aware of those documents.)  Without verifying their accuracy, consistent with the legal positions and pleadings on Mr. Clark's behalf taken or made in my two letters today, your Office should

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
    Phil Fox, Esq.
    January 31, 2022
    Page 48

consult those documents and not proceed only by looking at what Senator Durbin and his staff prepared and sent to you. Also, we do not waive arguments that DOJ improperly released those documents despite the fact that they were covered by multiple privileges. Additionally, we do not possibly understand how DOJ concluded it could release such documents but in the July letter to Mr. Clark (and duplicated to others like Mr. Rosen), law enforcement privilege was being maintained.

But with those caveats in mind, please look at the December 30, 2020 and January 1, 2021 emails from Mark Meadows, the President's Chief of Staff, to Mr. Rosen. *See* U.S. House of Representatives Oversight Committee, *DOJ Selected Documents* (June 15, 2021) at 219, 226, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/COR-SelectedDOJDocuments-2021-6-15-FINAL.pdf ("Can you have your team look into these allegations of wrongdoing. Only the alleged fraudulent activity[?] Thanks Mark") & ("There have been allegations of signature match anomalies in Fulton county, Ga. Can you get *Jeff Clark* to engage on this issue immediately to determine if there is any truth to this allegation") (emphasis added) (last visited Jan. 31, 2022). A reasonable inference from these two emails would be that the President had asked his Chief of Staff to relay this instruction to Acting AG Rosen.[14] *See, e.g.*, David Z. Morris, *Congressman Calls for Investigation of Trump's Insecure Phone*, FORTUNE (Feb. 18, 2017) ("By most accounts Trump does not use email, reducing the likelihood of sensitive or classified information being leaked through a hack ...."), *available at* https://fortune.com/2017/02/18/trump-android-phone-ted-lieu/ (last visited Jan. 31, 2022).

The key point, however, is that both of these emails both came *after* December 28, 2021. As I have noted in emails to DOJ (and which is supported by other DOJ/congressionally released documents) in order to try to obtain access to the relevant national security documents, Mr. Clark saw an Intelligence Community report on foreign election interference on January 1, 2021 and then discussed that matter with Director of

---

[14] Assuming this is correct, it appears that there was a twinge of insubordination in an email exchange inside the walls of DOJ, for in response to Mark Meadows' January 1, 2021 email to Mr. Rosen, Mr. Rosen forwarded it to Mr. Donoghue, with the note "Can you believe this? I am not going to respond to the message below." Donoghue responded 6 minutes later: "At least it's better than the last one, but that's not saying much.").

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 49

National Intelligence Ratcliffe on January 2, 2021. And finally, as the Durbin report itself asserts in its chronology, there was an Oval Office meeting on January 3, 2021 including President Trump, Mr. Clark, and Messrs. Rosen & Donoghue, *et al.* Thus, if the emails above are credited, they show a basically unbroken chain pursuant to which Mr. Clark was entitled to act running from December 30, 2020 to January 3, 2021—all of which *postdates* December 28, 2020.

From what is available for you to review, Mr. Clark was not being insubordinate to his DOJ superiors. All in the chain were subordinate to President Trump.

**XI.    EVEN IF THE BAR DID HAVE THE CONSTITUTIONAL AUTHORITY TO ADJUDICATE THE COMPLAINT FILED BY SENATOR DURBIN (WHICH IT DOES NOT), SIGNIFICANT PUBLIC INFORMATION WAS AVAILABLE BEFORE JANUARY 3, 2021, AND HAS ONLY BEEN CONFIRMED FURTHER SINCE, THAT COULD HAVE LED A REASONABLE DOJ LAWYER TO WANT TO INVESTIGATE.**

There is ample evidence of election irregularity in Georgia and in other 2020 presidential election battleground States. The mainstream media can pretend this is not true and report on any new information coming to light in a biased fashion, pooh-poohing it, but a prosecutor acting under the federal law that governs the District of Columbia carrying an obligation to see that justice is done cannot proceed in such a blinkered way.

Numerous sources are referred to below, and anyone as well-read and as aware of national news, from a variety of sources, as Mr. Clark is, would no doubt have known much of this information even before the Fall of 2021 or today, January 31, 2022. For this reason, you should consider the entire book *Rigged*, written by Molly Hemingway, incorporated by reference here, especially Chapter 10, "The Trouble with Fulton County." *See* Mollie Hemingway, RIGGED: HOW THE MEDIA, BIG TECH, AND THE DEMOCRATS SEIZED OUR ELECTIONS (2021). We can purchase a copy of the book to send to you if that is necessary.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 50


There is no retreat in this Section from the arguments advanced in other Sections above that the D.C. Bar does not have the authority to intrude into the separation of powers or use local bar rules to second guess the decisions of a lawyer inside the federal government giving advice to the President.

We note, however, that if you decide not to exercise your prosecutorial discretion to end the investigation *and* you reject those constitutional arguments and our other objections, the Board would need to adjudicate a truly monumental set of facts to decide that D.C. Rule of Professional Responsibility 8.4 had been violated by Mr. Clark in the course of allegedly investigating (or advocating for reopening an investigation into) election irregularities and recommending options inside DOJ and/or to the President of the United States. There is more than enough evidence to support a good-faith desire to investigate further and no clear and convincing evidence that Mr. Clark deliberately lied. Any such claim would be far-fetched. And the ultimate recipient of legal advice, the President of the United States, even if the testimony provided to the Senate Judiciary Committee were considered beyond cavil, does not reveal the President asserting that Mr. Clark lied or that his own, very public, doubts about the 2020 election were fabrications.

Bar processes are not the place to litigate the most controversial presidential election in U.S. history (far surpassing *Bush v. Gore* in 2000). Instead, as I argue in the companion letter to this one, focused on your subpoena, the reason Board Rule 4.1 exists is precisely to defer bar investigations until after other proceedings bearing on issues of great magnitude, like those here, are fully resolved.

Mollie Hemingway explores many questionable practices or issues impacting the outcome of the 2020 election, such as ballot-harvesting, voter database deficiencies, clear violations of state law as fixed pursuant to Article II by the state legislatures, signature verification problems, and lack of proper, bipartisan oversight of the ballot-counting process.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
> Phil Fox, Esq.
> January 31, 2022
> Page 51

      **A.**     **On or Before January 3, 2021, a Reasonable Lawyer Could Legitimately Believe That the Presidential Election Was Irregular Enough to Want to Investigate or Reopen Prior Investigations.**

The discussion below focuses on Georgia because Mr. Clark's alleged letter focused on Georgia. Many of the issues are generalizable. If you find it necessary, we can produce catalogues of pre-January 3, 2021 election irregularities in other battleground States such as Arizona, Pennsylvania, Wisconsin, etc. And even what is below is just a smattering of the eyebrow-raising information concerning Georgia.

Fulton County, Georgia has a "long history of mismanaging elections." RIGGED, 291. Indeed, the June 9, 2020 primary was a mess there, putting anyone on notice that the county should be carefully scrutinized. The problems were so significant that the state elections board sued the county, eventually settling the suit in a consent decree. *See id.* at 291. Two examples of mismanagement in Fulton were admitted to by Georgia Secretary of State Raffensberger: (1) The email system was set up so that for every voter who requested an absentee ballot, it generated 20 different emails to 20 different employees, which overwhelmed the servers; and (2) voters sent in their requests in different formats from PDF's to JPEGs to .MOV files to embedded photos. Investigators said the county's printers couldn't handle the different formats. *See also* Richard Elliot, *Fulton County Broke the Law in Handling of Absentee Ballot Requests, State Investigation Finds*, WSB-TV CHANNEL 2, *available at* https://www.wsbtv.com/news/local/fulton-county/fulton-county-broke-law-handling-absentee-ballot-requests-state-investigation-finds/XWE4XMFIRVHETHSI3LT7OJA36Y/ (Aug. 27, 2020), (last visited Jan. 31, 2022).

Later, a report by Seven Hills Strategy would emerge, giving a much more blow-by-blow description of Fulton County problems, issues, and mismanagement. *See* Seven Hills Strategy, *State Election Board Report – November 13, 2020 Unabridged Notes Detailing Everything Witnessed Nov 2-Nov 7, 2020*, *available at* https://justthenews.com/sites/default/files/2021-06/Unabridged%20Notes.pdf (last visited Jan. 31, 2022).

"The problems in Fulton County were so extensive that neither of the Republican commissioners voted to certify the election." RIGGED, 298. Indeed, "the first certification

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 52

was on November 13, but the county was still finding, processing, and tabulating absentee ballots as late as November 12. Later, during the runoff, the county would discover thumb drives accidentally left in voting machines, further worrying the Republican commissioners about chain-of-custody issues and inventory management." *Id.* at 298-99.

The Democrats' main election lawyer, Marc Elias, changed state legislative law in lawsuits in numerous battleground States. A Mark Zuckerberg-funded effort quietly took control (or at least outsized influence) of local election infrastructure and government offices. The mainstream media provided a steady anti-Trump narrative. And Big Tech systematically censored conservative voices on the Internet.

Even *Time* magazine, which is not a conservative outlet, would look back shortly after the Trump Administration ended and note that these changes worked "a revolution in how people vote." Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election,* TIME, *available at* https://time.com/5936036/secret-2020-election-campaign/ (Feb. 4, 2021). Any sophisticated lawyer, seeing multiple chess pieces being moved on a strategic national board simultaneously in the run up to the 2020 presidential election on November 3, 2020 would know that some kind of coordination of the rollout all of those pieces was being orchestrated, even before *Time* magazine's piece from Molly Ball would reveal to the world that there was a "secret history" behind a "shadow campaign" to "fortify[]" the election. *Id. See also id.* ("[T]he participants want the secret history of the 2020 election told, even though it sounds like a paranoid fever dream—*a well-funded cabal of powerful people,* ranging across industries and ideologies, working together behind the scenes to influence perceptions, *change rules and laws,* steer media coverage and control the flow of information.") (emphasis added).

On December 10, 2021, a summary of Trump election challenges was published. *See* Jonathan Raymond, *Status of the Trump Election Lawsuits in Georgia,* ALIVE, *available at* https://www.11alive.com/article/news/politics/elections/trump-election-lawsuits-georgia-statuses/85-81d484df-e746-4c5a-be3a-d73555e9df70 (Dec. 10, 2020). It makes clear that there were standing defenses being presented to those suits, but a potential ruling on standing is *not* a ruling on the merits. Additionally, in light of Federal Rule of Civil Procedure 11 and state-law analogues, any lawyer thinking about investigating a

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
   Phil Fox, Esq.
   January 31, 2022
   Page 53

dispute would have a good-faith belief to do so premised on the fact that any lawyers appearing on a complaint filed by President Trump were bound to have done an investigation of any factual allegations on pain of being sanctioned. Where there is the legal smoke of a complaint there may (not must) be fire and other lawyers are entitled to assume that pending deeper investigation.

Additionally, the Supreme Court's ruling in the *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), came down on December 11, 2020. The majority refused to grant the motion for leave to file a bill of complaint because of a lack of standing—again not a merits ruling. But there was a dissent by Justices Alito and Thomas. They would have allowed the bill of complaint to be filed, potentially putting the merits at issue. That suit was also joined by 17 State Attorneys General other than Texas's. *See* Dave Boyer & Alex Swoyer, *17 States Back Texas, Ask Supreme Court to Hear Election Challenge*, WASHINGTON TIMES (Dec. 9, 2020), *available at* https://www.washingtontimes.com/news/2020/dec/9/17-states-back-texas-ask-supreme-court-hear-electi/ (last visited Jan. 31, 2022). Any rational lawyer could think that a total of 18 State Attorneys General would not be bringing claims that lacked colorability even if reasons were emerging to doubt extravagant election claims made on TV by some attorneys. Hence, a rational lawyer could properly conclude from the State AG's suit alone that additional investigation by federal authorities was appropriate.

Note as well that experienced and respected former federal prosecutor Andrew McCarthy thought that one of Trump's lawsuits was facially quite strong. *See* Andrew McCarthy, *As Time Is Running Out, Trump Campaign Files Stronger Lawsuit in Georgia: Biden still would win the presidency even if Georgia's election outcome were reversed. But the state should answer the claims of illegality anyway*, NATIONAL REVIEW (Dec. 7, 2020). The argument here is obviously one based on this article's subtitle: like former federal prosecutor Andrew McCarthy, a rational lawyer inside DOJ in late 2020 could have thought that further investigation was warranted based on such a complaint, i.e., that Georgia "should answer the claims of illegality *anyway*." This suit was slow-walked in the Georgia state court system and thus was also never resolved on the merits.

Any astute lawyer following these matters in the news would also have been aware of the 2005 Carter-Baker Report calling attention to mail-in ballots as a hiding place

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 54

for fraud that could be exploited. *See* BUILDING CONFIDENCE IN U.S. ELECTIONS, REPORT OF
THE COMMISSION ON FEDERAL ELECTION REFORM (Sept. 2005), *available at*
https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.
pdf (last visited Jan. 31, 2022). Together with 2020's COVID-induced expansion of mail-
in balloting, the Report's conclusion below could have generated serious cause for alarm
such that any rational lawyer would have wanted to keep an eye on this issue:

> Fraud occurs in several ways. Absentee ballots remain the largest source of
> potential voter fraud. A notorious recent case of absentee ballot fraud was
> Miami's mayoral election of 1998, and in that case, the judge declared the
> election fraudulent and called for a new election. Absentee balloting is
> vulnerable to abuse in several ways: Blank ballots mailed to the wrong
> address or to large residential buildings might get intercepted. Citizens
> who vote at home, at nursing homes, at the workplace, or in church are
> more susceptible to pressure overt and subtle, or to intimidation. Vote
> buying schemes are far more difficult to detect when citizens vote by mail.

*Id.* at 46 (footnote omitted).

Hemingway also concluded that there was a critical absence of signature matching
in Georgia, an issue that was also in the news before January 3, 2020. *See, e.g.,* Tyler Olson,
*Georgia Recount Signature-Matching Impossible Despite Demands from Trump, Republicans,
Says Secretary of State,* FOX NEWS (Nov. 23, 2020):

> In July that same year, the Fulton County elections division had acquired a
> new platform to handle absentee-by-mail ballots from a company called
> BlueCrest. The stations they purchased had the ability to scan the oath
> envelope, open the envelope, remove the ballot, and flatten the ballot itself
> in order to start the scanning process. The system also had optional
> capabilities for matching signatures to official signatures on file. While
> Barron had indicated to commissioners that the match capability was being
> brought into use, the Republicans later found out that the managers never
> had any intention of using that system. ***Consequently, there was no
> effective signature match going on at all.***

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 55

RIGGED, 299 (emphasis added).

Ballot-counting oversight was plagued with problems, especially in Fulton
County. It is highly suspicious, standing alone, that Republican observers were ejected
from the State Farm Arena at around 10:30 at night on November 3, when counting briefly
stopped for the night. *See id.* at 287-89. And at least by December 4, 2020, news would
break showing Georgia election workers rescanning the same ballots through machines
multiple times. *See Corrupt Georgia Election Worker Seen Loading Same Ballots 3 Times Into
Machine, available at* https://youtu.be/RiREC3Zy20E  *See also* Ben Brasch, *Georgia Opens 2
Investigations Into Fulton's Elections Operations*, ATLANTA JOURNAL-CONSTITUTION, *available
at* https://www.ajc.com/news/atlanta-news/georgia-opens-2-investigations-into-fultons-
elections-operations/EVCBN4ZJTZELPDHMH63POL3RKQ/ (Nov. 17, 2020).

Left-wing media outlets have in recent times embarked on fashioning a cottage
industry of fact-checking that seems designed to enforce political correctness. One
backed by ByteDance, a Chinese company that Mr. Clark was involved in DOJ litigation
concerning because of the national security risks it poses to the United States, attempted
to attack the video evidence. But a rational lawyer could have been skeptical of such
media fact-checking operations. *See, e.g.,* Tristan Justice, *China-Funded Facebook Fact-
Checker Is Now Censoring Criticism of Its Fake Fact Checks*, THE FEDERALIST, *available at*
https://thefederalist.com/2020/12/07/china-funded-facebook-fact-checker-is-now-
censoring-criticism-of-its-fake-fact-checks/ (Dec. 7, 2020).

Also, consider that there were significant voter database problems, also known
prior to January 3, 2021, and which are ably described by Mollie Hemingway. "Active
voter registrations in [Fulton] county total more than 95 percent of the adult population
of the county, an improbably high percentage. Nationwide, the Census Bureau said that
in the 2016 presidential election, 70 percent of the voting-eligible population was
registered to vote." RIGGED, 300. It would not be prevarication or malfeasance to want
to investigate such an issue.

As conceded by the Molly Ball piece in *Time* magazine, celebrating how a powerful
"cabal" of the rich and powerful "fortif[ied]" the election, Silicon Valley was very active

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 56

in monkeying with Georgia and other battleground States.  Mollie Hemingway delved into the issue in depth, but some of the key points she quickly summarizes as follows in a short piece drawn from her book *Rigged*:

> Zuckerberg's help to Democrats is well known when it comes to censoring their political opponents in the name of preventing "misinformation." Less well known is the fact that he directly funded liberal groups running partisan get-out-the-vote operations. In fact, he helped those groups infiltrate election offices in key swing states by doling out large grants to crucial districts.

> The Chan Zuckerberg Initiative, an organization led by Zuckerberg's wife Priscilla, gave more than $400 million to nonprofit groups involved in "securing" the 2020 election. Most of those funds—colloquially called "Zuckerbucks"—were funneled through the Center for Tech and Civic Life (CTCL), a voter outreach organization founded by Tiana Epps-Johnson, Whitney May, and Donny Bridges. All three had previously worked on activism relating to election rules for the New Organizing Institute, once described by The Washington Post as "the Democratic Party's Hogwarts for digital wizardry."

> * * *

> According to the Foundation for Government Accountability (FGA), Georgia received more than $31 million in Zuckerbucks, one of the highest amounts in the country. *The three Georgia counties that received the most money spent only 1.3 percent of it on personal protective equipment.* [This is important because it tends to give lie to the claim that the 2020 election needed to be run in an unprecedent fashion by mail due to the dangers of COVID.] The rest was spent on salaries, laptops, vehicle rentals, attorney fees for public records requests, mail-in balloting, and other measures that allowed elections offices to hire activists to work the election. Not all Georgia counties received CTCL funding. And of those that did, Trump-

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 57

voting counties received an average of $1.91 per registered voter, compared
to $7.13 per registered voter in Biden-voting counties.

Mollie Hemingway, *"Zuckerbucks" and the 2020 Election*, IMPRIMIS (Oct. 2021), *available at*
https://imprimis.hillsdale.edu/zuckerbucks-2020-election/ (last visited Jan. 31, 2022).
Information on the corruptive influence of "Zuckerbucks" was also known prior to
January 3, 2021. *See, e.g.*, Michael Patrick Leahy, *Report: Mark Zuckerberg's $419 Million
Non-Profit Contributions 'Improperly Influenced 2020 Presidential Election'*, BREITBART,
*available at* https://www.breitbart.com/politics/2020/12/18/report-mark-zuckerbergs-419-
million-non-profit-contributions-improperly-influenced-2020-presidential-election/ (last
visited Jan. 31, 2022). A rational lawyer could have concluded that investigating the
Center for Tech and Civic life was worth doing *before* the presidential election was
certified by Congress on January 6, 2021.

Finally, note that Mr. Clark was attendance at the D.C. Circuit's Judicial
Conference in 2019 held in Cambridge, Maryland. By all accounts that conference was a
success and the D.C. appellate and trial court Judges appreciated Professor J. Alex
Halderman's presentation that in part bore on hacking election machines, when the
Russian election interference allegations were still often in the news. *See* C.V. of Prof.
Halderman, item "Panelist: How Adversaries Can Erode Public Trust in Democratic
Institutions. Co-panelists: Hany Farid, Ron Rivest, Suzanne Spaulding; moderator: Hon.
James E. Boasberg. D.C. Circuit Judicial Conference, Cambridge, Maryland, June 26,
2019," *available at* https://jhalderm.com/home/halderman-cv.pdf (last visited Jan. 31,
2022). Apparently, then-Chief Judge Merrick Garland thought that Professor
Halderman's work and views were worth spotlighting to the D.C. federal judiciary and
to its prominent practitioners.

Recently, it came to light that Professor Halderman is the author of a 25,000-word
"secret report," that Dominion voting machines are susceptible of hacking. *See* Mark
Niesse, *Secret Report Finds Flaw in Georgia Voting System, But State in the Dark*, Atlanta
Journal-Constitution (Jan. 26, 2022), *available at* https://www.ajc.com/politics/secret-
report-on-georgia-voting-system-finds-flaws-but-state-shows-no-
interest/YKFEET2WE5BBPJ7TYVOYMBTIKQ/

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 58

      **B.**      **New Information That Has Come to Light Since January 3, 2021 Only Reinforces What Could Have Worried a Rational Lawyer Before That Time.**

      **1.**      **New Legal Developments**

Since the election the reasonableness of contemporaneous skepticism over the integrity and legality of the 2020 election has been vindicated by several developments.

In *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (decided February 22, 2021, just over a month after Mr. Clark had resigned from DOJ near the end of the Trump Administration), Justice Thomas dissented from the denial of *certiorari* because non-legislative state officials had changed the statutory rules for federal elections and the appointment of presidential electors in clear violation of the Electors and Elections clauses of the Constitution. art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent that was joined by Justice Gorsuch noting the same infirmity. Both dissents noted the public importance of resolving the questions presented.  If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have had similar views, is that not *ipso facto* evidence of being motivated by a good-faith legal position?

More recently, the Commonwealth Court of Pennsylvania, an intermediate appellate court, held in *McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022) that Pennsylvania's Act 77, which provided for universal mail-in balloting in Pennsylvania, was unconstitutional under the Pennsylvania constitution's strict limitations on absentee balloting. This was the statute in effect during the 2020 election, and the statute from which non-legislative officials further departed in violation of the Elections and Electors clauses. Approximately 2.6 million absentee ballots were cast by means held unconstitutional by a Pennsylvania court. *McLinko* bears out the views of Justices Thomas, Alito, and Gorsuch, and by assumption based on attacks on Mr. Clark, his views as well.

The Wisconsin Supreme Court in a 4-3 ruling in *Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021) declined to consider whether drop boxes were illegal under Wisconsin law. The three dissenters, all writing separately but all

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 59

joining the other dissents, concluded in exceptionally strong terms that the drop box procedures in the 2020 election, used by "hundreds of thousands of voters," were illegal. And on January 14, 2022, a Wisconsin trial court ruled that drop boxes were illegal under Wisconsin law, in apparent accord with the views of the dissenters in *Trump v. Biden.*

A post-election audit of the 2020 election in Maricopa County, Arizona conducted by the State Senate found, *inter alia.* substantial defects in signature verification, including the presence of 17,322 duplicates, and intentional and substantial spoliation of digital records on the voting equipment shortly before it was delivered for forensic examination. *See* Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate,* BREITBART (Sept. 25, 2021), *available at* https://www.breitbart.com/politics/2021/09/25/arizona-senate-draft-report-on-the-maricopa-county-election-audit-highlights-49000-questionable-votes-asks-ag-to-investigate/ (last visited Jan. 31, 2022).

## 2. New Factual Developments

Georgia State law is clear: ballot harvesting is illegal in Georgia. O.C.G.A. § 21-2-385(a) in effect for the 2020 election, provided in part that "mailing or delivery [of an absentee ballot] may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector." Very strong – practically irrefutable - evidence has emerged since the election proving this limitation was violated on a systematic and large scale basis in Georgia and other battleground states.

Filmmaker and conservative commentator Dinesh D'Souza has announced a new film called "2,000 Mules". While information on "2,000 Mules" is limited so far, the trailer claims to show "never before seen security footage" of what are purportedly "mules" (i.e., ballot harvesters). The video shows these "mules" stuffing what appears to be multiple ballots or even sets of ballots into ballot boxes, with some "mules" then "snapping photos [on their phones] to get paid." https://rumble.com/vtlq96-explosive-new-surveillance-footage-of-ballot-drop-boxes.html (last visited Jan. 31, 2022).    "We

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 60

tracked 2,000 mules making multiple ballot drops ... leaving no fingerprints ... snapping photos to get paid. *Id.*

The new evidence is said to be based on "cell phone geotracking," similar to claims that the "[c]onservative election integrity group True the Vote" has made, according to a report by Breitbart News. *See* Matthew Boyle, *Exclusive — True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART, *available at* https://www.breitbart.com/politics/2021/08/24/exclusive-true-the-vote-conducting-massive-clandestine-voter-fraud-investigation/ (Aug. 4, 2021). True the Vote "has been conducting a months-long massive and clandestine voter fraud investigation into the 2020 presidential election, the results of which may soon start coming out." *Id.*

Breitbart's Matthew Boyle explained: "A document that the group's founder Catherine Engelbrecht circulated to prospective donors, obtained by Breitbart News, details several facets of the investigation—which centers on what the group describes as the collection of cell phone GPS ping data in key election hotspots around the country including Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan." The trailer for "2,000 Mules," based on True the Vote's work, similarly alleges "[a] coordinated ring of illegal vote harvesting in all the key states where the election was decided." https://rumble.com/vtlq96-explosive-new-surveillance-footage-of-ballot-drop-boxes.html.

"[True the Vote's] document says that [it] has spent the last several months since late last year collecting more than 27 terabytes of geospatial and temporal data—a total of 10 trillion cell phone pings—between Oct. 1 and Nov. 6 in targeted areas in Georgia, Arizona, Michigan, Wisconsin, Pennsylvania, and Texas. The data includes geofenced points of interest like ballot dropbox locations, as well as UPS stores and select government, commercial, and non-governmental organization (NGO) facilities." Boyle, — *True The Vote Conducting Massive Clandestine Voter Fraud Investigation*. "The group is expected to begin releasing some of these videos, which purportedly show the same people going multiple times to the same drop boxes, in the coming weeks." *Id.*

The expert affidavit of Gregg Phillips, filed April 8, 2021 in *Schmitz v. Barron, et al.,* Fulton Superior Court Civil Action File No. as Exh. C to the Amended and Restated

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 61

Verified Petition to Contest Results of House District 52 Election, describes his analysis of 1.2 trillion mobile device signals for the geotracking analysis and tracks cellphones making multiple runs to and from drop boxes – a massive and practically irrefutable violation of O.C.G.A. § 21-2-385(a).

As a result of a complaint by True the Vote to the Georgia Secretary of State, that office is now investigating the ballot harvesting scheme in Georgia. https://justthenews.com/politics-policy/elections/georgia-opens-investigation-possible-illegal-ballot-harvesting-2020. True the Vote has provided the Secretary of State's office with a confidential whistleblower who was part of the scheme. The whistleblower claims he was paid $10 per ballot he put into dropboxes.

I could provide additional material involving post-January 3, 2021 revelations but it should suffice to show that concerns about the presidential election contest results in Georgia were well-founded to cover just one other example.

In July 2021, Margot Cleveland with *The Federalist* reported that "[n]ew evidence indicates that more than 10,300 illegal votes were cast in Georgia in the November 2020 general election—a number that will continue to rise over the next several months, potentially exceeding the 11,779 votes that separated Joe Biden and Donald Trump." Margot Cleveland, *New Evidence Indicates Enough Illegal Votes in Georgia to Tip 2020 Results*, THE FEDERALIST, *available at* https://thefederalist.com/2021/07/09/new-evidence-indicates-enough-illegal-votes-in-georgia-to-tip-2020-results/ (July 9, 2021).

This evidence came from "Mark Davis, the president of Data Productions Inc. and an expert in voter data analytics and residency issues, obtained data from the National Change of Address (NCOA) database that identified Georgia residents who had confirmed moves with the U.S. Postal Service. After excluding moves with effective dates within 30 days of the general election, and by using data available from the Georgia Secretary of State's Office, Davis identified nearly 35,000 Georgia voters who indicated they had moved from one Georgia county to another, but then voted in the 2020 general election in the county from which they had moved." *Id.*

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 62

This analysis is especially concerning because even if only one-third of the nearly 35,000 Georgians who allegedly voted illegally had truly done so (roughly 11,666 people), then that would still equal the margin between Biden and Trump in that State.

Cleveland continued to summarize Davis' investigation: "In Georgia, there was both an audit and a statewide recount confirming Biden's victory, but ignored in the process was evidence that nearly 35,000 Georgians had potentially voted illegally." *Id.* Jake Evans, "a well-known Atlanta election lawyer," explained that "[u]nder Georgia law, residents must vote in the county in which they reside, unless they changed their residence within 30 days of the election." That is, "outside of the 30-day grace period, if people vote in a county in which they no longer reside, "Their vote in that county would be illegal.""

"Critics of Trump's challenge to the certification of Georgia's election results framed the NCOA information as either unreliable or of an insufficient magnitude to cast the outcome of the election in doubt. But by updating their voter registration information with the same address as contained in the NCOA database, the voters themselves have established the reliability of that information." *Id.*

And more telling than that was the reaction of the Georgia Secretary of State's office: "Upon learning of this new development" (the results of Davis' investigation), "the Georgia Secretary of State's Office quietly opened an investigation into potentially illegal voting by residents who had moved between counties. Davis provided his data to the office in May [2021], with a detailed explanation of his analysis."

Similarly, Georgia Governor Brian Kemp wrote a lengthy letter to the State Election Board requesting an investigation into substantial irregularities in the post-election audit. The Governor's office carefully reviewed the analysis of Joseph Rossi, and finding no explanation themselves for the inconsistencies, asked the State Election Board to investigate. https://thefederalist.com/2021/11/24/georgia-governor-releases-more-evidence-that-2020-ballots-were-miscounted/.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 63

      **3.**     **The Special Case of Revelations About the Actions of Former Attorney General Barr Regarding the Non-Investigation by DOJ of Election Fraud**

There have been two noteworthy revelations relating to the actions of former Attorney General Barr or on his watch: (1) allegations by former U.S. Attorney William McSwain; and (2) federal FOIA responses to document requests for investigations performed by the U.S. Attorneys concerning election irregularities in the 2020 presidential election. Neither of these revelations paint a picture of an active DOJ that would not have benefitted from more energetic leadership to investigate the issues of election integrity in late 2020/early 2021, which undermines significantly the allegations suggesting that if Mr. Clark pressed for greater investigations, he was doing so for an improper reason.

      a)     **Allegations by former U.S. Attorney for the Eastern District of Pennsylvania William McSwain Indicate that Former Attorney General Barr's Instructions to U.S. Attorneys to Investigate Election Irregularities Were Not the Actual Policy on the Ground.**

On December 1, 2020, General Barr gave a one-on-one interview with a reporter from the Associated Press. "Barr told the AP that U.S. attorneys and FBI agents have been working to follow up specific complaints and information they've received, but 'to date, we have not seen fraud on a scale that could have effected a different outcome in the election.'" Michael Balsamo, *Disputing Trump, Barr Says No Widespread Election Fraud*, AP NEWS (Dec. 1, 2020), *available at* https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (last visited Jan. 31, 2022).

The perception that widespread and energetic investigations were done would be seriously shaken by USA McSwain's allegations. As *Conservative Treehouse* would note, "there's a big difference between not seeing election fraud and purposely blocking a United States Attorney office from investigating allegations of fraud with an institutional motive *not* to discover or see it." *During Speech President Trump Reveals Letter from Pennsylvania U.S. Attorney Detailing Bill Barr Blocking Philadelphia Vote Fraud Investigation*, CONSERVATIVE TREEHOUSE (July 11, 2021), *available at* https://tinyurl.com/44nnvt86 (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 64

Specifically, McSwain wrote to President Trump on June 9, 2021, stating the following:

> In the spring of 2020, I prosecuted and won an election fraud case against a Judge of Elections in South Philadelphia who was stuffing the ballot box. I also charged the political consultant (a former Democratic Congressman) who was paying bribes to the Judge to stuff the ballot box.[15]

> *President Trump, you were right to be upset about* **the way the Democrats ran the 2020 election in Pennsylvania — it was a partisan disgrace. The Governor, the Secretary of the Commonwealth, and the partisan State Supreme Court made up their own rules and did not follow the law. Even worse, the State Attorney General, Josh Shapiro — the very person responsible for the enforcement of state election law — declared days before Election Day that you could not win the election. It would be hard to imagine a more irresponsible statement by a law enforcement officer, especially during a hotly contested election. In light of such statements, it is hardly surprising that many Pennsylvanians lack faith in our state's election results.**

> *On Election Day and afterwards, our Office received various allegations of voter fraud and election irregularities. As part of my responsibilities as U.S. Attorney, I wanted to be transparent with the public and, of course, investigate fully any allegations. Attorney General Barr, however, instructed me not to make any public statements or put out any press releases regarding possible election irregularities. I was also given a directive to pass along serious allegations to the State Attorney General for*

---

[15] USA McSwain considered this one of his signature accomplishments. *See* Press Release, United States Attorney McSwain Announces Resignation (Jan. 14, 2021), *available at* https://www.justice.gov/usao-edpa/pr/united-states-attorney-mcswain-announces-resignation (last visited Jan. 31, 2022) ("U.S. Attorney McSwain has prioritized the fight against public corruption, which erodes the public's trust in its elected officials and government. During the past three years, the Office has brought charges for corruption and/or fraud and embezzlement against dozens of elected officials, public office holders and public employees. Examples include: ... "election fraud charges against former U.S. Congressman Ozzie Myers of South Philadelphia.").

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
    Phil Fox, Esq.
    January 31, 2022
    Page 65

> *investigation—the same State Attorney General who had already declared*
> *that you could not win.*
>
>     I disagreed with that decision, but those were my orders. As a Marine
> infantry officer, I was trained to follow the chain of command and to respect
> the orders of my superiors, even when I disagree with them.

Letter from William M. McSwain to Former President Trump (June 9, 2021), *available at*
https://cdn.donaldjtrump.com/djtweb/general/Letter_to_President_Trump.pdf
(emphasis added).

    Before analyzing the McSwain letter further, it is important to pause and ask—
should the Pennsylvania Bar be investigating McSwain for improper conduct because he
held the view that the Pennsylvania presidential election was suspicious and worth
investigating more thoroughly than former Attorney General Barr preferred? Why are
views Mr. Clark allegedly expressed inside the Justice Department and to President
Trump, said to be similar to McSwain's, causing Mr. Clark to be investigated by the DC
Bar but not Mr. McSwain similarly being investigated by the Pennsylvania Bar? Could
the answer lie in the fact that McSwain is a candidate for Governor in Pennsylvania and
thus is a more powerful political figure? *See id.* ("I will be the Republican candidate for
Governor with the best chance to win the general election in November 2022 [and] would
welcome the chance to discuss this with you in person [President Trump]. I would be
honored to have your support."). Isn't the reason thus similar to why the 35 lawyer
members of Congress who objected on the floor of Congress to the Biden certification are
also not seeing their bar licenses threatened?

    Again, what logical line can be drawn between Mr. Clark's alleged views on
election facts and Mr. McSwain's views of those facts, or between Mr. Clark's alleged
views on those facts and those expressed by lawyer-legislators in Congress? As to
McSwain, one possible answer is that McSwain purported to follow the chain of
command. *See id.* ("I disagreed with that decision [i.e., his instructions from AG Barr],
but those were my orders. As a Marine infantry officer, I was trained to follow the chain
of command and to respect the orders of my superiors, even when I disagree with
them."). But such a rationale would not hold up because Mr. Clark, as documents
disclosed by Congress appear to indicate, was speaking with the President directly. *See*

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 66

*supra* at X. The President of the United States is the Executive Branch of the federal government. He is the very font of the chain of command. If he decides to investigate a particular course of action, he can take the counsel of his subordinates as he wills and, if Mr. Clark turned out to have been responsive to President Trump's call, then he was not being insubordinate. Mr. Clark can also say, with great familiarity as to work on major pieces of litigation, including multidistrict litigation ("MDLs") and significant emergencies, it is not uncommon for client principals to gather with partners from the law firm representing them, along with associates from that same firm, and sometimes, however rare, clients will opt to pursue a course of action that a bright young associate suggests, rather than the differing advice a partner might suggest. There are chains of command, but especially where all are assembled together and unified in a discussion, the client is the boss. And in the context of this particular dispute, the President is the chief of all of his Executive Branch subordinates. He is constitutionally entitled to elevate or not the advice received from any of them; his options are not restricted to what he might hear from a cabinet officer alone.

Similarly, Representative Scott Perry of Pennsylvania has stated that he introduced Mr. Clark to former President Trump. *Pa. Rep. Scott Perry: I 'Obliged' Trump with Introduction to Lawyer Jeffrey Clark*, KDKA 2, CBS Pittsburgh (Jan. 25, 2021), *available at* https://pittsburgh.cbslocal.com/2021/01/25/perry-i-obliged-trump-with-introduction-to-justice-lawyer/ (last visited Jan. 31, 2022) ("But Perry did say he obliged Trump's request for an introduction to the former assistant attorney general, Jeffrey Clark, who Perry knew from unrelated legislative matters, and the three men went on to discuss their shared concerns about the election. 'My conversations with the president or the assistant attorney general, as they have been with all whom I've engaged following the election, were a reiteration of the many concerns about the integrity of our elections, and that those allegations should at least be investigated to ease the minds of the voters that they had, indeed, participated in a free and fair election,' Perry said in a statement released by his office Monday.").

Assuming all of this to be true for the sake of argument, note that there is no indication that Congressman Perry saw fit to do so in a similar fashion as to USA McSwain. But even if he had done so, and McSwain and President Trump had discussed their doubts about the official purported results in Pennsylvania or elsewhere, there

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 67

would be no material differences, on these assumed facts, as compared to Mr. Clark's situation. And similar to the allegations against Mr. Clark, had USA McSwain been put together with President Trump and President Trump had asked for McSwain's views on the election, McSwain would not have remotely been insubordinate to his DOJ superiors to provide those views. Pursuant to the Constitution, in fact, it would have been improper for Mr. McSwain not to have provided those views simply because he had received a prior, inferior-level instruction from General Barr. Additionally, both Congressman Perry's public statement in January 2021, and McSwain's letter which became public in July 2021, express the view that there should have been more *investigation* of election irregularities. Neither Congressman Perry, nor USA McSwain, *nor* AAG Clark (by allegation) did nothing improper in harboring the view that the 2020 presidential election should be investigated further or expressing that view to former President Trump. However one slices it, none of this is grist for the Bar's disciplinary mill.[16]

Now, let's return to the issue of USA McSwain's letter itself and what it reveals about how the Justice Department was actually proceeding to investigate the election. McSwain says, in very plain terms, that he was faced with "various allegations of voter fraud and election irregularities," yet "Attorney General Barr ... instructed me not to make any public statements or put out any press releases regarding possible election irregularities." McSwain Letter at 1. General Barr could respond that he did not want to announce investigations that would unfairly prejudice election outcomes. And that is surely a factor to be weighed—i.e., the mere making of allegations, for the election impact they could have, is something to be avoided. The issue, however, is whether the relevant allegations rose to a level worthy of announcement. Reasonable legal minds could easily differ over such a sensitive matter and it is not for any local bar to second-guess

---

[16] Mr. Perry is not a lawyer, but that did not stop Pennsylvania Governor Wolf (also a non-lawyer), as reflected in the subtitle of the CBS Pittsburgh story, from asserting that Perry's "attempt to compromise our justice system is a disgrace." This is ordinary political hyperbole typical of our less-civil age, but it is a fundamental right in our polity to question the 2020 election results. The bar grievance process designed to protect clients and courts should not be perverted into a mechanism for penalizing heterodox political thought, political debate, disagreements about facts or law, or controversial opinions.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
    Phil Fox, Esq.
    January 31, 2022
    Page 68

discretionary judgment calls by federal lawyers in the Justice Department through the blunt and inapposite instrument of bar discipline.

Moreover, USA's McSwain's allegations suggest something far worse—sweeping election improprieties under the rug, going to the highest level of the Justice Department. How else could one explain that McSwain was "also given a directive to pass along serious allegations to the State Attorney General for investigation—the same Attorney General who had already declared that [President Trump] could not win"? *Id.* Such an official would appear to have *prejudged* the matter and thus is a state prosecutor to whom delegation of a patently federal matter would violate basic principles of due process. No wonder USA McSwain disagreed with General Barr on this. As the Bar's chief prosecutor, you must consider this difference of opinion when assessing Mr. Clark's alleged conduct, assuming you do not take the more prudent path and decline proceeding further with this matter.

One last point from USA McSwain is also worth highlighting. Apparently, he also differed with General Barr on the relevance of the fact that whole swaths of Pennsylvania state government were biased as to the 2020 presidential election: "The Governor, the Secretary of the Commonwealth, and the partisan State Supreme Court made up their own rules and did not follow the law." *Id.* at 1. Could you penetrate into the Executive Branch's internal deliberations (and you cannot and should not), you might find that Mr. Clark shared USA McSwain's view of Pennsylvania's conduct and the conduct of other States where election laws were changed to deviate from the constitutional delegation only to state legislatures to make such law in the context of the 2020 presidential election.

> **b)   Evidence from a Relevant FOIA Request That Is Still Pending.**

The lack of serious investigation claimed by Mr. McSwain finds echoes in the testimony of former US Attorney for the Northern District of Georgia, B.J. Pak to the Senate Judiciary Committee about his office's investigation of election irregularities. The primary determination he describes seems to be that no suitcases of ballots were brought into the Fulton County absentee ballot counting room at State Farm Arena. *See* pp. 13-20; 55; 79-84. If that is the extent of their determination, it reflects only a cursory review of the State Farm video, because that it is clearly evident from the video. However, the same

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 69

video just as clearly shows duplicate scanning of ballots, an allegation that Mr. Pak said had "no substance. *See* p. 76.

The lack of any real investigation of election irregularities within DOJ is also suggested by the preliminary response of DOJ to a FOIA request for records of such investigations in 7 states comprising 12 districts. Twitter user "FoiaFan," a/k/a/ @15poundstogo, posted that the preliminary response from the Administrative Office of U.S. Attorneys was that 4 of the 12 districts had no responsive material to produce. *See* thread                                                                                    at https://twitter.com/15poundstogo/status/1469108757636558854?s=20&t=L8oa6kMRBN0o TBbzd4Jtnw, last visited January 31, 2022.

## XII.   CONCLUSION

In light of Board Rule 2.3(2), I urge you to reconsider this matter.  Docketing a complaint should only occur if it is not "unfounded on its face."  But in light of the separation of powers, preemption, and several other issues that inherently apply here to an attempt to peer into the Executive Branch engineered by one actor in the Legislative Branch, the complaint by Senator Durbin is "unfounded on its face."

Also, pursuant to Board Rule 2.9(a), we ask that you confer with us in an effort to resolve the objections and arguments we have raised in this letter and my other letter of today.  Additionally, pursuant to Board Rule 3.1, please provide me by Wednesday, February 2, 2022, access to "all material in the files of Disciplinary Counsel pertaining to the pending charges that are neither privileged nor the work product of the Office of Disciplinary Counsel."  That day provides the requisite two-notice established in Board Rule 3.1.

Respectfully,

CALDWELL, CARLSON, ELLIOTT &
DELOACH, LLP

Harry W. MacDougald

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 70

Enclosures

cc:      Jeffrey Bossert Clark (w/ enclosures)

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 5, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

I have been retained to represent Jeffrey Clark in the investigative matters pending before your Committee.[1]

Despite disparaging and misleading media narratives, Mr. Clark is not a politician and has never sought notoriety or press attention beyond what was necessary to discharge his duties. Indeed, despite serving more than four years during the Bush Administration's Justice Department from 2001-2005 and more than two years during the Trump Administration's Justice Department from 2018-2021, he was never once during those six-plus years of service asked to come before a congressional committee for

---

[1] This letter focuses on the issues surrounding the executive privilege, though there are additional legal objections, including those of a structural constitutional nature, that we will interpose in good faith as well to Mr. Clark testifying, should doing so become necessary. We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in response to the subpoena as it is currently framed.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 2

oversight purposes, even though he litigated and supervised highly controversial cases.[2]
He had a winning record, recovered billions of dollars for the fisc, successfully defended
numerous agency rulemakings of extreme complexity, and personally briefed and
argued many cases—exemplary service.  He was confirmed in October 2018 with
bipartisan support in the Senate—just one part of his distinguished 25-year legal career.

Now, after his most recent, 26-month-plus tenure in government ending in
January 2021, he wants nothing more than to return to ordinary life and law practice,
without being subjected to selective anonymous leaks and press attacks.  Yet he finds
himself involuntarily caught up in a novel conflict that includes both significant inter-
branch[3] and cross-presidential[4] features to which we must provide a response.

The main purpose of this letter is this:  Because former President Trump was
properly entitled, while he held office, to the confidential advice of lawyers like Mr. Clark,
Mr. Clark is subject to a sacred trust—one that is particularly vital to the constitutional
separation of powers.  As a result, any attempts—whether by the House or by the current
President—to invade that sphere of confidentiality must be resisted.  Nothing less will
comport with both Mr. Clark's obligations to former President Trump and with Mr.
Clark's ethical obligations as an attorney.  The general category of executive privilege,
the specific categories of the presidential communications, law enforcement, and
deliberative process privileges,[5] as well as attorney-client privilege and the work product
doctrine, all harmonize on this point.  Most importantly, core matters of constitutional
principle hang in the balance.

---

[2] For instance, Mr. Clark was integral to defending former President Trump's decision to withdraw from
the Paris Climate Agreement, to resisting improper judicial interference with the Census, to crafting and
then personally defending, in litigation, the first major reform in four decades of the National
Environmental Policy Act's regulations, and to shepherding through the judicial process various agency
actions protecting the southern border with Mexico against incursions.  This work was unpopular in some
political quarters but at all times was consistent with law and with his client agencies' policy decisions.

[3] A single House of Congress vs. former President Trump.

[4] President Biden vs. former President Trump, *i.e.*, the current President vs. the immediately past President.

[5] Indeed, Mr. Clark's work was integral to the United States' win in the Supreme Court's most recent
deliberative process case, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 3

Mr. Clark's position as a legal advisor to the President late in 2020 and early 2021 was particularly sensitive because he was a Senate-confirmed Justice Department leader with significant high-profile litigation and governmental experience, making it natural for a President to seek out and consult his views.[6] We trust that members of Congress of all stripes would agree that it is indisputable that American Presidents need to be able to consult, as they see fit, with their Senate-confirmed appointees. The principle goes both ways. Whomever succeeds President Biden, for instance, should not be able to expose to public scrutiny advice provided to President Biden by his advisors. Establishing precedent to the contrary would deeply chill the vigorous Executive Branch and energetic President the Founders envisioned. *See* Federalist Paper No. 70 (Hamilton) (Mar. 18, 1788) ("Energy in the executive is a leading character in the definition of good government."), *available at* https://tinyurl.com/3ep7fhz9. Without that energy and ability to be candid, presidential advisors would be reduced to bland, tasteless creatures, and the prospect of innovative advice would be stifled.

For these reasons, as amplified below, and with due respect to the Committee, Mr. Clark has come with me today, to present this letter of objection. Mr. Clark will, of course, abide by a future judicial decision(s) appropriately governing all underlying disputes with finality, but for now he must decline to testify as a threshold matter because the President's confidences are not his to waive.

1.      Since August 2, 2021, when a pivotal letter was sent on behalf of former President Trump to Mr. Clark (Attachment), there have been several cardinal developments:

(1) On September 23, 2021, this Committee subpoenaed senior White House officials Mark Meadows and Daniel Scavino, senior Pentagon official Kashyap Patel, and

---

[6] Beginning in November 2018, Mr. Clark headed one of the Justice Department's seven litigating Divisions (the approximately 112 year-old Environment & Natural Resources Division, which has existed for most of the 151 years of the Justice Department's history). And later, in light of his excellent service in the Environment Division during the last Administration, Mr. Clark was also tapped by the Attorney General in the Fall of 2020 to run a second of those seven litigating Divisions as the Acting Assistant Attorney General for the Civil Division.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 4

Stephen Bannon, making especially clear to Mr. Clark that executive privilege had been invoked in light of the violation of a condition set forth in the August 2, 2021, letter from former President Trump's counsel, as explained in more detail below;

(2) On or about October 7, 2021, former President Trump invoked executive privilege and instructed these four presidential advisors not to comply with the Committee's requests;[7]

(3) Additionally, on September 29, 2021, the Committee had subpoenaed 11 other individuals to appear for questioning; and, most importantly,

(4) The former President took the critical step of bringing suit against the Committee, among others, in *Trump v. Thompson*, Civ. A. No. 21-2769 (D.D.C. Oct. 18, 2021). In this case, President Trump asserts executive privilege and is objecting to the Committee's request to the Archivist of the United States to produce records of his administration.

The August 2 letter from your former colleague, Georgia Congressman Douglas A. Collins, stated to Mr. Clark that "President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege," and that this "executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it." Attachment at 1.

The Collins letter also quoted the Supreme Court's recognition that "the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 449 (1977)). That decision provides that the purpose of the privilege is to "give his advisers some assurance of confidentiality," so that the "President [can] expect to receive the full and frank submission of facts and opinions upon which effective discharge of his duties depends." *Id.* Additionally, the August 2 letter noted that an earlier July 26, 2021 letter to Mr. Clark

---

[7] See Jacqueline Alemany, et al., *Trump Lawyer Tells Former Aides Not to Cooperate with Jan. 6 Committee*, WASH. POST (Oct. 7, 2021), *available at* https://www.washingtonpost.com/politics/2021/10/07/trump-lawyer-tells-former-aides-not-cooperate-with-jan-6-committee/.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 5

from the current Justice Department had selectively edited a quotation out the *Nixon* decision, leaving off the key sentence that "***the privilege survives the individual President's tenure.***" Attachment at 2 (quoting *Nixon*, 433 U.S. at 449) (emphasis added). *See also* Prof. Saikrishna Prakash, *Trump Is Right: Former Presidents Can Assert Executive Privilege*, Wash. Post. (Oct. 29, 2021), *available at* https://tinyurl.com/ykcpz94w.

I concur with that assessment by the former President and his counsel. Were any successor occupant of the office of President able to waive claims of executive privilege asserted by his or her predecessors, the principal purpose of the privilege would be defeated, to the detriment of the Executive Branch, to the separation of powers, and to the proper functioning of government as envisioned by the Constitution, relevant judicial precedent, and long traditions of inter-branch accommodation. This is particularly true when, as here, President Biden's purported waivers over recent months may have been informed by partisan political purposes. This is suggested by the haste with which Mr. Biden prejudged Mr. Bannon's invocation of the privilege on behalf of former President Trump.[8] Executive privilege has fundamental importance to and constitutional significance in the operation of government. Waivers of executive privilege should therefore be considered only with a gravity and solemnity commensurate with their deployment, and should not be influenced by workaday political grievances or by grudges lingering from past political controversies, even bitter ones.

---

[8] See Katherine Fung, *Biden's Comments Could Fumble DOJ Prosecution of Steve Bannon: Here's How*, NEWSWEEK (Oct. 21, 2021) ("referring to those, like Bannon, who have refused to comply with the subpoena to testify before the January 6 committee [and] asked if they should face prosecution, Biden said, 'I do, yes.'"); Donald Judd & Rachel Janfaza, *Biden Says DOJ Should Prosecute Those Who Defy January 6 Committee Subpoenas*, CNN (Oct. 16, 2021) (same); *see also id.* (quoting Press Secretary Jen Psaki as arguing, contrary to law, that ultimate decisions would be made by the Justice Department because "[t]hey're an independent agency ...."), *available at* https://www.newsweek.com/bidens-comments-could-fumble-doj-prosecution-steve-bannon-heres-how-1641428. While President Biden later acknowledged he had been wrong to make the statement, the damage in the public mind had already been done. *See* Kaanita Iyer, *Biden Says He Was Wrong to Suggest Those Who Defy Subpoenas from January 6 Committee Should Be Prosecuted*, CNN, *available at* https://edition.cnn.com/2021/10/21/politics/january-6-joe-biden-town-hall/index.html (Oct. 22, 2021). For, as the Committee is aware, the President is the chief law enforcement officer of the United States and the Constitution does not mention the Attorney General by name. The Constitution simply contemplates that there will be a "principal Officer in each of the executive Departments." U.S. Const. art. II, sec. 2. Nor do any statutes establish the Department of Justice as an "independent agency."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 6

    2.    Other former Department of Justice officials who received the Collins letter
have apparently interpreted its concluding paragraph to mean that the former President
had waived the privilege on a blanket basis or somehow otherwise greenlighted their
testimony to Committees looking into assertedly similar issues prior to this Committee
beginning its work.  We disagree with that interpretation. No fair reading of the Collins
letter can conclude that it waives any privileges as to an official like Mr. Clark, *especially
after* the key contingency set out in the letter had been triggered:

> Nonetheless, to avoid further *distraction and without in any way otherwise
> waiving the executive privilege* associated with the matters the executive
> privilege associated with the matters the Committees are purporting to
> investigate, President Trump will agree not to seek judicial intervention to
> prevent your testimony or the testimony of the five other former Department
> officials ... who have already received letters from the Department similar to
> the July 26, 2021 letter you received, *so long as the Committees do not seek
> privileged information from any other Trump administration officials or
> advisors.*

Attachment at 2 (emphasis added). The condition in the emphasized language has been
triggered because the Committee sought privileged information from multiple other
Trump administration officials or advisors before Mr. Clark was subpoenaed on October
13, 2021.

    Our position is simple and is dictated by the plain text of the letter.  The Collins
letter does not waive privilege as to Mr. Clark.  Even before the contingency triggered by
your Committee seeking information from other Trump Administration officials had
occurred, at best the Collins letter indicated that former President Trump would agree
himself not to seek judicial intervention on the pre-contingency state of the facts.  That is
not remotely the same as authorizing testimony or waiving executive privilege.  All
portions of the Collins letter prior to the concluding paragraph clearly invoked privilege.
Nor could Mr. Collins' indicating that the former President would not file suit at an
earlier time act to relieve Mr. Clark of his ethical obligations.

    And surely, once the Committee issued subpoenas to Messrs. Meadows, Scavino,
Patel and Bannon on September 23, the assertion of executive privilege set forth in all of

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 7

the other paragraphs of that letter applied with special force to Mr. Clark. This is because Congress *has, in fact, sought* privileged information from Messrs. Meadows, Scavino, and Patel as they are all, no doubt, "other Trump administration officials." In short, even former President Trump's statement that he would not go to court in August 2021 was expressly conditional, and the Committee's issuance of the Meadows, Scavino, and Patel subpoenas has caused the failure of that condition. Therefore, especially after the triggering of the contingency, the letter simply cannot be read as an unconditional waiver as to Mr. Clark or the others named in the final paragraph.

Accordingly, particularly under the present circumstances, the Collins letter expressly informs Mr. Clark that President Trump is asserting and not waiving executive privilege with respect to the Committee's pursuit of information from Mr. Clark. President Trump's assertion of his privileges with respect to the Committee's subpoena to Mr. Clark is confirmed in *Trump v. Thompson, et al,* U.S.D.C. D.C. 1:21-cv-02769-TSC, by footnote 2 of his brief in support of his application for a preliminary injunction:

> The Committee also sought testimony and documents from several individuals, some of whom were serving in the Trump Administration in January and others who were not. To preserve all privileges applicable to him and the Presidency, President Trump sent a letter to a number of these individuals, instructing them to preserve any and all relevant and applicable privileges, including without limitation the presidential communications and deliberative process privileges and attorney-client privilege, all to the extent allowed by law.

*Id.,* Doc. 5, p. 1, n.2. The Committee of course has actual notice of this contention since it is a party to that litigation.

Mr. Clark thus has no choice but to comply with President Trump's assertion of executive privilege and related privileges.

3.      Since September 7, 2021, staff on the Select Committee has been in contact with Mr. Clark's former attorney, Robert Driscoll, about the possibility of Mr. Clark giving a transcribed interview to the Committee regarding communications with and advice given to former President Trump during the last few months of his Administration.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 8

In good faith and while he was engaging in legal research and keeping apprised of related actions by the Committee and other parts of Congress, Mr. Clark had been requesting and reviewing documents from the Department of Justice pursuant to 28 C.F.R. § 16.300. And, if the federal judicial system orders Mr. Clark directly or produces final and clearly applicable precedent in (a) related case(s) indicating that Mr. Clark must testify, he would resume that process consistent with other legal strictures. But in line with our research and study, events subsequent to September 7 have convinced me that the only proper course of action for Mr. Clark now is to stand on the privilege position articulated to him on August 2 by former President Trump and affirmed in his October 19, 2021 filing in *Trump v. Thompson*.

This is for three reasons: (1) first and foremost because former President Trump, as noted, took heavy step of invoking the privilege in federal court litigation on October 18 against the Committee in its official capacity, indicating that the inter-branch accommodation process had broken down; (2) because the September 23 subpoenas to Messrs. Meadows, Scavino, and Patel unmistakably triggered the contingency in the Collins letter, seemingly removing the basis for any potential accommodation agreement with the Committee premised on it cabining the scope of its inquiry; and (3) because the former President acted to invoke the privilege as to those advisors and Mr. Bannon.

4.      I am aware that other former top officials in the Department of Justice have provided testimony to Congress, despite the former President's assertion of privilege and despite the failure of the conditions in the Collins letter. As the privilege was not theirs to waive, at least without greater clarity (such as a court order with finality or a comprehensive arrangement entered into between former President Trump and Congress, where the latter agreed not to seek "privileged information from any other Trump administration officials or advisors"), it is unclear to me how their testimony could be consistent with former President Trump's assertion of executive privilege. Former President Trump holds that privilege, not them. Be that as it may, in the present circumstances, the fact that other former officials may have testified, rightly or wrongly at the time, does not change Mr. Clark's obligations in light of the recent positions taken by former President Trump in the Collins letter and in *Trump v. Thompson*. Indeed, D.C. Bar Ethics Opinion #288 has advised that, even in response to a congressional subpoena (and therefore, by parity of reasoning, in response to a voluntary request as well), a "lawyer has a professional responsibility to seek to quash or limit the subpoena on all

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 9

available, legitimate grounds to protect confidential documents and client secrets." *See also* American Bar Association's Committee on Ethics and Professional Responsibility, Formal Opinion 94-385 (1994).

It is improper to put Mr. Clark in a vise between this Committee and its claimed enforcement powers on the one hand and his constitutional and ethical obligations on the other, especially while there is a pending lawsuit to determine President Trump's privilege objections. To apply such pressure to Mr. Clark is to present him with a potential Hobson's choice in a manner not countenanced by the long history of inter-branch accommodation over Congressional requests for information from the Executive Branch. The Constitution is the ultimate source of our law and this Committee is bound to respect government-wide constitutional boundaries, including respecting the prerogatives of the coequal Executive Branch.

Additionally, the claim made by Senate counsel at the outset of the relevant testimonies of at least one of these other Department of Justice officials, namely, that the Collins letter was a "letter of nonobjection ... on behalf of former President Trump,"[9] if it were ever correct there (and it is not because nothing in the letter waives privilege or states a general principle of non-objection), is obviously incorrect as to Mr. Clark at the present time. The Collins letter quite explicitly (1) asserts that the former President has not waived claims of executive privilege; (2) asserts the privilege; and (3) at most, even from this Committee's potential perspective, fixes conditions that as to Mr. Clark are no longer met.

In light of the foregoing, I have advised my client that, at this time and based on these most up-to-date factual developments, he is duty-bound not to provide testimony to your Committee covering information protected by the former President's assertion of executive privilege. Accordingly, beyond showing up today to present this letter as a sign of his respect for a committee of the House of Representatives, albeit one not formed in observance of the ordinary process of minority participation, Mr. Clark cannot answer deposition questions at this time. No adverse inferences can or should be drawn from Mr. Clark accepting my advice. His doing so defends the Republic's interest in the

---

[9] Transcript, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf at 6-7 (Aug. 7, 2021).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 10

separation of powers.  As noted, Mr. Clark is not a politician but he is a strong defender
of the Constitution, stemming from his political beliefs as an unapologetic conservative—
beliefs protected by the First Amendment.

     **5.**     In addition to the foregoing, I must also point out that the vast majority of
the document requests in the subpoena sent to Mr. Clark are duplicated in the requests
for documents sent by the Committee to the National Archives presently at issue in the
*Trump v. Thompson* litigation. It is entirely proper, therefore, to defer compliance with the
Committee's subpoena to Mr. Clark until that litigation is resolved.

     Moreover, the documents subpoenaed from Mr. Clark are instead largely in the
possession of the Department of Justice or the Archives. Mr. Clark left his work papers at
the Department of Justice when he resigned in anticipation of the January 20, 2021
inauguration of President Biden.  Based on prior actions, beginning with those of the
House Oversight Committee, we also believe that your Committee has access to Mr.
Clark's government records, making the imposition on us of organizational work, such
as Bates-stamping documents, unduly burdensome. If the Committee could please
confirm this one way or the other, it may obviate any claim of demonstrably critical need
for Mr. Clark to re-produce documents the Committee already has, should that become
necessary at some future point.

     **6.**     Accordingly, I respectfully urge the Committee to recognize that the best
and most regular course in light of the latest developments would be to pause the request
for the testimony of Mr. Clark (likely along with the requests for the testimony of Messrs.
Meadows, Scavino, and Patel, who would seem similarly situated) pending resolution of
the *Trump v. Thompson* litigation.  That will provide important guidance from the Article
III branch of government to referee this inter-branch dispute, including, among other
things, the entwined issue of whether the current President can purport to waive the
former President's executive privilege over the former President's objection. As Justice
Powell remarked in concurrence in *Nixon*, "[t]he difficult constitutional questions lie
ahead." 433 U.S. at 503. *See also id.* at 491 (Blackmun, J., concurring) (noting that
historically some presidential transitions had been "openly hostile," and hoping that the
statute under consideration there "did not become a model for the disposition of the
papers of each president who leaves office at a time when his successor or the Congress
is not of his political persuasion."). A pause, as we here request, would also show proper

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 11

comity both to Executive Branch's interests (considered holistically and not as defined myopically to embrace only the views of the current President) and to the Judicial Branch's role in resolving cases and controversies. As *Nixon* indicates, "[t]he confidentiality necessary to this exchange [of advice and confidences between a President and an advisor] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449.

7.    I am also compelled to note the disconnect between the scope and purpose of the Committee's authorizing resolution and the information sought from Mr. Clark. The Committee's scope revolves around events at the Capitol on January 6, 2021. The Committee would not appear to be seeking to question Mr. Clark about January 6, 2021 and no media reporting has connected him to those events. Mr. Clark had nothing to do with the January 6 protests or the incursion of some into the Capitol. He has informed me he worked from home that day to avoid wrestling with potential street closures to get to and from his office at Main Justice. Nor did Mr. Clark have any responsibilities to oversee security at the Capitol or have the ability to deploy any Department of Justice personnel or resources there. Indeed, Acting Attorney General Rosen testified *almost 6 months ago* that a January 3, 2021 Oval Office meeting involving him and Mr. Clark, *inter alia*, did not relate to January 6. *See* House Oversight and Reform Committee Holds Hearing on Jan. 6 Riot at U.S. Capitol, *available at* https://www.youtube.com/watch?v=719UGi8dNng, beginning at circa the one-hour, 15-minute mark (Rep. Connolly) (streamed May 12, 2021).[10] That should alone be sufficient for Mr. Clark to be excluded from a January 6 inquiry.

Indeed, just about a week after January 6, Mr. Clark gave an "exit interview" to a reporter for *Bloomberg Law* that condemned the individuals who forcibly went into the Capitol and engaged in violence, noting that some of them may have been moved by mob psychology (Mr. Clark specifically remembers referencing Gustave Le Bon), besmirching by mere association the far more numerous peaceful protesters exercising their First

---

[10] Q. Rep. Connolly: "Did you meet with the President at the White House on January 3rd?" A. Former Acting AG Rosen: "I did." Q. Rep. Connolly: "You did, but you decline to tell us what the nature of that conversation was about, is that correct?" A. Former Acting AG Rosen: "I can tell you it did not relate to the planning and preparations for the events on January 6th."

CALDWELL, CARLSON
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 12

Amendment rights.  As a clear example of mainstream media bias, however, the report later published about that interview omitted Mr. Clark's remarks on January 6, even though the reporter had *repeatedly* sought Mr. Clark's views on the topic during the course of the interview.[11]

For all of these reasons, the information and testimony sought by the Committee as applied to Mr. Clark in particular are outside the scope of the Committee's charter and are neither proper subjects of the Committee's subpoena, nor any subsequent attempt to enforce the subpoena.

Finally, I would kindly request a response to the objections set out in this letter, which may include a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.  And for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances.  *See supra* n.1.

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Enc.
cc:      Jeffrey Bossert Clark

---

[11] *See* Ellen Gilmer, *Top Official Steps Down from DOJ's Environment, Civil Divisions*, BLOOMBERG LAW (Jan. 14, 2021), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/top-official-steps-down-from-dojs-environment-civil-divisions?context=article-related.

**From:** Doug Collins <doug@northgeorgialawyers.com>
**Date:** August 2, 2021 at 6:20:20 PM EDT
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:** Letter for Mr. Jeff Clark

Please find the attached letter for your client Mr. Jeff Clark.

Thank you for your cooperation.

**Douglas A. Collins**
**Oliver & Weidner, LLC**
**854 Washington St. Suite 300**
**Clarkesville, GA 30523**
**706-754-9000**
**NorthGeorgiaLawyers.com**

=========================================================
NOTICE: In an ideal world, perhaps disclaimer clauses in lawyer emails would not be necessary; but this is not an ideal world, so here goes. This e-mail and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "CC" and "BCC" lines of this e-mail. If you are not an intended recipient, your receipt of this e-mail and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the e-mail and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this e-mail. DO NOT review, copy, or rely on in any way the contents of this e-mail and its attachments. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. Most legal rights have time limits, and this e-mail does not constitute advice on the application of limitation periods unless expressly stated above. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of confidentiality and privileges applicable to this e-mail and any attachments are expressly reserved.
=========================================================



JAMES C. WEIDNER

ERNEST H. "BUCKY" WOODS, III

DOUGLAS A. COLLINS

WILLIAM R. OLIVER
(OF COUNSEL)

TEL. (706) 754-9000
FAX: (706) 754-0098

854 WASHINGTON STREET
SUITE 300
P.O. BOX 2017
CLARKESVILLE, GA 30523

NorthGeorgiaLawyers.com

August 2, 2021

Mr. Jeff Clark:

We represent former President Donald J. Trump and write concerning requests sent to you by the U.S. House of Representatives Committee on Oversight and Reform and the U.S. Senate Judiciary Committee to provide transcribed interviews on matters related to your service as Deputy Attorney General and Acting Attorney General during President Trump's administration. We also understand that, as set forth in its July 26, 2021, letter to you, the U.S. Department of Justice stated that President Biden decided to waive the executive and other privileges that protect from disclosure non-public information concerning those matters and has authorized you to provide such information.

Please be advised that the Department's purported waiver and authorization are unlawful, and that President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege. The executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it. The reason is clear: if a President were empowered unilaterally to waive executive privilege applicable to communications with his or her predecessors, particularly those of the opposite party, there would effectively be no executive privilege. To the extent the privilege would continue to exist at all, it would become yet another weapon to level the kind of unjustifiable partisan political attacks the Democrat-controlled administration and Committees are seeking to level here.

As the Supreme Court held in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) – where, like here, the then-current administration did not support a former President's assertion of executive privilege – the executive privilege is crucial to Executive Branch decision-making:

> Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977).  The Department's July 26 letter to you quoted this decision but left out the very next sentence in the opinion: "**Therefore, the privilege survives the individual President's tenure**." Id. at 448-49 (quoting, and adopting, Brief for the Solicitor General on Behalf of Federal Appellees) (emphasis added).

Here, it is clear that even though President Biden and the Department do not know the nature or content of the non-public information the Committees seek, they have not sought or considered the views of the President who does know as to whether the confidentiality of that information at issue should continue to be protected.  Such consideration is the minimum that should be required before a President waives the executive privilege protecting the communications of a predecessor.  *See* Office of Legal Counsel Memorandum on Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act, June 20, 2001, at 5 ("[A]lthough the privilege belongs to the Presidency as an institution and not to any individual President, the person who served as President at the time the documents in question were created is often particularly well situated to determine whether the documents are subject to a claim of executive privilege and, if so, to recommend that the privilege be asserted and the documents withheld from disclosure.").

Nonetheless, to avoid further distraction and without in any way otherwise waiving the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials (Richard P. Donoghue, Patrick Hovakimian, Byung J. "BJay" Pak, Bobby L. Christine, and Jeffrey B. Clark) who have already received letters from the Department similar to the July 26, 2021 letter you received, so long as the Committees do not seek privileged information from any other Trump administration officials or advisors. If the Committees do seek such information, however, we will take all necessary and appropriate steps, on President Trump's behalf, to defend the Office of the Presidency.

Sincerely yours,
OLIVER & WEIDNER, LLC

Douglas A. Collins

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 12, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

This letter and the attached memo constitute my response on behalf of Jeff Clark
to your letters of November 5 and 9, 2021. This cover letter will summarize that memo.

*Separation of Powers Violations.* As we have stated repeatedly, the doctrine of
executive privilege central to our objections is designed to preserve the separation of
powers. You inadvertently but powerfully confirmed the validity of our worries about
the Committee's intrusions into the separation of powers when you were quoted in
*Politico* on November 9 saying "And we'll let the evidence based on what we look at
*determine guilt or innocence*."[1] But no Congressional committee wields constitutional
authority to "determine guilt or innocence." And Congress lacks the power to issue or
enforce subpoenas to carry out such an *unlawful and plainly non-legislative purpose*.

---

[1] *See* Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, POLITICO, *available at* https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 2

*Due Process Violations.*  We have also repeatedly pointed out serious due process objections to how the Committee is proceeding as to Mr. Clark, but none of your letters deigns to address these problems. For example:

- You claim the authority to rule on our objections to your own Committee's questions. Due process forbids anyone acting as the judge of their own case.

- You have proven the wisdom of that constitutional guardrail by exhibiting an unalterably closed mind in judging your own case. On November 5 you wrote both that (a) our objections had been overruled but that (b) the underlying reasoning would come later (and came November 9)—a real-life case of the surrealistic royal decree where the Red Queen in *Alice in Wonderland* pronounced: "sentence first-verdict afterwards."

- Your letter of November 9 was thus just a series of *post hoc* rationalizations designed to justify what you had let slip was an outgrowth of your already made-up mind back on November 5.

- On November 5 at 4:30 pm, you directed us to appear in person once again at 4 pm. We lack a time machine, and I was on an airplane when that letter was received. And compelled attendance without counsel would breach due process.

- To the extent the Committee is permitted to question Mr. Clark about election-related matters, he should be able to review all DOJ election-related investigation files, which the Committee and DOJ have strangely combined to declare off-limits.

- Similarly, Mr. Clark has been unfairly denied access to refresh his memory about classified analysis of foreign influence on the election that he reviewed while he was at DOJ, and which include his personal notes on a classified conversation with Director of National Intelligence John Ratcliffe that he had on January 2, 2021.

- We have not yet been provided with a copy of the transcript of the November 5 session, though it was promised at that time and you have quoted from it liberally in your November 9 letter.

*Proper and Repeated Presidential Instructions Exist to Mr. Clark to Assert Executive Privilege.*  More than once, your letters dispute the sufficiency of President Trump's direction to Mr. Clark to assert executive privilege, contending, for example,

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 3

that President Trump only gave the direction once. While we are unaware of any legal authority that would support the peculiar notion that a Presidential directive must be repeated to be effective, in this case, *the relevant instruction actually was given twice*. In addition to his August 2 letter, Mr. Collins was quoted by Fox News on August 3 as saying President Trump regarded the communications as privileged and that he "hopes the former officials will withhold any information from Congress that would fall under executive privilege."[2]

The Committee simultaneously and by its own admissions (a) seeks to question Mr. Clark about his direct communications with President Trump, but (b) contends that Mr. Clark cannot claim executive privilege because he was not part of a "small cadre" working directly with the President. The contradictory nature of these positions is plain.

*Mr. Clark Cannot Be Made a Pawn of an Inter-Branch Squeeze Play.* The Committee's attempt to force Mr. Clark to testify—before the applicable contours of executive privilege are decided, for instance, in *Trump v. Thompson*—is extremely unfair. You are putting him to the Hobson's choice of risking contempt for following the instructions to assert executive privilege given to him by the President for whom he worked, or violating his professional responsibilities to honor those instructions—all while leaving Mr. Clark in the posture of having to guess how the courts will draw that line. Once struck, the bell of testimony, of course, cannot be un-rung. As esteemed former Solicitor General Rex Lee wrote in a notable law review article relied on by another former Solicitor General (albeit when he, Ted Olson, was the head of the Office of Legal Counsel), "It is neither necessary nor fair to make [the Executive Brach official] the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute," especially when there is already an expedited proceeding underway, between President Trump and the Committee directly, that will provide at least some guidance on the executive privilege questions involving Mr. Clark. Rex Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. REV. 231, 239. *See generally* 8 Op. OLC 101 (1984).

---

[2] Tyler Olson, *Trump Foreshadows Executive Privilege Fight in Election Investigations, But Won't Try to Block Testimony Yet* (Aug. 3, 2021), *available at* https://www.foxnews.com/politics/trump-executive-privilege-election-investigations-wont-block-testimony.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 4

*DOJ's July 26, 2021 Letter Is Internally Contradictory.* Your letters place great (as well as misplaced) weight on DOJ's July 26 letter to Mr. Clark. Under certain conditions, this letter purported to waive executive privilege for Mr. Clark's direct communications with President Trump, while asserting law enforcement privilege to conceal, most remarkably, *any investigations* (or lack thereof) underway while he was there, which would necessarily include any inquiries delving into election irregularities in particular. Executive privilege exists to serve the Republic, not any one President, and cannot be so nakedly contorted to serve the current Administration's political grievances against the former President. Most ironically, the DOJ letter zealously guards and refuses to waive the Department's prerogatives to avoid public disclosures because that could chill candid discussions inside DOJ but cavalierly disregards the very same concern as it applies to the President having candid discussions with his advisors, even though the presidential communications privilege is of a constitutionally higher order than a DOJ intramural law enforcement privilege. The logical contradictions in these positions are glaring.

*Mr. Clark Is an Irrelevant, or at Best Marginal, Witness In Light of the Committee's Limited Charter.* The Committee's investigative jurisdiction over the events of January 6 does not extend to the information sought from Mr. Clark regarding the election or his interactions with the former President.

- Mr. Clark had zero involvement in the events of January 6th;

- Mr. Clark had no authority over any law enforcement function relevant to January 6th;

- There is no demonstrably critical need for Mr. Clark's testimony regarding either January 6th itself or internal deliberations as to the election (which is a different topic), especially given the testimony previously given by other DOJ officials;

- The Committee's theory of relevance with respect to Mr. Clark does not make any sense. His confidential and privileged deliberations regarding the election were totally unknown to anyone in the Capitol crowd or the public at large at the time of January 6. Therefore, Mr. Clark's legal advice could not possibly have contributed to the opinions of anyone amongst the January 6th protesters toward the election, and so could not have any causal connection whatsoever to the tragic disturbance of good order on that day.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 5

- The baying after Mr. Clark based on such an incoherent theory of relevance stands in stark contrast to the Committee's studious disinterest in one Mr. Ray Epps, who is on video recorded on January 5 and 6th *repeatedly* inciting and whipping up protestors to "enter the Capitol" on January 6. Your colleague Representative Massie has called for answers on this issue, which would clearly be part of the mix if the Committee's membership were balanced. Hounding Mr. Clark, who had nothing to do with January 6, while leaving Mr. Epps entirely undisturbed, when the latter was obviously up to his neck in the events of that day, requires explanation and confirms that Mr. Clark is being deployed as a prop in the public-private partnership of narrative-mongering.[3]

*The Committee Has Repeatedly Mischaracterized Our Legal Positions.* The Committee, both in person and in writing, has repeatedly mischaracterized our position to lay an inaccurate predicate for contempt. We have not asserted an absolute or blanket refusal to answer. We have instead pleaded with the Committee that it is only prudent and fair to await the final merits resolution of litigation, including but not limited to *Trump v Thompson*, so that we will all know where things stand on executive privilege.[4]

*The Committee Is Violating the Governing Congressional Rules.* Defects in the Committee's organization render it incapable of complying with the Rules of the House with respect to depositions. As Rep. Banks and others stated in THE FEDERALIST on

---

[3] The Committee has emphasized concern about threats to the safety of its members and to the Capitol building. We respect those concerns and agree that they should be taken very seriously and have underscored, as you know, that new legislation has already been passed to address such concerns. But you should be aware that the constancy of improper, anonymous, and, in many instances, inaccurate leaks against Mr. Clark in the media poses very real safety concerns for him as well. Over the Summer and into the Fall, Mr. Clark repeatedly received threatening messages at a place of employment, leading the employer to make several reports to the FBI. And the peaks and valleys of those threats correspond very closely in time with media hit pieces, especially when they are broadcast on television.

[4] Relatedly, you have wrongly claimed that we "abrupt[ly]" left the November 5 deposition. That is inaccurate, as we interacted with Committee for about 90 minutes and also patiently accommodated requests for the Select Committee to conduct sidebars with itself during which we were instructed to leave the room. And most importantly, we left only after our respective legal positions had been hashed and rehashed for the fifth or sixth time, constituting badgering or harassment of the witness.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 6

November 9, 2021,[5] the nominal members of the minority party on the Committee were appointed by the Speaker, not the Minority Leader, and therefore constitute representatives of the majority, not the minority. The Minority Leader's appointments to the Committee were refused by the Speaker. As a result, there is no ranking minority member to be consulted on the issuance of subpoenas, and no minority staff to participate in examining witnesses or conducting the Committee's investigation. Consequently, the Committee's subpoena to Mr. Clark is invalid under the Rules of the House.

*Conclusion.* Finally, we must observe that the Committee's project here appears to be an attempt to relitigate the failed second impeachment of former President Trump but without following the prescribed constitutional process. To date, Mr. Clark has engaged with the Committee with patience and in good faith, but the evidence of bias against him and improper political agendas mounts by the day. We recognize that the Committee is formed exclusively of staunch opponents of former President Trump, but even so, at some point the war on Mr. Trump must eventually run its course.

As we have often stated and reiterate here, we are certainly willing to engage in further dialogue over a reduced scope of inquiry, or to consider written questions, or to discuss other means of accommodating the inter-branch and cross-presidential interests that are presently in tension in this matter.

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:    Jeffrey Bossert Clark

---

[5] *See* Mollie Hemingway, *J6 Committee Misleading Witnesses About Republican Staff Presence,* THE FEDERALIST (Nov. 10, 2021), *available at* https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/.

## MEMORANDUM RE: CLARK SUBPOENA

November 12, 2021

This Memorandum (or "Memo") responds more fully to Chairman Thompson's letters of November 5, 2021 and November 9, 2021 and accompanies my cover letter of November 12 to Chairman Bennie G. Thompson.[1] I also incorporate by reference the points made in my November 8 letter. This Memo is organized so as to respond, roughly sequentially, to your points as they were made in your November 5 letter, coupled with supplementation regarding your November 9 letter as appropriate:

1.      There is a self-evident problem posed by your November 5 letter.  It proposed resuming the deposition at 4:00 pm that day, but that letter was not sent until 4:30 pm—a half-hour *in the past* at the time your November 5 letter was sent.  Given that, we also do not understand your assertion that you would rule at 4:00 pm on our objections inasmuch as your November 5 letter appears to have already rejected those claims.[2] This is clear from your November 9 letter, which refers to your November 5 letter providing "notice of my rulings on the objections you raised at your deposition on November 5," Thompson Letter at 2 (Nov. 9, 2021). This is yet another illustration of the "unalterably closed mind" problem that I explained from the airplane during my return flight to Atlanta on November 5 and my point that you ruling on objections we presented using that frame of mind is a violation of due process. *See* my email to Mr. Heaphy of Nov. 5, 2021, (citing *Air Transp. Ass'n of Am. v. National Mediation Bd.*, 663 F.3d 476 (D.C. Cir. 2011)). *See also* Point 13, *infra*.  And most importantly, nowhere do your November 5 or 9 letters even reference due process or respond to our arguments in that vein.[3]

---

[1] This Memo reminds you and the Committee of the same reservations of rights stated in my November 5, 2021 letter to you.  To economize on words, I will not restate those reservations here. Additionally, you cannot assume that any point in your letters not responded to in specific terms are points that we accept.  I reserve all of Mr. Clark's rights.

[2] Though, of course, we would urge you to reconsider, even now.

[3] We suspect part of the problem here is the Committee's extreme haste.  In addition to the timing problem (calling for Mr. Clark to return to a congressional office building at 4:00 pm in a letter sent at 4:30 pm), page 6 of your November 9 letter reflects a heading that repeats itself (*i.e.*, heading II.C).

Memorandum Re: Clark Subpoena
November 12, 2021
Page 2

**2.** Your November 5 letter also indicated that a more detailed letter would be forthcoming, which was the November 9 letter. But we similarly do not see how, before that more detailed letter provided all of the legal analysis your staff thought necessary to include, you could have been fully informed in ruling on the objections as of 4:00 or even 4:30 pm last Friday, November 5, given that the November 9 letter was still four days in the future. All of this similarly underscores the due process problems with how the Committee is proceeding. Taking a step back, I cannot help but observe that the chronology of when, exactly, you overruled the objections calls to mind the Queen of Hearts' demand in *Alice in Wonderland* of "Sentence first—verdict afterwards." https://wordhistories.net/2019/07/14/sentence-first-verdict-afterwards/.

**3.** You assert that "[a]ll the requested documents relate directly to the inquiry being conducted by the Select Committee …." Chairman Thompson Letter, at 1 (Nov. 5, 2021). We strongly dispute that there is such a direct relationship. Mr. Clark had no involvement with the events of January 6th. And, as I noted in my November 5 letter, former Acting Attorney General Rosen has already testified to the House that the January 3, 2021 Oval Office meeting Mr. Clark participated in "did not relate to the planning and preparations for the events on January 6th." At best, Mr. Clark is a very tangential witness in light of House Resolution 503, which sets up this Committee's function. That point alone—together with the point made in my November 8, 2021 letter to you that protective legislation for the Capitol has already been passed and additional legislation of that type need not await interviewing Mr. Clark—undercuts any claimed urgent or "demonstrably critical" need for Mr. Clark's testimony.

**a.** Mr. Clark was not a "cause" of a "domestic terrorist attack on the Capitol. *Compare* House Resolution 503, § 3(1). Nor was he in charge of the "preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government …." *Compare id.* Nor did Mr. Clark participate in any January 6 activities at the Capitol where some of the individuals involved may have sought to interrupt the "peaceful transfer of power." Nor could Mr. Clark's work, which was not publicly released while he served in the Trump Administration, be an "influencing factor" leading

Memorandum Re: Clark Subpoena
November 12, 2021
Page 3

to a decision by some individuals to go into the Capitol building on January 6. *Contra* Thompson Letter, at 8 & n.13 (Nov. 9, 2021) (citing H. Res. 503, § 3(1)).[4]

       **b.**     All Mr. Clark knows about "evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol," etc. is what he has read or seen in the media or learned by watching some portions of past testimony by other officials on those topics, especially to the House Oversight Committee. *Compare id.* § 3(2).

       **c.**     The purpose enunciated in House Resolution 503 Section 3(3) is also something that does not embrace Mr. Clark.

       **d.**     We note that Section 4(a)(1)(B) of House Resolution 503 references "malign foreign influence operations." Mr. Clark has no visibility into that issue as it may relate to the events of January 6, 2021. But he did review classified information on potential foreign influence as it bore on the 2020 presidential election. Pursuant to Justice Department regulations, he requested that he be allowed to re-review such material, including his personal notes on that topic left in the Justice Department Command Center. But the Department denied his request, noting that the Committee had told the Department that this was not relevant to the Committee's inquiry.[5] If the Committee has

---

[4] What appears far more relevant for getting to the bottom of why some individuals went into the Capitol Building are the activities of a Mr. Ray Epps, who was caught on video on both January 5 and 6, 2021 urging protestors and anyone nearby who would listen, it seems, to "enter the Capitol" on January 6. Yet it is Mr. Clark who has been subpoenaed to testify about non-public information based on work subject to various Executive Branch, DOJ, and general legal confidentiality protections, while Mr. Epps has not been subpoenaed. *See, e.g.,* https://youtu.be/uHn1hZyPJxk, Video Gallery, Rep. Thomas Massie, *available at* https://massie.house.gov/videos/ (page 2) (last visited Nov. 12, 2021). If the Committee were properly constituted, *see* Point 16, *infra,* the Committee minority could use the Committee's investigators to pursue this promising lead evenhandedly. As former Rep. Henry J. Hyde once memorably said, "The mortal enemy of equal justice is a double standard." Impeachment Trial of William Jefferson Clinton, remarks of Rep. Henry J. Hyde, available at https://www.washingtonpost.com/wp-srv/politics/special/clinton/stories/managers2text020899.htm.

[5] On October 14, 2021, Kira Antell of the Department of Justice's Office of Legislative Affairs emailed Mr. Clark's former counsel, stating as follows:

Memorandum Re: Clark Subpoena
November 12, 2021
Page 4

changed its mind and now views the issue of foreign influence in the election to be relevant, the Department's denial of Mr. Clark's request is another denial of due process. And, even if the Committee's position that the foreign influence question is irrelevant remains unchanged, it is not up to Ms. Antell and/or this Committee to decide what materials Mr. Clark needs to refresh his recollection. Mr. Clark, consulting with me as his lawyer, should be able to make that determination.  Part of due process requires giving witnesses the ability to determine how to answer particular lines of questioning; due process is not consistent with trying to place entire lines of inquiry beyond question, especially where intent is a relevant legal factor. As a result, however one slices it, blocking Mr. Clark from accessing the classified material on foreign election interference that he previously reviewed is a denial of due process.

4.     We reiterate that Mr. Clark did not state on November 5 that, for all time, he would "not answer any of the Select Committee's questions on any subject and would not produce any documents," as you assert in your November 5 letter. As I explained in my November 5 and November 8 letters, the issue is predominantly one of timing, prudence, and fairness in awaiting, at the very least, a final merits outcome of the *Trump v. Thompson* litigation. The mismatch between the written statements of our position and the Committee's various erroneous characterizations of our position makes it particularly important for this dialogue to occur in writing.

5.     You argue that the August 2, 2021 letter from Mr. Collins to Mr. Clark does not allow executive privilege to apply to Mr. Clark absent a "***further instruction***[] from former President Trump with respect to Mr. Clark's testimony." Chairman Thompson Letter, at 2 (emphasis added). We do not understand why **one instruction** given in August 2 is not enough and a "further instruction" would be required. You offer no explanation

---

Finally, I wanted to address your question seeking access to materials relating to a classified ODNI briefing of Mr. Clark in early January. OLA has spoken to the Select Committee and confirmed that the details of this briefing are outside the scope of their interest in speaking with Mr. Clark. Beyond confirming with Mr. Clark that the briefing occurred, they do not require additional information about that briefing. We believe this resolves this question.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 5

for that, and there is simply no support for that view in the text of the letter. The August 2 letter speaks for itself.

And, lest there be any doubt, a later interview does actually constitute *a second instruction* because Mr. Collins later stated that he "hopes the former officials will withhold any information from Congress that would fall under executive privilege" and that "'I would hope they would honor that,' Collins said when asked whether Rosen and the other officials [clearly including Mr. Clark] should withhold certain deliberations from Congress. 'The former president still believes those are privileged communications that are covered under executive privilege'"[6]

If the Committee wishes to contest our plain-text reading of that letter and Mr. Collins' related statements to the media, it can consult with former President Trump's lawyers on that point, though we should be included in any such process—it should not be *ex parte*. You also assert that our position is based on suppositions about former President Trump's position. Again, that is obviously not the case. Our position is based on the text of the August 2 letter *and* Mr. Collins' amplification of that letter to the media. Your interpretation of the August 2 letter is inconsistent both with the letter itself and Mr. Collins' interpretation of his own letter.

6.      Relatedly, you argue in the November 9 letter that Mr. Clark should testify because, *inter alia*, Messrs. Rosen and Donoghue testified based on a July 26, 2021 letter they (along with Mr. Clark) all received at roughly the same time.  *See* Thompson Letter at 1 n.2 (Nov. 9). Especially after the August 3 comments were made by Mr. Collins to the media, we are at a loss to explain why others at DOJ were anxious to testify. Part of the answer may appear in a story in the *New York Times*, which states as follows:

Mr. Rosen has spent much of the year in discussions with the Justice Department over what information he could provide to investigators, given

---

[6] Tyler Olson, *Trump Foreshadows Executive Privilege Fight in Election Investigations, But Won't Try to Block Testimony Yet* (Aug. 3, 2021), *available at* https://www.foxnews.com/politics/trump-executive-privilege-election-investigations-wont-block-testimony.   Of course, as the Committee knows, President Trump decided in the Fall—after the Collins letter dated August 2 and Mr. Collins' statements to the media reported on August 3, that he would indeed go to court.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 6

that decision-making conversations between administration officials are usually kept confidential.

Douglas A. Collins, a lawyer for Mr. Trump, said last week that the former president would not seek to bar former Justice Department officials from speaking with investigators. But Mr. Collins said he might take some undisclosed legal action if congressional investigators sought "privileged information."[7]

*Mr. Rosen quickly scheduled interviews with congressional investigators to get as much of his version of events on the record before any players could ask the courts to block the proceedings*, according to two people familiar with those discussions who are not authorized to speak about continuing investigations.

Katie Benner, *Former Acting Attorney General Testifies About Trump's Efforts to Subvert Election*, New York Times (Aug. 7, 2021), *available at* https://www.nytimes.com/2021/08/07/us/politics/jeffrey-rosen-trump-election.html (emphasis added). Mr. Clark has acted, we believe, more consonant with the President's instructions as conveyed via Mr. Collins to Mr. Clark and the others. Thus, we do not view it as consistent with Mr. Clark's duties as a lawyer and former government official to make "quick[]" disclosure decisions on his own before courts rule on all relevant legal disputes.[8]

7.      As explained in my November 8 letter and above, I do not agree that Mr. Clark has invoked "blanket testimonial immunity." *See also* Thompson Letter at 4 (Nov.

---

[7] This is a misleading characterization of what the text of the August 2 letter says. It appears designed to convey to the *New York Times*' readers that (a) former President Trump was not asserting privilege and was greenlighting testimony; and (b) former President Trump's future condition was vague. Neither is accurate—and, as we have repeatedly explained, the letter clearly invokes privilege and its condition was plainly triggered by this Committee's post-August 2 actions.

[8] This is also as good a juncture as any to note that one feature of the real story here should be to ask why so many anonymous leaks keep occurring—leaks that violate Executive Branch confidentiality of various stripes.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 7

9, 2021) (referencing "absolute testimonial immunity"). For the sake of economy, I would refer you to the November 8 letter's points about the issue of timing, prudence, and fairness re *Trump v. Thompson* (now on interlocutory, not final merits appeal) and our continuing invitation to negotiate a narrower scope for potential testimony. Consider as well entering negotiations with us on written questions that could be confidentially propounded to Mr. Clark for our consideration, as opposed to another live session.

We remind you that Mr. Clark's livelihood has been threatened by "cancel culture" and that he also has a pressing family matter in the Philadelphia area to attend to that he has been holding off on, so proceeding via writing would be appreciated in light of the fact that two weeks of Mr. Clark's extension request were denied with no real explanation. Mr. Clark is no longer a government employee, where interfacing with Congress in some instances would have been part of his job duties. As a private citizen, the Committee should make some reasonable accommodation to Mr. Clark's circumstances, especially when his testimony is at best tangential to January 6 and is certainly not urgent in light of the prior passage of protective legislation.

8.      Relatedly, your November 9 letter asserts that privilege assertions must be on a document-by-document basis. *See* Thompson Letter at 2 & 7 (Nov. 9, 2021) (asserting this is what "the law requires." But just yesterday, a *New York Times* story came out indicating that a different legal position is colorable. That story reports as follows: "During arguments last week, [Judge Chutkan] rejected a suggestion by a lawyer for Mr. Trump that she examine each document before deciding whether executive privilege applied." Charlie Savage, *Swift Ruling Tests Trump's Tactic of Running Out the Clock*, New York Times (Nov. 10, 2021), *available at* https://www.nytimes.com/2021/11/10/us/politics/swift-ruling-tests-trump-delay-tactic.html.[9]  The Committee cannot urge on us (or benefit from) an approach by the courts based on rejecting use of a document-by-document approach, while arguing here that it is incumbent on us to use only a document-by-document approach.  Indeed, such an internally inconsistent position could trigger estoppel.

---

[9] Of course, we do not agree that President Trump's lawyers are trying to achieve strategic delay in *Trump v. Thompson*.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 8

**9.** You refer to the July 26, 2021 letter sent to Mr. Clark by the Justice Department. *See* Chairman Thompson Letter at 2 n.3 (Nov. 5, 2021). We do not think that letter supports your position, for multiple reasons, but for now it should suffice to point out that that letter is curiously vehement that Mr. Clark not disclose the Department's "investigations and prosecutions ongoing while [Mr. Clark] served in the Department," because if it were known that such "deliberations would become subject to Congressional challenge and scrutiny, [the Department] would face a grave danger that [Department lawyers] would be chilled from providing the candid and independent analysis essential to just and effective law enforcement." Weinsheimer Letter at 3 (July 26, 2021).

DOJ's rationale of avoiding the chilling of candid advice is, of course, one of the core purposes of the executive privilege, which is clearly rooted in the separation of powers, a structural constitutional principle that outranks the mere policy concerns of one department of the federal government. ***Most importantly, what DOJ has done in the July 26 letter is strongly endorse on of our main arguments.***[10] The Department's version of executive privilege, however, seems carefully molded to achieve political objectives rather than doctrinal coherence: it would purportedly shield whatever can be smuggled under the skirt of "ongoing investigations and prosecutions," while totally exposing advice given directly to former President Trump, as well as internal deliberations leading up to such advice, even if they were based on such investigations. Respectfully, the internal contradiction of that position is obvious and disabling. It also makes little sense to imagine, as the July 26 DOJ letter does, that DOJ's departmental privilege is superior to the brand of executive privilege attending to direct presidential communications and—applying the same method of innuendo the Committee is using in the press—causes one to ask: what does DOJ have to hide?

Even if the Committee were able to somehow properly establish that such election matters fall into Resolution 503's charter (something we think it cannot), then by parity of reasoning and as an element of due process Mr. Clark should be able to review all of

---

[10] Alternatively, because the Justice Department is part of the unitary Executive and reports to the President, the concern the Department points out here as to its own investigations is just a part of the umbrella concept of the executive privilege. Either way, the two parts of DOJ's letter are at war with one another.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 9

the election-related investigative files of the Department, particularly since the asserted results of those inquiries were an explicit premise of the advice that others gave to President Trump, according to their testimony. In all events, however, it is clear that proceeding on the basis of such an incoherent version of executive privilege in the manner the July 26 letter proposes would be fundamentally unfair and thus deny Mr. Clark due process. It would tie one arm behind his back.

10.    Note as well that your November 9 letter admits there is overlap between that litigation and Mr. Clark's testimony.[11] But your letter further contends that Mr. Clark is only entitled to assert executive privilege as to the documents and testimony to which it applies. The Committee's position thus assumes the point in question.  And *Trump v. Thompson*, which may be just the first of multiple cases in this area, is not yet even concluded,[12] so neither we nor the Committee knows the precise contours of executive privilege in this matter. Given this uncertainty and Mr. Clark's competing duties as a witness on the one hand and as a lawyer ethically obligated to protect the privileges asserted by former President Trump on the other, it is grossly unfair to require him to guess now where that line will ultimately be drawn, on pain of civil or criminal contempt if he is over-inclusive in asserting the privilege, and a violation of the bar rules if he is under-inclusive. You assert that there is no authority supporting awaiting the outcome of related judicial review proceedings, *see* Chairman Thompson Letter at 5 (Nov. 9, 2021). But we are hardly the first to note the unfairness of the dilemma you are imposing on Mr. Clark:

> By wielding the cudgel of criminal contempt, however, Congress seeks to invoke the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried

---

[11] Your November 9 letter merely quibbles about the extent of the overlap.  *See* Thompson Letter, at 5 (Nov. 9, 2021) ("your letter overstates the relationship between the litigation involving documents held by the National Archives and the instant matter.").

[12] I also specifically alert you here that I am aware that *Trump v. Thompson* may not result in a final merits resolution of the underlying privilege dispute.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 10

> out the President's constitutionally authorized commands, for asserting a
> constitutional privilege.

8 Op. OLC 101, 139 (1984). This passage, in turn, cited a law review article by former
Solicitor General Rex Lee as follows:

> [W]hen the only alleged criminal conduct of the putative defendant consists
> of obedience to an assertion of executive privilege by the President from
> whom the defendant's governmental authority derives, the defendant is not
> really being prosecuted for conduct of his own. He is a defendant only
> because his prosecution is one way of bringing before the courts a dispute
> between the President and the Congress. It is neither necessary nor fair to
> make [the Executive Brach official] the pawn in a criminal prosecution in
> order to achieve judicial resolution of an interbranch dispute, at least where
> there is an alternative means for vindicating congressional investigative
> interests and for getting the legal issues into court.

*Id*. at 139, n. 39, *citing* Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial
Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. REV. 231, 239.
This is precisely the unfair trap in which Mr. Clark finds himself.

   Also relevant to the hazard of assuming the eventual outcome of the *Trump v.
Thompson* litigation, the Executive Branch has long taken the position that executive
privilege applies even where the President was not directly involved in the
communications and documents in question. The history of that position is set forth in 8
Op. OLC 101 (1984) which involved the assertion of executive privilege by the
Administrator of the EPA as instructed by the President. The Department of Justice
confirmed that executive privilege applied. Based on executive privilege, documents and
communications between EPA enforcement staff and DOJ's Environment and Natural
Resources Division were withheld from Congress. The OLC opinion not only affirmed
the propriety of the executive privilege claim, it also declined to prosecute any criminal
contempt of Congress. "We believe that the Department's long-standing position that the
contempt of Congress statute does not apply to executive officials who assert Presidential
claims of executive privilege is sound, and we concur with it." *Id*. at 129. "[T]he separation
of powers principles that underlie the doctrine of executive privilege also would preclude

Case 1:22-mc-00096-RC    Document 1-72    Filed 10/17/22    Page 174 of 627

Memorandum Re: Clark Subpoena
November 12, 2021
Page 11

application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege." *Id*. at 134. Thus, the idea that executive privilege is limited to officials like former White House Counsels Donald McGahan or Harriet Miers has no foundation in the law or history of executive privilege.

11.    Your November 5 letter also asserts that Mr. Clark was not among the "small cadre of senior advisors" to former President Trump. *See* Chairman Thompson Letter at 3. Perhaps if this inquiry involved Mr. Clark's work in defending, say, the Affordable Clean Energy rule issued by EPA during the Trump Administration, Mr. Clark might not be standing on executive privilege. But Mr. Clark had conversations directly with President Trump that the subpoena indicates the Committee is interested in penetrating into. *See* Thompson Letter, at 5 (Nov. 9, 2021) (Committee admitting that "the Select Committee is interested in conversations and interactions Mr. Clark had with former President Trump").

The "small cadre" concept, even assuming its validity, has to be interpreted functionally. It cannot mean that anything a White House official, who is close on a paper org chart to the President, advises is privileged but that the advice of any official situated in an Executive Branch department, even if given directly to the President, is not privileged. Moreover, as noted, this "small cadre" concept is contrary to the Department of Justice's long-standing position that the privilege applies much more broadly to executive branch officials even in the absence of any direct involvement by or communication with the President. See 8 Op. OLC 101 (1984). The concept advanced in your letter would hamstring the President's constitutional effectiveness, especially as applied to his high-ranking officials who are Senate-confirmed. The President, in other words, should not be confined to hosting confidential conversations only with those advisors who physically work at the White House. Discharge of the President's Article II duties to take care that the laws are faithfully executed may sometimes, and at the President's sole discretion, require consulting with a wide variety of department, agency, board, etc. officials.

12.    On page 3 of your November 5 letter, you again attempt to mischaracterize our position as "categorical" or "blanket." You did not attend last Friday's session and so perhaps you were misinformed on this point. But my November 5 letter, our statements at the session that same day, and my November 8 letter were not categorical. Our point,

Memorandum Re: Clark Subpoena
November 12, 2021
Page 12

again, which seems to have been missed, is that timing is a critical consideration here as a threshold matter. There is no reason to put Mr. Clark (and me, as his lawyer, frankly) at risk of guessing wrong about how matters like the *Trump v. Thompson* litigation will come out. We have not heard any rationale from this Committee's lawyers or members who attended Friday's session as to why that is not a prudent way to proceed. Obviously, once Mr. Clark answers questions on the substance of his presidential conversations and his related actions at the Department, he cannot un-testify if the *Trump v. Thompson* case or other litigation ultimately holds that the invocation of the privilege is proper in whole or in part.

13.     Respectfully, your November 5 letter appears to cast in concrete terms the due process problem by stating that the "deposition will resume at 4:00 pm this afternoon,[13] ***at which time I will formally reject your claims of privilege***." Chairman Thompson Letter at 4 (Nov. 5) (emphasis added). That inherently shows (a) an "unalterably closed mind," especially when you were not a percipient participant in Friday's session and (b) renders surplusage the November 9 letter providing fuller responses. In light of this sequence of events, it is clear that your November 9 letter lays out a series of *post hoc* rationalizations that crystallize the point that your mind was already made up as of at least 4:30 pm on Friday November 5 when your letter was transmitted to me. Finally, (c) you have not provided any response to my point from the airplane last Friday that you ruling on objections to your own questions is itself a violation of due process.

14.     I also request, with respect, that you should respond to our objection based on *Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995), that Congress cannot apply law to fact without unconstitutionally intruding into the judicial sphere.  Under the Constitution, the Executive Branch, in essence, proposes violations of law to the Judicial Branch and then the latter branch disposes of such disputes.  But Congress's role in that process is neither to propose nor dispose in that process.  Instead, Congress is only designed to debate and pass new legislation or not.

---

[13] Again, this was a time period 30 minutes *before* I received your letter from Ms. Lucier.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 13

Your public statements confirm a confusion about how this basic constitutional structure functions. Commenting on Judge Chutkan's November 9, 2021 ruling in *Trump v. Thompson*, you are quoted in *Politico* as saying: "If we have access to the records, they'll speak for themselves. So we look forward, as a committee, to getting it. ***And we'll let the evidence based on what we look at determine guilt or innocence.***"[14] (emphasis added). Obviously, legislative committees can never have any valid legislative or constitutional purpose in determining guilt or innocence, and therefore may not conduct investigations or issue subpoenas to achieve such flagrantly unconstitutional purposes. Additionally, it is not even proper for the Legislative Branch to arrogate to itself processes of legal discovery in the hopes it can make a later hand-off to the Executive. For instance, Congress cannot circumvent the Fourth Amendment by proceeding as if that constitutional constraint applies only to the Executive Branch. The Constitution binds all three branches of government and all must take an oath to be bound by and support the Constitution. *See* U.S. Const., art. VI ("The Senators and Representatives before mentioned … shall be bound by Oath or Affirmation, to support this Constitution ….").

15.      You assert that under the circumstances, Mr. Clark is "willfull[y]" not complying with the subpoena. Thompson Letter of Nov. 5 at p. 4; *see also* Thompson Letter of Nov. 9, at pp. 9-10. That is not the case. We seek to continue the dialogue about how to secure appropriately cabined testimony from Mr. Clark at the appropriate time and framed with due regard for all of necessary constitutional or other legal and ethical guardrails.

16.      It should also be noted that the Committee's subpoena to Mr. Clark does not comply with the relevant Rules of the House. The minority party, through the governing congressional processes, must be represented on the Committee and participate in the issuance of subpoenas and the examination of witnesses. There are no members of the Committee who were appointed by the Minority Leader. The persons selected by the Minority Leader were refused by the Speaker and are not allowed to participate in the Committee's proceedings. Instead, the Speaker selected two nominal

---

[14] Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, Politico, *available at* https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 14

members of the minority party to serve on the Committee. Their nominal party membership does not meet the requirements of the House Rules because they were selected and appointed by the Speaker and not the Minority Leader. There is no ranking minority member with whom to consult, and no properly constituted minority participation in the proceedings. This is a fatal defect in the Committee's subpoena to Mr. Clark. We also incorporate by reference the legal arguments made by Representative Banks and other attorneys and congressional staff, as reported in *The Federalist* in the article set out in the margin below.[15]  In light of the points made in that article, when you respond to this letter please include a listing of the name and position of everyone affiliated with Congress who was present on November 5 in the room or by videoconference.

17.    Your November 9 letter suggests that Mr. Clark should have told this Committee or others before November 5, 2021 that he intended to stand on President Trump's instruction to him through Mr. Collins to assert executive privilege.  Mr. Clark had no obligation to reveal his discussions with counsel before he arrived last Friday and your suggestion particularly ignores my recent entry into the case.  We also disagree that the other Committees and this Committee are interchangeable.

18.    Your November 9 letter claims that Mr. Clark left "abrupt[ly] on November 5."  *See* Thompson Letter at 2 (Nov. 9, 2021). You may be misinformed, as that is not accurate.  We were present for about 90 minutes and we also accommodated two requests that we leave the room for a period of time so that the Committee members and staff present could confer with one another.  And your related assertions about timing in getting back to the Committee after we left the building that day ignore that we were harassed by the press as we attempted to walk to have a meeting and that other urgent client matters arose for me as I scrambled to get to the airport to go back to Atlanta.

19.    I wish to conclude by noting that your November 9 letter ignores my November 8 request for a copy of the transcript from November 5.  Nor have we received any other word on that request since November 9. The silence is particularly troubling in

---

[15] Mollie Hemingway, *J6 Committee Misleading Witnesses About Republican Staff Presence*, THE FEDERALIST (Nov. 10, 2021), *available at* https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 15

light of the fact that on page 3 (at footnote 4) and page 4 (at footnote 8), as just two examples, you appear to be quoting from the transcript. This points out another due process problem of the Committee acting to advantage itself over Mr. Clark. Providing us with the transcript would also, for instance, make clear that we did not leave precipitously. We also offered numerous times to continue the conversation.

Thank you for your continued attention to this matter, Mr. Chairman. I want you to be assured that while we disagree with the positions you took in your November 5 and 9 letters, our legal arguments are rooted in good faith. We are simply attempting to vindicate the Constitution, which requires energetic defense of the Executive Branch's prerogatives, and make sure that Mr. Clark's rights are protected.

Respectfully submitted, this 12th day of November, 2021.

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

cc:   Jeffrey Bossert Clark

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737
November 29, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

### LIMITS ON THE COMMITTEE'S DEPOSITION POWER

Dear Representative Thompson:

This letter is sent for two reasons: *first*, to note that based on our research regarding congressional powers, we have concluded that the current composition of this Committee precludes its use of deposition authority under the Committee's authorizing Resolution and the governing House Regulations for Use of Deposition Authority; *second*, to note that I am nonetheless willing to allow Mr. Clark to testify at a public Committee hearing (but not at a closed deposition) on two topics relating specifically to the January 6 events (see below) that do not implicate any of the privileges previously asserted.

1. **The Committee's Current Composition and Genesis Precludes It from Wielding Deposition Authority Under the House's "Regulations on the Use of Deposition Authority."**

This Committee's purported use of deposition authority is *ultra vires*. That is true for numerous reasons, which we enumerate below:

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 2

      **A.**     The deposition rules contemplate that the "ranking minority member" of the Committee must be consulted before depositions can be taken. *See, e.g.,* Regulations for the Use of Deposition Authority, Cong Rec. H41, Rule 2 (Jan. 4, 2021) [hereinafter "Deposition Rules") ("Consultation with the ranking minority member shall include three days' notice before any deposition is taken"); *see also* Rules 3, 4, 5, and 9 (also requiring consultation with and participation by the "ranking minority member" or their designees).

      Similarly, H. Res. 503, § 5(c)(6)—the Resolution creating the January 6 Committee—requires consultation with the ranking member in order to take a deposition:

> (6) (A) The chair of the Select Committee, **upon consultation with the ranking minority member**, may order the taking of depositions, *including pursuant to subpoena,* by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

> (B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

H. Res. 503, § 5(c)(6) (all forms of emphasis added).

      Thus, to take a deposition, you as Committee Chair are expressly and unambiguously required by H. Res 503, § 5(c)(6) to consult with the ranking minority member and to comply with the procedures specified in the Deposition Rules discussed above.

      The first problem is that this Committee not only does not have a ranking minority member, it does not even purport to have a ranking minority member. Instead, it purports only to have Representative Cheney as a Vice Chair, but even that designation is flatly contrary to the Rules of the House. *See* January 6 Select Committee, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 3


2, 2021), *available at* https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (Attachment A). The Deposition Rules are silent on Vice Chairs; neither they nor the Committee's enabling Resolution can be construed to treat Vice Chairs as if they are equivalent to ranking minority members.[1]

The Committee, lacking a minority ranking member, thus must take the bitter with the sweet. The sweet, in the view of the House's majority party, involves a gerrymander of the Committee's membership without the Republican Steering Committee's or Conference's participation or consent, and thus avoids the inconvenient complications and respect for minority prerogatives that would go along with true bipartisanship. Whereas the bitter is that, by proceeding in this manner, the Committee loses the ability to make use of deposition authority under H. Res. 503, § 5(c)(6) or the Deposition Rules. To do so, the Committee would have to be reconstituted.

**B.**  Each of the two parties in Congress has rules and procedures governing how their committee chairs and ranking minority members are designated. On the Republican side, the Conference Rules of the 117th Congress are relevant. Rule 2(d)(2) is

---

[1] There is also serious controversy over whether Vice Chair Cheney even still qualifies as a Republican. The Wyoming Republican party no longer recognizes her as such. *See e.g.*, Associated Press, *Wyoming Republican Party Stops Recognizing Liz Cheney as Member*, THE GUARDIAN (Nov. 16, 2021), *available at* https://www.theguardian.com/us-news/2021/nov/15/liz-cheney-wyoming-republican-party-trump.
Speaking for herself, the Chair of the Republican National Committee argues that "she still considers Rep. Liz Cheney (R-Wyo.) to be a member of the party after the Wyoming GOP voted to no longer recognize the Republican congresswoman." Julia Manchester, *McDaniel Says She Still Considers Cheney a Republican Despite Wyoming GOP Vote*, The Hill (Nov. 18, 2021), *available at* https://thehill.com/homenews/house/582150-mcdaniel-says-she-still-considers-cheney-a-republican-after-wyoming-gop-vote [hereinafter "Manchester Article"]. Former Speaker of the House Thomas "Tip" O'Neill is perhaps best known for political aphorism contained in the title of his book. *See* Thomas P. O'Neill & Gary Hymel, ALL POLITICS IS LOCAL: AND OTHER RULES OF THE GAME (1993). And, in that vein, even Chair McDaniel acknowledged: "The thing about that everyone should be taking note [of] is that a state party is the most grassroots body that the state has. These are people who are running in their district committee and they're going to their county convention and they're getting on their state committee and they really represent where the party is in their state." Manchester Article.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 4


a default rule that provides that references to Chairs equate to the Ranking Republican Member when the Republican party is in the House's minority, as now. *See* House GOP, Conference Rules of the 11th Congress, *available at* https://www.gop.gov/conference-rules-of-the-117th-congress/ [hereinafter "House GOP Conference Rules"]. And Rule 14 provides that the Republican Steering Committee nominates its chairs/ranking minority members and they must be voted on by the full GOP House Conference. *See* House GOP Conference Rules at Rule 14(a)(1), (b). Such chairs/ranking members need not be the Republican member with the longest service on the Committee. *See id.*

By rule and the customs, traditions, and precedents of the House, it is the role of each party, in line with its own internal processes, to designate committee chairs and ranking members and thus that role cannot be usurped by the other party. The only way for a ranking Republican minority member to be designated is for the procedure in the House GOP Conference Rules to be followed. Representative Cheney thus can only be denominated the ranking minority member (which, again, is a pivotal role given how H. Res. 503, § 5(c)(6) and the Deposition Rules work) if the Republican Steering Committee has nominated her to that role and she is then confirmed by vote of the full Republican Conference.

Representative Cheney was neither nominated for the ranking minority member role on this Committee nor voted into that role by the full Republican Conference. It appears that she does not carry the title of Ranking Minority Member in silent recognition of this very fact. Instead, she carries only the title of Vice Chair, an appellation conferred on her solely by you as Chair. *See* Attachment A, entitled *"Chairman Thompson Announces* Representative Cheney as Select Committee Vice Chair"). And, as you are well aware, the history of this Committee leaves Representative Cheney owing her post on this Committee to Speaker Pelosi. *See* Associated Press, *Pelosi Appoints Cheney to Jan. 6 Committee*, NEW YORK TIMES (July 1, 2021), available at https://www.nytimes.com/video/us/politics/100000007846056/pelosi-cheney-january-6-committee.html. This makes her, in essence, a Democrat-appointed member of the Committee in the first instance *and* a Democrat-appointed leader acting in the capacity as Vice Chair of the Committee as well—*a doubly Democrat appointment*. Indeed, during our November 23, 2021 session at the Longworth House

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 5

Building to review the draft November 5, 2021 transcript, Mr. Clark also specifically asked Mr. Barry Pump, your Parliamentarian, to confirm that Vice Chairs can be appointed by and be members of the majority party on this Committee and Mr. Pump confirmed that was accurate.

But even Rep. Cheney's appointment as the "Vice Chair" of the Committee is legally defective. The definition of a "Vice Chair[s]" under the Rules of the House clearly requires they be a member of the majority party. Rule XI(2)(d) provides in relevant part as follows:

**Temporary absence of chair**

(d) A member of the *majority party* on each standing committee or subcommittee thereof **shall be designated by the chair of the full committee as the** *vice chair* **of the committee or subcommittee**, as the case may be, and shall preside during the absence of the chair from any meeting.

(all forms of emphasis added). This rule is applicable to the January 6 Select Committee because (1) Rule X(10)(b) makes Rule XI(2)(a) applicable to Select Committees; (2) Rule XI(2)(a) requires the Committee to adopt rules; (3) H. Res. 503 § 5(c) specifically states that "Rule XI of the Rules of the House of Representatives shall apply to the Select Committee except as follows"; and (4) clause 2(d) of Rule XI is not one of the listed exceptions.

Therefore, to the extent she is a member of the minority party, Representative Cheney cannot be a "Vice Chair" as that term is used and defined in the Rules of the House. Representative Cheney, it seems, is thus neither fish nor fowl.

Contrary to the Associated Press's suggestion, the law and procedures governing this Committee are not a matter of "close enough," like "horseshoes and hand grenades." *See Pelosi Appoints Cheney to Jan. 6 Committee*, NEW YORK TIMES ("Ms. Cheney's appointment appeared to be an attempt by Democrats to bring *a degree of bipartisanship* to the investigation.") (emphasis added). Representative Cheney cannot be considered a Republican appointee to this Committee because she was not appointed

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 6

in accord with Republican processes, and is not a "ranking minority member," and this precludes the Committee making use of deposition processes because use of those processes requires the presence on the Committee of a ranking minority member.

      **C.**    This problem is a further reflection of the overarching fact that this Committee is misstructured because it was formulated as a political monolith. *See* MacDougald Letter, at 5-6 (Nov. 12, 2021); Memo. Re: Clark Subpoena, at 13-14 (Nov. 12, 2021); MacDougald Letter, at Att. B (Nov. 8, 2021). Minority Leader McCarthy's designees for this Committee, especially Representatives Banks and Jordan, were rejected by the Speaker of the House. *See* Mike Lillis, *Pelosi Rejects Jordan, Banks for Jan. 6 Committee*, THE HILL (July 21, 2021), available at https://thehill.com/homenews/house/564122-pelosi-rejects-jordan-banks-for-jan-6-committee. We explain in our separate letter, also carrying today's date and addressed to procedural and other issues, how our November 5, 2021 letter objections were repeatedly misconstrued by the Committee and its lawyers. Related to that set of problems for the Committee, we note here that it is hard to imagine that Representatives Banks or Jordan would have allowed our November 5 objections to be mischaracterized and then ruled on as they were mis-framed, at least not without making a strong record objecting to proceeding in such an unlawful fashion.[2] Accordingly, how minority party Members of the Committee, especially the ranking minority member leader thereof, come to be designated and whether that process has been hijacked by the majority party is a matter of great significance and not a mere technicality.

      **D.**    Additionally, under the Deposition Rules, the ranking minority member can designate committee counsel to conduct a deposition. Those rules establish a balance requirement in that "[o]ne of the committee counsel shall be designated by the chair and the other by the ranking minority member per round." Deposition Rules at Rule 5. Indeed, Rule 6 specifically states as follows:

---

[2] As I note in our other letter dated today, we will be responding separately to your November 17, 2021 letter, which is relevant to these points.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 7

> Deposition questions shall be propounded in rounds. The length of each
> round shall not exceed 60 minutes per side, ***and shall provide equal time
> to the majority and the minority***. In each round, the member(s) or
> committee counsel designated by the chair shall ask questions first, and
> the member(s) or committee counsel designated by the ranking minority
> member shall ask questions second.

Deposition Rules at Rule 6. This scrupulously ensures balance between the majority and
minority lawyers in their role of propounding deposition questions. Yet, there is no
minority counsel for this Committee that has been properly designated by the ranking
minority member, because the Committee lacks a ranking minority member for the
reasons explained above.

     E.     Relatedly, we note that the brief instances where John Wood, ostensible
minority counsel, participated in the November 5 proceedings (*i.e.*, the deposition itself,
and the sessions held after Mr. Clark and I departed that day) reinforce that these
proceedings are not being conducted in true bipartisan fashion. Mr. Wood spoke when
we were present only to urge us not to leave the deposition when it became
unproductive in light of the fact that the Committee and staff had not yet fully digested
my November 5 letter. *See* Dr. Tr. at 37:10-13.[3] Nor did he push back on a single point
made or position taken by any majority party Member of the Committee or Mr. Heaphy,
majority investigative counsel. All of this is consistent with Representative Banks' view
of Mr. Wood's participation.[4] And it also appears Mr. Wood declined to state anything
for the record in the first session held outside of our presence on November 5, let alone

---

[3] All citations to the Draft Transcript (Dr. Tr.) are to the version Mr. Clark reviewed on November 23,
2021 at the Longworth House Office Building and that I simultaneously reviewed, connected to Mr. Clark
by Webex, from an Atlanta federal building.

[4] *See* Mollie Hemingway, *J6 Committee Misleading Witnesses About Republican Staff Presence* (Nov. 10, 2021)
(arguing that John Wood and Representative Cheney, in the context of this Committee's operations, both
work for the Democrat Party and that according to Representative Banks, at least some witnesses are
being misled "about the motives and the position of the person questioning them."), *available at*
https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/
(Attachment B), *incorporated by reference into* Memo. Re: Clark Subpoena, at 14 & n.15 (Nov. 12, 2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 8

anything that would call in question the majority's January 6 narratives, or whether the Committee is proceeding in conformity with the House Rules and its own enabling Resolution. *See id.* at 44:24.[5]

None of these points are designed to impugn Mr. Wood personally, especially because he and Mr. Clark were once colleagues together in private practice and in the Bush Administration.[6] But, as the design of the Appointments Clause of the United States Constitution recognizes, loyalty flows structurally from the authority that makes any given appointment and can terminate it,[7] and here it is clear that Mr. Wood was appointed by you as Chair of the Committee, Representative Thompson. Accordingly, Mr. Wood is here serving your interests and those of your political party, not those of the minority party. *See* January 6 Select Committee, *Thompson & Cheney Announce Senior Investigative Counsel for the Select Committee* (Sept. 17, 2021), *available at* https://january6th.house.gov/news/press-releases/thompson-cheney-announce-senior-

---

[5] We acknowledge there is some lack of clarity in our notes about the relevant person speaking (hampered, as we were, by not having a transcript we could take with us on November 23 and by the threshold problems encountered on November 23 as we described in our letter to you that evening). If page 44, line 24 of the deposition transcript is not Mr. Wood speaking, we apologize for that error stemming from our hastily written-up notes. But if that is in error, it would only underscore why we should be given the opportunity to review the transcript again before it is finalized—preferably by receiving a physical copy of the finalized transcript or, at the very least on that follow-up occasion, not being hampered by the threshold problems that created time pressure for our transcript review on November 23.

[6] The same is true as to the points made in this letter concerning Representative Cheney's participation on the Committee as currently structured—the points are legal in nature, not personal.

[7] *See, e.g.,* Jennifer Nou, *Subdelegating Powers*, 117 COLUM. L. REV. 473, 512 (2017) ("The core concern is that the President, in whom the Constitution vests the 'executive Power' and who must 'take Care' to 'faithfully execute' the laws, will lose control of an unelected bureaucracy. To mitigate this possibility, the Appointments Clause and other constitutional provisions ensure that the President is able to hire loyalists in key positions and fire insubordinates.") (footnote omitted). Of course, the principal obligation of any Executive Branch official is to his Oath to the Constitution as a whole, which Mr. Clark takes very seriously. But it is undeniable that the President cannot function properly and ensure that the branch functions in a unitary fashion without the ability to select his own appointees, subject to Senate confirmation for high-ranking officials.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 9

investigative-counsel-select-committee. Mr. Wood's past appointments by President George W. Bush notwithstanding, he was not appointed here pursuant to a consultation with Minority Leader McCarthy, *et al.* or the designated ranking minority member on the Committee. Of course, while Mr. Wood served in the Executive Branch more than a decade ago, the structure of the Constitution ensured his loyalty to President Bush. But as to his service with this Committee, the manner of his appointment ensures his loyalty to you as Chair.

The Rules of the Republican Conference make this point explicit. A member's designation as the ranking Republican member of a Committee comes only through nomination by the Steering Committee and election by the Conference. Conference Rule 14(d)(1) concomitantly requires, among other things, that Republican ranking members "ensure that each measure on which the Republican Conference has taken a position is managed in accordance with such position on the floor of the House of Representatives."

F.     These problems with the absence of both a minority ranking member and a counsel chosen by a properly constituted ranking minority member cannot be retroactively fixed. They render the November 5 deposition of Mr. Clark *ultra vires* and preclude its use for any follow-on purpose.

2.     **Proposal for Testimony on a Limited Topic to the Full Committee in a Public Hearing.**

The Committee and its staff have repeatedly mischaracterized our position as claiming blanket privilege for Mr. Clark. We have not done so. Our position has instead emphasized prudence in awaiting, at the very least, full resolution of *Trump v. Thompson* so that the boundary points for testimony are clearer. Nevertheless, to serve the interests of the historic inter-branch accommodation process related to executive privilege disputes, I am willing to offer Mr. Clark's testimony in a public hearing before the full Committee (not in a closed-door deposition, including for the reasons given above about why use of the Deposition Rules here is *ultra vires*) on defined topics. *See, e.g.,* Dawn Johnsen, *Executive Privilege Since* United States v. Nixon: *Issues of Motivation and Accommodation*, 83 MINN. L. REV. 1127 (1999) (referring to "the accommodation process"

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 10

as "a central feature of executive branch policy in this area and the process actually used to negotiate with Congress to seek to accommodate the legitimate needs of both branches").[8]

As you know, we learned only on November 23 of two sessions held as part of the November 5 proceedings that occurred without either me or Mr. Clark present. At one of those sessions, Representative Schiff stated as follows: Mr. Clark "refus[ed] even to answer questions about his statements about January 6th made to the press at least strike this member as not in good faith …." Dr. Tr. 46:5-7.[9]

Respectfully, we believe it was **_always clear_** from what was actually said on November 5 (both in writing and orally) that Mr. Clark was not refusing to ever testify about his remarks to a *Bloomberg Law* reporter on January 6. But that he was only urging, as a matter of proceeding in an orderly fashion, the Committee to await the conclusion of the *Trump v. Thompson* litigation before we discussed how to agree about testimony on any topic—all while inviting a dialogue with the Committee.[10] Nevertheless, to avoid any implication (even an unfair one) that Mr. Clark is not proceeding in good faith, I can now agree to allow Mr. Clark appear in a public meeting of the full Committee to testify about the following topics that do not implicate any of the privileges asserted and are also appropriately tailored to the Committee's mission under H. Res. 503:

> (1) Mr. Clark's questioning by and responses to a *Bloomberg Law* reporter interviewing him after January 6 about events at the Capitol, and (2) his role, if any, in planning, attending, responding to, or investigating January

---

[8] Professor Johnsen was the Acting Assistant Attorney General for the Office of Legal Counsel at the start of the Biden Administration.

[9] Again, this citation is drawn from our notes since we lack access to a copy of a final transcript, though we have again requested we be given one in our other later dated today.

[10] A dialogue which at all times it appears the Committee has refused to enter, insisting on Mr. Clark's testimony on a smorgasbord of more than 20 topics, including Mr. Clark's conversations with President Trump. *See* Dr. Tr. at page 41 (Mr. Heaphy listing topics without Mr. Clark or me present in the room).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 11


6's events or former President Trump's speech on the Ellipse that same
day.

Please let us know if this proposal is agreeable to the Committee, or otherwise
continue the dialogue with us, consistent with the Committee's obligation to seek
accommodation in good faith in cases involving invocations of executive privilege.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Encls.
cc:    Jeffrey Bossert Clark (w/ enclosures)

Case 1:22-mc-00096-RC   Document 1-72   Filed 10/17/22   Page 190 of 627

HOME (/)    ABOUT (/ABOUT)

(/)

COMMITTEE ACTIVITY (HTTPS://JANUARY6TH.HOUSE.GOV/COMMITTEE_ACTIVITY)

MEDIA CENTER (/NEWS)    WATCH LIVE (/NEWS/WATCH-LIVE)    CONTACT (/CONTACT)

TIP LINE (/TIP-LINE)

(http://twitter.com/January6thC

(http://www.facebook.com/Janu

(http://www.youtube.com/chan

Q   (/search)

# CHAIRMAN THOMPSON ANNOUNCES REPRESENTATIVE CHENEY AS SELECT COMMITTEE VICE CHAIR

Sep 2, 2021

**Bolton, MS**—Chairman Bennie G. Thompson today announced that he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee.

Chairman Thompson said, "Representative Cheney has demonstrated again and again her commitment to getting answers about January 6th, ensuring accountability, and doing whatever it takes to protect democracy for the American people. Her leadership and insights have shaped the early work of the Select Committee and this appointment underscores the bipartisan nature of this effort."

House Resolution 503 established the Select Committee to investigate and report upon the facts, circumstances, and causes related to the January 6th attack and interference with the peaceful transfer of power.

"Every member of this committee is dedicated to conducting a non-partisan, professional, and thorough investigation of all the relevant facts regarding January 6th and the threat to our Constitution we faced that day. I have accepted the position of Vice Chair of the committee to assure that we achieve that goal. We owe it to the American people to investigate everything that led up to, and transpired on, January 6th. We will not be deterred by threats or attempted obstruction and we will not rest until our task is complete," said Vice Chair Cheney.

Chairman Thompson continued, "It's important to everyone that the Select Committee's leadership reflect the bipartisan effort we are engaged in and I'm pleased that Ms. Cheney has agreed to serve as the select committee's Vice Chair. We are fortunate to have a partner of such strength and courage, and I look forward to continuing our work together as we uncover the facts, tell the American people the full story of January 6th, and ensure that nothing like that day ever happens again."

# # #

f    (https://www.facebook.com/sharer/sharer.php?u=/news/press-

Attachment A

Case 1:22-mc-00096-RC   Document 1-72   Filed 10/17/22   Page 191 of 627

Chairman Thompson Announces Representative Cheney as Select Committee to Investigate the January 6th Attack on the United States Capito     11/29/21  11 04 AM

releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair) 🐦 (https://twitter.com/intent/tweet?&url=/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair&text=Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair) ✉ (mailto:?subject=Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair&body=/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair)

https // anuary6th house gov/news/press  re eases/cha rman  thompson  announces  representat ve  cheney  se ect  comm ttee  v ce  cha r

Page 2 of 2

*our latest*
*most popular*
*contributors*
*subscribe*



CORRUPTION

# J6 Committee Misleading Witnesses About Republican Staff Presence

*'If this was a real investigation, that'd land you in jail for prosecutorial misconduct,' Rep. Jim Banks said.*

Wyoming Rep. Liz Cheney ran to CNN a few weeks ago to accuse conservative stalwart Rep. Jim Banks of falsely presenting himself as the Jan. 6 commission's ranking member. Banks is, in fact, congressional Republicans' choice to be their top investigator on the committee, but he has been prevented from fulfilling his duties by Speaker of the House Nancy Pelosi.

However, it's Cheney who appears to be misrepresenting herself as the ranking member — that is, the top Republican — on the committee.

January 6 Select Committee staff have been falsely telling witnesses that Republican staff will be present for interviews, according to multiple eyewitness sources and documents. In fact, not a single Republican-appointed member of Congress nor a single staff member representing the Republican conference is part of the controversial committee.

Attachment B

Witnesses are being told that John Wood, a longtime friend and ally of the Cheney family, will represent Republicans when witnesses testify. But neither Cheney nor her friend is representing the Republican conference. In fact, Cheney was appointed to the committee in early July by Pelosi herself.

"John Wood works for the Democrat Party, just like Liz Cheney, who was appointed by Pelosi and is not the Ranking Member of the Select Committee. She is misleading witnesses, before they testify under penalty of law, about the motives and the position of the person questioning them," said Banks, who has continued leading Republicans' investigation of the federal government's handling of the Jan. 6 riot at the Capitol. Cheney's work with CNN was designed to prevent him from being able to gain answers to the questions the select committee was ostensibly set up to answer.

Cheney was given six days to explain whether she considers herself just the Democrat-appointed vice-chair of the committee or also the Republican ranking member, as is being represented to key witnesses. She has not responded to multiple requests for comment.

The misrepresentation to witnesses is key because the absence of any ranking member — meaning, in this case, any Republican-appointed member — or minority party staff means the committee appears to be failing to adhere to ironclad rules for its work.

Pelosi "blew up" the Jan. 6 committee when she took what she herself admitted was the "unprecedented" step of refusing to seat multiple Republican-appointed members, including the highly respected Navy officer and Indiana Republican Banks, who was to be the committee's ranking member. She also banned Rep. Jim Jordan of Ohio, who currently serves as the top Republican on the Judiciary Committee.

Pelosi chose two of her key Republican allies and anti-Trump obsessives to fill two

of her slots for the committee. As such, they do not represent the Republican conference, which opposed their selection, but the Democrat conference, which supported their selection.

Cheney was promoted to vice-chair in September in thanks for her stalwart work on Pelosi's behalf. Cheney, who has been censured by Wyoming Republicans for working against Republican voters and their interests, and who lost her position as House Conference chair for hijacking multiple briefings for Republican policy initiatives to talk about her personal vendetta against Trump, is facing precipitously low poll numbers and a challenge from popular Republican Harriet Hageman.

Cheney was joined by lame-duck Adam Kinzinger of Illinois, who recently announced his retirement rather than facing certain defeat from Illinois constituents who don't share his anti-Trump obsession. Kinzinger was appointed by Pelosi in late July to make the committee appear more bipartisan after she'd vetoed Banks and Jordan. Cheney, her selection for vice-chair, was brought in for the sole purpose of helping Democrats with their tribunal.

The resolution establishing the committee, purportedly to investigate the federal government's role in detecting, preventing, preparing for, and responding to the Jan. 6 riot, says depositions taken by the select committee must follow House rules.

Those rules clearly state, "Consultation with the ranking minority member shall include three days' notice before any deposition." Also, "A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round."

Additionally, the rules say, "Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second."

The point of these rules is to structure depositions so the minority and the majority counsel have the same opportunity to question witnesses and gather information for their separate reports. That's why they rotate and why they're allotted equal time. Having questions alternate from one hostile lawyer to another hostile lawyer who is working with the first makes a mockery of the provisions. It also means that the hostile lawyers can coordinate and cherry-pick which information to leak or publish, and which to conceal from the public because it contradicts their preferred narrative.

The rules do not envision the circumstances that accompany Pelosi's uni-party select committee. The House Rules "become nonsensical in a situation like this," said one congressional aide, adding, "This isn't just a partisan investigation — it's a coverup."

For the select committee to be in accordance with the rules regarding consultation for depositions, Cheney must be considered simultaneously the ranking member for the minority party while also being the vice-chair for the majority party.

Hill lawyers say Pelosi's handling of the committee casts doubt on its adherence to the rules. Because she vetoed the ranking member from the committee, it has no ranking member. But the committee rules require consultation with the ranking member before taking certain basic actions, such as taking depositions, including those pursuant to subpoenas.

"So how can you consult with the ranking member when you don't have one?"

asked one Hill attorney.

The multiple sources consulted for this article include a document which confirmed January 6 Committee staff represented to a witness that Wood would be the Republican counsel during their interview.

"If this was a real investigation, that'd land you in jail for prosecutorial misconduct," Banks said of the false representation. "Fortunately for Liz, this is a sham investigation," he added.

> *Mollie Ziegler Hemingway is a senior editor at The Federalist. She is Senior Journalism Fellow at Hillsdale College. A Fox News contributor, she is a regular member of the Fox News All-Stars panel on "Special Report with Bret Baier." She is the author of "Rigged: How the Media, Big Tech, and the Democrats Seized Our Elections." Follow her on Twitter at @MZHemingway.*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 29, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

## ADDITIONAL OBJECTIONS BASED ON INFORMATION
## FIRST LEARNED OF BY MR. CLARK AND COUNSEL ON 11/23/21

Dear Representative Thompson:

This letter is sent to flag additional legal objections arising from or catalyzed by (1) Mr. Clark's review on November 23, 2021 at the Longworth House Office Building of the draft November 5, 2021 deposition transcript and/or (2) my simultaneous review of that same draft transcript from a federal building in Atlanta, Georgia, with a Webex connection linking the two locations. Most significantly, unbeknownst to Mr. Clark and me before November 23, two transcribed sessions were held with Committee Members and staff *after* we had departed on November 5.

Learning the content of these sessions only upon our review of the draft transcript presents yet another serious due process problem with these proceedings as applied to Mr. Clark. Particularly alarming is that the topics on which Mr. Clark was to be questioned were not shared with us while we were present but were instead put on the record in Star Chamber fashion. *See In re Oliver*, 333 U.S. 257, 268–69 (1948) ("[D]istrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 2

French monarchy's abuse of the *lettre de cachet*." (footnotes omitted)). Had we not asked to review a copy of the draft transcript, we would have been kept in the dark about specific topics that Mr. Clark supposedly refused to testify about on a blanket basis so that the myth that Mr. Clark issued a blanket refusal to testify could be perpetuated. Please see the first point below for more on this.

Any references below to the November 5 draft transcript, not yet finalized, are based on our notes. Those notes may not be perfect because of the range of problems set out in our letter to you sent the evening of November 23, which caused us to lose time and because those problems made conditions for our review sub-optimal. Nor is there any reason why we should have been denied the ability to take away copies of the draft deposition transcript so that we could review it under conditions that allowed us to consult freely while maintaining attorney-client privilege and so that we could more accurately quote from it to protect Mr. Clark's legal rights. Both of us are lawyers and we have never encountered a legal process that did not allows us access in writing, but only under observed and highly controlled circumstances, to a pre-final deposition transcript to review. We do recognize that you indicated in a letter dated November 26, 2021 to me that the Committee is still considering our request for a copy of the transcript. Please let us know about the Committee's resolution there when you can.[1] But the restrictions on our access to the transcript are another Star Chamber-like feature of the Committee's proceedings.

The new objections we raise are as follows, and they are without prejudice to a response to your November 17, 2021 letter, which we are still working on:

---

[1] In a footnote, *see* Thompson Letter, at 1 n.3 (Nov. 26, 2021), you argue that action by the full House of Representatives would be required to release the audio file from November 5. But neither House Resolution 558 (112th Cong.) nor House Resolution 553 (116th Cong.) preclude release of the audio file. Instead, both Resolutions simply show the full House resolving to release audio files for trial purposes. However, you cite no authority for the proposition that a resolution by the full House is a necessary condition and thus that an audio file can be released only in that fashion. You or your advising counsel must see that those Resolutions do not prove the point for which they are cited—far from it.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 3

*First*, there is *no indication* in the transcript of the second session held without us on November 5 present—from 4:15 pm to approximately 4:21 pm—that you had either read my November 5 letter or properly understood that it was *not* asserting an absolute privilege to all potential questions. Nevertheless, Mr. Heaphy represented to you that the "letter [was] asserting blanket privilege." Dr. Tr. at 48:24.[2] So, at the time you ruled, you appear to have been misinformed about the contents of our November 5 letter and transcribed statements on the morning of November 5. Accordingly, we request that you acknowledge in writing that:

(1) the concluding paragraph of my November 5 letter noted that you could respond with "a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.";

(2) Mr. Clark and I repeatedly stated on November 5, as the draft transcript reflects, that we were not adopting a blanket position, *see, e.g.*, Dr. Tr. at 36:4-6 (where Mr. Clark clearly stated "I would say that we've not reached an impasse, and there have been repeated attempts to characterize the position as absolutist. It's not. We're inviting a dialogue in the letter."). You were apparently not informed of this either; and thus

(3) your ruling that "Mr. Clark does not enjoy categorical claims of privilege across every element[] of the select committee investigation authorized by House Resolution 503" should be withdrawn as a *non sequitur* because it is ruling on a counterfactual objection that we did not actually advance either in our November 5 letter or in the live session on November 5. Additionally, you are by now certainly aware (or should be aware) that my November 8, 2021 letter to you (*e.g.*, pages 1-2, 4) and my November 12, 2021 letter (*e.g.*, pages 6-7) noted that we were not asserting "absolute immunity."

In the alternative, we would request that you share this letter immediately with all Committee Members and it is to them we address this follow-on request: "Please invoke Rule 7 of the 117th Congress Regulations for Use of Deposition Authority by appealing

---

[2] All citations to the Draft Transcript (abbreviated Dr. Tr.) are to the version we reviewed on November 23.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 4

Chairman Thompson's ruling in accord with that Rule."[3] Relatedly, if such an appeal is filed by a Member, I would request the opportunity to be heard on Mr. Clark's behalf in a transcribed and in-person meeting held before a quorum of the Committee.

Given the clear disconnect between a misconstrued objection we did not make, which was what you ruled regarding on November 5, and the basis for and contours of our objection as we actually stated it, all other Members of the Committee should vote to reverse your ruling on appeal. But at the very least, one or more Members of the minority should file an appeal in an attempt to get you to rule on the objection that was actually made and not one that put words in our mouths. So whether such an appeal will be filed now that this issue has been surfaced (and again, it could not have been surfaced prior to our transcript review on November 23) will act as an important test of whether there is *representation of the minority party in more than name only on this Committee* or if those ostensible Members also have an unalterably closed mind characterized by prejudgment, which I have previously explained is a violation of due process. Please see my email drafted while I was in flight on November 5 back to Atlanta and in the attachment to my subsequent November 12 letter. *See* MacDougald Letter, at 2 & Att. B (Nov. 8, 2021); Memo. Re: Clark Subpoena, at 1 (Nov. 12, 2021).

*Second,* as is implicit in the first objection above, but which I state as a separate point here for clarity, we have now seen for the first time that the transcript clearly reflects that *you had already ruled* in the second session on November 5 (held without us present) that our objection (as mis-framed) had been overruled. This clinches the Queen of Hearts problem of *post hoc* rationalization that I set out in my November 12 letter and attached memo. *See* MacDougald Letter, at 2 (Nov. 12, 2021); Memo. Re: Clark Subpoena, at 2 (Nov. 12, 2021). In other words, this revelation confirms that the November 9 letter you sent to me was an attempt to paper over the defects of your November 5 late afternoon ruling

---

[3] We advance this argument as an alternative one to our primary position, stated in my other letter to you today, that this Committee's composition precludes any use of the House Deposition Rules and thus that the November 5 deposition was *ultra vires.* I continue to reserve all of Mr. Clark's legal rights, especially as various problems with the Committee's actions continue to emerge.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 5

and thus forms another reason why one or more Members should appeal your November 5 ruling.[4]

*Third*, in your November 26 letter, you register a sort of complaint that because Mr. Clark did not sign the transcript or certificate set before him on November 23, you may not opt not to include the corrections we identified to the transcript on November 23 in the final transcript. *See* Thompson Letter, at 1 (Nov. 26). But you ignore the due process problem we identified of a transcript that Mr. Clark is expected to sign but that (a) had errors and multiple versions floating around as a "known issue" on November 23 and yet we still encountered that issue last week; (b) yet you will not allow us to lock down a single final version of the transcript that we can keep a copy of to ensure the transcript is not further changed; (c) you present no response to my point that the integrity of the transcript has already been threatened in a legally unprecedented fashion; and (d) you are silent about our sensible suggestion that a certified pdf document could be produced and retained by all sides, assuring everyone that the transcript could not undergo further unilateral revision.

*Fourth*, your letter offers no response to our request that the identity of all Members and staff present for any portion of the November 5 questioning be listed to reflect the relevant portions of the transcript for which they were present. *See* MacDougald Letter, at 3 (Nov. 23, 2021) ("[T]his must be corrected in the revised transcript such that the transcript accurately indicates precisely who affiliated with the Committee was present for each of the three distinct segments of the session on November 5 reflected in the transcript, respectively, i.e., (1) the main period where Mr. Clark and I were present, (2) the period late morning where staff and some members remained on the record to mark exhibits for identification purposes and to set out their unilateral positions without our presence; and (3) the period late afternoon where Chair Thompson participated and purported to rule on our legal objections, again without us

---

[4] We recognize that Rule 7 concerning depositions indicates that appeals must be noticed by Members within 3 days of the ruling but your November 5 ruling was clearly interlocutory and can be revisited. And avoiding the due process problems we have been highlighting since November 8 surely provides a strong basis for you to reconsider. Members could also call for you to reconsider your ruling as a general matter—outside the parameters of Rule 7.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 6

present."). There is no reason for the Committee not to do so unless it or the court reporter did not track that information, in which case that point should be admitted and memorialized as part of the final transcript.

*Fifth*, and reserving all rights as to other topics, in the extensive list of topics Mr. Heaphy set out on the record but *without Mr. Clark or I being present*, we have to point out that one of the topics Mr. Heaphy flagged directly contradicts a statement that the Department of Justice made to us about the Committee's position on topics, namely, DOJ's statement via Kira Antell as follows:

> Finally, I wanted to address your question seeking access to materials relating to a classified ODNI [Office of the Director of National Intelligence] briefing of Mr. Clark in early January. OLA [*i.e.,* DOJ's Office of Legislative Affairs] has spoken to the Select Committee and confirmed that the details of this briefing are outside the scope of their interest in speaking with Mr. Clark.

MacDougald Letter, at 3-4 & n.5 (Nov. 12, 2021) (quoting Ms. Antell). *Compare* Dr. Tr. at 43:13-15 (Heaphy: "[W]e wanted to ask him, for instance, about an ODNI briefing that he sought about alleged interference with Dominion voting machines by the Chinese government.").[5] Even assuming for the sake of argument that this is a permissible line of inquiry with Mr. Clark in light of the various applicable privileges, this is a serious contradiction which we will take up with DOJ by renewing our request under DOJ's

---

[5] Note once more that this is the Committee's unilateral view of this issue. By contrast, Mr. Clark thinks the relevant ODNI materials, including his secure discussion with the then-Director of National Intelligence Ratcliffe, are relevant for many reasons, assuming the various privilege objections were resolved in favor of giving testimony on this topic. As I explained on November 12, it is not up to the Committee to decide what is relevant to Mr. Clark's potential response to any given line of questioning. MacDougald Letter, at 4 (Nov. 12, 2021). Mr. Clark can determine that for himself, consulting with me. The manner in which the Committee is proceeding, based on what Ms. Antell has represented, is equivalent to asserting in circular fashion that "Mr. Clark does not need access to X category of material because we do not believe he needs access to it." It is sufficient to show that Mr. Clark is entitled to review and refresh his recollection from that material that the Committee wants to ask about it.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 7

regulations to be able to review the relevant documents. This will require confirmation
that Mr. Clark's security clearances are still operable and that I, as his counsel, obtain
those security clearances anew, so that Mr. Clark can be given the due process
protections provided by receiving advice of counsel.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:    Jeffrey Bossert Clark

# CALDWELL, CARLSON,
# ELLIOTT & DELOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 30, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

Dear Representative Thompson:

In addition to the reasons previously set forth in my (1) letter to you of November 5, 2021, (2) my email to Mr. Heaphy of November 5, 2021, and my letters of (3) November 8, (4) November 12, (5) November 23, and (6)-(7) November 29, 2021 (two separate letters covering different issues), I now write to inform you and the Committee that on my advice Jeffrey Clark is asserting his rights against self-incrimination under the Fifth Amendment to the U.S. Constitution.

As previously explained in this body of correspondence, the Committee's processes as applied to Mr. Clark are unconstitutional on multiple grounds, run afoul of congressional rules and historical precedent, and are abusive, unfair, and appear designed to head to a predetermined outcome. The Committee has refused to even consider narrowing the scope of testimony to the proper boundaries of its jurisdiction, to allow the pending *Trump v. Thompson* case to run its course so that it can at least inform the applicability of any applicable privileges (including executive privilege), or to proceed by way of written questions. Instead, the Committee has demonstrated at all times an unalterably closed mind, culminating in issuing a tweet at 1:52 PM yesterday announcing that a meeting would be held at 7:00 PM tomorrow to vote on a

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 2

report holding Mr. Clark in contempt and recommending referral to the Department of Justice for prosecution for criminal contempt. This was followed by a reporter's tweet *two minutes later* with an image of what appeared to be a press release announcing the meeting. And only one minute after that reporter's tweet was issued, a *Politico* story was posted to the web that could not possibly have been written, edited, and internally reviewed so soon after the Committee's tweet. *See* Betsy Woodruff Swan, *Jan. 6 Investigators Prepare to Hold Former Trump Admin Official in Contempt*, POLITICO (Nov. 29, 2021), *available at* https://www.politico.com/news/2021/11/29/jan-6-investigators-523456 (Attachment A) (bearing a *1:55 pm time stamp*). In your haste to publicly flay Mr. Clark, you did not even respond before sending out the Committee's tweet yesterday to either of our two weighty letters from yesterday morning before releasing that tweet (instead prioritizing giving advance warning and explanation on background to the press), other than Mr. Heaphy briefly acknowledging receipt later that afternoon.

This letter divided into two parts: (1) a catalogue of the legal problems with how the Committee has proceeded and continues to proceed as set forth in my previous correspondence; and (2) support for Fifth Amendment invocation.

LEGAL ISSUES

Our correspondence has described a number of profound legal defects afflicting the Committee's pursuit of Mr. Clark. They are listed below. We reserve any other applicable legal arguments not listed below.

**1. The Committee Has No Authority to Take Depositions.** As explained in my letter of November 29, 2021, the Committee as presently constituted cannot comply with either its enabling resolution, H. Res. 503, or the Rules of the House regarding the use of deposition authority, and certainly has not done so in the case of Mr. Clark. Those rules unambiguously require consultation with and participation by a duly constituted and appointed ranking minority member and their duly appointed minority counsel. The Committee has no such ranking minority member and moreover implicitly concedes the point in that it does not even purport to have a ranking minority member. *See* my letter of November 29, 2021, regarding deposition authority, pp. 1-9. Today, you sent another letter and all it does is assert, conclusorily, that "both the deposition of Mr.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 3

Clark and the transcript review process were conducted in full compliance with the House's deposition rules and regulations." Thompson Letter, at 1 & n.1 (Nov. 30, 2021). But your letter of today makes no attempt at all to grapple with the serious legal arguments I advanced in my November 29 letter. The Committee rushes onward nonetheless, heedless of any legal restraints on its composition or authority.

Nor does the composition of the Committee conform with its enabling resolution, H. Res. 503, Section 2(a), which states that "The Speaker shall appoint 13 Members to the Select Committee, *5 of whom shall be appointed after consultation with the minority leader.*" (Emphasis added). That requirement was simply swept aside by the Speaker. The Committee has only two members of the minority party, neither of whom were appointed in consultation with the Minority Leader. It is crystal clear that the January 6 Committee is not a properly composed Committee.

As for the upcoming vote on whether to refer Mr. Clark for criminal contempt, the law is clear that no such prosecution may be had where the Committee has failed, as here, to follow its own rules. *Yellin v. U.S.*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution of in Yellin's case meticulously. It is not too exacting to require that the Committee be equally meticulous in following its own rules"); *Christofel v. U.S.*, 338 U.S. 84, 90 (1949) ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."); *U.S. v. Reinecke*, 524 F.2d. 435 (D.C. Cir. 1975) (same).

**2. Separation of Powers.**

A. You were quoted in *Politico* on November 9 saying "and we'll let the evidence based on what we look at determine guilt or innocence." Obviously, however, no congressional committee wields constitutional authority to "determine guilt or innocence." Similarly, no committee has authority to issue or enforce subpoenas to carry out such a flagrantly unconstitutional purpose. *See* my letter of November 12, p. 1.

B. In historical context, this is no surprise. As James Madison explored, legislative bodies tend to constantly push their powers beyond legitimate boundaries:

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 4

> The legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex. The founders of our republics have so much merit for the wisdom which they have displayed, that no task can be less pleasing than that of pointing out the errors into which they have fallen. A respect for truth, however, obliges us to remark, that they seem never for a moment to have turned their eyes from the danger to liberty from the overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority. They seem never to have recollected the danger from legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations.

Federalist No. 48 (Feb. 1, 1788).

Madison notes that the Constitution's new, American version of the separation of powers is the only means for constraining legislative bodies from abusing their power:

> TO WHAT expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several departments, as laid down in the Constitution? The only answer that can be given is, that as all these exterior provisions are found to be inadequate, the defect must be supplied, by so contriving *the interior structure of the government* as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places.

Federalist No. 51 (Feb. 8, 1788) (emphasis added).

Madison then summarizes the various structural restraints to protect the President and the Judiciary from Congress abusing its power relative to the first two branches. In the midst of this explanation, Madison clarifies that preservation of the Constitution in practice requires Presidents and Justices to protect their institutions against the tendency in which the Legislative Branch will indulge to abuse its powers:

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 5

> Ambition must be made to counteract ambition. The interest of the man
> must be connected with the constitutional rights of the place. It may be a
> reflection on human nature, that such devices should be necessary to
> control the abuses of government. But what is government itself, but the
> greatest of all reflections on human nature? If men were angels, no
> government would be necessary. If angels were to govern men, neither
> external nor internal controls on government would be necessary. In
> framing a government which is to be administered by men over men, the
> great difficulty lies in this: you must first enable the government to control
> the governed; and in the next place oblige it to control itself.

*Id.*

This language was widely quoted by constitution-makers in Eastern Europe after
the fall of the Soviet Union. By following former President Trump's instruction, Mr.
Clark is vindicating the separation of powers. What this Committee appears to construe
as contempt of Congress is actually a heroic defense, at great personal and financial
cost, of the Constitution.

C. The Committee's subpoena and nearly all the topics of intended inquiry
invade executive privilege, which rests on the separation of powers. The Committee
seeks to question Mr. Clark about his communications with senior Department of
Justice officials and the President himself that, all else being equal, are unquestionably
within the scope executive privilege. The legal issue at hand goes to defining the
contours of that privilege in the present context, a matter that is currently in direct
litigation between the Committee and President Trump before the D.C. Circuit, and
which is very likely headed for the Supreme Court. I have pleaded with the Committee
to wait until that litigation has been concluded to revisit the permissible scope of
inquiry with Mr. Clark. But the Committee has consistently refused to do so, forcing Mr.
Clark, in a grotesquely unfair manner, to choose between violating his professional
obligations to comply with President Trump's invocation of his privileges on the one
hand and being held in contempt and possibly prosecuted on the other. This vendetta
against Mr. Clark violates his constitutional rights and the Committee's constitutional

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 6

duty to pursue accommodation rather than conflict in matters of executive privilege. *See* my letter of November 5, 2021, pp. 8-10 and my letter of November 12, 2021, p. 3.

D. The Committee refuses to recognize that President Trump has instructed Mr. Clark to assert executive and other applicable privileges. It simply refuses to recognize the plain text of the letter from President Trump's then-counsel, former Representative Doug Collins, of August 2, 2021, the subsequent triggering of the conditions set forth in that letter by the Committee's issuance of subpoena to President Trump's closest advisors, or the positions taken by President Trump in his direct lawsuit against the Committee. *See* my November 5, 2021 letter, pp. 2-7; November 12, 2021 letter pp. 2-3; Memo of November 12, pp. 4-5. The Committee refuses to allow that litigation to conclude, even as it proceeds on an accelerated timetable. Instead, the Committee is hell-bent on holding Mr. Clark in contempt without regard to law, process, tradition, or its constitutional duty of accommodation in matters of executive privilege.

E. The Committee contends unreasonably that Mr. Clark is inexorably bound by President Biden's purported waiver of President Trump's executive privilege, though that very question is at the core of the currently pending *Trump v. Thompson*. Even in the context of an extremely deferential facial challenge to the statute in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Court recognized that a former President of necessity retains rights of executive privilege. The Court did not purport to delineate how an as-applied dispute over conflicting claims of privilege and waiver between a former and current President would be resolved. As Justice Powell observed, "the difficult constitutional questions lie ahead." 433 U.S. at 503. The Committee's position ignores cautions voiced in Justice Blackmun's concurrence, 433 U.S. at 491, and the dissents of Chief Justice Burger, 433 U.S. at 519-520, and Justice Rehnquist, 433 U.S. at 556, that for executive privilege to serve the Presidency and the incumbent President, it must apply as well to the former President after he leaves office. Sometimes presidential transitions are hostile. At present, President Trump is the strongest and most likely opponent to President Biden's re-election and so the political expedience of the purported waiver is clear. The institutional and constitutional nature of executive privilege preclude it being interpreted to countenance a politically motivated, tit-for-tat waiver by each succeeding administration of the previous administration's executive

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 7

privilege. This would open a Pandora's box that would hamstring effective functioning of the executive branch, including the current administration of President Biden. *See* my letter of November 5, pp. 10-11.

F. The Committee relies on a letter to Mr. Clark from DOJ dated July 26, 2021, contending that the letter conclusively waives executive privilege with respect to its inquiry. The text of this letter cannot bear the Committee's wishful reading. *First*, the letter makes no reference to the January 6 Committee, and thus does not waive any privilege as to the Committee. *Second*, even if it did, the time frame as to which the privilege is purportedly waived in that letter is far narrower and shorter than the time frame set forth in the Committee's subpoena to Mr. Clark. This is a fundamental mismatch that renders untenable the Committee's reliance on that letter as opening up an inquiry of whatever time range it defines. When it comes to purported waivers of executive privilege, the Committee's reach exceeds its grasp.

### 3. Due Process Violations

A. You as Chairman claim authority to rule on our objections to your own subpoenas. Separation of powers and the Due Process Clause do not permit you to serve as both prosecutor, judge and jury. *See* my letter of November 12, 2021, p. 2.

B. You prejudged our objections, rejecting them out of hand on the afternoon of November 5, 2021, only later concocting a series of *post hoc* rationalizations for a decision already made before any analysis of our objections had been undertaken. *Id.* Once we were able to review the deposition transcript, which you have furnished to us, your fatal prejudgment became clear. Worse yet, until we first saw a draft of the transcript on November 23, we did not know that you held *two sessions* on November 5 that were transcribed (the second of which is where your ruling on our November 5 objections occurred) *without either me or Mr. Clark being present*. As I previously pointed out in my November 29, 2021 letter regarding deposition transcript, pp. 1-2, that is the Star Chamber reborn.

C. You and the Committee approach this matter with unalterably closed minds, evidenced by the full sweep of the offenses against fairness, logic, and the law

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 8

catalogued in this letter and my prior correspondence, as well as a multitude of other statements and actions by you and other members of the Committee. *See* my email of November 5, 2021, and my letters of November 12, p. 2; my Memo of November 12, pp. 1-2; and my letter of November 29, regarding review of the deposition transcript, p. 4.

D. You directed us at 4:30 PM on November 5 to appear at 4:00 PM on November 5, and would hold Mr. Clark in contempt for being unable to travel backward in time. *See* my November 12, 2021 letter at p. 2.

E. The Committee claims unbounded jurisdiction. The Committee claims authority to inquire into any election-related matter going all the way from April 2020 to the day of the response to the subpoena. This claim rests on the idea that the events of January 6 at the Capitol were caused by or arose from persons harboring or expressing concern over or skepticism towards the integrity of the November 2020 election. The First Amendment, to say nothing of the demands of mere rationality, stand in the way of such a grandiose conception of the Committee's investigative authority. The January 6 Committee cannot be allowed to become a roving commission to investigate and punish those holding what you regard as impure thoughts about the election or that trench on your view of what is politically correct or out of line with a "well-established" mainstream media narrative you happen to embrace. *See* my November 12, 2021 letter, pp. 4-5.

This legal, logical, and causal disconnect is especially stark in the case of Mr. Clark. He had nothing to do with the events of January 6. There is no logical or causal connection whatsoever between anything he did or did not do regarding the election—all of which was completely unknown to the public on January 6 or before—and the actions of those who entered the Capitol. *Id*. Assuming, purely for the sake of argument, that *New York Times* stories in late January 2021 based on anonymous leaks have some accuracy, the entire kerfuffle about Mr. Clark and the election is over a letter that was never sent.

In any event, Mr. Clark, like every American, is entitled by the First Amendment to freedom of thought (and, within the walls of the White House and the Justice Department, to freedom of speech as well) regarding the election. Accordingly, he

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 9

cannot constitutionally be required to answer to the Committee or any other government body for his views on the topic. This is the United States of America.

F. Assuming for the sake of argument that, despite the various privilege objections I have asserted, the Committee is authorized to inquire into Mr. Clark's election-related work at the Department of Justice, the Committee and the Department have combined to deny him the opportunity to review DOJ election-related investigative files and other materials needed in his preparation. *See* my November 12, 2021 letter, p. 2. Yet DOJ's July letter seems curiously aggressive about protecting from disclosure its actions or inactions concerning investigating election irregularities.

As one example, DOJ denied Mr. Clark access to the classified ODNI materials he reviewed relating to an analysis of foreign influence or interference in the election, as well as his related January 2, 2021 classified conversation with DNI Ratcliffe, based on the assertion by DOJ that the Committee was *not* interested in that topic. But Mr. Heaphy indicated on November 5, again while we were not present, that he *did intend* to ask about that topic. *See* my November 12 letter, pp. 3-4 & n. 5; November 29, letter, pp. 6-7 & n. 5. That contradiction is glaring. Additionally, in order to respect and observe Mr. Clark's due process and right to counsel protections, I must be allowed to review those materials as well, in accord with the Fifth *and* Sixth Amendments to the Constitution.

G. The Committee has time and again persisted in mischaracterizing our position as asserting a blanket refusal to testify on any topic. One of us has corrected the Committee on this point in nearly every one of our communications with the Committee, which collectively conclusively refute the Committee's attempts to restate that position to its liking. *See* my letter of November 5, p. 12; my November 12 letter p. 4; my Memo of November 12, p. 13; my November 29 letter regarding deposition authority, pp. 9-11. We have *repeatedly* sought a narrowed scope of testimony and have offered to testify on two topics that do not implicate executive privilege. The Committee is thus creating a knowingly fake narrative as a pretext for holding Mr. Clark in contempt. This is particularly true in light of breaking news that former White House Chief of Staff Mark Meadows has reached an arrangement to inquire into a limited set of topics that appear not to involve executive privilege. *See* Annie Grayer, *et al., First on*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 10

*CNN: Meadows Cooperating with January 6 Investigators*, DAILY MAIL (Nov. 30, 2021),
*available at* https://edition.cnn.com/2021/11/30/politics/mark-meadows-january-6-
committee/index.html. The story hints that the difference in treatment goes to a feeling
by someone on the Committee that he or she can "tell the difference between someone
who is stalling or faking," *id.*, and someone who is not, apparently placing Mr.
Meadows in the latter category. With due respect, I have provided you with extensive
legal analysis and at no time have ever said that my willingness to allow Mr. Clark to
discuss a limited set of topics was a "final offer." None of that constitutes "stalling" or
"faking." The legal objections are presented in good faith and the invitation to negotiate
on topics was offered in good faith. And in this regard it is important to note that at no
point has the Committee itself ever made any form of offer to narrow its cornucopia of
topics. It instead has insisted on *all topics*—and we were not even aware of that list of
topics (since it was put on the record without us being present) until November 23
when we first saw the transcription of a previously secret session where neither me nor
my client were present.

The Committee has thus itself established that it is an instrumentality of partisan
and ideological combat against its political enemies and not a legitimate or lawful
congressional investigation. Mr. Clark and his legal and constitutional rights cannot be
allowed to become casualties of the Committee's irrational quest to press the endless
attack on former President Trump or to give itself a stump issue for the 2022 midterms.

FIFTH AMENDMENT

In the face of this ongoing abuse by the Committee, the growing roar of a
madding crowd seeking Mr. Clark's prosecution and destruction over a letter never sent
(again, referencing the anonymously sourced *New York Times* stories for the sake of
argument), and the politicization of the current Department of Justice, I have advised
Mr. Clark to assert his rights against self-incrimination under the Fifth Amendment.[1]

---

[1] In footnote 1 of my letter of November 5, 2021, I stated "We also reserve all of Mr. Clark's individual
rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as
executive privilege and related privileges should be a sufficient threshold ground not to testify in

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 11

There is something of a cultural revolution underway in our country. The Committee has joined that effort, attempting to control thought and to punish those who dissent, and trying to enforce ideological conformity, by one means or another. We are seeing the equivalent of struggle sessions to compel a public confession of faith in a dogmatic view of the 2020 election. We have seen careers ruined, and families and friendships ruptured. The Constitution, especially the Bill of Rights, and most especially the Fifth Amendment, were designed from the outset to protect our liberty against such encroachments and excesses, as may from time to time threaten to sweep away reason and justice. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Thus, it is elementary that the Fifth Amendment equally protects the innocent, especially in situations like this one:

> The privilege against self-incrimination is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution—and the necessities for its preservation—are to be found in the lessons of history. As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately in 1791 into the federal Bill of Rights. The privilege, this Court has stated, 'was generally regarded then, as now, as a privilege of great value, *a protection to the innocent* though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions.

---

response to the subpoena as it is currently framed." At p. 12 of the same letter, referring back to that footnote, I said "for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances. *See supra* n. 1." My Memo of November 12, 2021, states in footnote 1 "This Memo reminds you and the Committee of the same reservations of rights stated in my November 5, 2021 letter to you. To economize on words, I will not restate those reservations here."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 12

*Quinn v. United States*, 349 U.S. 155, 161-162 (1955) (citations omitted) (emphasis added).

Accordingly, Mr. Clark's invocation of his Fifth Amendment rights can and should in no way be construed or depicted as supporting an inference of guilt or wrongdoing on his part. It is instead his constitutional refuge against the media-hyped hysteria surrounding the events of January 6.

The threat of a Committee vote to hold Mr. Clark in criminal contempt, particularly given the record of this matter, supplies all the justification needed to support the invocation of Mr. Clark's Fifth Amendment rights. Moreover, there has been a chorus of voices calling for Mr. Clark's criminal prosecution (and disbarment):

- Lawrence Tribe, Barbara McQuade and Joyce White Vance, *Here's a Roadmap for the Justice Department to Follow In Investigating Trump*, Wash. Post (Aug. 5, 2021), suggesting conspiracy to defraud the United States, obstruction of the electoral count, obstruction of an official proceeding, RICO, voter fraud, violation of the Hatch Act, inciting insurrection and seditious conspiracy as plausible theories for prosecution. *Available at* https://www.washingtonpost.com/opinions/2021/08/05/heres-roadmap-justice-department-follow-investigating-trump/.

- Lawrence Tribe and Dennis Aftergut, *What Does Jeffrey Clark Have to Hide — And What Are Congress and AG Garland Going To Do About It?*, urging prosecution of Mr. Clark for criminal contempt. *Available at* https://thehill.com/opinion/judiciary/580643-what-does-jeffrey-clark-have-to-hide-and-what-are-congress-and-ag-garland?amp;

- Glenn Kirschner, *DOJ Officials Thwarted Trump's Coup. Next Step: A Criminal Investigation*. *Available at* https://www.msnbc.com/opinion/doj-officials-thwarted-trump-s-coup-next-step-criminal-investigation-n1276610?cid=eml_mda_20210812&user_email=990c6d84822b8256bd81680 2c8af5bf571a92069ce45a25cd044407010e9260f;

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 13

- Rep. Thompson, joined by nine other members of the House, sued President Trump and others, alleging they unlawfully "conspired to incite an assembled crowd to march upon and enter the Capitol of the United States …." *Thompson et al v. Trump et al.*, Case No. 1:21-cv-0400-APM (D.D.C.), Doc. 11-1, p. 1, ¶ 1.

- Rep. Swalwell filed suit against President Trump and others, alleging they incited a violent attack on the Capitol. *Swalwell v. Trump, et al.*, 1:21:-cv-00586-APM (D.D.C.) Doc. 1.

- Rep. Raskin, appearing on the Dean Obeidallah Show, referring to President Trump, said "[Y]ou're right, he's not been criminally charged for it yet. But we're perfectly willing to turn over evidence of criminal acts to the Department of Justice." (This remark also reveals Representative Raskin misconceiving Congress's role and trenching into Executive Branch powers.) *Available at* https://www.mediaite.com/radio/jamie-raskin-commission-investigating-pro-trump-insurrection-is-turning-over-evidence-of-criminal-acts-to-doi/ (where Rep. Raskin also concedes that, as to former President Trump, the issue was ***already adjudicated*** in a Senate impeachment trial ***and Rep. Raskin, as House impeachment manager, lost that case***).

Further examples can be collected, but the point is clear enough—Mr. Clark has a reasonable basis for believing that his testimony before the Committee would be used against him in a criminal prosecution and is therefore entitled to assert his privilege against self-incrimination under the Fifth Amendment.

Mr. Clark's Fifth Amendment rights extend to shield him from compelled production of documents or a privilege log. "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. *Fisher v. United States,* 425 U.S. 391, 410 (1976); *United States v. Doe*, 465 U.S. 605, 614, n.13 (1984); *United States v. Grable*, 98 F.3d 251, 254 (6th Cir. 1996), *cert. denied*, 519 U.S. 1059, (1997). The same is true of a privilege log. *SEC v. Coldicutt*, 2017 U.S. Dist. Lexis 88401 (C.D. CA 2017) ("involuntary act of producing a

C ALDWELL,  C ARLSON,
E LLIOTT  &  D E L O A C H ,  LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 14

more detailed privilege log could have a testimonial aspect."). Therefore, we decline on
Fifth Amendment grounds to deliver a privilege log.

The events of January 6 should be investigated thoroughly. Yet the Committee's
actions as described herein – pursuit of privileged matters far beyond that question, its
consistent pattern of aggressively mischaracterizing our position, trampling on
elementary due process rights, and refusing to seek any reasonable accommodation of
the institutional and individual interests and rights at stake in this matter – combine
with the other surrounding circumstances to create a reasonable apprehension sufficient
to warrant invocation of the Fifth Amendment right against self-incrimination. As noted
above, we are pleased to learn that you have reached some sort of accommodation with
Mark Meadows regarding testimony on topics that do not implicate executive privilege
and so are left to wonder why you are not willing to do so for Mr. Clark, subject to an
agreement that doing so does not waive any privileges, including those under the Fifth
Amendment.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:    Jeffrey Bossert Clark

**DCCA No. _____**

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

_____
                                          :
**In the Matter of**                      :
                                          :
**CONFIDENTIAL (J.B.C.), ESQ.**     :     **Disciplinary Docket No. 2021-D193**
                                          :
   **Respondent,**         :
                                          :
**A Member of the Bar of the District** :
  **of Columbia Court of Appeals.** :
_____          :

## DISCIPLINARY COUNSEL'S MOTION
## FOR LEAVE TO FILE UNDER SEAL

**COMES NOW** the Office of Disciplinary Counsel, by Disciplinary Counsel

and the undersigned Assistant Disciplinary Counsel, pursuant to D.C. Bar R. XI, §

17(a), for leave to file the attached _Motion to Enforce Subpoena Duces Tecum_, with

exhibits, under seal to preserve the confidentiality of the above-captioned

disciplinary proceeding.

Disciplinary Counsel has docketed an investigation of Respondent's conduct.

D.C. Bar R. XI, § 17(a) states, in pertinent part:

> [A]ll proceedings involving allegations of misconduct by an
> attorney shall be kept confidential until either a petition has been
> filed under § 8(c) or an informal admonition has been issued.

**Exhibit D**

In support of the attached *Motion to Enforce Subpoena*, Disciplinary Counsel includes the subpoena at issue and other documents that reveal the identity of the attorney under investigation.   By placing this matter under seal, Respondent's identity will be protected, and the confidential nature of the investigation will be preserved.

WHEREFORE, Disciplinary Counsel respectfully requests that the court grant this motion.

Respectfully submitted,

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel
Bar Registration No. 113050

/s/ Jason R. Horrell_____
Jason R. Horrell
Assistant Disciplinary Counsel
Bar Registration No. 1033885

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
202-638-1501

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of February, 2022, I caused a copy of the foregoing *Disciplinary Counsel's Motion for Leave to File Under Seal* to be served on the District of Columbia Court of Appeals Clerk of Court by email to OOluyemi@dcappeals.gov, and that copies were sent to Respondent's counsel, Harry W. MacDougald, Esq., by email to hmacdougald@CCEDlaw.com, and by first-class U.S. mail to:

> Harry W. MacDougald, Esq.
> Caldwell, Carlson, Elliott & DeLoach, LLP
> Two Ravinia Drive, Suite 1600
> Atlanta, GA 30345

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III

3

**UNDER SEAL**

**DCCA No. _____**

**DISTRICT OF COLUMBIA
COURT OF APPEALS**

| | |
|---|---|
| In the Matter of : | |
| : | |
| CONFIDENTIAL (J.B.C.), ESQ. : | **Disciplinary Docket No. 2021-D193** |
| : | |
| Respondent, : | |
| : | |
| A Member of the Bar of the District : | |
| of Columbia Court of Appeals. : | |
| Bar Number: 455315 : | |
| Date of Admission:  July 7, 1997 : | |
| : | |

## DISCIPLINARY COUNSEL'S MOTION TO
## ENFORCE SUBPOENA *DUCES TECUM*

Disciplinary Counsel moves the Court, pursuant to D.C. Bar Rule XI, § 18(d), for an order enforcing a subpoena *dues tecum* and compelling Respondent, Jeffrey B. Clark, Esquire to produce certain documents set forth in the attachment to the subpoena.

As grounds for the motion, Disciplinary Counsel states the following:

1.    On October 7, 2021, Senator Richard Durbin, the Chair of the U. S. Senate Committee on the Judiciary, forwarded a Majority Staff Interim Report of

1

that Committee to the Office of Disciplinary Counsel, calling its attention to the conduct of Respondent Jeffrey B. Clark, a member of the D.C. Bar.

2.    The Report alleged that on December 28, 2020, Mr. Clark, who was serving as the Acting Assistant Attorney General for the Civil Division of the United States Department of Justice, forwarded a draft letter to Acting Attorney General Jeffrey Rosen and his deputy, Richard Donohue, and sought their authorization to send it to the governor of Georgia and certain other Georgia state officials.  The letter asserted that the Department of Justice had taken notice of certain irregularities in the November general election that called for a special session of the Georgia legislature to be convened.  Mr. Donoghue was monitoring Department of Justice investigations into allegations of election irregularities and had been briefing Mr. Rosen on those matters.  Mr. Rosen and Mr. Donoghue refused to authorize sending Mr. Clark's letter, in part because they were unaware of any suspicion of misconduct that would affect the outcome of the presidential election, as represented in the letter. Mr. Clark initially accepted this decision, but several days later, he revived the idea of sending his proposed letter.  He informed Mr. Rosen that the President was prepared to appoint Mr. Clark to replace Mr. Rosen as Acting Attorney General, but that he, Mr. Clark, would not accept the position if Mr. Rosen would send the letter. In a subsequent meeting with the President, at which Mr. Rosen and Mr. Donoghue

were present, Mr. Clark promised that he would send the letter if he were appointed Acting Attorney General.

3.      After reviewing the Report, Disciplinary Counsel docketed an investigation to determine whether Mr. Clark was attempting to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, or conduct that seriously interferes with the administration of justice, in violation of Rules 8.4(a), (c), and (d), by advocating the sending of the letter to the Georgia officials even though there was no evidence of election irregularities that would have affected the outcome of the election.

4.      On October 18, 2021, Disciplinary Counsel informed Mr. Clark, through his then-counsel, that he had docketed an investigation, forwarded the Report and other materials to him, and requested a written response.  Disciplinary Counsel also forwarded a subpoena *duces tecum* to Mr. Clark's counsel.  Responses were due on November 8, 2021.

5.      By agreement with counsel for Mr. Clark, and in light of the pandemic, these papers were forwarded electronically.

6.      For some unknown reason, these documents were not received by Mr. Clark's counsel, which Disciplinary Counsel learned when he inquired on November 9, 2021.  Mr. Clark's initial counsel also informed Disciplinary Counsel that he no

longer represented Mr. Clark and advised Disciplinary Counsel to contact Mr. Clark directly.

7.    On November 22, 2021, Disciplinary Counsel resent electronically the letter and subpoena to Mr. Clark directly, with a return date of December 13, 2021. Exhibit A.  (Exhibit A does not include the Report and the attached exhibits to that Report.)

8.    Mr. Clark was unable to respond by December 13 for a variety of reasons:  he became ill, there was some technical difficulty in transmitting all the materials, and he was seeking new counsel.

9.    The technical difficulties were resolved at least by January 6, 2022, and Disciplinary Counsel insisted on a response during the month of January.  Mr. Clark agreed to respond by 5:00 pm on January 31, 2022.  Exhibit B.

10.    Toward the close of business on January 28, 2022, the last business day before the responses were due, Mr. Clark's current counsel informed Disciplinary Counsel by telephone that Mr. Clark would assert his Fifth Amendment privilege against self-incrimination to the production of the subpoenaed documents.  This was the first time either Mr. Clark or his counsel had given any indication that he did not intend to comply with the subpoena.

11.    On January 31, 2022, Mr. MacDougald transmitted a letter (Exhibit C), asserting the privilege against self-incrimination, pursuant to the act of production

doctrine, and refusing to produce any of the subpoenaed documents. He also suggested that some of the materials might be subject to executive privilege and that the subpoena had been improperly served. Mr. Clark also asserted the privilege "in response to the . . . allegations (dated November 22, 2021)," which Disciplinary Counsel understands to mean that he is refusing to comply with Board Rule 2.8 requiring that respondents set forth their position with respect to allegations in the complaint or other documents on which the investigation is based.

## ARGUMENT

The Fifth Amendment privilege against self-incrimination applies to compelled incriminating testimony, but does not protect the contents of pre-existing, voluntarily prepared documents. *Fisher v. United States*, 425 U.S. 391, 408-9 (1976). A limited exception to that general proposition is the act of production doctrine, which recognizes that the compelled production of evidence may have communicative aspects of its own separate from the contents of papers produced. *Id*. at 410. A party invoking the act of production doctrine has the burden of proof. *See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) (stating that "[i]t is well established that the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability"). Furthermore, the "basis of a privilege must

be adequately established in the record through evidence sufficient to establish the privilege with reasonable certainty." *Id.* at 750-51 (cleaned up).

The act of production exception is generally invoked in response to a subpoena for personal records when producing the documents would admit that they existed, were in the possession or control of the witness, were authentic in the sense that they were the witness's actual records, and were responsive to the subpoena. *United States v. Hubbell,* 167 F3d 552, 567-68 (D.C. Cir. 1999), *aff'd* 530 U.S. 27 (2000). If the documents would incriminate the witness, the act of production serves as a link in the chain between the incriminating evidence and the witness: these incriminating documents are my documents, and they are what they purport to be. *See generally*, *In re Public Defender Service*, 831 A.2d 890, 912-13 (D.C. 2003).

In order for the Fifth Amendment privilege to apply to the act of production, there must be compulsion, such as a subpoena; the production must constitute testimony, *i.e.,* these documents exist, are authentic, and are in the possession of the witness; and the testimonial linkage to the documents must have an incriminating effect. *Hubbell* at 567. An incriminating effect requires the party claiming the privilege to show that by producing the documents there are "substantial and 'real,' not merely trifling or imaginary hazards of incrimination." *Hubbell* at 581; *see also United States v. Schmidt*, 816 F.2d 1477, 1482 (10th Cir. 1987) (holding that a "generalized fear of criminal prosecution" was an "insufficient basis for asserting a

blanket claim of Fifth Amendment privilege in refusing to produce any of the documents requested").    Whether compelled production is testimonial, and incriminating depends on the facts and circumstances of the particular case.  *Public Defender Service* at 913.

While there is no question that production would be compulsory in this case, there is no incrimination; the type of documents at issue in no way incriminate Mr. Clark nor does their production have an incriminating effect.  It is hardly necessary to point out that Disciplinary Counsel has no authority to investigate or bring a criminal case and hence production to Disciplinary Counsel cannot directly incriminate Mr. Clark.  Nor in his letter asserting the privilege (Exhibit C) did Mr. Clark's counsel assert that Mr. Clark is even the subject, much less the target, of any criminal investigation.  Nor does the letter specify what criminal charges Mr. Clark might realistically be subject to.  The closest he comes to specifying a possible criminal charge is a dialogue between a reporter and lawyer, who is not a prosecutor, and who invoked as a possible violation, 18 U.S.C. § 610.  *See* Exhibit C at 7.  That statute prohibits a person from attempting to intimidate, command, or coerce a federal employee to engage or not engage in political activity such as voting or making a political contribution or working on a campaign—activities that no one has alleged are involved here.  At one other point, he cites to an editorial in which three law professors argue that members of former President Trump's inner circle,

not mentioning Mr. Clark by name, might be investigated for obstructing an official proceeding (Exhibit C at 8), which is presumably a reference to the January 6 riot and is entirely divorced from the allegations under investigation. Moreover, the citations to these statutes is preceded by the statement that, "we stoutly deny that Mr. Clark has committed any criminal acts . . . ." Exhibit C at 6.

Mr. Clark's generalized fear of potential prosecution based on opinions made in popular media by, in his attorney's words, "partisan pundits and legal commentators trying to dream up theories upon which he might be criminally prosecuted" (Exhibit C at 6), cannot support his invocation of the Fifth Amendment. The letter invoking the privilege (Exhibit C) in no way attempts to show how, by providing the subpoenaed documents, Mr. Clark would be providing testimony that would constitute evidence against him for the violation of 18 U.S.C. §§ 610, 1512, or any other criminal statute. Exhibit C at 2-4, sets forth, accurately, five categories of documents called for by the subpoena:

- Documents of which Mr. Clark was aware of before January 4, 2021 that contain evidence of irregularities in the 2020 presidential election that may have affected the outcome in Georgia or any other state;

- Specifically identifying documents that came to his attention following the December 1, 2020 announcement by the Attorney General that the

Department had found no evidence of fraud that might affect the outcome of the election;

> • Any file that Mr. Clark maintained relating to his efforts between November 3, 2020 and January 4, 2021 to persuade Department of Justice officials to intervene in the certification of election results by any state, including Georgia;

> • Any legal research he conducted before January 4, 2021 relating to the authority of the Department to intervene in a state's election certification process;

> • All written Department policies and guidelines of which he was aware that were in effect between November 3, 2020, and January 4, 2021 relating to contacts between Department employees and the White House.

None of these materials will incriminate Mr. Clark if they are produced, which is undoubtedly the reason he made no effort to specify how they would do so. How could it possibly incriminate him to produce evidence of election fraud or authority for the conduct that he was urging his superiors to take? These documents and their production could not possibly prove Mr. Clark coerced a federal employee with respect to election activities or obstructed an official proceeding. This is far removed from the situation in *Hubble*, where a criminal defendant was required to produce to the grand jury personal financial records which established his income tax evasion, or in *Public Defender Service*, where a grand jury subpoena, if complied with, might

have linked the defendant to a coerced witness statement—and in both of those cases, rather than uphold a plausible assertion of the privilege, the courts remanded the cases for further evidentiary proceedings to develop the facts. Mr. Clark has not even made the theoretical linkage between the act of producing the documents at issue and any crime, much less the linkage that proved inadequate in both *Hubble* and *Public Defender Service.*

The letter from counsel invoking the Fifth Amendment also suggested that some of the subpoenaed information was protected by executive privilege and that the subpoena may not have been properly served. None of the materials requested in the subpoena asks for communications between Mr. Clark and former President Trump. Surely not all of them are so privileged, so at a minimum Mr. Clark must provide some specification of the materials he claims are. Moreover, this is not Mr. Clark's privilege to assert, and no one in possession of the privilege has asserted executive privilege in this disciplinary matter.

As to service, Mr. Clark's initial counsel agreed to accept electronic service, which most people are doing during the pandemic. There were technical problems in effecting service, but Mr. Clark received some of the materials in December 2021 and all of them by January 6, 2022. Exhibit B. Mr. Clark did not object to electronic service when he was served after his initial counsel withdrew. He has had the subpoena in his possession for at least four weeks—and likely longer since the

transmission problems seem to have been with the voluminous materials received from the Senate Judiciary Committee.  He has made no effort to quash the subpoena pursuant to Rule XI, § 18(c), or explain how he has been prejudiced by the electronic service, to which he made no objection until January 31, 2022.  Raising the prospect of executive privilege and improper service is simply a further effort to delay this investigation.

Wherefore, for the foregoing reasons, Disciplinary Counsel requests that the court order Mr. Clark to comply with the subpoena no later than one week from the issuance of its order.

Respectfully submitted,

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel
Bar Registration No. 113050

/s/ Jason R. Horrell
Jason R. Horrell
Assistant Disciplinary Counsel
Bar Registration No. 1033885

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
202-638-1501

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2022, I caused a copy of the foregoing *Disciplinary Counsel's Motion to Enforce Subpoena Duces Tecum* to be served on the District of Columbia Court of Appeals Clerk of Court by email to OOluyemi@dcappeals.gov, and that copies were sent to Respondent's counsel, Harry W. MacDougald, Esq., by email to hmacdougald@CCEDlaw.com, and by first-class U.S. mail to:

> Harry W. MacDougald, Esq.
> Caldwell, Carlson, Elliott & DeLoach, LLP
> Two Ravinia Drive, Suite 1600
> Atlanta, GA 30345

*Hamilton P. Fox, III*
_____
Hamilton P. Fox, III

DCCA No. _____

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

| | |
|---|---|
| _____ : | |
| In the Matter of : | |
| : | |
| **CONFIDENTIAL (J.B.C.), ESQ.** : | **Disciplinary Docket No. 2021-D193** |
| : | |
| **Respondent,** : | |
| : | |
| **A Member of the Bar of the District** : | |
| **of Columbia Court of Appeals.** : | |
| **Bar Number: 455315** : | |
| **Date of Admission:  July 7, 1997** : | |
| _____: | |

## <u>PROPOSED ORDER</u>

On consideration of Disciplinary Counsel's motion to enforce subpoena *duces tecum*, it is, pursuant to Rule XI, § 18(d) of the Rules Governing the Bar of the District of Columbia,

**ORDERED** that Disciplinary Counsel's motion is granted. It is

**FURTHER ORDERED** that Respondent shall produce all documents and files described in Disciplinary Counsel's subpoena dated November 22, 2021 and shall comply with the terms and conditions of the subpoena within 10 days of the date of this order.

1

BY THE COURT:


**<u>Copies to</u>:**

Respondent's Counsel
Harry W. MacDougald, Esq.
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30345
and via email to <u>hmacdougald@CCEDlaw.com</u>

Hamilton P. Fox, III, Esquire
  Disciplinary Counsel

## DCCA NO. 22-BS-0059

## DISTRICT OF COLUMBIA

## COURT OF APPEALS

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | |

## RESPONSE TO MOTION TO COMPEL AND CROSS-MOTION TO QUASH

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice application in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**Motion for pro hac vice admission in progress*

Exhibit E

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 1

   NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN ............................. 1

   ODC'S ACTIONS TO DATE ............................................................................. 3

ARGUMENT ...................................................................................................... 6

   PROCEDURAL BACKGROUND ........................................................................ 6

     A.   Enforcement of Subpoenas ................................................................. 6

     B.   Standard of Review ............................................................................. 7

     C.   The Subpoena Was Improperly Served and Should Be Quashed. ................. 7

   I.    THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA. ........... 8

     A.   Mr. Clark Properly Invoked the Fifth Amendment. ........................................ 9

     B.   Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine. ............ 11

     C.   Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege ........................................................................ 13

   II.   THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE. ........................................... 14

     A.   28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers. ........................... 15

     B.   Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question. ................................................................................ 19

     C.   There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation ................................................. 19

     D.   Rule 8.4(d) Does Not Apply ........................................................................ 20

   III.   THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED. ........... 21

     A.   Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes. ................................................................................ 22

     B.   Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election. ............................................................................................... 22

     C.   Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General. ............................................................................ 24

     D.   The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects. ....................................................... 25

CONCLUSION ................................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Bond v. United States*, 572 U.S. 844 (2014) ...................................................................... 16

*Branch v. Smith*, 538 U.S. 254 (2003) .............................................................................. 16

*Brooks v. United States*, 448 A.2d 253 (D.C. 1982) ......................................................... 14

*Butler v. United States*, 890 A.2d 181 (D.C. 2006) .......................................................... 10

*Carter v. United States*, 684 A.2d 331 (D.C. 1996) ...................................................... 9, 11

*CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) ................ 8

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ............................................... 16

*District of Columbia v. Carter*, 409 U.S. 418 (1973) ........................................................ 17

*Fisher v. United States*, 425 U.S. 391 (1976) ................................................................... 12

*FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980) ............. 8

*Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963) ........................................ 8

*In re Artis*, 883 A.2d 85 (D.C. 2005) .............................................................. 6, 10, 12, 14

*In re Benjamin*, 698 A.2d 434 (D.C. 1997) ......................................................................... 6

*In re Burton*, 472 A.2d 831 (D.C. 1984) .......................................................................... 11

*In re Confidential*, 701 A.2d 842 (D.C. 1997) ................................................................... 7

*In re Hopkins*, 677 A.2d 55 (D.C. 1996) .......................................................................... 21

*In re Horowitz*, 482 F.2d 72 (2d. Cir. 1973) .................................................................... 14

*In re Pearson*, 228 A.3d 417 (D.C. 2020) ....................................................................... 21

*In re Public Defender Serv.*, 831 A.2d 890 (D.C. 2003) ........................................ 7, 13, 14

*In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078 (E.D.N.Y. 1978) .......... 15

*In re Romansky*, 825 A.2d 311 (D.C. 2003) ..................................................................... 20

*In re Sealed Case*, 116 F.3d 550 (D.C. Cir. 1997) ............................................................. 8

*In re Thorup*, 432 A.2d 1221 (D.C. 1981) ......................................................................... 6

*In re Yelverton*, 105 A.3d 413 (D.C. 2014) ..................................................................... 21

*In the Matter of Shorter*, 570 A.2d 760 (D.C. 1990) ........................................................ 20

*Johnson v. United States*, 746 A.2d 349 (D.C. 2000) ....................................................... 10

*Lefkowitz v. Turley*, 414 U.S. 70 (1973).......................................................................... 9, 10

*Mason v. United States*, 244 U.S. 362 (1917) .................................................................... 9

*McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659
  (Pa. Commw. Ct. Jan. 28, 2022) .................................................................................. 26

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) ......................... 8

*Ohio v. Reiner*, 532 U.S. 17 (2001).................................................................................. 14

*Pulley v. United States*, 532 A.2d 651 (D.C. 1987) ............................................................ 8

*Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) ...................... 24

*Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020)................................................................. 25

*Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021) .......... 26

*United States v. John Does*, 465 U.S. 605 (1984) ............................................................. 12

*Wilson v. United States*, 558 A.2d 1135 (D.C. 1989), *overruled on other grounds*, 684 A.2d
  331 (D.C. 1996) ........................................................................................................... 9

## Statutes

5 U.S.C. § 7323 .................................................................................................................. 11

18 U.S.C § 371 ............................................................................................................ 11
18 U.S.C. § 1512 ......................................................................................................... 11
18 U.S.C. § 1962 ......................................................................................................... 11
18 U.S.C. § 2383 ......................................................................................................... 11
18 U.S.C. § 2384 ......................................................................................................... 11
26 U.S.C. § 170 ........................................................................................................... 18
28 U.S.C. § 506 ........................................................................................................... 15
28 U.S.C. § 509 ........................................................................................................... 16
28 U.S.C. § 510 ........................................................................................................... 16
28 U.S.C. § 515 ........................................................................................................... 16
28 U.S.C. § 516 ........................................................................................................... 16
28 U.S.C. § 517 ........................................................................................................... 16
28 U.S.C. § 519 ........................................................................................................... 16
28 U.S.C. § 533 ........................................................................................................... 16
28 U.S.C. § 547 ........................................................................................................... 16
28 USC § 530B ....................................................................................... 15, 16, 17, 19
28 U.S.C. § 1257 ......................................................................................................... 17
28 U.S.C. § 1927 ......................................................................................................... 17
42 U.S.C. § 1983 ......................................................................................................... 17
42 U.S.C. § 8285a ....................................................................................................... 17
52 U.S.C. § 20511 ....................................................................................................... 11
D.C. Code § 11-944 .................................................................................................... 17
D.C. Code § 23-1330 .................................................................................................. 17
O.C.G.A. § 21-2-385 ............................................................................................ 27, 28
Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ...................................................... 17
Pub. L. 96-132, 93 Stat. 1040 (1979) ........................................................................ 17

**Other Authorities**

OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*
   (Aug. 2, 1985) ......................................................................................................... 15

**Rules**

Board Rule 2.9 ............................................................................................................... 5
Board Rule 3.14 ............................................................................................................. 7
Board Rule 3.15 ............................................................................................................. 7
Board Rule 3.16 ............................................................................................................. 7
Board Rule 4.1 .......................................................................................................... 5, 18
D.C. Bar Rule XI, § 18 ................................................................................................. 6
D.C. Bar Rule XI, § 8 ................................................................................................... 6
D.C. Rules of Professional Conduct 1.2(e) ............................................................... 10
D.C. Rules of Professional Conduct 8.4(c) .................................................. 19, 20, 21
D.C. Rules of Professional Conduct 8.4(d) ............................................................... 21
Fed. R. Civ. P. Rule 45 ................................................................................................. 8
Superior Court Rule 45 ........................................................................................ 6, 7, 8
Supreme Court Rule 47 ............................................................................................... 18
United States Senate, Rule IX ...................................................................................... 2

## Regulations and Preambles

28 C.F.R. § 16.21 ..................................................................................................... 6

28 C.F.R. § 77.2 .............................................................................................. 16, 19

64 Fed. Reg. 19,273 (Apr. 20, 1999) .................................................................. 16

## Constitutional Provisions

U.S. Const., art. 1, § 4, cl. 1 ............................................................................... 25

U.S. Const., art. I, § 5 ............................................................................................ 2

U.S. Const., art. I, § 8, cl. 17 ............................................................................. 17

U.S. Const., art. II, § 1, cl. 2 .............................................................................. 25

U.S. Const., art. II, § 2, cl. 1 .............................................................................. 15

U.S. Const., art. II, § 3 ........................................................................................ 15

U.S. Const., amend V ..................................................................................... passim

## Other References

147 Cong. Rec. H34 (Jan. 6, 2001) ................................................................... 22

151 Cong. Rec. H127 (Jan. 6, 2005) ................................................................. 22

Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016*, DAILY WIRE (Jan. 4, 2021) ................................................. 23

Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee ............................................................................ 22

Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022) ................................................ 10

DOJ Office of Inspector General Press Release, *available at* https://tinyurl.com/2p9ad5tm s

John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022) .............................................................. 28

Li Zhou, 147 *Republican Lawmakers Still Objected to the Election Results After the Capitol Attack: Congress Has Certified President-Elect Joe Biden as the Winner of the Election—But Some Republicans Still Objected*, Vox (Jan. 7, 2021) ......... 24

Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART (Aug. 4, 2021) ................................. 27

Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, BREITBART (Sept. 25, 2021) ................................................................ 27

Rep. Lofgren, YouTube, *available at* https://tinyurl.com/2n6cu36c ....................... 10

*Rep. Raskin Challenges Awarding of Electors*, YOUTUBE (Jan. 8, 2017), *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) ...................................... 23

Trailer, 2000 Mules, https://tinyurl.com/2p86dznj .......................................... 28

Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk ....................................................................... 23

Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, POLITICO (Feb. 11, 2022) ............................... 26

## INTRODUCTION

The Motion to Compel should be denied and the subpoena quashed on three grounds: (1) Respondent Mr. Clark properly invoked his Fifth Amendment rights, *see infra* Section I; (2) the Bar's disciplinary authority does not extend to the preparation of privileged Executive Branch discussion drafts of letters never sent, *see infra* Section II; and (3) investigating and potentially punishing the preparation of confidential, non-public discussion drafts pertaining to a very contentious political dispute, at the behest of a highly partisan member of the opposite party in a rival branch of government, would embroil the Bar in matters far beyond its charter, and pervert the disciplinary process to purely political ends, *see infra* Section III. Oral argument is requested.

## STATEMENT OF FACTS

### NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN

The Office of Disciplinary Counsel ("ODC") began its investigation of Respondent a week after receiving a letter from Senator Richard Durbin, Chairman of the Senate Judiciary Committee. Senator Durbin has no personal knowledge of the matters complained of. At least one other politically motivated complaint was filed by a collection of third-party detractors but was rightly rejected by ODC for lack of personal knowledge, which should similarly have been fatal to the Durbin complaint as well.

Senator Durbin, a partisan opponent of President Trump, here complains about a confidential and privileged discussion draft of a letter calling for more legislative investigation allegedly prepared by Respondent while he was a senior DOJ official about a matter of intense political controversy. The draft was reportedly the subject of vigorous internal privileged and confidential debate involving legal judgment, first among senior DOJ officials including Respondent, and later played out before the President himself and his most senior legal advisors at the White House and DOJ. After considering the letter, the President appears to have decided

against sending it, and so it was never sent. That was the end of the matter, at least until the phalanx of privileges attending the preparation and discussion of the draft—executive, law enforcement, and attorney-client—were all breached via anonymous leaks to the *New York Times*, and it became fodder for the lawfare element of the political witch hunt currently underway against Respondent.

The crux of the allegations are that Respondent made knowingly false statements of fact about possible election anomalies in the never-sent discussion draft of a letter calling for investigation. The allegations of "knowing falsity" rest on the dogged premise that there was no possible good-faith belief that there were any election irregularities sufficient to suggest a state legislature engage in further investigation. But premises do not equal truth; they are just the position of one side in an intense partisan political controversy that evenly divides Americans.

Being evenly balanced between the political parties, Senator Durbin's Senate Judiciary Committee could not issue subpoenas.[1] Senator Durbin's letter to the ODC consequently spoke only for himself, not the entire Committee. ODC has thus taken up a complaint from a single politically motivated member of one branch of government who is trying to weaponize the bar disciplinary process against a senior official (from a rival political party) at an Executive Branch department over a never-sent privileged and confidential discussion draft of a letter calling for more state legislative process. The complaint, the investigation, and any potential punishment are thus all directed not against conduct but against constitutionally protected thoughts and legal advice deemed contrary to the foundational premise upon which the allegations rest.

To proceed further, ODC would have to distinguish among (1) the true state of the facts; (2) individual perceptions of the facts; (3) opinions about the significance of the perceived facts;

---

[1] *See* Rule IX of the Rules of Procedure of the United States Senate, *available at* https://tinyurl.com/36uuee5f (last visited Feb. 15, 2022), a rule with constitutional imprimatur, U.S. Const., art. I, § 5 ("Each House may determine the Rules of its Proceedings ....").

and (4) legal, policy and prudential judgments about what ought to be done or not done in light of the perceived facts. At the time, there were intense controversies attached to each of these four tiers of inquiry. Those controversies still exist and will persist well into the future—just as they still do with respect to the *Bush v. Gore* controversy arising back in 2000.

## ODC's Actions to Date

After docketing Senator Durbin's complaint on October 14, 2021, ODC made immediate resort to a subpoena, bypassing less invasive or aggressive methods of trying to gather information.

ODC's aggression out of the gate stumbled on a series of procedural faults along the way. A first letter purporting to transmit the subpoena to Respondent's former counsel dated October 18, 2021, the so-called "B letter," was never received. *See* Affidavit of Robert A. Driscoll, ¶¶ 4-11 (attached as Exhibit 1). A follow-up "D letter," premised on the lack of any response to the first letter and dated November 9, 2021 and purportedly sent to Respondent's former counsel, was also never received. *See generally* Driscoll Affidavit.

On November 22, 2021, Disciplinary Counsel, Mr. Fox, left a voice mail for Respondent's former counsel saying that no response had been received to either letter and that a motion to compel would be filed that day or early the next morning. *See id*. at ¶ 6. The former counsel, Mr. Driscoll, immediately returned the call and informed Mr. Fox that he had never received anything from him and that he no longer represented Mr. Clark. *See id*. at ¶ 7. Mr. Driscoll then double-checked all incoming email systems including filters and regular mail and confirmed that nothing had been received from Mr. Fox, and so informed Mr. Fox. *See id*. at ¶ 8-9.

Importantly, Mr. Fox never mentioned or discussed a subpoena with Mr. Driscoll, and Mr. Driscoll never made any agreement to accept service of the subpoena on behalf of the Respondent. Thereafter, Mr. Fox attempted to deliver a new "B letter" dated November 22, 2021 and subpoena directly to Respondent. This letter, however, was initially not received either.

Next, Respondent got Covid, and Mr. Fox very kindly accommodated his recovery. Mr. Fox and Respondent later began exchanging emails in which Mr. Fox attempted to deliver the letter and its exhibits via email. This too was beset with delivery problems. Some of the email exchanged between Respondent and Mr. Fox and his assistants was intercepted by each side's spam filters. Mr. Clark thus did not receive the full set of documents comprising the "B letter" and its attachments until January 6, 2022. *See* Aff. of Resp., ¶¶ 4-6 (attached as Exhibit 2).

Respondent agreed to and did respond to ODC's letter and subpoena on January 31, 2022. *See id.* at ¶ 6. But he never agreed to accept service of the subpoena via email.

The subpoena called for Respondent to either produce documents or appear at the Bar offices on the return date (which was never corrected by ODC to the agreed-on January 31, 2022 date) if documents were not to be produced. On Friday January 28, 2022, new counsel for Respondent spoke to Mr. Fox by telephone to say that Respondent would invoke the Fifth Amendment and would not be producing any documents, inquiring if Respondent nevertheless needed to appear. Mr. Fox replied, "no," but that if Mr. Clark claimed the Fifth Amendment against the production of documents, "I promise you I will ratchet up the discipline" and that a motion to compel would be rapidly filed. Mr. Fox followed up with an email at 8:30 PM that Friday evening reiterating that threat. *See* Harry MacDougald Aff. at ¶¶ 5-6 (attached as Exhibit 3).

On January 31, 2022, Mr. MacDougald (one of Mr. Clark's undersigned counsel) delivered to Mr. Fox two lengthy letters responding to the unserved subpoena. The shorter letter invoked, *inter alia*, Mr. Clark's Fifth Amendment privilege against self-incrimination as well as the act of production doctrine, and laid out in detail the basis for a well-founded fear of criminal prosecution and the overlap with a document subpoena issued by the January 6 House Select Committee. The letter thus requested a deferral under Board Rule 4.1, noted the defects in the subpoena's service,

highlighted separation of powers issues, and reserved all other rights, defenses, and objections. The longer letter asserted a series of substantive legal objections to the ODC proceeding with the investigation and attached the full set of letters to the January 6 Committee as exhibits.

Mr. Fox filed this Motion to Compel on February 3, 2022. There was no meet and confer (*see* Board Rule 2.9(a)) or other discussion about Respondents' objections. While the Motion recites that it was served with exhibits by regular mail and email on February 3, 2022, a remarkable series of clerical problems in ODC prevented delivery of the complete motion and exhibits from being accomplished until February 14, 2022. *See* Exhibit 3 ¶¶ 7-15.  When Mr. Fox was first informed of non-deliver, he quickly sent the Motion to Compel to undersigned counsel, informed us that the exhibits were documents we already had, and agreed that the response to his Motion could be filed on February 15, 2022, and a motion to that effect was filed in this Court. *Id*. at ¶ 10.

Mr. Fox produced certain correspondence with Senator Durbin and his staff dated October 14, 2021, which informed the Senator that his complaint had been docketed as an investigation rather than a charge, that the matter was confidential, and that he would automatically furnish the Senator with any response made by Mr. Clark. In his letters to Mr. Fox of January 31, 2022 in response to the subpoena, undersigned counsel vigorously objected to furnishing Mr. Clark's response to Senator Durbin on the grounds that it would breach the confidentiality of the proceedings, as Senator Durbin was not Respondent's client, and that in the supercharged political atmosphere surrounding the underlying issues, doing so would very likely result in a media leak of the information, further fueling the partisan furor raging against Mr. Clark.

Mr. Fox also produced "*Touhy* correspondence" with DOJ (*see* 28 C.F.R. § 16.21 *et seq.*), seeking access to former DOJ officials as witnesses. DOJ replied, agreeing to Mr. Fox's request. However, DOJ failed in multiple respects to comply with its own regulations governing such

matters, as we are just setting before DOJ today and thus which we do not further address here, pending a response by DOJ. Lastly, Mr. Fox also shared two additional *Touhy*-related documents with us on February 11, 2022.

<div align="center">

**ARGUMENT**

</div>

PROCEDURAL BACKGROUND

### A. Enforcement of Subpoenas

When conducting an investigation, Disciplinary Counsel may propound "written inquiries" with the explicit limitation that the investigation is subject to "constitutional limitations." D.C. Bar Rule XI, § 8(a). But no subpoena may include inquiries crossing over into the impermissible territory of litigation-like interrogatories. *See In re Artis*, 883 A.2d 85 (D.C. 2005). This Court frames disciplinary proceedings as "adversary, adjudicatory proceedings" related to property rights and which therefore are attended by due process protections. *See In re Benjamin*, 698 A.2d 434, 439 (D.C. 1997) (citing *In re Thorup*, 432 A.2d 1221, 1225 (D.C. 1981)).

Disciplinary Counsel may compel the attendance of witnesses and the production of pertinent books, papers, documents, etc., but only subject to D.C. Superior Court Rule 45. *See* D.C. Bar Rule XI, § 18(a). This Court may, "on proper application," enforce a subpoena. *See id.*, § 18(d).[2] Superior Court Rule 45(b)(1) prescribes the manner for service of subpoenas, requiring delivery to the person named by anyone over the age of 18 years who is not a party to the action and the tendering of certain fees if attendance is demanded (as it originally was in the alternative here). Rule 45(b)(3) requires the one serving the subpoena to certify proof of service showing the

---

[2] However, if there is a challenge to the subpoena, Bar Rule XI, § 18(c) contemplates a Board of Professional Responsibility's Hearing Committee to hear and determine the challenge. We did not bring such a challenge because ODC did not engage in the required meet and confer after we filed the January 31, 2022 letters. ODC simply proceeded immediately to this Court. Especially given the pendency of various investigations—and the ***interim*** nature of the report that Senator Durbin's staff prepared, we are at a loss to explain why ODC considers this matter to be exigent.

<div align="center">6</div>

date and manner of service and the name of the person served.

Board Rules 3.14 through 3.16 also control subpoenas issued during an investigation, and they allow for Disciplinary Counsel to apply directly to this Court for enforcement. On February 3, 2022, Disciplinary Counsel chose to file a motion to enforce directly with this Court.

Pursuant to Superior Court Rule 45(c)(3)(A), as transplanted here, subpoenas may be quashed on timely motion if they require disclosure of privileged or protected matter not subject to exception or waiver, is unduly burdensome or fails to provide a reasonable time to comply; and under sub-rule (c)(3)(B)(i) if the subpoena requests "confidential research." Parties may also describe their objections, if substantiated, to a subpoena as "overbroad" or amounting to a "fishing expedition." *In re Confidential*, 701 A.2d 842, 842 (D.C. 1997). If there is an assertion of a privilege, etc., then under Superior Court Rule 45(d)(2), the claim must be expressly made.

### B. Standard of Review

Since Disciplinary Counsel chose to seek enforcement of his subpoena directly with the Court of Appeals, any issues and objections must be decided here in the first instance and not on review. Since the subpoena enforcement involves questions of law, questions of fact, and mixed questions of law and fact, the Court should act in the same vein as a trial court, deciding questions of law and finding facts. *Cf. In re Public Defender Serv.*, 831 A.2d 890, 898-99 (D.C. 2003), which discussed the various roles in the context of a grand jury subpoena. This analysis applies here by analogy as well, especially given the assertion of constitutional and other privileges.

### C. The Subpoena Was Improperly Served and Should Be Quashed.

The applicable procedure for service of subpoenas is very clear. Superior Court Rule 45(b)(1) requires that the subpoena be served by an adult who is not party to the action, coupled with certified proof of subpoena service and tendered fees (if attendance might be required). There is no certified proof of service by an adult here (and no fees tendered) because the subpoena was

not so served. Service was not waived, no testimony has been given, and objections were timely made, preserving all rights. *See In re Sealed Case*, 116 F.3d 550, 561-62 (D.C. Cir. 1997).

Thus, the service requirement has not been met. And where subpoenas are not properly served, they must be quashed. *See Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963); *see also Pulley v. United States*, 532 A.2d 651, 653 (D.C. 1987) (citing *CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) (quashing subpoena for failure to tender fees)).

Further, since Superior Court Rule 45 is "virtually identical" to Fed. R. Civ. P. Rule 45, it is instructive to refer to the importance of maintaining the integrity of the service requirement. *See also FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1312-13 (D.C. Cir. 1980), which underscored the point:

> By contrast, Federal Rule 45(c), governing subpoena service, does not permit any form of mail service, nor does it allow service of the subpoena merely by delivery to a witness' dwelling place. Thus, under the Federal Rules, compulsory process may be served upon an unwilling witness only in person. Even within the United States, and even upon a United States citizen, service by registered U.S. mail is never a valid means of delivering compulsory process ….

*See also id.* at 1307.

The Supreme Court has repeatedly emphasized the importance of service. *See, e.g., Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (even actual notice via fax of a file-stamped copy of a pleading was not valid service). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant …. Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 350-51.

## I.   THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA.

The Fifth Amendment privilege against self-incrimination:

not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but ***also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal***, where the answers might incriminate him in future criminal proceedings.

*Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (emphasis added).

### A. Mr. Clark Properly Invoked the Fifth Amendment.

In the District, it has long been settled that a court evaluating a Fifth Amendment claim should not speculate about whether criminal prosecution is "likely" but should instead limit its inquiry to whether criminal prosecution is "possible." *Carter v. United States*, 684 A.2d 331, 334-35, 338 (D.C. 1996) (en banc). The *Carter* decision overruled a line of cases requiring courts to assess the probability of prosecution before upholding Fifth Amendment privilege.

Moreover, the Fifth Amendment is to be "liberally construed" and thus is not limited to situations where the compelled disclosures themselves would be incriminating. It is sufficient if the disclosure could possibly supply a "link in the chain" leading to prosecution. *Wilson v. United States*, 558 A.2d 1135, 1141 (D.C. 1989), *overruled on other grounds by Carter*, 684 A.2d 331 (D.C. 1996) (en banc). In a foundational case, the United States Supreme Court described this concept as follows: "A question which might appear at first sight a very innocent one might, by affording a link in a chain of evidence, become the means of bringing home an offense to the party answering." *Mason v. United States*, 244 U.S. 362, 364-66 (1917) (citing 1861 English decision).

Although the Fifth Amendment must normally be asserted on a question-by-question basis, this Court recognizes that the combination of the "possible prosecution" standard and the "link in the chain" doctrine can easily render entire areas of testimony privileged. *See, e.g., Butler v. United States*, 890 A.2d 181, 188 (D.C. 2006) (granting a witness blanket immunity was procedurally flawed but harmless since it was "obvious that *any* testimony" would be incriminating) (italics in original); *Johnson v. United States*, 746 A.2d 349, 356 (D.C. 2000) (same).

ODC's investigation of Mr. Clark presents an obvious Fifth Amendment case. The letter from Senator Durbin that triggered this investigation itself states that "Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against counseling a client to engage, or assisting a client, in conduct **the lawyer knows is criminal or fraudulent**." Exhibit 4 at 2 (internal quotations and brackets omitted) (emphasis added). This allegation of criminal conduct in the triggering complaint, standing alone, is sufficient to justify Mr. Clark's Fifth Amendment invocation. If further reinforcement is needed, Mr. Clark's letter in response to this subpoena detailed many examples of lawyers implicitly or explicitly calling for Mr. Clark's criminal prosecution based on his service in the Justice Department. *See* Exhibit C to Motion to Enforce at 6-8. Notably, the January 6 Select Committee appears to have accepted Mr. Clark's invocation of the Fifth Amendment as to the same subject matter and has publicly pivoted to the topic of whether to grant him immunity.[3]

In contesting the validity of Mr. Clark's Fifth Amendment invocation, Disciplinary Counsel first argues that the Office of Disciplinary Counsel itself cannot charge crimes. Motion at 7. As quoted above, however, the Supreme Court has long held that the Fifth Amendment applies outside of the strictly criminal context, if the disclosures "might incriminate in [] future criminal proceedings." *Lefkowitz*, 414 U.S. at 77. And most importantly, this Court has held repeatedly that Fifth Amendment protection applies in Disciplinary Counsel cases. *See, e.g., In re Artis*, 883 A.2d 85, 103 (D.C. 2005); *In re Burton*, 472 A.2d 831, 845-46 (D.C. 1984).

Disciplinary Counsel then argues that Mr. Clark has not asserted he is "even the subject, much less the target, of any criminal investigation." Motion at 7. Putting aside the obvious point

---

[3] *See, e.g.,* Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022), *available at* https://tinyurl.com/bdemy976, (last visited Feb. 15, 2022); https://tinyurl.com/2n6cu36c (Rep. Lofgren, YouTube video) (last visited Feb. 15, 2022).

the criminal investigations are often confidential, no Court has ever held that Fifth Amendment protection is only available to persons known to be under active criminal investigation. Disciplinary counsel cites no cases in support of this argument.

Next, Disciplinary Counsel argues that Mr. Clark has not "specif[ied] what criminal charges [he] might realistically be subject to." *Id.* This argument is unavailing for two reasons. *First*, Mr. Clark has no burden to show that he "might realistically be subject to" criminal prosecution. This standard for Fifth Amendment protection was explicitly rejected by this Court *en banc* in *Carter*, cited above. *Second*, this Court has never required individuals seeking Fifth Amendment protection to identify specific criminal statutes. Disciplinary Counsel cites no case imposing this requirement. In any event, in his counsel's letter to Disciplinary Counsel, Mr. Clark cited an editorial by several prominent law professors that did identify several specific statutes the authors contended could serve as a basis for criminal investigation of former President Trump and "members of his inner circle." Motion, Exhibit 3 at 8 (collected list of statutes below):

> Obstruction of an Official Proceeding (18 U.S.C. § 1512); Conspiracy to Defraud the Government (18 U.S.C § 371); Voter Fraud for Pressuring State Officials Not to Certify the Election (52 U.S.C. § 20511); the Hatch Act (5 U.S.C. § 7323); the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962(c)); Insurrection (18 U.S.C. § 2383); and Seditious Conspiracy (18 U.S.C. § 2384).

## B. Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine.

Disciplinary Counsel also disputes Mr. Clark's invocation of the Fifth Amendment "act of production" privilege. But Disciplinary Counsel's arguments in that vein fail because ODC's subpoena is plainly more than a simple demand for documents.

To be sure, the Fifth Amendment privilege does not ordinarily apply to "pre-existing, voluntarily prepared documents." *Fisher v. United States*, 425 U.S. 391, 408-09 (1976). However, when a given request goes in any way beyond mere production of pre-existing documents, the

Fifth Amendment bar arises. *See*, *e.g., United States v. John Does*, 465 U.S. 605, 610-15 (1984) (compelled oral or written testimony that restates the contents of documents would be privileged).

In *In re Artis*, this Court considered a case where Disciplinary Counsel had issued "interrogatory-like questions" to respondent. 888 A.2d 85 (D.C. 2005). This Court affirmed the respondent's right to assert his Fifth Amendment privilege and did not order the respondent to answer Disciplinary Counsel's "interrogatory-like questions." *Id*. at 99, 101 & n.13.

Here, Disciplinary Counsel incorrectly claims that its subpoena merely seeks "five categories of documents." Motion at 11-12. To the contrary, the subpoena seeks much more than that and is in fact directly analogous to the "interrogatory-like questions" (*i.e.*, those inherently forcing respondent admissions) at issue in *In re Artis.* The emphasized portions of the following subpoena requests make clear that more than simple production of documents is demanded:

- Produce all documents and records … ***of which you were aware*** before January 4, 2021, ***that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state***;

- ***Identify the source*** *of any document (including contact information for any persons bringing the document to* ***your attention***, *how it came to* ***your attention***, *and the date it came to* ***your attention***;

- ***Specify what information*** *of election fraud came to* ***your attention*** following the announcement of Attorney General Barr on December 1, 2020 that the Department found no evidence of fraud on a scale that could have affected the results of the presidential election;

- Produce any file or collection of materials or correspondence, written or electronic, ***relating to any efforts that you made between the November 3, 2020 presidential election and January 4, 2021***, that relate in any way to any ***efforts you made to persuade*** officials of the United States Department of Justice to intervene in the certification by any state;

- ***Provide the results*** of any legal research ***that you conducted, had conducted, or received before January 4, 2021*** … [t]his information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [*sic*] and Natural Resources Division to investigate allegations of election fraud;

- Provide all written policies and guidelines of the Department of Justice, *of which **you were aware*** and that were in effect between November 3, 2020 and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President;

The emphasized portions of the foregoing list of demands make clear that the subpoena does not simply request "categories of documents." It requires Mr. Clark to make substantive assertions or concessions about such things as: (1) when he became aware of certain documents; (2) how and by whom the documents came to his attention; (3) the relationship between the documents and his "efforts"; (4) the "results" of his legal research and when he conducted it; and (5) which policies he was "aware [of] that were in effect" at certain times. These requests go far beyond the type of "preexisting documents" that fall outside the scope of the Fifth AmendmentThe requests demand substantive admissions from Mr. Clark about facts relating to his *mens rea* and that could obviously be used as a "link in the chain" of some future criminal case. And even if there are **no** responsive documents to a given request, this answer itself could be used as an admission to incriminate Mr. Clark. It is therefore not necessary even to engage in an "act of production" analysis to sustain Mr. Clark's Fifth Amendment invocation.

### C.  Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege.

However, to the extent this Court decides the Fifth Amendment act of production doctrine is implicated here, District law clearly supports Mr. Clark's ability to assert this privilege in response to the subpoena. In *In re Public Defender Service*, this Court held as follows:

> A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect. That is, by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.
>
> ***
>
> Even where the contents of a subpoenaed document may be incriminating, the act of production privilege is not automatic. The act of production privilege does not apply if the existence and authenticity of a document is a foregone conclusion as

> would be the case if the act of production adds little or nothing to the sum total of the Government's information.

831 A.2d 890, 912 (D.C. 2003) (internal quotations and citations omitted).

Instead of attempting to meet *In re Public Defender Service's* "foregone conclusion" standard, Disciplinary Counsel argues that Mr. Clark has not shown that responding to the subpoena will conclusively prove him guilty of a crime:

> This is far removed from the situation in *Hubble*, where a criminal defendant was required to produce to the grand jury personal financial records **which established his income tax evasion**, or in Public Defender Service, where a grand jury subpoena, if complied with, **might have linked the defendant to a coerced witness statement**.

Motion at 13 (emphasis added). However, there is no requirement that Mr. Clark demonstrate that responding to the subpoena will conclusively prove him guilty of a criminal act. *Ohio v. Reiner*, 532 U.S. 17, 18 (2001) (Fifth Amendment "protects the innocent as well as the guilty"); *see also In re Artis*, 883 A.2d at 99 (noting Board's conclusion, which was affirmed in relevant part, that respondents "should not be obligated to respond to vague and overly broad questions that require him or her to make Bar Counsel's case"). It is sufficient if the subpoena response could furnish a "link in the chain" of possible prosecution, even if meritless. Mr. Clark has met that standard.

## II.    THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE.

In the grand jury context, this Court has held that a subpoena must have a "legitimate purpose." *Brooks v. United States*, 448 A.2d 253, 261 (D.C. 1982).  *See also In re Horowitz*, 482 F.2d 72, 80 (2d. Cir. 1973) (documents that have "no conceivable relevance" to legitimate object of grand jury investigation need not be produced); *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) ("The documents requested must be shown to have some general relevance to the subject matter of a legitimate grand jury investigation.").

The same rationale of these grand jury cases applies in the bar discipline context.  As

explained below, ODC's subpoena should be quashed because it has no reasonable relation to a legitimate area of bar discipline enforcement.

### A. 28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers.

Under the U.S. Constitution, the President of the United States, not the Attorney General is its chief law enforcement officer. *See* U.S. Const., art. II, § 3 (the President "shall take Care that the Laws be faithfully executed …."). It is therefore far from obvious that state and local bar authorities can always wield disciplinary jurisdiction over lawyers authorized by virtue of their appointments pursuant to Article II, to exercise executive authority and advise the President, as that could hamper the President's ability to obtain legal advice.

In keeping with the President's authority and right to receive full and frank advice and information, senior federal officers have a reciprocal duty to provide it upon request. *See* U.S. Const., art. II, § 2, cl. 1 (Opinion Clause); 28 U.S.C. § 506 (Assistant Attorney Generals, like Mr. Clark, to be appointed by President with advice and consent of Senate); OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys* (Aug. 2, 1985) ("Rules promulgated by state courts or bar associations that are inconsistent with the requirements or exigencies of federal service may violate the Supremacy Clause."), *available at* https://tinyurl.com/56bft7sb, *last visited* (Feb. 15, 2022) (hereafter "OLC Opinion").

Where, as here, the face of Disciplinary Counsel's interrogatories show that they seek access to information that ODC has no authority to seek or review, the Court need not reach the constitutional arguments in order to quash the subpoena. We nevertheless reserve them.[4]

---

[4] *See Bond v. United States*, 572 U.S. 844, 855 (2014) ("well-established principle governing the prudent exercise of this Court's jurisdiction [is] that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

That is because even beyond the Fifth Amendment as applied here, there is a more than sufficient basis on which to deny enforcement of the subpoena. For the statute Congress passed purporting to subject Justice Department lawyers to state and local bar rules, 28 U.S.C. § 530B(a), does not authorize *any inquiry* into the internal policy deliberations of the Department of Justice or of any other agency of the federal government that employs lawyers. Nor does the statute, by its terms, authorize the D.C. Bar to oversee the enforcement of internal DOJ and Executive Branch policies governing the conduct of their respective internal operations. *See* 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to ***State*** laws and rules, and local Federal court rules, governing attorneys in each ***State*** where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that ***State***.") (emphasis added). Relatedly, in 1999 DOJ improperly purported ***to extend*** the reach of Section 530B(a), by regulation issued under Section 530(B)(b), to the District of Columbia. *See* 28 C.F.R. § 77.2(h).[5]

---

[5] The relevant preamble (hastily assembled via an ***interim*** final rule) does not even address how the Justice Department could try, via its subordinated rulemaking powers, to extend the statute to the District of Columbia when the statute does not mention the District. The preamble cites to 28 U.S.C. §§ 509, 510, 515(a), 516, 517, 519, 533, and 547. *See* 64 Fed. Reg. 19,273, 19274 (Apr. 20, 1999). But none of these statutes even reference the District of Columbia specifically. And these provisions say nothing about the power of D.C. Bar authorities to sit in oversight of the discretionary actions of Justice Department lawyers. The 1999 rule is thus invalid under step one of the *Chevron* test, which voids regulatory interpretations of any statute that conflict with the statute's plain text, interpreted using "traditional tools of statutory construction." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). And the canon of interpreting statutes as part of the *corpus juris* (the whole body of the law) is no doubt such a traditional tool of statutory interpretation. *See, e.g., Branch v. Smith*, 538 U.S. 254, 282 (2003) ("courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes."). The plain text is violated here because D.C. is not a "State," *see infra*.

The preamble also mentions (1) Pub. L. 96-132, 93 Stat. 1040, 1044 (1979); and (2) Pub. L. 105-277 (1998), section 102 of the Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act. But both of these provisions are appropriations law limited to one-off fiscal years; they lack general effect. Moreover, the former provision predates Section 530B(a) and the latter provision is silent on 530B(a) and thus cannot be read to amend it. Finally,

All lawyers who practice before this Court and in the federal courts of the District of Columbia are, by statute, subject to the authority of each court to control the conduct of the attorneys who appear there. Significantly, there is an established, but limited, procedure for doing so. *See, e.g.*, D.C. Code § 11-944(a) (contempt for "disobedience of an order or for contempt committed in the presence of the court"); 28 U.S.C. § 1927 (counsel's liability for excessive costs); *see also generally* D.C. Code § 23-1330 (preserving contempt power). The D.C. Bar, by contrast, has no general investigatory authority over the ethics of Department of Justice lawyers. The Constitution reserves that power to the Executive Branch.

Section 530B(a) reflects this division of authority. The District of Columbia is not a "State." All law in the District is federal law and Congress alone defines the nature, scope, and means of enforcement of all federal powers exercised here, including that of the D.C. Bar. U.S. Const., art. I, § 8, cl. 17 ("Seat of the Government"). Specific language is ordinarily required to treat the District as if it were a State. *See, e.g., District of Columbia v. Carter*, 409 U.S. 418, 432-33 (1973) (D.C. not a State for purposes of 42 U.S.C. § 1983). The United States Code is replete with examples where Congress has ***specifically defined*** D.C. to fall within the meaning of the term "State," but only for purposes of that particular statute.[6] Indeed, by contrast, Chapter 31 of part II of title 28 of the United States Code lacks any specialized definition section. Congress thus knows

---

the fact that the statutes DOJ cited to extend Section 530B(a) to District of Columbia Bar rules point to two specific appropriations statutes mentioning the District shows that not even the DOJ of 1999 thought that it would be plausible to argue that D.C. Bar's rules were "local Federal court rules" within the meaning of Section 530B(a) or the preamble would have made that argument.

[6] *See, e.g.*, 28 U.S.C. § 1257(b) ("For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."); 42 U.S.C. § 8285a(2) ("the term 'State' means any of the several States, the District of Columbia …"); *see also, e.g.*, 26 U.S.C. § 170(c)(1) (applying term "charitable contribution" for tax purposes to include gifts for the use of "States, a possession of the United States … or the United States or the District of Columbia");. And Supreme Court Rule 47 states that "[t]he term "state court," when used in these Rules, includes the District of Columbia Court of Appeals."

how to confer power on District authorities when it wants to. And it expressly withheld it here.

And for good reason. The conduct that Disciplinary Counsel seeks to investigate is not behavior committed in the presence of a court and found by it to have violated its rules of conduct. Mr. Clark was a senior Executive Branch official who served as the head of two of Main Justice's seven litigating divisions, each with nationwide jurisdiction. His client was the Executive Branch, and the power to define the nature and scope of his duties to that client and its member departments and agencies, and to investigate alleged violations of DOJ and other federal rules of lawyer conduct, rest in the first instance with the Executive Branch alone. The same holds true for allegations that an attorney employed by the federal government has violated federal law.

To be clear, this does not mean that Mr. Clark is free of all ethical obligations here. DOJ houses both an Office of Professional Responsibility and an Office of Inspector General ("OIG"). The OIG is investigating the matters Senator Durbin's complaint involves. *See* DOJ Office of Inspector General, *available at* https://tinyurl.com/2p9ad5tm (Jan 25, 2021) (last visited Feb. 15, 2022). That ODC seeks, through this subpoena, to jump ahead of that investigation and, in effect, preempt it (rather than *vice versa*) is clear from ODC's refusal to defer under Board Rule 4.1 until federal authorities with authority over DOJ officials complete their respective investigations.

ODC's rush to assert disciplinary jurisdiction in this case is a clear indication that its investigation is intended to thrust itself into the administration of the federal Executive Branch and to use its subpoena power for partisan purposes. Senator Durbin has no direct knowledge of the facts, and only the Department of Justice knows what information it holds concerning how and to what extent it investigated the 2020 election. It is undisputed that DOJ has denied the Senate Judiciary Committee access to DOJ's investigative records. *See* Exhibit 5 (Letter, ADAG Weinsheimer to Mr. Clark (July 26, 2021)). It is also likely that it will object if Mr. Clark seeks

these records to defend against the allegations of misconduct made by Senator Durbin.

Senator Durbin thus turned to ODC, in the hope that it would lend its subpoena power to the effort to advance the political narrative of his investigation. This Court should reject that end run around the limits on the Senate Judiciary Committee's party balance and quash the subpoena.

**B. Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question.**

Even if the foregoing jurisdictional hurdle were overcome, 28 U.S.C. § 530B extends state bar disciplinary jurisdiction over federal government lawyers only "to the same extent and in the same manner as other attorneys in that State." Similarly, the regulation subjecting lawyers working for the federal government to local bar disciplinary processes, 28 C.F.R. § 77.2(j)(2) (emphasis added), contains an important exception: it does not apply if the local jurisdiction "would not ***ordinarily*** apply its rules of ethical conduct to particular conduct or activity by the attorney."

Neither the D.C. Bar, nor any bar in America, "ordinarily" disciplines lawyers over never-sent confidential internal discussions of letters drafted for assessment and consideration. It is unheard of. And neither Mr. Fox nor undersigned counsel have been able to identify any such case anywhere. This alone should be fatal to the Bar's jurisdiction in this case.

**C. There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation.**

D.C. Rules of Professional Conduct (hereafter "RPC") 8.4(c) prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." The people to whom the draft letter was allegedly delivered, and whose signature would be required thereon, were the Acting Attorney General Jeff Rosen and the Principal Associate Deputy Attorney General Richard Donoghue. They are not minors or seniors with diminished capacity who might easily be misled. They are instead seasoned lawyers who make no claim of having been deceived and no doubt understood the draft letter to

be a proposal contingent on facts they were in superior possession of. Instead, they are reported to have vehemently rejected the draft letter, and to have persuaded the President to reject it as well.

Of the species of misconduct prohibited by RPC 8.4(c), dishonesty sometimes appears the most broadly construed. *In the Matter of Shorter*, 570 A.2d 760, 767–68 (D.C. 1990), the lawyer answered questions posed by the IRS honestly, but only answered the questions asked and did not volunteer information not asked for that he knew they would want to know. Though not "legally … characterized as an act of fraud, deceit or misrepresentation," the conduct showed "a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness." And in *In re Romansky*, 825 A.2d 311, 315–17 (D.C. 2003)*,* the lawyer instructed an associate to record time to a client other than the one for whom the work was actually done. Though it was an internal accounting matter that did not operate to the financial detriment of either client, it was held to be dishonest because it simply was not true. But the conduct challenged in this case falls far short of even the highwater marks of RPC 8.4(c)'s reach as reflected in *Shorter* and *Romansky*.

In this case, a privileged and confidential draft of a letter appears to have been discussed amongst strong-willed senior officials who had diverging access to facts, diverging views of the facts, diverging views of the facts' significance, and diverging views of what ought to be done. There appears to have been a frank exchange of views on each of these areas of disagreement—as the rules of privilege and confidentiality are meant to protect and indeed foster. The matter was presented to the ultimate decision maker, President Trump, and after hearing differing views, he decided against the letter, and that was the end of the matter. RPC 8.4(c) thus has no application, and, to the knowledge of the undersigned, has never applied to anything like this situation.

### D.  Rule 8.4(d) Does Not Apply.

In *In re Yelverton*, 105 A.3d 413, 426 (D.C. 2014), this Court held that "[c]onduct violates RPC 8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an

20

identifiable case or tribunal, ***and*** (3) harms the judicial process in a more than a de minimis way." (emphasis added). And *In re Pearson* is to the same effect, stating the third element in slightly different verbiage to require the conduct to "taint[s] the judicial process in more than a *de minimis* way'" 228 A.3d 417,426 (D.C. 2020), *citing In re Hopkins,* 677 A.2d 55, 59–61 (D.C. 1996)*.*

      Not one of these three essential elements is remotely established by what is alleged here. *First*, confidential and privileged internal deliberations and debates over legal theories and arguments are not improper. *Second*, there is no identifiable case or tribunal because the entire discussion appears to have been internal and confidential, and no document was ever filed in any court or tribunal anywhere. *Third*, no judicial process was harmed because nothing was ever filed in any court or tribunal anywhere. RPC 8.4(d) simply does not apply to the conduct in question.

      The application of Bar discipline, at the behest of a bitter political adversary of the former President, to a confidential discussion draft of a letter never sent, which simply called for more state legislative investigation, is unprecedented, unfounded, and improper. One must ask why this docket was opened and whether political influence was at play.

## III.   THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED.

      It should be self-evident that a bar disciplinary process may not be appropriately used as an instrumentality of partisan political warfare. The country is sharply divided over the propriety of the 2020 election. Investigations into and litigation over the conduct of the election rage across many States around the country, with notable decisions finding irregularities and illegality. Absent affirmative misconduct in a particular case or before a particular tribunal, the Bar should not join the victors on the battlefield in the grisly business of dispatching the wounded, especially in a case such as this. Among the many evils that would ensue, the Bar's neutrality would suffer gravely. Presidential Administrations change hands and weeding out frivolous complaints protects the Bar.

**A. Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes.**

In Georgia, a Committee of the State Senate held hearings on election irregularities and found that "[t]he oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified."[7] The Report recommended, *inter alia*, calling a special session of the legislature to consider whether to rescind the certification of Georgia' electors and determine the "proper Electors" for the State of Georgia. *Id*. at p. 15. Other States acted similarly.

**B. Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election.**

Numerous members of Congress over the years, especially on one side of the political divide, have questioned presidential election results. Indeed, the Chair of the House January 6 Select Committee, Bennie Thompson, objected to the certification of the 2000 and 2004 presidential elections.[8] And his fellow January 6 Committee member, Jaime Raskin—both a lawyer and constitutional law professor—objected to certification during the 2016 presidential election. *See Rep. Raskin Challenges Awarding of Electors*, YOUTUBE, *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) (last visited Feb. 15, 2022). Indeed, Senator Durbin, the sole complainant here, defended Senator Boxer's right to object to certification of the 2004

---

[7] Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, *available at* https://tinyurl.com/3dzkfmxf (Dec. 17, 2020) (last visited Feb. 15, 2022).

[8] The Congressional Black Caucus objected to the certification of Florida's electoral votes. *See* 147 Cong. Rec. H34 (Jan. 6, 2001). Representative Thompson is a member of that caucus *See also* 151 Cong. Rec. H127 (Jan. 6, 2005).

election, assuming her good faith, even though he opted not to object himself.[9] No leaked, purported facts show Mr. Clark to have done anything other than raise questions inside DOJ and at the White House about the 2020 presidential election's regularity in particular States and counties. *See, e.g.* Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk (last visited Feb. 15, 2022) (impeachment manager stating that President Trump "turned to Jeffrey Clark, another Department lawyer, who had allegedly expressed support for using the Department of Justice to investigate the election results," going on to say Acting Attorney General Rosen "refuse[d] to reopen investigations"). That is a debatable, internal DOJ decision as to how much or little to investigate, not a disciplinary matter.

Indeed, just as Senator Durbin did with Senator Boxer, Mr. Clark's good faith should be presumed, even if his DOJ superiors and colleagues disagreed with him on the merits, just as every other Senator in 2004 disagreed with Senator Boxer, who stood as the sole Senator challenging the Bush v. Kerry election. Objections and a desire to further investigate the results of presidential elections are simply not the stuff of proper bar complaints, especially not by politically motivated complainants like Senator Durbin, who have no personal knowledge of the underlying conduct.

In this past presidential election, 147 members of the House and Senate (***including 8 Senators*** (*i.e.,* 7 more than in the 2004 election where Senator Durbin defended Senator Boxer's right to object) plus 139 House members) objected to certifying Arizona's or Pennsylvania's

---

[9] *See* Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016*, DAILY WIRE (Jan. 4, 2021) ("'Some may criticize our colleague from California for bringing us here for this brief debate,' Durbin said on the Senate floor following Boxer's objection, while noting that he would vote to certify the Ohio electoral votes for Bush. 'I thank her for doing that because it gives members an opportunity once again on a bipartisan basis to look at a challenge that we face not just in the last election in one State but in many States.'"), *available at* https://tinyurl.com/yjyw7x83 (last visited Feb. 15, 2022).

electoral votes.[10] And 35 of those members are lawyers (two of whom are former Supreme Court clerks, Senators Cruz and Hawley, who once were Texas Solicitor General and Missouri Attorney General, respectively). Are those nearly three dozen lawyer-legislators to be subjected to bar discipline in their respective States or in D.C., where they typically made media statements, on the theory that they were lying when they appeared on TV to demand more investigation or make factual claims? That is unthinkable and would plunge this or any state or local bar deep into purely political waters, taking it far afield from its traditional compass. No bar, including this one, is equipped to retry the presidential election and the privileged options debated inside the Executive Branch or with the President himself in the wake of a truly unique election where standard voting rules were jettisoned or changed in the wake of the COVID pandemic. *See* Letter, H. MacDougald to Chair Thompson (Nov. 5, 2021) (attached as Exhibit 6) (by attaching this letter, the executive privilege, deliberative process privilege, and attorney-client privilege arguments are incorporated).

### C. Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General.

The Court should terminate this matter and preclude the Bar from re-litigating the 2020 election by holding there is no colorable discipline case where three Supreme Court Justices and 18 State Attorneys General raised similar questions about the 2020 election's regularity.

Most important in that regard is *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021). There, Justice Thomas dissented from the denial of certiorari because non-legislative state officials had changed the statutory rules for federal elections and the appointment of presidential electors in violation of the Electors and Elections Clauses of the Constitution. *See* U.S. Const., art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent joined by

---

[10] See Li Zhou, *147 Republican Lawmakers Still Objected to the Election Results After the Capitol Attack*, Vox (Jan. 7, 2021), *available as* https://tinyurl.com/4v6w229c (last visited Feb. 15, 2022).

Justice Gorsuch to flag the same infirmity. Both dissents noted the public importance of resolving the questions presented. If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have advanced similar views, bar discipline should be out of the question.

Also relevant, Justices Thomas and Alito dissented in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), a 2020 election challenge filed by Texas (and later joined by 17 other States) that complained about similar unconstitutional election-rule changes made in the so-called battleground States. They would have allowed Texas's bill of complaint to be filed, potentially putting the merits of the election challenge before the Supreme Court. And those two Justices, whatever the Court's view of their jurisprudence, surely did not act unethically in the *Texas* case. Mr. Clark was also entitled to presume, if that is what he did, that 18 State Attorneys General were presenting good-faith objections and for that reason to press for the President and DOJ to agree with the position of the State Attorneys General as well. In other words, this Court should not start down Disciplinary Counsel's slippery slope lest it find itself necessarily implying that three Supreme Court Justices and 18 State Attorneys General were all acting beyond the pale of legitimate legal debate, the judicial canons, and the Model Code of Professional Responsibility.

This Court should deny enforcement of the subpoena and act now to register its disapproval of this witch hunt. Doing so would send a strong signal that this Court will not allow the bar discipline process to be perverted for political ends, or to become a tool of persecution, inflicting significant legal costs on a former official like Mr. Clark and chilling the public service of those on either side of the aisle who must come to D.C. to serve varying presidential administrations.

### D. The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects.

The dogmatic premise of Senator Durbin's complaint that there were no significant irregularities in the 2020 election, accepted by ODC as sufficient to docket this case, has been

refuted by subsequent judicial decisions. In *McLinko v. Commonwealth of Pennsylvania*, *et al.*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022), the Commonwealth Court of Pennsylvania held that Pennsylvania's Act 77, allowance of universal mail-in balloting in Pennsylvania in the 2020 election, was unconstitutional under the Pennsylvania Constitution's strict limitations on absentee balloting. Approximately 2.6 million absentee ballots were thus cast by means held unconstitutional by a Pennsylvania court, well in excess of the margin of Biden victory.[11] *McLinko* thus bears out the views of Justices Thomas, Alito, and Gorsuch.

The Wisconsin Supreme Court, in a 4-3 ruling in *Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021), declined to consider whether drop boxes were illegal under Wisconsin law. The three dissenters, all writing separately but all joining the other dissents, concluded in exceptionally strong terms that the drop box procedures in the 2020 election, used by "hundreds of thousands of voters," were clearly illegal, also exceeding the margin of victory. And on January 14, 2022, a Wisconsin trial court ruled that drop boxes ***were illegal*** under Wisconsin law, in apparent accord with the views of the dissenters in *Trump v. Biden*.[12] Of course, the Judges taking ***either position*** were not acting unethically. Being on the losing side in a controversy, internal or external (but especially internal), does not equate to unethical conduct.

Additionally, a post-election audit of the 2020 election in Maricopa County, Arizona conducted by the Arizona Senate found, *inter alia*. substantial defects in signature verification, including the presence of 17,322 duplicates (alone exceeding the margin of victory), and

---

[11] *See* https://tinyurl.com/2p8u55cn (last visited Feb. 15, 2022)

[12] Moreover, on Friday, February 11, 2022, the Wisconsin Supreme Court reportedly voted 4-3 the other way to allow a trial court order banning drop boxes to remain in effect for an April 2022 local election. *See* Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, Politico (Feb. 11, 2022), *available at* https://tinyurl.com/y32cy8xc (last visited Feb. 15, 2022).

intentional and substantial spoliation of digital records on the voting equipment shortly before it was delivered for forensic examination.[13]

While not yet the subject of a judicial decision on the merits, evidence has emerged of a vast scheme to violate Georgia's law against ballot harvesting, O.C.G.A. § 21-2-385(a), which was in effect for the 2020 election. That statute permits only near relatives or cohabitants to mail or deliver absentee ballots. Strong evidence has emerged since 2020 proving this limitation was violated on a large-scale basis in Georgia and other battleground States with similar laws.

An election integrity group, "True the Vote," has collected cell phone location data in key election hotspots around the country including Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan. *See* Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART, *available at* https://tinyurl.com/3bwujuxv (Aug. 4, 2021) (last visited Feb. 15, 2022). "[True the Vote's] document says that [it] has spent the last several months since late last year collecting more than 27 terabytes of geospatial and temporal data—a total of 10 trillion cell phone pings—between Oct. 1 and Nov. 6 in targeted areas in Georgia, Arizona, Michigan, Wisconsin, Pennsylvania, and Texas. The data includes geofenced points of interest like ballot dropbox locations, as well as UPS stores and select government, commercial, and non-governmental organization (NGO) facilities." *Id.*

As a result of a complaint by True the Vote, the Georgia Secretary of State's Office is now investigating the ballot harvesting scheme in Georgia. *See* John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022), *available at*

---

[13] *See* Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, BREITBART (Sept. 25, 2021), *available at* https://tinyurl.com/4kh45tup (last visited Feb. 15, 2022). This is the same investigation that the Biden DOJ's Civil Rights Division threatened to derail **in a letter _actually sent_ to the State of Arizona**. *See* https://tinyurl.com/2437rmb6 (last visited Feb. 15, 2022).

https://tinyurl.com/yprpt44m (last visited Feb. 15, 2022). True the Vote has identified a confidential whistleblower who claims he was paid $10 per ballot he put into dropboxes.

The expert affidavit of Gregg Phillips, filed April 8, 2021 in *Schmitz v. Barron*, *et al.*, Fulton Super. Ct, Civ. A. No. 2020CV342969, describes his geotracking analysis of 1.2 trillion mobile device signals showing 240 unique devices making multiple runs to and from drop boxes. Mr. Phillips concludes that "[a]round 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits." Exhibit 7 at ¶ 46. If correct, this was a systematic violation of O.C.G.A. § 21-2-385(a) and exceeded the margin of victory. *See id*. This pattern of conduct is further documented in dropbox surveillance video collected by local governments and obtained by True the Vote. Filmmaker and conservative commentator Dinesh D'Souza has announced a movie called "2,000 Mules". While information on the film is currently quite limited, the trailer claims to show "never before seen security footage" of ballot harvesters. The video shows these alleged harvesters (termed "mules" by the filmmakers) stuffing what appear to be multiple ballots or even sets of ballots into ballot boxes, with some then "snapping photos [on their phones] to get paid." https://tinyurl.com/2p86dznj (last visited Feb. 15, 2022).

There was ample evidence before January 4, 2021 that could cause a reasonable attorney to be skeptical of some parts of the 2020 election. Further evidence has emerged since then, and in some States it has even ripened into trial and appellate court decisions revealing that the elections in Wisconsin and Pennsylvania were conducted unlawfully, at least in part.

## CONCLUSION

ODC has no proper role investigating Respondent here and, at the very least, it should await the conclusion of federal and state investigations before trying to do so. For the foregoing reasons, ODC's motion should be denied and the cross-motion to quash should be granted.

Respectfully submitted this 15th day of February 2022.

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Response to Motion to Compel and Cross-Motion to Quash* by U.S. First Class Mail with sufficient postage thereon to insure delivery, and by email addressed to:

Hamilton P. Fox
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This 15th day of February 2022.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

# Exh. 1

# Affidavit of Robert N. Driscoll

**DCCA NO. _____**

**DISTRICT OF COLUMBIA**

**COURT OF APPEALS**

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A member of the Bar of the District of Columbia Court of Appeals** | |

## AFFIDAVIT OF ROBERT N. DRISCOLL

Personally appeared before the undersigned officer, duly authorized to administer oaths, Robert N. Driscoll, who, after being duly sworn, testified and stated as follows:

1.

My name is Robert N. Driscoll. I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 2004 and the Commonwealth of Massachusetts since 1994. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeals for the First, Seventh, Tenth and D.C. Circuits, various U.S. District Courts, and the District of Columbia

Court of Appeals. I am a member of the law firm McGlinchey Stafford PLLC, a national firm with approximately 155 lawyers in offices in 15 cities, including Washington, D.C.

3.

I represented Respondent in connection with investigations by various congressional committees, including the January 6 Select Committee, and briefly in connection with the above-referenced disciplinary matter. All of my representation of Respondent ended on October 25, 2021.

4.

My first contact with any member of the DC Bar Office of Disciplinary Counsel regarding any potential disciplinary issue related to Respondent came on October 14, 2021, at 4:57 PM. At that time, I received a voice mail from Hamilton P. Fox, Disciplinary Counsel for the District of Columbia Bar, which stated as follows: "Mr. Driscoll, my name is Hamilton Fox. I am the disciplinary counsel for the District of Columbia. I am calling you on the assumption that you represent [Respondent]. Uh, would you give me a call please? Uh, my direct dial telephone number is [redacted]."

5.

The next day, on October 15, 2021, at 11:29 AM, I called Mr. Fox. We spoke for a few minutes. He indicated that the D.C. Bar had received a complaint from a

2

third party about Respondent, and that Mr. Fox would forward it to me and that

Respondent could respond if we wished to. No mention was made of a subpoena,

or of accepting service of a subpoena. No agreement was made between me and

Mr. Fox regarding service of any process or subpoena nor any deadline for

responding.

6.

On November 22, 2021, at 10:37 AM, I received a voicemail from Mr. Fox

which said as follows: "Uh Bob this is Phil Fox over at the Office of Disciplinary

Counsel. Uh, it has not escaped my attention that I've had no response whatsoever

to either what we call the B-letter that I sent to you, uh to [Respondent] care of

you, or the subpoena. Uh, nor have we had a response to what we call the D-letter,

which is our procedure for the follow-up, which was due on Friday. So, we are

preparing motions to compel. Um, if you don't want to go that route uh give me a

call, [redacted]. I suspect we'll have the motions uh certainly by tomorrow – filed

by tomorrow morning, if not today. Thanks."

7.

I called Mr. Fox at 10:40 AM on November 22, 2021, immediately after

listening to his voice mail. I told him that I had not received anything from the

Office of Disciplinary Counsel at all, that I no longer represented Respondent, and

that Respondent was now represented by Harry MacDougald.

3

8.

I then made immediate and urgent efforts to check all incoming mail and email to confirm I had not received anything from Mr. Fox – I had not. Indeed, I have never received any written correspondence of any kind, (mail, email or electronic message) from the Office of Disciplinary Counsel.

9.

Once I had doubled-checked for mail and searched my email system (including filters) to confirm I had not received any correspondence of any kind regarding Respondent, I called Mr. Fox again at 11:19 AM on November 22, 2021, and confirmed to him that I had searched all electronic records and regular mail, and that I had received no letter or any other document from the Office of Disciplinary Counsel regarding Respondent by email, regular mail, or other means.

10.

The totality of my communications with Mr. Fox before withdrawing from representing Respondent were the voice mail described in paragraph 4 above and the telephone conversation described in paragraph 5 above.

11.

At no point did I ever agree on behalf of Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena. Indeed, I was unaware of the existence of any subpoena related to

4

Respondent until contacted by his successor counsel regarding this matter, and I

certainly did not agree to accept service of a subpoena or agree to a deadline for

any response.

_____

Robert N. Driscoll

Sworn to and subscribed before me, this 11 day of February, 2022.

_____ (seal)

Notary Public

My commission expires: _11-30-2023_

5

# Exh. 2

# Affidavit of Jeffrey B. Clark

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

In the Matter of

CONFIDENTIAL (J.B.C.), ESQ.

      Respondent,

A member of the Bar of the District of
Columbia Court of Appeals

Disciplinary Docket

No. 2021-D193

## AFFIDAVIT OF JEFFREY B. CLARK

Personally appeared before the undersigned officer, duly authorized to administer oaths,

Jeffrey B. Clark, who, after being duly sworn, testified and stated as follows:

1.

My name is Jeffrey B. Clark. I am over the age of 18, suffer no mental imparities, and

have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 1997. I am

admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for all Circuits, the

U.S. District Court for Southern District of Alabama, the District of Columbia, District of

Nebraska, and Eastern District of Texas, as well as the Court of Federal Claims. I am the

Respondent in the above-referenced matter.

3.

I was previously represented in this matter by Robert N. Driscoll. However, that engagement terminated on October 25, 2021. Between October 25, 2021 and mid-January 2022, I was seeking counsel to represent me in this matter.

4.

I began corresponding directly with Hamilton Fox, the D.C. Bar Disciplinary Counsel in late November 2021 into early December 2022, especially after discovering that emails notifying me of documents from the DC Bar being available on a file sharing service had been caught in my spam filter. As a result, I had not received or been able to retrieve the material Mr. Fox's assistant had been trying to send me. I emailed Mr. Fox about this problem on December 2, 2021, and he replied the same day. *See* Exh. 1.

5.

On December 3, 2021, I tested positive for Covid, and let Mr. Fox know about that via email shortly thereafter. He very graciously gave me time to recover, which took the month of December and required a hospital trip to receive monoclonal antibodies.

6.

When I had recovered from Covid, I had an email dialog with Mr. Fox and one of his assistants. Delivery problems persisted such that I did not receive a complete copy of Mr. Fox's letter transmitting the subpoena and its attachments until January 6, 2022. Mr. Fox and I agreed that I would respond to the subpoena on January 31, 2022.

2

7.

At no point did I agree to accept legal service of the subpoena by email.

Jeffrey B. Clark

Sworn to and subscribed before me, this 15 day of February, 2022.

Notary Public
My commission expires: 04/30/2023

KIRAN R. SHRESTHA
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
REGISTRATION #7130618
MY COMMISSION EXPIRES APRIL 30, 2023

3

# Clark Affidavit

# Exh. 1

Subject: RE: [EXT]DC Bar Correspondence

From: Jeffrey Clark - To: Phil Fox - Cc: Harry MacDougald - Date: December 2, 2021 at 11:29 AM

Thank you Mr. Fox and I wish you are at your professional best in the argument.

Jeff Clark

**From:** Phil Fox <████████dcodc.org>
**Sent:** Thursday, December 2, 2021 11:24 AM
**To:** Jeffrey Clark <█████████████████████>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** RE: [EXT]DC Bar Correspondence

I am preparing for an argument at 2:00 today. I have asked my secretary to resend the material, but I am confident that you have most of it since it is the public record stuff from the Judiciary Committee. I'll get back to you after the argument. For future reference, my direct dial number is 202/454-1728.

**From:** Jeffrey Clark <█████████████████████>
**Sent:** Thursday, December 2, 2021 11:12 AM
**To:** Phil Fox <████████dcodc.org>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** [EXT]DC Bar Correspondence
**Importance:** High

Mr. Fox,

Apologies. After I discovered a few days ago that materials from some kind of dropbox-like site were sitting in my spam folder and emailing with Ms. Thornton, I was hoping to give you a call yesterday, but the January 6 Committee is setting unrealistic deadlines. Despite the fact that my lawyer has a hearing in Atlanta on Friday, they are insisting on a second deposition on Saturday, and I need to use the time between now and then to get ready.

Juggling a lot on my end and so don't have the to-spam emails in front of me but my understanding is that they indicated the dropbox-type access expired on 11/29. So it would be best if you re-sent them to me, if that is not too much to ask. Given the spam problem, I authorize you to send anything you need to, to me to this email address as direct attachments, but maybe with a CONFIDENTIAL header on it, assuming the file size is not too large that they will go through as ordinary attachments. If there is a file-size issue, please re-ripen the dropbox-type access but send me an email here, since your test on that (when the sending email address was yours and not the more general email address) worked, to let me know to check my spam box. When I can free up some time, I'll figure out how to put that general address you use to keep confidentiality into my trusted senders or whatever the Outlook term is for that in the program.

Also, I will need to get separate counsel for this and to contact my malpractice carrier to inquire re how that works as no claim has ever been filed against me in my 25-year career, so I am not familiar with any of these processes. My lawyer for the Committee interaction may be able to help me for a bit but I think I should retain someone who regularly practices ethics law to assist me and that will take some time to find and get retention/insurance arrangements worked out with, particularly given that the political issues involved impact the pool of lawyers that I can attract. I've copied my lawyer for Committee matters, Mr. Harry MacDougald here, for the limited temporary purpose of helping me as I search for ethics counsel.

I hope you will bear with me. The legal issues here are far from ordinary.

Thank you very much Mr. Fox.

Respectfully submitted,

Jeff Clark

# Exh. 3

# Affidavit of Harry W. MacDougald

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

| | |
|---|---|
| In the Matter of | |
| CONFIDENTIAL (J.B.C.), ESQ. | Disciplinary Docket |
| Respondent, | No. 2021-D193 |
| A member of the Bar of the District of Columbia Court of Appeals | |

## AFFIDAVIT OF HARRY W. MACDOUGALD

Personally appeared before the undersigned officer, duly authorized to administer oaths, Harry W. MacDougald, who, after being duly sworn, testified and stated as follows:

1.

My name is Harry W. MacDougald.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the State of Georgia since 1985. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for the 11th and D.C. Circuits, and the Northern and Southern U.S. District Courts in Georgia, and all Georgia trial and appellate courts. I am a partner in Caldwell, Carlson, Elliott & DeLoach, LLP in Atlanta, Georgia.

3.

I represent the Respondent in connection with the January 6 Select Committee and in connection with the above-referenced disciplinary matter. I did not begin representing

Respondent in the above-referenced matter until January, 2022, though I was copied on some emails between the Respondent and Disciplinary Counsel beginning December 2, 2021 while Respondent was looking for other counsel to represent him in this matter.

<div align="center">4.</div>

At no point did I ever agree on behalf of the Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena.

<div align="center">5.</div>

On the afternoon of January 28, 2022, I had a telephone conversation with Phil Fox, D.C. Bar Disciplinary Counsel. I told Mr. Fox we would not be producing any documents in response to the subpoena and whether, in light of that, asked if the Respondent needed to appear at the Bar offices in response to the subpoena. Mr. Fox replied that Respondent was not required to appear but that we "would be in court very quickly" on a motion to compel. He indicated that asserting the act of production privilege would be frivolous and that doing so would not stand Respondent in good stead when it came time for imposing disciplinary sanctions. He added "I promise you I will ratchet up" the sanction to be imposed if we asserted the Fifth.

<div align="center">6.</div>

At 8:30 PM Friday evening, January 28, 2022, Mr. Fox sent me an email, attached hereto as Exh. 1, in which he reiterated this threat as follows:

> Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

<div align="center">2</div>

7.

On the morning of Saturday February 5, 2022, I received an email from Mr. Fox's

assistant, Angela Thornton, which attached a letter from Mr. Fox dated February 3, 3022

purporting to transmit his motion to compel and the exhibits thereto. However, Ms. Thornton's

email included only the letter, and not the motion or any of its exhibits. See Exh. 2.

8.

I promptly replied to Ms. Thornton and said that I didn't see the motion. Ms. Thornton

replied "Motion? No motion with this email, just the letter addressed to you from Mr. Fox." I

replied as follows:

> The first sentence of the letter says: "Accompanying this letter is a Motion to
> Compel that we filed with the Court of Appeals today."
>
> That is the motion after which I am inquiring.
>
> Thanks for any help you can provide on that.

*Id*.

9.

After about an hour with no response from Ms. Thornton, I emailed her again at 11:05

AM, saying the following:

> Ms. Thornton:
>
> The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being
> transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from
> Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion
> it says is enclosed.
>
> And today, your email transmitting the letter did not include the motion either.
>
> I did receive some document production via a file share type of thing, but there was
> no motion in there, either.

3

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

*Id.*

10.

Ms. Thornton never responded to three emails to her asking for a copy of the motion. Therefore, at 5:20 PM I emailed this conversation to Mr. Fox, informed him I still did not have the motion, and asking if he could please email it to me. Mr. Fox responded promptly, and we exchanged numerous emails on the topic. *See* Exh. 3. The upshot of those emails was that I received an email with the motion attached, but never received an email with the exhibits. Mr. Fox was clearly exerting himself to deliver the documents to me, and indicated he had emailed the exhibits, but I never got them. He identified the exhibits, which were documents that I already had. He added that he would send the motion and exhibits via FedEx on Monday. *Id.* at p. 2.

11.

By mid-afternoon Friday February 11, 2022, I still had not received the motion by regular mail, nor had I received any of the exhibits via email, nor had I received a FedEx delivery as Mr. Fox had indicated the previous Saturday would be forthcoming. I therefore emailed Mr. Fox to let him know I still had not received the exhibits and would he mind putting the material on a file sharing site for download. Mr. Fox replied that he would look into it but "I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt." *See* Exh. 4.

12.

In response to that information, two assistants and I looked in every office in our firm and queried everyone in the office but we could not find any such FedEx package. We also had someone check on the 16th floor of the two other buildings in our office park to seek if perhaps the package had been misdelivered, but we could not find it that way either. *Id*.

13.

I kept Mr. Fox apprised of these efforts as they unfolded and asked him if he could identify who had signed for the package, or perhaps give me the tracking number and we would check that ourselves. *Id*. At first he indicated that would have to wait until Monday, but among several emails passing between us that afternoon, Mr. Fox forwarded me the FedEx airbill for the delivery. *See* Exh. 5. This email was actually received before my last reply to Mr. Fox asking for the tracking number in Exh. 4, but I did not see it until after I sent that reply because I was looking around the office trying to find the package. Once I saw the airbill, which has the tracking number on it, I entered that tracking number into the FedEx package tracking webpage. The result was that there was no such tracking number in the FedEx system. I then had two assistants search for the tracking number on the FedEx website with the same result. I relayed that information to Mr. Fox. *See* Exh. 6. For reasons unknown to me, it appears this package tracking number never made it into the FedEx system.

14.

On February 14, 2022, Mr. Fox's assistant. Ms. Thornton sent me a DropBox link from which I was able to download Mr. Fox's letter of February 3, 2022 (which I had first received February 5, 2022), and the motion with all of its exhibits. This was the first time I had received the complete package of the motion and all of its exhibits.

5

15.

On February 15, 2022, I received delivery of a FedEx package bearing the same airbill number as the one Mr. Fox emailed me on February 11 that is attached to Exh. 6. The airbill was filled out on February 7, but the FedEx tracking history shows that it first entered the FedEx system on February 14, 2022. Exh. 7.

Harry W. MacDougald

Sworn to and subscribed before me, this 15 day of February, 2022.

Notary Public
My commission expires: _____

YVETTE ANN RIX
Notary Public, State of Georgia
Fulton County
My Comm. Expires June 4, 2024

# MacDougald Affidavit

# Exh. 1

**Subject: Re: [EXT]Jeffrey Clark**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: January 28, 2022 at 8:30 PM

Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:34 PM
**To:** Phil Fox
**Subject:** RE: [EXT]Jeffrey Clark

Any time is fine including tonight or this weekend. My direct rings over to my cell, which is 404-388-8622.

Best,

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: January 28, 2022 at 3:32:32 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Jeffrey Clark


I am in the middle of a meeting.  How long will you be available?

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:32 PM
**To:** Phil Fox <███████dcodc.org>
**Subject:** [EXT]Jeffrey Clark


Mr. Fox:


Can you give me a call at the number below regarding Mr. Clarke's response to your subpoena? Maybe 5 min.

Thanks.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 2

**Subject: RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary**

From: hmacdougald@ccedlaw.com - To: Angela Thornton - Cc:  - Date: February 5, 2022 at 11:05 AM

Ms. Thornton:

The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion it says is enclosed.

And today, your email transmitting the letter did not include the motion either.

I did receive some document production via a file share type of thing, but there was no motion in there, either.

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct:  404-843-4109

From: hmacdougald@ccedlaw.com <hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton ████████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

> The first sentence of the letter says "Accompanying this letter is a Motion to Compel that we filed with the Court of Appeals today."
>
> That is the motion after which I am inquiring.
>
> Thanks for any help you can provide on that.
>
> -----
> Harry W. MacDougald
> Caldwell, Carlson, Elliott & DeLoach, LLP
> Two Ravinia Drive
> Suite 1600
> Atlanta, Georgia 30346
> 404-843-1956
> Direct:  404-843-4109
>
> From: Angela Thornton <████████████████
> Date: February 5, 2022 at 10:07:03 AM
> To: Harry MacDougald <hmacdougald@ccedlaw.com>
> Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193
>
> Motion? No motion with this email, just the letter addressed to you from

Mr. Fox.

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Saturday, February 5, 2022 10:06 AM
To: Angela Thornton <█████████████████>
Subject: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't see the motion

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton <█████████████████>
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Dear Mr. MacDougald, please see letter attached from Mr. Fox, Disciplinary Counsel.  If there are questions or concerns, please don't hesitate to let us know.  Thank you.

Regards,

Angela

# MacDougald Affidavit

# Exh. 3

**Subject: Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc: - Date: February 5, 2022 at 6:12 PM

The attachments, actually exhibits, are all things you have: the November letter and subpoena to Clark; the email chain, which is also attached to one of your January 31 letters, about the difficulty we had then in getting all the materials to Clark; and your letter asserting the Fifth. I will make sure a hard copy of everything is sent to you on Monday. I don't understand why we are having such difficulty transmitting this stuff. We have been doing virtually everything electronically for two years, and I am unaware of any other case where we have had these problems.

Get Outlook for iOS

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 6:01:41 PM
**To:** Phil Fox <███████dcodc.org>
**Subject:** RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I got the email transmitting the motion and saying the attachments would come separately, but haven't seen those yet.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <█████dcodc.org>
Date: February 5, 2022 at 5:59:48 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Azadeh Matinpour <████████████████ Angela Thornton <█████████████████ Jason Horrell <█████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I just resent everything—first the motion and then the motion with the attachments.  Nothing bounced back.  Did you get them?

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Saturday, February 5, 2022 5:39 PM
To: Phil Fox <█████dcodc.org>
Subject: RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Thanks - much appreciated.

Have a good rest of your weekend.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600

Atlanta, Georgia 30346
[404-843-1956](tel:404-843-1956)

Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: February 5, 2022 at 5:36:28 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't know without looking, but I am not going to take advantage of your failure to receive it.

---

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Saturday, February 5, 2022 5:35 PM
To: Phil Fox <███████dcodc.org>
Subject: Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I received the letter this morning but no motion.

I know it's not your job to help me read the rules, but I'll go ahead and ask - is it correct that we have a 7 calendar day response time for responding to motions?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
[404-843-1956](tel:404-843-1956)

Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: February 5, 2022 at 5:32:30 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

It is just the letter and the motion. If I can't get it to you, we will FedEx it Monday. I will try again.

Get Outlook for iOS

---

From: Harry MacDougald <hmacdougald@ccedlaw.com>

Sent: Saturday, February 5, 2022 5:28:53 PM
To: Phil Fox < ██████ dcodc.org>
Subject: Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193

No sir, I have not seen it yet. I got this one, but I haven't seen the other
one  with the motion. I checked my online spam folder as well. Not sure
what's going on with that. Is it a particularly large attachment?


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <██████dcodc.org>
Date: February 5, 2022 at 5:25:43 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193


Did you get the email with the motion that I just sent you?


Get Outlook for iOS
_____
From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Saturday, February 5, 2022 5:20:02 PM
To: Phil Fox <██████dcodc.org>
Subject: Fwd: RE: [EXT]Re: in re Clark/Disciplinary Counsel
- Disciplinary Docket No. 2021-D193

Mr. Fox:


Please see the correspondence below. No response to three
emails to Ms. Thornton asking for the motion. I still do not
have the motion referred to in your letter of 2/3, which I
just received this morning.


If you could please send me the motion at your earliest
convenience, I'd appreciate it.


Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 11:05:33 AM
To: Angela Thornton <█████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193



Ms. Thornton:


The letter you sent me this morning from Mr.
Fox is dated 2/3, and states it is being
transmitted to me on 2/3 via email.  However, I
do not have an email from 2/3 from Mr. Fox, or
a letter from Mr. Fox sent to me that day, much
less a copy of the motion it says is enclosed.


And today, your email transmitting the letter did
not include the motion either.


I did receive some document production via a
file share type of thing, but there was no motion
in there, either.


It's possible I have missed something as I was
in court all day Thursday and had outpatient
surgery yesterday, but searching my emails I
don't have anything from Mr. Fox on 2/3.
Perhaps someone else in your office sent it?


In any event, we would appreciate your sending
us the motion at your earliest convenience and
letting me know one way or the other whether I
have overlooked its prior transmittal from your
office.


Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct:  404-843-4109


From:  hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton <█████████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary
Counsel - Disciplinary Docket No. 2021-D193



The first sentence of the letter says
"Accompanying this letter is a
Motion to Compel that we filed with
the Court of Appeals today."


That is the motion after which I am
inquiring.


Thanks for any help you can provide
on that.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Angela Thornton
<██████████████████████
Date: February 5, 2022 at 10:07:03
AM
To: Harry MacDougald
<hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re
Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193

Motion? No motion with this email, just the letter addressed to you from Mr. Fox.

---

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Saturday, February 5, 2022 10:06 AM
To: Angela Thornton <████████████>
Subject: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't see the motion

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton
<████████████>
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Dear Mr. MacDougald,
please see

letter attached from Mr. Fox, Disciplinary Counsel. If there are questions or concerns, please don't hesitate to let us know. Thank you.

Regards,

Angela

# MacDougald Affidavit

# Exh. 4

Subject: RE: [EXT]Service Copy of Motion

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc: Angela Thornton - Date: February 11, 2022 at 5:14 PM

That will have to wait until next week.

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 5:13 PM
**To:** Phil Fox <▓▓▓▓dcodc.org>
**Subject:** RE: [EXT]Service Copy of Motion

I received an email from Ms. Thornton sent at 11 AM transmitting your letter of today's date and attachments consisting of correspondence between you and Mr. Weinsheimer dated Feb 7 and 8 respectively, for which you have my thanks.

If you or Ms. Thornton can give us the tracking number for the FedEx package we can look up who signed for it.

Both me and my assistant checked all the offices in our suite and asked everyone who is still here and no sign of it. Our office manager has not seen it either. We also checked the 16th floor of the other two buildings in our office park and nothing there either - one of them is vacant anyway. There's no one at home in the other suites on our floor so we don't know if it might have gone to one of them by mistake. So the next available step is to let us know who signed for it or give us the tracking number so we can check ourselves.

Thank you in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <▓▓▓▓dcodc.org>
Date: February 11, 2022 at 4:59:31 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject: RE: [EXT]Service Copy of Motion

I don't. Angela might next week. Did you receive the email and attachments that we sent you this morning?

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Friday, February 11, 2022 4:58 PM
To: Phil Fox <▓▓▓▓dcodc.org>

Subject: RE: [EXT]Service Copy of Motion

Do you have a name of who signed for it?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: February 11, 2022 at 4:41:38 PM
To:
Subject:  RE: [EXT]Service Copy of Motion


We'll look into that, but I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt.

From: Harry MacDougald <hmacdougald@ccedlaw.com>
Sent: Friday, February 11, 2022 4:31 PM
To: Phil Fox <███████dcodc.org>
Subject: [EXT]Service Copy of Motion

Mr. Fox:

While our building's mail has not yet arrived today (even though it's a 17 story building), I still have not received the mail service copy of your motion to compel, and never did receive the emails transmitting the exhibits.

Would you mind perhaps using a file sharing service like DropBox or the like to get the full set to me electronically?

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 5

**Subject:** FW: In re Clark - DDNo. 2021-D193

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: February 11, 2022 at 4:48 PM, Attachments: 2021-D193 fedex shipping bill 02072022.pdf

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.

**From:** Angela Thornton <███████████████████
**Sent:** Monday, February 7, 2022 1:47 PM
**To:** Phil Fox <███████dcodc.org>; Jason Horrell <████████████████ Azadeh Matinpour
<████████████
**Subject:** In re Clark - DDNo. 2021-D193

David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning

Angela

**FedEx Express**

Package
US Airbill

FedEx Tracking Number: 8148 8013 6300

MUR 1

Form 0215

Sender's Copy

**1 From** *Please print and press hard.*

Date 2/7/2022

Sender's FedEx Account Number

SENDER'S FEDEX ACCOUNT NUMBER IS USED FOR BILLING ONLY

Sender's Name Hamilton P. Fox, III   Phone 202.638-1501

Company OFFICE OF DISCIPLINARY COUNSEL

Address 515 5TH ST NW

Dept/Floor/Suite/Room

City WASHINGTON   State DC   ZIP 20001-2710

**2 Your Internal Billing Reference** 2021-D1093

*First 24 characters will appear on invoice.*

**3 To**

Recipient's Name Harry W. MacDougald   Phone 404,843-4109

Company Caldwell, Carlson, Elliott & DeLoach, LLP

Address Two Ravinia Drive  Suite 1600

Dept/Floor/Suite/Room

Address
*Use this line for the HOLD location address or for continuation of your shipping address.*

City Atlanta   State GA   ZIP 30346

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

6

0133821617

**4 Express Package Service** *To most locations.*

☐ FedEx First Overnight
☐ FedEx Priority Overnight
☐ FedEx Standard Overnight
☐ FedEx 2Day A.M.
☐ FedEx 2Day
☐ FedEx Express Saver

**5 Packaging**
☐ FedEx Envelope*   ☐ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6 Special Handling and Delivery Signature Options**
☐ Saturday Delivery
☐ No Signature Required
☐ Direct Signature
☐ Indirect Signature

**Does this shipment contain dangerous goods?**
☐ No   ☐ Yes   ☐ Dry Ice
☐ Cargo Aircraft Only

**7 Payment** *Bill to:*
☐ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Total Packages   Total Weight 0.15 ₂₂   Total Declared Value* $ .00

611

00066
00200

fedex.com 1.800.GoFedEx 1.800.463.3339

# MacDougald Affidavit

# Exh. 6

**Subject: Re: FW: In re Clark - DDNo. 2021-D193**

From: hmacdougald@ccedlaw.com - To: Phil Fox - Cc:  - Date: February 11, 2022 at 5:30 PM

Phil:

Thank you for sending the FedEx Airbill.

Three people in my office including me and two assistants have put the tracking number from the airbill into the FedEx tracking number search box and we get this response:  "No record of this tracking number can be found at this time, please check the number and try again later. For further assistance, please contact Customer Service."

The airbill is filled out to not require a signature for delivery.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct:  404-843-4109

From:  Phil Fox <███████dcodc.org>
Date: February 11, 2022 at 4:48:29 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  FW: In re Clark - DDNo. 2021-D193

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.


From: Angela Thornton <████████████████
Sent: Monday, February 7, 2022 1:47 PM
To: Phil Fox <██████dcodc.org>; Jason Horrell <█████████████ Azadeh Matinpour <████████
Subject: In re Clark - DDNo. 2021-D193


David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning


Angela

# MacDougald Affidavit

# Exh. 7



FedEx Tracking                                                      Track Another Shipment        Help

814880136300

**ADD NICKNAME**



# Delivered
# Tuesday, February 15, 2022 at 8:06 am



**DELIVERED**

Signature release on file

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

**FROM**

WASHINGTON, DC US

**TO**

GA US

**MANAGE DELIVERY** ⌄

Travel History          Shipment Facts

# Travel History

**TIME ZONE**
Local Scan Time ⌄

**Tuesday, February 15, 2022**

| 8:06 AM | GA | Delivered<br>Package delivered to recipient address - release authorized |
| 6:15 AM | MARIETTA, GA | On FedEx vehicle for delivery |
| 5:39 AM | ATLANTA, GA | At destination sort facility |
| 3:48 AM | MEMPHIS, TN | Departed FedEx hub |
| 12:17 AM | MEMPHIS, TN | Shipment arriving On-Time |
| 12:05 AM | MEMPHIS, TN | Arrived at FedEx hub |

Monday, February 14, 2022

| 9:21 PM | WASHINGTON, DC | Left FedEx origin facility |
| 4:13 PM | WASHINGTON, DC | Picked up |

Expand History ⌄

## Shipment Facts

| **TRACKING NUMBER** | **SERVICE** | **WEIGHT** |
| 814880136300 | FedEx First Overnight | 0.5 lbs / 0.23 kgs |

| **TOTAL PIECES** | **TOTAL SHIPMENT WEIGHT** | **TERMS** |
| 1 | 0.5 lbs / 0.23 kgs | Shipper |

| **SHIPPER REFERENCE** | **PACKAGING** | **SPECIAL HANDLING SECTION** |
| 2621 D193 | FedEx Envelope | Deliver Weekday |

| **SHIP DATE** | **SHIPMENT-FACTS.COD-DETAIL** | **STANDARD TRANSIT** |
| 2/14/22 ⓘ | $0.00 | 2/15/22 before 8:30 am ⓘ |

**ACTUAL DELIVERY**
2/15/22 at 8:06 am

## Exh. 4

## Senator Durbin Letter to Office of Disciplinary Counsel, October 7, 2021

RICHARD J. DURBIN, ILLINOIS, CHAIR

PATRICK J. LEAHY, VERMONT
DIANNE FEINSTEIN, CALIFORNIA
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
ALEX PADILLA, CALIFORNIA
JON OSSOFF, GEORGIA

CHARLES E. GRASSLEY, IOWA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JOSHUA D. HAWLEY, MISSOURI
TOM COTTON, ARKANSAS
JOHN KENNEDY, LOUISIANA
THOM TILLIS, NORTH CAROLINA
MARSHA BLACKBURN, TENNESSEE

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

October 7, 2021

Office of Disciplinary Counsel
District of Columbia Court of Appeals
515 5th Street NW
Building A, Suite 117
Washington, D.C. 20001

## Re:   Request for Disciplinary Investigation of Jeffrey Bossert Clark

To the Disciplinary Counsel:

As the Chair of the U.S. Senate Judiciary Committee, I write to express my grave concern about actions taken by Jeffrey Bossert Clark that may constitute serious professional misconduct under the D.C. Rules of Professional Conduct. Since January 2021, the Committee has been investigating allegations that Mr. Clark aided then-President Trump's efforts to enlist the U.S. Department of Justice (DOJ) in overturning the results of the 2020 Presidential election. After months of reviewing documents and interviewing key former DOJ personnel with firsthand knowledge of Mr. Clark's actions, the Committee has released the attached interim staff report (the "Report"). Based on the Report's findings, I respectfully request that the Office of Disciplinary Counsel open an investigation to determine whether Mr. Clark, who is a member of the D.C. Bar, violated applicable D.C. Rules of Professional Conduct and should be subject to disciplinary action.

As further detailed in the Report, Mr. Clark attempted to enlist DOJ in President Trump's efforts to overturn the results of the presidential election without evidence or legal authority. In furtherance of this goal, Mr. Clark:

- violated, blatantly and on multiple occasions, longstanding DOJ policies designed to insulate the Department's investigations and prosecutions from partisan political influence by meeting with President Trump;

- continually pressed DOJ leadership to publicly announce that there was corruption in the 2020 general election and to urge swing-state legislatures to convene special legislative sessions to appoint alternate slates of electors, despite being repeatedly told by DOJ leadership that his election fraud claims were baseless and that DOJ lacked legal authority to pursue his proposed course of action; and

- attempted to coerce then-Acting Attorney General Jeffrey Rosen into agreeing to his proposals by threatening Mr. Rosen with the prospect of replacing him as Attorney General.

Lawyers admitted to the D.C. Bar swear an oath "to support the Constitution of the United States."[1] It should go without saying that attempts to subvert a free and fair election do not support the Constitution.

The D.C. Bar defines misconduct as "[a]cts or omissions by an attorney…which violate the attorney's oath of office or the rules or code of professional conduct currently in effect."[2] Mr. Clark's actions implicate several D.C. Rules of Professional Conduct. First, by using his official capacity as an Acting Assistant Attorney General to push DOJ to take official action based on verifiable falsehoods, Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against "counsel[ing] a client to engage, or assist[ing] a client, in conduct the lawyer knows is criminal or fraudulent." While Rule 1.2(e) allows "lawyers to discuss the consequences of any proposed course of conduct with a client" and "assist a client to make a good-faith effort to determine the validity, scope, meaning, or application of the law," Mr. Clark's actions do not fit into this exemption. To the contrary, as the Report demonstrates, he repeatedly pressed DOJ leadership to take the extraordinary and unlawful step of intervening in states' appointment of electors based on false claims of election fraud. Rule 1.0(f) defines knowledge as "actual knowledge," which "may be inferred from circumstances." The American Bar Association's Standing Committee on Ethics and Professional Responsibility has further clarified that actual knowledge "may be inferred from the circumstances, including a lawyer's willful blindness to or conscious avoidance of facts." ABA Formal Op. 491 (2020). As the Report establishes, Mr. Clark should have known, and was given every opportunity to know, that the election fraud claims he pushed were false.

Mr. Clark also appears to have violated at least four of the prohibitions in Rule 8.4 regarding professional misconduct. First, the verifiable falsehoods at the core of Mr. Clark's efforts implicate Rule 8.4(c)'s prohibition of "conduct involving dishonesty, fraud, deceit, or misrepresentation." Second, his repeated requests that Acting Attorney General Rosen endorse these falsehoods, and his suggestion that he would decline an offer to replace Rosen as Acting Attorney General if Rosen agreed to pursue his proposal, implicate Rule 8.4(a)'s prohibition against knowingly assisting or inducing someone to violate the Rules of Professional Conduct. Third, Rule 8.4(e) prohibits a lawyer from "stat[ing] or imply[ing] an ability to influence improperly a government agency or official," and Mr. Clark attempted to improperly influence both DOJ's own leadership and several state legislatures. Finally, as a senior DOJ official who sought to improperly use DOJ's law enforcement powers on behalf of a political candidate and to overturn the election results, the totality of Mr. Clark's efforts implicate Rule 8.4(d)'s prohibition of "conduct that seriously interferes with the administration of justice." Other Rules may be similarly implicated.

Mr. Clark's misconduct does more than speak to his fitness as a lawyer; his activities, which were part of a broader course of conduct by President Trump and his allies to overturn the election, have had severe ramifications for the rule of law. When a government lawyer,

---

[1] Attorney Oath of Admission to the District of Columbia Bar, *available at* https://www.dccourts.gov/sites/default/files/divisionspdfs/committee%20on%20admissions%20pdf/Attorney_Oath_Statement_Roll_of_Attorneys.pdf.

[2] Rules Governing the District of Columbia Bar, Rule XI, Section 2(b).

particularly one entrusted with a high level of leadership in the nation's foremost law enforcement agency, commits serious violations of professional conduct, such actions undermine the integrity of our justice system and erode public confidence in it. Public confidence is further eroded when serious misconduct comes to light only to be met with no consequences. Therefore, I submit this letter of complaint to respectfully request that the Office of the Disciplinary Counsel initiate an investigation and take appropriate disciplinary proceedings pursuant to Rule XI of the Rules Governing the District of Columbia Bar.

I appreciate your prompt attention to this sensitive matter. The Committee is available for further consultation as needed.

Sincerely,

Richard J. Durbin
Chair, U.S. Senate Committee on the Judiciary

Enclosure

cc:     The Honorable Charles E. Grassley
        Ranking Member, U.S. Senate Committee on the Judiciary

# Exh. 5

# Bradley Weinsheimer Letter to Jeffrey B. Clark, July 26, 2021



**U.S. Department of Justice**

Office of the Deputy Attorney General

_Bradley Weinsheimer_                                          _Washington, D.C. 20530_
Associate Deputy Attorney General

July 26, 2021

Jeffrey B. Clark
Lorton, VA
Via email to Counsel

Dear Mr. Clark:

 The Department of Justice (Department) understands that you have been requested by the
U.S. House of Representatives Committee on Oversight and Reform (House Oversight
Committee), and the U.S. Senate Judiciary Committee to provide transcribed interviews to the
Committees relating to your service as Assistant Attorney General for the Environment and
Natural Resources Division and Acting Assistant Attorney General for the Civil Division. In
these interviews, you are authorized to provide information you learned while at the Department
as described more fully below.

 According to information provided to you and the Department by the House Oversight
Committee, its focus is on "examining President Trump's efforts to pressure the Department of
Justice (DOJ) to take official action to challenge the results of the presidential election and
advance unsubstantiated allegations of voter fraud."[1] The House Oversight Committee has stated
that they wish to ask you questions "regarding any efforts by President Trump and others to
advance unsubstantiated allegations of voter fraud, challenge the 2020 election results, interfere
with Congress's count of the Electoral College vote, or overturn President Biden's certified
victory."[2]

 Based upon information provided to you and to the Department from the Senate Judiciary
Committee, the Department understands that the scope of that Committee's inquiry is very
similar to that of the House Oversight Committee. The letter to the Department dated January
23, 2021, explained that the Senate Judiciary Committee is conducting oversight into public
reporting about "an alleged plot between then-President Donald Trump and [you] to use the
Department of Justice to further Trump's efforts to subvert the results of the 2020 presidential
election"—events that the letter described as raising "deeply troubling questions regarding the
Justice Department's role" in those purported efforts.[3] In addition, the Senate Judiciary

---

[1] Letter from Carolyn B. Maloney, Chairwoman, House Committee on Oversight and Reform, to Jeffrey B. Clark,
June 14, 2021.

[2] _Id._

[3] Letter from Richard J. Durbin et al., Senate Judiciary Committee, to Monty Wilkinson, Acting Attorney General,
Dep't of Justice, January 23, 2021, at 1, https://www.judiciary.senate.gov/press/dem/releases/senate-judiciary-
committee-democrats-seek-answers-about-dojs-role-in-trumps-scheme-to-overturn-the-2020-election.

Committee has represented to the Department that the scope of its interview will cover your knowledge of attempts to involve the Department in efforts to challenge or overturn the 2020 election results. This includes your knowledge of any such attempts by Department officials or by White House officials to engage in such efforts. The Committee has further represented that the time frame for its inquiry will begin following former Attorney General William Barr's December 14, 2021, resignation announcement.

Department attorneys, including those who have left the Department, are obligated to protect non-public information they learned in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the Department has sought to balance the Executive Branch's confidentiality interests with Congress's legitimate need to gather information.[4]

The extraordinary events in this matter constitute exceptional circumstances warranting an accommodation to Congress in this case. Congress has articulated compelling legislative interests in the matters being investigated, and the information the Committees have requested from you bears directly on Congress's interest in understanding these extraordinary events: namely, the question whether former President Trump sought to cause the Department to use its law enforcement and litigation authorities to advance his personal political interests with respect to the results of the 2020 presidential election. After balancing the Legislative and Executive Branch interests, as required under the accommodation process, it is the Executive Branch's view that this presents an exceptional situation in which the congressional need for information outweighs the Executive Branch's interest in maintaining confidentiality.

The Executive Branch reached this view consistent with established practice. Because of the nature of the privilege, the Department has consulted with the White House Counsel's Office in considering whether to authorize you to provide information that may implicate the presidential communications privilege. The Counsel's Office conveyed to the Department that President Biden has decided that it would not be appropriate to assert executive privilege with respect to communications with former President Trump and his advisors and staff on matters related to the scope of the Committees' proposed interviews, notwithstanding the view of former President Trump's counsel that executive privilege should be asserted to prevent testimony regarding these communications. *See Nixon v. Administrator of General Servs.*, 433 U.S. 425, 449 (1977) ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support

---

[4] *See* Letter for Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (Jan. 27, 2000) ("Linder Letter") ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

invocation of the privilege accordingly."); *see also id.* (explaining that the presidential communications privilege "is not for the benefit of the President as an individual, but for the benefit of the Republic") (internal citation omitted).

Therefore, given these extraordinary circumstances, including President Biden's determination on executive privilege, and having reviewed the scope of the Committees' requested interviews, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, so long as the testimony is confined to the scope of the interviews as set forth by the Committees and as limited in the penultimate paragraph below.[5] This accommodation is unique to the facts and circumstances of this particular matter and the legislative interests that the Committees have articulated.

Consistent with appropriate governmental privileges, the Department expects that you will decline to respond to questions outside the scope of the interview as outlined above and instead will advise the Committees to contact the Department's Office of Legislative Affairs should they seek information that you are unable to provide.

Please note that it is important that you not discuss Department deliberations concerning investigations and prosecutions that were ongoing while you served in the Department. The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations. If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing." Linder Letter. Discussion of pending criminal cases and possible charges also could violate court rules and potentially implicate rules of professional conduct governing extra-judicial statements. We assume, moreover, that such Department deliberations are not within the scope of the requested testimony as defined by the Committees.

Accordingly, consistent with standard practice, you should decline to answer any such questions and instead advise the Committees to contact the Department's Office of Legislative Affairs if they wish to follow up on the questions. Responding in such a way would afford the Department the full opportunity to consider particular questions and possible accommodations that may fulfill the Committees' legitimate need for information while protecting Executive Branch confidentiality interests regarding investigations and prosecutions.

Sincerely,

Bradley Weinsheimer

---

[5] You are not authorized to reveal information the disclosure of which is prohibited by law or court order, including classified information and information subject to Federal Rule of Criminal Procedure 6(e).

3

<u>Exh. 6</u>

<u>MacDougald Letter to Rep. Bennie
G. Thompson, November 5, 2021</u>

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

HARRY W. MACDOUGALD                     ATTORNEYS AT LAW              hmacdougald@CCEDlaw.com
MANAGING PARTNER                         TWO RAVINIA DRIVE                 www.CCEDlaw.com
                                            SUITE 1800
                                     ATLANTA, GEORGIA 30346

                                     TELEPHONE 404-843-1956
                                     FACSIMILE 404-843-2737

November 5, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

I have been retained to represent Jeffrey Clark in the investigative matters pending before your Committee.[1]

Despite disparaging and misleading media narratives, Mr. Clark is not a politician and has never sought notoriety or press attention beyond what was necessary to discharge his duties. Indeed, despite serving more than four years during the Bush Administration's Justice Department from 2001-2005 and more than two years during the Trump Administration's Justice Department from 2018-2021, he was never once during those six-plus years of service asked to come before a congressional committee for

_____

[1] This letter focuses on the issues surrounding the executive privilege, though there are additional legal objections, including those of a structural constitutional nature, that we will interpose in good faith as well to Mr. Clark testifying, should doing so become necessary. We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in response to the subpoena as it is currently framed.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 2

oversight purposes, even though he litigated and supervised highly controversial cases.[2]
He had a winning record, recovered billions of dollars for the fisc, successfully defended
numerous agency rulemakings of extreme complexity, and personally briefed and
argued many cases—exemplary service. He was confirmed in October 2018 with
bipartisan support in the Senate—just one part of his distinguished 25-year legal career.

Now, after his most recent, 26-month-plus tenure in government ending in
January 2021, he wants nothing more than to return to ordinary life and law practice,
without being subjected to selective anonymous leaks and press attacks. Yet he finds
himself involuntarily caught up in a novel conflict that includes both significant inter-
branch[3] and cross-presidential[4] features to which we must provide a response.

The main purpose of this letter is this: Because former President Trump was
properly entitled, while he held office, to the confidential advice of lawyers like Mr. Clark,
Mr. Clark is subject to a sacred trust—one that is particularly vital to the constitutional
separation of powers. As a result, any attempts—whether by the House or by the current
President—to invade that sphere of confidentiality must be resisted. Nothing less will
comport with both Mr. Clark's obligations to former President Trump and with Mr.
Clark's ethical obligations as an attorney. The general category of executive privilege,
the specific categories of the presidential communications, law enforcement, and
deliberative process privileges,[5] as well as attorney-client privilege and the work product
doctrine, all harmonize on this point. Most importantly, core matters of constitutional
principle hang in the balance.

---

[2] For instance, Mr. Clark was integral to defending former President Trump's decision to withdraw from
the Paris Climate Agreement, to resisting improper judicial interference with the Census, to crafting and
then personally defending, in litigation, the first major reform in four decades of the National
Environmental Policy Act's regulations, and to shepherding through the judicial process various agency
actions protecting the southern border with Mexico against incursions. This work was unpopular in some
political quarters but at all times was consistent with law and with his client agencies' policy decisions.

[3] A single House of Congress vs. former President Trump.

[4] President Biden vs. former President Trump, *i.e.*, the current President vs. the immediately past President.

[5] Indeed, Mr. Clark's work was integral to the United States' win in the Supreme Court's most recent
deliberative process case, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 3

  Mr. Clark's position as a legal advisor to the President late in 2020 and early 2021 was particularly sensitive because he was a Senate-confirmed Justice Department leader with significant high-profile litigation and governmental experience, making it natural for a President to seek out and consult his views.[6] We trust that members of Congress of all stripes would agree that it is indisputable that American Presidents need to be able to consult, as they see fit, with their Senate-confirmed appointees. The principle goes both ways. Whomever succeeds President Biden, for instance, should not be able to expose to public scrutiny advice provided to President Biden by his advisors. Establishing precedent to the contrary would deeply chill the vigorous Executive Branch and energetic President the Founders envisioned. *See* Federalist Paper No. 70 (Hamilton) (Mar. 18, 1788) ("Energy in the executive is a leading character in the definition of good government."), *available at* https://tinyurl.com/3ep7fhz9. Without that energy and ability to be candid, presidential advisors would be reduced to bland, tasteless creatures, and the prospect of innovative advice would be stifled.

  For these reasons, as amplified below, and with due respect to the Committee, Mr. Clark has come with me today, to present this letter of objection. Mr. Clark will, of course, abide by a future judicial decision(s) appropriately governing all underlying disputes with finality, but for now he must decline to testify as a threshold matter because the President's confidences are not his to waive.

  1.    Since August 2, 2021, when a pivotal letter was sent on behalf of former President Trump to Mr. Clark (Attachment), there have been several cardinal developments:

  (1) On September 23, 2021, this Committee subpoenaed senior White House officials Mark Meadows and Daniel Scavino, senior Pentagon official Kashyap Patel, and

---

[6] Beginning in November 2018, Mr. Clark headed one of the Justice Department's seven litigating Divisions (the approximately 112 year-old Environment & Natural Resources Division, which has existed for most of the 151 years of the Justice Department's history). And later, in light of his excellent service in the Environment Division during the last Administration, Mr. Clark was also tapped by the Attorney General in the Fall of 2020 to run a second of those seven litigating Divisions as the Acting Assistant Attorney General for the Civil Division.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 4

Stephen Bannon, making especially clear to Mr. Clark that executive privilege had
been invoked in light of the violation of a condition set forth in the August 2, 2021,
letter from former President Trump's counsel, as explained in more detail below;

(2) On or about October 7, 2021, former President Trump invoked executive privilege
and instructed these four presidential advisors not to comply with the Committee's
requests;[7]

(3) Additionally, on September 29, 2021, the Committee had subpoenaed 11 other
individuals to appear for questioning; and, most importantly,

(4) The former President took the critical step of bringing suit against the Committee,
among others, in *Trump v. Thompson*, Civ. A. No. 21-2769 (D.D.C. Oct. 18, 2021). In this
case, President Trump asserts executive privilege and is objecting to the Committee's
request to the Archivist of the United States to produce records of his administration.

The August 2 letter from your former colleague, Georgia Congressman Douglas A.
Collins, stated to Mr. Clark that "President Trump continues to assert that the non-public
information the Committees seek is and should be protected from disclosure by the
executive privilege," and that this "executive privilege applicable to communications
with President Trump belongs to the Office of the Presidency, not to any individual
President, and President Biden has no power to unilaterally waive it." Attachment at 1.

The Collins letter also quoted the Supreme Court's recognition that "the privilege
is not for the benefit of the President as an individual, but for the benefit of the Republic."
*Id.* (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 449 (1977)). That decision
provides that the purpose of the privilege is to "give his advisers some assurance of
confidentiality," so that the "President [can] expect to receive the full and frank
submission of facts and opinions upon which effective discharge of his duties depends."
*Id.* Additionally, the August 2 letter noted that an earlier July 26, 2021 letter to Mr. Clark

---

[7] See Jacqueline Alemany, et al., *Trump Lawyer Tells Former Aides Not to Cooperate with Jan. 6 Committee*,
WASH. POST (Oct. 7, 2021), *available at* https://www.washingtonpost.com/politics/2021/10/07/trump-lawyer-
tells-former-aides-not-cooperate-with-jan-6-committee/.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 5

from the current Justice Department had selectively edited a quotation out the *Nixon* decision, leaving off the key sentence that "***the privilege survives the individual President's tenure.***"  Attachment at 2 (quoting *Nixon*, 433 U.S. at 449) (emphasis added). *See also* Prof. Saikrishna Prakash, *Trump Is Right: Former Presidents Can Assert Executive Privilege*, Wash. Post. (Oct. 29, 2021), *available at* https://tinyurl.com/ykcpz94w.

I concur with that assessment by the former President and his counsel.  Were any successor occupant of the office of President able to waive claims of executive privilege asserted by his or her predecessors, the principal purpose of the privilege would be defeated, to the detriment of the Executive Branch, to the separation of powers, and to the proper functioning of government as envisioned by the Constitution, relevant judicial precedent, and long traditions of inter-branch accommodation.  This is particularly true when, as here, President Biden's purported waivers over recent months may have been informed by partisan political purposes.  This is suggested by the haste with which Mr. Biden prejudged Mr. Bannon's invocation of the privilege on behalf of former President Trump.[8]  Executive privilege has fundamental importance to and constitutional significance in the operation of government. Waivers of executive privilege should therefore be considered only with a gravity and solemnity commensurate with their deployment, and should not be influenced by workaday political grievances or by grudges lingering from past political controversies, even bitter ones.

---

[8] See Katherine Fung, *Biden's Comments Could Fumble DOJ Prosecution of Steve Bannon: Here's How*, NEWSWEEK (Oct. 21, 2021) ("referring to those, like Bannon, who have refused to comply with the subpoena to testify before the January 6 committee [and] asked if they should face prosecution, Biden said, 'I do, yes.'"); Donald Judd & Rachel Janfaza, *Biden Says DOJ Should Prosecute Those Who Defy January 6 Committee Subpoenas*, CNN (Oct. 16, 2021) (same); *see also id.* (quoting Press Secretary Jen Psaki as arguing, contrary to law, that ultimate decisions would be made by the Justice Department because "[t]hey're an independent agency ...."), *available at* https://www.newsweek.com/bidens-comments-could-fumble-doj-prosecution-steve-bannon-heres-how-1641428. While President Biden later acknowledged he had been wrong to make the statement, the damage in the public mind had already been done.  *See* Kaanita Iyer, *Biden Says He Was Wrong to Suggest Those Who Defy Subpoenas from January 6 Committee Should Be Prosecuted*, CNN, *available at* https://edition.cnn.com/2021/10/21/politics/january-6-joe-biden-town-hall/index.html (Oct. 22, 2021).  For, as the Committee is aware, the President is the chief law enforcement officer of the United States and the Constitution does not mention the Attorney General by name.  The Constitution simply contemplates that there will be a "principal Officer in each of the executive departments." U.S. Const. art. II, sec. 2.  Nor do any statutes establish the Department of Justice as an "independent agency."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 6

    2.    Other former Department of Justice officials who received the Collins letter
have apparently interpreted its concluding paragraph to mean that the former President
had waived the privilege on a blanket basis or somehow otherwise greenlighted their
testimony to Committees looking into assertedly similar issues prior to this Committee
beginning its work. We disagree with that interpretation. No fair reading of the Collins
letter can conclude that it waives any privileges as to an official like Mr. Clark, ***especially
after*** the key contingency set out in the letter had been triggered:

> Nonetheless, to avoid further ***distraction and without in any way otherwise
> waiving the executive privilege*** associated with the matters the executive
> privilege associated with the matters the Committees are purporting to
> investigate, President Trump will agree not to seek judicial intervention to
> prevent your testimony or the testimony of the five other former Department
> officials … who have already received letters from the Department similar to
> the July 26, 2021 letter you received, ***so long as the Committees do not seek
> privileged information from any other Trump administration officials or
> advisors.***

Attachment at 2 (emphasis added). The condition in the emphasized language has been
triggered because the Committee sought privileged information from multiple other
Trump administration officials or advisors before Mr. Clark was subpoenaed on October
13, 2021.

    Our position is simple and is dictated by the plain text of the letter. The Collins
letter does not waive privilege as to Mr. Clark. Even before the contingency triggered by
your Committee seeking information from other Trump Administration officials had
occurred, at best the Collins letter indicated that former President Trump would agree
himself not to seek judicial intervention on the pre-contingency state of the facts. That is
not remotely the same as authorizing testimony or waiving executive privilege. All
portions of the Collins letter prior to the concluding paragraph clearly invoked privilege.
Nor could Mr. Collins' indicating that the former President would not file suit at an
earlier time act to relieve Mr. Clark of his ethical obligations.

    And surely, once the Committee issued subpoenas to Messrs. Meadows, Scavino,
Patel and Bannon on September 23, the assertion of executive privilege set forth in all of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 7

the other paragraphs of that letter applied with special force to Mr. Clark. This is because Congress *has, in fact, sought* privileged information from Messrs. Meadows, Scavino, and Patel as they are all, no doubt, "other Trump administration officials." In short, even former President Trump's statement that he would not go to court in August 2021 was expressly conditional, and the Committee's issuance of the Meadows, Scavino, and Patel subpoenas has caused the failure of that condition. Therefore, especially after the triggering of the contingency, the letter simply cannot be read as an unconditional waiver as to Mr. Clark or the others named in the final paragraph.

Accordingly, particularly under the present circumstances, the Collins letter expressly informs Mr. Clark that President Trump is asserting and not waiving executive privilege with respect to the Committee's pursuit of information from Mr. Clark. President Trump's assertion of his privileges with respect to the Committee's subpoena to Mr. Clark is confirmed in *Trump v. Thompson, et al,* U.S.D.C. D.C. 1:21-cv-02769-TSC, by footnote 2 of his brief in support of his application for a preliminary injunction:

> The Committee also sought testimony and documents from several individuals, some of whom were serving in the Trump Administration in January and others who were not. To preserve all privileges applicable to him and the Presidency, President Trump sent a letter to a number of these individuals, instructing them to preserve any and all relevant and applicable privileges, including without limitation the presidential communications and deliberative process privileges and attorney-client privilege, all to the extent allowed by law.

*Id.,* Doc. 5, p. 1, n.2. The Committee of course has actual notice of this contention since it is a party to that litigation.

Mr. Clark thus has no choice but to comply with President Trump's assertion of executive privilege and related privileges.

**3.** Since September 7, 2021, staff on the Select Committee has been in contact with Mr. Clark's former attorney, Robert Driscoll, about the possibility of Mr. Clark giving a transcribed interview to the Committee regarding communications with and advice given to former President Trump during the last few months of his Administration.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 8

In good faith and while he was engaging in legal research and keeping apprised of related actions by the Committee and other parts of Congress, Mr. Clark had been requesting and reviewing documents from the Department of Justice pursuant to 28 C.F.R. § 16.300. And, if the federal judicial system orders Mr. Clark directly or produces final and clearly applicable precedent in (a) related case(s) indicating that Mr. Clark must testify, he would resume that process consistent with other legal strictures. But in line with our research and study, events subsequent to September 7 have convinced me that the only proper course of action for Mr. Clark now is to stand on the privilege position articulated to him on August 2 by former President Trump and affirmed in his October 19, 2021 filing in *Trump v. Thompson.*

This is for three reasons: (1) first and foremost because former President Trump, as noted, took heavy step of invoking the privilege in federal court litigation on October 18 against the Committee in its official capacity, indicating that the inter-branch accommodation process had broken down; (2) because the September 23 subpoenas to Messrs. Meadows, Scavino, and Patel unmistakably triggered the contingency in the Collins letter, seemingly removing the basis for any potential accommodation agreement with the Committee premised on it cabining the scope of its inquiry; and (3) because the former President acted to invoke the privilege as to those advisors and Mr. Bannon.

4.      I am aware that other former top officials in the Department of Justice have provided testimony to Congress, despite the former President's assertion of privilege and despite the failure of the conditions in the Collins letter. As the privilege was not theirs to waive, at least without greater clarity (such as a court order with finality or a comprehensive arrangement entered into between former President Trump and Congress, where the latter agreed not to seek "privileged information from any other Trump administration officials or advisors"), it is unclear to me how their testimony could be consistent with former President Trump's assertion of executive privilege. Former President Trump holds that privilege, not them. Be that as it may, in the present circumstances, the fact that other former officials may have testified, rightly or wrongly at the time, does not change Mr. Clark's obligations in light of the recent positions taken by former President Trump in the Collins letter and in *Trump v. Thompson.* Indeed, D.C. Bar Ethics Opinion #288 has advised that, even in response to a congressional subpoena (and therefore, by parity of reasoning, in response to a voluntary request as well), a "lawyer has a professional responsibility to seek to quash or limit the subpoena on all

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 9

available, legitimate grounds to protect confidential documents and client secrets." *See also* American Bar Association's Committee on Ethics and Professional Responsibility, Formal Opinion 94-385 (1994).

It is improper to put Mr. Clark in a vise between this Committee and its claimed enforcement powers on the one hand and his constitutional and ethical obligations on the other, especially while there is a pending lawsuit to determine President Trump's privilege objections. To apply such pressure to Mr. Clark is to present him with a potential Hobson's choice in a manner not countenanced by the long history of inter-branch accommodation over Congressional requests for information from the Executive Branch. The Constitution is the ultimate source of our law and this Committee is bound to respect government-wide constitutional boundaries, including respecting the prerogatives of the coequal Executive Branch.

Additionally, the claim made by Senate counsel at the outset of the relevant testimonies of at least one of these other Department of Justice officials, namely, that the Collins letter was a "letter of nonobjection ... on behalf of former President Trump,"[9] if it were ever correct there (and it is not because nothing in the letter waives privilege or states a general principle of non-objection), is obviously incorrect as to Mr. Clark at the present time. The Collins letter quite explicitly (1) asserts that the former President has not waived claims of executive privilege; (2) asserts the privilege; and (3) at most, even from this Committee's potential perspective, fixes conditions that as to Mr. Clark are no longer met.

In light of the foregoing, I have advised my client that, at this time and based on these most up-to-date factual developments, he is duty-bound not to provide testimony to your Committee covering information protected by the former President's assertion of executive privilege. Accordingly, beyond showing up today to present this letter as a sign of his respect for a committee of the House of Representatives, albeit one not formed in observance of the ordinary process of minority participation, Mr. Clark cannot answer deposition questions at this time. No adverse inferences can or should be drawn from Mr. Clark accepting my advice. His doing so defends the Republic's interest in the

---

[9] Transcript, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf at 6-7 (Aug. 7, 2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 10

separation of powers.  As noted, Mr. Clark is not a politician but he is a strong defender
of the Constitution, stemming from his political beliefs as an unapologetic conservative—
beliefs protected by the First Amendment.

     **5.**     In addition to the foregoing, I must also point out that the vast majority of
the document requests in the subpoena sent to Mr. Clark are duplicated in the requests
for documents sent by the Committee to the National Archives presently at issue in the
*Trump v. Thompson* litigation. It is entirely proper, therefore, to defer compliance with the
Committee's subpoena to Mr. Clark until that litigation is resolved.

     Moreover, the documents subpoenaed from Mr. Clark are instead largely in the
possession of the Department of Justice or the Archives. Mr. Clark left his work papers at
the Department of Justice when he resigned in anticipation of the January 20, 2021
inauguration of President Biden.  Based on prior actions, beginning with those of the
House Oversight Committee, we also believe that your Committee has access to Mr.
Clark's government records, making the imposition on us of organizational work, such
as Bates-stamping documents, unduly burdensome. If the Committee could please
confirm this one way or the other, it may obviate any claim of demonstrably critical need
for Mr. Clark to re-produce documents the Committee already has, should that become
necessary at some future point.

     **6.**     Accordingly, I respectfully urge the Committee to recognize that the best
and most regular course in light of the latest developments would be to pause the request
for the testimony of Mr. Clark (likely along with the requests for the testimony of Messrs.
Meadows, Scavino, and Patel, who would seem similarly situated) pending resolution of
the *Trump v. Thompson* litigation.  That will provide important guidance from the Article
III branch of government to referee this inter-branch dispute, including, among other
things, the entwined issue of whether the current President can purport to waive the
former President's executive privilege over the former President's objection. As Justice
Powell remarked in concurrence in *Nixon*, "[t]he difficult constitutional questions lie
ahead." 433 U.S. at 503. *See also id.* at 491 (Blackmun, J., concurring) (noting that
historically some presidential transitions had been "openly hostile," and hoping that the
statute under consideration there "did not become a model for the disposition of the
papers of each president who leaves office at a time when his successor or the Congress
is not of his political persuasion."). A pause, as we here request, would also show proper

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 11

comity both to Executive Branch's interests (considered holistically and not as defined myopically to embrace only the views of the current President) and to the Judicial Branch's role in resolving cases and controversies. As *Nixon* indicates, "[t]he confidentiality necessary to this exchange [of advice and confidences between a President and an advisor] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449.

       7.     I am also compelled to note the disconnect between the scope and purpose of the Committee's authorizing resolution and the information sought from Mr. Clark. The Committee's scope revolves around events at the Capitol on January 6, 2021. The Committee would not appear to be seeking to question Mr. Clark about January 6, 2021 and no media reporting has connected him to those events. Mr. Clark had nothing to do with the January 6 protests or the incursion of some into the Capitol. He has informed me he worked from home that day to avoid wrestling with potential street closures to get to and from his office at Main Justice. Nor did Mr. Clark have any responsibilities to oversee security at the Capitol or have the ability to deploy any Department of Justice personnel or resources there. Indeed, Acting Attorney General Rosen testified **almost 6 months ago** that a January 3, 2021 Oval Office meeting involving him and Mr. Clark, *inter alia*, did not relate to January 6. *See* House Oversight and Reform Committee Holds Hearing on Jan. 6 Riot at U.S. Capitol, *available at* https://www.youtube.com/watch?v=719UGi8dNng, beginning at circa the one-hour, 15-minute mark (Rep. Connolly) (streamed May 12, 2021).[10] That should alone be sufficient for Mr. Clark to be excluded from a January 6 inquiry.

      Indeed, just about a week after January 6, Mr. Clark gave an "exit interview" to a reporter for *Bloomberg Law* that condemned the individuals who forcibly went into the Capitol and engaged in violence, noting that some of them may have been moved by mob psychology (Mr. Clark specifically remembers referencing Gustave Le Bon), besmirching by mere association the far more numerous peaceful protesters exercising their First

---

[10] Q. Rep. Connolly: "Did you meet with the President at the White House on January 3rd?" A. Former Acting AG Rosen: "I did." Q. Rep. Connolly: "You did, but you decline to tell us what the nature of that conversation was about, is that correct?" A. Former Acting AG Rosen: "I can tell you it did not relate to the planning and preparations for the events on January 6th."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 12

Amendment rights.  As a clear example of mainstream media bias, however, the report
later published about that interview omitted Mr. Clark's remarks on January 6, even
though the reporter had *repeatedly* sought Mr. Clark's views on the topic during the
course of the interview.[11]

        For all of these reasons, the information and testimony sought by the Committee
as applied to Mr. Clark in particular are outside the scope of the Committee's charter and
are neither proper subjects of the Committee's subpoena, nor any subsequent attempt to
enforce the subpoena.

        Finally, I would kindly request a response to the objections set out in this letter,
which may include a proposal to me by the Committee as to a more limited scope of
inquiry narrowed to January 6—something that I would be happy to engage on to try to
reach an agreement.   And for the avoidance of all doubt, we reiterate that, during
continued discussions and at all times, we reserve all other objections as may be
applicable under the circumstances.  *See supra* n.1.


                                Respectfully,

                                Caldwell, Carlson, Elliott & DeLoach, LLP

                                Harry W. MacDougald

Enc.
cc:     Jeffrey Bossert Clark

---

[11] *See* Ellen Gilmer, *Top Official Steps Down from DOJ's Environment, Civil Divisions*, BLOOMBERG LAW (Jan.
14, 2021), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/top-official-steps-
down-from-dojs-environment-civil-divisions?context=article-related.

**From:** Doug Collins <doug@northgeorgialawyers.com>
**Date:** August 2, 2021 at 6:20:20 PM EDT
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:** Letter for Mr. Jeff Clark

Please find the attached letter for your client Mr. Jeff Clark.

Thank you for your cooperation.

**Douglas A. Collins**
**Oliver & Weidner, LLC**
**854 Washington St. Suite 300**
**Clarkesville, GA 30523**
**706-754-9000**
**NorthGeorgiaLawyers.com**

============================================================
NOTICE: In an ideal world, perhaps disclaimer clauses in lawyer emails would not be necessary; but this is not an ideal world, so here goes. This e-mail and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "CC" and "BCC" lines of this e-mail. If you are not an intended recipient, your receipt of this e-mail and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the e-mail and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this e-mail. DO NOT review, copy, or rely on in any way the contents of this e-mail and its attachments. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. Most legal rights have time limits, and this e-mail does not constitute advice on the application of limitation periods unless expressly stated above. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of confidentiality and privileges applicable to this e-mail and any attachments are expressly reserved.
============================================================

JAMES C. WEIDNER

ERNEST H. "BUCKY" WOODS, III

DOUGLAS A. COLLINS

WILLIAM R. OLIVER
(OF COUNSEL)



TEL. (706) 754-9000

FAX: (706) 754-0098

854 WASHINGTON STREET
SUITE 300
P.O. BOX 2017
CLARKESVILLE, GA 30523

NorthGeorgiaLawyers.com

August 2, 2021

Mr. Jeff Clark:

We represent former President Donald J. Trump and write concerning requests sent to you by the U.S. House of Representatives Committee on Oversight and Reform and the U.S. Senate Judiciary Committee to provide transcribed interviews on matters related to your service as Deputy Attorney General and Acting Attorney General during President Trump's administration. We also understand that, as set forth in its July 26, 2021, letter to you, the U.S. Department of Justice stated that President Biden decided to waive the executive and other privileges that protect from disclosure non-public information concerning those matters and has authorized you to provide such information.

Please be advised that the Department's purported waiver and authorization are unlawful, and that President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege. The executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it. The reason is clear: if a President were empowered unilaterally to waive executive privilege applicable to communications with his or her predecessors, particularly those of the opposite party, there would effectively be no executive privilege. To the extent the privilege would continue to exist at all, it would become yet another weapon to level the kind of unjustifiable partisan political attacks the Democrat-controlled administration and Committees are seeking to level here.

As the Supreme Court held in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) – where, like here, the then-current administration did not support a former President's assertion of executive privilege – the executive privilege is crucial to Executive Branch decision-making:

> Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977). The Department's July 26 letter to you quoted this decision but left out the very next sentence in the opinion: "**Therefore, the privilege survives the individual President's tenure.**" Id. at 448-49 (quoting, and adopting, Brief for the Solicitor General on Behalf of Federal Appellees) (emphasis added).

Here, it is clear that even though President Biden and the Department do not know the nature or content of the non-public information the Committees seek, they have not sought or considered the views of the President who does know as to whether the confidentiality of that information at issue should continue to be protected. Such consideration is the minimum that should be required before a President waives the executive privilege protecting the communications of a predecessor. *See* Office of Legal Counsel Memorandum on Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act, June 20, 2001, at 5 ("[A]lthough the privilege belongs to the Presidency as an institution and not to any individual President, the person who served as President at the time the documents in question were created is often particularly well situated to determine whether the documents are subject to a claim of executive privilege and, if so, to recommend that the privilege be asserted and the documents withheld from disclosure.").

Nonetheless, to avoid further distraction and without in any way otherwise waiving the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials (Richard P. Donoghue, Patrick Hovakimian, Byung J. "BJay" Pak, Bobby L. Christine, and Jeffrey B. Clark) who have already received letters from the Department similar to the July 26, 2021 letter you received, so long as the Committees do not seek privileged information from any other Trump administration officials or advisors. If the Committees do seek such information, however, we will take all necessary and appropriate steps, on President Trump's behalf, to defend the Office of the Presidency.

Sincerely yours,

OLIVER & WEIDNER, LLC

Douglas A. Collins

<u>**Exh. 7**</u>

<u>**Expert Affidavit of Gregg Phillips, from
Schmitz v. Barron, Fulton County,
Georgia Superior Court Case No.
2020CV342969**</u>

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| WARREN M. SCHMITZ, JR., | ) |
| | ) |
| **Plaintiff,** | ) |
| | )    **Civil Action File No.** |
| **v.** | ) |
| | )    **2020CV342969** |
| RICHARD L. BARRON, IN HIS | ) |
| OFFICIAL CAPACITY AS FULTON | ) |
| COUNTY DIRECTOR | ) |
| REGISTRATION & ELECTIONS AND | ) |
| FULTON COUNTY BOARD OF | ) |
| REGISTRATION AND ELECTIONS, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**AFFIDAVIT OF GREGG PHILLIPS IN SUPPORT OF VERIFIED AMENDED
PETITION TO CONTEST RESULTS OF HOUSE DISTRICT 52 ELECTION**

      Personally appeared before me, the undersigned notary public, duly authorized by law to

administer oaths, Gregg Phillips, who being duly sworn, deposes and states as follows:

1.

      My name is Gregg Phillips.

2.

      I am over the age of 21 years, and I am under no legal disability which would prevent me

from giving this testimony.  I have personal knowledge of the facts recited herein.

3.

      This Affidavit is given in support of the Verified Amended Petition to Contest Results of

House District 52 Election filed in the above-styled action on November 25, 2020 (the "Petition").

4.

Exhibit C to Amended and Restated Complaint

I have personal knowledge of the facts contained in this Affidavit, and am legally competent and can testify to such facts.

5.

Rep. Deborah Silcox and Shea Roberts competed in the November 3, 2020 General Election for HD 52 (the "Election"). The certified totals of the Election showed Ms. Roberts ahead by 377 votes, with a final tally of 17,069 votes for Ms. Roberts and 16,692 for Rep. Silcox.

6.

I own a data security company called OpSec Group where I am the managing partner. In addition, I am the CEO and Founder of CoverMe Services, a Georgia based healthcare technology company focused on the use of complex algorithms in healthcare finance.

7.

I have more than three decades of experience administration, program integrity, project management, healthcare, elections, and data driven decision making.

8.

My company has developed formulas to assess the fit, risk and reliability of data analytics across multiple industries.

9.

My group and I use detailed analytical approaches to investigate complex issues, evaluate the risk in decisions, and build measured solutions.

10.

We observe, research and interpret results using applications and data known to law enforcement, program integrity, quality control, and election professionals.

{00594334. }

Exhibit C to Amended and Restated Complaint

11.

My approach to analytics is measured and balanced and common practice in this industry.

12.

I am an expert in using large data sets in fraud control, quality control and identity resolution in voting related cases and analysis.

13.

Previously, I have testified in 10 trials as an expert witness. Our approach and algorithms have been used in high profile voter rights cases argued in the Supreme Court of the United States. In addition, our methods and algorithms have been used in the resolution of 43 million individual cases.

14.

I am not being compensated nor have been offered anything of value in exchange for this affidavit or potential testimony.

15.

In November, the OPSEC team developed a hypothesis that ballot trafficking is occurring in relation to certain non-profit organizations and drop boxes in Georgia.

16.

OPSEC purchased commercially available data worth approximately $200,000.00 for use in the analysis performed.

17.

I leveraged commercially available historic and near real time behavioral mobility data to assist a client organization, True the Vote, in analyzing patterns of election fraud in the form of ballot harvesting in key battleground states, including Georgia.

{00594334. }

Exhibit C to Amended and Restated Complaint

18.

Specifically, I used commercially available data, in addition to proprietary formulas, algorithms, and intellectual property developed by me.

19.

From this data and that gathered through our research, I was then able to develop and test the hypothesis to reach the conclusions.

20.

First, I geofenced all 27 identified organizations offices back to October 1, 2020 and harvested all devices observed on or near the premises inside the geofences established by our analytical team.

21.

Then, I observed 1.2 trillion mobile device signals over a period of 97 days from 10/1/2020 through 1/5/2021.

22.

To execute this project, I processed 25 terabytes of raw data in order to harvest 17,000 unique mobile devices.

23.

From the 17,000 unique mobile devises, I was further able to pinpoint the total number unique targeted mobile devices to 279. By applying certain quality management techniques, I was able to eliminate another 37 devices causing unacceptable levels of false positives. The final number of unique devices targeted was 240.

24.

{00594334. }

Exhibit C to Amended and Restated Complaint

Geofencing was used around suspected ballot harvesting organizations which then allowed the expert to use device-centric mobile advertising IDs and behavioral data analytics to pin 240 target devices and further establish a pattern of travel in and out of these locations.

25.

Geofencing was also used to create virtual perimeters around 36 Fulton County drop boxes and 309 drop boxes in the Atlanta metro area from 10/1/20 through Election Day 1/5/21.

26.

Geofencing perimeters were used to identify the presence of the 240 targeted devices as close as 18 inches from 28 drop boxes in a single day.

27.

This is the same type of data analytics and algorithms that are used by law enforcement and the intelligence community across the country and around the world.

28.

A total of eight metro-Atlanta counties were analyzed during this process.

29.

Fulton County comprised more than one-half of the drop box visits by the 240 targeted devices.

30.

Analysis of hotline, whistleblower and media reports resulted in the identification of 28 organizations whose addresses revealed a high level of activity involving the 240 targeted devices.

31.

From there, I was able to match these devices within 100 feet of an organization and 100 feet of ten or more drop boxes, which gave me a total of 240 Unique Devices of Interest.

{00594334. }

Exhibit C to Amended and Restated Complaint

32.

I then looked at devices that were both found at an organization and then also at any given drop box in Fulton County, GA and across the metro-Atlanta area.

33.

In order to make sure that my team ruled out any false positives, false negatives, or any accidental matches (such as firefighters or police officers), we ran this data from October to January.

34.

Upon doing this, we found that this vote trafficking was only done in October and December.

35.

This helped to rule out anyone who maybe worked nearby a drop box location as this trafficking only occurred in the month leading up to each election.

36.

For purposes of HD-52, this vote trafficking was executed in the month of October alone.

37.

To corroborate this data, we had the determine where the ballots were coming from that were being deposited into these drop boxes.

38.

The first hypothesis was UPS stores.

39.

To test this hypothesis, my team geofenced 18 UPS stores under the theory that this was the starting point of where these target devices would go and physically pick up ballots.

{00594334.}

Exhibit C to Amended and Restated Complaint

40.

The behavioral cellphone data then corroborated this data showing 240 devices were within the virtual boundaries, established by the geofences, of one or more targeted organizations, two or more UPS stores, and 10 or more drop boxes with the period of starting October 1, 2020 and extending through November 3, 2020.

41.

From each respective UPS store, each target device was then tracked as heading back to the location of their respective organization, or "stash houses", as we refer to them as.

**Accuracy of Cell Phone Data**

42.

The data tracks movement of each device as often as every four (4) seconds and as close at eighteen (18) inches to any respective specific location, inside or outside of a geofence within the purchased jurisdiction.

43.

For reference, this is the same type of data and tracking mechanisms that are used to help identify terrorists throughout the world, human trafficking criminals, and drug traffickers at the border.

44.

The specific cell phone data are signals that can be tracked back four (4) years.

45.

There are approximately 27,000 cell phone applications that track, save and market location data.

**Conclusions for HD-51 and HD-51**

{00594334. }

Exhibit C to Amended and Restated Complaint

46.

Around 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits.

47.

For HD-51, estimated 1,700-2,000 votes influenced by harvesting.

48.

For HD-52, estimated 1,700-2,000 votes influenced by harvesting.

49.

I have come to the conclusion that this exact vote trafficking scheme affected the results of the 2020 November General Election for House District 52 in Georgia.

**FURTHER AFFIANT SAYETH NOT**.

[SIGNATURE ON FOLLOWING PAGE]

{00594334.}

Exhibit C to Amended and Restated Complaint

*Gregg Allen Phillips*
_____
GREGG PHILLIPS

SUBSCRIBED TO AND SWORN BEFORE ME
ON THIS  8th  DAY OF APRIL, 2021 IN THE
PRESENCE OF:

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

10/18/2024
_____

Patricia A Glasper
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 12-9064-1
Expires October 18, 2024

Notarized online using audio-video communication

Exhibit C to Amended and Restated Complaint

**UNDER SEAL**

**DCCA No. 21-BS-0059**

**DISTRICT OF COLUMBIA
COURT OF APPEAL**

<table>
<tr><td colspan="2">_____</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**In the Matter of**</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**Confidential (J.B.C.),**</td><td>:</td><td>**Disciplinary Docket No.  2021-D193**</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**Respondent**</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**A Member of the Bar of the District**</td><td>:</td><td></td></tr>
<tr><td>**of Columbia Court of Appeals**</td><td>:</td><td></td></tr>
<tr><td colspan="2">_____:</td><td></td></tr>
</table>

**DISCIPLINARY COUNSEL'S REPLY TO RESONDENT'S
OPPOSITION TO MOTION TO COMPEL AND
<u>CROSS-MOTION TO QUASH SUBPOENA</u>**

**<u>ADDITIONAL FACTUAL STATEMENTS</u>**

Contrary to Respondent's Response to the Motion to Compel ("Response"), Disciplinary Counsel did not inform Senator Durbin that it "would automatically furnish the Senator with any response made by Mr. Clark." *See* Exhibit A attached. Disciplinary Counsel has not disclosed to the Judiciary Committee staff or Senator Durbin any of the responses from Mr. Clark nor the fact that this motion has been filed.

For almost two years, Disciplinary Counsel has been conducting business electronically. Uniquely in this case, and in contrast to hundreds of other cases since

**Exhibit F**

March 2020, this respondent failed to receive the electronic communications, even though none of the electronic communications "bounced back." A "B letter" and a subpoena was forwarded to Mr. Clark's first lawyer in October 2021. After being alerted in November that this communication had not been received and that counsel had withdrawn, Disciplinary Counsel forwarded the letter and subpoena to Mr. Clark directly. Again, there was no bounce back. Mr. Clark became ill. He also claimed that he had not received complete copies of the materials, some of which had been captured by his spam filter. Although his affidavit is vague as to when he first received the subpoena, he clearly had it as of January 6, 2022. *See* Affidavit of Jeffrey B. Clark, ¶ 6, Exh. 2 to Response.

Before January 31, 2022, neither Mr. Clark nor his counsel complained about lack of personal service. Nor did either ever express any concerns about producing the subpoenaed documents prior to January 31. This entire course of conduct seems to be designed to achieve nothing other than to delay Disciplinary Counsel's investigation. A January 31 letter (Exhibit C to the Motion) asked explicitly for Disciplinary Counsel to defer its investigation until after the January 6th House Committee's investigation, despite the fact that Mr. Clark had publicly refused to cooperate with that investigation.

## **ARGUMENT**

### I.    **Respondent Has Failed to Meet His Burden of Showing That the Act of Producing the Subpoenaed Documents Would Incriminate Him.**

Respondent fails utterly to show—even address—how production of the subpoenaed documents would incriminate him. There is no conceivable crime that could be proven by showing Respondent was in possession of evidence of election fraud, which he wished to be investigated, or what authority he was aware of to justify the Department of Justice intervening in an election certification process. Senator Durbin's letter raised the prospect of a violation of Rule 1.2(e), prohibiting counseling a client to engage in criminal or fraudulent conduct. Senator Durbin did not explain what criminal or fraudulent conduct he was referring to, and Disciplinary Counsel has been unable to identify it, which is why it is not investigating a Rule 1.2(e) violation. If Respondent had evidence of election fraud, how would the act of producing that evidence implicate him when he sought to have his "client" investigate election fraud? It would seem to prove the exact opposite.

Nor does bloviating by various commentators in the media mean that there is an actual criminal violation that might be proven by showing Respondent possessed evidence of election fraud (committed by others; there is no suggestion Respondent engaged in election fraud) or legal authority for the Department to intervene in the certification of a state's election. Production of such evidence could in no way incriminate Respondent for the crimes his Response lists: witness tampering (18 U.S.C. 1512); conspiracy to defraud the United States (18 U.S.C. 371); voter intimidation or voter fraud (53 U.S.C. 20511); political campaigning by a

government employee (5 U.S.C. 7323); conducting an enterprise through a pattern of racketeering (18 U.S.C. 1962(c); or conspiring to overthrow by force the government of the United States (18 U.S.C. 2384). Respondent does not even attempt to articulate how showing he possessed the documents called for would be a link in the chain of evidence that might be used to prove any of these violations. He does not attempt to do so because it is impossible.

It is Respondent's burden to show producing these documents would be incriminating. Citing *Carter v. United States,* 684 A.2d 331 (D.C. 1996) (*en banc*), Respondent says that he does not have to prove that a prosecution is likely. But he does have to show that the testimony would be "incriminating." *Carter* at 338, 344. He has made no showing. The absence of a criminal investigation of Respondent may not be dispositive, but it is certainly significant evidence that Respondent is in no danger of criminal prosecution. If Respondent's showing is sufficient, then any lawyer whose records are subpoenaed by Disciplinary Counsel can simply assert that the act of producing them would incriminate him, cite vaguely to a criminal statute, and refuse to comply. The ability to subpoena documents, the only formal discovery tool that Disciplinary Counsel has, would be a nullity.

The act of production doctrine is limited to evidence that is incriminating— financial records showing tax fraud (*United States v. Hubble*, 1867 F.3d 352 (D.C. Cir. 199), *aff'd* 530 U.S. 27 (2000)) or a coerced witness statement (*In re Public*

*Defender Service*, 831 A.2d 890 (D.C. 2003))—whereby the very act of production establishes an element of the crime. Hubble had to produce records that showed his tax evasion was intentional. PDS may have had a client's document that, if produced, would show a client had coerced a false witness statement. When Respondent complies with this subpoena, he will show only that he had evidence of election fraud or authority for the Department's intervention in a state certification. That does not incriminate him.

Respondent is quite open about wanting to delay and has requested Disciplinary Counsel to defer. Delay is unfortunately endemic to our disciplinary system, but it is not conducive to the development of facts about conduct that occurred more than one year ago. Disciplinary Counsel urges the Court to decide this case without the requested oral argument and to do so quickly.

## II.    **Respondent's Motion to Quash is Untimely and Without Merit.**

Rule XI, § 18, permits Disciplinary Counsel to subpoena documents during an investigation and provides that it may apply to the Court to enforce a subpoena. Board Rule 3.14 also permits Disciplinary Counsel to apply directly to the Court; no proceedings before the Board are required. The rules also permit a respondent to file a motion to quash before the Board, which is to be determined by a hearing committee. Rule XI, § 18(c); Board Rule 3.15. Respondent did not avail himself of this procedure. Instead, he strung out the process, never raising any informal, much

less formal objection to the subpoena until the date on which production was due, and then raised his Fifth Amendment claim.  Only after Disciplinary Counsel filed its motion to compel, did he file a purported motion to quash, not with the Board, as required by Rule XI, § 18(c) and Board Rule 3.15, but with this Court.  In addition to filing his motion in the wrong forum, it is untimely.  A motion to quash should be filed before the production date, or at least no later than that date, and not after the subpoena is overdue and a motion to compel has been filed.

It appears there are five grounds for the motion to quash. First, Respondent complains he was not personally served.  He has waived this claim by not raising it promptly.  Moreover, he does not dispute that he has the actual subpoena, provides no explanation for why he has been prejudiced, and offers no explanation as to how he would be in a more advantageous position if he were provided another copy by personal service. *See Hall v. Sullivan*, 229 F.R.D. 501, 504 (D. Md. 2005) (no reason to require personal service of subpoena *duces tecum* "so long as the service is in a manner that reasonably ensures actual receipt of the subpoena by the witness.") During the pandemic, most persons have accepted process electronically because they actively eschew personal contact from strangers.  If Respondent wanted such service even though he was in physical receipt of the subpoena, he should have said so before the return date. *Cf. In re Clark,* 684 A.2d 1276 (D.C. 1996) (respondent

waives challenge to personal jurisdiction by acknowledging receipt of petition, requesting more time to respond, and submitting responsive pleading).

Second, Respondent argues that Disciplinary Counsel has served interrogatories, not a document subpoena. This is precisely the sort of argument that Respondent should have raised initially with Disciplinary Counsel, and if that had failed, in a timely motion to quash. The documents sought are identified by the date they came to Respondent's attention in order to discern what documents he had in late December 2020 and early January 2021. This not only limits the scope of the subpoena but also deals with the problem illustrated by the Response itself: the tendency to rely on information that was not in existence at the relevant time. *See* Response at 25-28 (relying on sources of information published after January 2021). The requested documents are nothing like the detailed requests in *In re Artis,* 883 A.2d 85 (D.C. 2005), which were propounded and labeled as interrogatories. *Id.* at 98, n.12. But even in *Artis*, this Court noted a respondent's Rule XI, § 8(a) obligation to respond to [Disciplinary] Counsels' written inquires . . . ." *Id*. at 93.

Third, he claims that, despite the existence of a statute, 28 U.S.C. § 530B, and Department of Justice regulations, 28 C.F.R. § 77.1 *et seq.*, both of which subject Department of Justice lawyers to state codes of professional conduct, the District of Columbia has no general disciplinary authority over Department lawyers because it is not a "state." The Department's regulations specifically include the District of

Columbia.   28 C.F.R. §§ 77.2; 77.3.   Furthermore, it is well settled that local jurisdictions, including the District of Columbia, can regulate federal attorneys admitted to their bars. *Leis v. Flynt*, 439 U.S. 438, 442 (1972).  This is so even if 28 U.S.C. § 530B did not explicitly say as much.  *See Mendoza Toro v. Gil*, 110 F.Supp.2d 28, 37 n. 3 (D.P.R. 2000) (DOJ attorneys subject to local ethics rules even though territory is not a state).  This Court has disciplined members of its bar who work for the Department of Justice for years.  *See In re Kent,* 467 A.2d 982 (D.C. 1983)*; In re Howes*, 52 A.3d 1 (D.C. 2012)*; In re Kline*, 113 A.3d 202 (D.C. 2015)*.* There has never been a suggestion that the D.C. Rules of Professional Conduct do not apply to Department of Justice lawyers because D.C. is not a state.  In *Kline* and in a case now pending before this Court, *In re Dobbie and Taylor,* DCCA No. 21-BG-024, the Department has filed amici briefs in support of its respondent lawyers. Neither brief argued that Department lawyers were not subject to this Court's disciplinary authority.

Fourth, in a vague separation-of-powers, federal-supremacy argument, Respondent claims the disciplinary rules do not apply to lawyers who are senior federal officials.  This argument was raised only for the purpose of preserving it, but this Court has disciplined members of its Bar serving as senior federal officials in the past.  *See In re Allen*, 27 A.3d 1178 (D.C. 2011) (Assistant to the President for

Domestic Policy); *In re Abrams*, 689 A.2d 6 (D.C. 1997) (*en banc*), *cert. denied*, 521 U.S. 1121 (1997) (Assistant Secretary of State).

Fifth, Respondent argues that his conduct could not possibly constitute a violation of Rules 8.4(a), (c), or (d). This cart is way before the horse. The "B letter" and the accompanying subpoena were the initial step in this investigation. The investigation is not complete, no charges are brought, and none may ever be. Disciplinary Counsel knows a little more about the facts than in the normal case because of the Senate Report, however. It appears that Respondent may have repeatedly attempted to persuade and then coerce the Acting Attorney General to send a letter that had false claims about the status of the Department's investigations. The letter also sought to convene the Georgia legislature to take certain action for which there may have been no basis. In at least one other case, this Court has applied Rule 8.4(d) to a legislative proceeding. *In re White*, 11 A.3d 1226 (D.C. 2011). Moreover, had Respondent achieved his result, undoubtedly much unnecessary litigation would have followed. But the question of whether there are actual violations here cannot be resolved until the investigation is completed.

### III.   Respondent's "Pandora's Box" Arguments Are Not a Basis to Deny Enforcement of the Subpoena.

It is difficult to discern the relevancy of these arguments, which are an amalgam of claims that any allegations against Respondent are purely partisan and that there were valid claims of election fraud. At best, they are policy reasons why

charges should not be brought, which are premature at the investigative stage when the facts have not been determined.  Moreover, the charging decision is one the Court has delegated to Disciplinary Counsel, subject to the contact member process.  Rule XI, § 6(a).  But just because a lawyer's conduct occurred in a politicized environment does not insulate him from scrutiny for violations of the Rules of Professional Conduct.

WHEREFORE, the Motion to Compel should be granted, and the Motion to Quash should be denied.

Respectfully submitted,

*Hamilton P. Fox,* III

Hamilton P. Fox, III
Disciplinary Counsel
Bar Registration No. 113050

/s/ Jason R. Horrell
Jason R. Horrell
Assistant Disciplinary Counsel
Bar Registration No. 1033885

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of February, 2022, I caused a copy of the foregoing *Disciplinary Counsel's Response to Respondent's Opposition to Motion to Compel and Cross Motion to Quash Subpoena* to be served to Respondent's counsels via email to Harry W. MacDougald, Esquire hmacdougald@CCEDlaw.com, to Charles Burnham, Esquire, charles@burnhamgorokhov.com, and Robert A. Destro, Esquire, Robert.destro@protonmail.com.

*Hamilton P. Fox, III*

_____

Hamilton P. Fox, III

11

UNDER SEAL

DCCA NO. 21-BS-0059

DISTRICT OF COLUMBIA
COURT OF APPEALS

| | |
|---|---|
| In the Matter of | |
| CONFIDENTIAL (J.B.C.), ESQ. | Disciplinary Docket |
| Respondent, | No. 2021-D193 |
| A member of the Bar of the District of Columbia Court of Appeals | |

RESPONDENT'S REPLY IN SUPPORT OF
CROSS-MOTION TO QUASH

Standing on all prior arguments without repeating them, the Cross-Motion to Quash should also be granted because:

1. **Filing a Reply in Support of a Cross-Motion Is Procedurally Proper.**  The Rules of this Court support the filing of this Reply in Support of Cross-Motion to Quash.  DCCA Rule 27(a)(4)(B) permits motion responses to go farther and also include motions for affirmative relief. Respondent thus filed his response on February 15, 2022 to the Motion to Compel coupled with a cross-motion to quash (collectively, the "Response")—which combined Respondent's opposition and cross-motion that Disciplinary Counsel replied to on February 18, 2022. *See also* DCCA R. 4(c)(2)(C) (recognizing the prospect of a cross-motion); DCCA R. 27(c) (same).  As a result, this reply in support of the cross-motion would ordinarily be due on February 21, 2022.  But that is the President's Day holiday; even so, out of an abundance of caution, we nevertheless file this Reply in Support of Cross-Motion to Quash on February 21, 2022, not on February 22, 2022.

2. **Senator Durbin Rightfully Not Copied.**  ODC now advises that Senator Durbin has not been given copies of our responses for Mr. Clark filed with ODC on January 31, 2022. This is appropriate.  In light of its confidentiality obligations under Board Rule 2.19, ODC has properly

1

Exhibit G

retreated from its unqualified statement on Nov. 22, 2021 that "[a] necessary disclosure includes sending a copy of your response to the complainant [*i.e.*, Senator Durbin] for comment."  *See* Fox Letter to Clark, part of Mot. to Compel, Ex. A.

**3.   Disciplinary Counsel Provides No Reason to Excuse Non-Service of the Subpoena and Non-Tendering of Attendance Fees.**  The subpoena (Mot. to Compel, Ex. A), is clearly ***blank*** at the bottom of the page, where personal certification by the server is required, ***conclusively proving*** on the face of the subpoena that proper service never occurred.  ODC's Reply also provides no response on the failure to tender witness fees, since the Subpoena demanded Mr. Clark's appearance (in the alternative), if he opted not to provide the documents based on an assertion of privilege.  *See id.* at checked box "Production & delivery of these documents will eliminate the need for a personal appearance."  In other words, since ODC did not know for sure at the time whether Respondent would produce documents, it was obligated to tender attendance fees as part of proper service under Superior Court Rule 45(b)(1).  Yet it did not do so.  *See* Response at 6-8.

ODC notes that these days respondents often do not insist on their rights of formal service and agree to accept electronic service.  Respondent takes ODC at its word.  But we are nonetheless entitled to insist on proper service of Mr. Clark where no such agreement was ever made.  The fact that ODC may have grown accustomed to ***wrongly equating service with receipt of a document by another means*** is not a reason to ignore the teaching of cases like *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, where it was undisputed that the defendant got a copy of the relevant document by fax but the Court still held that did not equal formal service and thus was defective. 526 U.S. 344 (1999).  The three dissenters thought that receipt of the fax was enough, but their position obviously did not prevail; similarly, no mere Maryland district court decision, Reply at 6, can stand in the teeth of *Murphy Brothers*.  Moreover, Superior Court Rule 45 cannot be rendered

superfluous.  There would be no need to specify certification by an adult witness and the tendering

of fees, if those requirements could easily be sidestepped simply by using email instead. And email

is sometimes foiled by spam filters as this case shows.  Rule 45's terms must be adhered to.

Respect for Mr. Clark's legal rights may slow down the strange and unseemly haste with

which ODC wishes to proceed here.  But that does not mean that standing on the rights of service

is interposed merely for delay.[1]  Nor do counsel's letters to Congress reflect that Mr. Clark has

refused under any circumstances to cooperate with the January 6 Committee, as ODC suggests.[2]

*See* Reply at 2.  Instead, counsel called for the Committee to seek a judicial resolution of the

executive privilege issues. Additionally, after Mr. Clark claimed his Fifth Amendment privilege in

a second deposition to the January 6 Committee, held on February 2, 2022, the Committee

responded by having a member go to the media to suggest ***it may offer him immunity***, Response

at 10 & n.3.  While the questions presented by immunity are not ripe, they obviously leave open

the prospect that Mr. Clark may cooperate.  So ODC is wrong once again. Note as well that there

is no indication that the January 6 Committee plans to go to court by some means, direct or indirect,

to seek to pierce Mr. Clark's Fifth Amendment privilege.  That Committee knows that since at least

---

[1] By way of contrast, Mr. Clark did agree, through his prior counsel, Mr. Driscoll, to accept electronic service of the January 6 Select Committee's subpoena (***not the subpoena at issue here***). This was because Mr. Clark worried that service would be attempted at his place of employment, something he feared for its harassing effect.  But in between that time and when Mr. Clark secured a full copy of ***this subpoena*** by email, a coordinated social media campaign to "cancel" Mr. Clark was launched and he was driven from his job.  As a result, ***as to this subpoena***, Mr. Clark opted to insist on proper service, and he is entitled to do so.

[2] We are glad to see Mr. Fox acknowledge for the first time the close interconnection of this proceeding and the House Select Committee's proceedings, Reply at 2.  That is what this subpoena really seems aimed to do—*i.e.,* to improperly use Bar processes to obtain access to documents sought by the House Select Committee and the Senate Judiciary Committee. After all, Mr. Fox said in his November 22, 2021, letter that he would send "a copy of your response to the complainant [i.e., Senator Durbin] for comment." That turns the ordinary process on its head, where wrongdoing must first be established in some other forum before bar investigations begin.

3

two of its members (Chair Thompson and Representative Raskin) have asserted Mr. Clark or President Trump could be prosecuted, they cannot make the argument that Mr. Clark's invocation of the Fifth Amendment is pretextual.[3] Consider whether Congress may have wanted to misuse ODC as a convenient stalking horse because ODC comes to the matter fresh, without having made similar allegations of criminal wrongdoing.

**4. ODC Treats Mr. Clark's Fifth Amendment Rights in a Cavalier Fashion.**  ODC suggests Mr. Clark has nothing to worry about—if he can produce evidence of election fraud, then ODC will go away.[4]  *See* Reply at 3-5.  Beyond the fact that Mr. Clark does not have to lay out facts and then tie them to criminal code provisions (in effect fashioning his own chains)—as ODC has cited and can cite no cases to that effect in its Motion to Compel or Reply—ODC's new argument that Mr. Clark offering additional documents on election irregularities may end ODC's investigation cannot withstand even the slightest scrutiny:

*First*, ODC has no power to bind any criminal courts, state or federal.  An "oops" uttered a year from now by ODC after forcing Mr. Clark into making a document-based admission, despite his Fifth Amendment rights, would not un-ring the bell if such an admission has already been made.  *Second*, the subpoena is not limited to seeking information about election fraud.  *See* Att. to Subpoena (especially the 4th through 6th bullets in the Response at 12-13, reproducing subpoena text with emphasis).[5]  *Third*, ODC's Reply nowhere grapples with Respondent's executive

---

[3] Senator Durbin's assertion in his complaint of criminal conduct to ODC is similar, but he faces a second barrier the January 6 Committee does not face in pursuing Mr. Clark—the Senate Judiciary Committee he chairs lacks subpoena power, given its rules and current party balance.

[4] Of course, Mr. Clark has no assurance that ODC will stand down if it can review additional documents, especially since there is ample evidence already in the record, including the draft letter itself that Mr. Clark is being pilloried for (see below, the argument labeled "Fifth"), showing colorable sworn evidence of election irregularities, and yet ODC presses ahead.

[5] The 4th bullet calls for documents relating to any efforts to persuade DOJ officials to take steps

privilege, deliberative-process privilege, and attorney-client privilege arguments.  *See id.* at 24; *see also* Exhibit 1 herein, at 33-37 (summarizing these arguments and attaching detailed letters on those matters as sent to the January 6 Committee).  ***Fourth***, Mr. Clark is being denied access to all national security information necessary to his defense.  *See* Exhibit 2.

*Fifth*, we filed an extensive letter with ODC on January 31, 2022 (excerpts thereof included as Exhibit 1).  Pages 49-57 therein cited publicly available pre-1/3/21 information supporting the view that the election was or at least could have been irregular and so deserved Georgia's investigation.  Take just two examples: (i) Mr. Clark attended the 2019 D.C. Circuit Judicial Conference where Professor Halderman spoke ***to acclaim from the D.C. judges in attendance*** about how electronic voting machines could be hacked, *see id.* at 57; and (ii) more importantly, the draft letter to Georgia officials attributed to Mr. Clark ***itself cited Georgia evidence***:

> No doubt, many of Georgia's state legislators are aware of ***irregularities***, ***sworn to by a variety of witnesses, and we have taken notice of their complaints***.  *See, e.g.,* the Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee Summary of Testimony from December 3, 2020 Hearing, http://www.senatorligon.com/THE_FINAL%20REPORT.PDF (Dec. 17, 2020) (last visited Dec. 28, 2020); Debra[] Heine, Georgia State Senate Report: Election Results Are 'Untrustworthy;' Certification Should Be Rescinded, THE TENNESSEE STAR (Dec. 22, 2020), *available at* https://tennesseestar.com/2020/12/22/georgia-state-senate-report-electionresults-are-untrustworthy-certification-should-be-rescinded/ (last visited Dec. 28, 2020).

Key Document H (emphasis added), which is, in turn, an exhibit to Senator Durbin's *Subverting Justice* report (attached to Mot. to Compel) and is cited right at the start of ODC's 11/22/21 letter.

ODC nowhere addresses why this evidence was not ***alone*** enough to negate both Senator Durbin's claims of misconduct and ODC's suggestion that the draft letter made misrepresentations.

---

regarding the 2020 election; the 5th calls for legal research relating to the powers of Assistant Attorneys General; and the 6th calls for DOJ policy documents concerning contacts with the White House (in turn raising separation of powers issues of restricting degrees of presidential freedom).

And we pointed this Court to the Georgia Senate Report, *see* Response at 22 & n.7. ODC's refusal to engage with this evidence in its Reply is troubling. This record reflects that ODC is not really interested in evidence of election irregularities, but in ***trying to secure document-based admissions from Mr. Clark about that evidence***. That would clearly violate the executive, law-enforcement, deliberative-process, and attorney-client privileges—all of which protect discretionary decisionmaking at the highest levels of the Executive Branch—and would be used by Mr. Clark's political foes to assert misconduct occurred and urge his prosecution. Of course, we maintain that Mr. Clark is innocent but ***risk of prosecution*** remains due to the political bonfire into which Mr. Clark has been pulled. ODC argues there's no risk because producing additional evidence of election irregularities would not lead to prosecution for a list of crimes ("Respondent is in no danger of criminal prosecution," Reply at 4), but that ignores that the subpoena effectively poses interrogatories to secure document-based admissions, violating *Artis*.

Policy disagreements within the Department of Justice about the wisdom of any recommendation Mr. Clark made are not the stuff of Bar discipline. Nevertheless, Mr. Clark's foes have repeatedly urged and may still seek his prosecution for one or more of the list of crimes they have drawn up against him, *compare* Reply at 3-4 *to* Response at 11. Mr. Fox is an estimable lawyer (and we are gratified that, based on what he has seen, he does not think Mr. Clark committed a crime[6]) ***but his views do not control and there are clearly many lawyers who disagree with him and advocate for prosecution***. *See* Exhibit 1 (Nov. 30, 2021 letter) at 12-13 (collecting criminal claims of Profs. Tribe and McQuade (herself a former U.S. Attorney), Joyce Vance (former U.S. Attorney), Dennis Aftergut (former AUSA), and Glenn Kirschner (same)).[7] ODC's scornful

---

[6] We agree there is no evidence of criminal wrongdoing, as the draft Georgia letter and Senator Ligon's report alone provide a colorable basis for recommending more investigation to Georgia.

[7] Even Republican lawyer-legislators see ***risk*** for Mr. Clark. *See* House Rules Committee Hrg.

disregard of the risks faced by Mr. Clark is unjust.  Mr. Fox does not represent Mr. Clark and has no responsibility to protect his interests in the singular and difficult circumstances confronting him. It is up to Mr. Clark and his counsel to decide how to protect his interests, not Mr. Fox.

**5.   ODC's Argument That a Motion to Quash Should Have Been Filed to the Board Is Illogical.**  ODC argues that Respondent should have gone to the Board below to quash.  This makes no sense.  It was ODC that bypassed the Board to come directly here, ***without engaging in a prior meet and confer, a mere three days after*** the agreed-on January 31, 2022 written-inquiry response date ***as to an unserved subpoena***, making good on Mr. Fox's improper threats on January 28, 2021.  ODC could have requested information pursuant to Board Rule 2.9 and, if we had objected on Mr. Clark's behalf, the dispute would have been resolved at the Board Chair level.  *See* Board Rule 2.9(a). Instead, ODC immediately sought relief in this Court. Having done so, it cannot be herd to complain that Mr. Clark also seeks counter-relief in this Court. Thus it is plain that this Court must decide whether to quash ODC's subpoena or simply declare the subpoena unenforceable for non-service.  Consistent with ordinary principles of judicial review, the Board is divested of jurisdiction over this matter while the Motion to Compel is pending here.

**6.   ODC's *Artis* Response Fails.**  ODC argues that *In Re Artis* does not bar the interrogatories in its subpoena because D.C. Bar Rule XI, § 8 authorizes "written inquires [*sic*]."  Reply at 7 (citing *In re Artis*, 883 A.2d 85, 93 (D.C. 2005)).  This ignores that *Artis* held that a general denial was a sufficient response to such "written inquiries."  Indeed, the relevant section of this Court's opinion

---

Video (Dec. 2, 2021), https://www.youtube.com/watch?v=jvZ2kmeFuDI, at 1:35.10 to 1:37.40 (colloquy between Rep. Armstrong as witness and Rep. Reschenthaler as Committee Member ("[P]eople have been openly calling for his prosecution"; He's not "invoking his Fifth Amendment right just to invoke it.")).  ODC's claim that crediting Mr. Clark with a rational fear of prosecution would leave ODC in a place where ***any lawyer*** could make vague claims and avoid a subpoena, Reply at 4, is farcical. Mr. Clark is uniquely beset by a political mob braying for his prosecution.

in *Artis* starting on page 93 is entitled "Respondent's General Denial."  Here, we submitted a general denial ***and*** filed two letters totaling 190 pages of points, authorities and exhibits. Therefore, D.C. Bar Rule XI, Section 8 was more than complied with.  That leaves ODC arguing the point that in *Artis* the interrogatories were ***labeled*** "interrogatories," Reply at 7, *i.e.*, the wolf came as a wolf.  But a wolf in sheep's clothing is still a wolf.  Moreover, ODC ignores that Section 8's text requires a response to written inquiries "subject to constitutional limitations." Mr. Clark asserted, in thorough and comprehensive fashion, a suite of substantial constitutional limitations, including but not limited to the separation of powers (especially in the form of the executive privilege that defends that constitutional doctrine) and Mr. Clark's Fifth Amendment privilege.

**7.  ODC Has No Response to the *Chevron* Step One Defect in 28 C.F.R. § 77.2(h).**  Our Response argued, as a jurisdictional matter, that (a) 28 U.S.C. § 530B was wrongly extended as a general matter by DOJ in 28 C.F.R. § 77.2(h) to the District of Columbia, since D.C. is not a "State" and (b) DOJ's citations of authority in the preamble did not support such an extension and, in fact, showed that, at best, Congress had allowed such application ***only for two particular fiscal years*** (none of which are current fiscal year 2022). *See* Response at 16-19 & nn.5-6. In reality and to be more precise, 93 Stat. 1040, 1044 simply provided that DOJ lawyers must be licensed under state, D.C., or territorial law during fiscal year 1980 and 112 Stat. 2681, 2681-66 readopted that provision for fiscal year 1999.  Neither provision went as far as or equaled Section 530B's authorization to make "attorney[s] for the government subject to State laws and rules."  Indeed, Section 77.2(h)(3) differentiates between the requirement to be a bar member and ethics rules.

ODC ignores both the *Chevron* challenge and the defects in the preamble and simply cites cases where discipline was applied to federal lawyers in D.C. or territories or that power was not

questioned.[8] That is not an actual jurisdictional ruling that grapples with the *Chevron* step one and DOJ rule preamble defects. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("drive-by jurisdictional rulings" are not precedential). The *Chevron* and preamble arguments were not made, as far as can be seen from the cases that ODC relies upon. Hence, they are not precedent for rejecting those arguments. Seeing discipline applied to federal lawyers barred in D.C. (or territories for that matter) is not the same as a precedential ruling somehow overriding or excusing the *Chevron* one/preamble defects. Therefore, the Court cannot simply brush the objection aside.

**8. ODC's Cart-Before-the-Horse Arguments Ignore the Inherent Authority of the Court.** We noted that the separation-of-powers problems here are acute because the Senate Judiciary Committee and the House January 6 Committee are both seeking Mr. Clark's testimony about conversations with the President or memorializations thereof. As necessary, we will develop

---

[8] All of ODC's cases are unavailing. None of them even cite *Chevron* or Section 77.2(h). *See* Reply at 8-9 (citing *Leis v. Flynt*, 439 U.S. 438 (1979); *Mendoza Toro v. Gil*, 110 F. Supp. 2d 28 (D.P.R. 2000); *In re Kline*, 113 A.3d 202 (D.C. 2015); *In re Howes*, 52 A.3d 1 (D.C. 2012); *In re Allen*, 27 A.3d 1178 (D.C. Cir. 2011); *In re Abrams*, 689 A.2d 6 (D.C. 1997) (en banc), *cert. denied*, 521 U.S. 1121 (1997); *In re Kent*, 467 A.2d 982 (D.C. 1983). *Leis*'s holding is that pornographer Larry Flynt's out-of-state lawyers had no property right to practice in a State where they were not licensed. The Supreme Court's statement that "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions." is both classic dicta and a *non sequitur* as to the argument we present to oppose the subpoena. If *Leis* held what ODC claims, Section 530B and Section 77.2(h) would not have been necessary for Congress and DOJ, respectively, to put in place.

Additionally, *Leis*, *In re Abrams*, and *In re Kent* are all pre-Section 530B/pre-Section 77.2(h). *Mendoza Toro*, *In re Howes*, and *In re Kline* all involved AUSAs practicing before D.C. or Puerto Rico courts, which we conceded subjects them to local discipline. Mr. Clark here appeared in no D.C. court. *Mendoza Toro* also involved an attorney affirmatively arguing that she was bound by Puerto Rico ethics laws. *In re Kent* involved an AUSA who pleaded guilty to taking property without right and presented no reported jurisdictional defenses; neither did the White House assistant in *In re Allen* which was also similar to *In re Kent* in that it involved shoplifting. *In re Howes* involved an AUSA who admitted to six ethics rule violations before the Bar. Finally, while we do not have access to the briefing in *In re Dobbie and Taylor*, DCCA No. 21-BG-024, it would not be surprising if DOJ, consistent with the Section 77.2(h) regulation we argue is *ultra vires*, conceded D.C. Bar jurisdiction. Of course, that cannot preclude us from arguing DOJ is wrong.

that argument in greater detail below with ODC. But ODC insists that an investigation is required now to see if Rules 8.4(a), (c), (d) have been violated. Reply at 9. Respectfully, this ignores that the draft letter *itself* cited evidence (*see supra* Point 4) and thus the notion that the Senate Report facially shows that a "false claim," Reply at 9, was made by Mr. Clark fails at the outset. This Court clearly has the inherent power to instruct ODC to withdraw from this campaign of political "lawfare" against Mr. Clark. That would spare him tens of thousands of dollars in legal expenses and avoid chilling political appointees of both parties considering future public service.

**9. It Is Entirely Proper to Consider the Policy Implications of Proceeding Further.** The fact that a political witch hunt is being conducted against Mr. Clark, and that ODC still identifies no case (*see* Response at 19-20) where discipline has ever been imposed for a never-sent confidential draft letter rejected by the principal, is clearly relevant. ODC does not even indicate whether it reviewed or analyzed the sworn testimony given to the Georgia Senate, though the letter cites that very testimony, and decided that all of it was somehow unreliable (as would seem necessary to meet its "clear and convincing" evidentiary burden, *see* Board Rule 11.6, to show a violation of D.C.'s Rules of Professional Conduct by Mr. Clark). This Court, by contrast, can and should look at that evidence and conclude it was enough and hence this ill-conceived investigation should be terminated. Anything else will incentivize third-party lawfare strategies, where "the process is the punishment," making even a future Respondent victory on the merits below pyrrhic.

<div align="center">

**CONCLUSION**

</div>

Oral argument should be granted and it is telling that ODC opposes oral argument across the board, *see* Reply at 5, even on the bedrock constitutional issues surrounding the Fifth Amendment. The Cross-Motion to Quash should be granted on one or more of the grounds given above or in the Response.

<div align="center">

10

</div>

Respectfully submitted this 21st day of February 2022.

_/s/ Charles Burnham_
Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert Destro*
Ohio Bar #0024315
4532 Langston Blvd., #520
Arlington, VA 22207
(202) 319-5303

robertdestro@protonmail.com

_* Motion for pro hac vice admission in progress_

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

_* Motion for pro hac vice admission in progress_

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing parties and others with a copy of this *Reply in Support of Cross-Motion to Quash* by U.S. First Class Mail with sufficient postage thereon to insure delivery, and by email addressed to:

Hamilton P. Fox
DC Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This 21st day of February 2022.

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

1  OFFICE OF GENERAL COUNSEL
2  U.S. HOUSE OF REPRESENTATIVES
   5140 O'Neill House Office Building
3  Washington, D.C. 20515

4  SHER TREMONTE LLP
   90 Broad Street, 23rd Floor
5  New York, New York 10004

6
   ARNOLD & PORTER
7  601 Massachusetts Ave, NW
   Washington, D.C. 20001
8

9  Counsel for the Congressional Defendants

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                 **SOUTHERN DIVISION**

14

15  JOHN C. EASTMAN               Case No. 8:22-cv-00099-DOC-DFM

16           Plaintiff,           **CONGRESSIONAL DEFENDANTS'**
                                   **BRIEF IN OPPOSITION TO**
17  vs.                           **PLAINTIFF'S PRIVILEGE**
                                   **ASSERTIONS**
18  BENNIE G. THOMPSON, *et al.*,

19           Defendants.          Date:      March 8, 2022
                                   Time:      9:00 a.m.
20                                 Location: Courtroom 9D

21

22

23

24

25

26

27

28
                        Exhibit H

                **DEFENDANTS' MEMORANDUM OF LAW**

## **INTRODUCTION**

The Select Committee is investigating the violent attack on our Capitol on January 6, 2021, and an effort by the former President of the United States to remain in office by obstructing Congress' count of the electoral votes. Plaintiff John Eastman purports to have been the former President's lawyer in connection with that effort. But Plaintiff's role was not simply as an advisor; he spoke at the rally on the morning of January 6, spreading proven falsehoods to the tens of thousands of people attending that rally, and appears to have a broader role in many of the specific issues the Select Committee is investigating. The Select Committee requires a detailed understanding of all of Plaintiff's activities in order to inform Congress' legislative judgments and to help ensure that no President can threaten the peaceful transition of power ever again.

Plaintiff has already invoked his Fifth Amendment right against self-incrimination in response to 146 separate questions posed by the Select Committee.[1] Now he is attempting to conceal a range of relevant documents behind claims of attorney-client privilege and work-product protection. Below, the Select Committee focuses on Plaintiff's (and apparently Mr. Trump's) claims for documents dated January 4-7, 2021, and respectfully urges the Court to reject every such claim.

*First,* to the extent attorney-client privilege applies in the context of a Congressional subpoena,[2] "[a] party asserting [privilege] has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). Plaintiff here fails to carry his burden of establishing the existence of a legitimate attorney-client relationship with former President Donald Trump during the period at issue. And even if Plaintiff could make such a showing, many of the communications during this period included individuals outside of any attorney-client or confidential relationship—and Plaintiff has not demonstrated the necessary common interest arrangement with these

[1] Ex. A, Eastman Deposition.
[2] *Infra* at 37-39

**DEFENDANTS' MEMORANDUM OF LAW**

third parties to preserve the privilege. And even if Plaintiff could establish an attorney-client relationship and some broad common interest agreement, Plaintiff chose to distribute these communications over an unprotected university server even after he was expressly admonished by the University President and reminded that he was not free to use University email and computers in support of a political candidate. Finally, Plaintiff admitted that President Trump authorized him to discuss their communications in public, apparently in an effort to establish some form of defense for President Trump's conduct. Any privilege over these subjects was, therefore, waived.

*Second*, as to work product, Plaintiff falls far short of meeting his burden to establish that the documents are prepared by party, or a party's representative, in anticipation of litigation. Even had Plaintiff met that burden, the work product doctrine provides nothing close to absolute protection from disclosure. Courts have already held that former President Trump's interests in secrecy of certain materials ordinarily shielded by executive privilege are outweighed by the Select Committee's interests. *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *60 (D.C. Cir. Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022) (holding that any such privilege was overcome by the Select Committee's "uniquely compelling need," the sitting President's judgment that release was in the country's best interest, and the careful compromise negotiated between the two branches of government). Here, Mr. Trump's (or Plaintiff's) interests in protecting work product are outweighed by the Select Committee's substantial need; the Select Committee cannot, without undue hardship, obtain their substantial equivalent by other means.

*Third*, Plaintiff's documents should be reviewed *in camera* by this Court for application of the crime/fraud exception. The Court inquired about that exception, and the Select Committee has seriously considered that issue.[3] Although the investigation is continuing and will provide substantial further relevant information, sufficient

---

[3] *See* Scheduling Conference Tr. 6, ECF No. 113.

**DEFENDANTS' MEMORANDUM OF LAW**

1  information already exists to justify *in camera* review and likely rejection of those

2  privileges.

3      *Finally*, this Court should deny Plaintiff's effort to shoehorn into this current

4  briefing on privilege issues a motion to reconsider this Court's prior constitutional

5  holdings.

6                    **SUMMARY OF BACKGROUND**[4]

7      Before the 2020 election even took place, President Trump and his supporters

8  began to lay the groundwork to cast doubt on the results.[5]  On election night, Mr. Trump

9  began falsely asserting, without basis, that he had prevailed and called on States to stop

10 counting mail-in and absentee votes.[6]  In the six weeks that followed, President Trump's

11 legal team and his supporters took their allegations to the courts, ultimately litigating and

12 losing more than 60 challenges to the election results in seven States.[7]  State Bars of both

13 _____

14 [4] The Select Committee is in the midst of its investigation, but has already developed
   many thousands of pages of evidence.  A full recitation of that evidence—with attached

15 exhibits—would be overwhelmingly lengthy, so the Select Committee here briefly
   summarizes key points relevant to the documents at issue.  The Select Committee stands

16 ready to make further submissions on specific relevant topics of interest to the Court
   (under seal, if appropriate).  Order re: Prod. and Priv. Log (Jan. 26, 2022), ECF No. 50, at

17 3.  Several other federal courts have already summarized the events of January 6, 2021.

18 *See*, *e.g.*, *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315 (D.C. Cir.
   Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022); *United States v. Nordean*, No. 21-175,

19 (D.D.C.) Mem. Op. (Dec. 28, 2021) (ECF No. 263).

20 [5] Kevin Liptak, *A List of the Times Trump Has Said He Won't Accept the Election
   Results or Leave Office if He Loses*, CNN (September 24, 2020),

21 https://www.cnn.com/2020/09/24/politics/trump-election-warnings-leaving-
   office/index.html.

22 [6] *President Trump Remarks on Election Status*, C-SPAN (November 4, 2020),

23 https://www.c-span.org/video/?477710-1/president-trump-remarks-election-status ("This

24 is a fraud on the American public.  This is an embarrassment to our country.  We were
   getting ready to win this election.  Frankly, we did win this election.").

25 [7] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald

26 Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021),

27 https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-
   efforts-overturn-election-numbers/4130307001/.  For relevant examples of decisions

28

                           3
              **DEFENDANTS' MEMORANDUM OF LAW**

New York and Washington, D.C. suspended the law license of one of President Trump's lead attorneys, Rudolph Giuliani. *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021) (explaining that Giuliani had "communicated demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer" and emphasizing that "[t]he seriousness of [Giuliani's] uncontroverted misconduct cannot be overstated"); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021). Other counsel in litigation challenging the election have also faced sanctions. *See King v. Whitmer*, 20-cv-13134, 2021 WL 3771875, at *1 (E.D. Mich. 2021). (sanctioning Lin Wood, Sidney Powell, and seven others and explaining, "[i]t is one thing to take on the charge of vindicating rights associated with an allegedly fraudulent election. It is another to take on the charge of deceiving a federal court and the American people into believing that rights were infringed, without regard to whether any laws or rights were in fact violated. This is what happened here"). On March 1, 2022, the State Bar of California's Chief Trial Counsel announced an investigation into Plaintiff's actions "following and in relation to the November 2020 presidential election."[8]

---

addressing President Trump's claims of fraud and irregularities, *see*, *e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020) ("[T]his Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."); *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 Ariz. LEXIS 313, at *2, 6-7 (Dec. 8, 2020) (plaintiff failed "to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results"); *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620 (E.D. Wis. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 927 (7th Cir. 2020); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1331 (N.D. Ga. 2020); *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020).

[8] State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation. Disciplinary investigations are launched if a complainant "sufficiently alleges misconduct," including a potential interview of

**DEFENDANTS' MEMORANDUM OF LAW**

As the courts were overwhelmingly ruling against President Trump's claims of election misconduct, he and his associates began to plan extra-judicial efforts to overturn the results of the election and prevent the President-elect from assuming office.[9]  At the heart of these efforts was an aggressive public misinformation campaign to persuade millions of Americans that the election had in fact been stolen.  The President and his associates persisted in making "stolen election" claims even after the President's own appointees at the Department of Justice and the Department of Homeland Security, along with his own campaign staff, had informed the President that his claims were wrong.

According to the President's senior campaign advisor, soon after the election, a campaign data expert told the President "in pretty blunt terms" that he was going to lose.[10]  On November 12, 2020, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) issued a public statement noting "unfounded claims and opportunities for misinformation" about the election, and affirming that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[11]  The following month, Attorney General William Barr

---

complainants, and a review of open-sourced and legal documents. California State Bar, *2020 Annual Discipline Report*, at C-2 (Apr. 27, 2021), https://www.calbar.ca.gov/Portals/0/documents/reports/2020-Annual-Discipline-Report.pdf. While Plaintiff is entitled to a presumption of innocence in that process, the Bar's Chief Trial Counsel has determined that the public announcement was "warranted for protection of the public."  State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation (citing Cal. Bus. And Prof. Code, s. 6086.1(b)(2); State Bar Rule of Procedure 2302(d)(1).)

[9] President Trump's January 30, 2022 public statement acknowledges that he was attempting to "overturn" the election on January 6, 2021.  *See Statement by Donald J. Trump, 45th President of the United States of America*, SAVE AMERICA (Jan. 30, 2022), https://www.donaldjtrump.com/news/news-hktthafwz61481.

[10] Ex. D, Jason Miller Deposition 90-91.

[11] CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (concluding that "[t]he

---

**DEFENDANTS' MEMORANDUM OF LAW**

1     stated publicly that the "U.S. Justice Department ha[d] uncovered no evidence of

2     widespread voter fraud that could change the outcome of the 2020 election," a position

3     he reiterated on December 21 when rejecting calls to appoint a special prosecutor to

4     investigate election fraud.[12]  A senior advisor to the President's campaign agreed with

5     Barr's analysis and said that to the President on multiple occasions.[13]

6           Evidence obtained by the Select Committee reveals that Acting Attorney General

7     Jeffrey Rosen and Acting Deputy Attorney General Richard Donoghue discussed

8     allegations of voter fraud with President Trump on multiple occasions in December of

9     2020—and informed him, both as to specific allegations and more generally, that the

10    President's claims of massive fraud sufficient to overturn the election were not supported

11    by the evidence.[14]  According to Rosen, at a December 15, 2020 meeting at the White

12    House that included Rosen, Donoghue, Ken Cuccinelli (Department of Homeland

13    Security), Pat Cipollone (White House Counsel), and Mark Meadows (White House

14    Chief of Staff), participants told the President that "people are telling you things that are

---

16    November 3rd election was the most secure in American history," and "[t]here [wa]s no
17    evidence that any voting system deleted or lost votes, changed votes, or was in any way
     compromised").

18    [12] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*,
19    Associated Press (December 1, 2020); *AG Barr says he won't appoint a special*
     *counsel to investigate voter fraud*, Yahoo News (December 21, 2020).  In a new book,
20    Mr. Barr reportedly blames the President for the events of January 6, stating that Trump
     had "lost his grip" and that "[t]he absurd lengths to which [the President] took his 'stolen
21    election' claim led to the rioting on Capitol Hill."  Sadie Gurman, *Ex-Attorney General*
22    *William Barr Urges GOP to Move On From Trump*, Wall. St. J. (Feb. 27, 2022),
     https://www.wsj.com/articles/ex-attorney-general-william-barr-urges-gop-to-move-on-
23    from-trump-11645959600.
24    [13] Ex. D, Miller Tr. 118-19.
     [14] *See* Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the
25    Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final; *see also* Ex. B,
26    Donoghue Tr. 59–62 (discussing specific allegations that Donoghue and Rosen
     discredited to the President, including a 68% error rate in Michigan; a truck driver who
27    had allegedly driven ballots from New York to Pennsylvania; suitcases of fraudulent
     ballots allegedly counted in Georgia; and the repeated scanning of ballots, among many
28    others).

**DEFENDANTS' MEMORANDUM OF LAW**

not right."[15]  According to Donoghue, he personally informed the President on a December 27, 2020 phone call "in very clear terms" that the Department of Justice had done "dozens of investigations, hundreds of interviews," had looked at "Georgia, Pennsylvania, Michigan, Nevada" and concluded that "the major allegations are not supported by the evidence developed."[16]

The President nevertheless continued to insist falsely through January that he had "won the election in a landslide." And despite being repeatedly told that his allegations of campaign fraud were false, the President continued to feature those same false allegations in ads seen by millions of Americans.[17]  (The Select Committee will address these issues in detail in hearings later this year.)

As the President and his associates propagated dangerous misinformation to the public, Plaintiff was a leader in a related effort to persuade state officials to alter their election results based on these same fraudulent claims.

President Trump, Plaintiff, and several other associates of the President reached out directly to state officials to communicate unsubstantiated allegations of election fraud

---

[15] Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final.

[16] *Id.* at 59-60; *see also id.* at 61-62 (reflecting Donoghue's notes of a phone call, which state, "Told [the President] flat out that much of the information he's getting is false and/or just not supported by the evidence.  We look[ed] at the allegations but they don't pan out.").  *See also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript.

[17] *See* Alex Wayne, Mario Parker, and Mark Niquette, *Trump Campaign to Run Ads Promoting Effort to Overturn Election*, Bloomberg (Dec. 11, 2020), https://www.bloomberg.com/news/articles/2020-12-11/trump-campaign-to-run-ads-promoting-effort-to-overturn-election; Donald J. Trump, The evidence is overwhelming – FRAUD!, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, Stop the Steal, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

**DEFENDANTS' MEMORANDUM OF LAW**

and request that state legislatures disregard popular election results.[18]  On January 2,
2021, the President and Plaintiff convened a video conference with hundreds of state
legislators from swing states won by candidate Biden.[19]  The Trump team reportedly
urged the legislators to "decertify" the election results in their States.[20]  According to
Michigan State Senator Ed McBroom, this call focused (without any valid legal or factual
basis) on the purported power of state legislators to reject the rulings of federal and state
courts and overturn already certified election results.[21]  That same day, President Trump
spoke with Georgia Secretary of State Brad Raffensperger, pressing false and
unsubstantiated claims of election fraud, and ultimately asking Raffensperger to "find
11,780 votes" for Trump in the State.[22]

President Trump also took steps that would have corrupted the Department of
Justice; he offered the role of Acting Attorney General to another Justice Department

---

[18] The Select Committee has interviewed a number of state officials, and their accounts
are consistent with the press reports cited in the paragraph that accompanies this footnote.
Plaintiff has claimed privilege over several communications with state legislators
referring to potential legislative action.  *See, e.g.*, 024762 ("Comm with agent of potential
client re statistical report in anticipation of legislative action or litigation."); 024778
("Comm with co-counsel re possible legislative action in support of pending litigation").
[19] M. Leahy, *President Trump Joins Call Urging State Legislators to Review Evidence
and Consider Decertifying 'Unlawful' Election Results*, BREITBART (Jan. 3, 2021),
https://www.breitbart.com/politics/2021/01/03/president-trump-joins-call-urging-state-
legislators-to-review-evidence-and-consider-decertifying-unlawful-election-results/; *see
also* J. Alemany,  *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team
'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct.
23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-
giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.
[20] J. Alemany, *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team
'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct.
23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-
giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.
[21] *Id.*
[22] A. Gardner, *Here's the full transcript and audio of the call between Trump and
Raffensperger*, Washington Post (Jan. 5, 2021),
https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-
vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

**DEFENDANTS' MEMORANDUM OF LAW**

political appointee, Jeffrey Clark, knowing that Mr. Clark was pressing to issue official letters to multiple state legislatures falsely alerting them that the election may have been stolen and urging them to reconsider certified election results.[23]  The Department's senior leadership and President Trump's White House Counsel threatened to resign if President Trump elevated Clark and fired those who were resisting Clark's requests.[24]

Mr. Trump's team also mounted an effort to obtain false election certificates purporting to demonstrate that the electors of seven States were committed to President Trump rather than President Biden.  (The Select Committee has deposed several signers of these false certificates, and plans to interview others.)  Michigan Republican Co-Chair, Meshawn Maddock publicly stated, for example, that she "fought to seat the electors" because "the Trump campaign asked us to do that."[25]  The certificates included false statements that they were official.[26]

When the Electoral College met on December 14, 2020, and confirmed the certified results of the election, the results of the election should have been final.  But Plaintiff advised President Trump to press an unconstitutional plan to disregard those

---

[23] *See* Ex. B, Donoghue Tr. 77-81, 123-24 (discussing the proposed letter to states and Oval Office meeting).

[24] Ex. C, Rosen Tr. at 105-106, 118; Ex. B, Donoghue Tr. 125-27.

[25] *MAGA confession: Trump lawyer admits fraudulent electors plot*, MSNBC (Jan. 21, 2022), https://www.msnbc.com/the-beat-with-ari/watch/maga-confession-trump-lawyer-admits-fraudulent-electors-plot-131436613579.

[26] Five of the seven certificates submitted to federal officials on behalf of Trump-Pence electors in the States falsely claimed to be "the duly elected and qualified Electors for President and Vice President of the United States of America from the State of [Arizona, Georgia, Michigan, Nevada, Wisconsin]." Ex. E, NARA Unofficial Certificates. The certificate submitted on behalf of the Trump-Pence electors in two other States included language indicating that the undersigned electors "might later be determined [to be]" (Pennsylvania) or may "ultimately [be] recognized as" (New Mexico) the duly elected and qualified electors. Ex. E, NARA production 37941, 37944, 37945, 37946, 37947, 38948, 37949.

9

**DEFENDANTS' MEMORANDUM OF LAW**

results on January 6.[27]  The text of the Twelfth Amendment to the Constitution clearly describes Congress's obligation to count certified electoral votes: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; the person having the greatest Number of votes for President, shall be the President."  U.S. Const., amend. XII.  Nothing in the Constitution permits Congress or the presiding officer (the President of the Senate, Michael R. Pence) to refuse to count certified electoral votes in this context, yet that is precisely what Plaintiff suggested.  Plaintiff's proposal was the subject of heated discussions in the White House in the days before January 6, including with the Vice President's legal counsel and others who told Plaintiff that what he was proposing was illegal.[28]

This did not deter either Plaintiff or President Trump.  Describing his own proposals in a now-public memorandum, Plaintiff characterized his proposed options as "BOLD, Certainly," but necessary because "this Election was Stolen by a strategic Democrat plan to systematically flout existing election laws for partisan advantage," advising that "we're no longer playing by Queensbury Rules."[29]

---

[27] *See* Ex. F, Jacob Tr. 89-96.  Plaintiff's proposals, in the form of two memoranda, are now in the public domain.  *See READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (September 21, 2021), https://www.cnn.com/2021/09/21/politics/read-eastman-memo/index.html and Jan. 3 Memo on Jan. 6 Scenario, CNN, http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--.jan.3.memo.on.jan.6.scenario.pdf (provided by Plaintiff to CNN per CNN reporting, *see* Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM, https://twitter.com/jeremyherb/status/1440432387263922185).

[28] *See, e.g.*, Ex. F, Jacob Tr. 105-11, 127-28.

[29] *Id.*  The Marquess of Queensberry rules are "a code of fair play presumed to apply in any fight" and were developed to regulate boxing matches. *Marquis of Queensberry Rules*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Marquis%20of%20Queensberry%20rules.

**DEFENDANTS' MEMORANDUM OF LAW**

Following this advice from Plaintiff—advice that Plaintiff admitted no member of the Supreme Court would accept[30]—President Trump repeatedly attempted to instruct, direct, or pressure the Vice President, in his capacity as President as of the Senate, to refuse to count the votes from six States.  For example, on January 4, 2021, President Trump and Plaintiff met with Vice President Pence and his staff.  In that meeting, according to one participant, Plaintiff tried to persuade the Vice President to take action on the electors.[31]  Again the next day, Plaintiff tried to persuade the Vice President and his staff that the Vice President should reject certain electors.[32]

The pressure continued on January 6.  At 1:00 a.m., President Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency . . . Mike can send it back!"[33]  At 8:17 a.m., the President tweeted, "States want to correct their votes . . . All Mike Pence has to do is send them back to the States, AND WE WIN.  Do it Mike, this is a time for extreme courage!"[34]  Shortly after this tweet, President Trump placed a phone call to Vice President Pence.[35]  He later connected with the Vice President by phone around 11:20 a.m.[36]  General Keith Kellogg and others were with President Trump during that call, and General Kellogg described the pressure that Trump put on Pence:

---

[30] Ex. F, Jacob Tr. 109-11, 117 ("[Plaintiff] had acknowledged that he would lose 9-0 at the Supreme Court.").

[31] Ex. F  at 82, 95.

[32] Id. at 92.

[33] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 1:00:50 AM EST, https://web.archive.org/web/20210106060056/https://twitter.com/realdonaldtrump/status/1346698217304584192.

[34] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 8:17:22 AM EST, https://web.archive.org/web/20210106131747/https://twitter.com/realdonaldtrump/status/1346808075626426371.

[35] Ex. I, Short Tr. 12.

[36] Ex. H, Private Schedule, P-R000285 (handwritten notes on President's private schedule indicate call with VPOTUS at 11:20 AM)]; see also Ex. I, Short Tr. at 16; Ex. F, Jacob Tr. 168.

**DEFENDANTS' MEMORANDUM OF LAW**

Q:  It's also been reported that the President said to the Vice President that
something to the effect of, "You don't have the courage to make a hard
decision."  And maybe not those exact words, but something like that.  Do
you remember anything like that?
A:  Words—and I don't remember exactly either, but something like that,
yeah.  Like you're not tough enough to make the call.[37]

In his speech to the crowd and television crews that came to the capital on January
6, President Trump explicitly identified the advice given by Plaintiff Eastman when
imploring Vice President Pence:

John [Eastman] is one of the most brilliant lawyers in the country and he
looked at this, and he said what an absolute disgrace that this could be
happening to our Constitution, and he looked at Mike Pence, and I hope Mike
is going to do the right thing.  I hope so.  I hope so because if Mike Pence
does the right thing, we win the election. . . . And Mike Pence, I hope you're
going to stand up for the good of our Constitution and for the good of our
country.  And if you're not, I'm going to be very disappointed in you.[38]

Vice President Pence had repeatedly made clear that he would not unilaterally
reject electors or return them to the states.[39]  Nevertheless, just before President Trump
spoke, Plaintiff falsely alleged widespread manipulation and fraud with voting machines,
purportedly altering the election outcome, and then delivered this message to the crowd:

And all we are demanding of Vice President Pence is this afternoon at 1:00
he let the legislators of the state look into this so we get to the bottom of it,
and the American people know whether we have control of the direction of
our government, or not.  We no longer live in a self-governing republic if we
can't get the answer to this question.  This is bigger than President Trump.  It
is a very essence of our republican form of government, and it has to be done.

---

[37] Ex. G, Kellogg Tr. 87, 90-92.
[38] Donald J. Trump Speech on January 6, 2021.  The speech transcript can be found at
https://wehco.media.clients.ellingtoncms.com/news/documents/2021/01/13/Trump_Jan._
6_speech.pdf.
[39] *See, e.g.*, Ex. I, Short Tr. 26-27.

**DEFENDANTS' MEMORANDUM OF LAW**

And anybody that is not willing to stand up to do it, does not deserve to be in the office.  It is that simple.[40]

Shortly thereafter—with the assault on the United States Capitol already underway—Trump tweeted at 2:24 p.m., "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"[41]  The evidence obtained by the Select Committee indicates that President Trump was aware that the violent crowd had breached security and was assaulting the Capitol when Mr. Trump tweeted.[42]  The evidence will show that rioters reacted to this tweet, resulting in further violence at the Capitol.[43]  Indeed, rioters at the Capitol were shouting for the Vice President to be

---

[40] John Eastman at January 6 Rally, C-SPAN, https://www.c-span.org/video/?c4953961/user-clip-john-eastman-january-6-rally.
Rudy Giuliani likewise described this plan in his January 6, 2021 rally speech.  *See* Rudy Giuliani Speech, March for Trump, (Jan. 6, 2021) ("[Vice President Pence] can decide on the validity of these crooked ballots, or he can send it back to the legislators, give them five to 10 days to finally finish the work."), https://www.rev.com/blog/transcripts/rudy-giuliani-speech-transcript-at-trumps-washington-d-c-rally-wants-trial-by-combat.
[41] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 2:24:22PM ET, https://web.archive.org/web/20210106192450/https://twitter.com/realdonaldtrump/status/1346900434540240897.
[42] *See, e.g.*, Ex. J, Williamson Tr. 60-65.
[43] *See United States of America v. Derrick Evans*, https://www.justice.gov/usao-dc/pressrelease/file/1351946/download ("They're making an announcement right now saying if Pence betrayed us you better get your mind right because we're storming that building."); *United States of America v. Marhsall Neefe and Charles Bradford Smith*, https://www.justice.gov/usaodc/case-multi-defendant/file/1432686/download ("Then we heard the news on [P]ence . . . And lost it . . . So we stormed."); *United States of America v. Joshua Matthew Black*, https://www.justice.gov/opa/page/file/1354806/download ("Once we found Pence turned on us and that they had stolen the election, like officially, the crowd went crazy.  I mean, it became a mob.  We crossed the gate.").

---

13

**DEFENDANTS' MEMORANDUM OF LAW**

hanged.[44]  A minute after President Trump's tweet, Plaintiff sent an email to Vice

President Pence's lawyer stating:  "The 'siege' is because YOU and your boss did not do

what was necessary to allow this to be aired in a public way so the American people can

see for themselves what happened."[45]

Later that evening, Plaintiff made a final plea to the Vice President's lawyer:  "I

implore you to consider one more relatively minor violation [of the Electoral Count Act]

and adjourn for 10 days to allow the legislatures to finish their investigations, as well as

to allow a full forensic audit of the massive amount of illegal activity that has occurred

here."[46]  Plaintiff *knew* what he was proposing would violate the law, but he nonetheless

urged the Vice President to take those actions.

The Vice President rejected Plaintiff's pleas that he violate the law, and has since

indicated that what the President and Plaintiff were insisting he do was "Un-American."[47]

Former Fourth Circuit Judge Michael Luttig—for whom Plaintiff had previously worked

as a law clerk—described Plaintiff's view of the Vice President's authority as "incorrect

at every turn."[48]  Evidence obtained by the Select Committee to date indicates that

President Trump's White House Counsel confronted Plaintiff before the rally, and

rejected Plaintiff's advice to Mr. Trump.  And Plaintiff admitted that not a single Justice

of the Supreme Court would agree with his view that the Vice President could refuse to

count certain electoral votes.[49]

---

[44] A. Parker,  *How the rioters who stormed the Capitol came dangerously close to Pence*,
Washington Post (Jan. 15, 2021), https://www.washingtonpost.com/politics/pence-
rioters-capitol-attack/2021/01/15/ab62e434-567c-11eb-a08b-f1381ef3d207_story.html.
[45] Ex. L (005379, Email from John Eastman (via his Chapman University email account)
to Gregory Jacob on January 6, 2021, 12:25 p.m. MST).
[46] Exs. L, M (005479, Email from John Eastman (via his Chapman University email
account) to Gregory Jacob on January 6, 2021, 9:44 p.m. MST).
[47] *See Pence slams Trump for 'un-American' bid to overturn vote*, BBC News (Feb. 4,
2022), https://www.bbc.com/news/av/world-us-canada-60268412.
[48] Tweets by @judgeluttig, Sept. 21, 2021 at 11:50 PM,
https://twitter.com/judgeluttig/status/1440523766920933389.
[49] Ex. F, Jacob Tr. 117.

**DEFENDANTS' MEMORANDUM OF LAW**

As documents now available to the Select Committee demonstrate, Plaintiff used his Chapman University email account to email Greg Jacob, Counsel to the Vice President, on January 5 and 6 urging the Vice President to take illegal action and refuse to count electoral votes.[50]

\* \* \*

The Select Committee's investigation is continuing to gather evidence on the planning for the violent assault, communications between those who participated, and communications by the Trump team from the Willard war room and elsewhere.  Various individuals planned for violence that day, including with the placement of pipe bombs, the accumulation of weaponry for potential use on January 6 across the river in Virginia, and the use of tactical gear and other weaponry.[51]  Evidence also indicates that the violent rioters who attacked police, breached the Capitol, and obstructed and impeded the electoral vote were provoked by President Trump's fraudulent campaign to persuade the American people that the election was in fact stolen.[52]  Indeed, the President's rhetoric

---

[50] Exs. L, M [Chapman005235, Chapman005236, Chapman005479].

[51] *See* Grand Jury Indictment, *United States v. Crowl et al.*, No. 21-cr-28-APM (Jan 12, 2022), available at: https://www.justice.gov/opa/press-release/file/1462476/download ("Rhodes and certain regional leaders of the Oath Keepers began recruiting others to travel to Washington, D.C., to participate in operations aimed at stopping the transfer of presidential power.  They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer Rhodes's call to take up arms at Rhodes's direction.  Some also amassed firearms on the outskirts of Washington, D.C., distributed them among 'quick reaction force' ('QRF') teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.").

[52] *See United States v. Chrestman*, No. 1:21-mj-00218 (DDC), https://www.justice.gov/usao-dc/defendants/chrestman-william; K. Polantz, , *Sobbing Capitol rioter described his assault of police Officer Michael Fanone: 'My God. What did I just do?'*, CNN (December 1, 2021) (rioter charged with assaulting Metropolitan Police Department Officer Michael Fanone on January 6 with an "electroshock weapon" told investigators: "Trump called us.  Trump called us to D.C. . . .  If he's the commander in chief and the leader of our country, and he's calling for help—I thought he was calling

persuaded thousands of Americans to travel to Washington for January 6, some of whom marched on the Capitol, breached security, and took other illegal actions. The Select Committee's hearings will address those issues in detail.

Ultimately, President Trump issued a video and a tweet urging the rioters to leave the Capitol, stressing "[w]e love you, you're very special. You've seen what happens, you see the way others are treated that are so bad and so evil. I know how you feel."[53] At 6:00 p.m., the President tweeted: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!"[54]

The January 6 attack resulted in multiple deaths, physical harm to more than 140 law enforcement officers, and trauma among government employees, press, and

---

for help"); *United States v. Grayson*, No. 1:21-mj-00163 (DDC), https://www.justice.gov/opa/page/file/1360506/download; *United States v. Cua*, No. 21-CR-107 (DDC), https://www.justice.gov/usao-dc/case-multi-defendant/file/1365571/download; Sergeant Aquilino Gonell Testimony, House Select Committee to Investigate the January 6th Attack on the United States Capitol, *The Law Enforcement Experience on January 6th* (July 27, 2021) (Capitol Police Sergeant Aquilino Gonell testifying that during hand-to-hand combat with rioters "all of them, all of them, were telling us 'Trump sent us.'"). A number of defendants in pending criminal cases have identified President Trump's allegations about the "stolen election" as a motivation for their activities at the Capitol; several also specifically cite President Trump's tweets asking that supporters come to Washington, D.C. on January 6. *See, e.g.*, *United States v. Sandlin*, https://www.justice.gov/opa/page/file/1362396/download: ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); *United States v. Neefe et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is literally calling people to DC in a show of force. Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there.'").
[53] *President Trump Video Statement on Capitol Protesters*, C-Span (Jan. 6, 2021), https://www.c-span.org/video/?507774-1/president-trump-claims-election-stolen-tells-protesters-leave-capitol.
[54] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 6:01:04 PM ET, https://web.archive.org/web/20210106230114/https://twitter.com/realdonaldtrump/status/1346954970910707712

Members of Congress.  *See* H. Res. 503, Preamble.  Law enforcement eventually cleared the rioters, and the electoral count successfully resumed at 8:06 p.m. in the Senate after a nearly six-hour delay.

## PROCEDURAL HISTORY

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6, the Select Committee has issued subpoenas to various government agencies, private companies, and numerous individuals, including Plaintiff and his former employer, Chapman University.  In a cover letter accompanying the subpoena at issue here, Chairman Thompson explained that the Select Committee had "credible evidence" that Plaintiff knew about, and "may have participated in, attempts to encourage the Vice President of the United States to reject the electors from several states or, at the very least, to delay the electoral college results to give states more time to submit different slates of electors."  Nov. 8, 2021 Select Committee Cover Letter to Eastman at 1.[55]  Chairman Thompson noted that Plaintiff wrote "two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election."  *Id.*  Chairman Thompson also explained that Plaintiff had "participated in a briefing for nearly 300 state legislators from several states regarding purported election fraud," "testified to Georgia state senators regarding alleged voter fraud and reportedly shared a paper that argued that the state legislature could reject election results and directly appoint electors," was "at the Willard Hotel 'war room' with Steve Bannon and others on the days leading up to January 6 where the focus was on delaying or blocking the certification of the election," and on January 6, "spoke at the rally at the White House Ellipse."  *Id.* at 2.

After Plaintiff refused to produce any documents responsive to a subpoena issued to him directly (which is not before this Court), and invoked the Fifth Amendment

---

[55]     *Available at* https://perma.cc/ZV8J-P2QS.

DEFENDANTS' MEMORANDUM OF LAW

privilege against forced self-incrimination repeatedly during his deposition, the Select Committee issued a separate subpoena to Chapman for certain documents in its possession "attributable to Dr. John Eastman, that are related in any way to the 2020 election or the January 6, 2021 Joint Session of Congress."  Compl. Ex. B at 4, ECF No. 1-2.  That subpoena requested documents from November 3, 2020 to January 20, 2021.  *Id.*  The deadline to produce the subpoenaed documents was January 21, 2022.  *Id.* at 3.

The day before the subpoena's deadline, Plaintiff initiated this action and sought to enjoin Chapman from producing responsive records.  In his application for emergency injunctive relief, Plaintiff made broad assertions of attorney-client privilege without identifying individual communications to which these privileges applied.  This Court granted Plaintiff's request for a four-day *ex parte* temporary restraining order until the parties appeared for a January 24 hearing to discuss Plaintiff's request for a temporary restraining order.  *See* Civil Minutes, Jan. 20, 2022, ECF No. 12.

At the January 24 hearing, the parties agreed that Plaintiff would expeditiously produce a privilege log with particularized assertions of privilege.  The Court denied Plaintiff's application to maintain the temporary restraining order, rejected his First Amendment, Fourth Amendment, and Congressional authority claims, and ordered Plaintiff to produce all non-privileged, responsive documents to the Select Committee on a rolling basis.  The Court also denied Plaintiff's blanket attorney-client privilege and attorney work product protection claims with the proviso that Plaintiff retained the right to raise these claims as to specific documents during production.  *See* Order, Jan. 25, 2020, ECF No. 43.

Although Plaintiff produced the requested logs, those logs failed to provide sufficient information to allow the Select Committee to assess the privilege assertions' validity.  After several efforts to secure adequate information from Plaintiff, Congressional Defendants asked this Court to establish a briefing schedule to address Plaintiff's outstanding privilege assertions and the insufficiency of the information provided on his daily logs.  *See* Notice, Feb. 11, 2022, ECF No. 101.  This Court granted

that request as to the privilege assertions on Plaintiff's January 4-7 document logs and set a hearing to address these issues. *See* Civil Minutes, Feb. 14, 2022, ECF No. 104. At Congressional Defendants' request, the Court also ordered Plaintiff to produce "evidence of all attorney-client and agent relationships asserted in the privilege log," including "evidence documenting any attorney-client relationships that existed with his clients." *Id.* The Court's order did not address motions for reconsideration.

## STANDARD OF REVIEW

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (citations omitted); *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The same is true of the work product doctrine. *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995); *Cameron v. City of El Segundo*, No. 20-CV-04689, 2021 WL 3466324, at \*12 (C.D. Cal. Apr. 30, 2021). "Evidentiary privileges in litigation" like those at issue here "are not favored." *Herbert v. Lando*, 441 U.S. 153, 175 (1979). "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), *as amended on denial of reh'g* (Mar. 13, 2002) (internal quotation omitted).

## ARGUMENT

"[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). Inherent in this investigative authority, Congress can compel production of documents and testimony through legislative subpoenas. It should now be beyond dispute that the Select Committee is operating properly with an appropriate legislative

**DEFENDANTS' MEMORANDUM OF LAW**

purpose.  Order, Dkt. No. 43 at 10 (holding that "the issues surrounding the 2020 election and the January 6th attacks" are "clearly 'subjects on which legislation could be had'"); *see also Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *6 (describing "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations).

## I.    Plaintiff Has Not Met His Burden to Establish Application of the Common Law Attorney-Client Privilege

### A.    Plaintiff Has Neither Met His Burden to Establish the Attorney-Client Relationship Nor Has He Sufficiently Established the Privileged Nature of the Communications

Plaintiff claims that "[t]he attorney-client relationship between Dr. Eastman and President Trump should be beyond dispute," Br. at 11, and declares that he filed briefs on behalf of the Trump campaign in state litigation in December 2020.  Pl.'s Ex. 1, Eastman Decl. ¶ 20.  But Plaintiff does not even attempt in his declaration to claim attorney-client privilege over the relevant matters and the relevant time at issue here.

Over the past months, the Congressional Defendants repeatedly asked Plaintiff to disclose the engagement letters that show the identity of his client and the period of the representation.  Ex. 1, Email Exchange Between Douglas Letter and Charles Burnham. Appended to his declaration, Plaintiff finally revealed what he purports is an engagement letter.  That letter identifies the client as "Donald J. Trump for President, Inc."  Ex. A to Ex. 1 at 1.  But—despite a clearly delineated signature page with lines for the client and attorney to sign—that letter is unsigned.  Ex. A to Ex. 1 at 4.  *See In re W/B Assocs.*, 307 B.R. 476, 483 (Bankr. W.D. Pa. 2004), *aff'd sub nom. Est. Partners, Ltd. v. Leckey*, No. 04CV1404, 2005 WL 4659380 (W.D. Pa. Aug. 31, 2005), *aff'd sub nom. In re W/B Assocs.*, 196 F. App'x 105 (3d Cir. 2006) ("An unsigned agreement, in and of itself, raises material questions as to its validity and applicability."); *Solis v. Taco Maker, Inc.*, No. 1:09-CV-3293, 2013 WL 4541912, at *5 (N.D. Ga. Aug. 27, 2013) (unsigned

engagement letter insufficient to establish attorney client relationship).[56]  And Plaintiff

provided no declaration from his client regarding the scope of his representation.

The lack of signatures is critical because the letter itself states that it becomes

operative "[u]pon the proper signatures by all parties hereto."  Ex. A to Ex. 1 at 1.  By the

terms of the letter, therefore, the absence of signatures suggests the letter was not

operative.  Plaintiff's declaration, moreover, does not authenticate this unsigned letter,

nor does Plaintiff include the cover email by which the engagement letter was

"transmitted."  Ex. 1, Eastman Decl.  ¶ 23.[57]  Although Plaintiff had the burden to

establish the elements of the privilege in his opening brief, this unsigned and

unauthenticated engagement letter is insufficient to establish an attorney-client

relationship during the period at issue (January 4 through 7) as to either President Trump

the individual or President Trump's campaign.  Any belated effort to cure this defect in

his reply by appending a signed engagement letter or the cover email to the letter should

not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal.

2000) ("It is improper for a moving party to introduce new facts or different legal

arguments in the reply brief than those presented in the moving papers.").

Nor can Plaintiff meet his burden by noting his involvement prior to the election in

a so-called "Election Integrity Working Group." Ex. 1, Eastman Decl. ¶ 25.  No

documentation accompanies this assertion, which in any event provides no indication that

---

[56]  Plaintiff emphasizes his appearances in a number of cases, but simply naming these cases does not meet Plaintiff's burden to show that the disputed communications related to any of those cases.  One of the cases had already concluded before the time at issue here, *see State of Texas v. Commonwealth of Pennsylvania, et al.*, No. 22O155 (motion for leave to file a bill of complaint denied on December 11, 2020), and nowhere do Plaintiff's privilege logs identify communications linked to either of the other cases.

[57]  Plaintiff had the burden to establish the elements of the privilege in his opening brief.  Any belated effort to cure this defect in his reply by appending a signed engagement letter or the cover email to the letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

21
**DEFENDANTS' MEMORANDUM OF LAW**

Plaintiff had a relevant attorney-client relationship during January 4 through January 7.
"[T]he burden of establishing the existence of the relationship rests on the claimant of the
privilege against disclosure. That burden is not, of course, discharged by mere conclusory
or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the
existence of the relationship, and any spurious claims could never be exposed." *In re
Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). Nor does Plaintiff provide any basis to
conclude that the "Working Group" was providing legal advice at the client's request.

Furthermore, 004722, 004723, 004744, 004745, 004766, 004767, and 004788
were received by various third parties, and Plaintiff fails to meet his burden to show that
such disclosure did not destroy the privilege. "[V]oluntarily disclosing privileged
documents to third parties will generally destroy the privilege." *In re Pac. Pictures
Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *see also Reiserer v. United States*, 479
F.3d 1160, 1165 (9th Cir. 2007) ("there is no confidentiality where a third party . . . either
receives or generates the documents"). "Because the attorney-client privilege applies
only where the communication between attorney and client is confidential, there is no
privilege protecting the documents the [Select Committee] seeks in the present action."
*Reiserer*, 479 F.3d at 1165.

"The mere presence of a third party at an attorney-client meeting does not
necessarily destroy the privilege," *United States v. Landof*, 591 F.2d 36, 39 (9th Cir.
1978) because "[t]he attorney-client privilege may extend to communications with third
parties who have been engaged to assist the attorney in providing legal advice," *Richey*,
632 F.3d at 566. But "a shared desire to see the same outcome in a legal matter is
insufficient to bring a communication between two parties within this [common interest]
exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. To invoke the common interest
exception, "the parties must make the communication in pursuit of a joint strategy in
accordance with some form of agreement—whether written or unwritten." *Id.*
Moreover, "[a] person who is not represented by a lawyer and who is not himself or
herself a lawyer cannot participate in a common-interest arrangement." Restatement

(Third) of the Law Governing Lawyers § 76 (2000); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (common interest privilege "only applies when clients are represented by separate counsel").[58]

Plaintiff makes no effort to meet his burden of establishing that the third-party recipients of his emails were retained to assist Plaintiff in providing legal advice, nor does he even try to establish that Plaintiff and these parties had "some form of agreement" to pursue a joint legal strategy. *In re Pac. Pictures Corp.*, 679 F.3d at 1129. This Court instructed Plaintiff to "file with the Court and the Select Committee evidence of all attorney-client and agent relationships asserted in the privilege log." Order, ECF No. 104. ¶ 2. Plaintiff did not identify a single common interest agreement. Plaintiff's self-serving assertion of a common interest "on information and belief" and conclusory claims about a general common interest—as opposed to an actual agreement—do not satisfy his burden to show that these third parties were brought within the ambit of the privilege such that inclusion of these third parties did not destroy any privilege. Br. 17-21; *see also, e.g.*, *Sony Computer Ent. Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 634 (N.D. Cal. 2005) ("Where a third party is present, no presumption of confidentiality obtains, and the usual allocation of burden of proof, resting with the proponent of the

---

[58] *See also Sec. & Exch. Comm'n v. Aequitas Mgmt., LLC*, No. 16-CV-438, 2017 WL 6329716, at *3 (D. Or. July 7, 2017), *objections overruled,* 2017 WL 6328150 (D. Or. Dec. 11, 2017) (common interest privilege "only applies when clients are represented by separate counsel"); *Swortwood v. Tenedora de Empresas, S.A. de C.V.*, No. 13CV362, 2014 WL 895456, at *4 (S.D. Cal. Mar. 6, 2014), *clarified on denial of reconsideration sub nom. Swortwood v. Empresas*, No. 13CV362, 2014 WL 12026069 (S.D. Cal. Apr. 18, 2014) ("Since Mr. Diez Barroso was not individually represented by counsel, Defendant can not establish the applicability of the common interest doctrine."); *Finisar Corp. v. U.S. Bank Tr. Nat. Ass'n*, No. C 07-04052, 2008 WL 2622864, at *4 (N.D. Cal. June 30, 2008) ("Under the strict confines of the common interest doctrine, the lack of representation for the remaining parties vitiates any claim to a privilege.") (quoting *Cavallaro v. United States*, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), aff'd, 284 F.3d 236 (1st Cir. 2002)); *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, No. CV-14-085, 2015 WL 11117150, at *2 (E.D. Wash. June 1, 2015) (for common interest to apply, "[t]he communications, however, must be shared by attorneys for the separate parties").

**DEFENDANTS' MEMORANDUM OF LAW**

privilege, applies in determining whether confidentiality was preserved under [the relevant privilege statute].”); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1427 (3d Cir. 1991) (voluntary disclosure to third party waives attorney-client privilege even if third party agrees not to further disclose communication).[59]

Ninth Circuit precedent is clear: “A party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted.” *Martin*, 278 F.3d at 1000. Plaintiff’s privilege log and brief instead summarily label a multitude of documents as privileged without properly identifying a client, establishing the advice as legal (as opposed to political or strategic), or showing that the third parties included on the communication were agents of the client. Such “[b]lanket assertions [of privilege] are ‘extremely disfavored.’” *Id.* (quoting *Clarke v. Am. Com. Nat’l Bank*, 974 F.2d 127, 129 (9th Cir.1992)). Accordingly, Plaintiff’s attorney-client claims must be rejected.

In addition, to the extent that the Court finds that Plaintiff was providing advice on political or campaign strategy rather than law, the communications are not privileged, because “advice on political, strategic, or policy issues . . . would not be shielded from disclosure by the attorney-client privilege.” *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998); *Md. Restorative Just. Initiative v. Hogan*, No. 16-01021, 2017 WL 4280779, at *3 (D. Md. Sept. 27, 2017) (“A claim of attorney-client privilege is only legitimate where the client has sought the giving of *legal*, not *political*, advice.”).

---

[59] “It is appropriate that the proponent of the privilege has the burden of proving that a third party was present to further the interest of the proponent because, in this situation, where the privilege turns on the nature of the relationship and content of communications with the third party in question, the proponent is in the better posture to come forward with specific evidence explaining why confidentiality was not broken.” *Sony Computer Ent. Am., Inc.*, 229 F.R.D. at 634 n.1.

**B.    Plaintiff Cannot Invoke Attorney-Client Privilege Over Documents on Chapman's Server**[60]

"Confidentiality is an aspect of a communication that must be shown to exist to bring the communication within the attorney-client communication privilege.  When the confidentiality element is not shown to exist, the assertion of the attorney-client privilege to safeguard a communication from disclosure, is improper."  *Long v. Marubeni Am. Corp.*, No. 05CIV.639, 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006) (use of employer email or internet not privileged when policy disclaimed any right to personal privacy and company retained right to monitor data flowing through its systems).

As the Supreme Court explained, an employee's expectation of privacy "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  In the context of email communication over an employer's email system, "the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable."  *Doe 1 v. George Washington Univ.*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020), *reconsideration denied*, — F. Supp. 3d —, 2021 WL 5416631 (D.D.C. Nov. 19, 2021) (quoting *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009)); *see also In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 258 (Bankr. S.D.N.Y. 2005).

Courts confronting the issue have applied four factors: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?"  *George Washington Univ.*, 480 F. Supp. 3d at 226 (quoting *In re Asia Glob. Crossing, Ltd.*, 322 B.R. at 257). These factors point to the conclusion that any intent Plaintiff may have had to communicate confidentially over the Chapman server was not objectively reasonable.

---

[60]  Plaintiff's assertion that the Congressional Defendants waived this argument, Br. 22-23, is addressed at 53-57, *infra*.

Chapman's Computer and Network Policy directly undermines any purported expectation of confidentiality.  That policy is clear: "Users should not expect privacy in the contents of University-owned computers or e-mail messages."  *Policies and Procedures: Computer and Network Acceptable Use Policy*, Chapman University, https://perma.cc/7ZUA-ZALN (last visited Mar. 2, 2022) (emphasis added).

The policy also expressly bans personal use on its network and computing systems. *Id.* (all university computing and network systems and services are a "University-owned resource and business tool to be used only by authorized persons for educational purposes or to carry out the legitimate business of the University").  And through its policy, Chapman reserves "the right to retrieve the contents of University-owned computers and e-mail messages for legitimate reasons."  *Id.*

Chapman's policy is notable in that, in response to the known risks to privilege posed by university email policies, many other universities have in the past decade developed policies that are more protective of user privacy.[61]  The use of "bare-bones-no-privacy policies" like Chapman's, in which users are warned "that they do not have an expectation of privacy," is followed by only a "small minority" of universities.  Sisk & Halbur, *supra* at n.61, at 1297, 1301; *Policies and Procedures: Computer and Network*

---

[61] *See, e.g.*, UCLA Policy 410: Nonconsensual Access to Electronic Communications Records (effective on Aug. 16, 2010) (requiring the consent of the user before accessing electronic communications records except in exceptional circumstances), https://perma.cc/3CP4-QSYD; Stanford Administrative Guide, Privacy and Access to Electronic Information 6.1.1 (last updated on Oct. 4, 2016) (acknowledging the importance of users' right to privacy and requiring the consent of the user before accessing electronic communications except in exceptional circumstances), https://perma.cc/E4C5-Z37P; *see generally* American Bar Association, Standing Committee on Ethics and Professional Responsibility, Formal Opinion 11-459 (2011) https://perma.cc/VF5N-VFFB; State Bar of California, Standing Committee on Professional Responsibility and Conduct, Formal Opinion 2010-179 §3(a)(iii) (2010), https://perma.cc/6737-D8NV; G. Sisk & N. Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277 (2010).

**DEFENDANTS' MEMORANDUM OF LAW**

*Acceptable Use Policy*, Chapman University ("Users should not expect privacy in the contents of University-owned computers or e-mail messages").

Plaintiff was notified of Chapman's relatively stringent policy and can be presumed to be aware of the it. Plaintiff served on the Chapman faculty for over twenty years and was previously the Dean of Chapman's law school. According to the University, whenever Plaintiff logged on to Chapman's network during the relevant period he received a "splash screen" message stating: "Use of this computer system constitutes your consent that your activities on, or information you store in, any part of the system is subject to monitoring and recording by Chapman University or its agents, consistent with the Computer and Acceptable Use Policy without further notice." Decl. of Janine DuMontelle ¶ 6, ECF No. 17-1.

Moreover, in reference to Plaintiff's representation of President Trump in Supreme Court litigation, Chapman's President publicly emphasized the university's "clear policies in place regarding outside activity," explaining that "acting privately, Chapman faculty and staff are not free to use Chapman University's email address, physical address or telephone number in connection with the support of a political candidate." Dawn Bonker, *President Struppa's Message on Supreme Court Case*, Chapman University (Dec. 10, 2020), https://perma.cc/3CTG-4DBN.

At this Court's hearing on January 15, Chapman's counsel emphasized that President Trump "was not a clinic client, nor would he have been eligible to be a clinic client of Chapman," that Plaintiff's representation of the President was "improper" and "unauthorized," and that Plaintiff's use of his Chapman account for such representation was like "having contraband on our system." Hearing Tr. Re: Pl.'s App. for TRO at 29.

Putting all of this together, Plaintiff certainly had no legitimate expectation of confidentiality during the dates at issue here—January 4-7, 2021—nearly one month after the University President's public statement.

Plaintiff insists that this Court should disregard Chapman's policy because Plaintiff is a professor, not a student. The information provided by the university to this

**DEFENDANTS' MEMORANDUM OF LAW**

Court provides no indication that this makes any difference. To the contrary, less than a month before the period at issue here, Chapman's President admonished Plaintiff's use of the Chapman server and email address for the very purpose used here, and was crystal clear that the policy applied to "*faculty and staff*." *See* Bonker, *supra* (emphasis added).

Plaintiff's reliance on *Convertino v. U.S. Dep't of Just.* is misplaced. *Convertino*, like the cases the Congressional Defendants cite above, holds that "for documents sent through e-mail to be protected by the attorney-client privilege there must be a subjective expectation of confidentiality that is found to be objectively reasonable." 674 F. Supp. 2d at 110. "Because his expectations were reasonable," the District Court for the District of Columbia held in that situation that "[the official's] private e-mails will remain protected by the attorney-client privilege." *Id.* Here, by contrast, Plaintiff had no reasonable expectation that his documents would remain protected. Not only was the University's policy clear, but any expectation of confidentiality was manifestly unreasonable following the admonishment by Chapman's President. *See* Bonker, *supra*.

For the same reason, *United States v. Long*, 64 M.J. 57 (C.A.A.F. 2006) is inapposite. *See* Br. at 28 (relying on *Long*). Applying a clearly erroneous standard, the Court of Appeals for the Armed Forces concluded there that the lower court did not err in finding a subjective expectation of privacy because "the agency [had a] practice of recognizing the privacy interest of users in their e-mail." *Long*, 64 M.J. at 63. By contrast, here, as we have highlighted, the University President (in specific reference to Plaintiff and his political work for President Trump) emphasized that Plaintiff and other faculty had staff had no privacy interest. This fact is also fatal to Plaintiff's reliance on his prior practices violating Chapman's policy. *See* Br. 29-30.

Likewise, Plaintiff's suggestion that his unauthorized use of Chapman's system is "irrelevant" because "[t]he privilege is held by the client," Br. 30, makes little legal difference. As the Ninth Circuit has recognized, "[t]here are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client." *In re Pac. Pictures Corp.*, 679 F.3d at 1130. Plaintiff's decision to continue

using a server and email account in an unauthorized way after being specifically

admonished by the University President against doing so is precisely such an instance

where, as the attorney, Plaintiff's actions defeated application of the privilege.

## C. President Trump Waived Privilege By Expressly Asking for Disclosure to Third Parties

"[A] fundamental prerequisite to assertion of the privilege" is "confidentiality both

at the time of the communication and maintained since." *Coastal States Gas Corp. v.*

*Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980). "Voluntary disclosure of

privileged communications constitutes waiver of the privilege for all other

communications on the same subject." *Richey*, 632 F.3d at 566 (citation omitted); *see*

*also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).

Plaintiff has stated publicly that President Trump authorized Plaintiff's discussion

of advice relating to the election and the events leading up to January 6. Two

memoranda that Plaintiff wrote outlining how former Vice President Pence could

overturn the results of the Presidential election are already in the public domain and have

been provided to the media, and discussed, by Plaintiff.[62]

Plaintiff discussed the advice in his legal memo at length on a podcast, noting that

Plaintiff himself provided the memorandum to author Bob Woodward, and saying at the

outset that Mr. Trump had "authorized" him "to talk about these things."[63] Plaintiff has

also made extensive public remarks regarding the events of January 6 and his advice to

President Trump on numerous other occasions.[64] These "[v]oluntary

---

[62] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (Sept. 21, 2021), https://perma.cc/LP48-JRAF; Jan. 3 Memo on Jan. 6 Scenario, CNN, https://perma.cc/B8XQ-4T3Z (provided by John Eastman to CNN per CNN reporting, *see* Jeremy Herb (@jeremyherb), Twitter (Sept. 21, 2021, 5:46 PM), https://perma.cc/GX4R-MK9B.

[63] *Another Way: Discussing the John Eastman Memo with Eastman*, Equal Citizens (Sept. 27, 2021), https://perma.cc/A2RZ-MFWP.

[64] *See, e.g.*, M. Schmidt , *The Lawyer Behind the Memo on How Trump Could Stay in Office*, N.Y. Times (Oct. 2, 2021),https://perma.cc/9BQQ-5Y39; John McCormack, *John*

disclosure[s] . . . constitute[] waiver of the privilege for all other communications on the same subject" of the events surrounding the January 6, 2021 joint session of Congress. *United States v. Richey*, 632 F.3d at 566.

Plaintiff asserts that "[t]he statements about President Trump attributed to Dr. Eastman by the defendants make no reference to privilege," Br. 24, but nowhere does he cite authority that waiver must make explicit reference to privilege. And, undermining Plaintiff's representation, Plaintiff indeed recognized the privileged nature of attorney-client relationships. On May 5, 2021, Plaintiff appeared on the Peter Boyles Show and stated that "I would normally not talk about a private conversation I have with a client, but I have express authorization from my client, the President of the United States at the time, to describe what occurred—to truthfully describe what occurred in that conversation."[65]

Plaintiff states the unremarkable proposition that "[c]ourts have long recognized that disclosure of privileged information on a particular subject does not necessarily imply a complete waiver of the privilege." Br. 25.[66] But no one here has asserted a "complete waiver of the privilege." At issue is former President Trump's waiver of the subject matter of issues the events of January 6 and Plaintiff's advice about the effort to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.

Plaintiff insists that this statement does not waive privilege because his "statements in the very same interview that the conversation in question occurred in the presence of

*Eastman vs. the Eastman Memo,* Nat'l Rev. (Oct. 22, 2021), https://perma.cc/VD6N-R9Q9; John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on the 2020 Election*, Sacramento Bee (Oct. 7, 2021), https://www.sacbee.com/opinion/op-ed/ai1icle2548 l 2552.html.

[65] *Peter Boyles Show: Peter Boyles May 5 8am*, 710KNUS News/Talk (May 5, 2021), https://perma.cc/Q6YE-KD5F.

[66] Plaintiff relies on *Weil*, 647 F.2d at 25, which is inapposite. Whereas *Weil* involved a company's *inadvertent* disclosure, Plaintiff's disclosure was both intentional and repeated.

three non-clients in addition to the President." Br. 24. Waiver, however, does not attach to individual "conversations;" instead, it applies to "all other communications *on the same subject*." *Richey*, 632 F.3d at 566 (emphasis added and citation omitted). President Trump—presumably for strategic and political gain—approved of Plaintiff's public disclosures of his advice on the subject of the effort to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act. He cannot now come back and reclaim privilege over communications "on the same subject." *Richey*, 632 F.3d at 566. Neither former President Trump nor Plaintiff can use attorney-client privilege "both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted); *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301-02 (Fed. Cir. 2006).

## II. The Documents Sought from Chapman Are Not Protected by the Common Law Attorney Work-Product Doctrine

"The work-product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Sanmina Corp.*, 968 F.3d at 1119 (internal quotation marks and citation omitted). To qualify for work-product protection, documents must: "(1) be prepared in anticipation of litigation or for trial and (2) be prepared by or for another party or by or for that other party's representative." *Richey*, 632 F.3d at 567 (internal quotation marks and citation omitted).

"The party claiming work product immunity has the burden of proving the applicability of the doctrine." *Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003) (citations omitted). The work product doctrine does not protect against disclosure if the party seeking the discovery "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(ii). Plaintiff fails both steps of the test. *First*, he fails to satisfy his burden to invoke the work product doctrine because he cannot show that the disputed materials were prepared in anticipation

of litigation (as opposed to political purposes).  *Second*, Plaintiff fails to undercut the Select Committee's substantial need for the documents.

### A.  Plaintiff Failed To Meet His Burden To Invoke The Work Product Doctrine

Plaintiff has failed to meet his burden to establish that these materials were prepared in anticipation of litigation, as opposed to primarily for another purpose. Numerous documents make no reference to any pending litigation and or anticipated litigation for which these materials were prepared.[67]  Indeed, Plaintiff emphasized "[t]he main thing here is that Pence should do this without asking for permission—either from a vote of the joint session *or from the Court*."[68] (emphasis added).

Even if litigation was of some concern, Plaintiff does not prove that these materials were created "because of" the prospect of litigation—Plaintiff does not and cannot establish that these documents "would not have been created in substantially similar form but for the prospect of . . . litigation."  *Am. C.L. Union of N. California v. United States Dep't of Just.*, 880 F.3d 473, 485-86 (9th Cir. 2018); *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011).  Congressional Defendants believe that many (if not the vast majority) of the communications at issue involved efforts to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.  *See* 20-24,

---

[67] *See* 004494; 004496; 004547; 004553; 004707; 004708; 004713; 004720; 004721; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004827; 004828; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005017; 005018; 005023; 005024; 005045; 005046; 005061; 005064; 005066; 005067; 005068; 005091; 005094; 005096; 005097; 005101; 005113; 005114; 005130; 005131; 005134; 005135; 005154; 005155; 005156; 005157; 005158; 005159; 005160; 005161; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005412; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005667; 005668; 005672; 005676; 005677; 005678; 005680; 005704; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

[68] *See supra* n.27.

*supra*.   There is no reason to believe that such communications would not have been "created in substantially similar form" absent the possibility that litigation would somehow ensue.  Plaintiff's repeated and unsupported assertions that the documents were prepared "in anticipation of litigation" do not make it so.

Furthermore, it would pervert the purpose of the work-product doctrine to allow Plaintiff to claim protection for his advice aimed at—to put it bluntly—overturning a democratic election.  Because the purpose of the work-product doctrine "is to protect the integrity of the adversary process[,] ... it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process."  *United States v. Christensen*, 828 F.3d 970, 1010 (9th Cir. 2015) (quoting *Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983)); *see also* 38-53, *infra* (discussing the crime-fraud doctrine).  Conduct that is "merely unethical, as opposed to illegal" is "enough to vitiate the work product doctrine" here.  *Id.*  As noted above, *see* n.8 *supra*, Plaintiff is currently the subject of a California State Bar ethics investigation.

Second, Plaintiff fails to establish that all the documents over which he asserts work-product protection were "prepared by or for another party or by or for that other party's representative."  *Richey*, 632 F.3d at 567.  In numerous documents, Plaintiff has asserted privileges over communications with like-minded lawyers, pundits, and "scholar advisors" that purportedly contain work product prepared on behalf of President Trump. [69]  Plaintiff's overreach here is twofold.  First, the paltry descriptions in his privilege claims can scarcely support a claim that his own communications were work product for

---

[69] *See* 004494; 004496; 004547; 004707; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005023; 005024; 005061; 005130; 005131; 005134; 005135; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005668; 005672; 005676; 005677; 005678; 005680; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

**DEFENDANTS' MEMORANDUM OF LAW**

a client, rather than mere discussions about the election with like-minded correspondents.
*See, e.g.,* 023956 (describing a communication "re legal perspectives on the election and
possible litigation").  Second, Plaintiff's correspondents themselves are often not
lawyers, *e.g.*, 005338; even when they are—and even when they are lawyers working on
election-related matters—he has not met his burden to demonstrate that they were
generating work product on behalf of President Trump.  Indeed, Plaintiff has presented
no evidence that he had an agent relationship with any of these people, despite this
Court's order instructing Plaintiff to "file with the Court and the Select Committee
evidence of all attorney-client and agent relationships asserted in the privilege log."
Order, ECF No. 104. ¶ 2.  In his declaration (Ex. 1 Eastman Decl. ¶ 29), he claims to
have communicated extensively with "statistical and other experts," but makes no
attempt to show that these people—or any of the others on his logs—had agent or
attorney-client relationships.  Plaintiff cannot retrospectively designate communications
with ideological or political confreres as deserving work-product protection absent
establishing that those people were representatives of his client.

Finally, Plaintiff waived any claim to work product protection when he shared
these materials with "potential adversaries."  *Sanmina*, 968 F.3d at 1121.  *See, e.g.*,
004494 (journalists); 005489 ("advisor[s]"); 005283 ("scholar advisors"); 024795
("legislative allies").  Not only is Plaintiff's disclosure "inconsistent with the
maintenance of secrecy," *id.*, Plaintiff acted with complete disregard of the maintenance
of secrecy against someone with interests that were potentially adverse to his or those of
his client, especially Congress.  *See United States v. Caldwell*, 7 F.4th 191, 207 (4th Cir.
2021) ("[W]hen an attorney freely and voluntarily discloses the contents of otherwise
protected work product to someone with interests adverse to his or those of the client,

. . . he may be deemed to have waived work product protection.") (quoting *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981)).[70]

For example, in 004494-95 and 004496-538, Plaintiff lists as "W/P" an email exchange with ████████████████████████. Plaintiff cannot claim work product protection over an email with a journalist, who could well have published the exchange.[71] Plaintiff's

> voluntary disclosure of his alleged work product to present or potential adversaries, in this instance, constituted a waiver of the work product privilege. It was [Plaintiff's] self-interested decision to disclose information to [the Vice President, his staff, and state officials] so as to [facilitate reversal of the election result]. Yet, [Plaintiff] now seeks work product protection for those same disclosures and documents against different adversaries in suits revolving around the same matters disclosed[.]

*Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 248 (C.D. Cal. 1993). The work-product doctrine does not stretch that far.

Further, whether Plaintiff "intended that result or not," work-product protection should cease here because fairness requires it. *Sanmina*, 968 F.3d at 1122. When assessing the fairness principle underlying waivers, "the overriding concern in the work-product context is not the confidentiality of a communication, but the protection of the

---

[70] To the extent the work product doctrine can apply to legislative subpoenas, the term "potential adversaries" should be read broadly. Plaintiff cannot have it both ways: He cannot apply a *litigation* privilege to a *legislative* subpoena but at the same time restrict waiver of that privilege to *litigation* adversaries.

[71] *See Flaherty v. Seroussi*, 209 F.R.D. 300, 307 (N.D.N.Y. 2002) ("dissemination of materials prepared by plaintiff's counsel to the media is conceptually inconsistent with his claim that those documents provide an indication of his closely guarded trial strategy, and should therefore be shielded from disclosure"); *Anderson v. SeaWorld Parks & Ent., Inc.*, 329 F.R.D. 628, 637 (N.D. Cal. 2019) ("Work product protection does not attach to an attorney's work directing a public relations campaign, nor is there any expectation of confidentiality where [attorney] directed the consultants to share the list with a journalist."); *Montesa v. Schwartz*, No. 12CIV6057, 2016 WL 3476431, at *9 (S.D.N.Y. June 20, 2016) ("Plaintiffs cannot argue that their adversaries in this litigation were not substantially more likely to obtain this information by virtue of its disclosure to a journalist, who very well could have published this entire e-mail exchange.")

adversary process." *Id.* at 1124.  Here, Plaintiff's selective disclosure of information he now contends is work product weighs heavily against applying the protection.[72]  Plaintiff "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

"[U]nder the totality of the circumstances, [Plaintiff] acted in such a way that is inconsistent with the maintenance of secrecy" against the Select Committee regarding the contested documents.  *Sanmina*, 968 F.3d at 1124.

**B.    The Select Committee Has A Substantial Need For The Documents And Cannot Obtain The Substantial Equivalent Of The Documents Without Undue Hardship**

Even had Plaintiff sufficiently invoked the work product doctrine, the Select Committee has a substantial need for the documents and cannot, without undue hardship, obtain their substantial equivalent by other means.  *See Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("work-product materials nonetheless may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship").  "The undue hardship prong examines the burden obtaining the information from an alternate source would impose on the party requesting discovery." *Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000).

Here, the Select Committee has already sought the materials from an alternate source: Chapman University.  This case involves Plaintiff's attempt to impede the Select Committee from obtaining the documents from that alternate source.  Even if some third source were available for the requested documents, Plaintiff would likely attempt to prevent disclosure in that circumstance as well.  Because the disputed documents are pivotal to the Select Committee's investigation and it would be nearly impossible to access these communications otherwise, the work product doctrine does not apply.  *See*

---

[72] It also indicates that these documents were created for political or strategic purposes and not "because of" anticipated litigation. *Am. C.L. Union of N. California*, 880 F.3d at 485-86.

**DEFENDANTS' MEMORANDUM OF LAW**

*U.S. v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657, at *6-7 (C.D. Cal.) (party established entitlement to opinion work product by showing (1) it would be nearly impossible to get these communications otherwise; (2) the work product was pertinent to the party's "most salient defense"; and (3) the attorney's mental impressions were a pivotal issue).

Plaintiff was a central figure in the effort to encourage the former Vice President to reject the electors from several states and in the strategy to facilitate different slates of electors. He may also have played other important roles in the events under investigation. Plaintiff's "strategy, mental impressions and opinion" concerning these efforts "are directly at issue" in the Select Committee's investigation. *Reavis v. Metro. Prop. & Liab. Ins. Co.*, 117 F.R.D. 160, 164 (S.D. Cal. 1987). The Select Committee, therefore, has a substantial need for these materials.[73]

Plaintiff claims that Congressional Defendants have "offered no argument or evidence of the Select Committee's need for any of these particular documents in pursuit of any valid legislative purpose, much lass [*sic*] a need that would qualify as substantial or compelling in support of a legislative purpose." Br. 16. Congressional Defendants cannot specifically address documents they have not seen, many of which are scantly described in the privilege logs. *See, e.g.*, 004707 ("[c]omm with co-counsel"); 004494 ("[c]omm re statistical evidence"); 004708 ("[c]omm with co-counsel re legal advice"); 004720 ("comm with co-counsel re legal strategy"); 005874 ("comm re fact information"); 004964 ("[a]ttachment"). But as this Court has noted, Plaintiff's "actions clearly fall within the bounds of an investigation into 'the influencing factors that fomented such an attack on American representative democracy,'" ECF No. 43 at 9 (Jan.

---

[73] Plaintiff's privilege log does little to reveal whether the materials he seeks to withhold are ordinary work product or opinion work product. The Select Committee, however, meets either test: It has both a "substantial need" and a "compelling need" for the materials sought. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling").

25, 2022) (quoting H.R. Res. 503 § 3(1)) and "there are numerous plausible legislative measures that could relate to Dr. Eastman's communications," *id.* at 10. The pressing need to complete a full investigation into an unprecedented attack on American democracy by reviewing documents involving a key participant is both substantial and compelling.[74]

## III. The Court Should Review the Documents *In Camera* Under the Crime Fraud Exception

Communications in which a "client consults an attorney for advice that will serve him in the commission of a fraud or crime" are not privileged from disclosure. *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (internal quotations omitted). This exception to the attorney-client privilege applies where (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) the attorney-client communications for which production is sought are "sufficiently related to" and were made "in furtherance of [the] intended, or present, continuing illegality." *Id.* at 381-83 (internal quotation marks omitted).

It bears emphasizing that this is true even if "the attorney is unaware that his advice may further an illegal purpose." *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988), *cert. denied*, 492 U.S. 906 (1989). And it is likewise true where the crime or

---

[74] Congress has consistently taken the view that its investigative committees are not bound by judicial common law privileges such as the attorney-client privilege or the work product doctrine. *See generally*, Congressional Research Service, Congressional Oversight Manual 61-62 (March 21, 2021). This aspect of Congress's investigative authority is rooted in the separation of powers inherent in the Constitution's structure. *Id.* Congress and its committees make decisions regarding such common law privileges by balancing the important institutional, constitutional, and individual interests at stake on a case-by-case basis. Here, Congressional Defendants have determined, consistent with their prerogatives, not to submit an argument on this point. This is not, however, intended to indicate, in any way, that Congress or its investigative committees will decline to assert this institutional authority in other proceedings.

**DEFENDANTS' MEMORANDUM OF LAW**

fraud is ultimately unsuccessful. *In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377, 382 (9th Cir. 1996).

Critically for this case, an *in camera* review of the documents is warranted when the party seeking production has provided "a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted). That standard has plainly been met here. As discussed in the Background section above, evidence and information available to the Committee establishes a good-faith belief that Mr. Trump and others may have engaged in criminal and/or fraudulent acts, and that Plaintiff's legal assistance was used in furtherance of those activities. Accordingly, this Court should conduct an *in camera* review of the documents to determine whether the crime-fraud exception applies.

## A. Obstruction of an Official Proceeding

The evidence detailed above provides, at minimum, a good-faith basis for concluding that President Trump has violated section 18 U.S.C. § 1512(c)(2). The elements of the offense under 1512(c)(2) are: (1) the defendant obstructed, influenced or impeded, *or attempted* to obstruct, influence or impede, (2) an official proceeding of the United States, and (3) that the defendant did so corruptly. *Id.* (emphasis added). To date, six judges from the United States District Court for the District of Columbia have addressed the applicability of section 1512(c) to defendants criminally charged in connection with the January 6th attack on the Capitol. Each has concluded that Congress's proceeding to count the electoral votes on January 6th was an "official proceeding" for purposes of this section, and each has refused to dismiss charges against defendants under that section.[75]

---

[75] *United States v. DeCarlo*, No. 21-73, (D.D.C.) Minute Entry (Jan. 21, 2022) (rejecting motion to dismiss for "the reasons stated on the record," after deciding to rule orally "rather than adding a sixth written opinion to those already excellent opinions written by my colleagues"); *United States v. Nordean*, No. 21-175, (D.D.C.) Mem. Op., at 9-12

Section 1512(c) requires a nexus between the obstructive conduct and a "specific official proceeding" that was either "pending or was reasonably foreseeable[.]" *United States v. Lonich*, 2022 U.S. App. LEXIS 623*, at *49-*50 (9th Cir. 2022). The statutory definition of "official proceeding" includes proceedings of various kinds, one of which (as noted above) is "a proceeding before the Congress[.]" 18 U.S.C. § 1515(a)(1)(B). Although the Ninth Circuit has not defined "corruptly," as used in Section 1512(c), it has held that the *mens rea* component of Section 1512(c) is, if anything, more than satisfied simply by proving that a person acted with "consciousness of wrongdoing." *Lonich*, 2022 U.S. App. LEXIS 623*, at *52-*53; *see also United States v. Watters* 717 F.3d 733, 735 (9th Cir. 2013) (upholding district court's jury instructions). Section 1512(c) does not require proof that the accused acted "with an evil or wicked purpose." *Id.* at 735-36 (distinguishing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)).

Congressional proceedings to count electoral votes are governed by the Twelfth Amendment to the U.S. Constitution and by the Electoral Count Act. The Twelfth Amendment requires presidential electors to meet in their respective States and *certify* their State's votes for President and Vice President. U.S. Const., amend. XII. The Twelfth Amendment's text regarding the counting of votes is clear and unequivocal in this context: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; The person having the greatest Number of votes for President, shall be the President." *Id.* Although some have theorized that there may be ambiguity about which slate to count if a state submits two slates officially certified by the state's Governor, no such ambiguity was present on January 6, 2021. Each state submitted only one officially-certified

---

(Dec. 28, 2021) (ECF No. 263); *United States v. Montgomery*, No. 21-46 (D.D.C.), Mem. Op. and Order, at 8-21 (Dec. 28, 2021) (ECF No. 87); *United States v. Mostofsky*, No. 21-138 (D.D.C.), Mem. Op., at 21-24 (Dec. 21, 2021) (ECF No. 88); *United States v. Caldwell*, No. 21-28 (D.D.C.) Mem. Op. and Order, at 8-16 (Dec. 20, 2021) (ECF No. 558); *United States v. Sandlin*, No. 21-88, (D.D.C.) Mem. Op., at 5-9 (Dec. 10, 2021) (ECF No. 63).)

electoral slate.  Also, the specific text of the Twelfth Amendment makes clear that the presiding officer cannot delay the count in this context, by instructing that the presiding officer shall "open all the certificates and the votes shall then be counted . . ."  It is not permissible to wait 10 days or any other extended period before counting certified electoral votes.

The Electoral Count Act of 1887 provides for objections by House and Senate members, and a process to resolve such objections through votes in each separate chamber.  3 U.S.C. §§ 5, 6, 15.  Nothing in the Twelfth Amendment or the Electoral Count Act provides a basis for the presiding officer of the Senate to unilaterally refuse to count electoral votes—for any reason.  Any such effort by the presiding officer would violate the law.   This is exactly what the Vice President's counsel explained at length to Plaintiff and President Trump before January 6.[76]  Plaintiff acknowledged that the Supreme Court would reject such an effort 9-0.[77] And the Vice President made this crystal clear in writing on January 6: any attempt by the Vice President to take the course of action the President insisted he take would have been *illegal*.[78]

Nevertheless, pursuant to Plaintiff's plan, the President repeatedly asked the Vice President to exercise unilateral authority illegally, as presiding officer of the Joint Session of Congress, to refuse to count electoral votes.  *See supra* at 11-13.  In service of this effort, he and Plaintiff met with the Vice President and his staff several times to advocate that he unilaterally reject and refuse to count or prevent the counting of certified

---

[76] *See, e.g.,* Ex. F, Jacob Tr. 82, 96-97, 107-10 ("[Plaintiff] had acknowledged that he would lose 9-0 at the Supreme Court."); Ex. N, Email Exchange Between John Eastman and Gregory Jacob ("Respectfully, it was gravely, gravely irresponsible for you to entice the President with an academic theory that had no legal viability, and that you well know we would lose before any judge who heard and decided the case.").

[77] Ex. N, Email Exchange Between John Eastman and Gregory Jacob.

[78] Public Letter from Michael R. Pence to Congress (Jan. 6, 2021), https://int.nyt.com/data/documenttools/pence-letter-on-vp-and-counting-electoral-votes/9d6f117b6b98d66f/full.pdf. *See also* Ex. N. Ex. N, Email Exchange Between John Eastman and Gregory Jacob.

1  electoral votes, and both also engaged in a public campaign to pressure the Vice
2  President.  *See supra* at 3-17.

3      The President and Plaintiff also took steps to alter the certification of electors from
4  various States.  *See supra* at 18.  For example, the President called and met with state
5  officials, met numerous times with officials in the Department of Justice, tweeted and
6  spoke about these issues publicly, and engaged in a personal campaign to persuade the
7  public that the election had been tainted by widespread fraud.

8      As indicated, there can be no legitimate question that the Joint Session of Congress
9  held on January 6th pursuant to the Twelfth Amendment and the Electoral Count Act
10 constitutes an "official proceeding" under Section 1512(c).[79]

11     The evidence supports an inference that President Trump and members of his
12 campaign knew he had not won enough legitimate state electoral votes to be declared the
13 winner of the 2020 Presidential election during the January 6 Joint Session of Congress,
14 but the President nevertheless sought to use the Vice President to manipulate the results
15 in his favor.  By December 14, 2020, the Electoral College had voted to send 306
16 certified electoral votes for Biden and 232 certified electoral votes for Trump.[80]  No state
17 legislature had certified an alternate slate between that time and January 6, 2021.
18 Moreover, no court had endorsed the Trump campaign's numerous attempts to challenge
19 state election results in the wake of the election.[81]  Thus, even if the Vice President had
20 authority to reject certified electoral certificates (and he did not), there was no valid
21 lawful basis to do so. *See supra* at 3-17.

22

23 [79] *See supra* at 40 n.75 (citing cases).
24 [80] M. Sherman, *Electoral College makes it official: Biden won, Trump lost*, Associated
   Press (Dec. 14, 2020), https://apnews.com/article/joe-biden-270-electoral-college-vote-
25 d429ef97af2bf574d16463384dc7cc1e.
26 [81] *See supra* at 3-5.  In the single case the President won, his campaign challenged a state-
   ordered deadline extension in Pennsylvania for the submission of personal identification
27 for mailed ballots, affecting a small number of votes.  *See* Order, *Trump v. Boockvar*, No.
28 602 M.D. 2020 (Pa. Commonwealth Ct. Nov. 12, 2020),
   https://www.pacourts.us/Storage/media/pdfs/20210604/020642-file-10440.pdf.

Nevertheless, as shown above (*see supra* at 11-13), the President and Plaintiff engaged in an extensive public and private campaign to convince the Vice President to reject certain Biden electors or delay the proceedings, without basis, so that the President and his associates would have additional time to manipulate the results.   Had this effort succeeded, the electoral count would have been obstructed, impeded, influenced, and (at the very least) delayed, all without any genuine legal justification and based on the false pretense that the election had been stolen.  There is no genuine question that the President and Plaintiff *attempted* to accomplish this specific illegal result.

The evidence is also more than sufficient to establish a good faith belief that Plaintiff's advice was used to further these ends.  Plaintiff was the architect of the strategies proposed to the Vice President both directly and through his staff.  His memos provided the basis for arguments made to the Vice President by both the President and Plaintiff himself.  Plaintiff was likewise personally involved in persuading state legislators that they had authority to reject the election results and submit alternate slates of electors to Congress.[82]  And he was even involved in the effort to spread false allegations of election fraud to the public.[83]

## B. Conspiracy to Defraud the United States

The Select Committee also has a good-faith basis for concluding that the President and members of his Campaign engaged in a criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

An individual "defrauds" the government for purposes of Section 371 if he "interfere[s] with or obstruct[s] one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  The conspiracy need not aim to deprive the government of property.  *See Haas v. Henkel*, 216 U.S. 462, 479 (1910).  It need not involve any detrimental reliance by the government.  *See Dennis v. United States*, 384 U.S. 855, 861-

---

[82] *See supra* at 8, 11.

[83] *See supra* at 13 n.40.

**DEFENDANTS' MEMORANDUM OF LAW**

62 (1966). And "[n]either the conspiracy's goal nor the means used to achieve it need to be independently illegal." *United States v. Boone*, 951 F.2d 1526, 1559 (9th Cir.1991).

To establish a violation Section 371's "defraud" clause, "the government need only show" that (1) the defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means, and (4) that a member of the conspiracy engaged in at least one overt act in furtherance of the conspiracy. *United States v. Meredith*, 685 F.3d 814, 822 (9th Cir. 2012) (citation omitted). The "agreement" need not be express and can be inferred from the conspirators' conduct in furtherance of their common objectives. *Ianelli v. United States*, 420 U.S. 770, 777 & n.10 (1975); *see also United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014).

"This is a very broad provision, which subjects a wide range of activity to potential criminal penalties." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993), *partially overruled on unrelated grounds as recognized by United States v. Conti*, 804 F.3d 977, 980 (9th Cir. 2015).

The evidence supports an inference that President Trump, Plaintiff, and several others entered into an agreement to defraud the United States by interfering with the election certification process, disseminating false information about election fraud, and pressuring state officials to alter state election results and federal officials to assist in that effort. As noted above, in particular, the President and Plaintiff worked jointly to attempt to persuade the Vice President to use his position on January 6, 2021, to reject certified electoral slates submitted by certain States and/or to delay the proceedings by sending the count back to the States. *See supra* at 11-13. Plaintiff first crafted a "plan" to justify this course of action.[84] Plaintiff and the President then met and spoke with the Vice President

---

[84] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (Sept. 21, 2021),https://www.cnn.com/2021/09/21/politics/read-eastman-memo/index.html; Jan. 3 Memo on Jan. 6 Scenario, CNN, http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--.jan.3.memo.on.jan.6.scenario.pdf (provided by John Eastman to CNN per CNN reporting, *see* Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM, https://twitter.com/jeremyherb/status/1440432387263922185).

and members of his staff on several occasions on January 4-6 in an attempt to execute Plaintiff's plan.[85]  Plaintiff continued these efforts to persuade the Vice President via ongoing conversations with the Vice President's staff, and the President employed numerous public statements to exert additional pressure on Pence.[86]  The evidence developed to date indicates that these actions were all part of a concerted effort to achieve a common goal: to prevent or delay the certification of the 2020 presidential election results.

In addition to the legal effort to delay the certification, there is also evidence that the conspiracy extended to the rioters engaged in acts of violence at the Capitol.  In a civil case filed against the President and others by several members of Congress, Judge Amit Mehta in the District of Columbia specifically found that it was plausible to believe that the President entered into a conspiracy with the rioters on January 6, 2021, "to disrupt the Certification of the Electoral College vote through force, intimidation, or threats." *Thompson v. Trump*, No. 21-cv-00400 (APM), --- F.3d ---, 2022 WL 503384, at *33. (D.D.C. Feb. 18, 2022).  Judge Mehta's opinion demonstrates the breadth of conspiratorial conduct and further supports the existence of common law fraud.

As part of the effort described above, the conspirators also obstructed a lawful governmental function by pressuring the Vice President to violate his duty to count the electoral certificates presented from certain States.  As an alternative, they urged the Vice President to delay the count to allow state legislatures to convene and select alternate electors.  The apparent objective of these efforts was to overturn the results of the 2020 presidential election and declare Donald Trump the winner.  In this way, the conspiracy aimed to obstruct and interfere with the proper functioning of the United States government.

As summarized *supra* at 11-13, the President and Plaintiff engaged in an extensive campaign to persuade the public, state officials, members of Congress, and Vice

---

[85] *See supra* at 11.
[86] *See supra* at 11-13.

**DEFENDANTS' MEMORANDUM OF LAW**

President Pence that the 2020 election had been unlawfully "stolen" by Joseph Biden. The President continued this effort despite repeated assurances from countless sources that there was no evidence of widespread election fraud. *See supra* at 6. On November 12, 2020, CISA issued a joint statement of election security agencies stating: "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[87] At around the same time, researchers working for the President's campaign concluded that several the claims of fraud relating to Dominion voting machines were false.[88]

In December, Attorney General Barr publicly announced that there was no widespread election fraud.[89] By January 6, more than 60 court cases had rejected legal claims alleging election fraud.[90] The New York court that suspended Giuliani's law license said that certain of his allegations lacked a "scintilla of evidence."[91] On multiple occasions, acting Attorney General Rosen and acting Deputy Attorney General Donoghue told the President personally that the Department of Justice and Federal

---

[87] Department of Homeland Security Cybersecurity and Infrastructure Security Agency, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election; *see also* Christopher Krebs, *Opinion: Trump fired me for saying this, but I'll say it again: The election wasn't rigged*, WASHINGTON POST (Dec. 1, 2020), https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html.

[88] *Read the Trump campaign's internal memo*, N.Y. Times (Sept. 21, 2021), https://www.nytimes.com/interactive/2021/09/21/us/trump-campaign-memo.html.

[89] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS (December 1, 2020); *AG Barr says he won't appoint a special counsel to investigate voter fraud*, YAHOO NEWS (December 21, 2020).

[90] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/.

[91] *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021).

**DEFENDANTS' MEMORANDUM OF LAW**

Bureau of Investigations had found no evidence to substantiate claims being raised by the President.[92]  Georgia Secretary of State Brad Raffensperger likewise rebutted many of the President's allegations of fraud in Georgia.[93]  Despite these refutations and the absence of any evidence to support the allegations he was making, the President and his associates continued to publicly advance the narrative that the election had been tainted by widespread fraud.[94]

As noted above, the President called and met with state officials regarding the election results, met numerous times with officials in the Department of Justice, tweeted and spoke about these issues publicly, and engaged in a personal campaign to persuade the Vice President to alter the certification results.  *See supra* at 11-13.  For his part, Plaintiff drafted legal memoranda outlining several possible ways to ensure that Donald Trump would be named the winner of the 2020 election, met with the Vice President and his staff to press this plan, and spoke publicly on these issues in advance of the attack on the Capitol.  *See supra* at 12.

A review of the documents at issue is likely to reveal that the President engaged Plaintiff's counsel in furtherance of these conspiratorial ends.

---

[92] Senate Judiciary Committee Staff Report, Subverting Justice, How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election, at 5, 14-16, 19, 27-28, https://www.judiciary.senate.gov/imo/media/doc/Interim%20Staff%20Report%20FINAL.pdf; *see also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript; Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final;

[93] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[94] *See, e.g., Donald Trump Rally Speech Transcript Dalton, Georgia: Senate Runoff Election*, The Rev (Jan. 4, 2021), https://www.rev.com/blog/transcripts/donald-trump-rally-speech-transcript-dalton-georgia-senate-runoff-election (reiterating numerous allegations of election fraud before crowd in Dalton, Georgia on January 4th).

**DEFENDANTS' MEMORANDUM OF LAW**

## C.    Common Law Fraud

There is also evidence to support a good-faith, reasonable belief  that *in camera*
review of the materials may reveal that the President and members of his Campaign
engaged in common law fraud in connection with their efforts to overturn the 2020
election results.

The District of Columbia, where these events occurred, defines common law fraud
as: (1) a false representation; (2) in reference to material fact; (3) made with knowledge
of its falsity; (4) with the intent to deceive; and (5) action is taken in reliance upon the
representation.  *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 560 (D.C.
2002).[95]

As described above, the evidence shows that the President made numerous false
statements regarding election fraud, both personally and through his associates, to the
public at-large and to various state and federal officials.  *See supra* at 6-7.  These
statements referred to material facts regarding the validity of state and federal election
results.  *See supra* at 7-8.  And the evidence supports a good-faith inference that the
President did so with knowledge of the falsity of these statements and an intent to
deceive his listeners in hopes they would take steps in reliance thereon.

In addition to the numerous refutations of fraud mentioned above, *see supra* at 7-8,
a specific example helps illustrate the point: On December 3, 2020, Trump's YouTube
channel posted an edited video clip, purporting to show Georgia officials pulling
suitcases of ballots from under a table after poll workers had left for the day.[96] The next
morning, a Georgia official responded to the allegation on Twitter, indicating that the
video "was watched in its entirety (hours) by @GaSecofState investigators" and

[95] The definition of fraudulent deceit under California law largely tracks these elements.
*See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (requiring 1) a
misrepresentation; 2) knowledge of falsity (or scienter); 3) intent to defraud, *i.e.*, to
induce reliance; 4) justifiable reliance; and 5) resulting damage).
[96] Donald J. Trump, *Video from GA shows suitcases filled with ballots pulled from under
a table AFTER poll workers left*, YouTube,
https://www.youtube.com/watch?v=nVP_60Hm4P8.

"[s]how[ed] normal ballot processing.[97]  That same day, a local news outlet ran a fact-checking segment debunking the President's claims.[98]  After the broadcast,  the Georgia official tweeted: "You can watch the @wsbtv report to show that the President's team is intentionally misleading the public about what happened at State Farm Arena on election night.  They had the whole video too and ignored the truth."[99]

The next day, the Georgia Secretary of State's office released the full video to local news outlets, which thoroughly debunked the President's claims.[100]  On December 6, 2020, the Chief Investigator in the Georgia Secretary of State's Office issued a sworn declaration affirming that "there were no mystery ballots that were brought in from an unknown location and hidden under tables as has been reported by some" and explaining the context of the video clip.[101]  The following day, Georgia election officials addressed the issue yet again in a public press conference, stating that "what you saw, the secret suitcases with magic ballots, were actually ballots that had been packed into those absentee ballot carriers by the workers in plain view of the monitors and the press."[102]

Nevertheless, on December 11, 2020, and December 23, 2020, the Trump campaign ran two advertisements on Facebook with the same selectively edited footage

---

[97] Gabriel Sterling, Twitter (6:41 A.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334825233610633217.

[98] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, GPB (Dec. 4, 2020), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

[99] Gabriel Sterling, Twitter (2:58 P.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334950232526884873.

[100] Georgia election officials shows frame-by-frame of State Farm Arenda Election Night video," WSB-TV (Dec. 5, 2020), available at: https://www.youtube.com/watch?v=h-9jFuieH_U.

[101] *Coreco Ja'Qan Pearson, et al. v. Brian Kemp, et al.*, 1:20-cv-4809 (N.D. Ga.) (Docket No. 72-1), available at: https://www.documentcloud.org/documents/20420664-frances-watson-affidavit.

[102] Transcript, Press Conference: Georgia Election Officials Briefing Transcript December 7: Will Recertify Election Results Today (Dec. 7, 2020), available at: https://www.rev.com/blog/transcripts/georgia-election-officials-briefing-transcript-december-7-will-recertify-election-results-today.

---

49

**DEFENDANTS' MEMORANDUM OF LAW**

and the same claim that the video showed "suitcases of ballots added in secret in Georgia."[103]  On December 27 and 31, 2020, Acting Deputy Attorney General Donoghue again debunked this claim directly to the President.[104]

Undeterred, the Trump campaign continued to run the ads on Facebook.  And the President continued to rely on this allegation in his efforts to overturn the results of the election.  During a January 2, 2021, telephone conversation with Georgia Secretary of State Brad Raffensperger, the President suggested that suitcases of illicit ballots explained a "minimum" of 18,000 votes for President Biden, ultimately asking Raffensperger to "find 11,780 votes" for him in Georgia.[105]  During this call, Raffensperger explained to the President that the video in question had been selectively edited, and that Raffensperger's office had reviewed the full tape and found no evidence of fraud.[106]  Raffensperger also offered to provide the President a link to the full video, to which the President responded: "I don't care about the link.  I don't need it."[107]  The following day, the President tweeted: "I spoke to Secretary of State Brad Raffensperger yesterday about Fulton County and voter fraud in Georgia.  He was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state

---

[103] Donald J. Trump, *The evidence is overwhelming – FRAUD!*, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, *Stop the Steal*, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

[104] [Cite Donoghue TI at 43] (informing President Trump that the "allegations about ballots being smuggled in a suitcase and run through the machines several times, it was not true, that we had looked at it, we looked at the video, we interviewed the witnesses, and it was not true").

[105] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[106] *Id.*

[107] *Id.*

**DEFENDANTS' MEMORANDUM OF LAW**

'voters', dead voters, and more.  He has no clue!"[108]  On January 6th, Trump once again

reiterated the claim that Georgia "election officials [had] pull[ed] boxes . . . and suitcases

of ballots out from under a table" in his speech just before rioters attacked the Capitol.[109]

The evidence also shows that many members of the public acted in reliance on the

President's statements.  *See infra* at 52-53.   Several defendants in pending criminal cases

identified the President's allegations about the "stolen election" as a motivation for their

activities at the Capitol.  And a number specifically cited the President's tweets asking

his supporters to come to Washington, D.C. on January 6.  For example, one defendant

who later pled guilty to threatening Nancy Pelosi texted a family member on January 6 to

say: "[Trump] wants heads and I'm going to deliver."[110]  Another defendant released a

statement through his attorney, stating: "I was in Washington, D.C. on January 6, 2021,

because I believed I was following the instructions of former President Trump and he

was my president and the commander-in-chief.  His statements also had me believing the

---

[108] Jason Braverman, *Trump asks Georgia election officials to 'find' votes during call with Sec. of State*, 11Alive,
https://www.11alive.com/article/news/politics/elections/trump-tweets-about-fulton-county-brad-raffensperger-brian-kemp/85-a503efec-df8a-42ee-a92f-70271eac840f (original tweet link broken
https://twitter.com/realDonaldTrump/status/1345731043861659650).

[109] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021) ("Then election officials pull boxes, Democrats, and suitcases of ballots out from under a table. You all saw it on television, totally fraudulent. And illegally scanned them for nearly two hours, totally unsupervised. Tens of thousands of votes. This act coincided with a mysterious vote dump of up to 100,000 votes for Joe Biden, almost none for Trump. Oh, that sounds fair. That was at 1:34 a.m."),
https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[110] Jordan Fischer et al., *Georgia man who wanted to 'remove some craniums' on January 6 sentenced to more than 2 years in prison*, WUSA9 (Dec. 14, 2021),
https://www.wusa9.com/article/news/national/capitol-riots/georgia-man-cleveland-meredith-jr-who-wanted-to-remove-some-craniums-on-january-6-sentenced-to-more-than-2-years-in-prison-trump-noggin-pelosi-bowser/65-e3e4de7e-cf5e-4c62-af1f-53fb214576f0.

**DEFENDANTS' MEMORANDUM OF LAW**

election was stolen from him."[111]  There are many other examples of this kind.[112]  Indeed, even today, polling suggests that "[m]ore than 40% of Americans still do not believe that Joe Biden legitimately won the 2020 presidential election despite no evidence of widespread voter fraud."[113]

As explained at length above, it appears that President Trump's false statements to his supporters and government officials were informed by Dr. Eastman's extensive advice that the election was stolen and that Congress or the Vice President could change the outcome of the election on January 6.[114]

---

[111] Dan Mangan, *Capitol rioter Garret Miller says he was following Trump's orders, apologizes to AOC for threat*, CNBC (Jan. 25, 2021).

[112] *See, e.g.*, *United States v. Sandlin*, https://www.justice.gov/opa/page/file/1362396/download ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); *United States v. Neefe et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is literally calling people to DC in a show of force.  Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."); *United States v. Caldwell et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1369071/download ("Trump said It's gonna be wild!!!!!!!  It's gonna be wild!!!!!!!  He wants us to make it WILD that's what he's saying. He called us all to the Capitol and wants us to make it wild!! !  Sir Yes Sir!!!  Gentlemen we are heading to DC pack your shit!!").

[113] Maya Yang, *More than 40% in US do not believe Biden legitimately won election – poll*, GUARDIAN (Jan. 5, 2022), https://www.theguardian.com/us-news/2022/jan/05/america-biden-election-2020-poll-victory.

[114] This does not represent the entirety of the evidence obtained by the Select Committee with respect to these issues.  In addition, the Select Committee is receiving new evidence on a regular basis as part of its ongoing investigation.  The Select Committee can make additional evidence available to the Court as requested.

**DEFENDANTS' MEMORANDUM OF LAW**

**IV.  The Select Committee Has Not Waived Its Arguments That Plaintiff Is Not
Entitled To Attorney-client Or Work-Product Protections Over The
Documents At Issue**

Plaintiff contends that the Select Committee has "waived" its right to object to
privilege based on Plaintiff's public statements, the "particulars" of the Chapman
University email system, or "any other 'generalized' waiver argument."  Br. at 22.  That
contention is obviously wrong.

Plaintiff reasons that the Select Committee "necessarily conceded the possibility
that at least some privileged content exists in the Chapman materials" because it
"conced[ed] that a privilege log is appropriate."  Br. at 22.  The Select Committee made
no such concessions.  As reflected in the statement quoted in Plaintiff's brief, counsel for
the Select Committee stated at the hearing, "if this [a privilege review] is considered
something that is important to do now, we would certainly entertain it."  *Id.*  That is, *if*
this Court believed that an initial privilege review and log were appropriate, the Select
Committee would not object to such a process.  In no way did counsel's statement
concede that any of the documents at issue may ultimately be withheld because of
privilege.

Indeed, as Plaintiff recognizes, Br. at 22, the Select Committee argued in its brief
in opposition to a temporary restraining order that Plaintiff could not claim attorney-
client privilege or work product protection over any of the documents at issue (*see* ECF
No. 23-1 at 17-23), and the Select Committee never abandoned that argument.  To the
contrary, in each of the notices the Select Committee has filed with its privilege log
objections, it has explicitly "preserve[d] its ability to argue in subsequent briefing on
Plaintiff's privilege claims that, as a general matter, none of the documents contained in
the Chapman University production set can be withheld on the basis of attorney-client or
work product privilege."  *See, e.g.*, ECF No. 71 at 2.  Plaintiff cites no case law
supporting his view of waiver, and the Select Committee is aware of none.

**DEFENDANTS' MEMORANDUM OF LAW**

## V. This Court Should Not Revisit Its Ruling Rejecting Plaintiff's First and Fourth Amendment Claims

Plaintiff asks this Court to "revisit" its holding denying a preliminary injunction based on Plaintiff's First and Fourth Amendment claims. Br. at 31-37. That request is procedurally improper. This Court directed Plaintiff to "file briefing … supporting his assertions of privilege for each document between January 4 and January 7, 2021." ECF No. 104. Inserting into such briefing a request for reconsideration of the Court's ruling on Plaintiff's First and Fourth Amendment claims—which are not relevant to the privilege claims—is entirely inappropriate.

Local Rule 7-18 describes the proper procedure for seeking the Court's reconsideration of a previous ruling, and the grounds on which such a request may be made. Barring a showing of good cause, the rule requires that a motion be made no later than 14 days after the Order at issue was entered. In this case, the relevant Order was entered on January 25, almost one month before Plaintiff filed this brief. *See* ECF No. 43. Thus, Plaintiff both failed to submit his request in the proper format of a motion for reconsideration and failed to file it in a timely manner.

Moreover, under Local Rule 7-18, a motion for reconsideration may only be made on the following grounds:

> (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.

Consistent with this rule, "the Federal Rules of Civil Procedure provide that a motion for reconsideration 'should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'" *Zhur v. Neufeld*, No. 17-9203, 2018 WL 4191325, *1 (C.D. Cal. Aug. 29, 2018) (citing Fed. R. Civ. P. 59(e));

*see also Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Contrary to Plaintiff's assertion that his First and Fourth Amendment claims were not fully briefed (Br. at 31), the claims were first raised in Plaintiff's Complaint, the Select Committee responded to these claims in their opposition, ECF No. 23-1 at 24-25, and Plaintiff addressed the First and Fourth Amendments claims in his reply, ECF No. 27 at 23). Following briefing and oral argument, this Court denied Plaintiff's request for a temporary restraining order or preliminary injunction, specifically rejecting his First and Fourth Amendment claims. *See* ECF No. 43 at 12-14. For the reasons stated in the Select Committee's opposition and this Court's Order, that ruling was correct.

Instead of relying on new evidence or intervening case law, Plaintiff simply reargues the merits, relying on precedents addressed in both the Select Committee's opposition and the Court's Order. With respect to the First Amendment claim, Plaintiff discusses "at some length" the Supreme Court's decision in *Watkins v. United States*, 354 U.S. 178 (1957), a decision that this Court correctly applied in its Order. See Br. at 32; ECF No. 43, at 12. Similarly, in reraising his Fourth Amendment claim, Plaintiff unpersuasively attempts to distinguish two "historic" Supreme Court decisions (cited in his Complaint), on which this Court correctly relied in denying a preliminary injunction. *See* Compl. ¶¶ 95, 98; ECF No. 43, at 13; Br. at 36 (citing *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946); *McPhaul v. United States*, 364 U.S. 372, 382 (1960)). Plaintiff offers no explanation as to how his argument raises "a material difference in fact or law from that presented to the Court" previously or "the emergence of new material facts or a change of law." Local Rule 7-18. It does not.

In addition, Plaintiff has not shown that this Court committed clear error. The Court appropriately analyzed the interests at stake in rejecting Plaintiff's First Amendment claim. To determine whether the First Amendment bars the Select Committee's access to information it seeks through a duly-authorized subpoena depends on a balancing of "the competing private and public interests at stake in the particular

**DEFENDANTS' MEMORANDUM OF LAW**

circumstances shown." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959). The Court considered the competing interests at stake and found that "[t]he public interest here is weighty and urgent," ECF No. 43, at 12, and that Plaintiff identified no "specific associational interest threatened by" or "any particular harm likely to result from" production of the materials sought by the Select Committee. *Id.* at 12-13.

Plaintiff's brief fails to address the substantial public interest in the Select Committee's investigation, instead arguing that "the Select Committee's resolution poses the same First Amendment risks of unrestrained congressional power that the Supreme Court identified in *Watkins*." Br. at 34. But, again, Plaintiff has not identified any specific associational interest threatened by production of his Chapman communications or any particular harm likely to result from their production. *See* ECF No. 43, at 12-13. His vague reference to communications that "reveal much" about third-parties' "identities, associational choices, political beliefs and other protected First Amendment interests"—and the notion that "having disfavored views on the 2020 election" can be "personally damaging"—is insufficient. Br. at 35-36. The Court's rejection of Plaintiff's First Amendment claim was thus unquestionably correct, and Plaintiff provides no persuasive reason for the Court to reconsider it now.

The Court also appropriately rejected Plaintiff's Fourth Amendment claim, finding that the subpoena is not "overbroad or indefinite given its context." ECF No. 43, at 14. A subpoena is not impermissibly overbroad so as to violate the Fourth Amendment as long as its call for documents or testimony are within the scope of the Congressional inquiry at issue. *See McPhaul*, 364 U.S. at 382. The requests at issue are well within the scope of the Select Committee's inquiry. *See* ECF No. 23-1 at 25. And Plaintiff's belated attempt to distinguish *McPhaul* and *Oklahoma Press* is unavailing. Relying on recent Supreme Court decisions in distinct Fourth Amendment contexts, the most Plaintiff can say is that "if *McPhaul* and *Oklahoma Press* were to be decided today they would be likely to come out quite differently." Br. 36-37. Even if that doubtful

**DEFENDANTS' MEMORANDUM OF LAW**

proposition were correct, Plaintiff does not (and cannot) argue that this Court is free to disregard those Supreme Court rulings.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's claims of privilege should be rejected, leaving Chapman University free to comply with the House subpoena at issue here as it has stated it wishes to do.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
   *General Counsel*
TODD B. TATELMAN
   *Principal Deputy General Counsel*
ERIC R. COLUMBUS
   *Special Litigation Counsel*
MICHELLE S. KALLEN
   *Special Litigation Counsel*
STACIE M. FAHSEL
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte
Noam Biale
Maya Brodziak
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor

**DEFENDANTS' MEMORANDUM OF LAW**

New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

Dated: March 2, 2022

**DEFENDANTS' MEMORANDUM OF LAW**

# CERTIFICATE OF SERVICE

## WASHINGTON, DISTRICT OF COLUMBIA

I am employed in the aforesaid county, District of Columbia; I am over the age of 18 years and not a party to the within action; my business address is:

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

On March 2, 2022, I served the **CONGRESSIONAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS** on the interested parties in this action:

Anthony T. Caso
Constitutional Counsel Group
174 W Lincoln Ave #620
Anaheim, CA 92805-2901
atcaso@ccg1776.com

Charles Burnham
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
charles@burnhamgorokhov.com

*Attorneys for Plaintiff John C. Eastman*

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)**
   The document was served on the following via The United States District Court – Central District's CM/ECF electronic transfer system which generates a Notice of Electronic Filing upon the parties, the assigned judge, and any registered user in the case:

☒ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 2, 2022 here, at Bethesda, Maryland.

_/s/_ Douglas N. Letter

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

1   OFFICE OF GENERAL COUNSEL
2   U.S. HOUSE OF REPRESENTATIVES
    5140 O'Neill House Office Building
3   Washington, D.C. 20515

4   SHER TREMONTE LLP
    90 Broad Street, 23rd Floor
5   New York, New York 10004

6   ARNOLD & PORTER
7   601 Massachusetts Ave, NW
    Washington, D.C. 20001
8

9   Counsel for the Congressional Defendants

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                   SOUTHERN DIVISION

14

15   JOHN C. EASTMAN,                Case No. 8:22-cv-00099-DOC-DFM

16          Plaintiff,               **DECLARATION OF DOUGLAS N.
                                      LETTER IN SUPPORT OF
17   vs.                             CONGRESSIONAL DEFENDANTS'
                                      OPPOSITION TO PLAINTIFF'S
18   BENNIE G. THOMPSON, *et al.*,   PRIVILEGE ASSERTIONS**

19          Defendants.
                                      Date:      March 8, 2022
20                                    Time:      9:00 a.m.
                                      Location: Courtroom 9D
21

22

23

24

25

26

27

28

---

**DECLARATION OF DOUGLAS N. LETTER**

I, Douglas N. Letter, declare as follows:

      1.     I am the General Counsel, of the U.S. House of Representatives and counsel for the Congressional Defendants in this action.

      2.     I make this declaration in support of the Congressional Defendants' Opposition to Plaintiff's Privilege Assertions.

      3.     Attached hereto as Exhibit 1 are true and accurate copies of email messages between myself and Plaintiff's counsel, Charles Burnham, that occurred on Monday, January 31, 2022 at 4:06p EST, Thursday, February 3, 2022 at 7:13p EST, and Tuesday, February 8, 2022 at 3:05p EST.

      I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed on March 2, 2022, in Bethesda, Maryland.

                              */s/ Douglas N. Letter*
                              Douglas N. Letter

**DECLARATION OF DOUGLAS N. LETTER**

1  OFFICE OF GENERAL COUNSEL
2  U.S. HOUSE OF REPRESENTATIVES
   5140 O'Neill House Office Building
3  Washington, D.C. 20515

4  SHER TREMONTE LLP
   90 Broad Street, 23rd Floor
5  New York, New York 10004

6
   ARNOLD & PORTER
7  601 Massachusetts Ave, NW
   Washington, D.C. 20001
8

9  Counsel for the Congressional Defendants

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                   **SOUTHERN DIVISION**

14

15  JOHN C. EASTMAN                    | Case No. 8:22-cv-00099-DOC-DFM

16          Plaintiff,                 | **DECLARATION OF JOHN WOOD IN SUPPORT OF CONGRESSIONAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS**
17  vs.
18  BENNIE G. THOMPSON, *et al.*,
19          Defendants.               | Date:     March 8, 2022
20                                     | Time:     9:00 a.m.
                                        | Location: Courtroom 9D
21
22
23
24
25
26
27
28

                   **DECLARATION OF JOHN F. WOOD**

I, John Wood declare as follows:

1.    I am Senior Investigative Counsel and Of Counsel to the Vice Chair, Select Committee to Investigate the January 6th Attack on the U.S. Capitol, U.S. House of Representatives.

2.    I make this declaration in support of Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions.

3.    Attached hereto as Exhibit A is a true and accurate copy of the transcript of the deposition of John Eastman by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on December 9, 2021.

4.    Attached hereto as Exhibit B is a true and accurate copy of certain pages from the interview of Richard Peter Donoghue by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on October 1, 2021.

5.    Attached hereto as Exhibit C is a true and accurate copy of certain pages from the interview of Jeffrey A. Rosen by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on October 13, 2021.

6.    Attached hereto as Exhibit D is a true and accurate copy of certain pages from the deposition of Jason Miller by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on February 3, 2022.

7.    Attached hereto as Exhibit E are true and accurate copies of certain documents produced by the National Archives and Records Administration ("NARA") to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

8.    Attached hereto as Exhibit F is a true and accurate copy of certain pages from the deposition of Greg Jacob by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on February 1, 2022.

9.    Attached hereto as Exhibit G is a true and accurate copy of certain pages from the deposition of Keith Kellogg, Jr. by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on December 14, 2021.

**DECLARATION OF JOHN F. WOOD**

1

10.     Attached hereto as Exhibit H is a true and accurate copy of a document produced by NARA to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

11.     Attached hereto as Exhibit I is a true and accurate copy of certain pages from the deposition of Marc Short by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on January 26, 2022.

12.     Attached hereto as Exhibit J is a true and accurate copy of certain pages from the deposition of Benjamin Williamson by the Select Committee to Investigate the January 6th Attack on the U.S. Capitol on January 25, 2022.

13.     Attached hereto as Exhibit K is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 5, 2021, 7:29 PM MST, along with the attachment thereto, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005235 and Chapman005236.

14.     Attached hereto as Exhibit L is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 12:25 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005379.

15.     Attached hereto as Exhibit M is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 4:45 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005442.

16.     Attached hereto as Exhibit N is a true and accurate copy of an email from John Eastman (via his Chapman University email account) to Gregory Jacob on January 6, 2021, 9:44 PM MST, produced to the Select Committee to Investigate the January 6th Attack on the U.S. Capitol as Chapman005479.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

**DECLARATION OF JOHN F. WOOD**

2

Executed on March 2, 2022, in Washington, DC.

/s/ John F. Wood
John F. Wood

**DECLARATION OF JOHN F. WOOD**

3

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

JOHN C. EASTMAN

    Plaintiff,

vs.

BENNIE G. THOMPSON, *et al.*,

    Defendants.

Case No. 8:22-cv-00099-DOC-DFM

# **Exhibit A**

1

2

3

4

5    SELECT COMMITTEE TO INVESTIGATE THE

6    JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7    U.S. HOUSE OF REPRESENTATIVES,

8    WASHINGTON, D.C.

9

10

11

12    DEPOSITION OF:    JOHN EASTMAN

13

14

15

16                   Thursday, December 9, 2021

17

18                    Washington, D.C.

19

20

21       The interview in the above matter was held in Room 1309, Longworth House

22    Office Building, commencing at 12:57 p.m.

23          Present:    Representatives Lofgren, Raskin, Cheney, and Kinzinger.

1

2    Appearances:

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    JOHN WOOD, SENIOR INVESTIGATIVE COUNSEL

9    AND OF CHAIR TO THE VICE CHAIR

10   CASEY LUCIER, INVESTIGATIVE COUNSEL

11   JOE MAHER, DETAILEE

12   DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13   JENNA HOPKINS, PROFESSIONAL STAFF

14   EVAN MAULDIN, CHIEF CLERK

15

16

17   For JOHN EASTMAN:

18

19   CHARLES BURNHAM

1    Amendment grounds.

2          Mr. Raskin.    Well, then, if he's going to assert it, would he assert it so I can hear

3    that?

4          Mr. Burnham.    Certainly.

5          The Witness.    Yes.    On advice of counsel, I'm asserting the Fifth.

6          Mr. Raskin.    Okay.    So to be clear, you're asserting the Fifth Amendment as to

7    whether or not you were answering -- you're asserting the Fifth as to whether or not

8    you're refusing to answer questions just about all of your actions or also about the ideas

9    that you have about the electoral college.    Is that right?

10          The Witness.    And on advice of counsel, yes, I'm asserting the Fifth.

11          Mr. Raskin.    Thank you.    I yield back.

12          Mr. Wood.    Do any other members have questions?

13             BY MR. WOOD:

14    Q      Dr. Eastman, if you could turn your attention to exhibit 10 in your binder,

15    which has a -- the first page is an email from Jeffrey Clark at the Department of Justice

16    dated December 28th, 2020, and then the next several pages are a draft of a letter to

17    Governor Brian Kemp, Speaker of the House David Ralston, President Pro Tem of the

18    Senate Butch Miller, all of the State of Georgia.

19          Have you seen this letter before?

20    A      Fifth.

21    Q      Dr. Eastman, did you have any role in drafting this letter?

22    A      Fifth.

23    Q      Dr. Eastman, did you speak to Jeffrey Clark about this letter?

24    A      Fifth.

25    Q      Dr. Eastman, did you speak with anyone else at the Department of Justice



1    regarding efforts to overturn the results of the 2020 Presidential election?

2         A    Fifth.

3         Q    Dr. Eastman, regarding the 2020 election, did you speak with Representative

4    Scott Perry?

5         A    Fifth.

6         Q    Dr. Eastman, with regard to the 2020 election and any efforts to change the

7    outcome of the election, did you speak with Senator Josh Hawley?

8         A    Fifth.

9         Q    And just so I understand, Dr. Eastman, with regard to whether you had any

10   conversations with Senator Josh Hawley about efforts to overturn the results of the 2020

11   election, you're taking the Fifth Amendment on the grounds that your answer could tend

12   to incriminate you?

13        A    Fifth.

14        Q    Is that a yes?

15        Mr. Burnham.    That was an invocation of the Fifth in response to your question

16   about his basis for taking the Fifth, but I think it could be taken as a yes.

17        Mr. Wood.    Okay.    Just to be clear, I wasn't trying to ask about the basis for

18   taking the Fifth, I just wanted to clarify that he was taking the Fifth on the grounds that it

19   could incriminate him, not anything about the factual basis or legal basis underlying that.

20             BY MR. WOOD:

21        Q    Dr. Eastman, did you clerk with now Senator Ted Cruz.

22        A    Yes.

23        Q    Dr. Eastman, did you have any communications with Senator Ted Cruz

24   regarding efforts to change the outcome of the 2020 election?

25        A    Fifth.

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>    Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>    Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# **Exhibit B**

1

2

3

4      SELECT COMMITTEE TO INVESTIGATE THE

5      JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6      U.S. HOUSE OF REPRESENTATIVES,

7      WASHINGTON, D.C.

8

9

10

11

12     INTERVIEW OF:    RICHARD PETER DONOGHUE

13

14

15                                        Friday, October 1, 2021

16

17                                        Washington, D.C.

18

19

20           The interview in the above matter was held via Webex, commencing at 10:02 a.m.

21           Present:    Representatives Schiff, Lofgren, Murphy, Raskin, and Cheney.

1    <u>Appearances:</u>

2

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    TIM HEAPHY, CHIEF INVESTIGATIVE COUNSEL

9    MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

10   SOUMYA DAYANANDA, SENIOR INVESTIGATIVE COUNSEL

11   JOE MAHER, DETAILEE

12   DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13   JACOB NELSON, RESEARCHER

14   JENNA HOPKINS, PROFESSIONAL STAFF

15   EVAN MAULDIN, CHIEF CLERK

16   KRISTIN AMERLING, DEPUTY STAFF DIRECTOR

17   SAMANTHA STILES, CHIEF ADMINISTRATIVE OFFICER

18

19   For the DEPARTMENT OF JUSTICE:

20

21   KIRA ANTELL, OFFICE OF LEGISLATIVE AFFAIRS

22   BRAD WEINSHEIMER, OFFICE OF THE DEPUTY ATTORNEY GENERAL

1

2      For RICHARD PETER DONOGHUE:

3

4      GREG ANDRES

5      CHARLES KLUG

6      KATHERINE SWAN

7      BROOK JACKLING

8      Davis Polk

9      901 15th Street, NW

10     Washington, D.C. 20005

1    false and/or just not supported by the evidence.    We look at the allegations but they

2    don't pan out."

3            The President was getting very frustrated.    He said, "This is electioneering fraud."

4            And then, again, I have a quote from him:    "We have an obligation to tell people

5    that this was an illegal, corrupt election."

6            Then he said, "People tell me Jeff Clark is great" and that "I should put him in.

7    People want me to replace DOJ leadership."

8            At which point I responded, sir, that's fine, you should have the leadership you

9    want, but understand, changing the leadership in the Department won't change anything.

10   The --

11           Q    All right.    Let me stop you there.

12           A    -- Department operates --

13           Q    Let me stop you there, Mr. Donoghue.    Just two things.

14           So, going back to, "We have an obligation to tell people that this was an illegal,

15   corrupt election," is it fair to say that what he was asking you to do, primarily, was tell

16   people, in some form, a press conference or otherwise, that there was corruption so that

17   some other political strategy could unfold?    Was it your impression that the precise ask

18   from the President was more about a public statement than actually the day-to-day

19   investigative work?

20           A    I think he probably cared about both of them, but -- I don't want to

21   speculate about what was in his mind, but this is what he said.    And I think what you

22   take away from that, logically, is that he wanted the Department to say something

23   publicly.

24           Q    Right.    So there's pressure on you and Mr. Rosen, to which you push back,

25   to say something publicly, to say something publicly without basis, that there is an illegal,

1   But we weren't reporting back to the White House simply because the President

2   mentioned some allegations.

3       Q      I see.    It wouldn't be consistent with protocol for you to go back to the

4   President every time something that comes up in a discussion is investigated or resolved?

5       A      He didn't instruct us to do that, and we weren't going to do it.    So.

6       Q      Yeah.    All right.    I want to turn your attention, if you can now to

7   exhibit 10, which we get back into Mr. Clark.    The next day, December 28th, you and Mr.

8   Rosen get an email from Mr. Clark, and he is asking for two urgent action items.    Tell us

9   about this email, the two actions that he requested, and what your response was.

10      A      Right.    So DAG Rosen and I spoke, I think, probably several times on the

11  27th and certainly the 28th because that was a Monday.    DAG Rosen and Jeff Clark had

12  a long personal and professional relationship.    They had known each other for decades.

13  They had worked at the same law firm together.    He knew Jeff Clark much better than I

14  did.    And, you know, we discussed why Jeff Clark's name was coming up, why it was

15  coming from the President, why it was coming from this Congressman.    And Jeff Rosen

16  said:    Well, look, I am going to talk to Jeff Clark to find out what's going on here.    We

17  got to get to the bottom of this.

18      So I think he had conversations with Jeff Clark earlier on the 28th.    They

19  preceded this email, which came fairly late in the day.    I did not talk to Jeff Clark before

20  this.

21      So, at 4:40, I received this email from Jeff Clark.    I read it.    I read the

22  attachment.    I had to read it more than once to make sure I really understood what he

23  was proposing.    And then I drafted a response.    I don't know where Jeff Rosen was at

24  this point, but I went to his office, and he wasn't there.    So I didn't get to discuss my

25  response with him before I sent it.    But I sent it out.    And then I saw him shortly

1   afterward, and he was very upset by Jeff Clark's request.    And he said that he had

2   instructed one of his administrative support personnel to get Jeff Clark in his conference

3   room.    He was -- he was a little angry.    And he said:    I want him down here.    We

4   need to talk to this guy and find out what's going on.

5       So I think there's some emails that show up.

6       Q    Yeah.    And I don't want to jump ahead too much, Mr. Donoghue, because I

7   want to get to that conversation.    But let's go back to Mr. Clark's email.    The first thing

8   he asks of you is:    I would like to have your authorization -- "you" meaning you and Mr.

9   Rosen -- to get a classified briefing tomorrow from ODNI led by DNI Ratcliffe on foreign

10  election interference issues.    And he mentions activating the IEEPA and 2018 EO powers

11  about the Dominion machine access to the internet through a smart thermostat with a

12  net connection trail leading back to China.    He is essentially asking if you can get a

13  briefing about this allegation of Chinese control of Dominion machines through a

14  thermostat.    Did that strike you as odd, and what was your reaction to that specific

15  request?

16      A    Yes, it struck me as odd.    I won't go into details, but we received briefing

17  about what the IC, the intelligence community, knew about the election in advance.

18  This was inconsistent with what we had been told.    And I had not heard anything about

19  smart thermostats and internet connections leading back to China and things like that.

20  So the whole thing struck me as very odd.

21      Q    Yeah, and that Mr. Clark, the head -- acting head of the Civil Division is asking

22  for a classified briefing with the Director of National Intelligence about this allegation.

23  That also procedurally was odd?

24      A    Yes.

25      Q    Okay.    He also then -- the second ask is this draft letter, which I believe is

1    attached to the email that he sends you and Mr. Rosen.    And that letter is a draft letter

2    that you and Mr. Rosen and he, Mr. Clark, would sign to the Governor, the Speaker of the

3    House, and the president pro tempore of the Georgia legislature, essentially asking them

4    to stand down and not certify the results of their election.    How did that request strike

5    you, and what did you do about it?

6        A    It struck me as very strange and somewhat alarming.    And, as I said, I had

7    to read it more than once to make sure I understood what he was proposing here.    It

8    was completely inconsistent with the Department's role, generally.    And it was

9    inconsistent with what our investigations, to date, had revealed.    And so I think I made

10   my views known in the email response I sent to him.

11       Q    Yeah, which we'll get to.    To be clear, he asks that -- a version of this letter

12   be sent to each relevant State.    So was his request to send this letter, drafted for

13   Georgia, not just to Georgia officials but to officials in other States where there had been

14   allegations of election fraud?

15       A    Yes.    That was my understanding of his proposal.

16       Q    All right.    He writes that he put it together quickly -- "it" being the

17   letter -- but other messages suggest that it may have been drafted by Ken Klukowski.

18   Do you know Ken Klukowski and what his role may have been within the Department's

19   Civil Division at that time?

20       A    No.    I don't.

21       Q    Okay.    Did you know whether or not Mr. Clark was talking to anyone else in

22   the Department about this letter or other election issues?

23       A    No.    I had no reason to think that.

24       Q    All right.    So you respond, Mr. Donoghue.    We get to your response, which

25   is tab 11.    You drafted a pretty comprehensive, specific response reflecting your

1    frustration on the 28th, just about a little over an hour later, at 5:50.    I won't ask you to

2    read it to us, but just summarize for us your overall reaction and what's reflected in the

3    email.

4            A    I tried to make it clear to him that this is not the Department's role.    Again,

5    we don't do quality control for State elections.    The States run the elections.    We

6    investigate crimes, and we look at civil rights matters.    So I tried to make it clear to him

7    that this is simply not our role, to recommend to the States what they do and, secondly,

8    that we have conducted investigations and that the factual claim he was making here was

9    simply not accurate.    And so I reminded him that AG Barr had made public statements

10    on this point, less than a week prior, or, I guess, exactly a week prior was the last time he

11    had made some public statements, and that this was just completely unacceptable and

12    not anything that I would ever sign.    And I know Jeff Clark -- or Jeff Rosen, rather, had

13    the same response.

14            Q    You say in the first paragraph:    There's no chance that I would sign this

15    letter or anything remotely like this.    You sort of lead with the conclusion.    You then, in

16    the first paragraph, challenge his factual assumptions.    You said:    The investigations

17    that I am aware of relate to suspicions of misconduct that are of such a small scale that it

18    would simply not impact the outcome of the election.    AG Barr made that clear to the

19    public only last week, and I am not aware of intervening developments that would change

20    that conclusion.

21            So, setting aside whether it would be appropriate for the Department to tell a

22    State what to do, you're challenging -- is it fair to say you're challenging the factual basis

23    included in his letter to the State official?

24            A    That's right.    And he himself, Jeff Clark, would have no way of knowing

25    what investigations we had conducted or not because he was not involved in election

1    matters.

2          Q    Right.    You then, in the second paragraph, Mr. Donoghue, you say:    I

3    cannot imagine a scenario in which the Department would recommend that a State

4    would assemble its legislature to determine whether already certified election results

5    should somehow be overridden by legislative action.    This would be a grave step for the

6    Department to take and could have tremendous constitutional, political, and social

7    ramifications for the country.

8          Is that your sort of procedural response here that this is just not the Department's

9    role to be quality control for State elections and tell a State legislature what to do?

10         A    Yes.    That's the point I was making.    Yes.

11         Q    All right.    So, when you and Mr. Rosen get this letter, you compose the

12   response.    You indicated previously that Mr. Rosen essentially summons Mr. Clark up to

13   the 5th floor for a face-to-face meeting.    Does that meeting then occur?

14         A    Yes.    He is on the 4th floor.    But, yes, in the DAG conference on the 4th

15   floor.

16         Q    Okay.    So you are personally present, Mr. Donoghue, for that meeting

17   between Clark and Rosen?

18         A    Yes.    It was the three of us.

19         Q    Tell us about the conversation there with Mr. Clark.

20         A    Mr. Clark explained that he had been looking at some of these allegations on

21   his own, that he had information, that he had concerns about the reliability of the

22   outcome of the election.    He mentioned this smart thermostat thing.    It was clear that

23   he had been reading some affidavits that were attached to some of the civil filings in

24   some of the cases that were pending or already dismissed around the country.    He had

25   various theories that seemed to be derived from the internet about why the outcome of

1    so when you joined at the President's invitation?

2       A    That's right.

3       Q    All right.    And who was inside the meeting when you got there?

4       A    When I entered the Oval Office, the President was behind the desk, and it

5    was Pat Cipollone, Pat Philbin, a White House lawyer named Eric Herschmann, Jeff Clark,

6    Jeff Rosen, Steve Engel, and then me.

7       Q    Are you sure Mr. Herschmann was a White House lawyer?

8       A    He was a lawyer who worked at the White House.    I'm not -- initially I

9    thought he worked in the White House Counsel's Office, but I think later someone told

10    me that wasn't the case.    I don't remember.    His role was never clear to me.    I knew

11    he was a lawyer from New York.    I know he had been a prosecutor at some point.    But I

12    don't know what his title exactly was.    I'd seen him in some meetings previously, but I

13    didn't know exactly what his role was.

14       Q    Okay.

15       All right.    And, again, no notes of this meeting.    Is that right?    You don't take

16    notes -- you were inside the Oval Office and, you indicated before, didn't take notes when

17    you were in discussions inside that office.

18       A    No.

19       Q    All right.    Well, tell us what you remember, then, about the conversation.

20    What was the topic when you arrived, and how did it evolve from there?

21       A    The meeting took about another 2-1/2 hours from the time I entered.    It

22    was entirely focused on whether there should be a DOJ leadership change.    So the

23    election allegations played into this, but they were more background than anything else.

24       And the President was basically trying to make a decision and letting everyone

25    speak their minds.    And it was a very blunt, intense conversation that took several

1     hours.    And Jeff Clark certainly was advocating for change in leadership that would put

2     him at the top of the Department, and everyone else in the room was advocating against

3     that and talking about what a disaster this would be.

4           Q     What were Clark's purported bases for why it was in the President's interest

5     for him to step in?    What would he do, how would things change, according to Mr. Clark

6     in the meeting?

7           A     He repeatedly said to the President that, if he was put in the seat, he would

8     conduct real investigations that would, in his view, uncover widespread fraud; he would

9     send out the letter that he had drafted; and that this was a last opportunity to sort of set

10     things straight with this defective election, and that he could do it, and he had the

11     intelligence and the will and the desire to pursue these matters in the way that the

12     President thought most appropriate.

13           Q     You said everyone else in the room was against this.    That's Mr. Cipollone,

14     Mr. Philbin, Mr. Herschmann, you, and Mr. Rosen.    What were the arguments that you

15     put forth as to why it would be a bad idea for him to replace Rosen with Clark?

16           A     So, at one point early on, the President said something to the effect of,

17     "What do I have to lose?    If I do this, what do I have to lose?"    And I said,

18     "Mr. President, you have a great deal to lose.    Is this really how you want your

19     administration to end?    You're going hurt the country, you're going to hurt the

20     Department, you're going to hurt yourself, with people grasping at straws on these

21     desperate theories about election fraud, and is this really in anyone's best interest?"

22         And then other people began chiming in, and that's kind of the way the

23     conversation went.    People would talk about the downsides of doing this.

24         And then -- and I said something to the effect of, "You're going to have a huge

25     personnel blowout within hours, because you're going to have all kinds of problems with

1    resignations and other issues, and that's not going to be in anyone's interest."

2    And so the President said, "Well, suppose I do this" -- I was sitting directly in front

3    of the President.   Jeff Rosen was to my right; Jeff Clark was to my left.   The President

4    said, "Suppose I do this, suppose I replace him," Jeff Rosen, "with him," Jeff Clark, "what

5    do you do?"   And I said, "Sir, I would resign immediately.   There is no way I'm serving

6    1 minute under this guy," Jeff Clark.

7    And then the President turned to Steve Engel, and he said, "Steve, you wouldn't

8    resign, would you?"   And Steve said, "Absolutely I would, Mr. President.   You'd leave

9    me no choice."

10   And I said, "And we're not the only ones.   You should understand that your

11   entire Department leadership will resign.   Every AAG will resign."   I didn't tell him

12   about the call or anything, but I made it clear that I knew what they were going to do.

13   And I said, "Mr. President, these aren't bureaucratic leftovers from another

14   administration.   You picked them.   This is your leadership team.   You sent every one

15   of them to the Senate; you got them confirmed.   What is that going to say about you,

16   when we all walk out at the same time?   And I don't even know what that's going to do

17   to the U.S. attorney community.   You could have mass resignations amongst your

18   U.S. attorneys.   And then it will trickle down from there; you could have resignations

19   across the Department.   And what happens if, within 48 hours, we have hundreds of

20   resignations from your Justice Department because of your actions?   What does that say

21   about your leadership?"

22   So we had that part of the conversation.   Steve Engel, I remember, made the

23   point that Jeff Clark would be leading what he called a graveyard; there would be no one

24   left.   How is he going to do anything if there's no leadership really left to carry out any of

25   these ideas?

1           I made the point that Jeff Clark is not even competent to serve as the Attorney

2    General.   He's never been a criminal attorney.   He's never conducted a criminal

3    investigation in his life.   He's never been in front of a grand jury, much less a trial jury.

4           And he kind of retorted by saying, "Well, I've done a lot of very complicated

5    appeals and civil litigation, environmental litigation, and things like that."   And I said,

6    "That's right.   You're an environmental lawyer.   How about you go back to your office,

7    and we'll call you when there's an oil spill."

8           And so it got very confrontational at points.

9           And Pat Cipollone weighed in at one point, I remember, saying, you know, "That

10    letter that this guy wants to send, that letter is a murder-suicide pact.   It's going to

11    damage everyone who touches it.   And we should have nothing to do with that letter.

12    I don't ever want to see that letter again."   And so we went along those lines.

13           I remember Eric Herschmann chimed in several times, saying that, whatever Jeff

14    Clark wanted to do or thought he could do, there was no reason to think he could really

15    do it.

16           I remember saying at some point that, you know, Jeff wouldn't even know how to

17    find his way to Chris Wray's office, much less march in there and direct the FBI what to

18    do, and that, if you walked into Chris Wray's office, he wouldn't even know who you are.

19           So we had these conversations that went around and around and were very blunt

20    and direct.   And that went on for 2-1/2 hours.

21    Q    At one point, did the President disparage Mr. Rosen or talk about

22    Mr. Rosen's inaction or unwillingness to do anything about the election?

23    A    He did say several times, "You two," pointing at Mr. Rosen and me, "You two

24    haven't done anything.   You two don't care.   You haven't taken appropriate actions.

25    Everyone tells me I should fire you," and things of that nature.

1      He came back to that at the very end when he decided against a leadership

2   change.    And he announced that, and then he came back to that point and he said, "And

3   I know that these two here, they're not going to do anything.    They're not going to fix

4   this.    But that's the way it is, and I'm going to let it go anyway."

5      Q      Did Mr. Cipollone say anything about what he would do with respect to a

6   potential resignation if the President made this change?

7      A      He did at some point.    I guess that was on the heels of us talking about how

8   there would be resignations in the Department.    And I think Pat Cipollone said, "Well,

9   I'm not going to stand for this, I'm not going to be here if this happens either."

10     Q      So he said he would resign or not stand for it, would not be here, if the

11   President made this change.

12     A      Right.

13     Q      Who, Mr. Donoghue, was, sort of, the primary advocate or voice against the

14   leadership change?    Was it you personally, or was it sort of a consensus and everyone

15   was sort of equally chiming in?    Or just give me a better sense as to, sort of, who was

16   doing most of the talking and was the most strenuous advocate.

17     A      It was definitely a consensus.    We were all on the same page except for Jeff

18   Clark.    But we played different roles.

19           For one thing, Jeff Rosen was in a bad position because he was defending his own

20   job.    So anything he said, obviously, was very self-interested.    And so he wasn't in the

21   best position to make some of these arguments.    And by demeanor, he just has a

22   different demeanor, as does Pat Cipollone, as does Steve Engel.    So everyone played

23   their own role.    My demeanor is more aggressive and more blunt, and so I played that

24   role.

25           And so everyone was on the same page, advocating for the same thing in very

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

JOHN C. EASTMAN

    Plaintiff,

vs.

BENNIE G. THOMPSON, *et al.*,

    Defendants.

Case No. 8:22-cv-00099-DOC-DFM

# Exhibit C

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:    JEFFREY A. ROSEN

Wednesday, October 13, 2021

Washington, D.C.

The interview in the above matter was held in Room 4480, O'Neill House Office

Building, commencing at 10:00 a.m.

Present:    Representatives Murphy, Luria, and Cheney.

Appearances:

For the SELECT COMMITTEE TO INVESTIGATE

THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

TIM HEAPHY, CHIEF INVESTIGATIVE COUNSEL

SOUMYA DAYANANDA, SENIOR INVESTIGATIVE COUNSEL

EVAN MAULDIN, CHIEF CLERK

SAMANTHA STILES, CHIEF ADMINISTRATIVE OFFICER

JOHN WOOD, SENIOR INVESTIGATIVE COUNSEL

DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

JOE MAHER, DETAILEE

CASEY LUCIER, INVESTIGATIVE COUNSEL

JENNA HOPKINS, PROFESSIONAL STAFF

DAMON MARKS, RESEARCHER

For the DEPARTMENT OF JUSTICE:

KIRA ANTELL

BRAD WEINSHEIMER

EMILY LOEB

For JEFFREY A. ROSEN:


MEREDITH POHL

REGINALD BROWN

JOHN BYRNES

Kirkland & Ellis LLP

1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

He also defended his own credentials against some of the attacks that were being made.    He argued that the rest of the room were being self-defeating, you know, that, if you don't try it, you don't know what's going to happen, I think was the nature of that.

Let me think.    This was a very, very long meeting.

Q    Yeah.

A    And everybody spoke at one time or another.    Some people spoke repeatedly.    The President interjected some places.    There were a few places he spoke at greater length, but a lot of the meeting, he let other people talk.

Q    Uh-huh.

A    And so I'm trying to remember the different places that Jeff Clark spoke. Because he spoke more than once.    And I have more the image, that he would get in a debate, you know, that Rich Donoghue and he would have back-and-forth, and Steve Engel and he would have back-and-forth, and Eric Herschmann and he would have back-and-forth --

Q    Yeah.

A    -- that that occurred numerous times.

But the overall substance was, different people in the room were saying, this is not legally well-founded, this is not the Department's role, this letter is inappropriate. They challenged Jeff Clark's qualifications to even be making these arguments.    They challenged both whether he was qualified to be Attorney General but also is he even qualified to address election fraud, you know, even from his current position, let's say.

Q    Uh-huh.

A    And so there's this range of issues.

Now, at more than one juncture, a number of people do raise that, if this goes ahead, there are going to be resignations.    And I think lots of people raised that.    I let

other people speak to that, for obvious reasons, that they were speaking in support of me, so it wasn't my place to speak to.    Jeff Clark didn't speak to that, but I think almost everybody else did.    I remember Pat Cipollone spoke to it, Rich Donoghue.

There was one moment where I remember Steve Engel, and Steve was explaining why he thought it was inappropriate for the Department of Justice to be sending a letter to Georgia and that he had multiple reasons for that.    And he commented that, if it went, that there would be resignations.    And, again, this is in substance.    I don't remember the exact words.

And then Steve Engel, when he was saying that, the President said to him, "Well, Steve, you've been at Justice the whole time.    You wouldn't resign."    And Steve -- I remember this because it was very vivid -- said, "No, Mr. President.    If you replace Jeff Rosen with Jeff Clark and send this letter, I would have no choice.    I would have to resign."

And the President looked to me, startled, and said, "Steve, you wouldn't resign." And Engel repeated it.    He said, "Mr. President, I would have no choice.    I would have to resign."

So that was highly corroborative of what had been said by other folks.

Q    Uh-huh.

So the only substantive election-related action that was discussed was the sending of the letter?    Was there also a discussion of the special counsel or the press conference or the Supreme Court brief, the litany of possible things that had been considered that you mentioned in your opening statement?

A    I don't remember them being discussed in individual -- you know, what about the Supreme Court brief --

Q    Yeah.

Mr. Flynn, but Sidney Powell, Mike Lindell -- there were media accounts of these going on.

I wasn't present at them, and I didn't have anybody reporting to me what happened at them, but I had a just general awareness from media accounts that that has happened.

Ms. <u>Cheney.</u>    And did Pat Cipollone ever tell you what he thought about the President's claims about election fraud?

Mr. <u>Rosen.</u>    So the way you've stated that, I'm not sure.    Because the way the conversations with him went more was that he was supportive of the Department's position, you know, that "the Department should do what you think is right," "I agree the Department should proceed the way you think best."

I would be surprised if he didn't agree on the Department's posture that there had not been widespread fraud, but I don't know if I can specifically remember that or not. But I have more of this big-picture recollection that he was very supportive of the Department and me.    And I maybe -- I'm not sure if I assumed he agreed or he said he agreed.

Ms. <u>Cheney.</u>    And then my last question:    In the meeting on the 3rd, did he speak out and say, I also will resign?

Mr. <u>Rosen.</u>    Yes.

Ms. <u>Cheney.</u>    And did Pat Philbin as well?

Mr. <u>Rosen.</u>    He may have.    I think Pat Cipollone recited that lots of people were going to resign and that it would include him.    And while I don't have a specific, you know, again, word-for-word kind of recollection, if he did that the way I remember it, I'm sure he would've included Pat Philbin, because they were very closely aligned.

So Pat Cipollone was one of the people who said that there would be lots of

**Subject: Jeffrey Clark**

From: Heaphy, Tim - To: hmacdougald@ccedlaw.com, Charles Burnham - Cc: Wood, John, George, Dan - Date: March 10, 2022 at 2:10 PM

Harry/Charles,

Can we schedule a call to talk about your client Jeffrey Clark?  The Select Committee is evaluating a potential grant of use immunity to him, which would resolve his Fifth Amendment privilege objection.  We'd like to talk with you about what impact such immunity would have on Mr. Clark's other objections and potential cooperation with the Select Committee.  Let us know if there's a time in tomorrow or early next week when we could schedule a call?

Thanks,

Tim Heaphy

Dan George, John Wood

Timothy J. Heaphy
Chief Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives
202-309-5396 (cell)

Exhibit I



**Office of the Special Counsel**

**Second Interim Investigative Report**

**On the Apparatus & Procedures of the Wisconsin Elections System**

**Delivered to the Wisconsin State Assembly on March 1, 2022**

EXHIBIT J

## **Table of Contents**

Introduction

Statement of Progress

Chapter 1: The Center for Tech and Civic Life's $8,800,000 Zuckerberg Plan Grant with the Cities of Milwaukee, Madison, Racine, Kenosha and Green Bay (the Zuckerberg 5 Cities) Facially Violates Wisconsin Law Prohibiting Election Bribery.

Chapter 2: The Motive for These Grants Was Impermissible and Partisan Get Out the Vote Efforts (GOTV).

Chapter 3: Government Oversight Has Been Obstructed by Governmental and Outside Corporate Collusion.

Chapter 4: This Collusion and Entanglement Also Caused a Host of Questionable Actions by the Zuckerberg Five.

Chapter 5: Corporate Legal Defense to Facilitate Obstruction Might Violate the Wisconsin Ethics Code.

Chapter 6: Wisconsin Election Officials' Widespread Use of Absentee Ballot Drop Boxes Facially Violated Wisconsin Law.

Chapter 7: The Wisconsin Elections Commission (WEC) Unlawfully Directed Clerks to Violate Rules Protecting Nursing Home Residents, Resulting in a 100% Voting Rate in Many Nursing Homes in 2020, Including Many Ineligible Voters.

Chapter 8: WEC Also Unlawfully Encouraged Evasion of Ballot Security Measures Related to "Indefinitely Confined" Voters at the Behest of Outside Corporations.

Chapter 9: Wards Under Guardianship Orders (and Legally Prohibited from Voting) Voted Unimpeded by Wisconsin's Election Officials as They Are Not Recorded in the WisVote Voter Database, Even Though the Circuit Courts Have This Information.

Chapter 10:  Non-citizens Voted Unimpeded by Wisconsin's Election Officials as They Are Not Recorded in the WisVote Voter Database, Even Though Wisconsin Law Requires Citizenship to Vote.

Chapter 11:  Milwaukee, Madison, Racine, Kenosha, and Green Bay Election Officials May Have Violated the Federal and Wisconsin Equal Protection Clauses by Not Treating All Voters Equal in the Same Election.

Chapter 12:  Recommendations

Chapter 13:  Conclusion

Appendix I: Litigation Summary

Appendix II: Decertification and the Electoral Count Act

## Introduction

The Office of the Special Counsel files this Investigative Report on Wisconsin's administration of the 2020 elections as a first step to begin restoring faith in America's elections. This effort is undertaken because Americans' faith in its election system was shaken by events both before and after the November 2020 Presidential election. For example, a January 2022 ABC/Ipsos poll revealed that only 20% of the public is very confident about the integrity of our national election system. This 20% number is a significant drop from 37% from a similar ABC poll conducted one year earlier. America's doubts about its election system crosses partisan lines. Among Democrats, only 30% say they are "very confident" in the U.S. election systems overall. Among independents, only 20% consider themselves "very confident" in the nation's elections. Among Republicans, only 13% are "very confident" with America's elections.

This shaken faith is not a result of legitimate legislative inquiries into election administration, nor is it a result of lawful contests lodged by any candidate or party. Rather, it is largely a function of opaque, confusing, and often botched election processes that could have been corrected, and still can be corrected, with concerted effort on the part of lawmakers and conscientious civil servants who work for Wisconsin State government. Helping correct these processes for future elections is the major purpose of this Report.

On November 10, 2021, the Office of the Special Counsel (OSC) outlined the preliminary steps it had taken to undertake a fully comprehensive review of the 2020 elections in the State of Wisconsin. That document outlined the constitutional authority of the people of the State of Wisconsin, through their Legislature, to investigate their own

4

government.  That Interim Report also outlined the initial roadblocks to a full investigation, and expressed the expectation that the information necessary to provide democratic accountability for and oversight of Wisconsin election proceedings was forthcoming. As outlined in Appendix I, OSC and the Assembly continue to be blocked from investigating portions of the Wisconsin government.  Not only has the Wisconsin Attorney General intervened (and lost) in court to block certain subpoenas, and not only have left-wing groups provided support adverse to Wisconsin taxpayers—for instance by providing legal support to government employees seeking to keep their work secret, filing dilatory open records requests, and advancing frivolous complaints before various boards—but the Administrator of the Wisconsin Elections Commission (WEC) has explicitly stated to the Chairwoman of the Assembly Committee on Campaigns and Elections that she is prohibited by law and by private contract from turning over certain public records.  Until these lawsuits are resolved, there appears to be no way to fully vindicate the right of the people of the State of Wisconsin to know how their government is run.  Such lawsuits have proved a costly and time-wasting exercise.

Nevertheless, the OSC has continued to investigate available records, interview witnesses, and make substantial headway on several issues contained in this report. Further, good work by citizens' groups has provided the Assembly and the OSC with useful leads on how best to cure various systemic problems in the State.

While WEC and the State Attorney General have refused to cooperate with the Legislature's investigation and actively obstructed it, this Report is final in the sense that

it provides a list of recommendations with enough time for the Legislature to act before the close of its session in March.  However, the Assembly continues to authorize the OSC to operate past the final adjudication, on the merits, of the various legal challenges to the valid legislative subpoenas we have issued.  Following any favorable adjudication, the OSC will manage and process the voluminous responsive records, and will facilitate any available audits.

Despite this cover-up, or perhaps because of it, the OSC can still reach certain conclusions about the integrity of election administration in the State of Wisconsin, and we can still make baseline recommendations.  While we cannot, for example, recommend certain server protocols because we have been unable to obtain government records detailing precisely what the numerous electronic systems entail (Wisconsin uses numerous machine and system vendors) or precisely how the existing systems were used in 2020, we do have information relating to how confusing and opaque the system is.  It is beyond doubt that no single governmental person or entity in the State of Wisconsin has a handle on these systems—that is a damning indictment on its own.  Elections systems must be readily understandable by voters and newly elected county clerks—confusing systems harm voter confidence and tend to facilitate fraud.

The facts contained in this report are substantiated by records the OSC has made available to the Assembly and other public information.  To the extent that any of these facts are disputable, the OSC encourages any individual named in this Report, any subject

of validly issued legislative subpoenas, or any other fact witness to make themselves available to the OSC for interview.

Accordingly, at this stage, the recommendations included in this Report largely fall within the umbrella of <u>enabling oversight and transparency</u> of our election systems. It draws no conclusions about specific, unauthorized outside interference or insider threats to machine voting, but it does provide numerous examples of security gaps that tend to enable bad actors to operate in the shadows. Absent access to these systems, it would not be unfair for any citizens to conclude the worst, however. It is a commonplace in the law for it to assume the worst about the nature and impact of hidden or destroyed evidence, and it is up to government to justify its actions to the people, not the other way around.

A few additional recommendations in this Report fall within the second umbrella— <u>maintaining political accountability</u>. While it is clear that the outside groups and the bureaucrats in Madison who run our elections have not been accountable to the voters or the state government, there are some measures that can help return our State to a functional democracy.

This Report has another purpose: to catalog the numerous questionable and unlawful actions of various actors in the 2020 election.

Some unlawful conduct and irregularities outlined in this Report include:

1.  Election officials' use of absentee ballot drop boxes in violation of Wis. Stat. § 6.87(4)(b)1 and § 6.855;

2.  The Center for Tech and Civic Life's $8,800,000 Zuckerberg Plan Grants being run in the Cities of Milwaukee, Madison, Racine,

Kenosha and Green Bay constituting Election Bribery Under Wis. Stat. § 12.11;

3.    WEC's failing to maintain a sufficiently accurate WisVote voter database, as determined by the Legislative Audit Bureau;

4.    The Cities of Milwaukee, Madison, Racine, Kenosha and Green Bay engaging private companies in election administration in unprecedented ways, including tolerating unauthorized users and unauthorized uses of WisVote private voter data under Wisconsin Elections Commission (WEC) policies, such as sharing voter data for free that would have cost the public $12,500;

5.    As the Racine County Sheriff's Office has concluded, WEC unlawfully directed the municipal clerks not to send out the legally required special voting deputies to nursing homes, resulting in many nursing homes' registered residents voting at 100% rates and many ineligible residents voting, despite a guardianship order or incapacity;

6.    Unlawful voting by wards-under-guardianship left unchecked by Wisconsin election officials, where WEC failed to record that information in the State's WisVote voter database, despite its availability through the circuit courts—all in violation of the federal Help America Vote Act.

7.    WEC's failure to record non-citizens in the WisVote voter database, thereby permitting non-citizens to vote, even though Wisconsin law requires citizenship to vote—all in violation of the Help America Vote Act.  Unlawful voting by non-citizens left unchecked by Wisconsin election officials, with WEC failing to record that information in the State's WisVote voter database; and

8.    Wisconsin election officials' and WEC's violation of Federal and Wisconsin Equal Protection Clauses by failing to treat all voters the same in the same election.

It is important to state what this Report is not.  This Report is not intended to re-analyze the re-count that occurred in late 2020.   And the purpose of this Report is not to challenge certification of the Presidential election, though in Appendix II we do sketch how that might be done.   Any decisions in that vein must be made by the elected

8

representatives of the people, that is, the Wisconsin Legislature.  Yet it is clear that Wisconsin election officials' unlawful conduct in the 2020 Presidential election casts grave doubt on Wisconsin's 2020 Presidential election certification.  <u>This Report thus does surface very big questions: how should Presidential election certification occur in Wisconsin going forward and would the Legislature have any remedies to decertify if it wanted to do so?</u>

In 2020 in Wisconsin, the certification of its Presidential election spanned two steps and to a large extent operated in a legal vacuum.  *First*, on November 30, 2020, Wisconsin Elections Commission (WEC) Chairperson Ann Jacobs, on her own and without a full Commission vote, signed the "determination of the recount and the presidential contest." This unilateral action led one of the sidelined Commissioners to call for Jacobs' resignation.  *Second*, a few hours later, Governor Tony Evers certified the results of the state's November 3 election by signing the Certificate of Ascertainment that approved the slate of electors for President-elect Joe Biden and Vice President-elect Kamala Harris.

Neither the WEC Chairperson nor the Governor had an incentive to proceed with greater deliberation and address the serious concerns of citizens and other Commissioners. This is a serious gap in the legal structure governing elections that should be corrected as far in advance of the 2024 presidential election as possible.  In the meantime, many of the doubts relating to large categories of ballots are continuing to be both broadened and deepened.  Recently, a Wisconsin court invalidated the use of drop boxes.  Additionally,

this Report flags systematic problems with voting in elder care facilities, an issue that was also recently blown wide open by the Racine County Sheriff.

There are other issues outlined in this Report, many of which could justify post-election administrative correction by WEC under Wis. Stat. § 5.06, which authorizes exactly such a post-certification process to correct mistakes made by election officials. Administrative corrections under Wis. Stat. § 5.06 would flush out election officials' unlawful conduct. Such a post-certification administrative correction will not de-certify the election on a self-executing basis, but these challenges, which can be filed by any voter in an election (or by district attorneys or the Attorney General of the State), are a worthwhile step to take. However, as noted, these complaints are directed *to* WEC. But complaints *about* WEC cannot fairly be adjudicated by this body—another legal gap.

It is the duty of all citizens of our State and our nation to work hard to secure our democracy for this generation and the next. This Report is one small step towards fulfilling that duty we all share. And without the tireless work of concerned citizens, and dedicated public servants such as the Sheriff of Racine County, much of what is made public in this Report would not have been exposed to the light. In our own way, we can each do our part, whether by voting, or by volunteering, or by leading campaigns to improve the integrity of our elections. The true story of the 2020 elections in Wisconsin might never be fully known—as noted, the constitutional duty of the Legislature is still imperiled in the state courts—but the recommendations in this Report constitute a good beginning.

## **Statement of Progress**

The Special Counsel has been maintaining an active investigation and continuing to fight for the Legislature's right to conduct an election-integrity investigation.  Since the first Interim report, the Special Counsel has issued 76 new subpoenas.  This brings the total subpoenas issued by the OSC to 90.  These subpoenas were served upon entities named in this report, including Dominion Voting Systems, Inc., Electronic System and Software, LLC (ESS), Quickbase, Inc., USDR, CTCL, NVAHI, The Elections Group, and others.

The subpoenas were also served upon or sent to some of the persons who had the most information about the role of private companies and individuals in Wisconsin's election.  This included Michael Spitzer Rubenstein, Tiana Epps-Johnson, Ari Steinberg, and Harrison Hersch.  Finally, the subpoenas were served on local persons such as Hannah Bubacz, a Milwaukee city employee, and Sarah Linske, an IT employee for WEC.

To the extent that individuals responded to subpoena, it was to produce documents.  Some recipients, including the major private companies and individuals, did not comply at all.  They either informed the OSC that they would not comply with the subpoena or attend the depositions or embroiled the OSC in litigation.  As of the writing of this Report, the litigation surrounding the investigation of the 2020 election has been pervasive and time-consuming.

The Special Counsel has been sued three different times in three different cases in Dane County Circuit Court.  The OSC has defended against a lawsuit brought by the Wisconsin Attorney General in which he asked the court to declare that the OSC did not have the authority to conduct the investigation.  Two additional lawsuits related to open

11

records requests to the OSC were filed by organizations supported by Democrat-backed labor unions.

In Waukesha County, the OSC filed a petition to enforce the legislative subpoenas. Initially, the lawsuit included only four defendants. Six additional defendants were later added, bringing the total to ten. Two attorneys from the OSC are assigned to that case and briefing is underway. Prosecuting the enforcement action detracts from the OSC's ability to conduct and complete its investigation.

The OSC did receive a large quantity of documents from the Zuckerberg 5. Those documents were electronic in form. The process of organizing and reviewing them has required a significant expenditure of time and resources, and that will continue to be the case as OSC receives additional documents.

The OSC launched a major investigation into nursing home abuse. Attorneys and investigators were dispatched to multiple nursing homes across the State. They identified and met with multiple residents who voted, despite the fact they were clearly incapable of voting and/ or not legally permitted to vote because of a guardianship order. The OSC representatives made detailed notes and videos of these residents for evidentiary purposes.

The Special Counsel intended to use a professional statistician in the nursing home setting. Using a controlled environment, the OSC could take a detailed sampling of nursing home abuse and voting irregularities to determine, statewide, the number of improperly cast ballots in residential care facilities. The OSC was not able to complete this task by the time this Report was due. Instead, the personnel conducting the nursing home investigation were also repurposed to assist in the drafting of this Report.

The OSC received information that an entity had cellphone pinging data related to the City of Milwaukee and its absentee ballot drop boxes.  As of the time of this Report, the OSC has not been able to run to ground all the issues relating to obtaining this data.

The OSC consulted with multiple computer security experts regarding voting machines.  Two major machine manufacturers were identified in Wisconsin, Dominion Voting and ESS.  The OSC viewed extensive reporting about the integrity of the machines. The OSC learned that some Dominion machines are extremely vulnerable to hacking and manipulation. These specific machines can be manipulated to alter actual votes cast— either surreptitiously or by the machine technicians.

The Special Counsel reviewed extensive reporting of a Dominion machine failure event in another State.  The OSC was able to identify, through the reports of experts, that the failed machine recorded two anonymous and unauthorized access events from its VPN. This means, contrary to what Dominion has publicly stated, that at least some machines had access to the internet on election night.  Shortly after the unauthorized access was recorded, the machine failed and was reset, wiping all voting history and forcing that election administrator to rely on unverifiable paper printouts from the failed machine.

ESS machines were equally problematic. The central problem is that several of the machines are made with a 4G wireless modem installed, enabling them to connect to the internet through a Wi-Fi hotspot. One municipality under investigation in Wisconsin by the OSC admitted that these machines had these modems and were connected to the internet on election night.  The reason given was to "transmit data" about votes to the county clerks.

The OSC learned that all machines in Green Bay were ESS machines and were connected to a secret, hidden Wi-Fi access point at the Grand Hyatt hotel, which was the location used by the City of Green Bay on the day of the 2020 Presidential election. The OSC discovered the Wi-Fi, machines, and ballots were controlled by a single individual who was not a government employee but an agent of a special interest group operating in Wisconsin.

The OSC began a comprehensive investigation of voting machines in Wisconsin. As part of that investigation, subpoenas were sent to Dominion, ESS, and Command Central, LLC, a Dominion reseller and servicer. The information sought included information about who, when, where, and what updates the machines were provided. The OSC learned that one machine company representative stated that the voting machines were "wiped" during updates, meaning they did not retain federally required voter data.

It was discovered that Command Central, LLC, received images of cast ballots on election night using the internet. Command Central is alleged to be holding actual ballots cast on election night at its offices in Minnesota in violation of Wisconsin law. The OSC was not able to complete this portion of its investigation, however.

As of the date of this Report, the voting machine companies have refused to comply with the OSC's legislative subpoenas, and have provided no data. The OSC considers this investigation incomplete but ongoing.

The OSC also sought information about the machines in Wisconsin used on election night from the clerks. The clerks either did not possess the data sought by the OSC or refused to provide it, with Green Bay and Madison insinuating that providing secure voting machine data to the OSC would somehow compromise election integrity. In other words,

these cities claim that it is impossible to verify the integrity of the voting machines because doing that would jeopardize the integrity of both the machines and future elections. The Special Counsel intends to resolve this issue as the investigation moves forward.

The OSC's investigation discovered the use of a ballot tracking and harvesting application in Wisconsin. An extensive amount of time and effort went into this portion of the investigation. The OSC became attuned to the possibility of an application when reviewing email exchanges between the Zuckerberg 5 and third parties. This involved tracking applications in Georgia and Pennsylvania.

The OSC discovered ballot tracking programs in both Georgia and Pennsylvania. The OSC was able to locate and identify the developer of both programs in those States. The OSC obtained the source code for the Pennsylvania application. Ultimately, that data and source code would not prove to be helpful to discovering information about the Wisconsin application.

However, the OSC still located the Wisconsin application and its developers. In the course of that investigation, the OSC documented multiple misrepresentations of material facts by WEC administrator Meagan Wolfe. For example, Ms. Wolfe told the Assembly Committee on Campaigns and Elections both that she did not know about the CTCL grants and that cities did not have access to statewide WisVote or BadgerBooks data. Both of these statements are demonstrably untrue.

Ms. Wolfe also told the Commission that there was no API (Application Programming Interface that allows direct access) into the WisVote or BadgerBooks system. Yet cities have provided information that they *do* have access to statewide WisVote and BadgerBooks data. At least one city apparently provided an API to the WisVote and

BadgerBooks systems, which provided real time, free information to special interest groups who used that information for selective, racially-targeted get-out-the-vote purposes under the contracts.  That application may still have an active API and may remain viable, so that it might be used by the private groups in future elections.

Moving forward, the OSC will continue working to obtain answers to the important questions raised by these findings.  The tasks remaining include:

1.   Vindicating the legislature's subpoena and investigative authority through ongoing litigation;

2.   Compelling witnesses (individual or institutional) with crucial information about Wisconsin elections to provide testimony.  This includes Meagan Wolfe, Ann Jacobs, Michael Spitzer Rubenstein, Tiana Epps-Johnson, Trina Zanow, Sarah Linske, Hannah Bubacz, Harrison Hersch, Dominion, ESS, and the Zuckerberg 5 through ongoing litigation.

3.   Determining the identities of any groups or individuals engaged in ballot harvesting in Wisconsin;

4.   Verifying the integrity of Wisconsin's voting machines;

5.   Identifying additional votes cast unlawfully as a consequence of WEC's directives to clerks regarding SVDs;

6.   Providing additional reporting as necessary, possibly including a more robust roadmap to the outside groups and leadership that interfered with the administration of past Wisconsin elections.

# Chapter 1

## The Center for Tech and Civic Life's $8,800,000 Zuckerberg Plan Grant with the Cities of Milwaukee, Madison, Racine, Kenosha and Green Bay (the Zuckerberg 5) Facially Violates Wisconsin Law Prohibiting Election Bribery.

The Cities of Milwaukee, Madison, Racine, Kenosha and Green Bay entered into an agreement with Center for Tech and Civic Life (CTCL).  In the agreement, the Cities took CTCL's money to facilitate in-person and absentee voting within their respective city. The agreement documents included the Wisconsin Safe Voting Plan (WSVP), the CTCL worksheets and the CTCL acceptance letters, which were conditioned on the Cities spending CTCL's transferred money in accordance with the WSVP. These documents are in the accompanying appendix: App. 7-27 (WSVP); App. 513-519, (CTCL worksheet blank form), 520-537 (Green Bay worksheet), 538-551 (Kenosha worksheet), 552-563 (Madison worksheet), 564-575 (Milwaukee worksheet), 576-587 (Racine worksheet); 588-601 (CTCL grant application acceptance letters for Milwaukee, Madison, Kenosha, Green Bay and Racine).

**Any Agreement Where a City's Election Officials Receive CTCL or Other's Private Money to Facilitate In-Person and Absentee Voting Within a City Facially Violates Wis. Stat. § 12.11's Prohibition on Election Bribery Under Wis. Stat. § 12.11.**

The CTCL agreement facially violates the election bribery prohibition of Wis. Stat. § 12.11 because the participating cities and public officials received private money to facilitate in-person or absentee voting within such a city. Any similar agreements in the 2022 and 2024 election cycle would also be prohibited election bribery.

Wis. Stat. § 12.11, in relevant part, prohibits a city from receiving money to facilitate electors going to the polls or to facilitate electors to voting by absentee ballot:

> Election bribery
>
> (1) In this section, "anything of value" includes any amount of money, or any object which has utility independent of any political message it contains and the value of which exceeds $1...
>
> (1m) Any person who does any of the following violates this chapter:
>
> 1.    Offers, gives, lends or promises to give or lend, or endeavors to procure, anything of value, or any office or employment or any privilege or immunity to, or for, any elector, or *to or for any other person, in order to induce any elector                                                                to*:
>
>   1. *Go to ... the polls*.
>
>   2. *Vote*....

Wis. Stat. § 12.11 (emphasis added). Although the word "person" is not defined in section 12.11, it is defined elsewhere to include "bodies politic," which also includes municipalities. *See* Wis. Stat. § 990.01(26). Although the word "induce" is not defined in Wis. Stat. § 12.11, it is commonly defined to mean "to call forth or bring about by influence or stimulation."

Wis. Stat. § 12.11 requires three elements for a municipality or its officials to engage in "election bribery:" (1) the definition of "anything of value" must be met; (2) the thing of value must be received by a municipality or its election officials; and (3) the municipality must receive the thing of value in order to facilitate electors going to the polls or voting by absentee ballot. With respect to the first element, Wis. Stat. § 12.11 defines "anything of value" to mean "any amount of money, or any object which has utility independent of any political message it contains and the value of which exceeds $1." To

meet the second element, Wis. Stat. § 12.11 requires that the item of value be received by a municipality.  Finally, the city must receive the item of value in order to facilitate electors to go to the polls or in order to facilitate electors to vote.

## 1.      Conception of the Election Bribery Scheme

The record created by public document requests shows that CTCL, a private company headquartered in Chicago[3], engaged in an election bribery scheme.  CTCL reached out to the City of Racine to allow CTCL to provide grant money to certain handpicked cities in Wisconsin to facilitate increased in-person and absentee voting in the cities. App. 402. This first grant of $100,000 was to be split among the five largest cities in Wisconsin at $10,000 per city, plus an extra $50,000 to Racine for organizing the five cities.  App. 402. This first grant required the mayors of the five largest cities in Wisconsin and their respective staffs to complete CTCL election administration forms, including goals and plans to facilitate increased in-person and absentee voting in their respective cities and "communities of color" and develop a joint plan for elections only in these cities and not statewide. App. 297.

Christie Baumel (a City of Madison employee) wrote on June 9, 2020, regarding CTCL and "Election Cost Grant:"

> My understanding is that this is a small planning grant that Racine received from the Center for Tech & Civic Life to produce, by June 15th, a proposal for safe and secure election administration, according to the **needs identified by the five largest municipalities**. In other words, this information informs the Center for Tech & Civic Life in their consideration of where and how to support complete, safe, secure [sic] elections in Wisconsin.

App. 603 (emphasis added.)

19

As part of the election bribery scheme, CTCL was reaching out to the five largest cities in Wisconsin, and CTCL wanted information from those cities in determining how to provide money to those cities to facilitate increased in-person and absentee voting. *Id.* This program and the larger amount of grant money was not available to any cities or counties in Wisconsin other than the five largest cities. These five cities began to identify themselves and to be identified by CTCL as the "Zuckerberg 5," including a letterhead with the five cities' seals.[4]    App. 7, 141-143. Whitney May, Director of Government Services at CTCL, wrote to representatives of the other Zuckerberg 5 cities on August 18, 2020, stating, "You are the famous WI-5 … excited to see November be an even bigger success for you and your teams." *Id.*; App. 375-376.

The attempt of CTCL to target the five largest cities in Wisconsin for election support to facilitate increased in-person and absentee voting had been ongoing since early 2020, as indicated in emails and invitations from Vicky Selkowe, a Racine employee who opposed Trump and those that voted for him,[5] to Kenosha, Madison, Milwaukee, and Green Bay mayors, and a few other city officials from the Zuckerberg 5. App. 331-349; 392-401; 481-487. Only those four cities plus Racine were invited to "[a]pply for a COVID-19 grant" from CTCL and to thus be in on the "plan" to accept CTCL's private money to facilitate increased in-person and absentee voting in the 2020 election. App. 603-604.

The CTCL Agreement required the Zuckerberg 5 Mayors and their respective staffs to develop a joint plan for the Zuckerberg 5's elections pursuant to the agreement by June 15, 2020:

> The City of Racine, and any cities granted funds under paragraph 4, shall produce, by June 15th, 2020, a plan for a safe and secure election

administration in each such city in 2020, including election administration needs, budget estimates for such assessment, and an assessment of the impact of the plan on voters.

App. 2. The carrot for the Zuckerberg 5 to provide this information for CTCL was to get part of a $100,000 grant. Once the Zuckerberg 5 expressed interest in receiving the $10,000 grants from CTCL, they quickly provided information to Ms. Selkowe and CTCL on CTCL's form so they could develop a "comprehensive plan" for election administration for their "national funding partner, the Center for Tech & Civic Life" by June 15, 2020. App. 604 (emphasis added).

Following the expected "Council approval" on June 2, Ms. Selkowe of Racine sought to "immediately" connect with "municipal clerks and other relevant staff" to "swiftly gather information about" the cities' "election administration needs." App. 604.  Ms. Selkowe obtained the information from the Zuckerberg 5 through the five completed CTCL forms, then either Racine or CTCL used that information to prepare the WSVP, as requested by CTCL. App. 513-519, (CTCL blank form), 520-537 (Green Bay), 538-551 (Kenosha), 552-563 (Madison), 564-575 (Milwaukee), 576-587 (Racine). Ms. Selkowe made clear that she was the point person for communicating with the different city staffs to gather information to prepare this plan. *Id.* at 604.

## 2.    The First Contract Between CTCL and the Zuckerberg 5

On about May 28, 2020, the Racine Common Council approved, and signed, the CTCL conditional grant in the amount of $100,000 to recruit and later coordinate with the Zuckerberg 5 to join the WSVP 2020 submitted to CTCL on June 15, 2020. App. 325-349, 402-405. The grant and distribution to the Zuckerberg 5 was not random, rather it was the

intentional culmination of meetings or virtual meetings on May 16, 2020, June 13, 2020, and August 14, 2020. *Id.* These meetings were also secretive. The mayors and their staff were invited to the meeting. However, neither the Common Council members nor the public were informed that the meetings were even set to occur. *Id.* The Common Council members of Racine were later asked to vote only to approve what was decided at the secret meetings. App. 486-487.

It is not believed that the Common Councils of the other four cities of the Zuckerberg 5 were asked to vote on the $100,000 grant, except perhaps long after they had already received the money and committed to accepting the larger grant and its conditions. *Id.* For example, the City of Madison received the $10,000 even though on July 13, 2020, Maribeth Witzel-Behl, the Madison City Clerk, wrote that "Common Council has yet to accept the $10,000" from CTCL. App. 605-606.

The grant approved by the Racine Common Council stated, "[t]he grant funds must be used exclusively for the public purpose of planning safe and secure election administration in the City of Racine in 2020 and coordinating such planning." App. 404. Thus, the consideration for the Zuckerberg 5 to receive the first, small grant, was that they provide information for CTCL to use in preparing the WSVP for the large grant. *Id.*

**3.** **The WSVP and CTCL's Grant Acceptance Letter Incorporating the WSVP Is the Agreement Where the City Agreed to Take CTCL's Private Money to Facilitate Increased In-Person Voting and to Facilitate Absentee Voting.**

The WSVP and CTCL's grant acceptance letter incorporating the WSVP is the agreement in which the City agreed to take CTCL's private money to facilitate increased

in-person voting and to facilitate absentee voting. The WSVP was developed ostensibly "in the midst of the COVID-19 Pandemic" to ensure voting could be "done in accordance with prevailing public health requirements" to "reduce the risk of exposure to coronavirus." Further, it was intended to assist with "a scramble to procure enough PPE to keep polling locations clean and disinfected." App. 7-27.

However, another election purpose existed as evidenced by the documents obtained by the Special Counsel. That other election purpose was to fuse together the CTCL, their allied private corporations, the Zuckerberg 5, and $8.8 million of private funding into joint operations in that group of cities, where the focus would be on facilitating increased in-person and absentee voting, particularly in their "communities of color." *See, e.g., App*. 7-27 (WSVP).  From the beginning, the purpose of the WSVP contract and its private funding was for the Zuckerberg 5 to use CTCL's private money to facilitate greater in-person voting and greater absentee voting, particularly in targeted neighborhoods.

**4.**   **Having Agreed to the Initial $10,000 Per City Grants (Plus $50,000 Extra for Racine), the Zuckerberg 5 Entered New Grant Agreements for Larger Grants Which Included CTCL's "Conditions" and Performance Requirements Under WSVP.**

On or about July 6, 2020, Ms. Selkowe announced that the WSVP had been fully approved for funding by the Center for Tech & Civic Life; the initial $10,000 grant was just the first step for the Zuckerberg 5 to get an even larger grant from CTCL.  *See, e.g.,* App. 1-27.  Also, on July 6, Tiana Epps-Johnson of CTCL emailed Ms. Selkowe stating CTCL intends to fund each of the Zuckerberg 5 with far larger sums of money: Green Bay—$1,093,400;      Kenosha—$862,779;      Madison—$1,271,788;      Milwaukee—

$2,154,500; and Racine—$942,100. App. 11. This brought the total grants to the Zuckerberg 5 to $6,324,567.00. *Id.* Each of the Zuckerberg 5, expressly or impliedly, accepted the large grant money. For example, sometime in July 2020 the City of Madison accepted $1,271,788 by vote of Common Council. App. 605.

Concurrently with CTCL's plans to provide the Zuckerberg 5 with $6,324,567.00 in grant money, CTCL agents began to inform the Zuckerberg 5 of the conditions and the consideration for that grant money. App. 588-601.  In other words, the grants were not for purely altruistic purposes as "strings" were clearly attached.  On July 10, 2020, Ms. Selkowe started contacting each of the Zuckerberg 5 to let them know Tiana Epps-Johnson would contact them to start introducing the Zuckerberg 5 to CTCL's "partners." App. 463-464. "Tiana and her team have arranged for extensive expert technical assistance from fantastic and knowledgeable partners across the country, to help each City implement our parts of the Plan." *Id.* Tiana will send a "draft grant agreement" for the city's review and "approval on Monday." *Id.* It was assumed that each City would vote to accept the money, and the terms of the agreement were not important. *Id.*

On July 10, 2020, Ms. Selkowe sent an email to Celestine Jeffreys and copied Tiana Epps-Johnson, stating that Green Bay should work with CTCL, along with several of the other largest Wisconsin cities, to "implement our parts of the Plan," and to allow the City of Green Bay to "understand the resources she's [Tiana Epps-Johnson of CTCL] bringing to each of our Cities [the "cities" of Milwaukee, Racine, Madison, Kenosha and hopefully Green Bay] to successfully and quickly implement the components of our Plan."  App. 261-262. By approximately July 24, 2020, each of the Zuckerberg 5 had agreed to contracts with CTCL, along with the conditions, rules, and regulations CTCL attached to the grants.

App. 32-33 (Green Bay), 3-5 (Racine), 371-373 (Kenosha), 392-401 (Milwaukee), 406-410 (Madison).

**5.      The Grant Agreements and the WSVP Between CTCL and the Zuckerberg 5 Contain Conditions Regarding the City Facilitating Increased In-Person and Absentee Voting.**

In addition to being informed that the Zuckerberg 5 should work with CTCL's "partners," the grant agreement contained express conditions that each of the Zuckerberg 5 had to follow in order to receive and keep the grant funds. *Id.* The grant agreement incorporated the WSVP and its provisions:

> The grant funds must be used exclusively for the public purpose of planning and operationalizing safe and secure election administration in the City of _____ in accordance with the Wisconsin Safe Voting Plan 2020.

*Id.* The consideration for the second contract heavily implied that the Zuckerberg 5 were to use CTCL's "partners" for election administration.  By the time the second contracts and grants came to be issued, the Zuckerberg 5 were deeply embedded in election administration, especially in Green Bay and Milwaukee.  Michael Spitzer Rubenstein was listed as a "CTCL grant mentor" who was directing election administration in Green Bay. The contracts for the Zuckerberg 5 required the cities to report to CTCL its spending, not make changes to their spending, or pay the grant money back to CTCL. *Id.*

Specifically, the conditions in the second contract included:

a.      The grant funds must be used exclusively for the public purpose of planning and operationalizing safe and secure election administration in the City of _____ in accordance with the Wisconsin Safe Voting Plan 2020.

b.   Requiring each city or county receiving the funds to report back to CTCL by January 31, 2021 regarding the moneys used to conduct federal elections;

    c.    The City of _____ shall not reduce or otherwise modify planned municipal spending on 2020 elections, including the budget of the City Clerk of _____ ('the Clerk') or fail to appropriate or provide previously budgeted funds to the Clerk for the term of this grant. Any amount reduced or not provided in contravention of this paragraph shall be repaid to CTCL up to the total amount of this grant.

    d.    The City of _____ shall not use any part of this grant to give a grant to another organization unless CTCL agrees to the specific sub-recipient in advance, in writing.

App. 588-589 (Milwaukee), 591-592 (Madison), 595-596 (Kenosha), 598-599 (Green Bay), 3-4 (Racine). CTCL provided a grant tracking form to the Zuckerberg 5 to keep track of their expenditures, which they would later have to report to CTCL. App. 609.

Thus, the text of the grant document provides the conditions clearly: the grant funds had to be used for "planning and operationalizing … election administration." App. 3-4, 588-589, 591-592, 595-596, 598-599. The Zuckerberg 5 had to "report back to CTCL by January 31, 2021" regarding the moneys they used. Any moneys used "in contravention" of the grant agreement would have to be "repaid to CTCL" up to the whole amount of the grant. *Id.* The Zuckerberg 5 were not allowed to pay any part of the grant money to another organization "unless CTCL agrees … in advance, in writing." *Id.*

The Zuckerberg 5 have admitted that these were "conditions" and that generally the money from CTCL was "conditional." To underscore the conditions on the grant money, on July 24, 2020, Dennis Granadas of CTCL wrote Celestine Jeffreys of Green Bay:

Please find attached the revised grant agreement for review and signature. Please note that we made a few edits to clean up language, but this did not change the substance of the agreement, unless an update was requested. If you have any concerns please let me know. In addition, we also updated Section 7 for clarity to the following (changes highlighted in bold): "**The City of Green Bay shall not reduce** or otherwise modify planned municipal spending on 2020 elections, including the budget of the City Clerk of Green

Bay ('the Clerk') or fail to appropriate or provide previously budgeted funds to the Clerk for the term of this grant. Any amount reduced or not provided in contravention of this paragraph shall be repaid to CTCL up to the total amount of this grant." I look forward to receiving the signed agreement. Please let me know if you have any questions/concerns. Have a great weekend.

App. 611 (emphasis added).

These provisions requiring repayment of the grant moneys are referred to as "claw-back" provisions and require the Zuckerberg 5 to return the moneys to CTCL, if CTCL disagreed with how the Zuckerberg 5 spent the money and conducted their 2020 elections. App. 4, 589, 592, 596, 599. After the election in November 2020, CTCL demanded that the Zuckerberg 5 submit forms to CTCL to prove they complied with the grant conditions by January 31, 2021. App. 609.  These conditions, including the WSVP provisions to facilitate increased in-person and absentee voting in each participating city, were not merely "boilerplate" provisions.   Instead, CTCL intended to, and did, enforce its contractual requirements on the Zuckerberg 5. *Id.*

6.      **The Grant Agreements and the WSVP Between CTCL and the Zuckerberg 5 Contain Conditions Requiring Participant Cities to Place CTCL-Funded Absentee Ballot Drop Boxes in Targeted Neighborhoods, Even Though Absentee Ballot Drop Boxes Are Unlawful in Wisconsin.**

The WSVP and CTCL's grant acceptance letter incorporated the agreement where the cities agreed to take CTCL's private money to purchase and place absentee drop boxes in targeted neighborhoods.  App. 10, 16-17.  The WSVP provided Green Bay $50,000, Kenosha $40,000, Madison $50,000, Milwaukee $58,500, and Racine $18,000 for absentee ballot drop boxes. App. 17.  The WSVP provided at total of $216,500 for absentee ballot drop boxes in the Zuckerberg 5.  App. 17.  The use of absentee ballot drop boxes, outside

27

of narrow exceptions, has been successfully challenged as being a violation of Wisconsin law.

In a case in the Wisconsin Circuit Court for Waukesha County, the plaintiffs sued the WEC to challenge 2020 guidance memos that the WEC issued to municipal clerks. Complaint, *Teigen v. Wisconsin Elections Commission*, No. 21-CV-958 (Wis. Cir. Ct. for Waukesha Cnty. June 28, 2021) (under review by the Wisconsin Supreme Court), available at App. 649-660. In particular, the plaintiffs challenged a memorandum that purported to authorize unstaffed ballot drop boxes:

> Despite this requirement in the statutes [i.e., the requirement that an absentee ballot either be returned by mail or be returned by the voter "in person, to the municipal clerk." Wis. Stat. § 6.87(4)(b)1], WEC Commissioners sent a memo to municipal clerks dated August 19, 2020, (the "August 2020 WEC Memo") stating that absentee ballots do not need to be mailed by the voter or delivered by the voter, in person, to the municipal clerk but instead could be dropped into a drop box *and that the ballot drop boxes could be unstaffed*, temporary, or permanent. (A true and correct copy of the August 2020 WEC Memo is attached hereto as Exhibit B.)

Id. ¶ 10, available at App. 651 (emphasis added).

The Waukesha County Circuit Court granted summary judgment to the plaintiffs and declared the use of ballot drop boxes, outside of narrow exceptions, to be inconsistent with Wisconsin law:

> For the reasons set forth by the Court on the record at the January 13, 2022 hearing, the Court hereby declares that WEC's interpretation of state statutes in the Memos is inconsistent with state law, to the extent they conflict with the following: (1) an elector must personally mail or deliver his or her own absentee ballot, except where the law explicitly authorizes an agent to act on an elector's behalf, (2) the only lawful methods for casting an absentee ballot pursuant to Wis. Stat. § 6.87(4)(b)1. are for the elector to place the envelope containing the ballot in the mail or for the elector to deliver the ballot in person to the municipal clerk, (3) *the use of drop boxes, as described in the Memos, is not permitted under Wisconsin law unless the drop box is staffed*

28

> *by the clerk and located at the office of the clerk or a properly designated*
> *alternate site under Wis. Stat. § 6.855.*

Order Granting Summary Judgment for Plaintiffs, *Teigen v. Wisconsin Elections Commission*, No. 21-CV-958 (Wis. Cir. Ct. for Waukesha Cnty. January 20, 2020), available at App. 66 (emphasis added).  The Zuckerberg 5's privately funded absentee ballot drop boxes in the 2020 election were legally unauthorized under Wisconsin law. This makes the Zuckerberg 5 and CTCL's agreement for CTCL-funded purchase and placement of absentee ballot drop boxes a void contract provision as against state law and public policy.

**7.      Other Entities Have Reported About CTCL's Selective Funding to the Zuckerberg 5.**

It is important to note that two non-profit corporations have analyzed the Zuckerberg 5's acceptance and use of the CTCL moneys and published analytical reports in 2021. App. 488-512. Both reports are consistent with our conclusions here. *Id. First*, the Wisconsin Institute for Law & Liberty (WILL) in a June 9, 2021, report titled "Finger on the Scale: Examining Private Funding of Elections in Wisconsin." That report had the following "key takeaways:"

1.      WILL received records from 196 communities that received a total $10.3 million in funding from CTCL. These grants ranged from a high of $3.4 million for the City of Milwaukee to $2,212 for the Town of Mountain in Oconto County.

2.      The largest five cities in the state (Milwaukee, Madison, Green Bay, Kenosha, and Racine) received nearly 86% of all CTCL grant funds in Wisconsin.

3.      While most small towns used CTCL resources for voting equipment

and COVID-related equipment, Milwaukee, Green Bay, and Madison spent close to or above $100,000 on ostensibly "non-partisan" voter education efforts.

4.    Areas of the state that received grants saw statistically significant increases in turnout for Democrats. Increases in turnout were not seen for Donald Trump.

5.    This WILL report highlights the inequitable distribution of private resources that came into the state during the 2020 election. Reforms that are designed to ensure that any grant money is distributed in a per capita manner across the state will go a long way in increasing faith that our elections are being conducted in an open and honest manner.

App. 491.

The WILL report also calculated the CTCL funding per 2016 voter in Wisconsin's ten largest cities. It showed a huge amount of CTCL funding went to the Zuckerberg 5 per voter and in total showed only a small amount of CTCL funding went to the Wisconsin cities which were not among the Zuckerberg 5:

| Municipality | CTCL Funding Per 2016 Voter | Total CTCL Grant Amount |
| --- | --- | --- |
| Milwaukee* | $13.82 | $3,409,500 |
| Madison* | $8.30 | $1,271,788 |
| Green Bay* | $36.00 | $1,600,000 |
| Kenosha* | $20.94 | $862,799 |
| Racine* | $53.41 | $1,699,100 |
| Appleton | $0.51 | $18,330 |
| Waukesha | $1.18 | $42,100 |

| | | |
|---|---|---|
| Eau Claire | $2.01 | $71,000 |
| Oshkosh | $0.00 | $0.00 |
| Janesville | $6.11 | $183,292 |

App. 500 (" * " denotes a Zuckerberg 5 City).

Notably, the WILL Report concluded that the CTCL funding affected Wisconsin's

2020 election outcomes in favor of candidate Biden over then-President Trump by at least

8,000 votes:

> For candidate Biden there was a statistically significant increase in turnout in cities that received CTCL grants. In those cities, candidate Biden received approximately 41 more votes on average. While the coefficient was also positive for then-President Trump, it did not reach traditional levels of statistical significance. This means that we cannot say that turnout for Republicans in CTCL receiving areas swas any different than it would have been without the grants. Given the number of municipalities in the state that received grants, this is a potential electoral impact of more than 8,000 votes in the direction of candidate Biden.

 App. 503.

*Second*, the Foundation for Government Accountability (FGA) in a June 14, 2021

report titled "How Zuckerbucks Infiltrated the Wisconsin Election" made five key findings:

1. More than 200 Wisconsin jurisdictions received "Zuckerbucks" for the 2020 election, totaling more than $9 million;

2. Nearly $3.5 million was funneled into the City of Milwaukee via two grants;

3. Green Bay spent only 0.8 percent of funds on personal protective equipment—instead purchasing two new 2020 Ford 550s and paying a public relations firm nearly $150,000 for voter outreach;

4.      A representative of CTCL had behind-the-scenes access to election administration in Green Bay and Milwaukee; and,

5.      A former staff member for Governor Evers worked for the grantor to coordinate grant applications in Eau Claire.

App. 508. The FGS report contends that "Wisconsin can—and should—prohibit local jurisdictions from accepting private money for election administration." *Id.* The relative funding levels for personal protective equipment also gives the lie to a claim that the extraordinary injection of "Zuckerbucks" into this election was necessitated by or intended primarily to ensure the election did not worsen the public health as opposed to influencing voting patterns.

**The Zuckerberg 5 Agreed to the Wisconsin Safe Voting Plan Which Contains Geographic and Demographic Classifications to Increase In-person Voting and Absentee Voting for Targeted Areas and Groups—the Kinds of Efforts Typically Associated with Campaigning.**

According to the CTCL website, CTCL is not "a grantmaking organization" in "normal years."[6] The WSVP contains provisions to increase in-person voting and absentee voting for targeted areas and groups.  These groups met particular demographic criteria, which not-coincidentally, matched that of the Biden-voter profile. App. 7-27. Typically, candidates and campaigns, not cities, engage in get-out-the-vote efforts targeting areas and groups; CTCL provided the Zuckerberg 5 about $8.8 million to carry out the WSVP provisions. App. 493.

The following WSVP provisions are geographic and demographic classifications designed not for safe voting during COVID but to increase in-person voting for targeted

areas and groups, increase absentee voting for targeted areas and groups, or both. App. 7-27.  Additionally, these provisions are privately funded and disfavor Wisconsinites outside of the Zuckerberg 5. *Id.*

**1.    "[T]o be intentional and strategic in reaching our historically disenfranchised residents and communities"**

On page one, the WSVP requires the Zuckerberg 5 to "be intentional and strategic in reaching our historically disenfranchised residents and communities; and, above all, ensure the right to vote in our dense and diverse communities" within the Zuckerberg 5. App. 7. This election administration provision, promoting in-person voting and absentee voting, is privately funded, disfavors Wisconsinites outside the Zuckerberg 5, and favors black and minority voters as opposed to the rest of the residents and communities within the Zuckerberg 5. *Id.*

**2.    "[E]ncourage and increase … in-person" and "absentee voting by mail and early" voting**

On pages 5 and 6, the Zuckerberg Plan states that about one-half of the grant money will be used by the Zuckerberg 5 to "encourage and increase … in-person" voting and "dramatically expand strategic voter education & outreach efforts"—"particularly to historically disenfranchised residents" within the Zuckerberg 5. App. 11-12. The remainder was slated to be used to encourage and increase absentee voting by mail and early voting" and "dramatically expand strategic voter education & outreach efforts"—"particularly to historically disenfranchised residents" as opposed to the rest of the residents and communities within the Zuckerberg 5. *Id.*; App. 11-12.

| Goal | Green Bay | Kenosha | Madison | Milwaukee | Racine | Totals |
|------|-----------|---------|---------|-----------|--------|--------|
| Encourage and Increase Absentee Voting By Mail and Early, In-Person | $277,000 | $455,239 | $548,500 | $998,500 | $293,600 | $2,572,839 |
| Dramatically Expand Strategic Voter Education & Outreach Efforts | $215,000 | $58,000 | $175,000 | $280,000 | $337,000 | $1,065,000 |
| Totals: | $1,093,400 | $862,779 | $1,271,788 | $2,154,500 | $942,100 | $6,324,567 |

One way the Zuckerberg 5 were to accomplish this feat was through a specific and targeted campaign directed at black and minority voters.

3.    **"Dramatically Expand Voter & Community Education & Outreach, Particularly to Historically Disenfranchised Residents"**

On page fifteen, the WSVP calls for the cities to specifically target "[h]istorically [d]isenfranchised [r]esidents" within the Zuckerberg 5.  The WSVP and CTCL defined "historically disenfranchised voters" to mean:

> All five municipalities expressed strong and clear needs for resources to conduct voter outreach and education to their communities, with a particular emphasis on reaching **voters of color, low-income voters without reliable access to internet, voters with disabilities, and voters whose primary language is not English.**

App. 21 (emphasis added). Each of the Zuckerberg 5 had their own plans to "target" certain residents and communities for higher in-person voter turnout.

Green Bay wanted private grant funds to "be distributed in partnership with key community organizations including churches, educational institutions, and organizations serving African immigrants, "LatinX" residents, and African Americans." App. 21-22. Green Bay wanted to reach out to the Hmong, Somali and Spanish-communities with targeted mail, geo-fencing, posters (billboards), radio, television and streaming PSAs, digital advertising, automated calls and automated texts, [sic] as well as voter-navigators. App. 544. Green Bay's goal was to increase voter participation in these select, race-based groups by 25% for the November 2020 elections. *Id.* Green Bay's privately funded get-out-the-vote effort did not include electors who did not live in Green Bay or electors in Green Bay who were not members of preferred racial groups.

In Kenosha, grant funds would be used "for social media advertising, including on online media like Hulu, Spotify, and Pandora ($10,000), targeted radio and print advertising ($6,000), and large graphic posters ($3,000) to display in low-income neighborhoods, on City buses, and at bus stations, and at libraries ($5000)." App. 22. Kenosha's privately funded get-out-the-vote effort did not include electors who did not live in Kenosha or electors in Kenosha who did not live in low-income neighborhoods. *Id.*

In Madison, private funds would support partnering "with community organizations and run ads on local Spanish-language radio, in the Spanish-language newspapers, on local hip hop radio stations, in African American-focused printed publications, and in online publications run by and for our communities of color (advertising total $100,000)." App. 22. Madison's privately funded get-out-the-vote effort did not include electors who did not live in Madison, were not Spanish-speaking, did not listen to hip hop radio stations, read

African American-focused printed publications, or online publications run by and for Madison's preferred racial groups. *Id.*

Milwaukee stated that it intended to use these private funds to "get-out-the-vote" based on race, criminal status, and harnessing "current protests" related to the Black Lives Matter movement. App. 571.    The City used the private funds to support a "communications effort [that] would focus on appealing to a variety of communities within Milwaukee, including historically underrepresented communities such as LatinX and African Americans, and would include a specific focus on the re-enfranchisement of voters who are no longer on probation or parole for a felony." App. 22-23. Milwaukee's privately funded get-out-the-vote efforts did not include electors who did not live in Milwaukee or electors who are not members of preferred racial groupings. *Id.*

In Racine, the private funds supported renting "billboards in key parts of the City ($5,000) to place messages in Spanish to reach Spanish-speaking voters" and "targeted outreach aimed at City residents with criminal records to encourage them to see if they are not eligible to vote." App. 23. Racine's privately funded get-out-the-vote efforts did not include either electors who did not live in Racine or electors who were not Spanish-speaking. *Id.*

Additionally, in Racine, private funds were to be used "to purchase a Mobile Voting Precinct so the City can travel around the City to community centers and strategically chosen partner locations and enable people to vote in this accessible (ADA-compliant), secure, and completely portable polling booth on wheels, an investment that the City will be able to use for years to come." *Id.* This privately funded get-out-the-vote effort excluded

electors who did not live in Racine and those who did not live near "strategically chosen partner locations." *Id.*

Individually and collectively, these privately funded election administration provisions promoting in-person voting classifications disfavor Wisconsinites outside the Zuckerberg 5 and favor only selectively defined minorities. App. 21-23.

**4.      WSVP's "Absentee Voting" provisions**.

On page four, the WSVP requires the Zuckerberg 5 to take specific actions with early voting:

Absentee Voting (By Mail and Early, In-Person)

1.    Provide assistance to help voters comply with absentee ballot requests & certification requirements;

2.    Utilize secure drop-boxes to facilitate return of absentee ballots;

3.    Deploy additional staff and/or technology improvements to expedite & improve accuracy of absentee ballot processing; and,

4.    Expand In-Person Early Voting (Including Curbside Voting)

App. 10. This election administration provision, promoting absentee voting, is privately funded and disfavors Wisconsinites outside of the Zuckerberg 5. Only electors in the Zuckerberg 5 benefit from the "assistance," "drop-boxes," "improvement," and increased "early voting." *Id.*

5.      **"Provide assistance to help voters comply with absentee ballot request
        & certification requirements"**

On pages nine and ten, the WSVP requires that the Zuckerberg 5, "[p]rovide
assistance to help voters comply with absentee ballot request & [sic] certification
requirements." App. 15-16. None of the private funding in this regard would benefit
residents outside the Zuckerberg 5. *Id.* Instead, it targeted only the "Biden profile voter."

In Green Bay, the City would use the private money to fund bilingual LTE "voter
navigators" to help Green Bay residents properly upload a valid photo ID, complete their
ballots, comply with certification requirements, offer witness signatures, and assist voters
prior to the elections. App. 15. Green Bay would also utilize the private funds to pay for
social media and local print and radio advertising to educate and direct Green Bay voters
so they could upload photo IDs and request and complete absentee ballots. *Id.* In Kenosha,
the City would use the private money to have Clerk's staff train Kenosha library staff on
how to help Kenosha residents request and complete absentee ballots. *Id.*

6.      **"Utilize Secure Drop-Boxes to Facilitate Return of Absentee Ballots"**

On pages ten and eleven, the WSVP requires the Zuckerberg 5 to establish and use
ballot drop boxes. App. 16-17. In Green Bay, the City intended to use private money to
add ballot drop-boxes, at a minimum, at the transit center and two fire stations.  *Id.* at 16.
This was in addition to the one already in use at City Hall. *Id.* Green Bay intended to
possibly use the drop boxes at its libraries, police community buildings, major grocery
stores, gas stations, the University of Wisconsin Green Bay, and Northern Wisconsin
Technical College. *Id.*

In Kenosha, the City intended to use the private money to install four additional internal security boxes at Kenosha libraries and the Kenosha Water Utility to provide easy access to each side of the City to ballot drop-boxes. *Id.* at 16. Madison intended to use the private money to place and maintain one secure drop box for every 15,000 voters, or twelve drop boxes total, and to provide a potential absentee ballot witness at each drop box. *Id.* at 16. Milwaukee intended to use the private money to install secure 24-hour drop boxes at all thirteen of its public library branches, while Racine intended to use the private money to have three additional drop boxes to be installed at key locations around the city. *Id.* at 16–17.

### 7. "Expand In-Person Early Voting (Including Curbside Voting)"

On pages twelve through fourteen, the WSVP set out the plan to expand in-person absentee voting. App. 18-20. Green Bay used private money to expand and establish at least three EIPEV sites in trusted locations, ideally on the east (potentially UWGB) and west sides (potentially NWTC or an Oneida Nation facility) of the City, as well as at City Hall. *Id.* at 18. The city also used the private money to print additional ballots, signage, and materials to have available at these early voting sites. *Id.* Kenosha used private money to offer early drive-thru voting on City Hall property and for staffing for drive-thru early voting. *Id.*

In Madison, the City intended to use private money to provide eighteen in-person absentee voting locations for the two weeks leading up to the August election and for the four weeks leading up to the November election. *Id.* The City purchased and utilized tents for the curbside voting locations in order to protect the ballots, staff, and equipment from getting wet or damaged. Additionally, it purchased and utilized large feather flags to identify the curbside voting sites. *Id.*

Milwaukee also used private money to set up three in-person early voting locations for two weeks prior to the August election and fifteen in-person early voting locations and one drive-thru location. *Id.* at 18-19. Racine used private money to offer a total of three EIPAV satellite locations for one week prior to the August election as well as offering a curbside in-person early voting option. *Id.* at 19. For the November election, Racine intended to use private money to offer EIPAV at four satellite locations two weeks prior to the election and at the Clerk's office six weeks prior. *Id.*

**Chapter 2**

**The Motive for These Grants Was Impermissible and Partisan Get –**

**Out-the-Vote Effort (GOTV)**

While it is clear that the statute prohibiting election bribery was violated, the reader may be asking (to put it simply): "*So what? Aren't we told all the time that voting is a good thing and that we should encourage more people to vote? Isn't that what American democracy is all about? Why should we care if outside groups came in and used their financial resources to get more people to vote? Isn't it just sour grapes to allege that this effort to "fortify" the election crossed over into bribery?*

These questions, and others like it, have been presented to the Wisconsin public by the outside groups who came here and by their advocates in the press and elsewhere as a sort of prophylactic defense of the entire bribery scheme.  The outside groups know that their questions act as a potent offensive weapon used to discourage the kind of public scrutiny this Report reflects. This is so because anyone who asks critical questions will immediately be put back on their heels: "Tell us why you don't want more people to vote. What do you have against more *people of color* voting in our elections—are you *racist*?" For the record, all those concerned with this Report are, all things being equal, in favor of more people voting and no one has considered race as a factor one way or the other except to the extent necessary to determine the partisan motives of the private groups who designed and implemented this scheme and who are now cynically and hypocritically

41

deploying the charge of racism in an attempt to shield their misconduct from the light of day.

The scheme designed and implemented by Zuckerberg's CTCL had its origins in a man named David Plouffe. Plouffe's political track record and savvy were likely taken into account by Mark Zuckerberg and his wife Pricilla when they hired David Plouffe to run their political operation-- the [Pricilla] Chan [and Mark] Zuckerberg Initiative— for the purpose of electing Joe Biden president and defeating then-President Trump.

Writing about President-elect Trump's first public appearance after his 2016 presidential victory, Plouffe had this to say: "It's not that we were simply horrified by the reality show performer and his grifter family appearing on stage as America's next first family—though what a horrifying sight it was." (p. xiii) Writing his book in late summer of 2019, Plouffe tells the reader he does not care who the Democratic nominee will be because it does not matter: the goal for everybody should be to defeat President Trump. And Plouffe knew just how to do it: "**We'll do it through turnout**—growing the overall number of people who walk the walk and actually cast votes. Democracy isn't a metaphor or a game. This year especially it's a deadly serious test." (p. xiv (emphasis added))

Turnout, otherwise known as "getting out the vote," (GOTV) has before 2020 been an exclusively partisan phrase (CITE) used by partisan campaigns to (1) identify; (2) locate; (3) inform; (4) persuade; and, (5) facilitate increasing the number of votes for the candidate that *they favor*.  The same is true of efforts to get their ballots into the hands of

a "voter navigator," or ballot harvester, or into a drop box (another concept largely unknown prior to November 2020).

The Zuckerberg-funded CTCL/ Zuckerberg 5 scheme would prove to be an effective way to accomplish the partisan effort to "turnout" their desired voters and it was done with the active support of the very people and the governmental institution (WEC) that were supposed to be guarding the Wisconsin elections administrative process from the partisan activities they facilitated.

**Chapter 3**

**Government Oversight Has Been Obstructed by Governmental and**

**Outside Corporate Collusion**

WEC and the State Attorney General have failed to cooperate with this investigation. In fact, WEC and the State Attorney General each have actively resisted and obstructed the investigation's search for the truth.  Wisconsin law requires that actions taken by WEC be accomplished by a majority vote, at a publicly noticed meeting. Wis. Stat. 5.05 (1e); Wis. Stat. § 5.05(5s)(a). Yet WEC, aided by the State Attorney General, has impeded this investigation through obstructive litigation carried on without any record of an approval by the majority of the Commission at a public meeting of the Commission.

These actions of WEC continue a pattern of misconduct by the agency that rose to new heights during the 2020 election cycle, in which new election related polices were spread throughout the state (such as the expanded use of unlawful "drop boxes" and the fraudulent use of the "indefinitely confined" status)  without having been approved by either the administrative rule-making process, ensuring that changes in law are vetted in properly noticed public meetings, or by receiving a majority vote of the Commission.

Following initial compliance with the valid Assembly subpoenas, the OSC subsequently faced numerous dilatory actions constituting obstruction of this investigation. Such actions include:

1. Instructions by the Governor to governmental actors not to comply with Legislative oversight;

2. Frivolous and subsequently dismissed ethics complaints against OSC staff;

3. Voluminous open record requests by outside, dark money nonprofits;

4. Free, dark money attorneys provided to various governmental actors;

5. Private investigators looking into the private lives of OSC staff, and outside hacks of devices;

6. Coordinated media campaigns against Legislative oversight and the OSC;

7. Intervention in lawsuits by the Attorney General on behalf of individuals and adverse to the mission of his Office; and,

8. Withholding and destruction of evidence, often poorly justified by claimed contractual obligations with commercial vendors, placing private business ahead of the public interest.

# Chapter 4

## This Collusion and Entanglement Also Caused a Host of Questionable Actions by the Zuckerberg 5

Wisconsin engaged private companies in election administration in unlawful ways for the 2020 Presidential election.

1. Wisconsin law and WEC's 250-page Election Administration Manual for Wisconsin Municipal Clerks do not legally authorize CTCL and its "partners" to participate in Zuckerberg 5's election administration.

2. WEC's WisVote security policies do not legally authorize the Zuckerberg 5 election officials to share WisVote data with CTCL and its partners.

3. The security of WisVote FIDO Keys required by WEC for WisVote access is unacceptable and an invitation to fraud as the ability to properly track all of the access points and personnel is a key feature required to maintain voting integrity.

4. CTCL pushed onto the Zuckerberg 5 the CTCL "partners" who would unlawfully administer aspects of the election.

5. The projects that CTCL's partners promoted had nothing to do with Covid-19 safety.

6. After the Zuckerberg 5 agreed to the large grants, and CTCL convinced the Zuckerberg 5 to utilize CTCL's "partners," CTCL sought to unlawfully embed those "partners" into the Zuckerberg 5's election administration.

7. Given a blank check to run the election, CTCL and its "partners" took full advantage of the opportunity to administer the election in at least one of the Zuckerberg 5.

8. The "private corporate partners" were from out of state, and not necessarily knowledgeable about Wisconsin election law, or concerned about it.

9.  Safe voting was a pretext—the real reason for CTCL's WSVP grants was to facilitate increased in-person and absentee voting in specific targeted areas inside the Zuckerberg 5.

10. The Zuckerberg 5 became beholden to CTCL as a result of the WSVP's private funding and the WSVP's provisions.

11. The Zuckerberg 5 ceded administrative control over the election to CTCL and its private partners, including WisVote data sharing, so they could collectively facilitate increased in-person and absentee voting in the 2020 election.

**1.      Wisconsin Law and WEC's 250-Page Election Administration Manual for Wisconsin Municipal Clerks Cannot Legally Authorize CTCL and Its "Partners" to Participate in Zuckerberg 5's Election Administration.**

Wisconsin's municipal clerks are provided training on administering elections, including being provided WEC's 250-page Election Administration Manual for Wisconsin Municipal Clerks.  This Manual also illustrates why the WSVP, CTCL and its "partners" participating in the Zuckerberg 5's election administration for the 2020 Presidential Election was not legally authorized.

According to the Manual, "The municipal clerk's election duties include, but are not limited to, supervision of elections and voter registration in the municipality, equipping polling places, purchasing and maintaining election equipment, preparing ballots and notices, and conducting and tracking the training of other election officials."

The Manual reserves those duties to municipal clerks, and nowhere does it authorize CTCL and its "partners," to engage in Zuckerberg 5's election administration. We also have seen no evidence that personnel from CTCL or its partners were trained in Wisconsin election law, as is required of the municipal clerks.

47

2.      **WEC's WisVote Security Policies Do Not Legally Authorize the
        Zuckerberg 5 Election Officials to Share WisVote Data with CTCL
        and Its Partners.**

WEC's policies on WisVote security are written so that municipal clerks do not work hand-in-hand with private companies to administer the elections.  So, the Zuckerberg 5's municipal clerks jeopardized WisVote security when data sharing with CTCL and its partners.

The WisVote system is the Statewide Voter Registration System (SVRS) that originated in 2006 and provided key tools for the former State Elections Board to carry out its critical election business practices.  In early 2016, SVRS was replaced by WisVote, which reportedly improved usability and functionality and lowered costs.

Three fundamental goals served as the strategic vision for the WisVote system: improved usability for clerks, reduced costs, and creating a stable and supportable system.

WisVote is not simply a voter registration list, but a full elections administration package.  The system is accessed by more than 1,600 users in 700 separate locations across the State. Users connect to the system using the internet. Some locations in Wisconsin do not have high-speed internet access available, in which case, the municipal clerk relies on another clerk (usually the county clerk) to perform data entry functions. The system includes several confidential fields, including driver license numbers, dates of birth, partial social security numbers and voters who are under a protective order, which must be protected by statute.

There are four security to gain access to the WisVote system:

1. User must have a viable computer that can access the internet. That computer must have a "Fast Identity Online" (FIDO) user authentication key applet downloaded to the system

2. User must have an assigned User Name

3. User must have an assigned password

4. User must possess a WEC issued FIDO Key

WEC controls the username and password access.

There are four levels of access to the WisVote system:

1. Clerk: this access certification was developed to train new staff in the complete WisVote system application. This access level allows users to perform all WisVote functions, including printing poll books, mapping, and other election administration duties.

2. Data Entry: this access certification was developed to train new staff to enter voter registration applications, update voter status, and record voter participation. This access level will not allow users to merge voters, print poll books, or perform other election administration duties unless the user completes the full WisVote system training.

3. WEDC Entry: this role does not require additional WisVote training other than the WisVote Introduction tutorials and the Security Series videos; however, the clerk, or authorized designee, must still submit the Request to Add Authorized Users form to ensure users receive the correct WisVote permissions. These users can view municipal data and Election Reconciliation information, but only have the ability to modify or edit Inspectors' Statement and EDR Postcard data.

4. Read Only: this role does not require any additional WisVote training other than the WisVote Introduction tutorials and the Security Series videos; however, the clerk, or authorized designee, must still submit the Request to Add Authorized Users form to ensure users receive the correct WisVote permissions. These users can view municipal data, but will not have the ability to add, delete, or modify data in WisVote.

WEC's WisVote security rules do not contemplate or authorize non-governmental outside parties receiving WisVote data shared by Zuckerberg 5's election officials.

Further, WEC's rules provide a specific process to obtain access to WisVote data:

To obtain access to WisVote, the clerk, or authorized designee, will complete the following process:

1) Email a completed and signed copy of the Request to Add Authorized Users in The Learning Center (TLC) to Elections Help Desk (elections@wi.gov). Identify the role type for each user identified on the form. There are four user access levels in WisVote from which to choose:

2) Upon receipt of the completed Request to Add Authorized Users in TLC form, the Elections Help Desk will create and issue a login and password for the user to obtain access to TLC website to allow for the new users to complete the following training:

a. Securing WisVote: this is a series of electronic learning modules located under the Election Security Awareness tile in TLC. All WisVote users are required to complete this training regardless of their access level (please also note that this specific training may also be made available and accessed by individuals identified by the clerk, or an authorized designee, who do not require WisVote access and still wish to participate in this cybersecurity educational opportunity—indicate Requested WisVote Access Level as "Not Applicable" on the Request to Add Authorized Users in TLC form); *AND* The training associated with the access levels listed above, if applicable.

3) Once new users complete the Securing WisVote training series AND all required training related to their WisVote Access Level, if applicable, an email shall be sent to the Elections Help Desk (elections@wi.gov). The email should state that the Securing WisVote series was completed and should also contain the appropriate Access Certification document (also found on this page), as an attachment. Upon receipt, WEC staff will issue a WisVote username and password.

4) When logging into WisVote for the first time, new users will see the WisVote User Agreement and the WisVote Confidentiality Agreement, in electronic

format.  To acknowledge and accept the terms of these agreements, the user will click the "I agree" button when prompted with each agreement.

CTCL and its partners did not follow this process and yet obtained WisVote data from Zuckerberg 5's election officials.  By contrast, the public receives WisVote only as WEC updates the information and for a charge of $12,500 for a daily snapshot of statewide data.  Accordingly, under Wisconsin Elections Commission's security policies, CTCL's and its partners were allowed to access to WisVote in this way, opening the system up to unauthorized uses by unauthorized users.  The Zuckerberg 5's WisVote data sharing with CTCL and its partners was thus unlawful.

5.    **The Security of WisVote FIDO Keys Required by WEC for Wisvote Access Is Unacceptable.**

The security of WisVote FIDO Keys, required by WEC for WisVote security is unacceptable. Under WEC's policies for a multi-factor authentication, three things are needed for WisVote access: login in name; password; and FIDO Key. The FIDO Key is contained in a flash drive that is inserted into a personal computer.

In 2018, WEC mass-issued FIDO Keys across the State to counties and municipalities.  The instructions received from WEC to the key recipients were unclear as to security protocols.  For example, one county indicated they had requested 2 FIDO Keys and they received 15 keys.  When the clerk received the 15 keys, she called WEC and asked, "what should I do with the additional 13 keys you sent that I didn't request?"  WEC said, "hold on to them just in case you need another or one breaks." One would think that at the time these FIDO Keys were issued, WEC would have a master record of custody as

to how many FIDO Keys had been shipped.  If that was the case, WEC cannot apparently find it now.

In mid-September 2021, an open records request was sent to the WEC requesting the total number of FIDO Keys that had been issued by WEC to the various counties and municipalities across the State.  The request also asked for a list of individuals to whom the keys were issued.  WEC initially issued a copy of a 2020 list of FIDO Key users. Knowing this list changes monthly, a second request was made to determine how many of those users had changed.  The 2020 list listed 3,137 FIDO Key users across the State.  Of that list, 404 active users had been disabled leaving a balance of 2,733 active users. The updated list indicated that205 active users had been added two weeks later and accounted for a total of 2,938 keys.  Of those 2,938 active keys, 1,929, or 66% were issued with clerk access.

WEC apparently does not know how many FIDO Keys they have actually issued because individual county or municipal clerks have FIDO Keys that were not assigned or listed on WEC's list.  For example, WEC issued a total of 36 FIDO Keys to the Fond du Lac County Clerk, who issued 12 keys to various municipalities and still has 24 in her possession.  In contrast, WEC's list confirms 12 keys that were issued without accounting for the 24 keys that remain in the Clerk's possession.  WEC's records similarly reflect two of the 15 FIDO Keys that WEC issued to the Kewaunee County Clerk and that the Clerk then issued, but they fail to reflect the other 13 FIDO Keys that WEC issued to the Clerk that remain in the Clerk's filing cabinet. Our investigation repeatedly found that counties

and municipalities have more keys than WEC can account for.  Yet, the FIDO Keys are supposed to be a major part of WEC's security policy for WisVote data.

There does not seem to be a meaningful pattern as to how FIDO Keys are used to counties or municipalities.  For example, as mentioned in the previous paragraphs, clerks have different methods of distributing the keys that they receive from WEC.  Some clerks manage their municipality or county WisVote data entry very carefully.  For example, the Kewaunee County Clerk only allows 2 people to make entries or adjustments in the WisVote system.  Fond du Lac County allows 12 people in the entire County to enter data or make changes to the data.  A close look at the Zuckerberg 5 cities of Madison, Milwaukee, Kenosha, Green Bay and Racine shows a remarkable array of differences in how the FIDO Keys are issued and ultimately used.

There is no known explanation as to why there is such diversity of FIDO Key distribution and accountability in the different cities.  The chart below lists the Zuckerberg 5 cities where large sums of CTCL money was applied.  It is unclear why 64% of FIDO Keys assigned to one city consist of keys with clerk-level access that would allow unfettered access to the entire WisVote database and enable the user to activate and deactivate voters.

FIDO Keys by Zuckerberg 5 Cities per April 2021 WEC Report

| City | Population over 18 yrs | Total Keys | Clerk Keys | % of Keys for Clerks | Data Entry Keys | Other Key Types | One Key for every X residents |
|------|------|------|------|------|------|------|------|
| Madison | 214,180 | 124 | 17 | 14% | 107 | N/A | 1,727 |
| Kenosha | 74,766 | 23 | 6 | 26% | 17 | | 3,251 |
| Milwaukee | 450,233 | 306 | 196 | 64% | 108 | 2 | 1,471 |
| Green Bay | 78,777 | 13 | 4 | 31% | 8 | 1 | 6,060 |
| Racine | 60,123 | 98 | 22 | 22% | 76 | | 614 |

In talking to various clerks across the State, it is known that employees of municipalities that have been issued FIDO Keys will often allow other employees in their organization to use their computer, username, password, and FIDO Key to access the WisVote system and make entries.  During the 2020 election, this type of usage was extended to third parties in the Zuckerberg 5 cities as further detailed below.  FIDO Keys are an area of concern and require more investigation and attention overall.

1.    **CTCL Pushed Onto the Zuckerberg 5 the CTCL "Partners" Who Would Unlawfully Administer Aspects of the Election.**

As part of the WSVP, CTCL pushed onto the Zuckerberg 5 the CTCL "partners" who would effectively administer aspects of the election in an unlawful manner. Under the WSVP, CTCL promoted to the Zuckerberg 5 numerous entities, CTCL's "partners.," CTCL would then recommend that the Zuckerberg 5 connect with and use those partners in the administration of the election. App. 39-52, 53-69, 78-80. However, since the Zuckerberg 5 were contractually bound to use only the "organizations" that CTCL approved "in advance, in writing," the "partner" referrals that CTCL made were more than mere "suggestions," they were part of the CTCL's binding contractual agreement with the Zuckerberg 5. App. 4, 589, 592, 596, 599.

In late July 2020, CTCL Director of Government Services Whitney May hosted a series of separate "kick off" calls for each of the Zuckerberg 5 city's public officials, where she introduced and provided an overview of CTCL's allied corporations (sometimes-called "technical partners") to inject themselves into that city's election administration. App. 454-459, 480. CTCL's "partners" introduced to the Zuckerberg 5 were private corporations that would act to unlawfully aid or administer the relevant city's election administration:

1.    The National Vote At Home Institute ("VoteAtHome" or "NVAHI") was represented by CTCL as a "technical assistance partner" that could consult about, among other things, "support outreach around absentee voting," voting machines and "curing absentee ballots," and to even take the duty of curing absentee ballots off the city's hands. App. 39-52, 53-69. The NVAHI also offered advice and guidance on accepting ballots and streaming central count during election night and on the day of the count.  App. 70-77.

2.    The Elections Group and Ryan Chew were represented to be able to provide "technical assistance partners to support your office" and "will be connecting

with you in the coming days regarding drop boxes" and technical assistance to "support your office," and worked on "voter outreach." App. 78-80, 81-83, 171. Elections Group Guide to Ballot Boxes. App. 84-124.

3.    Ideas42 was represented by CTCL as using "behavioral science insights" to help with communications. App. 324.

4.    Power the Polls was represented by CTCL to help recruit poll workers. -App. 124.

5.    The Mikva Challenge was recommended to recruit Chicago-based high school age students to be Zuckerberg 5 poll workers. App. 127.

6.    US Digital Response was suggested to help with and then take over "absentee ballot curing," and to "help streamline the hiring, onboarding, and management" of Green Bay's poll workers. App. 130-138.

7.    Center for Civic Design was tapped to design absentee ballots and the absentee voting instructions. App. 196.

8.    Eric Ming, the Communications Director for CSME, was selected to serve as a "communications consultant to review your [City of Green Bay] advertising plan for November." App. 43, 158-159.

9.    The Brennan Center, which focuses on "election integrity" including "post-election audits and cybersecurity" was involved. App. 160.

10.    HVS Productions added "voter navigator" FAQs and Election Countdown Copy for the city of Green Bay. App. 163-168.

11.    Modern Elections was picked to address Spanish language issues. App. 169-171.

Importantly, none of the referenced "partners" mandated by CTCL were health or medical experts that one might expect for efforts allegedly tied to the COVID pandemic; rather, as the grant contracts required, these were "experts" in "election administration." *See* App. 454-462, 480.  Further, several clerks did inform the OSC that actions by these representatives adversely affected the public health safety of staff and voters.

Former Green Bay Clerk Kris Teske has described this usurpation by CTCL and its "partners" of election administration. She stated in her Answer in a prior WEC proceeding:

1.  "Others in the Mayor's office began to hold meetings and make decisions relating to the election outside of the Clerk's office." App. 674.

2.  "This caused planning for the election to become VERY dysfunctional and caused great confusion in the Clerk's office as many of the meetings and decisions were driven by the Mayor's chief of staff and other senior officials without the knowledge or consent of the Clerk's office." *Id.*

3.  "I wrote several emails outlining my concerns with meetings that excluded the Clerk's office and decisions that were made without consulting the Clerk's office." App. 675.

4.  "[T]he office's [Clerk's office] ability to fulfill the obligations for the election were greatly hindered and diminished by outside interference." App. 677.

As Teske asserted, Wisconsin law and WEC's Election Administration Manual for Wisconsin Municipal Clerks did not legally authorize CTCL and its partners to engage in Zuckerberg 5's election administration.

## 12.    The Projects That CTCL's Partners Promoted Had Nothing to Do with Covid-19 Safety.

CTCL's partners had nothing to do with Covid-19 safety.  Neither CTCL nor its "partners" were medical or health professionals.  Instead, CTCL boasted that it had a "network of current and former election administrators and election experts available" to "scale up your vote by mail processes," and "ensure forms, envelopes, and other materials are understood and completed correctly by voters."  App. 38.

On July 31, 2020, shortly after the grant agreements were negotiated and executed CTCL's Director of Government Services wrote to Madison employee Maribeth Witzel-Behl about the "projects" CTCL required:

> Hi Maribeth:
>
> Reflecting on your Safe Voting Plan and the kickoff call last week. I wanted to get your feedback about the **projects** our technical partners should tackle first. What are the most urgent areas where you'd like support from the partners? Here's what we captured in our notes as the likely top 3-4:
>
> 1. **Adding satellite locations and drop boxes**—help site locations and provide tailored guidelines and implementation support (Elections Group)
>
> 2. **Printing materials for mail ballots** – redesign bilingual **absentee ballot** instruction sheet and letter (Center for Civic Design, who is working with WEC on envelope design)
>
> 3. **Targeting communities with election information** – NVAHA is launching a communications toolkit on August 5 to support **outreach** around **absentee voting** (National Vote at Home Institute), share research insights about how to engage people who might not trust the **vote by mail** process (Center for Civic Design)
>
> 4. **Training election officials**—review quick guides and other training materials (Elections Group)

App. 479 (emphasis added).

Explaining this "targeting" of communications, Celestine Jeffreys wrote to Whitney May of CTCL on August 27, 2020 that "[t]here are probably 5 organizations that are focused on working with disadvantaged populations and/or with voters directly." App. 37, 45.

CTCL, when working with the Zuckerberg 5, had other conditions that had nothing to do with COVID prevention, including:

1.      Employing "voter navigators" to help voters "complete their ballots." App. 34-35.

2.      The "voter navigators" would later be "trained and utilized as election inspectors." App. 35.

3.      "Utilize paid social media" and "print and radio advertising" to direct voters "to request and complete absentee ballots." App. 34.

4.      "enter new voter registrations and assist with all election certification tasks." App. 34.

5.      "reach voters and potential voters through a multi-prong strategy utilizing 'every door direct mail,' targeted mail, geo-fencing, billboards radio, television, and streaming-service PSAs, digital advertising, and automated calls and texts," and direct mail to "eligible but not registered voters." App. 36.

6.      Assist new voters to "obtain required documents" to get valid state ID needed for voting, targeting African immigrants, LatinX residents, and African Americans. *Id.*

7.      "facilitate Election day Registrations and verification of photo ID." App. 36.

Thus, after the grant agreements commenced, CTCL promoted election activities having nothing to do with Covid-19 safety.  CTCL instead focused on targeting voter outreach and absentee voting. CTCL also required the Zuckerberg 5 to target specific geographic and demographic voter characteristics. App. 7-27. Using the grant funds to target voter outreach was required by CTCL as one of the WSVP conditions. App. 3, 7-27.

Again, CTCL and its partners had no specific medical or health experience, and the WSVP "projects" had nothing to do with Covid-19 safety. App. 7-27.

**5.      After the Zuckerberg 5 Agreed to the Large Grants, and CTCL Convinced the Zuckerberg 5 to Utilize CTCL's "Partners," CTCL Sought to Unlawfully Embed Those "Partners" into the Zuckerberg 5's Election Administration.**

After the Zuckerberg 5 agreed to the large grants, CTCL offered Milwaukee to provide "an experienced elections staffer [from the Elections Group] that could potentially embed with your staff in Milwaukee in a matter of days and fill that kind of a role." App. 382 (emphasis added).

CTCL and its partners pushed to get involved with, and take over, other parts of the election administration, as well.   One of CTCL's recommended "partners" was the National Vote at Home Institute ("NVAHI"). Michael Spitzer Rubenstein, NVAHI's employee, wrote to Claire Woodall-Vogg, the Executive Director of the City of Milwaukee Election Commission: "[C]an you connect me to Reid Magney and anyone else who might make sense at the WEC? Would you also be able to make the connection with the Milwaukee County Clerk?" App. 381.

CTCL and its "partners" made many other attempts to access information to which private entities were obviously not entitled. *Id.* The following communications demonstrate such efforts, not authorized by the governing law:

1. **If you could send the procedures manual and any instructions for *ballot reconstruction,* I'd appreciate that**. On my end: · By Monday, **I'll have our edits on the absentee voter instructions.** · We're pushing Quickbase to get their system up and running and I'll keep you updated. · I'll revise the planning tool to accurately reflect the process. App. 381 (Michael Spitzer Rubenstein emailing to Claire Woodall-Vogg of Milwaukee).

2.  I'll create a flowchart for the VBM [vote by mail] processing that we will be able to share with both inspectors and also observers. · **I'll take a look at the reconstruction process** and try to figure out ways to make sure it's followed. App. 381 (Michael Spitzer-Rubenstein emailing to Claire Woodall-Vogg of Milwaukee)

3.  "That sounds like a real pain. It would be helpful to just understand the system and maybe the USDR folks can figure out a way to simplify something for you. … if it's okay with you, **they'd also like to record the screen-share to refer back to, if needed." We're hoping there's an easier way to get the data out of WisVote than you having to manually export it every day or week**. To that end, we have two questions: 1**. Would you or someone else on your team be able to do a screen-share so we can see the process for an export**? 2. **Do you know if WisVote has an API or anything similar so that it can connect with other software apps**? **That would be the holy grail** (but I'm not expecting it to be that easy). App. 389 (Michael Spitzer-Rubenstein to Claire Woodall-Vogg).

4.  I know you won't have the final data on absentee ballots until Monday night but I imagine you'll want to set things up beforehand. **Just let me know your timeline for doing so and if you get me the absentee data a day ahead of time and I can set things up. And as a reminder, here's what I'll need: 1) Number of ballot preparation teams 2) Number of**

returned ballots per ward 3) **Number of outstanding ballots per ward**. App. 390 (Michael Spitzer-Rubenstein to Claire Woodall-Vogg).

5. **In order to get the data by ward, are you able to run a summary in WisVote or do you have to download all the active voters, absentee applications, etc. and then do an Excel pivot table or something similar**? We added Census data and zip codes to the map and so now we'!re moving to figure out how we'll update this. Also, **if you can send these reports (whether in summary form or just the raw data), we can put them in: Active voters, Absentee applications, Ballots received, Ballots rejected/returned to be cured**. App. 391, Michael Spitzer Rubenstein to Claire Woodall-Vogg.

6. "I'll try and do a better job clarifying the current need. We are not actually using anything visual right now (though will in the future). In the state of affairs now, **we are just looking for raw data. The end result of this data will be some formulas, algorithms and reports that cross reference information about ballots and the census data**. For example, **we want to deliver to Milwaukee + Voteathome answers to questions like "How many of age residents are also registered to vote?" or "what percentage of ballots are unreturned in areas with predominantly minorities?"** To do that, we need a clear link between address + Census Tract. We need this for all ~300k voters and the ~200k+ absentee ballots, and it needs to be able automatic as we perform more

inserts. To accomplish this, we were making calls to the Census API. They allow you to pass in an address and get the Census Tract. That solution "works", but is far too slow. Their batch solution isn't working either." App. 388 (emphasis added).

CTCL and its partners were influencing public officials while those officials were doing their jobs to administer the election. *See, e.g.*, App. 381, 383-388, 390-391. Although some of these attempts by CTCL and its partners to tamper with, or take over the Zuckerberg 5's election administration, may have been rebuffed, others were not *Id.* The Zuckerberg 5 apparently agreed that some of CTCL's attempts would have been too egregious. App. 389. For example, Claire Woodall-Vogg responded:

> While I completely understand and appreciate the assistance that is trying to be provided, *I am definitely not comfortable having a non-staff member involved in the functions of our voter database, much less recording it.* While it is a pain to have to remember to generate a report each night and less than ideal, it takes me less than 5 minutes. Without consulting with the state, which I know they don't have the capacity or interest in right now, I don't think I'm comfortable having USDR get involved when it comes to our voter database. I hope you can see where I am coming from – this is our secure database that is certainly already receiving hacking attempts from outside forces.

App. 389 (Claire Woodall-Vogg to Michael Spitzer Rubenstein) (emphasis added).

Kris Teske confirmed that CTCL and its "partners" sought to improperly interject or "embed" themselves into the election administration. App. 674. She stated in her answer in a prior WEC proceeding: "A further complicating factor arose when outside (private) organizations were engaged to participate in the planning and administration of the election." *Id.*

Another example of embedding is in Milwaukee. The Elections Group employee Ryan Chew wrote at 4:07 a.m. on November 4, 2020, the day after the Presidential election, to Milwaukee election official Claire Woodall-Vogg:

> Damn Claire, you have a flair for drama, delivering just the margin needed
>
> at 3:00 a.m. I bet you had those votes counted at midnight, and just wanted
>
> to keep the world waiting.

App. 610. Woodall-Vogg responded, "LOL. I just wanted to say I had been awake for a full 24 hours." *Id.*

1.    **Given a Blank Check to Run the Election, CTCL and Its "Partners" Took Full Advantage of the Opportunity to Administer the Election in at Least One of the Zuckerberg 5.**

The Zuckerberg 5 used (at a minimum) the following group of CTCL's allied corporations to engage in election administration: Center for Civic Design, App. 451-453, 467-471, 474-475, 478; Vote at Home Institute, App. 447, 449, 465-466, 477; Voter Participation Center, App. 476; healthyvoting.org, App. 445; Elections Group, App. 444; Brennan Center, App. 440; Simon and Company, Inc., App. 448, 450. CTCL and its partners assumed numerous aspects of administration of Zuckerberg 5's election processes.

*See, e.g.*, App. at 451-453, 467-471. For example, in Green Bay, the private corporations and their employees engaged in the following aspects of election administration:

a.   Vote at Home volunteered to take the curing of ballots off of a municipality's plate; (*id.* at 172-174);

b.   Elections Group offered to "lend a hand" to Central Count stations (*id.* at 175-76);

c.   Offered to connect a municipality to "partners like Power the Polls" to recruit poll workers and to partner with CTCL to send out e-mails to recruit poll workers; (*id.* at 177);

d.   Advised the City as to using DS200 voting machines; (*id.* at 178);

e.   Provided a "voter navigator" job description; (*id.* at 182);

f.   Advised a municipality regarding moving the "Central Count" from City Hall to a different location, which was wired to provide election results directly to private corporate employees; (*id.* at 262);

g.   The Center for Civic Design offered a municipality to design the absentee voting instructions and the absentee envelopes; (*id.* at 184-196);

h.   The Elections Group issued a Guide to Ballot Drop Boxes, a report on Planning Drop Boxes, Voter Outreach, and Communication; (*id.* at 197-236);

i.   Provided advice about procedures for challenging an elector's ballot; (*id.* at 232-236); and

j.      Conservation Voices and curing. (*id.* at 237-240).

Whitney May of CTCL advised Milwaukee's Information Coordinator, Michelle Nelson, on how to request additional funding for election administration from the City and encouraged her to consult with other Zuckerberg 5 clerks:

> Below is some language I drafted along with 2 links that may help you frame the need for more staff. And have you asked Kris in Green Bay or Tara in Racine about their staffing levels? If they have similar numbers of registered voters as Kenosha, but more staff than Kenosha, then I think that's also a way to make your case to Admin.

App. 377. This email raises the concern that CTCL was drafting documents regarding municipal funding for election administration for the Zuckerberg 5. *Id.* Based on CTCL contact with the Commission, the CTCL and its partners may have drafted documents for Commission staff as well. *Id.*

Kris Teske saw these acts of usurpation as well, describing them in her communications. App. 318-319. As early as July, she claimed that the Mayor's office was diverting her authority as a result of the CTCL Contract. She wrote in an e-mail:

> I haven't been in any discussions or emails as to what they are going to do with the money. I only know what has been on the news/in the media... Again, I feel I am being left out of the discussions and not listened to at the meetings.

*Id.* at 318. Kris Teske also wrote, "Celestine also talked about having advisors from the organization giving the grant who will be 'helping us' with the election and I don't know anything about that." *Id.* at 319. "I don't understand how people who don't have the

66

knowledge of the process can tell us how to manage the election." *Id.* Teske expressed

concern that voting laws may be being broken. She wrote:

> I just attended the Ad Hoc meeting on Elections…. I also asked when these
> people from the grant give us advisors who is going to be determining if their
> advice is legal or not…I don't think it pays to talk to the Mayor because he
> sides with Celestine, so I know this is what he wants. I just don't know where
> the Clerk's Office fits in anymore.

*Id.* at 318-319.

Some of the most aggressive and egregious usurpation of election administration

was performed by Michael Spitzer Rubenstein of NVAHI. Mr. Spitzer Rubenstein

performed tasks such as:

    a.    Providing instructions to the Central Count workers (App. 241-242);

    b.    Augmenting the City of Green Bay's "guide with the DS450" voting machine

        instructions; issuing a purchase order (*id.* at 49); asking about 62001 openers

        (*id.* at 243);

    c.    Corresponding with the Green Bay City Attorney and other employees to

        interpret Wisconsin law and even to develop absentee voting protocols

        potentially inconsistent with Wisconsin Law (App. 73);

    d.    Offering to take "curing ballots" off of the City of Green Bay's plate (*id.* at

        135, 137, 138, 172-173);

    e.    "[H]elping Milwaukee assign inspectors to Central Count stations," and

        offering to do the same for Green Bay (*id.* at 244);

    f.    Setting up the voting machines and patterns in the Central Count location

        (App. 175, 178, 179-195);

g.  Offering "additional resources" such as "funding available, both from ourselves, and the Center for Tech and Civic Life (thanks to Priscilla Chan and Mark Zuckerberg)" (*id.* at 124);

h.  Determining whether to accept ballots after the deadline of 8 pm (*id.* at 291-292);

i.  Allocating poll workers on election day (App. 252);

j.  Teske stating finance person does not want NVAHI person in office, but Chief of Staff is running show (*id.* at 249-251);

k.  Sharing Central Count guidance # of poll workers (*id.* at 252).

Further: "Michael Spitzer Rubenstein will be the on-site contact for the group [on Election Day]." App. 257-261. Mr. Spitzer Rubenstein was one of three people providing "supervision and check-in duties" for workers on the days of the election and subsequent vote counting. App. 306.

One of the functions of Mr. Spitzer Rubenstein's service as "on-site contact" was to coordinate with the contractor staff at the Hyatt Regency and KI Convention Center to set up wireless networks for Election Day operations. At Mr. Spitzer Rubenstein's instruction, there were three WiFi networks available. One was the general conference facility public network that would be available to members of the press and others. That network was password-protected, but the password was widely available. A second password-protected WiFi network was created for Central Count staff. Mr. Spitzer Rubenstein also directed that a third WiFi network be established, but that network was to be hidden and it was not

to be password-protected. Spitzer Rubenstein also ensured that "both networks reach[ed] [his] hotel room on the 8th floor" (App. 262-266).

Spitzer Rubenstein had unfettered access to the Central Count, ballots, and ballot counting:

1. Spitzer Rubenstein developed a diagram and map of the "Central Count" area of the election and developed roles for the staff to handle and count ballots, and Central Count procedures (App. 267-288);

2. Assigned inspectors for vote counting and polling places (App. 244);

3. Pushed for control of ballot curing process (App. 172-173);

4. Provided advice to Green Bay's City Attorney regarding interpretation of Wis. Stat. governing the timing and receipt of ballots (App. 289-292);

5. Instructed "pull the numbers on the absentee ballots returned and outstanding per ward" information on vote results so he could determine which wards were on which voting machines (App. 293-295);

6. Created a "poll worker needs" spreadsheet (App. 296-298);

7. Put himself in charge of transporting ballots to City Hall and then to Central Count on election day; and then counting them. (Discussion of "moving ballot boxes in the morning and evening." November, 2, 2020 (App. 280, 299-301);

8. Stated "I'm putting together instructions for the Central Count

workers, …" (App. 302);

9.    Corresponded with Saralynn Flynn, also of Vote at Home, who wrote: "here is the document I made to hand out to central count observers." (App. 241) The "document" he created warned Election Observers to "NOT interfere in any way with the election process," while CTCL personnel, partners, "pollworkers" and others deputized by CTCL, transported ballots, counted ballots, and "cured" defective mail in and absentee ballots, and otherwise exercised considerable control over the election process (App. 303);

10.   Had unrestricted access on election day to the Central Count floor (App. 304).

On election day, Spitzer Rubenstein had access to ballots and determined which ones would be counted or not counted. Spitzer Rubenstein wrote to Vanessa Chavez, Green Bay City Attorney, on November 3, 2020 at 9:29 pm: "Be prepared: ballots delayed." The text stated: "I think we're probably okay; I don't think anyone challenged the ballots when they came in."  App. 304 (emphasis added). Spitzer Rubenstein explained that someone "prevented one of the drop box deliveries from getting to City Hall by 8 PM," so the ballots were "delayed," i.e., did not arrive on time as required by law. Forty-seven boxes of ballots were expected to be delivered and apparently, according to Spitzer Rubenstein's email, some of them were late but he decided that despite some of them being late, they were to be counted anyway because no one "challenged them." *Id.*

70

1.     **The "Private Corporate Partners" Were from Out of State, and Not Necessarily Knowledgeable About Wisconsin Election Law, or Concerned About It.**

Notably, CTCL's "private corporate partners" were from out of State, and not necessarily knowledgeable about Wisconsin election law, or concerned about it. Ryan Chew of the Elections Group was located outside of Wisconsin. Further, Chew was described by Whitney May of CTCL as having "decades of election experience working with the Cook County Clerk in Illinois. They [Mr. Chew and Gail, also from the Elections Group] are available to discuss your drop box plans (and more!)."  App. 374. CTCL is headquartered in Illinois. Spitzer Rubenstein is a lawyer who lives in Brooklyn.  Kris Teske stated in her answer that "[m]any of these [election administration] decisions were made by persons who were not authorized to do so and some were made by people not qualified to make them as, again, election laws need to be followed to ensure the integrity of the election." App. 676.

2.     **Safe Voting Was a Pretext—The Real Reason for CTCL's WSVP Grants was to Facilitate Increased In-Person and Absentee Voting in Specific Targeted Areas Inside the Zuckerberg 5.**

The real reason for CTCL's WSVP grants was to facilitate increased in-person and absentee voting in specific targeted areas inside the Zuckerberg 5. App. 7-27. Safe voting was merely a pretext.

On June 10, 2020, Vicky Selkowe informed the representatives of the other Zuckerberg 5 that: "[o]ur national funding partner, the Center for Tech & Civic Life, has one additional question area they'd like answered: "What steps can you take to update

registered voters' addresses before November? What steps can you take to register new voters? How much would each cost?" App. 604.

3.      **The Zuckerberg 5 Became Beholden to CTCL as a Result of the WSVP's Private Funding and the WSVP's Provisions.**

The documents show that the Zuckerberg 5 became beholden to CTCL as a result of the WSVP's private funding and the WSVP's provisions.

On August 1, 2020, Maggie McClain of Madison emailed Maribeth Witzel-Behl stating: "is there an approval/letter giving the go-ahead for this? Or an okay from CTCL saying the *grant funds could be used for this*? I need something to attach to the requisition." App. 607.

On August 31, 2020, Kenosha sought and obtained CTCL permission for purchasing 3 DS450 high speed ballot tabulators for use at absentee central count locations at an amended cost of $180,000 instead of $172,000. App. 378-380. Madison sought similar approval from CTCL regarding election administration financing.  App. 437-439, 441-443, 446, 450, 472-473.

On September 22, 2020, Karalyn Kratowitz, the interim deputy mayor of Madison, asked CTCL for instruction on and permission as to how to spend the money. App. 446.

On January 7, 2021, pursuant to the agreement, CTCL told Madison to report by January 31, 2021. App. 609.

The Zuckerberg 5 were periodically required to report to CTCL on election administration. All the Zuckerberg 5 were required to report to CTCL on their expenditures

by January 31, 2021.  App. 4 (Racine), 589 (Milwaukee), 592 (Madison), 596 (Kenosha), 599 (Green Bay).

4.      **The Zuckerberg 5 Ceded Administrative Control Over the Election to CTCL and its Private Partners, Including WisVote Data Sharing, so they Could Collectively Facilitate Increased In-Person and Absentee Voting in the 2020 Election.**

As set forth above, CTCL's stated and implied conditions led to the Zuckerberg 5's municipal clerks and other staff to sometimes eagerly step aside, and other times to be pushed aside, to let CTCL and its private corporate partners engage in aspects of election administration—including exclusive free access to WisVote data not available to the public and not for free (e.g., $12,500 for copy of statewide WisVote data). *See, e.g.*, App. 7-27. CTCL and the private corporations, as revealed by the documents, had an ulterior motive in the WSVP to facilitate increased in-person and absentee voting in the Zuckerberg 5 and among their preferred racial groups. *Id.*

## Chapter 5
## Corporate Legal Defense to Facilitate Obstruction Might Violate the
## Wisconsin Ethics Code

The unlawful actions of various Wisconsin election officials has opened them up to legal liability.  In certain contexts, Wisconsin's election officials can enjoy legal immunity; in others, they can be represented by government attorneys or government-financed attorneys.  Finally, in some contexts, unlawful actions of officials can place them in a position where they-- just like any other members of the public-- may have to hire and pay their own attorneys to defend themselves.

CEIR's Election Officials Legal Defense Network (EOLDN), announced in December of 2021, provides legal services for government officials on the hook for misconduct.  In Wisconsin, this is not a solution to these election officials' legal problems.  In fact, accepting EOLDN's legal services may get these election officials into more jeopardy, because the EOLDN system facially violates Wis. Stat. § 19.59 (1)(b), prohibiting such transactions.  Wis. Stat. § 19.59 (1)(b) provides:

> (b) No person may offer or give to a local public official, directly or indirectly, and no local public official may solicit or accept from any person, directly or indirectly, anything of value if it could reasonably be expected to influence the local public official's vote, official actions or judgment, or could reasonably be considered as a reward for any official action or inaction on the part of the local public official.

The problem is that CTCL and CEIR are Zuckerberg-Chan financed entities that worked together as a joint venture in the 2020 election.  CTCL received $350 million for the 2020 election.  CEIR received $69 million for the 2020 election. CTCL funded the $8.8

million Wisconsin Safe Voting Plan (WSVP), which the cities of Milwaukee, Madison, Green Bay, Racine and Kenosha used to purchase illegal drop boxes and the provision of those funds constitutes election bribery under Wis. Stat. § 12.11.

EOLDN's three leaders: David Becker, Bob Bauer and Ben Ginsberg have different roles regarding the Zuckerbergs' CTCL and WSVP.  Becker, as President of CEIR, received $69 million from Zuckerberg-Chan.  Bauer and Ginsberg are election law attorneys who likely represent-- or are being paid by-- CEIR, CTCL, or related entities. Not surprisingly, all three—Becker, Bauer and Ginsberg—have publicly supported CTCL's distributions in Wisconsin as lawful.

EOLDN should know that CTCL and CEIR are potential parties or witnesses to future illegal drop box or election bribery litigation or prosecutions. In turn, CEIR and related entities are disqualified from providing attorneys for Wisconsin election bribery defendants because they are potential parties, potential witnesses or biased due to previous representation of related parties.  Further, it appears, EOLDN, on behalf of Zuckerberg and Chan, are improperly coordinating legal defenses of election officials to protect CTCL, CEIR, Zuckerberg, Chan and related entities and individuals.

By providing free legal defense services for election officials in these subject areas, EOLDN may be violating the first part of Wis. Stat. § 19.59 (1)(b), which prohibits such transactions:

> No person may offer or give to a local public official, directly or indirectly, and no local public official may solicit or accept from any person, directly or

> indirectly, anything of value if it could reasonably be expected to influence the local public official's vote, official actions or judgment.

The law applies to these circumstances as follows. The "person" is EOLDN or their attorney. The local public official is the election official receiving free EOLDN legal services. The "anything of value" provided is the free legal defense services provided by EOLDN. The gift of the free legal services could reasonably be expected to influence the election officials' official actions or judgment. Since EOLDN's free legal services will have foremost in mind protecting the interests of CTCL, CEIR, Zuckerberg and Chan, it will influence the election officials' official actions and judgment in defending Wis. Stat. § 5.06 administrative corrections and related criminal prosecutions. So, all the elements are satisfied for the transaction to be deemed prohibited.

By providing free legal defense services for election officials in these subject areas, EOLDN may be violating the second part of Wis. Stat. § 19.59 (1)(b) prohibiting such transactions:

> No person may offer or give to a local public official, directly or indirectly, and no local public official may solicit or accept from any person, directly or indirectly, anything of value if it …could reasonably be considered as a reward for any official action or inaction on the part of the local public official

The law applies to the circumstances as follows. The "person" is EOLDN or their attorney. The local public official is the election official receiving free EOLDN legal services. The "anything of value" provided is the free legal defense services provided by EOLDN. EOLDN or its attorney's gift of the legal services could reasonably be considered a reward for the official's actions regarding the illegal drop boxes, election bribery and/or violating

76

the special voting deputies law.   Recall CTCL, Zuckerberg and Chan financed the illegal drop boxes and election bribery, so EOLDN's free legal services to the election officials could be reasonably seen as a "reward" for their participation in unlawful actions related to the election.

**Chapter 6**

**Wisconsin Election Officials' Widespread Use of Absentee Ballot Drop Boxes**

**Facially Violated Wisconsin Law**

In Wisconsin, election officials' unprecedented use of absentee ballot drop boxes facially violated Wisconsin law.  This practice of unlawful absentee ballot drop boxes was particularly pervasive in the cities of Milwaukee, Madison, Kenosha, Racine and Green Bay.  These bulk absentee ballot drop boxes were privately financed by Center for Tech and Civic Life (CTCL).  The WSVP and CTCL's grant acceptance letter incorporating the WSVP is the agreement in which the city agreed to take CTCL's money to purchase and place absentee drop boxes in targeted neighborhoods.  App. 10, 16-17.

In total, the WSVP provided $216,500 for unlawful absentee ballot drop boxes in the Zuckerberg 5.  App. 17.  The WSVP provided Green Bay $50,000 for absentee ballot drop boxes.  App. 16.  The WSVP provided Kenosha $40,000 for absentee ballot drop boxes. App. 16.  The WSVP provided Madison $50,000 for absentee ballot drop boxes. App. 16.  The WSVP provided Milwaukee $58,500 for absentee ballot drop boxes. App. 16.  The WSVP provided Racine $18,000 for absentee ballot drop boxes. App. 17.

The use of absentee ballot drop boxes has been successfully challenged in state court as being unlawful. In a case in the Waukesha County Circuit Court, the plaintiffs sued the WEC to challenge 2020 guidance memos that the WEC issued to municipal clerks. Complaint, Teigen v. Wisconsin Elections Commission, No. 21-CV-958 (Wis. Cir. Ct. for Waukesha Cnty. June 28, 2021) (under review by the Wisconsin Supreme Court), available

78

at App. 649-660. In particular, the plaintiffs challenged a memorandum that purported to authorize unstaffed ballot drop boxes:

> Despite this requirement in the statutes [i.e., the requirement that an absentee ballot either be returned by mail or be returned by the voter "in person, to the municipal clerk." Wis. Stat. § 6.87(4)(b)1], WEC Commissioners sent a memo to municipal clerks dated August 19, 2020, (the "August 2020 WEC Memo") stating that absentee ballots do not need to be mailed by the voter or delivered by the voter, in person, to the municipal clerk but instead could be dropped into a drop box and that the ballot drop boxes could be unstaffed, temporary, or permanent. (A true and correct copy of the August 2020 WEC Memo is attached hereto as Exhibit B.).
>
> Id. ¶ 10, available at App. 651.

The court granted the plaintiffs motion for summary judgment and declared the use of ballot drop boxes, outside of narrow exceptions, to be inconsistent with Wisconsin law:

> For the reasons set forth by the Court on the record at the January 13, 2022 hearing, the Court hereby declares that WEC's interpretation of state statutes in the Memos is inconsistent with state law, to the extent they conflict with the following: (1) an elector must personally mail or deliver his or her own absentee ballot, except where the law explicitly authorizes an agent to act on an elector's behalf, (2) the only lawful methods for casting an absentee ballot pursuant to Wis. Stat. § 6.87(4)(b)1. are for the elector to place the envelope containing the ballot in the mail or for the elector to deliver the ballot in person to the municipal clerk, (3) the use of drop boxes, as described in the Memos, is not permitted under Wisconsin law unless the drop box is staffed by the clerk and located at the office of the clerk or a properly designated alternate site under Wis. Stat. § 6.855.
>
> Order Granting Summary Judgment for Plaintiffs, Teigen v. Wisconsin Elections Commission, No. 21-CV-958 (Wis. Cir. Ct. for Waukesha Cnty. January 20, 2020), available at App. 66.

Accordingly, the Zuckerberg 5's privately funded absentee ballot drop boxes in the 2020 election were unlawful under Wis. Stat. § 6.87(4)(b)1 and § 6.855.   Thus, the

Zuckerberg 5 and CTCL's agreement for CTCL-funded purchase and placement of absentee ballot drop boxes was also unlawful and contrary to public policy.  We suggest below legislative action that would make this prohibition even more clear.

**Chapter 7**

**The Wisconsin Elections Commission (WEC) Unlawfully Directed Clerks to Violate Rules Protecting Nursing Home Residents, Resulting in a 100% Voting Rate in Many Nursing Homes in 2020, Including Many Ineligible Voters**

Contrary to statements made by several groups and media sources over the past months, the OSC has uncovered evidence of election fraud in the November 2020 election. Rampant fraud and abuse occurred statewide at Wisconsin's nursing homes and other residential care facilities in relation to absentee voting at these facilities. This fraud and abuse was the ultimate result of unlawful acts by WEC's members and its staff, the end results being:

1.  Residents were illegally assisted with "marking" their ballots by nursing home staff and administrators;

2.  Absentee ballots for residents were illegally handled by facility staff and administrators;

3.  Resident absentee ballots were illegally "witnessed" by nursing home staff and administrators;

4.  Suspected forger of resident signatures by nursing home staff and administrators;

5.  Improbably high voting rates for residents at nursing homes; and

6.  Ballots cast by residents—

    1.  Where those residents were unaware of their surroundings, with whom they are speaking at any given time, or what year it is; and/or

81

2. Where those residents' right to vote had been taken away by court order because they have been adjudicated as mentally incompetent.

Through these acts, the members and staff of WEC mandated widespread election fraud to take place where our most vulnerable adult citizens reside.

The OSC has spent significant time and resources investigating the fraud and abuse that occurred at Wisconsin's nursing homes. However, that part of the investigation is nowhere near complete. While the OSC has been able to audit the votes of several nursing homes in five counties, and has interviewed the families of many residents who have been abused, the OSC believes a state-wide, complete audit of all absentee votes from all facilities governed by Wis. Stat 6.875 is necessary. The OSC is continuing to pursue this avenue of the investigation with an eye towards completing that audit.

There are four distinct types of Elderly Care Facilities in Wisconsin, Assisted Living (including assisted living apartments), Adult Day Care Centers, Nursing Homes and Memory Care Units.  Many of the memory care units are operated within the Nursing Home environment.   In total, there are about 92,000 people in Wisconsin who reside in these facilities.

Wisconsin law defines "election fraud" at Wis. Stat. § 12.13. That section provides in pertinent part—

**"12.13 Election Fraud**

**(1)** ELECTORS.  Whoever intentionally does any of the following violates this chapter:

  …

**(h)** Procures, assists or advises someone to do any of the acts prohibited by this subsection.

(2) ELECTION OFFICIALS.

…

**(b)** No election official may:

…

3. Permit registration or receipt of a vote from a person who the official knows is not a legally qualified elector or who has refused after being challenged to make the oath or to properly answer the necessary questions pertaining to the requisite requirements and residence; or put into the ballot box a ballot other than the official's own or other one lawfully received.

4. Intentionally assist or cause to be made a false statement, canvass, certificate or return of the votes cast at any election.

**…**

7. In the course of the person's official duties or on account of the person's official position, intentionally violate or intentionally cause any other person to violate any provision of chs. 5 to 12 or which no other penalty is expressly prescribed.

(3) PROHIBITED ACTS.  No person may:

…

**(L)** When not authorized, during or after an election, break open or violate the seals or locks on a ballot box containing ballots of that election or obtain unlawful possession of a ballot box with official ballots; conceal, withhold or destroy ballots or ballot boxes; willfully, fraudulently or forcibly add to or diminish the number of ballots legally deposited in a ballot box; or aid or abet any person in doing any of the acts prohibited by this paragraph.

…

**(N)** Receive a ballot from or give a ballot to a person other than the election official in charge.

…

**(P)** Receive a completed ballot from a voter unless qualified to do so."

Wisconsin has enacted rules specifically related to the conduct of absentee voting in nursing homes and other residential care facilities. These rules are found in Wis. Stat. § 6.875. Wis.. Sat. § 6.875(2)(a) specifically states—

> Absentee voting in person inside residential care facilities and qualified retirement homes shall be conducted by municipalities only in the manner prescribed in this section. At any residential care facility or qualified retirement home where a municipality dispatches special voting deputies to conduct absentee voting in person under this section, the procedures prescribed in this section are the exclusive means of absentee voting in person inside that facility or home for electors who are occupants of the facility or home.

Among the rules that must be followed are that municipal clerks or boards of election commissioners <u>must</u> designate "Special Voting Deputies" (SVDs) for the purpose of supervising absentee voting in qualified retirement homes and residential care facilities, and that these SVDs <u>must</u> be dispatched to nursing homes to supervise absentee voting in those facilities, except in very limited circumstances.

If a resident at a nursing home or other residential care facility requests an absentee ballot, and SVDs are dispatched to that facility (which again must happen except in very limited circumstances) the law provides that the clerks or the board of electors <u>must</u> give the ballot to the SVDs "who shall personally deliver the ballot to the elector" when the SVDs visit the facility.

Once the ballot is delivered, the SVDs may assist the resident with "marking" the ballot. Importantly, the only people authorized by Wisconsin law to assist a resident in

"marking" an absentee ballot are SVDs and "immediate family members." It is illegal for anyone else under any circumstances to do so. Further, the law specifically provides that "the [SVDs] **shall not accept** an absentee ballot submitted by an elector whose ballot was not issued to the elector by the [SVDs]" and that "[a]ll voting shall be conducted in the presence of the [SVDs]."

Once voting is complete on the day of an SVD's visit to the facility, Wisconsin law provides—

> **(d)** Upon completion of the voting on each day at each residential care facility or qualified retirement home, the deputies shall seal the absentee ballot envelopes and any absentee ballot applications inside a carrier envelope and shall seal the carrier envelope and sign their names to the seal. The deputies shall place the envelope inside a ballot bag or container. As soon as possible after visiting each residential care facility or retirement home, but not later than 18 hours after the visit, the deputies shall deliver the ballot bag or container to the clerk or board of election commissioners of the municipality in which the elector casting the ballot resides.

There is no provision in Wis. Stat. § 6.875 for absentee ballots from nursing home residents to be returned by mail, except in the case of a voter that "maintains a residence outside the facility or home" in which case the voter may request and return an absentee ballot in the standard manner as provided for elsewhere in the statutes. Wis. Stat. § 6.875(ar)2.

Despite the clear mandates of Wisconsin law, in a June 24, 2020 memorandum directed to all clerks of the state, WEC directed clerks not to send SVDs to facilities, and to instead mail ballots to voters in those facilities. WEC further stated that "The regular rules for absentee voting by mail will apply to ballots sent by mail to care facility voters."

On September 25, 2020, WEC forwarded to all clerks of the State two documents, a "Sample Nursing Home and Care Facility Letter" (the "Facility Letter") and a training document entitled "Absentee Voting at Nursing Homes and Care Facilities" (the "Training Document").

The Facility Letter was provided to clerks as a template for letters to be sent by the clerks to nursing homes in their jurisdiction, directing those facilities as to the purported new rules for absentee voting for the November 2020 election. In the Facility Letter, WEC told the clerks to advise facilities that the normal restrictions against facility staff assisting residents with voting will not be in place "because of SVDs being restricted from visiting." It further provided that "[r]esidents who receive ballots will have to vote their ballot, have a witness provide required information on the return envelope, and return their ballot by mail in order to participate." The letter also stated that facility staff may assist residents in "completing the information required on the voter registration form" and completing absentee ballot request forms.

In addition to providing further details as to how facility staff could assist residents with registration, absentee ballot application, and voting, the Training Document stated—

As a care facility administrator or staff member, you are able to:

1. Assist residents in filling out their ballots or certificate envelopes.

2. Assist residents in completing voter registration forms and absentee requests.

3. Sign the special certificate envelope (EL-122sp) if necessary (see below for explanation).

4. Witness ballots.

The Training Document also provided certain "Absentee Voting FAQs" with answers thereto, including—

> Q: How do residents of my facility return their ballot? We used to have people (SVDs) come to the facility and administer the voting and take the ballots back. Now what is expected?

> A: Ballots should be mailed back to the clerk using the postage-paid return envelope provided by the clerk with the voter's ballot. They can also be returned to the clerk's office in-person at the request of the voter.

> Q: Who can assist the voter in voting their ballot?

> A: Anyone can assist the voter in reading and/or marking their ballot, except the voter's employer, including care facility staff and family. Normally, care facility staff are restricted from assisting voters, but this restriction is not in effect because the voter is casting their ballot by mail. Wis. Stat. § 6.87(5)

> Q: Can a resident's ballot be returned using a drop box at the Town/Village/City Hall?

> A: Yes, the ballot may be returned to a drop box or directly to the clerk's office at the request of the voter. All ballots must be received by 8:00 PM on election day in order to be counted. Not all municipalities offer drop boxes, so you should check with the clerk to see if one is available for ballot return.

Each and every WEC directive identified above in regard to absentee voting in nursing homes and other resident care facilities is a direct violation of Wisconsin law, and ultimately encouraged widespread fraud in regard to absentee voting at these facilities.

In addition to other violations, WEC's directives were illegal in the following ways:

1.  Directing that facility staff may assist voters in registering to vote, applying for an absentee ballot and/or assisting the voter in marking the ballot are all violations of provisions of Wis. Stat. § 6.875;

2.  Directing that clerks not send SVDs to any facilities violated the basic tenets of Wis. Stat. § 6.875 that absentee voting in nursing homes "shall" be conducted in compliance with that statute and that all absentee voting at nursing homes must be conducted "in the presence of [SVDs];"

3.  Directing clerks to mail ballots directly to nursing home residents violated the rule that absentee ballots requested by facility residents <u>must</u> be given first to SVDs, and then the SVDs are the <u>only</u> persons authorized to then give those ballots to the residents;

4.  Directing that absentee ballots may be returned by mail, by placing them in a ballot drop box, and/or by returning them directly to the clerk (by someone other than an SVD) "at the request of the voter" all violate the rule that these absentee ballots are to be returned <u>only</u> to an SVD, who then <u>must</u> place them in a ballot bag or container and return them to the clerk within 18 hours.

Ultimately, WEC's directives mandated that widespread "election fraud" be undertaken in relation to the November 2020 election. As is noted above, "election fraud" occurs when ballots are given to, or received by anyone other than "the election official in charge" or when a person receives a completed ballot from a person "unless qualified to do so."

WEC's directives caused ballots to be mailed directly to nursing home residents rather than the "election officials in charge"—who would have been the SVDs. By the same token, it caused completed ballots to be illegally given to facility staff or returned by mail rather than the SVDs, violating both the rule that ballots cannot be given to anyone other than the "election official in charge" as well as the prohibition against receiving a completed ballot from someone "unless qualified to do so."

The <u>only</u> persons qualified to receive completed ballots from nursing home residents are, and were, SVDs. The law did not change before or after the November 2020 election, and WEC's directives were in direct violation thereof. As a result, WEC's directors and

staff committed election fraud themselves by mandating and/or encouraging others to commit acts prohibited by the election fraud statute.

The OSC has evidence that facility staff and directors—

1. Assisted residents in completing ballots;

2. Assisted residents in obtaining absentee ballots;

3. Pressured residents to vote;

4. Collected completed ballots from residents;

5. Forged signatures of residents;

6. Illegally returned residents' ballots to the municipal clerks by mail, by placing the ballots in drop boxes, and/or delivering them directly to the clerks;

7. Pressured and/or assisted incompetent persons to complete and cast ballots in the November 2020 election, up to and including persons who have had their right to vote take away by court order due to mental incompetence.

Not only did WEC's directives mandate and/or encourage violations of Wis. Stat. § 6.875 and the election fraud statute: it led to absurd results relating to nursing home voting in the November 2020 election. The following chart shows the registered voting rates in the November 2020 election for nursing homes that were vetted by the OSC in Milwaukee, Racine, Dane, Kenosha, and Brown Counties:

| County | # of Nursing Homes Vettted | # of Registered Voters | # of Voters Nov 2020 | % of Registered Voters that Voted |
|--------|------|------|------|------|
| Milwaukee | 30 | 1084 | 1084 | 100% |
| Racine | 12 | 348 | 348 | 100% |
| Dane | 24 | 723 | 723 | 100% |
| Kenosha | 9 | 866 | 841 | 97% |
| Brown | 16 | 280 | 265 | 95% |

It is important to note that the above chart only reflects voting at the nursing homes that the OSC has been able to vet to this juncture. There are more facilities in these counties, and after auditing the votes from other facilities, the above percentages may change. Further, as is noted above, the OSC believes a complete state-wide audit of absentee ballots sourced from nursing home and other residential care facility residents is necessary.

Election fraud is a crime. The Racine County Sheriff's Office recommended criminal prosecution of certain members of WEC relating to their instructions to municipal clerks not to send SVDs to nursing homes for the November 2020 Presidential election. Specifically, the Sheriff recommended charges for WEC Commissioners Margaret Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudson, and Mark Thomsen. The recommended charges are the same for each Commissioner, and include:

1. Misconduct in Public Office in violation of Wis. Stat. § 946.12(2) (Felony);

2. Election Fraud—Election Official Assisting with Violations in violation of Wis. Stat. § 12.13(2)(b)7 (Felony);

3. Party to the Crime of Election Fraud—Receive Ballot Non-Election Official

90

in violation of Wis. Stat. § 12.13(3)(n) (Misdemeanor);

4.  Party to the Crime of Election Fraud—Illegal Ballot Receipt in violation of
    Wis. Stat. § 12.13(3)(p) (Misdemeanor);

5.  Party to the Crime of Election Fraud—Solicit Assistance in violation of Wis.
    Stat. § 12.13(3)(s) (Misdemeanor)

In a recent letter, Racine County District Attorney Patricia Hanson, after stating she

did not have jurisdiction to prosecute, stated to Sheriff Christopher Schmaling that, in her

expert legal opinion, multiple members of WEC acted "contrary" to Wisconsin Elections

laws. District Attorney Hanson stated:

> Despite knowing that what they were doing was contrary to law and despite
> being told by the Governor's Office that they were exceeding their authority,
> the WEC instructed municipal and county clerks to eliminate the SVD
> process for elections in 2020. Proof of this comes directly from the
> recordings of the WEC meetings that can be found on their website and their
> recorded meetings.

District Attorney Hanson further stated:

> It is appalling to me that an appointed, unelected group of volunteers, has
> enough authority to change how some of our most vulnerable citizens access
> voting. Dispensing with the mandatory process created by the legislature of
> using sworn and trained SVDs to assist citizens in nursing homes, directly
> led to what occurred at Ridgewood Care Center in Racine County. Residents
> who did not request ballots voted because someone else made a request for a
> ballot on their behalf and then voted on their behalf. If even one person's
> right to freely choose to vote or not to vote was diminished, then a travesty
> of justice has occurred.

While the Racine County District Attorney has decided not to prosecute on

jurisdictional grounds, the OISC has learned that the Racine County Sheriff's Office has

forwarded referrals to the District Attorneys for the resident counties of the above-noted

WEC members—St. Croix, Sheboygan, Green Lake and Milwaukee Counties. No decision has been made by those District Attorneys regarding prosecution as of this writing.

In an October 28, 2021 press release, WEC Chairman Ann Jacobs inaccurately denied that anyone at WEC broke the law and attempted to justify WEC's possibly unlawful acts by stating that had they not performed them, "many residents in Wisconsin care facilities could have and would have been disenfranchised and not able to vote in the 2020 elections." The OSC finds this statement to be no excuse.

WEC's solution to the potential "disenfranchisement" of nursing home residents who wished to vote absentee (a privilege under the law) was to completely strip away the protections afforded to those persons by Wisconsin law and allow nursing home residents to be subjected to undue influence, overzealous solicitation, and outright fraud.

Under Wisconsin law, while voting is a right, voting by absentee ballot is a privilege. Wisconsin law specifically provides that "the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses." Beyond the stringent safeguards of absentee voting in general, absentee voting in nursing homes requires specialized supervision precisely because those facilities house our state's most vulnerable residents.

In stark contrast to what Wisconsin law seeks to prevent, WECs directives led to the abuse of some of our State's most vulnerable citizens. Many residents were pressured

to vote when there is no scenario under which that should have ever happened legally or morally. The OSC conducted interviews with the families of several facility residents who were extremely vulnerable, and yet cast ballots in the November 2020 election. Among the stories we were told were—

1. In Brown County Facility 1, 20 absentee ballots were cast.  A study of the Absentee Ballot Envelopes obtained through open records request revealed all 20 of the envelopes were witnessed by the same person.  At this facility, Resident A voted, and Resident A's family provided copies of that resident's signature against the signature on the absentee envelope, and they do not match.  Further, Resident A does not have the mental capacity to vote as is evinced in a video interview.

2. At the same facility, Resident B, according to WisVote data, voted twice, both by absentee ballot.

3. In Brown County Facility 2, Resident C voted in 2020.  According to family, Resident C was not of sound mind for over 10 years. This is documented in a video interview;

4. In Brown County Facility 3, Resident D was taken from the facility to vote by family and guardian to Resident D's assigned polling location. Resident D had registered to vote at this location on Oct 29th as well. When Resident D presented herself to vote on election day, the Resident D was told that Resident D had already voted. After questioning from family, Resident D recollected that someone at the nursing home had come around talking about voting at the nursing home, however, Resident D denied voting at the home. WisVote shows her voting absentee;

5. In Dane County Facility 1, Resident E, who has been adjudicated incompetent since 1972, voted in 2020. Video of Resident E shows Resident E is clearly not mentally capable of voting;

6. In Dane County Facility 2, Resident F never requested an absentee ballot for the November 2020 election, yet received one. Resident F's guardian intercepted the ballot and subsequently Resident F did not vote.  The guardian notified the nursing home that Resident F was no longer going to be voting yet in the Spring of 2021, WisVote records reveal that Resident F voted again;

7. In Kenosha Facility 1, Resident G voted absentee in the Nov 2020 election. Resident G was interviewed on video and it shows she is clearly incapable of voting;

8. In Kenosha Facility 2, Resident H voted absentee in November of 2020. Resident H's guardian reported it as Resident H is incapable of voting as Resident H suffered from severe dementia. However, WisVote records indicate Resident H voted throughout the calendar year 2020;

9. In Milwaukee County Facility 1, WisVote data shows 3 adjudicated incompetent voters voted in the November 2020 election. However, it was actually 2 individuals with one casting two ballots;

10. In Milwaukee County Facility 2, Resident I is 104 years old and clearly incompetent. Resident I's family indicated Resident I had been incompetent for several years. This is an extremely egregious case as shown by video of Resident I with family. Resident I cannot comprehend anything;

11. In Outagamie County facility 1, Resident J, who has been adjudicated incompetent not only voted in the November 2020 election, but she also voted in February 2021. The video of Resident J verifies the fact that Resident J is incompetent.

12. In Washington County Facility 1, Resident K was found incompetent in 2018 by two separate doctors. Resident K cast a ballot in the November 2020 Presidential election. Resident K passed in November of 2021.

It is "disenfranchisement" when electors are pressured to fill out ballots they did not wish to or in a way they don't desire or even understand. It is "disenfranchisement" when ballots are illegally cast on behalf of persons who have had their right to vote taken away by the courts of this State due to their mental incompetence. In no way was WEC's mandating illegal activity a "solution" to "disenfranchisement" and to suggest that WEC's actions were a good faith effort at doing so ignores the facts and the law.

WEC's unlawful activities facilitated and encouraged possible widespread criminality and election fraud. Aside from the fact that they were legally and morally

wrong, these acts led to 100% voting rates in many nursing homes in Brown, Dane, Kenosha, Milwaukee and Racine Counties and incapacitated people voting statewide. Given that there are approximately 92,000 residents of facilities governed by Wis. Stat. § 6.875 statewide, the fact that tens of thousands of illegal ballots from these facilities were counted casts doubt on the 2020 Presidential election result.

## Chapter 8

## WEC Also Unlawfully Encouraged Evasion of Ballot Security

## Measures Related to "Indefinitely Confined" Voters at the Behest of

## Outside Corporations

Wisconsin, like many States, has strict absentee voting laws. These laws are designed to avoid the many prevalent dangers of fraud or abuse that are inherent in an absentee setting. It was never the intention of the Legislature to make absentee voting easily accessible from one's home without meeting voting identification requirements and complying with stringent voter protection laws. However, the Legislature made a special, narrow exception for indefinitely confined voters.

This exception for voting absentee applies when voters are confined to their homes and declare themselves to be indefinitely confined. An elector who is indefinitely confined because of age, physical illness, or infirmity, or is disabled for an indefinite period may, by signing a statement to that effect, require that an absentee ballot be sent to the elector automatically for every election. There are two requirements to vote indefinitely confined. The voter must be indefinitely confined to their home, and the reason for this confinement must be the voter's age, physical illness, sickness, or disability. While one can indefinitely confine themselves to their home for any reason, that confinement does not qualify for an absentee ballot unless the confinement is for a statutory reason—not including a reasonable or unreasonable fear of becoming ill from COVID.

96

This statute was grossly misconstrued by the Dane and Milwaukee County clerks. Both clerks issued statements that they would send absentee ballots to voters who were indefinitely confined to their homes because of a fear of contracting COVID. The Wisconsin Supreme Court corrected this legally erroneous statement. However, during the time the clerks made their announcement until the judiciary forced the clerks to stop their announcements, the number of newly designated indefinitely confined voters skyrocketed. The clerks did nothing to remove these voters or determine which voters met the true legal definition of "indefinitely confined." Instead, the clerks sent these registrants absentee ballots. In doing so, they not only gave ballots to unqualified indefinitely confined voters but skirted a very important protection for election fraud.

Voter identification is required for every ballot issued in Wisconsin except to the indefinitely confined voter.

Instead, the voter "may, in lieu of providing proof of identification, submit with his or her absentee ballot a statement . . . which contains the name and address of the elector and verifies that the name and address are correct."  Wis. Stat. § 6.87.  This feature of indefinitely confined voting was also abused. In one documented incident from the Dane County recount, a voter reported that he called the clerk's office and requested an absentee ballot. He was asked if he had identification that had his current address. Having just moved to the city, he responded that he had not obtained a new identification card. He was told not to worry, that he could still get a ballot by declaring himself to be indefinitely confined. Then, he was instructed to say that he would provide proof of his address by statement.

The clerk's office said not only would it send him a ballot for the 2020 general election, but they would send him a ballot to his home every year after without his having to request the ballot and without the necessity for identification until he stopped voting or reported that he was no longer indefinitely confined. The voter, an honest individual, declined the clerk's suggestion and reported his experience.

This was not the only abuse of the indefinitely confined voting law. A flagrant example is that of State Senator Patricia Schachtner. Schachtner and her husband signed statements indicating that they were indefinitely confined voters for the November 2020 election and opted to receive absentee ballots pursuant to Wis. Stat. § 6.87(2). However, social media showed the Schachtner family to be active outside their home in the months prior to and during the election both for personal recreation and as Schachtner campaigned for reelection. Additionally, Schachtner was named to be a Presidential elector to cast electoral college votes for Biden at the Wisconsin Capitol on December 14, 2020, approximately one month after the election for which she was indefinitely confined.

This is an egregious violation of the indefinitely confined status.  One cannot be confined to one's home for a length of time with no definite end because of age, physical illness or infirmity, or disability and also campaign for reelection, enjoy social and family life, and appear at the Wisconsin Capitol to vote. Clearly, Schachtner and her husband were not indefinitely confined to their home when she requested and cast her ballot in the 2020 election. Schachtner and many others failed to follow our election law and no enforcement action was taken.

Our Republic and way of life is in danger if we fail to follow and enforce the law. The rule of law requires that legal rules be publicly known, consistently enforced, and even-handedly applied. Violating the rule of law can lead to uncertainty.  Uncertainty provides opportunities for arbitrary power. Without the rule of law, citizens may be tempted to take justice into their own hands.

My investigation will determine why the clerks failed to act on their obligation to review and expunge from the voter rolls those claiming to be indefinitely confined voters when the clerk has "reliable information that [the] . . . elector no longer qualifies for the service." Wis. Stat. § 6.86(2)(b). I am concerned that the electors who claimed they were indefinitely confined, but were not physically ill, infirm, elderly, or disabled failed to take steps to remove themselves from that status prior to the November 3, 2020, election. *See* Wis. Stat. § 6.86(2)(a). I am even more concerned that ineligible voters might have taken advantage of that status in order to vote without the need to properly identify themselves. I expect to issue another report that includes the impact of indefinitely confined voting abuses and how the Legislature can prevent these abuses in the future to restore confidence in the rule of law.

# Chapter 9

## Wards Under Guardianship Order Voted Unimpeded by Wisconsin's Election Officials as They Are Not Recorded in the WisVote Voter Database, Even Though the Circuit Courts Have This Information.

Wis. Stat. § 6.03 disqualifies from voting those citizens who are incapable of understanding the voting process or are under court-ordered guardianship, unless the court has determined that the right to vote is preserved.  The statute states:

6.03     Disqualification of electors.

(1)   The following persons shall not be allowed to vote in any election and any attempt to vote shall be rejected:`

(a) Any person who is incapable of understanding the objective of the elective process or who is under guardianship, unless the court has determined that the person is competent to exercise the right to vote.

(b) Any person convicted of treason, felony or bribery, unless the person's right to vote is restored through a pardon or under s. 304.078 (3).

(2)   No person shall be allowed to vote in any election in which the person has made or become interested, directly or indirectly, in any bet or wager depending upon the result of the election.

(3)  No person may be denied the right to register to vote or the right to vote by reason that the person is alleged to be incapable of understanding the objective of the elective process unless the person has been adjudicated incompetent in this state. If a determination of incompetency of the person has already been made, or if a determination of limited incompetency has been made that does not include a specific finding that the subject is competent to exercise the right to vote, and a guardian has been appointed as a result of any such determination, then no determination of incapacity of understanding the objective of the elective process is required unless the guardianship is terminated or modified under s. 54.64.

The Help America Vote Act, section 21083, provides "if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. §§ 1973gg–2(b))

[now 52 U.S.C. § 20503(b)], that State shall remove the names of ineligible voters from the computerized list in accordance with State law."  Wisconsin is described in section 20503(b); so, section 21083 requires the state's election officials to follow state law on removal of ineligible voters from the computerized list.  Accordingly, section 21083 requires that WEC remove the names of ineligible voters from the computerized list, WisVote, in accordance with Wisconsin law.

In Wisconsin, ineligibility information about wards under guardianship without the right to vote is available from the circuit courts.  Information about persons who are incapable of understanding the objective of the elective process is available from family, friends, medical authorities and nursing homes.

Under federal law, WEC is legally required to include in WisVote ineligibility information about ineligible wards and incapacitated persons.  WEC is also legally required under federal law to distribute to the State's municipal clerks lists of wards and incapacitated person so as to prevent these ineligible non-citizens from election day registration and voting.

In violation of its federal and state legal duties, Wisconsin election officials failed to prevent wards and incapacitated persons from voting in the 2020 Presidential election—casting doubt on the election result.

## Chapter 10

## Non-citizens Voted Unimpeded by Wisconsin's Election Officials, as

## They Are not Recorded in the WisVote Voter Database, Even Though

## Wisconsin Law Requires Citizenship to Vote.

Wis. Stat. § 6.02 requires citizenship to be qualified as an elector.  The statute states:

6.02    Qualifications, general.
(1)  Every U.S. citizen age 18 or older who has resided in an election district or
ward for 28 consecutive days before any election where the citizen offers to
vote is an eligible elector.
(2)  Any U.S. citizen age 18 or older who moves within this state later than
28 days before an election shall vote at his or her previous ward or election
district if the person is otherwise qualified. If the elector can comply with the
28-day residence requirement at the new address and is otherwise qualified,
he or she may vote in the new ward or election district.

Section 21083 of the Help America Vote Act provides "if a State is described in

section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. §§ 1973gg–2(b))

[now 52 U.S.C. § 20503(b)], that State shall remove the names of ineligible voters from

the computerized list in accordance with State law."  Wisconsin is described in section

20503(b); so, section 21083 requires the state's election officials to follow state law on

removal of ineligible voters from the computerized list.  Accordingly, section 21083

requires that WEC remove the names of non-citizens, who are by definition ineligible

voters, from the computerized list, WisVote, in accordance with Wisconsin law.

In Wisconsin, ineligibility information about non-citizens is available from the

Department of Transportation.  The Department of Transportation issues driver licenses to

non-citizens who qualify.  Under federal law, WEC is legally required to include in

102

WisVote ineligibility information about non-citizens from the Department of Transportation. WEC is also legally required under federal law to distribute to the state's municipal clerks lists of non-citizens so as to prevent these ineligible non-citizens from election day registration and voting.

In violation of its federal and state legal obligations, Wisconsin election officials failed to prevent non-citizens from voting in the 2020 Presidential election—casting doubt on the election result.

**Chapter 11**

**Milwaukee, Madison, Racine, Kenosha, and Green Bay Election Officials May Have Violated the Federal and Wisconsin Equal Protection Clauses by Not Treating All Voters Equally in the Same Election.**

Importantly, the Zuckerberg 5 election officials violated Federal and Wisconsin Equal Protection Clauses by not treating all voters the same in the same election. Treating all voters equally in the same election is a bedrock principle of election law.

The public record shows that the public's right to vote was unjustifiably burdened by the Zuckerberg 5 targeting geographic and demographic groups for increased voting. The Zuckerberg 5's conduct promoting voting for certain voter groups affected election outcomes—as concluded by WILL's 2021 analytical report. The Zuckerberg 5 in the WSVP crossed the line between election administration and campaigning and that never should have never occurred.

The appropriate standard of review for Equal Protection Clause analysis is Anderson-Burdick scrutiny for the disparate treatment of voters and, also, here, strict scrutiny of the government's rationale. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, the legal standard used is generally found in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See also Clements v. Fashing*, 457 U.S. 957, 965

104

(1982). Although *Anderson* and *Burdick* were both ballot-access cases, the Supreme

Court has confirmed their vitality in a much broader range of voting rights contexts.

*See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J.,

concurring.) ("To evaluate a law respecting the right to vote—whether it governs

voter qualifications, candidate selection, or the voting process—we use the approach

set out in Burdick.... "). The *Burdick* Court stated the standard as follows:

> A court considering a challenge to a state election law must weigh "the
> character and magnitude of the asserted injury to the rights protected
> by the First and Fourteenth Amendments that the plaintiff seeks to
> vindicate" against "the precise interests put forward by the State as
> justifications for the burden imposed by its rule," taking into
> consideration "the extent to which those interests make it necessary to
> burden the plaintiffs' rights."

*Burdick,* 504 U.S. at 434, (quoting *Anderson,* 460 U.S. at 789). This standard is

sufficiently flexible to accommodate the complexities of state election regulations while

also protecting the fundamental importance of the right to vote. *Obama for America v.*

*Husted*, 697 F.3d 423, 428–30 (6th Cir. 2012). There is no "litmus test" to separate valid

from invalid voting regulations; courts must weigh the burden on voters against the State's

asserted justifications and "make the 'hard judgment' that our adversary system

demands." *Crawford,* 553 U.S. at 190 (Stevens, J., announcing the judgment of the Court).

Similar to the federal constitution, Wisconsin's Constitution requires equality from

the government, including the Zuckerberg 5 when it takes on a government function:

> Equality; inherent rights. Section 1. All people are born equally free and
> independent, and have certain inherent rights; among these are life, liberty

and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

Art. I, sec. 1. The same legal standard of review applies for state constitutional claims.

The *Anderson–Burdick* standard, therefore, applies.

Additionally, when a state's classification "severely" burdens the fundamental right to vote, strict scrutiny is the appropriate standard. *Burdick,* 504 U.S. at 434 (1992). The federal courts "have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v. Va. Bd. of Educ.,* 383 U.S. 663, 670 (1966). Here, it is the CTCLs private funding of the Zuckerberg Plan's governmental classifications that treat voters differently in the same elections, which triggers strict scrutiny.

Nothing could be more repugnant to democracy than private corporations paying to increase voting access for targeted demographic groups, so that they can manipulate election outcomes—something that will occur repeatedly under the auspices of the WSVP provisions. Private corporations were paying money to affect the election outcome. So strict scrutiny must apply when private funding of election administration targeting voter groups is involved—because the credibility of our federal elections is at stake

Additionally, in *Bush v. Gore*, the U.S. Supreme Court emphasized that equal protection restrictions apply not only to the "initial allocation of the franchise," but "to the manner of its exercise" as well. *Bush*, 531 U.S. 98, *at* 104 (2000). The State may not subject voters to "arbitrary and disparate treatment" that "value[s] one person's vote over that of

106

another." *Id.* This equal protection prohibition on "arbitrary and disparate treatment" of different voters participating in the same election is what at least one commentator calls *Bush's* "Uniformity Principle." Michael T. Morley, *Bush v. Gore's Uniformity Principle and the Equal Protection Right to Vote,* 28 Geo. Mason L. Rev. 229 (Fall 2020).

Courts have applied the Uniformity Principle to intentional discrimination concerning in-person voting opportunities. For example, in *Obama for America v. Husted,* 697 F.3d 423 (6th Cir. 2012), the Sixth Circuit held that it was unconstitutional for the State of Ohio to allow only domestic military voters to cast ballots in person over the weekend before Election Day. *Id.* at 437. The court noted that, although military voters can face unexpected emergencies that prevent them from voting in person on Election Day, other voters may face similar contingencies:

> At any time, personal contingencies like medical emergencies or sudden business trips could arise, and police officers, firefighters and other first responders could be suddenly called to serve at a moment's notice. There is no reason to provide these voters with fewer opportunities to vote than military voters .... *Id.* at 435. The court concluded that the Equal Protection Clause therefore prohibited the state from making special accommodations only for military voters. *Id.* at 436. The court added that it would be "worrisome ... if states were permitted to pick and choose among groups of similarly situated voters to dole out special voting privileges."

*Id.* at 435.

Similarly, the Zuckerberg 5's WSVP was their collective effort "to pick and choose among groups of similarly situated voters to dole out special voting privileges"—which, when the Zuckerberg 5 is taking on a government function, violates the Equal Protection

107

Clause. *Id.* at 435.  Accordingly, a post-certification administrative correction for the 2020 Presidential election should be made that the Zuckerberg 5 violated the federal and state Equal Protection Clauses.

## Chapter 12

## Recommendations

As noted above, OSC respectfully submits the following recommendations to the Wisconsin Assembly for its consideration, and its staff is pleased to provide additional information, testimony, and technical assistance.  These recommendations fall into two categories: those facilitating transparency, and those facilitating political accountability.  However, there is a strong positive synergy between the two goals: *i.e.*, the more transparent a process, the more politically accountable, and vice versa.

The OSC also submits a number of recommendations for WEC, as currently constituted, and for clerks.  As the Administrator of WEC has noted, however, advice from WEC does not provide a legal safe harbor for clerks, and neither does advice from the OSC or any other merely persuasive authority in this area.  Ultimately, it is incumbent upon the approximately 1,852 municipal clerks, the primary agents of election supervision in the State, to consult with their available counsel and make their own independent legal determinations in every case.

## Legislative Recommendations to Serve Transparency

1. **<u>Eliminate the Wisconsin Elections Commission</u>**.  As outlined in the Interim Report and above, replacing the disgraced and abolished Government Accountability Board with WEC has continued many of the same abuses of secrecy and confusion.  The staff remains deeply connected to special interest groups and fails to adequately respond to voter and clerk complaints.  Its biennial appropriation is over $10 million, money which could be spent to

support municipal and county clerk operations.  In addition, as its Administrator has noted, WEC provides no authoritative legal safe harbor for clerks: eliminating WEC would help clarify the constitutional and statutory authority of popularly elected officials and the voters in handling election matters.  Any functions of WEC that might arguably be required by various federal laws could lawfully be handled by an empowered executive branch office of the Secretary of State, or by a collective body of county clerks themselves, or by some other structure.  Currently, Wisconsin is only one of two States with a politically unaccountable bureaucracy tasked with providing guidance in election administration.

2. **Eliminate or Reduce Fees for Voter Registration Data**.  Currently, voter registration information, including addresses, names, and voter history, are available for purchase. WEC sells that information for $12,500.  However, this information is not available in real-time and, worse yet, the fees are waived by contract with special interest groups.  This fee should be eliminated or reduced by statute to a token fee (say, $40 as it is in Arizona) to put all citizens on equal footing, and to allow for citizens to help keep the system up-to-date.  It is important that the names and addresses of those who voted—with certain exceptions—are made freely available so that anyone so interested could compare, at no, or low cost, the names and addresses of those eligible to vote with those who, in fact voted. This would remove much of the opacity of the current system and bolster public faith in elections.

3. **Maintain a Single Statewide Voter Registration Database, and Make it Publicly Available and Secure**.  As it stands, Wisconsin maintains several competing sets of interlocking databases and access systems.  Clerks have noted that they were often given

superfluous sets of access keys, and that these systems are theoretically accessible out of state or out of the United States.  WEC has also complained to the Assembly that providing comparisons between data sets on certain dates is extremely expensive.  Making the information publicly available would place all individuals and parties on an equal footing and allow academic institutions (for example) to compare data sets over time.  This would facilitate data quality and transparency with no cost to voter privacy.

1.      **Set Up An Office to Engage in Auditing and Oversight of Elections**.  Currently, there is no office in the State of Wisconsin with an ongoing charge to audit elections, or to systematically intake and respond to citizen complaints.  The Legislature could consider setting up an office whose role is distinct from the Legislative Audit Bureau (LAB) and which merely undertakes periodic and random auditing of elections in various jurisdictions and delivering those results to the Legislature.  This should professionalize and standardize oversight and facilitate long-term improvement and data quality.  In addition, the Legislature could consider appropriating funds to enable the Attorney General to vigorously engage in investigation and prosecution of election law violations.

2.      **Standardize a Process for Post-Election Contest**.  Inevitably, elections will be contested. The Legislature should consider reviewing remedies to enable losers of elections to audit a small number of wards for a nominal cost, or for free.  It should consider other remedies, including injunctive relief, to preserve the *status quo* while electoral contests are investigated.

3.      **Prohibit Certain Contractual Terms in Government Contracts**.  The Legislature should consider prohibiting certain vendor contractual terms as a matter of public policy.

111

For example, it should limit the use and release of sensitive voter data by vendors. It should prohibit terms that block Wisconsin governmental entities from obtaining or releasing data they paid for. And it should prohibit contracting with entities that do not timely respond to governmental requests for information, such as valid criminal or legislative subpoenas.

4. **Minimize Pre-Voting**. It is evident that widespread use of absentee and absentee-in-person voting renders public participation and oversight of counting impossible. Guidance by WEC "enabling" clerks to open envelopes prior to the statutorily mandated deadline denies citizens their right to observe that process. If public oversight of absentee voting is too burdensome, a better option is to prioritize traditional, in-person voting.

5. **Encourage In-House Technical Support**. Each clerk OSC spoke with made clear that their office simply does not have the technical ability to service various electronic voting machines. They simply do not and cannot understand how the various machines work. In the past, municipal public works departments maintained expertise in servicing analog machines. The Legislature should consider funding a program to bring technical expertise in-house, including considering a single state-wide machine system or single-client vendor.

6. **Exit the Electronic Registration Information Center (ERIC)**. The State of Wisconsin pays this outside group six figures per year to assist it in cleaning up our voter rolls, but receives little to no benefit from it. In fact, as was recently noted in testimony before the Assembly, the contract with ERIC ties the hands of election officials in numerous ways. The State can seek lawful, bilateral agreements with States to ensure only lawful voters are on the rolls, without the concerns about partisanship.

**Legislative Recommendations to Serve Political Accountability**

1.    <u>**Provide a Method in Law for Private Challenge to Wisconsin Voter Rolls**</u>.  As it stands, there is no clear method for individuals with facial evidence of inaccurate voter rolls to enter state court and seek to fix that problem.  The Assembly could consider various legal methods to enable citizens or civil rights groups to help maintain election database integrity in this way.  Such a cause of action should take into account administrative burdens, and could even provide nominal rewards for successful voter roll challenges.

2.    <u>**Locate Certification of Presidential Electors in a Politically Accountable Body**</u>.  In 2020, the presidential electors were certified by a single member of WEC and the Governor.  As a political action, certification of electors cannot be subject to the whim of the courts, or purely legal processes.  Legitimate contests have occurred in the past and will occur again.  To ensure widespread bipartisan confidence in the system, state law should explicitly authorize the contingent creation by campaigns of alternative slates of electors, and could consider penalties for certain actions of those alternates if results are not contested.  In the event of widespread contest, the thumb should be on the scale in favor of withholding certification of electors. As noted in the Interim Report, "Hasty certification of electors in a tightly contested election may disenfranchise voters to the same extent as missing a deadline and failing to certify electors at all. While hasty certification may violate the state constitutional duties of the Legislature, delaying certification of electors until resolution of relevant issues does no such violence to our legal system."  Finally, placing certification of electors in a politically accountable body, such an association of elected county clerks, could restore confidence in the results of even a closely contested

presidential contest in the State.

3.      **Provide a Method for Pre- and Post-Certification Challenges to Presidential Elections.**  As noted in Appendix II, certification of electors in a Presidential election is a quintessentially political act, delegated by the state and federal constitutions to our elected state Legislature.   However, the Legislature can consider establishing processes for standardizing challenges both pre-and post-certification.  Such processes might establish administrative or legal rights, or establish opportunities to raise or expedite decertification procedures on the floor of the Assembly or Senate.  The Legislature might also consider formalizing the ability of candidates to assemble alternative slates of electors, to ratify an already lawful process.

4.      **Prohibit Outside Funding and Staff in Elections Administration**.  OSC concurs in the recommendation of numerous clerks that outside money be prohibited in the administration of Wisconsin elections.  Our State has a deep, progressive history and is suspicious of private entities engaging in governmental activity.  Clerk's offices should be (and in 2020 were) adequately funded by state and federal entities, as appropriate, but outside grants should be disfavored or prohibited, especially where those grants have any conditions on them.  Further, outside volunteers and observers should all be treated on equal footing.

**Recommendations for the Wisconsin Elections Commission**

**(as currently constituted)**

1.  **Comply with Legislative Audit Bureau Recommendations**. In particular, promulgate statutorily required administrative rules prescribing the contents of training that municipal clerks provide to special voting deputies and election inspectors; eliminate all statutorily non-compliant guidance.

2.  **Enter Into Data-Sharing Agreement with Wisconsin Department of Transportation**. In particular, execute with the Department of Transportation a new written data-sharing agreement that includes provisions for verifying the information provided by individuals who register to vote by all methods and that specifies the procedures for verifying this information; establish a system to regularly review and update the data-sharing agreement; and comply with statutes by working with the Department of Transportation to obtain the electronic signatures of individuals who register online to vote.  An enforcement mechanism to align the data, such as by citizen suit, perhaps accompanied by a small monetary bounty, would also be a useful supplement to this reform.

1.  **Enter Into Data-Sharing Agreement with Wisconsin Department of Health Services**. In order to ensure that our most vulnerable are not exploited, and to facilitate accurate voter rolls, WEC should work to execute a new written data-sharing agreement with the Department of Health Services and establish a system to regularly review and update the data-sharing agreement.  Again, a citizen suit and bounty reform could be added on here as well to ensure data-sharing occurs properly.

115

2.    **Enter Into Data-Sharing Agreement with Wisconsin Department of Corrections (DOC)**. In order to ensure that only eligible voters are registered, WEC should work with DOC to execute a new data-sharing agreement and implementation system.  Again, a citizen suit and bounty reform could be added on here as well to ensure data-sharing occurs properly.

3.    **Provide Additional Training to Clerks**. If there is one function that an independent election administration can perform well, it is training. WEC should consider providing additional training to clerks along several dimensions: providing training for clerks related to machine certification, security, and statutorily mandated pre-election testing; training related to reviewing Election Day forms after each election and investigating relevant issues, including those related to tamper-evident seals; and training on ensuring that ballots are counted accurately when paper jams occur in electronic voting equipment.

<div align="center">

**Recommendations for Clerks**

</div>

1.    **Familiarize Yourself with Your Wisconsin Code Authority**.  Surprisingly, many clerks have expressed to the OSC that they are under the impression that WEC guidance is binding, even when they believe such guidance (say, on drop boxes) is unlawful.  Clerks and whatever counsel they have available should review their authority ahead of any conflict.

2.    **Make Independent Assessments**. In circumstances where WEC guidance is contrary to law, clerks are empowered to make independent assessments, as they are the elected officials responsible for elections administration.  As the Administrator of WEC has noted,

WEC guidance provides no legal safe harbor or immunity for clerks: it is true that clerks are on the legal hook for their own assessments, and should develop good relationships with corporate or outside counsel.

3.  **Carefully Review Outside Contracts**.  Clerks and other election officials should be careful not to enter into contractual arrangements with outside groups that do not serve the public interest, even when these agreements sound attractive or come with funding grants. As we saw in 2020, these contracts can be leveraged to coerce election officials and cause them to violate their oaths of office.  When clerks do enter into outside contracts, they should endeavor to make those contracts public in their entirety.   In the interests of transparency, clerks should endeavor to obtain comparable contracts, and donor lists, from nonprofits before engaging them.

4.  **Explicitly Prohibit Your Staff from Engaging in Get-Out-The-Vote (GOTV) Operations**.  In 2020, we did see widespread GOTV operations engaged in by municipal clerk's offices.  This is inappropriate, as GOTV is a partisan activity, historically (and currently) engaged in by candidates and their parties.  Staff should be apprised that even when described as "voter education," encouraging voting by any group is not the duty of a busy and potentially underfunded clerk's office.

5.  **Consider Robust Voter Roll Review in Your Jurisdiction**.  County and municipal clerks are responsible for maintaining the integrity of the voting rolls.  Even in election years, federal law does not prohibit Wisconsin officials from removing ineligible voters from the rolls.

6.  **<u>Maintain An Exhaustive and Clear List of Election Day Personnel</u>**.  Under Wisconsin law, there are two classes of person on election day: election workers, and the general public.  There is no third category.  Election workers are bound by legal and ethical norms.  Do not permit unauthorized individuals to operate under the color of state law.

7.  **<u>Catalog All Absentee Ballots Sent Out and Match These with Ballots Returned.</u>** Some voters have reported receiving as many as four absentee ballots leading up to the November 3, 2020 election.

8.  **<u>Do Not Engage in Ballot Curing for Absentee Ballots Missing Requisite Voter Data.</u>** Neither state nor federal law mandate curing ballots that are legally incomplete: clerks can take reasonable efforts to contact voters to remedy seemingly minor defects, but should be mindful of their own resources and state law.

# Chapter 13

## Conclusion

As noted at the outset, this Report by no means represents a "full audit" of the 2020 elections in the State of Wisconsin.  Instead, it represents a snapshot of various issues identified by the OSC, other governmental actors, and citizens in the State, and makes a number of recommendations to fix them.  Without full transparency by governmental actors, without a fully equipped office to investigate, and without time, some degree of triage by OSC was necessary.  A full audit would undoubtedly take a look not just at evidence of major issues and draw inferences, but would take a comprehensive look at election processes, contracts, and machines, to stress test and run other technical reviews. This office has engaged with outside contractors and entered preliminary steps in the government procurement process.  However, these auditors have let us know that without full access to information, they are unable to provide robust conclusions.

Again, as discussed by the Committee of Jurisdiction and the Speaker in public, the work of the Office of the Special Counsel is just getting started.  The Office will remain authorized during the pendency of litigation to ensure that once the Wisconsin Supreme Court vindicates the right of the people to know what their own government is up to, we can expeditiously run necessary tests.

In the meantime, the major issues identified with compliance and oversight, especially at a time when the federal Congress is making known that legislative oversight is critical to lawmaking, are themselves cause for concern.  The Special Counsel hopes that

the Assembly and the public can continue to fight to hold our election administration accountable and to ensure it is secure and efficient.

Finally, the Special Counsel would like to thank the concerned citizens and citizen groups, the numerous clerks and other public servants who have cooperated with the investigation, and the staff, contractors, and partners of the OSC and Assembly for their hard work and dedication to improving our democratic system.

## Appendix I: Litigation Summary

As noted throughout, this Report regarding the administration of the 2020 election in Wisconsin is incomplete because the Office of the Special Counsel has received little to no cooperation in its investigation from the government officials and others that were responsible for conducting the election. As part of its investigation, the OSC has sent out ninety subpoenas for witness testimony. While we have conducted numerous interviews with voluntary witnesses, including governmental witnesses, due to public pressure from the Governor and out-of-state actors, word has gone out that the government does not need to respond to the elected Assembly.  Instead, the OSC has been embroiled in litigation relative to those subpoenas since late 2020.

1.   **Dane County Case Number 2021CV002552,** *Wisconsin Elections Commission et al. vs. Wisconsin State Assembly et al.*

On October 21, 2020 WEC and its Administrator—Meagan Wolfe—sued the OSC and the Wisconsin Assembly in Dane County Circuit Court seeking an order that OSC subpoenas with which they had been served were invalid as impinging upon her personal rights. In doing so, WEC aims at the authorized mission of the OSC to investigate whether officials "have failed to adhere to our election laws by, at various times, ignoring, violating, and encouraging noncompliance with bright-line rules established by the statutes and regulations governing the administration of elections in Wisconsin."

Notably, WEC took the unprecedented step of employing the Wisconsin Department of Justice as its attorneys in the lawsuit against the OSC and the Assembly.

Until this lawsuit, never before in the history of the State had one arm of the executive branch of Wisconsin's state government (WEC) used another arm of the executive branch (the DOJ) to seek a ruling from a separate branch (the judiciary) that an action by a third branch of state government was invalid and unenforceable (the subpoenas issued by OSC via the Assembly).   In short, taxpayer money is being used by the Attorney General to block routine oversight by the duly-elected legislative body in the State, leading to a great waste of taxpayer money.

On October 25, 2021, the Attorney General lost, as Dane County Circuit Court Judge Rhonda Lanford ruled that WEC was not entitled to an emergency injunction invalidating the subpoenas or preventing OSC from seeking to enforce them. After further litigation, on January 10 2022, Judge Lanford ruled that while WEC did have the authority to bring the lawsuit and it would not be dismissed outright, WEC had not established that it was entitled to a temporary or permanent injunction against enforcement of the subpoenas. The matter was held open for further proceedings to address the WEC's overall complaint that the subpoenas are an invalid exercise of legislative authority.

Since that time, WEC has filed an Amended Complaint setting forth additional facts in support of its claims that the subpoenas are invalid, and other parties have sought to intervene and participate in the matter. A hearing is scheduled for March 17, 2022 on the proposed intervention of these other parties, but there is no other scheduled court activity.

In the meantime, neither WEC or Ms. Wolfe have voluntarily agreed to present their testimony to the OSC. It is likely that unless and until the matter is resolved by the Dane

County Circuit Court (and then all potential appeals are exhausted) the subpoenas for WEC and Ms. Wolfe will remain unsatisfied.

2.   **Waukesha County Case Number 2021CV001710,** *Michael J. Gableman vs. Eric Genrich et al.*

Among the parties that have been subpoenaed for their testimony are the Mayor of Green Bay—Eric Genrich—and the Mayor of Madison—Satya Rhodes-Conway. In response to subpoenas with which they were served, the mayors did provide some documents that were requested, but at the same time neither agreed to appear to testify as required by the subpoenas. As a result, the OSC was put in a position of having to seek judicial assistance to direct that the mayors provide that testimony.

To do so, the OSC filed petitions for "writs of assistance" from the Waukesha County Circuit Court to require the mayors to appear and give the required testimony. A judicial writ of assistance is provided for by Wisconsin's statutes. When a judge issues one, a witness must appear for testimony required by a subpoena. If the witness does not, the judge may order that the recalcitrant witness be subjected to punitive action, up to and including incarceration. However, before that can happen, the witness has the opportunity to appear before the court and argue that he or she is excused from appearing because the subpoena is invalid or for any number of other reasons.

The OSC filed for writs of assistance in Waukesha County Circuit Court as the statute setting forth the procedure for obtaining such writs commands that the writ be

sought "in the county where the person was obliged to attend." Wis. Stat. § 885.12. As the mayors' testimony was compelled by the subpoenas to occur in Waukesha County, the OSC was mandated to seek writs of assistance from the Waukesha County Circuit Court.

Before there was any substantive court appearance or action of any kind, Mayor Genrich appeared in the action represented by two law firms—Stafford Rosenbaum. LLP and Law Forward, Inc. Stafford Rosenbaum is a Madison-based law firm with over 50 attorneys, and Law Forward is an "impact litigation firm committed to protecting and advancing democracy and to restoring Wisconsin's pragmatic progressive tradition." Law Forward has a "Legal Advisory Council" that is comprised of, among others, prominent Democrat politicians, including former United States Senator Russ Feingold, and former Lt. Governor Barbara Lawton. There are no current or former elected officials on Law Forward's advisory council that identified as Republican over the course of their respective careers. There are also several attorneys on the Council that have written about, and advocated for, progressive political causes, but none that appear to have ever advocated for conservative ones.

Mayor Genrich is now additionally represented by two more attorneys—Aaron Scherzer and Christine P. Sun. Mr. Scherzer and Ms. Sun are associated with the "States United Democracy Center," an organization whose professed mission is "advancing free, fair, and secure elections," focusing on "connecting State officials, law enforcement leaders, and pro-democracy partners across America with the tools and expertise they need to safeguard our democracy."

124

Mayor Rhodes-Conway appeared by two lawyers for the City of Madison.

At the very outset, the mayors' attorneys portrayed the actions of the OSC as—

3. "lacking in legal merit;"

4. a "gross distortion of the relevant facts" and "a gross mischaracterization of the facts;"

5. "departing so greatly from legal standards" so that the Special Counsel should be sanctioned by the Court;

6. "an abuse of process;" and

7. "a bad-faith effort to publicly harass local officials with no legal basis."

None of these statements are remotely true, of course, but the OSC has been forced to respond to these scurrilous accusations both in the press and in court.

Shortly afterward, the representatives of WEC and the mayors began "cross-pollinating" the Dane County matter with the Waukesha County matter by filing letters with the respective courts smearing the OSC and improperly attempting to influence the respective judges. The Wisconsin Department of Justice filed a letter in the Waukesha County matter, arguing that the subpoenas were invalid and that the validity of the subpoenas addressed to the mayors would be addressed in large part by the court in the Dane County matter discussed above. In addition, mayor Genrich's representatives attempted to influence the outcome of the Dane County matter by filing a letter with that court arguing that the OSC had made "misrepresentations" to the Waukesha County court and that the subpoenas were "unauthorized, quasi-depositions of mayors and elections officials throughout Wisconsin."

As of this writing, written briefs are being submitted to the Court regarding the following inquiries submitted by the Court:

1. The Court's authority to issue the writs;

2. The correct procedure to follow; and

3. The factual basis of the writs.

A hearing is scheduled on those issues on April 22, 2022. While the Court has asked that these issues be addressed, it is only a preliminary inquiry. The Court has additionally stated that it will not be addressing the actual issuance of the writs or whether the mayors have a reasonable excuse for their failure to comply with the subpoenas. Those issues will be addressed subsequently.

As with the Dane County matter, the Waukesha County matter is nowhere near resolution. First, all issues will need to be addressed by the Circuit Court judge, and then it is likely that any decision will be appealed up to the Wisconsin Supreme Court (and potentially the United States Supreme Court). In the meantime, as with WEC and Ms. Wolfe, neither mayor has voluntarily agreed to give testimony, and it is likely their subpoenas will remain unsatisfied until the conclusion of all litigation.

1. **Dane County Case Number 2021CV003007, *American Oversight vs. Assembly Office of Special Counsel et al.***

In addition to the above, the OSC has been forced into litigation over issues surrounding the voluminous requests for documents it has received pursuant to Wisconsin's Open Records law. While these requests and the attendant litigation have not

directly affected the OSC's ability to obtain necessary information—as the lack of cooperation and litigation over the subpoenas has done—at the same time, it has strained the OSC's resources and indirectly affected the OSC's work in a very significant way.

In Dane County Case Number 2021CV003007, a group called American Oversight has sued the OSC, along with the Wisconsin State Assembly, Speaker of the Assembly Robin Vos, and Wisconsin State Senate Sergeant-at-Arms Edward Blazel over purportedly insufficient responses to requests made to the OSC and the other defendants under Wisconsin's Open Records law.

Before the work of the OSC has finished, or even begun in large part, American Oversight has referred to the OSC's efforts on behalf of the Assembly as "baseless," that the OSC is "perpetuating Trump's big lie that the election was somehow stolen," and that the real purpose of the OSC's work is to "create a pretext for enacting new restrictions on voting rights."

Pursuant to their efforts to establish their narrative prior to the work of the OSC coming to fruition, American Oversight has served numerous open records requests upon the OSC, including the following—

2. A September 15, 2021, demand for all "organizing materials," of the OSC, including contracts, agreements, scopes of work, and other documents related to the "scope of investigative authority" of the OSC;

3. A September 15, 2021, demand for all "work product" materials, including "interim reports, analyses, notifications, or other work product produced or collected by individuals or entities under contract to investigate" the November 2020 election, or any other;

4.  A September 15, 2021, demand for all "communications" between "former justice Michael Gableman, or anyone communicating on his behalf, such as an administrative assistant, or any individual designated or engaged as an investigator, including, but not limited to Steven Page, and (ii) any other contractor or agent of the Wisconsin Assembly charged with investigating the November 2020 election," as well as all "calendar entries" maintained by any investigators;

5.  An October 15, 2021 demand for "external communications" between the OSC and a list of 30 individuals and/or entities;

6.  An October 26, 2021, demand for "organizing materials" similar to the one served in September of 2021;

7.  An October 26, 2021, demand for "work product" similar to the one served in September of 2021; and

8.  An October 26, 2021, demand for "communications" similar to the one served in September of 2021.

All of the above open records requests are currently part of the litigation pending in Dane County.

In addition, American Oversight has served four additional open records requests, dated January 18, 2022, and February 1, 2022, that are still being processed by the OSC, and are not part of any litigation as of yet.

Beyond those served by American Oversight, the *Milwaukee Journal Sentinel*, via reporter Patrick Marley, served an open records request dated February 7, 2022, in which the following records were demanded:

— The call log showing all calls to and from all cell phones used by Gableman;

—The call log showing all calls to and from all cell phones used by any of Gableman's staff (including direct employees, contractors and subcontractors);

— All paper and electronic calendars for Gableman;

128

— All emails and/or text messages between Gableman and Rudy Giuliani;

— All emails and/or text messages between Gableman and John Eastman;

— All emails and/or text messages between Gableman and Phill Kline;

— All emails and/or text messages between Gableman and Erick Kaardal;

— All emails and/or text messages between Gableman and Phil Waldron;

— All emails and/or text messages between Gableman and James Troupis;

— All emails and/or text messages between Gableman and Kenneth Chesebro;

— All emails and/or text messages between Gableman and David Clarke;

— All emails and/or text messages between Gableman and Rep. Janel Brandtjen;

— All emails and/or text messages between Gableman and Rep. Timothy Ramthun;

In addition, I am requesting the following documents since Sept. 28, 2021:

— All emails and/or text messages between Gableman and Robin Vos;

— All emails and/or text messages between Gableman and Reince Priebus;

— All emails and/or text messages between Gableman and Nick Boerke;

— All emails and/or text messages between Gableman and Andrew Kloster;

— All emails and/or text messages between Gableman and Harry Wait;

— All emails and/or text messages between Gableman and Gary Wait;

— All emails and/or text messages between Gableman and Peter Bernegger;

— All emails and/or text messages between Gableman and Jefferson Davis;

— All emails and/or text messages between Gableman and Mike Lindell;

— All emails and/or text messages between Gableman and Steve Bannon;

— All emails and/or text messages between Gableman and Seth Keshel;

— All emails and/or text messages between Gableman and Shiva Ayyadurai;

— All emails and/or text messages between Gableman and Ron Heuer;

— The computer security protocols for the Office of Special Counsel;

— Transcripts of witness interviews;

— Audio and/or video recordings of witness interviews;

— All submissions to wifraud.com.

The Special Counsel believes in governmental transparency and is making every effort to comply with the above demands.

However, including the Special Counsel himself, the OSC has a full-time staff of two persons. It also has five part-time staff members consisting of four attorneys and an investigator. Simply responding to these voluminous open records requests is a task that has taken up a tremendous amount of staff time. In addition, the Assembly has engaged outside counsel to defend the American Oversight lawsuit and will likely have to hire counsel to defend further lawsuits if the responses provided to the outstanding demands do not satisfy American Oversight or the *Milwaukee Journal Sentinel*.

While the OSC will continue to see that its duties under Wisconsin's open records law are fulfilled, doing so has, and will continue to materially hamper the ability of the OSC staff to address the substantive issues with which it was charged with investigating and reporting upon to the Wisconsin State Assembly.

## Appendix II: Decertification and the Electoral Count Act

Certification of electors in a state is a quintessentially political act, delegated by the United States Constitution to state legislatures, which may voluntarily adopt revocable and defeasible rules to guide the process. Wisconsin election law does not explicitly authorize the decertification of electors. But neither does it prohibit it. For this reason, the U.S. Constitution and the gap-filling common law against which backdrop the federal and Wisconsin Constitutions were adopted provide the ultimate guidance. And under those two documents, it is clear that the Wisconsin Legislature could lawfully take steps to decertify electors in any Presidential election, for example in light of violations of state election law that did or likely could have affected the outcome of the election. Furthermore, notwithstanding the current debate over amending the federal Electoral Count Act, the supreme responsibility for running state elections in Wisconsin is vested in our state Legislature—not any other state instrumentality, and not the federal government.

The U.S. Constitution provides in relevant respect that "Each State shall appoint, *in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress ....*" U.S. Const., art. II., § 1, cl. 2. This is a direct delegation to each state legislature. It is not a delegation to the Wisconsin Governor (or WEC) *and* its Legislature. The Framers knew how to delegate to, respectively, state legislatures or state executives, or to both acting concurrently. *Compare, e.g., id. with id.* at art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall

protect each of them against Invasion; *and on Application of the Legislature, or of the Executive* (when the Legislature cannot be convened) against domestic Violence.") (emphasis added) *and id*. at XVII amend. ("When vacancies happen in the representation of any State in the Senate, *the executive authority of such State* shall issue writs of election to fill such vacancies: *Provided, That the legislature of any State may empower the executive thereof* to make temporary appointments until the people fill the vacancies by election as the legislature may direct.") (emphases added).

The direct constitutional delegation to state legislatures here operates as a "plenary" power. *See McPherson v. Blecker*, 146 U.S. 1, 35 (1892); *see also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors."). Pursuant to that plenary power, it is true that after 1824 most state legislatures began to delegate, in effect, their plenary power to *a process of popular selection of the presidential electors* carried out under a suite of state law provisions. Yet, as applied here, these delegations and self-imposed statutory processes by the Wisconsin legislature are not irrevocable. An election of presidential electors that violates Wisconsin (or any other state legislature's relevant laws) is both void and voidable.

This Report has documented not just one, but a great collection of Wisconsin election law violations. As a political matter, the actions of state actors certifying electors in any Presidential election can be reconsidered as the Wisconsin Legislature sees fit using its plenary power under Article II of the federal Constitution, as recognized in *McPherson*

and *Bush v. Gore*.  Indeed, *McPherson* noted that "there is no doubt of the right of the legislature to resume the power *at any time*."  *McPherson*, 146 U.S. at 35 (emphasis added).

The process of presidential elections can be conceived of as having five steps: (1) certification pursuant to state law; (2) the arrival of the "safe harbor" date specified in the Electoral Count Act ("ECA"), 3 U.S.C. § 5, purporting to make "conclusive" the determination of election contests in the courts "or other methods and procedures" before that date; (3) the date when state-certified electors meet and cast their votes in their respective States; (4) the opening by the Vice President and counting of electoral votes pursuant to the ECA, 3 U.S.C. § 15, on January 6 of the year following a presidential election; and (5) the inauguration of the President on January 20 of that same year at noon, per the Twentieth Amendment to the Constitution.  However, that Article II of the U.S. Constitution assigns to Congress only the power to "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."  Hence, the relevance of the ECA should not be overstated. The powers to set the time for choosing electors and the day thereof is not the power for Congress to override the plenary power of state legislators to select the State's electors or to act to correct mistakenly certified electors who were certified only because state law was violated in the process.

Two legal analyses from Legislative Council and the Legislative Reference Bureau argue that various events on that five-step process timeline, coupled with silence or the lack of specificity in various sources of law, means that state legislatures cannot decertify.

133

This logic of those pieces is defective.  They ignore the full logical implications of the "plenary" power of the state legislatures to act "at any time" to determine proper electors. For example, when electors were wrongly certified in Hawaii in the 1960 presidential election for Vice President Nixon, that problem was retroactively corrected and Hawaii's electoral votes were counted for John F. Kennedy.

As to the initial method for selecting the President, it matters what system of state law is put in place to select electors and when, relative to that system, new election laws are adopted.  No one would support the Wisconsin Legislature allowing an election to be run using one set of election laws and then, just because a majority of both houses thereof did not like the tally of the people's votes occurring within the proper confines of Wisconsin law, adopting a new set of legislative rules and applying them to an already conducted popular election as if that had always been the law.

But the premise of the use of the method of popularly electing elections is inherently, and unavoidably, that such elections be conducted *without violation* of the relevant State's election laws to the extent that the outcome of the election did or likley could swing based on such violations of state law.  If an election were purportedly run using the *ex ante* set of legislative election rules (or some of those rules), but *in reality*, the election was run in flat violation of those laws, then the decision of which set of electors to certify (or decertify) devolves back upon the Wisconsin Legislature, where the plenary power to select electors was initially reposed.  This is particularly true when the courts do not reach the merits of election disputes brought to them for resolution of whether the *ex*

*ante* rules were actually followed, dismissing challenges, for instance, on grounds of lack of standing, laches, and the like, as is the case in Wisconsin regarding numerous legal challenges.

The ECA is not constitutional law and it cannot be used to strip state legislatures of their Article II plenary power over elector selection, especially when evidence of widespread violations of state election law become clear only late in an election cycle or even after an election cycle is over.  At that point, the principle that comes into play is the common law principle that fraud or illegality vitiate results rendered under an illegal or fraudulent process.  *See, e.g., United States v. Throckmorton*, 98 U.S. 61, 64 (1878) ("Fraud vitiates even the most solemn contracts, documents, and even judgments."); *see also United States v. Bradley*, 35 U.S. 343, 360 (1836) (citing *Pigot's Case*, 11 Co. Lit. 27b (1614)). To take just one example, the Third Circuit recognized more than a quarter century ago that an illegally certified candidate who was already sitting in the Pennsylvania Legislature and had been sworn in must be stripped of his office based on violations of that State's election laws.  *See Marks v. Stinson*, No. Civ. A. 93-6157, 1994 WL 47710, at *15-16 (E.D. Pa. Feb. 18, 1994), *vacated in part*, 19 F.3d 873 (3d Cir.), *aff'd after remand*, 37 F.3d 1487 (3d Cir.).   And this occurred where there was no mechanism in the Pennsylvania Constitution for explicitly applying such a remedy.  The Legislative Council and Reference Bureau do not take account of this precedent, logic, or history.

Thus it is clear that the Wisconsin Legislature (acting without the concurrence of the Governor, *see supra*), could decertify the certified electors in the 2020 presidential

election.  Two steps would be required for it to do so.  *First*, the Legislature would need a majority in both houses to pass a resolution concluding that the 2020 election was (a) held in violation of state law, as detailed in this Report (or other sources), in one or more respects; and (b) the degree of violation of state law in place on November 3, 2020 rose to the level that fraud or other illegality under Wisconsin law could have affected the outcome, using any evidentiary test for certainty the Legislature agreed should apply (for instance, a preponderance, etc.).  And *second*, the Legislature would need to invoke and then exercise its plenary power to designate the slate of electors it thought best accorded with the outcome of the election, had it been run legally in accord with the state election laws in effect on November 3, 2020.  This would lead to decertifying the relevant electors, if the Legislature concluded that they were not the slate of electors that best accorded with the election if run consistent with all relevant Wisconsin laws in effect on election day.

However, this action would not, on its own, have any other legal consequence under state or federal law. It would not, for example, change who the current President is.

# A Historic Press Conference of National Significance





March 7th, 2022 – Roswell, GA

## VoterGA Press Conference

Garland Favorito, VoterGA Research Team

### *How Georgia 2020 Election Results Were Electronically Manipulated*



Exhibit K

# Introduction Points



I. SB202 made ballot images public record after our lobbying efforts in 2021

II. Our volunteer team performed a statewide analysis of Nov. 2020 ballot images

III. Findings based on original Fulton Co. ballot images via ORR & legal discovery

IV. Fulton is our example but other counties appear to have similar problems

V. Anyone can verify our findings based on ballot images at GAballots.com, other sites or through their own separate ORRs

VI. The SOS could have done the same analysis and reached the same conclusions we will reach today before he certified the 2020 election

# How Ballot Image Creation Works

➢ Ballots are scanned to automatically produce digital images and cast vote records that are tabulated

➢ Scans produce a .TIF image and a .SHA authentication file for the image

➢ In person images are stored on redundant compact flash cards

➢ Mail-in ballot images are stored on memory sticks and loaded to election management server (EMS) or loaded directly to the EMS



In Person

Mail-in

High Speed

Network Connect

Sealed

# How Ballot is Processed



1.  Scanning –
    Paper Ballot is scanned
    2020 Ballot Image (.TIF) was created in two pages

2.  **Cast Vote Creation** –
    Ballot Image is analyzed using OCR
    Cast vote record is created on Page 3 w/ Auditmark
    Authentication file (.SHA) is created

3.  **Adjudication** (Optional) –
    If ballot has questionable marks it goes to adjudication
    3-Member Review Panel should review & approve the
    vote changes confirming the Voter's intent
    Adjudication section is created on Page# 3



# Process Sequence



**Scan**
**Adjudicate**
**Verify**
**Publish**

*Results Publishing*



County Elections Management Server

County Web Server

SOE Software (Scytl)

GA SOS Office

Edison Media Line Feed

# Fulton Co. 15 point Election Manipulation Evidence



1. 17,724 final certified Fulton votes have <u>no</u> ballot images
2. All 374,128 in-person ballot images for the <u>original</u> count are missing
3. 132,284 mail-in ballot images cannot be authenticated due to <u>missing</u> .SHA files
4. 4,000+ tabulator images have impossible <u>duplicate time stamps</u>
5. 104,9994 image files in 1,096 batches have impossible, <u>duplicate time stamps</u>
6. All ballot batches were <u>improperly forced to adjudication</u> to facilitate tampering
7. 10 ballots were impossibly adjudicated in <u>one minute by one user</u>
8. 941 Image files were <u>backdated</u> prior to adjudication
9. All 16,034 mail-in image authentication files were <u>added days after scanning</u>
10. Same <u>12</u> tabulators closed <u>148</u> early voting polls masking identity of scanning tabulator
11. One tabulator serial# impossibly closed two polls in <u>same overlapping times</u>
12. One tabulator was <u>never closed</u> and could have added many illegitimate votes
13. Images in 288 batches have <u>backfilled time stamps</u> out of scanning chronological order
14. 85 closing tapes for 12,024 Election Day ballots are <u>unsigned or missing</u>
15. All but two tabulator closing tapes for early voting are <u>unsigned</u>

# 17,724 final certified Fulton votes have no ballot images



1

➢ The Dominion system requires a ballot image to tabulate results
➢ 17,724 certified Fulton Co. Presidential <u>recount</u> votes have no ballot images

| 2020 Georgia Presidential | Election Day | | | Advanced In Person | | | Absentee Mail-in | | | Provisional | | | Total Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ballot Images | Certified Results | Variance | Ballot Images | Certified Results | Variance | Ballot Images | Certified Results | Variance | Ballot Images | Certified Results | Variance | |
| Undervotes | 232 | 232 | 0 | 666 | 700 | (34) | 1,463 | 1,463 | 0 | 19 | 19 | 0 | (34) |
| Overvotes | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 41 | 0 | 2 | 2 | 0 | 0 |
| Donald Trump | 18,701 | 18,701 | 0 | 84,034 | 88,312 | (4,278) | 29,536 | 29,536 | 0 | 697 | 698 | (1) | (4,279) |
| Joe Biden | 35,659 | 35,659 | 0 | 213,518 | 226,818 | (13,300) | 115,724 | 115,724 | 0 | 2,008 | 2,011 | (3) | (13,303) |
| Jo Jorgenson | 1,367 | 1,367 | 0 | 3,047 | 3,154 | (107) | 1,728 | 1,728 | 0 | 71 | 71 | 0 | (107) |
| Qualified Write-in | | 0 | 0 | | 0 | 0 | 152 | 152 | 0 | | 0 | 0 | 0 |
| Unqualified Write-ins | 147 | 147 | 0 | 1,353 | 1,354 | (1) | 29 | 29 | 0 | 7 | 7 | 0 | (1) |
| Fulton Co. Total | 56,106 | 56,106 | 0 | 302,618 | 320,338 | (17,720) | 148,673 | 148,673 | 0 | 2,804 | 2,808 | (4) | (17,690) |

IMPACT: 13,303 extra Bidens votes and 4,279 Trump votes cannot be substantiated

# All in-person ballot images for original count are missing



2

➢ All 374,128 in-person ballot images from the 524,659 original election count are missing in violation of federal and state law



Election Records Must be Retained:

➢ Federal law: **22 Months** - USC 52 20701

➢ State law: **24 Months** - O.C.G.A. 21-2-500, O.C.G.A. 21-2-73

IMPACT: None of the 374,128 in person votes cast can be authenticated

# 132,284 Mail-in Ballot Images Cannot be Authenticated

3



➢ Each ballot is scanned into a .TIF ballot image file and .SHA authentication file

➢ Only 16,034 SHA files exist for 148,318 TIF ballot images

➢ Batch SHA files missing & present for same tabulator and time stamp

➢ IMPACT: 132,284 Fulton mail-in ballot images cannot be authenticated

## Tabulator 5150

### SHA files at 2020-10-30 13:37:26

| Name | Size | Packed Size | Modified |
|---|---|---|---|
| 05150_00027_000099.sha | 32 | | 2020-10-30 13:37 |
| 05150_00027_000099.tif | 228 986 | | 2020-10-30 13:37 |
| 05150_00027_000100.sha | 32 | | 2020-10-30 13:37 |
| 05150_00027_000100.tif | 236 474 | | 2020-10-30 13:37 |

### Ballots Scanned At

05150_00027_000100.tif scanned at: 16:17:29 on 10/23/20.

Scanned on: ICC  Tabulator: 5150  Batch: 27
Poll ID:  671  Ballot ID: 1069

05150_00027_000099.tif scanned at: 16:17:28 on 10/23/20.

Scanned on: ICC  Tabulator: 5150  Batch: 27
Poll ID:  200  Ballot ID: 1127

### No SHA files at 2020-10-30 13:37:26

| Name | Size | Packed Size | Modified |
|---|---|---|---|
| 05150_00131_000001.tif | 247 086 | | 2020-10-30 13:37 |
| 05150_00131_000002.tif | 231 735 | | 2020-10-30 13:37 |

05150_00131_000001.tif scanned at: 13:33:23 on 10/30/20.

Scanned on: ICC  Tabulator: 5150  Batch: 131
Poll ID:  619  Ballot ID: 338

05150_00131_000002.tif scanned at: 13:33:27 on 10/30/20.

Scanned on: ICC  Tabulator: 5150  Batch: 131
Poll ID:  87  Ballot ID: 10

### SHA files at 2020-10-30 13:37:28

| Name | Size | Packed Size | Modified |
|---|---|---|---|
| 05150_00002_000002.sha | 32 | | 2020-10-30 13:37 |
| 05150_00002_000002.tif | 228 916 | | 2020-10-30 13:37 |
| 05150_00002_000003.sha | 32 | | 2020-10-30 13:37 |
| 05150_00002_000003.tif | 226 959 | | 2020-10-30 13:37 |

05150_00002_000002.tif scanned at: 14:23:18 on 10/22/20.

Scanned on: ICC  Tabulator: 5150  Batch: 2
Poll ID:  612  Ballot ID: 839

05150_00002_000003.tif scanned at: 14:23:19 on 10/22/20.

Scanned on: ICC  Tabulator: 5150  Batch: 2
Poll ID:  424  Ballot ID: 930

# Ballot Images Have Impossible Duplicate Scan Time Stamps



4

➤Canon and Fulton confirmed scanning a mail-in ballot takes one second or more

➤4,000+ mail-in tabulator ballots have <u>duplicate scan time stamps</u>

➤3-8 ballots were scanned in one second many times



IMPACT: 4000+ ballot images from impossible scan speeds cannot be authenticated

# 1,096 Batches Have Duplicate File Modified Time Stamps

5



➢Batches typically contain about 100 ballots

➢1,096 batches have impossible, duplicate file modified time stamps to the second

| Tabulator ID | Batch Number | Ballot Count | Adjudicated Count | Batch Files Modified Within |
|---|---|---|---|---|
| 5164 | 014 | 98 | 6 | 1 min 32 sec |
| 5164 | 015 | 101 | | 1 min 20 sec |
| 5164 | 016 | 101 | 10 | 1 min 38 sec |
| 5150 | 045 | 101 | 3 | 0 sec |
| 5160 | 119 | 97 | 1 | 0 sec |
| 5164 | 017 | 100 | 5 | 0 sec |
| 5162 | 139 | 99 | 3 | 0 sec |
| 5162 | 140 | 100 | 2 | 0 sec |
| 5160 | 120 | 99 | | 0 sec |
| 5162 | 141 | 99 | | 0 sec |
| 5160 | 121 | 100 | 2 | 0 sec |
| 5162 | 142 | 100 | | 0 sec |
| 5160 | 122 | 101 | 7 | 0 sec |

| Ballot Image File Name | Scanned Timestamp | File Modified Timestamp |
|---|---|---|
| 05160_00119_000001.tif | 10/28/2020 7:58:59 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000002.tif | 10/28/2020 7:59:00 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000003.tif | 10/28/2020 7:59:01 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000004.tif | 10/28/2020 7:59:02 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000005.tif | 10/28/2020 7:59:03 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000006.tif | 10/28/2020 7:59:04 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000007.tif | 10/28/2020 7:59:04 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000008.tif | 10/28/2020 7:59:05 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000009.tif | 10/28/2020 7:59:06 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000010.tif | 10/28/2020 7:59:07 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000011.tif | 10/28/2020 7:59:08 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000012.tif | 10/28/2020 7:59:08 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000013.tif | 10/28/2020 7:59:10 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000014.tif | 10/28/2020 7:59:10 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000015.tif | 10/28/2020 7:59:11 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000016.tif | 10/28/2020 7:59:12 AM | 10/28/2020 8:11:08 AM |
| 05160_00119_000018.tif | 10/28/2020 7:59:13 AM | 10/28/2020 8:11:08 AM |

➢IMPACT: Over 104,994 ballot image files electronically manipulated

# Batches of ballots improperly forced to adjudication



➢ Only questionably marked ballots should be sent to adjudication

➢ Adjudication logs say <u>all batches were sent to adjudication unnecessarily</u>



➢ IMPACT: All ballots went to adjudication where they had risk of electronic manipulation

# 10 ballots impossibly adjudicated in one minute



> Fulton adjudication had no more than 4 authorized users & 2 visible workstations

> Logs show up to <u>10 ballots adjudicated in one minute by same person</u>

| Adjudicated By | Adjudicated At | Adjudicated Count |
|---|---|---|
| emsadmin06 | 11/5/2020 12:51:00 AM | 2 |
| emsadmin04 | 11/5/2020 12:51:00 AM | 1 |
| emsadmin02 | 11/5/2020 12:52:00 AM | 7 |
| emsadmin03 | 11/5/2020 12:52:00 AM | 5 |
| emsadmin04 | 11/5/2020 12:52:00 AM | 4 |
| emsadmin06 | 11/5/2020 12:52:00 AM | 2 |
| emsadmin02 | 11/5/2020 12:53:00 AM | **10** |
| emsadmin03 | 11/5/2020 12:53:00 AM | 6 |
| emsadmin04 | 11/5/2020 12:53:00 AM | 3 |
| emsadmin06 | 11/5/2020 12:53:00 AM | 2 |
| emsadmin02 | 11/5/2020 12:54:00 AM | 3 |
| emsadmin03 | 11/5/2020 12:54:00 AM | 3 |
| emsadmin04 | 11/5/2020 12:54:00 AM | 2 |
| emsadmin06 | 11/5/2020 12:54:00 AM | 2 |



| Ballot Image File Name | Adjudicated At | Adjudicated By |
|---|---|---|
| 05162_00302_000056.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00302_000095.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00303_000066.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00304_000007.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00304_000042.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00304_000069.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00305_000016.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00305_000026.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05162_00305_000033.tif | 11/5/2020 12:53:00 AM | emsadmin02 |
| 05164_00112_000065.tif | 11/5/2020 12:53:00 AM | emsadmin02 |

> IMPACT: Impossible adjudication speeds indicate potential electronic manipulation

# Image Files Backdated prior to Adjudication



8

➢ Each ballot image has an adjudication timestamp if it was adjudicated

➢ Each .TIF ballot image file has file modification timestamp

➢ 941 images have file modification timestamp BEFORE Image Adjudication timestamp

| Ballot Image File Name | Adjudicated By | Adjudicated Timestamp | File Modified Timestamp | Time Difference |
|---|---|---|---|---|
| 05150_00029_000008.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:02 PM | - 4 min 58 sec |
| 05150_00003_000003.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:10 PM | - 4 min 50 sec |
| 05150_00003_000006.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:16 PM | - 4 min 44 sec |
| 05150_00003_000038.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:24 PM | - 4 min 36 sec |
| 05150_00042_000050.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:36 PM | - 4 min 24 sec |
| 05150_00005_000058.tif | emsadmin02 | 10/30/2020 4:19:00 PM | 10/30/2020 4:14:46 PM | - 4 min 14 sec |
| 05150_00041_000071.tif | emsadmin04 | 10/30/2020 4:19:00 PM | 10/30/2020 4:15:00 PM | - 4 min |
| 05150_00044_000020.tif | emsadmin03 | 10/30/2020 4:19:00 PM | 10/30/2020 4:15:14 PM | - 3 min 46 sec |
| 05150_00043_000007.tif | emsadmin03 | 10/30/2020 4:19:00 PM | 10/30/2020 4:15:52 PM | - 3 min 8 sec |
| 05150_00032_000023.tif | emsadmin06 | 10/30/2020 4:19:00 PM | 10/30/2020 4:17:50 PM | - 1 min 10 sec |
| 05150_00032_000080.tif | emsadmin06 | 10/30/2020 4:19:00 PM | 10/30/2020 4:18:04 PM | - 56 sec |
| 05150_00031_000095.tif | emsadmin06 | 10/30/2020 4:19:00 PM | 10/30/2020 4:18:14 PM | - 46 sec |
| 05150_00031_000097.tif | emsadmin06 | 10/30/2020 4:19:00 PM | 10/30/2020 4:18:22 PM | - 38 sec |
| 05150_00033_000017.tif | emsadmin06 | 10/30/2020 4:19:00 PM | 10/30/2020 4:18:36 PM | - 24 sec |

➢ IMPACT: File modified and backdated to retroactively add or change images

# All 16,034 authenticated images added days after scanning

9

VOTERGA.ORG

- Ballot image files are modified only when scanned or adjudicated
- 16,034 image file modified dates are 3-8 days after image scan date
- Images not requiring adjudication were modified 3-8 days later

| Tabulator | Batch | Ballot Count | Scanning Start Timestamp | Scanning Time (Secs) | File Modification Start Timestamp | File Modification End Timestamp |
|---|---|---|---|---|---|---|
| 5150 | 001 | 98 | 10/22/2020 1:50:20 PM | 76 | 10/30/2020 1:38:38 PM | 10/30/2020 1:38:40 PM |
| 5150 | 002 | 102 | 10/22/2020 2:23:18 PM | 78 | 10/30/2020 1:37:28 PM | 10/30/2020 1:37:30 PM |
| 5150 | 003 | 99 | 10/22/2020 2:42:59 PM | 78 | 10/30/2020 1:37:54 PM | 10/30/2020 1:37:54 PM |
| 5150 | 005 | 101 | 10/22/2020 3:01:07 PM | 81 | 10/30/2020 1:38:08 PM | 10/30/2020 1:38:08 PM |
| 5150 | 006 | 101 | 10/23/2020 9:33:41 AM | 114 | 10/30/2020 1:38:14 PM | 10/30/2020 1:38:14 PM |
| 5150 | 007 | 101 | 10/23/2020 9:37:03 AM | 75 | 10/30/2020 1:38:12 PM | 10/30/2020 1:38:12 PM |
| 5150 | 008 | 100 | 10/23/2020 9:50:45 AM | 120 | 10/30/2020 1:38:10 PM | 10/30/2020 1:38:10 PM |
| 5150 | 009 | 98 | 10/23/2020 9:59:22 AM | 72 | 10/30/2020 1:37:08 PM | 10/30/2020 1:37:08 PM |
| 5150 | 010 | 101 | 10/23/2020 10:02:35 AM | 101 | 10/30/2020 1:37:38 PM | 10/30/2020 1:37:38 PM |
| 5150 | 011 | 99 | 10/23/2020 10:44:10 AM | 205 | 10/30/2020 1:37:36 PM | 10/30/2020 1:37:36 PM |
| 5150 | 012 | 98 | 10/23/2020 11:01:49 AM | 120 | 10/30/2020 1:37:34 PM | 10/30/2020 1:37:34 PM |

- IMPACT: Mail-in ballot Image files were held until last day of Early Voting and modified

# Same tabulator closed many early voting polls



10

> All 148 early voting tabulators were closed on only 12 different tabulators



IMPACT: Process masks identity of scanning tabulator & circumvents protective counter

# Tabulator impossibly closed 2 polls in overlapping times



➤ Several tabulators are shown closing multiple locations concurrently

➤ Tabulator serial# AAFAJJY0174 used on 11/03/20 to close:

  ➤ Georgia Intl. Convention Center poll location from 9:27pm to 9:35pm

  ➤ Metropolitan Library poll location closing time **OVERLAPS** from 9:29pm to 9:30pm

\

➤ IMPACT: Time stamp overlap indicates illegal system tampering





# Tabulator Open for Weeks after Election

12



➤ Each poll location tabulator is opened before votes are cast and closed afterwards

➤ Closing Poll tape for AV East Point Library shows poll opened on October 12th 2020 and closed on December 5th , 2019



➤ IMPACT: Tabulator appears to have used votes from period prior to the election

# 288 batches have images backfilled out of chronological order    13

- All ballots in 288 Batches were modified within 2 seconds of each other
- All batches had invalid backfilled images out of chronological sequence

| Tabulator ID | Batch Number | Ballot Count | Adjudicated Count | Batch Files Modified Within |
|---|---|---|---|---|
| 5160 | 117 | 100 | 2 | 2 sec |
| 5162 | 130 | 99 | 2 | 8 min 36 sec |
| 5162 | 131 | 98 | 4 | 5 min 18 sec |
| 5162 | 132 | 99 | | 4 min 22 sec |
| 5150 | 040 | 100 | 3 | 2 sec |
| 5150 | 041 | 99 | 2 | 2 sec |
| 5150 | 042 | 100 | 1 | 2 sec |
| 5162 | 133 | 97 | 1 | 6 min 2 sec |
| 5150 | 043 | 100 | 2 | 2 sec |
| 5162 | 134 | 100 | 1 | 2 min 54 sec |
| 5150 | 044 | 99 | 2 | 0 sec |
| 5160 | 118 | 97 | 3 | 0 sec |
| 5162 | 135 | 101 | 1 | 4 min 44 sec |
| 5162 | 136 | 99 | 2 | 2 min 50 sec |

| Ballot Image File Name | Scanned Timestamp | File Modified Timestamp | Potential Backfill |
|---|---|---|---|
| 05150_00041_000001.tif | 10/26/2020 5:07:49 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000002.tif | 10/26/2020 5:07:50 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000003.tif | 10/26/2020 5:07:52 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000004.tif | 10/26/2020 5:07:54 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000005.tif | 10/26/2020 5:07:56 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000006.tif | 10/26/2020 5:07:58 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000007.tif | 10/26/2020 5:08:00 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000008.tif | 10/26/2020 5:08:02 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000009.tif | 10/26/2020 5:08:05 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000010.tif | 10/26/2020 5:08:06 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000011.tif | 10/26/2020 5:08:07 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000012.tif | 10/26/2020 5:08:08 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000013.tif | 10/26/2020 5:08:10 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000015.tif | 10/26/2020 5:08:11 PM | 10/30/2020 1:38:00 PM | |
| 05150_00041_000014.tif | 10/26/2020 5:08:11 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000016.tif | 10/26/2020 5:08:12 PM | 10/30/2020 1:37:58 PM | ⬇ |
| 05150_00041_000017.tif | 10/26/2020 5:08:13 PM | 10/30/2020 1:38:00 PM | |

IMPACT: Image files were illegitimately modified in the batch making entire batch invalid

# Election Day tabulator closing tapes are unsigned or missing

14

VOTERGA.ORG

➢ 59 tabulator closing tapes for 6,429 ballots are NOT signed by the poll manager and two witnesses as required by Georgia law

➢ 26 tabulator closing tapes for 5,695 ballots are missing



➢ IMPACT: 12,024 Election Day votes were not certified by poll managers and Fulton Co. should have never certified those votes into the Election Day results

# Tabulator closing tapes for early voting are all unsigned



➢315,000 ballots were cast during in-person early voting in Fulton Co.

➢All tabulator closing tapes from early voting except two were NOT signed by the poll manager and two witnesses as required by Georgia law



➢IMPACT: Nearly all 315,000 early votes were not certified by poll managers and Fulton Co. should have never certified the early voting election results

# How much should zero tapes cost?



➤ We submitted ORRs for Fulton Co. machine zero tapes

➤ 300 + machines require about 5 copies per tape

➤ We received cost estimates over $11,000

➤ They finally agreed

    on $834.50

**From:** Rosenberg, Steven <Steven.Rosenberg@fultoncountyga.gov>
**Sent:** Wednesday, March 2, 2022  11:46 AM
**To:** Garland Favorito; McCray, Unique
**Cc:** Eatmon, Shana; GARLANDF@msn.com; Angie Allison; Robinson, Jessica
**Subject:** RE: [Records Center] Open Records Request :: R000887 - R001198

Garland,

I've re-opened R000887 so that we can provide you with early-voting recap sheets. We did not read your request to include that (the request said "in-person" in our defense), but we will endeavor to provide them to you in the upcoming days.

As for the cost – recap sheets are, relatively speaking, easy to locate. Poll tapes are not. They are stored in boxes and the effort to retrieve them is significantly more time consuming. I do want to be as clear and transparent as possible. I also hope you appreciate that nothing in the open records act requires an explanation from me other than to provide you with the cost estimate and that that estimate be based upon the salary of the lowest-paid, full-time employee capable of searching. The elections department, like many County departments, currently has significant staffing shortages. Those shortages lead to increased time to respond and often, increased costs. This is due to people leaving who knew where materials were stored, people not utilizing best practices to store and label materials, and generally the glut of requests for records that Fulton receives as opposed to some of our neighboring counties. That all said, I believe and have seen nothing to suggest that our estimated fees are nothing other than a legitimate effort to capture the amount of time necessary to produce responsive records. We don't provide estimates with an eye toward putting people off from making requests or requiring us to fulfill requests. That would be illegal. We don't do it.

I know that will not be satisfying to you, but it is truthful. I'm sorry if we don't always get it right, but we try to. In that regard, I see that our fees on R001198 could be less confusing. Our charge is based upon 447.75 hours of time at an hourly rate of $25. 7.75 hours of time at an hourly rate of $22, a jump drive for $7, and copying at $.10 per page (5000 pages). This is a total of $11,878.25.

Now that said, that number, to me, seems excessive. I am in conversation with the department about that estimate and should be able to provide you with additional information today. Please understand that to some degree, I'm an outsider like you in that I'm not in the department, pulling the records. That's why I say it seems like a lot. It may not be, but I'm checking and will let you know.

Dear Garland Favorito:

This correspondence is in response to your Open Records Act Request Reference#: R001198-021522 dated February 15, 2022. Your request sought the following:

• An electronic copy of the opening "zero" tapes for in person and early voting machines used in the November 2020 election

After reviewing the aforementioned request, we believe we may have responsive records. As permitted by O.C.G.A. § 50-18-71(c), a fee will be charged to cover the administrative costs associated with the time spent searching for, retrieving, redacting, and supervising access to the requested documents. The fee represents the hourly rate of the lowest paid full-time employee(s) with the necessary skill and training to respond to your request. However, no charge will be made for the first fifteen minutes of staff time expended in complying with your request. Unless otherwise provided by law, the charge for copies is generally $0.10 per page, as permitted by O.C.G.A. § 50-18-71(c).

Because this amount is in excess of $500, we will delay producing said records until such time as you pay the estimated costs. You may do so forwarding a check, payable to Fulton County, to the attention of Steven Rosenberg, at the address above. The estimated cost for search, retrieval, and copying of the responsive records is $11,878.25. This amount includes the following fees listed below:

Copies per page at $0.10 per page: $500.00
Lowest paid full-time employee(s) with the necessary skill and training.: $11,193.75
Lowest paid full-time employee(s) with the necessary skill and training.: $170.50
Lowest paid full-time employee(s) with the necessary skill and training.: $14.00

It is anticipated that responsive records can be made available 14 business days after payment is received and processed.

Finally, please be advised that certain requested documents, or portions thereof, have been redacted pursuant to the Georgia Open Records Act. Specifically, the following records may be exempted or redacted:

Please feel free to contact me at if you have any questions.

Sincerely,

Jessica Robinson

Registration & Elections



# Other counties may have worse irregularities



**Cobb County:**

➤ <u>All</u> original .TIF ballot images files are destroyed in conflict with federal, state law

➤ <u>All</u> .SHA authentication files for December recount ballot images are destroyed

➤ Closing poll tapes for precincts having a total of 8,000 ballots are missing

*Both Cobb and Fulton added hand count audit tally sheets for over 50,000 ballots weeks after the initial audit results were published by the SOS office*

# Conclusion



➢ Only one or two individuals with extensive voting system expertise needed

➢ These manipulation activities were performed without ability to detect them

➢ Fulton Co. allowed contractor and third party resources to run technical aspects or their election

➢ Resources were not sworn to uphold the Georgia Constitution and were not monitored properly

➢ This evidence proves we must have and independent election audit. If not, why are we voting?

➢ No mechanism for accountability, bizarre double standard of justice
    Ex: $1K fine per missing ballot image, 1.7 million lost or destroyed statewide