# EXHIBIT 1

# *Subverting*

# JUSTICE

## How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election



**MAJORITY STAFF REPORT**

**Table of Contents**

**EXECUTIVE SUMMARY** ................................................................................................ 1

    A.   The Senate Judiciary Committee's Investigation ............................................. 1

    B.   Key Findings ...................................................................................................... 2

**REPORT** ............................................................................................................................. 6

**I.**   **Applicable Legal Requirements** ........................................................................... 6

    A.   DOJ's Limited Role in Election Fraud Investigations .................................... 6

    B.   Limits on White House-DOJ Communications ............................................... 7

    C.   Applicable Federal Laws Governing Political Interference with Investigations .......... 10

**II.**  **December 1 – December 15: Attorney General Barr Announces His Resignation After Declaring that DOJ Has Found No Evidence of Widespread Election Fraud** 11

**III.** **December 15 – December 27: Following Barr's Announcement, Trump Repeatedly Contacts DOJ's Incoming Leadership About His Election Fraud Claims** ............... 13

    A.   December 15, 2020 Oval Office Meeting ...................................................... 13

    B.   December 23 and 24 Trump-Rosen Calls ..................................................... 14

    C.   December 27 Trump-Rosen Call ..................................................................... 15

    D.   December 27 Outreach from Congressman Perry to Donoghue ..................... 16

    E.   December 28 Trump-Donoghue Call ............................................................. 19

**IV.** **December 28: Jeffrey Clark Urges DOJ Leadership to Intervene in Georgia's Appointment of Electors and to Replicate this "Proof of Concept" in Other States** 19

    A.   Clark's Late December Oval Office Meeting With Trump ............................ 19

    B.   Clark's "Two Urgent Action Items" ............................................................. 20

    C.   Rosen and Donoghue Reject Clark's Proposal ............................................. 22

**V.**  **December 29 – December 30: Meanwhile, Trump Urges DOJ to File a Supreme Court Action Contesting the Election** ............................................................... 24

**VI.** **December 29 – January 1: White House Pressure on DOJ Escalates** ................. 27

    A.   DOJ Leadership is Summoned to a December 31 Oval Office Meeting ........ 27

    B.   Clark Reveals Ongoing Contacts With Trump ............................................. 28

    C.   White House Chief of Staff Mark Meadows Asks DOJ to Initiate Baseless Election Fraud Investigations, Contrary to Longstanding Rules Against White House-DOJ Interference .............................................................................. 29

**VII. January 2 – 4: DOJ Leadership Thwarts the Trump-Clark Plot, but U.S. Attorney BJay Pak is Ousted** ............................................................................................ 33

A.   January 2: Clark's Plans Crystallize and Trump Calls the Georgia Secretary of State . 33

B.   January 3: Clark Reveals That Trump Will Install Him That Day ............................... 35

C.   The Justice Department Leadership Assembles ........................................................... 37

D.   The January 3, 2021 Oval Office Meeting .................................................................. 37

E.   U.S. Attorney Pak Resigns .......................................................................................... 39

**VIII.    Recommendations** ......................................................................................... 43

**APPENDIX A: CHRONOLOGY OF KEY EVENTS** ....................................................... A-1

**APPENDIX B: KEY DOCUMENTS** ................................................................................. A-9



*Meeting with DOJ leadership, December 31, 2020 | Photo courtesy of the White House*
*SJC-Pre-CertificationEvents-000334*

## EXECUTIVE SUMMARY

### A.  The Senate Judiciary Committee's Investigation

On January 22, 2021, the *New York Times* reported that Jeffrey Bossert Clark, the former Acting Assistant Attorney General for the Department of Justice's (DOJ) Civil Division, sought to involve DOJ in efforts to overturn the 2020 presidential election results and plotted with then-President Trump to oust Acting Attorney General Jeffrey Rosen, who reportedly refused Trump's demands.[1] On January 23, 2021, the *Wall Street Journal* reported that Trump had urged DOJ to file a lawsuit in the Supreme Court seeking to invalidate President Biden's victory.[2] These reports followed Trump's months-long effort to undermine the results of the election, which culminated in the violent insurrection at the United States Capitol on January 6, 2021.

The Senate Committee on the Judiciary immediately launched an investigation into Trump's reported efforts to enlist DOJ in his election subversion scheme. On January 23, 2021, the Committee asked DOJ to produce documents related to these efforts. DOJ cooperated with the Committee's request, producing several hundred pages of calendars, emails, and other documents in the ensuing months.

On May 20, 2021, following DOJ's production of emails from former White House Chief of Staff Mark Meadows to Rosen asking DOJ to investigate several debunked election fraud claims, the Committee asked the National Archives and Records Administration (NARA) for additional Trump White House records related to Trump's attempts to secure DOJ's help in overturning the election results. The Committee's request sought White House records between November 3, 2020 and the end of Trump's presidency related to meetings and communications between and among White House and DOJ officials. NARA has not responded to date, and has represented to the Committee that the delay in transitioning electronic Trump records from the White House to NARA may prevent the Committee from obtaining a response for several more months.

In addition to obtaining and reviewing documents, the Committee interviewed key former DOJ personnel, including Rosen, former Principal Associate Deputy Attorney General Richard Donoghue, and former U.S. Attorney for the Northern District of Georgia Byung Jin ("BJay") Pak. DOJ and the White House authorized these witnesses to testify about their internal communications without restriction, citing the Committee's "compelling legislative interests … in understanding these extraordinary events: namely, the question whether former President Trump sought to cause the Department to use its law enforcement and litigation authorities to

---

[1] Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General,* N.Y. Times (Jan. 22, 2021).
[2] Jess Bravin & Sadie Gurman, *Trump Pressed Justice Department to Go Directly to Supreme Court to Overturn Election Results*, Wall St. J. (Jan. 23, 2021).

advance his personal political interests with respect to the results of the 2020 presidential election."[3]

The Committee also requested to interview Clark, whom DOJ authorized to testify on the same terms as the other former DOJ officials. DOJ authorized Clark's appearance on July 26, 2021. More than two months after DOJ authorized him to testify without restriction, Clark still has not agreed to the Committee's request that he sit for a voluntary interview.

### B.  Key Findings

The Committee continues to investigate Trump's efforts to involve DOJ in his election subversion scheme, including by pursuing Trump White House records that NARA has thus far been unable to produce and additional witness interviews as appropriate. Given the gravity of the misconduct the Committee has uncovered to date, however—and in the interest of making a public record of Trump's efforts to compromise DOJ's independence—the Committee is releasing this interim staff report. The report makes six primary findings:

**FINDING 1: President Trump repeatedly asked DOJ leadership to endorse his false claims that the election was stolen and to assist his efforts to overturn the election results.** Beginning on the day former Attorney General William Barr announced his resignation and continuing almost until the January 6 insurrection, Trump directly and repeatedly asked DOJ's acting leadership to initiate investigations, file lawsuits on his behalf, and publicly declare the 2020 election "corrupt." Documents and testimony confirm that Rosen, and in some cases other senior DOJ leaders, participated in several calls and meetings where Trump directly raised discredited claims of election fraud and asked why DOJ was not doing more to address them. These calls and meetings included:

- December 15, 2020 – Oval Office meeting including Rosen and Donoghue
- December 23, 2020 – Trump-Rosen Call
- December 24, 2020 – Trump-Rosen Call
- December 27, 2020 – Trump-Rosen-Donoghue Call
- December 28, 2020 – Trump-Donoghue Call
- December 30, 2020 – Trump-Rosen Call
- December 31, 2020 – Oval Office meeting including Rosen and Donoghue
- January 3, 2021 – Oval Office meeting including Rosen and Donoghue
- January 3, 2021 – Trump-Donoghue Call

In attempting to enlist DOJ for personal, political purposes in an effort to maintain his hold on the White House, Trump grossly abused the power of the presidency. He also arguably

---

[3] Letter from Bradley Weinsheimer, Assoc. Dep. Att'y Gen., to Jeffrey Clark (July 26, 2021) (on file with the Committee); Letter from Bradley Weinsheimer, Assoc. Dep. Att'y Gen., to Richard Donoghue (July 26, 2021) (on file with the Committee); Letter from Bradley Weinsheimer, Assoc. Dep. Att'y Gen., to Byung J. Pak (July 26, 2021) (on file with the Committee); Letter from Bradley Weinsheimer, Assoc. Dep. Att'y Gen., to Jeffrey Rosen (July 26, 2021) (on file with the Committee).

violated the criminal provisions of the Hatch Act, which prevent any person—including the President—from commanding federal government employees to engage in political activity.[4]

**FINDING 2: White House Chief of Staff Mark Meadows asked Acting Attorney General Rosen to initiate election fraud investigations on multiple occasions, violating longstanding restrictions on White House-DOJ communications about specific law-enforcement matters.** Meadows asked Rosen to have DOJ investigate at least four categories of false election fraud claims that Trump and his allies were pushing. Between December 29 and January 1, Meadows asked Rosen to have DOJ:

- Investigate various discredited claims of election fraud in Georgia that the Trump campaign was simultaneously advancing in a lawsuit that the Georgia Supreme Court had refused to hear on an expedited basis;

- Investigate false claims of "signature match anomalies" in Fulton County, Georgia, even though Republican state elections officials had made clear "there has been no evidence presented of any issues with the signature matching process."[5]

- Investigate a theory known as "Italygate," which was promoted by an ally of the President's personal attorney, Rudy Giuliani, and which held that the Central Intelligence Agency (CIA) and an Italian IT contractor used military satellites to manipulate voting machines and change Trump votes to Biden votes. Meadows also asked DOJ to meet with Giuliani on Italygate and other election fraud claims.

- Investigate a series of claims of election fraud in New Mexico that had been widely refuted and in some cases rejected by the courts, including a claim that Dominion Voting Systems machines caused late-night "vote dumps" for Democratic candidates.

These requests violated longstanding policies limiting communications between White House and DOJ officials on specific law enforcement matters.[6] The White House and DOJ established these policies following Watergate to protect DOJ's investigations and prosecutions from partisan political interference and to prevent White House officials from corrupting DOJ for their own personal gain.

**FINDING 3: After personally meeting with Trump, Jeffrey Bossert Clark pushed Rosen and Donoghue to assist Trump's election subversion scheme—and told Rosen he would decline Trump's potential offer to install him as Acting Attorney General if Rosen agreed to aid that scheme.** Clark pushed Rosen and Donoghue to publicly announce that DOJ was investigating election fraud and tell key swing state legislatures they should appoint

---

[4] 18 U.S.C. § 610.
[5] GA Secretary of State Brad Raffensperger (@GaSecofState), Twitter (Dec. 8, 2020, 7:55 a.m.), https://twitter.com/GaSecofState/status/1336293440338989060.
[6] Memorandum from White House Counsel Donald F. McGahn II to All White House Staff, at 1 (Jan. 27, 2017); *see also* Memorandum from Attorney General Eric Holder for Heads of Department Components, All United States Attorneys, at 1 (May 11, 2009).

alternate slates of electors following certification of the popular vote. He did so following personal communications with Trump, including at least one meeting that Clark attended in the Oval Office without the knowledge of DOJ leadership.

On December 28, 2020, Clark emailed Rosen and Donoghue a draft letter addressed to the Georgia Governor, General Assembly Speaker, and Senate President Pro Tempore. The letter was titled "Georgia Proof of Concept" and Clark suggested replicating it in "each relevant state." The letter would have informed state officials that DOJ had "taken notice" of election irregularities in their state and recommended calling a special legislative session to evaluate these irregularities, determine who "won the most legal votes," and consider appointing a new slate of Electors. Clark's proposal to wield DOJ's power to override the already-certified popular vote reflected a stunning distortion of DOJ's authority: DOJ protects ballot access and ballot integrity, but has no role in determining which candidate won a particular election.

Documents and testimony confirm that Donoghue and Rosen rejected Clark's recommendation but that Clark—potentially with the assistance of lower-level allies within DOJ—continued to press his "Proof of Concept" for the next several days. Clark eventually informed Rosen and Donoghue that Trump had offered to install him in Rosen's place, and told Rosen he would turn down Trump's offer if Rosen would agree to sign the "Proof of Concept" letter. Clark's efforts culminated in an Oval Office meeting where Rosen, Donoghue, and Steven Engel, the Assistant Attorney General for the Office of Legal Counsel, informed Trump that DOJ's senior leaders would resign if Trump carried out his plans.

**FINDING 4: Trump allies with links to the "Stop the Steal" movement and the January 6 insurrection participated in the pressure campaign against DOJ.** In addition to Trump White House officials, including the President himself, outside Trump allies with ties to the "Stop the Steal" movement and the January 6 insurrection also pressured DOJ to help overturn the election results. They included:

- U.S. Representative Scott Perry of Pennsylvania's 10th Congressional District, who led the objection to counting Pennsylvania's electoral votes on the House floor in the hours immediately following the January 6 insurrection. Perry has acknowledged introducing Clark to Trump, and documents and testimony confirm that he directly communicated with Donoghue about his false Pennsylvania election fraud claims.

- Doug Mastriano, a Republican State Senator from Pennsylvania who participated in Rudy Giuliani's so-called election fraud "hearings," spent thousands of dollars from his campaign account to bus people to the January 6 "Save America Rally," and was present on the Capitol grounds as the insurrection unfolded. Documents show that, like Perry, Mastriano directly communicated with Donoghue about his false election fraud claims.

- Cleta Mitchell, a Trump campaign legal adviser, early proponent of Trump's false stolen election claims, and participant the January 2, 2021 call where Trump

pressured Georgia Secretary of State Brad Raffensperger to "find 11,780 votes." Mitchell emailed Meadows a copy of Trump's lawsuit against Raffensperger and offered to send DOJ 1,800 pages of supporting exhibits; Meadows sent the materials to Rosen, asking DOJ to investigate.

**FINDING 5: Trump forced the resignation of U.S. Attorney Byung Jin ("BJay") Pak, whom he believed was not doing enough to address false claims of election fraud in Georgia. Trump then went outside the line of succession when naming an Acting U.S. Attorney, bypassing First Assistant U.S. Attorney Kurt Erskine and instead appointing Bobby Christine because he believed Christine would "do something" about his election fraud claims.** U.S. Attorney Pak investigated and did not substantiate various claims of election fraud advanced by Trump and his allies, including false claims that a videotape showed suitcases of illegal ballots being tabulated at Atlanta's State Farm Arena. Trump accused Pak publicly and privately of being a "Never Trumper" and told Rosen and Donoghue on January 3 that he wanted to fire him. Trump relented when Donoghue argued that Pak already planned to resign, agreeing not to fire Pak so long as he resigned the following day. Although First Assistant U.S. Attorney (FAUSA) Erskine was next in the line of succession and Christine was already serving as U.S. Attorney for the Southern District of Georgia, Trump told Donoghue he liked Christine and thought he would "do something" about his election fraud claims.

**FINDING 6: By pursuing false claims of election fraud before votes were certified, DOJ deviated from longstanding practice meant to avoid inserting DOJ itself as an issue in the election.** Prior to the 2020 general election, DOJ's longstanding policy and practice was to avoid taking overt steps in election fraud investigations until after votes were certified, in order to avoid inserting DOJ itself as an issue in the election. Then-Attorney General Barr weakened this decades-long policy shortly before and after the 2020 election, including in a November 9, 2020 memo that directed prosecutors not to wait until after certification to investigate allegations of voting irregularities that "could potentially impact the outcome of a federal election in an individual State." Consistent with this directive and following additional personal involvement by Barr, DOJ took overt steps to investigate false claims of election fraud before certification in one instance detailed to the Committee—and likely others.

\*\*\*

The Committee's investigation to date underscores how Trump's efforts to use DOJ as a means to overturn the election results was part of his interrelated efforts to retain the presidency by any means necessary. As has been well-documented by other sources, Trump's efforts to lay the foundation of the "Big Lie" preceded the general election by several months; Attorney General Barr inserted DOJ into that initial effort through various public remarks and actions prior to November 3, 2020 that cast doubt on voting by mail procedures implemented to facilitate exercise of the franchise during the worst public health crisis in a century. Concurrent with Trump's post-election attempts to weaponize DOJ, Trump also reportedly engaged in a separate and equally aggressive pressure campaign on Vice President Mike Pence to set aside the electoral votes of contested states. This "back-up plan," as it were, culminated on January 4—one day after Clark's final attempt to wrest control of DOJ from Rosen, and again in the Oval

Office—when Trump and outside attorney John Eastman attempted to convince Pence that he could circumvent the certification through a procedural loophole in the Electoral Count Act.[7] All of these efforts, in turn, created the disinformation ecosystem necessary for Trump to incite almost 1,000 Americans to breach the Capitol in a violent attempt to subvert democracy by stopping the certification of a free and fair election.

