# EXHIBIT 5

## CALDWELL, CARLSON, ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

**CONFIDENTIAL**

**VIA EMAIL ONLY** foxp@dcodc.org

January 31, 2022

Hamilton P. ("Phil") Fox, III
Disciplinary Counsel
Office of the Disciplinary Counsel
Building A, Room 117
515 5th Street NW,
Washington, DC 20001

**Re: Clark/Disciplinary Counsel**
**Disciplinary Docket No. 2021-D193**
**Agreed-Upon Date of Response: January 31, 2022**

Dear Mr. Fox:

I write to you in my capacity as counsel for Mr. Jeffrey Bossert Clark, Esq. (who, come this July, will have been an honorable and estimable member of this Bar for 25 years). The purpose of this letter is to set out just some of Mr. Clark's legal defenses and also to point to some documents that have been released (improperly in my view), along with some public information of a general nature, so as to help guide your prosecutorial discretion. Upon review of these matters, and my related letter (also dated today, and incorporated herein by reference) setting out responses to the subpoena you sent, we would hope you would agree not to proceed further.

You are no doubt well aware that this is a unique case. To begin, please let us know if you are aware of a single situation where a bar complaint was filed solely by the chair of one congressional committee complaining about the purported conduct of a

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 2

lawyer internal to the Executive Branch (as to which the Chair himself has no firsthand knowledge) alleged to have advised the President to endorse the sending of legal correspondence where the relevant correspondence was never sent. I would be extremely surprised if such a situation exists in the annals of the D.C. Bar's enforcement files. Indeed, I would just as surprised if a complaint had ever been filed or seriously entertained by your Office where a leak of private counsel advice to a private client involving unsent correspondence followed by a complaint by a third-party bystander that was not the recipient of the relevant advice which was at issue.

Instead, it appears to both me and to my client that this is a politically supercharged case that the Bar should not intrude into. The purpose of the D.C. Bar Rules is not to referee confidential internal legal discussions, especially not ones inside the superior federal government's Executive Branch, that result in inaction. That would be akin to disciplining a lawyer for "thought crime." The purpose of the D.C. Bar Rules is to protect the public. The consideration of and debate over options and theories furthers the public's interest by improving the quality of the legal judgments and advice that emerge from such exchanges, which are perfectly routine in any law office in America. Anything else would lead to a leaden orthodoxy, which is contrary to the ethic of the entire profession, and certainly contrary to how the Framers anticipated the energetic Executive Branch would run.

I will explain more below about the import of this as a political example of a complainant trying to "weaponize" bar discipline mechanisms. But I first turn to the caution that nothing in this letter should be taken as testimony by Mr. Clark about the underlying facts. That is not the purpose of this letter and indeed we think it is beyond the power of your Office to inquire into facts privileged in multiple dimensions and involving advice within the federal government given to the President of the United States himself.

**Preliminary Caveats**

I recognize that you and your Office in the ordinary case would be most interested in the facts as represented by the lawyer facing a disciplinary charge. But in the ordinary case, privilege issues are no barrier to the lawyer setting out the particulars of his factual defense. That is because, I would venture, in many of cases you deal with, the client

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 3

complains about his or her lawyer's conduct in some way and at this confidential stage
of the proceedings, you can investigate any underlying factual disputes before deciding
whether to seek discipline.  That way, if you decide not to proceed, the complaining
client's confidences are maintained.

But as we understand you to be proceeding here, any response we provide to your
subpoena should, in your view, automatically go to Senator Durbin at the Senate
Judiciary Committee. "A necessary disclosure includes sending a copy of your response
to the complainant for comment." *See* Fox Letter to Clark, at 3 (Nov. 22, 2021). Of course,
once the information you seek falls into the hands of the Senate, executive privilege and
other privileges would be breached, as your Office would have no power to stop the
Senate from using that information, going forward, however it sees fit.  In light of the
confidentiality of the investigative stage and the rules and D.C. Bar Opinion discussed in
greater detail below, you should agree not to send Senator Durbin either response letter
I am submitting today. He was not the client and has no right to information concerning
how an investigation by your Office is proceeding. Bystanders cannot invade the
privilege merely by filing a bar complaint and bystanders should similarly not be entitled
to an explanation as to why advice given to non-bystanders or debated with other
Executive Branch lawyers is privileged.

Because Mr. Clark is duty-bound both under the superior federal constitutional
law that governs privileges held by the President and by the very rules your Office is
designed to enforce, he can neither set out the nature of his legal advice to the President
nor matters subsumed therein, such as the facts of which he made himself aware in
developing that advice. I amplify below on the host of legal reasons why this is true. But
for now pause and consider (as both points are in the public record) that Mr. Clark has
resisted testifying to both the Senate Judiciary Committee and the House January 6 Select
Committee. If sustained, the manner in which you propose to proceed would bust the
privileges and retroactively render pointless the principled legal positions Mr. Clark took.
It cannot be the law that one or another congressional committee can use a bar complaint
as a pass key to open the doors locked by privilege. We are confronted with an extreme
irony: the Office that disciplines lawyers for breaching client confidences is trying to
gather privileged advice given to the President when the President has not complained

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 4

to the Bar, all in order to breach the privilege by giving that information to the President's bitter political adversaries.

Your approach would reveal lawyer-client confidences, not protect them. Therefore, and in more detail below and in my related letter concerning the subpoena, I have to counsel Mr. Clark to proceed differently.

For such reasons, nothing in this letter should be taken as Mr. Clark's testimony or Mr. Clark's representations, in any form, as to the actual underlying facts. Instead, this letter will respond in some places with other documents that the Justice Department in the Biden Administration saw fit (unwisely and improperly in our view) to disclose to the public or with other public information. Accordingly, it is important to reinforce in clear terms our caveats to how this letter should be read, hence the emphasis:

*Nothing in this letter constitutes testimony by, a factual concession by, or waiver of legal rights or of any of the applicable privileges relied upon here or in related congressional proceedings by Mr. Clark. The Senate Judiciary Committee Chair (and not just your Office) should similarly take note of this caveat as you are apparently determined to act as a pass-through to him. Mr. Clark reserves all of his legal rights, including to defend himself via arguments not presented in this letter as this matter unfolds.*

This letter will also refer to public information available before January 3, 2021, when the Senate Judiciary Committee Chair appears to have concluded that an Oval Office meeting took place. And lastly, this letter will also point out some matters and information coming to light after January 3, 2021. And most importantly, I will also set forth substantive arguments as to why you should close this matter. In totality, it is plain that bar discipline is simply not appropriate for the underlying disputes.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 5

I.  **D.C. BAR RULE XI, THE D.C. RULES OF PROFESSIONAL CONDUCT, AND APPLICABLE PROVISIONS OF CONSTITUTIONAL AND STATUTORY LAW ESTABLISH MR. CLARK'S RIGHT TO DUE PROCESS AND CONSTRAIN DISCIPLINARY COUNSEL'S DISCRETION TO SHARE INFORMATION WITH, OR OTHERWISE TO ASSIST ONGOING INVESTIGATIONS CONDUCTED BY CONGRESS OR STATE OFFICIALS.**

Mr. Clark respectfully submits that any disclosure of any part of the investigative record, including the substantive content of his response to Senator Durbin's charges during the investigation phase of a disciplinary proceeding, has no legitimate investigative purpose and does not fall under any of the enumerated exceptions to the confidentiality rules.

In sum, your plan to make confidential investigative material, including legal arguments, available to partisan majority staff is neither a "necessary" disclosure nor an appropriate one. Disciplinary Counsel has no authority to provide investigative material that will inevitably be shared with "fact-checkers," reporters, and others who will seek to "debunk" or otherwise ridicule to a general audience either the substance of the information provided, the arguments made, or Mr. Clark's character, honesty, or good faith interpretation of either his authorities as Assistant Attorney General or the scope of his discretion to exercise them under the circumstances.

Thus, disclosure of any substantive "investigative" information, including the existence of a pending investigation and that information was sought using a subpoena, would violate the confidentiality and *ex parte* communication rules in D.C. Bar Rule XI, various provisions of the D.C. Rules of Professional Conduct, and the impartiality and the *ex parte* communications rules of the D.C. Rules of Judicial Conduct as well.

Moreover, sharing information with Senator Durbin produced by Disciplinary Counsel through either a request for information or a subpoena authorized under D.C. Bar Rule XI, Section 18 would create at least the appearance of an ongoing information-sharing relationship with the Senate Judiciary Committee. It would also raise serious questions about possible collaboration and ongoing *ex parte* communications between and among staff members of the office of Disciplinary Counsel with Members of the Senate Judiciary Committee, their staff, or Members and staff of other Congressional

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 6

committees, including the January 6th Committee, and substantive communications between Disciplinary Counsel and the U.S. Department of Justice concerning the charges asserted by Senator Durbin.

> ### A. Confidentiality Is an Essential Component of the Process "Due" Mr. Clark Under D.C. Bar Rule XI, Which Limits Disciplinary Counsel's Authority to Make Disclosures of Investigative Materials.

In *Matter of Williams*, the Court of Appeals observed that:

> It is well settled that disciplinary proceedings are quasi-criminal in nature and that an attorney who is the subject of such proceedings is entitled to procedural due process safeguards. *In re Ruffalo*, 390 U.S. 544, 550 (1968); *In re Thorup*, 432 A.2d 1221, 1225 (D.C.1981); *In re Burka*, 423 A.2d 181, 185 (D.C.1980) (en banc); *In re Colson*, 412 A.2d 1160, 1164 (D.C.1979) (en banc); *In re Wild*, 361 A.2d 182, 184 (D.C. 1976). The procedural requirements which apply in attorney disciplinary proceedings are analogous to those of other "contested cases." *In re Thorup, supra*, 432 A.2d [1221] at 1225.

*Id.*, 464 A.2d at 118–19 (remanding, for, among other things, relying on complaints from the client as "evidence" of misconduct). *Accord In re Artis*, 883 A.2d 85, 100 (D.C. 2005) (observing that "[i]n adopting rules permitting discovery by a prosecutor in a criminal proceeding, courts and legislatures have proceeded with caution because of the Fifth Amendment privilege against self-incrimination, the Sixth Amendment's guarantee of effective assistance of counsel, the attorney-client privilege, and the attorney work product doctrine.")

Disciplinary Counsel's letter of November 22, 2021 appears to assert that a "necessary disclosure" "includes sending a copy of [Respondent's] response to the complainant for comment." Respondent respectfully submits that such a disclosure during the investigation phase of a disciplinary proceeding would violate both D.C. Bar Rule XI and several specific D.C. Rules of Professional Conduct.

D.C. Bar Rule XI, Section 17 provides: "Except as otherwise provided in this rule or as the Court may otherwise order, all proceedings involving allegations of misconduct

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 7

by an attorney shall be kept confidential until either a petition has been filed under section 8(c) or an informal admonition has been issued." Rule XI, Section 17 contains only limited exceptions, none of which would permit Disciplinary Counsel—or, indeed, the Board or any of its members—to share information that could prejudice any Respondent during the investigation period.

That, however, is precisely what you have indicated that you will do. By sharing information with the Senator or his staff, you would not only violate the confidentiality rules that govern proceedings under D.C. Bar Rule XI, but also destroy the separation of powers that insulates the legislative powers of Congress under Article I from the judicial powers of the local Court of Appeals by utilizing the subpoena powers granted by the Court to advance the partisan investigations that Senator Durbin and others are conducting.

A disciplinary proceeding is quasi-criminal in nature, *Matter of Williams, supra*, and is conducted under powers delegated by the District of Columbia Court of Appeals. Disciplinary Counsel must therefore comply with not only the strictures of D.C. Bar Rule XI, which define the powers of the Office, but also the duties that bind prosecutors under D.C. Rules of Professional Conduct, and court-appointed personnel under the D.C. Rules of Judicial Conduct.

D.C. Bar Rule XI, Section 6(a)(4) provides that "Disciplinary Counsel shall have the power and duty:

(4) To prosecute all disciplinary proceedings before Hearing Committees, the Board, and the Court. When appearing before the Court, Disciplinary Counsel may, after notice to the Board, argue for a disposition other than that contained in the report and recommendation of the Board.

Section 6(a) confers enormous prosecutorial discretion. Like other prosecutors, Disciplinary Counsel has explicit power to investigate, prosecute, and make recommendations for disposition that are at odds with the conclusions of the Board. Under certain specified conditions only, he may "disclose information pertaining to proceeding" to "any duly authorized law enforcement officer or agency conducting an investigation," and respond to a grand jury subpoena, but only after having sought and

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 8

received authorization from the Court of Appeals to do so.  *See* D.C. Bar Rule XI, Section 17(c)-(f).  Board Rule 2.9(b) does not confer, as you appear to claim, unfettered discretion to decide when a disclosure is "necessary."

The confidentiality rule is central to the Due Process obligations of the Court of Appeals, in whose name the Disciplinary Counsel acts.  *See* D.C. Bar Rule XI, Sections 1 & 6.  Chief among these obligations is Disciplinary Counsel's "responsibility [to serve in the role of] a minister of justice and not simply that of an advocate" who has "specific obligations" ensure that the Respondent "is accorded procedural justice" and that a finding of misconduct "is decided upon the basis of sufficient evidence."  *See* D.C. Bar Rule of Professional Conduct 3.8, cmt. [1].

Under D.C. Rules of Professional Conduct 3.4, 3.6 and 3.8, "procedural justice" includes, at a minimum, a requirement that Disciplinary Counsel "shall not"

- Breach the confidentiality requirement of D.C. Bar Rule XI, Section 17 by making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding."  D.C. Rule of Professional Conduct Rule 3.6 and  comment [2] [reminding lawyers that they are bound by Rule 3.4(c) to comply with "special court rules of confidentiality … that have not been found invalid."

- Knowingly breach the confidentiality requirement of D.C. Bar Rule, Section 17 "except for an open refusal based on an assertion that no valid obligation exists." Rule 3.4(c).

- "In exercising discretion to investigate or to prosecute, improperly favor or invidiously discriminate against any person;" D.C. Rule of Professional Conduct 3.8(a).  *See also* U.S. Const., amend. I (association, petition, and speech); D.C. Human Rights Act, § 2-1401.01 (stating the intent of the Council to "secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including *but not limited to* … political affiliation …."

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 9

- "Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense;" D.C. Rule of Professional Conduct 3.8(d).

- "Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused." D.C. Rule of Professional Conduct 3.8(f).

Sharing investigative information with Senator Durbin about Mr. Clark's submissions or arguments at *any stage of a disciplinary proceeding* is not "necessary" to *Disciplinary Counsel's* conduct of this investigation. Nor is it "necessary" to the ongoing investigation being conducted by Senator Durbin's staff.

To the contrary, *each* instance of information sharing of the sort contemplated by Disciplinary Counsel would be a forbidden "extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." D.C. Rule of Professional Conduct 3.6(c). Any communication with outside parties other than an acknowledgement of receipt of the complaint and that it is "under review" would also be a violation of the D.C. Rules of Judicial Conduct 2.9.

Nor is Disciplinary Counsel is permitted by D.C. Bar Rule XI, by the D.C. Bar Rule of Professional Conduct 3.8 and 1.7(b), or by D.C. Rule of Judicial Conduct 2.3 (bias), 2.4 (external influence), and 2.6 (right to be heard) to use the subpoena power authorized by Rule XI, Section 18 for partisan political purposes. Nor may he authorize any person under his supervision to share information to advance a partisan interpretation of either civil or criminal law.  *See* D.C. Rule of Professional Conduct 1.7(a)(4) (forbidding representation if the "lawyer's professional judgment ... will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."); Rule 1.10 (imputed disqualification); Rule 5.1 (Responsibilities of Partners, Managers and Supervisory Lawyers).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 10

Senator Durbin has no personal interest in the outcome of this investigation that would warrant any form of *ex parte* communication, coordination, or information-sharing with him or his staff. To our knowledge, Senator Durbin has never been a client of Mr. Clark. Mr. Clark's client was the Executive Branch. *See* D.C. Bar Rule of Professional Conduct 1.13 (the organization as client); D.C. Bar Rule of Professional Conduct 1.13 (duties of former government employees).

Like any Member of Congress, or of the general public, Senator Durbin has an interest in the faithful execution of the laws by members of the Executive Branch, but he has no knowledge of Mr. Clark's conduct within the Department of Justice akin to that which would be within the unique knowledge of a client. Neither he nor his staff can provide any information about Mr. Clark's conduct in office that is not under the exclusive control of the Department of Justice, the White House, President Trump, and those who were parties to the communications referenced in the "interim staff report" and various media outlets. Aside from serving as the nominal "complainant," he has absolutely no personal or institutional (i.e., legislative) interest in the outcome of this investigation. Members of Congress are not junior varsity prosecutors and cannot constitutionally be permitted to slip into such an improper role.

I would welcome your written response to the confidentiality questions posed above and specifically request that you provide us with advance notice of any proposed disclosure to Senator Durbin or his staff so that an appropriate motion for a protective order can be filed in accordance with the Rules.

### B. The Subject Matter of Your Inquiry Poses Novel and Difficult Questions of Constitutional Law and Professional Responsibility Not Suitable For Interpretation or Enforcement in the Disciplinary Context.

You are seeking documents and answers to questions that pose novel, complex and difficult constitutional and professional ethics questions. *See, e.g.*, *Trump v. Thompson*, No. 21A272 (S. Ct. Jan. 19, 2022) (statement of Justice Kavanaugh respecting the denial of the application for injunction pending appeal) (observing that "If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 11

could be a political opponent of a former President), the consequences for the Presidency would be severe.")

Disciplinary Counsel "seeks privileged information, seeks information that exceeds constitutional limitations or is otherwise improper," D.C. Bar Rule 2.9(a), and thus exceeds the lawful scope of a bar disciplinary inquiry. Among these novel, complex, and difficult constitutional, legal and professional ethics questions are the following, and to be clear, I welcome your written response to these questions:

1. Whether Disciplinary Counsel and the Board rejects the claims of executive privilege and separation of powers that Mr. Clark has made to the January 6 Committee and also makes here.

2. Whether Disciplinary Counsel has established, as a matter of fact, any of the following questions:

   i. That there was no foreign interference in the 2020 election. Has it been able to secure access to classified information for this purpose? Do you wish to stand by your position advanced via email that, even if Mr. Clark is denied access by DOJ and/or by the Intelligence Community to information he apparently reviewed on January 1-2, 2021, there is no reason to terminate or delay this proceeding?

   ii. That there was no basis in fact for President Trump to believe that there was (or may have been) foreign interference in the 2020 election?

   iii. That there was no basis in fact for Mr. Clark to believe that there was (or may have been) foreign interference in the 2020 election?

   iv. That there was no basis in fact for any rational lawyer to think that any foreign interference that might have occurred was equivalent to the level of Russian interference in the 2016 election that occupied official Washington for all of President Trump's term of office?

   v. That there were no irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 12

     vi. That there was no basis in fact for President Trump to believe there were irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

    vii. That there was no basis in fact for Mr. Clark to believe there were irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

   viii. That there was a basis in fact for Attorney General Barr to believe there were no irregularities, of whatever character, in the administration of the 2020 election in the State of Georgia?

    ix. That there was no basis in fact for any person to conclude that there were possible violations of federal law in the administration of the 2020 election in the State of Georgia that could reasonably be investigated by the Department of Justice?

    x. That there were no possible violations of federal law in the administration of the 2020 election in the State of Georgia that could reasonably be investigated by the Department of Justice?

    xi. That Mr. Clark had no factual basis to suggest, if he did, to the senior leadership team at the DOJ that an investigation into the conduct of the election in Georgia should be considered?

   xii. That the Department of Justice had at the time actually forbidden direct communication by the President with a Senate-confirmed presidential appointee and how that could possibly be consistent with Article II of the Constitution?

   xiii. That Mr. Clark received a direct order not to communicate with the President on any issue validly within the purview of his position as a Senate-confirmed Assistant Attorney General?

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 13

    xiv.  That the testimony of Mr. Donoghue is a true and complete rendition of the facts known to him and to the Department of Justice between December 2020 and January 3, 2021?

    xv.  Whether Mr. Donohue is a credible witness?

    xvi.  Whether the testimony of Mr. Rosen is a true and complete rendition of the facts known to him and to the Department of Justice between December 2020 and January 3, 2021?

    xvii.  Whether Mr. Rosen is a credible witness?

    xviii.  That Mr. Clark was *not* specifically asked by the President or by Mr. Rosen to investigate alleged irregularities in the conduct of the 2020 election in the State of Georgia?

3. Whether Disciplinary Counsel views the work product (reports or Member statements), including the factual findings made in the proceedings before the January 6th Committee and the investigation by the Senate Judiciary Committee as something your Office can take as a given without conducting an independent factfinding investigation?

4. Whether Disciplinary Counsel intends, at the appropriate time, to call as witnesses the Department of Justice and White House officials whose testimony was taken before the January 6th Committee and the Senate Judiciary Committee?

5. Whether Disciplinary Counsel considers the documents produced by the Department of Justice to the Senate Judiciary Committee to congressional Committees as the complete documentary record that could justify a formal complaint?

6. Whether Disciplinary Counsel has ever filed a complaint against any attorney for the federal government, including the Department of Justice, based on an internal dispute in an confidential, privileged internal discussion over a legal or policy issue among the attorneys in his or her office?

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 14

7. Whether Disciplinary Counsel has ever filed a complaint against counsel for an organization based on a confidential and privileged internal policy or legal dispute among the attorneys for the organization?

II. **IN YOUR CAPACITY AS "CHIEF PROSECUTOR" OF DISCIPLINARY RULE VIOLATIONS, YOU SHOULD EXERCISE YOUR PROSECUTORIAL DISCRETION TO PROCEED NO FURTHER ON SENATOR DURBIN'S COMPLAINT.**

A. **Chief Prosecutor**

Rule XI of the D.C. Court of Appeals Rules Governing the Bar provides that you serve as the "Chief Prosecutor" of violations of those rules by attorney members of this Bar. https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/purpose-and-mission (last visited Jan. 31, 2022). Hence you have the ability to dismiss the complaint you received from Senator Durbin on October 7, 2021, on the basis of prosecutorial discretion.

You should consider exercising your prosecutorial discretion in light of all of the points both in this letter and my subpoena letter, but I set out several additional overarching observations here that should lead you to that conclusion even without studying the balance of this letter.

B. **This Is a Politically Motivated Bar Complaint.**

*First*, this is self-evidently a political dispute. The letter you received is signed by former President Trump's longtime political foe Senator Durbin (even looking back to the era before the 2020 election).[1] Senator Durbin's letter mentions President Trump *four*

---

[1] *See* Mollie Mansfield, *Colorful Insult: Democrat Senator Dick Durbin Mocks Trump as an 'Orange Cloud' Threatening to Rain on Amy Coney Barrett's Nomination*, THE U.S. SUN (Oct. 14, 2020), *available at* https://www.the-sun.com/news/1632573/donald-trump-orange-cloud-amy-coney-barrett/ (last visited Jan. 31, 202s). Senator Durbin has also criticized President Trump for pushing his authority before Congress "non stop." Lisa Mascaro, *It's Not Just the Presidency: Trump Is Changing Congress*, AP NEWS (July 11, 2020),

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 15

*times*.  This is not the kind of dispute that an apolitical bar association should wade into, especially not where Mr. Clark has not been found liable or guilty of any wrongdoing as a prelude to this inquiry.  And in my companion letter on the subpoena, you will see extensive argument as to why you should defer consideration of this matter, if you do not dismiss it, under Board Rule 4.1.  As we noted there, our understanding is that Board Rule 4.1 deferrals are regularly granted.

Every member of the Senate Judiciary Committee majority, many voters, and many pressure groups on the Left, together with left-leaning legal academics, may think it beyond question that President Biden was duly elected and that there were, back in early January 2021 and still are, no sufficient election irregularities to warrant questioning that conclusion.  Messrs. Rosen and Donoghue, among others at the Department of Justice, may also agree with that position.  But a large number of American voters disagree, including many Democrats, and their numbers are growing.[2]

> 1.   **It is rational to conclude that numerous American lawyers have questioned and do continue to question, in some fashion, the outcome of the 2020 presidential election.**

I conservatively, if informally, estimate that about 250,000 lawyers in the United States hold a skeptical view about the election, marking it out as a subject appropriate for further investigation to any such lawyer postured to be able to do anything about his or her beliefs.  I could lay out the calculation in great detail, but it boils down to the following table and so in the interests of brevity and because this is a very early stage of the bar process, I do not spell out more at this time:[3]

---

*available at* https://apnews.com/article/immigration-donald-trump-ap-top-news-douglas-brinkley-politics-3e1b0fc5f17ad40b242a9555b2ac412e (last visited Jan. 31, 2022).

[2] According to a recent Rasmussen poll, 79% of Republicans, 41% of Democrats, and 58% of unaffiliated voters believe it is at least somewhat likely that cheating in some form affected the 2020 presidential election outcome.  *See* https://t.co/AhznOMXZ5V (last visited Jan. 31, 2022).

[3]   For   other   relevant   sources   to   my   informal   estimate,   see https://en.wikipedia.org/wiki/2020_United_States_presidential_election (last visited Jan. 31, 2022). Approximately 1 in 300 persons in America are lawyers.  https://www.infobloom.com/what-percent-of-

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 16

| Candidate | Total Number of Votes by Candidate | # of Lawyers (i.e., 1 in 300) | # Who Think Cheating in Some Form According to Rasmussen Poll (using conservative party affiliation poll figure) |
|---|---|---|---|
| Biden | 81,268,924 | 270,896 | 111,068 |
| Trump | 74,216,154 | 247,387 | 143,485 |
| Total | 155,485,078 | 518,284 | 254,552 |

Accordingly, even if, as he is accused, Mr. Clark were of the view that the 2020 election was irregular (especially in Georgia), he would have a lot of company. Are all of these lawyers to be hunted down and disciplined by their respective bars for disagreeing with the view the mainstream media portrays as the only acceptable view in polite Beltway company (even though the Rasmussen poll suggests the public consensus is to the contrary)? It is not a sufficient response to observe Mr. Clark was a lawyer and leader at the Justice Department when he is claimed to have expressed such views. Why should the fact that several of the actual lawyers at the Justice Department in December 2020 to early January 2021 thought one thing (the election was regular, or at least regular enough) but one of them (Mr. Clark, by hypothesis) thought something different constitute a matter for local bar investigation, warranting even penetration into the most confidential deliberations involving the United States President?

> 2. **147 Members of both houses of Congress (35 of whom were lawyers) questioned certifying the electors sent to them and they did so publicly and with potential legal effect, compared to the apparent purely internal letter under consideration here that the Senate report accepts was never sent.**

More importantly, *a total of 147 members of the Senate and House* backed objections on January 6, 2021 to certifying Arizona's or Pennsylvania's electoral

---

the-us-population-do-lawyers-comprise.htm (last visited Jan. 31, 2022). I coupled this with other conservative assumptions. For instance, another source tells me that there are 1.33 million lawyers in America, more than double the conservative assumption of the number of lawyers I use in the table above. *See* Statista, *Number of Lawyers in the United States from 2007 to 2021, available* at https://www.statista.com/statistics/740222/number-of-lawyers-us/ (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 17

outcomes, despite the fact that the mainstream press insisted that Biden had clearly won. See Li Zhou, *147 Republican Lawmakers Still Objected to the Election Results After the Capitol Attack: Congress has certified President-elect Joe Biden as the winner of the election—but some Republicans still objected*, VOX (Jan. 7, 2021), *available as* https://www.vox.com/2021/1/6/22218058/republicans-objections-election-results (last visited Jan. 31, 2022) (listing 8 Senators and 139 members of Congress). Thus, many members of Congress agreed with the views attributed to Mr. Clark by Mr. Durbin.

Indeed, typically a greater percentage of members of Congress are lawyers than the 1 in 300 in the general population. In fact, 35 of 147, or 23.81%, of these objecting members are lawyers.[4] Are the 35 lawyer members of Congress, spread across more than a dozen States, who formally questioned the 2020 presidential election results, also to be subjected to bar discipline? That is unthinkable and reveals that the issue involved here is at its core political. At least two of these 35 members of Congress, both Senators, are also former Supreme Court clerks. As a result, even if this Office were to try to assert that Mr. Clark's actions are unique because lawyers at the top of their profession should know better, that line of defense would fail. Beyond the fact that President Biden's chief of Staff Ron Klain led Mr. Gore's charge from a political strategy standpoint in *Bush v. Gore*, I am not aware of any bar proceedings brought against him and he is at the top of the legal profession. And Senators Hawley and Cruz similarly have credentials that place them at the top of the profession and they questioned the election. Taking that position is not *per se* or inherently false or designed to mislead. The examples of Senators Cruz and Hawley are not purely hypothetical. Apparently, suggesting disbarment was one of Lieutenant General Russel Honoré's first (partisan) reactions. General Honoré had been hand-picked by Speaker Pelosi to do a security review of the Capitol after the January 6 riot. Referring to Senator Hawley, he tweeted "[t]his little piece of s—with his @Yale law degree should be run out of DC and disbarred ASAP." Julie Kelly, JANUARY 6: HOW DEMOCRATS USED THE CAPITOL PROTEST TO LAUNCH A WAR ON TERROR AGAINST THE POLITICAL RIGHT 74 (2022). Although General Honoré later deleted the tweet, *see id.*, his views represent a malign spirit of political revenge that bar authorities should abjure.

---

[4] Again, we could provide information on that calculation in greater detail.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 18

Partisan controversies around Presidential elections have long shelf lives. Up to at least as recently as 2016 (*16 years after* the relevant presidential election was held), the outcome in *Bush v. Gore* is still being vigorously questioned. *See, e.g.*, Michael S. Kang & Joanna M. Shepherd, *The Long Shadow of* Bush v. Gore: *Judicial Partisanship in Election Cases*, 68 STAN. L. REV. 1411 (2016) (the authors are tenured professors at the Emory Law School).

Disputes about the reliability of presidential elections are commonplace and, at least before the new phenomenon of trying to weaponize the bar to settle partisan scores, such disputes were just considered fodder for ordinary dissent. *See, e.g.*, Norman Ornstein, *Enlist George W. Bush and Al Gore to Help Us Prevent a Trump-Biden Nightmare in 2020*, USA TODAY (Aug. 7, 2020) (recognizing that the 2000 presidential election was, to date, "the most controversial and contentious election in American history"), *available at* https://www.usatoday.com/story/opinion/2020/08/07/george-bush-al-gore-help-us-prevent-trump-biden-nightmare-column/3310060001/ (last visited Jan. 31, 2022). *See also* Austin Huguelet, *Congress Has Objected to Electoral College Votes Before. Here's a Look at Past Efforts*, SPRINGFIELD NEWS-LEADER, *available at* https://www.news-leader.com/story/news/politics/2021/01/05/past-objections-electoral-college-vote-counts-president-trump-josh-hawley/4129641001/ (last visited Jan. 31, 2022) ("At a press conference outside the House chamber, Rep. Eddie Bernie Jackson, D-Texas, told reporters there was "overwhelming evidence that George W. Bush did not win this election either by the national popular vote or the Florida popular vote.").

There are also those who think the 2004 presidential election was rigged in favor of President Bush and against John Kerry. *See* Joanna Weiss, *What Happened to the Democrats Who Never Accepted Bush's Election: The 2004 vote-fraud conspiracy movement never really died. What does that mean for Trump's believers—and America?*, Politico (Dec. 19, 2020), *available at* https://www.politico.com/news/magazine/2020/12/19/2004-kerry-election-fraud-2020-448604 (last visited Jan. 31, 2022); *see also* Huguelet, *Congress Has Objected to Electoral College Votes Before*:

When it came time to count the state [of Ohio's] votes, Rep. Stephanie Tubbs Jones, D-Ohio, rose to object and said she had a senator. Sen. Barbara Boxer, D-Calif., concurred, saying she was acting "to cast the light of truth on a flawed system which must be fixed now," according to a New York Times account of

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 19

the challenge. The objection failed 1-74 in the Senate and 31-267 in the House, and Republicans dismissed the complaint as sour grapes. Majority Leader Tom DeLay, R-Texas, called it Democrats' "quadrennial crying wolf," as his colleagues ridiculed stories of disenfranchisement as "Hollywood inspired."

