Exhibit 1

DCCA No. 22-BG-891

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

| | | |
|---|---|---|
| **In the Matter of** | : | |
| | : | |
| **JEFFREY B. CLARK, ESQUIRE** | : | |
| | : | |
| **Respondent,** | : | **Disciplinary Docket No. 2021-D193** |
| | : | |
| **A Member of the Bar of the District** | : | |
| **of Columbia Court of Appeals.** | : | |
| **Bar Number: 455315** | : | |
| **Date of Admission:  July 7, 1997** | : | |
| | : | |

## <u>DISCIPLINARY COUNSEL'S NOTICE OF ORDER GRANTING REMAND</u>

Disciplinary Counsel hereby notifies the Court that on June 8, 2023, the United States District Court for the District of Columbia granted Disciplinary Counsel's three Motions to Remand and remanded this matter to the D.C. disciplinary system.  The District Court's Order and accompanying Memorandum Opinion are attached.  Disciplinary Counsel is simultaneously notifying the Board on Professional Responsibility by separate filing.

Respectfully submitted,

HAMILTON P. FOX, III
  *Disciplinary Counsel*

THEODORE (JACK) METZLER
  *Senior Assistant Disciplinary Counsel*

Dated: June 9, 2023                    s/ Jason R. Horrell
                                       JASON R. HORRELL
                                         *Assistant Disciplinary Counsel*

                                       OFFICE OF DISCIPLINARY COUNSEL
                                       515 Fifth Street, N.W.
                                       Building A, Room 117
                                       Washington, D.C.  20001
                                       (202) 638-1501


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 9, 2023, I caused a copy of the foregoing to be filed with the District of Columbia Court of Appeals via its electronic filing system, and served on the following via email:

Respondent's counsel
Harry W. MacDougald, hmacdougald@CCEDlaw.com
Charles Burnham, charles@burnhamgorokhov.com
Robert A. Destro, Robert.destro@protonmail.com.

                                       s/ Jason R. Horrell
                                       JASON R. HORRELL
                                         *Assistant Disciplinary Counsel*

Attachment

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                            |   |             |             |
|----------------------------|---|-------------|-------------|
|                            | : |             |             |
| IN RE JEFFREY B. CLARK     | : | Case Nos.:  | 22-mc-0096  |
|                            | : |             | 22-mc-0117  |
|                            | : |             | 23-mc-0007  |
|                            | : |             |             |

## ORDER

### GRANTING MOTIONS TO REMAND

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, it is hereby **ORDERED** that the D.C. Office of Disciplinary Counsel's Motions to Remand (Case No. 22-mc-0096, ECF No. 5; Case No. 22-mc-0117, ECF No. 4; Case No. 23-mc-0007, ECF No. 4) are **GRANTED** and this matter shall be **REMANDED** for further proceedings.

It is **FURTHER ORDERED** that, because the Court lacks subject-matter jurisdiction over this matter, Mr. Clark's Motion to Stay Subpoena Response Deadline (Case No. 22-mc-0096, ECF No. 2) and Motion to Quash (Case No. 22-mc-0096, ECF No. 4) are **DENIED** as moot.

   **SO ORDERED**.

Dated:  June 8, 2023                                        RUDOLPH CONTRERAS
                                                           United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| IN RE JEFFREY B. CLARK | : | Case Nos.: | 22-mc-0096 |
|  | : |  | 22-mc-0117 |
|  | : |  | 23-mc-0007 |
|  | : |  |  |

**<u>MEMORANDUM OPINION</u>**

GRANTING MOTIONS TO REMAND

**I. INTRODUCTION**

On July 19, 2022, the Office of Disciplinary Counsel ("ODC") for the D.C. Board on

Professional Responsibility (the "Board"), the entity that regulates the conduct of attorneys

admitted to the D.C. Bar, commenced a disciplinary proceeding against Jeffrey B. Clark, an

attorney admitted to the D.C. Bar and a former Assistant Attorney General of the United States.

*See* 1d Notice of Removal, Ex. A-2 ("Petition and Specification"), ECF No. 1-2.  Mr. Clark

removed the disciplinary proceeding to this Court, *see* 1d Notice of Removal, Case No. 22-mc-

0096, ECF No. 1, and subsequently filed separate notices of removal as to ODC's motion to

enforce a subpoena, *see* 2d Notice of Removal, Case No. 22-mc-0117, ECF No. 1, and as to a

separate subpoena later issued by ODC, *see* 3d Notice of Removal, Case No. 23-mc-0007, ECF

No. 1.  Before the Court are ODC's motions to remand.  *See* 1d Mot. Remand, ECF No. 5; 2d

Mot. Remand, ECF No. 4; 3d Mot. Remand, ECF No. 4.[1]  As set forth in detail below, because

---

[1] Because Mr. Clark filed three separate notices of removal, there are three separate case numbers and dockets corresponding to this matter.  For purposes of citations in this Opinion, all citations to Mr. Clark's first notice of removal, ODC's first motion to remand, and related submissions refer to docket entries in Case No. 22-mc-0096; all citations to Mr. Clark's second notice of removal, ODC's second motion to remand, and related submissions refer to docket entries in Case No. 22-mc-0117; and all citations to Mr. Clark's third notice of removal, ODC's third motion to remand, and related submissions refer to docket entries in Case No. 23-mc-0007.  The parties have agreed to consolidate Case No. 22-mc-0096 and Case No. 22-mc-117.  *See*

the Court lacks subject-matter jurisdiction over the Board's disciplinary proceeding, ODC's

motions to remand are granted.[2]

## II. BACKGROUND

### A. The DCCA and Attorney Discipline in D.C.

In 1970, Congress passed legislation creating the Superior Court of the District of

Columbia and the District of Columbia Court of Appeals ("DCCA") as Article I courts. *See*

District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358,

§ 101, 84 Stat. 473, 475 (1970). For present purposes, two sections of that legislation bear

notice. First, the legislation rewrote subchapter I of chapter 5 of title 11 of the D.C. Code, which

concerns the jurisdiction of the U.S. District Court for the District of Columbia. *Id.*, 84 Stat. at

476. As amended, that subchapter contained three sections. The first two provided for the

District Court's jurisdiction, "[i]n addition to its jurisdiction as a United States district court and

any other jurisdiction conferred on it by law," over certain "civil action[s]" and "criminal

case[s]," respectively, brought under D.C. law. *Id.*, 84 Stat. at 476–78. The third provided that

"[a] civil action or criminal prosecution in the Superior Court of the District of Columbia is

_____

ODC's Reply Supp. 2d Mot. Remand at 1, ECF No. 6. The Court consolidates all three cases, as all involve "common question[s] of law or fact." Fed. R. Civ. P. 42(a); *see Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001) ("The district court has broad discretion in determining whether to consolidate related cases.").

[2] Mr. Clark's third notice of removal nominally concerns a subpoena, but he claims that it was never served on him. *See* 3d Notice of Removal at 1. In addition, as explained below, the District of Columbia Court of Appeals has issued an order holding in abeyance a prior subpoena pending this Court's resolution of the first two motions to remand, *see* 3d Notice of Removal, Ex. 14, ECF No. 1-14, and ODC acknowledges both that the production deadline for the later subpoena has passed and that it has not brought a motion to compel a response to that subpoena, *see* 3d Mot. Remand at 1. While the analysis herein would apply equally to the issues presented by removal of that subpoena, because it does not appear to represent a live proceeding over which the Court could exercise removal jurisdiction, the Court confines its analysis to the similar arguments raised in the parties' briefing on the first and second notices of removal and corresponding motions to remand.

removable to the United States District Court for the District of Columbia in accordance with [28 U.S.C. § 1441, *et seq.*]." *Id.*, 84 Stat. at 478. These provisions remain unchanged in the version of the D.C. Code in force today. *See* D.C. Code §§ 11-501–03.

Second, the legislation separately rewrote chapter 25 of title 11 of the D.C. Code. 84 Stat. at 520. It provided that the DCCA "shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension and expulsion," specifying that the DCCA "may censure, suspend from practice, or expel a member of its bar for crime, misdemeanor, fraud, deceit, malpractice, professional misconduct, or conduct prejudicial to the administration of justice." *Id.*, 84 Stat. at 521. The legislation required that "written charges, under oath" be filed with the DCCA before a member of "its bar" could be censured, suspended, or expelled, but also permitted "other courts"—the "Federal courts in the District of Columbia and the Superior Court"—to "censure, suspend, or expel an attorney from the practice at their respective bars." *Id.* All of this language remains unchanged in the D.C. Code today. *See* D.C. Code §§ 11-2501–04. No provision for removal of disciplinary actions to the U.S. District Court was included in the original legislation, nor has one been added since. *See* D.C. Code tit. 11, ch. 25.

Pursuant to its authority under this chapter, the DCCA has adopted standards of conduct for members of the D.C. Bar and rules governing attorney discipline. *See generally* D.C. Rules of Pro. Conduct (D.C. Bar 2018); D.C. Bar R. XI (disciplinary proceedings). Specifically, D.C. Bar Rule XI lays out the grounds for discipline and the procedure for disciplinary proceedings. *See* D.C. Bar R. XI. As relevant here, it establishes the Board and authorizes it to "consider and investigate any alleged ground for discipline . . . called to its attention, or upon its own motion, and to take such action with respect thereto as shall be appropriate to effect the purposes of this

rule." *Id.* § 4(e)(1). In particular, Rule XI authorizes the Board to "adopt rules, procedures, and policies not inconsistent with this rule or any other rules of [the DCCA]," *id.* § 4(e)(10), which the Board has done, *see* Board Rules (Bd. on Prof. Resp. 2023). Rule XI also empowers the Board to appoint "Disciplinary Counsel," together with a staff, and to appoint "Hearing Committees." D.C. Bar R. XI*,* § 4(e)(2), (e)(4).

Disciplinary Counsel is charged with "investigat[ing] all matters involving alleged misconduct by an attorney subject to the disciplinary jurisdiction of [the DCCA]" and "prosecut[ing] all disciplinary proceedings before Hearing Committees, the Board, and the Court." *Id.* § 6(a)(2), (a)(4). Hearing Committees are three-member panels that "conduct hearings on formal charges of misconduct" and "submit their findings and recommendations on formal charges of misconduct to the Board, together with the record of the hearing." *Id.* § 5(c). The Board "review[s] the findings and recommendations of the Hearing Committees" and "prepare[s] and forward[s] its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the [DCCA]." *Id.* § 4(e)(7). Upon receiving the Board's report, the DCCA must "enter an appropriate order as soon as the business of the Court permits." *Id.* § 9(h)(1). In doing so, the DCCA must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.*

### B.  28 U.S.C § 530B, the McDade Amendment

In 1979, Congress folded a requirement into a Department of Justice ("DOJ") appropriations bill that DOJ attorneys "shall be duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia." Department of Justice

Appropriation Authorization Act, Pub. L. No. 96-132, § 3(a), 93 Stat. 1040, 1044 (1979). The following year, the DOJ Office of Legal Counsel ("OLC"), responding to an American Bar Association ("ABA") disciplinary rule that prohibited direct contact with a represented opposing party without the consent of the party's counsel (the "no-contact rule"), issued an opinion finding that "courts have no authority to exclude evidence solely on the basis of a violation of [the ABA rule], and state bar associations may not, consistent with the Supremacy Clause, impose sanctions on a government attorney who has acted within the scope of his federal responsibilities." *Ethical Restraints on the ABA Code of Professional Responsibility on Federal Investigations*, 4B Op. O.L.C. 576, 577 (1980).

Spurred by unanimous state-level adoption of a version of the no-contact rule over the following years, *see* Charles Doyle, Cong. Rsch. Serv., RL30060, McDade-Murtha Amendment: Ethical Standards for Justice Department Attorneys 10 (2001), together with a Second Circuit decision rejecting DOJ's argument that state bar ethics rules did not apply to prosecutors conducting investigations before formal initiation of a prosecution, *see United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), *cert. denied*, 498 U.S. 871 (1990), Attorney General Richard Thornburgh issued a memorandum in 1989 to all DOJ litigators, *see N.Y. Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 131–32 (D.D.C. 2003) (citing *Hammad*, 858 F.2d at 837). The Thornburgh Memorandum "encouraged" DOJ attorneys to be "sensitive to the interests that are sought to be protected by [the no-contact rule]," but explained the "Department's position that contact with a represented individual in the course of authorized law enforcement activity does not violate [the no-contact rule]" and that DOJ would "resist, on Supremacy Clause grounds, local attempts to curb legitimate federal law enforcement techniques." *In re Doe*, 801 F. Supp. 478, 492–93 (D.N.M. 1992) (quoting in full the Thornburgh Memorandum). Both the courts and

Congress took issue with the Thornburgh Memorandum. *See, e.g.*, *United States v. Lopez*, 4 F.3d 1455, 1458 (9th Cir. 1993) (endorsing the district court's "trenchant analysis of the inefficacy of the [Thornburgh Memorandum]," which the district court described as "preposterous" (citing *United States v. Lopez*, 765 F. Supp. 1433, 1453 (N.D. Cal. 1991), *vacated on other grounds*, 989 F.2d 1032 (9th Cir.)); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 961 F. Supp. 1288, 1294 (E.D. Mo. 1997) (quoting House Subcommittee's conclusion, after a hearing in 1990 "address[ing] the propriety of the Thornburgh Memorandum," that it "disagree[d] with the Attorney General's attempts to exempt departmental attorneys from compliance with the ethical requirements adopted by the State bars to which they belong and in the rules of the Federal Courts before which they appear.").

Still, in 1994, DOJ, under Attorney General Janet Reno, promulgated regulations "intended to preempt and supersede the application of state laws and rules and local federal court rules to the extent that they relate to contacts by attorneys for the government . . . with represented parties[.]" *O'Keefe*, 961 F. Supp. at 1293 (quoting the version of 28 C.F.R. pt. 77 then in force). But in 1998, the Eighth Circuit struck down these regulations as in excess of statutory authority. *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998).

While this played out, Congress carried through the requirement from the 1979 appropriations bill that DOJ attorneys maintain state bar licensure. *See, e.g.*, Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act [hereinafter "Appropriations Act"] of 1993, Pub. L. No. 102-395, § 102(a), 106 Stat. 1828, 1838 (1992) (reenacting the provisions in Pub. L. No. 96-132); Appropriations Act of 1994, Pub. L. No. 103-121, § 102, 107 Stat. 1153, 1163 (1993) (same); Appropriations Act of 1995, Pub. L.

No. 103-317, § 102, 108 Stat. 1724, 1734 (1994) (same); Appropriations Act of 1998, Pub. L.

No. 105-119, § 102, 111 Stat. 2440, 2456–57 (1997) (same); Appropriations Act of 2000, Pub.

L. No. 106-113, § 102, 113 Stat. 1501, 1501A-19 (1999) (same). And in 1998, less than a year

after the Eight Circuit's decision in *O'Keefe*, Congress passed what is referred to as the McDade

Amendment, after its sponsor Representative Joseph McDade. *See* Omnibus Consolidated and

Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 801, 112 Stat.

2681, 2681-118–19 (1998). Passed as a rider to an omnibus appropriations bill, the McDade

Amendment, as codified at 28 U.S.C. § 530B (hereinafter "section 530B"), provides in full:

(a) An attorney for the Government shall be subject to State laws and rules, and local
Federal court rules, governing attorneys in each State where such attorney engages in
that attorney's duties, to the same extent and in the same manner as other attorneys in
that State.

(b) The Attorney General shall make and amend rules of the Department of Justice to
assure compliance with this section.

(c) As used in this section, the term "attorney for the Government" includes any attorney
described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations
and also includes any independent counsel, or employee of such a counsel, appointed
under chapter 40.

The McDade Amendment passed after Representative McDade introduced a standalone

version of the legislation in May 1996, *see* H.R. 3386, 104th Cong. (1996), reintroduced it in

January 1997, *see* H.R. 232, 105th Cong. (1997), and reintroduced it again together with

Representative John Murtha in amended form in March 1998, *see* H.R. 3396, 105th Cong.

(1998). The version passed into law closely resembled the 1996 and 1997 bills, and the

committee report explained that the enacted version "includes language to make government

attorneys subject to laws and rules of the State and the rules of the local Federal court in which

they are practicing" and "addresses the concerns of the Committee about the Department of

Justice's issuance of a regulation that exempts its attorneys from the same State laws and rules of

ethics which all other attorneys must follow." H.R. Rep. No. 105-636, at 154 (1998). In April

1999, pursuant to section 530B(b), DOJ promulgated regulations to enforce the McDade

Amendment. *See* Ethical Standards for Attorneys for the Government, 64 Fed. Reg. 19273,

19275 (Apr. 20, 1999) (codified in 28 C.F.R. pt. 77).

## C. Disciplinary Charges Against Mr. Clark

On July 19, 2022, ODC filed with the Board a Petition Instituting Formal Disciplinary

Proceedings against Mr. Clark together with a Specification of Charges (the "Specification").

*See* Petition and Specification. The Specification alleges that Mr. Clark, who "at all relevant

times" concurrently served in DOJ as Assistant Attorney General for the Environment and

Natural Resources Division and Acting Assistant Attorney General for the Civil Division,

"attempted to engage in conduct involving dishonesty" in violation of D.C. Bar Rules 8.4(a) and

(c) and "attempted to engage in conduct that would seriously interfere with the administration of

justice" in violation of D.C. Bar Rules 8.4(a) and (d). *Id.* ¶¶ 8, 31. These charges arose out of

Mr. Clark's alleged conduct in the wake of the 2020 presidential election. The Specification

alleges that, despite having "no involvement in or responsibility for [DOJ's] post-election

investigations into allegations of fraud or irregularities," on December 28, 2020, Mr. Clark

tasked a senior counsel in the Civil Division with researching "the authority of state legislatures

to send unauthorized slate [*sic*] of electors to Congress." *Id.* ¶¶ 9, 12. Mr. Clark allegedly then

"used this research to write" what came to be referred to as the "Proof of Concept letter," which

he emailed to the Deputy Attorney General, Jeffrey Rosen, and the Principal Associate Deputy

Attorney General, Richard Donoghue. *Id.* ¶¶ 4, 12, 13 (formatting omitted). The Proof of

Concept letter, which was "drafted to be signed by Mr. Rosen, Mr. Donoghue and [Mr. Clark],"

and "addressed to the Georgia Governor, Speaker of the House, and President *Pro Tempore* of

the Senate," "recommended that the Governor call the Georgia legislature into special session and argued that if the Governor refused to do so, the legislature had the authority to convene such a session on its own initiative." *Id.* ¶ 14.

The Specification alleges that the Proof of Concept letter contained multiple false or misleading statements. First, the letter "stated that the Department of Justice had 'identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia.'" *Id.* ¶ 15. The Specification alleges that this statement was false, as DOJ was "aware of no allegations of fraud in Georgia that would have affected the results of the presidential election." *Id.* Second, the letter "stated that [DOJ] found 'troubling the current posture of a pending lawsuit in Fulton County' and the 'litigation's sluggish pace.'" *Id.* ¶ 16. The Specification alleges that this statement also was false, as DOJ "had no involvement in the Fulton County case and was not concerned by its lack of progress." *Id.* Third, the letter stated that DOJ "believed 'that in Georgia . . . both a slate of electors supporting Joseph R. Biden, Jr., and a separate slate of electors supporting Donald J. Trump, gathered on that day at the proper location to cast their ballots, and that both sets of those ballots have been transmitted to Washington, D.C., to be opened by Vice President Pence.'" *Id.* ¶ 17. The Specifications alleges that this statement was "misleading," as the "Governor of Georgia had certified a slate of electors to the Electoral College pledged to Joseph Biden, and there was no legitimate alternative slate of Georgia electors pledged to Donald Trump." *Id.* Fourth, the letter stated that DOJ "had concluded that the Governor should convene a special session of the Georgia legislature. *Id.* ¶ 18. The Specification alleges that this "statement was false," as DOJ "had not made such a determination." *Id.* Finally, the letter "stated that [DOJ] had concluded that if the Governor refused to convene a special session of the Georgia legislature, the

legislature had the authority to do so on its own initiative." *Id.* ¶ 19.  The Specification alleges that this "statement was false," as DOJ "had made no such determination." *Id.*

The Specification also details efforts allegedly undertaken by Mr. Clark to ensure the Proof of Concept letter's transmission, over the objections of his superiors, Mr. Rosen and Mr. Donoghue.  Specifically, it alleges that "a little more than an hour" after Mr. Clark sent the Proof of Concept letter to Mr. Rosen and Mr. Donoghue, Mr. Donoghue responded, in a message copying Mr. Rosen, that he would not sign the letter because he "kn[e]w of nothing that would support the statement 'we have identified significant concerns that may have impacted the outcome of the election in multiple states'" and did not think DOJ's "role should include making recommendations to a State legislature about how they should meet their Constitutional obligations to appoint Electors." *Id.* ¶ 20.  That evening, Mr. Clark allegedly met with Mr. Rosen and Mr. Donoghue, who informed Mr. Clark that they "would not authorize or sign the letter because it contained false statements." *Id.* ¶ 21.  On January 2, 2021, Mr. Clark allegedly had a second meeting with Mr. Rosen and Mr. Donoghue, at which he "informed them that the President had offered him the position of Acting Attorney General, and that he was thinking about accepting it if Mr. Rosen and Mr. Donoghue were unwilling to send the Proof of Concept letter." *Id.* ¶ 23.  After Mr. Rosen and Mr. Donoghue again refused to send the letter, Mr. Clark allegedly met with Mr. Rosen again the following day and told him that "he intended to accept the President's offer to become Acting Attorney General and that he would send the Proof of Concept letter once he assumed the position." *Id.* ¶ 26.

The Specification states that Mr. Rosen informed Mr. Donoghue, who in turn informed "some of the Assistant Attorneys General," all of whom "agreed that they would resign if [Mr. Clark] carried out his plan." *Id.* ¶ 27.  The following day, Mr. Rosen organized a meeting

between himself, the President, Mr. Clark, Mr. Donoghue, the White House Counsel, and two additional lawyers.  *See id.* ¶ 28.  In the meeting, "all the lawyers argued against appointing [Mr. Clark] as Acting Attorney General," and "[a]ll but [Mr. Clark] opposed sending the letter," but Mr. Clark allegedly "stated that he would send the Proof of Concept letter if the President appointed him Acting Attorney General."  *Id.* ¶ 29.  Mr. Donoghue allegedly informed the President that "he should expect that all the Assistant Attorneys General would resign" if Mr. Clark was appointed Acting Attorney General, and that he believed "a number" of U.S. Attorneys would too.  *Id.* ¶ 30.  The White House Counsel also allegedly threatened to resign. *See id.*  The Specification states that "[t]he President decided not to appoint [Mr. Clark] Acting Attorney General, and the Proof of Concept letter was never sent."  *Id.*

### D.  Relevant Procedural History

Mr. Clark's notices of removal and the more than 100 attached exhibits reveal a labyrinthine procedural history beginning before ODC filed the Petition and Specification.  The Court briefly summarizes the most relevant pieces of this backstory.  The disciplinary proceeding against Mr. Clark was assigned to Hearing Committee Number Twelve.  *See* 1d Notice of Removal at 6.  On October 6, 2022, ODC served on Mr. Clark a subpoena for documents.  *Id.* Ex. A-54, ECF No. 1-54.  On October 17, 2022, Mr. Clark filed a notice of removal in this Court, purporting to remove the disciplinary proceeding on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441 and federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).  *See* 1d Notice of Removal, ECF No. 1.  Mr. Clark subsequently filed a motion to stay the deadline for responding to the October 6 subpoena and a motion to quash.  *See* Mot. Stay, ECF No. 2; Mot. Quash, ECF No. 4.  On October 21, 2022, ODC moved to remand. *See* 1d Mot. Remand, ECF No. 1-5.  On October 26, 2022, ODC moved in the DCCA to enforce

its October 6 subpoena.  *See* 2d Notice of Removal, Ex. A-3, ECF No. 1-3.  Mr. Clark filed a

second notice of removal as to that motion on November 25, 2022, *see id.*, and ODC filed a

second motion to remand on November 29, 2022, *see* 2d Mot. Remand, ECF No. 4.  On

December 27, 2022, ODC attempted to serve another subpoena on Mr. Clark.  *See* 3d Notice of

Removal, Ex. 7, ECF No. 1-7; 3d Notice of Removal at 4–5, ECF No. 1.  On January 17, 2023,

the DCCA issued an order holding in abeyance ODC's motion to enforce the October 6

subpoena "until [Mr. Clark's] removal of this matter to the United States District Court for the

District of Columbia has been resolved."  3d Notice of Removal, Ex. 14, ECF No. 1-14.  Still,

Mr. Clark filed a third notice of removal as to the December 27 subpoena on January 26, 2023,

*see* 3d Notice of Removal, and ODC filed a third motion to remand on February 8, 2023, *see* 3d

Mot. Remand, ECF No. 4.

## III.  LEGAL STANDARD

Removal and remand are governed by 28 U.S.C. § 1441 *et seq*.  Section 1441 provides

for removal, "[e]xcept as otherwise expressly provided by Act of Congress," of "any civil action

brought in a State court of which the district courts of the United States have original

jurisdiction."  § 1441(a).  Additionally, section 1442, the federal officer removal statute, provides

in relevant part that "[a] civil action or criminal prosecution that is commenced in a State court"

may be removed to U.S. district court if it is "against or directed to"

> [t]he United States or any agency thereof or any officer (or person acting under that
> officer) of the United States or of any agency thereof, in any official or individual
> capacity, for or relating to any act under color of such office or on account of any right,
> title or authority claimed under any Act of Congress for the apprehension or punishment
> of criminals or the collection of the revenue.

§ 1442(a).  Section 1442 also contains a paragraph defining "State" to include the District of

Columbia and "State court" to include "the Superior Court of the District of Columbia, a court of

a United States territory or insular possession, and a tribal court." § 1442(d)(1), (d)(5)–(6).

Sections 1446 and 1455 go on to provide the procedures for removal of civil actions and criminal

prosecutions, respectively. *See* §§ 1446, 1455. Section 1447 governs remand after removal,

providing that, "[i]f at any time before final judgment it appears that the district court lacks

subject matter jurisdiction, the case shall be remanded." § 1447(c).

"When a plaintiff seeks to have a case that has been removed to federal court remanded

back to state court, the party opposing a motion to remand bears the burden of establishing that

subject matter jurisdiction exists in federal court." *Mizell v. SunTrust Bank*, 26 F. Supp. 3d 80,

84 (D.D.C. 2014) (quotation omitted). Courts in this Circuit generally "construe[] removal

jurisdiction strictly, favoring remand where the propriety of removal is unclear," *Ballard v.

District of Columbia*, 813 F. Supp. 2d 34, 38 (D.D.C. 2011), except that cases removed under

§ 1442 should be construed "liberally in favor of removal," *K&D LLC v. Trump Old Post Off.

LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).

## IV.  ANALYSIS

Mr. Clark's notices of removal and the parties' submissions in relation to ODC's

corresponding motions to remand are addressed to the same controlling jurisdictional questions,

so the Court considers them together, except as explained *supra* note 2. Mr. Clark asserts two

sources of federal jurisdiction: federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441

and federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442. *See* 1d Notice Removal at

23–34; Opp'n to 2d Mot. Remand at 3–7; 19–23, ECF No. 13.

### A.  "Civil Action" or "Criminal Prosecution"

Mr. Clark acknowledges that this case is neither a "civil action" nor "criminal

prosecution" within the meaning of 28 U.S.C. §§ 1441, 1442, 1446, 1455. Instead, he argues

that the "hybrid nature of Bar disciplinary proceedings as quasi-criminal" requires the Court to "harmonize the removal statutes' treatment of civil and criminal cases."  Opp'n to 2d Mot. Remand at 17–18 (arguing that "D.C. bar discipline proceedings are ***both*** criminal ***and*** civil").  ODC takes the position that disciplinary proceedings are "neither civil nor criminal" and therefore not removeable.  1d Mot. Remand at 6.  Confining its analysis to the nature of the Board's proceeding against Mr. Clark, the Court agrees with ODC.

1.  The Board's Disciplinary Proceeding is not a Civil Action under §§ 1441, 1442, 1446

Mr. Clark concedes that this case is not purely a "civil action" under sections 1441, 1442 and 1446.  *See* 1d Notice of Removal at 1 ("Jeffrey B. Clark ('Respondent') hereby gives notice and removes this quasi-prosecution case . . .").  This is appropriate, as the disciplinary proceeding bears none of the essential hallmarks of a civil case.  It involves no "private injury," *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 299 (1888), *overruled on other grounds by Milwaukee v. M.E. White Co.*, 296 U.S. 268 (1935); *see also* Action, Black's Law Dictionary (11th ed. 2019) (defining "civil action" as "[a]n action brought to enforce, redress, or protect a private or civil right").  Nor is it "of a character traditionally cognizable by courts of common law or of equity."  *Milwaukee v. M.E. White*, 296 U.S. at 271; *see also Leis v. Flynt*, 439 U.S. 438, 442 (1979) (rejecting out-of-state lawyers' claim of right to appear *pro hac vice* in Ohio court, explaining that "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia," which "prescribe the qualifications for admission to practice and the standards of professional conduct" and "are responsible for the discipline of lawyers").  Other federal courts have similarly found that attorney disciplinary proceedings are not "civil actions" under the removal statute.  *See, e.g.*, *Mass. Bd. of Bar Overseers v. Belanger*, No. 20-cv-10445, 2020 WL 1821826, at *2 (D. Mass.

14

Apr. 10, 2020) (finding that a bar disciplinary action is "not a civil matter but, rather, 'quasi-criminal' or '*sui generis*, neither civil nor criminal in character' such that this court has no jurisdiction" (citations omitted)); *Colorado v. Ziankovich*, No. 19-cv-3087, 2019 WL 6907460, at *2 (D. Colo. Dec. 19, 2019) (finding that attorney disciplinary proceedings are "not 'civil actions' subject to removal"); *Sup. Ct. of Cal. v. Kinney*, No. 15-cv-1552, 2015 WL 3413232, at *5 (N.D. Cal. May 27, 2015) ("[T]he disciplinary proceedings formerly pending before the State and now pending before the California Supreme Court are not 'civil actions'; they 'are *sui generis*, neither civil nor criminal in character.'") (citations omitted); *Ala. Bar Ass'n v. Dickerson*, 240 F. Supp. 732, 734 (D. Ala. 1965) (finding an attorney disciplinary proceeding "not a civil action within the contemplation of the federal removal statute").

This understanding also comports with the history of the removal statute. The version of the removal statute in effect until 1948 provided for removal of "[a]ny suit of a civil nature, at law or in equity," over which U.S. district courts have original jurisdiction. Judicial Code of 1911, § 28, 36 Stat. 1087, 1094 (1911). In 1948, Congress codified Title 28, and in doing so revised the general removal statute to the formulation that endures in relevant part today permitting removal of "any civil action brought in a State court" over which U.S. district courts have original jurisdiction, "[e]xcept as otherwise expressly provided by Act of Congress." Pub. L. No. 773, 62 Stat. 937 (1948); *see* 28 U.S.C. § 1441. "The right to remove a case from a state to a federal court is purely statutory," Charles A. Wright & Arthur R. Miller, 14C *Federal Practice and Procedure* § 3721 (4th ed. 2023), and "[b]ecause of the significant federalism concerns involved, [the court] strictly construes the scope of its removal jurisdiction," *Downey v. Ambassador Dev.*, 568 F. Supp. 2d 28, 30 (D.D.C. 2008) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107–09 (1941)). Consistent with this approach, the Court views as

significant Congress's decision to limit the scope of removeable proceedings from "[a]ny suit of a civil nature, at law or in equity" to only "any civil action brought in a State court" and not otherwise expressly barred by Congress.  Mr. Clark argues that the "hybrid nature" of the disciplinary proceeding makes it "both criminal and civil" for purposes of evaluating removal under section 1442.  *See* Opp'n to 2d Mot. Remand at 18.  But to whatever extent certain features of the Board's disciplinary proceeding could be viewed as "civil in nature," *see, e.g.*, Board Rules, ch. 3 (governing discovery), as explained above, they do not transform the proceeding into a "civil action" within the meaning of sections 1441, 1442, and 1446.

  2.  The Board's Disciplinary Proceeding Is Not a Criminal Prosecution under §§ 1442, 1455

         Unlike with civil actions, there is no statute generally permitting removal of criminal prosecutions.  This reflects the understanding, grounded in principles of federalism and comity, that upon removal of a state prosecution to a federal court, "the jurisdiction of the courts of a state to try offenses against its own laws and in violation of its own peace and dignity is wrested from it by the order of an inferior federal court."  *Maryland v. Soper*, 270 U.S. 9, 29 (1926); *see also California v. Mesa*, 813 F.2d 960, 966 (9th Cir. 1987) (explaining that "removal of state criminal prosecutions constitutes a far greater disruption of legitimate state authority than removal of state law civil suits against federal officials" because "removal forces the state to enforce its own laws in an alien forum" and "a polity's ability to protect its citizens from violence and other breaches of the peace through enforcement of criminal laws is the centermost pillar of sovereignty").  Instead, Mr. Clark relies on section 1442(a)(1)'s provision for removal of criminal prosecutions against federal officers.

         Recall that section 1442(a) permits removal of a "civil action or criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer . . . of the United

States . . . in an official or individual capacity, for or relating to any act under color of [his] office." § 1442(a).  While section 1442 operates as an exception to the general rule that the cause of action must arise under federal law in order to establish federal jurisdiction, an officer seeking removal under section 1442 still must "raise a colorable federal defense."  *K&D LLC*, 951 F.3d at 506 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).

Mr. Clark relies heavily on *In re Artis*, 883 A.2d 85 (D.C. 2005) to analogize the Board's disciplinary proceeding to a criminal prosecution.  *See, e.g.*, 1d Notice of Removal ¶¶ 48–49; Opp'n to 1d Mot. Remand at 16–17; Opp'n to 2d Mot. Remand at 17.  In that case, the DCCA, acknowledging the "quasi-criminal" nature of a disciplinary proceeding commenced by the Board, found no error in the Board's decision to recognize the respondent's right to assert the Fifth Amendment privilege against self-incrimination to avoid answering interrogatories.  *See In re Artis*, 883 A.2d at 101, 103.  Without disagreeing with the argument that the proceeding would not result in "criminal liability," the court emphasized that "the privilege against self-incrimination can be asserted in any proceeding, including administrative, investigatory or adjudicatory ones."  *Id.* at 102–03.  The court explained that "[t]he Fifth Amendment protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."  *Id.* (quoting *Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C. 1997) (internal quotation omitted)).  As the court suggested, the mere fact that one may invoke the Fifth Amendment in the context of a disciplinary proceeding does not transform the proceeding into a criminal prosecution for purposes of removal.  *See City of Neodesha v. BP Corp. N. Am.*, 176 F. Supp. 3d 1233, 1243 (D. Kan. 2016) (explaining, before finding state complaints for violations of a city waste ordinance civil actions for purposes of removal, that the fact that a "proceeding provides procedural

17

protections that are usually reserved for criminal trials does not turn [them] into criminal prosecutions" (citing *Allen v. Illinois*, 478 U.S. 364, 371 (1986)).

Moreover, the Board's disciplinary proceeding serves a different primary purpose than a criminal prosecution. Whereas "[p]unitive fines and imprisonment are the common tools of the criminal law," "[t]ools of attorney discipline, such as reprimands, are not traditional criminal punishments." *Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110, 117 (2d Cir. 2009); *see Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982) ("States traditionally have exercised extensive control over the professional conduct of attorneys. The ultimate objective of such control is the protection of the public, the purification of the bar and prevention of recurrence." (cleaned up)). This distinction has deep roots. *See Ex parte Wall*, 107 U.S. 265, 288 (1883) ("[T]he constitutional privilege of trial by jury for crimes does not apply to prevent the courts from punishing its officers for contempt, or from removing them in proper cases."). At the same time, whatever the primary aim of a bar disciplinary proceeding, the Supreme Court also has acknowledged that "[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer." *In re Ruffalo*, 390 U.S. 544, 550 (1968); *see also Charlton v. FTC*, 543 F.2d 903, 906 (D.C. Cir. 1976) (quoting the same language from *In re Ruffalo* in the context of reviewing a decision by the Federal Trade Commission to reprimand an attorney and suspend him from practicing before it).

Perhaps in light of this tension, the Supreme Court also has held, in the context of evaluating the nature of contempt proceedings, that courts generally should "defer[] to a legislature's determination whether a sanction is civil or criminal," as "state law provides strong guidance about whether or not the State is exercising its authority in a nonpunitive, noncriminal manner." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838 (1994)

(quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631 (1988) (internal quotation omitted)). The DCCA, the highest court in D.C., has repeatedly held, in decisions both before and after *In re Artis*, that, "[i]n all cases, the purpose of imposing a sanction is not to punish the attorney, but to protect the public and the courts, safeguard the integrity of the profession, and deter respondent and other attorneys from engaging in similar misconduct." *In re Cater*, 887 A.2d 1, 17 (D.C. 2005); *see also In re Kanu*, 5 A.3d 1, 16 (D.C. 2010) (explaining the purpose of attorney discipline to "protect the public, the courts, and the legal profession."); *In re Abrams*, 689 A.2d 6, 12 (D.C. 1997) ("Disciplinary sanctions are designed to maintain the integrity of the profession, to protect the public and the courts, and to deter other attorneys from engaging in similar misconduct. Our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney; rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." (cleaned up)). The D.C. Code also makes clear that disciplinary actions by the Board are not considered criminal prosecutions in the District of Columbia. *See* D.C. Code § 23-101 (providing, in section titled "Conduct of prosecutions," that all prosecutions either must be conducted by the D.C. Attorney General's office or U.S. Attorney's Office for D.C.); D.C. Code tit. 22 (laying out "Criminal Offense and Penalties" in D.C., but not including violations of attorney professional conduct rules adopted by the DCCA pursuant to § 11-2501); D.C. Code § 16-702 (providing that all criminal offenses must be prosecuted by either indictment or information). While it may be possible to imagine a state bar disciplinary proceeding designed such that it is simply a criminal prosecution by another name—for example, one designed to punish attorneys, perhaps through imposition of a monetary penalty, beyond the protective and deterrent purposes of the Board's proceeding—no such proceeding is at issue here.

### 3.  Section 530B and the Functional Test

Mr. Clark argues that the court should find that, regardless of how it is labeled, "[i]f a state investigative body operates in an adjudicatory manner, and if a federal officer or his agent is subject to its process, the statutory requirements of § 1442(a)(1) are satisfied."  Opp'n to 1d Mot. Remand at 7.  For support, Mr. Clark relies principally on *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571 (4th Cir. 1989), which endorsed a "functional test" to determining the nature of a proceeding for purposes of section 1442.  *Wilson v. Gottlieb*, 821 F. Supp.2d 778, 783 (D. Md. 2011) (characterizing *Kolibash*); *see* Opp'n to 1d Mot. Remand at 6–7.  The *Kolibash* court found that, although a state bar disciplinary proceeding was a "quasi-civil proceeding," because it was "adjudicatory in nature," to hold it "outside the operation of the removal statute would be to elevate form over substance."  *Kolibash*, 872 F.2d at 576.

At the outset it is important to note that the functional test is heavily contested in the context of removal under both sections 1441 and 1442.  *See Or. Bureau of Lab. and Indust. ex rel. Richardson v. West Comms.*, 288 F.3d 414, 418–19 (9th Cir. 2002) (rejecting the functional test because it "goes beyond the language of the statute" and is a "judicially-developed analysis that neither appears in, nor is necessarily implied by, the statutory language" and "changes the meaning and the reach of the statute."); *Porter Trust v. Rural Water Sewer and Solid Waste Mgmt. Dist. No. 1*, 607 F.3d 1251, 1255 (10th Cir. 2010) ("[T]he appropriate test involves application of the plain language of § 1441(a) rather than a functional test . . ."); *Sun Buick v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1261–64 (3d Cir. 1994) (casting doubt on the functional test in context of removal under section 1441); *Wirtz Corp. v. United Distillers & Vintners N. Am., Inc.*, 224 F.3d 708, 713 (7th Cir. 2000) (declining to extend previous application of the functional test beyond "the particular facts of that case"); *N.Y. Div. of Human Rts. on Complaint*

*of Housing Opportunities Made Equal, Inc. v. Folino*, No. 11-cv-569A, 2011 WL 11068867, at *2 (W.D.N.Y. July 11, 2011) (aligning with the "more recent trend away from functional analysis and toward the plain language of the removal statute."); *Wade v. Burns*, 361 F. Supp. 3d 306, 311 (D. Conn. 2019) (rejecting the functional test in context of removal under section 1442); *In re Gorence*, 810 F. Supp. 1234, 1238 (D.N.M. 1992) (rejecting *Kolibash* as nonbinding authority and finding that state bar disciplinary proceeding was not removeable under section 1442).[3]

It is also somewhat out of date. The only case Mr. Clark cites that cuts against the "more recent trend away from functional analysis and toward the plain language of the removal statute" is *In re Lusk*, SACV 16-0930 AG, 2016 WL 4107671, at *5 (C.D. Cal. July 30, 2016). *Folino*, 2011 WL 11068867, at *2; *see* Opp'n to 1d Mot. Remand at 7 n.2. In that case, the court applied *Kolibash* to uphold removal pursuant to section 1442 of a complaint by a private individual against a National Guardsman for unlicensed practice of law in California. *See In re Lusk*, 2016 WL 4107671, at *1–2. In doing so, however, the court explained that the relevant state procedure gave the state court "the potential power to seize [the respondent's] . . . military law practice." *Id.* at *5. Accordingly, the court stressed that to grant remand would be to risk the "extraordinary result" of "a state court seizing a military law practice regulated by the United

---

[3] The D.C. Circuit has not considered the merits of *Kolibash*. Nor has it weighed in on the broader issue beyond noting, in the context of evaluating the civil contempt proceeding that could follow issuance of subpoenas in a state contract and tort action, that "[t]he circuits that have considered whether proceedings not generally thought paradigm 'civil actions' or 'criminal prosecutions' can be removed under § 1442(a) have not been uniform in their approach." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 414 (D.C. Cir. 1995). The Circuit found no occasion to resolve the ambiguity left by that lack of uniformity, as it found that the "circuits to have confronted the question whether a contempt proceeding is removable have . . . answered affirmatively." *Id.* In addition, as explored in depth below, decisions like this one that were decided before the enactment of section 530B have limited relevance to the present analysis.

States Army." *Id.* No similar risk is present here. *See* D.C. Code § 11-2502 (permitting only censure, suspension or disbarment). Indeed, a more closely analogous case decided closer in time to *Kolibash*, which the Court discusses further below, found that a state bar disciplinary proceeding was not removable under the functional test. *See In re Doe*, 801 F. Supp. 478, 482–83 (D.N.M. 1992) (distinguishing *Kolibash* and finding that state bar disciplinary proceeding was "neither civil nor criminal in nature" and therefore not removeable under section 1442).[4]

More centrally, *Kolibash* was decided long before section 530B was enacted, and the *In re Lusk* court did not consider—nor have the parties identified any court that has considered—how section 530B interacts with removal under section 1442. Addressing itself to that task now, the Court finds that any argument that the Board's disciplinary proceeding should fit within a functional definition of "criminal prosecution" for purposes of removal under section 1442 is foreclosed by reference to section 530B.

Recall that, as discussed in detail *supra* Section II.A, Congress passed legislation amending the D.C. Code to authorize the DCCA to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion." District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, § 101, 84 Stat. 473, 475 (1970). Unlike in the sections of that legislation concerning "civil action[s]" and "criminal case[s]," 84 Stat. at 478–480, the chapter authorizing the DCCA to regulate admission to and empowering it to discipline members of its bar contained no provision for removal to federal court, *see* 84 Stat. at 520–21.

---

[4] *In re Doe* and a related case from this District, *United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993), involved consideration of the predecessor statutes to section 530B—which required that DOJ attorneys maintain state bar licensure, as discussed *supra* Section II.B—in relation to a New Mexico bar disciplinary proceeding. These cases, the closest analogies to the present case of which the Court is aware, are discussed in detail below.

Acting pursuant to that chapter, the DCCA, and through it the Board, have adopted a comprehensive set of procedural and substantive rules governing discipline for admitted attorneys.  *See* D.C. Bar R. XI; Board Rules (Bd. on Prof. Resp. 2023).  Those rules provide for the DCCA-appointed Board to investigate "any alleged ground for discipline" and make findings and recommend sanctions to the DCCA, which holds final authority over disciplinary decisions. D.C. Bar R. XI, §§ 4, 9; *see In re Artis*, 883 A.2d at 92 ("[T]he ultimate choice of sanction is for the court to decide.").  Congress then passed section 530B making "attorney[s] for the Government . . . subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties."  28 U.S.C. § 530B(a).  It would utterly frustrate this scheme to construe the terms "civil action" and "criminal prosecution" in section 1442 to encompass the Board's disciplinary proceedings, and thereby permit near wholesale removal of such proceedings against federal government attorneys to federal court.[5]

Mr. Clark makes two unpersuasive arguments to the contrary.  First, he argues at length that D.C. is not a "state" within the meaning of section 530B because the statute does not specifically reference D.C. in subjecting government attorneys to "State laws and rules, and local Federal court rules."  *See* 1d Notice of Removal at 29–30; Opp'n to 1d Mot. Remand at 13; 2d Notice of Removal at 23–25; Opp'n to 2d Mot. Remand at 3–6.  The Court questions whether the DCCA, being on the one hand an Article I court and on the other specifically constructed to be "comparable to [courts] of the states," could plausibly be found to be neither a federal nor a state court.  *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1123 (D.C. Cir. 2004) (internal

---

[5] And surely it would be near wholesale, given that professional misconduct, by nature, is likely to be carried out "under color of" official authority.  28 U.S.C. § 1442(a)(1).

quotation omitted)).[6]  Regardless, section 530B *does* apply to D.C. by its own terms.  Section

530B(c) defines "attorney for the Government" to include "any attorney described in section

77.2(a) of part 77 of title 28 of the Code of Federal Regulations."  § 530B(c).  That regulation

defines "attorney for the government" broadly to include attorneys who practice, by nature of

their positions, in D.C.  *See* 28 C.F.R. § 77.2(a).  For example, it defines the term to include the

Attorney General, Deputy Attorney General, Solicitor General and, "the Assistant Attorneys

General"—the same position held by Mr. Clark.  *Id.*  It also includes "any attorney employed in,

or head of, any other legal office in the Department of Justice agency," "any United States

Attorney," and "any Assistant United States attorney," among others.  *Id.*  To accept Mr. Clark's

position would be to subscribe to the absurd proposition that Congress chose to make these

officials subject to jurisdictional rules of professional conduct everywhere except where they

work.  *See United States v. Wilson*, 290 F.3d 347, 361 (D.C. Cir. 2002) (explaining that "'absurd

results' are strongly disfavored" in statutory interpretation (quoting *Griffin v. Oceanic

Contractors*, 458 U.S. 564, 575 (1982)).  That D.C. is home to, by far, the most government

lawyers in the country only compounds this absurdity.  *See FedScope Federal Workforce Data*,

---

[6] The Court also notes that, applying Mr. Clark's literalist approach more broadly would threaten the availability of removal under section 1442 without reference to section 530B. Section 1442 permits removal civil actions or criminal prosecutions "commenced in a State court," a term it defines to include only, as relevant here, "the Superior Court of the District of Columbia."  28 U.S.C. § 1442(a), (d)(6).  But the disciplinary proceeding against Mr. Clark was commenced in the DCCA, not the Superior Court.  *See* Petition and Specification.  As it was Congress that vested the DCCA with authority to administer attorney discipline in D.C., *see* D.C. Code § 11-2502, that Congress also defined "State court" to include only the D.C. Superior Court is further evidence that it did not intend to make the Board's disciplinary proceeding removeable under section 1442.

U.S. Office of Personnel Management (Dec. 2022), https://www.fedscope.opm.gov (showing

D.C. with 14,810 government attorneys, compared to the next highest Virginia with 3,115).[7]

  The legislative history confirms beyond a whisper of doubt that Congress did not intend

to exempt D.C. from section 530B.  First, debate over section 530B took place during the

investigations of independent counsel Kenneth W. Starr.  Indeed, Mr. Starr issued his report

concluding that President Clinton committed perjury and attempted to obstruct justice on

September 11, 1998, just weeks before Congress passed section 530B as part of the omnibus

appropriations bill.  *See* Communication from Kenneth W. Starr, Independent Counsel, H.R.

Doc. No. 105-310 (1998).  This context, including broad upset among President Clinton's

supporters over a perception of prosecutorial overreach, affected Congress's consideration of

section 530B.  Most significantly, during floor debate, Representative John Conyers offered an

amendment to add "independent counsel[s] appointed under title 28 of the United States Code

and any employee of such independent counsel" to the definition of "attorney[s] for the

government" who would be subject to section 530B.  144 Cong. Rec. H7229 (daily ed. Aug. 5,

1998) (perfecting amendment offered by Rep. John Conyers).  Propounding the amendment from

the floor, Representative Conyers argued that "the present independent counsel, perhaps more

than anyone else, should be subject to each and every stringent provision that is included in this

measure."  *Id.* (statement of Rep. John Conyers).  This sentiment was echoed by others, *see, e.g.*,

*id.* at H7236 (statement of Rep. Terrance John Cox) ("I am talking about generic prosecutors, but

I am talking about Ken Starr also. . . .  We would not be in this debate today, would not have this

---

[7] To access the correct data set, click the link to "Employment" under heading "Status Data" on homepage; then click the link for March 2022; then click "Occupation – All" in the top ribbon; then select "White Collar," then "09xx-Legal and Kindred," then "0905-General Attorney;" and then click "United States" to see a state-by-state breakdown.

amendment today if this poster boy for unethical prosecutors had not violated all of us in the way

he has done."), and the amendment passed by a vote of 249 to 182, *id.* at H7242.[8]  The language

from the Conyers amendment remains in force in section 530B.  *See* 28 U.S.C. § 530B(c).

Of course, Mr. Starr's investigation was based in Washington, D.C., so the purpose of the

Conyers amendment could only have been to subject him to D.C.'s bar rules.  Similarly, in a

floor speech accompanying the introduction of his standalone version of the legislation that

would become section 530B, Representative McDade listed "specific instances of prosecutorial

misconduct" that would be remediated by the bill.  144 Cong. Rec. E301 (daily ed. Mar. 5, 1998)

(statement of Rep. Joseph M. McDade).  Included in that list were multiple cases prosecuted in

D.C., which, again, only makes sense if the intent of the legislation was to subject government

attorneys in D.C. to D.C.'s bar rules.  *See id.* at E302–03 (citing *Barry v. United States*, 865 F.2d

1317 (D.C. Cir. 1989), *United States v. Cuffie*, 80 F.3d 514 (D.C. Cir. 1996), *United States v.*

*Heldt*, 668 F.2d 1238 (D.C. Cir. 1981), and *United States v. Adonis*, 744 F. Supp. 336, 345–47

(D.D.C. 1990)).  Accordingly, both the text and legislative history of section 530B make

unmistakably clear that it applies to D.C.[9]

---

[8] Congress considered, and rejected, legislation to amend section 530B after it took effect in 1999.  *See* Federal Prosecutor Ethics Act, S. 250, 106th Cong. (1999). The report of a hearing by the Subcommittee on Criminal Justice Oversight in which the bill was considered further confirms that Congress understood section 530B as at least in part a reaction to the Starr investigations.  *See, e.g.*, *The Effect of State Ethics Rules on Federal Law Enforcement: Hearing Before the Subcomm. on Criminal Justice Oversight*, 106th Cong. 4 (1999) (statement of Sen. Chuck Schumer) ("I also believe the adoption of [section 530B] last year had something to do with the fact that 1998 presented us with a high-profile example of overreaching on the part of one prosecutor.  In this sense, Federal prosecutors as a whole were punished for the sins of Ken Starr.").

[9] ODC also makes an alternative argument that, even if section 530B is ambiguous in its application to D.C., the Court should apply deference, under *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), to DOJ's reasonable interpretation, made explicit in its regulations pursuant to section 530B(b), that the statute does apply to D.C.  *See* 28 C.F.R. § 77.2(i) (defining "state of licensure" to include "the District of Columbia"); 1d Mot. Remand at 4.  Mr. Clark

Second, Mr. Clark cites authority for the general proposition that section 1442 should be construed broadly.  He principally relies on the Supreme Court's opinions in *Willingham v. Morgan*, 395 U.S. 402 (1969) and *Mesa v. California*, 489 U.S. 121 (1989).  *See* Opp'n to 1d Mot. Remand at 14–15; Opp'n to 2d Mot. Remand at 17.  *Willingham* involved a suit against the warden and chief medical officer at a U.S. prison.  *See Willingham*, 395 U.S. at 403.  The Court reviewed the long history of section 1442 and its purpose to "protect federal officers from interference by hostile state courts."  *Id.* at 405.  In light of that purpose, the Court explained that section 1442 "is not 'narrow' or 'limited'" but "is broad enough to cover *all cases* where federal officers can raise a colorable defense arising out of their duty to enforce federal law."  *Id.* at 407 (emphasis added).  *Mesa* reiterated this explanation in the context of a suit against U.S. Postal Service employees for traffic violations, although, notably, in the process of affirming the remand order of the court below.  *See Mesa*, 489 U.S. at 123.

Mr. Clark seizes on the words "all cases" as used in *Willingham* and quoted in *Mesa* as if they rewrite the statutory language "civil action" and "criminal prosecution" rather than simply paraphrasing it.  *See, e.g.*, Opp'n to 1d Mot. Remand at 2–3.  But the question before the *Willingham* court was how broadly to read section 1442's requirement that the federal officer's actions be done "under color" of his office.  *See Willingham*, 395 U.S. at 407.  And the related question before the *Mesa* court was whether removal under section 1442 also requires the federal officer to raise a federal defense.  *See Mesa*, 489 U.S. at 139.  Neither case examined the scope of the terms "civil action" or "criminal prosecution," neither involved a state bar disciplinary proceeding, and both were decided long before the enactment of section 530B.  The teaching of

---

disagrees.  *See* 1d Notice of Removal at 31.  Because the Court finds that section 530B unambiguously applies to D.C., it does not reach this alternative argument.

these cases, therefore, is that courts should construe broadly what *conduct* provides a proper basis for removal of a proceeding under section 1442; they say nothing about how courts should construe the nature of the *proceeding* itself—especially in the presence of a separate statute committing the subject matter of a proceeding to state control.

Moreover, the concern animating the principle of broad construction is not present here. The *Willingham* Court explained that the availability of removal under section 1442 reflects the concern that, in certain cases, "federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham*, 395 U.S. at 407. The *Mesa* Court similarly recognized section 1442's purpose to protect against "true state hostility." *Mesa*, 489 U.S. at 139. Both cases cited *Tennessee v. Davis*, 100 U.S. 257 (1880) for support. *See id.; Willingham*, 395 U.S. at 406. *Davis* involved the state murder prosecution of a federal revenue officer who returned fire when attacked in the performance of his "duty to seize illicit distilleries and the apparatus used for the illicit and unlawful distillation of spirits." *Davis*, 100 U.S. at 257. The Court found removal of such criminal proceedings appropriate, explaining that "[t]he legislation of a State may be unfriendly" and "affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws," or "deny the authority conferred by those laws." *Id.* at 263. Indeed, intense state opposition to federal revenue laws motivated passage of an early iteration of the federal officer removal statute, *see* David N. Goldman, *The Neglected History of State Prosecutions for State Crimes in Federal Courts*, 52 Tex. Tech. L. Rev. 783, 788–89 (2020) [hereinafter *Neglected History*] (explaining the history of the Force Act of 1833), an amended version of which was in force when *Davis* was decided, *see Davis*, 100 U.S. at 261.

*Davis* was itself an echo of earlier cases involving sharp disagreements between the state and federal governments. In fact, the first known case of federal officer removal involved a

federal officer, acting under orders to enforce a treaty protecting tribal territory in Alabama from incursion by settlers in the early 1830s, who was prosecuted by Alabama after he shot a settler who resisted his attempts to remove him from the territory.  *See* Goldman, *Neglected History*, *supra*, at 813–14.  With "the Alabama government and its citizens on one side and the federal government on the other," President Andrew Jackson ordered the case removed to federal court. *Id.* at 813–15.[10]  Similarly, in response to northern states' efforts to legislatively nullify the Fugitive Slave Act, in 1855 the Senate engaged in "epic" debate over a bill to amend the federal officer removal statute to permit removal of cases against officers for enforcing the Act.  *Id.* at 795–96.

The point is that, to whatever extent Mr. Clark's appeal to precedent counsels in favor of a broad construction of section 1442, it equally reveals the roots of this principle in conflict between state and federal interests.  *See, e.g.*, *Davis,* 100 U.S. at 263 (warning of the peril of providing no federal forum for federal officers charged with "an alleged offense against the law of the state, yet warranted by the federal authority they possess").  It is because of such conflict that federal officers require the "protection of a federal forum," *Willingham*, 395 U.S. at 407, lest they be subject to "true state hostility," *Mesa*, 489 U.S. at 139.  *See In re Gorence*, 810 F. Supp. at 1238 ("Without conflict [between state and federal interests], no purpose exists for removing the action concerning the federal officer to federal court.").  In stark contrast to the divergent state and federal approaches to tribal land use, revenue collection, and slaveholding that motivated early attempts to craft federal officer removal policy, here, through section 530B,

---

[10] While Congress had recently passed the first version of the federal officer removal statute, as noted in reference to *Davis* above, it only covered removal of cases against federal officers "for or on account of any act done under the revenue laws of the United States." Goldman, *Neglected History*, *supra*, at 788 (quoting the Force Act of 1833).

Congress has explicitly directed that federal officers be subject to state bar rules. With federal and state interests thus aligned, nothing in the cases cited by Mr. Clark, or in the history of the federal officer removal statute, supports resolving any remainder of ambiguity concerning the removability of a state bar disciplinary proceeding in favor of granting a federal forum. Indeed, well-established principles of comity for state proceedings counsel against it. *See Garden State*, 457 U.S. at 431 (applying the abstention principle first outlined in *Younger v. Harris*, 401 U.S. 37 (1971) to a constitutional attack on state bar disciplinary rules during the pendency of a disciplinary proceeding, explaining that such proceeding "are of a character to warrant federal-court deference"); *Klayman v. Lim*, 830 Fed. Appx. 660, 662 (D.C. Cir. 2020) (affirming district court's abstention from deciding claims for injunctive relief "against ongoing proceedings within the District of Columbia's system of attorney discipline").

This reasoning is reinforced by the related opinions of the only courts that appear to have directly considered a similar question. In *In re Doe*, 801 F. Supp. 478 (D.N.M. 1992), the court considered the removal of a New Mexico state bar disciplinary proceeding against an Assistant U.S. Attorney ("AUSA") for violation of the no-contact rule. The prosecution at issue occurred in D.C., so the Board first considered the alleged misconduct, but referred the matter to the New Mexico Disciplinary Board (the "NM Board") upon finding that the AUSA was licensed only in New Mexico. *See In re Doe*, 801 F. Supp. at 480–81. The AUSA removed the proceeding to federal district court in New Mexico under section 1442. *See id.* at 481. Considering the NM Board's motion to remand, the court found that the "disciplinary proceeding [was] neither a criminal prosecution nor a civil action against [the AUSA]" and that the AUSA had no colorable federal defense, so it granted the motion. *Id.* at 482–89.

Thereafter, back in D.C., the United States initiated an action to enjoin the NM Board's proceeding, giving rise to the court's opinion in *United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993). The issue before the court on the parties' cross motions for summary judgment was "whether the Supremacy Clause would be violated by allowing the disciplinary proceeding in New Mexico to go forward." *Ferrara*, 847 F. Supp. at 967. The court first held that it lacked personal jurisdiction over the NM Board, but nonetheless found, after thorough analysis, that the "Supremacy Clause is no impediment to the maintenance of a disciplinary proceeding against [the AUSA] by the Disciplinary Board of New Mexico." *Id.* at 968. Importantly, the court explained that the predecessor statutes to section 530B, which required that DOJ attorneys "be duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia," Department of Justice Appropriation Authorization Act, Pub. L. No. 96-132, § 3(a), 93 Stat. 1040, 1044 (1979),[11] established that Congress "clearly contemplated compliance with [the state of licensure's] code of professional responsibility," *Ferrara*, 847 F. Supp. at 969. Accordingly, it reasoned that, "[b]ecause state regulation of the federal function is here authorized by Congress, this Court will not interfere with that regulation." *Id.*; *see also In re Howes*, 123 N.M. 311, 320–21 (N.M. 1997) (adopting *In re Doe*, 801 F. Supp 478 and *Ferrara*, 847 F. Supp. 964)*; United States v. Tapp*, No. CR107-108, 2008 WL 2371422, at *9 (S.D. Ga. June 4, 2008) (describing the section 530B predecessor statute as a "major change for Justice Department lawyers" in which "Congress mandated that they be admitted to practice and licensed by the state courts, thereby placing them under the supervisions of *these courts* concerning their professional conduct" (emphasis added)).

---

[11] *See supra* Section II.B.

Section 530B crystalizes the *Ferrera* court's inference in statute: Congress has committed the regulation of federal government attorneys to the states and courts where they practice.  *See N.Y. Bar Ass'n*, 276 F. Supp. 2d at 133 (explaining that section 530B "reflects the respect Congress has for the right of the states to regulate the ethical conduct of lawyers who practice law in their jurisdictions.").[12]  Consistent with that directive, and with the tradition, "[s]ince the founding of the Republic," that attorney regulation be left "exclusively to the States and the District of Columbia within their respective jurisdictions," *Leis*, 439 U.S. at 442,[13] the Court finds that Mr. Clark has not met his burden to establish federal jurisdiction over the Board's disciplinary proceeding under section 1442.[14]

## B.  Federal Question Jurisdiction

Notwithstanding its finding that the Board's disciplinary proceeding is neither a "civil action" nor a "criminal prosecution" within the meaning of the removal statutes, the Court briefly addresses Mr. Clark's inconsistent alternative arguments that federal question jurisdiction

---

[12] As noted above, it may be possible to imagine a state bar disciplinary proceeding designed such that it is simply a "criminal prosecution" by another name, but for the reasons explained *supra* Sections IV.A.1–2, the Board's proceeding against Mr. Clark is not within that category.

[13] This tradition remains firmly established even where the state proceeding concerns a high-ranking federal government official.  *See, e.g.*, *Neal v. Clinton*, No. 2000-5677, 2001 WL 34355768, at *3 (Ark. Cir. Ct. Jan. 19, 2001) (ordering 5-year suspension of President Clinton's law license and a fine based on conduct in office); *In re Nixon*, 53 A.D.2d 178, 182 (N.Y. App. Div. 1976) (ordering disbarment of President Nixon for conduct in office); *Md. State Bar Ass'n v. Agnew*, 271 Md. 543, 544–45, 552–54 (Md. 1974) (ordering disbarment of Vice President Spiro Agnew); *In re Swindall*, 266 Ga. 553, 554 (Ga. 1996) (ordering disbarment of Congressman Patrick Swindall); *State Bar of Nev. v. Claiborne*, 104 Nev. 115, 231-32 (Nev. 1988) (considering at length but ultimately declining to impose discipline on U.S. District Judge Harry Claiborne).

[14] As the Court finds that the Board's disciplinary action is not a removeable proceeding under section 1442, it does not reach the questions of whether Mr. Clark acted "under color" of his office or has pled a colorable federal defense.

lies under 28 U.S.C. § 1331.  First, rehashing the argument that section 530B does not apply to

D.C., Mr. Clark's first and second notices of removal argue that section 530B constitutes a

congressional decree that federal government attorneys in D.C. not be subject to regulation

except by the federal government.  *See* 1d Notice of Removal at 30.  Accordingly, he contends,

"the DCCA is entirely fenced out of the federal grant of authority to regulate Justice Department

lawyers engaged in internal deliberations" and "that area of regulation is, in short, completely

preempted."  *Id*.  Next, he amends this argument in his opposition to ODC's first motion to

remand, claiming instead that complete preemption applies because "[t]he regulation of lawyers

employed by the U.S. Justice Department was not historically within the States' sphere of

power."  Opp'n to 1d Mot. Remand at 20.  Finally, in opposition to ODC's second motion to

remand, he reverts to his first argument, but with the twist that, even if section 530B applies to

D.C., the fact that it subjects federal government attorneys to state bar rules only "to the same

extent and in the same manner as other attorneys" somehow renders the Board's proceeding

preempted.  Opp'n to 2d Mot. Remand at 11–12.

　　There is no merit to these arguments.  As to the first, the Court has found that section

530B applies to D.C.  *See infra* Section IV.A.3.  As to the second, Mr. Clark, only citing two

out-of-date and largely irrelevant OLC opinions for support, misstates the history of state

regulation of attorneys.  *See Leis*, 439 U.S. at 442 ("Since the founding of the Republic, the

licensing and regulation of lawyers has been left exclusively to the States and the District of

Columbia within their respective jurisdictions.").  As to the third, the Court struggles to see

anything in a statute that explicitly subjects federal government attorneys to regulation by states

that preempts their regulation by states.  This case does not arise under federal law.

### C. Ancillary Removal

To the extent Mr. Clark argues that ODC's motion to enforce the October 6 subpoena

should be separately removeable, *see* 2d Notice of Removal at 1–2; Opp'n to 1d Mot. Remand at

18–19, the Court cannot agree. "Proceedings that are ancillary to an action pending in state court

cannot be removed separately from the main claim." Wright & Miller, *supra*, at § 3721.1.

Courts have found this doctrine, historically developed with respect to the general removal

statute, "applicable in the § 1442 context." *Ohio v. Doe*, 433 F.3d 502, 506 (6th Cir. 2006); *see*

*also Armistead v. C&M Transport*, 49 F.3d 43, 45–46 (1st Cir. 1995); *Wuxi Taihu Tractor Co. v.*

*York Grp.*, 460 Fed. Appx. 357, 358–59 (5th Cir. 2012). "This prudential doctrine seeks to avoid

the waste of having federal courts entertain satellite elements of pending state suits and

judgments." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 724 (7th Cir.) (finding that federal

action for a declaratory judgment alongside a parallel state court proceeding was removeable as

an "independent controversy with some new and different party" (citation omitted)).

Mr. Clark argues that removal of the subpoena enforcement action alone is contemplated

by the text of section 1442, which defines "civil action" and "criminal prosecution" to include

"any proceeding (whether or not ancillary to another proceeding) to the extent that in such a

proceeding a judicial order, including a subpoena for testimony or documents, is sought or

raised." 28 U.S.C. § 1442(d)(1); *see Brown & Williamson*, 62 F.3d at 412–415 (finding

subpoena issued to non-party congressmen in the context of a state contract and tort suit

removeable as a "civil action"). But that provision, added to section 1442 as part of the Removal

Clarification Act of 2011, merely "respond[ed] to" what was at the time an "inter- and intra-

circuit split as to whether State 'pre-suit discovery' laws qualify as civil actions or criminal

prosecutions that are removeable under § 1442." H.R. Rep. No. 112-17, at 2 (2011). The

Committee report explains that this "problem occurs when a plaintiff who contemplates suit against a Federal officer petitions for discovery without actually filing suit in State court." *Id.* at 4. In light of the narrow purpose of this legislation to close a loophole under which certain courts rejected removal of pre-suit civil discovery demands, the Court will not extend the reach of section 1442(d)(1) to cover this "satellite " enforcement action involving no new parties that is "an integral part of" and "supplementary to" the otherwise unremovable Board proceeding. *Armistead*, 49 F.3d at 46. To hold otherwise would render state bars toothless to enforce their disciplinary rules, in defiance of section 530B's purpose to subject federal government attorneys to those rules. This approach also is consistent with well-established principles of comity, under which federal courts abstain from interfering in "state criminal prosecutions" and "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Spring Comms., Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (citation omitted). The Supreme Court has explained that these principles apply in the similar context of state court contempt proceedings. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977) ("Whether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature, we think the salient fact is that federal court interference with the State's contempt process is 'an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding." (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).

Accordingly, because ODC's motion to enforce the subpoena before the DCCA is a "supplementary proceeding" that is "incident to" and a "substantial continuation" of the Board's disciplinary proceeding, not an "original and independent proceeding," and in line with

principles of comity, the Court rejects Mr. Clark's attempt to remove it separate from the disciplinary proceeding to this Court.  *Barrow v. Hunton*, 99 U.S. 80, 82–83 (1878).

## V.  CONCLUSION

For the foregoing reasons, ODC's Motions to Remand (Case No. 22-mc-0096, ECF No. 5; Case No. 22-mc-0117, ECF No. 4; Case No. 23-mc-0007, ECF No. 4) are **GRANTED**.  In addition, because the Court lacks subject-matter jurisdiction over this matter, Mr. Clark's Motion to Stay Subpoena Response Deadline (Case No. 22-mc-0096, ECF No. 2) and Motion to Quash (Case No. 22-mc-0096, ECF No. 4) are **DENIED** as moot.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 8, 2023

RUDOLPH CONTRERAS
United States District Judge

Exhibit 2

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Clerk of the Court
Received 06/11/2023 09:46 PM
Filed 06/12/2023 09:46 PM

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket No:

**2021-D193**

DCCA No:

**22-BG-891**

## MOTION TO CONTINUE ABEYANCE
## OF PROCEEDINGS BEFORE THIS COURT AND/OR
## DEFER PROCEEDINGS BELOW

Comes now the Respondent Jeffrey B. Clark, and moves this Court to continue its January 17, 2023 order holding the Office of Disciplinary Counsel's Motion to Enforce Subpoena Duces Tecum in Abeyance and (additionally — or in the alternative) to order that proceedings before the Board of Professional Responsibility to be deferred.

### PROCEDURAL BACKGROUND

Mr. Clark, the Respondent, is before the Board on Professional Responsibility pursuant to a Specification of Charges initiated by the Office of Disciplinary Counsel.

In the wake of a ruling by this Court on September 15, 2022, Respondent filed a notice of removal of the case in federal court on October 17, 2022. *See In Re: Jeffrey B. Clark*, 1:22-mc-96, ECF 1. Mr. Clark's removal was based in part on 28 U.S.C. § 1442, the federal officer removal statute. ODC moved to remand the case back to this forum. *Id*. at ECF 5.

Indeed, two additional removals were wastefully necessitated in federal court because ODC kept attempting to issue subpoenas and otherwise proceed as if the case had never been removed. That is, until this Court finally put a stop to that conduct by entering an abeyance order. Thankfully, following Respondent's removal(s), the Board appropriately ceased pursuing substantive proceedings and simply began lodging ODC's attempted post-removal filings and any responses we saw necessary to make out of an abundance of caution to lodge our opposition to ODC's arguments.

More particularly, on October 26, 2022, over a week after Mr. Clark had removed the case to federal court, ODC filed a Motion to Enforce Subpoena Duces Tecum. This Court issued on order holding ODC's motion in abeyance "until respondent's removal of this matter to the United States District Court for the District of Columbia *has been resolved*." Exh. 1 (emphasis added).

The district court granted ODC's motion to remand in a 36-page opinion on June 8, 2021. *Id*. at ECF 20 (Exh. 2). Mr. Clark has filed a protective notice of appeal of the District Court's ruling. *See* Exh. 3.

The issue of Respondent's removal to the District Court has not been resolved, however, because Mr. Clark possesses an appeal of right of that order under 28 U.S.C. § 1447(d). Additionally, the District Court's remand order has not yet been reduced to a judgment consistent with Federal Rule of Civil Procedure 58. *See also* Fed. R. Cr. P. 32(k). Hence, the time for appeal has not even yet begun to run, which is why Respondent has

only filed a protective notice of appeal. *See, e.g., Abdulwali v. WMATA*, 315 F.3d 302, 303-04 (D.C. Cir. 2003) (appeal from order premature).

## ARGUMENT

### I.    This Court's Abeyance Order Should Be Continued.

As stated above, this Court has already ordered that Disciplinary Counsel's motion to enforce subpoena duces tecum be held in abeyance "until respondent's removal of this matter to the United States District Court for the District of Columbia has been resolved."

In purely civil cases (this case is a hybrid criminal/civil matter in light *of In re Artis*, 883 A.2d 85, 101, 103 (D.C. 2005)), appeals from remand orders are generally not proper. *See* 28 U.S.C. § 1447(d). However, there is an exception specified for federal officer statute removals. *See id.* (allowing appeals from 28 U.S.C. § 1442 or § 1443 removals—and this is a Section 1442 removal).

In particular, Section 1447(d) states that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, ***except that an order remanding a case to the State court from which it was removed pursuant to section 1442*** [the federal officer removal statute] ***or 1443 of this title shall be reviewable on appeal or otherwise***" (italics added).  The federal statutory scheme therefore clearly contemplates that further appellate proceedings can (and now must) be "resolved" first before Mr. Clark's removal action can be fully determined.

3

Obviously, there can be no final resolution of the removal issue until this appeal as of right, which Mr. Clark desires to take and has explicitly protected his right to take, is concluded. That is not imminent. Mr. Clark has raised a host of important removal jurisdiction questions that have riven the federal Circuits. *Compare Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571 (4th Cir. 1989) (Wilkinson, J.) (allowing removal of bar discipline cases against the U.S. Attorney in the Northern District of West Virginia) (one of Mr. Clark's principal authorities for removing) *with In re Echeles*, 430 F.2d 347 (7th Cir. 1970) ("disbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, *sui generis*, and result from the inherent power of courts over their officers") (cited by ODC for the proposition that bar proceedings are not cases and are thus not removable).

Moreover, this conclusion is reinforced by the obvious merit of Mr. Clark's potential appeal of the District Court's action.  Even a brief perusal of the District Court's 36-page opinion will make clear that the removability of this case and others like it is an important legal question as to which no binding D.C. Circuit precedent exists.  For example, it took the district court 12 pages of analysis (involving arguments going through highly obscure legislative history, including from a sole, individual legislator) to conclude that Congress had granted the District of Columbia authority to regulate federal lawyers at all (a conclusion which we dispute).  Exh. 2 at 20-32.

The District Court ignored that Congress was clear here. Congress knows how to specify which categories of cases cannot be removed. Bar cases are not on the special list Congress adopted. *See* 28 U.S.C. § 1445 (entitled "Nonremovable actions") (providing only that actions against railroads are not removable, actions against carriers, receivers, and shippers in certain situations, workmen's compensation cases arising under state law, and certain Violence Against Women Act cases cannot be removed to any district court in the United States). Additionally, the Supreme Court has specifically instructed that the federal officer removal statute is to be broadly construed not to create gaps of unremovable matters. *See Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969). ("The federal officer removal statute is not 'narrow' or 'limited.' *Colorado v. Symes*, 286 U.S. 510, 517 (1932). At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.").

Furthermore, the District Court gives little attention to Mr. Clark's important separation of powers and other constitutional arguments that, even assuming the District of Columbia has some removal-proof authority to regulate federal lawyers, such authority could not possibly extend to the legal drafting and deliberations of Senate-confirmed Presidential advisers acting in the course of their duties. *Id*. at 33.

In other words, the appeal poses various questions of first impression that the D.C. Circuit will have to weigh carefully and it may take some time to brief, complete oral

argument, and finally resolve.[1] Mr. Clark no doubt has an appeal here that goes well beyond the colorable (indeed, it is very strong) that he must be allowed to complete, consistent with the statutory scheme that Congress has designed to protect federal officers.

Moreover, even if the textual terms of this Court's abeyance order did not compel this result, continuing the abeyance of proceedings below pending final resolution of the removal issues would also promote judicial economy and align with prudent judicial management.  Were this Court to allow proceedings below to resume prior to a final resolution of the appeal, including potential U.S. Supreme Court review of the relevant Circuit divisions that the D.C. Circuit's ultimate resolution will inevitably deepen in one direction or another, future proceedings below could later be revealed to be *ultra vires* and thus legally null. Granting a continued abeyance would therefore avoid potential waste of judicial resources. This Court would do well to avoid all of the ensuing headaches that would result from allowing proceedings below in the local bar process to go on while, on a parallel track, a complex Article III court appeal is also underway.

---

[1] Reinforcing this, the District Court took about **eight months** from the time of the first notice of removal to issue its order and accompanying opinion. Curiously, however, the District Court did not hold oral argument in this important matter. As we will set out at the appropriate time to the D.C. Circuit, this led to two interrelated problems: ***first***, the District Court crafted arguments that ODC did not itself present to that Court; and ***second***, the District Court denied Respondent his opportunity to respond to those newly non-advocate crafted arguments in this important case.

## II.     This Court Should Defer Proceedings Before the Board and Hearing Committee.

Under D.C. Code § 11-2501(a) this Court has authority to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion."  Pursuant to this grant, this Court has the inherent authority to define and regulate the practice of law in the District of Columbia.  *See In re Banks*, 805 A.2d 990, 997 (D.C. 2002).  Ergo, if this Court is preliminarily inclined to agree with the District Court's remand order (and it should instead look to the federal statutory scheme and continue to hold this case in abeyance), that simply means, at most, that this Court has power to decide, as a prudent case management matter, how to proceed pending resolution of Mr. Clark's appeal.

ODC's action against Mr. Clark presents a very important question for the D.C. legal community and for the country.  Namely, the overarching question posed is whether ODC can properly bring "quasi-criminal" proceedings (*see In re Artis*, 883 A.2d at 101, 103) against Senate-confirmed presidential advisers based on draft legal documents and non-finalized, and heavily debated legal policy proposals. Or whether such an attempt at discipline by one city's legal processes violates the separation of powers, since this Court's authorities (and that of the relevant administrative bodies below) stem from Article I of the Constitution, whereas Mr. Clark was acting pursuant to Article II power as flowing from the President of the United States. If ODC's action against Mr. Clark is successful, it will likely not be the last attempt by a state or D.C. bar

7

entity to sit in judgment of presidential advisers inside the federal government, which sits above D.C. local government. The stakes are thus enormous and of important constitutional dimension.

Mr. Clark's case, and others like it, would seem to be paradigmatic examples of why the federal officer removal statute was enacted.  *See, e.g., State of N.J. v. Moriarty*, 268 F. Supp. 546, 555 (E.D. Okla. 1956) (purpose of federal removal privilege is to ensure that "the officer was entitled to — and the interest of national supremacy required — his protection in actions brought against him which attacked and threatened him with personal liabilities or penalties").  Internal Executive Branch deliberations often involve lawyers. Hence, there is a strong prospect that such deliberations would be liberally disrupted and may even need to be entirely reconstructed, such as by excluding lawyers entirely from high-level policy discussions, if ODC is allowed to proceed with this case. Most importantly, it makes little sense to imagine local, Article I-empowered officials or state officials sitting in judgment over federal Executive Branch decisionmaking.

Although the district court has ruled against Mr. Clark, Judge Contreras' lengthy and legislative history-laden opinion shows that the question is certainly debatable. Thus, even apart from the precise terms of this Court's abeyance order (which requires the abeyance to continue), it would also be an appropriate exercise of this Court's inherent supervisory authority of the Board of Professional Responsibility, its Hearing Committees, and ODC to hold off on resumption of any proceedings before the assigned

Hearing Committee and/or the Board until, at the very least, the important removal

questions are fully resolved in federal court appellate proceedings.

**CONCLUSION**

For the foregoing reasons, Mr. Clark respectfully requests this Court to continue

its abeyance order until Mr. Clark's appeal of the District Court's remand decision is

concluded and/or to order that further proceedings before the Board of Professional

Responsibility and its assigned Hearing Committee be deferred even if this Court

possessed discretion in this matter.

Respectfully submitted this 11th day of June 2023.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K St., NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice admission before DCCA
in progress

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before
DCCA in progress

9

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below*** through the Court's electronic filing system.

This this 11th day of June, 2023.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
1750 K Street, NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

10

Exhibit 3

No. 22-BG-891

# DISTRICT OF COLUMBIA COURT OF APPEALS



Clerk of the Court
Received 06/20/2023 09:03 AM

In the Matter of:

Jeffrey B. Clark, Esq.
*Respondent*,

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar No. 455315)
Board Docket No. 22-BD-039
Disciplinary Docket No. 2021-D193

## DISCIPLINARY COUNSEL'S OPPOSITION
## TO MOTION TO CONTINUE ABEYANCE

This matter is before the Court on Disciplinary Counsel's motion to enforce a subpoena against Respondent Jeffrey Clark. The subpoena was issued in connection with a disciplinary proceeding against Clark which is pending before a hearing committee of the Board of Professional Responsibility. The hearing in that matter was scheduled to begin on January 9, 2023. On October 17, 2022, Clark filed a notice purporting to remove the proceeding to federal court. Clark later filed notices purporting to remove both this subpoena-enforcement matter and another subpoena issued by Disciplinary Counsel.[1] Disciplinary Counsel moved to remand all three

---

[1] Clark had refused to accept service of the second subpoena when a process server attempted to serve him at this home; Clark attempted to remove the second subpoena before any enforcement action had been initiated.

matters, arguing that this Court has exclusive jurisdiction to discipline attorneys admitted to its bar and the federal courts lack such jurisdiction. On January 17, 2023, this Court determined to hold the subpoena-enforcement matter in abeyance until the removal was resolved by the federal court. The Board on Professional Responsibility likewise began to treat the underlying disciplinary matter as if it were before the federal court and did not proceed to hold the scheduled evidentiary hearing. When Disciplinary Counsel filed its witness list, exhibit list, and proposed exhibits, for example, the Board sent an email stating that the materials "have been received and are lodged in Board Docket No. 22-BD-039, which has been removed to the U.S. District Court for the District of Columbia."

Eight months after Clark initially filed his notice of removal, the district court held that it lacked jurisdiction and granted Disciplinary Counsel's three motions to remand. Mem. Op. Granting Motions to Remand, *In re Clark*, No. 1:22-mc-96 (D. D.C. Jun. 8, 2023) ("*Remand Opinion*"). On the same day, the district court issued a separate order granting the motions and remanding "for further proceedings." Order Granting Motions to Remand, *In re Clark*, No. 1:22-mc-96 (D. D.C. Jun. 8, 2023). Clark now asks this Court to continue to hold this matter in abeyance and to order

further that the underlying disciplinary proceedings be "deferred" so that he may appeal the district court's remand order.[2] The Court should deny the motion.

In effect, Clark is asking this Court to stay the disciplinary proceeding while he appeals another court's ruling that it lacks jurisdiction over the matter. A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 566 U.S. 418, 427 (2009) (cleaned up). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* at 433 (cleaned up). The party requesting such a stay "bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.*

The movant's showing is evaluated under the traditional four-factor test for a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Dist. of Columbia*

---

[2] On June 16, 2023, the hearing committee ordered the parties to file status reports addressing the rescheduling of the hearing.

*v. Towers*, 250 A.3d 1048, 1053 (D.C. 2021) (applying four-factor test to stay pending appeal).

"The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434. It is not enough to show a mere possibility of success or some possibility of irreparable injury. *Id.* Here, Clark has not shown that he is likely to succeed on the merits or will suffer any irreparable injury. Further, the public interest favors denying the stay.

## A. Clark has not established a likelihood of success on the merits.

The district court's opinion carefully explains why the federal court lacks jurisdiction to adjudicate attorney discipline matters. By their plain text, the removal statutes apply to "civil actions" and "criminal prosecution[s]." 28 U.S.C. §§ 1441 (civil actions), 1442 (civil action or criminal prosecutions against federal officers). Those statues do not reach disciplinary proceedings in furtherance of a court's authority to regulate the practice of law because such proceedings are neither civil actions nor criminal prosecutions. *Remand Opinion* 13-19. As even Clark agrees, an attorney-discipline proceeding is not purely a civil action. *Id.* at 14. It "bears none of the essential hallmarks of a civil case," and is not "of a character traditionally cognizable by courts of common law or equity." *Id.* (cleaned up). Accordingly, numerous federal courts have found that disciplinary matters are not removable as "civil actions." *Id.* at 14-15 (collecting cases). Nor is a disciplinary matter a

4

"criminal prosecution" amenable to removal under 28 U.S.C. § 1442. *Id.* at 16-19. Although this Court has described disciplinary matters as "quasi-criminal," *see In re Artis*, 883 A.2d 85, 103 (D.C. 2005), disciplinary proceedings do not result in criminal liability. *Remand Opinion* 7. They also serve a different purpose than criminal prosecutions. As this Court has repeatedly held, disciplinary sanctions are not intended "to punish the attorney, but to protect the public and the courts, safeguard the integrity of the profession, and deter respondent and other attorneys from engaging in similar misconduct."[3] *Id.* at 18-19 (quoting *In re Cater*, 887 A.2d 1, 17 (D.C. 2005)).

Although Clark argued that the court should ignore the plain text of the removal statutes and find *any* form of process against a federal officer to be removable, the district court explained in detail the error in that argument. *Id.* at 20-32. The court noted first that the test Clark suggests has been rejected by multiple federal courts of appeals and U.S. district courts. *Id.* at 20-21 (collecting cases). Clark's argument is also contrary to a federal statute that specifically makes attorneys for the government subject to discipline by state authorities. *Id.* at 22-32 (analyzing 28 U.S.C. § 530B). Only one of the several federal courts that have considered removal of

---

[3] A stay would not be appropriate even if a disciplinary proceeding *were* properly removable as a "criminal prosecution." Under 28 U.S.C. § 1455, the removal of a criminal prosecution "shall not prevent the State court in which such prosecution is pending from proceeding further, except that a judgment of conviction shall not be entered unless the prosecution is first remanded."

disciplinary actions against a federal officer has upheld removal, and that case was decided ten years before the enactment of the statute assigning to state authorities the responsibility to discipline federal lawyers. *Kolibash v. Comm. on Legal Ethics of W. Va. Bar,* 872 F.2d 571 (4th Cir. 1989).

Clark's motion does not show that he is likely to obtain a different result on appeal. He does not address the district court's holding that the disciplinary proceeding is not removable because it is neither a civil action or a criminal prosecution within the plain meaning of the removal statutes, relying instead on the absence of disciplinary proceedings from the list of non-removable actions in 28 U.S.C. § 1445. Mot. 5. That argument ignores that the non-removable matters described in Section 1445 are "civil actions" that might otherwise be removable. Congress had no reason to exclude disciplinary proceedings from statutes permitting removal of "civil actions" because the text of the removal statutes already excludes them. Beyond that argument, Clark claims that when working for the federal government, members of the D.C. Bar are immune from the disciplinary authority of the D.C. Court of Appeals, an argument that is contrary both to the district court's analysis of 28 U.S.C. § 530B, which Clark does not address, and to his own admission that the Court of Appeals has inherent authority to regulate the practice of law in D.C. *Compare* Mot. at 5 *with id.* at 7. Clark makes the bare claim that his appeal has "obvious merit," but does not show that any of his arguments are likely to succeed. He asserts only that

"various questions of first impression" are at issue, that the appeal presents "a very important question for the D.C. legal community and the country," and that the question "is certainly debatable." *Id.* at 5, 7, 8. That is insufficient to show a strong likelihood of success on the merits.

## B.   Clark has not shown irreparable harm from denying a stay.

Clark does not allege any particular harm that would come from denying a stay. Although he claims generally that the operation of the executive branch of the federal government would be impeded if its government attorneys are subject to the disciplinary authority of their licensing jurisdiction, *see* Mot. at 8, Clark does not explain why a stay is necessary to prevent that outcome. Clark is no longer a lawyer in the executive branch, and a stay of his disciplinary proceedings would affect only the proceeding against him. Even if Clark had shown "some possibility of irreparable injury" it would be insufficient to meet this factor. *Nken*, 556 U.S. at 434 (cleaned up). In fact, Clark has not shown or even claimed he would suffer *any* irreparable injury absent a stay.

## C.   The public interest favors denying the stay.

The final two factors do not favor Clark's stay motion. The third factor (harm to other parties) is not applicable because strictly speaking, there is no "other party" to disciplinary proceedings. Disciplinary Counsel is an arm of the Court, as are the hearing committees and the Board. They assist the Court in its regulation of the

lawyers admitted to its bar. But as noted above, the purpose of disciplinary proceedings is to protect the court, the public, and the integrity of the profession. Those goals are ill-served when a lawyer whose misconduct has been documented in highly publicized proceedings is permitted to continue to practice, suffering no consequences for his misconduct. *See* Subverting Justice, Majority Staff Report, Senate Committee on the Judiciary (2021)[4]; The Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, 373-403 (2022)[5].

The public interest favors a prompt resolution of this disciplinary matter. Delays in D.C.'s attorney disciplinary system have long been an issue of public importance and concern. *See, e.g.*, Peter H. Wolf, *Fifteen Years for One Disciplinary Case?!,* 150 D.W.L.R. 2938 (Nov. 22, 2022); Michael S. Frisch, *No Stone Left Unturned: The Failure of Attorney Self-regulation in the District of Columbia*, 18 Geo. J. Legal Ethics 325 (2005). Delays in disciplinary proceedings fail to protect the public and reinforce the impression that the disciplinary system is too friendly to attorneys who violate their professional obligations. Those concerns are heightened in this case because Clark's highly public misconduct occurred more than two years ago. Clark's frivolous removals have already delayed this matter by eight months,

---

[4] https://www.judiciary.senate.gov/subverting-justice-how-the-former-president-and-his-allies-pressured-doj-to-overturn-the-2020-election.

[5] https://www.govinfo.gov/app/details/GPO-J6-REPORT/context

and Clark agrees that the appeal will add further delay. Motion at 5-6 & n. 1. He has not presented any reason why such a delay is necessary or desirable.

Finally, Clark's misconduct was of a most grievous nature. He attempted to undermine the basic premise of a democracy: the winner of a majority of the votes is elected to office. He did so by attempting to coerce the Acting Attorney General of the United States to intervene in a presidential election based upon a baseless and dishonest claim of election fraud. This was one of many steps to deny the 2020 election results and attempt to perpetuate a losing incumbent in power. There is little dispute as to what Clark did. His conduct is documented in the public record and he has not denied it. There is an overwhelming public interest in promptly resolving these disciplinary charges. Clark has delayed this matter for eight months already. He should not be permitted to do so any longer.

## Conclusion

The Court should deny the motion.

Respectfully submitted,

HAMILTON P. FOX, III
  *Disciplinary Counsel*

JULIA L. PORTER
  *Deputy Disciplinary Counsel*

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
  *Senior Assistant Disciplinary Counsel*

JASON R. HORRELL

9

*Assistant Disciplinary Counsel*

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

## CERTIFICATE OF SERVICE

I certify that on June 20, 2023, I served the foregoing through the Court's electronic filing system on the following:

Charles Burnham, counsel for Respondent, charles@burnhamgorokhov.com

Board on Professional Responsibility, by its Executive Attorney James T. Phalen, jtphalen@dcbpr.org

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

Exhibit 4

**DISTRICT OF COLUMBIA COURT OF APPEALS**

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

**Disciplinary Docket No.**

**2021-D193**

**22-BG-891**

Clerk of the Court
Received 06/20/2023 09:17 PM
Resubmitted 06/21/2023 09:57 AM
Filed 06/21/2023 09:57 AM

**MOTION TO EXCEED LENGTH LIMITATIONS FOR RESPONDENT'S REPLY IN SUPPORT OF MOTION TO CONTINUE ABEYANCE OF PROCEEDINGS BEFORE THIS COURT AND/OR DEFER PROCEEDINGS BELOW**

**PROCEDURAL BACKGROUND**

On June 8, 2023 the U.S. District Court for the District of Columbia entered an order remanding Respondent Jeffrey Clark's disciplinary case back into this local District of Columbia process. Mr. Clark has appealed.

Mr. Clark filed a Motion to Continue Abeyance (etc.) with this Court on June 11, 2023. In light of the Juneteeth holiday, the Office of Disciplinary Counsel ("ODC") filed its opposition on June 20, 2023.  Mr. Clark now brings this motion to file a reply of up to 20 pages (a 10-page enlargement).  ODC objects to the motion.

**ARGUMENT**

On June 11, 2023, Respondent Jeffrey Clark filed a very straightforward Motion to Continue Abeyance (etc.).  This Court had previously ordered that disciplinary subpoena proceedings should be held in abeyance until Mr. Clark's removal action in federal court

is "resolved."  Mr. Clark's motion simply sought confirmation from this Court that, under the plain meaning of "resolved," proceedings would not recommence here or in the process below until all appeals were exhausted as to the District Court's remand order.

In its response to Mr. Clark's Motion, ODC does not explicitly question the propriety of this Court's abeyance order, offer a competing interpretation of "resolved," or dispute that Mr. Clark has an appeal of right from the District Court's grant of ODC's motion to remand his case.

Instead ODC completely recasts Mr. Clark's straightforward motion as "[i]n effect" a motion for stay pending appeal under federal law. Opp. at 3.  ODC then proceeds to spend the next 6 pages briefing the four-factor test for stays pending appeal while making a number of false assertions.  *See id*. at 3-9. ODC proceeds in this fashion despite the fact that this case entered an abeyance posture without ODC calling for application of the stay framework, this Court *sua sponte* doing so, or this Court in its January 17, 2023 order running through that framework or citing to it in any way. ODC may wish that, shortly after the January 17, 2023 order, it had moved to reconsider, arguing that an abeyance should not be granted without meeting the stay factors, but ODC did not do so.

Accordingly, although they are not framed as such, ODC's stay arguments are more in the nature of a "request for affirmative relief" under Rule 27(a)(4)(B) than actual responsive arguments because they, in substance, equate to a motion to reconsider (1) this Court's January 17, 2023 order placing this case into abeyance pending resolution of

the Article III court removal jurisdiction dispute and (2) the follow-on actions of the Board of Professional Responsibility to take proceedings against Mr. Clark off the hearing calendar and lodge rather than file all documents from the parties into its docket until the abeyance was lifted.[1]  As ODC acknowledges (Opp. at 2), its past efforts to advance its case against Mr. Clark in the face of removal proceedings have been rebuffed by the decisions of both this Court and the Board—decisions that ODC is now seeking to revisit.

As will be argued at greater length in his next filing, it is Mr. Clark's position that this Court should not entertain ODC's attempt to smuggle in a covert motion to reconsider under the guise of a responsive pleading (or to fuse the merits of Mr. Clark's defenses to the Charges into the disputed threshold issue of removal jurisdiction). However, ODC having made its arguments, it is obviously incumbent on undersigned counsel to respond in its forthcoming reply brief on the chance that this Court might see fit to consider them. Thus, this response must be longer than normal because it will necessarily include a demonstration that Mr. Clark can meet the four-part stay test as an alternative basis for granting his motion as compared to the arguments he presented in his actual Motion.

Mr. Clark is well prepared to meet this undertaking because he has excellent grounds for appeal.  In order for Respondent to make sure that he can cover the ground

---

[1] In fact, ODC's filing arguably violates Rule 27(a)(4)(B), which requires responsive pleadings that also request affirmative relief to have a title that "alert[s] the court to the request for relief."

of defending his original Motion against the Opposition, while also responding to ODC's improper attempt to recast that Motion or, in effect, file its own counter-motion, Respondent's counsel require additional pages of briefing to do so thereby exceeding the baseline allocation in Rule 27 of 10 pages for a reply brief.

As mentioned above, ODC's decision to attempt to recast the issue before the Court as litigation over a motion to stay pending appeal is, in substance, a request for the affirmative relief of reconsideration of this Court's January 17 order.  Under Rule 27 (a)(4)(B) and (d)(2) Mr. Clark is therefore entitled to up to 20 pages to respond to an opposition which also requests affirmative relief (a 10-page enlargement).  As a result, Mr. Clark requests that this Court grant him this additional space.

CONCLUSION

For the foregoing reasons, Respondent Jeffrey Clark respectfully requests this Court to grant him up to 20 pages to file his Reply in support of his Motion to Continue Abeyance and/or Defer Proceedings below.

Respectfully submitted this 21th day of June 2023.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress

4

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before*
*DCCA in progress*

5

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Motion to Exceed Length Limitations for Respondent's Reply in Support of Motion to Continue Abeyance of Proceedings Before this Court and/or Defer Proceedings Below* by email and through the Court's e-filing system:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 21 day of June, 2023.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464
1750 K Street, NW
Suite 300
Washington DC 20006
202-386-6920
charles@burnhamgorokhov.com

6

Exhibit 5

### DISTRICT OF COLUMBIA COURT OF APPEALS

Clerk of the Court
Received 06/22/2023 03:10 PM

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket Nos.

**2021-D193**

**22-BG-891**

## REPLY IN SUPPORT OF MOTION TO CONTINUE ABEYANCE OF PROCEEDINGS BEFORE THIS COURT AND/OR DEFER PROCEEDINGS BELOW

### INTRODUCTION

The Office of Disciplinary Counsel's ("ODC's") Opposition to Respondent's Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below ("Motion") offers no basis to deny the relief Respondent seeks here.

This is true for multiple reasons: **(1)** The Opposition *mischaracterizes* the Motion as one for a stay rather than for preservation of the *status quo*—abeyance—pending Respondent's appeal as of right to the D.C. Circuit filed on June 11, 2023, in D.C. Circuit Case No. 23-7073. **(2)** The Opposition concedes that this case has been in functional abeyance since January 17, 2023, both in this Court and as to all proceedings under the supervision of the Board of Professional Responsibility ("Board"), and yet neglects to explain why the issue that triggered this abeyance—removal—has been fully resolved. **(3)** The Opposition smuggles in a merits discussion of certain of Respondent's defenses (including his jurisdictional defense that Congress did not grant ODC jurisdiction to

bring Charges before the local D.C. Bar process against federal attorneys, especially not in the circumstances of this case), whereas the District Court's remand decision and the appeal thereof could properly decide only the issue of removal jurisdiction. And **(4)** the Opposition wrongly argues that Respondent has conceded the Charges against him.

## I.   ODC' OPPOSITION FAILS FOR NUMEROUS REASONS, INCLUDING BECAUSE IT TRIES TO AVOID GRAPPLING WITH RESPONDENT'S MOTION AS IT WAS ORIGINALLY FRAMED.

The Opposition *concedes* that this case has been in a functional abeyance at the Board level (and thus at the Hearing Committee level as well).[1] *See* Opp. at 2. What ODC fails to note is that that ODC itself contended it was voluntarily taking down the previously scheduled January 9, 2023, trial date below because a witness had been exposed to COVID (without explaining whether the witness was actually ill).[2] *See* Motion for Continuance, filed January 4, 2023. Moreover, it was only after this Court entered an abeyance on January 17, 2023, that proceedings by ODC in this Court or in the adjunct forums below came to a halt. At no point did ODC contest the January 17, 2023, abeyance Order or the Board taking the matter off the calendar pending resolution of the removal

---

[1] "The Board on Professional Responsibility likewise began to treat the underlying disciplinary matter as if it were before the federal court and did not proceed to hold the scheduled evidentiary hearing." Opp. at 2.

[2] We believe this may have been part of a thinly veiled attempt to save face, particularly given that ODC went on to misrepresent Respondent's position on the COVID issue. Respondent did not oppose a COVID-related extension. What Respondent opposed was ODC continuing to pretend that the removal had no impact on scheduling below, transferring venue to the Article III court. Respondent's counsel offered to join in a COVID-relating filing to the District Court; an offer Mr. Fox refused. *See* Response to Third Motion to Remand, attached hereto as Exh. 1, pp. 6-7.

jurisdiction dispute. As we have explained in the Motion to Exceed Length Limitations filed June 21, 2023, for this Reply, ODC is attempting to replace its divot from the start of 2023 in failing to argue that abeyance should not occur without applying the test for obtaining stays. But what this misses is that this Court has inherent authority to enter abeyances to manage its own docket and extend comity to another court system. *See, e.g., Landis v. North Am. Co.*, 299 U.S. 248 (1936). ODC also misses that this Court has already properly exercised its inherent discretion to await final resolution of the removal dispute in the Article III court process.

1.      *ODC Concessions Dictate That the Case Remain in Abeyance Pending Final Resolution of the Removal Dispute.* The District Court's remand order issued on June 8, 2023, did not terminate the dispute over removal jurisdiction. Respondent possesses and has exercised an *appeal as of right* to contest the remand order. *See* 28 U.S.C. § 1447(d). ODC's Opposition *never even mentions* Section 1447(d), let alone attempts to rebut that, in light of Respondent's Section 1447(d) appeal rights, there is no change in the circumstances giving rise to abeyance and no reason for this Court to lift the abeyance prematurely. As a result, ODC has effectively conceded all of the foregoing points in this paragraph and thus forfeited its ability to contest continued abeyance, pending final resolution of the removal dispute.

2.      *To Flip the Burden of Proof, ODC Mischaracterizes Our Motion as a Motion for a Stay that Respondent Did Not File.* Respondent clearly moved for a

continuance of the Order placing this case into an abeyance posture and did not move for stay pending appeal. And the plain terms of the January 17, 2023, Order clearly provided it would last until the removal jurisdiction dispute was resolved. It is now indisputable that the removal aspects of this controversy have **not** been finally resolved, given the pendency of the D.C. Circuit appeal.[3] Respondent did not move for a stay in this Court. However much ODC might wish to recharacterize Respondent's Motion—and as much as ODC might wish that the District Court's remand order were final—ODC can neither control our motions nor cut off Respondent's appeal rights. For this reason alone, pages 3 through 9 of ODC's Opposition should be ignored. The reason for ODC's *mischaracterization of* our Motion for abeyance is transparent: **(1)** to flip the burden, pretending that burden of proof falls on Mr. Clark rather than on ODC, which is trying to *change* rather than continue the *status quo*; **(2)** to interject a misplaced discussion of the merits into resolution of a removal jurisdiction issue; and **(3)** to further interject irrelevant and inflammatory material under the guise of arguing that denying a stay Respondent did not ask for would be in the "public interest."

3.       ***ODC Is Attempting to Cut Off and Get a Prejudgment of a Federal Procedural Motions Deadline.*** Respondent's motion in this Court merely seeks a continuance of the abeyance posture. Should that not be forthcoming (then and only

---

[3] Also, to be clear, the appeal Respondent is entitled to under federal statute may also entail a future *en banc* petition and/or a petition for *certiorari* to protect Respondent's important procedural right to obtain resolution only by Article III courts of any form of challenge to his actions while he was a federal officer.

then), Respondent will exercise his federal rights to seek a stay pending appeal pursuant to Federal Rule of Appellate Procedure 8. In that event, Respondent will first seek a stay from the District Court under FRAP 8(a)(1), and if that is denied, from the D.C. Circuit under FRAP 8(a)(2). Pursuant to a D.C. Circuit Court Clerk's Order of June 14, 2023, Respondent's stay motion in the D.C. Circuit is not due until July 15, 2023 or July 30, 2023 (depending on whether a Federal Rule of Appellate Procedure 8(a)(2) motion for stay pending appeal will be characterized as a substantive or procedural). *See* Exh. 2, Clerk's Order. Either way, the earliest possible federal deadline for a motion to stay is two-to-three weeks away. ODC cannot accelerate that deadline by the expedient of pretending here that Respondent has already moved for a stay.[4]

By contrast to ODC's attempt to reformulate the Motion into a form it would prefer, Respondent is proceeding with due respect for this Court and its adjuncts below as well as with appropriate respect for judicial economy. There is no need, in other words, for Respondent to seek a stay from the District Court or the D.C. Circuit under FRAP 8 if this case remains, as it should, in an abeyance posture pending final resolution of the removal question through all levels of Article III review. In other words, such abeyance should last until a final judgment on removal jurisdiction unreviewable by any form of

---

[4] Relatedly, the Chair of Hearing Committee 12 issued an order on June 16, 2023, attached hereto as Exh. 3, directing the parties to file status reports by July 23, 2023, and to make proposals for a schedule for trial. This order is premature during the pendency of Respondent's Motion to Continue the Abeyance, and during the pendency of the federal appeal of the remand order.

further appeal has issued.

Relatedly, trying to transmute Respondent's motion here into a stay request is inappropriate for yet another reason. The District Court by order of the assigned Judge or via its Clerk's Office has not yet issued a separate judgment as contemplated by Federal Rule of Civil Procedure 58. We did not hide the ball on that problem. We flagged it for both this Court and for ODC in our June 11, 2023, Motion, at 2-3 (docketed on June 12, 2023) (also citing Fed. R. Cr. P. 32(k) and *Abdulwali v. WMATA*, 315 F.3d 302, 303-04 (D.C. Cir. 2003) (appeal from order premature in the absence of judgment)). Yet ODC says nothing about FRCP 58, nor FRCrP 32(k), nor about *Abdulwali*. Instead, it pretends that all relevant action is occurring only in this Court and that Respondent has somehow procedurally defaulted here by not seeking to explain why it could meet the elements of a stay here. Worse yet, ODC demands we do so right now, even though the separate-document judgment rule on the Article III side has not yet been complied with by the District Court. This issue that ODC attempts to whistle past provides yet another reason why no change in the abeyance posture *status quo* has occurred or should be ordered here.

*4. Indeed, ODC's Attempts to Rewrite History or Mischaracterize the Proceedings to Its Benefit Suffer from a Plethora of Other Defects, Including Ones That Weigh in Favor of a Stay, Even If (Counterfactually) One Needed to be Sought.* The Opposition is so flawed it is infected by a veritable host of defects.

*First*, ODC badly misrepresents the record by saying "[t]here is little dispute as to

what Clark did. His conduct is documented in the public record *and he has not denied it*." Opp. at 9 (emphasis added). Wrong. *Mr. Clark has vehemently and continuously denied* any violation of the Rules of Professional Conduct and entered a general denial in his Answer. *See* Answer, at 29-30 (Fifty-Fourth Defense—Response to Enumerated Charges/General Denial) (Sept. 1, 2022).[5]

 *Second*, ODC proceeds here as if both the Senate Judiciary and House January 6 Committee Reports are irrefutable and should be taken as gospel. *See* Opp. at 8. This is not true, and, at the appropriate time, Mr. Clark will contest them as necessary. The Reports are hearsay and they have not been admitted into evidence in whole or in part. Moreover, Mr. Clark was not subpoenaed to and did not testify in the Senate Judiciary Committee proceeding that led to Senator Durbin's complaint (filed only on his own behalf). Additionally, while the January 6 Committee subpoenaed Mr. Clark, and he appeared before them twice, he did not testify on the merits because he invoked several privileges based on letters from counsel for President Trump and from the U.S. Justice Department. He also explained how that Committee was formulated in violation of law and also acted in violation of law. The Committee disagreed but stood down after Mr. Clark eventually invoked his Fifth Amendment rights. The Committee never took any

---

[5] *See also* Answer at 29-30 ("To the extent any answer is required, and preserving his Fifth Amendment rights against self-incrimination, *Respondent generally denies all allegations of professional misconduct in paragraphs 2-31*. *See In re Artis*, 883 A.2d 85, 93 (D.C. 2005). To the extent any further answer is required, and preserving his Fifth Amendment rights against self-incrimination, *any allegations not otherwise generally denied are hereby generally denied*.") (emphasis added).

steps to try to pierce Mr. Clark's privilege invocations in court or via a contempt referral to the Justice Department. And although ODC has attempted to pierce Mr. Clark's Fifth Amendment privilege assertions, it has not succeeded. Indeed, last Summer, in July 2022, ODC grew so impatient waiting for a decision from this Court that it dropped its motions to enforce subpoenas, and filed the Charges, only later to issue another subpoena *after* this case had already been removed, leading to this Court's January 17, 2023, abeyance. For these reasons, the Court should reject ODC's invitation to assume that Mr. Clark has conceded any merits defenses or has somehow acquiesced in the highly partisan, politically super-charged congressional reports on which ODC relies. He has not.

*Third*, ODC argues that the profession is harmed because these proceedings have been highly publicized. That cannot be laid at the feet of the Respondent. In fact, ODC is partly at fault for this. It appears to have been coordinating with the House January 6 Committee and we know it was coordinating with the media, as we have previously put on the record. *See* Response to Motion to Unseal and Cross-Motion to Stay, filed in this Court August 11, 2012, pp. 5-6.  At the appropriate time, we will seek a full disclosure of all of ODC's third-party contacts with members or agents of Congress and with the media, as well as seek the disclosure of any *ex parte* contacts with Hearing Committee Twelve and/or the Board below.

*Fourth*, ODC's contends that "delays" in this matter are somehow improper in and of themselves. They are not. We firmly believe Mr. Clark has a right to an Article III forum

8

to resolve the Charges against him. That is a longer process than ODC prefers, but there is no basis to favor its preferences over the Article III court process afforded by federal statute. By providing an appeal as of right in 28 U.S.C. § 1447(d), Congress has decided the right to appeal outweighs the local forum's interest in expedition or opponents of the federal officer's desire for expedition as a litigant. Moreover, delay here was at least in part caused by ODC's own voluntary actions because it repeatedly issued new subpoenas and attempted to proceed with this matter despite the removal. One removal should have been sufficient, but ODC's obdurate stubbornness necessitated *three removals*, no doubt needlessly complexifying Judge Contreras' task.[6]

*Fifth*, if a trial is conducted below and Mr. Clark later prevails in his D.C. Circuit appeal or at the U.S. Supreme Court—thereby establishing that there is federal-officer removal jurisdiction here—then the entire Hearing Committee Twelve trial and any related follow-on proceedings before the Board would become a nullity and a waste of resources for all concerned. It makes no sense to risk wasting those resources, and it

---

[6] As if it is somehow damning, in footnote 1 of the Opposition, ODC notes that Mr. Clark refused to accept service of a subpoena on December 27, 2022, and removed that subpoena without waiting for an enforcement action. This is true but neither relevant nor improper. Mr. Clark refused to accept service of the Christmastime subpoena because the case had already been removed twice at that point and the subpoena was plainly being used to harass Mr. Clark and his family over the holidays. We believe this is one factor in this Court entering its abeyance on January 17, 2023. Lastly, the federal officer removal statute explicitly permits the removal of subpoenas. There was no need for Mr. Clark to wait for ODC to seek judicial enforcement of the subpoena. *See* 28 U.S.C. § 1442(d)(1) ("The terms 'civil action' and 'criminal prosecution' include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, *including a subpoena for testimony or documents, is sought or* issued.") (emphasis added). By attempting service of the subpoena, ODC clearly brought itself within this statute.

would injure the public's interest to waste quasi-judicial and prosecutorial resources in this fashion.

*Sixth*, as a general matter, the public's interests are served by vindicating the intended structural relationship between state and federal governments embodied in the Supremacy Clause. An inferior level of local government should not be allowed to second-guess, let alone even begin to penetrate into confidential deliberations between the President and his closest legal advisors or even probe into internal deliberations within the walls of U.S. Justice Department that did not extend as well to the White House.[7]

    *5.  **ODC Completely Ignores the Argument That This Court Can Order a Deferral of Proceedings Below***. In the Motion, Respondent argued that this Court could directly order a deferral pursuant to D.C. Code § 11-2501(a). ODC utterly fails to address this argument, and thus cannot be heard now to contest this Court's power to do so.

II.    **THE PURPOSES OF BAR DISCIPLINE ARE ANALOGOUS TO THE PURPOSES OF CRIMINAL PROCEEDINGS.**

One defect of the Opposition deserves its own Roman numeral. Namely, ODC's

---

[7] Here, of course, as we have repeatedly pointed out, ***the District of Columbia is not a State***. We refer to the Supremacy Clause because 99.9% of situations where attorney discipline will be sought against federal lawyers would involve a State, one of its subdivisions including its municipal corporations. The stakes of ODC's case will thus carry important implications for the States. However, the fact that the locality at issue here is the District means that the precise constitutional problem presented by attempts of the D.C. Bar, as Article I creature, to regulate federal lawyers in the Article II Executive Branch is one of the separation of powers. Though it is also important that the federal government, as expressed across all three of its branches, sits at a hierarchical level of government above the District's local authorities and courts.

attempt to attack *in this Court* the removal jurisdiction dispute under the exclusive

jurisdiction of the D.C. Circuit in Respondent's appeal there. Specifically, ODC argues

that Mr. Clark's case is not removable pursuant to criminal removal statutes because

disciplinary proceedings "serve a different purpose than criminal prosecutions." Opp. at

5. ODC states that:

> As this Court has repeatedly held, disciplinary sanctions are not intended
> to punish the attorney, but *to protect the public* and the courts, *safeguard*
> *the integrity of the profession, and deter respondent and other attorneys*
> *from engaging in similar misconduct*.

*Id*. (internal quotations and citations omitted) (emphasis added).

However, what ODC's argument actually shows are the many important ways

that bar proceedings are indeed analogous to criminal proceedings. The purposes of

disciplinary proceedings offered by ODC are some of the very same purposes as those of

the federal criminal process as defined in 18 U.S.C. § 3553, which states that at federal

criminal sentencings:

> The court shall impose a sentence sufficient, but not greater than necessary
> to comply with the purposes set forth in paragraph (2) of this subsection
> [including]…*to promote respect for the law…to afford adequate deterrence*
> *to criminal conduct [and]…to protect the public from further crimes of the*
> *defendant*.

*Id*. (emphasis added).

Even the distinction that disciplinary proceedings are theoretically not for

"punishment" is only defensible at a highly rarefied level of abstraction. For instance, it

defies all common sense to regard a defendant fined $50 for reckless driving as having

received "punishment" while a father of four like Mr. Clark permanently deprived of his sole livelihood in his fifties has not. Even ODC implicitly recognizes the *de facto* punitive nature of bar proceedings when it laments that Mr. Clark has "suffer[ed] no **consequences** for his misconduct." Opp. at 8 (emphasis added). This is a thinly veiled baying for Mr. Clark to be punished.

To be sure, there remains some distinction between quasi-criminal disciplinary proceedings and the heartland of non-hybrid criminal cases. *See In re Artis*, 883 A.2d 85 (D.C. 2005). However, what ODC's argument unwittingly shows is the many important respects in which bar proceedings are like criminal cases and the consequent invalidity of its argument that such important proceedings may not be removed.

The main problem, however, is that it is not for this Court to decide the issue of removability. That is now next for the D.C. Circuit to decide in the appeal. This misplaced argument by ODC is thus one giant *non sequitur*.

III.   **IN THE ALTERNATIVE, RESPONDENT CAN NEVERTHELESS MEET THE REQUIREMENTS FOR OBTAINING A STAY PENDING RESOLUTION OF THE D.C. CIRCUIT APPEAL.**

As noted above, ODC's attempt to convert this motion to continue the abeyance into a motion for stay pending appeal should be rejected. ODC's stay theory cannot even get off the ground because the relevant appeal is not one to this Court but rather an appeal in a ***different Court***—the D.C. Circuit—which this Court can in no way usurp or prejudge.

But even if Respondent's Motion were to be considered as a motion for stay

pending appeal, it should be granted. In both this Court and in federal practice, the test for such a stay is as follows:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 566 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Dist. of Columbia v. Towers*, 250 A.3d 1048, 1053 (D.C. 2021) (applying same test to stay pending appeal and noting "where a case presents 'a serious legal question' and 'when there is little risk of harm to the other parties or to the public interest, '[a]n order maintaining the *status quo* may be appropriate.'"), *citing Walter E. Lynch & Co., Inc. v. Fuisz*, 862 A.2d 929, 932 (D.C. 2004).

> 1.    RESPONDENT HAS A STRONG LIKELIHOOD OF PREVAILING IN HIS FEDERAL APPEAL.

The language and rationale of the federal officer removal statute, 28 U.S.C. § 1442, as well as the clear weight of authority, support removal and demonstrate that Respondent has a strong likelihood of prevailing on the merits. The plain language of the federal officer removal statute covers "all" "civil actions" and "criminal prosecutions." The statute was amended in 2011 to add subsection (d) to broaden the definition of these terms to include not just subpoenas, but "***any proceeding … to the extent that in such proceeding a judicial order … is sought or issued***." (Emphasis added). This bar discipline case is unquestionably such a proceeding in that ODC seeks a judicial order from this

Court imposing discipline on Mr. Clark.

The District Court's ruling, however, wrongly rules that bar disciplinary proceedings are neither civil nor criminal and therefore fall into a gap between the two that is not subject to removal. The 2011 amendment to § 1442 plainly forecloses the District Court's reading. There is no such gap in "*any proceeding … to the extent that in such proceeding a judicial order … is sought or issued*."

The Supreme Court has made plain in several cases that "[t]he federal officer removal statute is *not* 'narrow' or 'limited.' *Colorado v. Symes*, 286 U.S. 510, 517 (1932). At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969). The statute and the oft-repeated policy of broad interpretation are to protect the supremacy of the federal government. They find expression in the decisions of most federal circuits holding that hybrid matters against federal officers are in fact removable.

Most directly on point is the Fourth Circuit decision in *Kolibash v. Committee on Legal Ethics of the West Virginia Bar*, 872 F.2d 571, 576 (4th Cir. 1989), holding a bar discipline matter removable and that "[t]he form that the state action takes is therefore not controlling; 'it is the state's power to subject federal officers to the state's process that § 1442(a)(1) curbs.'" While the District Court distinguished *Kolibash* here, *Kolibash* remains the most closely analogous reported federal appellate decision. The only cases to the

contrary are a smattering of district court decisions.

The clear weight of authority with respect to other types of hybrid proceedings favors removal. Contempt proceedings, though hybrid in nature, were held removable in the Fourth, Fifth, Seventh, and Eleventh Circuits. *North Carolina v. Carr*, 386 F.2d 129, 131 (4th Cir. 1967) ("the statute looks to the substance rather than the form of the state proceeding; this is the reason for the breadth of its language"); *Boron Oil Co. v. Downie*, 873 F.2d 67, 68 (4th Cir.1989); *Louisiana v. Sparks*, 978 F.2d 226, 231 (5th Cir.1992); *Wisconsin v. Schaffer*, 565 F.2d 961, 963–64 (7th Cir.1977) ("We think it unfruitful to quibble over the label affixed to this contempt action. Regardless of whether it is called civil, criminal, or sui generis, it clearly falls within the language and intent of the statute."); *Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir.1989).

Garnishments against federal officers, which are also hybrid in nature, are removable in the Ninth Circuit, *Nationwide Investors v. Miller*, 793 F.2d 1044, 1046 (9th Cir. 1986), but not removable in the Fifth, *Hexamer v. Foreness*, 981 F.2d 821, 823 (5th Cir. 1993).

Even before the 2011 amendment to § 1442(d) explicitly added subpoenas to the list of "actions" that could be removed, the D.C. Circuit had interpreted the statute broadly to include subpoenas, rejecting the formalistic argument that subpoenas were neither a criminal prosecution nor a civil action. *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995) ("We do not believe Congress used the terms "civil action," "against," or "act" in the limited fashion that appellant urges, but rather

meant to refer to ***any proceeding*** in which state judicial civil power was invoked against a federal official.") The D.C. Circuit is likely to apply the same reasoning to this case.

> 2.   SUBJECTING MR. CLARK TO AN ADMINISTRATIVE TRIAL BEFORE THE REMOVAL DISPUTE IS FULLY ADJUDICATED WOULD CAUSE IRREPARABLE HARM BY DEFEATING THE CONGRESSIONAL DIRECTIVE TO HOLD A JUDICIAL TRIAL IN AN ARTICLE III FORUM.

It is plain that lifting the abeyance posture of this case at this level and/or before the Hearing Committee during the pendency of Respondent's appeal of the remand decision would irreparably deprive Respondent of his right to have this case adjudicated in a federal forum.  The purpose of the federal officer removal statute would be defeated.

The federal officer removal statute is intended to protect federal supremacy against encroachment by hostile state of local governments and courts. Such hostility has historically often been largely, if not entirely, based on political affiliation and was directed against Republicans during the Reconstruction era, and is now revived against President Trump and those who supported him in jurisdictions around the country, including the District of Columbia. The District is as close as this Nation comes to a political monolith, with President Biden winning 92.1% of the vote in 2020 election, 26.06 percentage points higher than the next highest state in the Union. The D.C. government's hostility toward the Trump Administration reflects the views of its populace and is both flagrant and extreme. The federal officer removal statute was tailor made for such circumstances. Clear separation of powers and federal supremacy principles prohibit

such a municipal government from intruding into the most private counsels the President of the United States took with his senior legal advisors as to how to exercise his core Article II law enforcement powers. *See* U.S. Const., art. II, § 3 ("[H]e [the President] shall take Care that the Laws be faithfully executed").

       3.    There Would be no Prejudice to the D.C. Bar or To Others.

The D.C. Bar would not be prejudiced by continuing the abeyance posture, just as it was not prejudiced by the case being held in abeyance since January 2023. ODC contends that because it is an arm of this Court, the factor of harm to others from a stay drops out of the analysis. This ignores the fact that regardless of whether this matter is characterized as civil, criminal or hybrid, the opposing party is ODC. The case is styled *In re: Jeffrey Bossert Clark*, but the charges that commenced the case were filed by ODC, and it is the adversary in this case as a matter of *realpolitik*. Additionally, there is no harm to another party relevant to this case. Mr. Clark gave confidential advice inside the Executive Branch. The President who was the ultimate client for the advice has not complained about it. Nor did any of Mr. Clark's former colleagues at the Justice Department. They were instead stirred up by a partisan inquiry by Senator Durbin that was in turn stirred up by anonymous leaks to the *New York Times* in late January 2021.

Indeed, we are here only because one individual, Senator Dick Durbin, complained. And his complaint should never have been docketed, in the first place, because he lacked first-hand knowledge of events outside of the Legislative Branch,

violating one of ODC's long-standing docketing policies. A policy that ODC has never seriously tried to distinguish.

Moreover, ODC is responsible for much of the delay of which it complains. It repeatedly attempted to prosecute this case after the first removal, which necessitated Respondent filing two additional removals. ODC filed redundant motions for remand as to the second and third removals, increasing the burden on the District Court in ruling on remand, in addition to the trouble and fee expense these vexatious pursuits imposed on the Respondent. And, in any case, by authorizing appeals as of right, Congress in 28 U.S.C. § 1447(d) has resolved the competing interests in favor of an interlocutory appellate resolution of removal, a unique privilege for federal officers unlike any other category of removal except civil rights cases removed under 28 U.S.C. § 1443.

4.   THE PUBLIC INTEREST SUFFERS IF THE ABEYANCE POSTURE IS LIFTED.

As noted above, the public interest is served by preserving the structure of the relationship between the state or local governments, on the one hand, and the federal government, on the other, embodied in the Supremacy Clause and/or the separation of powers. Congress has explicitly commanded the proper approach. It is also one vindicating constitutional policy—preventing a hostile and inferior level of local government from penetrating into and/or second-guessing the federal government's actions or deliberations at the highest level.

## SUMMARY OF REASONS TO CONTINUE THE ABEYANCE POSTURE

*All of* ODC's points in its Opposition are wrong.

To summarize them: **(1)** ODC offers no reason why the abeyance posture of this case should be lifted before the hotly disputed issue of removal jurisdiction is fully resolved in the Article III forums; **(2)** ODC fails to contest that Respondent possesses an appeal as of right under Section 1447(d) to the D.C. Circuit, where a protective appeal is pending and where no initial deadline has yet run and where those deadlines should not be leapfrogged in this Article I forum; **(3)** ODC cannot be allowed to reformulate Respondent's Motion as it was framed and then attack that straw man; **(4)** Respondent is proceeding here first to continue the abeyance posture for the same reasons it was initially put in place in January 2023 and so that he can avoid burdening the Article III courts with a threshold stay fight under FRAP 8, if the abeyance posture can instead be continued; **(5)** Respondent should not be required to demonstrate here that a stay should be granted as if none of this procedural history existed, but even if forced to do so, Respondent has shown that **(i)** he has a likelihood of winning under the text of the statute and binding Supreme Court case law on Section 1442 removals; **(ii)** Respondent would suffer irreparable harm if he rightly claims and yet is denied an Article III forum in which to present his federal defenses; **(c)** the balance of harms favors the Respondent; and **(d)** the public interest would be served by continuing the abeyance posture; and **(6)** ODC failed to respond to Respondent's D.C. Code § 11-2501(a) argument, allowing this Court to

directly order a deferral of the proceedings below.

## CONCLUSION

For the foregoing reasons, Mr. Clark respectfully requests this Court **(1)** to continue its abeyance order until Mr. Clark's appeal of the District Court's remand decision is concluded and **(2)** to order that further proceedings before the Board of Professional Responsibility and its assigned Hearing Committee be deferred on the same terms.

Respectfully submitted this 22nd day of June 2023.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW, Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice admission before DCCA in progress

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Reply in Support of Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below* by U.S. First Class Mail with sufficient postage thereon to insure delivery, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org

This this 22nd day of June, 2023.

> /s/ Charles Burnham
> Charles Burnham
> DC Bar No. 1003464
> 1424 K Street, NW
> Suite 500
> Washington DC 20005
> (202) 386-6920
> charles@burnhamgorokhov.com

Exhibit 6

**DISTRICT OF COLUMBIA COURT OF APPEALS**

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket Nos.

**2021-D193**

**22-BG-891**

Clerk of the Court
Received 07/05/2023 10:16 PM
Filed 07/05/2023 10:16 PM

# MOTION TO EXPEDITE RULING ON MOTION TO CONTINUE ABEYANCE OF PROCEEDINGS BEFORE THIS COURT AND/OR DEFER PROCEEDINGS BELOW

Respondent Jeffrey B. Clark moved on June 11, 2023, to continue the abeyance ordered by this Court on January 17, 2023 and (additionally or in the alternative) to order that proceedings before the Board of Professional Responsibility, etc. be deferred.[1] The June 11 Motion has been fully briefed and is ripe for decision. Respondent respectfully asks the Court to expedite ruling on this Motion because the Hearing Committee issued an order today, July 5, 2023, immediately resuming proceedings at that level without waiting for this Court to act on the relief requested in the Motion, especially the request for a deferral order of all proceedings below pending future Article III court action.

Specifically, Respondent asked that the abeyance be continued because the grounds upon which it was originally entered still apply—the question of removal

---

[1] The January 17, 2023 Order held the Office of Disciplinary Counsel's Motion to Enforce Subpoena Duces Tecum in Abeyance.

jurisdiction remains unresolved due to the pendency of Respondent's appeal of the remand order issued by the U.S. District Court. While normal remand decisions are not appealable, federal officer removals may be appealed as of right under 28 U.S.C. § 1447(d).

Respondent's Motion to Continue Abeyance also asked this Court to hold proceedings before the Board of Professional Responsibility and Hearing Committee Number 12 in abeyance or to order them deferred.

Respondent brings this Motion for Expedited Consideration because the Chair of Hearing Committee Number 12 issued an Order on July 5, 2023 to resume proceedings before the Committee. *See* Exh. 1, attached hereto. The July 5 Order directed the resumption of proceedings before the Hearing Committee despite the pending D.C. Circuit appeal and despite Respondent's Motion to Continue Abeyance in this Court. The July 5 Order set a pre-hearing conference for July 12, 2023, and directed the parties to meet and confer on scheduling the evidentiary hearing and any associated preliminary events and deadlines. The July 5 Order thus makes resolution of Respondent's Motion to Continue Abeyance an urgent priority. ***We thus respectfully request a resolution of the pending Motion to Continue Abeyance on or before July 11, 2023***.

The July 5 Order rests on invalid premises. ***First***, with respect to the pending federal appeal, it relies at least in part on the fact that Respondent has not yet filed a motion for stay pending appeal in the Article III court system. *See* July 5 Order, pp. 2-3.

But the deadline for procedural motions in the federal appeal is July 14, 2023, and until today it was not clear that the Hearing Committee would move forward despite the pending federal appeal and the Motion to Continue Abeyance pending in this Court. Respondent conspicuously noted the timing of the procedural motions deadline in the D.C. Circuit in his Reply in Support of the Motion to Continue Abeyance, and stated that a motion for stay in the Article III court system would be filed if abeyance was not forthcoming from this Court. No weight can be given to Respondent not having filed a motion whose deadline is still ten days away and which may not ever be necessary if the abeyance is continued in this Court and extended to the Board and Hearing Committee level via a deferral order, as common sense and comity suggest should occur.

The January 17, 2023 abeyance order here implicitly recognized that it was inappropriate to move forward with proceedings in this Court, and by implication at the Board and Hearing Committee level, until the question of removal was resolved. Indeed, the Board and Hearing Committee Number 12 took no steps to adjudicate this case while the removal issue was under submission to the U.S. District Court. Nothing has changed since that time except that the *first stage* of the removal proceedings was decided against Mr. Clark. Hence, the logic of the January 17 abeyance applies with equal force now due to the pendency of the federal appeal. After all, it is obvious that if a trial (denominated a "hearing" under the disciplinary system) is conducted below and Mr. Clark later prevails in his D.C. Circuit appeal or at the U.S. Supreme Court—thereby establishing

that there *is* federal-officer removal jurisdiction here—then all proceedings before the Hearing Committee and any related follow-on proceedings before the Board or this Court would have been a waste of resources for all concerned. Surely that ought to be avoided.

*Second*, the Committee Chair also held that the abeyance in this Court of the motion to enforce a subpoena was collateral to the proceedings before the Hearing Committee and did not deprive it of jurisdiction to move forward with the evidentiary hearing. However, as noted above, after the abeyance order was entered, proceedings at the Board and Hearing Committee level *were also halted*, even though there was no specific Order to that effect entered at the Board or Hearing Committee level, a point not addressed in the July 5 Order. Indeed, ODC itself *conceded* that this case has been in a functional abeyance at the Board level (and thus at the Hearing Committee level as well).[2] This is why filings at the Board level were recorded as "lodged" rather than filed from October 17, 2022 forward. Thus, it is effectively, if not explicitly, conceded by all that the logic of this Court's abeyance order applies equally to proceedings before the Board and Hearing Committee, regardless of whether the proceedings in this Court are viewed as collateral to those before the Hearing Committee. It simply makes no sense to proceed in this Court or its adjuncts until the question of removal has been finally resolved, and this

---

[2] "The Board on Professional Responsibility likewise began to treat the underlying disciplinary matter as if it were before the federal court and did not proceed to hold the scheduled evidentiary hearing." ODC Opposition to Motion for Abeyance at 2.

is as true now as it was in January 2023.

This Court has inherent authority to enter abeyances to manage its own docket and extend comity to another court system. *See, e.g., Landis v. North Am. Co.*, 299 U.S. 248 (1936), and to extend its orders to the Board and the Hearing Committee. The Board and Hearing Committee processes operate under the auspices of this Court and this Court exercises continuing supervisory authority over the Board and the Hearing Committee. The circumstances of this case are certainly appropriate for the exercise of supervisory authority so as to continue the abeyance posture ordered in January 2023.

### Conclusion

For the conservation of the resources of the Court, the Hearing Committee, the Board, the U.S. District Court, the D.C. Circuit Court of Appeals, and not least the parties, Mr. Clark respectfully requests this Court expedite its consideration of his Motion to Continue Abeyance until Mr. Clark's appeal of the District Court's remand decision, and any potential further appellate review, is concluded. He further requests that this Court order that proceedings before the Board of Professional Responsibility and its assigned Hearing Committee be deferred on the same terms.

Specifically, Mr. Clark requests that the Court issue an expedited ruling on his pending Motion **on or before <u>July 11, 2023.</u>** Should relief not be forthcoming in this posture, undersigned counsel will immediately begin preparing for filing here a mandamus petition because we believe that this Court and its adjuncts lack jurisdiction

over this matter on multiple grounds including, but not limited to (1) those based on federal statutory and regulatory limits imposed on disciplinary proceedings against federal attorneys **and** (2) the fact that removal automatically divested this Court and its adjuncts of power to hold an adjudicatory hearing.

 Respectfully submitted this 5th day of July 2023.

<u>/s/ Charles Burnham</u>
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

*Motion for pro hac vice admission before DCCA in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Motion to Expedite Ruling on Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below* by filing with the Court's electronic filing system which will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 5th day of July, 2023.

> /s/ Charles Burnham
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

Exhibit 7



**DCCA No. 22-BG-0059**

**DISTRICT OF COLUMBIA**
**COURT OF APPEALS**

Clerk of the Court
Received 07/07/2023 01:46 PM

|  |  |
|---|---|
| In the Matter of | : |
|  | : |
| **JEFFREY B. CLARK, ESQ.** | : **Disciplinary Docket No. 2021-D193** |
|  | : **Board Docket No. 22-BD-039** |
| **Respondent,** | : |
|  | : |
| A Member of the Bar of the District | : |
| of Columbia Court of Appeals. | : |
| Bar Number: 455315 | : |
| Date of Admission:  July 7, 1997 | : |
|  | : |

## DISCIPLINARY COUNSEL'S MOTION
## TO SUPPLEMENT THE RECORD

Pursuant to DCCA Rule 27(b), Disciplinary Counsel moves to supplement the record to include two recordings of public statements recently made by Respondent Jeffrey B. Clark that are directly related to the issue of whether the materials Disciplinary Counsel has subpoenaed would incriminate Mr. Clark.  The subpoenaed materials include documents relating to election fraud of which he was aware prior to January 4, 2021, and documents that support his contention that he was Acting Attorney General on January 3, 2021.  Mr. Clark has refused to comply with the subpoena because he contends that the very act of producing these documents would incriminate him.

On June 6, 2023, Mr. Clark testified before an ad hoc Congressional Committee in which he claimed that he was the only person in the Department of Justice interested in investigating election fraud. *See Testimony of Jeffrey Clark, Field Hearing on January 6th with Congressman Matt Gaetz (June 13, 2023)*, C-SPAN Video, beginning at 58:55, *available at* https://www.c-span.org/video/?528698-1/house-conservatives-investigations-prosecutions-january-6-attack-us-capitol. This testimony is relevant to the Court's consideration of whether the act of producing documents on which he determined there was a basis to investigate election fraud would incriminate him. It also relates to whether he has waived his privilege by such testimony.

On July 3, 2023, Mr. Clark gave an interview on a podcast. (In the podcast, the interviewer said that the date was July 3; there is a July 1 date and a July 5 date in the online materials as well.) *See Episode 2851: The Review of The Independence of The Justice Department (w/ Dr. Trent Talbot, Jeff Clark)*, www.warroom.org, FULL EPISODES (Video).[1] Mr. Clark's interview is approximately the first 26 minutes of the 49-minute podcast video. *Id.*

---

[1] *Available at* https://warroom.org/episode-2607-the-hearings-for-the-national-security-of-our-country-copy-copy-copy-copy-copy-copy-copy-copy-copy-copy-2-copy-copy-copy-2-copy-copy-copy-copy-copy-copy-copy-2-copy-copy-copy-copy-cop-7-6/.

In this interview, Mr. Clark discusses in more detail the information that led him to conclude that there was election fraud and his conclusion that the Department of Justice official in charge of such investigations was inept. *Id.* at 04:15-07:24. He also claimed during the interview that for a nine-hour period, he had been appointed Acting Attorney General. *Id.* at 13:50-14:31. This interview is relevant to Mr. Clark's claim that the act of producing the supporting documentation would be incriminating as well as to the issue of waiver.

Wherefore, Disciplinary Counsel requests that the record be supplemented to include the lodged materials.

Respectfully submitted,

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel
Bar Registration No. 113050
Jason R. Horrell
Assistant Disciplinary Counsel
Bar Registration No. 1033885

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
202-638-1501

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of July 2023, I caused a copy of the foregoing *Disciplinary Counsel's Motion to Supplement the Record* to be served on the District of Columbia Court of Appeals Clerk of Court by email to BarGovernanceFilings@dcappeals.gov, and that copies were served on the Board of Professional Responsibility c/o Case Managers to casemanagers@dcbpr.org, and to Respondent's counsel via email to Harry W. MacDougald, Esquire, to hmacdougald@CCEDlaw.com, to Charles Burnham, Esquire, to charles@burnhamgorokhov.com, and Robert A. Destro, Esquire, to Robert.destro@protonmail.com.


*Julia Porter*

_____

Julia Porter

Exhibit 8

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Clerk of the Court
Received 07/10/2023 01:51 PM
Filed 07/10/2023 01:51 PM

| | |
|---|---|
| In the Matter of | |
| **JEFFREY B. CLARK** | **Disciplinary Docket Nos.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2021-D193** |
| | **22-BG-891** |
| **Bar No. 455315** | |
| **Date of Admission: July 7, 1997** | |

# RESPONSE TO MOTION TO SUPPLEMENT

## BACKGROUND

Currently pending before this Court is ODC's Motion to Enforce Subpoena Duces Tecum against Respondent. That motion has been the subject of several prior filings and the Court is referred to that record for full detail on it and related legal issues. Respondent incorporates his past arguments as relevant to this filing, including those in his February 14, 2022 response to ODC's original motion.

Most recently, on July 7, ODC filed a "Motion to Supplement the Record" ("Motion")[1] asking this Court to receive into the record two unsworn public statements by Mr. Clark without citing any authority for doing so and despite the fact that ODC simultaneously takes the position that the record will be developed below before Hearing Committee Twelve.

---

[1] ODC filed its present Motion into the wrong docket, Case Num. 22-BG-59. That case is defunct, having been mooted by an order of this Court issued on September 15, 2022. On October 26, 2022, ODC filed a motion to enforce a revised subpoena and the Clerk's Office notified the parties that this should be treated as a separate action under Case Num. 22-BG-891. *See* Exh. 1.

**ARGUMENT**

**I.     ODC's Motion Raises New Substantive Claims and Is Not Properly Filed as a "Motion for Procedural Order."**

Although ODC purports to file its Motion under Rule 27(b) as a "Motion for a Procedural Order," this is not an accurate characterization because the Motion raises new substantive legal and factual issues. The Motion argues that Mr. Clark's public statements give rise to a waiver of his previously asserted Fifth Amendment privilege. Mr. Clark is currently employed as a Senior Fellow and Director of Litigation for a public policy think tank and frequently comments on matters of public concern. This was the capacity he was acting in when he made the relevant statements.

In ODC's original Motion to Enforce Subpoena, which it now seeks to "supplement," ODC challenged Mr. Clark's Fifth Amendment assertion in myriad ways including (1) that ODC cannot itself bring criminal charges; (2) that law enforcement had not specifically told Mr. Clark he was the target or subject of a criminal investigation; (3) that Mr. Clark did not "specify[]" the criminal charge he would face; 4) that ODC's specification of charges was different than potential criminal charges; and 5) that, in ODC's view, the subpoenaed materials would be "exculpatory" rather than "incriminating" in a "hypothetical criminal prosecution." Mtn. to Enforce (Feb. 3, 2022) at 5-10.

None of these challenges were even colorable, as Mr. Clark explained at the time. The significant fact for present purposes is that at no point did ODC include in its litany

of challenges to Mr. Clark's valid Fifth Amendment assertion the claim that Mr. Clark had waived the privilege.  It is therefore flatly inaccurate for ODC now to claim it is merely "supplementing" the record with new evidence that "relates" to some existing issue before the Court. ODC is raising an entirely new substantive claim calling for a substantive response. Although it should be unnecessary in order to defeat a Rule 27(b) motion, we offer a substantive response in Sections II & III below out of an abundance of caution.

Beyond the fact that the Motion goes beyond Rule 27(b), the Motion also ignores Respondent's pending motion to continue this matter in an abeyance posture or order a general deferral pending the outcome of the removal jurisdiction dispute now on appeal to the D.C. Circuit. If that relief is granted, there is no need to take up ODC's new Motion at this time.

## II.     No Waiver of Fifth Amendment

ODC is incorrect that Mr. Clark's public statements constitute a waiver of his Fifth Amendment privilege. *See* Motion at 2-3. ODC fails to bring to this Court's attention well-known controlling authority contrary to its position.[2] As this Court has repeatedly held,

---

[2] *Cf.* Rules of Professional Conduct 3.3: Candor to Tribunal ("A lawyer shall not knowingly…[f]ail to disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel and known to the lawyer to be dispositive of a question at issue and directly adverse to the position of the client"); *In re Rudolph W. Giuliani*, 22-BD-027, Report and Recommendation of Ad Hoc Hearing Committee at 17 ("Pennsylvania Rule 3.1 states '[a] lawyer shall not…controvert an issue…unless there is a basis in law and fact…*See also* D.C. Rule 3.1(same)"). Here, perhaps, ODC asserted Fifth Amendment waiver without researching the issue, but that would also be problematic.

"the general rule is that a witness who voluntarily testifies in one proceeding does not waive his Fifth Amendment privilege in a separate proceeding." *Ginyard v. United States*, 816 A.2d 21, 33 (D.C. 2003). Indeed, the statement Mr. Clark made on a podcast was not even made to any form of "proceeding."

This Court has recognized extremely limited exceptions to the general rule where (1) a grand jury witness is called to testify in the same criminal case to offer substantially the same testimony as offered to the grand jury; or (2) where a criminal defendant who testified at his own trial is called to offer substantially the same testimony as a witness in a codefendant's trial. *See Tomlin v. United States*, 680 A.2d 1020, 1024 (D.C. 1996) (relying on *Ellis v. United States*, 416 F.2d 791 (D.C. Cir. 1969)). The *Tomlin* panel explicitly confined its ruling to "the limited circumstances presented here," in view of the fact that even the District-specific exceptions to the separate proceeding general rule constituted "a minority rule that other jurisdictions have declined to follow and academics have criticized." *Id*. at 1022-23.

Importantly, the District's exceptions do not apply "when the witness is himself accused of or under indictment." *Tomlin*, 680 A.2d 1020, 1022 (quoting *Ellis* 416 F.2d at 805). They also do not apply to unsworn statements. *See Carter v. United States*, 791 A.2d 23, 24-25 (D.C. 2001) ("There is, of course, an important distinction between prior sworn testimony at a formal proceeding, for example a grand jury hearing, and statements volunteered during an informal investigation or properly supervised custodial

situation.").[3] Finally, no DC case has ever found that a privilege waiver had occurred based on a proceeding external to the particular case at issue.

Firmly established case law in this jurisdiction therefore presents at least two insuperable obstacles to ODC's waiver claim (1) Mr. Clark is the Respondent in this matter and not merely a witness; and 2) the prior statements on which ODC relies for waiver (in addition to being made outside this case) are unsworn. ODC should know from watching the entirety of the congressional field hearing that Mr. Clark appeared at that and which forms part of the subject of ODC's Motion that neither Mr. Clark nor any other witness that day were sworn in that proceeding. And, of course, it would be absurd to imagine that a discussion held on a private podcast was somehow sworn testimony to a government entity. For all of these reasons, there is thus no basis in law or fact for ODC to argue that Mr. Clark has waived his Fifth Amendment privilege.[4]

## III.    Act of Production

In addition to its arguments about waiver, ODC also suggests that Mr. Clark's

---

[3] We do not mean to suggest that the statements Mr. Clark made on a podcast or at a public hearing in support of individuals concerned about their due process rights being violated were or are akin to statements made either to a law-enforcement investigator or in a supervised custodial situation. Mr. Clark's statements are not analogous to those situations and, even in those situations, there was no Fifth Amendment waiver.

[4] In addition to Fifth Amendment, Mr. Clark has also raised executive privilege and law enforcement privilege. ODC's Motion does not address those privileges and Mr. Clark is under separate letter instructions from both the former President of the United States to invoke executive privilege and from the U.S. Justice Department to invoke law enforcement privilege. Before the Court could rule on ODC's pending subpoena enforcement motion, the Court would have to take up those privilege defenses as well.

public statements are "relevant to the Court's consideration of whether the act of producing documents on which he determined there was a basis to investigate election fraud would incriminate him." Motion at 2. Although it is difficult to tell, this appears to be a retread of ODC's argument that Mr. Clark has no act of production rights with respect to documents that in ODC's opinion would be exculpatory in a criminal case. There is no legal support for this argument.[5]

## IV.    Waiver/Forfeiture by ODC

ODC fails to cite any supporting authority that allows it to request record supplementation in a case where ODC is simultaneously taking the position that it is ripe for the Hearing Committee below to resume adjudication. *See* Exh. 2, Order (July 5, 2023) (Hearing Committee Twelve, at least preliminarily adopting ODC's position and ordering a pre-hearing status conference to be held on July 12, 2023 at 1 pm). Without a legal basis cited to support supplementation, it would seem that any factual record must first be produced below, beginning in the Hearing Committee, and tested against objections raised to admissibility to the Chair, rather than here.[6]

---

[5] Moreover, recall that Respondent's primary argument on this point was that the Court need not consider act of production. As argued in the initial response to ODC's motion, the subpoena does not merely request documents but is in fact a disguised set of interrogatories. *See* Respondent's February 14 Opposition at 11-13. Disguised interrogatories are improper under *In re Artis*, 888 A.2d 85, 99, 101 & n.13 (D.C. 2005) (refusing to order the respondent there to answer "interrogatory-like questions").

[6] These points do not waive our objection to the Chair of Hearing Committee's Twelve's Order issued July 5. We filed with the Chair to seek reconsideration of that Order on July 7, 2023. One of the grounds for that reconsideration is that adjudication at the Hearing Committee should not resume until the dispute between Respondent and ODC over removal jurisdiction now on appeal is finally resolved, as we have explained in

Additionally, it will be too late for ODC in a reply brief to try to set out legal support for its Motion.  *See Johnson v. District of Columbia*, 728 A.2d 70, n.1 (D.C. 1999) ("An appellant may not use the reply brief to raise new issues."); *see also* Rule 27(a)(3)(A)("A motion must state with particularity the grounds for the motion, the relief sought and the ***legal argument necessary to support it***") (emphasis added). That would constitute sandbagging. And for precisely the same reason, it would be too late for ODC on reply to try to present authorities to the contrary of *Ginyard*, *Tomkins, Ellis*, and *Carter* because ODC failed to do so in its opening Motion.

## CONCLUSION

Respondent respectfully requests this Court to deny the Motion. Specifically, the Court should rule that ODC's Motion requests relief that falls outside the scope of a Rule 27(b) Motion to Supplement the Record. And to the extent this Court reaches the merits of ODC's Motion, Respondent requests this Court to hold that there is no waiver of any of Mr. Clark's previously asserted privileges.

---

our other pending motions here seeking a continuance of the present abeyance and the entry of an overall order of deferral.

Respectfully submitted this 8th day of July 2023.

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*\*Motion for pro hac vice admission before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

*\* Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Response to Motion to Supplement*** by filing with the Court's electronic filing system which will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 8th day of July, 2023.

> /s/ Charles Burnham
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

Exhibit 9

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Clerk of the Court
Received 07/10/2023 10:18 PM
Filed 07/10/2023 10:18 PM

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
| JEFFREY B. CLARK, | : | DCCA No.: 22-BG-891 |
| | : | Board Docket No. 22-BD-039 |
| Respondent. | : | Disciplinary Docket No. 2021-D193 |
| | : | |
| A Member of the Bar of the District | : | |
| Of Columbia Court of Appeals | : | |
| (Bar Registration Number 455315) | : | |

**MOTION TO TAKE NOTICE OF FILING TO HEARING COMMITTEE TWELVE**

Respondent hereby moves for this Court to take notice of the attached filing made to the Chair of Hearing Committee Twelve below. *See* Exh. 1 (Motion to Vacate Orders (July 9, 2023)). ODC opposes the Court taking notice of this filing.[1]

The Chair has issued two orders—one on June 16, 2023 and one on July 5, 2023 (the latter setting a pre-hearing conference for July 12, 2023). A federal statute, 28 U.S.C. § 1447(c), makes those orders (and thus the pre-hearing conference date as well) legal nullities that should be vacated. Power does not return to a state or D.C. court (or adjunct thereof) until after the U.S. District Court Clerk mails a certified copy of a remand order back to the clerk of this Court (or, as appropriate to this setting, to a clerk acting for an adjunct body below). *Id.* ("A certified copy of the order of remand shall be mailed by the

---

[1] According to ODC: "The Office of Disciplinary Counsel does not consent to the motion. Clark is attempting supplement a motion pending before the Court of Appeals with arguments made in a different motion he has now made to the Hearing Committee. Disciplinary Counsel will respond to the latter motion in the forum in which it is pending. Disciplinary Counsel does not intend to otherwise respond to this motion unless directed to do so by the Court."

clerk to the clerk of the State court. The State court may **thereupon** proceed with such case.") (emphasis added). That mailing has not occurred, let alone been received below.

The attached motion to vacate filed to the Chair below explains this argument in further detail and we commend that motion's review by the Court here. We also urge the Court to consider the points therein in connection with our pending motions here to continue holding this matter in abeyance and to expedite the consideration of same.

Indeed, today the Chair of Hearing Committee Twelve has ordered ODC to respond to the noticed motion on a highly expedited basis by 3pm tomorrow. *See* Exh. 2.

Respectfully submitted this 10th day of July 2023.

<u>/s/ Charles Burnham</u>
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

2

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Motion to Take Notice of Hearing Committee Twelve Filing*** by filing with the Court's electronic filing system which will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 10th day of July, 2023.

> */s/ Charles Burnham*
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

3

Exhibit 10

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
|   JEFFREY B. CLARK | : | |
| | : | Board Docket No. 22-BD-039 |
| Respondent. | : | Disciplinary Docket No. 2021-D193 |
| | : | |
| A Member of the Bar of the | : | |
| District of Columbia Court of Appeals | : | |
| (Bar Registration No. 455315) | : | |

<u>ORDER</u>

Upon consideration of Disciplinary Counsel's Notice of Order Granting Remand, informing the Hearing Committee that the United States District Court for the District of Columbia granted Disciplinary Counsel's motion to remand the case, following Respondent's removal to federal court, it is hereby

ORDERED that no later than June 23, 2023, each party shall file a Report on the status of this matter.  The Report should also address rescheduling this matter for a hearing; identify any issues the parties believe may need to be addressed; propose any intermediate dates that may need to be scheduled in advance of hearing; and state the party's position on whether it is appropriate or necessary to schedule an additional prehearing conference.

HEARING COMMITTEE NUMBER TWELVE

By: _____
      Merril Hirsh
      Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire

charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

Exhibit 11



**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
| JEFFREY B. CLARK, | : | |
| | : | Board Docket No. 22-BD-039 |
| Respondent. | : | Disciplinary Docket No. 2021-D193 |
| | : | |
| A Member of the Bar of the District | : | |
| Of Columbia Court of Appeals | : | |
| (Bar Registration Number 455315) | : | |

<u>LODGED RESPONDENT STATUS REPORT</u>

1. ***Summary***: Respondent's view and that of his undersigned counsel is that nothing has

   changed in that matter that permits or objectively requires an order from this Hearing

   Committee to file a status report. ***First***, jurisdiction remains divested here while there

   is a pending case before the District of Columbia Court of Appeals ("DCCA"). *See, In*

   *re Jeffrey B. Clark*, 22-BG-891. Nor, ***second***, has any sort of remand been ordered by the

   DCCA or by the Board of Professional Responsibility. ***Third***, Respondent has filed a

   motion with the DCCA to continue the abeyance posture that this case has been held

   in since mid-January 2023. *See Motion to Continue Abeyance of Proceedings Before This*

   *Court and/or Defer Proceedings Below*. Briefing on that motion was not even due to be

   finished until today. But to be responsive to the Chair's June 16, 2023, Order, we pulled

ahead by one day the reply brief that was due in that sequence of briefing and filed it yesterday with the DCCA.[1]

2. *Lodging.* Given our position that the abeyance posture of this matter continues—of necessity—while that issue is pending before the DCCA—and indeed must also continue under the divestiture of jurisdiction as well—Respondent is only lodging, not filing, his Status Report today.

3. *Divestiture of Jurisdiction*. The Hearing Committee Chair is no doubt aware of our long-running position that while a case is pending at the DCCA in an appellate filing that ODC has voluntarily docketed, jurisdiction is divested here in this adjunct forum below. The pending case in the DCCA was filed by ODC on October 26, 2022. *See* Exhibit 1 (DCCA Docket Sheet). If ordered to do so, we would lodge a brief reiterating that position once more. But for purposes of the June 16, 2023, Order, we are assuming the Chair would agree that this would be a wasteful exercise. Moreover, on September 15, 2022, the DCCA issued an order mooting most of Respondent's objections to how the case was proceeding below. *See* Exhibit 2. That order did not explicitly state anything about Respondent's divestiture-of-jurisdiction points and indeed rendered

---

[1] Indeed, in light of the manner in which the Office of Disciplinary Counsel ("ODC") proceeded, such as by interjecting demonstrably incorrect and irrelevant merits arguments in response to our recent DCCA motion, we filed an over-length reply brief in support of that motion. As a result, we had to and did file an accompanying motion. *See Motion to Exceed Length Limitations for Respondent's Reply to in Support of Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below,* noting that ODC did not consent to the motion. And briefing on that accompanying procedural motion has certainly not even been completed—another factor making the Hearing Committee's June 16, 2023, Order here premature.

those points moot by dismissing No. 22-BG-059. Obviously, when a particular dispute

is dismissed at the higher level of the DCCA, its jurisdiction over a pending dispute

can no longer divest the adjunct bodies below of jurisdiction.

4. ***Appeal as of Right of the U.S. District Court for the District of Columbia's Remand***

   ***Order****.*  The Chair may not be aware, but Mr. Clark possesses an appeal as of right with

   respect to the June 8, 2023, remand order issued by the U.S. District Court, as it

   concerns a removal premised on the federal-officer removal statute (28 U.S.C. § 1442).

   *See* 28 U.S.C. § 1447(d). *See* Exhibit 3 (Notice of Appeal). The District Court's June 8,

   2023, Order is thus not immediately effective to dispose of the controversy over

   removal jurisdiction (a major issue of contention pending before the DCCA in the

   motions practice referenced above and in footnote 1). Indeed, the District Court has

   not even yet issued a Rule 58 separate judgment.[2] Nor has ODC sought the issuance of

   such a judgment, further rendering the Committee Chair's June 16, 2023, Order

   premature.

   The DCCA's stay order—as well as the stay posture most relevant here of lodging

   all materials filed below the DCCA level instituted by the Board consistent with the

---

[2] Though, of course, the District Court could not withhold such a document forever and thereby attempt to defeat Respondent's appellate rights. *See* Fed. R. App. P. 4(a)(7)(B) ("A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order."). More importantly, if such a separate judgment never issues, Federal Rule of Appellate Procedure 4(a)(2), (7) operate together to fix the relevant appellate timing rules affecting when Rule 58 separate judgment orders are not entered.

DCCA's January 17, 2023, stay order—was set up by the DCCA to continue until the removal jurisdiction dispute has been resolved. And that dispute, as noted, has not been resolved. Completion of the appeal (and all follow-on opportunities to challenge an appellate panel decision) must first be truly final and not subject to any higher-level appellate review before the proceedings of Hearing Committee Twelve may be reactivated.

5. ***Potential Rescheduling of the Hearing Before This Committee.*** As is implicit from the foregoing, Respondent's position is that it would be premature to reschedule the hearing at this time. Respondent cannot presently foresee when it would be ripe to set such a hearing date. This is true especially because Respondent will want to litigate to the Chair via motions practice numerous threshold matters, even were there to be a ruling final up through the DCCA level that the Board and Committee possess jurisdiction over this matter, despite the fact that the District of Columbia is not a "State" within the meaning of 28 U.S.C. § 530B (and relatedly that the U.S. Department of Justice regulation issued under this statute is *ultra vires* for exceeding the terms of Section 530B's authorization) and despite certain other of the Respondent's defenses including those asserting that an exercise of D.C. Bar jurisdiction here would also violate the separation of powers. *See* Answer (Third, Fourth, Fifth, Eighth, Eighteenth, Nineteenth, Twentieth, Twenty-Second, and Twenty-Third Defenses).

6. ***Intention to File a Mandamus Petition to the DCCA, If Needed.*** Respondent recognizes that there have been rulings south of the DCCA in this matter that Respondent cannot obtain a resolution of the threshold question of whether jurisdiction exists here, despite the limitations of Section 530B, until he first proceeds through a hearing, preserving jurisdictional objections for review by the DCCA. With due respect, and as the Chair is aware, we believe that such an approach violates *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) (threshold jurisdictional questions must be resolved before the merits); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) (requirement to establish subject matter jurisdiction as a threshold matter is "inflexible and without exception" and, for that reason, the Supreme Court rejected the doctrine of "hypothetical jurisdiction").[3] *Cf. Coinbase, Inc. v. Bielski*, Case No. 22-105, slip op. June 22 2023[4] (whether case belongs in arbitration or district court involves the entire case, therefore district court proceedings stayed pending interlocutory appeal of arbitrability, here analogous to removability; by long-standing practice, when Congress wants to authorize an interlocutory appeal and automatic stay pending appeal, it need not say anything about a stay).

---

[3] This is also the rule in ordinary judicial proceedings in District of Columbia Courts. *See UMC Dev. LLC v. District of Columbia*, 120 A.2d. 37, 42 (D.C. 2015) (standing is a matter posing "a threshold jurisdictional question which must be addressed prior to and independently of the merits of a party's claim.").

[4] Available at https://www.supremecourt.gov/opinions/22pdf/22-105_5536.pdf (last visited Jun. 23, 2023).

As a result, were Respondent to be faced with a future ruling holding against removal jurisdiction that can no longer be challenged because *certiorari* has been denied or because the U.S. Supreme Court rules against Mr. Clark, Respondent would still file a petition for mandamus to the DCCA arguing that no hearing can proceed before there is a final threshold resolution of the disputed issue of subject matter jurisdiction and thus that any general rule that the DCCA has created to the contrary is void as applied here. Relatedly, Respondent would take the position, at the very least, that it would be imprudent to hold a hearing before such a mandamus petition is finally resolved—and such a petition would also potentially involve U.S. Supreme Court review.

7. ***Issues That May Need to Be Addressed.*** Respondent cannot fully say at this premature juncture what the full range of other threshold matters that must or may need to be resolved by the Chair before a hearing could begin. After the October 2022 status conference that the Chair held was complete and the DCCA's September 15, 2022, order had issued, it became clear to us that we would need to remove this case to the Article III courts. Without clarity as to which procedural rules would govern this matter (i.e., the Federal Rules of Criminal Procedure, the Federal Rules of Civil procedure, or a hybrid of the two if removal jurisdiction were found to exist, versus the procedural rules governing the DCCA, Board, and Hearing Committee processes,

if removal jurisdiction is not held to exist), it is impossible to identify or formulate all necessary motions in advance.

8. *Five Threshold Motions Respondent Anticipates Would Need to Be Resolved Before It Would Be Prudent or Even Possible to Set a Hearing Date, Even If, Counterfactually, Both (a) the Removal Jurisdiction Dispute Were Final, and (b) the Jurisdictional Mandamus Petition Were Also Final.* At this time, we can alert the Chair to five threshold motions we would consider drawing up and filing if and when the removal issues and the mandamus-able issues are finally resolved:

   i. *Presidential Appointments Clause Prerogatives.* The Charges threaten to interfere with the exclusive Appointments Clause power of the President of the United States. *See* Answer (Sixth Defense).

   ii. *The Charges Present Non-Justiciable Political Questions in the Context of an Interbranch Dispute (Partly Mooted by the Dawn of the Current Congress).* Senator Durbin is the genesis of this matter. His complaint never should have been docketed because he had *no first-hand knowledge* of Mr. Clark's conduct, legal advice, and/or positions taken inside Executive Branch disputes. Numerous Democrats have objected to presidential elections, including far away from the floors of the two Houses of Congress. There is no basis for turning such a political dispute into a matter for bar discipline, despite the fact

that, as is common knowledge, many members of Congress are lawyers. *See* Answer (Ninth, Thirty-Sixth, Thirty-Seventh Defenses).

iii.    ***Respondent's Conduct Is Entitled to Official Immunity or Qualified Immunity.*** And, as the Chair is no doubt aware, the presence and applicability of an immunity to a particular matter means that Respondent could not be subjected to a hearing before the immunity was finally found not to exist. *See* Answer (Twenty-Fourth Defense).

iv.    ***The Charges Do Not State a Violation of the Rules of Professional Conduct and Respondent Certainly Had No Fair Notice of the Heretofore Unknown Offense of Persisting in Advancing a Legal Argument After Other Lawyers Disagreed But the President Had Not Yet Resolved the Dispute***. At the October 2022 status conference, you, as Chair, seemed to recognize that, after Mr. Fox's concession that he would not have brought this case merely for drafting a letter to be sent to state officials, a serious issue existed as to how such persistent conduct could possibly violate the Rules. *See* Answer (Twenty-Fifth and Twenty-Sixth Defenses).

v.    ***ODC Has Engaged in at Least Two Forms of Misconduct That Fatally Taint This Action: (1) ODC Improperly Threatened Respondent to Agree to Its Invalid Informational Demands or Discipline Would Be Heightened, Which Violates***

8

*Due Process; and (2) ODC Has Improperly Attempted to Try Its Case in the*

*Press.* See Answer (Forty-Fourth, Forty-Sixth, and Forty-Seventh Defenses.

Finally, as an overarching caveat, by setting out these five exemplar threshold motions, Respondent and his counsel do not intend to waive any of Respondent's other defenses or concede that those are not threshold matters as well. In this document, we are simply trying to be as transparent as we can at this time, in our lodged response to the June 16, 2023, Order.

9. *Intermediate Dates*. For the reasons listed above (and others), that we cannot hazard a guess at this point as to when it would be possible or prudent to set any intermediate dates. Respondent and undersigned counsel, however, put this Committee and ODC on notice of two points: **(i)** even once the removal jurisdiction and mandamus threshold issues are finally resolved, we will need a general transition period of at least two weeks and possibly as long as one month in which to assess where the case stands in light of any intervening judicial cases and formulate defenses based thereon; and **(ii)** each of the five exemplar motion should, in terms of a briefing schedule, be set over a sequential period of 3-4 weeks each after the general transition period ends. Each of the above-described motions will be complex and Respondent should not be denied adequate time to lay out any such defenses.

10. *Aid with Obtaining Documents from DOJ and Beyond.* Using its resource advantages as well as being able to use the period in which this matter was confidential and/or

under seal to its advantage, ODC has had the luxury of having been able to interview witnesses it believes support the Charges and look at documents that were released by the House Oversight Committee and the Senate Judiciary Committee in 2021, by the House January 6 Select Committee in 2022, and by the U.S. Justice Department (in violation of its *Touhy* regulations, we believe). Mr. Clark has not been afforded these luxuries and had hoped that Charges would never be filed in light of the extensive defenses he informed ODC of via late January 2022 letters. Moreover, the January 6 Committee has released only a small fraction of the evidence it collected; some of the unreleased evidence may be exculpatory as to Mr. Clark, especially considering the show-trial nature of those proceedings. In light of these issues, the Chair would need to assist Respondent by calling for the full span of documents to be released to the parties. Or, failing that, for Mr. Clark to approach the relevant bodies to see if they will share **all necessary information**. Finally, if that will not occur for one reason or another, we are putting the Committee and ODC on notice that we will argue that Mr. Clark's due process rights would be violated if a hearing goes forward nonetheless, since both the Biden Justice Department and the Biden National Archives and Records Administration (as the keeper of the now-defunct January 6 Committee records), have obvious incentives not to want to assist Mr. Clark to assemble the full span of his own records inside the Justice Department from 2020-early 2021 or to assemble documents provided by third parties to other governmental bodies. *See* Answer (Forty-Eighth &

Forty-Ninth Defenses). Resort to FOIA requests and FOIA litigation may become necessary. In addition, securing the testimony of current or former DOJ employees may become entangled in disputes or litigation over the application of the *Touhy* regulations.

11. ***Witnesses.*** The June 16, 2023 Order did not ask us to do so, but we want to put the Committee and ODC on full notice that we cannot possibly be expected to try to line up witnesses for Mr. Clark at this time because there is insufficient clarity as to scheduling and thus it would be unfair to the witnesses (and to Mr. Clark, who would then be potentially blamed for trying the patience of third parties), if scheduling guesses are made that may not hold up.

12. ***Information on Other Prosecutions.*** Much like we anticipate that President Trump, in defending the Mar-a-Lago documents prosecution brought against him on grounds that he is being selectively prosecuted, would want to see documents concerning DOJ investigations and prosecutorial decision memoranda as to other Presidents, Vice Presidents, and Senators, etc., with alleged document-retention problems, we will want a period of discovery into whether ODC has ever brought or even considered bringing a bar disciplinary case remotely like this one ever before. This is because Mr. Clark's due process (equal protection component) rights would be violated by selective D.C. Bar prosecution. *See* Answer (Thirty-Eighth and Thirty-Ninth Defenses). For instance, during election controversies in 2000, 2004, and 2016 were any Democrat

lawyers taking positions on those presidential elections ever even investigated for their positions?

13. ***Ex Parte Contacts.*** We anticipate that, at the appropriate time, we will file a motion requiring all *ex parte* contacts concerning **non-ministerial** matters (with ministerial matters being things such as extensions, page-enlargements, status phone calls, etc.) between the Board, this Hearing Committee, and ODC. Also, we have previously sought discovery of third-party contacts and coordination between ODC with (a) any members or agents of Congress, (b) DOJ or the Biden Administration, and (c) the media. We have been rebuffed there. That cannot be allowed to continue.

14. ***Renewed Deferral Motion.*** As the Chair is no doubt aware, this matter is just one piece in a mosaic of matters or potential matters that involve scrutiny of the actions of President Trump's lawyers or perceived allies of President Trump in late 2020 to early 2021. Under standard principles animating the DCCA, Board, and Hearing Committee approach to granting deferrals, Respondent thus may opt to file a renewed deferral motion on an appropriate future date.

15. ***Prehearing Conference.*** Given the intense complexity of this novel matter as well as the fact that the matter may take unexpected twists and turns, Respondent can easily anticipate that yes, a prehearing conference of considerable length would be required before this matter could be set for a hearing, if and after all prior hurdles to doing so

are surmounted, but it would be premature and inefficient to conduct such a

conference now.

Respectfully submitted this 23rd day of June 2023.

/s/ Charles Burnham                     Robert A. Destro*
Charles Burnham                         Ohio Bar #0024315
DC Bar No. 1003464                      4532 Langston Blvd, #520
1750 K Street, NW                       Arlington, VA 22207
Suite 300                               202-319-5303
Washington DC 20005                     robert.destro@protonmail.com
charles@burnhamgorokhov.com
                                        *Motion for pro hac vice admission
                                        before DCCA in progress

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice admission before
DCCA in progress

**CERTIFICATE OF SERVICE**

I hereby certify that I have on June 23, 2023, served counsel for the

opposing party and the executive attorney by email addressed to:

Hamilton P. Fox                       James T. Phalen
Jason R. Horrell                      Executive Attorney
Theodore (Jack) Metzler               Office of the Executive Attorney
Building A, Room 117                  430 E. Street, NW Suite 138
515 5th Street NW                     Washington, DC 20001
Washington DC 20001                   casemanagers@dcpbr.org
foxp@dcodc.org


                                      /s/ Charles Burnham
                                      Charles Burnham
                                      DC Bar No. 1003464
                                      1750 K Street, NW
                                      Suite 300
                                      Washington DC 20005
                                      (202) 386-6920
                                      charles@burnhamgorokhov.com

Appellate E-Filing System
District of Columbia
Court of Appeals
C-Track, the browser based CMS for Appellate Courts

Login

Find Case...

### Cases

Case Search
Participant Search

## Case Information: 22-BG-0891

| | | | |
|---|---|---|---|
| **Short Caption:** | IN RE JEFFREY B. CLARK, BAR REGISTRATION NO. 455315, BOARD DOCKET NO. 22-BD-39 | **Classification:** | Bar Governance - Bar - Disciplinary |
| **Superior Court or Agency Case Number:** | DDN: 2021-D193 | **Filed Date:** | 10/26/2022 |
| **Opening Event Date:** | 10/26/2022 | **Case Status:** | Pending |
| **Record Completed:** | | **Post-Decision Matter Pending:** | |
| **Briefs Completed:** | | | |
| **Argued/Submitted:** | | | |
| **Disposition:** | | **Next Scheduled Action:** | Review Filings/Statements/Pleadings |
| **Mandate Issued:** | | | |

## Party Information

| Appellate Role | Party Name | IFP | Attorney(s) | Arguing Attorney | E-Filer |
|---|---|---|---|---|---|
| Petitioner | Bar Counsel | N | Hamilton P. Fox | N | Y |
| | | | Jason Horrell | N | Y |
| | | | Theodore (Jack) Metzler | N | Y |
| Petitioner | Board on Professional Responsibility | | James T. Phalen | N | Y |
| Respondent | Jeffrey B. Clark | N | Charles Burnham | N | Y |

## Events

| Event Date | Status | Description | Result | PDF |
|---|---|---|---|---|
| 10/26/2022 | Filed | Bar Counsel's Motion To Enforce Subpoena | | |
| 11/04/2022 | Filed | Reply to Disciplinary Counsel's Motion to Enforce Subpoena. (Respondent) | | |
| 11/07/2022 | Filed | Disciplinary Counsel's Reply to Respondent's Response to Motion to Enforce (Petitioner Bar Counsel) | | |
| 11/26/2022 | Filed | Notification of Second Removal to Federal Court (Respondent) | | |
| 01/17/2023 | Filed | ORDER holding subpoena in abeyance pending outcome of removal matter in US District Court. | | |
| 06/09/2023 | Filed | Disciplinary Counsel's Notice of Order Granting Remand (Petitioner Bar Counsel) | | |

Exhibit 1

| 06/12/2023 | Filed | Motion to continue abeyance of proceedings before this court and/or defer proceedings below. (Respondent) |
| 06/16/2023 | Filed | Appearance by Theodore (Jack) Metzler (Petitioner Bar Counsel) |
| 06/20/2023 | Lodged | Opposition to Motion to Continue Abeyance (Petitioner Bar Counsel) |
| 06/21/2023 | Filed | Motion For Leave to Exceed Length Limitations for Reply in Support   of Motion to Continue Abeyance of Proceedings Before this Court and/or Defer   Proceedings Below (Respondent) |
| 06/22/2023 | Lodged | Reply in Support of Motion to Continue Abeyance of Proceedings Before   This Court and/or Defer Proceedings Below (Respondent) |

# 𝔇istrict of 𝔠olumbia
# 𝔠ourt of 𝔄ppeals

**No. 22-BG-059**

IN RE JEFFREY B. CLARK

A Member of the Bar of the
District of Columbia Court of Appeals          **DDN2021-D193**
**Bar Registration No.  445315**               **Board Docket No.: 22-BD-39**

FILED
SEP **15** 2022
DISTRICT OF COLUMBIA
COURT OF APPEALS

BEFORE:  Glickman and Howard, Associate Judges, and Steadman, Senior Judge.

## O R D E R
(FILED— September 15, 2022)

This matter began as a sealed motion to enforce a subpoena duces tecum to assist in the investigation of a potential disciplinary violation,  respondent then filed motions for leave to file his lodged opposition that exceeded the page limits and a motion to quash that was opposed by Disciplinary Counsel to which respondent filed a reply; Disciplinary Counsel filed a motion to supplement the record, respondent filed a response and Disciplinary Counsel filed a reply; Disciplinary Counsel then filed a motion to unseal the case stating that it had filed a petition and specification of charges that has been sent to a Hearing Committee (2022 BDN 39) but still seeks enforcement of the subpoena duces tecum to assist in presenting its case, respondent opposes and filed a motion to stay the proceedings before the Hearing Committee pending  resolution  of  this  matter  that  is  opposed  by  Disciplinary  Counsel  and respondent filed a reply, and finally respondent has filed a D.C. App. R. 28(k) letter, it is

ORDERED  that  respondent's  motions  for  leave  to  file  his  opposition  are granted.  It is

FURTHER ORDERED that Disciplinary Counsel's motion to supplement the motion is granted.  It is

Exhibit 2

No. 22-BG-59

FURTHER ORDERED that the motion to unseal is granted and the case number and caption are changed as reflected in this order.  Because Disciplinary Counsel has now filed a petition and specification of charges pursuant to D.C. Bar R. XI, § 8(c), D.C. Bar R. XI, § 17(a) no longer applies.  Any request for a protective order must be made to the Hearing Committee pursuant to D.C. Bar R. XI, § 17(d). It is

FURTHER ORDERED that respondent's motion to stay the disciplinary proceedings is denied.  It is

FURTHER ORDERED that respondent's motion to quash the subpoena is denied.  D.C. Bar R. XI, § 18(c) requires that all motions to quash a subpoena must be heard and decided by a Hearing Committee designated by the Executive Attorney. It is

FURTHER ORDERED that because disciplinary proceedings have been initiated the pending subpoena issued pursuant to D.C. Bar R. XI, § 18(b) no longer applies.  D.C. Bar R. XI, § 18(a) provides that once formal disciplinary proceedings are initiated the subpoena to compel attendance and production of documents may be issued by either Disciplinary Counsel or a member of the Hearing Committee. By reaching this resolution we express no opinion on whether the subpoenas was properly served.  Therefore, the motion to compel is denied as moot.

**PER CURIAM**

Copies e-served to:

Charles Burnham, Esquire

Hamilton Fox, Esquire
Disciplinary Counsel

**No. 22-BG-59**

Jason Horrell, Esquire
Office of Disciplinary Counsel

James Phalen, Esquire
Executive Attorney - BPR

Lucy Pittman, Esquire
Chair - BPR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: JEFFREY B. CLARK,

A member of the Bar of the
District of Columbia Court of
Appeals (Bar No. 455315)

Case Nos. 22-mc-00096, 22-mc-00117,
and 23-mc-00007 (consolidated)

### NOTICE OF APPEAL

Plaintiff/Charge Respondent Jeffrey B. Clark hereby files this notice of appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order of the United States District Court for the District of Columbia, entered June 8, 2023, granting motions to remand filed by Defendant/Charging Party Disciplinary Counsel Hamilton P. ("Phil") Fox. Appeals of right lie from remand orders arising from federal officer removal cases pursuant to 28 U.S.C. § 1447(d).

Respectfully submitted this 11th day of June 2023.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K St. NW
#300
Washington, DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

Exhibit 3

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this **Notice of Appeal** by filing with the Court's electronic filing system and by email addressed to:

Hamilton P. Fox, Esq.
Jason P. Horrell, Esq.
Office of Disciplinary Counsel
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org
horrellj@dcodc.org

This 11th day of June 2023.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K St. NW
#300
Washington, DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Exhibit 12

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**

RECEIVED

Jun 23 2023 4:35pm

Board on Professional
Responsibility

|  |  |  |
|---|---|---|
| In the Matter of | : | |
| | : | |
| JEFFREY B. CLARK, ESQUIRE | : | Disciplinary Docket No. 2021-D193 |
| | : | Board Docket No. 22-BD-039 |
| Respondent, | : | DCCA No. 21-BS-0059 |
| | : | |
| A Member of the Bar of the District | : | |
| of Columbia Court of Appeals. | : | |
| Bar Number: 455315 | : | |
| Date of Admission:  July 7, 1997 | : | |
| | : | |

<u>**DISCIPLINARY COUNSEL'S STATUS REPORT**</u>

Mr. Clark has noted an appeal from the district court's order of remand to the United States Court of Appeals for the District of Columbia Circuit.  There is also pending before the D.C. Court of Appeals a motion by Disciplinary Counsel to enforce a subpoena for documents from Mr. Clark.  That enforcement proceeding was held in abeyance by the Court pending resolution of the removal issue and should now be ripe for decision.  Mr. Clark has asked the Court to continue to hold the matter in abeyance.  Disciplinary Counsel has opposed that request, and the issue is pending.  Finally, it came to Disciplinary Counsel's attention that Mr. Clark had written a draft of a memoir of some sort in which he discussed the conduct that lies at the basis of this proceeding.  Disciplinary Counsel subpoenaed those materials in

December, but Mr. Clark refused to accept the subpoena when a process server attempted to serve it.

The Hearing Committee should re-set this case for a hearing as soon after Labor Day as possible. Disciplinary Counsel believes that its case should take two days to try but recommends that the Committee schedule three days (plus however long Mr. Clark believes his case will take) out of caution. (The initial hearing was scheduled for five days.) Disciplinary Counsel is available any day in September, other than September 18-21, and any other date later in the year other than November 16-19. The parties have already submitted witness lists and exhibit lists, but we suggest that they be given a chance to amend them. We suggest that the dates for those amendments should be three weeks before the hearing date.

Mr. Clark has heretofore asserted his privilege against self-incrimination in these proceedings as well as before the January 6 Committee. We note, however, that on June 6, 2023, he appeared before an ad hoc Congressional Committee and did not assert. His testimony touched on his investigation of election fraud while at the Department of Justice following the November 2020 election. It may be that he no longer intends to assert his privilege or that he has waived it. Disciplinary Counsel intends to call him as a witness in its case. If he does refuse to testify, the issue will arise as to what inference the Committee will be permitted to

2

draw from that refusal. This is an issue that has not been addressed in our disciplinary process. We believe that this issue should be the subject of a pre-hearing ruling so that Mr. Clark and Disciplinary Counsel will know in advance the consequences of Mr. Clark's refusal to testify. For example, Disciplinary Counsel would conduct its examination of Mr. Clark differently if the Hearing Committee determines that it may draw inferences from his invocation of the privilege. Accordingly, Disciplinary Counsel believes that a pre- hearing conference is needed to schedule a process to resolve this issue as well as the production of the materials Disciplinary Counsel attempted to subpoena and whatever other evidentiary issues Mr. Clark might raise. This conference should be scheduled for July.

Respectfully submitted,

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel
Bar Registration No. 113050

/s/ Jason R. Horrell
Jason R. Horrell
Assistant Disciplinary Counsel
Bar Registration No. 1033885

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of June 2023, I caused a copy of the foregoing *Disciplinary Counsel's Status Report* to be served via email on the Board on Professional Responsibility, at <u>CaseManager@dcbpr.org</u> and a copy sent via email to Jeffrey B. Clark's c/o Harry W. MacDougald, Esquire, at <u>hmacdougald@CCEDlaw.com,</u> to Charles Burnham, Esquire, at <u>charles@burnhamgorokhov.com,</u> and to Robert A. Destro, Esquire, at <u>Robert.destro@protonmail.com</u>.


*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel

Exhibit 13

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
| JEFFREY B. CLARK, | : | |
| | : | |
| Respondent. | : | Board Docket No. 22-BD-039 |
| | : | Disciplinary Docket No. 2021-D193 |
| A Member of the Bar of the | : | |
| District of Columbia Court of Appeals | : | |
| (Bar Registration No. 455315) | : | |

FILED

Jul 5 2023 12:04pm

Board on Professional Responsibility

ORDER

Disciplinary Counsel filed the Specification of Charges in this matter on July 19, 2022. Respondent filed his Answer on September 1, 2022. The matter was set for a hearing to begin on January 9, 2023.

On October 17, 2022, Respondent filed a notice of removal of this matter to the United States District Court for the District of Columbia. Disciplinary Counsel filed a motion to remand on October 21, 2022. On June 9, 2023, Disciplinary Counsel notified the Hearing Committee that the District Court had granted Disciplinary Counsel's motion to remand on June 8, 2023. *See* Order *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) ("this matter shall be REMANDED for further proceedings") (emphasis in original); *see also* Memorandum Op., *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) (setting forth basis for remand order). On June 16, 2023, the Hearing Committee ordered each party to report on the status of this matter,

specifically addressing rescheduling this matter for a hearing; identifying any issues the parties believe may need to be addressed; proposing any intermediate dates that may need to be scheduled in advance of hearing; and stating the party's position on whether it is appropriate or necessary to schedule an additional prehearing conference.  Both parties submitted timely reports, which Disciplinary Counsel purported to file and Respondent, Mr. Clark, to "lodge."

Disciplinary Counsel asserts that the case is ready for hearing, which should be scheduled as soon as possible after Labor Day.  Mr. Clark lodged his report because he maintains that this matter should be held in abeyance pending the Court of Appeals' consideration of a subpoena dispute between Mr. Clark and Disciplinary Counsel (*In re Clark*, D.C. App. No. 22-BG-0891).  Mr. Clark's Report at 2.

The fact that a party is seeking to enforce a subpoena for use in this proceeding, however, neither requires nor justifies holding this proceeding in abeyance, at least at this point.  A subpoena enforcement is not an appeal of this action.  It is a collateral proceeding that does not affect jurisdiction here.  Nor does its pendency justify delaying all other preparation in this matter.  *See In re Clark,* Board Dkt. 22-BD-039, at 4-5 (H.C. Report, Sept. 12, 2022), *adopted on other grounds,* Order, *In re Clark,* Board Dkt. 22-BD-039 (BPR, Sept. 27, 2022).

Regarding scheduling, Mr. Clark also notes that he has appealed the District Court's June 8 Order, attaches his Notice of Appeal, and argues that Hearing Committee proceedings may not commence until that appeal is complete and "not subject to any higher level appellate review."  Mr. Clark's Report at 4.  Mr. Clark

does not assert that the District Court's remand order has been stayed pending appeal, or that any court has issued an order specifically prohibiting further proceedings before this Hearing Committee.

Mr. Clark also argues that the remand order is not immediately effective to dispose of the controversy over removal jurisdiction because the District Court has not yet issued a separate "judgment" pursuant to Fed. R. Civ. P. 58, which requires that a judgment "must be set out in a separate document." Mr. Clark's Report at 3. As noted above, Mr. Clark's statement that the District Court did not create a separate document does not appear to be true. The District Court *did* enter a separate order remanding the case. *See In re Clark*, No. 23-7073 (D.D.C.), Dkt. Nos. 19-20. Indeed, Mr. Clark has appealed the order and the United States Court of Appeals for the District of Columbia Circuit has docketed the appeal. *In re Clark*, 23-7073 (D.C. Cir.).

But even if Mr. Clark were correct that the District Court did not properly enter a judgment in a separate document, that would raise a potential question only about whether his appeal was valid. It would not change the fact that the District Court ordered the case to be remanded. The Supreme Court has concluded that "[t]he sole purpose of the separate-document requirement, which was added to Rule 58 in 1963, was to clarify when the time for appeal under 28 U.S.C. § 2107 begins to run." *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384 (1978); *accord Diamond by Diamond v. McKenzie*, 770 F.2d 225, 230–31 (D.C. Cir. 1985). Courts enter many orders (for example, discovery rulings, injunctions, scheduling orders and *pro hac*

*vice* orders), that do not operate by themselves as final judgments. Those orders are nonetheless effective unless they are stayed.

Mr. Clark's decision to appeal did not stay the District Court's Order. "A stay" of a motion to remand pending appeal "is not a matter of right even if irreparable injury might result." *Leroy v. Hume*, 563 F.Supp.3d 22 (E.D. N.Y 2021) (quoting *Virginia Ry. Co. v. United States*, 272 U.S. 268, 272 (1926)). *See also, e.g.*, *Wilde v. Huntington Ingalls, Inc.*, 616 Fed. Appx. 710 (5th Cir. 2015) (denying motion to stay an order of remand pending appeal); *Martin v. Serrano Post Acute LLC*, 2020 WL 13302380 (C.D. Cal. 2020) (same) *Mayor of Baltimore v. BP P.L.C.*, 2019 WL 3464667 (D. Md. 2019) (same). The docket reflects that Mr. Clark did not even seek to stay order, much less obtain a stay.

Mr. Clark also asserts that it would be premature to reschedule the hearing at this time because, among other things, Mr. Clark will want to litigate to the Chair via motions practice "numerous threshold matters," and that *mandamus* proceedings may be required. Mr. Clark's Report at 4-5. However, Board Rule 7.16 does not permit our Committee to delay the hearing to resolve motions that are not directed to the manner in which the hearing is to be conducted, or the admissibility of evidence. Instead "the Hearing Committee shall include in its report to the Board a proposed disposition and the reasons therefor. The Board will rule on all such motions in its disposition in the case." *See also In re Stanton*, 470 A.2d 281, 285 (D.C. 1983) (appended Board report) (once a Specification of Charges has been filed, "the underlying purposes of the Board require that we proceed directly to a

hearing on the merits rather than being detoured into questions of pleading and form.").[1]

Upon consideration of the foregoing, and it appearing that this matter has been remanded to the Hearing Committee, and it further appearing that a pre-hearing conference would assist the Hearing Committee in scheduling this matter for a hearing, it is hereby

ORDERED that a pre-hearing conference will be held in the above-captioned matter at **1:00 p.m.** on **July 12, 2023**, via Zoom video conference, in accordance with Board Rule 7.24, and will be live-streamed on the Hearing Committees' YouTube channel.  Disciplinary Counsel and Mr. Clark and/or his counsel shall appear promptly at that time.  The parties are directed to avoid scheduling conflicting

---

[1] Mr. Clark renews an argument he has made before that the Committee should not follow the Board's procedures because, if this Committee were a federal court, it could not avoid reaching a difficult jurisdictional issue by resolving the case based on merits arguments that are easier to adjudicate.  Mr. Clark's Report at 5. Mr. Clark's argument misstates our role.  The Committee is not a federal court and does not determine merits at all.  Rather, it issues a report and recommendation that is filed with the Board (under procedures the Board establishes).  Nothing in the decisions Mr. Clark cites involving federal courts bars the Board from having the Committee issue a report and recommendation on all issues at once.  Nor does it authorize (much less require) the Committee to establish a motion practice that the Board did not contemplate.  In any event, even if we assumed that the federal court principle Mr. Clark references applied to this Committee, following Board Rule 7.16 (by making a report and recommendation after hearing rather than deciding a case on papers), would not violate that principle.  Complying with Board Rule 7.16 does not mean that the Committee will overlook a difficult "jurisdictional" argument in order to resolve the case on the merits.  To the contrary, the Rule contemplates that we carefully consider all issues, report on the relate facts and make recommendations on all appropriate determinations.

matters and shall inform any court or administrative agency of this prior commitment to the disciplinary system; and it is further

ORDERED that prior to the pre-hearing conference, the parties are directed to meet and confer with respect to scheduling the evidentiary hearing of this matter during 2023, and any intermediate dates that may need to be scheduled in advance of hearing. When considering scheduling, the parties are reminded that subpoenas are available to compel the attendance of witnesses, and witness testimony may be taken from a remote location pursuant to Board Rule 11.4. The parties are further reminded to allow time for opening statements and closing arguments when estimating the time necessary for the hearing; and it is further

ORDERED that Mr. Clark's attention is drawn to Board Administrative Order 2023-01, which provides, among other things, that

> Board oral arguments and Hearing Committee hearings in contested cases and reinstatement cases that have not yet been scheduled for a hearing, shall be scheduled for an in-person proceeding unless the respondent requests that the proceeding be held over Zoom. For Board arguments, the request to conduct the argument over Zoom, if any, shall be contained in the respondent's brief, immediately before the respondent's or counsel's signature. For Hearing Committee hearings in contested cases and reinstatement cases, the request to conduct the hearing over Zoom, if any, shall be made as soon as practicable, but no later than the date set for the pre-hearing conference. Such request shall be filed with the Office of the Executive Attorney and served on Disciplinary Counsel;

and it is further

ORDERED that the Office of the Executive Attorney is directed to serve this

order by email, and to circulate the link for the Zoom pre-hearing conference.

HEARING COMMITTEE NUMBER TWELVE

By: _____

Merril Hirsh
Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire
charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

Exhibit 14

# DISTRICT OF COLUMBIA COURT OF APPEALS

# BOARD ON PROFESSIONAL RESPONSIBILITY

## Hearing Committee Number Twelve

RECEIVED

July 5, 2023 10:41 pm

Board on Professional
Responsibility

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket No.

2021-D193

## LODGED NOTICE OF MOTION TO EXPEDITE FILED IN THE COURT OF APPEALS

Respondent hereby lodges this Notice of Motion to Expedite Filed in the Court of Appeals with the Board and Hearing Committee.  The filing and exhibit are attached.

Respectfully submitted July 5, 2023 .

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission
before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

*Motion for pro hac vice admission
before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this lodged filing by email:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464
1750 K Street, NW
Suite 300
Washington DC 20006
202-386-6920
charles@burnhamgorokhov.com

## DISTRICT OF COLUMBIA COURT OF APPEALS

| | |
|---|---|
| **In the Matter of** | |
| **JEFFREY B. CLARK** | **Disciplinary Docket Nos.** |
| **A Member of the Bar of the District of Columbia Court of Appeals** | **2021-D193** |
| | **22-BG-891** |
| **Bar No. 455315** | |
| **Date of Admission: July 7, 1997** | |

## MOTION TO EXPEDITE RULING ON MOTION TO CONTINUE ABEYANCE OF PROCEEDINGS BEFORE THIS COURT AND/OR DEFER PROCEEDINGS BELOW

Respondent Jeffrey B. Clark moved on June 11, 2023, to continue the abeyance ordered by this Court on January 17, 2023 and (additionally or in the alternative) to order that proceedings before the Board of Professional Responsibility, etc. be deferred.[1] The June 11 Motion has been fully briefed and is ripe for decision. Respondent respectfully asks the Court to expedite ruling on this Motion because the Hearing Committee issued an order today, July 5, 2023, immediately resuming proceedings at that level without waiting for this Court to act on the relief requested in the Motion, especially the request for a deferral order of all proceedings below pending future Article III court action.

Specifically, Respondent asked that the abeyance be continued because the grounds upon which it was originally entered still apply—the question of removal

---

[1] The January 17, 2023 Order held the Office of Disciplinary Counsel's Motion to Enforce Subpoena Duces Tecum in Abeyance.

jurisdiction remains unresolved due to the pendency of Respondent's appeal of the remand order issued by the U.S. District Court. While normal remand decisions are not appealable, federal officer removals may be appealed as of right under 28 U.S.C. § 1447(d).

Respondent's Motion to Continue Abeyance also asked this Court to hold proceedings before the Board of Professional Responsibility and Hearing Committee Number 12 in abeyance or to order them deferred.

Respondent brings this Motion for Expedited Consideration because the Chair of Hearing Committee Number 12 issued an Order on July 5, 2023 to resume proceedings before the Committee. *See* Exh. 1, attached hereto. The July 5 Order directed the resumption of proceedings before the Hearing Committee despite the pending D.C. Circuit appeal and despite Respondent's Motion to Continue Abeyance in this Court. The July 5 Order set a pre-hearing conference for July 12, 2023, and directed the parties to meet and confer on scheduling the evidentiary hearing and any associated preliminary events and deadlines. The July 5 Order thus makes resolution of Respondent's Motion to Continue Abeyance an urgent priority. ***We thus respectfully request a resolution of the pending Motion to Continue Abeyance on or before <u>July 11, 2023</u>***.

The July 5 Order rests on invalid premises. ***First***, with respect to the pending federal appeal, it relies at least in part on the fact that Respondent has not yet filed a motion for stay pending appeal in the Article III court system. *See* July 5 Order, pp. 2-3.

But the deadline for procedural motions in the federal appeal is July 14, 2023, and until today it was not clear that the Hearing Committee would move forward despite the pending federal appeal and the Motion to Continue Abeyance pending in this Court. Respondent conspicuously noted the timing of the procedural motions deadline in the D.C. Circuit in his Reply in Support of the Motion to Continue Abeyance, and stated that a motion for stay in the Article III court system would be filed if abeyance was not forthcoming from this Court. No weight can be given to Respondent not having filed a motion whose deadline is still ten days away and which may not ever be necessary if the abeyance is continued in this Court and extended to the Board and Hearing Committee level via a deferral order, as common sense and comity suggest should occur.

The January 17, 2023 abeyance order here implicitly recognized that it was inappropriate to move forward with proceedings in this Court, and by implication at the Board and Hearing Committee level, until the question of removal was resolved. Indeed, the Board and Hearing Committee Number 12 took no steps to adjudicate this case while the removal issue was under submission to the U.S. District Court. Nothing has changed since that time except that the *first stage* of the removal proceedings was decided against Mr. Clark. Hence, the logic of the January 17 abeyance applies with equal force now due to the pendency of the federal appeal. After all, it is obvious that if a trial (denominated a "hearing" under the disciplinary system) is conducted below and Mr. Clark later prevails in his D.C. Circuit appeal or at the U.S. Supreme Court—thereby establishing

that there *is* federal-officer removal jurisdiction here—then all proceedings before the Hearing Committee and any related follow-on proceedings before the Board or this Court would have been a waste of resources for all concerned. Surely that ought to be avoided.

*Second*, the Committee Chair also held that the abeyance in this Court of the motion to enforce a subpoena was collateral to the proceedings before the Hearing Committee and did not deprive it of jurisdiction to move forward with the evidentiary hearing. However, as noted above, after the abeyance order was entered, proceedings at the Board and Hearing Committee level *were also halted*, even though there was no specific Order to that effect entered at the Board or Hearing Committee level, a point not addressed in the July 5 Order. Indeed, ODC itself *conceded* that this case has been in a functional abeyance at the Board level (and thus at the Hearing Committee level as well).[2] This is why filings at the Board level were recorded as "lodged" rather than filed from October 17, 2022 forward. Thus, it is effectively, if not explicitly, conceded by all that the logic of this Court's abeyance order applies equally to proceedings before the Board and Hearing Committee, regardless of whether the proceedings in this Court are viewed as collateral to those before the Hearing Committee. It simply makes no sense to proceed in this Court or its adjuncts until the question of removal has been finally resolved, and this

---

[2] "The Board on Professional Responsibility likewise began to treat the underlying disciplinary matter as if it were before the federal court and did not proceed to hold the scheduled evidentiary hearing." ODC Opposition to Motion for Abeyance at 2.

is as true now as it was in January 2023.

This Court has inherent authority to enter abeyances to manage its own docket and extend comity to another court system. *See, e.g., Landis v. North Am. Co.*, 299 U.S. 248 (1936), and to extend its orders to the Board and the Hearing Committee. The Board and Hearing Committee processes operate under the auspices of this Court and this Court exercises continuing supervisory authority over the Board and the Hearing Committee. The circumstances of this case are certainly appropriate for the exercise of supervisory authority so as to continue the abeyance posture ordered in January 2023.

## CONCLUSION

For the conservation of the resources of the Court, the Hearing Committee, the Board, the U.S. District Court, the D.C. Circuit Court of Appeals, and not least the parties, Mr. Clark respectfully requests this Court expedite its consideration of his Motion to Continue Abeyance until Mr. Clark's appeal of the District Court's remand decision, and any potential further appellate review, is concluded. He further requests that this Court order that proceedings before the Board of Professional Responsibility and its assigned Hearing Committee be deferred on the same terms.

Specifically, Mr. Clark requests that the Court issue an expedited ruling on his pending Motion **on or before <u>July 11, 2023.</u>** Should relief not be forthcoming in this posture, undersigned counsel will immediately begin preparing for filing here a mandamus petition because we believe that this Court and its adjuncts lack jurisdiction

over this matter on multiple grounds including, but not limited to (1) those based on federal statutory and regulatory limits imposed on disciplinary proceedings against federal attorneys *and* (2) the fact that removal automatically divested this Court and its adjuncts of power to hold an adjudicatory hearing.

Respectfully submitted this 5th day of July 2023.

/s/ *Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Motion to Expedite Ruling on Motion to Continue Abeyance of Proceedings Before This Court and/or Defer Proceedings Below* by filing with the Court's electronic filing system which will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 5th day of July, 2023.

> */s/ Charles Burnham*
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

FILED

Jul 5 2023 12:04pm

Board on Professional Responsibility

In the Matter of:                          :
                                           :
    JEFFREY B. CLARK,                      :
                                           :
Respondent.                                :    Board Docket No. 22-BD-039
                                           :    Disciplinary Docket No. 2021-D193
A Member of the Bar of the                 :
District of Columbia Court of Appeals      :
(Bar Registration No. 455315)              :

<u>ORDER</u>

Disciplinary Counsel filed the Specification of Charges in this matter on July 19, 2022.  Respondent filed his Answer on September 1, 2022.  The matter was set for a hearing to begin on January 9, 2023.

On October 17, 2022, Respondent filed a notice of removal of this matter to the United States District Court for the District of Columbia.  Disciplinary Counsel filed a motion to remand on October 21, 2022.  On June 9, 2023, Disciplinary Counsel notified the Hearing Committee that the District Court had granted Disciplinary Counsel's motion to remand on June 8, 2023.  *See* Order *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) ("this matter shall be REMANDED for further proceedings") (emphasis in original); *see also* Memorandum Op., *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) (setting forth basis for remand order).  On June 16, 2023, the Hearing Committee ordered each party to report on the status of this matter,

specifically addressing rescheduling this matter for a hearing; identifying any issues the parties believe may need to be addressed; proposing any intermediate dates that may need to be scheduled in advance of hearing; and stating the party's position on whether it is appropriate or necessary to schedule an additional prehearing conference. Both parties submitted timely reports, which Disciplinary Counsel purported to file and Respondent, Mr. Clark, to "lodge."

Disciplinary Counsel asserts that the case is ready for hearing, which should be scheduled as soon as possible after Labor Day. Mr. Clark lodged his report because he maintains that this matter should be held in abeyance pending the Court of Appeals' consideration of a subpoena dispute between Mr. Clark and Disciplinary Counsel (*In re Clark*, D.C. App. No. 22-BG-0891). Mr. Clark's Report at 2.

The fact that a party is seeking to enforce a subpoena for use in this proceeding, however, neither requires nor justifies holding this proceeding in abeyance, at least at this point. A subpoena enforcement is not an appeal of this action. It is a collateral proceeding that does not affect jurisdiction here. Nor does its pendency justify delaying all other preparation in this matter. *See In re Clark,* Board Dkt. 22-BD-039, at 4-5 (H.C. Report, Sept. 12, 2022), *adopted on other grounds,* Order, *In re Clark,* Board Dkt. 22-BD-039 (BPR, Sept. 27, 2022).

Regarding scheduling, Mr. Clark also notes that he has appealed the District Court's June 8 Order, attaches his Notice of Appeal, and argues that Hearing Committee proceedings may not commence until that appeal is complete and "not subject to any higher level appellate review." Mr. Clark's Report at 4. Mr. Clark

does not assert that the District Court's remand order has been stayed pending appeal, or that any court has issued an order specifically prohibiting further proceedings before this Hearing Committee.

Mr. Clark also argues that the remand order is not immediately effective to dispose of the controversy over removal jurisdiction because the District Court has not yet issued a separate "judgment" pursuant to Fed. R. Civ. P. 58, which requires that a judgment "must be set out in a separate document." Mr. Clark's Report at 3. As noted above, Mr. Clark's statement that the District Court did not create a separate document does not appear to be true. The District Court *did* enter a separate order remanding the case. *See In re Clark*, No. 23-7073 (D.D.C.), Dkt. Nos. 19-20. Indeed, Mr. Clark has appealed the order and the United States Court of Appeals for the District of Columbia Circuit has docketed the appeal. *In re Clark*, 23-7073 (D.C. Cir.).

But even if Mr. Clark were correct that the District Court did not properly enter a judgment in a separate document, that would raise a potential question only about whether his appeal was valid. It would not change the fact that the District Court ordered the case to be remanded. The Supreme Court has concluded that "[t]he sole purpose of the separate-document requirement, which was added to Rule 58 in 1963, was to clarify when the time for appeal under 28 U.S.C. § 2107 begins to run." *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384 (1978); *accord Diamond by Diamond v. McKenzie*, 770 F.2d 225, 230–31 (D.C. Cir. 1985). Courts enter many orders (for example, discovery rulings, injunctions, scheduling orders and *pro hac*

*vice* orders), that do not operate by themselves as final judgments. Those orders are nonetheless effective unless they are stayed.

Mr. Clark's decision to appeal did not stay the District Court's Order. "A stay" of a motion to remand pending appeal "is not a matter of right even if irreparable injury might result." *Leroy v. Hume*, 563 F.Supp.3d 22 (E.D. N.Y 2021) (quoting *Virginia Ry. Co. v. United States*, 272 U.S. 268, 272 (1926)). *See also, e.g.*, *Wilde v. Huntington Ingalls, Inc*., 616 Fed. Appx. 710 (5th Cir. 2015) (denying motion to stay an order of remand pending appeal); *Martin v. Serrano Post Acute LLC*, 2020 WL 13302380 (C.D. Cal. 2020) (same) *Mayor of Baltimore v. BP P.L.C.*, 2019 WL 3464667 (D. Md. 2019) (same). The docket reflects that Mr. Clark did not even seek to stay order, much less obtain a stay.

Mr. Clark also asserts that it would be premature to reschedule the hearing at this time because, among other things, Mr. Clark will want to litigate to the Chair via motions practice "numerous threshold matters," and that *mandamus* proceedings may be required. Mr. Clark's Report at 4-5. However, Board Rule 7.16 does not permit our Committee to delay the hearing to resolve motions that are not directed to the manner in which the hearing is to be conducted, or the admissibility of evidence. Instead "the Hearing Committee shall include in its report to the Board a proposed disposition and the reasons therefor. The Board will rule on all such motions in its disposition in the case." *See also In re Stanton*, 470 A.2d 281, 285 (D.C. 1983) (appended Board report) (once a Specification of Charges has been filed, "the underlying purposes of the Board require that we proceed directly to a

hearing on the merits rather than being detoured into questions of pleading and form.").[1]

Upon consideration of the foregoing, and it appearing that this matter has been remanded to the Hearing Committee, and it further appearing that a pre-hearing conference would assist the Hearing Committee in scheduling this matter for a hearing, it is hereby

ORDERED that a pre-hearing conference will be held in the above-captioned matter at **1:00 p.m.** on **July 12, 2023**, via Zoom video conference, in accordance with Board Rule 7.24, and will be live-streamed on the Hearing Committees' YouTube channel.  Disciplinary Counsel and Mr. Clark and/or his counsel shall appear promptly at that time.  The parties are directed to avoid scheduling conflicting

---

[1] Mr. Clark renews an argument he has made before that the Committee should not follow the Board's procedures because, if this Committee were a federal court, it could not avoid reaching a difficult jurisdictional issue by resolving the case based on merits arguments that are easier to adjudicate.  Mr. Clark's Report at 5. Mr. Clark's argument misstates our role.  The Committee is not a federal court and does not determine merits at all.  Rather, it issues a report and recommendation that is filed with the Board (under procedures the Board establishes).  Nothing in the decisions Mr. Clark cites involving federal courts bars the Board from having the Committee issue a report and recommendation on all issues at once.  Nor does it authorize (much less require) the Committee to establish a motion practice that the Board did not contemplate.  In any event, even if we assumed that the federal court principle Mr. Clark references applied to this Committee, following Board Rule 7.16 (by making a report and recommendation after hearing rather than deciding a case on papers), would not violate that principle.  Complying with Board Rule 7.16 does not mean that the Committee will overlook a difficult "jurisdictional" argument in order to resolve the case on the merits.  To the contrary, the Rule contemplates that we carefully consider all issues, report on the relate facts and make recommendations on all appropriate determinations.

matters and shall inform any court or administrative agency of this prior commitment to the disciplinary system; and it is further

ORDERED that prior to the pre-hearing conference, the parties are directed to meet and confer with respect to scheduling the evidentiary hearing of this matter during 2023, and any intermediate dates that may need to be scheduled in advance of hearing. When considering scheduling, the parties are reminded that subpoenas are available to compel the attendance of witnesses, and witness testimony may be taken from a remote location pursuant to Board Rule 11.4. The parties are further reminded to allow time for opening statements and closing arguments when estimating the time necessary for the hearing; and it is further

ORDERED that Mr. Clark's attention is drawn to Board Administrative Order 2023-01, which provides, among other things, that

> Board oral arguments and Hearing Committee hearings in contested cases and reinstatement cases that have not yet been scheduled for a hearing, shall be scheduled for an in-person proceeding unless the respondent requests that the proceeding be held over Zoom. For Board arguments, the request to conduct the argument over Zoom, if any, shall be contained in the respondent's brief, immediately before the respondent's or counsel's signature. For Hearing Committee hearings in contested cases and reinstatement cases, the request to conduct the hearing over Zoom, if any, shall be made as soon as practicable, but no later than the date set for the pre-hearing conference. Such request shall be filed with the Office of the Executive Attorney and served on Disciplinary Counsel;

and it is further

ORDERED that the Office of the Executive Attorney is directed to serve this order by email, and to circulate the link for the Zoom pre-hearing conference.

HEARING COMMITTEE NUMBER TWELVE

By: _____
Merril Hirsh
Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire
charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

7

Exhibit 15

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**



RECEIVED

July 7, 2023 11:38 pm
Board on Professional
Responsibility

In the Matter of:                               :
                                                :
    JEFFREY B. CLARK,                         :
                                                :    Board Docket No. 22-BD-039
Respondent.                                     :    Disciplinary Docket No. 2021-D193
                                                :
A Member of the Bar of the District             :
Of Columbia Court of Appeals                    :
(Bar Registration Number 455315)                :

<u>LODGED RESPONDENT'S MOTION FOR RECONSIDERATION AND FOR
POSTPONEMENT OF PRE-HEARING CONFERENCE</u>

On July 5, 2023, the Chair of Hearing Committee Number Twelve ("Chair") issued an Order ("July 5 Order") reactivating disciplinary proceedings in this local Article I process against Respondent. Respectfully, undersigned submits that this Order is erroneous in several respects. As a result, this Order should be withdrawn entirely or reconsidered. Accordingly, the pre-hearing conference currently scheduled for July 12, 2023 should be taken off calendar, or at the very least postponed for 28 days, to await the outcome of entirely foreseeable pending decisions in the Article I and Article III court systems.

1. *It Is Abuse of Scheduling Discretion to Set a Pre-Hearing Conference Without Waiting for Rulings by Either the District of Columbia Court of Appeals <u>or</u> the District Court and the D.C. Circuit.*

    a. **<u>Pending DCCA Abeyance Continuance/Deferral Motion and Expedition Thereof.</u>** As the Chair is aware, based on our lodgings at the Board level, we have moved

1

the District of Columbia Court of Appeals ("DCCA") to continue this case in an abeyance posture and asked for additional or alternative relief. Specifically, consistent with the DCCA's supervisory jurisdiction of this adjunct process, we have asked that court to order the case deferred pending resolution in the Article III court system of Respondent's appeal as of right on the disputed issue of removal jurisdiction. Indeed, on July 5, 2023, we filed a motion at the DCCA to ask it to expedite its resolution of our pending abeyance continuance motion (and lodged notice of it at the Board level here). We asked for the DCCA to resolve the abeyance continuance motion **by July 11, 2023**, in an attempt to resolve our dispute with the Chair as soon as possible.[1]

    b. <u>**Holding a Status Conference Before the DCCA Rules on These Matters is Premature and *Ultra Vires.***</u> This Hearing Committee is indisputably subordinate to the DCCA. Hence, the Chair is acting *ultra vires* to set a pre-hearing conference for July 12, 2023 when it is quite possible that the DCCA, despite our best efforts, may not have resolved the disputed abeyance continuance motion by that time and despite the fact that the DCCA could easily decide to continue this case in abeyance mode. Setting a pre-hearing conference anyway, as the Chair's Order two days ago did, thus effectively prejudges the result of an exercise of DCCA discretion.

    c. <u>**The July 5 Order Did Not Take Account of Key Context.**</u> In the Order issued two days ago, the Chair emphasized that the January 17, 2023 abeyance order from the

---

[1] Though obviously, we cannot guarantee that the DCCA will act on any particular timetable.

DCCA stayed only a petition to enforce a particular subpoena drafted by the Office of Disciplinary Counsel ("ODC") last October. *See* July 5 Order at 2. This is true but it ignores key context acknowledged in the July 5 order's recitation of certain dates and events relevant to this matter. *See id.* at 1. Specifically, the Board appears to have treated this matter as existing in an abeyance posture starting at the point in time when Respondent removed this matter to the U.S. District Court on October 17, 2022. That is evidenced by the fact that from that time forward, all case event documents in this matter were labeled as "lodged."[2]

Taking account of all events at the two levels of process that rest above Hearing Committee Twelve, we also submit that the DCCA's January 17, 2023 Order was manifestly intended to harmonize the status of the subpoena dispute with the more general abeyance posture that had been in place at the Board level for the three prior months. The effect of the January 17 Order was thus to force ODC to stop harassing Mr. Clark with subpoenas as if the removal had not occurred, for instance by attempting to serve a subpoena three days after Christmas 2022 on Mr. Clark while he was home with his family for the holidays.

The July 5 Order ignores all of the foregoing context. In our view, nothing has

---

[2] Notably, the Chair, functionally criticizes undersigned counsel's decision lodge our response to the Chair's June 16, 2023 Order when that Order put the word "lodge" in quotation marks to describe our filing. *See* July 5 Order at 2. But we were merely proceeding in the same fashion as the Board, using terminology the Board was also using.

changed from the time this overall abeyance posture was, in effect, confirmed by the DCCA on January 17, 2023. The DCCA entered a stay pending resolution of the removal jurisdiction dispute. That was a live dispute subject to a different court process this Hearing Committee had no control over on January 17, 2023.  And it *remains a live dispute* subject to a different court process this Hearing Committee still has no control over on July 7, 2023. Moreover, this disputed posture will continue into the foreseeable future to a date that the Chair cannot precisely predict or prejudge.

  d. **The July 5 Order Ignores Our Pending Request to the DCCA for an Overall Deferral of All Aspects of This Matter.** Additionally, the July 5 Order ignores that we did not just ask the DCCA to continue the abeyance posture of the subpoena dispute until the removal jurisdiction dispute is entirely final, through all appellate levels, we also asked the DCCA formally to order a deferral of the entirety of this matter pending that same contingency. Hence, it is analytically deficient for the July 5 Order to presume, in effect, that all that is pending before the DCCA is an ancillary subpoena enforcement matter that can continue before the DCCA while a pre-hearing and hearing process continues on a parallel track here. That is not all that is pending before the DCCA. The deferral relief request is also pending there and, once more, the Chair should not prejudge the outcome of that request and should not issue scheduling orders in this matter that assume that the requested deferral relief will be denied.

4

e. **The July 5 Order Erroneously Relies on a September 27, 2022 Board Order**

**That Was Issued Before Removal Occurred.** The Chair states the following in the July 5

Order:

> The fact that a party is seeking to enforce a subpoena for use in this proceeding, however, neither requires nor justifies holding this proceeding in abeyance, at least at this point. A subpoena enforcement is not an appeal of this action. It is a collateral proceeding that does not affect jurisdiction here. Nor does its pendency justify delaying all other preparation in this matter. *See In re Clark*, Board Dkt. 22-BD-039, at 4-5 (H.C. Report, Sept. 12, 2022), *adopted on other grounds*, Order, *In re Clark*, Board Dkt. 22-BD-039 (BPR, Sept. 27, 2022).

Respectfully, the logic here is internally flawed for an additional reason. The

September 27, 2022 ruling of the Board that the Chair points to was issued on a date that

*precedes removal*. The problem with presuming that the January 17, 2023 order

(especially combined with the Board's functional abeyance since October 17, 2023) is as

narrow as the Chair frames it is that it ignores that the removal occurred *in between (1)*

*the September 15, 2022 DCCA order* granting a particular motion,[3] which is what the

September 27, 2022 Board order relied on, *and (2) the January 17, 2023 DCCA order*. The

Chair's order ignores the effect of the critical removal event that occurred between those

two bracketing orders. This makes it arbitrary and capricious for the Chair to rely on the

September 27, 2022 Board order. Neither the September 15, 2022 DCCA order nor the

September 27, 2022 Board order were framed to decide how this case proceeds while the

---

[3] The September 15, 2022 DCCA Order resolved three pending motions: granting a motion to unseal, denying a motion to quash the subpoena, and denying a motion to compel as moot.

removal jurisdiction dispute is live. And it is plainly very much alive. Only the functional abeyance at the Board level and the abeyance entered in the January 17 DCCA Order arose after removal occurred and thus those events and not a pre-removal event (the September 27, 2022 Board Order) should govern now.

**f. The July 5 Order Also Attempts to Prejudge the Outcome of Potential Stay Litigation in the Article III Court System.** What is more, the July 5 Order draws improper inferences from the status of District Court proceedings. That Order states: "Mr. Clark does not assert that the District Court's remand order has been stayed pending appeal, or that any court has issued an order specifically prohibiting further proceedings before this Hearing Committee." July 5 Order at 2-3. This is true but misses two key points: (1) we will be filing a stay motion with the District Court, on or before **July 11, 2023**, which we expect to be denied because that Court believes (wrongly) that it lacks removal jurisdiction and thus we will follow that up with a stay motion to the D.C. Circuit before the D.C. Circuit's procedural motion deadline; and (2) no "court ha[d] issued an order specifically prohibiting further proceedings before this Hearing Committee" in the period in between our October 17, 2022 removal and the Chair's July 5, 2023 Order either. Moreover, no such proceedings were conducted, ODC never complained after January 17, 2023 that proceedings at this level needed to resume, and the DCCA did not *sua sponte* order that any proceedings resume before Hearing Committee Twelve.

The Chair thus fails to explain how (1) it can fail to wait for Mr. Clark to pursue

and exhaust his Article III stay remedies (should those become necessary in light of how this Hearing Committee and/or the DCCA proceeds in pending motions practice occurring two levels above this Hearing Committee); and (2) why this matter was in an abeyance posture from October 17, 2022 at the Board level, undisturbed by any significant action by this Hearing Committee in the period October 17, 2021 until July 5, 2023.

**g. <u>The Chair Cannot Prejudge the Motions Deadlines Set by the D.C. Circuit.</u>**

Additionally, of course, no motions deadline set by the D.C. Circuit in the appeal will run out until the earliest of July 14, 2023 (the procedural motions deadline). And the substantive motions deadline does not elapse until July 31, 2023, weeks after the premature pre-hearing conference the Chair set for July 12 on July 5.

Moreover, D.C. Circuit Rules permit the filing of a dispositive motion (*i.e.*, for summary reversal) ***coupled with*** a motion for a stay. *See* D.C. Cir. R. 8(b) ("A party filing or opposing a motion for a stay or other emergency relief may, in addition or in the alternative, file a motion to dispose of the appeal in its entirety."). Hence, the Chair's July 5 Order thus not only boils down to an attempt to override or jump the gun on Mr. Clark's procedural motions deadline of July 14, 2023, but also to an improper attempt to override or jump the gun on Mr. Clark's dispositive motions deadline of July 31, 2023. Ignoring just one of those deadlines would be improper, let alone both.[4] Nevertheless, so as to

---

[4] The Chair's July 5 Order also argues that our indication that the District Court has not entered a separate judgment under Federal Rule of Civil Procedure 58 "does not appear to be true." July 5 Order at 3. The Chair states: "The District Court did enter a separate order remanding the case." *Id.* That is a separate ***order***

7

make clear that Respondent is not seeking delay for delay's sake, we will forego our option to file a combined dispositive and stay motion on or before July 31, 2023. Indeed, we are willing to go even farther than that and have moved up our plan (should it become necessary to execute) to file a stay motion in the District Court on July 11, 2023 instead of on the July 14, 2023 D.C. Circuit procedural motions deadline, as would be our right without the improper timing pressure of the July 5 Order. The Chair should thus reject out of hand the re-sounding of predictable refrains by ODC that we are seeking to delay this matter.

---

but Rule 58 calls for a separate *judgment*. *See* Fed. R. Civ. P. 58(a) ("Every judgment and amended judgment must be set out in a separate document, but a separate document is not required for an order disposing of a motion [going on to list 5 irrelevant categories of motion]."). Additionally, Rule 58 cross-references Federal Rule of Civil Procedure 79(a). *See* Fed. R. Civ. P. 58(c)(1). And Rule 79(a) specifically contrasts "orders" with "judgments." *See* Fed. R. Civ. P. 79(a)(3) ("Each [docket] entry must briefly show the nature of the paper filed or writ issued, the substance of each proof of service or other return, and the substance and date of entry *of each order __and__ judgment*.") (emphasis added). Hence, the Chair's treatment of the Rule 58 issue is another error infecting the July 5 Order.

In any event, the July 5 Order's ruling on the Rule 58 separate judgment issue misses a key part of our point: ODC has not called on the District Court or its Clerk to issue the required separate judgment and yet it is rushing to reignite the proceedings here. What is it that explains that rush, we ask? The Chair should put that question to ODC on the record.

Finally, the July 5 Order is also flawed in asserting that even if we were right about the need for a Rule 58 separate judgement "that would only raise a question about whether [the] appeal was valid." Order at 3. This is incorrect and at odds with federal procedural law. *See* Fed. R. App. P. 4(a)(7)(B) ("A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order."). What Rule 58 noncompliance (again which ODC could readily seek to address) impacts is *the timing for filing a notice of appeal*. *See* Fed. R. App. P. 4(a)(7)(A)(ii)(second bullet). Hence, a repeated theme becomes that ODC's unexplained desire to hurry this matter appears designed to shorten three federal law timelines that Respondent would otherwise be able to take advantage of. There is no reason to favor ODC's wishes over the timelines set by federal procedural law in connection with the federal appeal, especially where ODC has been on notice for weeks that delay could potentially result from the failure of the District Court to enter a separate judgment, without taking any steps to solve that problem by making a filing to the District Court.

### h. **Mr. Clark Cannot Be Faulted for Not Having Sought a Stay by July 5.**

Additionally, the July 5 Order is highly erroneous and prejudicial in faulting Mr. Clark

for not seeking a stay. *See* July 5 Order at 4 ("The docket reflects that Mr. Clark did not

even seek to [obtain a] stay order, much less obtain a stay."). Mr. Clark did not seek to

stay the June 8 District Court order because his alternative D.C. Circuit filing deadlines

for doing so have not yet run. It was not reasonably foreseeable to Mr. Clark that this

Hearing Committee would act in derogation of those deadlines, blame us for not moving

faster, all while not waiting for the pending abeyance continuance/deferral motion to be

resolved at the DCCA level.[5]

### i. **Requested Relief.** For the foregoing reasons alone the Chair should reconsider

---

[5] The propriety of any stay litigation in the Article III court system is not properly before the Hearing Committee. Hence we will not take any steps to somehow put it at issue here.

But it appears to us that the Chair may be motivated in part by thinking that stay relief is unlikely based on the cases it cites on page 4 of the July 5 Order. These cases were all exceptionally weak removal candidates, however. *Leroy v. Hume*, 554 F. Supp. 3d 470 (E.D.N.Y. 2023), is not a case that involved a federal officer at all but instead medical personnel at private, non-federal hospitals who tried to argue they should not be liable for malpractice because they were following federal COVID-19 treatment protocols. *See id* at 482 ("In the present case, by contrast, defendants have merely shown that they were complying with federal directives. Without showing that a 'special relationship' of delegation exists, defendants have not established that they are persons 'acting under' a federal officer for the purposes of the federal officer jurisdiction statute."). By contrast, Mr. Clark was not a private actor trying to claim he was "acting under" a federal actor, he was a Senate-confirmed officer of the United States.

Additionally, *Martin v. Serrano Post Acute LLC*, CV 20-5937 DSF (SKx), 2020 WL 5422949 (C.D. Cal. Sept. 10, 2020), is exactly the same sort of inapposite case involving private medical actors as *Leroy*. *Wilde v. Huntington Ingalls, Inc.*, 616 Fed. App'x 710 (5th Cir. 2015), did not involve federal officers either but a private ship manufacturer. *Mayor and City Council of Baltimore v. BP plc.*, 388 F. Supp. 3d 538 (D. Md. 2019), involved the weak claim that the oil company BP was a government actor, an argument BP advanced to avoid a state court forum for climate change nuisance claims. And finally, *Virginia Railway Co. v. United States*, 272 U.S. 658 (1926), is an irrelevant administrative law case about the Interstate Commerce Commission.

9

its July 5 Order setting a status conference for July 12, 2023, remove that date from the calendar, or at the very least postpone the hearing conference until the DCCA rules on the pending abeyance continuance/deferral motion (which is fully briefed) **and** until both the District Court and D.C. Circuit have ruled on the impending stay motion or motions to be filed there.

Even if the Chair were correct it need not wait for the stay decisions to be issued (though the Board was obviously willing to wait from October 17, 2022 until at least July 5, 2023), there is no reason the Chair should not show the Article III courts comity and enter a brief pause to await the resolution of the impending stay dispute. If the Chair does not prefer for some reason, that fits within a Hearing Committee's discretion, to reset the date pending the conclusion of the events noted above in the DCCA and the Article III courts, we would propose resetting the pre-hearing conference date until **August 9, 2023** (four weeks from the July 12, 2023 date). ***Both*** the open abeyance continuance/deferral dispute at the DCCA ***and*** the Article III stay motions could realistically be resolved by then. If not, then the parties could be ordered to make status filings on that date.

2.      ***The Chair Should Not Prejudge the Motions We Intend to File to Defend Mr. Clark***. At the bottom of page 4 and over on to page 5 of the July 5 Order, the Chair suggests that the Hearing Committee has no power to resolve such motions and instead must proceed to a merits hearing "rather than being detoured into questions of pleading and form." July 5 Order at 4-5, *citing In re Stanton*, 470 A.2d 281, 285 (D.C. Cir. 1983). With

due respect, we have not proposed to file motions on "questions of pleading and form." Instead, we are raising serious constitutional issues this Hearing Committee, the Board, and the DCCA has never encountered before that, in our view, should make holding a merits hearing entirely unnecessary.

At that point, the Chair includes a footnote indicating that the Hearing Committee is not a federal court. *See* July 5 Order at 5 n.1. Again, with respect, we submit that this is erroneous. The Hearing Committee is plainly a quasi-adjudicator acting at the first stage of a three-stage process culminating in review by the DCCA, which is an Article I federal court. Magistrate Judges operating as adjuncts within the Article III courts are themselves creatures of Article I, but no one could properly maintain that they are not wielding the powers of federal courts, especially when the parties consent to see certain matters resolved by Magistrate Judges. We submit that the Hearing Committee cannot sidestep the limitations the U.S. Supreme Court has recognized that the Constitution imposes on all federal courts to decide jurisdictional issues first. And if the Chair's footnote suggests that the DCCA set up the Hearing Committee (a non-court in the Chair's view as expressed in footnote 1 of the July 5 Order) in order to evade that important limitation, that would only compound the constitutional problem, making it worse than if the DCCA had simply set up a system that inadvertently runs afoul of cases like *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83 (1998).

Our suggestion is that, if he grants this Motion to Reconsider, the Chair should

11

strip out references suggesting how it would rule on motions we have not yet prepared and filed. However, the language and analysis in footnote one does cause us to alert the Chair to an additional threshold motion we will prepare and file. Specifically, Mr. Clark was an Article II, Senate-confirmed senior officer in the U.S. Justice Department. It is one thing to try to subject his actions and legal analysis to second guessing by an Article I adjunct tribunal (we think that alone is unconstitutional). But it is quite another that one of the members of the first-stage tribunal will be a lay person. No lay person can be invested with the authority to question complex legal advice given by an Article II official to the President of the United States.

3.     *Additional Ancillary Matters.* Without waiving any of Respondent's legal rights or any of the arguments set forth above, undersigned counsel inform the Chair that we have arranged for a meet-and-confer with ODC set for Monday afternoon, July 10, 2023 at 4 pm. *See* July 5 Order at 6. We will use that to inform any positions we take at a July 12, 2023 pre-hearing conference, should one go forward because this Motion is denied or because the DCCA denies our abeyance continuance/deferral motion at any point before July 12, 2023 at 1 pm.

Finally, there is the issue of Zoom hearings and the application of Board Administrative Order 2023-01. As we understand that order, Hearing Committee hearings must observe a default rule of being held in person unless Respondent requests a hearing to be held by Zoom and the Chair agrees. By contrast, the Chair's order seems

12

to read Administrative Order 2023-01 to mean that this default rule exists only after a pre-hearing conference has first been held. In any event, Respondent agrees to hold the July 12, 2023 hearing, if its Reconsideration Motion here is rejected or his DCCA abeyance continuance/deferral motion is denied before the pre-hearing conference begins, via Zoom and not in person.

Respectfully submitted July 7, 2023 .

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**Motion for pro hac vice admission before DCCA in progress*

13

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this ***Motion to Reconsider*** by email addressed to:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 7 day of June, 2023.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
1750 K Street, NW
Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

14

Exhibit 16

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**

<table>
<tr><td>In the Matter of:</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>JEFFREY B. CLARK,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>Board Docket No. 22-BD-039</td></tr>
<tr><td>Respondent.</td><td>:</td><td>Disciplinary Docket No. 2021-D193</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>A Member of the Bar of the District</td><td>:</td><td></td></tr>
<tr><td>Of Columbia Court of Appeals</td><td>:</td><td></td></tr>
<tr><td>(Bar Registration Number 455315)</td><td>:</td><td></td></tr>
</table>

RECEIVED

July 9, 2023 10:54 pm

Board on Professional
Responsibility

LODGED RESPONDENT'S MOTION TO VACATE ORDERS

*Introduction.* On June 16, 2023, the Chair of this Hearing Committee issued an order requiring status reports to be filed by the Office of Disciplinary Counsel ("ODC") and Respondent. And on July 5, 2023, after review of those reports, the Chair ordered that a pre-hearing conference would be calendared for July 12, 2023. Both of these orders presume that immediately after the U.S. District Court had issued a remand order in the removal proceedings occurring there, the Hearing Committee, in turn, had reacquired the power to resume adjudicating this case.

*But 28 U.S.C. § 1447(c) Means That Jurisdiction Has Not Yet Returned to the Hearing Committee.* The Chair's unstated presumption that jurisdiction has returned to the Hearing Committee is plainly incorrect. The issue is controlled by a plainly written federal statute, 28 U.S.C. § 1447(c). In relevant part, Section 1447(c) provides as follows: "A certified copy of the order of remand shall be mailed by the clerk to the clerk of the

1

State court. The State court *may thereupon* proceed with such case." (Emphasis added.)
Under this plain text, remand orders are not immediately effective. Instead, the U.S.
District Court Clerk must first mail a certified copy of the remand order to the Hearing
Committee (presumably via the Board of Professional Responsibility or the District Court
for the District of Columbia ("DCCA")). The statute also appears to contemplate receipt
of the certified copy mailed by the U.S. District Court clerk by the state/D.C. clerk.

*No Mailing of a Certified Copy of the Remand Order Has Occurred Here.* We are
aware of no indication such a mailing has occurred. *See* Exh. 1 (U.S. District Court Docket
Sheet). That docket sheet shows the remand order's entry on June 8, 2023 and four later
entries: (1) 6/11/23 notice of appeal; (2) 6/12/23 transmission of notice of appeal to the D.C.
Circuit; (3) 6/14/23 case number entered for the D.C. Circuit appeal; and (4) 7/7/23
payment for notice of appeal. None of those four entries indicate that the Section 1447(c)
mailing has occurred. Similarly, to our knowledge there are no events that will be
reflected on the Board of Professional Responsibility's docket sheet showing that the
Board's clerk has received a certified mailing from the U.S. District Court clerk compliant
with Section 1447(c).

*The Second and Third Circuits Have Adopted the Most Straightforward Reading
of Section 1447(c).* Judicial precedent supports our argument, which two Circuits (the
Second and the Third) have adopted:

> According to our precedent, the mailing of a certified copy of the remand
> order to state court is the event that formally transfers jurisdiction from a

district court within this Circuit to a state court. *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 225 (3d Cir. 1995) ("The general rule is that a district court loses jurisdiction over a case once it has completed the remand by sending a certified copy of the remand order to state court.") ….

*In our view, the text of 28 U.S.C. § 1447(c) establishes that jurisdiction remains with the district court until the jurisdiction-transferring event has occurred: "[a] certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case."* 28 U.S.C. § 1447(c).[2]

FN2. This accords with the rule recognized by the Court of Appeals for the Second Circuit as well. *Shapiro v. Logistec USA, Inc.*, 412 F.3d 307, 312 (2d Cir. 2005) ("*Section 1447(c) ... is not self-executing*.... This provision creates legal significance in the mailing of a certified copy of the remand order in terms of determining the time at which the district court is divested of jurisdiction....").

*Agostini v. Piper Aircraft Corp.*, 729 F.3d 350, 355-56 & n.2 (3d Cir. 2013) (paragraph breaks added) (emphasis added).

*Relevance of Respondent's Appeal as of Right as a Federal Officer.* This is not a situation where Respondent is somehow seeking appellate review of a remand order in contravention of the typical ban on such appellate review, since he possesses an appeal as of right to appeal to the D.C. Circuit the remand of his federal officer removal under 28 U.S.C. § 1447(d). Hence, cases that have tried to leverage the first clause of Section 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise ….") into the conclusion that remand orders must be immediately effective are inapposite. *See, e.g., In re Lowe*, 102 F.3d 731, 734 (4th Cir. 1996). This precludes any ability here to try to use Section 1447(d) to try to blunt the plain

meaning and import of Section 1447(c). We nevertheless point the Chair (and ODC) to the *In re Lowe* case consistent with our duty of candor.

*Only One Potential Reading of Section 1447(c) Could Make the June 16 and July 5 Orders Viable and Non-Void, But That Reading Violates the Most Basic Principles of Statutory Interpretation.* Indeed, a survey of this area of law indicates that there are three possible alternatives for when remand orders become effective to return jurisdiction to the state/D.C. court from which a removal has occurred:

> In brief, federal courts have ruled that state courts are reinvested with jurisdiction after remand at three different times:
>
> > (1) immediately upon the oral order of the federal court to remand the case to the state court;
> >
> > (2) upon the federal court clerk's mailing of the federal remand order to the state court; and
> >
> > (3) upon the state court's receipt of the federal remand order.

David A. Furlow & Charles W. Kelly, *Removal and Remand: When Does a Federal District Court Lose Jurisdiction Over a Case Remanded to State Court?* 41 Sw. L.J. 999, 1002 (1987) (footnotes omitted).

The June 16 and July 5 orders (and holding a July 12 pre-hearing conference) are proper only under possibility (1). The Chair should reject that alternative, however, first and foremost because it is contrary to the plain text of Section 1447(c). That provision speaks, in relevant part, in mandatory terms. It directs that the federal court clerk "shall" "mail[]" a "certified copy of the order of remand" to the clerk of the state/D.C. court. And,

even more importantly, Section 1447(c)'s last sentence states that only once that mailing occurs "may" the state/D.C. court "*thereupon* proceed with such case." (Emphasis added.) The word "thereupon" becomes surplusage if the mailing (or impliedly, the receipt of the mailing by the state/D.C. court clerk) is not the operative date for when jurisdiction is returned to the state/D.C. court. And it violates the cardinal rule of statutory construction to interpret the word "thereupon" as if it were surplusage, which is what possibility (1) contemplates.[1] *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality) (explaining and applying this cardinal rule); *Amoco Production Co. v. Watson*, 410 F.3d 722, 733 (D.C. 2005) ("It is a familiar canon of statutory construction that, if possible, we are to construe a statute so as to give effect to every clause and word.")(quotation marks omitted).

*Relief Requested in Light of the Void Nature of the June 16 and July 5 Orders.* For these reasons, the Chair should choose to follow the Second and Third Circuits and vacate its June 16, 2023 and July 5, 2023 orders and take the July 12, 2023 pre-hearing conference off of the calendar until, at the very least, some date after the mailing of a certified copy is completed and preferably, until after the date at which the reception of the certified remand order occurs. For the only extent to which any ambiguity exists in Section 1447(c)

---

[1] *See* OXFORD LEARNERS DICTIONARY (definition of "thereupon" as "immediately after the situation mentioned; as a direct result of the situation mentioned. The audience thereupon rose cheering to their feet."), *available at* https://www.oxfordlearnersdictionaries.com/definition/english/thereupon (last visited July 9, 2023).

is whether the "thereupon" refers to the act of mailing alone (the equivalent of contract law's "mailbox rule") or to the completion of the federal clerk mailing **and** the receipt of the certified order by the state/D.C. clerk.

In any event, it would not be proper for the Chair to proceed with the Wednesday, July 12, 2023 pre-hearing conference without addressing this issue after the completion of briefing by the parties, and the study of the issue by the Chair and issuance by the Chair of a reasoned decision on this point explaining its choice of which of the three conceptual timing possibilities best comports with Section 1447(c). State/D.C. court orders issued in between the time of removal and remand are void. *See Roman Catholic Archdiocese of San Juan, P.R. v. Acevedo Feliciano*, 140 S. Ct. 696, 700 (2020).[2]

---

[2] "Once a notice of removal is filed, 'the State court shall proceed no further unless and until the case is remanded.' 28 U. S. C. § 1446(d). The state court 'los[es] all jurisdiction over the case, and, *being without jurisdiction, its subsequent proceedings and judgment [are] not ... simply erroneous, but absolutely void*.' *Kern v. Huidekoper*, 103 U.S. 485, 493 (1881). 'Every order thereafter made in that court [is] *coram non judice*," meaning 'not before a judge.' *Steamship Co. v. Tugman*, 106 U.S. 118, 122 (1882) ...." *Roman Catholic Archdiocese of San Juan*, 140 S. Ct. at 700 (footnote omitted).

As we have argued to the U.S. District Court, in removal papers that were filed to the Board of Professional Responsibility, Mr. Clark removed this matter to federal court as both a civil matter and a criminal matter, arguing that bar discipline cases are hybrids of civil and criminal cases. We have also argued for applicability of Section 1446(d) here, meaning that the bar operative on the civil side on any proceedings in the DCCA and its adjunct forums makes void any proceedings to the contrary prior to a legally effective remand. And we believe recognition of the rule the *Roman Catholic Archdiocese of San Juan* outlines is the reason why this case was placed into an abeyance posture beginning from the October 17, 2022 date of removal. This bar, pursuant to Section 1447(c) continues here until the provisions of that statute are complied with.

The Chair should not wish to violate this ban until it is lifted or to risk building upon prior orders it issued before it was made aware of Section 1447(c)'s import. Additionally, any orders that build upon orders issued during the void phase would themselves be the fruit of such a tree of voidness and would risk later invalidation, which would not serve the purposes of judicial effiency.

*Independent Ground for Vacatur and Taking the July 12, 2023 Hearing Off Calendar.*  The grounds set out in this Motion to Vacate, which we again lodge so as not to be taken to concede the point that this Hearing Committee has reacquired jurisdiction, is in addition to the grounds set out in the Motion for Reconsideration for waiting for the DCCA to resolve the issue of whether to continue the abeyance posture this matter was in from October 2022 until at least June 7, 2023, and especially after the January 17, 2023 DCCA abeyance order.[3] This Motion to Vacate is also in addition to the grounds set out in the Motion to Reconsider requesting a voluntary abeyance pending the outcome of the D.C. Circuit appeal—or, at the very least, a temporary one for four weeks to see how proceedings in the DCCA, U.S. District Court (initial stay request soon to be filed), and D.C. Circuit (likely follow-on stay request soon to be filed).[4]

## CONCLUSION

Since the June 8, 2023 remand order (which again, has not yet been certified and mailed in accord with Section 1447(c)), the Chair has been setting fast deadlines and doing so during the Summer without soliciting information from Respondent's counsel about

---

[3] Indeed, Section 1447(c) affects not only proceedings before the Hearing Committee prior to the time at which jurisdiction actually resumes here but proceedings before the DCCA as well. Hence, the Section 1447(c) issue provides yet another reason for the DCCA to continue the abeyance posture that this matter has been in since October 2022.

[4] Take a step back and realize that the current noncompliance with Section 1447(c) has already prejudiced Respondent and undersigned counsel by imposing risks on us if we did not move up our planned timetable for filing stay motions with the District Court and the D.C. Circuit. We should not have been leveraged in that way based on an inaccurate presumption that the District Court remand order was immediately effective and self-executing. It was not.

their availability. Despite this, undersigned counsel has been working as quickly as possible to meet the deadlines, despite our disagreement with the Chair that this matter can or should resume before the D.C. Circuit appeal as of right is first resolved. Consistent with the demands the June 16 and July 5 orders created for us, we are presenting this Motion to Vacate to you as expeditiously as we could research and write it.

In light of the foregoing, we request that the Chair vacate the June 16 and July 5 orders, and consistent with that relief, take the July 12, 2023 pre-hearing conference off calendar. Instead, the Chair should await both (1) the sending by the U.S. District Court clerk of the certified copy by mail to at least one of the DCCA or its adjunct forums' clerks; and (2) the receipt of that certified copy in the mail, the method of delivery specified by Section 1447(c), by one or more of the DCCA and its adjuncts' clerks.

Once both of those events are complete, but without prejudice to the separate and independent arguments presented in the pending Motion for Reconsideration, we would request that a pre-hearing status conference be reset for a date no sooner than two weeks after the completion of both events.

Respectfully submitted this 9th day of July 2023.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before*

8

*DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

*\* Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Motion to Vacate*** by filing with the Court's electronic filing system which will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 9th day of July, 2023.

> */s/ Charles Burnham*
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

10

7/9/23, 10:37 PM
Case 1:22-mc-00096-RC    Document 27-1    Filed 07/25/23    Page 203 of 425
District of Columbia live database

APPEAL

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-mc-00096-RC

IN RE: JEFFREY B. CLARK

Assigned to: Judge Rudolph Contreras

 Case: 1:22-mc-00117-RC

Related Case: 1:23-mc-00007-RC

Case in other court:  USCA for the DC Circuit, 23-07073

Cause: MS:NoticeR

Date Filed: 10/17/2022

Jury Demand: Defendant

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: U.S. Government Defendant

**In Re**

**JEFFREY B. CLARK**

represented by **Charles Burnham**
BURNHAM & GOROKHOV PLLC
1424 K St. NW
Suite 500
Washington, DC 20005
202-386-6920
Email: charles@burnhamgorokhov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**JEFFREY B. CLARK**
*(A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 455315)*

represented by **Harry W. MacDougald**
CALDWELL, CARLSON, ELLIOTT & DELOACH, LLP
2 Ravinia Drive
Suite 1600
Atlanta, GA 30346
404-843-1956
Fax: 404-843-2737
Email: hmacdougald@ccedlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Burnham**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**D.C. OFFICE OF DISCIPLINARY COUNSEL**

represented by **Hamilton P. Fox , III**
OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A
Suite 117
Washington, DC 20001
202-638-1501

Email: foxp@dcodc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/17/2022 | 1 | NOTICE OF REMOVAL from DC Court of Appeals (Board of Professional Responsibility), case number 22-BD-039 filed by Jeffrey B Clark. (Attachments: # 1 Exhibit Bar Docket Sheet, # 2 Exhibit Specification of Charges, # 3 Exhibit Affidavit of Service, # 4 Exhibit Motion for Extension, # 5 Exhibit Motion for Leave to File Under Seal, # 6 Exhibit Opposition to Extension, # 7 Exhibit Motion to File Reply Under Seal, # 8 Exhibit Motion to File Under Seal, # 9 Exhibit Reply in Support of Motion for Extension, # 10 Exhibit Hearing Committee Order, # 11 Exhibit Board Order, # 12 Exhibit Opposition to Motion to Redact, # 13 Exhibit Motion to Recuse, # 14 Exhibit Sealed Response, # 15 Exhibit Notice and Motion to Seal, # 16 Exhibit Request for Deferral, # 17 Exhibit Hearing Committee Order, # 18 Exhibit Opposition to Request to Defer, # 19 Exhibit Motion to Seal, # 20 Exhibit Motion to Dismiss, # 21 Exhibit Answer, # 22 Exhibit Motion to File Answer Under Seal, # 23 Exhibit Motion to File Under Seal, # 24 Exhibit Board Order on Redactions, # 25 Exhibit Redacted Opposition, # 26 Exhibit Redacted Response, # 27 Exhibit Redacted Motion for Extension, # 28 Exhibit Redacted Board Order, # 29 Exhibit Opposition to Sealed Response, # 30 Exhibit Omnibus Response, # 31 Exhibit Redacted Omnibus Response, # 32 Exhibit Redacted Motion to File Answer Under Seal, # 33 Exhibit Redacted Answer, # 34 Exhibit Redacted Motion to Defer, # 35 Exhibit Redacted Motion to File Motion to Defer Under Seal, # 36 Exhibit Redacted Notice and Incorporated Motion to Seal, # 37 Exhibit Redacted Motion to Dismiss, # 38 Exhibit Redacted Motion to File Motion to Dismiss Under Seal, # 39 Exhibit Redacted Sealed Response, # 40 Exhibit Redacted Sealed Response, # 41 Exhibit Redacted Response in Support of Motion to Dismiss, # 42 Exhibit Reply Brief in Support of Motion to Dismiss, # 43 Exhibit Report and Rec, # 44 Exhibit Board Order Unsealing, # 45 Exhibit DCCA Order, # 46 Exhibit Motion Regarding Publicly Available Filings, # 47 Exhibit Board Order, # 48 Exhibit Withdrawal of Motion, # 49 Exhibit Board Order Denying Deferral, # 50 Exhibit Hearing Committee Conference, # 51 Exhibit Statement on Hearing Dates, # 52 Exhibit Hearing Committee Order, # 53 Exhibit Prehearing Transcript, # 54 Exhibit Subpoena, # 55 Exhibit Hearing Committee Order, # 56 Exhibit Subpoena to D. Smith, # 57 Exhibit Senator Durbin Letter, # 58 Exhibit Letter 1 to Phil Fox re Subpoena, # 59 Exhibit Letter 2 to Phil Fox, # 60 Exhibit Fox Letter to H. Macdougald, # 61 Exhibit DCCA Docket Sheet, # 62 Exhibit Motion to Enforce, # 63 Exhibit Appearance of Counsel, # 64 Exhibit Time Extension Motion, # 65 Exhibit Order Granting Motion for Extension, # 66 Exhibit Motion to Exceed Page Limitations, # 67 Exhibit Response to Motion to Compel, # 68 Exhibit ODC Reply Motion to Quash, # 69 Exhibit Reply in Support of Cross Motion to Quash, # 70 Exhibit Consent Motion to Supplement the Record, # 71 Exhibit Response to Motion to Supplement the Record, # 72 Exhibit Lodged Protective Motion to Quash, # 73 Exhibit Motion for Leave to Respond, # 74 Exhibit Motion to Unseal, # 75 Exhibit Response to Motion to Unseal, # 76 Exhibit ODC Opp to Cross Motion to Stay, # 77 Exhibit Reply Brief in Support of Cross Motion to Stay, # 78 Exhibit Letter Supplemental Authority, # 79 Exhibit Fox Email re Jurisdiction, # 80 Exhibit Fox Email re No Comparable Cases, # 81 Exhibit Key to Exhibits A and B)(Burnham, Charles) Modified on 10/19/2022 to remove incorrect filing fee information (zsl). (Entered: 10/17/2022) |
| 10/18/2022 | | NOTICE OF ERROR re 1 Notice of Removal; emailed to charles@burnhamgorokhov.com, cc'd -1 associated attorneys -- The PDF file you docketed contained errors: 1. Filing fee for miscellaneous case not paid. Please remit filing fee payment via check or money order. In the future, do not file these kinds of cases |

| | | electronically., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsb, ) (Entered: 10/18/2022) |
|---|---|---|
| 10/18/2022 | | Case Assigned to Judge Rudolph Contreras. (zsb) (Entered: 10/18/2022) |
| 10/18/2022 | 2 | MOTION to Stay *Subpoena Response Deadline and Other Deadlines* by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 10/18/2022) |
| 10/18/2022 | 3 | CIVIL COVER SHEET by JEFFREY B. CLARK filed by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 10/18/2022) |
| 10/19/2022 | | Filing fee received: $ 49, receipt number: 203251. (zsl) (Entered: 10/19/2022) |
| 10/19/2022 | 4 | MOTION to Quash by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 10/19/2022) |
| 10/21/2022 | 5 | MOTION to Remand to State Court */DC Court of Appeals' Board on Profession Responsibility* by Hamilton Phil Fox, III. (Attachments: # 1 Exhibit 10.07.2021 Senator Judiciary Report, # 2 Exhibit 10.18.2021 BLetter with subpoena but not report, # 3 Exhibit 11.22.2021 BLetter with subpoena but not report, # 4 Exhibit 01.10.2022 ODC's response to Respondent, # 5 Exhibit 01.02.2022 Corrected letter from Respondent, # 6 Text of Proposed Order Proposed Order to Remand)(Fox, Hamilton) (Entered: 10/21/2022) |
| 10/21/2022 | 6 | Memorandum in opposition to re 4 Motion to Quash, 2 Motion to Stay *Subpoena Response Deadline and other Deadlines* filed by Hamilton Phil Fox, III. (Attachments: # 1 Exhibit 10.07.2021 Senate Judiciary Report, # 2 Exhibit 10.18.2021 BLetter with subpoena but not report, # 3 Exhibit 11.22.2021 BLetter with subpoena but not report, # 4 Exhibit 01.10.2022 ODC's response to Respondent, # 5 Exhibit 01.02.2022 Respondent's Counsel letter, # 6 Text of Proposed Order to deny Motion to Quash and Motion to Stay)(Fox, Hamilton) (Entered: 10/21/2022) |
| 10/21/2022 | 7 | ERRATA *(correcting exhibit B-3 to Notice of Removal)* by JEFFREY B. CLARK re 1 Notice of Removal,,,,,,,,,,,,,,, (Attachments: # 1 Exhibit corrected exhibit B-3)(Burnham, Charles) (Entered: 10/21/2022) |
| 10/24/2022 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Harry W. MacDougald, Filing fee $ 100, receipt number ADCDC-9620359. Fee Status: Fee Paid. by JEFFREY B. CLARK. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing) (Burnham, Charles) (Entered: 10/24/2022) |
| 10/25/2022 | | MINUTE ORDER granting 8 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Harry W. MacDougald is admitted to represent JEFFREY B. CLARK *pro hac vice* in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 10-25-2022. (lcrc3) (Entered: 10/25/2022) |
| 10/27/2022 | 9 | NOTICE of Appearance by Harry W. MacDougald on behalf of JEFFREY B. CLARK (MacDougald, Harry) (Entered: 10/27/2022) |
| 10/28/2022 | 10 | REPLY to opposition to motion re 4 MOTION to Quash filed by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 10/28/2022) |
| 10/28/2022 | 11 | Supplemental MOTION to Quash *(supplementing ECF 4)* by JEFFREY B. CLARK. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Burnham, Charles) (Entered: 10/28/2022) |
| 11/04/2022 | 12 | ENTERED IN ERROR.....RESPONSE re 5 MOTION to Remand to State Court */DC Court of Appeals' Board on Profession Responsibility* filed by JEFFREY B. CLARK. |

| | | (Attachments: # 1 Exhibit)(Burnham, Charles); Modified on 11/7/2022; said pleading refiled as docket entry 13 (ztth). (Entered: 11/04/2022) |
|---|---|---|
| 11/07/2022 | 13 | RESPONSE re 5 MOTION to Remand to State Court *DC Court of Appeals' Board on Profession Responsibility CORRECTED* filed by JEFFREY B. CLARK. (Attachments: # 1 Exhibit)(Burnham, Charles) (Entered: 11/07/2022) |
| 11/07/2022 | | NOTICE OF ERROR regarding 12 Response to motion,. The following error(s) need correction: Incorrect court header/case caption/case number. (ztth) (Entered: 11/07/2022) |
| 11/08/2022 | 14 | REPLY to opposition to 5 motion *to Remand* filed by Hamilton Phil Fox, III. (Fox, Hamilton); Modified to add docket entry relationship on 11/8/2022 (ztth). (Entered: 11/08/2022) |
| 12/12/2022 | 15 | MOTION to Consolidate Cases *and Response to Second Motion to Remand in Related Case* by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 12/12/2022) |
| 12/19/2022 | 16 | REPLY to opposition to motion *To Consolidate Cases* filed by JEFFREY B. CLARK. (Attachments: # 1 Exhibit exhibits)(Burnham, Charles) (Entered: 12/19/2022) |
| 02/22/2023 | 17 | RESPONSE re 5 MOTION to Remand to State Court *DC Court of Appeals' Board on Profession Responsibility* filed by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 02/22/2023) |
| 02/22/2023 | 18 | MOTION to Consolidate Cases by JEFFREY B. CLARK. (See Docket Entry 17 to view document.) (ztth) (Entered: 02/24/2023) |
| 06/08/2023 | 19 | ORDER granting 5 the D.C. Office of Disciplinary Counsel's Motion to Remand and denying as moot 2 Mr. Clark's Motion to Stay and 4 Mr. Clark's Motion to Quash. See document for details. Signed by Judge Rudolph Contreras on 6/8/23. (lcrc2) (Entered: 06/08/2023) |
| 06/08/2023 | 20 | MEMORANDUM OPINION granting 5 the D.C. Office of Disciplinary Counsel's Motion to Remand and denying as moot 2 Mr. Clark's Motion to Stay and 4 Mr. Clark's Motion to Quash. See document for details. Signed by Judge Rudolph Contreras on 6/8/23. (lcrc2) (Entered: 06/08/2023) |
| 06/11/2023 | 21 | NOTICE OF APPEAL TO DC CIRCUIT COURT by JEFFREY B. CLARK, JEFFREY B. CLARK. Fee Status: No Fee Paid. Parties have been notified. (Burnham, Charles) (Entered: 06/11/2023) |
| 06/12/2023 | 22 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court or motion to proceed In Forma Pauperis has been decided re 21 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 06/12/2023) |
| 06/14/2023 | | USCA Case Number 23-7073 for 21 Notice of Appeal to DC Circuit Court filed by JEFFREY B. CLARK. (ztth) (Entered: 06/14/2023) |
| 07/07/2023 | | Payment for 21 Notice of Appeal to DC Circuit Court. ($505; Receipt number ADCDC-10188997). (Burnham, Charles) (Entered: 07/07/2023) |

| **PACER Service Center** |
|---|
| **Transaction Receipt** |
| 07/09/2023 22:37:08 |

| **PACER Login:** | cburnham123 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-mc-00096-RC |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

Exhibit 17

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

In the Matter of:                          :
                                           :                          **FILED**
       JEFFREY B. CLARK,                   :
                                           :                          Jul 12 2023 9:33am
Respondent.                                :    Board Docket No. 22-BD-039
                                           :    Disciplinary Docket No. 2021-D193   Board on Professional Responsibility
A Member of the Bar of the                 :
District of Columbia Court of Appeals      :
(Bar Registration No. 455315)              :

<u>ORDER</u>

Respondent Jeffrey B. Clark has Lodged a Motion to Vacate Orders, in which

he argues, among other things, that the Hearing Committee lacks jurisdiction

because the Clerk of the United States District Court for the District of Columbia

has not mailed a certified copy of the District Court's June 8, 2023 remand order to

the Hearing Committee.  Respondent relies on 28 U.S.C. § 1447(c), which provides

that

> (c) A motion to remand the case on the basis of any defect other than
> lack of subject matter jurisdiction must be made within 30 days after
> the filing of the notice of removal under section 1446(a). If at any time
> before final judgment it appears that the district court lacks subject
> matter jurisdiction, the case shall be remanded. An order remanding the
> case may require payment of just costs and any actual expenses,
> including attorney fees, incurred as a result of the removal. *A certified
> copy of the order of remand shall be mailed by the clerk to the clerk of
> the State court. The State court may thereupon proceed with such case.*

(emphasis added).  Mr. Clark urges that, notwithstanding the District Court's June 8, 2023 order remanding this case, proceedings before the Hearing Committee cannot resume unless and until the District Court Clerk mails a certified copy of the June 8 order (and preferably, until the certified copy is received).  Motion to Vacate at 5.

Disciplinary Counsel opposes Mr. Clark's motion on various grounds, and represents that the District Court Clerk has informed Disciplinary Counsel that "the clerk would not mail a certified copy of the order (or place a notation of remand on the docket indicating a certified copy was sent), because there is no state court clerk in this case to receive it."  Response at 5.

In reply, Mr. Clark argues, among other things, that the statement in Disciplinary Counsel's brief attributed to the District Court Clerk, "is unsworn, the specific Clerk's office attendant is not identified, and the specifics of the dialogue are not recounted."  Reply at 7.  Mr. Clark's Reply also notes that he has filed a copy of a motion seeking a stay pending appeal, which he has filed in the United States District Court for the District of Columbia.

Upon consideration of the foregoing, and it appearing that Disciplinary Counsel has not offered evidence of its conversation with the Clerk of the United States District Court for the District of Columbia, it is hereby

ORDERED that Mr. Clark's Lodged Motion to Vacate Orders shall remain under advisement, pending receipt of an affidavit filed by Disciplinary Counsel identifying the Clerk's Office employee referenced in Disciplinary Counsel's

response, that employee's authority to speak on behalf of the Clerk's Office, and setting forth the specifics of the dialogue that was summarized in Disciplinary Counsel's motion; and it is further

ORDERED that Respondent's Lodged Motion for Reconsideration and for Postponement of Prehearing Conference is granted in part; and it is further

ORDERED that the pre-hearing conference set for July 12, 2023 is postponed, pending resolution of Respondent's Motion to Vacate.

HEARING COMMITTEE NUMBER TWELVE

By: _Merril Hirsh_____
Merril Hirsh
Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire
charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

Exhibit 18



# DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY
## HEARING COMMITTEE NUMBER TWELVE

———————————————————————

In the Matter of:

Jeffrey B. Clark, Esq.
*Respondent*,

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar No. 455315)
Board Docket No. 22-BD-039
Disciplinary Docket No. 2021-D193

———————————————————————

## DISCIPLINARY COUNSEL'S
## OPPOSITION TO MOTION TO VACATE

———————————————————————

Respondent Jeffrey Clark asks the Chair to vacate two orders issued following the federal district court's decision that this disciplinary proceeding was not removable and that the district court does not have jurisdiction to consider it. Clark argues that it is instead the Hearing Committee which lacks jurisdiction to proceed. Clark cites 28 U.S.C. § 1447(c), which states that in a case "removed from a State court," an order remanding the case "shall be mailed by the clerk [of the district court] to the clerk of the State court," after which "[t]he State court may thereupon proceed with such case." Clark argues that because the district court's docket does not indicate that the clerk mailed a certified copy, the district court retains jurisdiction over the matter and the Hearing Committee may not act.

That is incorrect. The plain language of the removal statutes authorizes only the removal of a "civil action" or a "criminal prosecution" that was commenced "in a State court." *See* 28 U.S.C. § 1441(a) (civil actions), § 1442(a) (civil actions or criminal prosecutions against federal officers). As the federal district court held, this disciplinary proceeding is neither a civil action nor a criminal prosecution within the meaning of the removal statutes. More importantly—at least for determining whether the Hearing Committee may proceed—neither the Hearing Committee nor the Board on Professional Responsibility is a "State court." As a result, Clark's attempted removal of the disciplinary proceeding never divested the hearing committee of jurisdiction to proceed in the first place. The district court clerk is not required to mail a certified copy of the court's order to "the clerk of the State court" under Section 1447(c) because there is no such clerk. Indeed, the district court clerk confirmed with undersigned counsel that it would not mail a copy of the district court's order for precisely that reason.

## A.   Neither the notice of removal nor 28 U.S.C. § 1447(c) prevents the Hearing Committee from proceeding.

The right to remove a case from state court to federal court is "purely statutory" and "its scope and the terms of its availability therefore are entirely dependent on acts of Congress." 14C Wright & Miller, Fed. Prac. & Proc. Juris. § 3721 (Rev. 4th ed.); *see, e.g., Finn v. Am. Fire & Cas. Co.*, 207 F.2d 113, 115 (5th Cir. 1953) (removal jurisdiction is "purely statutory"). It is axiomatic that statutory

2

interpretation begins with the text of the statute; if the language is plain and unambiguous, then the language controls. *McPherson v. United States*, 692 A.2d 1342, 1344 (D.C. 1997) ("In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning."). Here, the removal statutes plainly authorize only the removal of cases from "State court"; they do not authorize removal from non-court bodies like the Board on Professional Responsibility or this Hearing Committee. In fact, "[t]he entire series of code sections dealing with removal refer only to removal from state courts, and not to removal from administrative bodies." *California Packing Corp. v. I.L.W.U. Local 142*, 253 F. Supp. 597, 598 (D. Haw. 1966).

The limitation to cases originating in state court appears throughout the statutes describing the procedural aspects of removal and remand. *See* 42 U.S.C. §§ 1446, 1447. Specifically, Section 1446 specifies the procedures to be followed when a defendant wishes "to remove any civil action *from a State court*." 42 U.S.C. § 1446(a) (emphasis added). Among other requirements, the defendant must "file a copy of the notice [of removal] *with the clerk of such State court*." *Id.* § 1446(d) (emphasis added). The clerk of the state court then "shall effect the removal," and "*the State Court* shall proceed no further unless and until the case is remanded." *Id.* (emphasis added). Section 1447 then specifies the procedure after removal for "any case removed *from a State court*." 28 U.S.C. § 1447(a) (emphasis added). It provides

3

that an "order of remand shall be mailed by the clerk [of the district court] to the clerk *of the State court*," and that "[*t*]*he State court* may thereupon proceed with such case." *Id.* § 1447(c) (emphasis added).

By the plain language, none of those provisions applies to matters like this one, in which removal was *not* sought from an action brought in a state court. This proceeding, like all contested disciplinary matters, was initiated by Disciplinary Counsel's filing of a petition and specification of charges with the Executive Attorney of the Board on Professional Responsibility and then assigned to this Hearing Committee. *See* D.C. Bar Rule XI, § 8(c). Neither the Board on Professional Responsibility nor the Hearing Committee is a court, nor are their members judges. *See* D.C. Bar. Rule XI, §§ 4(a) (composition of the Board), 5(a) (composition of hearing committees); *cf. In re Greenspan*, 910 A.2d 324, 338 (D.C. 2006) (finding Maryland Grievance Commission was not a "disciplining court" for reciprocal discipline under prior version of D.C. Bar R. XI, § 11). Accordingly, Clark could not comply with the requirement to file a copy of his notice of removal with the clerk of the state court because the matter was not pending in state court. There was likewise no clerk of a state court to "effect the removal," and no state court that was required to "proceed no further unless and until the case is remanded." *See* 28 U.S.C. § 1446(d).

Section 1447(c) does not apply for the same reason. Clark *sought to* remove this proceeding while it was pending before a Hearing Committee—not a state court;

therefore, Section 1447 does not apply because the matter is not a "case removed from a State court." 28 U.S.C. § 1447(a). The district court's clerk likewise cannot mail a certified copy of the district court's order to the "clerk of the State court" because there is no court, much less a clerk of that court.[1] Indeed, on July 7, 2023, undersigned counsel spoke with the clerk for the U.S. District Court for the District of Columbia to determine whether the clerk intended to mail a certified copy of the district court's order, and if so, to whom. The clerk advised counsel that the clerk would not mail a certified copy of the order (or place a notation of remand on the docket indicating a certified copy was sent), because there is no state court clerk in this case to receive it.

## B.   Clark's authorities are not applicable.

Clark argues that the Chair should follow cases holding that "a district court loses jurisdiction over a case once it has completed the remand by sending a certified copy of the remand order to state court." Br. 2-3 (quoting *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 225 (3d Cir. 1995)). But those cases involved matters that had been removed from state courts, not, as here, one in which the purported removal was not from a court at all. Unlike here, when a case is removed from state court,

---

[1] Clark recognizes the mismatch between the statutory language and his argument when he asserts that the clerk of the district court must send a copy of its order not to the clerk, but "to the *Hearing Committee* (presumably via the Board of Professional Responsibility or the District Court for the District of Columbia)." Br. 2.

Section 1446(d) vests jurisdiction over the case solely in the district court while it determines whether the case should be remanded, to the exclusion of the state court. Section 1447(c) then controls when jurisdiction returns to the state court following a remand. Accordingly, it is not surprising that courts in such cases have discussed when "a district court loses jurisdiction" such that it returns to state court. *See Trans Penn Wax Corp.*, 50 F.3d at 225.

Those cases are not applicable here. Instead, because the plain language of Section 1446(d) does not apply to Clark's purported removal, the district court never had jurisdiction over the case to the exclusion of the Hearing Committee. The district court thus had no more than the jurisdiction vested in all courts to determine their own jurisdiction. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 291 (1947); *Timus v. Dist. of Columbia Dept. of Human Rights*, 633 A.2d 751, 757 (D.C. 1993). It does not matter that the Board treated this matter as if it were removed in the interim. The Board does not have the power to grant the district court jurisdiction that is not granted by the removal statutes. Moreover, in exercising its jurisdiction to decide its own jurisdiction, the district court found that this matter was not in fact removable and that the federal courts lacked jurisdiction to hear it. *See* Mem. Op. Granting Motions to Remand, *In re Clark*, No. 1:22-mc-96 (D. D.C. Jun. 8, 2023). Clark's argument that the district court retains jurisdiction to the exclusion of the Hearing Committee is thus contrary not only the plain language of the removal

6

statutes, it is also contrary to the district court's thorough analysis and rejection of

the argument that it has jurisdiction over this matter, and to the district court clerk's

view that Section 1447(c) does not require it to send a certified copy of the district

court's judgment to anybody.

## Conclusion

The motion should be denied.

Respectfully submitted,

HAMILTON P. FOX, III
   *Disciplinary Counsel*

JULIA L. PORTER
   *Deputy Disciplinary Counsel*

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
   *Senior Assistant Disciplinary Counsel*

JASON HORRELL
   *Assistant Disciplinary Counsel*

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

## CERTIFICATE OF SERVICE

I certify that on July 11, 2023, I caused the foregoing to be filed by email to casemanager@dcbpr.org and also served it on the following:

Charles Burnham, counsel for Respondent, charles@burnhamgorokhov.com

Board on Professional Responsibility, by its Executive Attorney James T. Phalen, jtphalen@dcbpr.org.

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

Exhibit 19

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**



RECEIVED

July 11, 2023 7:32 pm

Board on Professional
Responsibility

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
| JEFFREY B. CLARK, | : | |
| | : | Board Docket No. 22-BD-039 |
| Respondent. | : | Disciplinary Docket No. 2021-D193 |
| | : | |
| A Member of the Bar of the District | : | |
| Of Columbia Court of Appeals | : | |
| (Bar Registration Number 455315) | : | |

<u>LODGED RESPONDENT'S REPLY IN SUPPORT OF MOTION TO VACATE ORDERS</u>

The Office of Disciplinary Counsel, in its attempt to barrel ahead with merits adjudication, despite the pendency of a good-faith (and strong) appeal to the D.C. Circuit of the federal-officer removal jurisdiction issue—and a potent stay motion (attached as Exhibit 1)—is grasping at straws.

All it can offer is (1) a totally new argument it never once made in the four-month period from October 2022 to February 2023 either here in the local Article I forums *or* in the District Court Article III forum—namely, that this Hearing Committee and the Board of Professional Responsibility ("Board") are not courts; and (2) an unsworn sentence saying the District Court Clerk's Office told ODC that it will not be issuing a certified copy of the June 8, 2023 remand order and mailing it over to this local Article I process. Neither of these grounds provide a reason to ignore the plain text of 28 U.S.C. § 1447(c).

1.      Mr. Fox has repeatedly told both the D.C. Court of Appeals and its adjunct

forums and the U.S. District Court that ODC is a creature of the DCCA. Just one of those instances should suffice for present purposes to show his radical *volte face*:

> As authorized by Congress, the Court sets its own rules for admission to its Bar and for the conduct of its members.  ***The Board on Professional Responsibility, including the hearing committees appointed by the Board, are agents of the Court.  The Board also appoints Disciplinary Counsel, who is also not an agent of the D.C. Bar.  Thus, disciplinary proceedings are not bar proceedings, but court proceedings.***

Disciplinary Counsel's Omnibus Response to Respondent's September 1, 2022, Pleadings at 4 (Sept. 6, 2022) (internal citations omitted). For the convenience of the Chair, we have attached the Omnibus filing in which Mr. Fox makes this argument as Exhibit 2.

      2.      This point was so obvious that it was cited as a key concession in our first removal notice filed on October 17, 2022. *See In re Clark*, No. 1:22-mc-00096-RC, Dkt. #1 at ¶ 20 ("Disciplinary Counsel Fox has filed charges against Mr. Clark before the Board, which Mr. Fox has repeatedly emphasized operates as part of the DCCA. *See, e.g.*, Exhibit B20 at 3 (characterizing the Board as 'an agency of this Court,' *i.e.*, the DCCA)."

      3.      Indeed, we anticipated this attempt by ODC to pivot and sealed off this avenue of retreat even further in our removal notice. For in Paragraph 51, we went farther:

> ***For purposes of Section 1442***, this case was "commenced in a State Court." The DCCA is clearly a court of the District of Columbia. And Section 1442(d)(5) defines the "District of Columbia" and certain other federal entities as "States." 42 U.S.C. § 1442(d)(5). The Board of Professional Responsibility is, in turn, part of the DCCA. *See* D.C. Bar Rule XI, § 1(a) (referring to "the disciplinary jurisdiction of this Court and ***its Board*** on Professional Responsibility") (emphasis added). The DCCA thus clearly regards the Board as a possessive creature of that court itself. In turn, the Board appoints the members of its Hearing Committees, such as Hearing

Committee Number Twelve, which has been assigned Respondent's case. And D.C. Bar Rule XI, § 4(e)(4), "Board of Professional Responsibility" (italics in original) provides as follows:

> *The Board shall have the power and duty to …. To appoint two or more Hearing Committees, each consisting of two members of the Bar and one person who is not a lawyer, and such alternate Hearing Committee members as may be required, who shall conduct hearings under this rule and such other hearings as the Court or the Board may direct, and shall submit their findings and recommendations, together with the record, to the Board or, if required under this rule, to the Court.*

Clearly, both the Board and the Board's Hearing Committees are adjuncts of the DCCA. All of these bodies, taken together, constitute either the DCCA (a court proper) or arms of that court.

**4.**     The Chair should order ODC to be estopped from making a contrary argument now, even if ODC somehow could somehow get past D.C. Bar Rule XI, § 1(a) and D.C. Bar Rule XI, § 4(e)(4), which it does not even try to do in its responsive brief filed today at 3 pm. Mr. Fox is plainly blowing hot and cold on the issue of whether the DCCA's adjuncts are part of that Court or not, in order to "deliberately chang[e] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. 742, 749–50 (2001). Mr. Fox is trying to "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," *Id.* at 750-51. And that's precisely why he should be estopped from pulling a "J-turn" here.[1] *See also Lofchie v. Washington Square Ltd. P'Ship*,

---

[1] "A J-turn is a driving maneuver in which a reversing vehicle is spun 180 degrees and continues, facing forward, without changing direction of travel. The J-turn is also called a 'moonshiner's turn' (from the evasive driving tactics used by bootleggers), a 'reverse 180,' a reverse flick, a 'Rockford Turn', a 'Rockford

580 A.2d 665, 668 (D.C. 1990) (concurrence) ("The independent doctrine of judicial estoppel precludes a litigant from playing fast and loose with a court of justice by changing his position according to the vicissitudes of self-interest.").

5.      Mr. Fox is no doubt attempting to pivot from his prior representations and removal briefing in order to capitalize on this language in footnote 1 of the Chair's July 5 Order:

> Mr. Clark renews an argument he has made before that the Committee should not follow the Board's procedures because, if this Committee were a federal court, it could not avoid reaching a difficult jurisdictional issue by resolving the case based on merits arguments that are easier to adjudicate. Mr. Clark's Report at 5. Mr. Clark's argument misstates our role. The Committee is not a federal court and does not determine merits at all.

Reliance on this footnote as a springboard for Mr. Fox's J-turn is misplaced, because it is not responsive to the point that jurisdiction has not returned the DCCA, the Board or the Hearing Committee unless and until the formal statutorily required act of mailing a certified copy of the remand order has occurred, which it has not. In any event, the footnote sets up a conflict with Mr. Fox's prior positions and the rules of the DCCA upon which he relied when previously making the contrary argument.

6.      If Mr. Fox were right in now claiming that the adjunct entities south of the Board were not courts such that so removal could occur, any hostile State or the District of Columbia could frustrate federal officer removals—or indeed any form of removal—

---

Spin', or simply a 'Rockford' popularized by the 1970s TV show *The Rockford Files*." https://en.wikipedia.org/wiki/J-turn (last visited July 11, 2023).

to federal court by the expedient of creating administrative bodies with quasi-judicial powers and claiming they were not courts. That would hand the keys of the kingdom to States and D.C. to control the removal issues entirely and frustrate the whole purpose of removal and especially defeat the purpose of federal officer removal, which is the preservation of federal supremacy and offering the forum change as a corrective to local bias. Congress and the Supreme Court have emphasized and reiterated many times that federal officer removal is wide-ranging and is to be broadly construed, and not evaded by pettifogging distinctions.

7.      The argument that neither the Hearing Committee nor the Board are courts—and therefore this case was never removable in the first place—cannot survive the text of 28 U.S.C. § 1442(d)(1), which after amendment by Pub. L. 112-239, 126 Stat. 1969, § 1087 (Jan. 2, 2013), expanded the definitions of "civil actions" and "criminal prosecutions" to include not just subpoenas, but "***any proceeding … to the extent that in such proceeding a judicial order … is sought or issued***." This bar discipline case is unquestionably such a proceeding in that ODC seeks a judicial order from the DCCA imposing discipline on Mr. Clark. Just yesterday, during the meet and confer ordered by the Chair, Mr. Fox disclosed for the first time that he is seeking disbarment. And that sanction can only be imposed by order of the DCCA. *See* D.C. Rule XI, § 9 (any Board recommendation for discipline greater than an informal admonition or reprimand is decided by the D.C. Court of Appeals). Therefore, the gambit of claiming this matter is

not removable because it did not originate in a court is without merit and should be rejected.

8.      Moreover, the second and third removals to federal court were of a subpoena enforcement motions in the DCCA—clearly a "court." And note that the federal officer removal statute explicitly makes subpoenas removable. The D.C. Circuit has now consolidated all three of the removals together for purposes of the appeal. Hence, they cannot be disentangled in this forum because exclusive power over that appeal rests in the D.C. Circuit. The U.S. District Court is divested of any disentanglement power by the appeal, and this body is also stripped of that power by the removal. Nor has this body regained any such power in the manner specified by 28 U.S.C. § 1447(c).

9.      As we argue in the motion for stay pending appeal attached hereto as Exhibit 1, the decision in *BP plc. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021) makes clear that in federal officer removal cases the case remains stayed in the court of origin pending the conclusion of any appeal.  "***Here, too, Congress has deemed it appropriate to allow appellate review before a district court may remand a case to state court.***" *Id.* at 1536. The Court explicitly rejected the argument that it would be imprudent policy to delay proceedings in the state or D.C. forum pending the appeal because Congress explicitly permitted the appeal to be concluded before the forum of origin could resume its proceedings. The Chair is respectfully referred to Section I(A) of the Motion for Stay for a fuller presentation of this important argument, which is incorporated herein

by reference.

10.   Mr. Fox next asserts that he was told by a Clerk of the U.S. District Court that no certified copy of the remand order would be sent as required by Section 1447(c). We do not see how this could possibly excuse non-compliance with § 1447(c). But in any case, the statement in the brief is unsworn, the specific Clerk's office attendant is not identified, and the specifics of the dialogue are not recounted. Unsworn anonymous hearsay recitations of the statements of a person in a clerk's office are not the law and do not control over the text of § 1447(c). In any event, we have now placed the § 1447(c) argument before the U.S. District Court in our motion for stay. *See* Exhibit 1, Section I.B. That is the court which will decide that question, not an unsworn statement of an unnamed person in the Clerk's Office.

## CONCLUSION

The Hearing Committee, and indeed any court or body hearing a matter, has an independent duty to ascertain whether it has jurisdiction over the matter before it, and to stop whenever it appears that jurisdiction is lacking. It is lacking in this case because the statutorily prescribed and mandatory procedure for returning jurisdiction to this forum has not been carried out. The arguments presented by ODC to evade this reality are without merit at best and disingenuous at worst. The Chair should vacate its orders of June 16 and July 5, and cancel the hearing set for July 12, 2023.

Respectfully submitted this 11th day of July 2023.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
* Motion for pro hac vice admission before DCCA
in progress

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before
DCCA in progress

8

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Lodged Respondent's Reply In Support Of Motion To Vacate Orders*** by filing with the Board's Case Manager, who will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 11th day of July, 2023.

> */s/ Charles Burnham*
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

IN RE: JEFFREY B. CLARK,

A member of the Bar of the
District of Columbia Court of
Appeals (Bar No. 455315)

Case No. 1:23-mc-00007-RC
Case No. 1:22-mc-00096-RC
Case No. 1:22-mc-00117-RC

---

**MOTION FOR STAY PENDING APPEAL**

All three of these cases are currently on consolidated appeal. Pursuant to Federal Rule of Appellate Procedure 8(a)(1)—though only out of an abundance of caution—Respondent-Appellant Jeffrey B. Clark hereby moves for a stay pending appeal of the Court's remand order dated June 8, 2023.

Based on the Supreme Court's decision in *BP plc. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021), and 28 U.S.C. § 1446(d), seeking a stay should not be necessary. Instead, the local D.C. process must stand down and first await the outcome of all stages of appeals in this case. Additionally, a stay is not necessary because, while the D.C. Office of Disciplinary Counsel ("ODC"), along with the Chair of D.C. Bar Hearing Committee Number Twelve, are harrying Mr. Clark in the local D.C. processes adjunct to the D.C. Court of Appeals ("DCCA"), the DCCA and its adjuncts have not yet acquired power over the case pursuant to 28 U.S.C. § 1446(c).

On July 10, 2023, at a Hearing Committee Twelve-ordered meet and confer session,

ODC informed us it will argue that we engaged in laches by not filing this stay motion sooner. That wholly ignores that this Court's June 8, 2023 remand order could not possibly return any jurisdiction to the DCCA and its adjuncts any earlier than some date after today—*i.e.*, until Section 1447(c) is complied with by this Court's Clerk sending a mailed certified copy of the June 8 remand order to a relevant clerk acting for the D.C. Bar disciplinary process. And to our knowledge, that event has not yet occurred.

Nevertheless, because ODC and Hearing Committee Twelve are threatening to begin a trial against Mr. Clark at some point after Labor Day this year (and we do not anticipate that appellate proceedings will be complete before then), we are compelled to seek a stay out of an abundance of caution. We have done our best to avert the need to come to this Court for a stay under FRAP 8(a)(1) and indeed we have a pending motions before the Hearing Committee ***both*** to vacate its scheduling orders setting a pre-trial conference for tomorrow, July 12, 2023 ***and*** to reconsider its decision to plow ahead with local adjudication.

## PROCEDURAL BACKGROUND

After this Court entered its remand order, Mr. Clark filed a notice of appeal on June 11, 2023, pursuant to 28 U.S.C. § 1447(d) which provides for appeal as of right from remand orders in cases removed under the federal officer removal statute. *See* 28 U.S.C. § 1442. On June 12, 2023, Mr. Clark moved the DCCA to continue its January 17, 2023, order that was holding the proceedings before that Court (a motion to enforce a

2

subpoena) in abeyance and to extend the abeyance to proceedings down to the level of Hearing Committee Twelve.

This Court should also be aware that at all points from the October 17, 2022, removal of this case here, the Board of Professional Responsibility's Clerk marked any documents sent to them by either side as lodged. This did not stop ODC from peppering Mr. Clark with briefs, a new local subpoena, and other local litigation filings prior to the time the DCCA acted to issue its January 17 order. Once the DCCA issued that January 17 order, however, ODC and Hearing Committee Twelve did stand down, even though the DCCA's abeyance order, by its textual terms, only ordered an abeyance of adjudication of ODC's motion to enforce its October 6, 2022, subpoena. Nevertheless, once ODC notified the Hearing Committee that this Court's June 8 Order had issued, this quickly led to the Chair of Hearing Committee Twelve on June 16, 2023, ordering the parties to file status reports by June 23, 2023.

In his June 23, 203 status report, Mr. Clark noted the pendency of the appeal in this case and of his motion to continue abeyance and/or defer consideration of all interrelated disputes until after the appeal to the D.C. Circuit and any follow-on levels of appellate review were complete. Despite this, on July 5, 2023, the Hearing Committee Chair issued an order, attached hereto as Exh. 1, rejecting Mr. Clark's arguments that the case should not proceed before the ultimate conclusion of his appeal of the remand order, setting a hearing for July 12, 2023, directing the parties to meet and confer on scheduling an

evidentiary hearing, and otherwise pressing forward with the local disciplinary proceeding. Later that same day, as a result of the July 5, 2022, Hearing Committee Chair order, Mr. Clark moved the DCCA to expedite its consideration of the motion to continue the abeyance as well as extend the abeyance to the Board and Hearing Committee below (termed a "deferral").

No ruling from the DCCA on the motion to continue abeyance/defer the matter has issued before it became necessary for us, again out of an abundance of caution, to make this FRAP 8(a)(1) stay filing, even though we do not think it should be necessary for the reasons quickly summarized above and set out in more detail below.

Accordingly, the current status in the local process is that the Chair of the Hearing Committee may be intending to go forward with his ordered July 12, 2023, pre-hearing conference despite the fact that he lacks power over this case—something this Court should remedy by issuing a stay to confirm, by binding ODC, that the local process should proceed no further until the appeal is complete. As of the time we are filing this stay motion, we do not know whether the July 12, 2023 at 1 pm conference will go forward, but as of now it is on the Board's calendar. See https://www.dcbar.org/attorney-discipline/board-on-professional-responsibility/hearing-and-oral-argument-schedule (last visited July 11, 2023). Therefore, having exhausted his only means of resolving this issue in the DCCA and its adjunct processes, so as to avoid troubling this Court, Mr. Clark now brings this FRAP 8(a)(1) motion for stay pending appeal.

## ARGUMENT AND CITATION OF AUTHORITY

We first argue below that the Supreme Court's 2021 *BP* decision, combined with Section 1446(d), which the *BP* decision invokes, makes seeking a discretionary stay unnecessary. This is because the appeal is effectively a continuation of Section 1446(d)'s command to the state/D.C. courts from which the case was removed to cease adjudication of such cases from the point when they are removed until the propriety of removal has been fully and finally tested (which in many cases does not include an appeal, but which does here in this federal officer removal situation). Additionally, Section 1447(c) has not yet been complied with because no certified copy of this Court's June 8 Order has yet been mailed by this Court's Clerk or received by a local D.C. Clerk.

In the alternative, this Motion argues that Mr. Clark can satisfy the traditional four-factor test for obtaining a discretionary stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009).

The Court is to exercise its discretion on whether to grant a stay according to the individual circumstances of the case. Granting an equitable stay under the four-factor test is

> "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." [*Virginia R. Co.*

> *v. United States*, 272 U.S. 658], 672–73 [(1926)]; *see* Hilton [*v. Braunskill*, 481 U.S. 770], 777 [(1987)], ("[T]he traditional stay factors contemplate individualized judgments in each case"). The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.

*Id*. at 433-34. As the Court noted in *Nken*,

> There is substantial overlap between these and the factors governing preliminary injunctions, *see Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008); not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."

*Id*. at 434.[1] "The first two factors of the traditional standard are the most critical." *Id*.

All four elements for a stay pending appeal are present in this case.

## I.    UNDER SUPREME COURT PRECEDENT, SECTION 1446(D), AND TEMPORARILY UNDER SECTION 1447(C), A MANDATORY STAY SHOULD BE GRANTED.

In its *BP v. Mayor and City Council of Baltimore* decision, the Supreme Court considered federal officer removals like this one and it plainly instructed that State and

---

[1] There is a circuit split over whether the decision in *Winter* overrules the sliding scale for evaluating the four-factor test for granting a preliminary injunction. *See Sherley v. Sebellius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (noting split). And some judges on the D.C. Circuit favor that view. *See Davis v. PBGC*, 571 F.3d 1288 (2009) (Kavanaugh, J., concurring). The D.C. Circuit has thus far not definitively resolved this issue for preliminary injunctions. In any event, the test for preliminary injunctions is merely similar, not identical to the test for stay pending appeal. The latter test is set forth with sufficient clarity in *Nken* and is satisfied in this case. *Compare Shapiro v. U.S. Department of Justice*, Case No. 13-555 (RDM), 2016 WL 3023980 (D.D.C. May 25, 2016) (discussing foregoing issues in granting motion for stay of a FOIA production order pending final judgment).

District of Columbia courts (for under 28 U.S.C. § 1451, the District is a "State" for removal purposes) lack the power to adjudicate cases pending the resolution of appealed remand orders because the state/D.C. adjudication is interrupted by the removal and the appeal. *See* Section I.A., *infra*.

Additionally, at least a temporary stay is required under Section 1446(c), which provides that state/D.C. courts cannot resume adjudication pending at least the mailing (and likely the reception as well) of a certified copy of this Court's remand order. *See* Section I.B., *infra*.

A.    ***The BP Case Contemplates That Appealed Federal Officer Removals Are Continuations of the Automatic District Court Stay in Section 1446(d).***

In the *BP* decision, the City of Baltimore brought common law nuisance and tort claims against the oil company BP, arguing that it had concealed the connection between fossil fuels and climate change and thus was responsible for damaging the City. *See* 141 S. Ct. at 1535; *id.* at 1546 (Sotomayor, J., dissenting). BP thereupon removed that case from state court to federal court on a variety of removal theories, one of which was that BP was acting at the government's request as to "some of their challenged exploration, drilling, and production operations," and so was entitled to make use of federal officer removal under 28 U.S.C. § 1442.  *Id.* at 1535.

The District of Maryland ordered a remand and BP appealed with the Fourth Circuit affirming. The Supreme Court took the case because of a split in the Circuits on the issue of whether in a case involving a federal officer removal, Section 1447(d) permits

all removal grounds to go up on appeal or only the federal-officer removal ground
because remand orders are typically not reviewable on appeal. *See id.* at 1537. The
Supreme Court vacated the Fourth Circuit's decision and remanded after holding that ***all
grounds*** for removing go up on appeal when one of the grounds is federal officer removal.
*See id.* at 1543.

In the course of reaching its holding, the Supreme Court had to reject several
arguments by the City that if all removal grounds go up on appeal from a remand order,
the merits of litigation would be slowed down in state courts (or, in accord with Section
1451, in the District of Columbia's courts). Many of these points of majority analysis are
relevant to require a stay here, but the clearest is this statement: "***Here, too, Congress has
deemed it appropriate to allow appellate review <u>before</u> a district court may remand a
case to state court.***" *BP*, 141 S. Ct. at 1536 (emphasis added). That directive cannot be
complied with if the DCCA and adjuncts can continue with merits litigation on a separate
track.

The Court next explained that removal and its consequences for appeals as of right
of federal-officer-based removals rests in the hands of removing defendants, not in the
hands of district courts or even intermediate appellate courts:

> All of which leaves the City to offer a different argument from a new
> direction. Now, the City contends, the defendants never really removed this
> case pursuant to § 1442. On this account, a case is not "removed pursuant
> to section 1442 or 1443" until a federal court (district or appellate) holds that
> one of these statutes authorizes removal. Because that never happened
> here, the City reasons, the defendants were not entitled to any appellate

review. But this argument isn't only novel—the City didn't pursue it below and no court of appeals has adopted it. It is also mistaken.

> *As we've seen, it is generally a <u>defendant's actions</u> under § 1446 that "effect the removal." Once a defendant complies with § 1446, a state court may not proceed "further unless and until the case is remanded." 28 U.S.C. § 1446(d).* That's why normally it's the plaintiff who must seek judicial intervention if it wishes to have the matter remanded to state court—just as the City did here.

*Id.* at 1539 (emphasis and one paragraph break added). And this teaching makes clear the statutory underpinning for the Court's conclusion that "appellate review" must occur "before a district court may remand a case to state court." *Id.* at 1536. Namely, it is Section 1446(d), which provides that "a state court may not proceed 'further unless and until the case is remanded.'" *BP*, 141 S. Ct. at 1539 (quoting Section 1446(d)).

This caused the City to respond with policy arguments that allowing appeals would simply delay litigation back in state court—with the Court again making quite clear that appeals *stop proceedings on remand* (more precisely, they simply continue the stay posture created by Section 1446(d) as soon as removal occurs), otherwise there would be nothing for the City to have complained about if the Supreme Court were contemplating federal officer removal-jurisdiction appeals occurring on one track but remanded state/D.C. merits litigation occurring a parallel track.

Specifically, the City argued as follows: "Barring appellate review of remand orders, the City says, serves the worthy goal of allowing the parties to get on with litigating the merits of their cases in state court. Meanwhile, the City submits, allowing

exceptions to this rule promises only to impair that efficiency interest." *Id.* at 1542. The

Supreme Court rejected that argument cannot occur : "For that subset of cases [*i.e.*, when

Congress has provided an exception to the non-appealability of remand orders, such as

under Section 1442 federal officer removals and under 28 U.S.C. § 1443 civil rights case

appeals], Congress has expressed a heightened concern for accuracy, authorized

appellate review, ***and accepted the delay it can entail***." *BP*, 141 S. Ct. at 1542 (emphasis

added).

Finally, the majority, in the opinion written by Justice Gorsuch, reasoned that the

delay-based policy argument was wrong on its own terms:

> In fact, allowing a fuller form of appellate review may actually help
> expedite some appeals. Suppose a court of appeals finds the § 1442 or § 1443
> issue a difficult and close one, but believes removal is clearly and easily
> warranted on another basis. ***Allowing the court to address that easier***
> ***question and avoid harder ones may facilitate a prompter resolution of the***
> ***proceeding for all involved.*** At the least, a rational Congress could have
> thought that considerations like these warranted allowing a court of
> appeals the power to review the whole of a district court's remand order
> rather than just certain select aspects of it.

*Id.*

This argument by the Supreme Court would be incoherent if it contemplated

appeals of removal jurisdiction disputes would take place on one track but also remanded

so that unstayed merits litigation could simultaneously take place in a state/D.C.-court

track on another. If that were the case, the Court would have said that the policy

arguments based on the delay of state/D.C. court litigation were a red herring because

the district courts possess the power to deny stays pending appeal in cases the district courts have ordered remanded. But that's not what the Supreme Court said at all. It plainly contemplated that the Section 1446(d)-based delay would continue on until appellate proceedings on the removal jurisdiction questions (all of them even, not even just questions of Section 1442-based federal officer-based removals) were concluded.

Indeed, while the lone dissenter, Justice Sotomayor disagreed with the majority as to whether all removal grounds should go up on appeal where Section 1447(d)-based federal officer removals are among the full range of grounds invoked or only federal officer removal ground alone, she agreed that such appeals (of any scope) create delay. Again, this would make no sense if she had the ready response of—'never fear, denied stays of remand orders pending appeal can eliminate or at least significantly reduce delay.'

Instead, Justice Sotomayor said:

> For more than a century, the rule has been that such remand orders are generally not subject to appellate review. *See In re Pennsylvania Co.*, 137 U.S. 451, 453–454 (1890). This rule, codified at 28 U.S.C. § 1447(d), "reflects ***Congress's longstanding policy of not permitting interruption of the litigation of the merits of a removed case by prolonged litigation of questions of jurisdiction of the district court to which the cause is removed.***" *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 238 (2007) (internal quotation marks omitted).

*BP*, 141 S. Ct. at 1544 (Sotomayor, J., dissenting); *see also id.* at 1544-45 (Sotomayor, J., dissenting). She thus fully anctiipated that interruption of state/D.C. proceedings would occur when federal-officer removal appeals occur.

Why was Justice Sotomayor saying this? Because she recognized that "litigation of the merits of a removed case" would be "interrupt[ed]." The majority was willing to accept that policy consequence because it was clearly chosen by Congress in the statute. She was not. Therefore, *all Justices in the* **BP** *case* fully recognized that delay of merits litigation resumption in state/D.C. courts would be delayed pending unusual situations where remand orders are appealable, as here.

A stay of the disciplinary process of the DCCA and its adjuncts is plainly warranted based on Section 1446(d) and in light of the plain import of the *BP* case. Beginning with the original notice of removal (and continuing into the second and third removals that ODC's vexatious attempts to continue litigating in the DCCA adjunct processes triggered) Mr. Clark prominently urged that Section 1446(d), which was pivotal to the outcome and reasoning of the *BP* decision, would automatically apply. *See* Notice of Removal, Dkt. # 1 at ¶ 77 ("But Section 1446(d) provides that once notice of removal is filed as to a civil action with the clerk of the 'State court' and notice is given to adverse parties 'the State court shall proceed no further unless and until the case is remanded.' 42 U.S.C. § 1446(d)."); *see also id.* at ¶¶ 78-79. All of these paragraphs of the removal notice will not be repeated here but should be deemed incorporated by reference. This is a hybrid civil-criminal matter, and it should be deemed subject to the Section 1446(d) ban on post-removal state/D.C. court proceedings, which pursuant to the *BP* decision, continue through the appeal's completion.

12

And this outcome makes perfect sense. If an appeal track of the removal jurisdiction questions goes forward while merits litigation resumes in the DCCA's superintended process and Mr. Clark prevails in the appeal, all such post-remand merits litigation would need to be reversed as a nullity. State/D.C. court orders issued in between the time of removal and remand are void. *See Roman Catholic Archdiocese of San Juan, P.R. v. Acevedo Feliciano*, 140 S. Ct. 696, 700 (2020).[2] Here, Mr. Clark is entitled to a federal Article III forum under Section 1442 and an appeal as of right on that issue to the D.C. Circuit under Section 1447(d). He should not be put to the diversion, the time, and the expense of litigating in two forums until the D.C. Circuit decides this appeal or potentially until the Supreme Court does after taking *certiorari*.

### B. *At the Very Least, a Temporary Mandatory Stay of the Remand Should Be Granted Given Section 1447(c)'s Plain Text.*

In relevant part, Section 1447(c) provides as follows: "A certified copy of the order

---

[2] "Once a notice of removal is filed, 'the State court shall proceed no further unless and until the case is remanded.' 28 U. S. C. § 1446(d). The state court 'los[es] all jurisdiction over the case, and, *being without jurisdiction, its subsequent proceedings and judgment [are] not ... simply erroneous, but absolutely void*.' *Kern v. Huidekoper*, 103 U.S. 485, 493 (1881). 'Every order thereafter made in that court [is] *coram non judice*,'" meaning 'not before a judge.' *Steamship Co. v. Tugman*, 106 U.S. 118, 122 (1882) ...." *Roman Catholic Archdiocese of San Juan*, 140 S. Ct. at 700 (footnote omitted).

Here, since June 16, 2023, Mr. Clark is being subjected to Hearing Committee Chair orders that are void because they were issued, at the very least, prior to compliance with Section 1447(c). They were also issued in violation of the *BP* case's teachings and the continuance of Section 1446(d)'s automatic stay. Any orders that build upon orders issued during the void phase would themselves be the fruit of such a tree of voidness and would risk later invalidation, which would not serve the purposes of judicial efficiency.

of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case." (Emphasis added.) Even putting aside the commands and logic of the *BP* decision covered above, the plain text of this statute makes clear that remand orders are not immediately effective. Instead, the U.S. District Court Clerk must first mail a certified copy of the remand order to the Hearing Committee (presumably via the Board of Professional Responsibility or the District of Columbia Court of Appeals ("DCCA")). The statute also appears to contemplate receipt of the certified copy mailed by the U.S. District Court clerk by the state/D.C. clerk.

We are aware of no indication such a mailing has occurred from this Court's Clerk. (The Court can consult the docket sheets for the three cases in this Court, now consolidated on appeal to confirm this.) That docket sheet shows the remand order's entry on June 8, 2023, and five later entries: (1) 6/11/23 notice of appeal; (2) 6/12/23 transmission of notice of appeal to the D.C. Circuit; (3) 6/14/23 case number entered for the D.C. Circuit appeal; (4) 7/7/23 payment for notice of appeal; and (5) 7/11/23 entry of appearance by Mr. Metzler for ODC. None of those five entries indicate that the Section 1447(c) mailing has occurred. Similarly, to our knowledge there are no events reflected on the Board of Professional Responsibility's docket sheet showing that the Board's clerk has received a certified mailing from the U.S. District Court clerk compliant with Section 1447(c).

Judicial precedent supports our argument, which two Circuits (the Second and the

Third) have adopted:

> According to our precedent, the mailing of a certified copy of the remand order to state court is the event that formally transfers jurisdiction from a district court within this Circuit to a state court. *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 225 (3d Cir. 1995) ("The general rule is that a district court loses jurisdiction over a case once it has completed the remand by sending a certified copy of the remand order to state court.") ….
>
> **In our view, the text of 28 U.S.C. § 1447(c) establishes that jurisdiction remains with the district court until the jurisdiction-transferring event has occurred: "[a] certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case."** 28 U.S.C. § 1447(c).[2]
>
> FN2. This accords with the rule recognized by the Court of Appeals for the Second Circuit as well. *Shapiro v. Logistec USA, Inc.*, 412 F.3d 307, 312 (2d Cir. 2005) ("***Section 1447(c) ... is not self-executing***.... This provision creates legal significance in the mailing of a certified copy of the remand order in terms of determining the time at which the district court is divested of jurisdiction....").

*Agostini v. Piper Aircraft Corp.*, 729 F.3d 350, 355-56 & n.2 (3d Cir. 2013) (paragraph breaks added) (emphasis added).

Only one potential reading of Section 1447(c) could allow the Hearing Committee adjunct to the DCCA able to proceed prior to the mailing of a certified copy of the June 8 remand order from this Court's Clerk, but as we explain below, that reading runs afoul of the plain text of Section 1447(c). Courts have reacted differently to the import of Section 1447(c):

> In brief, federal courts have ruled that state courts are reinvested with jurisdiction after remand at three different times:
>
> > (1) immediately upon the oral order of the federal court to remand the

15

case to the state court;

(2) upon the federal court clerk's mailing of the federal remand order to the state court; and

 (3) upon the state court's receipt of the federal remand order.

David A. Furlow & Charles W. Kelly, *Removal and Remand: When Does a Federal District Court Lose Jurisdiction Over a Case Remanded to State Court?* 41 Sw. L.J. 999, 1002 (1987) (footnotes omitted).

The first approach must be rejected here. The key language of Section 1447(c) speaks, in relevant part, in mandatory terms. It directs that the federal court clerk "shall" "mail[]" a "certified copy of the order of remand" to the clerk of the state/D.C. court. And, even more importantly, Section 1447(c)'s last sentence states that only once that mailing occurs "may" the state/D.C. court "thereupon proceed with such case." (Emphasis added.) The word "thereupon" becomes surplusage if the mailing (or impliedly, the receipt of the mailing by the state/D.C. court clerk) is not the operative date for when jurisdiction is returned to the state/D.C. court. And it violates the cardinal rule of statutory construction to interpret the word "thereupon" as if it were surplusage, which is what possibility (1) necessarily entails.  *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality) (explaining and applying this cardinal rule); *Amoco Production Co. v. Watson*, 410 F.3d 722, 733 (D.C. 2005) ("It is a familiar canon of statutory construction that, if possible, we are to construe a statute so as to give effect to every clause and word.") (quotation marks omitted).

The only extent to which any ambiguity exists in Section 1447(c) is whether the "thereupon" refers to the act of mailing alone (the equivalent of contract law's "mailbox rule") or to the completion of the federal clerk mailing and the receipt of the certified order by the state/D.C. clerk. And as to that choice, we urge the third reading of Section 1447(c) on this Court (*i.e.,* a remand order can be effective no earlier than the receipt of a certified copy mailed to the state/D.C. clerk by the Clerk of this Court). But at the very least, the second reading of the statute should be adopted. Even under that reading, the Hearing Committee across town does not yet have the power to proceed to resume litigation of this case under its Article I processes.

## II. A STAY SHOULD ALSO BE GRANTED UNDER THE TRADITIONAL FOUR-PART TEST OF A PROPER EXERCISE OF EQUITABLE DISCRETION.

All four elements of the traditional equitable test tracing back to the English Chancellor for granting a stay pending appeal are met here. *See Nken, supra*. We treat each of those four factors in turn below.

### A. *Respondent Has a Strong Likelihood of Prevailing in His Federal Appeal.*

The language and purpose of the federal officer removal statute, 28 U.S.C. § 1442, as well as the clear weight of authority, support removal and demonstrate that Mr. Clark has a strong likelihood of prevailing on the merits. The plain language of the federal officer removal statute covers "all" "civil actions" and "criminal prosecutions." The statute was amended by Pub. L. 112-239, 126 Stat. 1969, § 1087 (Jan. 2, 2013) (emphasis added) to add subsection (d) to broaden the definition of "civil actions" and "criminal

prosecutions" to include not just subpoenas, but "*any proceeding … to the extent that in such proceeding a judicial order … is sought or issued*." This bar discipline case is unquestionably such a proceeding in that ODC seeks an ultimate judicial order from the DCCA imposing discipline on Mr. Clark.

Additionally, Congress knows how to specify which cases are unremovable. The U.S. Code contains a dedicated provision setting out the categories of unremovable actions:

**28 U.S. Code § 1445 - Nonremovable actions**

(a) A civil action in any State court against a railroad or its receivers or trustees, arising under sections 1–4 and 5–10 of the Act of April 22, 1908 (45 U.S.C. 51–54, 55–60), may not be removed to any district court of the United States.

(b) A civil action in any State court against a carrier or its receivers or trustees to recover damages for delay, loss, or injury of shipments, arising under section 11706 or 14706 of title 49, may not be removed to any district court of the United States unless the matter in controversy exceeds $10,000, exclusive of interest and costs.

(c) A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States.

(d) A civil action in any State court arising under section 40302 of the Violence Against Women Act of 1994 may not be removed to any district court of the United States.

State/D.C. bar disciplinary cases fit into none of these specifically enumerated categories. Ergo the plain language of Section 1442 controls and this case can be removed

pursuant to the special forum protections afforded to federal officers.[3]

The Court's ruling, however, holds that bar disciplinary proceedings are neither civil nor criminal and therefore fall into a gap between the two that is not subject to removal. The amendment to Section 1442 cited above precludes this reading. There is no such gap in "*<u>any proceeding</u> … to the extent that in such proceeding a judicial order … is sought or issued*." And that lack of a gap is reinforced by the existence of Section 1445, which sets up explicitly which kinds of cases are not removable.

The Supreme Court has made plain in several cases that "[t]he federal officer removal statute is *not* 'narrow' or 'limited.' *Colorado v. Symes*, 286 U.S. 510, 517 (1932). At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969). The statute and the oft-repeated policy of broad interpretation are to protect the supremacy of the federal government. They find expression in the decisions of most federal circuits holding that hybrid matters against federal officers are in fact removable.

Most directly on point is the Fourth Circuit decision in *Kolibash v. Committee on Legal*

---

[3] We also removed on a Section 1331-related complete preemption ground under 28 U.S.C. § 1441. *See* Dkt. # 1 ¶¶ at 60-74. And under the *BP* decision, we are entitled to take that issue up to the D.C. Circuit as well, even though ordinarily, Section 1441 case remand orders are not appealable. But, they are only not appealable standing on their own. With Section 1442 as part of this case, the Section 1441 ground of removal does not stand alone and is part of the appealable June 8 order remanding this case.

*Ethics of the West Virginia Bar*, 872 F.2d 571, 576 (4th Cir. 1989), holding a bar discipline matter removable and that "[t]he form that the state action takes is therefore not controlling; 'it is the state's power to subject federal officers to the state's process that § 1442(a)(1) curbs.'" While the Court distinguished *Kolibash* here, *Kolibash* remains the most closely analogous reported federal appellate decision. The only cases to the contrary are a smattering of district court decisions, which are not precedential even within the confines of the individual districts that issued them.[4]

The clear weight of authority with respect to other types of hybrid proceedings favors removal. Contempt proceedings, though hybrid in nature, were held removable in the Fourth, Fifth, Seventh, and Eleventh Circuits. *See North Carolina v. Carr*, 386 F.2d 129, 131 (4th Cir. 1967) ("the statute looks to the substance rather than the form of the state proceeding; this is the reason for the breadth of its language"); *see also* ; *Louisiana v. Sparks*, 978 F.2d 226, 231 (5th Cir.1992); *Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir.1989); *Boron Oil Co. v. Downie*, 873 F.2d 67, 68 (4th Cir. 1989); *Wisconsin v. Schaffer*, 565 F.2d 961, 963–64 (7th Cir.1977) ("We think it unfruitful to quibble over the label affixed to this contempt action. Regardless of whether it is called civil, criminal, or *sui generis*, it clearly falls within the language and intent of the statute.").

---

[4] The Seventh Circuit did issue a ruling ODC tried to draw on. *See In re: Echeles*, 430 F.2d 347 (7th Cir. 1970) (holding attorney discipline proceedings before an executive committee of the U.S. District Court were neither civil nor criminal). However, that case did not involve removal under Section 1442 and is readily distinguishable.

Garnishments against federal officers, which are also hybrid in nature, are removable in the Ninth Circuit, *see Nationwide Investors v. Miller*, 793 F.2d 1044, 1046 (9th Cir. 1986), but not removable in the Fifth, *see Hexamer v. Foreness*, 981 F.2d 821, 823 (5th Cir. 1993). The existence of a Circuit split here in any area that could be analogized in some way to the hybrid nature of bar discipline cases only reinforces why a stay should be granted, since the issues are, at best, debatable and until the D.C. Circuit comes down one way or the other, Mr. Clark should be shielded from irreparable harm that would result from having to litigate in two courts systems at once (one under Article I and the other under Article III) and face wasteful proceedings in the local D.C. process that could be entirely nullified later.

Even before the broadening amendment to Section 1442(d) in Pub. L. 112-239, 126 Stat. 1969, § 1087 (Jan. 2, 2013) explicitly added subpoenas to the list of "actions" that could be removed, the D.C. Circuit had interpreted the statute broadly to include subpoenas, rejecting the analogously formalistic argument that subpoenas were neither a criminal prosecution nor a civil action. *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995) ("We do not believe Congress used the terms "civil action," "against," or "act" in the limited fashion that appellant urges, but rather meant to refer to ***any proceeding*** in which state judicial civil power was invoked against a federal official."). This holding neatly anticipated the amendment to Section 1442(d)(1).

The D.C. Circuit is likely to apply the same reasoning to this case, particularly since

§ 1442(d) by its plain terms applies to "*any proceeding … to the extent that in such proceeding a judicial order … is sought or issued*" is unquestionably broad enough to include D.C. bar discipline cases in which serious discipline can only be imposed by order of the D.C. Court of Appeals. *See* D.C. Rule XI, § 9 (any Board recommendation for discipline greater than an informal admonition or reprimand is decided by the D.C. Court of Appeals). ODC informed us for the first time on July 10, 2023, that it seeks disbarment.

The Board of Professional Responsibility is a creature of the DCCA since the Board was formulated via the DCCA adopting D.C. Bar Rule XI, § 4. The Board and its Hearing Committees perform a quintessentially judicial function in adjudicating bar discipline cases. The manifest congressional intent that the federal officer removal statute be broadly construed—applied over and over again—precludes the sort of interpretive gymnastics that would be required to say that this case is not removable.

Thus, Mr. Clark has shown a sufficient likelihood of prevailing on his appeal.[5]

**B.** **Subjecting Mr. Clark to an Administrative Trial Before the Removal Jurisdiction Dispute Is Fully Adjudicated Would Cause Irreparable Harm by Defeating the Congressional Directive to Hold Merits Proceedings Only in an Article III Forum.**

It is plain that permitting the D.C. Bar to move forward with disciplinary

---

[5] In *Shapiro v. U.S. Department of Justice*, Case No. 13-555 (RDM) (D.D.C. May 25, 2016) 2016 WL 3023980 at 8, while discussing this factor, observed that even if the sliding scale for preliminary injunctions is no longer applicable after *Winter v. Natural Resources Defense Council, supra*, "it makes little sense to make the issuance of a stay contingent on the Court's determination that its own ruling was likely wrong."

proceedings during the pendency of Mr. Clark's appeal of the remand decision would irreparably deprive him of his right to have this case adjudicated in a federal forum. The purpose of the federal officer removal statute would be defeated and if the D.C. Circuit reverses, all the time, trouble and expense of such proceedings would have been wasted.

The federal officer removal statute is intended to protect federal supremacy against encroachment by hostile state or local governments and courts. Such hostility has historically often been largely based on bitter policy disagreements over taxes, tariffs, prohibition and the like. *See Laible v. Lanter*, No. 21-102-DLB-CJS, 2022 WL 1913420, at 3-4 (E.D. Ky. Jun. 6, 2022) (recounting history), and authorities cited therein. Often in our history these disputes have fallen along partisan lines. Now, in this era, there are deeply held biases against President Trump and those who supported him in jurisdictions around the country, and especially in the District of Columbia. The District is as close as this Nation comes to a political monolith, with President Biden winning 92.1% of the vote in 2020 election, 26.06 percentage points higher than the next highest state in the Union. The D.C. government's antipathy toward the Trump Administration reflects the views of its populace and is immoderate to say the least. The federal officer removal statute was tailor made for such circumstances.

On the merits, but plainly of some relevance to the jurisdictional analysis and any discretionary stay choices here, clear separation of powers and federal supremacy principles prohibit such a municipal government from intruding into the most private

counsels the President of the United States took with his senior legal advisors as to how to exercise his core Article II law enforcement powers. *See* U.S. Const., art. II, § 3 ("[H]e [the President] shall take Care that the Laws be faithfully executed").

If the merits litigation processes of the DCCA and its adjuncts are not stayed (on a mandatory or discretionary basis), then Mr. Clark will be put through local litigation that will irreparably harm his reputation as printed news stories, blog entries, TV spots, and other forms of media are constantly attacking Mr. Clark. This is especially true because the D.C. Bar broadcasts its hearings (trials) on YouTube. None of that will be a bell that can be unrung. A stay is warranted to avoid that irreparable harm.

**C.** *There Would Be No Prejudice to the DCCA, the D.C. Bar, or to Others.*

The D.C. Bar would not be prejudiced by continuing the abeyance posture, just as it was not prejudiced by the case being held in abeyance since January 2023. Indeed, ODC contended before the DCCA that because it is an arm of the DCCA, the factor of harm to others from a stay drops out of the analysis. This ignores that regardless of whether this matter is characterized as civil, criminal or hybrid, the opposing party is ODC. The case is styled *In re: Jeffrey Bossert Clark*, but the charges that commenced the case were filed by ODC, and it is a determined adversary in this case. Additionally, there is no harm to another party relevant to this case. Mr. Clark gave confidential advice inside the Executive Branch. The President, who was the ultimate client for the advice, has not filed complaints about it to the D.C. Bar. Nor did any of Mr. Clark's former colleagues at the

Justice Department, even though they may have disagreed with it, even vehemently.

Any claim of prejudice to ODC is undermined by this case being docketed contrary to its long-standing policy of not docketing complaints lodged by persons who lack first-hand knowledge. Instead, it was docketed in response to a complaint from a partisan political actor, Senator Dick Durbin.[6]

Moreover, should ODC complain of prejudice due to delay, it is responsible for much of the delay of which it complains. It repeatedly attempted to prosecute this case after the first removal, which necessitated Mr. Clark having to file two additional removals. ODC then filed redundant motions for remand as to the second and third removals, increasing the burden on this Court in ruling on remand, in addition to the trouble and fee expense this needless multiplication of proceedings imposed on the Respondent. And, in any case, as the Supreme Court held in the *BP* case recognized, by authorizing appeals as of right, Congress in 28 U.S.C. § 1447(d) has resolved the competing interests in favor of an interlocutory appellate resolution of removal. Notably, this provision for appeal as of right is a relatively recent addition to the long history of federal officer removal statutes. *See* Pub. L. 112-239, 126 Stat. 1969, § 1087.

---

[6] We were also informed yesterday at a local process-based meet and confer, that ODC had no contact from Senator Durbin inquiring of the status of action on the letter he sent commencing this matter (though ODC tried to claim, implausibly in our view, that the Senator Durbin letter in 2021, out of which emerged ODC's investigation, was not the basis for the investigation). Hence, Senator Durbin obviously thinks his political objective of sending a complaint letter about Mr. Clark has already been achieved, which means there is no harm to him or those he represents from entering a stay.

**D.** *The Public Interest Suffers If the Stay Is Not Granted.*

As noted above, the public interest is served by preserving the structure of the relationship between the state or local governments, on the one hand, versus the federal government, on the other, embodied in the Supremacy Clause as to the 50 States and in the separation of powers here as to D.C. Congress has explicitly commanded the proper approach. A stay pending appeal also vindicates constitutional policy by preventing a hostile and inferior level of local government from penetrating into and/or second-guessing the federal government's actions or deliberations at the highest level.

## CONCLUSION

A stay of this Court's June 8 remand order and opinion should be granted, preferably on the grounds that such a stay is mandatory (*see* Section I, *supra*), but alternatively on the grounds that such a stay meets the four-factor test for granting discretionary stays as a matter of equity (*see* Section II, *supra*).

We have done our best to avert the need to seek a stay from this Court, sparing its resources. But ODC and the Hearing Committee assigned below have left us no choice but to seek this relief. Additionally, given ODC's constant pressure applied to Hearing Committee Twelve and the various orders issued by its Chair as a result, *we will deem inaction on this stay motion to be a denial unless it occurs before 5 p.m. EDT on July 13, 2023*. We will then seek a FRAP 8(a)(2) stay from the D.C. Circuit before that Court's procedural motion deadline of July 14, 2023.

26

Respectfully submitted this 11th day of July 2023.

/s/ *Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

/s/ *Harry W. MacDougald*
Harry W. MacDougald
Georgia Bar No. 463076
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
*Admitted Pro Hac Vice in Case No. 1:22-mc-00096-RC*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this *Motion for Stay Pending Appeal* by filing with the Court's electronic filing system and by email addressed to:

> Hamilton P. Fox, Esq.
> Jason P. Horrell, Esq.
> Office of Disciplinary Counsel
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org

This 11th day of July 2022.

/s/ Charles Burnham
Charles Burnham
DC Bar No. 1003464

Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

FILED

Jul 5 2023 12:04pm

Board on Professional Responsibility

In the Matter of:                              :
                                               :
    JEFFREY B. CLARK,                          :
                                               :
Respondent.                                    :    Board Docket No. 22-BD-039
                                               :    Disciplinary Docket No. 2021-D193
A Member of the Bar of the                     :
District of Columbia Court of Appeals          :
(Bar Registration No. 455315)                  :

ORDER

Disciplinary Counsel filed the Specification of Charges in this matter on July 19, 2022. Respondent filed his Answer on September 1, 2022. The matter was set for a hearing to begin on January 9, 2023.

On October 17, 2022, Respondent filed a notice of removal of this matter to the United States District Court for the District of Columbia. Disciplinary Counsel filed a motion to remand on October 21, 2022. On June 9, 2023, Disciplinary Counsel notified the Hearing Committee that the District Court had granted Disciplinary Counsel's motion to remand on June 8, 2023. *See* Order *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) ("this matter shall be REMANDED for further proceedings") (emphasis in original); *see also* Memorandum Op., *In re Clark*, Case Nos.: 22-mc-0096, 22-mc-0117, 23-mc-0007 (D.D.C. June 8, 2023) (setting forth basis for remand order). On June 16, 2023, the Hearing Committee ordered each party to report on the status of this matter,

specifically addressing rescheduling this matter for a hearing; identifying any issues the parties believe may need to be addressed; proposing any intermediate dates that may need to be scheduled in advance of hearing; and stating the party's position on whether it is appropriate or necessary to schedule an additional prehearing conference. Both parties submitted timely reports, which Disciplinary Counsel purported to file and Respondent, Mr. Clark, to "lodge."

Disciplinary Counsel asserts that the case is ready for hearing, which should be scheduled as soon as possible after Labor Day. Mr. Clark lodged his report because he maintains that this matter should be held in abeyance pending the Court of Appeals' consideration of a subpoena dispute between Mr. Clark and Disciplinary Counsel (*In re Clark*, D.C. App. No. 22-BG-0891). Mr. Clark's Report at 2.

The fact that a party is seeking to enforce a subpoena for use in this proceeding, however, neither requires nor justifies holding this proceeding in abeyance, at least at this point. A subpoena enforcement is not an appeal of this action. It is a collateral proceeding that does not affect jurisdiction here. Nor does its pendency justify delaying all other preparation in this matter. *See In re Clark,* Board Dkt. 22-BD-039, at 4-5 (H.C. Report, Sept. 12, 2022), *adopted on other grounds,* Order, *In re Clark,* Board Dkt. 22-BD-039 (BPR, Sept. 27, 2022).

Regarding scheduling, Mr. Clark also notes that he has appealed the District Court's June 8 Order, attaches his Notice of Appeal, and argues that Hearing Committee proceedings may not commence until that appeal is complete and "not subject to any higher level appellate review." Mr. Clark's Report at 4. Mr. Clark

does not assert that the District Court's remand order has been stayed pending appeal, or that any court has issued an order specifically prohibiting further proceedings before this Hearing Committee.

Mr. Clark also argues that the remand order is not immediately effective to dispose of the controversy over removal jurisdiction because the District Court has not yet issued a separate "judgment" pursuant to Fed. R. Civ. P. 58, which requires that a judgment "must be set out in a separate document." Mr. Clark's Report at 3. As noted above, Mr. Clark's statement that the District Court did not create a separate document does not appear to be true. The District Court *did* enter a separate order remanding the case. *See In re Clark*, No. 23-7073 (D.D.C.), Dkt. Nos. 19-20. Indeed, Mr. Clark has appealed the order and the United States Court of Appeals for the District of Columbia Circuit has docketed the appeal. *In re Clark*, 23-7073 (D.C. Cir.).

But even if Mr. Clark were correct that the District Court did not properly enter a judgment in a separate document, that would raise a potential question only about whether his appeal was valid. It would not change the fact that the District Court ordered the case to be remanded. The Supreme Court has concluded that "[t]he sole purpose of the separate-document requirement, which was added to Rule 58 in 1963, was to clarify when the time for appeal under 28 U.S.C. § 2107 begins to run." *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384 (1978); *accord Diamond by Diamond v. McKenzie*, 770 F.2d 225, 230–31 (D.C. Cir. 1985). Courts enter many orders (for example, discovery rulings, injunctions, scheduling orders and *pro hac*

*vice* orders), that do not operate by themselves as final judgments. Those orders are nonetheless effective unless they are stayed.

Mr. Clark's decision to appeal did not stay the District Court's Order. "A stay" of a motion to remand pending appeal "is not a matter of right even if irreparable injury might result." *Leroy v. Hume*, 563 F.Supp.3d 22 (E.D. N.Y 2021) (quoting *Virginia Ry. Co. v. United States*, 272 U.S. 268, 272 (1926)). *See also, e.g.*, *Wilde v. Huntington Ingalls, Inc.*, 616 Fed. Appx. 710 (5th Cir. 2015) (denying motion to stay an order of remand pending appeal); *Martin v. Serrano Post Acute LLC*, 2020 WL 13302380 (C.D. Cal. 2020) (same) *Mayor of Baltimore v. BP P.L.C.*, 2019 WL 3464667 (D. Md. 2019) (same). The docket reflects that Mr. Clark did not even seek to stay order, much less obtain a stay.

Mr. Clark also asserts that it would be premature to reschedule the hearing at this time because, among other things, Mr. Clark will want to litigate to the Chair via motions practice "numerous threshold matters," and that *mandamus* proceedings may be required. Mr. Clark's Report at 4-5. However, Board Rule 7.16 does not permit our Committee to delay the hearing to resolve motions that are not directed to the manner in which the hearing is to be conducted, or the admissibility of evidence. Instead "the Hearing Committee shall include in its report to the Board a proposed disposition and the reasons therefor. The Board will rule on all such motions in its disposition in the case." *See also In re Stanton*, 470 A.2d 281, 285 (D.C. 1983) (appended Board report) (once a Specification of Charges has been filed, "the underlying purposes of the Board require that we proceed directly to a

hearing on the merits rather than being detoured into questions of pleading and form.").[1]

Upon consideration of the foregoing, and it appearing that this matter has been remanded to the Hearing Committee, and it further appearing that a pre-hearing conference would assist the Hearing Committee in scheduling this matter for a hearing, it is hereby

ORDERED that a pre-hearing conference will be held in the above-captioned matter at **1:00 p.m.** on **July 12, 2023**, via Zoom video conference, in accordance with Board Rule 7.24, and will be live-streamed on the Hearing Committees' YouTube channel. Disciplinary Counsel and Mr. Clark and/or his counsel shall appear promptly at that time. The parties are directed to avoid scheduling conflicting

---

[1] Mr. Clark renews an argument he has made before that the Committee should not follow the Board's procedures because, if this Committee were a federal court, it could not avoid reaching a difficult jurisdictional issue by resolving the case based on merits arguments that are easier to adjudicate. Mr. Clark's Report at 5. Mr. Clark's argument misstates our role. The Committee is not a federal court and does not determine merits at all. Rather, it issues a report and recommendation that is filed with the Board (under procedures the Board establishes). Nothing in the decisions Mr. Clark cites involving federal courts bars the Board from having the Committee issue a report and recommendation on all issues at once. Nor does it authorize (much less require) the Committee to establish a motion practice that the Board did not contemplate. In any event, even if we assumed that the federal court principle Mr. Clark references applied to this Committee, following Board Rule 7.16 (by making a report and recommendation after hearing rather than deciding a case on papers), would not violate that principle. Complying with Board Rule 7.16 does not mean that the Committee will overlook a difficult "jurisdictional" argument in order to resolve the case on the merits. To the contrary, the Rule contemplates that we carefully consider all issues, report on the relate facts and make recommendations on all appropriate determinations.

matters and shall inform any court or administrative agency of this prior commitment to the disciplinary system; and it is further

ORDERED that prior to the pre-hearing conference, the parties are directed to meet and confer with respect to scheduling the evidentiary hearing of this matter during 2023, and any intermediate dates that may need to be scheduled in advance of hearing. When considering scheduling, the parties are reminded that subpoenas are available to compel the attendance of witnesses, and witness testimony may be taken from a remote location pursuant to Board Rule 11.4. The parties are further reminded to allow time for opening statements and closing arguments when estimating the time necessary for the hearing; and it is further

ORDERED that Mr. Clark's attention is drawn to Board Administrative Order 2023-01, which provides, among other things, that

> Board oral arguments and Hearing Committee hearings in contested cases and reinstatement cases that have not yet been scheduled for a hearing, shall be scheduled for an in-person proceeding unless the respondent requests that the proceeding be held over Zoom. For Board arguments, the request to conduct the argument over Zoom, if any, shall be contained in the respondent's brief, immediately before the respondent's or counsel's signature. For Hearing Committee hearings in contested cases and reinstatement cases, the request to conduct the hearing over Zoom, if any, shall be made as soon as practicable, but no later than the date set for the pre-hearing conference. Such request shall be filed with the Office of the Executive Attorney and served on Disciplinary Counsel;

and it is further

ORDERED that the Office of the Executive Attorney is directed to serve this order by email, and to circulate the link for the Zoom pre-hearing conference.

HEARING COMMITTEE NUMBER TWELVE

By: _Merril Hirsh_____

Merril Hirsh
Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire
charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

7



RECEIVED

Sep 6 2022 2:42pm

Board on Professional
Responsibility

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY
## HEARING COMMITTEE NUMBER TWELVE

| | | |
|---|---|---|
| **In the Matter of** | : | **Board No. 22-BD-039** |
| | : | |
| **JEFFREY B. CLARK, ESQUIRE** | : | **Disciplinary Docket No. 2021-D193** |
| | : | |
| **Respondent,** | : | |
| | : | |
| **A Member of the Bar of the District** | : | |
| **of Columbia Court of Appeals.** | : | |
| **Bar Number: 455315** | : | |
| **Date of Admission:  July 7, 1997** | : | |
| | : | |

## DISCIPLINARY COUNSEL'S OMNIBUS RESPONSE
## TO RESPONDENT'S SEPTEMBER 1, 2022 PLEADINGS

Disciplinary Counsel submits this Omnibus Response to the pleadings filed by Respondent on September 1, 2022.

On September 1, 2022, Respondent filed an Answer, a Motion to Dismiss, and three motions to file various pleadings under seal.  The next day, September 2, 2022, the Board resolved the motions to file under seal: only the portions of the pleadings that refer to a confidential matter are to be place under seal; redacted versions of pleadings are to be filed in the public record.  The Answer requires no response. Only the Motion to Dismiss now requires a response. Under the Board Rules, rather than engage in extensive pre-hearing rulings on motions, the Hearing Committee is required to conduct the evidentiary hearing on the merits of the Specification of

Charges and in its report and recommendation, make recommendations to the Board as to the disposition of the motion to dismiss.  Board Rule 7.16(a). Even if the Rules did not require this procedure, it would nonetheless be the only reasonable procedure to follow given the nature of the allegations made in the Motion to Dismiss.

Many of Respondent's arguments are dependent upon factual issues that have not yet been litigated.  For example, all his arguments relating to his claim that the charges fail to state a violation of the Rules are heavily fact-dependent.  They assume that the conduct at issue was a pre-decisional recommendation, part of providing advice to the President, or an honest expression of opinion on a legal issue, and therefore does not implicate Rule 8.4.  The evidence will show that this is not so. Had Respondent merely suggested sending the so-called "Proof of Concept" letter to various Georgia officials, this case would not have been brought. It is generally not a disciplinary violation to make a stupid suggestion.  Rather, these charges arise from Respondent's conduct *after* he proposed sending the letter and was informed by his superiors that there was no factual basis for the claims made in it—most significantly that there was no evidence of fraud in the 2020 presidential election that might have affected to results in Georgia.  The Department lawyers who were familiar with the investigations into election fraud told Respondent that there was no such evidence and attempted to put him in touch with the United States Attorney who had conducted the Georgia investigation.  Respondent did not follow up with

the U. S. Attorney.  Nevertheless, he persisted in attempting to persuade and then coerce his superiors to send the letter asserting the false information, and when they still refused to do so, attempted to have himself appointed Acting Attorney General based upon his assurances to the President that if he were so appointed, he would send the letter.

Perhaps Respondent contests these facts.  It is impossible to say since his Answer provides only a general denial.  Therefore, the facts need to be determined at an evidentiary hearing before Respondent's Motion to Dismiss can be resolved. Even his jurisdictional arguments are at least partially dependent upon unresolved facts.  For example, part of his separation of powers argument and his official immunity argument turned on his claim that he was giving legal advice to the President.  Those arguments have no merit, and Disciplinary Counsel believes the evidence will show that rather than advise the President, Respondent was engaged in an attempt to interfere improperly in state election proceedings.  This case does not attempt to intrude upon internal Department deliberations or regulate president authority, but rather regulate the conduct of an individual attorney subject to the Court's disciplinary authority who attempted to engage in dishonest conduct.  But those issues can only be resolved by airing the facts.

Moreover, Disciplinary Counsel believes that once the facts are developed at an evidentiary hearing, many of the convoluted legal arguments Respondent has put

forth will disappear, and that the logical time to address those arguments is after the facts have been established.  Accordingly, except to touch lightly on three points, Disciplinary Counsel does not intend to address them in this pleading, but rather to defer to the post-hearing briefing, as is the standard procedure.

1. **The D.C. Court of Appeals is an Article I Court Established by Federal Law and is Empowered to Regulate the Conduct of Members of Its Bar.**

While at times recognizing the unique status of the District of Columbia— "All law in the District is federal law . . ." (Motion to Dismiss at 18)—Respondent continually treats these proceedings as though they are an effort by a "mere" organ of a city government or a local bar association to regulate the operation of the federal government.  In fact, the Court of Appeals was created by a 1970 act of Congress. District of Columbia Court Reorganization Act of 1970, Pub. L. No. 91-358, 84 Stat. 473 (1970).  Its judges are appointed by the President and confirmed by the Senate. It is not an organ of the D.C. Government; the mayor and city council are not involved in the appointment process, for example.

As authorized by Congress, the Court sets its own rules for admission to its Bar and for the conduct of its members.  *Id.* at 521.  *See also* D.C. App. R. 46; D.C. Bar Rule XI.  The Board on Professional Responsibility, including the hearing committees appointed by the Board, are agents of the Court.  *See* Rule XI, § 4.  They are not agents of the D.C. Bar.  The Board also appoints Disciplinary Counsel, who is also not an agent of the D.C. Bar.  *See* Rule XI, § 4(e)(2).  Thus, disciplinary

proceedings are not bar proceedings, but court proceedings. Lawyers who are members of the D.C. Bar, but who are employed by the federal government, must still adhere to the standards of conduct to which all D.C. Bar members are held.

In a recent disciplinary matter, the Court reminded lawyers of its authority to regulate the conduct of members of its bar. Bar membership "arises from consensual covenant" between the Court and the attorney admitted to practice before it, and "[i]n return for the benefits of bar membership, members agree to be bound by Bar Rules and Rules of Professional Conduct … and to be subject to the disciplinary authority of this court and the Board …." *In re O'Neill*, 276 A.3d 492, 500 (D.C. 2022). The Court went on to remind attorneys that bar membership is a privilege, the receipt of which carries a duty "at all times and in all conduct, both professional and personal, to conform to the standards imposed upon members of the Bar," and that a violation of that duty "shall be grounds for discipline …." *Id*.

## 2. The Department of Justice has Authority to Require its Lawyers to Comply with the Standards of Conduct of the Bars to Which They Are Admitted.

Although the Court is empowered to discipline members of its bar, if necessary, Disciplinary Counsel can address in post-hearing briefing Respondent's contrived argument as to why he is not subject to the Rules of Professional Conduct, issued by the Court to which he is admitted to practice, by virtue of his status as an officer or employee of the Justice Department. Department lawyers and other high

federal officials who have been disciplined by the Court of Appeals would be surprised to learn of this immunity. *See In re Howes*, 52 A.3d 1 (D.C. 2012); *In re Kline*, 113 A.3d 202 (D.C. 2015); *In re Dobbie & Taylor* (BPR Jan. 13, 2021) (pending before DCCA); *see also In re Abrams*, 689 A.2d 6 (D.C. 1997) (Assistant Secretary of State for Inter–American Affairs); *In re Berger*, 927 A.2d 1032 (D.C. 2007) (National Security Advisor); *In re Sofaer*, 728 A.2d 625 (D.C. 1999) (Legal Advisor to U.S. State Department). In fact, although not members of the D.C. Bar, two presidents of the United States have been disbarred or suspended by state bars for their conduct while in office. *See Matter of Nixon*, 53 A.D.2d 178, 385 N.Y.S.2d 305 (1976) (disbarred); *Neal v. Clinton*, No. CIV 2000-5677, 2001 WL 34355768 (Ark. Cir. Ct. Jan 19, 2001) (five-year suspension).

But the Department of Justice has adopted a regulation that subjects its lawyers to compliance with the rules of the bars of the courts to which they are admitted "to the same extent and in the same manner" as other attorneys admitted to those bars. 28 C.F.R. § 77.3. While Respondent puts forth a complex argument as to why D.C. is not a "state" for purposes of 28 U.S.C. § 530B(a), if true, this would only mean that the Department was not *required* by the statute to make its D.C. Bar members—in contrast to all other lawyers employed by the Department—adhere to the rules of the jurisdiction to which they were admitted. Respondent does not say why this result would make any policy sense. Surely, in setting the employment

rules for its employees, the Department has independent authority, regardless of whether there is a federal statute that so requires, to mandate its D.C. Bar members to adhere to the D.C. Rules of Professional Conduct—specious arguments about *ultra vires* regulations, the *Chevron* doctrine, and the newly-minted "major question" doctrine, notwithstanding.

### 3. The Only Proceeding Pending Before the Court of Appeals is a Motion to Enforce a Subpoena.

This proceeding did not originate before the Court of Appeals, and the merits of Respondent's conduct are not under consideration by the Court.   When Respondent refused to comply with a subpoena for documents during the investigation of this matter, Disciplinary Counsel moved to enforce the subpoena before the Court pursuant to Rule XI, § 18(d).  Then Respondent sought to have the subpoena quashed by the Board, to which Disciplinary Counsel pointed out that the matter—meaning only the issue of the enforcement of the subpoena because that was the only matter pending—was before the Court.  The primary issue before the Court is whether the Fifth Amendment right against self-incrimination permits Respondent to refuse to comply with a subpoena that sought any evidence he had to support the claims made in the "Proof of Concept" letter that there was sufficient evidence of fraud in Georgia to affect the outcome of the 2020 election.

While the motion was under advisement, Disciplinary Counsel continued to investigate and concluded there was sufficient evidence to charge Respondent

without a response to its subpoena. These charges were brought approximately six months after the motion to enforce the investigative subpoena was filed with the Court. That does not mean that the subpoenaed evidence is not relevant, just not essential. (One might think that evidence supporting the claims Respondent sought to put forward in the "Proof of Concept" letter would be exculpatory and therefore something that Respondent would want made part of the record.)  Respondent, however, wants to treat this ancillary evidentiary matter as though the entire case were under consideration by the Court. His only hook for doing so is that, as a make-weight argument to his extensive discussion of the Fifth Amendment issues, he threw into his brief arguments about lack of jurisdiction over Department of Justice employees. But even he admits that the law in the District of Columbia does not require one tribunal to defer to another if efficiency is not served—if resolution in one tribunal will not resolve the issues in another. And of course, here we do not have separate tribunals—the Board and its hearing committees are agencies of the Court of Appeals. In any case, Respondent admits, in his discussion of the D.C. case law, that the "divestiture-of jurisdiction rule" is not really a jurisdictional prohibition. So it is not true, despite the heading to his argument, that "The Board Lacks Jurisdiction." Motion to Dismiss at 9.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

There is one genuine pre-litigation motion pending before the Hearing Committee — its recommendation on Respondent's request to defer these proceedings. That issue is briefed. If the decision is not to defer, the Hearing Committee should promptly schedule a status conference to establish a hearing date. Respondent's counsel requested and received access to Disciplinary Counsel's file last Fall. There may be some additional documents acquired since then, but there will not be many, if any. The exhibits will be sparse, and Disciplinary Counsel estimates that it would call three witnesses. There is no reason this case cannot be heard in the second half of October 2022.

Respectfully submitted,

*Hamilton P. Fox, III*

_____
Hamilton P. Fox, III
Disciplinary Counsel


**/s/ Jason R. Horrell**
Jason R. Horrell
Assistant Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of September 2022, I caused a copy of the foregoing *Disciplinary Counsel's Omnibus Response to Respondent's September 1, 2022 Pleadings* to be served on the Board of Professional Responsibility c/o Case Managers to casemanagers@dcbpr.org and to Respondent's counsels via email to Harry W. MacDougald, Esquire, to hmacdougald@CCEDlaw.com, to Charles Burnham, Esquire, to charles@burnhamgorokhov.com, and Robert A. Destro, Esquire, to Robert.destro@protonmail.com.

*Hamilton P. Fox, III*

_____

Hamilton P. Fox, III

Exhibit 20



RECEIVED

Jul 12 2023 4:04pm
Board on Professional
Responsibility

# DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY
## HEARING COMMITTEE NUMBER TWELVE

---

In the Matter of:

Jeffrey B. Clark, Esq.
*Respondent*,

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar No. 455315)
Board Docket No. 22-BD-039
Disciplinary Docket No. 2021-D193

---

## AFFIDAVIT

---

I, Theodore (Jack) Metzler, hereby state as follows:

1.      I am an attorney in the D.C. Office of Disciplinary Counsel. I represent the Office in the above-captioned matter and the related proceedings in the U.S. District Court for the District of Columbia and the U.S. Court of Appeals for the D.C. Circuit.

2.      On July 5, 2023, I telephoned the district court clerk's office to determine whether the clerk intended to mail a certified copy of the district court's June 8, 2023, remand order pursuant to 28 U.S.C. § 1447(c), and if so, to whom the clerk intended to send the order.

1

3.      I spoke to a clerk and explained that I was calling in regard to the court's order of remand in Case No. 1:22-mc-96. I referred the clerk to the provision of 28 U.S.C. § 1447(c) that states the clerk shall mail a certified copy of an order of remand to the clerk of the state court from which the case was removed. The clerk told me she was familiar with that rule.

4.      I asked the clerk whether the docket would reflect that a certified copy was sent. She stated that when the clerk sends a copy of a remand order, the clerk enters a notation on the docket that the case is remanded.

5.      I then noted that the remand order had been issued on June 8, 2023, but no clerk's notation had appeared on the docket almost a month later. I asked whether there was a timetable for mailing the order and entering the clerk's notation.

6.      I referred the clerk to the docket in another case, No. 1:20-cv-01932, *District of Columbia v. ExxonMobil Corp.*, in which the clerk's Section 1447(c) mailing was delayed only by multiple administrative stays, beginning with an emergency motion on the day after the remand order. I noted that in that case the clerk's remand notation appeared just two weeks after D.C. Circuit denied an emergency motion to stay and lifted its interim administrative stay. *See District of Columbia v. Exxon Mobil Corp.*, No. 22-7163, 2023 WL 1480039, at *1 (D.C. Cir. Jan. 30, 2023). (The appeal of the remand order in that case still has not been resolved. *See* Docket,

*District of Columbia v. ExxonMobil Corp.*, No. 22-7163 (D.C. Cir.) (argued May 8, 2023).)

7.      The clerk explained that she was not the clerk assigned to the case and that the clerk who was assigned to the case was out that day. She said she would check with her colleague and call me back.

8.      I asked the clerk if she would also ask her colleague to whom the clerk would mail a copy of the remand order. I noted that in this case, the removal had been noticed from a disciplinary proceeding before a hearing committee of the D.C. Board on Professional Responsibility, which does not have a clerk's office. The clerk agreed to ask her colleague that question.

9.      The clerk returned my call the next day. She stated that she had talked to her colleague about case 22-mc-96 and about the *ExxonMobil* case I had referred to. She relayed that her colleague said there would be no remand notation on the docket in 22-mc-96. To the best of my recollection, she said something like: "because like you said, there is no court clerk, so we would treat it like an agency case."

10.     To confirm my understanding, I asked the clerk whether, when a case is purportedly removed from an agency, there is no remand notation on the docket because there is no court clerk. She agreed.

11.     The clerk identified herself when she called, but I did not write down her name and I do not recall it. I do not recall whether she told me the name of her

colleague. While preparing this affidavit, I contacted the clerk's office again to as-certain whether I could provide the clerk's name. My call was returned by Simone Logan, who identified herself as the original clerk's colleague and a supervisor in the clerk's office. Ms. Logan agreed that I could provide her name in this affidavit.

12.     When preparing Disciplinary Counsel's opposition to the motion to va-cate, I mistakenly recalled that original return call from the clerk occurred on July 7. After reviewing my records, I see that the correct date was July 6.

13.     I do not claim that the information provided by the clerk is binding or an authoritative statement from the U.S. District Court. It reflects only the informal view of the clerk about an administrative aspect of her job—whether to send a copy of an order in the mail and make a particular notation on the docket. Nevertheless, I believe the clerk's view is relevant to Clark's argument that the Hearing Committee may not proceed because no such mailing has been made.

I swear that the foregoing is true and correct to the best of my knowledge and recollection.

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER

## CERTIFICATE OF SERVICE

I certify that on July 12, 2023, I caused the foregoing to be filed by email to casemanager@dcbpr.org and also served it on the following:

Charles Burnham, counsel for Respondent, charles@burnhamgorokhov.com, Board on Professional Responsibility, by its Executive Attorney James T. Phalen, jtphalen@dcbpr.org.

s/Theodore (Jack) Metzler
THEODORE (JACK) METZLER
OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

Exhibit 21

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER TWELVE

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | **FILED** |
| JEFFREY B. CLARK, | : | |
| | : | Jul 12 2023 9:33am |
| Respondent. | : | Board Docket No. 22-BD-039 |
| | : | Disciplinary Docket No. 2021-D193 |
| A Member of the Bar of the | : | Board on Professional Responsibility |
| District of Columbia Court of Appeals | : | |
| (Bar Registration No. 455315) | : | |

<u>ORDER</u>

Respondent Jeffrey B. Clark has Lodged a Motion to Vacate Orders, in which he argues, among other things, that the Hearing Committee lacks jurisdiction because the Clerk of the United States District Court for the District of Columbia has not mailed a certified copy of the District Court's June 8, 2023 remand order to the Hearing Committee.  Respondent relies on 28 U.S.C. § 1447(c), which provides that

> (c) A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. *A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.*

(emphasis added).  Mr. Clark urges that, notwithstanding the District Court's June 8, 2023 order remanding this case, proceedings before the Hearing Committee cannot resume unless and until the District Court Clerk mails a certified copy of the June 8 order (and preferably, until the certified copy is received).  Motion to Vacate at 5.

Disciplinary Counsel opposes Mr. Clark's motion on various grounds, and represents that the District Court Clerk has informed Disciplinary Counsel that "the clerk would not mail a certified copy of the order (or place a notation of remand on the docket indicating a certified copy was sent), because there is no state court clerk in this case to receive it."  Response at 5.

In reply, Mr. Clark argues, among other things, that the statement in Disciplinary Counsel's brief attributed to the District Court Clerk, "is unsworn, the specific Clerk's office attendant is not identified, and the specifics of the dialogue are not recounted."  Reply at 7.  Mr. Clark's Reply also notes that he has filed a copy of a motion seeking a stay pending appeal, which he has filed in the United States District Court for the District of Columbia.

Upon consideration of the foregoing, and it appearing that Disciplinary Counsel has not offered evidence of its conversation with the Clerk of the United States District Court for the District of Columbia, it is hereby

ORDERED that Mr. Clark's Lodged Motion to Vacate Orders shall remain under advisement, pending receipt of an affidavit filed by Disciplinary Counsel identifying the Clerk's Office employee referenced in Disciplinary Counsel's

response, that employee's authority to speak on behalf of the Clerk's Office, and setting forth the specifics of the dialogue that was summarized in Disciplinary Counsel's motion; and it is further

ORDERED that Respondent's Lodged Motion for Reconsideration and for Postponement of Prehearing Conference is granted in part; and it is further

ORDERED that the pre-hearing conference set for July 12, 2023 is postponed, pending resolution of Respondent's Motion to Vacate.


HEARING COMMITTEE NUMBER TWELVE

By: _Merril Hirsh_____
        Merril Hirsh
        Chair

cc:

Jeffrey Clark, Esquire
c/o Charles Burnham, Esquire
Robert A. Destro, Esquire
Harry W. MacDougald, Esquire
charles@burnhamgorokhov.com
robert.destro@protonmail.com
hmacdougald@ccedlaw.com

Hamilton P. Fox, III, Esquire
Jason R. Horrell, Esquire
Office of Disciplinary Counsel
foxp@dcodc.org
horrellj@dcodc.org

Exhibit 22

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD OF PROFESSIONAL RESPONSIBILITY**
**HEARING COMMITTEE NUMBER TWELVE**

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | |
| JEFFREY B. CLARK, | : | |
| | : | Board Docket No. 22-BD-039 |
| Respondent. | : | Disciplinary Docket No. 2021-D193 |
| | : | |
| A Member of the Bar of the District | : | |
| Of Columbia Court of Appeals | : | |
| (Bar Registration Number 455315) | : | |

RECEIVED

July 13, 2023 1:56 pm
Board on Professional
Responsibility

<u>LODGED RESPONDENT'S MOTION TO DISREGARD ODC AFFIDAVIT AS LEGALLY
DEFICIENT AND THUS IRRELEVANT</u>

    **1.**  The Chair of Hearing Committee Twelve issued an Order on the morning of
July 12, 2023 concerning Respondent Jeffrey B. Clark's Motion to Vacate Orders and
Motion for Reconsideration. In that Order, the Chair held that the Motion to Vacate
Orders was under advisement pending receipt of an "affidavit filed by Disciplinary
Counsel identifying the Clerk's Office employee referenced in Disciplinary Counsel's
response, the employee's authority to speak on behalf of the Clerk's Office, and setting
forth the specifics of the dialogue that was summarized in Disciplinary Counsel's
Motion." July 12 Order at 2. The Order also postponed the pre-hearing conference that
had been set for 1:00 PM yesterday.

    **2.** The Office of Disciplinary Counsel ("ODC") has now submitted an affidavit by
Theodore (Jack) Metzler of ODC in an attempt to meet the requirements of the Chair's
July 12 Order and of 28 U.S.C. § 1447(c) ("Affidavit"). The Affidavit, however, cannot

possibly demonstrate compliance with Section 1447(c) and indeed ODC makes no attempt to assert that it does. ODC even includes a concluding proviso paragraph wherein ODC recognizes the legal shortcomings of its own Affidavit.

**3.** The Affidavit recounts a sequence of sworn events that begin on July 5, 2023 and end yesterday, July 12, 2023. The key event that occurred most recently involves a supervisor in the U.S. District Court Clerk's Office named Simone Logan. To explain the legal defects in the Affidavit, we begin there.

**4.** Ms. Logan is not an Article III Judge. She thus cannot construe Section 1447(c) or its requirements. She cannot offer reasons why Section 1447(c) cannot be complied with. And she cannot vary the requirements of Section 1447(c).

**5.** Nor can the Hearing Committee dispense with the requirements of Section 1447(c) based on this Affidavit or based on the second-hand statements of Ms. Logan coming through Mr. Metzler. The first step in the portions of Section 1447(c) that the Chair highlighted in his Order this morning are also not committed to the Hearing Committee to administer in any fashion, let alone discharge. *See* July 12 Order at 1. Upon the removal, the matter is before an Article III court. And there it remains unless and until all conditions are met to even ***possibly*** return jurisdiction to this D.C. Court of Appeals ("DCCA") adjunct body. Just one of those conditions is compliance with the italicized language in Section 1447(c). And again, the Affidavit cannot satisfy even just that one condition. (Later in this Motion, we set out all of the other necessary conditions to

2

jurisdiction returning here, so that focus is not lost on the fact that there are numerous uncrossed hurdles to a resumption of jurisdiction here. In short, an important issue of how the removal-jurisdiction process works cannot be allowed to devolve into reading the entrails of what the legally deficient and irrelevant Affidavit means as to Section 1447(c) compliance. The answer is that the Affidavit has zero significance to Section 1447(c) compliance. Nothing can be discerned from it except various points we highlight below that damage ODC's position; they do not help it.

**6.** Having made the key Article III constitutional point, next we will walk through our objections and analysis to each of the paragraphs of the Affidavit:

    **a.** Paragraph 1: No objections.

    **b.** Paragraph 2: If the Chair were to overrule our constitutional and other legal objections in this Motion (and our prior related motions to vacate and to reconsider), we reserve the ability to examine Mr. Metzler under oath about his representation that he anticipated our Section 1447(c) noncompliance argument and thus called over to the U.S. District Court's Clerk's Office beginning on July 5, 2023 to inquire when they would be sending a certified copy of the June 8, 2023 remand order.[1] We did not file our Motion to Vacate Orders until July 9, 2023. We believe that Motion took the Chair and ODC by surprise, as it appears to us that

---

[1] We especially make this reservation because Mr. Metzler admits he misremembered when he spoke to the DDC Clerk's Office on one occasion. *See* Affidavit Paragraph 12.

both ODC and the Chair were assuming until or Motion to Vacate Orders was filed on July 9 that the June 8, 2023 remand order of the District Court was self-executing. This was incorrect for the reasons we have described.

One reason we are *dubitante* on Mr. Metzler's assertion in Paragraph 2 is that July 5 is still ***many weeks after*** ODC began making filings designed to reinitiate adjudication here. The first such filing was on June 9, 2023, when ODC made a notice filing of the June 8 remand order to the DCCA. Note that the reported phone call in Paragraph 2 of the Affidavit did not take place on June 8 or a few days after the date of the remand order; it took place nearly one month later.

Finally, even if Paragraph 2 of the Affidavit were to be credited, ODC's failure to spot for this Hearing Committee the absence of the certified mailed copy ***before*** it began vehemently contending that litigation should resume in this forum appears to be inconsistent with ODC's duty of candor.

Section 1447(c) is a ***jurisdictional*** provision. Hence, what Paragraph 2 is effectively saying is that ODC ***knew***, at some as yet unidentified point, that the mailing of the certified copy of the June 8 remand order had jurisdictional significance. Yet, until we filed our July 9 Motion to Vacate Orders ODC lawyers remained mum that there was a jurisdictional barrier to proceeding here. They also kept their lips sealed as to the potential relevance of the first Metzler call to the U.S. District Court Clerk's Office purportedly on July 5.

4

There has been a troubling pattern of ODC overzealousness against Mr. Clark. It began with Mr. Fox asserting that one of Mr. Clark's prior lawyers, Robert Driscoll, had agreed to accept e-mail service of a subpoena from Mr. Fox involving Mr. Clark. This was false. *See* Affidavit of Robert N. Driscoll (Feb. 11, 2022). Mr. Fox also threatened to "ratchet up" the discipline against Mr. Clark twice on January 28, 2022 if Mr. Clark asserted his Fifth Amendment rights in order to decline response to the subpoena. *See* Affidavit of Harry W. MacDougald (Feb. 15, 2022). Both of these were attached to the Response to Motion to Compel and Cross-Motion to Quash filed in DCCA litigation Mr. Fox filed to try to compel compliance with his subpoena.[2]

As of yesterday, July 12, 2023, we can now add a third incident to this catalogue, which Mr. Fox and the ODC he leads assert that they knew since at least July 5, 2023, that there was a jurisdictional defect to proceeding here but they did not disclose it (or the follow-on events about that involving the District Court Clerk's Office) until the filing of Mr. Metzler's Affidavit yesterday.

**c.** Paragraph 3: Note that Mr. Metzler indicates that the District Court Clerk's Office indicated that it is familiar with Section 1447(c)'s certified copy of a remand order mailing requirement. This indicates that those who are "repeat

---

[2] Both the Driscoll and MacDougald affidavits are exhibits to our Response to Motion to Compel and Cross-Motion to Quash. We are those attaching the entirety of that Response as Exhibit 1 herein.

players" on issues involving removal jurisdiction in that Clerk's Office know that the mailing step is required. They are not even lawyers. ODC's agents are.

**d.** Paragraphs 4 & 5: These paragraphs confirm that no mailing of a certified copy of the June 8 remand order has occurred because otherwise there would be a reference to that mailing on the District Court docket—precisely as we had argued to the Chair. And, as we know, there is no such indication on the relevant docket, as we pointed out in our Motion to Vacate Orders. This point alone is dispositive of the true dispute here—has Section 1447(c) been complied with such that jurisdiction could possibly have resumed here (assuming there were no other barriers to the resumption of jurisdiction, which there are, *see infra*).

**e.** Paragraph 6: This Paragraph references removal litigation in *District of Columbia v. ExxonMobil Corp.*, No. 1:20-cv-01932 (D.D.C. removed July 17, 2020). Paragraph 6 correctly notes that a remand order back to the D.C. Superior Court was issued in *ExxonMobil* and that that remand is now on appeal to the D.C. Circuit. Paragraph 6 notes that the appeal is still pending. Mr. Metzler, however, neglects to inform the Chair that the remanded Superior Court litigation was stayed on May 31, 2023 for a period of 60 days "in light of the pending appeal before the U.S. Court of Appeals for the District of Columbia Circuit." Exhibit 2 (Order Granting Defendants' Motion to Stay Proceedings). And, as Paragraph 6 concedes, **the ExxonMobil appeal has already been argued** (23 days previous to

the entry of the Superior Court stay). By contrast, in this case, the ink on the June 11 notice of appeal is barely dry and there has not been a briefing schedule issued, let alone briefs filed in the D.C. Circuit or oral argument held.

This is basic judicial prudence. There is no reason the Chair here could not similarly press pause on this case for 30 to 60 days to allow ***at least*** the stay litigation in the District Court and D.C. Circuit on the remand order in this case to run its course. The speed with which ODC is intent on proceeding is a back-door attempt to moot Mr. Clark's D.C. Circuit appeal rights. We make this point about a temporary stay in the alternative without detracting from our more fundamental position that this Court lacks power over this case given noncompliance with Section 1447(c) and other defects we catalogue below.

**f.** Paragraph 7: No objections subject to our proviso reserving our rights to conduct an examination as provided in Paragraph 2.

**g.** Paragraph 8: This Paragraph sees Mr. Metzler telling the unidentified District Court person he spoke to that Hearing Committee Twelve does not have a clerk's office. There is no indication, however, that he told this unidentified worker that the Board of Professional Responsibility ("Board") keeps the docket in these matters. Nor did Mr. Metzler inform this unidentified worker that the Hearing Committees and the Board are adjunct bodies of the DCCA, ***which it is beyond dispute is a court, with a clerk's office***. Mr. Metzler is thus recounting how he

7

posed a series of leading and misleading questions to a hapless clerk in order to get contrived answers favorable to ODC's position. What was a worker, who almost certainly was not a lawyer, who has no familiarity with the D.C. attorney discipline system, to say when Mr. Metzler gave her the technically true but substantively misleading premise that this Hearing Committee doesn't have its own clerk's office? Of course, the most natural response is going to be what we see in later paragraphs of the Affidavit — 'well, then I guess we can't mail out a certified copy of the remand order, Mr. Metzler.'

**h.** Paragraph 9: And sure enough, this Paragraph has the clerk saying exactly what Mr. Metzler induced her to say. Swears Mr. Metzler: "To the best of my recollection, she said something like: 'because[,] *like you said*, there is no court clerk, so we would treat it like an agency case." (Emphasis added). Mr. Metzler has led a District Court Clerk's Office worker astray with a false premise and elicited from her the revelation that it is impossible to do something impossible. This operetta well illustrates both why clerks are barred from the practice of law and why hearsay is inadmissible. In any event, the entire story is irrelevant to how Section 1447(c) works.

Moreover, this is not an agency case. There might be certain analogies between ODC, the Hearing Committees, and the Board to executive administrative agencies. But these adjunct bodies are nevertheless not executive agencies as we

explained recently in our Reply in Support of Motion to Vacate Orders and as Mr. Fox agreed *until two days ago at 3 p.m. when he filed to oppose our Motion to Vacate Orders*. Instead, the DCCA is a court and all Hearing Committees (including this one) and the Board are all adjuncts of that court. From Paragraph 9 it is clear that Mr. Metzler told the Clerk's Office worker at the DDC none of this, and even if he had, she may not have understood it. And she shouldn't be expected to.

      **i.**     Paragraph 10: Here, Mr. Metzler asks whether a case that is removed from an agency will fail to include a "remand notation on the [U.S. District Court for the District of Columbia] docket because there is no court clerk. She agreed." She may have agreed but again, this is a matter beyond her ken. We cannot speak to what the DDC Clerk's Office practice is in agency cases. But we can say that it is entirely inaccurate that agencies do not have clerks. Of course, they do. We offer just one example—the Environmental Protection Agency's Environmental Appeals Board has a "Clerk of the Board." *See* https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/General+Information/The+Clerk+of+the+Board?OpenDocument (last visited July 12, 2023). The whole interchange recounted in Paragraph 10 is a poster child for why it is impossible to rely on lay people working in Clerk's Offices to give accurate legal advice, especially not in complex jurisdictional disputes.

**j.** Paragraphs 11 & 12: No objections subject to our proviso reserving our rights to conduct an examination as provided in Paragraph 2.

**k.** Paragraph 13: This Paragraph is of decisive significance. Here, Mr. Metzler provides a critical legal caveat—"I do not claim that the information provided by the clerk is binding or an authoritative statement from the U.S. District Court. It reflects only the informal view of the clerk about an administrative aspect of her job—whether to send a copy of an order in the mail and make a particular notation on the docket." Affidavit, Paragraph 13. This is correct. The information provided to Mr. Metzler by the DDC Clerk's Office worker is not binding. Nor is it an authoritative statement from the District Court, which is an Article III court and has the exclusive power over this issue. The Clerk's Office does not have it. And this Hearing Committee, including its Chair, do not have it. And yes, it is correct that this was only the "informal view" of the worker who was contacted.

We disagree with the second aspect of Paragraph 13, namely, Mr. Metzler's "belie[f] the clerk's view is relevant to Clark's argument that the Hearing Committee may not proceed because no such mailing has been made." *Id.* Wrong. The Clerk's Office personnel's view is not relevant because it is legally indisputable that no one in the Clerk's Office wields Article III power and that Section 1447(c) has not been complied with. Allowing reports of conversations

10

with Clerk's Offices like the ones Mr. Metzler relates to govern jurisdictional issues, such as when jurisdiction changes hands, would lead to chaos. The Chair cannot give the Metzler Affidavit any credit whatsoever as to the removal-jurisdiction dispute that currently precludes the Chair and this Hearing Committee from proceeding any further.

The statement of the clerk recounted in his affidavit amounts to legal advice or a legal opinion as to the requirements of Section 1447(c) as applied here and whether the Clerk's Office has complied with those requirements. Clerks are not permitted to give legal advice, which constitutes the practice of law. 28 U.S.C. § 955 is explicit and unambiguous: "The clerk of each court and his deputies and assistants shall not practice law in any court of the United States."

> The clerk of court is neither obligated nor authorized to provide legal advice to *pro se* litigants. *See, e.g.*, *Madison v. BP Oil Co.*, 928 F. Supp. 1132, 1134 (S.D. Ala. 1996) ("the personnel of the Clerk's Office ... cannot give legal advice"); *Ayers v. Jacobs & Crumpler, P.A.*, Civ. A. No. 94-658-SLR, 1995 WL 704781, *4 (D. Del. Nov. 2, 1995) (stating that "[t]he Rules of Professional Conduct and the law of common sense" both indicate that court clerks are not to be the source of legal advice).[3]

*Roosevelt Land, LP v. Childress*, No. Civ. A. 05-1292 (RWR), 2006 WL 1877014, at *2

(D.D.C. July 5, 2006). *See also Uzoukwu v. Metropolitan Washington Council of Gov'ts*,

---

[3] They *Ayers* case's holding presents another irony, as we have ODC lawyers purporting to enforce the Rules of Professional Conduct doing something the Rules of Professional Conduct do not permit — trying to rely, to some extent, on the (invalid) legal advice of the District Court Clerk's Office.

983 F. Supp. 2d 67, 78 (D.D.C. 2013) ("As an initial matter, the Court, the Pro Se unit and the Clerk's office are prohibited from giving legal advice.") This prohibition, while expressed in cases involving a *pro se* litigant, should logically apply with even greater force where, as here, the party or advocate is a very experienced lawyer.

7.   We have no obligation to assist ODC. All of this is a problem of ODC's own making. Mr. Metzler's *ex parte* conversations with the Clerk's Office, which would not have come to light had we not filed the Motion to Vacate Orders, have only compounded ODC's predicament. What is certain is that Section 1447(c) has not been complied with and that that is an insuperable barrier to proceedings continuing here. The June 16, 2023 and July 5 Orders should be vacated.

8.   The Affidavit is also hearsay—a statement by an affiant repeating the statements of an out of court declarant offered to prove the truth of the matter asserted. Paragraph 9 relates double hearsay — what a second clerk told the first clerk (both unsworn and out of court) who talked to Mr. Metzler. To be clear, Respondent also lodges a general objection on this basis to the Affidavit being considered **for any purpose**.

9. Finally, as we indicated above, it is worth summarizing where our jurisdictional and prudential objections to the Chair proceeding further here stand:

a.   Section 1447(c) has not been complied with. Hence, Hearing Committee Twelve lacks remand jurisdiction.

**b.**  As we explained recently to the District Court in our stay motion that we also lodged here to incorporate the arguments therein by reference, the Hearing Committee lacks jurisdiction over this case under 28 U.S.C. § 1446(d), which continues in its automatic stay effect through conclusion of the appeal as of right provided to Mr. Clark as a federal officer under 28 U.S.C. § 1447(d), and as locked in by the U.S. Supreme Court's decision in *BP plc. V. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1536 (2021) ("***Here, too, Congress has deemed it appropriate to allow appellate review <u>before</u> a district court may remand a case to state court***."). Hence, the District Court cannot make its desire to remand effective before Mr. Clark's D.C. Circuit appeal is complete.

**c.**  ODC and particularly Mr. Fox are estopped to argue that the DCCA's adjuncts are not courts for purposes of the federal removal statutes in a bid to try to reinitiate proceedings in this Hearing Committee.

**d.**  Even if ODC were not estopped, it would eviscerate the federal removal statutes (especially federal officer removals) if States or the District of Columbia could use their courts to create non-court agents upon which to offload judicial business, while simultaneously claiming that such offloaded business does not involve and was not produced by courts. That would be a circumvention, a lock-picking device that would leave the federal removal statutes nullities, the barn door open. That is not and cannot be the law.

13

**e.** Even if the estoppel and circumvention arguments were both rejected, 28 U.S.C. § 1442(d)(1) (emphasis added), wherein the amendment adopted by Pub. L. 112-239, 126 Stat. 1969, § 1087 (Jan. 2, 2013), expanded the definitions of "civil actions" and "criminal prosecutions" to include not just subpoenas, but "***any proceeding … to the extent that in such proceeding a judicial order … is sought or issued***." It is now beyond dispute that these proceedings involve seeking a judicial order, especially after Mr. Fox at the start of this week (July 10, 2023) in the meet and confer the Chair ordered, threatened Mr. Clark through undersigned counsel with disbarment. Once again, as occurred back in January 2022, Mr. Fox used colorful language to flesh out his threat: "He can run, but he can't hide."[4] This is thuggish and it is conduct that the Chair (and other members of the Hearing Committee, to the extent they are involved) should not tolerate. *See* D.C. Rule XI, § 9 (any Board recommendation for discipline greater than an informal admonition or reprimand is decided by the D.C. Court of Appeals). Hence, it is clear that a judicial order is being sought, which also blocks ODC's attempt to argue that it is somehow relevant that the Hearing Committee is not a court. It is not relevant because even if the Hearing Committee were not a court (and we reject

---

[4] We will file an affidavit or declaration supporting this assertion if the Chair deems it necessary. But we doubt Mr. Fox will deny it. Four of Mr. Clark's lawyers—all of the undersigned along with Ed Martin were on the call to hear it.

that argument for the reasons given above and elsewhere), the removal does not hinge on that point, meaning that Section 1447(c) cannot be dodged. It must be satisfied.

f.   Even if the estoppel, circumvention, and Section 1442(d)(1) arguments were rejected, the pending D.C. Circuit appeal involves three consolidated actions that it is beyond the Chair's powers to disentangle. And two of those involve removals of subpoena actions at the DCCA, which is a court. Whichever way ODC turns, its attempt to reinitiate this case at this time should be rejected.

g.   Turning from our jurisdictional objections to the June 16 and July 5 Orders to our prudential objections, firstly, there is no reason for the Hearing Committee not to await resolution of our pending motion in the DCCA to grant an abeyance and deferral of this litigation just like it was plainly in such a posture from January 17, 2023 until at least June 7, 2023. This is particularly true because in its July 5 Order, the Chair wrongly relied on a pre-removal order from the Board and also may have overlooked that the relief we sought from the DCCA included not just a continuance of the January 17, 2023 abeyance but also a general deferral. *See* Motion for Reconsideration (July 7, 2023).

h.   Similarly, and as noted above, *supra* Paragraph 6.e., discussing the D.C. Superior Court stay in the *Exxon* litigation (which similarly is on appeal to the D.C. Circuit and involves a federal officer removal foundation), even if our *BP* and

Section 1446(d) arguments were to be rejected, there is no reason why it would not be wise to enter a temporary stay in this case to see how the stay litigation in the District Court and the D.C. Circuit plays out. We suggested, at the very least, a grant of such relief on page 7 of our Motion to Vacate Orders. Additionally, the July 5 Order appeared to fault us for not having filed stay papers sooner in the District Court, overlooking that the applicable D.C. Circuit deadlines had not yet run (being July 14 for procedural motions and July 31 for dispositive motions). And, as the Chair is now aware, we have now filed the first set of stay papers in the District Court on July 11, 2023.

 **i**. Lastly, there is no reason not to enter into a prudentially based pause in litigation here in light of the fact that if Respondent prevails in his appeal to the D.C. Circuit, any proceedings held here will be "absolutely void." "Once a notice of removal is filed, 'the State court shall proceed no further unless and until the case is remanded.' 28 U. S. C. § 1446(d). The state court 'los[es] all jurisdiction over the case, and, being without jurisdiction, its subsequent proceedings and judgment [are] not ... simply erroneous, but absolutely void.' *Kern v. Huidekoper*, 103 U.S. 485, 493 (1881). 'Every order thereafter made in that court [is] *coram non judice*,'" meaning 'not before a judge.' *Steamship Co. v. Tugman*, 106 U.S. 118, 122 (1882) ...." *Roman Catholic Archdiocese of San Juan, P.R. v. Acevedo Feliciano*, 140 S. Ct. 696, 700 (2020) (footnote omitted). We do not understand why the Chair or other

16

members of the Hearing Committee would want to take on that risk.

## CONCLUSION

Jurisdiction is lacking in the DCCA and its adjuncts, including Hearing Committee Twelve, for a panoply of reasons, with the noncompliance with Section 1447(c) being the most salient reason for purposes of this Motion. This problem cannot be solved by hearsay affidavits recounting the legal position or administrative practices of the U.S. District Court Clerk because a hearsay affidavit cannot amend a federal statute or suspend its operation and command. This is especially true as to a jurisdictional statute.

The Hearing Committee lacks jurisdiction and should suspend proceedings in this case.[5] The Chair should also vacate its orders of June 16 and July 5, and entirely cancel the hearing set for July 12, 2023, not just postpone it.

Respectfully submitted this 13th day of July 2023.

<table>
<tr>
<td>

_/s/ Charles Burnham_

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K Street, NW, Suite 300
Washington DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

</td>
<td>

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

</td>
</tr>
</table>

---

[5] As should be abundantly clear, Respondent reserves all other jurisdictional defenses previously asserted.

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com
* *Motion for pro hac vice admission before DCCA*
*in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Lodged Respondent's Motion to Disregard ODC Affidavit as Legally Deficient and Thus Irrelevant*** by filing with the Board's Case Manager, who will cause service to be made upon opposing counsel, and by email addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> Theodore (Jack) Metzler
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org
> horrellj@dcodc.org
> metzlerj@dcodc.org

This this 13th day of July, 2023.

> /s/ Charles Burnham
> Charles Burnham
> DC Bar No. 1003464
> 1750 K Street, NW
> Suite 300
> Washington DC 20006
> (202) 386-6920
> charles@burnhamgorokhov.com

# Exhibit 1

# DCCA NO. 22-BS-0059

# DISTRICT OF COLUMBIA

# COURT OF APPEALS

| | |
|---|---|
| In the Matter of | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | Disciplinary Docket |
| **Respondent,** | No. 2021-D193 |
| **A Member of the Bar of the District of Columbia Court of Appeals** | |

## RESPONSE TO MOTION TO COMPEL AND CROSS-MOTION TO QUASH

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for* p*ro hac vice application in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

\**Motion for pro hac vice admission in progress*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 1

   NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN ........................... 1

   ODC'S ACTIONS TO DATE ...................................................................................... 3

ARGUMENT .................................................................................................................. 6

   PROCEDURAL BACKGROUND ............................................................................... 6

      A.   Enforcement of Subpoenas .................................................................. 6

      B.   Standard of Review............................................................................. 7

      C.   The Subpoena Was Improperly Served and Should Be Quashed. ................... 7

   I.      THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA. ........... 8

      A.   Mr. Clark Properly Invoked the Fifth Amendment. ........................................ 9

      B.   Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine. ............ 11

      C.   Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege........................................................... 13

   II.     THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE. ............................................. 14

      A.   28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers........................... 15

      B.   Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question. ..................................................................................... 19

      C.   There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation.................................................. 19

      D.   Rule 8.4(d) Does Not Apply........................................................................ 20

   III.    THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED. ........... 21

      A.   Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes. ............................................................................... 22

      B.   Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election..................................................................................................... 22

      C.   Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General. .......................................................................... 24

      D.   The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects. ..................................................... 25

CONCLUSION............................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Bond v. United States*, 572 U.S. 844 (2014) ........................................................ 16

*Branch v. Smith*, 538 U.S. 254 (2003) ............................................................... 16

*Brooks v. United States*, 448 A.2d 253 (D.C. 1982) ........................................... 14

*Butler v. United States*, 890 A.2d 181 (D.C. 2006) ............................................ 10

*Carter v. United States*, 684 A.2d 331 (D.C. 1996) ........................................ 9, 11

*CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) ............ 8

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ................................ 16

*District of Columbia v. Carter*, 409 U.S. 418 (1973) ......................................... 17

*Fisher v. United States*, 425 U.S. 391 (1976) .................................................... 12

*FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980) ............. 8

*Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963) ............................ 8

*In re Artis*, 883 A.2d 85 (D.C. 2005) ....................................................... 6, 10, 12, 14

*In re Benjamin*, 698 A.2d 434 (D.C. 1997) .......................................................... 6

*In re Burton*, 472 A.2d 831 (D.C. 1984) ............................................................ 11

*In re Confidential*, 701 A.2d 842 (D.C. 1997) ...................................................... 7

*In re Hopkins*, 677 A.2d 55 (D.C. 1996) ............................................................ 21

*In re Horowitz*, 482 F.2d 72 (2d. Cir. 1973) ...................................................... 14

*In re Pearson*, 228 A.3d 417 (D.C. 2020) ......................................................... 21

*In re Public Defender Serv.*, 831 A.2d 890 (D.C. 2003) .................................. 7, 13, 14

*In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078 (E.D.N.Y. 1978) ......... 15

*In re Romansky*, 825 A.2d 311 (D.C. 2003) ....................................................... 20

*In re Sealed Case*, 116 F.3d 550 (D.C. Cir. 1997) ............................................... 8

*In re Thorup*, 432 A.2d 1221 (D.C. 1981) ........................................................... 6

*In re Yelverton*, 105 A.3d 413 (D.C. 2014) ........................................................ 21

*In the Matter of Shorter*, 570 A.2d 760 (D.C. 1990) ........................................... 20

*Johnson v. United States*, 746 A.2d 349 (D.C. 2000) ......................................... 10

*Lefkowitz v. Turley*, 414 U.S. 70 (1973) ......................................................... 9, 10

*Mason v. United States*, 244 U.S. 362 (1917) ...................................................... 9

*McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659
   (Pa. Commw. Ct. Jan. 28, 2022) ............................................................... 26

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) .................... 8

*Ohio v. Reiner*, 532 U.S. 17 (2001) ................................................................ 14

*Pulley v. United States*, 532 A.2d 651 (D.C. 1987) ............................................. 8

*Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) ................ 24

*Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020) ................................................. 25

*Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021) .......... 26

*United States v. John Does*, 465 U.S. 605 (1984) .............................................. 12

*Wilson v. United States*, 558 A.2d 1135 (D.C. 1989), *overruled on other grounds*, 684 A.2d
   331 (D.C. 1996) .............................................................................. 9

## Statutes

5 U.S.C. § 7323 ............................................................................... 11

18 U.S.C § 371 ......................................................................................................... 11
18 U.S.C. § 1512 ..................................................................................................... 11
18 U.S.C. § 1962 ..................................................................................................... 11
18 U.S.C. § 2383 ..................................................................................................... 11
18 U.S.C. § 2384 ..................................................................................................... 11
26 U.S.C. § 170 ....................................................................................................... 18
28 U.S.C. § 506 ....................................................................................................... 15
28 U.S.C. § 509 ....................................................................................................... 16
28 U.S.C. § 510 ....................................................................................................... 16
28 U.S.C. § 515 ....................................................................................................... 16
28 U.S.C. § 516 ....................................................................................................... 16
28 U.S.C. § 517 ....................................................................................................... 16
28 U.S.C. § 519 ....................................................................................................... 16
28 U.S.C. § 533 ....................................................................................................... 16
28 U.S.C. § 547 ....................................................................................................... 16
28 USC § 530B ...................................................................................... 15, 16, 17, 19
28 U.S.C. § 1257 ..................................................................................................... 17
28 U.S.C. § 1927 ..................................................................................................... 17
42 U.S.C. § 1983 ..................................................................................................... 17
42 U.S.C. § 8285a ................................................................................................... 17
52 U.S.C. § 20511 ................................................................................................... 11
D.C. Code § 11-944 ................................................................................................. 17
D.C. Code § 23-1330 ............................................................................................... 17
O.C.G.A. § 21-2-385 .......................................................................................... 27, 28
Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ................................................... 17
Pub. L. 96-132, 93 Stat. 1040 (1979) ..................................................................... 17

## Other Authorities

OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*
    (Aug. 2, 1985) ..................................................................................................... 15

## Rules

Board Rule 2.9 ........................................................................................................... 5
Board Rule 3.14 ......................................................................................................... 7
Board Rule 3.15 ......................................................................................................... 7
Board Rule 3.16 ......................................................................................................... 7
Board Rule 4.1 ...................................................................................................... 5, 18
D.C. Bar Rule XI, § 18 .............................................................................................. 6
D.C. Bar Rule XI, § 8 ................................................................................................ 6
D.C. Rules of Professional Conduct 1.2(e) ............................................................. 10
D.C. Rules of Professional Conduct 8.4(c) ............................................... 19, 20, 21
D.C. Rules of Professional Conduct 8.4(d) ............................................................. 21
Fed. R. Civ. P. Rule 45 .............................................................................................. 8
Superior Court Rule 45 ....................................................................................... 6, 7, 8
Supreme Court Rule 47 ............................................................................................ 18
United States Senate, Rule IX .................................................................................... 2

**Regulations and Preambles**

28 C.F.R. § 16.21 ................................................................................................... 6
28 C.F.R. § 77.2 ............................................................................................. 16, 19
64 Fed. Reg. 19,273 (Apr. 20, 1999) ..................................................................... 16

**Constitutional Provisions**

U.S. Const., art. 1, § 4, cl. 1 ................................................................................. 25
U.S. Const., art. I, § 5 ............................................................................................. 2
U.S. Const., art. I, § 8, cl. 17 ............................................................................... 17
U.S. Const., art. II, § 1, cl. 2 ............................................................................... 25
U.S. Const., art. II, § 2, cl. 1 ............................................................................... 15
U.S. Const., art. II, § 3 ........................................................................................ 15
U.S. Const., amend V ................................................................................... passim

**Other References**

147 Cong. Rec. H34 (Jan. 6, 2001)...................................................................... 22
151 Cong. Rec. H127 (Jan. 6, 2005) .................................................................... 22
Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016*, DAILY WIRE (Jan. 4, 2021)........................................................................... 23
Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee ................................................................................... 22
Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022)....................................................................... 10
DOJ Office of Inspector General Press Release, *available at* https://tinyurl.com/2p9ad5tm s
John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022) .................................................................................... 28
Li Zhou, 147 *Republican Lawmakers Still Objected to the Election Results After the Capitol Attack: Congress Has Certified President-Elect Joe Biden as the Winner of the Election— But Some Republicans Still Objected*, Vox (Jan. 7, 2021) ........................................ 24
Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART (Aug. 4, 2021) ........................................................... 27
Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, BREITBART (Sept. 25, 2021) ........................................................................................................... 27
Rep. Lofgren, YouTube, *available at* https://tinyurl.com/2n6cu36c ......................... 10
*Rep. Raskin Challenges Awarding of Electors*, YOUTUBE (Jan. 8, 2017), *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) ....................................................... 23
Trailer, 2000 Mules, https://tinyurl.com/2p86dznj ................................................ 28
Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk .............................................................................. 23
Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, POLITICO (Feb. 11, 2022) ..................................................... 26

## INTRODUCTION

The Motion to Compel should be denied and the subpoena quashed on three grounds: (1) Respondent Mr. Clark properly invoked his Fifth Amendment rights, *see infra* Section I; (2) the Bar's disciplinary authority does not extend to the preparation of privileged Executive Branch discussion drafts of letters never sent, *see infra* Section II; and (3) investigating and potentially punishing the preparation of confidential, non-public discussion drafts pertaining to a very contentious political dispute, at the behest of a highly partisan member of the opposite party in a rival branch of government, would embroil the Bar in matters far beyond its charter, and pervert the disciplinary process to purely political ends, *see infra* Section III. Oral argument is requested.

## STATEMENT OF FACTS

### NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN

The Office of Disciplinary Counsel ("ODC") began its investigation of Respondent a week after receiving a letter from Senator Richard Durbin, Chairman of the Senate Judiciary Committee. Senator Durbin has no personal knowledge of the matters complained of. At least one other politically motivated complaint was filed by a collection of third-party detractors but was rightly rejected by ODC for lack of personal knowledge, which should similarly have been fatal to the Durbin complaint as well.

Senator Durbin, a partisan opponent of President Trump, here complains about a confidential and privileged discussion draft of a letter calling for more legislative investigation allegedly prepared by Respondent while he was a senior DOJ official about a matter of intense political controversy. The draft was reportedly the subject of vigorous internal privileged and confidential debate involving legal judgment, first among senior DOJ officials including Respondent, and later played out before the President himself and his most senior legal advisors at the White House and DOJ. After considering the letter, the President appears to have decided

against sending it, and so it was never sent. That was the end of the matter, at least until the phalanx of privileges attending the preparation and discussion of the draft—executive, law enforcement, and attorney-client—were all breached via anonymous leaks to the *New York Times*, and it became fodder for the lawfare element of the political witch hunt currently underway against Respondent.

The crux of the allegations are that Respondent made knowingly false statements of fact about possible election anomalies in the never-sent discussion draft of a letter calling for investigation. The allegations of "knowing falsity" rest on the dogged premise that there was no possible good-faith belief that there were any election irregularities sufficient to suggest a state legislature engage in further investigation. But premises do not equal truth; they are just the position of one side in an intense partisan political controversy that evenly divides Americans.

Being evenly balanced between the political parties, Senator Durbin's Senate Judiciary Committee could not issue subpoenas.[1] Senator Durbin's letter to the ODC consequently spoke only for himself, not the entire Committee. ODC has thus taken up a complaint from a single politically motivated member of one branch of government who is trying to weaponize the bar disciplinary process against a senior official (from a rival political party) at an Executive Branch department over a never-sent privileged and confidential discussion draft of a letter calling for more state legislative process. The complaint, the investigation, and any potential punishment are thus all directed not against conduct but against constitutionally protected thoughts and legal advice deemed contrary to the foundational premise upon which the allegations rest.

To proceed further, ODC would have to distinguish among (1) the true state of the facts; (2) individual perceptions of the facts; (3) opinions about the significance of the perceived facts;

---

[1] *See* Rule IX of the Rules of Procedure of the United States Senate, *available at* https://tinyurl.com/36uuee5f (last visited Feb. 15, 2022), a rule with constitutional imprimatur, U.S. Const., art. I, § 5 ("Each House may determine the Rules of its Proceedings ....").

and (4) legal, policy and prudential judgments about what ought to be done or not done in light of the perceived facts. At the time, there were intense controversies attached to each of these four tiers of inquiry. Those controversies still exist and will persist well into the future—just as they still do with respect to the *Bush v. Gore* controversy arising back in 2000.

## ODC'S ACTIONS TO DATE

After docketing Senator Durbin's complaint on October 14, 2021, ODC made immediate resort to a subpoena, bypassing less invasive or aggressive methods of trying to gather information.

ODC's aggression out of the gate stumbled on a series of procedural faults along the way. A first letter purporting to transmit the subpoena to Respondent's former counsel dated October 18, 2021, the so-called "B letter," was never received. *See* Affidavit of Robert A. Driscoll, ¶¶ 4-11 (attached as Exhibit 1). A follow-up "D letter," premised on the lack of any response to the first letter and dated November 9, 2021 and purportedly sent to Respondent's former counsel, was also never received. *See generally* Driscoll Affidavit.

On November 22, 2021, Disciplinary Counsel, Mr. Fox, left a voice mail for Respondent's former counsel saying that no response had been received to either letter and that a motion to compel would be filed that day or early the next morning. *See id*. at ¶ 6. The former counsel, Mr. Driscoll, immediately returned the call and informed Mr. Fox that he had never received anything from him and that he no longer represented Mr. Clark. *See id*. at ¶ 7. Mr. Driscoll then double-checked all incoming email systems including filters and regular mail and confirmed that nothing had been received from Mr. Fox, and so informed Mr. Fox. *See id*. at ¶ 8-9.

Importantly, Mr. Fox never mentioned or discussed a subpoena with Mr. Driscoll, and Mr. Driscoll never made any agreement to accept service of the subpoena on behalf of the Respondent. Thereafter, Mr. Fox attempted to deliver a new "B letter" dated November 22, 2021 and subpoena directly to Respondent. This letter, however, was initially not received either.

Next, Respondent got Covid, and Mr. Fox very kindly accommodated his recovery. Mr. Fox and Respondent later began exchanging emails in which Mr. Fox attempted to deliver the letter and its exhibits via email. This too was beset with delivery problems. Some of the email exchanged between Respondent and Mr. Fox and his assistants was intercepted by each side's spam filters. Mr. Clark thus did not receive the full set of documents comprising the "B letter" and its attachments until January 6, 2022. *See* Aff. of Resp., ¶¶ 4-6 (attached as Exhibit 2).

Respondent agreed to and did respond to ODC's letter and subpoena on January 31, 2022. *See id.* at ¶ 6. But he never agreed to accept service of the subpoena via email.

The subpoena called for Respondent to either produce documents or appear at the Bar offices on the return date (which was never corrected by ODC to the agreed-on January 31, 2022 date) if documents were not to be produced. On Friday January 28, 2022, new counsel for Respondent spoke to Mr. Fox by telephone to say that Respondent would invoke the Fifth Amendment and would not be producing any documents, inquiring if Respondent nevertheless needed to appear. Mr. Fox replied, "no," but that if Mr. Clark claimed the Fifth Amendment against the production of documents, "I promise you I will ratchet up the discipline" and that a motion to compel would be rapidly filed. Mr. Fox followed up with an email at 8:30 PM that Friday evening reiterating that threat. *See* Harry MacDougald Aff. at ¶¶ 5-6 (attached as Exhibit 3).

On January 31, 2022, Mr. MacDougald (one of Mr. Clark's undersigned counsel) delivered to Mr. Fox two lengthy letters responding to the unserved subpoena. The shorter letter invoked, *inter alia*, Mr. Clark's Fifth Amendment privilege against self-incrimination as well as the act of production doctrine, and laid out in detail the basis for a well-founded fear of criminal prosecution and the overlap with a document subpoena issued by the January 6 House Select Committee. The letter thus requested a deferral under Board Rule 4.1, noted the defects in the subpoena's service,

highlighted separation of powers issues, and reserved all other rights, defenses, and objections. The longer letter asserted a series of substantive legal objections to the ODC proceeding with the investigation and attached the full set of letters to the January 6 Committee as exhibits.

Mr. Fox filed this Motion to Compel on February 3, 2022. There was no meet and confer (*see* Board Rule 2.9(a)) or other discussion about Respondents' objections. While the Motion recites that it was served with exhibits by regular mail and email on February 3, 2022, a remarkable series of clerical problems in ODC prevented delivery of the complete motion and exhibits from being accomplished until February 14, 2022. *See* Exhibit 3 ¶¶ 7-15.  When Mr. Fox was first informed of non-deliver, he quickly sent the Motion to Compel to undersigned counsel, informed us that the exhibits were documents we already had, and agreed that the response to his Motion could be filed on February 15, 2022, and a motion to that effect was filed in this Court. *Id*. at ¶ 10.

Mr. Fox produced certain correspondence with Senator Durbin and his staff dated October 14, 2021, which informed the Senator that his complaint had been docketed as an investigation rather than a charge, that the matter was confidential, and that he would automatically furnish the Senator with any response made by Mr. Clark. In his letters to Mr. Fox of January 31, 2022 in response to the subpoena, undersigned counsel vigorously objected to furnishing Mr. Clark's response to Senator Durbin on the grounds that it would breach the confidentiality of the proceedings, as Senator Durbin was not Respondent's client, and that in the supercharged political atmosphere surrounding the underlying issues, doing so would very likely result in a media leak of the information, further fueling the partisan furor raging against Mr. Clark.

Mr. Fox also produced "*Touhy* correspondence" with DOJ (*see* 28 C.F.R. § 16.21 *et seq.*), seeking access to former DOJ officials as witnesses. DOJ replied, agreeing to Mr. Fox's request. However, DOJ failed in multiple respects to comply with its own regulations governing such

matters, as we are just setting before DOJ today and thus which we do not further address here, pending a response by DOJ. Lastly, Mr. Fox also shared two additional *Touhy*-related documents with us on February 11, 2022.

## ARGUMENT

### PROCEDURAL BACKGROUND

#### A. Enforcement of Subpoenas

When conducting an investigation, Disciplinary Counsel may propound "written inquiries" with the explicit limitation that the investigation is subject to "constitutional limitations." D.C. Bar Rule XI, § 8(a). But no subpoena may include inquiries crossing over into the impermissible territory of litigation-like interrogatories. *See In re Artis*, 883 A.2d 85 (D.C. 2005). This Court frames disciplinary proceedings as "adversary, adjudicatory proceedings" related to property rights and which therefore are attended by due process protections. *See In re Benjamin*, 698 A.2d 434, 439 (D.C. 1997) (citing *In re Thorup*, 432 A.2d 1221, 1225 (D.C. 1981)).

Disciplinary Counsel may compel the attendance of witnesses and the production of pertinent books, papers, documents, etc., but only subject to D.C. Superior Court Rule 45. *See* D.C. Bar Rule XI, § 18(a). This Court may, "on proper application," enforce a subpoena. *See id.*, § 18(d).[2] Superior Court Rule 45(b)(1) prescribes the manner for service of subpoenas, requiring delivery to the person named by anyone over the age of 18 years who is not a party to the action and the tendering of certain fees if attendance is demanded (as it originally was in the alternative here). Rule 45(b)(3) requires the one serving the subpoena to certify proof of service showing the

---

[2] However, if there is a challenge to the subpoena, Bar Rule XI, § 18(c) contemplates a Board of Professional Responsibility's Hearing Committee to hear and determine the challenge. We did not bring such a challenge because ODC did not engage in the required meet and confer after we filed the January 31, 2022 letters. ODC simply proceeded immediately to this Court. Especially given the pendency of various investigations—and the ***interim*** nature of the report that Senator Durbin's staff prepared, we are at a loss to explain why ODC considers this matter to be exigent.

date and manner of service and the name of the person served.

Board Rules 3.14 through 3.16 also control subpoenas issued during an investigation, and they allow for Disciplinary Counsel to apply directly to this Court for enforcement. On February 3, 2022, Disciplinary Counsel chose to file a motion to enforce directly with this Court.

Pursuant to Superior Court Rule 45(c)(3)(A), as transplanted here, subpoenas may be quashed on timely motion if they require disclosure of privileged or protected matter not subject to exception or waiver, is unduly burdensome or fails to provide a reasonable time to comply; and under sub-rule (c)(3)(B)(i) if the subpoena requests "confidential research." Parties may also describe their objections, if substantiated, to a subpoena as "overbroad" or amounting to a "fishing expedition." *In re Confidential*, 701 A.2d 842, 842 (D.C. 1997). If there is an assertion of a privilege, etc., then under Superior Court Rule 45(d)(2), the claim must be expressly made.

### B.  Standard of Review

Since Disciplinary Counsel chose to seek enforcement of his subpoena directly with the Court of Appeals, any issues and objections must be decided here in the first instance and not on review. Since the subpoena enforcement involves questions of law, questions of fact, and mixed questions of law and fact, the Court should act in the same vein as a trial court, deciding questions of law and finding facts. *Cf. In re Public Defender Serv.*, 831 A.2d 890, 898-99 (D.C. 2003), which discussed the various roles in the context of a grand jury subpoena. This analysis applies here by analogy as well, especially given the assertion of constitutional and other privileges.

### C.  The Subpoena Was Improperly Served and Should Be Quashed.

The applicable procedure for service of subpoenas is very clear. Superior Court Rule 45(b)(1) requires that the subpoena be served by an adult who is not party to the action, coupled with certified proof of subpoena service and tendered fees (if attendance might be required). There is no certified proof of service by an adult here (and no fees tendered) because the subpoena was

not so served. Service was not waived, no testimony has been given, and objections were timely made, preserving all rights. *See In re Sealed Case*, 116 F.3d 550, 561-62 (D.C. Cir. 1997).

Thus, the service requirement has not been met. And where subpoenas are not properly served, they must be quashed. *See Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963); *see also Pulley v. United States*, 532 A.2d 651, 653 (D.C. 1987) (citing *CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) (quashing subpoena for failure to tender fees)).

Further, since Superior Court Rule 45 is "virtually identical" to Fed. R. Civ. P. Rule 45, it is instructive to refer to the importance of maintaining the integrity of the service requirement. *See also FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1312-13 (D.C. Cir. 1980), which underscored the point:

> By contrast, Federal Rule 45(c), governing subpoena service, does not permit any form of mail service, nor does it allow service of the subpoena merely by delivery to a witness' dwelling place. Thus, under the Federal Rules, compulsory process may be served upon an unwilling witness only in person. Even within the United States, and even upon a United States citizen, service by registered U.S. mail is never a valid means of delivering compulsory process ….

*See also id.* at 1307.

The Supreme Court has repeatedly emphasized the importance of service. *See, e.g., Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (even actual notice via fax of a file-stamped copy of a pleading was not valid service). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant …. Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 350-51.

## I.   THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA.

The Fifth Amendment privilege against self-incrimination:

not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but ***also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal***, where the answers might incriminate him in future criminal proceedings.

*Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (emphasis added).

### A. Mr. Clark Properly Invoked the Fifth Amendment.

In the District, it has long been settled that a court evaluating a Fifth Amendment claim should not speculate about whether criminal prosecution is "likely" but should instead limit its inquiry to whether criminal prosecution is "possible." *Carter v. United States*, 684 A.2d 331, 334-35, 338 (D.C. 1996) (en banc). The *Carter* decision overruled a line of cases requiring courts to assess the probability of prosecution before upholding Fifth Amendment privilege.

Moreover, the Fifth Amendment is to be "liberally construed" and thus is not limited to situations where the compelled disclosures themselves would be incriminating. It is sufficient if the disclosure could possibly supply a "link in the chain" leading to prosecution. *Wilson v. United States*, 558 A.2d 1135, 1141 (D.C. 1989), *overruled on other grounds by Carter*, 684 A.2d 331 (D.C. 1996) (en banc). In a foundational case, the United States Supreme Court described this concept as follows: "A question which might appear at first sight a very innocent one might, by affording a link in a chain of evidence, become the means of bringing home an offense to the party answering." *Mason v. United States*, 244 U.S. 362, 364-66 (1917) (citing 1861 English decision).

Although the Fifth Amendment must normally be asserted on a question-by-question basis, this Court recognizes that the combination of the "possible prosecution" standard and the "link in the chain" doctrine can easily render entire areas of testimony privileged. *See, e.g., Butler v. United States*, 890 A.2d 181, 188 (D.C. 2006) (granting a witness blanket immunity was procedurally flawed but harmless since it was "obvious that *any* testimony" would be incriminating) (italics in original); *Johnson v. United States*, 746 A.2d 349, 356 (D.C. 2000) (same).

9

ODC's investigation of Mr. Clark presents an obvious Fifth Amendment case. The letter from Senator Durbin that triggered this investigation itself states that "Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against counseling a client to engage, or assisting a client, in conduct *the lawyer knows is criminal or fraudulent*." Exhibit 4 at 2 (internal quotations and brackets omitted) (emphasis added). This allegation of criminal conduct in the triggering complaint, standing alone, is sufficient to justify Mr. Clark's Fifth Amendment invocation. If further reinforcement is needed, Mr. Clark's letter in response to this subpoena detailed many examples of lawyers implicitly or explicitly calling for Mr. Clark's criminal prosecution based on his service in the Justice Department. *See* Exhibit C to Motion to Enforce at 6-8. Notably, the January 6 Select Committee appears to have accepted Mr. Clark's invocation of the Fifth Amendment as to the same subject matter and has publicly pivoted to the topic of whether to grant him immunity.[3]

In contesting the validity of Mr. Clark's Fifth Amendment invocation, Disciplinary Counsel first argues that the Office of Disciplinary Counsel itself cannot charge crimes. Motion at 7. As quoted above, however, the Supreme Court has long held that the Fifth Amendment applies outside of the strictly criminal context, if the disclosures "might incriminate in [] future criminal proceedings." *Lefkowitz*, 414 U.S. at 77. And most importantly, this Court has held repeatedly that Fifth Amendment protection applies in Disciplinary Counsel cases. *See, e.g., In re Artis*, 883 A.2d 85, 103 (D.C. 2005); *In re Burton*, 472 A.2d 831, 845-46 (D.C. 1984).

Disciplinary Counsel then argues that Mr. Clark has not asserted he is "even the subject, much less the target, of any criminal investigation." Motion at 7. Putting aside the obvious point

---

3 *See, e.g.,* Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022), *available at* https://tinyurl.com/bdemy976, (last visited Feb. 15, 2022); https://tinyurl.com/2n6cu36c (Rep. Lofgren, YouTube video) (last visited Feb. 15, 2022).

the criminal investigations are often confidential, no Court has ever held that Fifth Amendment protection is only available to persons known to be under active criminal investigation. Disciplinary counsel cites no cases in support of this argument.

Next, Disciplinary Counsel argues that Mr. Clark has not "specif[ied] what criminal charges [he] might realistically be subject to." *Id.* This argument is unavailing for two reasons. *First*, Mr. Clark has no burden to show that he "might realistically be subject to" criminal prosecution. This standard for Fifth Amendment protection was explicitly rejected by this Court *en banc* in *Carter*, cited above. *Second*, this Court has never required individuals seeking Fifth Amendment protection to identify specific criminal statutes. Disciplinary Counsel cites no case imposing this requirement. In any event, in his counsel's letter to Disciplinary Counsel, Mr. Clark cited an editorial by several prominent law professors that did identify several specific statutes the authors contended could serve as a basis for criminal investigation of former President Trump and "members of his inner circle." Motion, Exhibit 3 at 8 (collected list of statutes below):

> Obstruction of an Official Proceeding (18 U.S.C. § 1512); Conspiracy to Defraud the Government (18 U.S.C § 371); Voter Fraud for Pressuring State Officials Not to Certify the Election (52 U.S.C. § 20511); the Hatch Act (5 U.S.C. § 7323); the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962(c)); Insurrection (18 U.S.C. § 2383); and Seditious Conspiracy (18 U.S.C. § 2384).

**B. Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine.**

Disciplinary Counsel also disputes Mr. Clark's invocation of the Fifth Amendment "act of production" privilege. But Disciplinary Counsel's arguments in that vein fail because ODC's subpoena is plainly more than a simple demand for documents.

To be sure, the Fifth Amendment privilege does not ordinarily apply to "pre-existing, voluntarily prepared documents." *Fisher v. United States*, 425 U.S. 391, 408-09 (1976). However, when a given request goes in any way beyond mere production of pre-existing documents, the

Fifth Amendment bar arises. *See*, *e.g., United States v. John Does*, 465 U.S. 605, 610-15 (1984) (compelled oral or written testimony that restates the contents of documents would be privileged).

In *In re Artis*, this Court considered a case where Disciplinary Counsel had issued "interrogatory-like questions" to respondent. 888 A.2d 85 (D.C. 2005). This Court affirmed the respondent's right to assert his Fifth Amendment privilege and did not order the respondent to answer Disciplinary Counsel's "interrogatory-like questions." *Id*. at 99, 101 & n.13.

Here, Disciplinary Counsel incorrectly claims that its subpoena merely seeks "five categories of documents." Motion at 11-12. To the contrary, the subpoena seeks much more than that and is in fact directly analogous to the "interrogatory-like questions" (*i.e.*, those inherently forcing respondent admissions) at issue in *In re Artis.* The emphasized portions of the following subpoena requests make clear that more than simple production of documents is demanded:

- Produce all documents and records … ***of which you were aware*** before January 4, 2021, ***that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state***;

- ***Identify the source*** *of any document (including contact information for any persons bringing the document to **your attention**, how it came to **your attention**, and the date it came to **your attention**;*

- ***Specify what information*** *of election fraud came to **your attention*** following the announcement of Attorney General Barr on December 1, 2020 that the Department found no evidence of fraud on a scale that could have affected the results of the presidential election;

- Produce any file or collection of materials or correspondence, written or electronic, ***relating to any efforts that you made*** between the November 3, 2020 presidential election ***and January 4, 2021***, that relate in any way to any ***efforts you made*** to persuade officials of the United States Department of Justice to intervene in the certification by any state;

- ***Provide the results*** of any legal research ***that you conducted, had conducted, or received before January 4, 2021*** … [t]his information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [*sic*] and Natural Resources Division to investigate allegations of election fraud;

- Provide all written policies and guidelines of the Department of Justice, *of which **you were aware*** and that were in effect between November 3, 2020 and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President;

The emphasized portions of the foregoing list of demands make clear that the subpoena does not simply request "categories of documents." It requires Mr. Clark to make substantive assertions or concessions about such things as: (1) when he became aware of certain documents; (2) how and by whom the documents came to his attention; (3) the relationship between the documents and his "efforts"; (4) the "results" of his legal research and when he conducted it; and (5) which policies he was "aware [of] that were in effect" at certain times. These requests go far beyond the type of "preexisting documents" that fall outside the scope of the Fifth AmendmentThe requests demand substantive admissions from Mr. Clark about facts relating to his *mens rea* and that could obviously be used as a "link in the chain" of some future criminal case. And even if there are **no** responsive documents to a given request, this answer itself could be used as an admission to incriminate Mr. Clark. It is therefore not necessary even to engage in an "act of production" analysis to sustain Mr. Clark's Fifth Amendment invocation.

### C. Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege.

However, to the extent this Court decides the Fifth Amendment act of production doctrine is implicated here, District law clearly supports Mr. Clark's ability to assert this privilege in response to the subpoena. In *In re Public Defender Service*, this Court held as follows:

> A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect. That is, by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.
>
> ***
>
> Even where the contents of a subpoenaed document may be incriminating, the act of production privilege is not automatic. The act of production privilege does not apply if the existence and authenticity of a document is a foregone conclusion as

> would be the case if the act of production adds little or nothing to the sum total of the Government's information.

831 A.2d 890, 912 (D.C. 2003) (internal quotations and citations omitted).

Instead of attempting to meet *In re Public Defender Service's* "foregone conclusion" standard, Disciplinary Counsel argues that Mr. Clark has not shown that responding to the subpoena will conclusively prove him guilty of a crime:

> This is far removed from the situation in *Hubble*, where a criminal defendant was required to produce to the grand jury personal financial records **which established his income tax evasion**, or in Public Defender Service, where a grand jury subpoena, if complied with, **might have linked the defendant to a coerced witness statement**.

Motion at 13 (emphasis added). However, there is no requirement that Mr. Clark demonstrate that responding to the subpoena will conclusively prove him guilty of a criminal act. *Ohio v. Reiner*, 532 U.S. 17, 18 (2001) (Fifth Amendment "protects the innocent as well as the guilty"); *see also In re Artis*, 883 A.2d at 99 (noting Board's conclusion, which was affirmed in relevant part, that respondents "should not be obligated to respond to vague and overly broad questions that require him or her to make Bar Counsel's case"). It is sufficient if the subpoena response could furnish a "link in the chain" of possible prosecution, even if meritless. Mr. Clark has met that standard.

## II.   THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE.

In the grand jury context, this Court has held that a subpoena must have a "legitimate purpose." *Brooks v. United States*, 448 A.2d 253, 261 (D.C. 1982).  *See also In re Horowitz*, 482 F.2d 72, 80 (2d. Cir. 1973) (documents that have "no conceivable relevance" to legitimate object of grand jury investigation need not be produced); *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) ("The documents requested must be shown to have some general relevance to the subject matter of a legitimate grand jury investigation.").

The same rationale of these grand jury cases applies in the bar discipline context.  As

explained below, ODC's subpoena should be quashed because it has no reasonable relation to a legitimate area of bar discipline enforcement.

### A. 28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers.

Under the U.S. Constitution, the President of the United States, not the Attorney General is its chief law enforcement officer. *See* U.S. Const., art. II, § 3 (the President "shall take Care that the Laws be faithfully executed …."). It is therefore far from obvious that state and local bar authorities can always wield disciplinary jurisdiction over lawyers authorized by virtue of their appointments pursuant to Article II, to exercise executive authority and advise the President, as that could hamper the President's ability to obtain legal advice.

In keeping with the President's authority and right to receive full and frank advice and information, senior federal officers have a reciprocal duty to provide it upon request. *See* U.S. Const., art. II, § 2, cl. 1 (Opinion Clause); 28 U.S.C. § 506 (Assistant Attorney Generals, like Mr. Clark, to be appointed by President with advice and consent of Senate); OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys* (Aug. 2, 1985) ("Rules promulgated by state courts or bar associations that are inconsistent with the requirements or exigencies of federal service may violate the Supremacy Clause."), *available at* https://tinyurl.com/56bft7sb, *last visited* (Feb. 15, 2022) (hereafter "OLC Opinion").

Where, as here, the face of Disciplinary Counsel's interrogatories show that they seek access to information that ODC has no authority to seek or review, the Court need not reach the constitutional arguments in order to quash the subpoena. We nevertheless reserve them.[4]

---

[4] *See Bond v. United States*, 572 U.S. 844, 855 (2014) ("well-established principle governing the prudent exercise of this Court's jurisdiction [is] that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

That is because even beyond the Fifth Amendment as applied here, there is a more than sufficient basis on which to deny enforcement of the subpoena. For the statute Congress passed purporting to subject Justice Department lawyers to state and local bar rules, 28 U.S.C. § 530B(a), does not authorize *any inquiry* into the internal policy deliberations of the Department of Justice or of any other agency of the federal government that employs lawyers. Nor does the statute, by its terms, authorize the D.C. Bar to oversee the enforcement of internal DOJ and Executive Branch policies governing the conduct of their respective internal operations. *See* 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to *State* laws and rules, and local Federal court rules, governing attorneys in each *State* where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that *State*.") (emphasis added). Relatedly, in 1999 DOJ improperly purported *to extend* the reach of Section 530B(a), by regulation issued under Section 530(B)(b), to the District of Columbia. *See* 28 C.F.R. § 77.2(h).[5]

---

[5] The relevant preamble (hastily assembled via an *interim* final rule) does not even address how the Justice Department could try, via its subordinated rulemaking powers, to extend the statute to the District of Columbia when the statute does not mention the District. The preamble cites to 28 U.S.C. §§ 509, 510, 515(a), 516, 517, 519, 533, and 547. *See* 64 Fed. Reg. 19,273, 19274 (Apr. 20, 1999). But none of these statutes even reference the District of Columbia specifically. And these provisions say nothing about the power of D.C. Bar authorities to sit in oversight of the discretionary actions of Justice Department lawyers. The 1999 rule is thus invalid under step one of the *Chevron* test, which voids regulatory interpretations of any statute that conflict with the statute's plain text, interpreted using "traditional tools of statutory construction." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). And the canon of interpreting statutes as part of the *corpus juris* (the whole body of the law) is no doubt such a traditional tool of statutory interpretation. *See, e.g., Branch v. Smith*, 538 U.S. 254, 282 (2003) ("courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes."). The plain text is violated here because D.C. is not a "State," *see infra*.

The preamble also mentions (1) Pub. L. 96-132, 93 Stat. 1040, 1044 (1979); and (2) Pub. L. 105-277 (1998), section 102 of the Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act. But both of these provisions are appropriations law limited to one-off fiscal years; they lack general effect. Moreover, the former provision predates Section 530B(a) and the latter provision is silent on 530B(a) and thus cannot be read to amend it. Finally,

All lawyers who practice before this Court and in the federal courts of the District of Columbia are, by statute, subject to the authority of each court to control the conduct of the attorneys who appear there. Significantly, there is an established, but limited, procedure for doing so. *See, e.g.*, D.C. Code § 11-944(a) (contempt for "disobedience of an order or for contempt committed in the presence of the court"); 28 U.S.C. § 1927 (counsel's liability for excessive costs); *see also generally* D.C. Code § 23-1330 (preserving contempt power). The D.C. Bar, by contrast, has no general investigatory authority over the ethics of Department of Justice lawyers. The Constitution reserves that power to the Executive Branch.

Section 530B(a) reflects this division of authority. The District of Columbia is not a "State." All law in the District is federal law and Congress alone defines the nature, scope, and means of enforcement of all federal powers exercised here, including that of the D.C. Bar. U.S. Const., art. I, § 8, cl. 17 ("Seat of the Government"). Specific language is ordinarily required to treat the District as if it were a State. *See, e.g., District of Columbia v. Carter*, 409 U.S. 418, 432-33 (1973) (D.C. not a State for purposes of 42 U.S.C. § 1983). The United States Code is replete with examples where Congress has **specifically defined** D.C. to fall within the meaning of the term "State," but only for purposes of that particular statute.[6] Indeed, by contrast, Chapter 31 of part II of title 28 of the United States Code lacks any specialized definition section. Congress thus knows

---

the fact that the statutes DOJ cited to extend Section 530B(a) to District of Columbia Bar rules point to two specific appropriations statutes mentioning the District shows that not even the DOJ of 1999 thought that it would be plausible to argue that D.C. Bar's rules were "local Federal court rules" within the meaning of Section 530B(a) or the preamble would have made that argument.

[6] *See, e.g.*, 28 U.S.C. § 1257(b) ("For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."); 42 U.S.C. § 8285a(2) ("the term 'State' means any of the several States, the District of Columbia …"); *see also, e.g.*, 26 U.S.C. § 170(c)(1) (applying term "charitable contribution" for tax purposes to include gifts for the use of "States, a possession of the United States … or the United States or the District of Columbia");. And Supreme Court Rule 47 states that "[t]he term "state court," when used in these Rules, includes the District of Columbia Court of Appeals."

how to confer power on District authorities when it wants to. And it expressly withheld it here.

And for good reason. The conduct that Disciplinary Counsel seeks to investigate is not behavior committed in the presence of a court and found by it to have violated its rules of conduct. Mr. Clark was a senior Executive Branch official who served as the head of two of Main Justice's seven litigating divisions, each with nationwide jurisdiction. His client was the Executive Branch, and the power to define the nature and scope of his duties to that client and its member departments and agencies, and to investigate alleged violations of DOJ and other federal rules of lawyer conduct, rest in the first instance with the Executive Branch alone. The same holds true for allegations that an attorney employed by the federal government has violated federal law.

To be clear, this does not mean that Mr. Clark is free of all ethical obligations here. DOJ houses both an Office of Professional Responsibility and an Office of Inspector General ("OIG"). The OIG is investigating the matters Senator Durbin's complaint involves. *See* DOJ Office of Inspector General, *available at* https://tinyurl.com/2p9ad5tm (Jan 25, 2021) (last visited Feb. 15, 2022). That ODC seeks, through this subpoena, to jump ahead of that investigation and, in effect, preempt it (rather than *vice versa*) is clear from ODC's refusal to defer under Board Rule 4.1 until federal authorities with authority over DOJ officials complete their respective investigations.

ODC's rush to assert disciplinary jurisdiction in this case is a clear indication that its investigation is intended to thrust itself into the administration of the federal Executive Branch and to use its subpoena power for partisan purposes. Senator Durbin has no direct knowledge of the facts, and only the Department of Justice knows what information it holds concerning how and to what extent it investigated the 2020 election. It is undisputed that DOJ has denied the Senate Judiciary Committee access to DOJ's investigative records. *See* Exhibit 5 (Letter, ADAG Weinsheimer to Mr. Clark (July 26, 2021)). It is also likely that it will object if Mr. Clark seeks

these records to defend against the allegations of misconduct made by Senator Durbin.

Senator Durbin thus turned to ODC, in the hope that it would lend its subpoena power to the effort to advance the political narrative of his investigation. This Court should reject that end run around the limits on the Senate Judiciary Committee's party balance and quash the subpoena.

### B. Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question.

Even if the foregoing jurisdictional hurdle were overcome, 28 U.S.C. § 530B extends state bar disciplinary jurisdiction over federal government lawyers only "to the same extent and in the same manner as other attorneys in that State." Similarly, the regulation subjecting lawyers working for the federal government to local bar disciplinary processes, 28 C.F.R. § 77.2(j)(2) (emphasis added), contains an important exception: it does not apply if the local jurisdiction "would not *ordinarily* apply its rules of ethical conduct to particular conduct or activity by the attorney."

Neither the D.C. Bar, nor any bar in America, "ordinarily" disciplines lawyers over never-sent confidential internal discussions of letters drafted for assessment and consideration. It is unheard of. And neither Mr. Fox nor undersigned counsel have been able to identify any such case anywhere. This alone should be fatal to the Bar's jurisdiction in this case.

### C. There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation.

D.C. Rules of Professional Conduct (hereafter "RPC") 8.4(c) prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." The people to whom the draft letter was allegedly delivered, and whose signature would be required thereon, were the Acting Attorney General Jeff Rosen and the Principal Associate Deputy Attorney General Richard Donoghue. They are not minors or seniors with diminished capacity who might easily be misled. They are instead seasoned lawyers who make no claim of having been deceived and no doubt understood the draft letter to

be a proposal contingent on facts they were in superior possession of. Instead, they are reported to have vehemently rejected the draft letter, and to have persuaded the President to reject it as well.

Of the species of misconduct prohibited by RPC 8.4(c), dishonesty sometimes appears the most broadly construed. *In the Matter of Shorter*, 570 A.2d 760, 767–68 (D.C. 1990), the lawyer answered questions posed by the IRS honestly, but only answered the questions asked and did not volunteer information not asked for that he knew they would want to know. Though not "legally … characterized as an act of fraud, deceit or misrepresentation," the conduct showed "a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness." And in *In re Romansky*, 825 A.2d 311, 315–17 (D.C. 2003)*,* the lawyer instructed an associate to record time to a client other than the one for whom the work was actually done. Though it was an internal accounting matter that did not operate to the financial detriment of either client, it was held to be dishonest because it simply was not true. But the conduct challenged in this case falls far short of even the highwater marks of RPC 8.4(c)'s reach as reflected in *Shorter* and *Romansky*.

In this case, a privileged and confidential draft of a letter appears to have been discussed amongst strong-willed senior officials who had diverging access to facts, diverging views of the facts, diverging views of the facts' significance, and diverging views of what ought to be done. There appears to have been a frank exchange of views on each of these areas of disagreement—as the rules of privilege and confidentiality are meant to protect and indeed foster. The matter was presented to the ultimate decision maker, President Trump, and after hearing differing views, he decided against the letter, and that was the end of the matter. RPC 8.4(c) thus has no application, and, to the knowledge of the undersigned, has never applied to anything like this situation.

### D.  Rule 8.4(d) Does Not Apply.

In *In re Yelverton*, 105 A.3d 413, 426 (D.C. 2014), this Court held that "[c]onduct violates RPC 8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an

identifiable case or tribunal, *and* (3) harms the judicial process in a more than a de minimis way." (emphasis added). And *In re Pearson* is to the same effect, stating the third element in slightly different verbiage to require the conduct to "taint[s] the judicial process in more than a *de minimis* way'" 228 A.3d 417,426 (D.C. 2020), *citing In re Hopkins,* 677 A.2d 55, 59–61 (D.C. 1996)*.*

Not one of these three essential elements is remotely established by what is alleged here. *First*, confidential and privileged internal deliberations and debates over legal theories and arguments are not improper. *Second*, there is no identifiable case or tribunal because the entire discussion appears to have been internal and confidential, and no document was ever filed in any court or tribunal anywhere. *Third*, no judicial process was harmed because nothing was ever filed in any court or tribunal anywhere. RPC 8.4(d) simply does not apply to the conduct in question.

The application of Bar discipline, at the behest of a bitter political adversary of the former President, to a confidential discussion draft of a letter never sent, which simply called for more state legislative investigation, is unprecedented, unfounded, and improper. One must ask why this docket was opened and whether political influence was at play.

## III. THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED.

It should be self-evident that a bar disciplinary process may not be appropriately used as an instrumentality of partisan political warfare. The country is sharply divided over the propriety of the 2020 election. Investigations into and litigation over the conduct of the election rage across many States around the country, with notable decisions finding irregularities and illegality. Absent affirmative misconduct in a particular case or before a particular tribunal, the Bar should not join the victors on the battlefield in the grisly business of dispatching the wounded, especially in a case such as this. Among the many evils that would ensue, the Bar's neutrality would suffer gravely. Presidential Administrations change hands and weeding out frivolous complaints protects the Bar.

**A. Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes.**

In Georgia, a Committee of the State Senate held hearings on election irregularities and found that "[t]he oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified."[7] The Report recommended, *inter alia*, calling a special session of the legislature to consider whether to rescind the certification of Georgia' electors and determine the "proper Electors" for the State of Georgia. *Id*. at p. 15. Other States acted similarly.

**B. Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election.**

Numerous members of Congress over the years, especially on one side of the political divide, have questioned presidential election results. Indeed, the Chair of the House January 6 Select Committee, Bennie Thompson, objected to the certification of the 2000 and 2004 presidential elections.[8] And his fellow January 6 Committee member, Jaime Raskin—both a lawyer and constitutional law professor—objected to certification during the 2016 presidential election. *See Rep. Raskin Challenges Awarding of Electors*, YOUTUBE, *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) (last visited Feb. 15, 2022). Indeed, Senator Durbin, the sole complainant here, defended Senator Boxer's right to object to certification of the 2004

---

[7] Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, *available at* https://tinyurl.com/3dzkfmxf (Dec. 17, 2020) (last visited Feb. 15, 2022).

[8] The Congressional Black Caucus objected to the certification of Florida's electoral votes. *See* 147 Cong. Rec. H34 (Jan. 6, 2001). Representative Thompson is a member of that caucus *See also* 151 Cong. Rec. H127 (Jan. 6, 2005).

election, assuming her good faith, even though he opted not to object himself.[9] No leaked, purported facts show Mr. Clark to have done anything other than raise questions inside DOJ and at the White House about the 2020 presidential election's regularity in particular States and counties. *See, e.g.* Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk (last visited Feb. 15, 2022) (impeachment manager stating that President Trump "turned to Jeffrey Clark, another Department lawyer, who had allegedly expressed support for using the Department of Justice to investigate the election results," going on to say Acting Attorney General Rosen "refuse[d] to reopen investigations"). That is a debatable, internal DOJ decision as to how much or little to investigate, not a disciplinary matter.

Indeed, just as Senator Durbin did with Senator Boxer, Mr. Clark's good faith should be presumed, even if his DOJ superiors and colleagues disagreed with him on the merits, just as every other Senator in 2004 disagreed with Senator Boxer, who stood as the sole Senator challenging the Bush v. Kerry election. Objections and a desire to further investigate the results of presidential elections are simply not the stuff of proper bar complaints, especially not by politically motivated complainants like Senator Durbin, who have no personal knowledge of the underlying conduct.

In this past presidential election, 147 members of the House and Senate (***including 8 Senators*** (*i.e.,* 7 more than in the 2004 election where Senator Durbin defended Senator Boxer's right to object) plus 139 House members) objected to certifying Arizona's or Pennsylvania's

---

[9] *See* Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016*, DAILY WIRE (Jan. 4, 2021) ("'Some may criticize our colleague from California for bringing us here for this brief debate,' Durbin said on the Senate floor following Boxer's objection, while noting that he would vote to certify the Ohio electoral votes for Bush. 'I thank her for doing that because it gives members an opportunity once again on a bipartisan basis to look at a challenge that we face not just in the last election in one State but in many States.'"), *available at* https://tinyurl.com/yjyw7x83 (last visited Feb. 15, 2022).

electoral votes.[10] And 35 of those members are lawyers (two of whom are former Supreme Court clerks, Senators Cruz and Hawley, who once were Texas Solicitor General and Missouri Attorney General, respectively). Are those nearly three dozen lawyer-legislators to be subjected to bar discipline in their respective States or in D.C., where they typically made media statements, on the theory that they were lying when they appeared on TV to demand more investigation or make factual claims? That is unthinkable and would plunge this or any state or local bar deep into purely political waters, taking it far afield from its traditional compass. No bar, including this one, is equipped to retry the presidential election and the privileged options debated inside the Executive Branch or with the President himself in the wake of a truly unique election where standard voting rules were jettisoned or changed in the wake of the COVID pandemic. *See* Letter, H. MacDougald to Chair Thompson (Nov. 5, 2021) (attached as Exhibit 6) (by attaching this letter, the executive privilege, deliberative process privilege, and attorney-client privilege arguments are incorporated).

### C.  Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General.

The Court should terminate this matter and preclude the Bar from re-litigating the 2020 election by holding there is no colorable discipline case where three Supreme Court Justices and 18 State Attorneys General raised similar questions about the 2020 election's regularity.

Most important in that regard is *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021). There, Justice Thomas dissented from the denial of certiorari because non-legislative state officials had changed the statutory rules for federal elections and the appointment of presidential electors in violation of the Electors and Elections Clauses of the Constitution. *See* U.S. Const., art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent joined by

---

[10] See Li Zhou, *147 Republican Lawmakers Still Objected to the Election Results After the Capitol Attack*, VOX (Jan. 7, 2021), *available as* https://tinyurl.com/4v6w229c (last visited Feb. 15, 2022).

Justice Gorsuch to flag the same infirmity. Both dissents noted the public importance of resolving the questions presented. If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have advanced similar views, bar discipline should be out of the question.

Also relevant, Justices Thomas and Alito dissented in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), a 2020 election challenge filed by Texas (and later joined by 17 other States) that complained about similar unconstitutional election-rule changes made in the so-called battleground States. They would have allowed Texas's bill of complaint to be filed, potentially putting the merits of the election challenge before the Supreme Court. And those two Justices, whatever the Court's view of their jurisprudence, surely did not act unethically in the *Texas* case. Mr. Clark was also entitled to presume, if that is what he did, that 18 State Attorneys General were presenting good-faith objections and for that reason to press for the President and DOJ to agree with the position of the State Attorneys General as well. In other words, this Court should not start down Disciplinary Counsel's slippery slope lest it find itself necessarily implying that three Supreme Court Justices and 18 State Attorneys General were all acting beyond the pale of legitimate legal debate, the judicial canons, and the Model Code of Professional Responsibility.

This Court should deny enforcement of the subpoena and act now to register its disapproval of this witch hunt. Doing so would send a strong signal that this Court will not allow the bar discipline process to be perverted for political ends, or to become a tool of persecution, inflicting significant legal costs on a former official like Mr. Clark and chilling the public service of those on either side of the aisle who must come to D.C. to serve varying presidential administrations.

### D. The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects.

The dogmatic premise of Senator Durbin's complaint that there were no significant irregularities in the 2020 election, accepted by ODC as sufficient to docket this case, has been

refuted by subsequent judicial decisions. In *McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022), the Commonwealth Court of Pennsylvania held that Pennsylvania's Act 77, allowance of universal mail-in balloting in Pennsylvania in the 2020 election, was unconstitutional under the Pennsylvania Constitution's strict limitations on absentee balloting. Approximately 2.6 million absentee ballots were thus cast by means held unconstitutional by a Pennsylvania court, well in excess of the margin of Biden victory.[11] *McLinko* thus bears out the views of Justices Thomas, Alito, and Gorsuch.

The Wisconsin Supreme Court, in a 4-3 ruling in *Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021), declined to consider whether drop boxes were illegal under Wisconsin law. The three dissenters, all writing separately but all joining the other dissents, concluded in exceptionally strong terms that the drop box procedures in the 2020 election, used by "hundreds of thousands of voters," were clearly illegal, also exceeding the margin of victory. And on January 14, 2022, a Wisconsin trial court ruled that drop boxes ***were illegal*** under Wisconsin law, in apparent accord with the views of the dissenters in *Trump v. Biden*.[12] Of course, the Judges taking ***either position*** were not acting unethically. Being on the losing side in a controversy, internal or external (but especially internal), does not equate to unethical conduct.

Additionally, a post-election audit of the 2020 election in Maricopa County, Arizona conducted by the Arizona Senate found, *inter alia*. substantial defects in signature verification, including the presence of 17,322 duplicates (alone exceeding the margin of victory), and

---

[11] *See* https://tinyurl.com/2p8u55cn (last visited Feb. 15, 2022)

[12] Moreover, on Friday, February 11, 2022, the Wisconsin Supreme Court reportedly voted 4-3 the other way to allow a trial court order banning drop boxes to remain in effect for an April 2022 local election. *See* Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, POLITICO (Feb. 11, 2022), *available at* https://tinyurl.com/y32cy8xc (last visited Feb. 15, 2022).

26

intentional and substantial spoliation of digital records on the voting equipment shortly before it was delivered for forensic examination.[13]

While not yet the subject of a judicial decision on the merits, evidence has emerged of a vast scheme to violate Georgia's law against ballot harvesting, O.C.G.A. § 21-2-385(a), which was in effect for the 2020 election. That statute permits only near relatives or cohabitants to mail or deliver absentee ballots. Strong evidence has emerged since 2020 proving this limitation was violated on a large-scale basis in Georgia and other battleground States with similar laws.

An election integrity group, "True the Vote," has collected cell phone location data in key election hotspots around the country including Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan. *See* Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, Breitbart, *available at* https://tinyurl.com/3bwujuxv (Aug. 4, 2021) (last visited Feb. 15, 2022). "[True the Vote's] document says that [it] has spent the last several months since late last year collecting more than 27 terabytes of geospatial and temporal data—a total of 10 trillion cell phone pings—between Oct. 1 and Nov. 6 in targeted areas in Georgia, Arizona, Michigan, Wisconsin, Pennsylvania, and Texas. The data includes geofenced points of interest like ballot dropbox locations, as well as UPS stores and select government, commercial, and non-governmental organization (NGO) facilities." *Id.*

As a result of a complaint by True the Vote, the Georgia Secretary of State's Office is now investigating the ballot harvesting scheme in Georgia. *See* John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022), *available at*

---

[13] *See* Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, Breitbart (Sept. 25, 2021), *available at* https://tinyurl.com/4kh45tup (last visited Feb. 15, 2022). This is the same investigation that the Biden DOJ's Civil Rights Division threatened to derail ***in a letter actually sent to the State of Arizona***. *See* https://tinyurl.com/2437rmb6 (last visited Feb. 15, 2022).

https://tinyurl.com/yprpt44m (last visited Feb. 15, 2022). True the Vote has identified a confidential whistleblower who claims he was paid $10 per ballot he put into dropboxes.

The expert affidavit of Gregg Phillips, filed April 8, 2021 in *Schmitz v. Barron*, *et al.*, Fulton Super. Ct, Civ. A. No. 2020CV342969, describes his geotracking analysis of 1.2 trillion mobile device signals showing 240 unique devices making multiple runs to and from drop boxes. Mr. Phillips concludes that "[a]round 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits." Exhibit 7 at ¶ 46. If correct, this was a systematic violation of O.C.G.A. § 21-2-385(a) and exceeded the margin of victory. *See id*. This pattern of conduct is further documented in dropbox surveillance video collected by local governments and obtained by True the Vote. Filmmaker and conservative commentator Dinesh D'Souza has announced a movie called "2,000 Mules". While information on the film is currently quite limited, the trailer claims to show "never before seen security footage" of ballot harvesters. The video shows these alleged harvesters (termed "mules" by the filmmakers) stuffing what appear to be multiple ballots or even sets of ballots into ballot boxes, with some then "snapping photos [on their phones] to get paid." https://tinyurl.com/2p86dznj (last visited Feb. 15, 2022).

There was ample evidence before January 4, 2021 that could cause a reasonable attorney to be skeptical of some parts of the 2020 election. Further evidence has emerged since then, and in some States it has even ripened into trial and appellate court decisions revealing that the elections in Wisconsin and Pennsylvania were conducted unlawfully, at least in part.

## CONCLUSION

ODC has no proper role investigating Respondent here and, at the very least, it should await the conclusion of federal and state investigations before trying to do so. For the foregoing reasons, ODC's motion should be denied and the cross-motion to quash should be granted.

Respectfully submitted this 15th day of February 2022.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission in progress

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice admission in progress

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy

of this *Response to Motion to Compel and Cross-Motion to Quash* by U.S. First Class Mail with

sufficient postage thereon to insure delivery, and by email addressed to:

> Hamilton P. Fox
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org

This 15th day of February 2022.

*/s/ Charles Burnham*

Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

# Exh. 1

# Affidavit of Robert N. Driscoll

**DCCA NO. _____**

**DISTRICT OF COLUMBIA**

**COURT OF APPEALS**

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A member of the Bar of the District of Columbia Court of Appeals** | |

## AFFIDAVIT OF ROBERT N. DRISCOLL

Personally appeared before the undersigned officer, duly authorized to administer oaths, Robert N. Driscoll, who, after being duly sworn, testified and stated as follows:

1.

My name is Robert N. Driscoll. I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 2004 and the Commonwealth of Massachusetts since 1994. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeals for the First, Seventh, Tenth and D.C. Circuits, various U.S. District Courts, and the District of Columbia

Court of Appeals. I am a member of the law firm McGlinchey Stafford PLLC, a

national firm with approximately 155 lawyers in offices in 15 cities, including

Washington, D.C.

3.

I represented Respondent in connection with investigations by various

congressional committees, including the January 6 Select Committee, and briefly

in connection with the above-referenced disciplinary matter. All of my

representation of Respondent ended on October 25, 2021.

4.

My first contact with any member of the DC Bar Office of Disciplinary

Counsel regarding any potential disciplinary issue related to Respondent came on

October 14, 2021, at 4:57 PM. At that time, I received a voice mail from Hamilton

P. Fox, Disciplinary Counsel for the District of Columbia Bar, which stated as

follows: "Mr. Driscoll, my name is Hamilton Fox. I am the disciplinary counsel for

the District of Columbia. I am calling you on the assumption that you represent

[Respondent]. Uh, would you give me a call please? Uh, my direct dial telephone

number is [redacted]."

5.

The next day, on October 15, 2021, at 11:29 AM, I called Mr. Fox. We spoke

for a few minutes. He indicated that the D.C. Bar had received a complaint from a

third party about Respondent, and that Mr. Fox would forward it to me and that

Respondent could respond if we wished to. No mention was made of a subpoena,

or of accepting service of a subpoena. No agreement was made between me and

Mr. Fox regarding service of any process or subpoena nor any deadline for

responding.

6.

On November 22, 2021, at 10:37 AM, I received a voicemail from Mr. Fox

which said as follows: "Uh Bob this is Phil Fox over at the Office of Disciplinary

Counsel. Uh, it has not escaped my attention that I've had no response whatsoever

to either what we call the B-letter that I sent to you, uh to [Respondent] care of

you, or the subpoena. Uh, nor have we had a response to what we call the D-letter,

which is our procedure for the follow-up, which was due on Friday. So, we are

preparing motions to compel. Um, if you don't want to go that route uh give me a

call, [redacted]. I suspect we'll have the motions uh certainly by tomorrow – filed

by tomorrow morning, if not today. Thanks."

7.

I called Mr. Fox at 10:40 AM on November 22, 2021, immediately after

listening to his voice mail. I told him that I had not received anything from the

Office of Disciplinary Counsel at all, that I no longer represented Respondent, and

that Respondent was now represented by Harry MacDougald.

3

8.

I then made immediate and urgent efforts to check all incoming mail and email to confirm I had not received anything from Mr. Fox – I had not. Indeed, I have never received any written correspondence of any kind, (mail, email or electronic message) from the Office of Disciplinary Counsel.

9.

Once I had doubled-checked for mail and searched my email system (including filters) to confirm I had not received any correspondence of any kind regarding Respondent, I called Mr. Fox again at 11:19 AM on November 22, 2021, and confirmed to him that I had searched all electronic records and regular mail, and that I had received no letter or any other document from the Office of Disciplinary Counsel regarding Respondent by email, regular mail, or other means.

10.

The totality of my communications with Mr. Fox before withdrawing from representing Respondent were the voice mail described in paragraph 4 above and the telephone conversation described in paragraph 5 above.

11.

At no point did I ever agree on behalf of Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena. Indeed, I was unaware of the existence of any subpoena related to

Respondent until contacted by his successor counsel regarding this matter, and I certainly did not agree to accept service of a subpoena or agree to a deadline for any response.

Robert N. Driscoll

Sworn to and subscribed before me, this 11 day of February, 2022.

_____ (seal)
Notary Public
My commission expires: 11-30-2023

5

# Exh. 2

# Affidavit of Jeffrey B. Clark

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

In the Matter of

CONFIDENTIAL (J.B.C.), ESQ.

    Respondent,

A member of the Bar of the District of
Columbia Court of Appeals

Disciplinary Docket

No. 2021-D193

## AFFIDAVIT OF JEFFREY B. CLARK

Personally appeared before the undersigned officer, duly authorized to administer oaths, Jeffrey B. Clark, who, after being duly sworn, testified and stated as follows:

1.

My name is Jeffrey B. Clark.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 1997. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for all Circuits, the U.S. District Court for Southern District of Alabama, the District of Columbia, District of Nebraska, and Eastern District of Texas, as well as the Court of Federal Claims. I am the Respondent in the above-referenced matter.

3.

I was previously represented in this matter by Robert N. Driscoll. However, that engagement terminated on October 25, 2021. Between October 25, 2021 and mid-January 2022, I was seeking counsel to represent me in this matter.

4.

I began corresponding directly with Hamilton Fox, the D.C. Bar Disciplinary Counsel in late November 2021 into early December 2022, especially after discovering that emails notifying me of documents from the DC Bar being available on a file sharing service had been caught in my spam filter. As a result, I had not received or been able to retrieve the material Mr. Fox's assistant had been trying to send me. I emailed Mr. Fox about this problem on December 2, 2021, and he replied the same day. *See* Exh. 1.

5.

On December 3, 2021, I tested positive for Covid, and let Mr. Fox know about that via email shortly thereafter. He very graciously gave me time to recover, which took the month of December and required a hospital trip to receive monoclonal antibodies.

6.

When I had recovered from Covid, I had an email dialog with Mr. Fox and one of his assistants. Delivery problems persisted such that I did not receive a complete copy of Mr. Fox's letter transmitting the subpoena and its attachments until January 6, 2022. Mr. Fox and I agreed that I would respond to the subpoena on January 31, 2022.

7.

At no point did I agree to accept legal service of the subpoena by email.

Jeffrey B. Clark

Sworn to and subscribed before me, this 15 day of February, 2022.

Notary Public
My commission expires: 04/30/2023

KIRAN R. SHRESTHA
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
REGISTRATION #7130618
MY COMMISSION EXPIRES APRIL 30, 2023

# Clark Affidavit

# Exh. 1

Subject: RE: [EXT]DC Bar Correspondence

From: Jeffrey Clark - To: Phil Fox - Cc: Harry MacDougald - Date: December 2, 2021 at 11:29 AM

Thank you Mr. Fox and I wish you are at your professional best in the argument.

Jeff Clark

**From:** Phil Fox <████████dcodc.org>
**Sent:** Thursday, December 2, 2021 11:24 AM
**To:** Jeffrey Clark <█████████████████████>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** RE: [EXT]DC Bar Correspondence

I am preparing for an argument at 2:00 today.  I have asked my secretary to resend the material, but I am confident that you have most of it since it is the public record stuff from the Judiciary Committee.  I'll get back to you after the argument.  For future reference, my direct dial number is  202/454-1728.

**From:** Jeffrey Clark <█████████████████████>
**Sent:** Thursday, December 2, 2021 11:12 AM
**To:** Phil Fox <████████dcodc.org>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** [EXT]DC Bar Correspondence
**Importance:** High

Mr. Fox,

Apologies.  After I discovered a few days ago that materials from some kind of dropbox-like site were sitting in my spam folder and emailing with Ms. Thornton, I was hoping to give you a call yesterday, but the January 6 Committee is setting unrealistic deadlines.  Despite the fact that my lawyer has a hearing in Atlanta on Friday, they are insisting on a second deposition on Saturday, and I need to use the time between now and then to get ready.

Juggling a lot on my end and so don't have the to-spam emails in front of me but my understanding is that they indicated the dropbox-type access expired on 11/29.  So it would be best if you re-sent them to me, if that is not too much to ask.  Given the spam problem, I authorize you to send anything you need to, to me to this email address as direct attachments, but maybe with a CONFIDENTIAL header on it, assuming the file size is not too large that they will go through as ordinary attachments.  If there is a file-size issue, please re-ripen the dropbox-type access but send me an email here, since your test on that (when the sending email address was yours and not the more general email address) worked, to let me know to check my spam box.  When I can free up some time, I'll figure out how to put that general address you use to keep confidentiality into my trusted senders or whatever the Outlook term is for that in the program.

Also, I will need to get separate counsel for this and to contact my malpractice carrier to inquire re how that works as no claim has ever been filed against me in my 25-year career, so I am not familiar with any of these processes. My lawyer for the Committee interaction may be able to help me for a bit but I think I should retain someone who regularly practices ethics law to assist me and that will take some time to find and get retention/insurance arrangements worked out with, particularly given that the political issues involved impact the pool of lawyers that I can attract.  I've copied my lawyer for Committee matters, Mr. Harry MacDougald here, for the limited temporary purpose of helping me as I search for ethics counsel.

I hope you will bear with me. The legal issues here are far from ordinary.

Thank you very much Mr. Fox.

Respectfully submitted,

Jeff Clark

# Exh. 3

# Affidavit of Harry W. MacDougald

**DCCA NO. 22-BS-0059**

**DISTRICT OF COLUMBIA**

**COURT OF APPEALS**

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A member of the Bar of the District of Columbia Court of Appeals** | |

## AFFIDAVIT OF HARRY W. MACDOUGALD

Personally appeared before the undersigned officer, duly authorized to administer oaths, Harry W. MacDougald, who, after being duly sworn, testified and stated as follows:

1.

My name is Harry W. MacDougald.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the State of Georgia since 1985. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for the 11th and D.C. Circuits, and the Northern and Southern U.S. District Courts in Georgia, and all Georgia trial and appellate courts. I am a partner in Caldwell, Carlson, Elliott & DeLoach, LLP in Atlanta, Georgia.

3.

I represent the Respondent in connection with the January 6 Select Committee and in connection with the above-referenced disciplinary matter. I did not begin representing

Respondent in the above-referenced matter until January, 2022, though I was copied on some emails between the Respondent and Disciplinary Counsel beginning December 2, 2021 while Respondent was looking for other counsel to represent him in this matter.

4.

At no point did I ever agree on behalf of the Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena.

5.

On the afternoon of January 28, 2022, I had a telephone conversation with Phil Fox, D.C. Bar Disciplinary Counsel. I told Mr. Fox we would not be producing any documents in response to the subpoena and whether, in light of that, asked if the Respondent needed to appear at the Bar offices in response to the subpoena. Mr. Fox replied that Respondent was not required to appear but that we "would be in court very quickly" on a motion to compel. He indicated that asserting the act of production privilege would be frivolous and that doing so would not stand Respondent in good stead when it came time for imposing disciplinary sanctions. He added "I promise you I will ratchet up" the sanction to be imposed if we asserted the Fifth.

6.

At 8:30 PM Friday evening, January 28, 2022, Mr. Fox sent me an email, attached hereto as Exh. 1, in which he reiterated this threat as follows:

> Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

2

7.

On the morning of Saturday February 5, 2022, I received an email from Mr. Fox's

assistant, Angela Thornton, which attached a letter from Mr. Fox dated February 3, 3022

purporting to transmit his motion to compel and the exhibits thereto. However, Ms. Thornton's

email included only the letter, and not the motion or any of its exhibits. See Exh. 2.

8.

I promptly replied to Ms. Thornton and said that I didn't see the motion. Ms. Thornton

replied "Motion? No motion with this email, just the letter addressed to you from Mr. Fox." I

replied as follows:

> The first sentence of the letter says: "Accompanying this letter is a Motion to
> Compel that we filed with the Court of Appeals today."

> That is the motion after which I am inquiring.

> Thanks for any help you can provide on that.

*Id*.

9.

After about an hour with no response from Ms. Thornton, I emailed her again at 11:05

AM, saying the following:

> Ms. Thornton:

> The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being
> transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from
> Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion
> it says is enclosed.

> And today, your email transmitting the letter did not include the motion either.

> I did receive some document production via a file share type of thing, but there was
> no motion in there, either.

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

*Id*.

10.

Ms. Thornton never responded to three emails to her asking for a copy of the motion. Therefore, at 5:20 PM I emailed this conversation to Mr. Fox, informed him I still did not have the motion, and asking if he could please email it to me. Mr. Fox responded promptly, and we exchanged numerous emails on the topic. *See* Exh. 3. The upshot of those emails was that I received an email with the motion attached, but never received an email with the exhibits. Mr. Fox was clearly exerting himself to deliver the documents to me, and indicated he had emailed the exhibits, but I never got them. He identified the exhibits, which were documents that I already had. He added that he would send the motion and exhibits via FedEx on Monday. *Id*. at p. 2.

11.

By mid-afternoon Friday February 11, 2022, I still had not received the motion by regular mail, nor had I received any of the exhibits via email, nor had I received a FedEx delivery as Mr. Fox had indicated the previous Saturday would be forthcoming. I therefore emailed Mr. Fox to let him know I still had not received the exhibits and would he mind putting the material on a file sharing site for download. Mr. Fox replied that he would look into it but "I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt." *See* Exh. 4.

12.

In response to that information, two assistants and I looked in every office in our firm and queried everyone in the office but we could not find any such FedEx package. We also had someone check on the 16th floor of the two other buildings in our office park to seek if perhaps the package had been misdelivered, but we could not find it that way either. *Id*.

13.

I kept Mr. Fox apprised of these efforts as they unfolded and asked him if he could identify who had signed for the package, or perhaps give me the tracking number and we would check that ourselves. *Id*. At first he indicated that would have to wait until Monday, but among several emails passing between us that afternoon, Mr. Fox forwarded me the FedEx airbill for the delivery. *See* Exh. 5. This email was actually received before my last reply to Mr. Fox asking for the tracking number in Exh. 4, but I did not see it until after I sent that reply because I was looking around the office trying to find the package. Once I saw the airbill, which has the tracking number on it, I entered that tracking number into the FedEx package tracking webpage. The result was that there was no such tracking number in the FedEx system. I then had two assistants search for the tracking number on the FedEx website with the same result. I relayed that information to Mr. Fox. *See* Exh. 6. For reasons unknown to me, it appears this package tracking number never made it into the FedEx system.

14.

On February 14, 2022, Mr. Fox's assistant. Ms. Thornton sent me a DropBox link from which I was able to download Mr. Fox's letter of February 3, 2022 (which I had first received February 5, 2022), and the motion with all of its exhibits. This was the first time I had received the complete package of the motion and all of its exhibits.

5

15.

On February 15, 2022, I received delivery of a FedEx package bearing the same airbill number as the one Mr. Fox emailed me on February 11 that is attached to Exh. 6. The airbill was filled out on February 7, but the FedEx tracking history shows that it first entered the FedEx system on February 14, 2022. Exh. 7.

Harry W. MacDougald

Sworn to and subscribed before me, this 15 day of February, 2022.

Notary Public
My commission expires: _____

YVETTE ANN RIX
Notary Public, State of Georgia
Fulton County
My Comm. Expires June 4, 2024

# MacDougald Affidavit

# Exh. 1

**Subject: Re: [EXT]Jeffrey Clark**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: January 28, 2022 at 8:30 PM

Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

Get Outlook for iOS

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:34 PM
**To:** Phil Fox
**Subject:** RE: [EXT]Jeffrey Clark

Any time is fine including tonight or this weekend. My direct rings over to my cell, which is 404-388-8622.

Best,

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <▮▮▮▮▮dcodc.org>
Date: January 28, 2022 at 3:32:32 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Jeffrey Clark

I am in the middle of a meeting.  How long will you be available?

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:32 PM
**To:** Phil Fox <▮▮▮▮▮dcodc.org>
**Subject:** [EXT]Jeffrey Clark

Mr. Fox:

Can you give me a call at the number below regarding Mr. Clarke's response to your subpoena? Maybe 5 min.

Thanks.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 2

Subject: RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary

From: hmacdougald@ccedlaw.com - To: Angela Thornton - Cc:  - Date: February 5, 2022 at 11:05 AM

Ms. Thornton:

The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion it says is enclosed.

And today, your email transmitting the letter did not include the motion either.

I did receive some document production via a file share type of thing, but there was no motion in there, either.

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: hmacdougald@ccedlaw.com <hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton ███████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193


The first sentence of the letter says "Accompanying this letter is a Motion to Compel that we filed with the Court of Appeals today."

That is the motion after which I am inquiring.

Thanks for any help you can provide on that.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Angela Thornton <███████████
Date: February 5, 2022 at 10:07:03 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Motion? No motion with this email, just the letter addressed to you from

Mr. Fox.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 10:06 AM
**To:** Angela Thornton <██████████████████
**Subject:** [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193


I don't see the motion


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton <██████████████████
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193


Dear Mr. MacDougald, please see letter attached from Mr.
Fox, Disciplinary Counsel.  If there are questions or concerns,
please don't hesitate to let us know.  Thank you.


Regards,


Angela

# MacDougald Affidavit

# Exh. 3

**Subject: Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: February 5, 2022 at 6:12 PM

The attachments, actually exhibits, are all things you have: the November letter and subpoena to Clark; the email chain, which is also attached to one of your January 31 letters, about the difficulty we had then in getting all the materials to Clark; and your letter asserting the Fifth. I will make sure a hard copy of everything is sent to you on Monday. I don't understand why we are having such difficulty transmitting this stuff. We have been doing virtually everything electronically for two years, and I am unaware of any other case where we have had these problems.

Get Outlook for iOS

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 6:01:41 PM
**To:** Phil Fox <████dcodc.org>
**Subject:** RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I got the email transmitting the motion and saying the attachments would come separately, but haven't seen those yet.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <████dcodc.org>
Date: February 5, 2022 at 5:59:48 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Azadeh Matinpour <██████████> Angela Thornton <██████████> Jason Horrell <██████████>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I just resent everything—first the motion and then the motion with the attachments.  Nothing bounced back.  Did you get them?

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:39 PM
**To:** Phil Fox <████dcodc.org>
**Subject:** RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Thanks - much appreciated.

Have a good rest of your weekend.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600

Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <████dcodc.org>
Date: February 5, 2022 at 5:36:28 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193


I don't know without looking, but I am not going to take advantage of your failure to receive it.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:35 PM
**To:** Phil Fox <████dcodc.org>
**Subject:** Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193


I received the letter this morning but no motion.


I know it's not your job to help me read the rules, but I'll go ahead and ask - is it correct that we have a 7 calendar day response time for responding to motions?


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Phil Fox <████dcodc.org>
Date: February 5, 2022 at 5:32:30 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193



It is just the letter and the motion. If I can't get it to you, we will FedEx it Monday. I will try again.


Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>

**Sent:** Saturday, February 5, 2022 5:28:53 PM
**To:** Phil Fox < ████ dcodc.org>
**Subject:** Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193

No sir, I have not seen it yet. I got this one, but I haven't seen the other
one  with the motion. I checked my online spam folder as well. Not sure
what's going on with that. Is it a particularly large attachment?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <████ dcodc.org>
Date: February 5, 2022 at 5:25:43 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193

Did you get the email with the motion that I just sent you?

Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:20:02 PM
**To:** Phil Fox < ████ dcodc.org>
**Subject:** Fwd: RE: [EXT]Re: in re Clark/Disciplinary Counsel
- Disciplinary Docket No. 2021-D193

Mr. Fox:

Please see the correspondence below. No response to three
emails to Ms. Thornton asking for the motion. I still do not
have the motion referred to in your letter of 2/3, which I
just received this morning.

If you could please send me the motion at your earliest
convenience, I'd appreciate it.

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 11:05:33 AM
To: Angela Thornton <███████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193



Ms. Thornton:


The letter you sent me this morning from Mr.
Fox is dated 2/3, and states it is being
transmitted to me on 2/3 via email.  However, I
do not have an email from 2/3 from Mr. Fox, or
a letter from Mr. Fox sent to me that day, much
less a copy of the motion it says is enclosed.


And today, your email transmitting the letter did
not include the motion either.


I did receive some document production via a
file share type of thing, but there was no motion
in there, either.


It's possible I have missed something as I was
in court all day Thursday and had outpatient
surgery yesterday, but searching my emails I
don't have anything from Mr. Fox on 2/3.
Perhaps someone else in your office sent it?


In any event, we would appreciate your sending
us the motion at your earliest convenience and
letting me know one way or the other whether I
have overlooked its prior transmittal from your
office.


Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton <█████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary
Counsel - Disciplinary Docket No. 2021-D193



The first sentence of the letter says
"Accompanying this letter is a
Motion to Compel that we filed with
the Court of Appeals today."


That is the motion after which I am
inquiring.


Thanks for any help you can provide
on that.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Angela Thornton
<█████████████████
Date: February 5, 2022 at 10:07:03
AM
To: Harry MacDougald
<hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re
Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193

Motion? No motion with this email, just the letter addressed to you from Mr. Fox.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 10:06 AM
**To:** Angela Thornton <████████████████████>
**Subject:** [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't see the motion

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton <████████████████████>
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Dear Mr. MacDougald,

please see

letter attached from Mr. Fox, Disciplinary Counsel. If there are questions or concerns, please don't hesitate to let us know. Thank you.

Regards,

Angela

# MacDougald Affidavit

# Exh. 4

Subject: RE: [EXT]Service Copy of Motion

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc: Angela Thornton - Date: February 11, 2022 at 5:14 PM

That will have to wait until next week.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 5:13 PM
**To:** Phil Fox <█████dcodc.org>
**Subject:** RE: [EXT]Service Copy of Motion

I received an email from Ms. Thornton sent at 11 AM transmitting your letter of today's date and attachments consisting of correspondence between you and Mr. Weinsheimer dated Feb 7 and 8 respectively, for which you have my thanks.

If you or Ms. Thornton can give us the tracking number for the FedEx package we can look up who signed for it.

Both me and my assistant checked all the offices in our suite and asked everyone who is still here and no sign of it. Our office manager has not seen it either. We also checked the 16th floor of the other two buildings in our office park and nothing there either - one of them is vacant anyway. There's no one at home in the other suites on our floor so we don't know if it might have gone to one of them by mistake. So the next available step is to let us know who signed for it or give us the tracking number so we can check ourselves.

Thank you in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <█████dcodc.org>
Date: February 11, 2022 at 4:59:31 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Service Copy of Motion

I don't.  Angela might next week.  Did you receive the email and attachments that we sent you this morning?

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 4:58 PM
**To:** Phil Fox <█████dcodc.org>

**Subject:** RE: [EXT]Service Copy of Motion

Do you have a name of who signed for it?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <████dcodc.org>
Date: February 11, 2022 at 4:41:38 PM
To:
Subject:  RE: [EXT]Service Copy of Motion


We'll look into that, but I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt.

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 4:31 PM
**To:** Phil Fox <████dcodc.org>
**Subject:** [EXT]Service Copy of Motion

Mr. Fox:

While our building's mail has not yet arrived today (even though it's a 17 story building), I still have not received the mail service copy of your motion to compel, and never did receive the emails transmitting the exhibits.

Would you mind perhaps using a file sharing service like DropBox or the like to get the full set to me electronically?

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 5

**Subject: FW: In re Clark - DDNo. 2021-D193**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: February 11, 2022 at 4:48 PM, Attachments: 2021-D193 fedex shipping bill 02072022.pdf

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.

---

**From:** Angela Thornton <█████████████████>
**Sent:** Monday, February 7, 2022 1:47 PM
**To:** Phil Fox <███████dcodc.org>; Jason Horrell <███████████████ Azadeh Matinpour <█████████████████
**Subject:** In re Clark - DDNo. 2021-D193

David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning

Angela

MUR 1

**FedEx Express** Package US Airbill

FedEx Tracking Number: 8148 8013 6300

**1 From** *Please print and press hard.*

Date 2/7/2022

Sender's FedEx Account Number

Sender's Name Hamilton P. Fox, III    Phone 202.638-1501

Company OFFICE OF DISCIPLINARY COUNSEL

Address 315 5TH ST NW

City WASHINGTON   State DC   ZIP 20001-2710

**2 Your Internal Billing Reference** 2021-D103

**3 To**
Recipient's Name Harry W. MacDougald    Phone 404.843-4109

Company Caldwell Carlson Elliott & DeLoach, LLP

Address Two Ravinia Drive Suite 1600

Address Atlanta   State GA   ZIP 30346

Ship it. Track it. Pay for it. All online.
Go to fedex.com

6

0133821617

**4 Express Package Service** *To most locations.*

☐ FedEx First Overnight
☐ FedEx Priority Overnight
☐ FedEx Standard Overnight

**5 Packaging**
☑ FedEx Envelope   ☐ FedEx Pak   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6 Special Handling and Delivery Signature Options**
☐ Saturday Delivery
☑ No Signature Required   ☐ Direct Signature   ☐ Indirect Signature

Does this shipment contain dangerous goods?
☑ No   ☐ Yes   ☐ Yes   ☐ Cargo Aircraft Only
☐ Dry Ice

**7 Payment** *Bill to:*
☑ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Total Packages 1   Total Weight 0.8992 lbs   Total Declared Value $

Form
ID No. 0215

Sender's Copy

611

00066
00200

# MacDougald Affidavit

# Exh. 6

Subject: Re: FW: In re Clark - DDNo. 2021-D193

From: hmacdougald@ccedlaw.com - To: Phil Fox - Cc:  - Date: February 11, 2022 at 5:30 PM

Phil:

Thank you for sending the FedEx Airbill.

Three people in my office including me and two assistants have put the tracking number from the airbill into the FedEx tracking number search box and we get this response:  "No record of this tracking number can be found at this time, please check the number and try again later. For further assistance, please contact Customer Service."

The airbill is filled out to not require a signature for delivery.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <██████dcodc.org>
Date: February 11, 2022 at 4:48:29 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  FW: In re Clark - DDNo. 2021-D193

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.

---

**From:** Angela Thornton <████████████████
**Sent:** Monday, February 7, 2022 1:47 PM
**To:** Phil Fox <██████dcodc.org>; Jason Horrell <████████████ Azadeh Matinpour <████████████
**Subject:** In re Clark - DDNo. 2021-D193

David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning

Angela

# MacDougald Affidavit

# Exh. 7



FedEx Tracking

Track Another Shipment    Help

814880136300

**ADD NICKNAME**



 ON TIME

# Delivered
# Tuesday, February 15, 2022 at 8:06 am

**DELIVERED**
Signature release on file

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| WASHINGTON, DC US | GA US |

**MANAGE DELIVERY** ⌄

Travel History     Shipment Facts

# Travel History

**TIME ZONE**
Local Scan Time     ⌄

**Tuesday, February 15, 2022**

| 8:06 AM | GA | Delivered<br>Package delivered to recipient address - release authorized |
|---|---|---|
| 6:15 AM | MARIETTA, GA | On FedEx vehicle for delivery |
| 5:39 AM | ATLANTA, GA | At destination sort facility |
| 3:48 AM | MEMPHIS, TN | Departed FedEx hub |
| 12:17 AM | MEMPHIS, TN | Shipment arriving On-Time |
| 12:05 AM | MEMPHIS, TN | Arrived at FedEx hub |

Monday, February 14, 2022

| | | |
|---|---|---|
| 9:21 PM | WASHINGTON, DC | Left FedEx origin facility |
| 4:13 PM | WASHINGTON, DC | Picked up |

Expand History ⌄

## Shipment Facts

**TRACKING NUMBER**
814880136300

**SERVICE**
FedEx First Overnight

**WEIGHT**
0.5 lbs / 0.23 kgs

**TOTAL PIECES**
1

**TOTAL SHIPMENT WEIGHT**
0.5 lbs / 0.23 kgs

**TERMS**
Shipper

**SHIPPER REFERENCE**
2621 D193

**PACKAGING**
FedEx Envelope

**SPECIAL HANDLING SECTION**
Deliver Weekday

**SHIP DATE**
2/14/22 ⑦

**SHIPMENT-FACTS.COD-DETAIL**
$0.00

**STANDARD TRANSIT**
2/15/22 before 8:30 am ⑦

**ACTUAL DELIVERY**
2/15/22 at 8:06 am

<u>**Exh. 4**</u>

<u>**Senator Durbin Letter to Office of
Disciplinary Counsel, October 7, 2021**</u>

RICHARD J. DURBIN, ILLINOIS, CHAIR

PATRICK J. LEAHY, VERMONT
DIANNE FEINSTEIN, CALIFORNIA
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
ALEX PADILLA, CALIFORNIA
JON OSSOFF, GEORGIA

CHARLES E. GRASSLEY, IOWA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JOSHUA D. HAWLEY, MISSOURI
TOM COTTON, ARKANSAS
JOHN KENNEDY, LOUISIANA
THOM TILLIS, NORTH CAROLINA
MARSHA BLACKBURN, TENNESSEE

# United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

October 7, 2021

Office of Disciplinary Counsel
District of Columbia Court of Appeals
515 5th Street NW
Building A, Suite 117
Washington, D.C. 20001

**Re:   Request for Disciplinary Investigation of Jeffrey Bossert Clark**

To the Disciplinary Counsel:

As the Chair of the U.S. Senate Judiciary Committee, I write to express my grave concern about actions taken by Jeffrey Bossert Clark that may constitute serious professional misconduct under the D.C. Rules of Professional Conduct. Since January 2021, the Committee has been investigating allegations that Mr. Clark aided then-President Trump's efforts to enlist the U.S. Department of Justice (DOJ) in overturning the results of the 2020 Presidential election. After months of reviewing documents and interviewing key former DOJ personnel with firsthand knowledge of Mr. Clark's actions, the Committee has released the attached interim staff report (the "Report"). Based on the Report's findings, I respectfully request that the Office of Disciplinary Counsel open an investigation to determine whether Mr. Clark, who is a member of the D.C. Bar, violated applicable D.C. Rules of Professional Conduct and should be subject to disciplinary action.

As further detailed in the Report, Mr. Clark attempted to enlist DOJ in President Trump's efforts to overturn the results of the presidential election without evidence or legal authority. In furtherance of this goal, Mr. Clark:

- violated, blatantly and on multiple occasions, longstanding DOJ policies designed to insulate the Department's investigations and prosecutions from partisan political influence by meeting with President Trump;

- continually pressed DOJ leadership to publicly announce that there was corruption in the 2020 general election and to urge swing-state legislatures to convene special legislative sessions to appoint alternate slates of electors, despite being repeatedly told by DOJ leadership that his election fraud claims were baseless and that DOJ lacked legal authority to pursue his proposed course of action; and

- attempted to coerce then-Acting Attorney General Jeffrey Rosen into agreeing to his proposals by threatening Mr. Rosen with the prospect of replacing him as Attorney General.

Lawyers admitted to the D.C. Bar swear an oath "to support the Constitution of the United States."[1] It should go without saying that attempts to subvert a free and fair election do not support the Constitution.

The D.C. Bar defines misconduct as "[a]cts or omissions by an attorney…which violate the attorney's oath of office or the rules or code of professional conduct currently in effect."[2] Mr. Clark's actions implicate several D.C. Rules of Professional Conduct. First, by using his official capacity as an Acting Assistant Attorney General to push DOJ to take official action based on verifiable falsehoods, Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against "counsel[ing] a client to engage, or assist[ing] a client, in conduct the lawyer knows is criminal or fraudulent." While Rule 1.2(e) allows "lawyers to discuss the consequences of any proposed course of conduct with a client" and "assist a client to make a good-faith effort to determine the validity, scope, meaning, or application of the law," Mr. Clark's actions do not fit into this exemption. To the contrary, as the Report demonstrates, he repeatedly pressed DOJ leadership to take the extraordinary and unlawful step of intervening in states' appointment of electors based on false claims of election fraud. Rule 1.0(f) defines knowledge as "actual knowledge," which "may be inferred from circumstances." The American Bar Association's Standing Committee on Ethics and Professional Responsibility has further clarified that actual knowledge "may be inferred from the circumstances, including a lawyer's willful blindness to or conscious avoidance of facts." ABA Formal Op. 491 (2020). As the Report establishes, Mr. Clark should have known, and was given every opportunity to know, that the election fraud claims he pushed were false.

Mr. Clark also appears to have violated at least four of the prohibitions in Rule 8.4 regarding professional misconduct. First, the verifiable falsehoods at the core of Mr. Clark's efforts implicate Rule 8.4(c)'s prohibition of "conduct involving dishonesty, fraud, deceit, or misrepresentation." Second, his repeated requests that Acting Attorney General Rosen endorse these falsehoods, and his suggestion that he would decline an offer to replace Rosen as Acting Attorney General if Rosen agreed to pursue his proposal, implicate Rule 8.4(a)'s prohibition against knowingly assisting or inducing someone to violate the Rules of Professional Conduct. Third, Rule 8.4(e) prohibits a lawyer from "stat[ing] or imply[ing] an ability to influence improperly a government agency or official," and Mr. Clark attempted to improperly influence both DOJ's own leadership and several state legislatures. Finally, as a senior DOJ official who sought to improperly use DOJ's law enforcement powers on behalf of a political candidate and to overturn the election results, the totality of Mr. Clark's efforts implicate Rule 8.4(d)'s prohibition of "conduct that seriously interferes with the administration of justice." Other Rules may be similarly implicated.

Mr. Clark's misconduct does more than speak to his fitness as a lawyer; his activities, which were part of a broader course of conduct by President Trump and his allies to overturn the election, have had severe ramifications for the rule of law. When a government lawyer,

---

[1] Attorney Oath of Admission to the District of Columbia Bar, *available at* https://www.dccourts.gov/sites/default/files/divisionspdfs/committee%20on%20admissions%20pdf/Attorney_Oath_Statement_Roll_of_Attorneys.pdf.

[2] Rules Governing the District of Columbia Bar, Rule XI, Section 2(b).

particularly one entrusted with a high level of leadership in the nation's foremost law enforcement agency, commits serious violations of professional conduct, such actions undermine the integrity of our justice system and erode public confidence in it. Public confidence is further eroded when serious misconduct comes to light only to be met with no consequences. Therefore, I submit this letter of complaint to respectfully request that the Office of the Disciplinary Counsel initiate an investigation and take appropriate disciplinary proceedings pursuant to Rule XI of the Rules Governing the District of Columbia Bar.

I appreciate your prompt attention to this sensitive matter. The Committee is available for further consultation as needed.

Sincerely,

Richard J. Durbin
Chair, U.S. Senate Committee on the Judiciary

Enclosure

cc:   The Honorable Charles E. Grassley
      Ranking Member, U.S. Senate Committee on the Judiciary

<u>**Exh. 5**</u>

<u>**Bradley Weinsheimer Letter to Jeffrey B. Clark, July 26, 2021**</u>



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

July 26, 2021

Jeffrey B. Clark
Lorton, VA
Via email to Counsel

Dear Mr. Clark:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on Oversight and Reform (House Oversight Committee), and the U.S. Senate Judiciary Committee to provide transcribed interviews to the Committees relating to your service as Assistant Attorney General for the Environment and Natural Resources Division and Acting Assistant Attorney General for the Civil Division. In these interviews, you are authorized to provide information you learned while at the Department as described more fully below.

According to information provided to you and the Department by the House Oversight Committee, its focus is on "examining President Trump's efforts to pressure the Department of Justice (DOJ) to take official action to challenge the results of the presidential election and advance unsubstantiated allegations of voter fraud."[1] The House Oversight Committee has stated that they wish to ask you questions "regarding any efforts by President Trump and others to advance unsubstantiated allegations of voter fraud, challenge the 2020 election results, interfere with Congress's count of the Electoral College vote, or overturn President Biden's certified victory."[2]

Based upon information provided to you and to the Department from the Senate Judiciary Committee, the Department understands that the scope of that Committee's inquiry is very similar to that of the House Oversight Committee. The letter to the Department dated January 23, 2021, explained that the Senate Judiciary Committee is conducting oversight into public reporting about "an alleged plot between then-President Donald Trump and [you] to use the Department of Justice to further Trump's efforts to subvert the results of the 2020 presidential election"—events that the letter described as raising "deeply troubling questions regarding the Justice Department's role" in those purported efforts.[3] In addition, the Senate Judiciary

---

[1] Letter from Carolyn B. Maloney, Chairwoman, House Committee on Oversight and Reform, to Jeffrey B. Clark, June 14, 2021.

[2] *Id.*

[3] Letter from Richard J. Durbin et al., Senate Judiciary Committee, to Monty Wilkinson, Acting Attorney General, Dep't of Justice, January 23, 2021, at 1, https://www.judiciary.senate.gov/press/dem/releases/senate-judiciary-committee-democrats-seek-answers-about-dojs-role-in-trumps-scheme-to-overturn-the-2020-election.

Committee has represented to the Department that the scope of its interview will cover your knowledge of attempts to involve the Department in efforts to challenge or overturn the 2020 election results. This includes your knowledge of any such attempts by Department officials or by White House officials to engage in such efforts. The Committee has further represented that the time frame for its inquiry will begin following former Attorney General William Barr's December 14, 2021, resignation announcement.

Department attorneys, including those who have left the Department, are obligated to protect non-public information they learned in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the Department has sought to balance the Executive Branch's confidentiality interests with Congress's legitimate need to gather information.[4]

The extraordinary events in this matter constitute exceptional circumstances warranting an accommodation to Congress in this case. Congress has articulated compelling legislative interests in the matters being investigated, and the information the Committees have requested from you bears directly on Congress's interest in understanding these extraordinary events: namely, the question whether former President Trump sought to cause the Department to use its law enforcement and litigation authorities to advance his personal political interests with respect to the results of the 2020 presidential election. After balancing the Legislative and Executive Branch interests, as required under the accommodation process, it is the Executive Branch's view that this presents an exceptional situation in which the congressional need for information outweighs the Executive Branch's interest in maintaining confidentiality.

The Executive Branch reached this view consistent with established practice. Because of the nature of the privilege, the Department has consulted with the White House Counsel's Office in considering whether to authorize you to provide information that may implicate the presidential communications privilege. The Counsel's Office conveyed to the Department that President Biden has decided that it would not be appropriate to assert executive privilege with respect to communications with former President Trump and his advisors and staff on matters related to the scope of the Committees' proposed interviews, notwithstanding the view of former President Trump's counsel that executive privilege should be asserted to prevent testimony regarding these communications. *See Nixon v. Administrator of General Servs.*, 433 U.S. 425, 449 (1977) ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support

---

[4] *See* Letter for Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (Jan. 27, 2000) ("Linder Letter") ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

2

invocation of the privilege accordingly."); *see also id.* (explaining that the presidential communications privilege "is not for the benefit of the President as an individual, but for the benefit of the Republic") (internal citation omitted).

Therefore, given these extraordinary circumstances, including President Biden's determination on executive privilege, and having reviewed the scope of the Committees' requested interviews, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, so long as the testimony is confined to the scope of the interviews as set forth by the Committees and as limited in the penultimate paragraph below.[5]  This accommodation is unique to the facts and circumstances of this particular matter and the legislative interests that the Committees have articulated.

Consistent with appropriate governmental privileges, the Department expects that you will decline to respond to questions outside the scope of the interview as outlined above and instead will advise the Committees to contact the Department's Office of Legislative Affairs should they seek information that you are unable to provide.

Please note that it is important that you not discuss Department deliberations concerning investigations and prosecutions that were ongoing while you served in the Department.  The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations.  If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."  Linder Letter.  Discussion of pending criminal cases and possible charges also could violate court rules and potentially implicate rules of professional conduct governing extra-judicial statements.  We assume, moreover, that such Department deliberations are not within the scope of the requested testimony as defined by the Committees.

Accordingly, consistent with standard practice, you should decline to answer any such questions and instead advise the Committees to contact the Department's Office of Legislative Affairs if they wish to follow up on the questions.  Responding in such a way would afford the Department the full opportunity to consider particular questions and possible accommodations that may fulfill the Committees' legitimate need for information while protecting Executive Branch confidentiality interests regarding investigations and prosecutions.

Sincerely,

Bradley Weinsheimer

---

[5] You are not authorized to reveal information the disclosure of which is prohibited by law or court order, including classified information and information subject to Federal Rule of Criminal Procedure 6(e).

3

# Exh. 6

# MacDougald Letter to Rep. Bennie G. Thompson, November 5, 2021

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1800
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 5, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

I have been retained to represent Jeffrey Clark in the investigative matters pending before your Committee.[1]

Despite disparaging and misleading media narratives, Mr. Clark is not a politician and has never sought notoriety or press attention beyond what was necessary to discharge his duties. Indeed, despite serving more than four years during the Bush Administration's Justice Department from 2001-2005 and more than two years during the Trump Administration's Justice Department from 2018-2021, he was never once during those six-plus years of service asked to come before a congressional committee for

---

[1] This letter focuses on the issues surrounding the executive privilege, though there are additional legal objections, including those of a structural constitutional nature, that we will interpose in good faith as well to Mr. Clark testifying, should doing so become necessary. We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in response to the subpoena as it is currently framed.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 2

oversight purposes, even though he litigated and supervised highly controversial cases.[2] He had a winning record, recovered billions of dollars for the fisc, successfully defended numerous agency rulemakings of extreme complexity, and personally briefed and argued many cases—exemplary service.  He was confirmed in October 2018 with bipartisan support in the Senate—just one part of his distinguished 25-year legal career.

Now, after his most recent, 26-month-plus tenure in government ending in January 2021, he wants nothing more than to return to ordinary life and law practice, without being subjected to selective anonymous leaks and press attacks.  Yet he finds himself involuntarily caught up in a novel conflict that includes both significant inter-branch[3] and cross-presidential[4] features to which we must provide a response.

The main purpose of this letter is this:  Because former President Trump was properly entitled, while he held office, to the confidential advice of lawyers like Mr. Clark, Mr. Clark is subject to a sacred trust—one that is particularly vital to the constitutional separation of powers.  As a result, any attempts—whether by the House or by the current President—to invade that sphere of confidentiality must be resisted.  Nothing less will comport with both Mr. Clark's obligations to former President Trump and with Mr. Clark's ethical obligations as an attorney.  The general category of executive privilege, the specific categories of the presidential communications, law enforcement, and deliberative process privileges,[5] as well as attorney-client privilege and the work product doctrine, all harmonize on this point.  Most importantly, core matters of constitutional principle hang in the balance.

_____

[2] For instance, Mr. Clark was integral to defending former President Trump's decision to withdraw from the Paris Climate Agreement, to resisting improper judicial interference with the Census, to crafting and then personally defending, in litigation, the first major reform in four decades of the National Environmental Policy Act's regulations, and to shepherding through the judicial process various agency actions protecting the southern border with Mexico against incursions.  This work was unpopular in some political quarters but at all times was consistent with law and with his client agencies' policy decisions.

[3] A single House of Congress vs. former President Trump.

[4] President Biden vs. former President Trump, *i.e.*, the current President vs. the immediately past President.

[5] Indeed, Mr. Clark's work was integral to the United States' win in the Supreme Court's most recent deliberative process case, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 3

Mr. Clark's position as a legal advisor to the President late in 2020 and early 2021 was particularly sensitive because he was a Senate-confirmed Justice Department leader with significant high-profile litigation and governmental experience, making it natural for a President to seek out and consult his views.[6] We trust that members of Congress of all stripes would agree that it is indisputable that American Presidents need to be able to consult, as they see fit, with their Senate-confirmed appointees. The principle goes both ways. Whomever succeeds President Biden, for instance, should not be able to expose to public scrutiny advice provided to President Biden by his advisors. Establishing precedent to the contrary would deeply chill the vigorous Executive Branch and energetic President the Founders envisioned. *See* Federalist Paper No. 70 (Hamilton) (Mar. 18, 1788) ("Energy in the executive is a leading character in the definition of good government."), *available at* https://tinyurl.com/3ep7fhz9. Without that energy and ability to be candid, presidential advisors would be reduced to bland, tasteless creatures, and the prospect of innovative advice would be stifled.

For these reasons, as amplified below, and with due respect to the Committee, Mr. Clark has come with me today, to present this letter of objection. Mr. Clark will, of course, abide by a future judicial decision(s) appropriately governing all underlying disputes with finality, but for now he must decline to testify as a threshold matter because the President's confidences are not his to waive.

1.    Since August 2, 2021, when a pivotal letter was sent on behalf of former President Trump to Mr. Clark (Attachment), there have been several cardinal developments:

(1) On September 23, 2021, this Committee subpoenaed senior White House officials Mark Meadows and Daniel Scavino, senior Pentagon official Kashyap Patel, and

---

[6] Beginning in November 2018, Mr. Clark headed one of the Justice Department's seven litigating Divisions (the approximately 112 year-old Environment & Natural Resources Division, which has existed for most of the 151 years of the Justice Department's history). And later, in light of his excellent service in the Environment Division during the last Administration, Mr. Clark was also tapped by the Attorney General in the Fall of 2020 to run a second of those seven litigating Divisions as the Acting Assistant Attorney General for the Civil Division.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 4

Stephen Bannon, making especially clear to Mr. Clark that executive privilege had
been invoked in light of the violation of a condition set forth in the August 2, 2021,
letter from former President Trump's counsel, as explained in more detail below;

(2) On or about October 7, 2021, former President Trump invoked executive privilege
and instructed these four presidential advisors not to comply with the Committee's
requests;[7]

(3) Additionally, on September 29, 2021, the Committee had subpoenaed 11 other
individuals to appear for questioning; and, most importantly,

(4) The former President took the critical step of bringing suit against the Committee,
among others, in *Trump v. Thompson*, Civ. A. No. 21-2769 (D.D.C. Oct. 18, 2021). In this
case, President Trump asserts executive privilege and is objecting to the Committee's
request to the Archivist of the United States to produce records of his administration.

The August 2 letter from your former colleague, Georgia Congressman Douglas A.
Collins, stated to Mr. Clark that "President Trump continues to assert that the non-public
information the Committees seek is and should be protected from disclosure by the
executive privilege," and that this "executive privilege applicable to communications
with President Trump belongs to the Office of the Presidency, not to any individual
President, and President Biden has no power to unilaterally waive it."   Attachment at 1.

The Collins letter also quoted the Supreme Court's recognition that "the privilege
is not for the benefit of the President as an individual, but for the benefit of the Republic."
*Id.* (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 449 (1977)).   That decision
provides that the purpose of the privilege is to "give his advisers some assurance of
confidentiality," so that the "President [can] expect to receive the full and frank
submission of facts and opinions upon which effective discharge of his duties depends."
*Id.*   Additionally, the August 2 letter noted that an earlier July 26, 2021 letter to Mr. Clark

[7] See Jacqueline Alemany, *et al.*, *Trump Lawyer Tells Former Aides Not to Cooperate with Jan. 6 Committee*,
WASH. POST (Oct. 7, 2021), *available at* https://www.washingtonpost.com/politics/2021/10/07/trump-lawyer-
tells-former-aides-not-cooperate-with-jan-6-committee/.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 5

from the current Justice Department had selectively edited a quotation out the *Nixon* decision, leaving off the key sentence that "***the privilege survives the individual President's tenure.***" Attachment at 2 (quoting *Nixon*, 433 U.S. at 449) (emphasis added). *See also* Prof. Saikrishna Prakash, *Trump Is Right: Former Presidents Can Assert Executive Privilege*, Wash. Post. (Oct. 29, 2021), *available at* https://tinyurl.com/ykcpz94w.

I concur with that assessment by the former President and his counsel. Were any successor occupant of the office of President able to waive claims of executive privilege asserted by his or her predecessors, the principal purpose of the privilege would be defeated, to the detriment of the Executive Branch, to the separation of powers, and to the proper functioning of government as envisioned by the Constitution, relevant judicial precedent, and long traditions of inter-branch accommodation. This is particularly true when, as here, President Biden's purported waivers over recent months may have been informed by partisan political purposes. This is suggested by the haste with which Mr. Biden prejudged Mr. Bannon's invocation of the privilege on behalf of former President Trump.[8] Executive privilege has fundamental importance to and constitutional significance in the operation of government. Waivers of executive privilege should therefore be considered only with a gravity and solemnity commensurate with their deployment, and should not be influenced by workaday political grievances or by grudges lingering from past political controversies, even bitter ones.

---

[8] See Katherine Fung, *Biden's Comments Could Fumble DOJ Prosecution of Steve Bannon: Here's How*, NEWSWEEK (Oct. 21, 2021) ("referring to those, like Bannon, who have refused to comply with the subpoena to testify before the January 6 committee [and] asked if they should face prosecution, Biden said, 'I do, yes.'"); Donald Judd & Rachel Janfaza, *Biden Says DOJ Should Prosecute Those Who Defy January 6 Committee Subpoenas*, CNN (Oct. 16, 2021) (same); *see also id.* (quoting Press Secretary Jen Psaki as arguing, contrary to law, that ultimate decisions would be made by the Justice Department because "[t]hey're an independent agency ...."), *available at* https://www.newsweek.com/bidens-comments-could-fumble-doj-prosecution-steve-bannon-heres-how-1641428. While President Biden later acknowledged he had been wrong to make the statement, the damage in the public mind had already been done. *See* Kaanita Iyer, *Biden Says He Was Wrong to Suggest Those Who Defy Subpoenas from January 6 Committee Should Be Prosecuted*, CNN, *available at* https://edition.cnn.com/2021/10/21/politics/january-6-joe-biden-town-hall/index.html (Oct. 22, 2021). For, as the Committee is aware, the President is the chief law enforcement officer of the United States and the Constitution does not mention the Attorney General by name. The Constitution simply contemplates that there will be a "principal Officer in each of the executive departments." U.S. Const. art. II, sec. 2. Nor do any statutes establish the Department of Justice as an "independent agency."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 6

2.      Other former Department of Justice officials who received the Collins letter
have apparently interpreted its concluding paragraph to mean that the former President
had waived the privilege on a blanket basis or somehow otherwise greenlighted their
testimony to Committees looking into assertedly similar issues prior to this Committee
beginning its work.  We disagree with that interpretation. No fair reading of the Collins
letter can conclude that it waives any privileges as to an official like Mr. Clark, *especially
after* the key contingency set out in the letter had been triggered:

> Nonetheless, to avoid further *distraction and without in any way otherwise
> waiving the executive privilege* associated with the matters the executive
> privilege associated with the matters the Committees are purporting to
> investigate, President Trump will agree not to seek judicial intervention to
> prevent your testimony or the testimony of the five other former Department
> officials … who have already received letters from the Department similar to
> the July 26, 2021 letter you received, *so long as the Committees do not seek
> privileged information from any other Trump administration officials or
> advisors.*

Attachment at 2 (emphasis added). The condition in the emphasized language has been
triggered because the Committee sought privileged information from multiple other
Trump administration officials or advisors before Mr. Clark was subpoenaed on October
13, 2021.

Our position is simple and is dictated by the plain text of the letter.  The Collins
letter does not waive privilege as to Mr. Clark.  Even before the contingency triggered by
your Committee seeking information from other Trump Administration officials had
occurred, at best the Collins letter indicated that former President Trump would agree
himself not to seek judicial intervention on the pre-contingency state of the facts.  That is
not remotely the same as authorizing testimony or waiving executive privilege.  All
portions of the Collins letter prior to the concluding paragraph clearly invoked privilege.
Nor could Mr. Collins' indicating that the former President would not file suit at an
earlier time act to relieve Mr. Clark of his ethical obligations.

And surely, once the Committee issued subpoenas to Messrs. Meadows, Scavino,
Patel and Bannon on September 23, the assertion of executive privilege set forth in all of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 7

the other paragraphs of that letter applied with special force to Mr. Clark.  This is because
Congress **has, in fact, sought** privileged information from Messrs. Meadows, Scavino,
and Patel as they are all, no doubt, "other Trump administration officials."  In short, even
former President Trump's statement that he would not go to court in August 2021 was
expressly conditional, and the Committee's issuance of the Meadows, Scavino, and Patel
subpoenas has caused the failure of that condition.  Therefore, especially after the
triggering of the contingency, the letter simply cannot be read as an unconditional waiver
as to Mr. Clark or the others named in the final paragraph.

Accordingly, particularly under the present circumstances, the Collins letter
expressly informs Mr. Clark that President Trump is asserting and not waiving executive
privilege with respect to the Committee's pursuit of information from Mr. Clark.
President Trump's assertion of his privileges with respect to the Committee's subpoena
to Mr. Clark is confirmed in *Trump v. Thompson, et al,* U.S.D.C. D.C. 1:21-cv-02769-TSC,
by footnote 2 of his brief in support of his application for a preliminary injunction:

> The Committee also sought testimony and documents from several individuals,
> some of whom were serving in the Trump Administration in January and others
> who were not. To preserve all privileges applicable to him and the Presidency,
> President Trump sent a letter to a number of these individuals, instructing them
> to preserve any and all relevant and applicable privileges, including without
> limitation the presidential communications and deliberative process privileges
> and attorney-client privilege, all to the extent allowed by law.

*Id.,* Doc. 5, p. 1, n.2. The Committee of course has actual notice of this contention since it
is a party to that litigation.

Mr. Clark thus has no choice but to comply with President Trump's assertion of
executive privilege and related privileges.

**3.**     Since September 7, 2021, staff on the Select Committee has been in contact
with Mr. Clark's former attorney, Robert Driscoll, about the possibility of Mr. Clark
giving a transcribed interview to the Committee regarding communications with and
advice given to former President Trump during the last few months of his
Administration.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 8

        In good faith and while he was engaging in legal research and keeping apprised
of related actions by the Committee and other parts of Congress, Mr. Clark had been
requesting and reviewing documents from the Department of Justice pursuant to 28
C.F.R. § 16.300.  And, if the federal judicial system orders Mr. Clark directly or produces
final and clearly applicable precedent in (a) related case(s) indicating that Mr. Clark must
testify, he would resume that process consistent with other legal strictures.  But in line
with our research and study, events subsequent to September 7 have convinced me that
the only proper course of action for Mr. Clark now is to stand on the privilege position
articulated to him on August 2 by former President Trump and affirmed in his October
19, 2021 filing in *Trump v. Thompson.*

        This is for three reasons: (1) first and foremost because former President Trump,
as noted, took heavy step of invoking the privilege in federal court litigation on October
18 against the Committee in its official capacity, indicating that the inter-branch
accommodation process had broken down; (2) because the September 23 subpoenas to
Messrs. Meadows, Scavino, and Patel unmistakably triggered the contingency in the
Collins letter, seemingly removing the basis for any potential accommodation agreement
with the Committee premised on it cabining the scope of its inquiry; and (3) because the
former President acted to invoke the privilege as to those advisors and Mr. Bannon.

        4.      I am aware that other former top officials in the Department of Justice have
provided testimony to Congress, despite the former President's assertion of privilege and
despite the failure of the conditions in the Collins letter. As the privilege was not theirs
to waive, at least without greater clarity (such as a court order with finality or a
comprehensive arrangement entered into between former President Trump and
Congress, where the latter agreed not to seek "privileged information from any other
Trump administration officials or advisors"), it is unclear to me how their testimony
could be consistent with former President Trump's assertion of executive privilege.
Former President Trump holds that privilege, not them.  Be that as it may, in the present
circumstances, the fact that other former officials may have testified, rightly or wrongly
at the time, does not change Mr. Clark's obligations in light of the recent positions taken
by former President Trump in the Collins letter and in *Trump v. Thompson.*  Indeed, D.C.
Bar Ethics Opinion #288 has advised that, even in response to a congressional subpoena
(and therefore, by parity of reasoning, in response to a voluntary request as well), a
"lawyer has a professional responsibility to seek to quash or limit the subpoena on all

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 9

available, legitimate grounds to protect confidential documents and client secrets." *See also* American Bar Association's Committee on Ethics and Professional Responsibility, Formal Opinion 94-385 (1994).

It is improper to put Mr. Clark in a vise between this Committee and its claimed enforcement powers on the one hand and his constitutional and ethical obligations on the other, especially while there is a pending lawsuit to determine President Trump's privilege objections. To apply such pressure to Mr. Clark is to present him with a potential Hobson's choice in a manner not countenanced by the long history of inter-branch accommodation over Congressional requests for information from the Executive Branch. The Constitution is the ultimate source of our law and this Committee is bound to respect government-wide constitutional boundaries, including respecting the prerogatives of the coequal Executive Branch.

Additionally, the claim made by Senate counsel at the outset of the relevant testimonies of at least one of these other Department of Justice officials, namely, that the Collins letter was a "letter of nonobjection … on behalf of former President Trump,"[9] if it were ever correct there (and it is not because nothing in the letter waives privilege or states a general principle of non-objection), is obviously incorrect as to Mr. Clark at the present time. The Collins letter quite explicitly (1) asserts that the former President has not waived claims of executive privilege; (2) asserts the privilege; and (3) at most, even from this Committee's potential perspective, fixes conditions that as to Mr. Clark are no longer met.

In light of the foregoing, I have advised my client that, at this time and based on these most up-to-date factual developments, he is duty-bound not to provide testimony to your Committee covering information protected by the former President's assertion of executive privilege. Accordingly, beyond showing up today to present this letter as a sign of his respect for a committee of the House of Representatives, albeit one not formed in observance of the ordinary process of minority participation, Mr. Clark cannot answer deposition questions at this time. No adverse inferences can or should be drawn from Mr. Clark accepting my advice. His doing so defends the Republic's interest in the

---

[9] Transcript, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf at 6-7 (Aug. 7, 2021).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 10

separation of powers.  As noted, Mr. Clark is not a politician but he is a strong defender
of the Constitution, stemming from his political beliefs as an unapologetic conservative—
beliefs protected by the First Amendment.

     **5.**     In addition to the foregoing, I must also point out that the vast majority of
the document requests in the subpoena sent to Mr. Clark are duplicated in the requests
for documents sent by the Committee to the National Archives presently at issue in the
*Trump v. Thompson* litigation. It is entirely proper, therefore, to defer compliance with the
Committee's subpoena to Mr. Clark until that litigation is resolved.

     Moreover, the documents subpoenaed from Mr. Clark are instead largely in the
possession of the Department of Justice or the Archives. Mr. Clark left his work papers at
the Department of Justice when he resigned in anticipation of the January 20, 2021
inauguration of President Biden.  Based on prior actions, beginning with those of the
House Oversight Committee, we also believe that your Committee has access to Mr.
Clark's government records, making the imposition on us of organizational work, such
as Bates-stamping documents, unduly burdensome. If the Committee could please
confirm this one way or the other, it may obviate any claim of demonstrably critical need
for Mr. Clark to re-produce documents the Committee already has, should that become
necessary at some future point.

     **6.**     Accordingly, I respectfully urge the Committee to recognize that the best
and most regular course in light of the latest developments would be to pause the request
for the testimony of Mr. Clark (likely along with the requests for the testimony of Messrs.
Meadows, Scavino, and Patel, who would seem similarly situated) pending resolution of
the *Trump v. Thompson* litigation.  That will provide important guidance from the Article
III branch of government to referee this inter-branch dispute, including, among other
things, the entwined issue of whether the current President can purport to waive the
former President's executive privilege over the former President's objection. As Justice
Powell remarked in concurrence in *Nixon*, "[t]he difficult constitutional questions lie
ahead." 433 U.S. at 503. *See also id.* at 491 (Blackmun, J., concurring) (noting that
historically some presidential transitions had been "openly hostile," and hoping that the
statute under consideration there "did not become a model for the disposition of the
papers of each president who leaves office at a time when his successor or the Congress
is not of his political persuasion."). A pause, as we here request, would also show proper

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 11

comity both to Executive Branch's interests (considered holistically and not as defined myopically to embrace only the views of the current President) and to the Judicial Branch's role in resolving cases and controversies. As *Nixon* indicates, "[t]he confidentiality necessary to this exchange [of advice and confidences between a President and an advisor] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449.

7.     I am also compelled to note the disconnect between the scope and purpose of the Committee's authorizing resolution and the information sought from Mr. Clark. The Committee's scope revolves around events at the Capitol on January 6, 2021. The Committee would not appear to be seeking to question Mr. Clark about January 6, 2021 and no media reporting has connected him to those events. Mr. Clark had nothing to do with the January 6 protests or the incursion of some into the Capitol. He has informed me he worked from home that day to avoid wrestling with potential street closures to get to and from his office at Main Justice. Nor did Mr. Clark have any responsibilities to oversee security at the Capitol or have the ability to deploy any Department of Justice personnel or resources there. Indeed, Acting Attorney General Rosen testified ***almost 6 months ago*** that a January 3, 2021 Oval Office meeting involving him and Mr. Clark, *inter alia*, did not relate to January 6. *See* House Oversight and Reform Committee Holds Hearing on Jan. 6 Riot at U.S. Capitol, *available at* https://www.youtube.com/watch?v=719UGi8dNng, beginning at circa the one-hour, 15-minute mark (Rep. Connolly) (streamed May 12, 2021).[10] That should alone be sufficient for Mr. Clark to be excluded from a January 6 inquiry.

Indeed, just about a week after January 6, Mr. Clark gave an "exit interview" to a reporter for *Bloomberg Law* that condemned the individuals who forcibly went into the Capitol and engaged in violence, noting that some of them may have been moved by mob psychology (Mr. Clark specifically remembers referencing Gustave Le Bon), besmirching by mere association the far more numerous peaceful protesters exercising their First

---

[10] Q. Rep. Connolly: "Did you meet with the President at the White House on January 3rd?" A. Former Acting AG Rosen: "I did." Q. Rep. Connolly: "You did, but you decline to tell us what the nature of that conversation was about, is that correct?" A. Former Acting AG Rosen: "I can tell you it did not relate to the planning and preparations for the events on January 6th."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 12

Amendment rights.  As a clear example of mainstream media bias, however, the report later published about that interview omitted Mr. Clark's remarks on January 6, even though the reporter had ***repeatedly*** sought Mr. Clark's views on the topic during the course of the interview.[11]

For all of these reasons, the information and testimony sought by the Committee as applied to Mr. Clark in particular are outside the scope of the Committee's charter and are neither proper subjects of the Committee's subpoena, nor any subsequent attempt to enforce the subpoena.

Finally, I would kindly request a response to the objections set out in this letter, which may include a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.  And for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances.  *See supra* n.1.

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Enc.
cc:    Jeffrey Bossert Clark

---

[11] *See* Ellen Gilmer, *Top Official Steps Down from DOJ's Environment, Civil Divisions*, BLOOMBERG LAW (Jan. 14, 2021), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/top-official-steps-down-from-dojs-environment-civil-divisions?context=article-related.

**From:** Doug Collins <doug@northgeorgialawyers.com>
**Date:** August 2, 2021 at 6:20:20 PM EDT
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:** Letter for Mr. Jeff Clark

Please find the attached letter for your client Mr. Jeff Clark.

Thank you for your cooperation.

**Douglas A. Collins**
**Oliver & Weidner, LLC**
**854 Washington St. Suite 300**
**Clarkesville, GA 30523**
**706-754-9000**
**NorthGeorgiaLawyers.com**

=========================================================
NOTICE: In an ideal world, perhaps disclaimer clauses in lawyer emails would not be necessary; but this is not an ideal world, so here goes. This e-mail and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "CC" and "BCC" lines of this e-mail. If you are not an intended recipient, your receipt of this e-mail and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the e-mail and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this e-mail. DO NOT review, copy, or rely on in any way the contents of this e-mail and its attachments. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. Most legal rights have time limits, and this e-mail does not constitute advice on the application of limitation periods unless expressly stated above. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of confidentiality and privileges applicable to this e-mail and any attachments are expressly reserved.
=============================================================

JAMES C. WEIDNER

ERNEST H. "BUCKY" WOODS, III

DOUGLAS A. COLLINS

WILLIAM R. OLIVER
(OF COUNSEL)



TEL. (706) 754-9000
FAX: (706) 754-0098

854 WASHINGTON STREET
SUITE 300
P.O. BOX 2017
CLARKESVILLE, GA 30523

NorthGeorgiaLawyers.com

August 2, 2021

Mr. Jeff Clark:

We represent former President Donald J. Trump and write concerning requests sent to you by the U.S. House of Representatives Committee on Oversight and Reform and the U.S. Senate Judiciary Committee to provide transcribed interviews on matters related to your service as Deputy Attorney General and Acting Attorney General during President Trump's administration. We also understand that, as set forth in its July 26, 2021, letter to you, the U.S. Department of Justice stated that President Biden decided to waive the executive and other privileges that protect from disclosure non-public information concerning those matters and has authorized you to provide such information.

Please be advised that the Department's purported waiver and authorization are unlawful, and that President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege. The executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it. The reason is clear: if a President were empowered unilaterally to waive executive privilege applicable to communications with his or her predecessors, particularly those of the opposite party, there would effectively be no executive privilege. To the extent the privilege would continue to exist at all, it would become yet another weapon to level the kind of unjustifiable partisan political attacks the Democrat-controlled administration and Committees are seeking to level here.

As the Supreme Court held in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) – where, like here, the then-current administration did not support a former President's assertion of executive privilege – the executive privilege is crucial to Executive Branch decision-making:

> Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977).  The Department's July 26 letter to you quoted this decision but left out the very next sentence in the opinion: **"Therefore, the privilege survives the individual President's tenure**." Id. at 448-49 (quoting, and adopting, Brief for the Solicitor General on Behalf of Federal Appellees) (emphasis added).

Here, it is clear that even though President Biden and the Department do not know the nature or content of the non-public information the Committees seek, they have not sought or considered the views of the President who does know as to whether the confidentiality of that information at issue should continue to be protected.  Such consideration is the minimum that should be required before a President waives the executive privilege protecting the communications of a predecessor.  *See* Office of Legal Counsel Memorandum on Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act, June 20, 2001, at 5 ("[A]lthough the privilege belongs to the Presidency as an institution and not to any individual President, the person who served as President at the time the documents in question were created is often particularly well situated to determine whether the documents are subject to a claim of executive privilege and, if so, to recommend that the privilege be asserted and the documents withheld from disclosure.").

Nonetheless, to avoid further distraction and without in any way otherwise waiving the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials (Richard P. Donoghue, Patrick Hovakimian, Byung J. "BJay" Pak, Bobby L. Christine, and Jeffrey B. Clark) who have already received letters from the Department similar to the July 26, 2021 letter you received, so long as the Committees do not seek privileged information from any other Trump administration officials or advisors. If the Committees do seek such information, however, we will take all necessary and appropriate steps, on President Trump's behalf, to defend the Office of the Presidency.

Sincerely yours,
OLIVER & WEIDNER, LLC

Douglas A. Collins

## Exh. 7

## Expert Affidavit of Gregg Phillips, from Schmitz v. Barron, Fulton County, Georgia Superior Court Case No. 2020CV342969

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

WARREN M. SCHMITZ, JR.,          )
                                 )
    Plaintiff,               )
                                 )
v.                               )          **Civil Action File No.**
                                 )
                                 )          **2020CV342969**
RICHARD L. BARRON, IN HIS        )
OFFICIAL CAPACITY AS FULTON      )
COUNTY DIRECTOR                  )
REGISTRATION & ELECTIONS AND     )
FULTON COUNTY BOARD OF           )
REGISTRATION AND ELECTIONS,      )
                                 )
    Defendants.              )
_____  )

---

**AFFIDAVIT OF GREGG PHILLIPS IN SUPPORT OF VERIFIED AMENDED
PETITION TO CONTEST RESULTS OF HOUSE DISTRICT 52 ELECTION**

Personally appeared before me, the undersigned notary public, duly authorized by law to

administer oaths, Gregg Phillips, who being duly sworn, deposes and states as follows:

1.

My name is Gregg Phillips.

2.

I am over the age of 21 years, and I am under no legal disability which would prevent me

from giving this testimony.  I have personal knowledge of the facts recited herein.

3.

This Affidavit is given in support of the Verified Amended Petition to Contest Results of

House District 52 Election filed in the above-styled action on November 25, 2020 (the "Petition").

4.

{00594334. }

Exhibit C to Amended and Restated Complaint

I have personal knowledge of the facts contained in this Affidavit, and am legally competent and can testify to such facts.

5.

Rep. Deborah Silcox and Shea Roberts competed in the November 3, 2020 General Election for HD 52 (the "Election"). The certified totals of the Election showed Ms. Roberts ahead by 377 votes, with a final tally of 17,069 votes for Ms. Roberts and 16,692 for Rep. Silcox.

6.

I own a data security company called OpSec Group where I am the managing partner. In addition, I am the CEO and Founder of CoverMe Services, a Georgia based healthcare technology company focused on the use of complex algorithms in healthcare finance.

7.

I have more than three decades of experience administration, program integrity, project management, healthcare, elections, and data driven decision making.

8.

My company has developed formulas to assess the fit, risk and reliability of data analytics across multiple industries.

9.

My group and I use detailed analytical approaches to investigate complex issues, evaluate the risk in decisions, and build measured solutions.

10.

We observe, research and interpret results using applications and data known to law enforcement, program integrity, quality control, and election professionals.

{00594334. }

Exhibit C to Amended and Restated Complaint

11.

My approach to analytics is measured and balanced and common practice in this industry.

12.

I am an expert in using large data sets in fraud control, quality control and identity resolution in voting related cases and analysis.

13.

Previously, I have testified in 10 trials as an expert witness. Our approach and algorithms have been used in high profile voter rights cases argued in the Supreme Court of the United States. In addition, our methods and algorithms have been used in the resolution of 43 million individual cases.

14.

I am not being compensated nor have been offered anything of value in exchange for this affidavit or potential testimony.

15.

In November, the OPSEC team developed a hypothesis that ballot trafficking is occurring in relation to certain non-profit organizations and drop boxes in Georgia.

16.

OPSEC purchased commercially available data worth approximately $200,000.00 for use in the analysis performed.

17.

I leveraged commercially available historic and near real time behavioral mobility data to assist a client organization, True the Vote, in analyzing patterns of election fraud in the form of ballot harvesting in key battleground states, including Georgia.

{00594334. }

Exhibit C to Amended and Restated Complaint

18.

Specifically, I used commercially available data, in addition to proprietary formulas, algorithms, and intellectual property developed by me.

19.

From this data and that gathered through our research, I was then able to develop and test the hypothesis to reach the conclusions.

20.

First, I geofenced all 27 identified organizations offices back to October 1, 2020 and harvested all devices observed on or near the premises inside the geofences established by our analytical team.

21.

Then, I observed 1.2 trillion mobile device signals over a period of 97 days from 10/1/2020 through 1/5/2021.

22.

To execute this project, I processed 25 terabytes of raw data in order to harvest 17,000 unique mobile devices.

23.

From the 17,000 unique mobile devises, I was further able to pinpoint the total number unique targeted mobile devices to 279. By applying certain quality management techniques, I was able to eliminate another 37 devices causing unacceptable levels of false positives. The final number of unique devices targeted was 240.

24.

{00594334.}

Exhibit C to Amended and Restated Complaint

Geofencing was used around suspected ballot harvesting organizations which then allowed the expert to use device-centric mobile advertising IDs and behavioral data analytics to pin 240 target devices and further establish a pattern of travel in and out of these locations.

25.

Geofencing was also used to create virtual perimeters around 36 Fulton County drop boxes and 309 drop boxes in the Atlanta metro area from 10/1/20 through Election Day 1/5/21.

26.

Geofencing perimeters were used to identify the presence of the 240 targeted devices as close as 18 inches from 28 drop boxes in a single day.

27.

This is the same type of data analytics and algorithms that are used by law enforcement and the intelligence community across the country and around the world.

28.

A total of eight metro-Atlanta counties were analyzed during this process.

29.

Fulton County comprised more than one-half of the drop box visits by the 240 targeted devices.

30.

Analysis of hotline, whistleblower and media reports resulted in the identification of 28 organizations whose addresses revealed a high level of activity involving the 240 targeted devices.

31.

From there, I was able to match these devices within 100 feet of an organization and 100 feet of ten or more drop boxes, which gave me a total of 240 Unique Devices of Interest.

{00594334. }

Exhibit C to Amended and Restated Complaint

32.

I then looked at devices that were both found at an organization and then also at any given drop box in Fulton County, GA and across the metro-Atlanta area.

33.

In order to make sure that my team ruled out any false positives, false negatives, or any accidental matches (such as firefighters or police officers), we ran this data from October to January.

34.

Upon doing this, we found that this vote trafficking was only done in October and December.

35.

This helped to rule out anyone who maybe worked nearby a drop box location as this trafficking only occurred in the month leading up to each election.

36.

For purposes of HD-52, this vote trafficking was executed in the month of October alone.

37.

To corroborate this data, we had the determine where the ballots were coming from that were being deposited into these drop boxes.

38.

The first hypothesis was UPS stores.

39.

To test this hypothesis, my team geofenced 18 UPS stores under the theory that this was the starting point of where these target devices would go and physically pick up ballots.

{00594334.}

Exhibit C to Amended and Restated Complaint

40.

The behavioral cellphone data then corroborated this data showing 240 devices were within the virtual boundaries, established by the geofences, of one or more targeted organizations, two or more UPS stores, and 10 or more drop boxes with the period of starting October 1, 2020 and extending through November 3, 2020.

41.

From each respective UPS store, each target device was then tracked as heading back to the location of their respective organization, or "stash houses", as we refer to them as.

**Accuracy of Cell Phone Data**

42.

The data tracks movement of each device as often as every four (4) seconds and as close at eighteen (18) inches to any respective specific location, inside or outside of a geofence within the purchased jurisdiction.

43.

For reference, this is the same type of data and tracking mechanisms that are used to help identify terrorists throughout the world, human trafficking criminals, and drug traffickers at the border.

44.

The specific cell phone data are signals that can be tracked back four (4) years.

45.

There are approximately 27,000 cell phone applications that track, save and market location data.

**Conclusions for HD-51 and HD-51**

{00594334.}

Exhibit C to Amended and Restated Complaint

46.

Around 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits.

47.

For HD-51, estimated 1,700-2,000 votes influenced by harvesting.

48.

For HD-52, estimated 1,700-2,000 votes influenced by harvesting.

49.

I have come to the conclusion that this exact vote trafficking scheme affected the results of the 2020 November General Election for House District 52 in Georgia.

**FURTHER AFFIANT SAYETH NOT**.

[SIGNATURE ON FOLLOWING PAGE]

{00594334. }

Exhibit C to Amended and Restated Complaint

*Gregg Allen Phillips*
_____
GREGG PHILLIPS

SUBSCRIBED TO AND SWORN BEFORE ME
ON THIS __8th__ DAY OF APRIL, 2021 IN THE
PRESENCE OF:

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

10/18/2024
_____

> Patricia A Glasper
> NOTARY PUBLIC
> STATE OF NEVADA
> Appt. No. 12-9064-1
> Expires October 18, 2024

Notarized online using audio-video communication

{00594334. }

Exhibit C to Amended and Restated Complaint

Exhibit 2

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **DISTRICT OF COLUMBIA,** | |
| **Plaintiff,** | |
| **v.** | **2020 CA 002892 B**<br>**Judge Alfred S. Irving, Jr.** |
| **EXXON MOBIL CORP.**, *et al.*, | |
| **Defendants.** | |

## <u>ORDER GRANTING DEFENDANTS' MOTION TO STAY PROCEEDINGS</u>

Before the Court is a *Motion to Stay Proceedings*, filed by Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, Chevron Corporation, Chevron U.S.A., Inc., Shell PLC (f/k/a/ Royal Dutch Shell PLC), Shell USA, Inc. (f/k/a/ Shell Oil Company), BP P.L.C., and BP America Inc. (collectively "Defendants") on March 20, 2023.  This matter was previously removed to the U.S. District Court for the District of Columbia on July 17, 2020.[1]  In February 2023, the District Court remanded the case.  Defendants ask this Court to stay proceedings in this matter pending resolution of the appeal of the District Court's remand order in the U.S. Court of Appeals for the District of Columbia Circuit[2] and disposition the petitions for writs of certiorari on similar cases pending before the Supreme Court.[3]  Given the pendency of the appeal in the federal Court of Appeals, which heard oral arguments on May 8, 2023, the Court will stay all proceedings in this case for a period of sixty days.

---

[1] Case number 1:20-cv-01932, before the Hon. Timothy J. Kelly.

[2] Case number 22-7163, before the Hons. Gregory G. Katsas, Neomi Rao, and Florence Y. Pan.

[3] The Court notes that the Supreme Court has denied six petitions for writs of certiorari on similar issues.  *See* Pl.'s Notice of Suppl. Authority (April 26, 2023); Pl.'s Notice of Suppl. Authority (May 17, 2023).

**ACCORDINGLY,** it is by the Court this 31st day of May 2023, hereby

**ORDERED** that Defendants' *Motion to Stay Proceedings* is **GRANTED**; and it is further

**ORDERED** that the proceedings in this case are **STAYED** for sixty days in light of the pending appeal before the U.S. Court of Appeals for the District of Columbia Circuit.

**Judge Alfred S. Irving, Jr.**

**Copies to:**
Matthew K. Edling
Anna C. Haac
Katherine H. Jones
Quentin C. Karpilow
Kathleen M. Konopka
Hassan A. Zavareei
matt@sheredling.com
ahaac@tzlegal.com
katie@sheredling.com
quentin@sheredling.com
kate@kateandviren.org
hzavareei@tzlegal.com
**Counsel for Plaintiff District of Columbia**

James W. Cooper
james.w.cooper@arnoldporter.com
Ethan G. Shenkman
Dep't Justice – ENRD Appellate
PO Box 23795
Washington, DC 20026
**Counsel for Defendants BP America Inc. and BP P.L.C.**

Theodore J. Boutrous
Thomas G. Hungar
tboutrous@gibsondunn.com
thungar@gibsondunn.com
**Counsel for Defendants Chevron Corporation and Chevron U.S.A. Inc.**

Justin Anderson
Craig A. Thompson
Theodore V. Wells
janderson@paulweiss.com
cathompson@venable.com
twells@paulweiss.com
**Counsel for Defendants Exxon Mobil Corp. and Exxonmobil Oil Corporation**

David C. Frederick
Kellogg, Huber, Hansen, Todd & Evans, PLLC
1615 M. Street NW STE. 400
Washington, DC 20036
Minsuk Han
mhan@kellogghansen.com
Vetan Kapoor
vkapoor@kellogghansen.com
Grace W. Knofczynski
gknofczynski@kellogghansen.com
Daniel S. Severson
dseverson@kellogghansen.com
James M. Webster, III
jwebster@kellogghansen.com
**Counsel for Defendants Shell PLC (f/k/a Royal Dutch Shell PLC) and Shell USA, Inc. (f/k/a Shell Oil Company)**