## REPORT

### I.   Applicable Legal Requirements

### A.   DOJ's Limited Role in Election Fraud Investigations

Although states have primary responsibility for the administration of federal elections, DOJ plays an essential, longstanding role in protecting the right to vote and the integrity of the vote. DOJ itself was founded in 1870 in the aftermath of the Civil War and its immediate imperative was to protect and preserve civil rights, particularly the right to vote for recently emancipated African Americans.[8] Today, the DOJ Civil Rights Division enforces a range of voting rights laws, including the Civil Rights Act, the Voting Rights Act of 1965, the Help America Vote Act, the National Voter Registration Act, and the Uniformed and Overseas Citizens Absentee Voting Act. In doing so, the Civil Rights Division, and DOJ more broadly, help ensure the right of every American citizen to vote and to have their vote count.

In addition to protecting ballot access, DOJ also plays an important role in protecting ballot integrity. The Criminal Division's Public Integrity Section (PIN) investigates and prosecutes election fraud, campaign finance violations, and public corruption that impacts elections. PIN's Election Crimes Branch (ECB) provides guidance to prosecutors on investigating election fraud, and has explained that DOJ's role in such cases is limited:

> The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.[9]

---

[7] Jamie Gangel & Jeremy Herb, *Memo shows Trump lawyer's six-step plan for Pence to overturn the election*, CNN (Sep. 20, 2021).

[8] The importance of DOJ's mission to protect the right to vote and the integrity of the vote was so great that President Ulysses S. Grant appointed Amos T. Akerman to be the first Attorney General to lead this new Department in large part due to his experience prosecuting voter intimidation cases as a U.S. Attorney in Georgia.

[9] Dep't of Justice, Federal Prosecution of Election Offenses at 84 (8th ed., Dec. 2017), *available at* https://www.justice.gov/criminal/file/1029066/download.

Consistent with its limited role in investigating and prosecuting election fraud, DOJ's longstanding policy is to avoid investigative steps that would impact the election at issue. Central to this policy is DOJ's recognition that publicizing a criminal election fraud investigation before the election has concluded could chill voting and "interject[] the investigation itself as an issue" in the adjudication of any election contest.[10] To that end, it is DOJ's general policy "not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified."[11] DOJ also requires prosecutors to consult with PIN before taking any investigative steps beyond a "preliminary inquiry" in election fraud matters, including conducting voter interviews before an election is certified.[12]

As discussed below, Attorney General Barr twice relaxed elements of DOJ's longstanding policy, once shortly before the election and the second time immediately afterward. Barr's second change, reflected in a November 9, 2020 memorandum, authorized DOJ to take overt investigative steps such as witness interviews after polls closed and before the vote was certified. This change prompted the longtime head of PIN's Election Crimes Branch to resign his position in protest and led to disputes between PIN and DOJ leadership over DOJ's role in post-election investigations.

## B. Limits on White House-DOJ Communications

### 1. The History Informing Limitations on Communications Between the White House and the Justice Department

DOJ's legitimacy and effectiveness depends on the public's confidence that its administration and enforcement of federal laws is done impartially, free from actual or perceived partisan or political influence. To prevent such improper influence, longstanding DOJ and White House guidelines limit communications between the White House and DOJ regarding specific law enforcement matters. The guidelines restrict who within DOJ and the White House can communicate with one another about pending and contemplated investigations and litigation; they also limit when such communications can occur in the first place.

These limitations were first implemented in 1978 by Attorney General Griffin Bell in an effort to make DOJ "a neutral zone in the Government, because the law has to be neutral, and in our form of government there are things that are non-partisan, and one is the law."[13] The White House-DOJ communications guidelines were implemented in direct response to Watergate. President Richard Nixon's abuses of his presidential powers severely undermined public confidence in several agencies, but none more so than the Justice Department, as President Gerald Ford's Attorney General Edward Levi described at his swearing-in:

---

[10] *Id.*

[11] *Id.* at 9.

[12] Dep't of Justice, Justice Manual § 9-85.210.

[13] Attorney General Griffin B. Bell, An Address Before Department of Justice Lawyers, 3 (Sept. 6, 1978), *available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/09-06-1978b.pdf.

We have lived in a time of change and corrosive skepticism and cynicism concerning the administration of justice. Nothing can more weaken the quality of life or more imperil the realization of those goals we all hold dear than our failure to make clear by word and deed that our law is not an instrument of partisan purpose, and it is not an instrument to be used in ways which are careless of the higher values which are within all of us.[14]

However, while Watergate was the impetus for these guidelines, the need to maintain DOJ's legitimacy by protecting it from political influence is a longstanding norm. In an address to the Second Annual Conference of U.S. Attorneys in 1940, Attorney General Robert Jackson highlighted "the most important reason why the prosecutor should have, as nearly as possible, a detached and impartial view," stating:

Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted…It is in this realm…that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.[15]

The norm that law enforcement must be free from political interference is so critical and so uniformly acknowledged in our system of government that the U.S. State Department regularly cites the politicization of a government's prosecutorial power as grounds for determining that a foreign power is an "authoritarian state."[16]

---

[14] Attorney General Edward Levi, Remarks at His Swearing-in Ceremony (Feb. 7, 1975), *available at* https://www.fordlibrarymuseum.gov/library/document/0248/whpr19750207-008.pdf.

[15] Attorney General Robert H. Jackson, The Federal Prosecutor, An Address at the Second Annual Conference of U.S. Attorneys, 4-5 (Apr. 1, 1940), *available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

[16] *See, e.g.*, U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2020 Country Reports on Human Rights Practices: Belarus (2020), *available at* https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/belarus/; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2020 Country Reports on Human Rights Practices: Tajikistan (2020), *available at* https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/tajikistan/; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., 2020 Country Reports on Human Rights Practices: Venezuela (2020), *available at* https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/venezuela/; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Country Reports on Human Rights Practices for 2011: Vietnam (2015), *available at* https://2009-2017.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2015&dlid=252813; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Country Reports on Human Rights Practices for 2011: Belarus (2011), *available at* https://2009-2017.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?dlid=186331 (archived).

## 2. Guidelines Restricting Communications Between the White House and the Justice Department

The restrictions on White House-DOJ communications are effectuated through internal policies issued by both entities, typically at the start of new presidential administrations. On January 27, 2017, White House Counsel Don McGahn issued guidelines that governed White House communications with the Justice Department for the entire duration of the Trump Administration. These guidelines, which McGahn emphasized in the memorandum "*must be strictly followed*," established four limitations on communications regarding "ongoing or contemplated cases or investigations":

- Only the President, Vice President, Counsel to the President, and designees of the Counsel to the President may be involved in communications about contemplated or pending investigations or enforcement actions. These individuals may designate subordinates, but ongoing contacts pursuant to such a designation should be handled in conjunction with the White House Counsel's Office.

- Communications regarding litigation where the government is or may be a defendant must first be cleared by the White House Counsel's Office.

- Responses to DOJ requests for White House views on any litigation must be made in consultation with the White House Counsel's Office.

- The President, Vice President, Counsel to the President, and Deputy Counsel to the President are the only White House individuals who may initiate a conversation with DOJ about a specific case or investigation. All communications about individual cases or investigations should be routed through the Attorney General, Deputy Attorney General, Associate Attorney General, or Solicitor General, unless the White House Counsel's Office approves different procedures for the specific case at issue.[17]

Additionally, the White House guidelines restricted requests for the Justice Department's Office of Legal Counsel to issue formal legal opinions to only "specific legal questions impacting particular matters before the Executive Branch."[18]

During the Trump administration, the Justice Department never issued guidelines on communications with the White House and left the 2009 guidelines issued by Attorney General Eric Holder in place. As an overarching principle, these guidelines make clear that "[Assistant Attorneys General, the United States Attorneys, and the heads of the investigative agencies in the Department] must be insulated from influences that should not affect decisions in particular criminal or civil cases."[19] The Justice Department guidelines established two main limitations on

---

[17] Memorandum from White House Counsel Donald F. McGahn II to All White House Staff, at 1 (Jan. 27, 2017).

[18] *Id.* at 2.

[19] Memorandum from Attorney General Eric Holder for Heads of Department Components, All United States Attorneys, at 1 (May 11, 2009).

communications with the White House regarding "pending or contemplated criminal or civil investigations and cases":

- The Justice Department will advise the White House concerning pending or contemplated criminal or civil investigations or cases only if it is important for the performance of the President's duties and appropriate from a law enforcement perspective.

- Initial communications concerning pending or contemplated criminal investigations or cases will involve only the Attorney General or the Deputy Attorney General and the President, Vice President, Counsel to the President, and Principal Deputy Counsel to the President. If the communications concern a pending or contemplated civil investigation or case, the Associate Attorney General may also be involved. Where ongoing communications are required, these officials may designate subordinates, but must monitor subordinate contacts and the subordinates must keep their superiors regularly informed of any such contacts.[20]

Additionally, the Justice Department guidelines restrict White House requests for legal advice to those from the President, the Counsel to the President, or one of the Deputy Counsels to the President, directed to the Attorney General and the Assistant Attorney General for the Office of Legal Counsel.[21] The Assistant Attorney General for the Office of Legal Counsel also has an independent duty to "report to the Attorney General and the Deputy Attorney General any communications that, in his or her view, constitute improper attempts to influence the Office of Legal Counsel's legal judgment."[22]

### C.  Applicable Federal Laws Governing Political Interference with Investigations

Beyond White House and DOJ guidelines, improper White House interference in specific law enforcement actions may implicate several federal laws, depending on the circumstances of that interference. Most notably, federal obstruction of justice statutes create criminal liability for "corrupt conduct capable of producing an effect that prevents justice from being duly administered, regardless of the means employed."[23] As the First and Seventh Circuits have held, obstruction of justice includes even otherwise lawful conduct or conduct within one's lawful authority when it constitutes an obstructive act done with an improper motive.[24] An improper request by a White House official that DOJ initiate or drop a specific law enforcement matter could implicate the obstruction statutes depending on the circumstances of the request.

---

[20] *Id.* at 1-2.
[21] *Id.* at 3
[22] *Id.*
[23] *United States v. Silverman*, 745 F.2d 1386, 1393 (11th Cir. 1984) (citing 18 U.S.C. § 1503).
[24] *See United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998); *United States v. Cintolo*, 818 F.2d 980, 992 (1st Cir. 1987).

Separately, the Hatch Act of 1939 may also be implicated by White House interference in DOJ investigations, to the extent such interference is designed to affect the results of a federal election. Among other provisions, the Hatch Act prohibits all employees, even political appointees,[25] from using their "official authority or influence for the purpose of interfering with or affecting the result of an election."[26] The Act's criminal provisions proscribe using "official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for [federal office]," as well as "command[ing] … any employee of the Federal Government … to engage in, or not to engage in, any political activity, including, but not limited to … working or refusing to work on behalf of a candidate."[27]

## II.  December 1 – December 15: Attorney General Barr Announces His Resignation After Declaring that DOJ Has Found No Evidence of Widespread Election Fraud

Although federal prosecutors routinely and appropriately investigate election fraud allegations, DOJ has long recognized that it "does not have a role in determining which candidate won a particular election."[28] DOJ also recognizes that publicizing a criminal investigation of election fraud allegations before the election has concluded "runs the obvious risk of chilling legitimate voting" and of "interjecting the investigation itself as an issue" in the adjudication of any election contest.[29] For this reason, prior to the 2020 election cycle, DOJ policy prohibited federal investigators and prosecutors from taking overt investigative steps in election fraud cases "until the election in question [had] been concluded, its results certified, and all recounts and election contests concluded."[30]

Following months of false claims by President Trump and Attorney General Barr that mail voting would lead to rampant fraud in the 2020 election, DOJ weakened this longstanding policy in two respects.[31] First, in early October 2020, DOJ announced "an exception to the general non-interference with elections policy," instructing U.S. Attorneys' Offices that they could publicly announce election fraud investigations prior to Election Day if "the integrity of any component of the federal government is implicated by election offenses."[32] The newly announced exception encompassed the U.S. Postal Service and thus claims of mail voting fraud, which DOJ could now announce while voting was underway.

Second, two days after then-candidate Joe Biden was declared the Electoral College winner, Barr issued a memorandum authorizing and encouraging overt, pre-certification

---

[25] 5 U.S.C. § 7322(1)(A)
[26] 5 U.S.C. § 7323(a)(1).
[27] 18 U.S.C. §§ 595, 610.
[28] Federal Prosecution of Election Offenses, *supra* n.9 at 84.
[29] *Id.*
[30] *Id.*
[31] Jane C. Timm, *Fact Check: Echoing Trump, Barr Misleads on Voter Fraud to Attack Expanded Vote-by-Mail*, NBC News (Sept. 19, 2020).
[32] Robert Faturechi & Justin Elliott, *DOJ Frees Federal Prosecutors to Take Steps That Could Interfere With Elections, Weakening Long-Standing Policy*, ProPublica (Oct. 7, 2020).

"election irregularity inquiries."[33] Barr's November 9, 2020 memorandum directly contradicted DOJ's longstanding policy against overtly investigating election fraud allegations before the election results are certified. Barr called DOJ's traditional policy a "passive and delayed enforcement approach" and asserted that "any concerns that overt actions taken by the Department could inadvertently impact the election are greatly minimized, if they exist at all, once voting has concluded, even if certification has not yet been completed." Accordingly, Barr authorized pre-certification investigations "if there are clear and apparently credible allegations of irregularities that, if true, could potentially impact the outcome of a federal election in an individual State"—and called on prosecutors to "timely and appropriately address allegations of voting irregularities so that all of the American people … can have full confidence in the results of our elections."

Barr's memo prompted the longtime career heard of DOJ's Election Crimes Branch to resign his position.[34] It also caused tensions between PIN and DOJ leadership more broadly. According to Donoghue, PIN—with whom the Justice Manual requires prosecutors to consult on election crimes matters—withheld its concurrence to pre-certification investigative activity "several times."[35] Donoghue recalled that in one case, following a dispute between PIN and a local U.S. Attorney's Office, Rosen generally determined that the U.S. Attorney's Office would not be permitted to move forward with investigative activity at the time. In most cases, however, DOJ leadership overrode PIN's concerns and allowed the relevant U.S. Attorney's Office or FBI to take the investigative steps to which PIN had objected.[36] This included Barr's direction that the FBI interview witnesses concerning allegations that election workers at Atlanta's State Farm Arena secretly tabulated suitcases full of illegal ballots.[37] As discussed further below, these claims were pushed by Giuliani at a Georgia Senate hearing and had already been debunked by the Georgia Secretary of State's Office by the time Barr's requested interviews took place.[38] PIN concluded that the claims did not fall within the scope of Barr's November 9 memo, which PIN Chief Corey Amundson noted "created an exception to the DOJ Election Non-Interference Policy for substantial, clear, apparently credible, and non-speculative allegations of voting and vote tabulation irregularities 'that, if true, could potentially impact the outcome of a federal election in an individual State.'"[39] Barr nonetheless directed the FBI to interview witnesses about the State Farm claims; like the Georgia Secretary of State's Office, the FBI and U.S. Attorney's Office also concluded they were meritless.[40]

---

[33] Memo from Attorney General Barr to United States Attorneys, Assistant Attorneys General, and the FBI Director on Post-Voting Election Irregularity Inquiries, Nov. 9, 2020.

[34] *Id.*; Dartunno Clark & Ken Dilanian, *Justice Department's Election Crimes Chief Resigns After Barr Allows Prosecutors to Investigate Voter Fraud Claims*, NBC News (Nov. 9, 2020).

[35] Transcript of Richard Donoghue Interview at 73 (Aug. 6, 2021) ("Donoghue Tr.").

[36] Donoghue Tr. at 73-74.

[37] *Id.*; Email from Richard Donoghue to David Bowdich (Dec. 7, 2020, 12:09 p.m.) (SJC-PreCertificationEvents-000751-753).

[38] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, Georgia Public Broadcasting (Dec. 4, 2020).

[39] Email from Corey Amundson to Redacted (Dec. 7, 2020, 12:34 a.m.) (SJC-PreCertificationEvents-000753).

[40] *See* Transcript of BJay Pak Interview at 22 (Aug. 11, 2021) ("Pak Tr.").