Yet we are not aware of any effort to root out lawyers in either the anti-*Bush v. Gore* 2000 or "Kerry-won" 2004 camps and subject them to bar discipline. And surely, Majority Leader DeLay's narrative would not have been enough to launch a bar inquiry based on a presumption that DeLay's view of the world was correct, even if it had achieved the status of media orthodoxy like the claim that President Trump's objections to the 2020 election constitute a "Big Lie."

Democrat politician-lawyers have routinely questioned presidential elections. *See generally* Video Compilation, *2 Decades of Dems Questioning Elections, available at* https://rumble.com/vt2xvy-democrats-questioning-the-legitimacy-of-election-results-and-voting-machine.html (Jan. 22, 2022) (showing Joe Biden, then-Senator Obama, then-Senator Clinton, former Governor McAuliffe, current White House of Staff Ron Klain, and David Boies—all lawyers—objecting vehemently to past presidential election results). No bar discipline cases were brought against them for doing so that I know of.

Objections to presidential certifications have become increasingly common. In 2017, Democrats objected to President Trump's certification on the ground, *inter alia,* that Russia had interfered in the 2016 presidential election. One of those objectors was Jaime Raskin, Congressman from Maryland, who is a lawyer and a constitutional law professor. *See Rep. Raskin Challenges Awarding of Electors,* YOUTUBE (Jan. 8, 2017), *available at* https://www.youtube.com/watch?v=bxEr_mRpp44 (last visited Jan. 23, 2022). Imagine if the Maryland bar had launched an inquiry into Representative Raskin's expressed views, alongside Robert Mueller's investigation of President Trump, which we now know concluded there was no Russian collusion. *See* Huguelet, *Congress Has Objected to Electoral College Votes Before* ("However, neither the Mueller report nor the Senate committee's report concluded Trump and his campaign coordinated with Russia on the influence campaign.").

Where one stands on these issues frequently depends on which side of the aisle one sits. It now appears, for instance, that President Biden is laying the groundwork for

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 20

questioning the outcome of the 2022 midterm elections: "'I think it would easily be illegitimate,' said Biden.  'The increase in the prospect of being illegitimate is in proportion to not being able to get these reforms passed.' Vice President Kamala Harris, sent out on the morning shows Thursday, offered basically the same position."  David Harsanyi, *Biden Is Not Alone.  Democrats Have Been Delegitimizing Elections for Years*, TOWNHALL      (Jan.      21,      2022),      *available      at* https://townhall.com/columnists/davidharsanyi/2022/01/21/biden-is-not-alone-democrats-have-been-delegitimizing-elections-for-years-n2602148 (last visited Jan. 31, 2022).  *See also id.* (noting that Representative Adam Schiff, a lawyer, and strong proponent of Russia collusion claims "[n]ever once … offered a scintilla of evidence demonstrating that a single person's vote was changed, altered or appropriated by Trump or Russians or anyone else.  Yet at one point, a healthy majority of Democrats claimed to believe that Putin had altered vote tallies.  How many Democrats still believe it?").

Finally, imagine if bar complaints were filed against Senator Cruz in Texas or Josh Hawley in Missouri.  These would be quickly dismissed as obvious political stunts.  By contrast, Senator Durbin's referral here hopes to succeed simply because Mr. Clark is not a politician with a national name, has far fewer resources with which to defend himself and has far fewer friends in politics to support him than either Senator Cruz or Senator Hawley.  The Bar should not proceed with a complaint against a former Justice Department official like Mr. Clark simply because he is weaker politically than a hypothetical member of Congress barred in D.C. who happened to object in public to the certification of Biden electors on January 6, 2021.

C.      **The Culpability of Mr. Clark for Claimed Rules Violations Cannot Be Established Based on Assuming the Views of His DOJ Superiors Are Gospel Truth or Entirely Complete.**

Additionally, note that Senators Cruz and Hawley are both qualified to serve as Attorney General of the United States.  Senator Hawley was the Attorney General of Missouri and Senator Cruz was the Solicitor General of Texas.  Senators often take cabinet positions.  Had they happened to be serving as the United States Attorney General role in the Trump Administration, which is far from beyond the pale to assume was possible,

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 21

they might have taken a position concerning election investigations different than former Attorney General Barr or former Acting Attorney General Rosen.

Thus, your Office cannot treat the fact, even if true, that Mr. Clark disagreed with his superiors at the time, Acting Attorney General Rosen and Mr. Donoghue, Principal Associate Deputy Attorney General (performing the duties of the office of Deputy Attorney General), as having any weight, dispositive or otherwise. Those were the gentlemen in the relevant DOJ chairs at the time, but there were respectable voices in the legal community at the time—in Congress no less—that held different views than Messrs. Rosen or Donoghue. For the sake of caution, I couch this next point in terms of Mr. Clark's experience in the Bush 43 Department of Justice—there, he saw for the first time at a formative stage of his accomplished legal career that disagreements between officials at a lower level at DOJ and those at a higher level are not uncommon. Mr. Clark disagreed with various decisions in 2001-2005 made by his Assistant Attorney General boss, whom he deeply respects, and with Solicitors General in that period and also respected, just to name those in two superior offices in the Department back at that time. The Department of Justice has a command structure but it is not an orthodox cathedral of thought from which one is automatically excommunicated for perceived doctrinal heresy. Justice Department leaders can and do disagree on matters of law and on matters of how to interpret or respond to facts.

> D.  **No One Asserts the Letter Attributed to Mr. Clark Was Ever Sent to Its Addressees.**

Note as well that according to Senator Durbin, the letter Mr. Clark is said to have drafted was never distributed publicly by him. *See* Senate Judiciary Majority Staff Report at 38-39 ("Donoghue told us that Trump did not reject the Clark course of action until 'very deep into the conversation," within the final 15 minutes of the two- to three-hour meeting."). By contrast, the 147 members of Congress voted *in an open public process for all to see*—a legal process in Congress that, if sufficient votes had been obtained, would have had at least some legal effect in the external world. And this is true even if it had only (1) triggered a longer legal process before the final certification of Joe Biden came somewhere between January 6, 2021 and inauguration day on January 20, 2021 but (2) had not altered the outcome in terms of Biden being sworn in as President. *See* David Cohen, *Ted Cruz Urges Critics of Presidential Election Challenge to Calm Down*, POLITICO (Jan.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 22

3, 2021), *available at* https://www.politico.com/news/2021/01/03/ted-cruz-presidential-election-challenge-calm-down-453842 (last visited Jan. 31, 2022) ("Cruz said he wants to do an emergency 10-day audit of the results, though he did not explain why he expects that audit would overturn President-elect Joe Biden's victory.").

Mr. Clark's purported letter had no actual or even potential legal effect outside the confines of the Executive Branch (or even inside it because of an alleged presidential decision not to approve it) because it is undisputed that it was never sent to anyone outside the Department, much less to the leaders of the Georgia Legislature or to Governor Kemp. Thus, there would be far more reason to discipline those members of Congress that are also bar members for their **public objections** to certain state electors than to discipline Mr. Clark, assuming the Senate Majority Staff Report is accurate, showing that Mr. Clark did no more than put a **mere option** before his Justice Department superiors and the President.

Mr. Clark cannot be subject to bar discipline on a basis that could not hold up as applied to similarly situated lawyer officials in any branch of government. At the very least, your Office would need to articulate a basis that would properly single out Mr. Clark but apply to no other federal lawyer officials (or state lawyer officials for that matter[5]) who questioned the 2020 presidential election. What logical stopping points can be articulated that would make Mr. Clark's alleged conduct subject to discipline but not the conduct of congressional lawyer objectors on January 6?

---

[5] There are also numerous state legislators, especially in but not limited to battleground States, who questioned the results of the 2020 presidential election. *See, e.g.,* Melanie Conklin, *These 15 State Legislators Asked Pence Not to Certify Election Results*, Wisconsin Examiner, *available at* https://tinyurl.com/axetbjfk (Jan. 14, 2021); Marie Albiges, *Republican Leaders in Pa. Senate Ask Congress to Delay Electoral College Count*, SPOTLIGHT PA, *available at* https://tinyurl.com/24z7smbw (Jan. 6, 2021); Joseph Wenzel, *23 State Legislators Send Letter Objecting to Electoral College Votes*, NEWS 4 NASHVILLE (Jan. 5, 2021), *available at* https://tinyurl.com/5bkup2mn (listing objecting Tennessee legislators). Given the nature of such legislative positions and the work of lawyers, several lawyers are no doubt among all state legislator objectors spread around the country. Yet there is no movement I know of to discipline state legislator-lawyers for their statements regarding the 2020 presidential election.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
    Phil Fox, Esq.
    January 31, 2022
    Page 23

        The Speech and Debate Clause cannot serve as this logical stopping point distinguishing congressional objectors who were lawyers from Mr. Clark. *See* U.S. Const. art. I, 6, cl. 1 (members of both Houses of Congress "for any Speech of Debate in either House … shall not be questioned in any other Place"). That is because this is essentially a constitutional rule of preemption making positions taken in speech or debate something that only Congress itself could discipline. As explored later in this letter, Mr. Clark's speech and writing advised the former President and thus is subject to executive privilege, a feature of the constitutional separation of powers. *See* Section III *infra*. Relatedly, applying local bar rules to Executive Branch deliberations is preempted by the constitutional structure. Local bar rules cannot serve as regulators of the superior federal government, which operates pursuant to the Supremacy Clause of the Constitution. *See* Section IV *infra*. Additionally, Mr. Clark cannot be questioned by this body in light of his Fifth Amendment rights, which he explicitly invoked in response to your subpoena and against the House January 6 Select Committee. *See* Ex. 5, Letter from Harry MacDougald to Chair Thompson (Nov. 30, 2021); *see also* my other letter of today's date.

        Indeed, federal legislator-lawyers objecting in some fashion to the 2020 presidential election did not confine their remarks to the halls of Congress. They appeared in the media or otherwise communicated their misgivings. "Conversely, speech and debate immunity will not protect Members engaged (even in their official capacities) in such non-legislative activities as negotiations with federal agencies, the issuance of press releases and newsletters, and the delivery of speeches in their home districts. *Gravel v. United States*; *Hutchinson v. Proxmire* (1979)." Judge James Buckley, *Speech and Debate Clause*, THE HERITAGE GUIDE TO THE CONSTITUTION, *available at* https://www.heritage.org/constitution/#!/articles/1/essays/27/speech-and-debate-clause (last visited Jan. 31, 2022). By contrast, Mr. Clark did not use his position at the Justice Department to make public statements about the election. We are here only because in January 2021, some anonymous leakers at the U.S. Justice Department decided to reveal confidences to the *New York Times* and that led to the Senate inquiry generating the complaint that is before you. *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General*, NEW YORK TIMES (Jan. 22, 2021), *available at* https://www.nytimes.com/2021/01/22/us/politics/jeffrey-clark-trump-justice-department-election.html.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 24

E.    **Comparing the Alleged Facts Concerning Mr. Clark to the Actions of Congressional Lawyer Objectors**

Indeed, Mr. Clark's alleged conduct compares favorably for purposes of considering bar discipline against the objecting Senators and House members who were lawyers:

**(1) No Firsthand Knowledge.** Senator Durbin's referral letter is not based on firsthand knowledge. It is based on testimony given to his Committee, but that testimony constitutes hearsay for purposes of this proceeding. (By contrast, if you were to try to view the testimony given to the Senate as dispositive, then serious Bill of Attainder issues arise. *See infra* Section VI.)

The witnesses themselves are the ones with the firsthand knowledge. Moreover, Mr. Clark was not given the opportunity to have one of his lawyers present to question the relevant Senate Judiciary Committee witnesses or to object to their testimony, denying him his due process rights as to the relevant Senate testimony.[6] *Cf.* Fed. R. Civ. P. 32(a)(1)(A) (deposition cannot be used against a party who was not present or represented or had notice of the taking). More importantly, as the holder of executive privilege, as far as we are aware, former President Trump was also not given the opportunity to be present to object to the questioning of the lawyer witnesses who reported to him. And, by contrast, the lawyer objectors in Congress engaged in public acts, again with potential legal significance.

**(2) Mr. Clark's Alleged Letter Was Never Sent.** Mr. Clark's alleged letter was never sent, whereas objecting members of Congress actually voted on the floor to object to certifying certain electors pursuant to 3 U.S.C. § 15, or, in the case of Rep. Gohmert, filed an unsuccessful federal lawsuit (which Mr. Clark got dismissed).

**(3) Mr. Clark's Alleged, Unsent Letter Had No Legal Effect Allegedly Because of a Presidential Decision, Whereas Congressional Objectors' Actions Did Have Legal Effect.** Given the reported decision of President Trump, Mr. Clark's letter had no legal

---

[6] Mr. Clark was asked to testify himself to the Senate and declined that request (which was not backed by subpoena). But that is different than being given the opportunity to have one of his lawyers present to object to the testimony of others at DOJ as it was provided.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 25

effect and was totally unknown to the public until much later via the *New York Times* anonymous leakers, whereas the members of Congress objecting on January 6, 2021 did cast public votes that had a legal effect, even though they did not change the outcome that most in the American public assumed would result on that day: certifying Biden as President.  President Trump's decisions (alleged to be not sending a Georgia letter and leaving the top two leaders at DOJ in place) supersede those of inferior officials in the Executive Branch.  Both houses of Congress act by voting and the vote of each member of the Senate and of the House of Representatives are equal to the other votes of their fellow house members.

(4) **Mr. Clark's Alleged Letter was a Mere Option.**  Mr. Clark's alleged letter was equivalent to presenting an option to the ultimate decisionmaker.  It is more akin to the legal advice that counsel for a Senator or House Member might have received and was free to accept or reject as the principal with legal decisionmaking power.  And surely the Bar could not conclude that, if a January 6 objecting member of Congress had received legal advice from a staffer *not* to object that day but had overruled it, the counsel who had recommended to the contrary was acting unethically.  The same is true for the obverse situation, i.e., no unethical conduct would exist where counsel for a member of Congress counseled the member to object to the certification of electors for Biden but the member rejected that advice and voted in the negative during the objection process.

Relatedly, I do not believe your Office will be able to point to an analogous situation where, at best, a single Committee of one House of Congress has successfully complained about and seen discipline imposed because of the lawyering performed for the head of another branch of the federal government.  As noted above, please inform us if attorney discipline has *ever* been imposed in such a politically charged setting and crossing the boundaries between two of the three branches of the federal government. We will also seek confirmation that this is the null set via working to see filed a D.C. FOIA request, which any further action concerning Senator Durbin's complaint should have to await under Board Rule 4.1.  We also explore in Section V below why, in the absence of specific prior precedent in this area, no lawyer with reasonable knowledge of and attentiveness to the bar rules could plausibly be said to be on fair notice (as required by the Due Process Clause) that conduct like Mr. Clark's could violate those rules

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 26

### F.   The Political Nature of the Charges Against Mr. Clark Are Intensified Because They Are Part of an Ongoing Partisan Political Plan.

Finally, those attentive to the positions the Democrat party is taking in the press know that a plan is being formulated to argue that former President Trump and members of Congress who supported him engaged in an "insurrection" and thus they should be barred from ever holding federal office again pursuant to Section 3 of the Fourteenth Amendment. *See* John Kruzel, *Democrats Quietly Explore Barring Trump from Office Over Jan. 6*, THE HILL (Jan. 6, 2022), *available at* https://thehill.com/policy/national-security/588489-democrats-quietly-explore-barring-trump-from-office-over-jan-6 (last visited Jan. 31, 2022) ("'We intend to litigate this question,' John Bonifax, [Free Speech for the People] told The Hill. 'So if a secretary of state does not follow the mandate of Section 3, the 14th Amendment, we will bring this matter in court.") (also noting that Harvard Law Professor Laurence Tribe has been consulting with some members of Congress and their staffs on the relevant constitutional issues involving disqualification from federal office). Similarly, Marc Elias, Democrat election law mastermind, has tweeted that he would pursue the same strategy against any candidate questioning the 2020 election. *See* https://twitter.com/marceelias/status/1473118873302056961?s=20&t=Ikr]CgSFOunkpE4zh]wCqQ and https://twitter.com/marceelias/status/1473730872255918092?s=20&t=7IxaQUaIXec5oztFCLvhTA

This only reinforces the deeply political nature of the issue and provides even more reason for your Office not to regard this as a matter for bar discipline. Too many legal questions remain the subject of debate as existing judicial precedent does not provide absolutely clear guidance.[7]

---

[7] The notion that President Trump and the 147 members of Congress engaged in "insurrection," as if they were no different than the Confederates in the early 1860s, is such a tortuous constitutional stretch as to be risible. But given the deep divides in the country's judiciary, we cannot rule out that especially some state forums (which for that reason seem to be the main targets for the strategy explored in the Kruzel article in *The Hill*) may take that position in 2022 and 2024 litigation. Review by the U.S. Supreme Court may accordingly become necessary to clarify the law of Section 3 of the Fourteenth Amendment. And those anticipated proceedings are also ones that should give grounds to defer consideration of this matter, if it is not dismissed, pursuant to Bar Rule 4.1

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 27

The effort to damage Mr. Clark's standing in the legal community is part of political strategy to weaken former President Trump's ability to run again for President in 2024 and similarly, even before that, to weaken the ability of President Trump's allies to win election or reelection to Congress in 2022. The D.C. Bar simply should not wade into a matter of that nature.[8]

G.     **The Political Nature of This Matter Is Also Revealed by the Fact That It Is an Attempt to Relitigate the Failed Second Impeachment Trial of President Trump, Triggering Preclusion and the Political Question Doctrine.**

In general, Article III of the U.S. Constitution contemplates that the federal courts will resolve cases and controversies within their purview either under the Constitution itself or under jurisdiction assigned to them by Congress. An important exception to that principle is that the Senate adjudicates impeachment trials. *See* U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives … shall have the sole Power of Impeachment"); *id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present."). Of course, this recognizes that impeachment involves a member of the Article III branch presiding (though at President Trump's second impeachment, Chief Justice Roberts did not preside) but the involvement of both houses of Congress in the process reflects the inherent political dimensions.

---

[8] I am aware of the D.C. Bar's actions concerning FBI lawyer Kevin Clinesmith, who is listed as an active attorney in good standing (Membership, https://join.dcbar.org/eweb/DynamicPage.aspx?Site=dcbar&WebCode=FindMemberResults (last visited Jan. 31, 2022), despite pleading guilty to forging a FISA document to win approval to spy on Carter Page. I do not need to take a position on Mr. Clinesmith's case here to note that while he was part of the politically driven and knowingly fraudulent Russia collusion investigation, he pleaded guilty to deliberately falsifying evidence presented to the FISC. Mr. Clark has not plead guilty to any offense, never took any relevant similarly objectionable position in a court or in public in any type of legal forum, and is not alleged to have falsified any legal documents. This case is thus radically distinguishable from Mr. Clinesmith's.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 28

The second impeachment of President Trump was an intensely political matter. The single Article of Impeachment that was pursued stated in relevant part as follows:

In the months preceding the Joint Session, President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials.

\*\*\*

President Trump's conduct on January 6, 2021, followed his prior efforts to subvert and obstruct the certification of the results of the 2020 Presidential election.

\*\*\*

Wherefore, Donald John Trump, by such conduct, has demonstrated that he will remain a threat to national security, democracy, and the Constitution if allowed to remain in office, and has acted in a manner grossly incompatible with self-governance and the rule of law. Donald John Trump thus warrants impeachment and trial, removal from office, and disqualification to hold and enjoy any office of honor, trust, or profit under the United States.

H. Res. 24 (as received in the Senate of the United States) (Jan. 25, 2021), *available at* https://www.congress.gov/bill/117th-congress/house-resolution/24/text (last visited Jan. 31, 2022).

Note that the ultimate point of the remedy sought is the same as that now on the planning table by former President Trump's opponents, which is to disqualify him from running for or holding office again. For example, Rep. Liz Cheney, Vice Chair of the January 6 Committee, said in a television interview that "[Trump] must not ever again be anywhere close to the Oval Office, … I'm going to do everything that I can—both to make sure that that never happens." https://www.theguardian.com/us-news/live/2021/may/13/liz-cheney-republicans-trump-us-politics-live?page=with:block-609d22628f08e659a47e3fef#block-609d22628f08e659a47e3fef, *Liz Cheney Does Not Rule*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 29

*Out Running for President to Stop Trump*, THE GUARDIAN, May 13, 2021 (last visited Jan. 31, 2022).

But more importantly for present purposes, the Article of Impeachment of which former President Trump was acquitted on February 13, 2021 specifically asserts that he was being impeached on a key ground relative to this matter, *inter alia*, namely that he questioned the 2020 election results. Hence, as a logical matter, it incorporates the allegations that Mr. Clark was part of such conduct by President Trump. And this is not merely a theoretical issue. Mr. Clark was referenced *at least twice* during the impeachment trial. *See* Tr. Day 2 (Feb. 10, 2021), *available at* https://www.congress.gov/117/crec/2021/02/10/CREC-2021-02-10-pt1-PgS615-4.pdf, at S626-S627 (last visited Jan. 31, 2022) ("He turned to Jeffrey Clark, another Justice Department lawyer, who had allegedly expressed support for using the Department of Justice to investigate the election results. Shortly after Acting Attorney General Rosen followed his duty—and the law—to refuse to reopen investigations, President Trump intended to replace Mr. Rosen with Mr. Clark, who could then try to stop Congress from certifying the electoral college results.").[9]

The House Impeachment managers could have called Mr. Clark as a witness but they chose not to. *See* Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule VI (Rev. Aug. 16, 1986), *available at* https://www.senate.gov/artandhistory/history/resources/pdf/3_1986SenatesImpeachme ntRules.pdf (last visited Jan. 31, 2022).

---

[9] Note that this statement from the House impeachment managers (a) is couched in "alleged" terms; and (b) suggests that Mr. Clark requested that the election results be *investigated*, which could not be a violation of the Rules of Professional Responsibility. Investigations are what the Justice Department does. Similarly, I do not see how Acting Attorney General Rosen refusing to pursue further investigation and thereby rejecting Mr. Clark's supposed "support for using the Department of Justice to investigate the election results," while perhaps a valid exercise of discretion, was "follow[ing] the law" as if the applicable law embodied a specific command to him. There is no mandatory duty on the Acting Attorney General's to avoid investigating election irregularities as thoroughly as possible. Instead, requesting investigation of the election results, even if that would require a reopening of some kind by the Department, involves discretionary matters that Mr. Clark (assuming the truth of the allegation) was properly able to request and that Mr. Rosen was properly able to oppose, leaving the matter to the President to decide.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 30

He was likely not called for several reasons: (1) the impeachment managers knew that even if his testimony were provided, it would not have supported the claims advanced at trial and in the Article of Impeachment against Mr. Trump that he had incited an insurrection; (2) they suspected that Mr. Clark would consult with the former President's counsel and be told to invoke executive privilege, just as Mr. Clark was instructed to do on August 2 & 3, 2021 by former Congressman Doug Collins when the Senate Judiciary Committee and House Oversight Committee were calling for Mr. Clark to testify. *See* Letter of Harry MacDougald to Chairman Bennie Thompson (Nov. 5, 2021) (Exh. 1); and (3) the ruling on executive privilege would have been referred to the presiding judge of the impeachment trial, in theory Chief Justice Roberts. But Chief Justice Roberts did not preside and so the impeachment trial would have lacked a mechanism to compel Mr. Clark to testify. *See* Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule V Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials, Rule VI (Rev. Aug. 16, 1986), *available at* https://www.senate.gov/artandhistory/history/resources/pdf/3_1986SenatesImpeachmentRules.pdf (last visited Jan. 31, 2022). ("The Presiding Officer shall have power to make and issue, by himself or by the Secretary of the Senate, all orders, mandates, writ, and precepts authorized by these rules or by the Senate, and to make and enforce such other regulations and orders in the premises as the Senate may authorize or provide.").

Under ordinary principles of issue and claim preclusion, with the Senate acting as the trying body in the second impeachment, it would not be able to take a second bite at the apple by subcontracting its investigative powers to a professional bar or to the Justice Department to pursue the same topics. The Senate theoretically could have convicted Mr. Trump of the offense(s) he was accused of in the Article of Impeachment and found as a matter of fact that Mr. Clark was part of providing illicit advice, as was asserted at the impeachment trial on February 10, 2021. But the fact remains that the requisite number of Senators did not so conclude. And that is dispositive under the Constitution's carefully delineated form of impeachment trial.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 31

For purposes of claim and issue preclusion against your Office here, Mr. Clark was in privity with President Trump, to whom he gave legal advice.[10] Section 83 of the Restatement of Judgments expounds:

> Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties . . . the statement that a person is bound by or has the benefit of a judgment as a privy is a short method of stating that under the circumstances and for the purpose of the case at hand he is bound by and entitled to the benefits of all or some of the rules of res judicata by way of merger, bar or collateral estoppel.

RESTATEMENT (FIRST) OF JUDGMENTS § 83, cmt. a (1942).

Having made the alleged actions part of the second impeachment trial, the Senate should not be assisted by an exercise of prosecutorial discretion here by your Office in an attempt to secure bar discipline against Mr. Clark, for the purpose of leveraging him to testify and provide documents when House Impeachment Managers decided not to seek such testimony or documents in February of last year.

An attempt to redo that decision will also run into the barrier of the political question doctrine (*see Nixon v. United States*, 506 U.S. 224 (1993)) fused together with preclusion principles, for the reasons explained in this paragraph and the block quotation below it. Rejecting an argument advanced on Twitter by former Principal Deputy Solicitor General Neal Katyal that acquittal in President Trump's first impeachment trial (concerning Ukraine) could leave him vulnerable to a second impeachment trial constituting a redo of the first, two law professors participating in a symposium held on "Impeachment and the President," refuted Katyal as follows:

---

[10] To be clear, I am *not* asserting that Mr. Clark is in privity with President Trump on all issues, only the particular sphere of issues addressed in the second impeachment trial, which referred to Mr. Clark's conduct as an agent of the President in the Executive Branch, as part of President Trump's alleged "high Crimes and Misdemeanors." U.S. Const., art. II, § 4..

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 32

First, even though as noted above impeachment trials are not criminal, they are nevertheless, under the words of Article I, "cases" in which the Senate, acting "on Oath or Affirmation" for this purpose, is empowered to "try" such matters and reach "judgment[s]" about the individuals who are being "tried." Indeed, it is precisely because the Senate is acting as a sort of judicial tribunal in a trial of impeachment that the federal courts (including the Supreme Court) should respect the judicial decisions made by the Senate and treat the results of impeachment trials as "political questions" ordinarily not susceptible to federal judicial review.

Just as state and federal courts in the United States would respect adjudications made by courts in other countries under principles of res judicata, so too they should respect judgments made by the Senate sitting as a judicial tribunal in impeachment cases. (This res judicata explanation for why impeachment trials are "political questions"—which focuses on the distinctively judicial character of the constitutional language empowering the Senate in impeachment proceedings—helps make political question doctrine less subjective and less capacious).

\*\*\*

Impeachment, and potential removal, of a President is a political as well as a quasi-judicial process.

Vikram David Amar & Jason Mazzone, *The Power to 'Try' 'Cases of Impeachment': Some Reflections on the Finality, Transparency and Integrity of Senate Adjudications of Presidential Impeachments (Including That of Donald J. Trump)*, 95 CHI.-KENT L. REV. 455, 456–57 (2020) (first paragraph break added).  President Trump's acquittal in the second impeachment trial means that claims based on conduct that the House Impeachment Managers adduced to the Senators but failed to prevail on are barred from being questioned in any other forum, including local bar disciplinary proceedings.[11]

---

[11] *See also id.* at 459 n.17 ("We suppose someone could argue that since President Trump did not receive a 2/3 vote in his favor, he was neither acquitted nor convicted, and that his impeachment trial resulted in a 'hung' Senate, in which case, the argument would continue, nothing was adjudicated. 'But in impeachment,

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 33

\* \* \*

If you consider the arguments in Section II, just as a threshold matter, I hope you will agree that this docket should quickly be closed without action. You could then write a short letter informing Senator Durbin that the D.C. Bar Rules do not exist to discipline attorneys at the Justice Department for taking positions within the range of political debate concerning the last election, especially when those positions are seemingly shared by 8% of the Senate (8 out of 100 Senators) and nearly a third of the House of Representatives (139 out of 435 Representatives).

The happenstance that Mr. Clark's two bosses at the Justice Department effectively supported an outcome under which Joe Biden became President is a non-factor. Bar discipline should not depend on the debatable views on a political question of an attorney's superiors. Legal positions can often be controversial. Internal debate about debatable questions in the Justice Department, which is, by analogy, a law firm, should not be stifled, especially when political judgment is an inseparable part of the analysis.

III.   THE SEPARATION OF POWERS WOULD BE INVADED BY PROCEEDING
       FURTHER ON SENATOR DURBIN'S COMPLAINT.

The fact that Senator Durbin has written to you to complain about Mr. Clark's conduct is not something that can be given dispositive weight or indeed any weight. Even assuming Senator Durbin wielded the whole might of the legislative branch (and he does not), he cannot invade the separation of powers. It is for the Executive Branch to investigate potential violations of law and to decide how to exercise the federal government's enforcement powers, not Senator Durbin.

---

when fewer than [two-thirds of the] Senators vote to convict, we say the impeached person is acquitted—even though 67 did not vote against conviction. This has been true from the beginning of the Republic all the way through William Rehnquist's pronouncement that Bill Clinton was acquitted [to the proclamation by Chief Justice Roberts that President Trump was acquitted]. It takes 67 to convict, but only 34 to acquit.' Vikram David Amar, *The Truth, the Whole Truth and Nothing But the Truth about "High Crimes and Misdemeanors" and the Constitution's Impeachment Process,*" 16 CONST. COMMENT. 403, 414 (1999).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 34

I begin with *Plaut v. Spendthrift Farms, Inc.*, 514 U.S. 211 (1995). *Plaut* invalidated a congressional statute that invaded the exclusive province of the Judicial Branch by purporting to, in effect, overrule a final judgment rendered by the U.S. Supreme Court. *Plaut* began by holding that the statute at issue "offends a postulate of Article III just as deeply rooted in our law as [others they Court had mentioned but found inapplicable, namely] Article III establishes a "judicial department" with the "province and duty … to say what the law is" in particular controversies." *Id.* at 218 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

Here, the other branch involved than the Congress is the Executive Branch, not the Judicial Branch, as in *Plaut*. Nevertheless, the "executive department," to use terminology more like *Marbury*, has a "province and duty," conferred on the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Pursuant to that duty, President Trump was free to consult with his appointees and lawyers in the Executive Branch, including Mr. Clark. The President, in the exercise of his executive power under the Constitution, "speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties." *Wilcox v. McConnel*, 38 U.S. (13 Pet.) 498, 513 (1839). *See also Wolsey v. Chapman*, 101 U.S. 755 (1880); *United States v. Farden*, 99 U.S. 10 (1879).

If President Trump considered making Mr. Clark the head of the Justice Department as part of the legal advice he was soliciting, that is fully within his constitutional remit. Nothing made Acting Attorney General Rosen unremovable (and any future legislation that tried to implement such a restriction as a result of the Senate's inquiry that generated the complaint here would be unconstitutional). Indeed, DOJ's Office of Legal Counsel concluded that Matt Whitaker, a non-Senate-confirmed official, could serve as Acting Attorney General. *See* Memorandum for Emmet T. Flood, Counsel to the President, Re: Designating an Acting Attorney General (Nov. 14, 2018), *available at* https://www.documentcloud.org/documents/5113259-OLC-Opinion-on-Matthew-Whitaker-Appointment.html. All the more reason that the President could have done so as to Mr. Clark, who was Senate-confirmed, with bipartisan support no less.