Notwithstanding his efforts to encourage election fraud investigations, on December 1, 2020, Attorney General Barr conceded that DOJ had found no evidence of widespread election fraud. He stated that DOJ and the Federal Bureau of Investigation (FBI) had been working to follow up on specific information they had received, but that "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[41] Barr added that DOJ and the Department of Homeland Security had "looked into" the conspiracy theory that Dominion Voting Systems "machines were programmed essentially to skew the election results," and that "we haven't seen anything to substantiate that."[42] Barr announced his resignation two weeks later, informing Trump on December 14 that he would step down effective December 23.

## III.  December 15 – December 27: Following Barr's Announcement, Trump Repeatedly Contacts DOJ's Incoming Leadership About His Election Fraud Claims

### A.  December 15, 2020 Oval Office Meeting

Following Barr's announcement, Trump immediately initiated a series of contacts with Deputy Attorney General Jeffrey Rosen that would continue through early January. On December 14, Special Assistant to the President and Oval Office Coordinator Molly Michael emailed Rosen two documents "From POTUS": (1) a set of talking points on claims of voter fraud in Antrim County, Michigan; and (2) a purported "forensic report" by Allied Security Operations Group (ASOG) on Dominion Voting Systems' performance in Antrim County.[43]

The ASOG report was authored by Russell Ramsland, a one-time Republican congressional candidate who served as an "expert witness" for Rudy Giuliani at so-called election-integrity hearings in Michigan and other states; Ramsland also authored affidavits in support of several failed election challenges, including an affidavit that erroneously cited data from Minnesota when claiming that more Michigan votes were recorded than there were Michigan voters.[44] The ASOG report and associated talking points contained a series of demonstrably false claims, ranging from a claim that Dominion voting machines caused an error rate of 68 percent when counting Antrim County ballots to a claim that Dominion's software is intentionally designed with inherent errors that enable systemic fraud. These claims have been extensively discredited, including by former Cybersecurity and Infrastructure Security Agency Director Chris Krebs, who called them "factually inaccurate," and by a former Election Assistance Commission official, who called them "preposterous."[45]

---

[41] Michael Balsamo, *Disputing Trump, Barr Says No Widespread Election Fraud*, Associated Press (Dec. 1, 2020).

[42] Katie Benner and Michael S. Schmidt, *Barr Acknowledges Justice Dept. Has Found No Widespread Voter Fraud*, N.Y. Times (Dec. 1, 2020).

[43] Email from Molly Michael to Jeffrey Rosen (Dec. 14, 2020, 4:57 p.m.) (SJC-Pre-CertificationEvents-000425).

[44] *Id.*; Emma Brown, Aaron C. Davis, Jon Swaine, & Josh Dawsey, *The Making of a Myth*, Wash. Post (May 9, 2021).

[45] Todd Spangler, *Former Election Security Chief for Trump Knocks Down Antrim County Report*, Detroit Free Press (Dec. 16, 2020).

On December 15, the day after Molly Michael sent the Antrim County materials to Rosen "From POTUS," Rosen and Donoghue were summoned to a meeting at the White House.[46] Barr was not invited, even though he was still Attorney General and would remain so for more than another week.[47] Other participants included White House Counsel Pat Cipollone, White House Chief of Staff Mark Meadows, and the Department of Homeland Security's Ken Cuccinelli, whom Barr had asked to review the ASOG report.[48] According to Rosen and Donoghue, Trump spent the meeting walking through a series of election fraud claims. The ASOG report was a topic of discussion; so were Trump's assertions that "bad things" had happened in Pennsylvania and Georgia, such as the claim that videotape showed election workers delivering suitcases of ballots in Georgia.[49] Rosen recalled Trump asking why DOJ wasn't "doing more to look at this" and whether DOJ was "going to do its job."[50] Rosen added that Trump was not "belligerent" or "angry" when he asked whether DOJ was going to "do its job," and that Rosen and Donoghue responded by making clear that DOJ was in fact doing its job.[51]

## B.  December 23 and 24 Trump-Rosen Calls

Trump called Rosen twice the following week. The first call was on December 23, Barr's final day as Attorney General; Rosen recalled this being a short call and mostly small talk, with Trump indicating that he might want to talk to Rosen again.[52] Trump in fact called Rosen again on December 24. According to Rosen, the call lasted approximately 10-15 minutes and Trump brought up the same sorts of election fraud claims he had raised during the December 15 meeting—asserting that there was fraud in Pennsylvania and Arizona, asking whether DOJ had looked into election fraud that "people are saying" had taken place, and telling Rosen to "make sure the Department is really looking into these things that you may have missed."[53]

At some point during the December 24 call, Trump also asked Rosen whether he knew "a guy named Jeff Clark."[54] Rosen recalled thinking it was "odd" and "curious" that the President would have known an Assistant Attorney General, but the significance of Trump's reference to Clark did not become fully apparent until the coming days. As discussed in greater detail below, Rosen called Clark on December 26 and learned that shortly before the December 24 Trump-Rosen call, Clark had met with Trump in the Oval Office.

---

[46] Donoghue Tr. at 26-27; Transcript of Jeffrey Rosen Interview at 28 (Aug. 7, 2021) ("Rosen Tr.").
[47] Rosen Tr. at 28-29.
[48] Rosen Tr. at 16-18, 29. Donoghue additionally recalled that Deputy White House Counsel Patrick Philbin attended, along with the Department of Homeland Security's Chad Mizelle; Rosen did not recall Mizelle attending this meeting.
[49] Donoghue Tr. at 27; Rosen Tr. at 30.
[50] Rosen Tr. at 34.
[51] Rosen Tr. at 33-38.
[52] Rosen Tr. at 41-42.
[53] Rosen Tr. at 81-84.
[54] Rosen Tr. at 82.

### C.  December 27 Trump-Rosen Call

At the end of their December 24 call, Rosen suggested to Trump that they defer any further discussions until the following Monday because of the upcoming Christmas holiday.[55] Trump did not wait that long to call again, calling Rosen twice on Sunday, December 27. He first called Rosen sometime Sunday morning; Rosen recalled discussing golf and other sports until Trump indicated that he was running late for a golf game, at which point the call ended.[56]

Trump called Rosen again the same afternoon.[57] After about 30 minutes, Rosen called Donoghue and asked to conference him in.[58] Donoghue described the portion of the call he participated in as a "long call … over an hour after I joined."[59] According to Donoghue, Trump "was going on at some length" about the same sorts of election fraud claims he had raised during the December 15 Oval Office meeting, maintaining that the "election has been stolen out from under the American people" and asking whether DOJ was taking these allegations seriously.[60] Among other things, Trump:

- Claimed that 205,000 more votes were certified in Pennsylvania than were cast;[61]
- Claimed that the State Farm Arena tape "shows fraud" by election workers in Atlanta who had ballots hidden under a table that they tabulated multiple times;[62]
- Said that Donoghue should go to Fulton County, Georgia and conduct a signature verification, and that he would find "tens of thousands" of illegal votes;[63] and
- Complained, "You guys aren't following the Internet the way I do."[64]

Trump also referenced three Republican elected officials who were amplifying his claims of a stolen election[65]: (1) Pennsylvania Rep. Scott Perry, who led the objection to certifying Pennsylvania's electoral votes, even after the January 6 insurrection[66]; (2) Ohio Rep. Jim Jordan, who attended a December 21, 2020 meeting where Trump and House Freedom Caucus members strategized about their plans for January 6[67]; and (3) Pennsylvania State Senator Doug Mastriano, who spent thousands of dollars from his campaign account to bus people to the January 6 "Save

---

[55] Rosen Tr. at 57.

[56] Rosen Tr. at 57-58.

[57] Rosen Tr. at 58.

[58] Donoghue Tr. at 37.

[59] Donoghue Tr. at 38.

[60] Donoghue Tr. at 39.

[61] Donoghue Tr. at 42; Notes of Dec. 27, 2020 Call (SJC-PreCertificationEvents-000735) ("12/27/20 Donoghue Notes").

[62] Donoghue Tr. at 44-45; 12/27/20 Donoghue Notes.

[63] 12/27/20 Donoghue Notes.

[64] Rosen Tr. at 93; Donoghue Tr. at 86.

[65] Donoghue Tr. at 41; 12/27/20 Donoghue Notes.

[66] Andrew Solender, *Majority of House Republicans Vote to Reject Pennsylvania, Arizona Electors*, Forbes (Jan. 7, 2021).

[67] Melissa Quinn, *Trump meets with GOP allies with eye on challenging count of electoral votes*, CBS News (Dec. 22, 2020).

America Rally" and was present on the Capitol grounds as the insurrection unfolded.[68] Trump complained that the Republican officials were trying to address election fraud claims but had limited capacity and authority to do so, whereas DOJ was not doing enough—in Donoghue's words, Trump was "complaining about what he thought to be the Department's lack of action. His displeasure was clear. He felt that we should be doing things that, in his mind, at least, we weren't doing."[69]

Rosen and Donoghue both recalled telling Trump that DOJ was doing its job, with Rosen at one point saying that DOJ "can't and won't just flip a switch and change the election."[70] In response, according to Donoghue's testimony and contemporaneous notes, Trump asked that DOJ "just say the election was corrupt and leave the rest to me and the [Republican] Congressmen," whom Donoghue understood to be the Republican House Members who would be challenging the Electoral College certification on January 6.[71] Rosen similarly recalled Trump telling them that DOJ "should be out there finding [the election fraud] and saying so," and that DOJ should "just have a press conference."[72]

At some point during the discussion Trump referenced Clark, indicating that people were telling him good things about Clark, that Trump should "put him in" to a leadership position, and that Trump should replace DOJ's leadership.[73] This was the first time Donoghue heard Clark's name mentioned in connection with the election, and the reference surprised him because Clark "didn't have anything to do with the Department's election responsibilities."[74] Rosen and Donoghue told Trump he should have the DOJ leadership he wanted, but that replacing DOJ's leadership would not change its position on the election.[75]

### D.  December 27 Outreach from Congressman Perry to Donoghue

Toward the end of the Rosen-Donoghue-Trump call, Trump asked Donoghue to provide his cell phone number so Trump could have elected officials with relevant information call him.[76] Congressman Perry called Donoghue later the same day.[77] At the time, Perry had been amplifying—both publicly and behind the scenes—Trump's false claims that the 2020 election was stolen. After media outlets reported that Vice President Biden had won the election, Perry was one of the first Republican federal officials to publicly dissent, arguing on Twitter that

---

[68] Pennsylvania Dep't of State, Campaign Finance Report: Doug Mastriano Year 2020 Cycle 7 (Sep. 20, 2021) at 33-34; Katie Meyer, Miles Bryan, & Ryan Briggs, *Mastriano campaign spent thousands on buses ahead of D.C. insurrection*, WHYY (Jan. 12, 2021).

[69] Donoghue Tr. at 43-44.

[70] Rosen Tr. at 93; Donoghue Tr. at 39; 12/27/20 Donoghue Notes (SJC-PreCertificationEvents-000738-39).

[71] Donoghue Tr. at 87; 12/27/20 Donoghue Notes.

[72] Rosen Tr. at 95-96.

[73] 12/27/20 Donoghue Notes; Donoghue Tr. at 88-89.

[74] Donoghue Tr. at 88-89.

[75] 12/27/20 Donoghue Notes; Rosen Tr. at 90-91.

[76] 12/27/20 Donoghue Notes; Donoghue Tr. at 90.

[77] Donoghue's contemporaneous notes are labeled "12/28/20," but Donoghue clarified that this was a mistake and that the call from Rep. Perry actually took place on the evening of December 27.

"[l]egal votes will determine who is POTUS."[78] He was one of the initial House Republicans who signed onto an amicus brief supporting Texas's failed attempt to have the Supreme Court invalidate the election results in four states that President Biden won.[79] And after reportedly meeting with Trump on December 21 to strategize about objecting to the Electoral College results at the January 6 Joint Session of Congress,[80] Perry led efforts to block the certification of Pennsylvania's Electoral College votes—speaking against certification on the House floor even after the January 6 insurrection.[81]

Perry told Donoghue that Trump had asked him to call and that DOJ hadn't done its job with respect to the elections.[82] Perry added something to the effect of, "I think Jeff Clark is great. I like that guy a lot. He's the kind of guy who could really get in there and do something about this."[83] Perry did not explain how he knew Clark and Donoghue did not ask.[84] At the end of the call, Perry indicated that he had information about "things going on in Pennsylvania," including the claim that there were 205,000 more votes than voters.[85] Donoghue responded that Perry could send him information about Pennsylvania but that DOJ had not seen fraud on a scale that would have changed the outcome there.[86]

Following their call, Perry emailed Donoghue a series of documents summarizing numerous Pennsylvania election fraud claims.[87] They included a variety of complaints about voting by mail that mirrored similar complaints made in other contested states. They also included several refuted allegations of election fraud in Pennsylvania, including that:

- An analysis of the Pennsylvania Department of State's Statewide Uniform Registry of Electors (SURE) system found that 205,000 more votes were reported as being cast than registered voters who voted.[88] On December 28, Perry also publicly promoted this particular claim on Twitter, tweeting that it "call[ed] into question the integrity not only of the PA system, but the competency of those charged with its oversight."[89] In reality, Pennsylvania votes cast equaled the same amount as registered voters who

---

[78] Representative Scott Perry (@RepScottPerry), Twitter (Nov. 7, 2020, 1:18 p.m.), https://twitter.com/RepScottPerry/status/1325140625218441225?s=20.

[79] Brief of Amicus Curiae of U.S. Representative Mike Johnson and 125 Other Members of the U.S. House of Representatives in Support of Plaintiff's Motion for Leave to File a Bill of Complaint and Motion for a Preliminary Injunction, Texas v. Pennsylvania, 141 S. Ct. 1230 (2020) (No. 155).

[80] Billy House & Laura Litvan, *Thune Sees Challenge to Biden Win Going Down Like 'Shot Dog'*, Bloomberg (Dec. 21, 2020).

[81] *Editorial: Scott Perry Must Resign*, York Dispatch (Jan. 7, 2021).

[82] Notes of Dec. 27, 2020 Donoghue-Perry Call (SJC-PreCertificationEvents-000705) ("12/27/20 Donoghue-Perry Notes").

[83] Donoghue Tr. at 91.

[84] Donoghue Tr. at 92.

[85] 12/27/20 Donoghue-Perry Notes; Donoghue Tr. at 93.

[86] *Id.*

[87] Email from Scott Perry to Richard Donoghue (Dec. 27, 2020, 8:37 p.m.) (SJC-Pre-CertificationEvents-000001-0000043).

[88] *Id.*

[89] Representative Scott Perry (@RepScottPerry), Twitter (Dec. 28, 2020, 6:01 p.m.), https://twitter.com/RepScottPerry/status/1343693703664308225?s=20.

voted. The so-called "analysis" of the SURE system was based on incomplete data: four of the state's biggest counties had not yet entered individualized voter histories, which was clear at the time this allegation was made from the vote counts certified by the counties hosted on the Secretary of State's website.[90]

- Over 4,000 Pennsylvanians voted more than once.[91] In reality, only three actual efforts to vote twice have been identified to date in the state of Pennsylvania, and all three were attempts to vote twice for Trump.[92] The false claim of over 4,000 double votes stems from a printing error that caused more than 4,000 voters to mistakenly receive two absentee ballots apiece. But that did not translate into any duplicate votes because, as the Pennsylvania Department of State explained, "all the duplicate ballots are coded for the same voter, so if a voter tried to submit more than one, the system would literally prevent the second ballot from being counted."[93] Additionally, all voters who received two absentee ballots were contacted by state election officials about the printing error prior to the election.[94]

- Pennsylvania's Democratic Governor and Secretary of State attempted to create "confusion, chaos, and instilling fear" under the guise of protecting public health by encouraging voters to vote by mail rather than in person.[95] In reality, state officials promoted voting by mail to ensure that voters had access to the ballot during an unprecedented global pandemic.

Donoghue forwarded Perry's email to Scott Brady, the United States Attorney for the Western District of Pennsylvania, with the note: "JFYI regarding allegations about PA voting irregularities, for whatever it may be worth."[96] According to Donoghue, he forwarded the materials to Brady "because a U.S. Attorney had to be looking at this thing, a U.S. Attorney in Pennsylvania."[97] Donoghue and Brady subsequently discussed the claims contained in the documents, to the extent they related to election fraud as opposed to complaints that state elected officials should not have changed certain voting procedures. Brady informed Donoghue that the claims "were not well founded." For example, Brady explained that there were not actually more

---

[90] Statement, Pennsylvania Dep't of State, Response to December 28, 2020, release of misinformation by group of GOP state House members (Dec. 29, 2020), available at https://www.dos.pa.gov/about-us/Documents/statements/2020-12-29-Response-PA-GOP-Legislators-Misinformation.pdf.