*Plaut* explores the issue of interbranch review and finds that it is unconstitutional for Congress to seek to intrude into spheres in which it does not belong. *See Plaut*, 514 U.S. at 221 ("Madison's Federalist No. 48, [includes] the famous description of the process

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 35

by which "[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex"). "But the doctrine of separation of powers is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features ... it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.* at 239.

*Plaut* also tied itself to the analysis in *INS v. Chadha*, 462 U.S. 919, 969 (1983), equating the need for an equivalent rule fencing out Congress: "We think legislated invalidation of judicial judgments deserves the same categorical treatment accorded by *Chadha* to congressional invalidation of executive action .... Separation of powers, a distinctively American political doctrine, profits from the advice authored by a distinctively American poet: Good fences make good neighbors." *Id.* at 240.

*Chadha's* invalidation of the one-house veto also has application here to Senator Durbin's complaint. He is a Senator in one House, albeit the upper one. And he is a single Senator at that. Under *Chadha*, even if the entire Senate had passed a resolution condemning President Trump and Mr. Clark for the options they considered in an internal debate in December 2020 through early January 2021, such a resolution would have no weight in your Office's inquiry. It would still be an intrusion on the internal deliberation processes of the Executive Branch. President Trump's consideration of appointing Mr. Clark Acting Attorney General and of a letter that would reopen election investigations (as Mr. Clark was accused at President Trump's second, failed impeachment trial) are not unlawful or unconstitutional activities and Congress has no business questioning them. A single house of the legislature, the Senate, has less of a basis to question them. And a single complaining Senator trying to weaponize the bar processes against Mr. Clark, and thus derivatively against former President Trump, still less.

A July 2021 letter to Mr. Clark from Bradley Weinsheimer, Associate Deputy Attorney General, purporting to waive executive privilege, reserved the law enforcement privilege with respect to investigations into the 2020 election. This is a topic into which you want to inquire, but the law enforcement privilege has been asserted as to that topic by the Biden Administration. That being so, it follows that the discussion of election investigations in the Department of Justice and with the President that is the focus of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 36

much of your subpoena is within the self-same law enforcement privilege. The President is the chief law enforcement officer under the Constitution.[12]

At this point, I have attached as exhibits all of my correspondence with the January 6 House Select Committee on the issue of executive privilege (and the other illegal acts of that Committee that try to pressure Mr. Clark to open up the confidential precincts of the Executive Branch to unconstitutional interbranch review).

1. November 5, 2021, letter to Rep. Bennie G. Thompson

Asserting executive privilege, including presidential communications privilege, law enforcement privilege and deliberative process privilege, attorney-client privilege and work product privilege, discussing the purported waiver by one President of a former President's privileges, and asking the Committee to delay the deposition. The letter also registered an objection to the scope of the subpoena since Mr. Clark had nothing whatsoever to do with the events of January 6.

2. November 12, 2021, letter and Memo to Rep. Bennie G. Thompson

The letter and the accompanying memo listed and argued that the Committee was violating or attempting to violate separation of powers, due process, executive privilege, that he was a pawn in an inter-branch political dispute, that his testimony was unnecessary and outside the Committee's span of power, that the Committee had repeatedly mischaracterized our position, that it was in violation of applicable Congressional rules,

3. First November 29, 2021, letter to Rep. Bennie G. Thompson

---

[12] To the extent Mr. Weinsheimer's letter is read to waive President Trumps' executive privilege but reserve *DOJ's* law enforcement privilege, that is a puzzling inversion that would conveniently operate to expose President Trump but shield Messrs. Barr, Rosen, Donoghue and other DOJ officials from having to explain how much—or more likely how little—they did to investigate election irregularities.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 37

Arguing that the Committee's composition and genesis preclude use of deposition authority under the Rules of the House, and proposing a deposition on limited topics in a public hearing.

4. Second November 29, 2021, letter to Rep. Bennie G. Thompson

Enumerating additional objections based on review of the transcript, including due process, that the Committee persistently mischaracterized our position, and that we had not been granted access to a certain ODNI draft report on foreign interference in the election.

5. November 30, 2021, letter to Rep. Bennie G. Thompson

Asserting the Fifth Amendment and cataloging the Committee's many legal and procedural defects and its many abuses of the constitutional limits under which it operates and of Mr. Clark's constitutional rights.

IV.   PREEMPTION

State and local governments lack the power to regulate the conduct of the federal government. Unfortunately, your November 22 letter shows no awareness of that important principle, so that it can be respected, and it can be explained to us how your Office thinks it can use its authority to intrude into legal advice the President of the United States saw fit to seek and receive.

As noted in my other letter today, and as set forth in the Office of Legal Counsel Opinion dated August 2, 1985 and entitled *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*,[13] any local bar's assertion of disciplinary authority over federal government attorneys that interferes with or penalizes the performance of authorized federal responsibilities very likely violates the Supremacy Clause and is preempted. "The purported imposition of exclusive disciplinary jurisdiction by state courts upon federal lawyers acting in the scope of their federal authority is subject to the overriding requirements of the Supremacy Clause. Rules promulgated by state courts that are inconsistent with the requirements or exigencies of federal service may violate the

---

[13] *Available at* https://www.justice.gov/file/23741/download (emphasis added) (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 38

Supremacy Clause." *Id.* Internal deliberations of the nature into which the Bar is inquiring are authorized activities for senior officials of the Justice Department and so are beyond the regulatory authority of the DC Bar.

It is not the role of a local government (like the District of Columbia, acting in its bar regulatory capacity as a quasi-analogue of a State) to intrude into the federal sphere of authority. And the Supreme Court long ago held that the States lacked the power to tax a federal government entity. *See M'Culloch v. State,* 17 U.S. 316 (1819). Just as "the power to tax involves the power to destroy," *id.* at 431, so the power to use bar subpoenas and investigative demands would be the power to destroy executive privilege and intrude on the superior federal government's confidential deliberations. This is because "the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied." The actions your Office proposes to engage in are plainly repugnant to respecting the superseding federal sphere of action and deliberation. Moreover, the District of Columbia is subordinate to and an instrument of the federal government. It is not its master.

Similarly, your Office's attempt to penetrate into the Executive Branch's workings here violate the teachings of *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779 (1995). *Term Limits* holds that the States could not impose additional qualifications for offices for House Representatives or Senators in addition to those set by the Constitution. "As Justice Story recognized, 'the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them …. No state can say, that it has reserved, what it never possessed.' 1 Story § 627." *Id.* at 803. "The Constitution 'nullifies sophisticated as well as simple-minded modes' of infringing on constitutional protections. *Lane v. Wilson,* 307 U.S. 268, 275 (1939); *Harman v. Forssenius,* 380 U.S. [528,] 540–541 [(1965)]." *Term Limits,* 514 U.S. at 829. This logic from *Term Limits, Lane,* and *Harman* reinforces why your Office cannot break a potential tie in the Senate Judiciary Committee to issue a subpoena that body did not choose to issue and to your knowledge only one Committee member wants

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 39

to issue.  Doing so would serve as a "sophisticated" but nonetheless improper "mode" "of infringing on constitutional protections."

Moreover, Justice Kennedy provided the fifth vote in *Term Limits* and his rationale for doing so is clear and applies here to bar what your Office has proposed to do in this matter.  "The States have no power, reserved or otherwise, over the exercise of federal authority within its proper sphere. *See* [*M'Culloch*], at 430 (where there is an attempt at 'usurpation of a power which the people of a single State cannot give,' there can be no question whether the power 'has been surrendered' by the people of a single State because '[t]he right never existed'). That the States may not invade the sphere of federal sovereignty is as incontestable, in my view, as the corollary proposition that the Federal Government must be held within the boundaries of its own power when it intrudes upon matters reserved to the States. *See United States v. Lopez*, 514 U.S. 549 (1995)."

## V.   THE THEORY THAT YOUR OFFICE IS PROCEEDING UNDER WOULD VIOLATE DUE PROCESS BY DEPRIVING MR. CLARK OF FAIR NOTICE OF A NOVEL APPLICATION OF THE BAR RULES.

At various points in my letters of today, I have noted that there does not appear to be a case remotely like this to which ethics rules have been applied and requesting if you are aware of any such authority.  In the absence of that, by proceeding here in order to establish a penal sanction as applied to Mr. Clark's bar license, your Office risks violating due process/fair notice principles.  While potential ambiguity or extensions of the law can be wrought on a prospective basis, it is plainly unlawful to pretend that the law is clear, which is a requirement before penalties can be imposed.  *See, e.g., General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) (Tatel, J.) (EPA could not hold a company liable for a new interpretation of regulations that the company was not aware of) ("In some cases, however, the agency will provide no pre-enforcement warning, effectively deciding 'to use a citation [or other punishment] as the initial means for announcing a particular interpretation'—or for making its interpretation clear. *E.g. Martin v. OSHRC*, 499 U.S. 144, 158 (1991) (noting that such a decision may raise a question about 'the adequacy of notice to regulated parties')."); *see also Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987) (Silberman, J.) (applying the same principle to a permit applicant).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 40

Moreover, the fair notice principles apply equally in the bar discipline context. *See In re Ruffalo*, 390 U.S. U.S. 544 (1968) (invalidating a disbarment order because the lawyer had no notice that his conduct—hiring a part-time FELA investigator who worked for a railroad—might later be considered by some lawyers as an offense warranting a disbarment order); *id.*, 390 U.S. at 1227 (White & Marshall, J.J. concurring in the result) ("I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.").

And here you are contemplating what seems to be an extreme innovation in the bar rules, interpreting them to penetrate into and take sides with one group of lawyers in a dispute over another. That would require the clearest advance notice to the bar in D.C., which is thick with lawyers working for the federal government and with the periodic waves of political appointee lawyers who sweep in and out of the City as presidential administrations change.

## VI.   BILL OF ATTAINDER

Senator Durbin's letter, while it avers many facts and spins many facts as well, cannot be taken to have any effect in this quasi-judicial, administrative-stage proceeding. As a logically prior matter, that is because if the action of a single house of Congress does not carry legal effect because it violates the requirements of bicameralism and presentment, then all the more so as to the action of one Committee in one house of Congress, or one Committee chair in one house. Moreover, only a court can hold a trial under our Constitution and thus no fact that Senator Durbin purports to have found can carry any weight as firmly established as your Office makes an independent inquiry.

But another, interrelated feature of the separation of powers, is the Bill of Attainder. *See* U.S. Const., art. I, § 10, cl. 1. The Bill of Attainder is one of the two individual liberties protected from both federal and state intrusion. James Madison noted in Federalist Paper 44 that "[b]ills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts are contrary to the first principles of the social compact and every principle of sound legislation."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 41

Historically, the punishment of a deprivation of a bar license would fall into the category of a "bill of pains and penalties," with a "bill of attainder" in its narrowest sense in English law meaning a condemnation to death. *See Legal Dictionary, available at* https://tinyurl.com/3ab7nfec (last visited Jan. 31, 2022). But under our Constitution, the Bill of Attainder prohibition applies to pains and penalties as well. *See id. See also Drehman v. Strifle,* 75 U.S. 595 (1869); *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87 (1810).

One of the pains-and-punishment style Bill of Attainder cases is *Ex Parte Garland,* 71 U.S. (4 Wall.) 333 (1866). That case struck down a statute which, in essence, disbarred former Confederate soldiers including a former Senator in the Confederacy. Hence, there is direct Supreme Court precedent that brands disbarment, where new legislative action penalizes already past conduct, a Bill of Attainder.

Bills of Attainder can also be set up conditionally, i.e., to apply if one of the targets or targeted classes does or does not do something. That seems eerily applicable here, post January 6, 2021, where the media and many in Congress seek affirmative repudiation of President Trump as a condition of reentry into genteel society in the Nation's capital. Compare the January 6 Committee's entreaties to come in and discuss with the Committee everything the witness can say criticizing President Trump, with the implicit understanding being: in that case, we will go easy on you. *See Cummings v. Missouri,* 71 U.S. 277 (1867) (invalidating loyalty oath or sacrifice one's ability to lawfully serve as a member of the clergy). No one should cow to that kind of imperial infringement on their God-given and constitutional rights. That is not America.

## VII.   OPINION CLAUSE

Under D.C. Bar Rule XI, Section (6)(a)(2), Disciplinary Counsel 's role is to determine whether "the apparent facts, if true, may warrant discipline." Senator Durbin's complaint under D.C. Rule of Professional Conduct 8.4 stands or falls on the allegation that "verifiable falsehoods [were] at the core of Mr. Clark's efforts." Your Office's role prior to the filing of a formal complaint is, therefore, to determine whether there is any truth to the proposition that *all* allegations of election fraud in the State of Georgia were "verifiably false."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 42

If, by contrast, *any* of the allegations being made at the time about the conduct of the election in Georgia were *not* "verifiably false," Senator Durbin's complaint becomes a dispute over the nature and scope of Mr. Clark's authority as Assistant Attorney General—a subject over which neither Disciplinary Counsel nor the Court of Appeals have jurisdiction.

As a Senate-confirmed senior official of the United States Department of Justice, Mr. Clark unquestionably had authority to make recommendations concerning the need for investigations into allegedly illegal conduct that came to his attention. Unless the allegations concerning illegal conduct in Georgia were *known* by Mr. Clark to be "verifiably false" at the time he sought to investigate them, he unquestionably had the authority and discretion to make the legal policy case for mounting an investigation.

Thus, unless this Office finds, as a preliminary matter, that *all* suspicions of illegal conduct in the Georgia election were "verifiably false," Senator Durbin's claims become little more than a baldly partisan effort to intrude into the deliberative process by which senior Justice Department officials resolve disputes over policy and the allocation of the DOJ's investigative resources.

Senator Durbin's reliance on, among other things, the statements of Mr. Clark's former colleagues demonstrates that his complaint is an effort to ensnare this Office and perhaps the D.C. Court of Appeals in an unconstitutional investigation into the internal deliberative process by which the President's advisors in the Department of Justice answer questions posed by the President pursuant to his power under Art. II section 2, cl. 1 ("The President ... may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Office ....") *See* Office of Legal Counsel, Memorandum for the Attorney General, Confidentiality of the Attorney General's Communications in Counseling the President, 6 Op. OLC 481 (Aug. 2, 1982), *available at* https://www.justice.gov/sites/default/files/olc/opinions/1982/08/31/op-olc-v006-p0481_0.pdf (last visited Jan. 31, 2022).

Senator Durbin has accused Mr. Clark of illegal conduct. Mr. Clark has responded by claiming his Fifth Amendment privilege against self-incrimination. Disciplinary

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 43

Counsel's letter to Mr. Clark indicates not only that he understands the nature of the charges, but he also expects Mr. Clark to supply the evidence supporting them.

Disciplinary Counsel's November 22 information requests are essentially improper "interrogatories," that are also vague and overbroad. Far exceeding the investigative authority granted by D.C. Bar Rule XI, Section 8, they call for legal conclusions and make unreasonable demands for information already available from other sources. Even more problematic, the interrogatories also seek information that may never be available because neither Disciplinary Counsel nor Mr. Clark at the moment (based on recent information I received from DOJ that Mr. Clark's security clearances were administratively suspended, which is suspicious and we are probing, on January 26, 2021) have either the requisite security clearances to review it, or the authority to demand access to the internal deliberative processes of the Department of Justice or the White House.

In *In Re: Artis*, 883 A.2d 85, 98-99 (D.C. 2005), the Court of Appeals observed that Disciplinary Counsel does not have the authority to demand answers to interrogatories that intrude on the inviolability of constitutionally based privileges.

> In this jurisdiction, the rules of discovery are much more restricted for the prosecutor in a criminal proceeding. *See Herndon, supra,* 596 A.2d at 596 (citing Super. Ct. Crim. R. 16 & 17); *see also Morris v. United States,* 622 A.2d 1116, 1124-25 (D.C.), *cert. denied* 510 U.S. 899 (1993) ("Discovery in criminal trials, especially discovery of the defense case, is very limited because of the adversarial nature of criminal prosecutions."). In adopting rules permitting discovery by a prosecutor in a criminal proceeding, courts and legislatures have proceeded with caution because of the Fifth Amendment privilege against self-incrimination, the Sixth Amendment's guarantee of effective assistance of counsel, the attorney-client privilege, and the attorney work product doctrine. *Middleton v. United States,* 401 A.2d 109, 115 (D.C.1979) (concluding that it was error for the trial court to compel disclosure of evidence gathered by the defense investigator absent statutory or other authority).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 44

The rationale of *Artis* also applies to the Mr. Clark's executive privilege claim. The Office of Legal Counsel of the U.S. Department of Justice has consistently taken the position that

> memoranda prepared by the Attorney General *or his assistants* containing legal or policy advice on issues under consideration by the President and his advisers may be properly encompassed by a claim of executive privilege. *This category of documents would include, for example, staff level advice to Assistant Attorneys General* concerning matters on which the President has sought advice, staff level advice to officials in the Office of the President, notes of middle level staff meetings concerning issues before the President or members of his staff, and tentative legal judgments or draft policy statements prepared for the President or his staff.

Office of Legal Counsel, *Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. OLC at 488-489 (emphasis added). *See also* 28 U.S.C. § 506 (establishing a certain fungibility as to most Assistant Attorneys General). This makes perfect sense. Advising the President and lawyering generally is often a collaborative enterprise. There would be no valid basis for construing Opinion Clause protection and ancillary doctrines to protect only words exchanged between the President, and as relevant here, the Acting Attorney General. No, the President may also hear from his Assistant Attorneys General and those Assistants may in turn receive input from their own staffs.

The inquiry that Disciplinary Counsel proposes is inconsistent not only with Executive Privilege, but also with both statutory and common law privileges governing internal government deliberations. Mr. Clark's role was to advise the Attorney General and, when requested, to advise the President. Depending on the circumstances, his client was the Executive Branch as embodied in its Chief Executive. *See* D.C. Rule of Professional Conduct 1.13.

> Exemption 5 of the Freedom of Information Act (FOIA) protects from compulsory disclosure to the public, government materials which are "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 45

agency." 5 U.S.C. § 552(b)(5). This exemption thus codifies the traditional common law privileges afforded certain documents in the context of civil litigation and discovery, *see* Fed. R. Civ. P. 26; Fed. R. Evid. 501, including the executive " deliberative process" privilege, *NLRB v. Sears, supra; EPA v. Mink*, 410 U.S. 73 (1973); *Taxation With Representation v. IRS*, 646 F.2d 666 (D.C. Cir. 1981); the attorney client privilege, *Brinton v. Department v. State*, 636 F.2d 600,603-04 (D.C. Cir. 1980), *cert. denied*, 452 U.S. 905 (1981); *Mead Data Central v. United States Department of Air Force*, 566 F.2d 242, 252-55 (D.C. Cir. 1977); and the attorney work-product privilege, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975); *Bristol-Myers Co. v. FTC*, 598 F.2d 18 (D.C. Cir. 1978), as applied to document requests of government agencies from members of the public. *See also Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C. Cir. 1980). All of these privileges encompassed by exemption 5 may be claimed, in appropriate circumstances, to protect communications between the Attorney General's Office and the Office of the President from compulsory disclosure to members of the press and the general public.

Office of Legal Counsel, *Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. OLC at 490.

## VIII.   FIRST AMENDMENT AND EQUAL PROTECTION

As every lawyer knows, the First Amendment protects the rights of free speech and free thought, U.S. Const. amend. I, while the Equal Protection clause guarantees the equal protection of the law, protects against arbitrary and capricious impositions by the government. U.S. Cons. Amend. XIV. Your Office's investigation of Mr. Clark threatens both of these rights in that, as discussed at length elsewhere in this letter, the real offense of which he is accused by Senator Durbin and which he wants investigated amounts to no more than a thought crime, a violation of the First Amendment, where a large number of others holding similar thoughts are not being charged or investigated, becoming its own violation of the Equal Protection clause. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 46

confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S.
624, 642 (1943). I do not elaborate on these themes further given the prodigious length of
this letter already, but will do so if required.

**IX.    D.C. BAR RULE OF PROFESSIONAL CONDUCT 8.4(D) CANNOT BE USED
TO TURN STANDING ON ONE'S FEDERAL CONSTITUTIONAL RIGHTS IN
RESISTING A SUBPOENA INTO AN INDEPENDENT VIOLATION OF THOSE
BAR RULES.**

You indicate that you are investigating a potential violation of D.C. Bar Rule of
Professional Conduct 8.4. In particular, your November 22 letter states, at page 3: "Please
be aware that the District of Columbia Court of Appeals has approved discipline based
in part on a violation of Rule 8.4(d) of the D.C. Rules of Professional Conduct (conduct
that seriously interferes with the administration of justice) where the attorney failed to
comply with Disciplinary Counsel's request for information. Moreover, your cooperation
will contribute to the resolution of this matter in a manner which safeguards the rights of
the public and protects attorneys from unfounded complaints."

I have already dealt above with the point that the public interest is not served by
this inquiry as to a proposed unsent letter that was never delivered in non-draft form
outside of the Executive Branch. Indeed, the superior interest of the people of the United
States is instead promoted by respecting and shielding Executive Branch confidences and
avoiding chilling the candor of those discussions.

Additionally, your Rule 8.4(d) theory cannot withstand scrutiny. In *In re Pearson*,
228 A.3d 417,426 (D.C. 2020), the Court explained that "[a] violation [of Rule 8.4(d)]
requires improper conduct that 'bear[s] directly upon the judicial process ... with respect
to an identifiable case or tribunal" and "taint[s] the judicial process in more than a *de
minimis* way'" citing *In re Hopkins*, 677 A.2d 55, 59–61 (D.C. 1996). In *In re Yelverton*, 105
A.3d 413, 426 (D.C. 2014) the D.C. Court of Appeals held that "[c]onduct violates Rule
8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an
identifiable case or tribunal, *and* (3) harms the judicial process in a more than a de
minimis way." (emphasis added).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 47

Not a single one of these three essential elements is even remotely satisfied by what is alleged here: a confidential and privileged internal legal deliberation over a letter that was never sent and a course of action that was rejected by the decisionmaker and never taken. Measured against the essential elements identified in *Yelverton*, (1) confidential and privileged internal deliberations and debates over legal theories and arguments are not improper; (2) there is no identifiable case or tribunal because the entire discussion was internal, confidential and totally unknown to the public and no document asserting the arguments or theories was ever filed in any court or tribunal anywhere; and (3) there was no judicial process that was affected in any way whatsoever because nothing was ever filed in any court or tribunal anywhere. The Bar does not have jurisdiction over such conduct. Rule 8.4(d) does not apply.

**X.   THE OFFICE'S INSUBORDINATION THEORY FAILS.**

On page 2 of your November 22, 2021 letter, you note that "[w]e are particularly concerned with your conduct after Mr. Rosen's and Mr. Donoghue's initial determination on December 28, 2020, not to send your draft letter because it lacked evidentiary support." Read in the context of the full letter, this seems to suggest that if Mr. Clark had continued to press a position to investigate or, in the terms of the House Impeachment Managers when referring to Mr. Clark, "reopen" an investigation, and/or spoke to the President, this could be disciplinable conduct. Respectfully, this is wrong on legal grounds based on a host of arguments included in this letter, including most importantly the preemption argument and the inability under the separation of powers for a Senator to try to penetrate into the management of the Executive Branch using a bar complaint as a device to do so.

But this Section also sets out certain publicly available documents that, if taken as true, show that any theory of insubordination trying to make December 28 a magic date falters.

Perhaps the easiest way to see this is to look at some of the documents that were released by the House Oversight Committee. (Your Office may not be aware of those documents.) Without verifying their accuracy, consistent with the legal positions and pleadings on Mr. Clark's behalf taken or made in my two letters today, your Office should

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 48

consult those documents and not proceed only by looking at what Senator Durbin and his staff prepared and sent to you.  Also, we do not waive arguments that DOJ improperly released those documents despite the fact that they were covered by multiple privileges. Additionally, we do not possibly understand how DOJ concluded it could release such documents but in the July letter to Mr. Clark (and duplicated to others like Mr. Rosen), law enforcement privilege was being maintained.

But with those caveats in mind, please look at the December 30, 2020 and January 1, 2021 emails from Mark Meadows, the President's Chief of Staff, to Mr. Rosen.  *See* U.S. House of Representatives Oversight Committee, *DOJ Selected Documents* (June 15, 2021) at 219, 226, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/COR-SelectedDOJDocuments-2021-6-15-FINAL.pdf ("Can you have your team look into these allegations of wrongdoing.  Only the alleged fraudulent activity[?]  Thanks Mark") & ("There have been allegations of signature match anomalies in Fulton county, Ga.  Can you get *Jeff Clark* to engage on this issue immediately to determine if there is any truth to this allegation") (emphasis added) (last visited Jan. 31, 2022).  A reasonable inference from these two emails would be that the President had asked his Chief of Staff to relay this instruction to Acting AG Rosen.[14]  *See, e.g.,* David Z. Morris, *Congressman Calls for Investigation of Trump's Insecure Phone,* FORTUNE (Feb. 18, 2017) ("By most accounts Trump does not use email, reducing the likelihood of sensitive or classified information being leaked through a hack ...."), *available at* https://fortune.com/2017/02/18/trump-android-phone-ted-lieu/ (last visited Jan. 31, 2022).

The key point, however, is that both of these emails both came *after* December 28, 2021.  As I have noted in emails to DOJ (and which is supported by other DOJ/congressionally released documents) in order to try to obtain access to the relevant national security documents, Mr. Clark saw an Intelligence Community report on foreign election interference on January 1, 2021 and then discussed that matter with Director of

---

[14] Assuming this is correct, it appears that there was a twinge of insubordination in an email exchange inside the walls of DOJ, for in response to Mark Meadows' January 1, 2021 email to Mr. Rosen, Mr. Rosen forwarded it to Mr. Donoghue, with the note "Can you believe this?  I am not going to respond to the message below."  Donoghue responded 6 minutes later:  "At least it's better than the last one, but that's not saying much.").

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 49

National Intelligence Ratcliffe on January 2, 2021. And finally, as the Durbin report itself asserts in its chronology, there was an Oval Office meeting on January 3, 2021 including President Trump, Mr. Clark, and Messrs. Rosen & Donoghue, *et al.* Thus, if the emails above are credited, they show a basically unbroken chain pursuant to which Mr. Clark was entitled to act running from December 30, 2020 to January 3, 2021—all of which *postdates* December 28, 2020.

From what is available for you to review, Mr. Clark was not being insubordinate to his DOJ superiors. All in the chain were subordinate to President Trump.

**XI.   EVEN IF THE BAR DID HAVE THE CONSTITUTIONAL AUTHORITY TO ADJUDICATE THE COMPLAINT FILED BY SENATOR DURBIN (WHICH IT DOES NOT), SIGNIFICANT PUBLIC INFORMATION WAS AVAILABLE BEFORE JANUARY 3, 2021, AND HAS ONLY BEEN CONFIRMED FURTHER SINCE, THAT COULD HAVE LED A REASONABLE DOJ LAWYER TO WANT TO INVESTIGATE.**

There is ample evidence of election irregularity in Georgia and in other 2020 presidential election battleground States. The mainstream media can pretend this is not true and report on any new information coming to light in a biased fashion, pooh-poohing it, but a prosecutor acting under the federal law that governs the District of Columbia carrying an obligation to see that justice is done cannot proceed in such a blinkered way.

Numerous sources are referred to below, and anyone as well-read and as aware of national news, from a variety of sources, as Mr. Clark is, would no doubt have known much of this information even before the Fall of 2021 or today, January 31, 2022. For this reason, you should consider the entire book *Rigged*, written by Molly Hemingway, incorporated by reference here, especially Chapter 10, "The Trouble with Fulton County." *See* Mollie Hemingway, RIGGED: HOW THE MEDIA, BIG TECH, AND THE DEMOCRATS SEIZED OUR ELECTIONS (2021). We can purchase a copy of the book to send to you if that is necessary.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 50

There is no retreat in this Section from the arguments advanced in other Sections above that the D.C. Bar does not have the authority to intrude into the separation of powers or use local bar rules to second guess the decisions of a lawyer inside the federal government giving advice to the President.

We note, however, that if you decide not to exercise your prosecutorial discretion to end the investigation *and* you reject those constitutional arguments and our other objections, the Board would need to adjudicate a truly monumental set of facts to decide that D.C. Rule of Professional Responsibility 8.4 had been violated by Mr. Clark in the course of allegedly investigating (or advocating for reopening an investigation into) election irregularities and recommending options inside DOJ and/or to the President of the United States. There is more than enough evidence to support a good-faith desire to investigate further and no clear and convincing evidence that Mr. Clark deliberately lied. Any such claim would be far-fetched. And the ultimate recipient of legal advice, the President of the United States, even if the testimony provided to the Senate Judiciary Committee were considered beyond cavil, does not reveal the President asserting that Mr. Clark lied or that his own, very public, doubts about the 2020 election were fabrications.

Bar processes are not the place to litigate the most controversial presidential election in U.S. history (far surpassing *Bush v. Gore* in 2000). Instead, as I argue in the companion letter to this one, focused on your subpoena, the reason Board Rule 4.1 exists is precisely to defer bar investigations until after other proceedings bearing on issues of great magnitude, like those here, are fully resolved.

Mollie Hemingway explores many questionable practices or issues impacting the outcome of the 2020 election, such as ballot-harvesting, voter database deficiencies, clear violations of state law as fixed pursuant to Article II by the state legislatures, signature verification problems, and lack of proper, bipartisan oversight of the ballot-counting process.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 51

A.   **On or Before January 3, 2021, a Reasonable Lawyer Could Legitimately Believe That the Presidential Election Was Irregular Enough to Want to Investigate or Reopen Prior Investigations.**

The discussion below focuses on Georgia because Mr. Clark's alleged letter focused on Georgia. Many of the issues are generalizable. If you find it necessary, we can produce catalogues of pre-January 3, 2021 election irregularities in other battleground States such as Arizona, Pennsylvania, Wisconsin, etc. And even what is below is just a smattering of the eyebrow-raising information concerning Georgia.

Fulton County, Georgia has a "long history of mismanaging elections." RIGGED, 291. Indeed, the June 9, 2020 primary was a mess there, putting anyone on notice that the county should be carefully scrutinized. The problems were so significant that the state elections board sued the county, eventually settling the suit in a consent decree. *See id.* at 291. Two examples of mismanagement in Fulton were admitted to by Georgia Secretary of State Raffensberger: (1) The email system was set up so that for every voter who requested an absentee ballot, it generated 20 different emails to 20 different employees, which overwhelmed the servers; and (2) voters sent in their requests in different formats from PDF's to JPEGs to .MOV files to embedded photos. Investigators said the county's printers couldn't handle the different formats. *See also* Richard Elliot, *Fulton County Broke the Law in Handling of Absentee Ballot Requests, State Investigation Finds*, WSB-TV CHANNEL 2, *available at* https://www.wsbtv.com/news/local/fulton-county/fulton-county-broke-law-handling-absentee-ballot-requests-state-investigation-finds/XWE4XMFIRVHETHSI3LT7OJA36Y/ (Aug. 27, 2020), (last visited Jan. 31, 2022).

Later, a report by Seven Hills Strategy would emerge, giving a much more blow-by-blow description of Fulton County problems, issues, and mismanagement. *See* Seven Hills Strategy, *State Election Board Report – November 13, 2020 Unabridged Notes Detailing Everything Witnessed Nov 2-Nov 7, 2020, available at* https://justthenews.com/sites/default/files/2021-06/Unabridged%20Notes.pdf (last visited Jan. 31, 2022).

"The problems in Fulton County were so extensive that neither of the Republican commissioners voted to certify the election." RIGGED, 298. Indeed, "the first certification

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 52

was on November 13, but the county was still finding, processing, and tabulating absentee ballots as late as November 12. Later, during the runoff, the county would discover thumb drives accidentally left in voting machines, further worrying the Republican commissioners about chain-of-custody issues and inventory management." *Id.* at 298-99.