[91] Email from Scott Perry to Richard Donoghue (Dec. 27, 2020, 8:37 p.m.) (SJC-Pre-CertificationEvents-000001-0000043).

[92] Rosalind S. Helderman, Jon Swaine, & Michelle Ye Hee Lee, *Despite Trump's intense hunt for voter fraud, officials in key states have so far identified just a small number of possible cases*, Wash. Post (Dec. 23, 2020).

[93] Miles Bryan, *PA Reaching Out To more than 4,000 Voters After Glitch Sends Them Two Mail Ballots*, 90.5 WESA (Oct. 22, 2020).

[94] *Id.*

[95] Email from Scott Perry to Richard Donoghue (Dec. 27, 2020, 8:37p.m.) (SJC-Pre-CertificationEvents-000001-0000043).

[96] Email from Richard Donoghue to Scott Brady (Dec. 27, 2020, 10:05 p.m.) (SJC-PreCertificationEvents-000336-381).

[97] Donoghue Tr. at 94.

votes certified than voters; in reality, the database analyzed by proponents of this false claim was missing data from four Pennsylvania counties.[98]

### E.  December 28 Trump-Donoghue Call

Trump called Donoghue the following morning. Donoghue recalled this December 28 call as "a very short call" and "essentially a follow-up" to the lengthy Trump-Rosen-Donoghue call the prior afternoon.[99] According to Donoghue, Trump said something to the effect of, "I don't know if I mentioned this last night"—referencing something that Trump had, in fact, raised during the December 27 call. Donoghue did not recall with certainty what topic Trump raised, but indicated that it may have been the claim that the Pennsylvania Secretary of State certified more ballots than were actually cast. Donoghue replied that Trump had raised the issue the prior evening, and the call ended.[100]

## IV.  December 28: Jeffrey Clark Urges DOJ Leadership to Intervene in Georgia's Appointment of Electors and to Replicate this "Proof of Concept" in Other States

Efforts to involve DOJ in Trump's election subversion scheme continued on December 28, when Clark approached Rosen and Donoghue with an audacious proposal: DOJ should inform the legislatures of Georgia and several other states that it was investigating voting irregularities, and recommend that each state legislature call a special session to consider appointing an alternate slate of electors.

### A.  Clark's Late December Oval Office Meeting With Trump

Clark initially served in the Trump administration as the Senate-confirmed Assistant Attorney General for ENRD. In this role, Clark reportedly "developed a reputation for pushing aggressive conservative legal principles and taking a hands-on approach that drew kudos from some colleagues but often frustrated career lawyers on his team."[101] Subsequently, Clark became the Acting Assistant Attorney General for the Civil Division in September 2020 when the division's previous Acting Assistant Attorney General, Ethan P. Davis, left DOJ. Prior to joining the Trump administration, Clark had known Rosen in private practice at the Washington, D.C. office of Kirkland & Ellis LLP, which Rosen joined in 1982 and Clark joined in 1996.

Rosen called Clark on December 26 in order to learn more about why Trump had mentioned Clark on their December 24 call. Rosen recalled asking Clark whether there was "something going on that I don't know about" and being "flabbergasted" when Clark admitted that he had met with the President. According to Rosen, Clark described having talked to Congressman Perry, getting caught up in a meeting that Perry asked him to join, and not initially realizing that it would be a meeting with Trump in the Oval Office. Rosen did not recall Clark

---

[98] Donoghue Tr. at 95-96.
[99] Donoghue Tr. at 51-52.
[100] Donoghue Tr. at 52.
[101] Ellen Gilmer, *Divisive Top Trump Environment Lawyer Reviews 'Challenging Job'*, Bloomberg Law (Jan. 19, 2021).

telling him who else participated in the meeting or how Clark had met Perry, who later acknowledged that he discussed election fraud claims with Clark and that "when President Trump asked if I would make an introduction [to Clark], I obliged."[102] Rosen also did not recall Clark's description, if any, of what transpired during the Oval Office meeting.[103]

Rosen recalled Clark indicating that the Oval Office meeting took place a day or two before Christmas, meaning either December 23 or 24.[104] If accurate, this means the meeting took place two or three days after Trump, Perry, Congressman Jordan, and other House Republicans met at the White House on December 21 to strategize about the January 6 Joint Session.

## B. Clark's "Two Urgent Action Items"

At 4:40 p.m. on December 28, Clark emailed Rosen and Donoghue with the subject "Two Urgent Action Items." The first action item requested a briefing from the Office of the Director of National Intelligence (ODNI):

> I would like to have your authorization to get a classified briefing tomorrow from ODNI led by DNI Radcliffe on foreign election interference issues. I can then assess how that relates to activating the IEEPA and 2018 EO powers on such matters (now twice renewed by the President).[105]

IEEPA refers to the International Emergency Economic Powers Act, which authorizes the president to declare a national emergency due to "unusual and extraordinary threats" to the United States and to block any transactions and freeze any assets within the jurisdiction of the United States to deal with the threat."[106] The 2018 EO Clark mentions is Executive Order 13848, which operationalizes IEEPA sanctions in the event of foreign interference in a U.S. election.[107]

As the basis for his "urgent" request, Clark cited evidence, supposedly in the public domain, from "white hat hackers" indicating that a "Dominion machine accessed the Internet through a smart thermostat with a net connecting trail leading back to China."[108] Clark did not produce or quote any of this purported evidence, but he wrote that he believed the ODNI "may" have additional classified intelligence on this matter.[109]

---

[102] Rosen Tr. at 84-88; Katie Benner & Catie Edmondson, *Pennsylvania Lawmaker Played Key Role in Trump's Plot to Oust Acting Attorney General*, N.Y. Times (Jan. 23, 2021); Jonathan Tamari & Chris Brennan, *Pa. Congressman Scott Perry Acknowledges Introducing Trump to Lawyer at the Center of Election Plot*, Phila. Inquirer, Jan. 25, 2021.

[103] Rosen Tr. at 87-88.

[104] Rosen Tr. at 86.

[105] Email from Jeffrey Clark to Jeffrey Rosen and Richard Donoghue (Dec. 28, 2020, 4:40 p.m.) (SJC-PreCertificationEvents-000697-702).

[106] 50 U.S.C. §§ 1701(a) & 1702(a)(1)(B).

[107] Exec. Order No. 13848, 83 Fed. Reg. 46843 (Sept. 14, 2018).

[108] Email from Jeffrey Clark to Jeffrey Rosen and Richard Donoghue (Dec. 28, 2020, 4:40 p.m.) (SJC-PreCertificationEvents-000697-702).

[109] *Id.*

The second "urgent action item" was a proposal that DOJ send letters to the elected leadership of Georgia and other contested states, urging them to convene special legislative sessions in order to appoint a different slate of electors than those popularly chosen in the 2020 election. Clark explained his proposal in the email:

> The concept is to send it to the Governor, Speaker, and President Pro Tempore of each relevant state to indicate that in light of time urgency and sworn evidence of election irregularities presented to courts and to legislative committees, the legislatures thereof should each assemble and make a decision about elector appointment in light of their deliberations.[110]

Clark attached a draft letter to this email titled "Georgia Proof of Concept" and addressed to Georgia Governor Brian Kemp, Speaker of the Georgia House David Ralston, and President Pro Tempore of the Georgia Senate Butch Miller.[111] Although Clark's draft was addressed to elected officials in Georgia, his transmittal email proposed sending a version of the letter to "each contested state"—according to Rosen, Pennsylvania, Michigan, Wisconsin, Arizona and Nevada.[112]

Clark's proposed letter opened by stating that DOJ had "taken notice" of irregularities" and that "[i]n light of these developments, the Department recommends that the Georgia General Assembly should convene in a special session so that its legislators are in a position to take additional testimony, receive new evidence, and deliberate on the matter consistent with duties under the U.S. Constitution."[113]

The letter emphasized that "[t]ime is of the essence" to take action due to the impending Joint Session of Congress "to count Electoral College certificates [internal citation removed], consider objections to any of those certificates, and decide between any competing slate of elector certificates…with the Vice President presiding over the session as President of the Senate."[114] The letter attempted to further underscore this "urgency" by highlighting that the Trump campaign's legal challenge to alleged voting irregularities filed on December 4, 2020, had not yet been given a hearing date, stating:

> Given the urgency of this serious matter, including the Fulton County litigation's sluggish pace, the Department believes that a special session of the Georgia General Assembly is warranted and is in the national interest.[115]

The letter then outlined a path for the Georgia General Assembly to take advantage of the Joint Session of Congress's certification procedure and replace the Georgia Presidential Electors

---

[110] Id.
[111] Id.
[112] Rosen Tr. at 105; see also Donoghue Tr. at 99 (proposal entailed sending the letter to each swing state).
[113] Email from Jeffrey Clark to Jeffrey Rosen and Richard Donoghue (Dec. 28, 2020, 4:40 p.m.) (SJC-PreCertificationEvents-000697-702).
[114] Id.
[115] Id.

lawfully chosen by the popular vote with a slate of Electors appointed after-the-fact by the legislature. The letter explained that the "purpose of the special session the Department recommends" is (1) to evaluate alleged voter irregularities; (2) to determine whether any such irregularities affected who "won the most legal votes"; and (3) to "take whatever action is necessary" if the "election failed to make a proper and valid choice."[116]

Despite the unprecedented, sweeping nature of this proposal and the lack of adherence to standard DOJ procedures, such as Office of Legal Counsel review, in the preparation of the letter, Clark expressed no hesitation that this letter was both appropriate and ready to send as is, stating:

> Personally, I see no valid downsides to sending out the letter. I put it together quickly and would want to do a formal cite check before sending but I don't think we should let unnecessary moss grow on this.[117]

### C.  Rosen and Donoghue Reject Clark's Proposal

Just over an hour later, at 5:50 p.m., Donoghue pushed back on Clark's unsubstantiated claims, declaring in an email, "there is no chance that I would sign this letter or anything remotely like this."[118] Donoghue made clear that no widespread election fraud affected the 2020 election, stating:

> While it may be true that the Department 'is investigating various irregularities in the 2020 election for President (something we typically would not state publicly), the investigations that I am aware of relate to suspicions of misconduct that are of such a small scale that they simply would not impact the outcome of the Presidential Election.[119]

After reiterating that "AG Barr made that clear to the public only last week," Donoghue highlighted specific statements in Clark's "Georgia Proof of Concept" letter that had no support, stating:

> I know of nothing that would support the statement "we have identified significant concerns that may have impacted the outcome of election in multiple states." Despite dramatic claims to the contrary, we have not seen the type of fraud that calls into question the reported (and certified) results of the election.[120]

Donoghue emphasized that it would be "utterly without precedent" for the Justice Department to take such action, stating:

---

[116] Id.
[117] Id.
[118] Email from Richard Donoghue to Jeffrey Clark (Dec. 28, 2020, 5:50 p.m.) (SJC-PreCertificationEvents-000703).
[119] Id.
[120] Id.

I cannot imagine a scenario in which the Department would recommend that a State assemble its legislature to determine whether already-certified election results should somehow be overridden by legislative action. Despite references to the 1960 Hawaii situation (and other historical anomalies, such as the 1876 Election), I believe this would be utterly without precedent. Even if I am incorrect about that, this would be a grave step for the Department to take and it could have tremendous Constitutional, political and social ramifications for the country.[121]

Donoghue ended his response by describing what proper consideration and procedure would look like before the Justice Department could take such action. He stated that research and discussion "that such a momentous step warrants" would be required and "[o]bviously, OLC would have to be involved in such discussions."[122]

At 6:00 p.m., Rosen and Donoghue met with Clark in Rosen's conference room.[123] According to Rosen, Clark reiterated the points from his email and said he wanted Rosen to hold a press conference where he announced that "there was corruption."[124] Clark gave no indication whether he was working with others on the letter, either within DOJ or at the White House.[125] According to Donoghue, however, he did make some reference to his Oval Office meeting with Trump, and to the fact that Trump was considering a leadership change at DOJ.[126]

Donoghue recalled the meeting being "difficult" and "heated," with Donoghue telling Clark he had "no business" involving himself in election fraud matters, asking why the President and Congressman Perry had mentioned his name, accusing him of violating the DOJ-White House contacts policy, and telling him his proof of concept proposal was "wildly inappropriate."[127] Rosen similarly called the meeting "contentious."[128] Rosen and Donoghue recalled making clear that DOJ would not send the letter, and stressing to Clark that it was not DOJ's role to serve as election officials and tell states what to do.[129] Rosen's impression at the time was that Clark accepted his and Donoghue's position.[130]

Following the meeting with Clark, Donoghue emailed Assistant Attorney General for OLC Steven Engel to set up a time to discuss "some antics that could potentially end up on your

---

[121] *Id.*

[122] *Id.*

[123] Jeffrey Rosen Calendar (Dec. 28, 2020); Richard Donoghue Calendar (Dec. 28, 2020); Jeffrey Clark Calendar (Dec. 28, 2020); Rosen Tr. at 102; Donoghue Tr. at 102.

[124] Rosen Tr. at 102. Rosen also recalled Clark asking at the meeting to have his title changed from Acting Assistant Attorney General for the Civil Division to Assistant Attorney General for the Civil Division. Rosen recalled Clark's request—to which Steven Engel, the Assistant Attorney General for the Office of Legal Counsel, was "very opposed"—coming up multiple times.

[125] Rosen Tr. at 103-106.

[126] Donoghue Tr. at 104.

[127] Donoghue Tr. at 103-104.

[128] Rosen Tr. at 103.

[129] Donoghue Tr. at 103; Rosen Tr. at 103.

[130] Rosen Tr. at 104.

radar."[131] Donoghue recalled that he and Rosen wanted to read Engel into the situation because Engel would have been next in line to become Acting Attorney General if Trump fired Rosen. They decided not to share the information beyond Engel at the time, however, for fear it would create panic within DOJ's leadership.[132]

## V.   December 29 – December 30: Meanwhile, Trump Urges DOJ to File a Supreme Court Action Contesting the Election

While Clark was encouraging Rosen and Donoghue to pursue his "proof of concept" in Georgia and elsewhere, Trump and his allies were simultaneously urging DOJ to take Trump's false claims of a stolen election directly to the Supreme Court. On December 29, 2020, White House Special Assistant and Oval Office Coordinator Molly Michael emailed a draft Supreme Court brief to Rosen, Donoghue, and Acting Solicitor General Jeffrey Wall, telling them: "The President asked me to send the attached draft document for your review. I have also shared with Mark Meadows and Pat Cipollone."[133]

The brief that Trump had directed Michael to share with DOJ was styled as a bill of complaint filed under the Supreme Court's original jurisdiction and against the states of Pennsylvania, Georgia, Michigan, Wisconsin, Arizona, and Nevada.[134] The proposed action asked the Court to declare that the six states administered the 2020 presidential election in violation of the Constitution's Electors Clause and Fourteenth Amendment; declare that the Electoral College votes cast by the electors in the six states were in violation of the Electors Clause and Fourteenth Amendment; enjoin the states from using the 2020 election results to appoint electors; and authorize the states to conduct a special election to appoint new electors. In short, Trump asked DOJ to petition the Supreme Court to overturn the election results.

In support of the relief it sought, the proposed Supreme Court brief made a variety of false factual claims about the election (many of which had already been rejected by courts), as well as claims taking issue with the use of mail ballots in general. Among others, these included claims that:

- In the six states Trump proposed suing, "Democrat voters voted by mail at two to three times the rate of Republicans";
- Georgia used Dominion voting machines, which had "known vulnerabilities to hacking and other irregularities";
- A "forensic audit" conducted by Allied Security Group found that "the Dominion voting system in Antrim County [Michigan] was designed to generate an error rate as high as 81.96%";

---

[131] Email from Richard Donoghue to Steven Engel (Dec. 28, 2020, 11:41 p.m.) (SJC-PreCertificationEvents-000272).

[132] Donoghue Tr. at 105-106.

[133] Email from Molly Michael to Jeffrey Rosen, Richard Donoghue, and Jeffrey Wall (Dec. 29, 2020, 11:17 a.m.) (SJC-Pre-CertificationEvents-000479).

[134] *See generally* SJC-Pre-CertificationEvents-000480-535.