The Democrats' main election lawyer, Marc Elias, changed state legislative law in lawsuits in numerous battleground States. A Mark Zuckerberg-funded effort quietly took control (or at least outsized influence) of local election infrastructure and government offices. The mainstream media provided a steady anti-Trump narrative. And Big Tech systematically censored conservative voices on the Internet.

Even *Time* magazine, which is not a conservative outlet, would look back shortly after the Trump Administration ended and note that these changes worked "a revolution in how people vote." Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME, *available at* https://time.com/5936036/secret-2020-election-campaign/ (Feb. 4, 2021). Any sophisticated lawyer, seeing multiple chess pieces being moved on a strategic national board simultaneously in the run up to the 2020 presidential election on November 3, 2020 would know that some kind of coordination of the rollout all of those pieces was being orchestrated, even before *Time* magazine's piece from Molly Ball would reveal to the world that there was a "secret history" behind a "shadow campaign" to "fortify[]" the election. *Id. See also id.* ("[T]he participants want the secret history of the 2020 election told, even though it sounds like a paranoid fever dream—*a well-funded cabal of powerful people*, ranging across industries and ideologies, working together behind the scenes to influence perceptions, *change rules and laws*, steer media coverage and control the flow of information.") (emphasis added).

On December 10, 2021, a summary of Trump election challenges was published. *See* Jonathan Raymond, *Status of the Trump Election Lawsuits in Georgia*, ALIVE, *available at* https://www.11alive.com/article/news/politics/elections/trump-election-lawsuits-georgia-statuses/85-81d484df-e746-4c5a-be3a-d73555e9df70 (Dec. 10, 2020). It makes clear that there were standing defenses being presented to those suits, but a potential ruling on standing is *not* a ruling on the merits. Additionally, in light of Federal Rule of Civil Procedure 11 and state-law analogues, any lawyer thinking about investigating a

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 53

dispute would have a good-faith belief to do so premised on the fact that any lawyers appearing on a complaint filed by President Trump were bound to have done an investigation of any factual allegations on pain of being sanctioned. Where there is the legal smoke of a complaint there may (not must) be fire and other lawyers are entitled to assume that pending deeper investigation.

Additionally, the Supreme Court's ruling in the *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), came down on December 11, 2020. The majority refused to grant the motion for leave to file a bill of complaint because of a lack of standing—again not a merits ruling. But there was a dissent by Justices Alito and Thomas. They would have allowed the bill of complaint to be filed, potentially putting the merits at issue. That suit was also joined by 17 State Attorneys General other than Texas's. *See* Dave Boyer & Alex Swoyer, *17 States Back Texas, Ask Supreme Court to Hear Election Challenge*, WASHINGTON TIMES (Dec. 9, 2020), *available at* https://www.washingtontimes.com/news/2020/dec/9/17-states-back-texas-ask-supreme-court-hear-electi/ (last visited Jan. 31, 2022). Any rational lawyer could think that a total of 18 State Attorneys General would not be bringing claims that lacked colorability even if reasons were emerging to doubt extravagant election claims made on TV by some attorneys. Hence, a rational lawyer could properly conclude from the State AG's suit alone that additional investigation by federal authorities was appropriate.

Note as well that experienced and respected former federal prosecutor Andrew McCarthy thought that one of Trump's lawsuits was facially quite strong. *See* Andrew McCarthy, *As Time Is Running Out, Trump Campaign Files Stronger Lawsuit in Georgia: Biden still would win the presidency even if Georgia's election outcome were reversed. But the state should answer the claims of illegality anyway*, NATIONAL REVIEW (Dec. 7, 2020). The argument here is obviously one based on this article's subtitle: like former federal prosecutor Andrew McCarthy, a rational lawyer inside DOJ in late 2020 could have thought that further investigation was warranted based on such a complaint, i.e., that Georgia "should answer the claims of illegality *anyway*." This suit was slow-walked in the Georgia state court system and thus was also never resolved on the merits.

Any astute lawyer following these matters in the news would also have been aware of the 2005 Carter-Baker Report calling attention to mail-in ballots as a hiding place

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 54

for fraud that could be exploited.  *See* BUILDING CONFIDENCE IN U.S. ELECTIONS, REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM (Sept. 2005), *available at* https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256. pdf (last visited Jan. 31, 2022).  Together with 2020's COVID-induced expansion of mail-in balloting, the Report's conclusion below could have generated serious cause for alarm such that any rational lawyer would have wanted to keep an eye on this issue:

> Fraud occurs in several ways. Absentee ballots remain the largest source of potential voter fraud. A notorious recent case of absentee ballot fraud was Miami's mayoral election of 1998, and in that case, the judge declared the election fraudulent and called for a new election. Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted.  Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail.

*Id.* at 46 (footnote omitted).

Hemingway also concluded that there was a critical absence of signature matching in Georgia, an issue that was also in the news before January 3, 2020.  *See, e.g.,* Tyler Olson, *Georgia Recount Signature-Matching Impossible Despite Demands from Trump, Republicans, Says Secretary of State*, FOX NEWS (Nov. 23, 2020):

> In July that same year, the Fulton County elections division had acquired a new platform to handle absentee-by-mail ballots from a company called BlueCrest. The stations they purchased had the ability to scan the oath envelope, open the envelope, remove the ballot, and flatten the ballot itself in order to start the scanning process. The system also had optional capabilities for matching signatures to official signatures on file. While Barron had indicated to commissioners that the match capability was being brought into use, the Republicans later found out that the managers never had any intention of using that system. *Consequently, there was no effective signature match going on at all.*

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 55

RIGGED, 299 (emphasis added).

Ballot-counting oversight was plagued with problems, especially in Fulton County. It is highly suspicious, standing alone, that Republican observers were ejected from the State Farm Arena at around 10:30 at night on November 3, when counting briefly stopped for the night. *See id.* at 287-89. And at least by December 4, 2020, news would break showing Georgia election workers rescanning the same ballots through machines multiple times. *See Corrupt Georgia Election Worker Seen Loading Same Ballots 3 Times Into Machine, available at* https://youtu.be/RiREC3Zy20E *See also* Ben Brasch, *Georgia Opens 2 Investigations Into Fulton's Elections Operations,* ATLANTA JOURNAL-CONSTITUTION, *available at* https://www.ajc.com/news/atlanta-news/georgia-opens-2-investigations-into-fultons-elections-operations/EVCBN4ZJTZELPDHMH63POL3RKQ/ (Nov. 17, 2020).

Left-wing media outlets have in recent times embarked on fashioning a cottage industry of fact-checking that seems designed to enforce political correctness. One backed by ByteDance, a Chinese company that Mr. Clark was involved in DOJ litigation concerning because of the national security risks it poses to the United States, attempted to attack the video evidence. But a rational lawyer could have been skeptical of such media fact-checking operations. *See, e.g.,* Tristan Justice, *China-Funded Facebook Fact-Checker Is Now Censoring Criticism of Its Fake Fact Checks,* THE FEDERALIST, *available at* https://thefederalist.com/2020/12/07/china-funded-facebook-fact-checker-is-now-censoring-criticism-of-its-fake-fact-checks/ (Dec. 7, 2020).

Also, consider that there were significant voter database problems, also known prior to January 3, 2021, and which are ably described by Mollie Hemingway. "Active voter registrations in [Fulton] county total more than 95 percent of the adult population of the county, an improbably high percentage. Nationwide, the Census Bureau said that in the 2016 presidential election, 70 percent of the voting-eligible population was registered to vote." RIGGED, 300. It would not be prevarication or malfeasance to want to investigate such an issue.

As conceded by the Molly Ball piece in *Time* magazine, celebrating how a powerful "cabal" of the rich and powerful "fortif[ied]" the election, Silicon Valley was very active

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 56

in monkeying with Georgia and other battleground States.  Mollie Hemingway delved into the issue in depth, but some of the key points she quickly summarizes as follows in a short piece drawn from her book *Rigged*:

> Zuckerberg's help to Democrats is well known when it comes to censoring their political opponents in the name of preventing "misinformation." Less well known is the fact that he directly funded liberal groups running partisan get-out-the-vote operations. In fact, he helped those groups infiltrate election offices in key swing states by doling out large grants to crucial districts.

> The Chan Zuckerberg Initiative, an organization led by Zuckerberg's wife Priscilla, gave more than $400 million to nonprofit groups involved in "securing" the 2020 election. Most of those funds—colloquially called "Zuckerbucks"—were funneled through the Center for Tech and Civic Life (CTCL), a voter outreach organization founded by Tiana Epps-Johnson, Whitney May, and Donny Bridges. All three had previously worked on activism relating to election rules for the New Organizing Institute, once described by The Washington Post as "the Democratic Party's Hogwarts for digital wizardry."

> \* \* \*

> According to the Foundation for Government Accountability (FGA), Georgia received more than $31 million in Zuckerbucks, one of the highest amounts in the country. ***The three Georgia counties that received the most money spent only 1.3 percent of it on personal protective equipment.*** [This is important because it tends to give lie to the claim that the 2020 election needed to be run in an unprecedent fashion by mail due to the dangers of COVID.] The rest was spent on salaries, laptops, vehicle rentals, attorney fees for public records requests, mail-in balloting, and other measures that allowed elections offices to hire activists to work the election. Not all Georgia counties received CTCL funding. And of those that did, Trump-

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 57

voting counties received an average of $1.91 per registered voter, compared to $7.13 per registered voter in Biden-voting counties.

Mollie Hemingway, *"Zuckerbucks" and the 2020 Election*, IMPRIMIS (Oct. 2021), *available at* https://imprimis.hillsdale.edu/zuckerbucks-2020-election/ (last visited Jan. 31, 2022). Information on the corruptive influence of "Zuckerbucks" was also known prior to January 3, 2021. *See, e.g.*, Michael Patrick Leahy, *Report: Mark Zuckerberg's $419 Million Non-Profit Contributions 'Improperly Influenced 2020 Presidential Election'*, BREITBART, *available at* https://www.breitbart.com/politics/2020/12/18/report-mark-zuckerbergs-419-million-non-profit-contributions-improperly-influenced-2020-presidential-election/ (last visited Jan. 31, 2022). A rational lawyer could have concluded that investigating the Center for Tech and Civic life was worth doing *before* the presidential election was certified by Congress on January 6, 2021.

Finally, note that Mr. Clark was attendance at the D.C. Circuit's Judicial Conference in 2019 held in Cambridge, Maryland. By all accounts that conference was a success and the D.C. appellate and trial court Judges appreciated Professor J. Alex Halderman's presentation that in part bore on hacking election machines, when the Russian election interference allegations were still often in the news. *See* C.V. of Prof. Halderman, item "Panelist: How Adversaries Can Erode Public Trust in Democratic Institutions. Co-panelists: Hany Farid, Ron Rivest, Suzanne Spaulding; moderator: Hon. James E. Boasberg. D.C. Circuit Judicial Conference, Cambridge, Maryland, June 26, 2019," *available at* https://jhalderm.com/home/halderman-cv.pdf (last visited Jan. 31, 2022). Apparently, then-Chief Judge Merrick Garland thought that Professor Halderman's work and views were worth spotlighting to the D.C. federal judiciary and to its prominent practitioners.

Recently, it came to light that Professor Halderman is the author of a 25,000-word "secret report," that Dominion voting machines are susceptible of hacking. *See* Mark Niesse, *Secret Report Finds Flaw in Georgia Voting System, But State in the Dark*, Atlanta Journal-Constitution (Jan. 26, 2022), *available at* https://www.ajc.com/politics/secret-report-on-georgia-voting-system-finds-flaws-but-state-shows-no-interest/YKFEET2WE5BBPJ7TYVOYMBTIKQ/

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 58

**B.    New Information That Has Come to Light Since January 3, 2021 Only Reinforces What Could Have Worried a Rational Lawyer Before That Time.**

**1.    New Legal Developments**

Since the election the reasonableness of contemporaneous skepticism over the integrity and legality of the 2020 election has been vindicated by several developments.

In *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (decided February 22, 2021, just over a month after Mr. Clark had resigned from DOJ near the end of the Trump Administration), Justice Thomas dissented from the denial of *certiorari* because non-legislative state officials had changed the statutory rules for federal elections and the appointment of presidential electors in clear violation of the Electors and Elections clauses of the Constitution. art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent that was joined by Justice Gorsuch noting the same infirmity. Both dissents noted the public importance of resolving the questions presented.  If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have had similar views, is that not *ipso facto* evidence of being motivated by a good-faith legal position?

More recently, the Commonwealth Court of Pennsylvania, an intermediate appellate court, held in *McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659  (Pa. Commw. Ct. Jan. 28, 2022) that Pennsylvania's Act 77, which provided for universal mail-in balloting in Pennsylvania, was unconstitutional under the Pennsylvania constitution's strict limitations on absentee balloting. This was the statute in effect during the 2020 election, and the statute from which non-legislative officials further departed in violation of the Elections and Electors clauses. Approximately 2.6 million absentee ballots were cast by means held unconstitutional by a Pennsylvania court.  *McLinko* bears out the views of Justices Thomas, Alito, and Gorsuch, and by assumption based on attacks on Mr. Clark, his views as well.

The Wisconsin Supreme Court in a 4-3 ruling in *Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021) declined to consider whether drop boxes were illegal under Wisconsin law. The three dissenters, all writing separately but all

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 59

joining the other dissents, concluded in exceptionally strong terms that the drop box procedures in the 2020 election, used by "hundreds of thousands of voters," were illegal. And on January 14, 2022, a Wisconsin trial court ruled that drop boxes were illegal under Wisconsin law, in apparent accord with the views of the dissenters in *Trump v. Biden.*

A post-election audit of the 2020 election in Maricopa County, Arizona conducted by the State Senate found, *inter alia.* substantial defects in signature verification, including the presence of 17,322 duplicates, and intentional and substantial spoliation of digital records on the voting equipment shortly before it was delivered for forensic examination. *See* Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate,* BREITBART (Sept. 25, 2021), *available at* https://www.breitbart.com/politics/2021/09/25/arizona-senate-draft-report-on-the-maricopa-county-election-audit-highlights-49000-questionable-votes-asks-ag-to-investigate/ (last visited Jan. 31, 2022).

### 2.    New Factual Developments

Georgia State law is clear: ballot harvesting is illegal in Georgia. O.C.G.A. § 21-2-385(a) in effect for the 2020 election, provided in part that "mailing or delivery [of an absentee ballot] may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector." Very strong – practically irrefutable - evidence has emerged since the election proving this limitation was violated on a systematic and large scale basis in Georgia and other battleground states.

Filmmaker and conservative commentator Dinesh D'Souza has announced a new film called "2,000 Mules". While information on "2,000 Mules" is limited so far, the trailer claims to show "never before seen security footage" of what are purportedly "mules" (i.e., ballot harvesters). The video shows these "mules" stuffing what appears to be multiple ballots or even sets of ballots into ballot boxes, with some "mules" then "snapping photos [on their phones] to get paid." https://rumble.com/vtlq96-explosive-new-surveillance-footage-of-ballot-drop-boxes.html (last visited Jan. 31, 2022).    "We

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 60

tracked 2,000 mules making multiple ballot drops ... leaving no fingerprints ... snapping photos to get paid. *Id.*

The new evidence is said to be based on "cell phone geotracking," similar to claims that the "[c]onservative election integrity group True the Vote" has made, according to a report by Breitbart News. *See* Matthew Boyle, *Exclusive — True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART, *available at* https://www.breitbart.com/politics/2021/08/24/exclusive-true-the-vote-conducting-massive-clandestine-voter-fraud-investigation/ (Aug. 4, 2021). True the Vote "has been conducting a months-long massive and clandestine voter fraud investigation into the 2020 presidential election, the results of which may soon start coming out." *Id.*

Breitbart's Matthew Boyle explained: "A document that the group's founder Catherine Engelbrecht circulated to prospective donors, obtained by Breitbart News, details several facets of the investigation—which centers on what the group describes as the collection of cell phone GPS ping data in key election hotspots around the country including Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan." The trailer for "2,000 Mules," based on True the Vote's work, similarly alleges "[a] coordinated ring of illegal vote harvesting in all the key states where the election was decided." https://rumble.com/vtlq96-explosive-new-surveillance-footage-of-ballot-drop-boxes.html.

"[True the Vote's] document says that [it] has spent the last several months since late last year collecting more than 27 terabytes of geospatial and temporal data—a total of 10 trillion cell phone pings—between Oct. 1 and Nov. 6 in targeted areas in Georgia, Arizona, Michigan, Wisconsin, Pennsylvania, and Texas. The data includes geofenced points of interest like ballot dropbox locations, as well as UPS stores and select government, commercial, and non-governmental organization (NGO) facilities." Boyle, — *True The Vote Conducting Massive Clandestine Voter Fraud Investigation*. "The group is expected to begin releasing some of these videos, which purportedly show the same people going multiple times to the same drop boxes, in the coming weeks." *Id.*

The expert affidavit of Gregg Phillips, filed April 8, 2021 in *Schmitz v. Barron, et al.*, Fulton Superior Court Civil Action File No. as Exh. C to the Amended and Restated

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 61

Verified Petition to Contest Results of House District 52 Election, describes his analysis of 1.2 trillion mobile device signals for the geotracking analysis and tracks cellphones making multiple runs to and from drop boxes – a massive and practically irrefutable violation of O.C.G.A. § 21-2-385(a).

As a result of a complaint by True the Vote to the Georgia Secretary of State, that office is now investigating the ballot harvesting scheme in Georgia. https://justthenews.com/politics-policy/elections/georgia-opens-investigation-possible-illegal-ballot-harvesting-2020. True the Vote has provided the Secretary of State's office with a confidential whistleblower who was part of the scheme. The whistleblower claims he was paid $10 per ballot he put into dropboxes.

I could provide additional material involving post-January 3, 2021 revelations but it should suffice to show that concerns about the presidential election contest results in Georgia were well-founded to cover just one other example.

In July 2021, Margot Cleveland with *The Federalist* reported that "[n]ew evidence indicates that more than 10,300 illegal votes were cast in Georgia in the November 2020 general election—a number that will continue to rise over the next several months, potentially exceeding the 11,779 votes that separated Joe Biden and Donald Trump." Margot Cleveland, *New Evidence Indicates Enough Illegal Votes in Georgia to Tip 2020 Results*, THE FEDERALIST, *available at* https://thefederalist.com/2021/07/09/new-evidence-indicates-enough-illegal-votes-in-georgia-to-tip-2020-results/ (July 9, 2021).

This evidence came from "Mark Davis, the president of Data Productions Inc. and an expert in voter data analytics and residency issues, obtained data from the National Change of Address (NCOA) database that identified Georgia residents who had confirmed moves with the U.S. Postal Service. After excluding moves with effective dates within 30 days of the general election, and by using data available from the Georgia Secretary of State's Office, Davis identified nearly 35,000 Georgia voters who indicated they had moved from one Georgia county to another, but then voted in the 2020 general election in the county from which they had moved." *Id*.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 62

This analysis is especially concerning because even if only one-third of the nearly 35,000 Georgians who allegedly voted illegally had truly done so (roughly 11,666 people), then that would still equal the margin between Biden and Trump in that State.

Cleveland continued to summarize Davis' investigation: "In Georgia, there was both an audit and a statewide recount confirming Biden's victory, but ignored in the process was evidence that nearly 35,000 Georgians had potentially voted illegally." *Id.* Jake Evans, "a well-known Atlanta election lawyer," explained that "[u]nder Georgia law, residents must vote in the county in which they reside, unless they changed their residence within 30 days of the election." That is, "outside of the 30-day grace period, if people vote in a county in which they no longer reside, "Their vote in that county would be illegal.'"

"Critics of Trump's challenge to the certification of Georgia's election results framed the NCOA information as either unreliable or of an insufficient magnitude to cast the outcome of the election in doubt. But by updating their voter registration information with the same address as contained in the NCOA database, the voters themselves have established the reliability of that information." *Id.*

And more telling than that was the reaction of the Georgia Secretary of State's office: "Upon learning of this new development" (the results of Davis' investigation), "the Georgia Secretary of State's Office quietly opened an investigation into potentially illegal voting by residents who had moved between counties. Davis provided his data to the office in May [2021], with a detailed explanation of his analysis."

Similarly, Georgia Governor Brian Kemp wrote a lengthy letter to the State Election Board requesting an investigation into substantial irregularities in the post-election audit. The Governor's office carefully reviewed the analysis of Joseph Rossi, and finding no explanation themselves for the inconsistencies, asked the State Election Board to investigate. https://thefederalist.com/2021/11/24/georgia-governor-releases-more-evidence-that-2020-ballots-were-miscounted/.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 63

>3.   **The Special Case of Revelations About the Actions of Former Attorney General Barr Regarding the Non-Investigation by DOJ of Election Fraud**

There have been two noteworthy revelations relating to the actions of former Attorney General Barr or on his watch: (1) allegations by former U.S. Attorney William McSwain; and (2) federal FOIA responses to document requests for investigations performed by the U.S. Attorneys concerning election irregularities in the 2020 presidential election. Neither of these revelations paint a picture of an active DOJ that would not have benefitted from more energetic leadership to investigate the issues of election integrity in late 2020/early 2021, which undermines significantly the allegations suggesting that if Mr. Clark pressed for greater investigations, he was doing so for an improper reason.

>>a)   **Allegations by former U.S. Attorney for the Eastern District of Pennsylvania William McSwain Indicate that Former Attorney General Barr's Instructions to U.S. Attorneys to Investigate Election Irregularities Were Not the Actual Policy on the Ground.**

On December 1, 2020, General Barr gave a one-on-one interview with a reporter from the Associated Press. "Barr told the AP that U.S. attorneys and FBI agents have been working to follow up specific complaints and information they've received, but 'to date, we have not seen fraud on a scale that could have effected a different outcome in the election.'" Michael Balsamo, *Disputing Trump, Barr Says No Widespread Election Fraud*, AP NEWS (Dec. 1, 2020), *available at* https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (last visited Jan. 31, 2022).

The perception that widespread and energetic investigations were done would be seriously shaken by USA McSwain's allegations. As *Conservative Treehouse* would note, "there's a big difference between not seeing election fraud and purposely blocking a United States Attorney office from investigating allegations of fraud with an institutional motive *not* to discover or see it." *During Speech President Trump Reveals Letter from Pennsylvania U.S. Attorney Detailing Bill Barr Blocking Philadelphia Vote Fraud Investigation*, CONSERVATIVE TREEHOUSE (July 11, 2021), *available at* https://tinyurl.com/44nnvt86 (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 64

Specifically, McSwain wrote to President Trump on June 9, 2021, stating the following:

> In the spring of 2020, I prosecuted and won an election fraud case against a Judge of Elections in South Philadelphia who was stuffing the ballot box. I also charged the political consultant (a former Democratic Congressman) who was paying bribes to the Judge to stuff the ballot box.[15]

> President Trump, you were right to be upset about *the way the Democrats ran the 2020 election in Pennsylvania—it was a partisan disgrace. The Governor, the Secretary of the Commonwealth, and the partisan State Supreme Court made up their own rules and did not follow the law. Even worse, the State Attorney General, Josh Shapiro—the very person responsible for the enforcement of state election law—declared days before Election Day that you could not win the election. It would be hard to imagine a more irresponsible statement by a law enforcement officer, especially during a hotly contested election.  In light of such statements, it is hardly surprising that many Pennsylvanians lack faith in our state's election results.*

> *On Election Day and afterwards, our Office received various allegations of voter fraud and election irregularities. As part of my responsibilities as U.S. Attorney, I wanted to be transparent with the public and, of course, investigate fully any allegations. Attorney General Barr, however, instructed me* not to make *any public statements or put out any press releases regarding possible election irregularities. I was also given a directive to pass along serious allegations to the State Attorney General for*

---

[15] USA McSwain considered this one of his signature accomplishments.  *See* Press Release, United States Attorney McSwain Announces Resignation (Jan. 14, 2021), *available at* https://www.justice.gov/usao-edpa/pr/united-states-attorney-mcswain-announces-resignation (last visited Jan. 31, 2022) ("U.S. Attorney McSwain has prioritized the fight against public corruption, which erodes the public's trust in its elected officials and government.  During the past three years, the Office has brought charges for corruption and/or fraud and embezzlement against dozens of elected officials, public office holders and public employees. Examples include: ... "election fraud charges against former U.S. Congressman Ozzie Myers of South Philadelphia.").

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP
Phil Fox, Esq.
January 31, 2022
Page 65

> *investigation—the same State Attorney General who had already declared*
> *that you could not win.*
>
> I disagreed with that decision, but those were my orders. As a Marine
> infantry officer, I was trained to follow the chain of command and to respect
> the orders of my superiors, even when I disagree with them.

Letter from William M. McSwain to Former President Trump (June 9, 2021), *available at*
https://cdn.donaldjtrump.com/djtweb/general/Letter_to_President_Trump.pdf
(emphasis added).

Before analyzing the McSwain letter further, it is important to pause and ask—
should the Pennsylvania Bar be investigating McSwain for improper conduct because he
held the view that the Pennsylvania presidential election was suspicious and worth
investigating more thoroughly than former Attorney General Barr preferred? Why are
views Mr. Clark allegedly expressed inside the Justice Department and to President
Trump, said to be similar to McSwain's, causing Mr. Clark to be investigated by the DC
Bar but not Mr. McSwain similarly being investigated by the Pennsylvania Bar? Could
the answer lie in the fact that McSwain is a candidate for Governor in Pennsylvania and
thus is a more powerful political figure? *See id.* ("I will be the Republican candidate for
Governor with the best chance to win the general election in November 2022 [and] would
welcome the chance to discuss this with you in person [President Trump]. I would be
honored to have your support."). Isn't the reason thus similar to why the 35 lawyer
members of Congress who objected on the floor of Congress to the Biden certification are
also not seeing their bar licenses threatened?

Again, what logical line can be drawn between Mr. Clark's alleged views on
election facts and Mr. McSwain's views of those facts, or between Mr. Clark's alleged
views on those facts and those expressed by lawyer-legislators in Congress? As to
McSwain, one possible answer is that McSwain purported to follow the chain of
command. *See id.* ("I disagreed with that decision [i.e., his instructions from AG Barr],
but those were my orders. As a Marine infantry officer, I was trained to follow the chain
of command and to respect the orders of my superiors, even when I disagree with
them."). But such a rationale would not hold up because Mr. Clark, as documents
disclosed by Congress appear to indicate, was speaking with the President directly. *See*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 66

*supra* at X.  The President of the United States is the Executive Branch of the federal government.  He is the very font of the chain of command.  If he decides to investigate a particular course of action, he can take the counsel of his subordinates as he wills and, if Mr. Clark turned out to have been responsive to President Trump's call, then he was not being insubordinate.  Mr. Clark can also say, with great familiarity as to work on major pieces of litigation, including multidistrict litigation ("MDLs") and significant emergencies, it is not uncommon for client principals to gather with partners from the law firm representing them, along with associates from that same firm, and sometimes, however rare, clients will opt to pursue a course of action that a bright young associate suggests, rather than the differing advice a partner might suggest.  There are chains of command, but especially where all are assembled together and unified in a discussion, the client is the boss.  And in the context of this particular dispute, the President is the chief of all of his Executive Branch subordinates.  He is constitutionally entitled to elevate or not the advice received from any of them; his options are not restricted to what he might hear from a cabinet officer alone.

Similarly, Representative Scott Perry of Pennsylvania has stated that he introduced Mr. Clark to former President Trump.  *Pa. Rep. Scott Perry: I 'Obliged' Trump with Introduction to Lawyer Jeffrey Clark*, KDKA 2, CBS Pittsburgh (Jan. 25, 2021), *available at* https://pittsburgh.cbslocal.com/2021/01/25/perry-i-obliged-trump-with-introduction-to-justice-lawyer/ (last visited Jan. 31, 2022) ("But Perry did say he obliged Trump's request for an introduction to the former assistant attorney general, Jeffrey Clark, who Perry knew from unrelated legislative matters, and the three men went on to discuss their shared concerns about the election.  'My conversations with the president or the assistant attorney general, as they have been with all whom I've engaged following the election, were a reiteration of the many concerns about the integrity of our elections, and that those allegations should at least be investigated to ease the minds of the voters that they had, indeed, participated in a free and fair election,' Perry said in a statement released by his office Monday.").

Assuming all of this to be true for the sake of argument, note that there is no indication that Congressman Perry saw fit to do so in a similar fashion as to USA McSwain.  But even if he had done so, and McSwain and President Trump had discussed their doubts about the official purported results in Pennsylvania or elsewhere, there

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 67

would be no material differences, on these assumed facts, as compared to Mr. Clark's situation. And similar to the allegations against Mr. Clark, had USA McSwain been put together with President Trump and President Trump had asked for McSwain's views on the election, McSwain would not have remotely been insubordinate to his DOJ superiors to provide those views. Pursuant to the Constitution, in fact, it would have been improper for Mr. McSwain not to have provided those views simply because he had received a prior, inferior-level instruction from General Barr. Additionally, both Congressman Perry's public statement in January 2021, and McSwain's letter which became public in July 2021, express the view that there should have been more *investigation* of election irregularities. Neither Congressman Perry, *nor* USA McSwain, *nor* AAG Clark (by allegation) did nothing improper in harboring the view that the 2020 presidential election should be investigated further or expressing that view to former President Trump. However one slices it, none of this is grist for the Bar's disciplinary mill.[16]

Now, let's return to the issue of USA McSwain's letter itself and what it reveals about how the Justice Department was actually proceeding to investigate the election. McSwain says, in very plain terms, that he was faced with "various allegations of voter fraud and election irregularities," yet "Attorney General Barr ... instructed me not to make any public statements or put out any press releases regarding possible election irregularities." McSwain Letter at 1. General Barr could respond that he did not want to announce investigations that would unfairly prejudice election outcomes. And that is surely a factor to be weighed—i.e., the mere making of allegations, for the election impact they could have, is something to be avoided. The issue, however, is whether the relevant allegations rose to a level worthy of announcement. Reasonable legal minds could easily differ over such a sensitive matter and it is not for any local bar to second-guess

---

[16] Mr. Perry is not a lawyer, but that did not stop Pennsylvania Governor Wolf (also a non-lawyer), as reflected in the subtitle of the CBS Pittsburgh story, from asserting that Perry's "attempt to compromise our justice system is a disgrace." This is ordinary political hyperbole typical of our less-civil age, but it is a fundamental right in our polity to question the 2020 election results. The bar grievance process designed to protect clients and courts should not be perverted into a mechanism for penalizing heterodox political thought, political debate, disagreements about facts or law, or controversial opinions.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 68

discretionary judgment calls by federal lawyers in the Justice Department through the blunt and inapposite instrument of bar discipline.

Moreover, USA's McSwain's allegations suggest something far worse—sweeping election improprieties under the rug, going to the highest level of the Justice Department. How else could one explain that McSwain was "also given a directive to pass along serious allegations to the State Attorney General for investigation—the same Attorney General who had already declared that [President Trump] could not win"? *Id.* Such an official would appear to have *prejudged* the matter and thus is a state prosecutor to whom delegation of a patently federal matter would violate basic principles of due process. No wonder USA McSwain disagreed with General Barr on this. As the Bar's chief prosecutor, you must consider this difference of opinion when assessing Mr. Clark's alleged conduct, assuming you do not take the more prudent path and decline proceeding further with this matter.

One last point from USA McSwain is also worth highlighting. Apparently, he also differed with General Barr on the relevance of the fact that whole swaths of Pennsylvania state government were biased as to the 2020 presidential election: "The Governor, the Secretary of the Commonwealth, and the partisan State Supreme Court made up their own rules and did not follow the law." *Id.* at 1. Could you penetrate into the Executive Branch's internal deliberations (and you cannot and should not), you might find that Mr. Clark shared USA McSwain's view of Pennsylvania's conduct and the conduct of other States where election laws were changed to deviate from the constitutional delegation only to state legislatures to make such law in the context of the 2020 presidential election.