- According to a USPS truck driver, the Wisconsin and Illinois chapter of the USPS dispatched employees to find 100,000 mail ballots, which were delivered to a sorting center in Madison and backdated;
- Nevada processed mail ballots through a sorting system, which "[a]nectdotal evidence suggests … was prone to false [signature-match] positives";
- A Republican state official in Arizona had claimed that there was unspecified evidence of "tampering" and "fraud" in Maricopa County; and
- Local officials in Philadelphia and Allegheny County, Pennsylvania, excluded Republican poll watchers from the opening, counting, and recording of mail ballots.[135]

At the same time as Molly Michael was emailing the draft brief to Rosen, Donoghue, and Wall, one of its authors attempted to reach Rosen on behalf of President Trump. Kurt B. Olsen, a private lawyer who had served as special counsel to Texas Attorney General Ken Paxton in his failed Supreme Court action against Pennsylvania, emailed Wall: "I represented Texas in the action filed in the SCT against Pennsylvania et al. Last night, the President directed me to meet with AG Rosen today to discuss a similar action to be brought by the United States. I have not been able to reach him despite multiple calls/texts. This is an urgent matter. Please call me … or ask AG Rosen to contact me asap."[136]

Over the next two days, Olsen contacted DOJ numerous times in an effort to discuss Trump's proposed Supreme Court action with Rosen, sending multiple emails and making multiple phone calls to Rosen's Chief of Staff, John Moran. For example, at 12:45 p.m. on December 29, Olsen emailed Moran to follow up on an apparent call, writing:

> Thank you for calling me on behalf of AG Rosen. Attached is a draft complaint to be brought by the United States modeled after the Texas action. As I said on our call, the President of the United States has seen this complaint, and he directed me last night to brief AG Rosen in person today to discuss bringing this action. I have been instructed to report back to the President this afternoon after this meeting. I can be at Main Justice (or anywhere else in the DC Metropolitan area) within an hour's notice.[137]

Olsen also emailed Moran a letter that Republican Pennsylvania State Senator Doug Mastriano had previously sent Donoghue, asking him to pass the materials along to Rosen and telling him that they "raise[] a litany of serious outcome changing issues re: fraudulent and illegal votes in Pennsylvania, and provides an additional justification for the United States to

---

[135] SJC-Pre-CertificationEvents-000480-535.

[136] Email from Kurt Olsen to Jeffrey Wall (Dec. 29, 2020, 10:57 a.m.) (SJC-Pre-CertificationEvents-000064).

[137] Email from Kurt Olsen to John Moran (Dec. 29, 2020, 12:45 p.m.) (SJC-Pre-CertificationEvents-000071).

bring an action in the Supreme Court."[138] Moran forwarded the email to Rosen without comment.[139]

Mastriano's letter raised a litany of false and debunked claims of widespread election fraud in Pennsylvania, which Mastriano had previously aired at a November 25, 2020 "hearing" at a hotel in Gettysburg featuring Trump campaign lawyers Rudy Giuliani and Jenna Ellis and a phone call from Trump himself.[140] Mastriano would later assume a lead role in the "Stop the Steal" movement, spending thousands of dollars from his campaign account to charter buses to Washington for Trump's January 6, 2021 "Save America Rally."[141] He and his wife took part in the January 6 insurrection, with video footage confirming that they passed through breached barricades and police lines at the U.S. Capitol. To date, no footage has emerged showing Mastriano in the Capitol itself, but his presence on the Capitol grounds and his involvement in funding travel to Washington have prompted calls for his resignation.[142]

Rosen recalled Olsen reaching him on the phone twice during this two-day period. Rosen described having a "general practice" of not meeting with anyone in the Trump campaign, and he recalled his first discussion with Olsen being almost accidental: his DOJ cell phone rang with a number he didn't recognize, and when he picked up, Olsen was on the other line.[143] Rosen recalled being annoyed at himself for answering once he realized it was Olsen, who asked whether Rosen had seen the Pennsylvania brief and stressed the importance of filing it. Rosen asked Olsen what his relationship to Trump was and expressed skepticism that there would be standing to bring the proposed lawsuit, and recalled the phone call ending with a polite brushoff.[144]

Following the call, and recognizing that he would probably need to discuss the Supreme Court proposal with Trump, Rosen asked the Office of Solicitor General (OSG) to prepare a list of points on the proposal.[145] OSG responded on December 30 with a one-page summary of the "numerous significant procedural hurdles" DOJ would face if it filed the proposed action.[146] Among other hurdles, OSG explained that DOJ could not file an original Supreme Court action for the benefit of a political candidate; OSG also explained that there is no general cause of action for DOJ to contest the outcome of an election. At Rosen's request, OLC Assistant Attorney General Engel then prepared a plain-English version of the OSG analysis that would be

---

[138] Email from Kurt Olsen to John Moran (Dec. 30, 2020, 10:17 a.m.) (SJC-Pre-CertificationEvents-000174-179).

[139] Email from John Moran to Jeffrey Rosen (Dec. 30, 2020, 10:49 a.m.) (SJC-Pre-CertificationEvents-000186-193).

[140] Quint Forgey, *Trump Takes His Fraud Claims to a Hotel Ballroom – by Phone*, Politico (Nov. 25, 2020).

[141] Katie Meyer, Miles Bryan & Ryan Briggs, *Mastriano Campaign Spent Thousands on Buses Ahead of D.C. Insurrection*, WHYY (Jan. 12, 2021).

[142] Jeremy Roebuck & Andrew Seidman, *Pa. GOP Lawmaker Doug Mastriano Says He Left the Capitol Area Before the Riot. New Videos Say Otherwise*, Phila. Inquirer (May 25, 2021).

[143] Rosen Tr. at 114-115.

[144] Rosen Tr. at 115.

[145] *Id.*

[146] Email from [Redacted] to Jeffrey Rosen (Dec. 30, 2020, 7:06 p.m.) (SJC-PreCertificationEvents-000710-711).

more easily understood by non-lawyers; Engel's version confirmed that "[t]here is no legal basis to bring this lawsuit."[147]

Olsen reached Rosen again on December 30. Donoghue was present for the entire call and took notes.[148] Rosen recalled Olsen being "aggressive," telling him that Trump wanted DOJ to "file this brief by noon today," and threatening to report Rosen's position back to Trump.[149] Rosen responded that he would discuss the matter with Trump but not Olsen, and recalled this being the last and only time he spoke to an outside Trump ally about challenges to the election results.[150]

Sometime during the afternoon of December 30, following his second call with Olsen, Rosen spoke directly with Trump about the Supreme Court proposal. Rosen did not recall who placed the call—whether Trump called him, or whether he initiated the call after getting a message that Trump wanted to talk.[151] Relying on Engel's points, Rosen told Trump that DOJ couldn't file the Supreme Court action. Although Rosen did not recall with certainty whether the proposal came up at an Oval Office meeting the following day, he recalled it essentially being put to rest during this December 30 call, with Trump accepting that DOJ would not pursue the idea.[152] By contrast, Donoghue recalled Trump revisiting the Supreme Court action the following day, as discussed below.

## VI.   December 29 – January 1: White House Pressure on DOJ Escalates

White House pressure on DOJ escalated in the waning days of 2020 as Trump continued to complain about DOJ's inaction on his election fraud claims, including during a December 31 Oval Office meeting with Rosen and Donoghue. During the same period of time, White House Chief of Staff Mark Meadows—who had recently shown up unannounced at Georgia's Cobb County Civic Center to question election officials about their mail ballot signature match audit— sent a series of emails to Rosen, directly asking him to have DOJ investigate specific, discredited allegations of election fraud pushed by Trump and his campaign.

### A.  DOJ Leadership is Summoned to a December 31 Oval Office Meeting

On Thursday, December 31, 2020, Rosen and Donoghue were summoned to the White House for a meeting in the Oval Office with Trump. Meadows, Cipollone, and Deputy White House Counsel Patrick Philbin also attended.[153] Rosen recalled that Trump "seemed unhappy"

---

[147] Rosen Tr. at 115; Email from Steven Engel to Jeffrey Rosen (Dec. 31, 2020, 9:02 a.m.) (SJC-PreCertificationEvents-000708-709).

[148] Donoghue Tr. at 113; Notes of Dec. 30, 2020 Olsen-Rosen-Donoghue Call ("12/30/20 Donoghue Notes") (SJC-PreCertificationEvents-000706).

[149] Rosen Tr. at 116.

[150] Id.

[151] Rosen Tr. at 117.

[152] Rosen Tr. at 117-118.

[153] There are conflicting accounts about whether Acting DHS General Counsel Chad Mizelle attended this meeting or the earlier, December 15 Oval Office meeting. Rosen recalled that Acting DHS General Counsel Chad Mizelle attended on December 31; Donoghue recalled that Mizelle had attended the December 15 Oval Office meeting, but

that DOJ still had not "found the fraud," and described their discussion as "more of the same"—but otherwise did not recall granular details from the meeting, which he viewed as less significant than the Oval Office meeting that took place three days later.[154]

Donoghue recalled the meeting in greater detail. He described it as "contentious" and told us that "[Trump's] frustration was increasing," with the President reiterating that Rosen and Donoghue weren't doing their jobs and that people were telling him he should fire both of them and install Clark instead.[155] Donoghue did not recall whether Clark's proposed letter was a specific topic of discussion, but did recall responding that although Trump should have whatever leadership he wanted, DOJ operated based on facts and evidence and that replacing its leadership would not change the outcome.[156]

Donoghue also recalled Trump raising the proposed Supreme Court action that Rosen believed had been put to rest the previous day. According to Donoghue, Trump was "very frustrated" when Rosen and Donoghue repeatedly told him that DOJ lacked standing to file the action, insisting that Olsen and others had told him the case was a slam dunk.[157] Finally, Donoghue told us that Trump raised the prospect of appointing a special counsel to investigate election fraud and told the group "something to the effect of, 'I think Ken Cuccinelli would be a great special counsel.'"[158]

## B.  Clark Reveals Ongoing Contacts With Trump

Following the December 31 Oval Office meeting, either later that night or sometime on January 1, Rosen spoke to Clark again.[159] Although Clark had previously assured Rosen that he would not speak to Trump again and would notify Rosen or Donoghue of any requests to do so, Clark revealed that he had in fact spoken to Trump again. According to Rosen, Clark disclosed that Trump had asked whether he would be willing to take over as Acting Attorney General if Trump decided to replace Rosen, and requested an answer from Clark by Monday, January 4.[160]

Rosen recalled Clark indicating that he hadn't yet decided whether he would accept Trump's offer, wanted to conduct some "due diligence" on certain election fraud claims, and might turn down the offer if he determined that Rosen and Donoghue were correct that there was no corruption.[161] As part of this "due diligence," Clark renewed the request he initially made in his December 28 email for a classified briefing by the DNI. Rosen told us that because he assumed that Clark would follow up with Trump whether he liked it or not, he decided to

---

that Trump, Meadows, Cipollone, Philbin, Rosen, and Donoghue were the only participants on December 27. Rosen Tr. at 138; Donoghue Tr. at 26-7, 117.
[154] Rosen Tr. at 139-142.
[155] Donoghue Tr. at 118.
[156] Donoghue Tr. at 118-119.
[157] Donoghue Tr. at 119-120.
[158] Donoghue Tr. at 30.
[159] Rosen Tr. at 128 & 137.
[160] Rosen Tr. at 129.
[161] *Id.*

facilitate Clark's request for a DNI briefing in the hopes that the briefing would help Clark understand why his theories were unsound. The briefing took place the following day.[162]

Rosen similarly suggested that Clark call U.S. Attorney Pak, whom he knew would explain that allegations of ballot destruction in Atlanta had been debunked.[163] At 8:24 p.m. on January 1, 2021, Rosen emailed Clark the cell phone number for Byung Jin "BJay" Pak, U.S. Attorney for the Northern District of Georgia.[164] Rosen then checked in with Clark at 8:52 a.m. the next morning, asking: "Were you able to follow up?"[165]

Clark responded at 9:50 a.m. the following morning, reporting: "I spoke to the source and am on with the guy who took the video right now. Working on it. More due diligence to do."[166] Clark did not directly answer Rosen's question about whether he reached out to Pak; as discussed below, Rosen learned the following day that Clark had not.

### C. White House Chief of Staff Mark Meadows Asks DOJ to Initiate Baseless Election Fraud Investigations, Contrary to Longstanding Rules Against White House-DOJ Interference

As Trump encouraged DOJ to intervene in his behalf in the Supreme Court and asked Clark to consider replacing Rosen, his Chief of Staff, Mark Meadows, asked DOJ to intervene in the electoral certification by launching baseless election fraud investigations. He did so in a series of direct communications with Rosen between December 29 and January 1. These communications, which are detailed below, violated longstanding restrictions on communications between White House and DOJ officials concerning specific law enforcement matters.

**December 29, 2020:** At 11:27 a.m., Meadows sent Rosen a copy of a letter dated December 27 and authored by Carlo Goria, an apparent representative of USAerospace Partners, a U.S.-based aviation service group.[167] Meadows emailed Rosen the letter without additional comment. Goria's letter was addressed to Trump and written in Italian, although Meadows later sent an English version to Rosen as well. The letter made several claims related to a conspiracy theory known as "Italygate," which holds that an information technology employee of Italian aerospace company Leonardo S.p.A. coordinated with the CIA to use military satellites to remotely switch Trump votes to Biden votes.

**December 30, 2020 (9:31 a.m.):** At 9:31 a.m., Meadows forwarded Rosen an email and attachments from Cleta Mitchell, an attorney at Foley & Lardner LLP law firm who had been

---

[162] Rosen Tr. at 129-30.
[163] Rosen Tr. at 130.
[164] Email from Jeffrey Rosen to Jeffrey Clark (Jan. 1, 2021, 8:24 p.m.) (SJC-PreCertificationEvents-000287).
[165] Email from Jeffrey Rosen to Jeffrey Clark (Jan. 2, 2021, 8:52 a.m.) (SJC-PreCertificationEvents-000289).
[166] Email from Jeffrey Clark to Jeffrey Rosen (Jan. 2, 2021, 9:50 a.m.) (SJC-PreCertificationEvents-000290).
[167] Email from Mark Meadows to Jeffrey Rosen (Dec. 29, 2020, 11:27 a.m.) (SJC-Pre-CertificationEvents-000536).

advising the Trump campaign on post-election litigation.[168] Mitchell had written Meadows earlier that morning, attaching a December 4 lawsuit filed by the Trump campaign in Georgia state court and an accompanying press release, which announced that the lawsuit was challenging "literally tens of thousands of illegal votes" in Georgia. She explained to Meadows:

> This is the petition filed in GA state court and the press release issued about it. I presume the DOJ would want all the exhibits – that's 1800 pages total. I need to get someone to forward that to a drop box. Plus I don't know what is happening re investigating the video issues in Fulton County. And the equipment. We didn't include the equipment in our lawsuit but there are certainly many issues and questions that some resources need to be devoted to reviewing.

Meadows forwarded Mitchell's email to Rosen, asking: "Can you have your team look into these allegations of wrongdoing. Only the alleged fraudulent activity. Thanks Mark."

The lawsuit whose allegations Meadows asked DOJ to investigate asserted a variety of false claims of election fraud, and the Georgia Supreme Court had rejected Trump's request to hear it on an expedited basis.[169] Among the false claims it asserted, and that Meadows asked DOJ to investigate, were:

- A claim that 66,247 underage voters had unlawfully cast ballots in Georgia. In reality, Republican elections official Gabriel Sterling made clear that it would be impossible for unregistered and underage voters to cast ballots: "There cannot be a ballot issued to you, there's no way to tie it back to you, there's nowhere for them to have a name to correspond back to unless they're registered voters." Only four Georgians requested absentee ballots before turning 18—and all four turned 18 before Election Day.[170]

- A claim that thousands of votes were unlawfully cast by individuals registered at Post Office boxes; who voted after registering in another state; who voted in Georgia and another state; who moved without re-registering in their new county; and who registered after the voter registration deadline. In reality, these claims originated from Matt Braynard, a Trump campaign data expert whose analysis had been widely discredited and who himself acknowledged that he never verified that any of the thousands of voters was actually illegitimate.[171] Georgia's two recounts and its

---

[168] Email from Mark Meadows to Jeffrey Rosen (Dec. 30, 2020, 9:31 a.m.) (SJC-Pre-CertificationEvents-000598-665); *see also* Michael S. Schmidt & Kenneth P. Vogel, *Trump Lawyer on Call Is a Conservative Firebrand Aiding His Push to Overturn Election*, N.Y. Times (Jan. 15, 2021).

[169] Order, *Trump et al. v. Raffensperger et al.*, No. S21M0561 (Ga. Sup. Ct. Dec. 12, 2020).

[170] Bill McCarthy, *Here's Why Georgia's Republican Officials Are Confident in Their Presidential Election Results*, Politifact (Jan. 5, 2021).