> **b)    Evidence from a Relevant FOIA Request That Is Still Pending.**

The lack of serious investigation claimed by Mr. McSwain finds echoes in the testimony of former US Attorney for the Northern District of Georgia, B.J. Pak to the Senate Judiciary Committee about his office's investigation of election irregularities. The primary determination he describes seems to be that no suitcases of ballots were brought into the Fulton County absentee ballot counting room at State Farm Arena. *See* pp. 13-20; 55; 79-84. If that is the extent of their determination, it reflects only a cursory review of the State Farm video, because that it is clearly evident from the video. However, the same

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 69

video just as clearly shows duplicate scanning of ballots, an allegation that Mr. Pak said had "no substance. *See* p. 76.

The lack of any real investigation of election irregularities within DOJ is also suggested by the preliminary response of DOJ to a FOIA request for records of such investigations in 7 states comprising 12 districts. Twitter user "FoiaFan," a/k/a/ @15poundstogo, posted that the preliminary response from the Administrative Office of U.S. Attorneys was that 4 of the 12 districts had no responsive material to produce. *See* thread                                                                                       at https://twitter.com/15poundstogo/status/1469108757636558854?s=20&t=L8oa6kMRBN0o TBbzd4Jtnw, last visited January 31, 2022.

## XII.   CONCLUSION

In light of Board Rule 2.3(2), I urge you to reconsider this matter. Docketing a complaint should only occur if it is not "unfounded on its face." But in light of the separation of powers, preemption, and several other issues that inherently apply here to an attempt to peer into the Executive Branch engineered by one actor in the Legislative Branch, the complaint by Senator Durbin is "unfounded on its face."

Also, pursuant to Board Rule 2.9(a), we ask that you confer with us in an effort to resolve the objections and arguments we have raised in this letter and my other letter of today. Additionally, pursuant to Board Rule 3.1, please provide me by Wednesday, February 2, 2022, access to "all material in the files of Disciplinary Counsel pertaining to the pending charges that are neither privileged nor the work product of the Office of Disciplinary Counsel." That day provides the requisite two-notice established in Board Rule 3.1.

Respectfully,

CALDWELL, CARLSON, ELLIOTT &
DELOACH, LLP

Harry W. MacDougald

CALDWELL, CARLSON,
 ELLIOTT & DELOACH, LLP
        Phil Fox, Esq.
        January 31, 2022
        Page 70


        Enclosures
        cc:    Jeffrey Bossert Clark (w/ enclosures)

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1800
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 5, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

I have been retained to represent Jeffrey Clark in the investigative matters pending before your Committee.[1]

Despite disparaging and misleading media narratives, Mr. Clark is not a politician and has never sought notoriety or press attention beyond what was necessary to discharge his duties. Indeed, despite serving more than four years during the Bush Administration's Justice Department from 2001-2005 and more than two years during the Trump Administration's Justice Department from 2018-2021, he was never once during those six-plus years of service asked to come before a congressional committee for

---

[1] This letter focuses on the issues surrounding the executive privilege, though there are additional legal objections, including those of a structural constitutional nature, that we will interpose in good faith as well to Mr. Clark testifying, should doing so become necessary. We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in response to the subpoena as it is currently framed.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 2

oversight purposes, even though he litigated and supervised highly controversial cases.[2]
He had a winning record, recovered billions of dollars for the fisc, successfully defended
numerous agency rulemakings of extreme complexity, and personally briefed and
argued many cases—exemplary service.  He was confirmed in October 2018 with
bipartisan support in the Senate—just one part of his distinguished 25-year legal career.

Now, after his most recent, 26-month-plus tenure in government ending in
January 2021, he wants nothing more than to return to ordinary life and law practice,
without being subjected to selective anonymous leaks and press attacks.  Yet he finds
himself involuntarily caught up in a novel conflict that includes both significant inter-
branch[3] and cross-presidential[4] features to which we must provide a response.

The main purpose of this letter is this:  Because former President Trump was
properly entitled, while he held office, to the confidential advice of lawyers like Mr. Clark,
Mr. Clark is subject to a sacred trust—one that is particularly vital to the constitutional
separation of powers.  As a result, any attempts—whether by the House or by the current
President—to invade that sphere of confidentiality must be resisted.  Nothing less will
comport with both Mr. Clark's obligations to former President Trump and with Mr.
Clark's ethical obligations as an attorney.  The general category of executive privilege,
the specific categories of the presidential communications, law enforcement, and
deliberative process privileges,[5] as well as attorney-client privilege and the work product
doctrine, all harmonize on this point.  Most importantly, core matters of constitutional
principle hang in the balance.

---

[2] For instance, Mr. Clark was integral to defending former President Trump's decision to withdraw from
the Paris Climate Agreement, to resisting improper judicial interference with the Census, to crafting and
then personally defending, in litigation, the first major reform in four decades of the National
Environmental Policy Act's regulations, and to shepherding through the judicial process various agency
actions protecting the southern border with Mexico against incursions.  This work was unpopular in some
political quarters but at all times was consistent with law and with his client agencies' policy decisions.

[3] A single House of Congress vs. former President Trump.

[4] President Biden vs. former President Trump, *i.e.*, the current President vs. the immediately past President.

[5] Indeed, Mr. Clark's work was integral to the United States' win in the Supreme Court's most recent
deliberative process case, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 3

Mr. Clark's position as a legal advisor to the President late in 2020 and early 2021 was particularly sensitive because he was a Senate-confirmed Justice Department leader with significant high-profile litigation and governmental experience, making it natural for a President to seek out and consult his views.[6]  We trust that members of Congress of all stripes would agree that it is indisputable that American Presidents need to be able to consult, as they see fit, with their Senate-confirmed appointees.  The principle goes both ways.  Whomever succeeds President Biden, for instance, should not be able to expose to public scrutiny advice provided to President Biden by his advisors.  Establishing precedent to the contrary would deeply chill the vigorous Executive Branch and energetic President the Founders envisioned.  *See* Federalist Paper No. 70 (Hamilton) (Mar. 18, 1788) ("Energy in the executive is a leading character in the definition of good government."), *available at* https://tinyurl.com/3ep7fhz9.  Without that energy and ability to be candid, presidential advisors would be reduced to bland, tasteless creatures, and the prospect of innovative advice would be stifled.

For these reasons, as amplified below, and with due respect to the Committee, Mr. Clark has come with me today, to present this letter of objection.  Mr. Clark will, of course, abide by a future judicial decision(s) appropriately governing all underlying disputes with finality, but for now he must decline to testify as a threshold matter because the President's confidences are not his to waive.

1.      Since August 2, 2021, when a pivotal letter was sent on behalf of former President Trump to Mr. Clark (Attachment), there have been several cardinal developments:

(1) On September 23, 2021, this Committee subpoenaed senior White House officials Mark Meadows and Daniel Scavino, senior Pentagon official Kashyap Patel, and

---

[6] Beginning in November 2018, Mr. Clark headed one of the Justice Department's seven litigating Divisions (the approximately 112 year-old Environment & Natural Resources Division, which has existed for most of the 151 years of the Justice Department's history).  And later, in light of his excellent service in the Environment Division during the last Administration, Mr. Clark was also tapped by the Attorney General in the Fall of 2020 to run a second of those seven litigating Divisions as the Acting Assistant Attorney General for the Civil Division.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 4

Stephen Bannon, making especially clear to Mr. Clark that executive privilege had been invoked in light of the violation of a condition set forth in the August 2, 2021, letter from former President Trump's counsel, as explained in more detail below;

(2) On or about October 7, 2021, former President Trump invoked executive privilege and instructed these four presidential advisors not to comply with the Committee's requests;[7]

(3) Additionally, on September 29, 2021, the Committee had subpoenaed 11 other individuals to appear for questioning; and, most importantly,

(4) The former President took the critical step of bringing suit against the Committee, among others, in *Trump v. Thompson*, Civ. A. No. 21-2769 (D.D.C. Oct. 18, 2021). In this case, President Trump asserts executive privilege and is objecting to the Committee's request to the Archivist of the United States to produce records of his administration.

The August 2 letter from your former colleague, Georgia Congressman Douglas A. Collins, stated to Mr. Clark that "President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege," and that this "executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it." Attachment at 1.

The Collins letter also quoted the Supreme Court's recognition that "the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 449 (1977)). That decision provides that the purpose of the privilege is to "give his advisers some assurance of confidentiality," so that the "President [can] expect to receive the full and frank submission of facts and opinions upon which effective discharge of his duties depends." *Id.* Additionally, the August 2 letter noted that an earlier July 26, 2021 letter to Mr. Clark

---

[7] See Jacqueline Alemany, *et al.*, *Trump Lawyer Tells Former Aides Not to Cooperate with Jan. 6 Committee*, WASH. POST (Oct. 7, 2021), *available at* https://www.washingtonpost.com/politics/2021/10/07/trump-lawyer-tells-former-aides-not-cooperate-with-jan-6-committee/.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 5

from the current Justice Department had selectively edited a quotation out the *Nixon* decision, leaving off the key sentence that "***the privilege survives the individual President's tenure.***" Attachment at 2 (quoting *Nixon*, 433 U.S. at 449) (emphasis added). *See also* Prof. Saikrishna Prakash, *Trump Is Right: Former Presidents Can Assert Executive Privilege*, Wash. Post. (Oct. 29, 2021), *available at* https://tinyurl.com/ykcpz94w.

I concur with that assessment by the former President and his counsel. Were any successor occupant of the office of President able to waive claims of executive privilege asserted by his or her predecessors, the principal purpose of the privilege would be defeated, to the detriment of the Executive Branch, to the separation of powers, and to the proper functioning of government as envisioned by the Constitution, relevant judicial precedent, and long traditions of inter-branch accommodation. This is particularly true when, as here, President Biden's purported waivers over recent months may have been informed by partisan political purposes. This is suggested by the haste with which Mr. Biden prejudged Mr. Bannon's invocation of the privilege on behalf of former President Trump.[8] Executive privilege has fundamental importance to and constitutional significance in the operation of government. Waivers of executive privilege should therefore be considered only with a gravity and solemnity commensurate with their deployment, and should not be influenced by workaday political grievances or by grudges lingering from past political controversies, even bitter ones.

---

[8] See Katherine Fung, *Biden's Comments Could Fumble DOJ Prosecution of Steve Bannon: Here's How*, NEWSWEEK (Oct. 21, 2021) ("referring to those, like Bannon, who have refused to comply with the subpoena to testify before the January 6 committee [and] asked if they should face prosecution, Biden said, 'I do, yes.'"); Donald Judd & Rachel Janfaza, *Biden Says DOJ Should Prosecute Those Who Defy January 6 Committee Subpoenas*, CNN (Oct. 16, 2021) (same); *see also id.* (quoting Press Secretary Jen Psaki as arguing, contrary to law, that ultimate decisions would be made by the Justice Department because "[t]hey're an independent agency ...."), *available at* https://www.newsweek.com/bidens-comments-could-fumble-doj-prosecution-steve-bannon-heres-how-1641428. While President Biden later acknowledged he had been wrong to make the statement, the damage in the public mind had already been done. *See* Kaanita Iyer, *Biden Says He Was Wrong to Suggest Those Who Defy Subpoenas from January 6 Committee Should Be Prosecuted*, CNN, *available at* https://edition.cnn.com/2021/10/21/politics/january-6-joe-biden-town-hall/index.html (Oct. 22, 2021). For, as the Committee is aware, the President is the chief law enforcement officer of the United States and the Constitution does not mention the Attorney General by name. The Constitution simply contemplates that there will be a "principal Officer in each of the executive departments." U.S. Const. art. II, sec. 2. Nor do any statutes establish the Department of Justice as an "independent agency."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 6

2.      Other former Department of Justice officials who received the Collins letter have apparently interpreted its concluding paragraph to mean that the former President had waived the privilege on a blanket basis or somehow otherwise greenlighted their testimony to Committees looking into assertedly similar issues prior to this Committee beginning its work.  We disagree with that interpretation. No fair reading of the Collins letter can conclude that it waives any privileges as to an official like Mr. Clark, *especially after* the key contingency set out in the letter had been triggered:

> Nonetheless, to avoid further *distraction and without in any way otherwise waiving the executive privilege* associated with the matters the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials … who have already received letters from the Department similar to the July 26, 2021 letter you received, *so long as the Committees do not seek privileged information from any other Trump administration officials or advisors.*

Attachment at 2 (emphasis added). The condition in the emphasized language has been triggered because the Committee sought privileged information from multiple other Trump administration officials or advisors before Mr. Clark was subpoenaed on October 13, 2021.

Our position is simple and is dictated by the plain text of the letter.  The Collins letter does not waive privilege as to Mr. Clark.  Even before the contingency triggered by your Committee seeking information from other Trump Administration officials had occurred, at best the Collins letter indicated that former President Trump would agree himself not to seek judicial intervention on the pre-contingency state of the facts.  That is not remotely the same as authorizing testimony or waiving executive privilege.  All portions of the Collins letter prior to the concluding paragraph clearly invoked privilege.  Nor could Mr. Collins' indicating that the former President would not file suit at an earlier time act to relieve Mr. Clark of his ethical obligations.

And surely, once the Committee issued subpoenas to Messrs. Meadows, Scavino, Patel and Bannon on September 23, the assertion of executive privilege set forth in all of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 7

the other paragraphs of that letter applied with special force to Mr. Clark. This is because Congress *has, in fact, sought* privileged information from Messrs. Meadows, Scavino, and Patel as they are all, no doubt, "other Trump administration officials." In short, even former President Trump's statement that he would not go to court in August 2021 was expressly conditional, and the Committee's issuance of the Meadows, Scavino, and Patel subpoenas has caused the failure of that condition. Therefore, especially after the triggering of the contingency, the letter simply cannot be read as an unconditional waiver as to Mr. Clark or the others named in the final paragraph.

Accordingly, particularly under the present circumstances, the Collins letter expressly informs Mr. Clark that President Trump is asserting and not waiving executive privilege with respect to the Committee's pursuit of information from Mr. Clark. President Trump's assertion of his privileges with respect to the Committee's subpoena to Mr. Clark is confirmed in *Trump v. Thompson, et al,* U.S.D.C. D.C. 1:21-cv-02769-TSC, by footnote 2 of his brief in support of his application for a preliminary injunction:

> The Committee also sought testimony and documents from several individuals, some of whom were serving in the Trump Administration in January and others who were not. To preserve all privileges applicable to him and the Presidency, President Trump sent a letter to a number of these individuals, instructing them to preserve any and all relevant and applicable privileges, including without limitation the presidential communications and deliberative process privileges and attorney-client privilege, all to the extent allowed by law.

*Id.,* Doc. 5, p. 1, n.2. The Committee of course has actual notice of this contention since it is a party to that litigation.

Mr. Clark thus has no choice but to comply with President Trump's assertion of executive privilege and related privileges.

3.    Since September 7, 2021, staff on the Select Committee has been in contact with Mr. Clark's former attorney, Robert Driscoll, about the possibility of Mr. Clark giving a transcribed interview to the Committee regarding communications with and advice given to former President Trump during the last few months of his Administration.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 8

In good faith and while he was engaging in legal research and keeping apprised of related actions by the Committee and other parts of Congress, Mr. Clark had been requesting and reviewing documents from the Department of Justice pursuant to 28 C.F.R. § 16.300. And, if the federal judicial system orders Mr. Clark directly or produces final and clearly applicable precedent in (a) related case(s) indicating that Mr. Clark must testify, he would resume that process consistent with other legal strictures. But in line with our research and study, events subsequent to September 7 have convinced me that the only proper course of action for Mr. Clark now is to stand on the privilege position articulated to him on August 2 by former President Trump and affirmed in his October 19, 2021 filing in *Trump v. Thompson.*

This is for three reasons: (1) first and foremost because former President Trump, as noted, took heavy step of invoking the privilege in federal court litigation on October 18 against the Committee in its official capacity, indicating that the inter-branch accommodation process had broken down; (2) because the September 23 subpoenas to Messrs. Meadows, Scavino, and Patel unmistakably triggered the contingency in the Collins letter, seemingly removing the basis for any potential accommodation agreement with the Committee premised on it cabining the scope of its inquiry; and (3) because the former President acted to invoke the privilege as to those advisors and Mr. Bannon.

4.      I am aware that other former top officials in the Department of Justice have provided testimony to Congress, despite the former President's assertion of privilege and despite the failure of the conditions in the Collins letter. As the privilege was not theirs to waive, at least without greater clarity (such as a court order with finality or a comprehensive arrangement entered into between former President Trump and Congress, where the latter agreed not to seek "privileged information from any other Trump administration officials or advisors"), it is unclear to me how their testimony could be consistent with former President Trump's assertion of executive privilege. Former President Trump holds that privilege, not them. Be that as it may, in the present circumstances, the fact that other former officials may have testified, rightly or wrongly at the time, does not change Mr. Clark's obligations in light of the recent positions taken by former President Trump in the Collins letter and in *Trump v. Thompson.* Indeed, D.C. Bar Ethics Opinion #288 has advised that, even in response to a congressional subpoena (and therefore, by parity of reasoning, in response to a voluntary request as well), a "lawyer has a professional responsibility to seek to quash or limit the subpoena on all

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 9

available, legitimate grounds to protect confidential documents and client secrets." *See also* American Bar Association's Committee on Ethics and Professional Responsibility, Formal Opinion 94-385 (1994).

It is improper to put Mr. Clark in a vise between this Committee and its claimed enforcement powers on the one hand and his constitutional and ethical obligations on the other, especially while there is a pending lawsuit to determine President Trump's privilege objections. To apply such pressure to Mr. Clark is to present him with a potential Hobson's choice in a manner not countenanced by the long history of inter-branch accommodation over Congressional requests for information from the Executive Branch. The Constitution is the ultimate source of our law and this Committee is bound to respect government-wide constitutional boundaries, including respecting the prerogatives of the coequal Executive Branch.

Additionally, the claim made by Senate counsel at the outset of the relevant testimonies of at least one of these other Department of Justice officials, namely, that the Collins letter was a "letter of nonobjection … on behalf of former President Trump,"[9] if it were ever correct there (and it is not because nothing in the letter waives privilege or states a general principle of non-objection), is obviously incorrect as to Mr. Clark at the present time. The Collins letter quite explicitly (1) asserts that the former President has not waived claims of executive privilege; (2) asserts the privilege; and (3) at most, even from this Committee's potential perspective, fixes conditions that as to Mr. Clark are no longer met.

In light of the foregoing, I have advised my client that, at this time and based on these most up-to-date factual developments, he is duty-bound not to provide testimony to your Committee covering information protected by the former President's assertion of executive privilege. Accordingly, beyond showing up today to present this letter as a sign of his respect for a committee of the House of Representatives, albeit one not formed in observance of the ordinary process of minority participation, Mr. Clark cannot answer deposition questions at this time. No adverse inferences can or should be drawn from Mr. Clark accepting my advice. His doing so defends the Republic's interest in the

---

[9] Transcript, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf at 6-7 (Aug. 7, 2021).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 10

separation of powers.  As noted, Mr. Clark is not a politician but he is a strong defender
of the Constitution, stemming from his political beliefs as an unapologetic conservative—
beliefs protected by the First Amendment.

     **5.**     In addition to the foregoing, I must also point out that the vast majority of
the document requests in the subpoena sent to Mr. Clark are duplicated in the requests
for documents sent by the Committee to the National Archives presently at issue in the
*Trump v. Thompson* litigation. It is entirely proper, therefore, to defer compliance with the
Committee's subpoena to Mr. Clark until that litigation is resolved.

     Moreover, the documents subpoenaed from Mr. Clark are instead largely in the
possession of the Department of Justice or the Archives. Mr. Clark left his work papers at
the Department of Justice when he resigned in anticipation of the January 20, 2021
inauguration of President Biden.  Based on prior actions, beginning with those of the
House Oversight Committee, we also believe that your Committee has access to Mr.
Clark's government records, making the imposition on us of organizational work, such
as Bates-stamping documents, unduly burdensome. If the Committee could please
confirm this one way or the other, it may obviate any claim of demonstrably critical need
for Mr. Clark to re-produce documents the Committee already has, should that become
necessary at some future point.

     **6.**     Accordingly, I respectfully urge the Committee to recognize that the best
and most regular course in light of the latest developments would be to pause the request
for the testimony of Mr. Clark (likely along with the requests for the testimony of Messrs.
Meadows, Scavino, and Patel, who would seem similarly situated) pending resolution of
the *Trump v. Thompson* litigation.  That will provide important guidance from the Article
III branch of government to referee this inter-branch dispute, including, among other
things, the entwined issue of whether the current President can purport to waive the
former President's executive privilege over the former President's objection. As Justice
Powell remarked in concurrence in *Nixon*, "[t]he difficult constitutional questions lie
ahead." 433 U.S. at 503. *See also id.* at 491 (Blackmun, J., concurring) (noting that
historically some presidential transitions had been "openly hostile," and hoping that the
statute under consideration there "did not become a model for the disposition of the
papers of each president who leaves office at a time when his successor or the Congress
is not of his political persuasion."). A pause, as we here request, would also show proper

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 11

comity both to Executive Branch's interests (considered holistically and not as defined myopically to embrace only the views of the current President) and to the Judicial Branch's role in resolving cases and controversies. As *Nixon* indicates, "[t]he confidentiality necessary to this exchange [of advice and confidences between a President and an advisor] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449.

7.     I am also compelled to note the disconnect between the scope and purpose of the Committee's authorizing resolution and the information sought from Mr. Clark. The Committee's scope revolves around events at the Capitol on January 6, 2021. The Committee would not appear to be seeking to question Mr. Clark about January 6, 2021 and no media reporting has connected him to those events. Mr. Clark had nothing to do with the January 6 protests or the incursion of some into the Capitol. He has informed me he worked from home that day to avoid wrestling with potential street closures to get to and from his office at Main Justice. Nor did Mr. Clark have any responsibilities to oversee security at the Capitol or have the ability to deploy any Department of Justice personnel or resources there. Indeed, Acting Attorney General Rosen testified *almost 6 months ago* that a January 3, 2021 Oval Office meeting involving him and Mr. Clark, *inter alia*, did not relate to January 6. *See* House Oversight and Reform Committee Holds Hearing on Jan. 6 Riot at U.S. Capitol, *available at* https://www.youtube.com/watch?v=719UGi8dNng, beginning at circa the one-hour, 15-minute mark (Rep. Connolly) (streamed May 12, 2021).[10] That should alone be sufficient for Mr. Clark to be excluded from a January 6 inquiry.

Indeed, just about a week after January 6, Mr. Clark gave an "exit interview" to a reporter for *Bloomberg Law* that condemned the individuals who forcibly went into the Capitol and engaged in violence, noting that some of them may have been moved by mob psychology (Mr. Clark specifically remembers referencing Gustave Le Bon), besmirching by mere association the far more numerous peaceful protesters exercising their First

_____

[10] Q. Rep. Connolly: "Did you meet with the President at the White House on January 3rd?" A. Former Acting AG Rosen: "I did." Q. Rep. Connolly: "You did, but you decline to tell us what the nature of that conversation was about, is that correct?" A. Former Acting AG Rosen: "I can tell you it did not relate to the planning and preparations for the events on January 6th."

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 12

Amendment rights.  As a clear example of mainstream media bias, however, the report later published about that interview omitted Mr. Clark's remarks on January 6, even though the reporter had *repeatedly* sought Mr. Clark's views on the topic during the course of the interview.[11]

For all of these reasons, the information and testimony sought by the Committee as applied to Mr. Clark in particular are outside the scope of the Committee's charter and are neither proper subjects of the Committee's subpoena, nor any subsequent attempt to enforce the subpoena.

Finally, I would kindly request a response to the objections set out in this letter, which may include a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.  And for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances. *See supra* n.1.

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Enc.
cc:    Jeffrey Bossert Clark

---

[11] *See* Ellen Gilmer, *Top Official Steps Down from DOJ's Environment, Civil Divisions*, BLOOMBERG LAW (Jan. 14, 2021), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/top-official-steps-down-from-dojs-environment-civil-divisions?context=article-related.

**From:** Doug Collins <doug@northgeorgialawyers.com>
**Date:** August 2, 2021 at 6:20:20 PM EDT
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:** Letter for Mr. Jeff Clark

Please find the attached letter for your client Mr. Jeff Clark.

Thank you for your cooperation.

**Douglas A. Collins**
**Oliver & Weidner, LLC**
**854 Washington St. Suite 300**
**Clarkesville, GA 30523**
**706-754-9000**
**NorthGeorgiaLawyers.com**

=========================================================
NOTICE: In an ideal world, perhaps disclaimer clauses in lawyer emails would not be necessary; but this is not an ideal world, so here goes. This e-mail and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "CC" and "BCC" lines of this e-mail. If you are not an intended recipient, your receipt of this e-mail and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the e-mail and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this e-mail. DO NOT review, copy, or rely on in any way the contents of this e-mail and its attachments. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. Most legal rights have time limits, and this e-mail does not constitute advice on the application of limitation periods unless expressly stated above. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of confidentiality and privileges applicable to this e-mail and any attachments are expressly reserved.
=========================================================

JAMES C. WEIDNER

ERNEST H. 'BUCKY' WOODS, III

DOUGLAS A. COLLINS

WILLIAM R. OLIVER
(OF COUNSEL)



TEL. (706) 754-9000
FAX: (706) 754-0098

854 WASHINGTON STREET
SUITE 300
P.O. BOX 2017
CLARKESVILLE, GA 30523

NorthGeorgiaLawyers.com

August 2, 2021

Mr. Jeff Clark:

We represent former President Donald J. Trump and write concerning requests sent to you by the U.S. House of Representatives Committee on Oversight and Reform and the U.S. Senate Judiciary Committee to provide transcribed interviews on matters related to your service as Deputy Attorney General and Acting Attorney General during President Trump's administration. We also understand that, as set forth in its July 26, 2021, letter to you, the U.S. Department of Justice stated that President Biden decided to waive the executive and other privileges that protect from disclosure non-public information concerning those matters and has authorized you to provide such information.

Please be advised that the Department's purported waiver and authorization are unlawful, and that President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege. The executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it. The reason is clear: if a President were empowered unilaterally to waive executive privilege applicable to communications with his or her predecessors, particularly those of the opposite party, there would effectively be no executive privilege. To the extent the privilege would continue to exist at all, it would become yet another weapon to level the kind of unjustifiable partisan political attacks the Democrat-controlled administration and Committees are seeking to level here.

As the Supreme Court held in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) – where, like here, the then-current administration did not support a former President's assertion of executive privilege – the executive privilege is crucial to Executive Branch decision-making:

> Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977).  The Department's July 26 letter to you quoted this decision but left out the very next sentence in the opinion: "**Therefore, the privilege survives the individual President's tenure**." Id. at 448-49 (quoting, and adopting, Brief for the Solicitor General on Behalf of Federal Appellees) (emphasis added).

Here, it is clear that even though President Biden and the Department do not know the nature or content of the non-public information the Committees seek, they have not sought or considered the views of the President who does know as to whether the confidentiality of that information at issue should continue to be protected.  Such consideration is the minimum that should be required before a President waives the executive privilege protecting the communications of a predecessor.  *See* Office of Legal Counsel Memorandum on Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act, June 20, 2001, at 5 ("[A]lthough the privilege belongs to the Presidency as an institution and not to any individual President, the person who served as President at the time the documents in question were created is often particularly well situated to determine whether the documents are subject to a claim of executive privilege and, if so, to recommend that the privilege be asserted and the documents withheld from disclosure.").

Nonetheless, to avoid further distraction and without in any way otherwise waiving the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials (Richard P. Donoghue, Patrick Hovakimian, Byung J. "BJay" Pak, Bobby L. Christine, and Jeffrey B. Clark) who have already received letters from the Department similar to the July 26, 2021 letter you received, so long as the Committees do not seek privileged information from any other Trump administration officials or advisors. If the Committees do seek such information, however, we will take all necessary and appropriate steps, on President Trump's behalf, to defend the Office of the Presidency.

Sincerely yours,
OLIVER & WEIDNER, LLC

Douglas A. Collins

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 12, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

This letter and the attached memo constitute my response on behalf of Jeff Clark to your letters of November 5 and 9, 2021. This cover letter will summarize that memo.

***Separation of Powers Violations.*** As we have stated repeatedly, the doctrine of executive privilege central to our objections is designed to preserve the separation of powers. You inadvertently but powerfully confirmed the validity of our worries about the Committee's intrusions into the separation of powers when you were quoted in *Politico* on November 9 saying "And we'll let the evidence based on what we look at ***determine guilt or innocence***."[1] But no Congressional committee wields constitutional authority to "determine guilt or innocence." And Congress lacks the power to issue or enforce subpoenas to carry out such an ***unlawful and plainly non-legislative purpose***.

---

[1] *See* Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, POLITICO, *available at* https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 2

*Due Process Violations.* We have also repeatedly pointed out serious due process objections to how the Committee is proceeding as to Mr. Clark, but none of your letters deigns to address these problems. For example:

- You claim the authority to rule on our objections to your own Committee's questions. Due process forbids anyone acting as the judge of their own case.

- You have proven the wisdom of that constitutional guardrail by exhibiting an unalterably closed mind in judging your own case. On November 5 you wrote both that (a) our objections had been overruled but that (b) the underlying reasoning would come later (and came November 9)—a real-life case of the surrealistic royal decree where the Red Queen in *Alice in Wonderland* pronounced: "sentence first-verdict afterwards."

- Your letter of November 9 was thus just a series of *post hoc* rationalizations designed to justify what you had let slip was an outgrowth of your already made-up mind back on November 5.

- On November 5 at 4:30 pm, you directed us to appear in person once again at 4 pm. We lack a time machine, and I was on an airplane when that letter was received. And compelled attendance without counsel would breach due process.

- To the extent the Committee is permitted to question Mr. Clark about election-related matters, he should be able to review all DOJ election-related investigation files, which the Committee and DOJ have strangely combined to declare off-limits.

- Similarly, Mr. Clark has been unfairly denied access to refresh his memory about classified analysis of foreign influence on the election that he reviewed while he was at DOJ, and which include his personal notes on a classified conversation with Director of National Intelligence John Ratcliffe that he had on January 2, 2021.

- We have not yet been provided with a copy of the transcript of the November 5 session, though it was promised at that time and you have quoted from it liberally in your November 9 letter.

*Proper and Repeated Presidential Instructions Exist to Mr. Clark to Assert Executive Privilege.* More than once, your letters dispute the sufficiency of President Trump's direction to Mr. Clark to assert executive privilege, contending, for example,

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 3

that President Trump only gave the direction once. While we are unaware of any legal authority that would support the peculiar notion that a Presidential directive must be repeated to be effective, in this case, *the relevant instruction actually was given twice*. In addition to his August 2 letter, Mr. Collins was quoted by Fox News on August 3 as saying President Trump regarded the communications as privileged and that he "hopes the former officials will withhold any information from Congress that would fall under executive privilege."[2]

The Committee simultaneously and by its own admissions (a) seeks to question Mr. Clark about his direct communications with President Trump, but (b) contends that Mr. Clark cannot claim executive privilege because he was not part of a "small cadre" working directly with the President. The contradictory nature of these positions is plain.

*Mr. Clark Cannot Be Made a Pawn of an Inter-Branch Squeeze Play.* The Committee's attempt to force Mr. Clark to testify—before the applicable contours of executive privilege are decided, for instance, in *Trump v. Thompson*—is extremely unfair. You are putting him to the Hobson's choice of risking contempt for following the instructions to assert executive privilege given to him by the President for whom he worked, or violating his professional responsibilities to honor those instructions—all while leaving Mr. Clark in the posture of having to guess how the courts will draw that line. Once struck, the bell of testimony, of course, cannot be un-rung. As esteemed former Solicitor General Rex Lee wrote in a notable law review article relied on by another former Solicitor General (albeit when he, Ted Olson, was the head of the Office of Legal Counsel), "It is neither necessary nor fair to make [the Executive Brach official] the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute," especially when there is already an expedited proceeding underway, between President Trump and the Committee directly, that will provide at least some guidance on the executive privilege questions involving Mr. Clark. Rex Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. REV. 231, 239. *See generally* 8 Op. OLC 101 (1984).