[171] *See* Mark Niesse, *5 Georgia Election Fraud Claims Explained*, Atlanta Journal-Constitution (Dec. 14, 2020).

signature audit confirmed Biden's victory and found no evidence of fraud or vote tampering.[172]

**December 30, 2020 (9:43 a.m.):** Shortly after asking Rosen to have DOJ investigate allegations of wrongdoing in Georgia, Meadows forwarded him an English version of the Italygate letter from Carlo Goria that he had originally sent the previous day. As before, Meadows sent the letter without additional comment.[173]

**January 1, 2021 (2:51-3:39 p.m.):** At 2:51 p.m., Rosen emailed Meadows, "Did not receive the video link. Can you re-send?"[174] Rosen told us that Meadows had previously sent a link that didn't work, so he asked him to resend it.[175] Meadows responded at 3:08 p.m., sending Rosen a link to a YouTube video titled "Brad Johnson: Rome, Satellites, Servers: an Update."[176] The thirteen-minute video featured Bradley Johnson, a retired CIA station chief-turned conservative freelance opinion contributor who had been promoting the Italygate conspiracy theory in videos and online posts. As proof of his claim that Leonardo S.p.A and the CIA used military satellites to remotely change Trump votes to Biden votes, Johnson pointed to a sudden increase in Biden votes in several states whose early returns showed Trump leading—in reality, the expected result of Democratic counties reporting their totals, and states reporting Democratic-leaning mail ballot totals, after Republican counties had.[177]

Rosen emailed Meadows to confirm receipt, and then forwarded the exchange and YouTube link to Donoghue. Donoghue responded at 3:39 p.m., "Pure insanity."[178]

**January 1, 2021 (4:13 p.m.):** Just hours after emailing Rosen a link to Brad Johnson's Italygate video, Meadows asked him to have DOJ investigate disproven allegations of election fraud in Georgia. He wrote: "There have been allegations of signature match anomalies in Fulton County, Ga. Can you get Jeff Clark to engage on this issue immediately to determine if there is any truth to this allegation."[179]

Rosen forwarded Meadows's request to Donoghue, asking, "Can you believe this? I am not going to respond to message below." Donoghue agreed, and—alluding to Meadows's earlier

---

[172] 3rd Strike Against Voter Fraud Claims Means They're out After Signature Audit Finds No Fraud, Georgia Secretary of State, *available at* https://sos.ga.gov/index.php/elections/3rd_strike_against_voter_fraud_claims_means_theyre_out_after_signature_audit_finds_no_fraud.
[173] Email from Mark Meadows to Jeffrey Rosen (Dec. 30, 2020, 9:43 a.m.) (SJC-Pre-CertificationEvents-000666).
[174] Email from Jeffrey Rosen to Mark Meadows (Jan. 1, 2021, 2:51 p.m.) (SJC-Pre-CertificationEvents-000668).
[175] Rosen Tr. at 147.
[176] Email from Mark Meadows to Jeffrey Rosen (Jan. 1, 2021, 3:08 p.m.) (SJC-Pre-CertificationEvents-000669).
[177] *See* Matt Gertz, Mark Meadows: Searching for 'Italygate,' Media Matters for America, June 7, 2021, *available at* https://www.mediamatters.org/voter-fraud-and-suppression/mark-meadows-searching-italygate.
[178] Email from Jeffrey Rosen to Mark Meadows (Jan. 1, 2021, 3:22 p.m.) (SJC-Pre-CertificationEvents-000671); Email from Richard Donoghue to Jeffrey Rosen (Jan. 1. 2021, 3:39 p.m.) (SJC-Pre-CertificationEvents-000678).
[179] Email from Mark Meadows to Jeffrey Rosen (Jan. 1, 2021, 4:13 p.m.) (SJC-Pre-CertificationEvents-000672).

emails on Italygate—observed, "At least it's better than the last one, but that doesn't say much."[180]

In a response to Donoghue later the same evening, Rosen elaborated on Meadows's efforts to have DOJ investigate Italygate, which included a request that Rosen arrange for Johnson to meet with the FBI. Rosen wrote:

> After this message, I was asked to have FBI meet with Brad Johnson, and I responded that Johnson could call or walk into FBI's Washington Field Office with any evidence he purports to have. On a follow up call, I learned that Johnson is working with Rudy Giuliani, who regarded my comments as "an insult." Asked if I would reconsider, I flatly refused, said I would not be giving any special treatment to Giuliani or any of his "witnesses," and reaffirmed yet again that I will not talk to Giuliani about any of this."[181]

During his interview, Rosen told us that it was Meadows who had called and asked him to follow up on the Italygate allegations. Rosen recalled telling Meadows that the theory was "another one that's debunked," being told "there's more to it," and Meadows asking him to meet with Giuliani. This was not the only time he was asked to talk to Giuliani. Rosen told us that he "had refused to meet with Rudy Giuliani, multiple times over, during the month of December."[182] He could not recall how many times he had been asked to meet with Giuliani, and whether the requests had always come from Meadows as opposed to Trump. Rosen told us he never met with Giuliani, however.[183]

**January 1, 2021 (6:56 p.m.):** Meadows emailed Rosen again at 6:56 p.m., this time asking DOJ to investigate allegations of election fraud in New Mexico being pushed by Steve Pearce, the state's Republican Party chair. Meadows attached a document titled "New Mexico List of Complaints" and asked Rosen, "Can you forward this list to your team to review the allegations contained herein. Steve Pearce is the chairman of the Republican Party for NM."[184] The "complaints" Meadows asked DOJ to investigate consisted of several claims that had been refuted and/or already rejected by courts, including:

- A claim that poll challengers were removed from the mail ballot certification process. In reality, Republican poll challengers and observers were allowed to participate in the mail and provisional ballot certification process, and the New Mexico Supreme Court had unanimously rejected a lawsuit by the Republican Party of New Mexico challenging the process by which poll watchers monitored mail ballot certification.[185]

---

[180] Email from Richard Donoghue to Jeffrey Rosen (Jan. 1, 2021, 4:28 p.m.) (SJC-Pre-CertificationEvents-000673).

[181] Email from Jeffrey Rosen to Richard Donoghue (Jan. 1, 2021, 7:13 p.m.) (SJC-Pre-CertificationEvents-000678).

[182] Rosen Tr. at 148-149.

[183] Rosen Tr. at 149-150.

[184] Email from Mark Meadows to Jeffrey Rosen (Jan. 1, 2021, 6:56 p.m.) (SJC-Pre-CertificationEvents-000675-77).

[185] Michael Gerstein, *New Mexico GOP Claims Election Violations; County Clerks Dispute*, Santa Fe New Mexican (Nov. 6, 2020); Dan Boyd, *NM Supreme Court Denies GOP Election Petition*, Albuquerque Journal (Oct. 27, 2020).

- A claim that Dominion voting machines were the only ones used in New Mexico, and caused late-night "vote dumps" for Democratic candidates. In reality, so-called "vote dumps" were the expected result of Democratic precincts reporting their totals at different times than Republican ones. For example, Pearce previously claimed that 400 votes "just show[ed] up out of thin air" in Soccoro County, but local elections officials confirmed that those ballots simply arrived at the county clerk's office later than others after being driven there from a Navajo reservation an hour away.[186]

- A claim that mail ballots had been fraudulently requested and returned. In reality, there is no evidence of widespread voter fraud in New Mexico, much less any that would overcome Biden's nearly 11-point victory in the state.[187]

## VII.    January 2 – 4: DOJ Leadership Thwarts the Trump-Clark Plot, but U.S. Attorney BJay Pak is Ousted

### A.    January 2: Clark's Plans Crystallize and Trump Calls the Georgia Secretary of State

On January 2, President Trump, joined by Cleta Mitchell, spoke with Georgia Secretary of State Brad Raffensperger for approximately an hour by phone to pressure him to change the state's vote totals from the 2020 election. Trump specifically told Raffensperger to find exactly enough votes to win, stating:

> All I want to do is this. I just want to find 11,780 votes, which is one more than [the 11,779 vote deficit] we have, because we won the state.[188]

During the call, President Trump also mentioned Pak, referring to him as "your never-Trumper U.S. attorney there," and alleged that the Trump campaign had a "new tape that we're going to release" purporting to show "devastating" voter fraud at the State Farm Arena.[189]

Clark met with Rosen and Donoghue the same afternoon. Rosen told us that the purpose of the meeting was twofold: first, to reinforce that Clark should stop meeting with Trump, and second, to determine where he stood after conducting the "due diligence" Rosen and Clark had discussed two days earlier.[190] Rosen asked Donoghue to join him because he didn't want to meet with Clark alone; Donoghue joined and took contemporaneous notes.[191] Clark acknowledged that

---

[186] Michael Gerstein, *New Mexico GOP Claims Election Violations; County Clerks Dispute*, Santa Fe New Mexican (Nov. 6, 2020).

[187] Charles Davis, *New Mexico Republicans Peddle 'Dangerous' Myth of Voter Fraud in a State Trump Lost by Double Digits*, Business Insider (Jan. 7, 2021).

[188] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Wash. Post (Jan. 5, 2021).

[189] *Id.*

[190] Rosen Tr. at 131.

[191] Donoghue Tr. at 137; Notes of Jan. 2, 2021 Meeting ("1/2/21 Donoghue Notes") (SJC-PreCertificationEvents-000714).

he had been briefed by the DNI, who confirmed that there was no evidence of ballot or data tampering. He continued to press debunked allegations of election fraud in Georgia, however, insisting that DOJ should send his proposed letter.[192] Clark admitted that he had not called U.S. Attorney Pak, despite being asked to do so by Rosen. Instead, he revealed that he had spoken to a witness who testified at a Georgia Senate hearing and claimed that he had seen trucks moving ballots to a location where they would be shredded.[193]

Donoghue recalled that the meeting "became very heated" as he made clear that Clark's conduct was unacceptable. He told us:

> I reminded [Clark] that I was his boss, that he was apparently continuing to violate the White House contact policy, that that letter was never going out while we were in charge of the Department. And I sort of orally reprimanded him on a number of points, including reaching out to witnesses, and [said] "Who told you to conduct investigations and interview witnesses," and things like that. I was getting very heated. And then he turned to Acting AG Rosen, and he said, "Well, the President has offered me the position of Acting Attorney General. I told him I would let him know my decision on Monday. I need to think about that a little bit more."[194]

Rosen told us that at some point during this discussion, Clark indicated that if Rosen would reconsider his refusal to sign Clark's proposed letter—and send it to the Georgia legislature under Rosen's name—Clark might turn down the President's offer to install him in Rosen's place. Rosen again refused to send the letter.[195] According to Rosen:

> Q.  So Jeff Clark framed it as a choice he was giving you, to essentially either go along with the letter that you had previously rejected and sign it under your own name, or he will presumably take the President up on his offer to be installed in your place. Is that how you understood it?
>
> A.  Close to that. That he was saying that having done some due diligence as he requested, that he wasn't satisfied that Rich Donoghue and I were on this, but that he still wasn't sure what his answer would be on it. And he raised another thing that he might point to, that he might be able to say no [to the President], is if – that letter, if I reversed my position on the letter, which I was unwilling to do.[196]

Later the same day, at 7:13 p.m., Rosen responded to Donoghue's December 28, 2020, email refutation of Clark's initial proposal, stating:

---

[192] Donoghue Tr. at 138-139; 1/2/21 Donoghue Notes.
[193] Donoghue Tr. at 140-141; 1/2/21 Donoghue Notes; Rosen Tr. at 130-132.
[194] Donoghue Tr. at 141-142.
[195] Rosen Tr. at 145-146.
[196] Rosen Tr. at 145-146.

Rich, thanks for responding to this earlier. I confirmed again today that I am not prepared to sign such a letter.[197]

Donoghue then emailed Engel at 8:08 p.m. to ask him to call when he was free so that Donoghue could "update you on today's events."[198] As discussed previously, Rosen and Donoghue had until this point limited the universe of DOJ officials they read into Clark's activities. They kept Engel and, eventually, Rosen's longtime deputy Patrick Hovakimian apprised[199]; they discussed whether to immediately expand the circle following this January 2 meeting, but decided to defer updating other DOJ officials until they saw how Clark's plans developed.[200]

### B. January 3: Clark Reveals That Trump Will Install Him That Day

Clark and Trump's plans came to a head the following day. Rosen recalled receiving a phone call from Clark around noon on Sunday, January 3; Clark told Rosen he wanted to talk further and that it was important.[201] Rosen responded that he was unavailable until the afternoon, and they eventually met in Rosen's conference room around 3:00 p.m. At Clark's request, Rosen agreed to take the meeting alone, without Donoghue—who recalled it being "clear to me at this point [that] Jeff Clark did not want me involved in any of these discussions."[202]

According to Rosen, Clark reported that he had spoken earlier with the President, that Trump had in fact offered to install Clark in Rosen's place, and that Clark had accepted. Clark also revealed that the schedule had been accelerated: Rosen would be replaced that day, not on Monday January 4 or sometime thereafter.[203] Clark told Rosen that he wanted him to stay on as his Deputy Attorney General and that Donoghue would be replaced; Rosen responded that "there was no universe I could imagine in which that would ever happen."[204]

Toward the end of their meeting, Rosen told Clark that he would not accept being fired by his subordinate—and would contact the President to discuss the matter directly.[205] Once the meeting concluded, around 4:00 p.m., Rosen called Meadows and said he needed to meet with Trump that day; Meadows said he would arrange it, and called back shortly thereafter to confirm a 6:15 p.m. meeting. Rosen also called Cipollone, who agreed to join the Oval Office meeting

---

[197] Email from Jeffrey Rosen to Richard Donoghue (Jan. 2, 2021, 7:13 p.m.) (SJC-PreCertificationEvents-000200).
[198] Email from Richard Donoghue to Steven Engel (Jan. 2, 2021, 8:08 p.m.) (SJC-PreCertificationEvents-000291).
[199] Hovakimian was Rosen's Chief of Staff until his nomination to be General Counsel of ODNI required him to formally step down from the role, although he remained on Rosen's staff while his nomination was pending in the Senate. *See* PN1918 (116th Cong.); Donoghue Tr. at 56-57.
[200] Donoghue Tr. at 142-143.
[201] Rosen Tr. at 157.
[202] Rosen Tr. at 158. Donoghue Tr. at 145.
[203] Rosen Tr. at 158.
[204] *Id.*
[205] Rosen Tr. at 159.

and suggested that it would be helpful to know that Rosen and Donoghue were not outliers, and that they had the backing of others in DOJ.[206]

Rosen also updated Donoghue on his conversation with Clark. Donoghue recalled responding, "Well, I guess that's it. Are we going to find out [that we're fired] in a tweet?" Donoghue added, "At that point, I went back to my office and I began taking things off the wall and put them in boxes, because I told the Acting AG I would immediately resign. There was no way I was going to serve under Jeff Clark."[207] At Rosen's request, Donoghue and Hovakimian arranged a call with DOJ's senior leadership to determine whether others would also resign.[208]

As Rosen and Donoghue planned to read a broader group of senior DOJ leaders into Clark and Trump's plans, Clark apparently took steps of his own to rally potential allies within DOJ. At some point either shortly before or after his initial conversation with Rosen, Clark sent a series of emails to Doug Smith, his Chief of Staff and the Deputy Assistant Attorney General for the Civil Division's Torts Branch. At 12:31 p.m. on January 3, 2021, Clark emailed Smith and told him to "please get back to DC immediately."[209] Smith responded at 2:38 p.m. that he had "a flight back tonight but will try to get back earlier."[210] Minutes later, at 2:42 p.m., Clark told Smith to "[t]ry to get back as soon as you can."[211] Sixteen minutes later, at 2:58 p.m., Smith told Clark that he was on his way to the airport and would probably get to Washington, D.C. around 6:00 p.m.[212] After the meeting with Rosen, Clark emailed Smith again at 4:37 p.m. to direct him to come to the Justice Department with "[l]egal pad in hand."[213]

Smith appears to be one of two DOJ officials whose help Clark enlisted, or attempted to enlist, while pursuing his scheme. The other was Civil Division Senior Counsel Kenneth Klukowski. Klukowski emailed Smith at 6:15 p.m. to inform him that he "[j]ust heard from Jeff[rey Clark] that our new meeting time tonight is 8pm…See you soon, sir!"[214] Emails suggest that Klukowski had played a role in Clark's "Proof of Concept" letter, a copy of which Klukowski emailed Clark at 4:20 p.m. on December 28—just twenty minutes before Clark sent the proposal to Rosen and Donoghue.[215] The extent of Klukowski's and Smith's role in Clark's scheme is unclear from the limited documents produced by DOJ; nor were the witnesses we interviewed able to shed light on their involvement.