---

[2] Tyler Olson, *Trump Foreshadows Executive Privilege Fight in Election Investigations, But Won't Try to Block Testimony Yet* (Aug. 3, 2021), *available at* https://www.foxnews.com/politics/trump-executive-privilege-election-investigations-wont-block-testimony.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 4

*DOJ's July 26, 2021 Letter Is Internally Contradictory.* Your letters place great (as well as misplaced) weight on DOJ's July 26 letter to Mr. Clark. Under certain conditions, this letter purported to waive executive privilege for Mr. Clark's direct communications with President Trump, while asserting law enforcement privilege to conceal, most remarkably, *any investigations* (or lack thereof) underway while he was there, which would necessarily include any inquiries delving into election irregularities in particular. Executive privilege exists to serve the Republic, not any one President, and cannot be so nakedly contorted to serve the current Administration's political grievances against the former President. Most ironically, the DOJ letter zealously guards and refuses to waive the Department's prerogatives to avoid public disclosures because that could chill candid discussions inside DOJ but cavalierly disregards the very same concern as it applies to the President having candid discussions with his advisors, even though the presidential communications privilege is of a constitutionally higher order than a DOJ intramural law enforcement privilege.  The logical contradictions in these positions are glaring.

*Mr. Clark Is an Irrelevant, or at Best Marginal, Witness In Light of the Committee's Limited Charter.* The Committee's investigative jurisdiction over the events of January 6 does not extend to the information sought from Mr. Clark regarding the election or his interactions with the former President.

- Mr. Clark had zero involvement in the events of January 6th;

- Mr. Clark had no authority over any law enforcement function relevant to January 6th;

- There is no demonstrably critical need for Mr. Clark's testimony regarding either January 6th itself or internal deliberations as to the election (which is a different topic), especially given the testimony previously given by other DOJ officials;

- The Committee's theory of relevance with respect to Mr. Clark does not make any sense. His confidential and privileged deliberations regarding the election were totally unknown to anyone in the Capitol crowd or the public at large at the time of January 6. Therefore, Mr. Clark's legal advice could not possibly have contributed to the opinions of anyone amongst the January 6th protesters toward the election, and so could not have any causal connection whatsoever to the tragic disturbance of good order on that day.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 5

- The baying after Mr. Clark based on such an incoherent theory of relevance stands in stark contrast to the Committee's studious disinterest in one Mr. Ray Epps, who is on video recorded on January 5 and 6th *repeatedly* inciting and whipping up protestors to "enter the Capitol" on January 6. Your colleague Representative Massie has called for answers on this issue, which would clearly be part of the mix if the Committee's membership were balanced. Hounding Mr. Clark, who had nothing to do with January 6, while leaving Mr. Epps entirely undisturbed, when the latter was obviously up to his neck in the events of that day, requires explanation and confirms that Mr. Clark is being deployed as a prop in the public-private partnership of narrative-mongering.[3]

*The Committee Has Repeatedly Mischaracterized Our Legal Positions.* The Committee, both in person and in writing, has repeatedly mischaracterized our position to lay an inaccurate predicate for contempt. We have not asserted an absolute or blanket refusal to answer. We have instead pleaded with the Committee that it is only prudent and fair to await the final merits resolution of litigation, including but not limited to *Trump v Thompson*, so that we will all know where things stand on executive privilege.[4]

*The Committee Is Violating the Governing Congressional Rules.* Defects in the Committee's organization render it incapable of complying with the Rules of the House with respect to depositions. As Rep. Banks and others stated in THE FEDERALIST on

---

[3] The Committee has emphasized concern about threats to the safety of its members and to the Capitol building. We respect those concerns and agree that they should be taken very seriously and have underscored, as you know, that new legislation has already been passed to address such concerns. But you should be aware that the constancy of improper, anonymous, and, in many instances, inaccurate leaks against Mr. Clark in the media poses very real safety concerns for him as well. Over the Summer and into the Fall, Mr. Clark repeatedly received threatening messages at a place of employment, leading the employer to make several reports to the FBI. And the peaks and valleys of those threats correspond very closely in time with media hit pieces, especially when they are broadcast on television.

[4] Relatedly, you have wrongly claimed that we "abrupt[ly]" left the November 5 deposition. That is inaccurate, as we interacted with Committee for about 90 minutes and also patiently accommodated requests for the Select Committee to conduct sidebars with itself during which we were instructed to leave the room. And most importantly, we left only after our respective legal positions had been hashed and rehashed for the fifth or sixth time, constituting badgering or harassment of the witness.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 12, 2021
Page 6

November 9, 2021,[5] the nominal members of the minority party on the Committee were appointed by the Speaker, not the Minority Leader, and therefore constitute representatives of the majority, not the minority. The Minority Leader's appointments to the Committee were refused by the Speaker. As a result, there is no ranking minority member to be consulted on the issuance of subpoenas, and no minority staff to participate in examining witnesses or conducting the Committee's investigation. Consequently, the Committee's subpoena to Mr. Clark is invalid under the Rules of the House.

*Conclusion.* Finally, we must observe that the Committee's project here appears to be an attempt to relitigate the failed second impeachment of former President Trump but without following the prescribed constitutional process. To date, Mr. Clark has engaged with the Committee with patience and in good faith, but the evidence of bias against him and improper political agendas mounts by the day. We recognize that the Committee is formed exclusively of staunch opponents of former President Trump, but even so, at some point the war on Mr. Trump must eventually run its course.

As we have often stated and reiterate here, we are certainly willing to engage in further dialogue over a reduced scope of inquiry, or to consider written questions, or to discuss other means of accommodating the inter-branch and cross-presidential interests that are presently in tension in this matter.

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:     Jeffrey Bossert Clark

---

[5] *See* Mollie Hemingway, *J6 Committee Misleading Witnesses About Republican Staff Presence*, THE FEDERALIST (Nov. 10, 2021), *available at* https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/.

# MEMORANDUM RE: CLARK SUBPOENA

November 12, 2021

This Memorandum (or "Memo") responds more fully to Chairman Thompson's letters of November 5, 2021 and November 9, 2021 and accompanies my cover letter of November 12 to Chairman Bennie G. Thompson.[1] I also incorporate by reference the points made in my November 8 letter. This Memo is organized so as to respond, roughly sequentially, to your points as they were made in your November 5 letter, coupled with supplementation regarding your November 9 letter as appropriate:

1.      There is a self-evident problem posed by your November 5 letter.  It proposed resuming the deposition at 4:00 pm that day, but that letter was not sent until 4:30 pm—a half-hour *in the past* at the time your November 5 letter was sent.  Given that, we also do not understand your assertion that you would rule at 4:00 pm on our objections inasmuch as your November 5 letter appears to have already rejected those claims.[2] This is clear from your November 9 letter, which refers to your November 5 letter providing "notice of my rulings on the objections you raised at your deposition on November 5," Thompson Letter at 2 (Nov. 9, 2021). This is yet another illustration of the "unalterably closed mind" problem that I explained from the airplane during my return flight to Atlanta on November 5 and my point that you ruling on objections we presented using that frame of mind is a violation of due process. *See* my email to Mr. Heaphy of Nov. 5, 2021, (citing *Air Transp. Ass'n of Am. v. National Mediation Bd.*, 663 F.3d 476 (D.C. Cir. 2011)). *See also* Point 13, *infra*.  And most importantly, nowhere do your November 5 or 9 letters even reference due process or respond to our arguments in that vein.[3]

---

[1] This Memo reminds you and the Committee of the same reservations of rights stated in my November 5, 2021 letter to you.  To economize on words, I will not restate those reservations here.  Additionally, you cannot assume that any point in your letters not responded to in specific terms are points that we accept.  I reserve all of Mr. Clark's rights.

[2] Though, of course, we would urge you to reconsider, even now.

[3] We suspect part of the problem here is the Committee's extreme haste.  In addition to the timing problem (calling for Mr. Clark to return to a congressional office building at 4:00 pm in a letter sent at 4:30 pm), page 6 of your November 9 letter reflects a heading that repeats itself (*i.e.*, heading II.C).

Memorandum Re: Clark Subpoena
November 12, 2021
Page 2

2.      Your November 5 letter also indicated that a more detailed letter would be forthcoming, which was the November 9 letter. But we similarly do not see how, before that more detailed letter provided all of the legal analysis your staff thought necessary to include, you could have been fully informed in ruling on the objections as of 4:00 or even 4:30 pm last Friday, November 5, given that the November 9 letter was still four days in the future. All of this similarly underscores the due process problems with how the Committee is proceeding. Taking a step back, I cannot help but observe that the chronology of when, exactly, you overruled the objections calls to mind the Queen of Hearts' demand in *Alice in Wonderland* of "Sentence first—verdict afterwards." https://wordhistories.net/2019/07/14/sentence-first-verdict-afterwards/.

3.      You assert that "[a]ll the requested documents relate directly to the inquiry being conducted by the Select Committee …." Chairman Thompson Letter, at 1 (Nov. 5, 2021). We strongly dispute that there is such a direct relationship. Mr. Clark had no involvement with the events of January 6th. And, as I noted in my November 5 letter, former Acting Attorney General Rosen has already testified to the House that the January 3, 2021 Oval Office meeting Mr. Clark participated in "did not relate to the planning and preparations for the events on January 6th." At best, Mr. Clark is a very tangential witness in light of House Resolution 503, which sets up this Committee's function. That point alone—together with the point made in my November 8, 2021 letter to you that protective legislation for the Capitol has already been passed and additional legislation of that type need not await interviewing Mr. Clark—undercuts any claimed urgent or "demonstrably critical" need for Mr. Clark's testimony.

a.      Mr. Clark was not a "cause" of a "domestic terrorist attack on the Capitol. *Compare* House Resolution 503, § 3(1). Nor was he in charge of the "preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government …." *Compare id.* Nor did Mr. Clark participate in any January 6 activities at the Capitol where some of the individuals involved may have sought to interrupt the "peaceful transfer of power."  Nor could Mr. Clark's work, which was not publicly released while he served in the Trump Administration, be an "influencing factor" leading

Memorandum Re: Clark Subpoena
November 12, 2021
Page 3

to a decision by some individuals to go into the Capitol building on January 6. *Contra* Thompson Letter, at 8 & n.13 (Nov. 9, 2021) (citing H. Res. 503, § 3(1)).[4]

> **b.**    All Mr. Clark knows about "evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol," etc. is what he has read or seen in the media or learned by watching some portions of past testimony by other officials on those topics, especially to the House Oversight Committee. *Compare id.* § 3(2).

> **c.**    The purpose enunciated in House Resolution 503 Section 3(3) is also something that does not embrace Mr. Clark.

> **d.**    We note that Section 4(a)(1)(B) of House Resolution 503 references "malign foreign influence operations." Mr. Clark has no visibility into that issue as it may relate to the events of January 6, 2021. But he did review classified information on potential foreign influence as it bore on the 2020 presidential election. Pursuant to Justice Department regulations, he requested that he be allowed to re-review such material, including his personal notes on that topic left in the Justice Department Command Center. But the Department denied his request, noting that the Committee had told the Department that this was not relevant to the Committee's inquiry.[5] If the Committee has

---

[4] What appears far more relevant for getting to the bottom of why some individuals went into the Capitol Building are the activities of a Mr. Ray Epps, who was caught on video on both January 5 and 6, 2021 urging protestors and anyone nearby who would listen, it seems, to "enter the Capitol" on January 6. Yet it is Mr. Clark who has been subpoenaed to testify about non-public information based on work subject to various Executive Branch, DOJ, and general legal confidentiality protections, while Mr. Epps has not been subpoenaed. *See, e.g.,* https://youtu.be/uHn1hZyPJxk, Video Gallery, Rep. Thomas Massie, *available at* https://massie.house.gov/videos/ (page 2) (last visited Nov. 12, 2021). If the Committee were properly constituted, *see* Point 16, *infra,* the Committee minority could use the Committee's investigators to pursue this promising lead evenhandedly. As former Rep. Henry J. Hyde once memorably said, "The mortal enemy of equal justice is a double standard." Impeachment Trial of William Jefferson Clinton, remarks of Rep.    Henry    J.    Hyde,    available    at    https://www.washingtonpost.com/wp-srv/politics/special/clinton/stories/managers2text020899.htm.

[5] On October 14, 2021, Kira Antell of the Department of Justice's Office of Legislative Affairs emailed Mr. Clark's former counsel, stating as follows:

Memorandum Re: Clark Subpoena
November 12, 2021
Page 4

changed its mind and now views the issue of foreign influence in the election to be relevant, the Department's denial of Mr. Clark's request is another denial of due process. And, even if the Committee's position that the foreign influence question is irrelevant remains unchanged, it is not up to Ms. Antell and/or this Committee to decide what materials Mr. Clark needs to refresh his recollection. Mr. Clark, consulting with me as his lawyer, should be able to make that determination.  Part of due process requires giving witnesses the ability to determine how to answer particular lines of questioning; due process is not consistent with trying to place entire lines of inquiry beyond question, especially where intent is a relevant legal factor. As a result, however one slices it, blocking Mr. Clark from accessing the classified material on foreign election interference that he previously reviewed is a denial of due process.

4.      We reiterate that Mr. Clark did not state on November 5 that, for all time, he would "not answer any of the Select Committee's questions on any subject and would not produce any documents," as you assert in your November 5 letter. As I explained in my November 5 and November 8 letters, the issue is predominantly one of timing, prudence, and fairness in awaiting, at the very least, a final merits outcome of the *Trump v. Thompson* litigation. The mismatch between the written statements of our position and the Committee's various erroneous characterizations of our position makes it particularly important for this dialogue to occur in writing.

5.      You argue that the August 2, 2021 letter from Mr. Collins to Mr. Clark does not allow executive privilege to apply to Mr. Clark absent a "***further instruction***[] from former President Trump with respect to Mr. Clark's testimony." Chairman Thompson Letter, at 2 (emphasis added). We do not understand why **one instruction** given in August 2 is not enough and a "further instruction" would be required. You offer no explanation

_____

Finally, I wanted to address your question seeking access to materials relating to a classified ODNI briefing of Mr. Clark in early January. OLA has spoken to the Select Committee and confirmed that the details of this briefing are outside the scope of their interest in speaking with Mr. Clark. Beyond confirming with Mr. Clark that the briefing occurred, they do not require additional information about that briefing. We believe this resolves this question.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 5

for that, and there is simply no support for that view in the text of the letter. The August 2 letter speaks for itself.

And, lest there be any doubt, a later interview does actually constitute **a second instruction** because Mr. Collins later stated that he "hopes the former officials will withhold any information from Congress that would fall under executive privilege" and that "'I would hope they would honor that,' Collins said when asked whether Rosen and the other officials [clearly including Mr. Clark] should withhold certain deliberations from Congress. 'The former president still believes those are privileged communications that are covered under executive privilege'"[6]

If the Committee wishes to contest our plain-text reading of that letter and Mr. Collins' related statements to the media, it can consult with former President Trump's lawyers on that point, though we should be included in any such process—it should not be *ex parte*. You also assert that our position is based on suppositions about former President Trump's position. Again, that is obviously not the case. Our position is based on the text of the August 2 letter **and** Mr. Collins' amplification of that letter to the media. Your interpretation of the August 2 letter is inconsistent both with the letter itself and Mr. Collins' interpretation of his own letter.

**6.**     Relatedly, you argue in the November 9 letter that Mr. Clark should testify because, *inter alia*, Messrs. Rosen and Donoghue testified based on a July 26, 2021 letter they (along with Mr. Clark) all received at roughly the same time.  *See* Thompson Letter at 1 n.2 (Nov. 9). Especially after the August 3 comments were made by Mr. Collins to the media, we are at a loss to explain why others at DOJ were anxious to testify. Part of the answer may appear in a story in the *New York Times*, which states as follows:

> Mr. Rosen has spent much of the year in discussions with the Justice Department over what information he could provide to investigators, given

---

[6] Tyler Olson, *Trump Foreshadows Executive Privilege Fight in Election Investigations, But Won't Try to Block Testimony Yet* (Aug. 3, 2021), *available at* https://www.foxnews.com/politics/trump-executive-privilege-election-investigations-wont-block-testimony.  Of course, as the Committee knows, President Trump decided in the Fall—after the Collins letter dated August 2 and Mr. Collins' statements to the media reported on August 3, that he would indeed go to court.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 6

that decision-making conversations between administration officials are usually kept confidential.

Douglas A. Collins, a lawyer for Mr. Trump, said last week that the former president would not seek to bar former Justice Department officials from speaking with investigators. But Mr. Collins said he might take some undisclosed legal action if congressional investigators sought "privileged information."[7]

*Mr. Rosen quickly scheduled interviews with congressional investigators to get as much of his version of events on the record before any players could ask the courts to block the proceedings*, according to two people familiar with those discussions who are not authorized to speak about continuing investigations.

Katie Benner, *Former Acting Attorney General Testifies About Trump's Efforts to Subvert Election*, New York Times (Aug. 7, 2021), *available at* https://www.nytimes.com/2021/08/07/us/politics/jeffrey-rosen-trump-election.html (emphasis added).  Mr. Clark has acted, we believe, more consonant with the President's instructions as conveyed via Mr. Collins to Mr. Clark and the others.  Thus, we do not view it as consistent with Mr. Clark's duties as a lawyer and former government official to make "quick[]" disclosure decisions on his own before courts rule on all relevant legal disputes.[8]

7.     As explained in my November 8 letter and above, I do not agree that Mr. Clark has invoked "blanket testimonial immunity."  *See also* Thompson Letter at 4 (Nov.

---

[7] This is a misleading characterization of what the text of the August 2 letter says.  It appears designed to convey to the *New York Times*' readers that (a) former President Trump was not asserting privilege and was greenlighting testimony; and (b) former President Trump's future condition was vague.  Neither is accurate—and, as we have repeatedly explained, the letter clearly invokes privilege and its condition was plainly triggered by this Committee's post-August 2 actions.

[8] This is also as good a juncture as any to note that one feature of the real story here should be to ask why so many anonymous leaks keep occurring—leaks that violate Executive Branch confidentiality of various stripes.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 7

9, 2021) (referencing "absolute testimonial immunity"). For the sake of economy, I would refer you to the November 8 letter's points about the issue of timing, prudence, and fairness re *Trump v. Thompson* (now on interlocutory, not final merits appeal) and our continuing invitation to negotiate a narrower scope for potential testimony. Consider as well entering negotiations with us on written questions that could be confidentially propounded to Mr. Clark for our consideration, as opposed to another live session.

We remind you that Mr. Clark's livelihood has been threatened by "cancel culture" and that he also has a pressing family matter in the Philadelphia area to attend to that he has been holding off on, so proceeding via writing would be appreciated in light of the fact that two weeks of Mr. Clark's extension request were denied with no real explanation. Mr. Clark is no longer a government employee, where interfacing with Congress in some instances would have been part of his job duties. As a private citizen, the Committee should make some reasonable accommodation to Mr. Clark's circumstances, especially when his testimony is at best tangential to January 6 and is certainly not urgent in light of the prior passage of protective legislation.

8.      Relatedly, your November 9 letter asserts that privilege assertions must be on a document-by-document basis.  *See* Thompson Letter at 2 & 7 (Nov. 9, 2021) (asserting this is what "the law requires."  But just yesterday, a *New York Times* story came out indicating that a different legal position is colorable.  That story reports as follows: "During arguments last week, [Judge Chutkan] rejected a suggestion by a lawyer for Mr. Trump that she examine each document before deciding whether executive privilege applied."  Charlie Savage, *Swift Ruling Tests Trump's Tactic of Running Out the Clock*, New York Times (Nov. 10, 2021), *available at* https://www.nytimes.com/2021/11/10/us/politics/swift-ruling-tests-trump-delay-tactic.html.[9]  The Committee cannot urge on us (or benefit from) an approach by the courts based on rejecting use of a document-by-document approach, while arguing here that it is incumbent on us to use only a document-by-document approach.  Indeed, such an internally inconsistent position could trigger estoppel.

---

[9] Of course, we do not agree that President Trump's lawyers are trying to achieve strategic delay in *Trump v. Thompson*.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 8

**9.**     You refer to the July 26, 2021 letter sent to Mr. Clark by the Justice Department. *See* Chairman Thompson Letter at 2 n.3 (Nov. 5, 2021). We do not think that letter supports your position, for multiple reasons, but for now it should suffice to point out that that letter is curiously vehement that Mr. Clark not disclose the Department's "investigations and prosecutions ongoing while [Mr. Clark] served in the Department," because if it were known that such "deliberations would become subject to Congressional challenge and scrutiny, [the Department] would face a grave danger that [Department lawyers] would be chilled from providing the candid and independent analysis essential to just and effective law enforcement." Weinsheimer Letter at 3 (July 26, 2021).

DOJ's rationale of avoiding the chilling of candid advice is, of course, one of the core purposes of the executive privilege, which is clearly rooted in the separation of powers, a structural constitutional principle that outranks the mere policy concerns of one department of the federal government.  ***Most importantly, what DOJ has done in the July 26 letter is strongly endorse on of our main arguments*.**[10] The Department's version of executive privilege, however, seems carefully molded to achieve political objectives rather than doctrinal coherence: it would purportedly shield whatever can be smuggled under the skirt of "ongoing investigations and prosecutions," while totally exposing advice given directly to former President Trump, as well as internal deliberations leading up to such advice, even if they were based on such investigations. Respectfully, the internal contradiction of that position is obvious and disabling. It also makes little sense to imagine, as the July 26 DOJ letter does, that DOJ's departmental privilege is superior to the brand of executive privilege attending to direct presidential communications and—applying the same method of innuendo the Committee is using in the press—causes one to ask: what does DOJ have to hide?

Even if the Committee were able to somehow properly establish that such election matters fall into Resolution 503's charter (something we think it cannot), then by parity of reasoning and as an element of due process Mr. Clark should be able to review all of

---

[10] Alternatively, because the Justice Department is part of the unitary Executive and reports to the President, the concern the Department points out here as to its own investigations is just a part of the umbrella concept of the executive privilege.  Either way, the two parts of DOJ's letter are at war with one another.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 9

the election-related investigative files of the Department, particularly since the asserted results of those inquiries were an explicit premise of the advice that others gave to President Trump, according to their testimony. In all events, however, it is clear that proceeding on the basis of such an incoherent version of executive privilege in the manner the July 26 letter proposes would be fundamentally unfair and thus deny Mr. Clark due process. It would tie one arm behind his back.

      10.    Note as well that your November 9 letter admits there is overlap between that litigation and Mr. Clark's testimony.[11] But your letter further contends that Mr. Clark is only entitled to assert executive privilege as to the documents and testimony to which it applies. The Committee's position thus assumes the point in question.  And *Trump v. Thompson*, which may be just the first of multiple cases in this area, is not yet even concluded,[12] so neither we nor the Committee knows the precise contours of executive privilege in this matter. Given this uncertainty and Mr. Clark's competing duties as a witness on the one hand and as a lawyer ethically obligated to protect the privileges asserted by former President Trump on the other, it is grossly unfair to require him to guess now where that line will ultimately be drawn, on pain of civil or criminal contempt if he is over-inclusive in asserting the privilege, and a violation of the bar rules if he is under-inclusive. You assert that there is no authority supporting awaiting the outcome of related judicial review proceedings, *see* Chairman Thompson Letter at 5 (Nov. 9, 2021). But we are hardly the first to note the unfairness of the dilemma you are imposing on Mr. Clark:

> By wielding the cudgel of criminal contempt, however, Congress seeks to invoke the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried

---

[11] Your November 9 letter merely quibbles about the extent of the overlap.  *See* Thompson Letter, at 5 (Nov. 9, 2021) ("your letter overstates the relationship between the litigation involving documents held by the National Archives and the instant matter.").

[12] I also specifically alert you here that I am aware that *Trump v. Thompson* may not result in a final merits resolution of the underlying privilege dispute.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 10

> out the President's constitutionally authorized commands, for asserting a
> constitutional privilege.

8 Op. OLC 101, 139 (1984). This passage, in turn, cited a law review article by former
Solicitor General Rex Lee as follows:

> [W]hen the only alleged criminal conduct of the putative defendant consists
> of obedience to an assertion of executive privilege by the President from
> whom the defendant's governmental authority derives, the defendant is not
> really being prosecuted for conduct of his own. He is a defendant only
> because his prosecution is one way of bringing before the courts a dispute
> between the President and the Congress. It is neither necessary nor fair to
> make [the Executive Brach official] the pawn in a criminal prosecution in
> order to achieve judicial resolution of an interbranch dispute, at least where
> there is an alternative means for vindicating congressional investigative
> interests and for getting the legal issues into court.

*Id*. at 139, n. 39, *citing* Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial
Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. REV. 231, 239.
This is precisely the unfair trap in which Mr. Clark finds himself.

Also relevant to the hazard of assuming the eventual outcome of the *Trump v.
Thompson* litigation, the Executive Branch has long taken the position that executive
privilege applies even where the President was not directly involved in the
communications and documents in question. The history of that position is set forth in 8
Op. OLC 101 (1984) which involved the assertion of executive privilege by the
Administrator of the EPA as instructed by the President. The Department of Justice
confirmed that executive privilege applied. Based on executive privilege, documents and
communications between EPA enforcement staff and DOJ's Environment and Natural
Resources Division were withheld from Congress. The OLC opinion not only affirmed
the propriety of the executive privilege claim, it also declined to prosecute any criminal
contempt of Congress. "We believe that the Department's long-standing position that the
contempt of Congress statute does not apply to executive officials who assert Presidential
claims of executive privilege is sound, and we concur with it." *Id*. at 129. "[T]he separation
of powers principles that underlie the doctrine of executive privilege also would preclude

Memorandum Re: Clark Subpoena
November 12, 2021
Page 11

application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege." *Id*. at 134. Thus, the idea that executive privilege is limited to officials like former White House Counsels Donald McGahan or Harriet Miers has no foundation in the law or history of executive privilege.

11.    Your November 5 letter also asserts that Mr. Clark was not among the "small cadre of senior advisors" to former President Trump. *See* Chairman Thompson Letter at 3. Perhaps if this inquiry involved Mr. Clark's work in defending, say, the Affordable Clean Energy rule issued by EPA during the Trump Administration, Mr. Clark might not be standing on executive privilege. But Mr. Clark had conversations directly with President Trump that the subpoena indicates the Committee is interested in penetrating into. *See* Thompson Letter, at 5 (Nov. 9, 2021) (Committee admitting that "the Select Committee is interested in conversations and interactions Mr. Clark had with former President Trump").

The "small cadre" concept, even assuming its validity, has to be interpreted functionally. It cannot mean that anything a White House official, who is close on a paper org chart to the President, advises is privileged but that the advice of any official situated in an Executive Branch department, even if given directly to the President, is not privileged. Moreover, as noted, this "small cadre" concept is contrary to the Department of Justice's long-standing position that the privilege applies much more broadly to executive branch officials even in the absence of any direct involvement by or communication with the President. See 8 Op. OLC 101 (1984). The concept advanced in your letter would hamstring the President's constitutional effectiveness, especially as applied to his high-ranking officials who are Senate-confirmed. The President, in other words, should not be confined to hosting confidential conversations only with those advisors who physically work at the White House. Discharge of the President's Article II duties to take care that the laws are faithfully executed may sometimes, and at the President's sole discretion, require consulting with a wide variety of department, agency, board, etc. officials.

12.    On page 3 of your November 5 letter, you again attempt to mischaracterize our position as "categorical" or "blanket." You did not attend last Friday's session and so perhaps you were misinformed on this point. But my November 5 letter, our statements at the session that same day, and my November 8 letter were not categorical. Our point,

Memorandum Re: Clark Subpoena
November 12, 2021
Page 12

again, which seems to have been missed, is that timing is a critical consideration here as a threshold matter. There is no reason to put Mr. Clark (and me, as his lawyer, frankly) at risk of guessing wrong about how matters like the *Trump v. Thompson* litigation will come out. We have not heard any rationale from this Committee's lawyers or members who attended Friday's session as to why that is not a prudent way to proceed. Obviously, once Mr. Clark answers questions on the substance of his presidential conversations and his related actions at the Department, he cannot un-testify if the *Trump v. Thompson* case or other litigation ultimately holds that the invocation of the privilege is proper in whole or in part.

13.    Respectfully, your November 5 letter appears to cast in concrete terms the due process problem by stating that the "deposition will resume at 4:00 pm this afternoon,[13] *at which time I will formally reject your claims of privilege*." Chairman Thompson Letter at 4 (Nov. 5) (emphasis added). That inherently shows (a) an "unalterably closed mind," especially when you were not a percipient participant in Friday's session and (b) renders surplusage the November 9 letter providing fuller responses. In light of this sequence of events, it is clear that your November 9 letter lays out a series of *post hoc* rationalizations that crystallize the point that your mind was already made up as of at least 4:30 pm on Friday November 5 when your letter was transmitted to me. Finally, (c) you have not provided any response to my point from the airplane last Friday that you ruling on objections to your own questions is itself a violation of due process.

14.    I also request, with respect, that you should respond to our objection based on *Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995), that Congress cannot apply law to fact without unconstitutionally intruding into the judicial sphere.  Under the Constitution, the Executive Branch, in essence, proposes violations of law to the Judicial Branch and then the latter branch disposes of such disputes.  But Congress's role in that process is neither to propose nor dispose in that process.  Instead, Congress is only designed to debate and pass new legislation or not.

---

13 Again, this was a time period 30 minutes *before* I received your letter from Ms. Lucier.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 13

Your public statements confirm a confusion about how this basic constitutional structure functions. Commenting on Judge Chutkan's November 9, 2021 ruling in *Trump v. Thompson*, you are quoted in *Politico* as saying: "If we have access to the records, they'll speak for themselves. So we look forward, as a committee, to getting it. ***And we'll let the evidence based on what we look at determine guilt or innocence***."[14] (emphasis added). Obviously, legislative committees can never have any valid legislative or constitutional purpose in determining guilt or innocence, and therefore may not conduct investigations or issue subpoenas to achieve such flagrantly unconstitutional purposes. Additionally, it is not even proper for the Legislative Branch to arrogate to itself processes of legal discovery in the hopes it can make a later hand-off to the Executive. For instance, Congress cannot circumvent the Fourth Amendment by proceeding as if that constitutional constraint applies only to the Executive Branch. The Constitution binds all three branches of government and all must take an oath to be bound by and support the Constitution. *See* U.S. Const., art. VI ("The Senators and Representatives before mentioned … shall be bound by Oath or Affirmation, to support this Constitution ….").

15.    You assert that under the circumstances, Mr. Clark is "willfull[y]" not complying with the subpoena. Thompson Letter of Nov. 5 at p. 4; *see also* Thompson Letter of Nov. 9, at pp. 9-10. That is not the case. We seek to continue the dialogue about how to secure appropriately cabined testimony from Mr. Clark at the appropriate time and framed with due regard for all of necessary constitutional or other legal and ethical guardrails.

16.    It should also be noted that the Committee's subpoena to Mr. Clark does not comply with the relevant Rules of the House. The minority party, through the governing congressional processes, must be represented on the Committee and participate in the issuance of subpoenas and the examination of witnesses. There are no members of the Committee who were appointed by the Minority Leader. The persons selected by the Minority Leader were refused by the Speaker and are not allowed to participate in the Committee's proceedings. Instead, the Speaker selected two nominal

---

[14] Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, POLITICO, *available at* https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 14

members of the minority party to serve on the Committee. Their nominal party membership does not meet the requirements of the House Rules because they were selected and appointed by the Speaker and not the Minority Leader. There is no ranking minority member with whom to consult, and no properly constituted minority participation in the proceedings. This is a fatal defect in the Committee's subpoena to Mr. Clark. We also incorporate by reference the legal arguments made by Representative Banks and other attorneys and congressional staff, as reported in *The Federalist* in the article set out in the margin below.[15]  In light of the points made in that article, when you respond to this letter please include a listing of the name and position of everyone affiliated with Congress who was present on November 5 in the room or by videoconference.