---

[206] Rosen Tr. at 160.

[207] Donoghue Tr. at 145-146.

[208] Donoghue Tr. At 147; Rosen Tr. At 160.

[209] Email from Jeffrey Clark to Douglas Smith (Jan. 3, 2021, 12:31 p.m.) (SJC-PreCertificationEvents-000294).

[210] Email from Douglas Smith to Jeffrey Clark (Jan. 3, 2021, 2:38 p.m.) (SJC-PreCertificationEvents-000295).

[211] Email from Jeffrey Clark to Douglas Smith (Jan. 3, 2021, 2:42 p.m.) (SJC-PreCertificationEvents-000296).

[212] Email from Douglas Smith to Jeffrey Clark (Jan. 3, 2021, 2:58 p.m.) (SJC-PreCertificationEvents-000297).

[213] Email from Jeffrey Clark to Douglas Smith (Jan. 3, 2021, 4:37 p.m.) (SJC-PreCertificationEvents-000304).

[214] Email from Kenneth Klukowski to Douglas Smith (Jan. 3, 2021, 6:15 p.m.) (SJC-PreCertificationEvents-000323).

[215] Email from Kenneth Klukowski to Jeffrey Clark (Dec. 28, 2020, 4:20 p.m.) (SJC-Pre-CertificationEvents-000044-49).

### C.  The Justice Department Leadership Assembles

From there, at 4:21 p.m., Hovakimian requested a conference line "for a call tonight,"[216] which Donoghue provided at 4:23 p.m.[217] At 4:28 p.m., Hovakimian emailed DOJ leadership asking them to "join Rich[ard Donoghue] and me for a call at 4:45 p.m."[218] The invitees included:

- Claire Murray, Principal Deputy Associate Attorney General;
- Jeffrey Wall, Acting Solicitor General;
- Makan Delrahim, Assistant Attorney General for the Antitrust Division;
- Steve Engel, Assistant Attorney General for the Office of Legal Counsel;
- John Demers, Assistant Attorney General for the National Security Division;
- Eric Dreiband, Assistant Attorney General for the Civil Rights Division; and
- David Burns, Principal Deputy Assistant Attorney General for the National Security Division and acting Assistant Attorney General for the Criminal Division.

Donoghue and Hovakimian took the call from Hovakimian's office. Donoghue explained what had taken place over the past week and asked the invitees to inform him and Hovakimian if they would resign. According to Donoghue, "essentially, everyone responded either during the call or immediately thereafter that they would resign."[219]

Hovakimian also drafted a resignation email at some point on January 3. The email, which Hovakimian never sent, was addressed to DOJ Component Heads, the Offices of the Attorney General and Deputy Attorney General, and the Chair and Vice Chair of the Attorney General's Advisory Committee. It read:

> This evening, after Acting Attorney General Jeff Rosen over the course of the last week repeatedly refused the President's direct instructions to utilize the Department of Justice's law enforcement powers for improper ends, the President removed Jeff from the Department. PADAG Rich Donoghue and I resign from the Department, effective immediately.[220]

### D.  The January 3, 2021 Oval Office Meeting

Rosen, Donoghue, and Engel arrived at the White House around 6:00 p.m. Donoghue initially waited in the hallway but joined the meeting at Trump's request about 25 minutes after it

---

[216] Email from Patrick Hovakimian to Nathan Gamble and Maya Suero (Jan. 3, 2021, 4:21 p.m.) (SJC-PreCertificationEvents-000299).

[217] Email from Richard Donoghue to Patrick Hovakimian (Jan. 3, 2021, 4:23 p.m.) (SJC-PreCertificationEvents-000300).

[218] Emails from Patrick Hovakimian to Claire Murray, Jeffrey Wall, Makan Delrahim, Steven Engel, John Demers, David Burns, and Eric Dreiband (collectively, "DOJ leadership") (Jan. 3, 2021, 4:28 and 4:30 p.m.) (SJC-PreCertificationEvents-000302-03).

[219] Donoghue Tr. at 148.

[220] Draft Resignation Letter (SJC-PreCertificationEvents-000729).

started; in all, the meeting lasted somewhere between two to three hours. The participants were Trump, Rosen, Donoghue, Engel, Cipollone, Philbin, and Clark.[221] Rosen also recalled Eric Herschmann, Senior Adviser to the President, participating in the meeting.[222]

According to Rosen, Trump opened the meeting by saying, "One thing we know is you, Rosen, aren't going to do anything to overturn the election."[223] Over the course of the next three hours, the group had what Donoghue called "a wide-ranging conversation" focused on whether Trump should replace DOJ's leadership, install Clark in Rosen's place, and send Clark's proposed letter—and whether Clark was even qualified to assume the Acting Attorney General position.[224] Rosen and Donoghue told us that by this point, Clark's proposed letter and his potential role as Acting Attorney General were intertwined:

> At that point, it was difficult to separate the issue of the letter and Jeff Clark being in the leadership position, because it was very clear, and he stated it repeatedly, that if the President made him the Acting Attorney General, he would send that letter. So it wasn't as if there was a third option where Jeff Clark would become the Acting Attorney General and the letter would not go. They were sort of one and the same at that point.[225]

At some point during the meeting, Donoghue and Engel made clear that all of the Assistant Attorneys General would resign if Trump replaced Rosen with Clark. Donoghue added that the mass resignations likely would not end there, and that U.S. Attorneys and other DOJ officials might also resign en masse. Donoghue told us that he raised the prospect of mass resignations "earlier rather than later" in the meeting because he thought it was important context for the President's decision.[226] Donoghue and Rosen also recalled Cipollone and Philbin pushing back against the proposal to replace Rosen with Clark, with Cipollone calling Clark's letter as a "murder-suicide pact" and the two White House lawyers indicating that they would also resign.[227] Beyond the letter, Rosen described Herschmann as being "highly critical" of Clark's "qualifications and capabilities."[228]

Despite being informed early on that the Clark course of action would prompt mass resignations—and even though every participant in the meeting except Clark advocated strongly against that course of action—Trump continued for some time to entertain the idea of installing Clark in Rosen's place. Donoghue told us that Trump did not reject the Clark course of action

---

[221] Donoghue Tr. at 149-151; Rosen Tr. at 47.
[222] Rosen Tr. at 47.
[223] Rosen Tr. at 112.
[224] Donoghue Tr. at 152.
[225] Donoghue Tr. at 152; Rosen Tr. at 49.
[226] Donoghue Tr. at 155.
[227] Donoghue Tr. at 157, 159; Rosen Tr. at 50.
[228] Rosen Tr. at 164.

until "very deep into the conversation," within the final 15 minutes of the two- to three-hour meeting.[229]

After almost three hours of radio silence, at 9:00 p.m., Hovakimian emailed the Justice Department leadership, stating:

> I only have limited visibility into this, but it sounds like Rosen and the cause of justice won. We will convene a call when Jeff is back in the building (hopefully shortly). Thanks.[230]

Demers responded, "Amazing."[231] At 9:28 p.m., Engel confirmed Hovakimian's announcement to the group, stating "that is correct."[232]

While Clark's specific gambit was rebuffed, Trump himself continued to push DOJ to investigate further Georgia election fraud allegations that very night. Donoghue told us that, shortly after the Oval Office meeting concluded, Trump contacted him to claim a DHS Special Agent was in custody of a truck full of shredded ballots outside of Atlanta.[233] Donoghue recalled telling Trump that he had not heard that, but also reminding Trump:

> If it's a DHS agent, remember they don't belong to DOJ. But if they have an issue that they need our assistance with, they certainly know how to contact us. I'm sure that will happen, if appropriate.[234]

Trump still asked Donoghue to make sure that Ken Cuccinelli at DHS knew about this claim, prompting Donoghue that same night to call Cuccinelli, who also was not aware of this claim.[235] This ballot shredding claim was ultimately determined by DHS, FBI, and the U.S. Attorney's Office in Atlanta to be false. While there were ballots shredded, they were from past elections, and were being cleared out to make room for the storage of the 2020 ballots according to the County's record retention procedures.[236]

### E.  U.S. Attorney Pak Resigns

At some point during the Oval Office meeting, Trump began to complain about U.S. Attorney Pak. By then Pak's office had investigated and debunked various allegations of election fraud in Georgia, including the false claim about a videotape from Atlanta's State Farm Arena. That claim came to the fore following a December 3, 2020 Georgia Senate hearing, where Rudy Giuliani showed a video that he said showed poll workers bringing suitcases of ballots out from

---

[229] Donoghue Tr. at 157.
[230] Email from Patrick Hovakimian to DOJ leadership (Jan. 3, 2021, 9:07 p.m.) (SJC-PreCertificationEvents-000324).
[231] Email from John Demers to Patrick Hovakimian (Jan. 3, 2021, 9:12 p.m.) (SJC-PreCertificationEvents-000325).
[232] Email from Steven Engel to DOJ leadership (Jan. 3, 2021, 9:28 p.m.) (SJC-PreCertificationEvents-000326).
[233] Donoghue Tr. at 52.
[234] *Id.* at 53.
[235] *Id.*
[236] *Id.* at 54.

under a table to secretly count after Republican poll watchers went home.[237] Pak told us that on December 4, Attorney General Barr asked if he had seen the news about the suitcase allegation; Pak said he had, and Barr asked him to make finding out more about Giuliani's allegations a "top priority" because they might come up at an upcoming meeting Barr would attend at the White House.[238]

By December 4, the Georgia Secretary of State's Office had already investigated and announced that the State Farm Arena allegations were false.[239] In reality, the "suitcase" was a secure ballot container, and the ballots were counted in the presence of poll watchers from both parties.[240] Although the Secretary of State's Office had already refuted the allegations, Pak took steps in response to Barr's request. Pak told us he alerted Donoghue, contacted his office's District Election Officer, and spoke to the FBI following Barr's request that he prioritize looking into Giuliani's allegations.[241] He told us he was "very sensitive" to the need to avoid overt investigative steps that voters in the upcoming January 5 Senate runoff might inadvertently view as lending legitimacy to the claims.[242] On the other hand, Pak did not know what the Secretary of State's investigation consisted of, and because Barr had prioritized the matter, Pak asked the FBI to investigate.[243] Within two or three days of his call with Barr, Pak personally reviewed the tape along with an audio recording of interviews the Secretary of State's Office had conducted, and determined that they were consistent with the Secretary of State's public refutation of Giuliani's allegations.[244] Around the same time, the FBI received authorization to interview a handful of poll workers and other individuals depicted in the State Farm videotape.[245] They received this authorization notwithstanding PIN's objection that witness interviews would be inconsistent with ECB's election non-interference policy and Barr's November 9 memo, discussed more fully above. Following the interviews, the FBI reported to Pak that nothing irregular had happened; Pak then reported to Donoghue and Barr that "there was no substance to the allegations."[246]

Donoghue and Rosen later told Trump that there was no merit to the State Farm Arena allegations, including on their December 27 call. Trump nonetheless continued to insist that there was fraud in Georgia. According to Donoghue, Trump raised Georgia during the January 3 Oval Office meeting; after being told that DOJ had looked into election fraud claims in Atlanta and determined there was no evidence to support them, Trump mentioned Pak. Donoghue told us that Trump looked at a piece of paper on his desk and responded, "Atlanta, Atlanta, no surprise there. They didn't find anything. No surprise because we have a never-Trumper there as U.S.

---

[237] Stephen Fowler, Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim, Georgia Public Broadcasting (Dec. 4, 2020).

[238] Pak Tr. at 13.

[239] Gabriel Sterling (@GabrielSterling), Twitter (Dec. 4, 2020, 6:41 a.m.), https://twitter.com/GabrielSterling/status/1334825233610633217?s=20org%2Fnews%2F2020%2F12%2F04%2Ffact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

[240] See Pak Tr. at 16-17.

[241] Pak Tr. at 14-15.

[242] Pak Tr. at 15.

[243] Pak Tr. at 38-39.

[244] Pak Tr. at 18, 21-22.

[245] Pak Tr. at 22-23.

[246] Pak Tr. at 20.

Attorney." Trump then read a quote, purportedly from Pak, criticizing the impact of Trump's rhetoric on the Republican Party's ability to appeal to minorities.[247]

Donoghue told us that he pushed back against Trump's characterization of Pak as a "never-Trumper" and that Trump disagreed and "was fixated on that for a short period of time." Trump then told Donoghue, "I want you to fire him."[248] Donoghue recalled the ensuring conversation as follows:

> I said, "Mr. President, I'm not going to fire him. There's no reason to fire him." And he said, "Then I'm firing him." And I said, "Well, before you do that, understand that I talked to BJay a couple of days ago, and he is submitting his resignation tomorrow morning," which would have been Monday morning. Pat Cipollone stepped in and said, "We're not firing someone who is resigning in a few hours." And the President said, "That's fine. I'm not going to fire him, then. But when his resignation comes in, it's accepted. Tomorrow is his last day as U.S. Attorney."[249]

In fact, Pak had not previously decided to resign on January 4. He told us that sometime prior to January 3, he had informed his office, the courts, and local law enforcement partners that he intended to remain in his position until Inauguration Day. He also informed Donoghue that he would probably submit his resignation sometime shortly after the January 5 runoff election but that the resignation would be effective as of January 20.[250] Pak told us he considered resigning on January 3 after he learned about Trump's call with Raffensperger, during which the President called Pak a "never Trumper" and continued to press election fraud claims that Pak had told DOJ leadership weren't true. Although Pak was "personally very concerned" that Trump apparently seeking to overturn the election and represent that there had been irregularities in Georgia, he decided not to submit his resignation on January 3 because he did not want to disrupt the upcoming special election. Instead, Pak decided to "stay with my original plan" to "submit my letter of resignation and give two weeks' notice and leave office on Inauguration Day."[251]

After Trump told Donoghue that January 4 would be Pak's last day as U.S. Attorney, the conversation turned to the question of who would replace him. According to Donoghue, Trump asked, "What do you know about Bobby Christine?"[252] Christine was the U.S. Attorney for the Southern District of Georgia, and Trump added, "I hear great things about him." Trump then told Donoghue he wanted Christine to run the Northern District of Georgia. Donoghue responded that Christine was already running a U.S. Attorney's office, and that Pak had a First Assistant U.S. Attorney who would step in when Pak left. Donoghue was referring to FAUSA Kurt Erskine, who would take over as Acting U.S. Attorney under DOJ's well-established line of succession.

---

[247] Donoghue Tr. at 160.
[248] Donoghue Tr. at 161.
[249] Donoghue Tr. at 161.
[250] Pak Tr. at 93-94.
[251] Pak Tr. at 90-91.
[252] Donoghue Tr. at 161.

Trump insisted on appointing Christine instead, telling Donoghue something to the effect of, "if he's good, he'll find out if there's something there."[253]

> Q.  You said the President said something to the effect of "I've heard great things about Bobby Christine, and if I put him in, he'll do something about it." Is that what you said?
>
> A.  Something to that effect. Of course it's not a quote, but he said something like, "Well, if this guy is good, maybe something will actually get done."
>
> Q.  And by "something getting done," what did you interpret him to mean?
>
> A.  That there would be some sort of investigation that hadn't been done. But as I had told him repeatedly, the Department's looked at it. They did their job in the Northern District of Georgia.[254]

Later that night, Donoghue emailed Pak to "[p]lease call ASAP."[255] Pak called him. According to Pak, Donoghue relayed that Trump was "very unhappy" with him, believed he was a never-Trumper, and wanted to fire him. Donoghue also relayed that upon learning that Pak intended to submit his resignation that week, Trump agreed to accept the resignation rather than fire Pak, but that Pak had to resign quickly:

> Mr. Donoghue then asked me … how long were you planning to stay after you submit your resignation. I told him that, you know, through inauguration. And Mr. Donoghue said no, unfortunately, it can't be that long.[256]

Donoghue indicated that Pak could remain at DOJ in another senior role through the end of the administration, but Pak declined.[257] According to Pak, Donoghue acknowledged that Pak could announce his resignation however he wanted, including by having a press conference or by "mak[ing] a big fuss," but suggested that it would be best for everyone if Pak left quietly. Pak responded that he would think about it.[258] Early the next morning, Pak called Donoghue back and informed him that he would submit a "very bland" resignation, in order to avoid impacting the upcoming special election. Pak also asked Donoghue to clarify why he had been asked to resign early. According to Pak, Donoghue responded that the President believed Pak was "not doing enough" and that the reason he was "not doing enough" was that he was a never-Trumper.[259]

---

[253] Donoghue Tr. at 162.
[254] Donoghue Tr. at 168-169.
[255] Email from Richard Donoghue to BJay Pak (Jan. 3, 2021, 10:09 p.m.) (SJC-PreCertificationEvents-000328).
[256] Pak Tr. at 95-96.
[257] Pak Tr. at 96.
[258] Pak Tr. at 96.
[259] Pak Tr. at 96.