17.    Your November 9 letter suggests that Mr. Clark should have told this Committee or others before November 5, 2021 that he intended to stand on President Trump's instruction to him through Mr. Collins to assert executive privilege.  Mr. Clark had no obligation to reveal his discussions with counsel before he arrived last Friday and your suggestion particularly ignores my recent entry into the case.  We also disagree that the other Committees and this Committee are interchangeable.

18.    Your November 9 letter claims that Mr. Clark left "abrupt[ly] on November 5."  *See* Thompson Letter at 2 (Nov. 9, 2021). You may be misinformed, as that is not accurate.  We were present for about 90 minutes and we also accommodated two requests that we leave the room for a period of time so that the Committee members and staff present could confer with one another.  And your related assertions about timing in getting back to the Committee after we left the building that day ignore that we were harassed by the press as we attempted to walk to have a meeting and that other urgent client matters arose for me as I scrambled to get to the airport to go back to Atlanta.

19.    I wish to conclude by noting that your November 9 letter ignores my November 8 request for a copy of the transcript from November 5.  Nor have we received any other word on that request since November 9. The silence is particularly troubling in

---

[15] Mollie Hemingway, *J6 Committee Misleading Witnesses About Republican Staff Presence*, THE FEDERALIST (Nov. 10, 2021), *available at* https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/.

Memorandum Re: Clark Subpoena
November 12, 2021
Page 15

light of the fact that on page 3 (at footnote 4) and page 4 (at footnote 8), as just two examples, you appear to be quoting from the transcript. This points out another due process problem of the Committee acting to advantage itself over Mr. Clark. Providing us with the transcript would also, for instance, make clear that we did not leave precipitously. We also offered numerous times to continue the conversation.

Thank you for your continued attention to this matter, Mr. Chairman. I want you to be assured that while we disagree with the positions you took in your November 5 and 9 letters, our legal arguments are rooted in good faith. We are simply attempting to vindicate the Constitution, which requires energetic defense of the Executive Branch's prerogatives, and make sure that Mr. Clark's rights are protected.

Respectfully submitted, this 12th day of November, 2021.

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

cc:   Jeffrey Bossert Clark

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737
November 29, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

### LIMITS ON THE COMMITTEE'S DEPOSITION POWER

Dear Representative Thompson:

   This letter is sent for two reasons: *first*, to note that based on our research regarding congressional powers, we have concluded that the current composition of this Committee precludes its use of deposition authority under the Committee's authorizing Resolution and the governing House Regulations for Use of Deposition Authority; *second*, to note that I am nonetheless willing to allow Mr. Clark to testify at a public Committee hearing (but not at a closed deposition) on two topics relating specifically to the January 6 events (see below) that do not implicate any of the privileges previously asserted.

1. **The Committee's Current Composition and Genesis Precludes It from Wielding Deposition Authority Under the House's "Regulations on the Use of Deposition Authority."**

   This Committee's purported use of deposition authority is *ultra vires*. That is true for numerous reasons, which we enumerate below:

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 2

**A.**     The deposition rules contemplate that the "ranking minority member" of the Committee must be consulted before depositions can be taken. *See, e.g.,* Regulations for the Use of Deposition Authority, Cong Rec. H41, Rule 2 (Jan. 4, 2021) [hereinafter "Deposition Rules") ("Consultation with the ranking minority member shall include three days' notice before any deposition is taken"); *see also* Rules 3, 4, 5, and 9 (also requiring consultation with and participation by the "ranking minority member" or their designees).

Similarly, H. Res. 503, § 5(c)(6)—the Resolution creating the January 6 Committee—requires consultation with the ranking member in order to take a deposition:

> (6) (A) The chair of the Select Committee, **upon consultation with the ranking minority member**, may order the taking of depositions, *including pursuant to subpoena,* by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

> (B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

H. Res. 503, § 5(c)(6) (all forms of emphasis added).

Thus, to take a deposition, you as Committee Chair are expressly and unambiguously required by H. Res 503, § 5(c)(6) to consult with the ranking minority member and to comply with the procedures specified in the Deposition Rules discussed above.

The first problem is that this Committee not only does not have a ranking minority member, it does not even purport to have a ranking minority member. Instead, it purports only to have Representative Cheney as a Vice Chair, but even that designation is flatly contrary to the Rules of the House. *See* January 6 Select Committee, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 3

2, 2021), *available at* https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (Attachment A). The Deposition Rules are silent on Vice Chairs; neither they nor the Committee's enabling Resolution can be construed to treat Vice Chairs as if they are equivalent to ranking minority members.[1]

The Committee, lacking a minority ranking member, thus must take the bitter with the sweet. The sweet, in the view of the House's majority party, involves a gerrymander of the Committee's membership without the Republican Steering Committee's or Conference's participation or consent, and thus avoids the inconvenient complications and respect for minority prerogatives that would go along with true bipartisanship. Whereas the bitter is that, by proceeding in this manner, the Committee loses the ability to make use of deposition authority under H. Res. 503, § 5(c)(6) or the Deposition Rules. To do so, the Committee would have to be reconstituted.

   **B.**   Each of the two parties in Congress has rules and procedures governing how their committee chairs and ranking minority members are designated. On the Republican side, the Conference Rules of the 117th Congress are relevant. Rule 2(d)(2) is

---

[1] There is also serious controversy over whether Vice Chair Cheney even still qualifies as a Republican. The Wyoming Republican party no longer recognizes her as such. *See e.g.*, Associated Press, *Wyoming Republican Party Stops Recognizing Liz Cheney as Member*, THE GUARDIAN (Nov. 16, 2021), *available at* https://www.theguardian.com/us-news/2021/nov/15/liz-cheney-wyoming-republican-party-trump.
Speaking for herself, the Chair of the Republican National Committee argues that "she still considers Rep. Liz Cheney (R-Wyo.) to be a member of the party after the Wyoming GOP voted to no longer recognize the Republican congresswoman." Julia Manchester, *McDaniel Says She Still Considers Cheney a Republican Despite Wyoming GOP Vote*, The Hill (Nov. 18, 2021), *available at* https://thehill.com/homenews/house/582150-mcdaniel-says-she-still-considers-cheney-a-republican-after-wyoming-gop-vote [hereinafter "Manchester Article"]. Former Speaker of the House Thomas "Tip" O'Neill is perhaps best known for political aphorism contained in the title of his book. *See* Thomas P. O'Neill & Gary Hymel, ALL POLITICS IS LOCAL: AND OTHER RULES OF THE GAME (1993). And, in that vein, even Chair McDaniel acknowledged: "The thing about that everyone should be taking note [of] is that a state party is the most grassroots body that the state has. These are people who are running in their district committee and they're going to their county convention and they're getting on their state committee and they really represent where the party is in their state." Manchester Article.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 4

a default rule that provides that references to Chairs equate to the Ranking Republican Member when the Republican party is in the House's minority, as now. *See* House GOP, Conference Rules of the 11th Congress, *available at* https://www.gop.gov/conference-rules-of-the-117th-congress/ [hereinafter "House GOP Conference Rules"]. And Rule 14 provides that the Republican Steering Committee nominates its chairs/ranking minority members and they must be voted on by the full GOP House Conference. *See* House GOP Conference Rules at Rule 14(a)(1), (b). Such chairs/ranking members need not be the Republican member with the longest service on the Committee. *See id.*

By rule and the customs, traditions, and precedents of the House, it is the role of each party, in line with its own internal processes, to designate committee chairs and ranking members and thus that role cannot be usurped by the other party. The only way for a ranking Republican minority member to be designated is for the procedure in the House GOP Conference Rules to be followed. Representative Cheney thus can only be denominated the ranking minority member (which, again, is a pivotal role given how H. Res. 503, § 5(c)(6) and the Deposition Rules work) if the Republican Steering Committee has nominated her to that role and she is then confirmed by vote of the full Republican Conference.

Representative Cheney was neither nominated for the ranking minority member role on this Committee nor voted into that role by the full Republican Conference. It appears that she does not carry the title of Ranking Minority Member in silent recognition of this very fact. Instead, she carries only the title of Vice Chair, an appellation conferred on her solely by you as Chair. *See* Attachment A, entitled *"Chairman Thompson Announces* Representative Cheney as Select Committee Vice Chair"). And, as you are well aware, the history of this Committee leaves Representative Cheney owing her post on this Committee to Speaker Pelosi. *See* Associated Press, *Pelosi Appoints Cheney to Jan. 6 Committee*, NEW YORK TIMES (July 1, 2021), available at https://www.nytimes.com/video/us/politics/100000007846056/pelosi-cheney-january-6-committee.html. This makes her, in essence, a Democrat-appointed member of the Committee in the first instance *and* a Democrat-appointed leader acting in the capacity as Vice Chair of the Committee as well—*a doubly Democrat appointment*. Indeed, during our November 23, 2021 session at the Longworth House

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 5

Building to review the draft November 5, 2021 transcript, Mr. Clark also specifically asked Mr. Barry Pump, your Parliamentarian, to confirm that Vice Chairs can be appointed by and be members of the majority party on this Committee and Mr. Pump confirmed that was accurate.

But even Rep. Cheney's appointment as the "Vice Chair" of the Committee is legally defective. The definition of a "Vice Chair[s]" under the Rules of the House clearly requires they be a member of the majority party. Rule XI(2)(d) provides in relevant part as follows:

**Temporary absence of chair**

(d) A member of the *majority party* on each standing committee or subcommittee thereof **shall be designated by the chair of the full committee as the** *vice chair* **of the committee or subcommittee**, as the case may be, and shall preside during the absence of the chair from any meeting.

(all forms of emphasis added). This rule is applicable to the January 6 Select Committee because (1) Rule X(10)(b) makes Rule XI(2)(a) applicable to Select Committees; (2) Rule XI(2)(a) requires the Committee to adopt rules; (3) H. Res. 503 § 5(c) specifically states that "Rule XI of the Rules of the House of Representatives shall apply to the Select Committee except as follows"; and (4) clause 2(d) of Rule XI is not one of the listed exceptions.

Therefore, to the extent she is a member of the minority party, Representative Cheney cannot be a "Vice Chair" as that term is used and defined in the Rules of the House. Representative Cheney, it seems, is thus neither fish nor fowl.

Contrary to the Associated Press's suggestion, the law and procedures governing this Committee are not a matter of "close enough," like "horseshoes and hand grenades." *See Pelosi Appoints Cheney to Jan. 6 Committee*, NEW YORK TIMES ("Ms. Cheney's appointment appeared to be an attempt by Democrats to bring *a degree of bipartisanship* to the investigation.") (emphasis added). Representative Cheney cannot be considered a Republican appointee to this Committee because she was not appointed

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 6

in accord with Republican processes, and is not a "ranking minority member," and this precludes the Committee making use of deposition processes because use of those processes requires the presence on the Committee of a ranking minority member.

      **C.**      This problem is a further reflection of the overarching fact that this Committee is misstructured because it was formulated as a political monolith. *See* MacDougald Letter, at 5-6 (Nov. 12, 2021); Memo. Re: Clark Subpoena, at 13-14 (Nov. 12, 2021); MacDougald Letter, at Att. B (Nov. 8, 2021). Minority Leader McCarthy's designees for this Committee, especially Representatives Banks and Jordan, were rejected by the Speaker of the House. *See* Mike Lillis, *Pelosi Rejects Jordan, Banks for Jan. 6 Committee,* THE HILL (July 21, 2021), available at https://thehill.com/homenews/house/564122-pelosi-rejects-jordan-banks-for-jan-6-committee. We explain in our separate letter, also carrying today's date and addressed to procedural and other issues, how our November 5, 2021 letter objections were repeatedly misconstrued by the Committee and its lawyers. Related to that set of problems for the Committee, we note here that it is hard to imagine that Representatives Banks or Jordan would have allowed our November 5 objections to be mischaracterized and then ruled on as they were mis-framed, at least not without making a strong record objecting to proceeding in such an unlawful fashion.[2] Accordingly, how minority party Members of the Committee, especially the ranking minority member leader thereof, come to be designated and whether that process has been hijacked by the majority party is a matter of great significance and not a mere technicality.

      **D.**      Additionally, under the Deposition Rules, the ranking minority member can designate committee counsel to conduct a deposition. Those rules establish a balance requirement in that "[o]ne of the committee counsel shall be designated by the chair and the other by the ranking minority member per round." Deposition Rules at Rule 5. Indeed, Rule 6 specifically states as follows:

---

[2] As I note in our other letter dated today, we will be responding separately to your November 17, 2021 letter, which is relevant to these points.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 7

> Deposition questions shall be propounded in rounds. The length of each
> round shall not exceed 60 minutes per side, ***and shall provide equal time
> to the majority and the minority***. In each round, the member(s) or
> committee counsel designated by the chair shall ask questions first, and
> the member(s) or committee counsel designated by the ranking minority
> member shall ask questions second.

Deposition Rules at Rule 6. This scrupulously ensures balance between the majority and
minority lawyers in their role of propounding deposition questions. Yet, there is no
minority counsel for this Committee that has been properly designated by the ranking
minority member, because the Committee lacks a ranking minority member for the
reasons explained above.

  **E.**  Relatedly, we note that the brief instances where John Wood, ostensible
minority counsel, participated in the November 5 proceedings (*i.e.*, the deposition itself,
and the sessions held after Mr. Clark and I departed that day) reinforce that these
proceedings are not being conducted in true bipartisan fashion. Mr. Wood spoke when
we were present only to urge us not to leave the deposition when it became
unproductive in light of the fact that the Committee and staff had not yet fully digested
my November 5 letter. *See* Dr. Tr. at 37:10-13.[3] Nor did he push back on a single point
made or position taken by any majority party Member of the Committee or Mr. Heaphy,
majority investigative counsel. All of this is consistent with Representative Banks' view
of Mr. Wood's participation.[4] And it also appears Mr. Wood declined to state anything
for the record in the first session held outside of our presence on November 5, let alone

---

[3] All citations to the Draft Transcript (Dr. Tr.) are to the version Mr. Clark reviewed on November 23,
2021 at the Longworth House Office Building and that I simultaneously reviewed, connected to Mr. Clark
by Webex, from an Atlanta federal building.

[4] *See Mollie Hemingway, J6 Committee Misleading Witnesses About Republican Staff Presence* (Nov. 10, 2021)
(arguing that John Wood and Representative Cheney, in the context of this Committee's operations, both
work for the Democrat Party and that according to Representative Banks, at least some witnesses are
being misled "about the motives and the position of the person questioning them."), *available at*
https://thefederalist.com/2021/11/10/j6-committee-misleading-witnesses-about-republican-staff-presence/
(Attachment B), *incorporated by reference into* Memo. Re: Clark Subpoena, at 14 & n.15 (Nov. 12, 2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 8


anything that would call in question the majority's January 6 narratives, or whether the Committee is proceeding in conformity with the House Rules and its own enabling Resolution. *See id.* at 44:24.[5]

None of these points are designed to impugn Mr. Wood personally, especially because he and Mr. Clark were once colleagues together in private practice and in the Bush Administration.[6] But, as the design of the Appointments Clause of the United States Constitution recognizes, loyalty flows structurally from the authority that makes any given appointment and can terminate it,[7] and here it is clear that Mr. Wood was appointed by you as Chair of the Committee, Representative Thompson. Accordingly, Mr. Wood is here serving your interests and those of your political party, not those of the minority party. *See* January 6 Select Committee, *Thompson & Cheney Announce Senior Investigative Counsel for the Select Committee* (Sept. 17, 2021), *available at* https://january6th.house.gov/news/press-releases/thompson-cheney-announce-senior-

---

[5] We acknowledge there is some lack of clarity in our notes about the relevant person speaking (hampered, as we were, by not having a transcript we could take with us on November 23 and by the threshold problems encountered on November 23 as we described in our letter to you that evening). If page 44, line 24 of the deposition transcript is not Mr. Wood speaking, we apologize for that error stemming from our hastily written-up notes. But if that is in error, it would only underscore why we should be given the opportunity to review the transcript again before it is finalized—preferably by receiving a physical copy of the finalized transcript or, at the very least on that follow-up occasion, not being hampered by the threshold problems that created time pressure for our transcript review on November 23.

[6] The same is true as to the points made in this letter concerning Representative Cheney's participation on the Committee as currently structured—the points are legal in nature, not personal.

[7] *See, e.g.,* Jennifer Nou, *Subdelegating Powers,* 117 COLUM. L. REV. 473, 512 (2017) ("The core concern is that the President, in whom the Constitution vests the 'executive Power' and who must 'take Care' to 'faithfully execute' the laws, will lose control of an unelected bureaucracy. To mitigate this possibility, the Appointments Clause and other constitutional provisions ensure that the President is able to hire loyalists in key positions and fire insubordinates.") (footnote omitted). Of course, the principal obligation of any Executive Branch official is to his Oath to the Constitution as a whole, which Mr. Clark takes very seriously. But it is undeniable that the President cannot function properly and ensure that the branch functions in a unitary fashion without the ability to select his own appointees, subject to Senate confirmation for high-ranking officials.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 9

investigative-counsel-select-committee. Mr. Wood's past appointments by President George W. Bush notwithstanding, he was not appointed here pursuant to a consultation with Minority Leader McCarthy, *et al.* or the designated ranking minority member on the Committee. Of course, while Mr. Wood served in the Executive Branch more than a decade ago, the structure of the Constitution ensured his loyalty to President Bush. But as to his service with this Committee, the manner of his appointment ensures his loyalty to you as Chair.

The Rules of the Republican Conference make this point explicit. A member's designation as the ranking Republican member of a Committee comes only through nomination by the Steering Committee and election by the Conference. Conference Rule 14(d)(1) concomitantly requires, among other things, that Republican ranking members "ensure that each measure on which the Republican Conference has taken a position is managed in accordance with such position on the floor of the House of Representatives."

F.    These problems with the absence of both a minority ranking member and a counsel chosen by a properly constituted ranking minority member cannot be retroactively fixed. They render the November 5 deposition of Mr. Clark *ultra vires* and preclude its use for any follow-on purpose.

2.    **Proposal for Testimony on a Limited Topic to the Full Committee in a Public Hearing.**

The Committee and its staff have repeatedly mischaracterized our position as claiming blanket privilege for Mr. Clark. We have not done so. Our position has instead emphasized prudence in awaiting, at the very least, full resolution of *Trump v. Thompson* so that the boundary points for testimony are clearer. Nevertheless, to serve the interests of the historic inter-branch accommodation process related to executive privilege disputes, I am willing to offer Mr. Clark's testimony in a public hearing before the full Committee (not in a closed-door deposition, including for the reasons given above about why use of the Deposition Rules here is *ultra vires*) on defined topics. *See, e.g.,* Dawn Johnsen, *Executive Privilege Since* United States v. Nixon: *Issues of Motivation and Accommodation*, 83 MINN. L. REV. 1127 (1999) (referring to "the accommodation process"

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 10

as "a central feature of executive branch policy in this area and the process actually used to negotiate with Congress to seek to accommodate the legitimate needs of both branches").[8]

As you know, we learned only on November 23 of two sessions held as part of the November 5 proceedings that occurred without either me or Mr. Clark present. At one of those sessions, Representative Schiff stated as follows: Mr. Clark "refus[ed] even to answer questions about his statements about January 6th made to the press at least strike this member as not in good faith ...." Dr. Tr. 46:5-7.[9]

Respectfully, we believe it was ***always clear*** from what was actually said on November 5 (both in writing and orally) that Mr. Clark was not refusing to ever testify about his remarks to a *Bloomberg Law* reporter on January 6. But that he was only urging, as a matter of proceeding in an orderly fashion, the Committee to await the conclusion of the *Trump v. Thompson* litigation before we discussed how to agree about testimony on any topic—all while inviting a dialogue with the Committee.[10] Nevertheless, to avoid any implication (even an unfair one) that Mr. Clark is not proceeding in good faith, I can now agree to allow Mr. Clark appear in a public meeting of the full Committee to testify about the following topics that do not implicate any of the privileges asserted and are also appropriately tailored to the Committee's mission under H. Res. 503:

> (1) Mr. Clark's questioning by and responses to a *Bloomberg Law* reporter interviewing him after January 6 about events at the Capitol, and (2) his role, if any, in planning, attending, responding to, or investigating January

---

[8] Professor Johnsen was the Acting Assistant Attorney General for the Office of Legal Counsel at the start of the Biden Administration.

[9] Again, this citation is drawn from our notes since we lack access to a copy of a final transcript, though we have again requested we be given one in our other later dated today.

[10] A dialogue which at all times it appears the Committee has refused to enter, insisting on Mr. Clark's testimony on a smorgasbord of more than 20 topics, including Mr. Clark's conversations with President Trump. *See* Dr. Tr. at page 41 (Mr. Heaphy listing topics without Mr. Clark or me present in the room).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 11

6's events or former President Trump's speech on the Ellipse that same
day.

Please let us know if this proposal is agreeable to the Committee, or otherwise
continue the dialogue with us, consistent with the Committee's obligation to seek
accommodation in good faith in cases involving invocations of executive privilege.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Encls.

cc:     Jeffrey Bossert Clark (w/ enclosures)

Case 1:22-mc-00096-RC   Document 6-5   Filed 10/21/22   Page 119 of 146

HOME (/)    ABOUT (/ABOUT)

(/)

COMMITTEE ACTIVITY (HTTPS://JANUARY6TH.HOUSE.GOV/COMMITTEE_ACTIVITY)

(http://twitter.com/January6thC

(http://www.facebook.com/Janu

MEDIA CENTER (/NEWS)    WATCH LIVE (/NEWS/WATCH-LIVE)    CONTACT (/CONTACT)

(http://www.youtube.com/chan

TIP LINE (/TIP-LINE)      Q   (/search)

# CHAIRMAN THOMPSON ANNOUNCES REPRESENTATIVE CHENEY AS SELECT COMMITTEE VICE CHAIR

Sep 2, 2021

**Bolton, MS**—Chairman Bennie G. Thompson today announced that he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee.

Chairman Thompson said, "Representative Cheney has demonstrated again and again her commitment to getting answers about January 6th, ensuring accountability, and doing whatever it takes to protect democracy for the American people. Her leadership and insights have shaped the early work of the Select Committee and this appointment underscores the bipartisan nature of this effort."

House Resolution 503 established the Select Committee to investigate and report upon the facts, circumstances, and causes related to the January 6th attack and interference with the peaceful transfer of power.

"Every member of this committee is dedicated to conducting a non-partisan, professional, and thorough investigation of all the relevant facts regarding January 6th and the threat to our Constitution we faced that day. I have accepted the position of Vice Chair of the committee to assure that we achieve that goal. We owe it to the American people to investigate everything that led up to, and transpired on, January 6th. We will not be deterred by threats or attempted obstruction and we will not rest until our task is complete," said Vice Chair Cheney.

Chairman Thompson continued, "It's important to everyone that the Select Committee's leadership reflect the bipartisan effort we are engaged in and I'm pleased that Ms. Cheney has agreed to serve as the select committee's Vice Chair. We are fortunate to have a partner of such strength and courage, and I look forward to continuing our work together as we uncover the facts, tell the American people the full story of January 6th, and ensure that nothing like that day ever happens again."

# # #

f       (https://www.facebook.com/sharer/sharer.php?u=/news/press-

Attachment A

Chairman Thompson Announces Representative Cheney as Select Committ... | Twitter gave the January 6th Attac... on the United States Cap to          11/29/21  11 04 AM

releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair) 🐦 (https://twitter.com/intent/tweet?&url=/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair&text=Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair) ✉ (mailto:?subject=Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair&body=/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair)

our latest
most popular
contributors
subscribe



CORRUPTION

# J6 Committee Misleading Witnesses About Republican Staff Presence

*'If this was a real investigation, that'd land you in jail for prosecutorial misconduct,' Rep. Jim Banks said.*

Wyoming Rep. Liz Cheney ran to CNN a few weeks ago to accuse conservative stalwart Rep. Jim Banks of falsely presenting himself as the Jan. 6 commission's ranking member. Banks is, in fact, congressional Republicans' choice to be their top investigator on the committee, but he has been prevented from fulfilling his duties by Speaker of the House Nancy Pelosi.

However, it's Cheney who appears to be misrepresenting herself as the ranking member — that is, the top Republican — on the committee.

January 6 Select Committee staff have been falsely telling witnesses that Republican staff will be present for interviews, according to multiple eyewitness sources and documents. In fact, not a single Republican-appointed member of Congress nor a single staff member representing the Republican conference is part of the controversial committee.

Attachment B

Witnesses are being told that John Wood, a longtime friend and ally of the Cheney family, will represent Republicans when witnesses testify. But neither Cheney nor her friend is representing the Republican conference. In fact, Cheney was appointed to the committee in early July by Pelosi herself.

"John Wood works for the Democrat Party, just like Liz Cheney, who was appointed by Pelosi and is not the Ranking Member of the Select Committee. She is misleading witnesses, before they testify under penalty of law, about the motives and the position of the person questioning them," said Banks, who has continued leading Republicans' investigation of the federal government's handling of the Jan. 6 riot at the Capitol. Cheney's work with CNN was designed to prevent him from being able to gain answers to the questions the select committee was ostensibly set up to answer.

Cheney was given six days to explain whether she considers herself just the Democrat-appointed vice-chair of the committee or also the Republican ranking member, as is being represented to key witnesses. She has not responded to multiple requests for comment.

The misrepresentation to witnesses is key because the absence of any ranking member — meaning, in this case, any Republican-appointed member — or minority party staff means the committee appears to be failing to adhere to ironclad rules for its work.

Pelosi "blew up" the Jan. 6 committee when she took what she herself admitted was the "unprecedented" step of refusing to seat multiple Republican-appointed members, including the highly respected Navy officer and Indiana Republican Banks, who was to be the committee's ranking member. She also banned Rep. Jim Jordan of Ohio, who currently serves as the top Republican on the Judiciary Committee.

Pelosi chose two of her key Republican allies and anti-Trump obsessives to fill two

of her slots for the committee. As such, they do not represent the Republican conference, which opposed their selection, but the Democrat conference, which supported their selection.

Cheney was promoted to vice-chair in September in thanks for her stalwart work on Pelosi's behalf. Cheney, who has been censured by Wyoming Republicans for working against Republican voters and their interests, and who lost her position as House Conference chair for hijacking multiple briefings for Republican policy initiatives to talk about her personal vendetta against Trump, is facing precipitously low poll numbers and a challenge from popular Republican Harriet Hageman.

Cheney was joined by lame-duck Adam Kinzinger of Illinois, who recently announced his retirement rather than facing certain defeat from Illinois constituents who don't share his anti-Trump obsession. Kinzinger was appointed by Pelosi in late July to make the committee appear more bipartisan after she'd vetoed Banks and Jordan. Cheney, her selection for vice-chair, was brought in for the sole purpose of helping Democrats with their tribunal.

The resolution establishing the committee, purportedly to investigate the federal government's role in detecting, preventing, preparing for, and responding to the Jan. 6 riot, says depositions taken by the select committee must follow House rules.

Those rules clearly state, "Consultation with the ranking minority member shall include three days' notice before any deposition." Also, "A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round."

Additionally, the rules say, "Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second."

The point of these rules is to structure depositions so the minority and the majority counsel have the same opportunity to question witnesses and gather information for their separate reports. That's why they rotate and why they're allotted equal time. Having questions alternate from one hostile lawyer to another hostile lawyer who is working with the first makes a mockery of the provisions. It also means that the hostile lawyers can coordinate and cherry-pick which information to leak or publish, and which to conceal from the public because it contradicts their preferred narrative.

The rules do not envision the circumstances that accompany Pelosi's uni-party select committee. The House Rules "become nonsensical in a situation like this," said one congressional aide, adding, "This isn't just a partisan investigation — it's a coverup."

For the select committee to be in accordance with the rules regarding consultation for depositions, Cheney must be considered simultaneously the ranking member for the minority party while also being the vice-chair for the majority party.

Hill lawyers say Pelosi's handling of the committee casts doubt on its adherence to the rules. Because she vetoed the ranking member from the committee, it has no ranking member. But the committee rules require consultation with the ranking member before taking certain basic actions, such as taking depositions, including those pursuant to subpoenas.

"So how can you consult with the ranking member when you don't have one?"

asked one Hill attorney.

The multiple sources consulted for this article include a document which confirmed January 6 Committee staff represented to a witness that Wood would be the Republican counsel during their interview.

"If this was a real investigation, that'd land you in jail for prosecutorial misconduct," Banks said of the false representation. "Fortunately for Liz, this is a sham investigation," he added.

> *Mollie Ziegler Hemingway is a senior editor at The Federalist. She is Senior Journalism Fellow at Hillsdale College. A Fox News contributor, she is a regular member of the Fox News All-Stars panel on "Special Report with Bret Baier." She is the author of "Rigged: How the Media, Big Tech, and the Democrats Seized Our Elections." Follow her on Twitter at @MZHemingway.*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 29, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

### ADDITIONAL OBJECTIONS BASED ON INFORMATION
### FIRST LEARNED OF BY MR. CLARK AND COUNSEL ON 11/23/21

Dear Representative Thompson:

This letter is sent to flag additional legal objections arising from or catalyzed by (1) Mr. Clark's review on November 23, 2021 at the Longworth House Office Building of the draft November 5, 2021 deposition transcript and/or (2) my simultaneous review of that same draft transcript from a federal building in Atlanta, Georgia, with a Webex connection linking the two locations. Most significantly, unbeknownst to Mr. Clark and me before November 23, two transcribed sessions were held with Committee Members and staff *after* we had departed on November 5.

Learning the content of these sessions only upon our review of the draft transcript presents yet another serious due process problem with these proceedings as applied to Mr. Clark. Particularly alarming is that the topics on which Mr. Clark was to be questioned were not shared with us while we were present but were instead put on the record in Star Chamber fashion. *See In re Oliver*, 333 U.S. 257, 268–69 (1948) ("[D]istrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 2

French monarchy's abuse of the *lettre de cachet*." (footnotes omitted)). Had we not asked to review a copy of the draft transcript, we would have been kept in the dark about specific topics that Mr. Clark supposedly refused to testify about on a blanket basis so that the myth that Mr. Clark issued a blanket refusal to testify could be perpetuated. Please see the first point below for more on this.

Any references below to the November 5 draft transcript, not yet finalized, are based on our notes. Those notes may not be perfect because of the range of problems set out in our letter to you sent the evening of November 23, which caused us to lose time and because those problems made conditions for our review sub-optimal. Nor is there any reason why we should have been denied the ability to take away copies of the draft deposition transcript so that we could review it under conditions that allowed us to consult freely while maintaining attorney-client privilege and so that we could more accurately quote from it to protect Mr. Clark's legal rights. Both of us are lawyers and we have never encountered a legal process that did not allows us access in writing, but only under observed and highly controlled circumstances, to a pre-final deposition transcript to review. We do recognize that you indicated in a letter dated November 26, 2021 to me that the Committee is still considering our request for a copy of the transcript. Please let us know about the Committee's resolution there when you can.[1] But the restrictions on our access to the transcript are another Star Chamber-like feature of the Committee's proceedings.