At 7:41 a.m., Pak submitted resignation letters to President Trump and Rosen through the Executive Office of United States Attorneys.[260] At 7:46 a.m., Pak emailed all the U.S. Attorneys (copying Donoghue) a personal announcement of his resignation. After his sentiments, Pak included his "wish and hope that at least some of you will consider continuing to serve our country -- our nation needs patriots like you to uphold the rule of law."[261] Donoghue forwarded this email to Rosen,[262] and replied to Pak: "You are a class act, my friend. Thank you."[263] Engel also separately reached out to Pak to offer "[m]any thanks for all of your service to the Department, and I hope that our paths do cross again."[264]

## VIII.     Recommendations

To date, the Committee's investigation has uncovered several facets of President Trump's attempts to enlist DOJ and its leadership in his efforts to overturn the results of the 2020 presidential election. These efforts highlight several ways in which bad-faith actors can exploit DOJ policy and norms to provide a platform for election fraud claims even when the claims are not backed by any credible evidence and insert DOJ unnecessarily in political controversies.

Because the Committee's investigation is not yet complete and more documents and interviews are still being pursued, we have not made findings or recommendations concerning possible criminal liability. However, the investigation has uncovered sufficient information to justify providing a set of recommendations on potential legislative and oversight steps to strengthen DOJ's protections against politicization of its investigative and prosecutorial powers and additional measures that should be taken in response to this episode. Additionally, as this interim report makes clear, this entire episode is not merely a policy failure, but also the result of conscious actions by a mix of bad-faith actors seeking to overturn the 2020 general election in favor of their preferred candidate as well as other actors attempting to placate Trump while running out the clock on his administration. As appropriate, federal and state bar associations should consider whether additional accountability measures are warranted to discipline these bad actors and deter future attempts to politicize DOJ.

Finally, some aspects of this episode implicate issues that extend beyond the immediate purview of this investigation, and should be pursued as appropriate by the House Select Committee on the January 6 Attack.

### Recommendation #1: Strengthen DOJ-White House Contacts Policy Through Increased Transparency and Enforcement

As this report makes clear, Jeffrey Clark blatantly violated the DOJ-White House contacts policy on multiple occasions by making unauthorized contact with President Trump. As the Senate-confirmed Assistant Attorney General for the Environment and Natural Resources

---

[260] Email from BJay Pak to Karen Winzenburg (Jan. 4, 2021, 7:41 a.m.) (SJC-PreCertificationEvents-000382-384).

[261] Email from BJay Pak to U.S. Attorneys (Jan. 4, 2021. 7:46 a.m.) (SJC-PreCertificationEvents-000385).

[262] Email from Richard Donoghue to Jeffrey Rosen (Jan. 4, 2021, 8:46 a.m.) (SJC-PreCertificationEvents-000387).

[263] Email from Richard Donoghue to BJay Pak (Jan. 4, 2021, 11:12 a.m.) (SJC-PreCertificationEvents-000391).

[264] Email from Steven Engel to BJay Pak (Jan. 4, 2021, 10:53 a.m.) (SJC-PreCertificationEvents-000389).

Division and the acting Assistant Attorney General for the Civil Division, Clark had a responsibility to know that the policy prohibited him from meeting with Trump without authorization. Regardless, prior to his unauthorized meetings with Trump, Clark had constructive knowledge that such contact violated the contacts policy after Donoghue sent that very policy to Clark and other senior DOJ leaders after the 2020 general election on November 11, 2020.[265] Yet even being admonished by Donoghue that his unauthorized meeting in the Oval Office violated the contacts policy, and even though Clark assured Rosen that he would not meet with the President again, Clark brazenly violated the policy at least once more.[266]

Mark Meadows also repeatedly violated the DOJ-White House contacts policy. The White House version of that policy in force at the time made clear that communications with DOJ about pending or contemplated investigations or cases were to involve only the President, Vice President, White House Counsel, and the White House Counsel's designees.[267] The policy, which was enshrined in a memo from former White House Counsel McGahn, stressed, "In order to ensure that DOJ exercises its investigatory and prosecutorial functions free from the fact or appearance of improper political influence, these rules must be strictly followed." Meadows violated the policy each time he contacted Rosen to request that DOJ look into election fraud allegations, whether in Fulton County, New Mexico, or elsewhere.

On July 21, 2021, Attorney General Merrick Garland and White House Counsel Dana Remus updated and reissued DOJ and White House versions of the contacts policies. The updated policies clarify and strengthen the limitations on communications between White House and DOJ officials on specific law enforcement matters. However, the misconduct documented in this report demonstrates why a stricter oversight regime around White House contacts with DOJ is appropriate, particularly given that even the Attorney General does not have the authority to fire a fellow presidentially appointed and Senate-confirmed official—a fact Rosen himself faced when confronted by Clark's repeated violations.[268]

Congress can provide additional teeth to the DOJ-White House contacts policy by requiring greater transparency and enhanced enforcement around covered communications. Current proposals that warrant particular consideration are the Title VI provisions within the Protecting Our Democracy Act (PODA) that would require the Attorney General to maintain a log of designated contacts between the White House and DOJ that is shared with the DOJ OIG, who would then notify the Senate and House Judiciary Committees of any inappropriate or improper contacts.[269] However, PODA only contemplates a semi-annual sharing of the contacts log with DOJ OIG, which would not have alerted OIG or Congress of Clark's violations until well after they occurred.[270] Consequently, it would be advisable for any such legislation to

---

[265] Email from Richard Donoghue to DOJ leadership (Nov. 11, 2020, 6:27 p.m.) (SJC-PreCertificationEvents-000680).
[266] Rosen Tr. at 84-85, 128-129; Donoghue Tr. at 104, 141.
[267] Memorandum from Donald F. McGahn II to All White House Staff (Jan. 27, 2017) (SJC-PreCertificationEvents-000685-686).
[268] Rosen Tr. at 131-132.
[269] Protecting Our Democracy Act, H.R. 5314, 117th Cong. §§ 601-604 (2021).
[270] Id. at §603(c)(1).

require regular IG access to the contacts log, and setting up an immediate "urgent concern" transmission system to the Senate and House Judiciary Committees similar to the one in place for whistleblower complaints in the Intelligence Community and the Intelligence Committees. Relatedly, the bipartisan Inspector General Access Act (IGAA) has a role to play in making any DOJ-White House contacts policy enforceable by expanding the jurisdiction of the DOJ Inspector General to cover matters of attorney misconduct.[271] The Committee has previously reported this legislation out on a bipartisan basis and Congress should enact it this year.

Additionally, while the information in this report demonstrates that various existing criminal provisions regarding the obstruction of justice—such as 18 U.S.C. § 1505's prohibition on obstructing proceedings before departments, agencies, and committees, and 18 U.S.C. § 1512(c)(2)'s prohibition on corruptly obstructing, influencing, or impeding any official proceeding—may apply to aspects of this episode, Congress should consider legislative amendments to related obstruction of justice provisions to ensure they clearly cover similarly corrupt actions. These include, but are not limited to:

- Consider amending 18 U.S.C. § 1505 to clarify that this provision applies to corrupt influence of state proceedings relating to federal elections;

- Consider amending 18 U.S.C. § 1512(c) to clarify that this provision also applies to state proceedings relating to federal elections; and

- Consider amending 18 U.S.C. § 372 to clarify that "corruptly persuading" constitutes a type of "force, intimidation, or threat" prohibited by the statute.

### Recommendation #2: Strengthen DOJ's Longstanding Policy of Election Non-Interference

Attorney General Barr twice relaxed elements of DOJ's longstanding policy of election non-interference, shortly before the election and immediately afterwards on November 9, 2020. The result of both actions was to cast public doubt on the integrity of the election where none was warranted and to encourage unwarranted investigative steps into non-credible allegations prior to the certification of the election. Attorney General Garland rescinded Barr's November 9 memo on February 3, 2021 and clarified that until DOJ was able to update the Justice Manual to reflect the newly changed policy, "the Department's forty-year old 'non-interference with elections policy'" contained in the ECB's Federal Prosecution of Election Offenses manual would govern.[272]

---

[271] Inspector General Access Act, S. 426 & H.R. 3064, 117th Cong. (2021).

[272] Memorandum from Attorney General Garland for Heads of Department Components, All United States Attorneys at 1 (Feb. 3, 2021). The February 3 memo also rescinded separate guidance issued by former Attorney General Barr on December 22, 2020, which directed the Civil Rights Division to assume that a state or local government that readopts preexisting voting procedures following the pandemic has done so lawfully, unless the preexisting procedures were previously found to be unlawful. *See* Memorandum from Attorney General Barr to the Assistant Attorney General, Civil Rights Division (Dec. 22, 2020).

As they work to update the Justice Manual to reflect the longstanding policy contained in the ECB manual, DOJ leadership should consider expanding the consultation requirements for election-related cases. There are various forms that such an expansion could take, such as explicitly requiring the approval of career attorneys in PIN before any investigative steps can be taken in election fraud cases (as opposed to merely consulting with PIN), but generally such an expansion should require a written request and approval process that includes a requirement for a written explanation when the initial decision by PIN is overruled by a political appointee, including the Attorney General.

Additionally, DOJ leadership should consider formalizing other existing norms regarding election non-interference, and centralizing all such policies and guidance to better ensure career staff and political appointees all share the same understanding. Specifically, DOJ should reduce the so-called "unwritten 60-day rule" to writing. Under this longstanding principle, in the 60-day period preceding a primary or general election, DOJ should avoid returning indictments against a candidate or taking overt investigative steps related to electoral matters.[273] In 2018, the DOJ Inspector General recommended that DOJ consider providing written guidance to agents and prosecutors concerning their obligations to avoid taking actions that could impact elections. DOJ has not yet implemented that recommendation.[274]

Although this report focuses on conduct during the post-election period, that conduct occurred against the backdrop of Attorney General Barr's pre-election efforts to cast doubt on the election's integrity. These efforts included a September 24, 2020 announcement that the U.S. Attorney's Office for the Middle District of Pennsylvania was investigating claims that mail ballots in Luzerne County had been discarded.[275] They also included Barr's numerous public statements baselessly suggesting that voting by mail would lead to fraud and DOJ's October 2020 directive that prosecutors could take overt, pre-election steps in election fraud investigations involving claims of misconduct by federal officials—including U.S. Postal Service employees.[276] To help ensure that agents and prosecutors adhere to DOJ's longstanding norms against election interference, DOJ should issue written guidance enshrining the 60-day rule.

### Recommendation #3: Further Investigation of Clark's Conduct by the District of Columbia Bar

Clark's attempts to enlist DOJ in Trump's effort to overturn the results of the presidential election without evidence or legal authority to do so clearly undermined the rule of law. Clark is

---

[273] *See* Department of Justice Office of the Inspector General, *A Review of Various Actions by the Federal Bureau of Investigation and the Department of Justice in Advance of the 2016 Election* at 17-18 (June 2018).

[274] Department of Justice Office of the Inspector General, *Recommendations Issued by the Office of the Inspector General that were Not Closed as of July 31, 2021* at 114.

[275] Department of Justice, Press Release: Revised Statement of U.S. Attorney Freed on Inquiry into Reports of Potential Issues with Mail-In Ballots (Sept. 24, 2020), *available at* https://www.justice.gov/usao-mdpa/pr/revised-statement-us-attorney-freed-inquiry-reports-potential-issues-mail-ballots.

[276] *See, e.g.*, Jane C. Timm, *Fact Check: Echoing Trump, Barr Misleads on Voter Fraud to Attack Expanded Vote-by-Mail*, NBC News (Sept. 19, 2020); Robert Faturechi & Justin Elliott, *DOJ Frees Federal Prosecutors to Take Steps That Could Interfere With Elections, Weakening Longstanding Policy*, ProPublica (Oct. 7, 2020).

currently barred in the District of Columbia, where DOJ is headquartered and where his offending conduct took place, and as such the District of Columbia Bar's Office of Disciplinary Counsel should evaluate Clark's conduct to determine whether disciplinary action is warranted. To that end, the Committee is concurrently submitting a formal complaint to the District of Columbia Bar based on the findings of our report.

Based on the facts this investigation has uncovered to date, Clark's conduct may implicate multiple Rules of Professional Conduct. This includes Rule 8.4's prohibitions against "conduct involving dishonesty, fraud, deceit, or misrepresentation," "conduct that seriously interferes with the administration of justice" and "stat[ing] or imply[ing] an ability to influence improperly a government agency or official."[277] Clark's conduct may also implicate Rule 1.2(e), which states that a "lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent," although a lawyer "may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good-faith effort to determine the validity, scope, meaning, or application of the law."[278] Clark's continued pursuit of his "Proof of Concept" letter despite being told repeatedly by DOJ leadership that his election fraud claims were baseless may implicate each of these rules.

A determination of whether Clark violated applicable rules of professional conduct would require an assessment of his state of mind, particularly to the extent those rules—like Rule 1.2(e)—include a knowledge element. Testimony by Clark himself would shed additional light on his state of mind, but to date he has not agreed to the Committee's request for a voluntary interview despite repeated follow-up and after more than two months have passed since DOJ authorized him to testify without restriction. Regardless, Clark should not be able to avoid discipline by asserting he subjectively assessed his claims to be factual or reasonable. Knowledge is ascertained by an objective standard,[279] and the disciplinary authority may prove that Clark "knowingly" pushed DOJ to act on baseless grounds through circumstantial evidence,[280] which, as demonstrated by this report, overwhelmingly shows Clark knew and should have known his claims were baseless. On this note, it should be noted that Rudy Giuliani has been suspended from practicing law in New York and faces disbarment for communicating "demonstrably false and misleading statements to courts, lawmakers and the public at large" regarding similar claims.[281] Additionally, nine other attorneys, including Sidney Powell and L. Lin Wood, have already been sanctioned by the Eastern District of Michigan and referred to the relevant disciplinary authorities for their admitting jurisdictions for their "bad faith" effort "to use the judicial process to frame a 'public narrative'" based on "conjecture and speculation" lacking evidentiary support, precisely like Clark.[282] Although Clark did not press the false claims in his "Proof of Concept" letter before a court in the same way that Giuliani, Powell, and Wood

---

[277] D.C. R. Prof. Conduct 8.4.

[278] D.C. R. Prof. Conduct 1.2(e).

[279] Rebecca Roiphe, *The Ethics of Willful Ignorance*, 24 Geo. J. Legal Ethics 187, 196 (2011).

[280] George Cohen, *The State Of Lawyer Knowledge Under The Model Rules Of Professional Conduct*, 3 Am. U. Bus. L. R. 115, 116 (2018).

[281] *Matter of Giuliani*, 146 N.Y.S. 3d 266 (App. Div. 1st Dep't 2021).

[282] *King v. Whitmer*, No. 20-13134, 2021 WL 3771875 *26, *34, *39 (E.D. Mich. Aug. 25, 2021).

did, the fact that those claims and others like them have been rejected in other disciplinary proceedings is at the very least circumstantial evidence that Clark knew they were baseless.

**Recommendation #4: Cooperation with the House Select Committee to Investigate Ties Between This Episode and the January 6 Attack**

As discussed throughout this report, President Trump's efforts to enlist DOJ and its leadership in his efforts to overturn the results of the 2020 presidential election were aided by numerous allies with clear ties to the "Stop the Steal" movement and the January 6 insurrection. As Trump himself noted to Rosen and Donoghue on December 27, he and his congressional allies could effectively position themselves to overturn the presidential election results with cover from DOJ, asking DOJ to "just say the election was corrupt and leave the rest to me and the [Republican] Congressmen."[283]

Three of these allies and their connections to January 6 are particularly notable: U.S. Representative Scott Perry, Pennsylvania State Senator Doug Mastriano, and Trump campaign attorney Cleta Mitchell. These ties warrant further investigation to better place Trump's efforts to enlist DOJ in his efforts to overturn the presidential election in context with the January 6 insurrection. Because the events of January 6 are outside the immediate purview of the Committee's investigation, this report is being made available to the House Select Committee on the January 6 Attack, as well as the public, to assist their investigation.

---

[283] 12/27/20 Donoghue Notes (SJC-PreCertificationEvents-000738); Donoghue Tr. at 86-87.