The new objections we raise are as follows, and they are without prejudice to a response to your November 17, 2021 letter, which we are still working on:

---

[1] In a footnote, *see* Thompson Letter, at 1 n.3 (Nov. 26, 2021), you argue that action by the full House of Representatives would be required to release the audio file from November 5. But neither House Resolution 558 (112th Cong.) nor House Resolution 553 (116th Cong.) preclude release of the audio file. Instead, both Resolutions simply show the full House resolving to release audio files for trial purposes. However, you cite no authority for the proposition that a resolution by the full House is a necessary condition and thus that an audio file can be released only in that fashion. You or your advising counsel must see that those Resolutions do not prove the point for which they are cited—far from it.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 3

*First*, there is **no indication** in the transcript of the second session held without us on November 5 present—from 4:15 pm to approximately 4:21 pm—that you had either read my November 5 letter or properly understood that it was **not** asserting an absolute privilege to all potential questions. Nevertheless, Mr. Heaphy represented to you that the "letter [was] asserting blanket privilege." Dr. Tr. at 48:24.[2] So, at the time you ruled, you appear to have been misinformed about the contents of our November 5 letter and transcribed statements on the morning of November 5. Accordingly, we request that you acknowledge in writing that:

(1) the concluding paragraph of my November 5 letter noted that you could respond with "a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.";

(2) Mr. Clark and I repeatedly stated on November 5, as the draft transcript reflects, that we were not adopting a blanket position, *see, e.g.,* Dr. Tr. at 36:4-6 (where Mr. Clark clearly stated "I would say that we've not reached an impasse, and there have been repeated attempts to characterize the position as absolutist. It's not. We're inviting a dialogue in the letter."). You were apparently not informed of this either; and thus

(3) your ruling that "Mr. Clark does not enjoy categorical claims of privilege across every element[] of the select committee investigation authorized by House Resolution 503" should be withdrawn as a *non sequitur* because it is ruling on a counterfactual objection that we did not actually advance either in our November 5 letter or in the live session on November 5. Additionally, you are by now certainly aware (or should be aware) that my November 8, 2021 letter to you (*e.g.*, pages 1-2, 4) and my November 12, 2021 letter (*e.g.*, pages 6-7) noted that we were not asserting "absolute immunity."

In the alternative, we would request that you share this letter immediately with all Committee Members and it is to them we address this follow-on request: "Please invoke Rule 7 of the 117th Congress Regulations for Use of Deposition Authority by appealing

---

[2] All citations to the Draft Transcript (abbreviated Dr. Tr.) are to the version we reviewed on November 23.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 4

Chairman Thompson's ruling in accord with that Rule."[3] Relatedly, if such an appeal is
filed by a Member, I would request the opportunity to be heard on Mr. Clark's behalf in
a transcribed and in-person meeting held before a quorum of the Committee.

Given the clear disconnect between a misconstrued objection we did not make,
which was what you ruled regarding on November 5, and the basis for and contours of
our objection as we actually stated it, all other Members of the Committee should vote to
reverse your ruling on appeal. But at the very least, one or more Members of the minority
should file an appeal in an attempt to get you to rule on the objection that was actually
made and not one that put words in our mouths. So whether such an appeal will be filed
now that this issue has been surfaced (and again, it could not have been surfaced prior to
our transcript review on November 23) will act as an important test of whether there is
*representation of the minority party in more than name only on this Committee* or if
those ostensible Members also have an unalterably closed mind characterized by
prejudgment, which I have previously explained is a violation of due process. Please see
my email drafted while I was in flight on November 5 back to Atlanta and in the
attachment to my subsequent November 12 letter. *See* MacDougald Letter, at 2 & Att. B
(Nov. 8, 2021); Memo. Re: Clark Subpoena, at 1 (Nov. 12, 2021).

*Second*, as is implicit in the first objection above, but which I state as a separate
point here for clarity, we have now seen for the first time that the transcript clearly reflects
that *you had already ruled* in the second session on November 5 (held without us present)
that our objection (as mis-framed) had been overruled. This clinches the Queen of Hearts
problem of *post hoc* rationalization that I set out in my November 12 letter and attached
memo. *See* MacDougald Letter, at 2 (Nov. 12, 2021); Memo. Re: Clark Subpoena, at 2 (Nov.
12, 2021). In other words, this revelation confirms that the November 9 letter you sent to
me was an attempt to paper over the defects of your November 5 late afternoon ruling

---

[3] We advance this argument as an alternative one to our primary position, stated in my other letter to you
today, that this Committee's composition precludes any use of the House Deposition Rules and thus that
the November 5 deposition was *ultra vires*. I continue to reserve all of Mr. Clark's legal rights, especially as
various problems with the Committee's actions continue to emerge.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 5

and thus forms another reason why one or more Members should appeal your November 5 ruling.[4]

*Third*, in your November 26 letter, you register a sort of complaint that because Mr. Clark did not sign the transcript or certificate set before him on November 23, you may not opt not to include the corrections we identified to the transcript on November 23 in the final transcript. *See* Thompson Letter, at 1 (Nov. 26). But you ignore the due process problem we identified of a transcript that Mr. Clark is expected to sign but that (a) had errors and multiple versions floating around as a "known issue" on November 23 and yet we still encountered that issue last week; (b) yet you will not allow us to lock down a single final version of the transcript that we can keep a copy of to ensure the transcript is not further changed; (c) you present no response to my point that the integrity of the transcript has already been threatened in a legally unprecedented fashion; and (d) you are silent about our sensible suggestion that a certified pdf document could be produced and retained by all sides, assuring everyone that the transcript could not undergo further unilateral revision.

*Fourth*, your letter offers no response to our request that the identity of all Members and staff present for any portion of the November 5 questioning be listed to reflect the relevant portions of the transcript for which they were present. *See* MacDougald Letter, at 3 (Nov. 23, 2021) ("[T]his must be corrected in the revised transcript such that the transcript accurately indicates precisely who affiliated with the Committee was present for each of the three distinct segments of the session on November 5 reflected in the transcript, respectively, i.e., (1) the main period where Mr. Clark and I were present, (2) the period late morning where staff and some members remained on the record to mark exhibits for identification purposes and to set out their unilateral positions without our presence; and (3) the period late afternoon where Chair Thompson participated and purported to rule on our legal objections, again without us

---

[4] We recognize that Rule 7 concerning depositions indicates that appeals must be noticed by Members within 3 days of the ruling but your November 5 ruling was clearly interlocutory and can be revisited. And avoiding the due process problems we have been highlighting since November 8 surely provides a strong basis for you to reconsider. Members could also call for you to reconsider your ruling as a general matter—outside the parameters of Rule 7.

C A L D W E L L ,   C A R L S O N ,
E L L I O T T   &   D E L O A C H ,   LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 6

present."). There is no reason for the Committee not to do so unless it or the court reporter did not track that information, in which case that point should be admitted and memorialized as part of the final transcript.

*Fifth*, and reserving all rights as to other topics, in the extensive list of topics Mr. Heaphy set out on the record but *without Mr. Clark or I being present*, we have to point out that one of the topics Mr. Heaphy flagged directly contradicts a statement that the Department of Justice made to us about the Committee's position on topics, namely, DOJ's statement via Kira Antell as follows:

> Finally, I wanted to address your question seeking access to materials relating to a classified ODNI [Office of the Director of National Intelligence] briefing of Mr. Clark in early January. OLA [*i.e.*, DOJ's Office of Legislative Affairs] has spoken to the Select Committee and confirmed that the details of this briefing are outside the scope of their interest in speaking with Mr. Clark.

MacDougald Letter, at 3-4 & n.5 (Nov. 12, 2021) (quoting Ms. Antell). *Compare* Dr. Tr. at 43:13-15 (Heaphy: "[W]e wanted to ask him, for instance, about an ODNI briefing that he sought about alleged interference with Dominion voting machines by the Chinese government.").[5] Even assuming for the sake of argument that this is a permissible line of inquiry with Mr. Clark in light of the various applicable privileges, this is a serious contradiction which we will take up with DOJ by renewing our request under DOJ's

---

[5] Note once more that this is the Committee's unilateral view of this issue. By contrast, Mr. Clark thinks the relevant ODNI materials, including his secure discussion with the then-Director of National Intelligence Ratcliffe, are relevant for many reasons, assuming the various privilege objections were resolved in favor of giving testimony on this topic. As I explained on November 12, it is not up to the Committee to decide what is relevant to Mr. Clark's potential response to any given line of questioning. MacDougald Letter, at 4 (Nov. 12, 2021). Mr. Clark can determine that for himself, consulting with me. The manner in which the Committee is proceeding, based on what Ms. Antell has represented, is equivalent to asserting in circular fashion that "Mr. Clark does not need access to X category of material because we do not believe he needs access to it." It is sufficient to show that Mr. Clark is entitled to review and refresh his recollection from that material that the Committee wants to ask about it.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 29, 2021
Page 7

regulations to be able to review the relevant documents. This will require confirmation that Mr. Clark's security clearances are still operable and that I, as his counsel, obtain those security clearances anew, so that Mr. Clark can be given the due process protections provided by receiving advice of counsel.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:   Jeffrey Bossert Clark

# CALDWELL, CARLSON,
# ELLIOTT & DELOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 30, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

**Via Email**

Dear Representative Thompson:

In addition to the reasons previously set forth in my (1) letter to you of November 5, 2021, (2) my email to Mr. Heaphy of November 5, 2021, and my letters of (3) November 8, (4) November 12, (5) November 23, and (6)-(7) November 29, 2021 (two separate letters covering different issues), I now write to inform you and the Committee that on my advice Jeffrey Clark is asserting his rights against self-incrimination under the Fifth Amendment to the U.S. Constitution.

As previously explained in this body of correspondence, the Committee's processes as applied to Mr. Clark are unconstitutional on multiple grounds, run afoul of congressional rules and historical precedent, and are abusive, unfair, and appear designed to head to a predetermined outcome. The Committee has refused to even consider narrowing the scope of testimony to the proper boundaries of its jurisdiction, to allow the pending *Trump v. Thompson* case to run its course so that it can at least inform the applicability of any applicable privileges (including executive privilege), or to proceed by way of written questions. Instead, the Committee has demonstrated at all times an unalterably closed mind, culminating in issuing a tweet at 1:52 PM yesterday announcing that a meeting would be held at 7:00 PM tomorrow to vote on a

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 2

report holding Mr. Clark in contempt and recommending referral to the Department of Justice for prosecution for criminal contempt. This was followed by a reporter's tweet *two minutes later* with an image of what appeared to be a press release announcing the meeting. And only one minute after that reporter's tweet was issued, a *Politico* story was posted to the web that could not possibly have been written, edited, and internally reviewed so soon after the Committee's tweet. *See* Betsy Woodruff Swan, *Jan. 6 Investigators Prepare to Hold Former Trump Admin Official in Contempt,* POLITICO (Nov. 29, 2021), *available at* https://www.politico.com/news/2021/11/29/jan-6-investigators-523456 (Attachment A) (bearing a *1:55 pm time stamp*). In your haste to publicly flay Mr. Clark, you did not even respond before sending out the Committee's tweet yesterday to either of our two weighty letters from yesterday morning before releasing that tweet (instead prioritizing giving advance warning and explanation on background to the press), other than Mr. Heaphy briefly acknowledging receipt later that afternoon.

This letter divided into two parts: (1) a catalogue of the legal problems with how the Committee has proceeded and continues to proceed as set forth in my previous correspondence; and (2) support for Fifth Amendment invocation.

LEGAL ISSUES

Our correspondence has described a number of profound legal defects afflicting the Committee's pursuit of Mr. Clark. They are listed below. We reserve any other applicable legal arguments not listed below.

**1. The Committee Has No Authority to Take Depositions.** As explained in my letter of November 29, 2021, the Committee as presently constituted cannot comply with either its enabling resolution, H. Res. 503, or the Rules of the House regarding the use of deposition authority, and certainly has not done so in the case of Mr. Clark. Those rules unambiguously require consultation with and participation by a duly constituted and appointed ranking minority member and their duly appointed minority counsel. The Committee has no such ranking minority member and moreover implicitly concedes the point in that it does not even purport to have a ranking minority member. *See* my letter of November 29, 2021, regarding deposition authority, pp. 1-9. Today, you sent another letter and all it does is assert, conclusorily, that "both the deposition of Mr.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 3

Clark and the transcript review process were conducted in full compliance with the House's deposition rules and regulations." Thompson Letter, at 1 & n.1 (Nov. 30, 2021). But your letter of today makes no attempt at all to grapple with the serious legal arguments I advanced in my November 29 letter. The Committee rushes onward nonetheless, heedless of any legal restraints on its composition or authority.

Nor does the composition of the Committee conform with its enabling resolution, H. Res. 503, Section 2(a), which states that "The Speaker shall appoint 13 Members to the Select Committee, *5 of whom shall be appointed after consultation with the minority leader.*" (Emphasis added). That requirement was simply swept aside by the Speaker. The Committee has only two members of the minority party, neither of whom were appointed in consultation with the Minority Leader. It is crystal clear that the January 6 Committee is not a properly composed Committee.

As for the upcoming vote on whether to refer Mr. Clark for criminal contempt, the law is clear that no such prosecution may be had where the Committee has failed, as here, to follow its own rules. *Yellin v. U.S.*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution of in Yellin's case meticulously. It is not too exacting to require that the Committee be equally meticulous in following its own rules"); *Christofel v. U.S.*, 338 U.S. 84, 90 (1949) ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."); *U.S. v. Reinecke*, 524 F.2d. 435 (D.C. Cir. 1975) (same).

**2. Separation of Powers.**

A. You were quoted in *Politico* on November 9 saying "and we'll let the evidence based on what we look at determine guilt or innocence." Obviously, however, no congressional committee wields constitutional authority to "determine guilt or innocence." Similarly, no committee has authority to issue or enforce subpoenas to carry out such a flagrantly unconstitutional purpose. *See* my letter of November 12, p. 1.

B. In historical context, this is no surprise. As James Madison explored, legislative bodies tend to constantly push their powers beyond legitimate boundaries:

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 4

> The legislative department is everywhere extending the sphere of its activity, and drawing all power into its impetuous vortex. The founders of our republics have so much merit for the wisdom which they have displayed, that no task can be less pleasing than that of pointing out the errors into which they have fallen. A respect for truth, however, obliges us to remark, that they seem never for a moment to have turned their eyes from the danger to liberty from the overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority. They seem never to have recollected the danger from legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations.

Federalist No. 48 (Feb. 1, 1788).

Madison notes that the Constitution's new, American version of the separation of powers is the only means for constraining legislative bodies from abusing their power:

> TO WHAT expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several departments, as laid down in the Constitution? The only answer that can be given is, that as all these exterior provisions are found to be inadequate, the defect must be supplied, by so contriving *the interior structure of the government* as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places.

Federalist No. 51 (Feb. 8, 1788) (emphasis added).

Madison then summarizes the various structural restraints to protect the President and the Judiciary from Congress abusing its power relative to the first two branches. In the midst of this explanation, Madison clarifies that preservation of the Constitution in practice requires Presidents and Justices to protect their institutions against the tendency in which the Legislative Branch will indulge to abuse its powers:

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 5

> Ambition must be made to counteract ambition. The interest of the man
> must be connected with the constitutional rights of the place. It may be a
> reflection on human nature, that such devices should be necessary to
> control the abuses of government. But what is government itself, but the
> greatest of all reflections on human nature? If men were angels, no
> government would be necessary. If angels were to govern men, neither
> external nor internal controls on government would be necessary. In
> framing a government which is to be administered by men over men, the
> great difficulty lies in this: you must first enable the government to control
> the governed; and in the next place oblige it to control itself.

*Id.*

This language was widely quoted by constitution-makers in Eastern Europe after
the fall of the Soviet Union. By following former President Trump's instruction, Mr.
Clark is vindicating the separation of powers. What this Committee appears to construe
as contempt of Congress is actually a heroic defense, at great personal and financial
cost, of the Constitution.

C. The Committee's subpoena and nearly all the topics of intended inquiry
invade executive privilege, which rests on the separation of powers. The Committee
seeks to question Mr. Clark about his communications with senior Department of
Justice officials and the President himself that, all else being equal, are unquestionably
within the scope executive privilege. The legal issue at hand goes to defining the
contours of that privilege in the present context, a matter that is currently in direct
litigation between the Committee and President Trump before the D.C. Circuit, and
which is very likely headed for the Supreme Court. I have pleaded with the Committee
to wait until that litigation has been concluded to revisit the permissible scope of
inquiry with Mr. Clark. But the Committee has consistently refused to do so, forcing Mr.
Clark, in a grotesquely unfair manner, to choose between violating his professional
obligations to comply with President Trump's invocation of his privileges on the one
hand and being held in contempt and possibly prosecuted on the other. This vendetta
against Mr. Clark violates his constitutional rights and the Committee's constitutional

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 6

duty to pursue accommodation rather than conflict in matters of executive privilege. *See* my letter of November 5, 2021, pp. 8-10 and my letter of November 12, 2021, p. 3.

D. The Committee refuses to recognize that President Trump has instructed Mr. Clark to assert executive and other applicable privileges. It simply refuses to recognize the plain text of the letter from President Trump's then-counsel, former Representative Doug Collins, of August 2, 2021, the subsequent triggering of the conditions set forth in that letter by the Committee's issuance of subpoena to President Trump's closest advisors, or the positions taken by President Trump in his direct lawsuit against the Committee. *See* my November 5, 2021 letter, pp. 2-7; November 12, 2021 letter pp. 2-3; Memo of November 12, pp. 4-5. The Committee refuses to allow that litigation to conclude, even as it proceeds on an accelerated timetable. Instead, the Committee is hell-bent on holding Mr. Clark in contempt without regard to law, process, tradition, or its constitutional duty of accommodation in matters of executive privilege.

E. The Committee contends unreasonably that Mr. Clark is inexorably bound by President Biden's purported waiver of President Trump's executive privilege, though that very question is at the core of the currently pending *Trump v. Thompson*. Even in the context of an extremely deferential facial challenge to the statute in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Court recognized that a former President of necessity retains rights of executive privilege. The Court did not purport to delineate how an as-applied dispute over conflicting claims of privilege and waiver between a former and current President would be resolved. As Justice Powell observed, "the difficult constitutional questions lie ahead." 433 U.S. at 503. The Committee's position ignores cautions voiced in Justice Blackmun's concurrence, 433 U.S. at 491, and the dissents of Chief Justice Burger, 433 U.S. at 519-520, and Justice Rehnquist, 433 U.S. at 556, that for executive privilege to serve the Presidency and the incumbent President, it must apply as well to the former President after he leaves office. Sometimes presidential transitions are hostile. At present, President Trump is the strongest and most likely opponent to President Biden's re-election and so the political expedience of the purported waiver is clear. The institutional and constitutional nature of executive privilege preclude it being interpreted to countenance a politically motivated, tit-for-tat waiver by each succeeding administration of the previous administration's executive

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 7

privilege. This would open a Pandora's box that would hamstring effective functioning of the executive branch, including the current administration of President Biden. *See* my letter of November 5, pp. 10-11.

F. The Committee relies on a letter to Mr. Clark from DOJ dated July 26, 2021, contending that the letter conclusively waives executive privilege with respect to its inquiry. The text of this letter cannot bear the Committee's wishful reading. *First*, the letter makes no reference to the January 6 Committee, and thus does not waive any privilege as to the Committee. *Second*, even if it did, the time frame as to which the privilege is purportedly waived in that letter is far narrower and shorter than the time frame set forth in the Committee's subpoena to Mr. Clark. This is a fundamental mismatch that renders untenable the Committee's reliance on that letter as opening up an inquiry of whatever time range it defines. When it comes to purported waivers of executive privilege, the Committee's reach exceeds its grasp.

**3. Due Process Violations**

A. You as Chairman claim authority to rule on our objections to your own subpoenas. Separation of powers and the Due Process Clause do not permit you to serve as both prosecutor, judge and jury. *See* my letter of November 12, 2021, p. 2.

B. You prejudged our objections, rejecting them out of hand on the afternoon of November 5, 2021, only later concocting a series of *post hoc* rationalizations for a decision already made before any analysis of our objections had been undertaken. *Id.* Once we were able to review the deposition transcript, which you have furnished to us, your fatal prejudgment became clear. Worse yet, until we first saw a draft of the transcript on November 23, we did not know that you held ***two sessions*** on November 5 that were transcribed (the second of which is where your ruling on our November 5 objections occurred) ***without either me or Mr. Clark being present***. As I previously pointed out in my November 29, 2021 letter regarding deposition transcript, pp. 1-2, that is the Star Chamber reborn.

C. You and the Committee approach this matter with unalterably closed minds, evidenced by the full sweep of the offenses against fairness, logic, and the law

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 8

catalogued in this letter and my prior correspondence, as well as a multitude of other statements and actions by you and other members of the Committee. *See* my email of November 5, 2021, and my letters of November 12, p. 2; my Memo of November 12, pp. 1-2; and my letter of November 29, regarding review of the deposition transcript, p. 4.

D. You directed us at 4:30 PM on November 5 to appear at 4:00 PM on November 5, and would hold Mr. Clark in contempt for being unable to travel backward in time. *See* my November 12, 2021 letter at p. 2.

E. The Committee claims unbounded jurisdiction. The Committee claims authority to inquire into any election-related matter going all the way from April 2020 to the day of the response to the subpoena. This claim rests on the idea that the events of January 6 at the Capitol were caused by or arose from persons harboring or expressing concern over or skepticism towards the integrity of the November 2020 election. The First Amendment, to say nothing of the demands of mere rationality, stand in the way of such a grandiose conception of the Committee's investigative authority. The January 6 Committee cannot be allowed to become a roving commission to investigate and punish those holding what you regard as impure thoughts about the election or that trench on your view of what is politically correct or out of line with a "well-established" mainstream media narrative you happen to embrace. *See* my November 12, 2021 letter, pp. 4-5.

This legal, logical, and causal disconnect is especially stark in the case of Mr. Clark. He had nothing to do with the events of January 6. There is no logical or causal connection whatsoever between anything he did or did not do regarding the election— all of which was completely unknown to the public on January 6 or before—and the actions of those who entered the Capitol. *Id*. Assuming, purely for the sake of argument, that *New York Times* stories in late January 2021 based on anonymous leaks have some accuracy, the entire kerfuffle about Mr. Clark and the election is over a letter that was never sent.

In any event, Mr. Clark, like every American, is entitled by the First Amendment to freedom of thought (and, within the walls of the White House and the Justice Department, to freedom of speech as well) regarding the election. Accordingly, he

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 9

cannot constitutionally be required to answer to the Committee or any other government body for his views on the topic. This is the United States of America.

F. Assuming for the sake of argument that, despite the various privilege objections I have asserted, the Committee is authorized to inquire into Mr. Clark's election-related work at the Department of Justice, the Committee and the Department have combined to deny him the opportunity to review DOJ election-related investigative files and other materials needed in his preparation. *See* my November 12, 2021 letter, p. 2. Yet DOJ's July letter seems curiously aggressive about protecting from disclosure its actions or inactions concerning investigating election irregularities.

As one example, DOJ denied Mr. Clark access to the classified ODNI materials he reviewed relating to an analysis of foreign influence or interference in the election, as well as his related January 2, 2021 classified conversation with DNI Ratcliffe, based on the assertion by DOJ that the Committee was *not* interested in that topic. But Mr. Heaphy indicated on November 5, again while we were not present, that he *did intend* to ask about that topic. *See* my November 12 letter, pp. 3-4 & n. 5; November 29, letter, pp. 6-7 & n. 5. That contradiction is glaring. Additionally, in order to respect and observe Mr. Clark's due process and right to counsel protections, I must be allowed to review those materials as well, in accord with the Fifth *and* Sixth Amendments to the Constitution.

G. The Committee has time and again persisted in mischaracterizing our position as asserting a blanket refusal to testify on any topic. One of us has corrected the Committee on this point in nearly every one of our communications with the Committee, which collectively conclusively refute the Committee's attempts to restate that position to its liking. *See* my letter of November 5, p. 12; my November 12 letter p. 4; my Memo of November 12, p. 13; my November 29 letter regarding deposition authority, pp. 9-11. We have *repeatedly* sought a narrowed scope of testimony and have offered to testify on two topics that do not implicate executive privilege. The Committee is thus creating a knowingly fake narrative as a pretext for holding Mr. Clark in contempt. This is particularly true in light of breaking news that former White House Chief of Staff Mark Meadows has reached an arrangement to inquire into a limited set of topics that appear not to involve executive privilege. *See* Annie Grayer, *et al., First on*

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 10

*CNN: Meadows Cooperating with January 6 Investigators,* DAILY MAIL (Nov. 30, 2021), *available at* https://edition.cnn.com/2021/11/30/politics/mark-meadows-january-6-committee/index.html. **The story hints** that the difference in treatment goes to a feeling by someone on the Committee that he or she can "tell the difference between someone who is stalling or faking," *id.*, and someone who is not, apparently placing Mr. Meadows in the latter category. With due respect, I have provided you with extensive legal analysis and at no time have ever said that my willingness to allow Mr. Clark to discuss a limited set of topics was a "final offer." None of that constitutes "stalling" or "faking." The legal objections are presented in good faith and the invitation to negotiate on topics was offered in good faith. And in this regard it is important to note that at no point has the Committee itself ever made any form of offer to narrow its cornucopia of topics. It instead has insisted on ***all topics***—and we were not even aware of that list of topics (since it was put on the record without us being present) until November 23 when we first saw the transcription of a previously secret session where neither me nor my client were present.

The Committee has thus itself established that it is an instrumentality of partisan and ideological combat against its political enemies and not a legitimate or lawful congressional investigation. Mr. Clark and his legal and constitutional rights cannot be allowed to become casualties of the Committee's irrational quest to press the endless attack on former President Trump or to give itself a stump issue for the 2022 midterms.

FIFTH AMENDMENT

In the face of this ongoing abuse by the Committee, the growing roar of a madding crowd seeking Mr. Clark's prosecution and destruction over a letter never sent (again, referencing the anonymously sourced *New York Times* stories for the sake of argument), and the politicization of the current Department of Justice, I have advised Mr. Clark to assert his rights against self-incrimination under the Fifth Amendment.[1]

---

[1] In footnote 1 of my letter of November 5, 2021, I stated "We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 11

There is something of a cultural revolution underway in our country. The Committee has joined that effort, attempting to control thought and to punish those who dissent, and trying to enforce ideological conformity, by one means or another. We are seeing the equivalent of struggle sessions to compel a public confession of faith in a dogmatic view of the 2020 election. We have seen careers ruined, and families and friendships ruptured. The Constitution, especially the Bill of Rights, and most especially the Fifth Amendment, were designed from the outset to protect our liberty against such encroachments and excesses, as may from time to time threaten to sweep away reason and justice. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Thus, it is elementary that the Fifth Amendment equally protects the innocent, especially in situations like this one:

> The privilege against self-incrimination is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution—and the necessities for its preservation—are to be found in the lessons of history. As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately in 1791 into the federal Bill of Rights. The privilege, this Court has stated, 'was generally regarded then, as now, as a privilege of great value, *a protection to the innocent* though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions.

---

response to the subpoena as it is currently framed." At p. 12 of the same letter, referring back to that footnote, I said "for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances. *See supra* n. 1." My Memo of November 12, 2021, states in footnote 1 "This Memo reminds you and the Committee of the same reservations of rights stated in my November 5, 2021 letter to you. To economize on words, I will not restate those reservations here."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 12

*Quinn v. United States*, 349 U.S. 155, 161-162 (1955) (citations omitted) (emphasis added).

Accordingly, Mr. Clark's invocation of his Fifth Amendment rights can and should in no way be construed or depicted as supporting an inference of guilt or wrongdoing on his part. It is instead his constitutional refuge against the media-hyped hysteria surrounding the events of January 6.

The threat of a Committee vote to hold Mr. Clark in criminal contempt, particularly given the record of this matter, supplies all the justification needed to support the invocation of Mr. Clark's Fifth Amendment rights. Moreover, there has been a chorus of voices calling for Mr. Clark's criminal prosecution (and disbarment):

- Lawrence Tribe, Barbara McQuade and Joyce White Vance, *Here's a Roadmap for the Justice Department to Follow In Investigating Trump*, Wash. Post (Aug. 5, 2021), suggesting conspiracy to defraud the United States, obstruction of the electoral count, obstruction of an official proceeding, RICO, voter fraud, violation of the Hatch Act, inciting insurrection and seditious conspiracy as plausible theories for prosecution. *Available at* https://www.washingtonpost.com/opinions/2021/08/05/heres-roadmap-justice-department-follow-investigating-trump/.

- Lawrence Tribe and Dennis Aftergut, *What Does Jeffrey Clark Have to Hide — And What Are Congress and AG Garland Going To Do About It?*, urging prosecution of Mr. Clark for criminal contempt. *Available at* https://thehill.com/opinion/judiciary/580643-what-does-jeffrey-clark-have-to-hide-and-what-are-congress-and-ag-garland?amp;

- Glenn Kirschner, *DOJ Officials Thwarted Trump's Coup. Next Step: A Criminal Investigation. Available at* https://www.msnbc.com/opinion/doj-officials-thwarted-trump-s-coup-next-step-criminal-investigation-n1276610?cid=eml_mda_20210812&user_email=990c6d84822b8256bd81680 2c8af5bf571a92069ce45a25cd044407010e9260f;

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 13

- Rep. Thompson, joined by nine other members of the House, sued President Trump and others, alleging they unlawfully "conspired to incite an assembled crowd to march upon and enter the Capitol of the United States …." *Thompson et al v. Trump et al.*, Case No. 1:21-cv-0400-APM (D.D.C.), Doc. 11-1, p. 1, ¶ 1.

- Rep. Swalwell filed suit against President Trump and others, alleging they incited a violent attack on the Capitol. *Swalwell v. Trump, et al.*, 1:21:-cv-00586-APM (D.D.C.) Doc. 1.

- Rep. Raskin, appearing on the Dean Obeidallah Show, referring to President Trump, said "[Y]ou're right, he's not been criminally charged for it yet. But we're perfectly willing to turn over evidence of criminal acts to the Department of Justice." (This remark also reveals Representative Raskin misconceiving Congress's role and trenching into Executive Branch powers.) *Available at* https://www.mediaite.com/radio/jamie-raskin-commission-investigating-pro-trump-insurrection-is-turning-over-evidence-of-criminal-acts-to-doi/ (where Rep. Raskin also concedes that, as to former President Trump, the issue was ***already adjudicated*** in a Senate impeachment trial ***and Rep. Raskin, as House impeachment manager, lost that case***).

Further examples can be collected, but the point is clear enough—Mr. Clark has a reasonable basis for believing that his testimony before the Committee would be used against him in a criminal prosecution and is therefore entitled to assert his privilege against self-incrimination under the Fifth Amendment.

Mr. Clark's Fifth Amendment rights extend to shield him from compelled production of documents or a privilege log. "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. *Fisher v. United States,* 425 U.S. 391, 410 (1976); *United States v. Doe*, 465 U.S. 605, 614, n.13 (1984); *United States v. Grable*, 98 F.3d 251, 254 (6th Cir. 1996), *cert. denied*, 519 U.S. 1059, (1997). The same is true of a privilege log. *SEC v. Coldicutt,* 2017 U.S. Dist. Lexis 88401 (C.D. CA 2017) ("involuntary act of producing a

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 30, 2021
Page 14

more detailed privilege log could have a testimonial aspect."). Therefore, we decline on Fifth Amendment grounds to deliver a privilege log.

The events of January 6 should be investigated thoroughly. Yet the Committee's actions as described herein – pursuit of privileged matters far beyond that question, its consistent pattern of aggressively mischaracterizing our position, trampling on elementary due process rights, and refusing to seek any reasonable accommodation of the institutional and individual interests and rights at stake in this matter – combine with the other surrounding circumstances to create a reasonable apprehension sufficient to warrant invocation of the Fifth Amendment right against self-incrimination. As noted above, we are pleased to learn that you have reached some sort of accommodation with Mark Meadows regarding testimony on topics that do not implicate executive privilege and so are left to wonder why you are not willing to do so for Mr. Clark, subject to an agreement that doing so does not waive any privileges, including those under the Fifth Amendment.

Sincerely,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

cc:   Jeffrey Bossert Clark